UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHEILA J. PORTER,<br><br>    Plaintiff,<br><br>vs.<br><br>ANDREA CABRAL, SUFFOLK COUNTY SHERIFF'S DEPARTMENT, SUFFOLK COUNTY, and CORRECTIONAL MEDICAL SERVICES, INC.,<br><br>    Defendants. | Civil Action No.<br><br>04-11935 DPW |

**COMPLAINT**

Plaintiff Sheila J. Porter, by her attorneys, files the following Complaint and in support thereof states as follows:

**INTRODUCTION**

1.    A deeply troubled institution, the Suffolk County Sheriff's Department has a continuing pattern of criminal conduct by employees covered up by a widespread "Code of Silence." In the Fall of 2002, the Special Commission appointed to investigate the operations of the Department "urge[d] an aggressive attack on the code of silence that prevents staff members from reporting the misconduct of fellow staff members." The Special Commission also mandated that the Department "must ensure that employees who do come forward with information are fully protected from retaliation by other officers and are supported by the administration." The Department, however, has defiantly refused to heed those warnings and instead has continued to sanction its policy of silence and retaliation.

1

2. One employee, Sheila Porter, stood up to the Department's lawlessness and acted as an informant/whistleblower for four years at the request of the Federal Bureau of Investigation ("FBI"). As a result of Mrs. Porter's courage and integrity in shattering the Department's Code of Silence, the Defendants terminated her from her nine-year post as a Nurse Practitioner, depriving her of her livelihood and dignity, and harming her reputation.

3. The FBI, the United States Attorneys' Office, the Special Commission appointed to investigate and report on the operations of the Department, and private litigants have all attacked the lawless and corrupt operation of the Department. Rather than cooperate with efforts to run the Sheriff's Department in a lawful manner, the government Defendants have consistently engaged in a strategy that promoted misconduct including, but not limited to: frivolously defending a federal lawsuit alleging harassment by Department personnel that resulted in a $500,000 verdict for a Department employee; reneging on and contemptuously refusing to pay a $5,000,000 settlement to victims until ordered by a federal judge to pay immediately; firing an employee who truthfully provided testimony in a federal trial that revealed misconduct; and failing to take adequate disciplinary action against Department employees who violated a myriad state and federal laws.

4. In addition to this pattern and policy of illegality by the Department, the Defendants specifically retaliated against Mrs. Porter for revealing suspected unlawful actions to an outside agency -- the FBI. Within days of informing the FBI that an inmate who was cooperating with federal law enforcement officials had been physically assaulted twice and was in physical danger if he remained at the Suffolk County House of Corrections (the "HOC"), Mrs. Porter was abruptly terminated because, she was told, she had talked to "an outside agency." Mrs. Porter had, indeed, provided truthful information to the FBI.

5.     The Defendants have turned a deaf ear on Mrs. Porter's demands to rectify their unlawful conduct, leaving Mrs. Porter with no choice but to vindicate her rights through this action. Moreover, not content with a defiant denial of their unlawful actions, at the apparent direction of Defendant Cabral, her administration recently defamed Mrs. Porter in a written statement released to the media, further ruining Mrs. Porter's reputation and inflicting additional emotional distress. That statement included, among other things, a false assertion that Mrs. Porter had her own secret and unspecified "agenda." By referring to such an "agenda," Defendant Cabral and her administration intended to make people believe that Mrs. Porter is motivated not by justice, but by prejudice, personal animus and/or some other sinister or unlawful motive. Such assertions are completely false, as Mrs. Porter's only "agenda" is seeking and speaking the truth. The Defendants' actions have violated many laws, including 42 U.S.C. § 1983, the Massachusetts Whistleblower Statute, the Massachusetts Civil Rights Act and public policy, and also constitutes breaches of contract, infliction of emotional distress and defamation. Through this action, Mrs. Porter seeks redress for the damage caused by the Defendants' actions. She also seeks such punitive damages as will cause the Defendants to begin to act in a lawful manner, cooperate in the protection of inmates, dismantle the Code of Silence and meet the minimum standards of conduct the citizens of Massachusetts are entitled to expect from a correctional facility, public officials, employers and others.

## PARTIES

6.     A highly successful Nurse Practitioner or Nurse for the past 35 years, Plaintiff Sheila Porter is a resident of Upton, Massachusetts. She devoted the last nine years of her life to caring for the inmates and staff of the HOC -- twice commended by the Department for saving lives -- and making constant efforts to ensure that the notoriously mismanaged HOC operated in

a legal fashion, until she was abruptly and illegally discharged from her employment with the Department and Correctional Medical Services, Inc. for reporting suspected inmate abuse to the FBI.

7.  Defendant Suffolk County Sheriff's Department (the "Department") oversees the operations of the HOC and the Nashua Street Jail (the "Jail"). The Department is charged with responsibilities that include preserving the safety of inmates and personnel at its facilities, and running those institutions in accordance with applicable state and federal laws, including the civil rights laws.

8.  Since approximately December 2002, Defendant Andrea Cabral has been Sheriff of Suffolk County, and the most senior official responsible for the operations of the Department, the HOC and the Jail.[1]  Defendant Cabral became the Sheriff after Richard Rouse resigned from that post after several reports of problems within the Department surfaced, including reports of inmate sexual and physical abuse, retaliatory conduct, mismanagement, and other unlawful conduct. At all relevant times hereto, Defendant Cabral held the authority to remove employees of the Department, including Mrs. Porter, and held responsibilities that included establishing, maintaining and enforcing the Department's policies and practices. Upon information and belief, Defendant Cabral is a resident of the Commonwealth of Massachusetts.

9.  The Department, the Jail and the HOC are instrumentalities of Defendant Suffolk County, which is a Massachusetts county government.

10. Headquartered in St. Louis, Missouri, Defendant Correctional Medical Services, Inc. ("CMS") is a corporation that, at all relevant times hereto, had a contract with the HOC, the Department and/or Suffolk County to provide healthcare services to inmates. Upon information

4

and belief, such contract contained promises by the parties thereto to, among other things, comply with laws applicable to the individuals working at the HOC through CMS. As one of those employees, Mrs. Porter was an intended beneficiary of the contract. At all times relevant to this action CMS was doing business in the Commonwealth of Massachusetts with the Department and was an agent and/or instrumentality of Suffolk County.

## JURISDICTION AND VENUE

11.    To the extent this matter arises under the Constitution and laws of the United States, this Court has jurisdiction over this case pursuant to 28 U.S.C. §1331. Mrs. Porter invokes pendent jurisdiction of this Court on all issues presented.

12.    Venue lies in this district under 28 U.S.C. §1391(b)(1) because the Defendants reside in this Commonwealth, and under 28 U.S.C. §1391(b)(2) because the events from which this case arose occurred in this district.

## STATEMENT OF FACTS

### I.    For Nine Years, Mrs. Porter Successfully Performed Her Employment Duties for CMS and the Department

13.    Mrs. Porter worked as a Nurse Practitioner at the Department's HOC from 1994 until June 10, 2003. From approximately January 2001 until her termination on June 10, 2003, Mrs. Porter was assigned to the Department through CMS. Before January 2001, Mrs. Porter was assigned to the Department through Correctional Health Solutions, Inc. ("CHS"), the company that provided nurse practitioners and other healthcare workers to the HOC prior to CMS. Like Mrs. Porter, some of the supervisors and employees of CHS who were working at the HOC and other correctional facilities as of January 2001 were hired by CMS when CMS

---

[1] Because the HOC, the Jail and the Department are instrumentalities of Suffolk County, all references herein to any of those entities also refer to Suffolk County. Moreover, any references to Suffolk County also refer to the HOC, the Jail and the Department.

5

assumed the healthcare services contract with the Department. The former CHS employees hired by CMS retained their knowledge about the Department that they acquired while employed by CHS and used it to CMS' benefit.

14. Mrs. Porter brought tremendous expertise -- approximately twenty years of experience in performing in nursing or nurse practitioner capacities -- to the Department. That expertise enabled Mrs. Porter to successfully perform her responsibilities for the Department, which included the day-to-day care and treatment of male and female inmates; emergency treatment of inmates and staff; and conducting physical examinations for prospective employees.

15. Both the Department and CMS were pleased with Mrs. Porter's job performance. In fact, CMS hired her away from CHS based on her seven prior years' success as a Nurse Practitioner at the Department. In addition, only a few months before her termination, Mrs. Porter received a favorable performance review and was granted a raise in the maximum amount permitted. The Department was so impressed with Mrs. Porter's skills and dedication during her nine years that, for the past few years, it has utilized her videotaped orientation to health services as part of its "new inmate" orientation program.

16. In addition to her excellent performance, Mrs. Porter helped to save lives at the HOC on many occasions. For example, in December 1994, Mrs. Porter helped save the life of a 73-year old visitor at the HOC and was praised by the Department for doing so. Similarly, in a letter dated August 26, 2002 (only ten months prior to her abrupt and unlawful discharge), the Department expressed gratitude for the "commendable job performed by" Mrs. Porter in helping to save an inmate's life. The Department reiterated its pleasure in having Mrs. Porter employed at the facility.

17. The Department and CMS were common law and joint employers of Mrs. Porter. Her performance as a Nurse Practitioner was for, and under the control and direction of, the Department and CMS. By way of example, the Department dictated the hours and days that Mrs. Porter worked; the manner in which she performed her responsibilities; the manner in which she was permitted to interact with inmates; and the times at which she was permitted to see inmates. CMS controlled, for example, Mrs. Porter's compensation, benefits and other terms and conditions of her employment.

18. In addition, during her tenure with the Department, Mrs. Porter was provided with several written policies established and maintained by Defendant Cabral and the Department. Those policies concerned employees' conduct and expressly stated that they applied to employees of the Department. The Department, through Defendant Cabral, required Mrs. Porter to comply with its policies. Similarly, CMS required Mrs. Porter to comply with its policies.

## II. The Department Has Engaged in a Pattern of Retaliation Against Those Who Fail to Abide by the Code of Silence

19. In addition to written policies, the Department had a clear, but unwritten, illegal practice and policy of requiring employees to be silent regarding suspected unlawful conduct by officers and other Department personnel. Mrs. Porter refused to follow this policy.

20. Because her responsibilities required her to have frequent and confidential contact with inmates regarding their health, Mrs. Porter learned of inmates' allegations of physical and sexual abuse by HOC officers, as well as other alleged misconduct of the Department. Some inmates confided in Mrs. Porter that their reports alleging abuse and other unlawful treatment that had been filed with the Sheriff's Investigation Division ("SID") -- the department responsible for investigating such claims by inmates and Department personnel -- had

7

mysteriously become "lost." They also shared with Mrs. Porter their fears of retaliation from correctional officers for having complained about them.

21.  Personnel were able to engage in unlawful conduct behind the shield of the Code of Silence fostered by the Department. The fear of reprisal and harassment from supervisors and fellow employees for reporting suspected unlawful activities fueled this silence during Mrs. Porter's tenure with the Department.

22.  Individuals who have dared to shatter the Code of Silence have suffered retaliation, such as dismissal, by the Department.

23.  For example, in September 1999, a female HOC corrections officer blew the whistle on a male colleague for writing love letters to a female inmate. The male guard assaulted the whistleblower and was criminally charged with assault and battery, and a court found probable cause to subject the guard to trial on those charges. As is typical at the Department, however, the male guard who wrote the letters is again working at the HOC.

24.  As another example of the Department's retaliatory pattern towards those who break the Code of Silence, Paul Davis, a former Jail guard, testified in federal court in approximately April 2003 in the trial of United States v. Eric J. Donnelly, et. al., about the criminal use of excessive force and obstruction of justice committed by Jail lieutenants, deputy sheriffs and guards. It was only after Mr. Davis cooperated with the FBI and testified truthfully about the Department's Code of Silence under oath, that the Department terminated Mr. Davis. Mr. Davis has since filed suit in this Court, alleging that the Department's discharge of him violated his civil rights and other laws.

25.  As yet another example, in May 2003, a jury sitting in the United States District Court for the District of Massachusetts awarded a former HOC corrections officer, Bruce Baron,

$500,000 in emotional distress damages stemming from the Department's policies and practices of retaliating against those who refuse to maintain the Code of Silence, which the jury found had violated the officer's civil rights.

26. Mr. Baron reported a supervisor how had violated Department rules. The supervisor was suspended for three days, but then returned to work.

27. Mr. Baron, however, was forced by the Department to resign in August 1998 after he had reported over 30 incidents of harassment to the SID, such as being called a "rat coward" for having reported the misconduct. The SID took no action to investigate his complaints.

28. As Mr. Baron's attorney was quoted by the Boston Globe: "Apparently, the Code of Silence still exists."

29. The Department's policy of punishing those who report misconduct extends to protecting those who engage in such misconduct. In approximately May 2000, for example, an internal investigator in the SID made a sexual remark to a female colleague. Although the investigator was suspended for three days, the Department permitted him to work extra overtime around the time of his suspension, so that he actually made more money than he would have had he worked during the suspension. Thus, while making it appear to the public that it was punishing the officer, the Department actually rewarded him for his conduct. Mr. Baron reported a supervisor who had violated Department rules. The supervisor was suspended for three days, but then returned to work.

30. The Department's Code of Silence and policy of retaliation still run strong.

### III.  Mrs. Porter Refused to be Muzzled by the Department's Code of Silence

31. Mrs. Porter knows first-hand that the Department's Code of Silence is as strong as ever. Nonetheless, she refused to be muzzled by the code during her tenure with the Department.

9

She came forward with information about unlawful activities; participated in several investigations and testified at depositions and hearings in legal disputes concerning several guards' alleged misconduct.

### A. For Four Years, Mrs. Porter Provided Valuable Information to the FBI for its Investigation of the Department's Illegal Activities

32. Due to the Department's policy of retaliation for breaking the Code of Silence and the allegations of widespread illegal conduct, the FBI launched an investigation into the Department and the facilities under its supervision: the HOC and the Jail. Richard Rouse, then Sheriff of Suffolk County, publicly announced the FBI investigation in approximately October 1999.

33. In approximately 1999, the FBI called Mrs. Porter at her home and requested that she provide information relating to its investigation. Shortly thereafter, the FBI asked Mrs. Porter for her continued cooperation by the way of supplying information on a regular basis about suspected unlawful activities of the Department and its personnel, and answering questions posed by the FBI about such matters.

34. Before Mrs. Porter responded to the FBI's unsolicited request, she informed a CHS Health Services Administrator at the HOC who referred her to a Regional Manager at CHS. After Mrs. Porter informed the Regional Manager that the FBI wanted to speak with Mrs. Porter, and that Mrs. Porter intended to comply with the FBI's request, the CHS Manager agreed. When CMS assumed the contractual relationship with the Department, CMS hired that former CHS Regional Manager into the same position, in which she remained through Mrs. Porter's discharge.

35. At no time did Mrs. Porter conceal her cooperation with the FBI from any CMS or Department supervisors. Indeed, from time to time, she informed managers of CMS and the

Department about her cooperation. No supervisor ever told Mrs. Porter that her cooperation with the FBI violated the policies of either CMS or the Department.

36. Mrs. Porter felt it was her duty, and indeed an honor, as a professional Nurse Practitioner committed to the health and safety of others and simply as a citizen, to comply with requests to cooperate with law enforcement. For approximately four years, while maintaining her exemplary performance as Nurse Practitioner, Mrs. Porter disclosed to the FBI information regarding activities, practices and policies of Suffolk County and the Department that she reasonably believed violated the law and/or posed a risk to public safety or public health. Some of the topics Mrs. Porter discussed with the FBI included sexual misconduct by officers against female inmates; inmate physical abuse by officers; drug use and dealing by Department personnel; the Department's Code of Silence and policy of retaliation; and suspicious inmate deaths.

37. The information concerning the Department that Mrs. Porter provided to the FBI was valuable, as she was one of the few individuals privy to such information who dared to break the Department's "Code of Silence."

38. One case of sexual abuse by HOC officers investigated by the FBI and about which Mrs. Porter shared information involved a complaint in July 1999 by "Jane Doe," a female inmate at the HOC who complained that she was required to have sex with at least three HOC guards and that she was pregnant. As was its custom, the Department initially dismissed Ms. Doe's allegations. It was only after Ms. Doe proved that she was pregnant that the Department investigated her claims. Ultimately, DNA samples taken from one of the guards demonstrated that he was the father of Ms. Doe's child. Ms. Doe sued that officer in a paternity suit, in which he was adjudged to be the child's father.

39. Ms. Doe now has pending a lawsuit arising from the facts that the Department ignored. Ms. Doe sued in the U.S. District Court for the District of Massachusetts in April of 2001, alleging that at least three different guards forced her to have sex with them in order that she could keep her cell lights on after the mandatory "lights out" time, be provided with food from outside the HOC and be offered extra time outside of her cell.

40. In May 2001, another former female HOC inmate filed suit in the U.S. District Court for the District of Massachusetts alleging that she was sexually assaulted by one of the same guards named by Ms. Doe, as well as by a male nurse. The inmate's allegations included that the guard had "hog-tied" her as part of a pattern of unwanted sexual advances, and that the male nurse forced her to have oral sex. Mrs. Porter shared information relevant to these allegations with the FBI and the Department's SID.

41. In addition to the sexual abuse, the FBI investigated physical abuse of Jail detainees and HOC inmates. Mrs. Porter provided information to the FBI concerning these allegations. After the FBI concluded its investigation, seven Jail officers were indicted on several criminal counts between May and July 2001 for beatings of Jail detainees from 1998 to 1999, and their deliberate efforts to conceal those beatings by cloaking them in the shield of silence. Ultimately, two deputy sheriffs and a lieutenant pled guilty to their crimes; another lieutenant was convicted of obstruction of justice; an officer was convicted of criminal civil rights violations, conspiracy to obstruct justice, obstruction of justice and perjury; and the remaining two officers were acquitted.

42. The FBI also investigated allegations of widespread drug trafficking by Department personnel, about which Mrs. Porter provided certain information. As a result of those investigations, at least four guards from the Jail and the HOC have been arrested since

February of 2003, for allegedly trafficking drugs to inmates at the Department's facilities. At least one of those HOC guards has been indicted on several drug related charges, including possession, distribution and conspiracy charges.

43. In addition to providing valuable information to the FBI, Mrs. Porter risked her personal safety by further cooperating with the FBI. In late 2002, at the FBI's request, Mrs. Porter placed a recording device on an inmate while on the HOC premises. The inmate, who had received threats by Department personnel, was also cooperating with FBI agents. When the FBI requested, Mrs. Porter later removed the device and provided it to the FBI. That inmate subsequently was transferred out of the HOC to another facility.

**B.      Mrs. Porter Testified at Legal Proceedings Against the Department**

44. In addition to regularly cooperating with the FBI, Mrs. Porter testified in cases, both for and against the Department, during her tenure with the Department.

45. For example, Mrs. Porter testified against an HOC guard in September of 2001 in Roxbury District Court at a probable cause hearing on a rape complaint against the HOC guard who had fathered Ms. Doe's child. The Court found sufficient evidence of rape, assault and battery, and civil rights violations to proceed to trial. The District Attorney, however, dropped the criminal charges, citing a loophole in the law (since closed) that failed to criminalize consensual sex between an officer and an inmate.

46. In September 1999, a female HOC corrections officer blew the whistle on a male colleague for writing love letters to a female inmate. The male guard assaulted the whistleblower and was criminally charged with assault and battery. Mrs. Porter testified on the whistleblower's behalf at a probable cause hearing in court against the male guard. While the magistrate judge found probable cause, the District Attorney's Office failed to pursue the case.

As is typical at the Department, the male guard who wrote the letters is again working at the HOC.

47.   In approximately April of 2001, Mrs. Porter was interviewed by counsel for the Department and scheduled to testify at an arbitration involving allegations against an HOC guard of sexual misconduct with a female inmate.

### C.   Mrs. Porter Provided Information to the Special Commission for its Investigation into the Department's Abuses and Mismanagement

48.   In July of 2001, in the midst of the egregious sexual and physical abuse allegations by Department personnel, Jane Swift, then the acting Governor of Massachusetts, appointed an independent Special Commission to investigate and report on the operations and management of the Department and its facilities.

49.   The Special Commission was comprised of seven independent, impartial experts with relevant experience, including the former U.S. Attorney for Massachusetts; the former Division Chief of the U.S. Department of Justice, Federal Bureau of Prisons, National Institute of Corrections the Jail Center; the Clerk-Magistrate of the Roxbury District Court Department of the Massachusetts Trial Court; a former Associate Justice of the Massachusetts Superior Court; a licensed psychologist and psychiatric social worker; a former Assistant U.S. Attorney for Massachusetts; and the former Chairman of the Finance Committee of the City of Boston.

50.   The Special Commission concluded its investigation in the Fall of 2002 and encountered a "disturbingly closed system" that included a culture and policy where the Defendants maintained a Code of Silence and employees provided information only "reluctantly, perhaps fearful of criticism or even retaliation," as disclosed in the 54-page report of the Special Commission of the Suffolk County Sheriff's Department (the "Report").

51.  In connection with its investigation, the Special Commission interviewed Mrs. Porter, who refused to be gagged by the Department's Code of Silence, instead fully cooperating with the Special Commission.

### 1. The Commission Found the Department a "Deeply Troubled Institution" and Urged the Department to Halt the "Code of Silence"

52.  The Special Commission found that the reported incidents of sexual misconduct and physical abuse were "egregious" and that the Department was a "deeply-troubled institution." The Special Commission also conveyed in its Report that the Department "continue[d] to be a disturbingly closed system in which outside input and internal and external accountability are limited."

53.  Apparent to the Commission was the Code of Silence perpetuated by the Department. In fact, the Report determined: "Staff maintain a Code of Silence due to concern about retaliation." The Commission instructed that the "Department must ensure that employees who do come forward with information are fully protected from retaliation by other officers and are supported by the administration." The Commission further warned that the "Department should attempt to penetrate the existing Code of Silence at every turn," and "urge[d] an aggressive attack on the Code of Silence that prevents staff members from reporting the misconduct of fellow staff members."

### IV. The Defendants Discharged Mrs. Porter For Cooperating with the FBI

54.  The explosive allegations that caused the Special Commission to launch its investigation into the Department forced former Sheriff Rouse to resign and resulted in a new Sheriff appointment. That new Sheriff -- Defendant Cabral -- understands that if similar allegations continue to surface, her prospects for maintaining her position are at risk.

55.     Nonetheless, the Department, run by Defendant Cabral since late 2002, has continued to sanction its Code of Silence and retaliatory policies and practices, contrary to the Special Commission's warnings. Mrs. Porter became one of the victims of such policies and practices.

56.     In approximately mid-May 2003, while working in the HOC infirmary, Mrs. Porter passed by the inmate on whom she had placed a recording device in 2002. Mrs. Porter was surprised to see the inmate and FBI cooperator, because he had previously been transferred out of the HOC in order to protect his safety.

57.     When Mrs. Porter later walked by the inmate's cell, he showed her bruises on his chest and upper arm, and reported that a guard had inflicted his injuries. He also stated that in order to avoid further abuse, he had waited until the guard went to lunch and then claimed he was going to kill himself, in order to be brought to protective custody in the infirmary.

58.     Mrs. Porter reported her observations and the inmate's statements to the HOC's mental health staff and other Department personnel, and explained her concern that the inmate may be in danger. Mrs. Porter also submitted a written report to Department personnel. On information and belief, medical personnel examined the inmate, but to Mrs. Porter's knowledge, no one other than she reported the alleged physical abuse.

59.     Approximately ten days after her conversation with the inmate, Mrs. Porter again saw him in the infirmary with new injuries, this time to his head. The inmate told Mrs. Porter that a guard had placed and held the heel of his boot against the inmate's head. Although someone other Mrs. Porter examined the inmate, Mrs. Porter nonetheless reported the suspected inmate abuse to personnel at the Department and submitted a written report.

60. During the inmate's stays in the infirmary, the inmate mentioned that he had been working with the FBI and asked Mrs. Porter to call the special agent in order to rescue him from the HOC. Consistent with her ongoing cooperation with the FBI, Mrs. Porter informed the FBI about the inmate's two sets of injuries and allegations of abuse.

61. Within days after speaking with the FBI, Mrs. Porter was called to the SID office and interrogated by two SID investigators as to when she had contacted the FBI agent regarding the suspected abuse of the inmate. At no time did SID inquire as to the health or safety of the inmate who was cooperating, or, to Mrs. Porter's knowledge, call the FBI and offer assistance in the FBI's investigation. Instead, SID conducted an "interview" of Mrs. Porter in an effort to confirm that she was cooperating, and had communicated, with the FBI regarding the suspected physical abuse. In short, SID was attempting to determine whether Mrs. Porter had violated the "Code of Silence."

62. Shortly after Mrs. Porter was interrogated by SID as to whether she had broken the Department's Code of Silence by cooperating with the FBI, she was terminated.

63. On June 10, 2003, Ms. Mastrorilli, the Deputy Superintendent of the HOC, called Mrs. Porter into a meeting with her and the CMS Health Services Administrator. Ms. Mastrorilli pulled out Policy S220, entitled "Employee Code of Conduct," which was established and maintained by the Department, through Defendant Cabral, and expressly applies to all employees of the Department, including those who work at the HOC.

64. Ms. Mastrorilli read from a portion of Policy S220 and alleged that Mrs. Porter had violated the Policy by talking to an "outside agency." Ms. Mastrorilli informed Mrs. Porter that she was forever banned from the premises of the HOC for having engaged in such conduct. Since June 10, 2003, Mrs. Porter has been banned from HOC premises. At no time did the

17

Department or CMS inquire as to the health, safety, danger or abuse of the cooperating inmate, or as to ways in which they could assist in the ongoing FBI investigation.

65. The Defendants' conduct in terminating Mrs. Porter for having cooperated with the FBI violated many laws, as well as the obligation of the Department and CMS (arising out of the contract between those entities) to act lawfully towards all individuals assigned by CMS to the Department, including Mrs. Porter. The Defendants breached that obligation in bad faith and deprived Mrs. Porter of her rights and benefits as a third-party beneficiary of that contract.

### A. Federal Investigations into the Department Expand to Include Mrs. Porter's Unlawful Termination

66. Mrs. Porter understands that the Department's retaliation, unlawful termination, violation of Mrs. Porter's civil rights, and attempt to obstruct justice by interfering with Mrs. Porter's efforts to cooperate, are being investigated by the FBI, the federal grand jury and the United States Attorney's Office in the District of Massachusetts and that such investigation has included grand jury testimony, including her own testimony, about the Department's activities.

67. On information and belief, the FBI continues to investigate various types of misconduct committed by Department, HOC and Jail personnel. Moreover, criminal cases are still pending against many Department personnel, including the charges of physical beatings of Jail detainees, the drug trafficking cases, and the sexual abuse cases.

### B. The Department Failed to Provide Mrs. Porter with Notice and Hearing

68. Section II of Policy S220 provides that an employee may not be subject to discipline for violating any Department rules or policies unless the employee is given a hearing, and has been found, by a preponderance of the evidence presented at such hearing, to actually have committed an enumerated offense.

69. Despite the clear provisions of Policy S220, Mrs. Porter was never provided with any warnings, let alone a hearing, regarding her purported violation of Policy S220. Instead, without any notice, the Department simply discharged her.

70. Thus, it is clear that the Department and Defendant Cabral on the one hand violated Policy S220 by depriving Mrs. Porter of the protections she deserved, while at the same time misused the Policy as a pretext to terminate Mrs. Porter for having cooperated with the FBI.

C. **CMS Also Failed to Provide Mrs. Porter with Warnings and Notice**

71. Just like the Department and its policy of silence and retaliation against cooperators, CMS ignored its obligations under its own policies to extend various protections to Mrs. Porter.

72. On June 10, 2003 -- the same day that the Department banished Mrs. Porter from her Nurse Practitioner position -- a CMS employee at the HOC recommended to management that Mrs. Porter be terminated.

73. That recommendation was not approved by a CMS Regional Manager until July 17, 2003, and by a Human Resources representative until July 21, 2003. Nonetheless, CMS terminated Mrs. Porter on June 10, 2003.

74. Mrs. Porter learned of her termination when, more than a week after she was terminated by the Department, she received a paycheck in the mail from CMS representing her final salary, and accrued, unused vacation, through June 10, 2003. She also received paperwork from CMS regarding her 401(k) plan rights, in light of her termination from CMS employment.

75. In discharging Mrs. Porter, CMS failed to follow the numerous policies governing the conduct of both CMS and its employees contained in the employee handbook (the "Success Guide") distributed by CMS to its employees, including Mrs. Porter.

19

76. The Corrective Action Policy in the CMS Success Guide generally requires that prior to terminating an employee, CMS must first provide a verbal warning, followed by a written warning, followed by further discussions with the employee, followed by a final written warning that is signed by the employee and a supervisor. In the event a termination is recommended by an employee's supervisor after such steps are followed, CMS' Regional Management, as well as the Human Resources Department, must review and make the final decision regarding the recommendation <u>before</u> the action is carried out. If a termination decision is made by such management, the employee's supervisor must communicate the decision to the employee.

77. The Success Guide also promises that in the event a correctional facility withdraws access from a CMS employee, "CMS will attempt to resolve the situation as soon as practical."

78. CMS breached all of these provisions of the Corrective Action Policy when it abruptly discharged Mrs. Porter. Indeed, prior to Mrs. Porter's attorneys' contacting CMS, CMS had never bothered to notify Mrs. Porter that her employment would be terminated or of the reasons for her termination. Similarly, at no time prior to her termination did anyone from CMS contact Mrs. Porter to ask her about the Department's actions of June 10, 2003. Upon information and belief, CMS made no attempt before discharging Mrs. Porter to rectify the Department's unlawful actions against Mrs. Porter or otherwise " resolve the situation," and certainly did nothing at all "as soon as practical."

79. CMS' failure to follow its own policies in the Success Guide when discharging Mrs. Porter demonstrates CMS' involvement in retaliating against Mrs. Porter for her cooperation with the FBI.