**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**SHEILA J. PORTER,**

       **Plaintiff,**

       **vs.**

**ANDREA CABRAL, SUFFOLK COUNTY SHERIFF'S DEPARTMENT, SUFFOLK COUNTY, and CORRECTIONAL MEDICAL SERVICES, INC.,**

       **Defendants.**

**Civil Action No. 04-11935 DPW**

**AMENDED COMPLAINT**

Plaintiff Sheila J. Porter, by her attorneys, files the following Amended Complaint and in support thereof states as follows:

**INTRODUCTION**

1.      A deeply troubled institution, the Suffolk County Sheriff's Department has a continuing pattern of criminal conduct by employees covered up by a widespread "Code of Silence." In the Fall of 2002, the Special Commission appointed to investigate the operations of the Department "urge[d] an aggressive attack on the code of silence that prevents staff members from reporting the misconduct of fellow staff members." The Special Commission also mandated that the Department "must ensure that employees who do come forward with information are fully protected from retaliation by other officers and are supported by the administration." The Department, however, has defiantly refused to heed those warnings and instead has continued to sanction its policy of silence and retaliation.

2.      One employee, Sheila Porter, stood up to the Department's lawlessness and acted as an informant/whistleblower for four years at the request of the Federal Bureau of Investigation ("FBI").  As a result of Mrs. Porter's courage and integrity in shattering the Department's Code of Silence, the Defendants terminated her from her nine-year post as a Nurse Practitioner, depriving her of her livelihood and dignity, and harming her reputation.

3.      The FBI, the United States Attorneys' Office, the Special Commission appointed to investigate and report on the operations of the Department, and private litigants have all attacked the lawless and corrupt operation of the Department.  Rather than cooperate with efforts to run the Sheriff's Department in a lawful manner, the government Defendants have consistently engaged in a strategy that promoted misconduct including, but not limited to: frivolously defending a federal lawsuit alleging harassment by Department personnel that resulted in a $500,000 verdict for a Department employee; reneging on and contemptuously refusing to pay a $5,000,000 settlement to victims until ordered by a federal judge to pay immediately; firing an employee who truthfully provided testimony in a federal trial that revealed misconduct; and failing to take adequate disciplinary action against Department employees who violated a myriad state and federal laws.

4.      In addition to this pattern and policy of illegality by the Department, the Defendants specifically retaliated against Mrs. Porter for revealing suspected unlawful actions to an outside agency -- the FBI.  Within days of informing the FBI that an inmate who was cooperating with federal law enforcement officials had been physically assaulted twice and was in physical danger if he remained at the Suffolk County House of Corrections (the "HOC"), Mrs. Porter was abruptly terminated because, she was told, she had talked to "an outside agency." Mrs. Porter had, indeed, provided truthful information to the FBI.

5.     The Defendants have turned a deaf ear on Mrs. Porter's demands to rectify their unlawful conduct, leaving Mrs. Porter with no choice but to vindicate her rights through this action.  Moreover, not content with a defiant denial of their unlawful actions, Defendant Cabral, herself and through her administration, has recently defamed Mrs. Porter on at least three separate occasions, with written and oral statements published in the media.   The defamatory statements included, among other things, false assertions that Mrs. Porter had her own secret and unspecified "agenda"; that Mrs. Porter is not a whistleblower; and that Mrs. Porter's claims are "100 percent ridiculous."  By making such statements, Defendant Cabral and her administration intended to make people believe that Mrs. Porter is a liar and is motivated not by justice, but by prejudice, personal animus and/or some other sinister or unlawful motive.  Such assertions are completely false, as Mrs. Porter's only "agenda" and motivation is seeking and speaking the truth.  The Defendants' actions have violated many laws, including 42 U.S.C. § 1983, the Massachusetts Whistleblower Statute, the Massachusetts Civil Rights Act and public policy, and also constitutes breaches of contract, infliction of emotional distress and defamation.  Through this action, Mrs. Porter seeks redress for the damage caused by the Defendants' actions.  She also seeks such punitive damages as will cause the Defendants to begin to act in a lawful manner, cooperate in the protection of inmates, dismantle the Code of Silence and meet the minimum standards of conduct the citizens of Massachusetts are entitled to expect from a correctional facility, public officials, employers and others.

## **PARTIES**

6.     A highly successful Nurse Practitioner or Nurse for the past 35 years, Plaintiff Sheila Porter is a resident of Upton, Massachusetts.  She devoted the last nine years of her life to caring for the inmates and staff of the HOC -- twice commended by the Department for saving

lives -- and making constant efforts to ensure that the notoriously mismanaged HOC operated in a legal fashion, until she was abruptly and illegally discharged from her employment with the Department and Correctional Medical Services, Inc. for reporting suspected inmate abuse to the FBI.

7.      Defendant Suffolk County Sheriff's Department (the "Department") oversees the operations of the HOC and the Nashua Street Jail (the "Jail").  The Department is charged with responsibilities that include preserving the safety of inmates and personnel at its facilities, and running those institutions in accordance with applicable state and federal laws, including the civil rights laws.

8.      Since approximately December 2002, Defendant Andrea Cabral has been Sheriff of Suffolk County, and the most senior official responsible for the operations of the Department, the HOC and the Jail.[1]  Defendant Cabral became the Sheriff after Richard Rouse resigned from that post after several reports of problems within the Department surfaced, including reports of inmate sexual and physical abuse, retaliatory conduct, mismanagement, and other unlawful conduct.  At all relevant times hereto, Defendant Cabral held the authority to remove employees of the Department, including Mrs. Porter, and held responsibilities that included establishing, maintaining and enforcing the Department's policies and practices.  Upon information and belief, Defendant Cabral is a resident of the Commonwealth of Massachusetts.

9.      The Department, the Jail and the HOC are instrumentalities of Defendant Suffolk County, which is a Massachusetts county government.

10.     Headquartered in St. Louis, Missouri, Defendant Correctional Medical Services, Inc. ("CMS") is a corporation that, at all relevant times hereto, had a contract with the HOC, the

Department and/or Suffolk County to provide healthcare services to inmates.  Upon information

and belief, such contract contained promises by the parties thereto to, among other things,

comply with laws applicable to the individuals working at the HOC through CMS.  As one of

those employees, Mrs. Porter was an intended beneficiary of the contract.  At all times relevant

to this action CMS was doing business in the Commonwealth of Massachusetts with the

Department and was an agent and/or instrumentality of Suffolk County.

## JURISDICTION AND VENUE

11.    To the extent this matter arises under the Constitution and laws of the United

States, this Court has jurisdiction over this case pursuant to 28 U.S.C. §1331.  Mrs. Porter

invokes pendent jurisdiction of this Court on all issues presented.

12.    Venue lies in this district under 28 U.S.C. §1391(b)(1) because the Defendants

reside in this Commonwealth, and under 28 U.S.C. §1391(b)(2) because the events from which

this case arose occurred in this district.

## STATEMENT OF FACTS

**I.    For Nine Years, Mrs. Porter Successfully Performed Her Employment Duties
for CMS and the Department**

13.    Mrs. Porter worked as a Nurse Practitioner at the Department's HOC from 1994

until June 10, 2003.  From approximately January 2001 until her termination on June 10, 2003,

Mrs. Porter was assigned to the Department through CMS.  Before January 2001, Mrs. Porter

was assigned to the Department through Correctional Health Solutions, Inc. ("CHS"), the

company that provided nurse practitioners and other healthcare workers to the HOC prior to

CMS.  Like Mrs. Porter, some of the supervisors and employees of CHS who were working at

---

[1] Because the HOC, the Jail and the Department are instrumentalities of Suffolk County, all references herein to any of those entities also refer to Suffolk County.  Moreover, any references to Suffolk County also refer to the HOC, the Jail and the Department.

the HOC and other correctional facilities as of January 2001 were hired by CMS when CMS assumed the healthcare services contract with the Department.  The former CHS employees hired by CMS retained their knowledge about the Department that they acquired while employed by CHS and used it to CMS' benefit.

14.     Mrs. Porter brought tremendous expertise -- approximately twenty years of experience in performing in nursing or nurse practitioner capacities -- to the Department.  That expertise enabled Mrs. Porter to successfully perform her responsibilities for the Department, which included the day-to-day care and treatment of male and female inmates; emergency treatment of inmates and staff; and conducting physical examinations for prospective employees.

15.     Both the Department and CMS were pleased with Mrs. Porter's job performance. In fact, CMS hired her away from CHS based on her seven prior years' success as a Nurse Practitioner at the Department.  In addition, only a few months before her termination, Mrs. Porter received a favorable performance review and was granted a raise in the maximum amount permitted.  The Department was so impressed with Mrs. Porter's skills and dedication during her nine years that, for the past few years, it has utilized her videotaped orientation to health services as part of its "new inmate" orientation program.

16.     In addition to her excellent performance, Mrs. Porter helped to save lives at the HOC on many occasions.  For example, in December 1994, Mrs. Porter helped save the life of a 73-year old visitor at the HOC and was praised by the Department for doing so.  Similarly, in a letter dated August 26, 2002 (only ten months prior to her abrupt and unlawful discharge), the Department expressed gratitude for the "commendable job performed by" Mrs. Porter in helping to save an inmate's life.  The Department reiterated its pleasure in having Mrs. Porter employed at the facility.

17.    The Department and CMS were common law and joint employers of Mrs. Porter. Her performance as a Nurse Practitioner was for, and under the control and direction of, the Department and CMS.  By way of example, the Department dictated the hours and days that Mrs. Porter worked; the manner in which she performed her responsibilities; the manner in which she was permitted to interact with inmates; and the times at which she was permitted to see inmates.  CMS controlled, for example, Mrs. Porter's compensation, benefits and other terms and conditions of her employment.

18.    In addition, during her tenure with the Department, Mrs. Porter was provided with several written policies established and maintained by Defendant Cabral and the Department. Those policies concerned employees' conduct and expressly stated that they applied to employees of the Department.  The Department, through Defendant Cabral, required Mrs. Porter to comply with its policies.  Similarly, CMS required Mrs. Porter to comply with its policies.

## II.    The Department Has Engaged in a Pattern of Retaliation Against Those Who Fail to Abide by the Code of Silence

19.    In addition to written policies, the Department had a clear, but unwritten, illegal practice and policy of requiring employees to be silent regarding suspected unlawful conduct by officers and other Department personnel.  Mrs. Porter refused to follow this policy.

20.    Because her responsibilities required her to have frequent and confidential contact with inmates regarding their health, Mrs. Porter learned of inmates' allegations of physical and sexual abuse by HOC officers, as well as other alleged misconduct of the Department.  Some inmates confided in Mrs. Porter that their reports alleging abuse and other unlawful treatment that had been filed with the Sheriff's Investigation Division ("SID") -- the department responsible for investigating such claims by inmates and Department personnel -- had

mysteriously become "lost."  They also shared with Mrs. Porter their fears of retaliation from correctional officers for having complained about them.

21.     Personnel were able to engage in unlawful conduct behind the shield of the Code of Silence fostered by the Department.  The fear of reprisal and harassment from supervisors and fellow employees for reporting suspected unlawful activities fueled this silence during Mrs. Porter's tenure with the Department.

22.     Individuals who have dared to shatter the Code of Silence have suffered retaliation, such as dismissal, by the Department.

23.     For example, in September 1999, a female HOC corrections officer blew the whistle on a male colleague for writing love letters to a female inmate.  The male guard assaulted the whistleblower and was criminally charged with assault and battery, and a court found probable cause to subject the guard to trial on those charges.  As is typical at the Department, however, the male guard who wrote the letters is again working at the HOC.

24.     As another example of the Department's retaliatory pattern towards those who break the Code of Silence, Paul Davis, a former Jail guard, testified in federal court in approximately April 2003 in the trial of <u>United States v. Eric J. Donnelly, et. al.</u>, about the criminal use of excessive force and obstruction of justice committed by Jail lieutenants, deputy sheriffs and guards.  It was only after Mr. Davis cooperated with the FBI and testified truthfully about the Department's Code of Silence under oath, that the Department terminated Mr. Davis.  Mr. Davis has since filed suit in this Court, alleging that the Department's discharge of him violated his civil rights and other laws.

25.     As yet another example, in May 2003, a jury sitting in the United States District Court for the District of Massachusetts awarded a former HOC corrections officer, Bruce Baron,

$500,000 in emotional distress damages stemming from the Department's policies and practices of retaliating against those who refuse to maintain the Code of Silence, which the jury found had violated the officer's civil rights.

26.    Mr. Baron reported a supervisor who had violated Department rules.  The supervisor was suspended for three days, but then returned to work.

27.    Mr. Baron, however, was forced by the Department to resign in August 1998 after he had reported over 30 incidents of harassment to the SID, such as being called a "rat coward" for having reported the misconduct.  The SID took no action to investigate his complaints.

28.    As Mr. Baron's attorney was quoted by the <u>Boston Globe</u>:  "Apparently, the Code of Silence still exists."

29.    The Department's policy of punishing those who report misconduct extends to protecting those who engage in such misconduct.  In approximately May 2000, for example, an internal investigator in the SID made a sexual remark to a female colleague.  Although the investigator was suspended for three days, the Department permitted him to work extra overtime around the time of his suspension, so that he actually made more money than he would have had he worked during the suspension.  Thus, while making it appear to the public that it was punishing the officer, the Department actually rewarded him for his conduct.  Mr. Baron reported a supervisor who had violated Department rules.  The supervisor was suspended for three days, but then returned to work.

30.    The Department's Code of Silence and policy of retaliation still run strong.

## III.    <u>Mrs. Porter Refused to be Muzzled by the Department's Code of Silence</u>

31.    Mrs. Porter knows first-hand that the Department's Code of Silence is as strong as ever.  Nonetheless, she refused to be muzzled by the code during her tenure with the Department.

She came forward with information about unlawful activities; participated in several investigations and testified at depositions and hearings in legal disputes concerning several guards' alleged misconduct.

**A.    For Four Years, Mrs. Porter Provided Valuable Information to the FBI for its Investigation of the Department's Illegal Activities**

32.    Due to the Department's policy of retaliation for breaking the Code of Silence and the allegations of widespread illegal conduct, the FBI launched an investigation into the Department and the facilities under its supervision:  the HOC and the Jail.  Richard Rouse, then Sheriff of Suffolk County, publicly announced the FBI investigation in approximately October 1999.

33.    In approximately 1999, the FBI called Mrs. Porter at her home and requested that she provide information relating to its investigation.  Shortly thereafter, the FBI asked Mrs. Porter for her continued cooperation by the way of supplying information on a regular basis about suspected unlawful activities of the Department and its personnel, and answering questions posed by the FBI about such matters.

34.    Before Mrs. Porter responded to the FBI's unsolicited request, she informed a CHS Health Services Administrator at the HOC who referred her to a Regional Manager at CHS. After Mrs. Porter informed the Regional Manager that the FBI wanted to speak with Mrs. Porter, and that Mrs. Porter intended to comply with the FBI's request, the CHS Manager agreed.  When CMS assumed the contractual relationship with the Department, CMS hired that former CHS Regional Manager into the same position, in which she remained through Mrs. Porter's discharge.

35.    At no time did Mrs. Porter conceal her cooperation with the FBI from any CMS or Department supervisors.  Indeed, from time to time, she informed managers of CMS and the

Department about her cooperation.  No supervisor ever told Mrs. Porter that her cooperation with the FBI violated the policies of either CMS or the Department.

36.    Mrs. Porter felt it was her duty, and indeed an honor, as a professional Nurse Practitioner committed to the health and safety of others and simply as a citizen, to comply with requests to cooperate with law enforcement.  For approximately four years, while maintaining her exemplary performance as Nurse Practitioner, Mrs. Porter disclosed to the FBI information regarding activities, practices and policies of Suffolk County and the Department that she reasonably believed violated the law and/or posed a risk to public safety or public health.  Some of the topics Mrs. Porter discussed with the FBI included sexual misconduct by officers against female inmates; inmate physical abuse by officers; drug use and dealing by Department personnel; the Department's Code of Silence and policy of retaliation; and suspicious inmate deaths.

37.    The information concerning the Department that Mrs. Porter provided to the FBI was valuable, as she was one of the few individuals privy to such information who dared to break the Department's "Code of Silence."

38.    One case of sexual abuse by HOC officers investigated by the FBI and about which Mrs. Porter shared information involved a complaint in July 1999 by "Jane Doe," a female inmate at the HOC who complained that she was required to have sex with at least three HOC guards and that she was pregnant.  As was its custom, the Department initially dismissed Ms. Doe's allegations.  It was only after Ms. Doe proved that she was pregnant that the Department investigated her claims.  Ultimately, DNA samples taken from one of the guards demonstrated that he was the father of Ms. Doe's child.  Ms. Doe sued that officer in a paternity suit, in which he was adjudged to be the child's father.

39.    Ms. Doe now has pending a lawsuit arising from the facts that the Department ignored. Ms. Doe sued in the U.S. District Court for the District of Massachusetts in April of 2001, alleging that at least three different guards forced her to have sex with them in order that she could keep her cell lights on after the mandatory "lights out" time, be provided with food from outside the HOC and be offered extra time outside of her cell.

40.    In May 2001, another former female HOC inmate filed suit in the U.S. District Court for the District of Massachusetts alleging that she was sexually assaulted by one of the same guards named by Ms. Doe, as well as by a male nurse. The inmate's allegations included that the guard had "hog-tied" her as part of a pattern of unwanted sexual advances, and that the male nurse forced her to have oral sex. Mrs. Porter shared information relevant to these allegations with the FBI and the Department's SID.

41.    In addition to the sexual abuse, the FBI investigated physical abuse of Jail detainees and HOC inmates. Mrs. Porter provided information to the FBI concerning these allegations. After the FBI concluded its investigation, seven Jail officers were indicted on several criminal counts between May and July 2001 for beatings of Jail detainees from 1998 to 1999, and their deliberate efforts to conceal those beatings by cloaking them in the shield of silence. Ultimately, two deputy sheriffs and a lieutenant pled guilty to their crimes; another lieutenant was convicted of obstruction of justice; an officer was convicted of criminal civil rights violations, conspiracy to obstruct justice, obstruction of justice and perjury; and the remaining two officers were acquitted.

42.    The FBI also investigated allegations of widespread drug trafficking by Department personnel, about which Mrs. Porter provided certain information. As a result of those investigations, at least four guards from the Jail and the HOC have been arrested since

February of 2003, for allegedly trafficking drugs to inmates at the Department's facilities. At least one of those HOC guards has been indicted on several drug related charges, including possession, distribution and conspiracy charges.

43.    In addition to providing valuable information to the FBI, Mrs. Porter risked her personal safety by further cooperating with the FBI. In late 2002, at the FBI's request, Mrs. Porter placed a recording device on an inmate while on the HOC premises. The inmate, who had received threats by Department personnel, was also cooperating with FBI agents. When the FBI requested, Mrs. Porter later removed the device and provided it to the FBI. That inmate subsequently was transferred out of the HOC to another facility.

### B.    Mrs. Porter Testified at Legal Proceedings Against the Department

44.    In addition to regularly cooperating with the FBI, Mrs. Porter testified in cases, both for and against the Department, during her tenure with the Department.

45.    For example, Mrs. Porter testified against an HOC guard in September of 2001 in Roxbury District Court at a probable cause hearing on a rape complaint against the HOC guard who had fathered Ms. Doe's child. The Court found sufficient evidence of rape, assault and battery, and civil rights violations to proceed to trial. The District Attorney, however, dropped the criminal charges, citing a loophole in the law (since closed) that failed to criminalize consensual sex between an officer and an inmate.

46.    In September 1999, a female HOC corrections officer blew the whistle on a male colleague for writing love letters to a female inmate. The male guard assaulted the whistleblower and was criminally charged with assault and battery. Mrs. Porter testified on the whistleblower's behalf at a probable cause hearing in court against the male guard. While the magistrate judge found probable cause, the District Attorney's Office failed to pursue the case.

As is typical at the Department, the male guard who wrote the letters is again working at the HOC.

47.    In approximately April of 2001, Mrs. Porter was interviewed by counsel for the Department and scheduled to testify at an arbitration involving allegations against an HOC guard of sexual misconduct with a female inmate.

### C.    Mrs. Porter Provided Information to the Special Commission for its Investigation into the Department's Abuses and Mismanagement

48.    In July of 2001, in the midst of the egregious sexual and physical abuse allegations by Department personnel, Jane Swift, then the acting Governor of Massachusetts, appointed an independent Special Commission to investigate and report on the operations and management of the Department and its facilities.

49.    The Special Commission was comprised of seven independent, impartial experts with relevant experience, including the former U.S. Attorney for Massachusetts; the former Division Chief of the U.S. Department of Justice, Federal Bureau of Prisons, National Institute of Corrections the Jail Center; the Clerk-Magistrate of the Roxbury District Court Department of the Massachusetts Trial Court; a former Associate Justice of the Massachusetts Superior Court; a licensed psychologist and psychiatric social worker; a former Assistant U.S. Attorney for Massachusetts; and the former Chairman of the Finance Committee of the City of Boston.

50.    The Special Commission concluded its investigation in the Fall of 2002 and encountered a "disturbingly closed system" that included a culture and policy where the Defendants maintained a Code of Silence and employees provided information only "reluctantly, perhaps fearful of criticism or even retaliation," as disclosed in the 54-page report of the Special Commission of the Suffolk County Sheriff's Department (the "Report").

51.     In connection with its investigation, the Special Commission interviewed Mrs. Porter, who refused to be gagged by the Department's Code of Silence, instead fully cooperating with the Special Commission.

**1.     The Commission Found the Department a "Deeply Troubled Institution" and Urged the Department to Halt the "Code of Silence"**

52.     The Special Commission found that the reported incidents of sexual misconduct and physical abuse were "egregious" and that the Department was a "deeply-troubled institution."  The Special Commission also conveyed in its Report that the Department "continue[d] to be a disturbingly closed system in which outside input and internal and external accountability are limited."

53.     Apparent to the Commission was the Code of Silence perpetuated by the Department.  In fact, the Report determined:  "Staff maintain a Code of Silence due to concern about retaliation."  The Commission instructed that the "Department must ensure that employees who do come forward with information are fully protected from retaliation by other officers and are supported by the administration."  The Commission further warned that the "Department should attempt to penetrate the existing Code of Silence at every turn," and "urge[d] an aggressive attack on the Code of Silence that prevents staff members from reporting the misconduct of fellow staff members."

**IV.     The Defendants Discharged Mrs. Porter For Cooperating with the FBI**

54.     The explosive allegations that caused the Special Commission to launch its investigation into the Department forced former Sheriff Rouse to resign and resulted in a new Sheriff appointment.  That new Sheriff -- Defendant Cabral -- understands that if similar allegations continue to surface, her prospects for maintaining her position are at risk.

55.     Nonetheless, the Department, run by Defendant Cabral since late 2002, has continued to sanction its Code of Silence and retaliatory policies and practices, contrary to the Special Commission's warnings.  Mrs. Porter became one of the victims of such policies and practices.

56.     In approximately mid-May 2003, while working in the HOC infirmary, Mrs. Porter passed by the inmate on whom she had placed a recording device in 2002.  Mrs. Porter was surprised to see the inmate and FBI cooperator, because he had previously been transferred out of the HOC in order to protect his safety.

57.     When Mrs. Porter later walked by the inmate's cell, he showed her bruises on his chest and upper arm, and reported that a guard had inflicted his injuries.  He also stated that in order to avoid further abuse, he had waited until the guard went to lunch and then claimed he was going to kill himself, in order to be brought to protective custody in the infirmary.

58.     Mrs. Porter reported her observations and the inmate's statements to the HOC's mental health staff and other Department personnel, and explained her concern that the inmate may be in danger.  Mrs. Porter also submitted a written report to Department personnel.  On information and belief, medical personnel examined the inmate, but to Mrs. Porter's knowledge, no one other than she reported the alleged physical abuse.

59.     Approximately ten days after her conversation with the inmate, Mrs. Porter again saw him in the infirmary with new injuries, this time to his head.  The inmate told Mrs. Porter that a guard had placed and held the heel of his boot against the inmate's head.  Although someone other Mrs. Porter examined the inmate, Mrs. Porter nonetheless reported the suspected inmate abuse to personnel at the Department and submitted a written report.

60.     During the inmate's stays in the infirmary, the inmate mentioned that he had been working with the FBI and asked Mrs. Porter to call the special agent in order to rescue him from the HOC.  Consistent with her ongoing cooperation with the FBI, Mrs. Porter informed the FBI about the inmate's two sets of injuries and allegations of abuse.

61.     Within days after speaking with the FBI, Mrs. Porter was summoned to the SID office, upon information and belief, at the direction and authorization of Defendant Cabral.  Mrs. Porter was directed into a small, windowless office room, after which the two SID investigators closed the door.  Although it was implied to Mrs. Porter that the purpose of the investigation involved the alleged abuse of an inmate who was cooperating with the FBI, as reported by Mrs. Porter, at no time did either of the SID investigators inquire as to the health or safety of the inmate, or, to Mrs. Porter's knowledge, call the FBI and offer assistance in the FBI's investigation.  It soon became clear that the true purpose of the interrogation was to determine the precise extent of Mrs. Porter's cooperation and communication with the FBI regarding the suspected physical abuse of inmates.  Despite Mrs. Porter's statement to the SID investigators that the situation was making her uncomfortable, they demanded that she answer all of their questions, and continued with their barrage.  Because of the intimidating nature of the interrogation, Mrs. Porter felt that she was unable to leave the room.  It was clear that SID was interrogating Mrs. Porter solely to determine whether she had violated the "Code of Silence." Based on Mrs. Porter's years of familiarity with the consequences others suffered for violating that Code, Mrs. Porter understood the implicit threat of adverse action.

62.     Shortly after Mrs. Porter was interrogated by SID as to whether she had broken the Department's Code of Silence by cooperating with the FBI, she was terminated.  Upon information and belief, that termination was directed and/or authorized by Defendant Cabral.

63.    On June 10, 2003, Ms. Mastrorilli, the Deputy Superintendent of the HOC, called Mrs. Porter into a meeting with her and the CMS Health Services Administrator.  Ms. Mastrorilli pulled out Policy S220, entitled "Employee Code of Conduct," which was established and maintained by the Department, through Defendant Cabral, and expressly applies to all employees of the Department, including those who work at the HOC.

64.    Ms. Mastrorilli read from a portion of Policy S220 and alleged that Mrs. Porter had violated the Policy by talking to an "outside agency."  Ms. Mastrorilli informed Mrs. Porter that she was forever banned from the premises of the HOC for having engaged in such conduct. Since June 10, 2003, Mrs. Porter has been banned from HOC premises.  At no time did the Department or CMS inquire as to the health, safety, danger or abuse of the cooperating inmate, or as to ways in which they could assist in the ongoing FBI investigation.

65.    The Defendants' conduct in terminating Mrs. Porter for having cooperated with the FBI violated many laws, as well as the obligation of the Department and CMS (arising out of the contract between those entities) to act lawfully towards all individuals assigned by CMS to the Department, including Mrs. Porter.  The Defendants breached that obligation in bad faith and deprived Mrs. Porter of her rights and benefits as a third-party beneficiary of that contract.

**A.    Federal Investigations into the Department Expand to Include Mrs. Porter's Unlawful Termination**

66.    Mrs. Porter understands that the Department's retaliation, unlawful termination, violation of Mrs. Porter's civil rights, and attempt to obstruct justice by interfering with Mrs. Porter's efforts to cooperate, are being investigated by the FBI, the federal grand jury and the United States Attorney's Office in the District of Massachusetts and that such investigation has included grand jury testimony, including her own testimony, about the Department's activities.

67.     On information and belief, the FBI continues to investigate various types of misconduct committed by Department, HOC and Jail personnel.  Moreover, criminal cases are still pending against many Department personnel, including the charges of physical beatings of Jail detainees, the drug trafficking cases, and the sexual abuse cases.

**B.     The Department Failed to Provide Mrs. Porter with Notice and Hearing**

68.     Section II of Policy S220 provides that an employee may not be subject to discipline for violating any Department rules or policies unless the employee is given a hearing, and has been found, by a preponderance of the evidence presented at such hearing, to actually have committed an enumerated offense.

69.     Despite the clear provisions of Policy S220, Mrs. Porter was never provided with any warnings, let alone a hearing, regarding her purported violation of Policy S220.  Instead, without any notice, the Department simply discharged her.

70.     Thus, it is clear that the Department and Defendant Cabral on the one hand violated Policy S220 by depriving Mrs. Porter of the protections she deserved, while at the same time misused the Policy as a pretext to terminate Mrs. Porter for having cooperated with the FBI.

**C.     CMS Also Failed to Provide Mrs. Porter with Warnings and Notice**

71.     Just like the Department and its policy of silence and retaliation against cooperators, CMS ignored its obligations under its own policies to extend various protections to Mrs. Porter.

72.     On June 10, 2003 -- the same day that the Department banished Mrs. Porter from her Nurse Practitioner position -- a CMS employee at the HOC recommended to management that Mrs. Porter be terminated.

73.    That recommendation was not approved by a CMS Regional Manager until July 17, 2003, and by a Human Resources representative until July 21, 2003.  Nonetheless, CMS terminated Mrs. Porter on June 10, 2003.

74.    Mrs. Porter learned of her termination when, more than a week after she was terminated by the Department, she received a paycheck in the mail from CMS representing her final salary, and accrued, unused vacation, through June 10, 2003.  She also received paperwork from CMS regarding her 401(k) plan rights, in light of her termination from CMS employment. As a result of CMS's conduct, Mrs. Porter has been deprived of significant 401(k) plan benefits, as well as vacation time.

75.    In discharging Mrs. Porter, CMS failed to follow the numerous policies governing the conduct of both CMS and its employees contained in the employee handbook (the "Success Guide") distributed by CMS to its employees, including Mrs. Porter.

76.    The Corrective Action Policy in the CMS Success Guide generally requires that prior to terminating an employee, CMS must first provide a verbal warning, followed by a written warning, followed by further discussions with the employee, followed by a final written warning that is signed by the employee and a supervisor.  In the event a termination is recommended by an employee's supervisor after such steps are followed, CMS' Regional Management, as well as the Human Resources Department, must review and make the final decision regarding the recommendation before the action is carried out.  If a termination decision is made by such management, the employee's supervisor must communicate the decision to the employee.

77.     The Success Guide also promises that in the event a correctional facility withdraws access from a CMS employee, "CMS will attempt to resolve the situation as soon as practical."

78.     CMS breached all of these provisions of the Corrective Action Policy when it abruptly discharged Mrs. Porter.  Indeed, prior to Mrs. Porter's attorneys' contacting CMS, CMS had never bothered to notify Mrs. Porter that her employment would be terminated or of the reasons for her termination.  Similarly, at no time prior to her termination did anyone from CMS contact Mrs. Porter to ask her about the Department's actions of June 10, 2003.  Upon information and belief, CMS made no attempt before discharging Mrs. Porter to rectify the Department's unlawful actions against Mrs. Porter or otherwise " resolve the situation," and certainly did nothing at all "as soon as practical."

79.     CMS' failure to follow its own policies in the Success Guide when discharging Mrs. Porter demonstrates CMS' involvement in retaliating against Mrs. Porter for her cooperation with the FBI.

### D.     CMS Feigned Ignorance of Retaliation

80.     Prior to initiating this lawsuit, Mrs. Porter, through her attorneys, provided written notice to the Department and CMS of their unlawful conduct in discharging her, and requested immediate action to rectify the matter.  A copy of the July 14, 2003 letters to the Department and CMS are attached hereto as Exhibits A and B, respectively.

81.     CMS responded to Mrs. Porter's demand letter by way of a letter faxed to Mrs. Porter's attorneys on July 29, 2003, a copy of which is attached hereto as Exhibit C.  In that letter, CMS falsely claimed that it had no knowledge as to the reason the Department had barred Mrs. Porter from its premises.  In fact, the CMS Health Services Administrator was present at the

meeting on June 10, 2003 and listened to everything Ms. Mastrorilli said when she informed

Mrs. Porter that she was terminated for having talked to an "outside agency."

    **E.**  **The Department Refused to Redress its Unlawful Treatment of Mrs. Porter**

  82.  The Department responded to Mrs. Porter's demand letter by claiming only that

Mrs. Porter's allegations were "completely unfounded," a copy of which is attached hereto as

Exhibit D.  The Department also refused, in that letter, to provide a copy of Mrs. Porter's

personnel file, to which she is entitled by state law.  Although the Department's letter was dated

July 22, 2003, it was not postmarked until well after that, and Mrs. Porter's attorneys did not

receive the letter until on or after July 30, 2003.

  83.  This defiant attitude of the Department is consistent with its practice of

responding to allegations, and even judicial and jury findings, of wrongdoing with bald

assertions of denial or callous indifference.  One egregious example of this defiant attitude of the

Department involved its refusal to pay $5,000,000 to victims of another unlawful Department

policy.

  84.  In 2001, the U.S. District Court for the District Court of Massachusetts granted

summary judgment to a class of approximately 5400 women, finding that the Department and the

City of Boston had violated Fourth Amendment and Equal Protection rights by enforcing a strip-

search policy against thousands of women arrested often for petty offenses.

  85.   After summarily losing, the Department and the City of Boston entered into an

agreement in July 2002 to make an aggregate payment of $10,000,000, to be borne equally

between them.

  86.  Despite that agreement, the Department tried to renege on its written agreement to

pay $5,000,000 by refusing to pay by the required deadline of November 29, 2002.  The City of

Boston paid its share of the settlement by the deadline. After refusing to pay its part of the settlement for months, the Department was held in contempt in April 2003 by the District Court, which also imposed a series of fines beginning at $3,000 per day, to increase by $1,000 per day for each week the settlement remained unpaid. Only after the District Court quashed the Department's stall tactics did the Department finally pay the $5,000,000 in May 2003.

## V.    Defendant Cabral Has Defamed Mrs. Porter

87.    Not content to willfully ignore her illegal conduct, Defendant Cabral has publicly lashed out against Mrs. Porter with defamatory statements, on at least three separate occasions.

88.    Defendant Cabral, upon information and belief, directed and/or authorized her personnel (whose identities are not yet known, but will be determined in the course of this action) to issue a written statement to WCVB-TV, Channel 5 News on or about August 25, 2004.

89.    That written statement included defamatory remarks about Mrs. Porter, including, for example, an assertion that Mrs. Porter had her own secret and unspecified "agenda."

90.    Defendant Cabral knew or should have known that WCVB-TV, Channel 5 News would broadcast their defamatory statements. WCVB-TV, Channel 5 News did, in fact, broadcast the denigrating statements about Mrs. Porter to thousands, if not millions, of viewers on its evening news program, both by verbally repeating the statements, and by displaying a copy of the libelous statements on its program.

91.    Defendant Cabral also defamed Mrs. Porter during a televised political debate between herself and her then-opponent for the Sheriff's position, Stephen Murphy, which aired on the program, "Greater Boston," on or about September 8, 2004. During that televised debate, Defendant Cabral made defamatory statements about Mrs. Porter, including that Mrs. Porter was not a whistleblower and that Mrs. Porter "clearly had" her "own agenda."

92.    Defendant Cabral knew that her statements about Mrs. Porter during that debate on "Greater Boston" would be and/or were being broadcast to the public.

93.    Defendant Cabral defamed Mrs. Porter yet again, in another highly public forum. In an article in the October 29, 2004 edition of The Boston Globe Magazine reporting on the author's interview with Defendant Cabral, the author explained that "a nurse at the Suffolk County House of Correction [Mrs. Porter] said she had been fired by the Cabral Administration after it learned she was helping the FBI look into inmate abuse."  Defendant Cabral, through her spokesperson Steve Tompkins, stated: "Those allegations were 100 percent ridiculous…[t]hat's why you haven't seen any follow up [after the election]."

94.    Defendant Cabral knew that her defamatory statements about Mrs. Porter, both directly from her and those that she directed and/or authorized Mr. Tompkins to make, would be published in The Boston Globe Magazine, and that this article would be read by thousands, if not hundreds of thousands, of readers.

95.    By making, directing and/or authorizing each of these defamatory statements about Mrs. Porter, Defendant Cabral intended to make people believe that Mrs. Porter is a liar, and is motivated not by justice, but by prejudice, personal animus and/or some other sinister or unlawful motive.  Such implications and assertions are completely false.  In fact, the only agenda of Mrs. Porter is to speak and seek the truth.

96.    By making, directing and/or authorizing each of these defamatory statements in highly public arenas, Defendant Cabral attempted to interfere with Mrs. Porter's rights to free speech by attempting to intimidate, threaten and coerce (morally and otherwise) Mrs. Porter into falling silent.  Furthermore, Defendant Cabral's actions were an attempt to interfere with Mrs.

Porter's ability to have continued employment with Defendant CMS and Mrs. Porter's other employers.

97.     The defamatory statements made by and at the direction of Defendant Cabral have impugned Mrs. Porter's character and injured her reputation, by among other things, humiliating her in the eyes of the public, including those for and with whom she works, and making her appear to be a liar and acting only to serve her own interests.  Despite that harm to Mrs. Porter, she will not be strong-armed by Defendant Cabral's intimidation, threats and coercion, and will not cease her pursuit for justice and to have her name cleared.

## VI.     Mrs. Porter's Quest for Justice and Vindication and Continued Exemplary Work

98.     In direct contrast to, and in spite of, the Defendants' turning deaf ears on Mrs. Porter and backlash against her, Mrs. Porter has remained an exemplary employee devoted to the care of inmates.  Prior to her abrupt discharge by CMS and the Department, Mrs. Porter had been approved by CMS to make a presentation on its behalf at a conference in Texas regarding medical services in correctional facilities.  In early October 2003, while still dealing with the Defendants' failure to rectify her unlawful discharge, Mrs. Porter nonetheless traveled to the Texas conference and made that presentation, during which she spoke positively about her experiences at the Department and CMS.

99.     In addition, Mrs. Porter began working through CMS as a Nurse Practitioner at a different Massachusetts county correctional facility in October 2003.  She took that position despite the significant personal sacrifices involved, including having to work a completely different shift from the one she held at the Department for several months, which prevented her from arriving safely at home until after 10:00 p.m.; having to endure a much longer commute

than the one she had while working at the HOC; and having to perform some different duties than those she held at the HOC.

100.    Because of her exemplary work experience, Mrs. Porter has since been hired and is working at a few other county facilities within Massachusetts, as well as at three Massachusetts Correctional Institutions.  In the application and interview processes that Mrs. Porter underwent with respect to each of those employers, Mrs. Porter was forced to re-live the humiliation, denigration and emotional distress she has suffered arising from her unlawful discharge on June 10, 2003.  She was forced to explain that the Defendants had barred her from the HOC premises, which placed her in the untenable position of having to try to defend herself for having been a law-abiding citizen and having cooperated with the FBI.  Moreover, the emotional turmoil involved in having to so defend herself, and a fear of retaliation for her cooperation, prevented Mrs. Porter from applying for certain positions.

101.    In short, Mrs. Porter has attempted in good faith – to no avail – to convince the Defendants to redress their wrongdoing.  Moreover, Mrs. Porter has been publicly smeared and humiliated by the malicious defamatory statements unleashed by and at the direction of Defendant Cabral.  Accordingly, Mrs. Porter has been forced to file this action in order to vindicate her rights.

### COUNT I
### (Violation of 42 U.S.C. § 1983)
### (All Defendants)

102.    Mrs. Porter incorporates by reference and realleges the allegations set forth in paragraphs 1 through 101 of this Complaint as if expressly set forth herein.

103.    Mrs. Porter exercised her clearly established right to free speech under the First Amendment and the laws of the Commonwealth by speaking with law enforcement officials

during her tenure with the Department. The topics of her discussions were matters of public concern and included, but were not limited to, suspected inmate abuse, crimes and other unlawful conduct committed by Department personnel.

104.    Because Mrs. Porter availed herself of the right to speak on matters of public concern, the Defendants discharged her.

105.    Mrs. Porter also exercised her clearly established right to free speech under the First Amendment and the laws of the Commonwealth by speaking out publicly about the suspected inmate abuse, crimes and other unlawful conduct committed by Department personnel.

106.    Because Mrs. Porter availed herself of the right to speak on matters of public concern, Defendant Cabral defamed Mrs. Porter in highly public arenas on at least three separate occasions, in an attempt to threaten, intimidate and coerce Mrs. Porter into falling silent with respect to such matters.

107.    In depriving Mrs. Porter of her clearly established constitutional rights, the Defendants acted under the color of state law, intentionally, with an evil motive, and with reckless and/or callous indifference.

108.    The actions of the Defendants derived from the policies and/or established and widespread customs and practices known and sanctioned by all of the Defendants. Defendant Cabral directly participated and/or acquiesced in violating Mrs. Porter's clearly established rights.

109.    Mrs. Porter is entitled to compensatory and punitive damages, costs and attorneys' fees, and is entitled to injunctive and other equitable relief, all as a result of the Defendants' conduct.

## COUNT II
### (Violation of M.G.L. 149, § 185)
### (Defendants Suffolk County and Suffolk County Sheriff's Department)

110.    Mrs. Porter incorporates by reference and realleges the allegations set forth in paragraphs 1 through 109 of this Complaint as if expressly set forth herein.

111.    The legislature of this Commonwealth enacted M.G.L. c. 149, § 185 in order to protect whistleblowers like Mrs. Porter who work for the Commonwealth, including any of agents or instrumentalities thereof, from retaliation for undertaking such good deeds as cooperating with law enforcement agencies.

112.    In blatant violation of M.G.L. c. 149, § 185, the Defendants retaliated against Mrs. Porter by discharging her because she reported conduct, practices and policies of Suffolk County and the Department to law enforcement agencies, which she reasonably believed violated civil and criminal laws and/or posed a risk to public safety and health.

113.    Although Mrs. Porter has afforded the Defendants ample time to rectify their wrongdoing after she notified them of such unlawful conduct, they have not done so.  In fact, the government Defendants responded in a manner consistent with their historical treatment of ignoring individuals who pursue their rights, and have refused to even discuss their unlawful conduct.

114.    Mrs. Porter's injuries and damages arising from the Defendants' actions include, without limitation, treble lost wages and benefits, emotional distress, costs and attorneys' fees. Moreover, Mrs. Porter is entitled to reinstatement with full fringe benefits and seniority rights, and other equitable relief.

**COUNT III**
**(Breach of Contract)**
**(Defendants Suffolk County and Suffolk County Sheriff's Department)**

115.    Mrs. Porter incorporates by reference and realleges the allegations set forth in paragraphs 1 through 114 of this Complaint as if expressly set forth herein.

116.    The conduct as set forth above by Suffolk County and the Department breached their contract with Mrs. Porter under Policy S220 regarding her rights to, among other things, a hearing and due process.

117.    As a result, Mrs. Porter has suffered injuries and damages including, but not limited to, lost wages, lost benefits and incidental and consequential damages.

**COUNT IV**
**(Breach of Contract)**
**(Defendant CMS)**

118.    Mrs. Porter incorporates by reference and realleges the allegations set forth in paragraphs 1 through 117 of this Complaint as if expressly set forth herein.

119.    The conduct as set forth above by CMS breached its contract with Mrs. Porter as set forth in the CMS Corrective Action Policy regarding her rights to, among other things, warnings, discussions and notice before adverse action was taken against her.  CMS further breached its contract with Mrs. Porter to follow its requirements of obtaining the requisite manager approvals before effecting her termination, and to communicate the decision to Mrs. Porter.

120.    CMS further breached its contract with Mrs. Porter by failing to rectify her having been banned by the Department from its premises.

121.    As a result, Mrs. Porter has suffered injuries and damages including, but not limited to, lost wages, lost benefits and incidental and consequential damages.

**COUNT V**
**(Breach of Contract)**
**(Defendants Suffolk County, Suffolk County Sheriff's Department and CMS)**

122.    Mrs. Porter incorporates by reference and realleges the allegations set forth in paragraphs 1 through 121 of this Complaint as if expressly set forth herein.

123.    Suffolk County and/or the Department entered into a contract with CMS regarding the provision of healthcare services, and such contract was in effect at all times relevant to this action.

124.    Such contract contained promises by the parties thereto to, among other things, comply with laws applicable to the individuals working at the HOC through CMS.

125.    As one of those employees, Mrs. Porter was an intended beneficiary of the contract.

126.    By engaging in the conduct set forth herein the Defendants unlawfully treated Mrs. Porter, thereby breaching their contractual obligation under the healthcare services agreement to act lawfully with respect to Mrs. Porter.  That unlawful conduct included the Department's breaching its contract with Mrs. Porter under Policy S220 regarding her rights to, among other things, a hearing and due process; and CMS's breach of its contract with Mrs. Porter under the Employee Success Guide in failing to give Mrs. Porter any warnings, discussions and notice, and failing to follow its requirements of obtaining the requisite manager approvals, and failing to rectify her having been banned by the Department from its premises.

127.    As a result, Mrs. Porter has suffered injuries and damages including, but not limited to, lost wages, lost benefits and incidental and consequential damages.

**COUNT VI**
**(Termination in Violation of Public Policy)**
**Defendants Suffolk County, Suffolk County Sheriff's Department and CMS)**

128.    Mrs. Porter incorporates by reference and realleges the allegations set forth in paragraphs 1through 127 of this Complaint as if expressly set forth herein.

129.    As an upstanding citizen, Mrs. Porter performed good public deeds for several years by cooperating with law enforcement officials.

130.    Mrs. Porter, however, was terminated by the Defendant because of that cooperation.

131.    The Defendants' actions as described herein violated the public policy of this Commonwealth to encourage people to work with law enforcement officials.  That public policy has been affirmed by the legislature and courts of this Commonwealth.

132.    Mrs. Porter is entitled to compensatory and punitive damages, emotional distress damages, costs and attorneys' fees, arising from her termination in violation of public policy.

**COUNT VII**
**(Massachusetts Civil Rights Act, M.G.L. c. 12 §§ 11H and 11I)**
**(Defendants Cabral and CMS)**

133.    Mrs. Porter incorporates by reference and realleges the allegations set forth in paragraphs 1through 132 of this Complaint as if expressly set forth herein.

134.    By engaging in the conduct described in this Complaint, the Defendants interfered or attempted to interfere by economic and moral threats, intimidation and/or coercion, with Mrs. Porter's exercise and enjoyment of rights secured by the constitutions and laws of the United States and of the Commonwealth of Massachusetts, including, but not limited to, her rights to free speech.  Such conduct includes, but is not limited to, Defendant Cabral's direction and/or authorization of SID personnel to interrogate Mrs. Porter about her cooperation with the FBI, in

an attempt to intimidate Mrs. Porter into silence and to exert economic coercion by implicitly

threatening loss of employment; the multiple public defamatory statements made by Defendant

Cabral in an attempt to exert moral intimidation and coercion over Mrs. Porter to stop her from

engaging in free speech; and economic coercion by CMS in the form of denying Mrs. Porter

vacation time, 401(k) benefits, and further employment.

135.    Mrs. Porter's injuries and damages arising from the Defendants' actions include,

without limitation, lost wages and benefits, emotional distress, compensatory damages, costs and

attorneys' fees.  Moreover, Mrs. Porter is entitled to injunctive other equitable relief.

## COUNT VIII
### (Intentional Infliction of Emotional Distress)
### (Defendant CMS)

136.    Mrs. Porter incorporates by reference and realleges the allegations set forth in

paragraphs 1through 135 of this Complaint as if expressly set forth herein.

137.    CMS knowingly engaged in the above-described conduct toward Mrs. Porter.

Such conduct was of an extreme and outrageous nature.

138.    CMS intended to cause, or should have known that its conduct would cause,

emotional distress to Ms. Porter.

139.    As a result of such conduct, Mrs. Porter has suffered extreme emotional distress

and injuries and damages including, but not limited to, compensatory damages, emotional

distress, costs and attorneys' fees.

## COUNT IX
### (Defamation)
### (Defendant Cabral)

140.    Mrs. Porter incorporates by reference and realleges the allegations set forth in

paragraphs 1through 139 of this Complaint as if expressly set forth herein.

32

141.    The above-described statements unleashed by and at the direction of Defendant Cabral regarding Mrs. Porter, including but not limited to, that Mrs. Porter is not a whistleblower, that Mrs. Porter has a secret "agenda," and that Mrs. Porter's claims are "100 percent ridiculous," were defamatory.

142.    Those statements were false and Defendant Cabral was intentionally at fault with respect to the publication of those statements.  Moreover, Defendant Cabral published the statements with malice, without any justification or privilege.

143.    Defendant Cabral knew that by making such defamatory remarks to the press, the press would broadcast their remarks to the public.  In fact, Channel 5 News, the program "Greater Boston" and The Boston Globe Magazine did broadcast Defendant Cabrals' false, denigrating statements about Mrs. Porter to thousands, if not millions, of viewers and readers.

144.    The Defendant's defamatory statements are capable of damaging Mrs. Porter's reputation in the community, and of prejudicing Mrs. Porter in her profession.  Indeed, those statements have impugned Mrs. Porter's character and injured her personal and professional reputation, by humiliating and ridiculing her in the eyes of the public, and making her appear to be a liar and out to serve only her own interests.

145.    Mrs. Porter is entitled to compensatory damages, including but not limited to, those for the harm to her personal and professional reputations, mental suffering and emotional distress, and special damages and/or harm caused by the defamation by Defendant Cabral, and Mrs. Porter is also entitled to her costs and attorneys' fees.

### COUNT X
**(Intentional Infliction of Emotional Distress)**
**(Defendant Cabral)**

146.    Mrs. Porter incorporates by reference and realleges the allegations set forth

paragraphs 1 through 145 of this Complaint as if expressly set forth herein.

147.    The above-described defamatory statements made with malice by or at the direction of Defendant Cabral, and Defendant Cabral's direction of her personnel to interrogate and discharge Mrs. Porter, constituted conduct of an extreme and outrageous nature.

<u>148.</u>    Defendant Cabral intended to cause, or should have known that her conduct would cause, emotional distress to Ms. Porter.

149.    As a result of such conduct, Mrs. Porter has suffered extreme emotional distress and injuries and damages and seeks remedies including, but not limited to, compensatory damages, emotional distress damages, costs and attorneys' fees.

**<u>COUNT XI</u>**
**(Tortious Interference with Advantageous Relations)**
**(Defendant Cabral)**

150.    Mrs. Porter incorporates by reference and realleges the allegations set forth paragraphs 1 through 149 of this Complaint as if expressly set forth herein.

151.    Mrs. Porter was employed with CMS and the Department before she was unlawfully discharged on June 10, 2003.  Defendant Cabral was aware of these relationships.

152.    Defendant Cabral interfered with Mrs. Porter's ability continue these relationships, by, for example, directing that Mrs. Porter be terminated from her position as a Nurse Practitioner at the Department.  Such conduct also interfered with Mrs. Porter's relationship with CMS.

153.    Defendant Cabral's interference was both intentional and improper in motive and/or means.  Defendant Cabral was motivated by malice, as she acted with the unlawful purpose of harming Mrs. Porter in retaliation for Mrs. Porter's refusal to follow the Code of Silence.

34

154.    Mrs. Porter has suffered injuries and damages as a result of Defendant Cabral's interference, including, but not limited to, lost wages, lost benefits, emotional distress and incidental and consequential damages.

**WHEREFORE**, Mrs. Porter requests that the Court:

a.    Enter judgment against the Defendants on all counts asserted against them;

b.    Order the Defendants to issue a written, public apology to Mrs. Porter for their unlawful conduct;

c.    Enjoin the Defendants from continuing to engage in the illegal activities described herein;

d.    Reinstate Mrs. Porter to her prior positions with CMS and the Department;

e.    Bestow all rights and benefits of employment upon Mrs. Porter as if she had not been terminated and retaliated against, including, without limitation, back pay, front pay, seniority, benefits, and consequential damages in an amount to be determined at trial;

f.    Award treble damages pursuant to M.G.L. c. 149 § 185;

g.    Award compensatory damages, including but not limited to mental suffering and emotional distress damages, suffered by Mrs. Porter, as a result of Defendants' conduct described in this Complaint;

h.    Award special damages and/or harm suffered by Mrs. Porter as a result of the defamatory statements about her;

i.    Award punitive and exemplary damages in an amount of at least $2,000,000 or some other amount to be determined at trial;

j.    Award attorneys' fees, costs and expert witness fees incurred in bringing this action; and

k.    Award such other relief as this Court deems just and appropriate.

**PLAINTIFF DEMANDS A TRIAL BY JURY FOR ALL ISSUES SO TRIABLE.**

**Sheila J. Porter,**

By her attorneys,

/s Maura M. Jakola
Joseph F. Savage, Jr. BBO #443030
Maura M. Jakola  BBO #654695
Jennifer M. Goddard BBO #631144
TESTA, HURWITZ & THIBEAULT, LLP
125 High Street
Oliver Street Tower
Boston, Massachusetts 02110
Phone:  (617) 248-7000
Fax:     (617) 248-7100

9771\1.3135192

36