1    surprised, and that was okay.

2        Q    When do you recall actually making

3    contact with F.B.I. Agent Robinson?

4        A    The next day.

5        Q    And this was sometime in late 1999,

6    early 2000?

7        A    Yes.

8        Q    Can you be any more specific as to the

9    time frame?

10       A    No.

11       Q    Okay. What did you discuss when you had

12   a conversation with her?

13       A    I believe the first conversation Maureen

14   explained that they were looking for some

15   information, and that they understood that I might

16   have some information that they needed, and I

17   believe my reaction to that was, "In what areas?"

18       Q    What did she say?

19       A    She indicated three areas of concern:

20   Sexual abuse of the females, physical abuse of

21   inmates, and drug use or abuse within the

22   facility.

23       Q    How did Maureen Robinson understand that

24   you may have some information that they were

Sheila J. Porter                                      05/18/2005

105

1         A     Yes.

2         Q     Did you do that in a face-to-face

3    meeting?

4         A     Yes.

5         Q     What was discussed; what were the

6    arrangements?

7         A     That I could contact them anytime by

8    phone, and I could speak with them by phone or

9    meet them in person.

10        Q     You said "them." Who besides Maureen

11   Robinson were you allowed to contact?

12        A     At first I believe it was just Maureen,

13   and then there was a second agent.

14        Q     Who was that?

15        A     Krista Snyder.

16        Q     Let's start with Maureen first. What

17   contact information did she provide to you; how

18   were you supposed to get ahold of her?

19        A     She gave me her business card, and then

20   also gave me -- the business card had the office

21   number on it, and she gave me her extension, which

22   I also wrote on the card.

23        Q     What specific information did she ask

24   you to provide?

1        A    Any information that I had concerning

2    cases that might come up from time to time,

3    allegations of abuse, sexual or physical,

4    allegations of drug selling or drug dealing.

5        Q    Did she give you any instructions as to

6    how to perform this service for the F.B.I.?

7        A    She read a -- a paper that gave me the

8    dos and don'ts, but I don't -- I guess it was

9    instructions.  I'm trying to remember what it was

10   called.  Each -- each year I had this piece of

11   paper read to me.

12       Q    Each year...

13       A    That I continued --

14       Q    To provide --

15       A    -- doing --

16       Q    I'm sorry.

17       A    That I continued providing information.

18       Q    What was this piece of paper?

19       A    It talked about whether or not I was

20   freely -- that I wasn't being coerced to do this;

21   that I wasn't being paid to do this; I wasn't -- I

22   didn't disclose it to anyone; I didn't speak to

23   the news media and say, By the way...

24       Q    By the way what?

1        A    Any information that I had concerning

2    cases that might come up from time to time,

3    allegations of abuse, sexual or physical,

4    allegations of drug selling or drug dealing.

5        Q    Did she give you any instructions as to

6    how to perform this service for the F.B.I.?

7        A    She read a -- a paper that gave me the

8    dos and don'ts, but I don't -- I guess it was

9    instructions. I'm trying to remember what it was

10   called. Each -- each year I had this piece of

11   paper read to me.

12       Q    Each year...

13       A    That I continued --

14       Q    To provide --

15       A    -- doing --

16       Q    I'm sorry.

17       A    That I continued providing information.

18       Q    What was this piece of paper?

19       A    It talked about whether or not I was

20   freely -- that I wasn't being coerced to do this;

21   that I wasn't being paid to do this; I wasn't -- I

22   didn't disclose it to anyone; I didn't speak to

23   the news media and say, By the way...

24       Q    By the way what?

Sheila J. Porter                                        05/18/2005

107

1        A    I just spoke with the F.B.I.  There were

2    about 10 or 12 items, and I couldn't tell you what

3    else was on that specific paper.

4        Q    Did they provide you --

5        A    Admonitions.  I'm sorry.  That name just

6    came to me, admonitions.

7        Q    Were you provided with a copy of that?

8        A    No.

9        Q    Were you asked to sign anything?

10       A    No.

11       Q    Did you have an informant agreement with

12   them?

13       A    Verbal.

14       Q    What was that verbal agreement?

15       A    That I would provide information to

16   them, and they would protect my identity.

17       Q    Did you have scheduled reporting times?

18       A    No.

19       Q    So when did they expect you to report

20   the information?

21       A    When I had something to report.

22       Q    And did they give you categories of

23   information that they were looking for?

24       A    Yes.

1       Q    And those were...

2       A    Sexual abuse, physical abuse, drug

3   dealing.

4       Q    Were you instructed by the F.B.I. not to

5   provide that same information to the Sheriff's

6   Department?

7       A    Never.

8       Q    So Ms. Robinson didn't tell you, "Report

9   to us, but don't report to the Sheriff's

10  Investigation Division"?

11      A    Correct.

12      Q    Did she ever tell you that you should

13  report this information to the Sheriff's

14  Investigation Division?

15      A    Yes.

16      Q    She did tell you that?

17      A    Yes.

18      Q    What did she say?

19      A    That was along with the admonitions that

20  tell you not to disclose to this person, and it

21  was, of course, you can report to SID or, you

22  know, things that you need to report, you can

23  report.

24      Q    Is that how it was communicated to you:

126

1    case there was a problem.

2         Q    Who asked you to con -- who asked you to

3    place a wire on Inmate Rene Rosario in November of

4    2002?

5         A    Krista Snyder.

6         Q    And who is she?

7         A    An F.B.I. agent.

8         Q    And you indicated earlier that initially

9    you were providing information to Maureen

10   Robinson.  When did you begin providing

11   information to F.B.I. Agent Krista Snyder?

12        A    They were frequently together.  Maureen

13   was part of it, but it happened that it was Krista

14   that I spoke to.

15        Q    Is it fair to say shortly after you

16   agreed to provide information on an ongoing basis

17   to the F.B.I. you were working with Maureen

18   Robinson and Krista Snyder from the F.B.I.?

19        A    Correct.

20        Q    So when did Krista Snyder contact you

21   regarding placing a wire -- and by a wire, you

22   mean recording device?

23        A    Yes.

24        Q    -- on Inmate Rene Rosario?

127

1         A    Perhaps in October of 2002.

2         Q    What did she ask you to do; how did this

3    conversation happen?

4         A    She asked me if I knew Rene, and I knew

5    him from -- I believe that this was already his

6    second incarceration at Suffolk; but, again, one

7    of those things, I did his intake physical, and I

8    knew the name as a person that had -- that had

9    been at the institution. And she asked me if I

10   knew any more about him, and I really didn't at

11   that point in time. And she told me that Rene was

12   -- had been a witness in a Federal investigation

13   at the jail, at the Suffolk County jail, and that

14   he claimed that he had had some issues around that

15   since that time.

16             The question that I'm answering

17   again so I can -- I'm lost.

18        Q    Have you finished your answer on that?

19             MR. SAVAGE:  She's lost.

20        A    I'm not sure what the question --

21        Q    Let me ask you another question.

22        A    Okay.

23        Q    We'll get back.

24             Krista Snyder asked you to place a

1    recording device on Inmate Rene Rosario.

2        A    Yes.

3        Q    And I was asking you what exactly did

4    she communicate to you and what did she ask you to

5    do.

6        A    She asked me to place the wire on Rene

7    and -- to place it and retrieve it -- to record

8    some issues of threats or abuse that he alleged

9    were happening at the House of Correction.

10       Q    Is that the purpose that F.B.I. Agent

11   Snyder articulated to you for the reason why the

12   wire was to be placed on Inmate Rosario?

13       A    Yes.

14       Q    Where did this conversation take place

15   between you and Krista Snyder?

16       A    I think that one was in a coffee shop at

17   the same -- at the same South Bay Plaza.

18       Q    Who else was present?

19       A    Maureen.

20       Q    Maureen Robinson?

21       A    Yes.

22       Q    Any other persons present?

23       A    No.

24       Q    Prior to that conversation, was that the

Sheila J. Porter                                    05/18/2005

134

1     Q    who gave you the recording device?

2     A    I had the device more than once and -- I

3  had the device outside. I believe it was decided

4  that I couldn't bring it through the security

5  gate. So I believe it was given to me inside the

6  facility by Paul. I am not positive about that

7  one.

8     Q    who decided that you couldn't bring it

9  through?

10    A    It would set off alarms.

11    Q    who decided that it couldn't be brought

12  through?

13    A    That was a decision between -- between

14  Krista and myself; I would have set off alarms

15  with it.

16    Q    During your conversations with Krista

17  Snyder and Maureen Robinson, did they indicate

18  that anyone within the Suffolk County Sheriff's

19  Department was involved in the process to wire

20  Mr. Rosario?

21    A    Yes. At first I didn't know whom, and I

22  had to sign a paper releasing the F.B.I. or

23  telling people at Suffolk County that I was

24  involved in this activity.

Sheila J. Porter                                    05/18/2005

135

1       Q    Do you have a copy of that?

2       A    No, I don't.

3       Q    They ask you to sign a waiver, a

4    release?

5       A    Yes.

6       Q    You said initially you didn't know who

7    was involved, but then you became aware. When did

8    you become aware that someone within the Suffolk

9    County Sheriff's Department was involved in the

10   process to wire Rene Rosario in November of 2002?

11      A    When I talked with Paul.

12      Q    And when was that?

13      A    Before I -- sometime before I wired him,

14   I spoke with Paul, and he gave me a -- an

15   emergency phone number and his extension to

16   contact him if I needed assistance.

17      Q    Well, what did he say, other than giving

18   you his emergency contact number?

19      A    He spoke with Rene. We -- he spoke with

20   Rene in the office.

21      Q    When?

22      A    Before I wired him.

23      Q    On the same date that you wired him?

24      A    He spoke with him more than once. I saw

Sheila J. Porter                                        05/18/2005

137

1   contact person?

2       A    Yes --

3       Q    When --

4       A    -- he gave --

5       Q    I'm sorry.  When did that occur?

6       A    Before I put the wire on Rene.

7       Q    Before, when?  The day before?  The

8   morning of?

9       A    I don't know.

10      Q    Where did you get the wire from?

11      A    The wire came from Krista and Maureen,

12  and as I said, that piece is a little fuzzy,

13  because I didn't bring it through.  I -- I can't

14  remember exactly how that happened.

15      Q    So you don't recall from whom you

16  received the recording device that you were

17  placing on Rene Rosario?

18      A    I had it twice.

19      Q    When was the first time that you had it?

20      A    The week before when we couldn't place

21  it.

22      Q    When you say we, who is we?

23      A    The F.B.I. and I.

24      Q    Was Paul DeFazio involved in that --

Sheila J. Porter                                    05/18/2005

138

1     A    Yes.

2     Q    -- incident?

3          How was he involved?

4     A    I just remember him as my contact

5   person.  I remember that he gave me his number.  I

6   couldn't tell you whether it was at the first of

7   it, in the middle of it.  I know it was before I

8   actually placed the wire, but I can't tell you

9   exactly when.  And he spoke with Rene while Rene

10  had the wire on.

11    Q    Was Paul DeFazio ever present during a

12  conversation between you, Maureen Robinson, and

13  Krista Snyder that concerned the wiring of Rene

14  Rosario?

15    A    No.

16    Q    Did they ever mention his name other

17  than to identify him as an emergency contact

18  person?

19    A    No.

20    Q    Did they indicate to you that they had

21  someone within the Suffolk County Sheriff's

22  Department who had approved the wiring of Rene

23  Rosario?

24    A    I didn't ask that.

149

1        A    I could see him through the window.

2        Q    Okay.  Well, that's my question.

3             Did you go into the office?

4        A    No.

5        Q    Did you ever -- did you talk with

6   Mr. DeFazio after you saw him speaking with

7   Mr. Rosario?

8        A    I don't remember.

9        Q    Did you ever ask him what was

10  communicated between himself and Mr. Rosario?

11       A    No.

12       Q    Was Mr. DeFazio present when you took

13  the wire off?

14       A    No.

15       Q    After you took the wire off, what did

16  you do with it?

17       A    That's that same fuzzy area.  I'm not

18  sure how I got it back out again.

19       Q    Did you provide it -- did you bring it

20  out and give it back to Krista Snyder?

21       A    I could have.  I really don't remember

22  how I got it in and out.  I really don't.

23       Q    Did you give it to Paul DeFazio?

24       A    I -- I just don't remember.

150

1       Q    Why was it taken off?

2       A    It was only supposed to be on a

3  specified time; the battery would have run out.

4       Q    Who told you that?

5       A    Krista.

6       Q    What else did she tell you about the

7  wire?

8       A    How to put it on; how to take it off.

9       Q    In 2000 how many times did you provide

10  information to the F.B.I.?

11       A    40 or 50.

12       Q    To whom in the F.B.I.?

13       A    Maureen or Krista.

14       Q    How?

15       A    Telephone or face to face.

16       Q    What information was communicated?

17       A    Information about suspected sexual

18  abuse, physical abuse, or drug use.

19       Q    Each time that you communicated this

20  information to Maureen Robinson and Krista Snyder,

21  did you also communicate the information to the

22  Suffolk County Sheriff's Department?

23       A    Sometimes, yes; sometimes, no.

24       Q    What times did you not?

Sheila J. Porter

05/18/2005

151

1        A    Hearsay information that I had only a --
2    a report but no real knowledge or no belief one
3    way or the other, just no way to determine. I
4    heard a lot of things, and I reported what I heard
5    and let other people figure it out. If it was
6    something that I knew, something that the inmate
7    told me about himself, it was reported within the
8    House of Correction.

9        Q    Was that your criteria in terms of when
10    you reported things to SID; if it was hearsay
11    information, you didn't; if it was information
12    communicated to you directly from an inmate, then
13    you did?

14        A    Hearsay about another inmate, I probably
15    would not. An inmate telling me himself that he
16    had been abused, yes.

17        Q    You would report that to SID?

18        A    Yes.

19        Q    And you did?

20        A    Yes.

21        Q    Over the course of the nine years that
22    you were working at the House of Correction, you
23    did that how often?

24        A    A lot. Probably three or four times a

153

| | | |
|---|---|---|
| 1 | A | 15, maybe.  I don't know.  Maybe more. |
| 2 | Q | You spoke to Steve Jacobs regularly? |
| 3 | A | Yes. |
| 4 | Q | You spoke to Paul DeFazio? |
| 5 | A | Yes. |
| 6 | Q | What other names? |
| 7 | A | Brenda. |
| 8 | Q | Brenda Garcia? |
| 9 | A | Yeah.  Another Steve.  Let's see.  I can |

10  tell you what they look like, but I don't remember

11  their names.  I'm sorry.  There are some that I

12  know better than others.

13      Q    You understood that it was their

14  responsibility to investigate allegations of

15  officer misconduct?

16      A    Yes.

17      Q    And that in so doing they would

18  oftentimes require the assistance of and

19  cooperation of medical personnel?

20      A    Yes.

21      Q    In 2001 do you recall how many times you

22  provided information to the F.B.I.?

23      A    About the same the entire time.

24      Q    What do you mean about the same the

1    entire time?

2        A    Probably 40 or 50 times a year all four

3    years.  Sometimes the same information with more

4    information concerning the same incident,

5    sometimes different things.

6        Q    Do you recall specific incidents or

7    specific illegal activities that you provided

8    information on?

9        A    Yes.

10       Q    What are those?

11       A    I really can't answer that.

12       Q    But the categories, not --

13       A    The categories?

14       Q    The types of incidents.

15       A    Sure.  The same categories, physical

16   abuse of an inmate, sexual abuse of an inmate, and

17   possible drug dealing or drug use/abuse.

18       Q    Was the drug use/abuse, did that involve

19   officers as well?

20       A    It could.

21       Q    Did it?

22       A    Yes.

23       Q    The physical abuse allegations, that

24   involved allegations of misconduct of officers on

1      A      Yes.

2      Q      So he knew you to call you by your name?

3      A      Yes.

4      Q      Did he provide any more detailed

5    information concerning the circumstances of his

6    injury?

7      A      I don't think so.

8      Q      Did you conduct a physical examination

9    of Mr. Rosario at that time?

10      A      I looked through the window and saw what

11    he showed me.  That's not a physical examination.

12      Q      Okay.  So my question is:  Did you

13    conduct a physical examination of Mr. Rosario at

14    that time?

15      A      No.

16      Q      Why didn't you?

17      A      I thought that because of our previous

18    history together that that particular thing would

19    be best left to the other mid-level provider that

20    was on duty that day.

21      Q      Explain what you mean by that.

22      A      It was known in the facility by rumor

23    that Rene and I had worked together one way or

24    another.  I don't know if anybody knew about the

195

1    injury was to assess what the injuries might in

2    fact be and the extent of them?

3         A     If indeed I examined him, yes, it would

4    have been.

5         Q     Wouldn't a physical examination have

6    been necessary at that time in sound nurse

7    practitioner judgment to commence that evaluation?

8         A     Someone did examine him.

9         Q     When did Beth Bringola examine

10   Mr. Rosario?

11        A     Sometime after I was at -- that I

12   stopped at the cell.

13        Q     When?

14        A     I don't know.

15        Q     Were you present?

16        A     No.

17        Q     When did you record your observations of

18   Mr. Rosario in his medical records pertaining to

19   the encounter that you have just testified about?

20        A     I didn't.

21        Q     You did not?

22        A     I didn't record them in the medical

23   record.  I recorded them, but not in the medical

24   record.

Sheila J. Porter                                    05/18/2005

                                                        200

1         A    I passed the information along to my

2    supervisor and to the mental health person who

3    would be the next person to see him.

4         Q    And neither of those people were Beth

5    Bringola, correct?

6         A    Correct.

7         Q    Beth Bringola is the person whom you've

8    identified who conducted the physical examination

9    of Mr. Rosario, correct?

10        A    Yes.

11        Q    Wouldn't it have been important for Beth

12   Bringola to know your firsthand observations of

13   and communications with Rene Rosario before she

14   conducted her physical examination?

15        A    Not necessarily.

16        Q    Wouldn't it have been -- you were the

17   first medical provider to see Mr. Rosario after he

18   allegedly sustained this injury, correct?

19        A    Oh, I don't know.  It was -- I didn't

20   see him for probably a half to three-quarters of

21   an hour after he came downstairs, and I don't know

22   how soon he came down.

23        Q    Well, you saw him come down, right?

24        A    But I don't know how much before that it

209

```
 1    -- that the reason for his admission to the
 2    infirmary was not accurate?
 3         A    Yes.
 4         Q    Were you concerned that if they weren't
 5    -- if medical personnel weren't aware of that that
 6    he might be prescribed some medication that
 7    wouldn't be indicated?
 8         A    No.
 9         Q    Why not?
10         A    Gayle talked with him, Beth examined
11    him.  Both of those -- Gayle is a social worker.
12    She's trained to discern whether or not this
13    person is hearing voices or not, and she's trained
14    to discern what his mental health issues are.
15    Beth examined him.  Craig, the nurse, was in
16    there.
17         Q    You weren't present, as you indicated,
18    during the examination by Beth Bringola, correct?
19         A    Correct.
20         Q    Did you look at his medical chart?  Did
21    she chart her -- strike that.
22              Do you know whether or not she
23    documented her physical examination in the medical
24    chart?
```

234

1          Q     Okay.  Well, have you used that term

2     before?

3          A     I have no idea.

4          Q     Mrs. Porter, when did you -- when did

5     you call the F.B.I. regarding the information that

6     Rene Rosario had provided to you?

7          A     Probably on the 19th.

8          Q     When you say probably, could it have

9     been the 20th?

10         A     I think I made the phone call on the

11    19th, but I didn't talk to anyone.

12         Q     When did you talk to someone regarding

13    the allegations that Mr. Rosario had made to you?

14         A     I think the 20th.

15         Q     And whom did you speak with?

16         A     Krista.

17         Q     Krista Snyder?

18         A     Um-hm.

19         Q     How did you contact them?

20         A     Phone.

21         Q     What did you tell them?

22         A     What Rene told me.

23         Q     Had you already completed the document

24    that's been identified as Exhibit No. 5?