1   A   Yes.
2   Q   On or about May 20th?
3   A   I believe the 19th.
4   Q   When did you actually speak with Krista
5   Snyder?
6   A   Time frame?
7   Q   May 19th to the 20th.
8   A   The 20th.
9   Q   Did you tell Donna Jurdak that you felt
10  threatened in the interview?
11  A   I don't believe so.
12  Q   Did you tell her that you felt coerced?
13  A   I don't believe so.
14  Q   Did you tell her that you wanted to
15  complain about the way in which you were treated
16  by Brian Dacey and Sonya Aleman during this
17  interview?
18  A   No.
19  Q   Did you feel that you had a basis to
20  complain about the manner in which you had been
21  treated?
22  A   Yes.
23  Q   And did you in fact make such a
24  complaint?

1   A   Yes.
2   Q   To whom?
3   A   The F.B.I.
4   Q   Did you report to the superintendent of
5   the House of Correction that you felt that you had
6   been intimidated or threatened or that you were
7   complaining about the treatment at the hands of
8   Brian Dacey and Sonya Aleman?
9   A   I did not.
10  Q   Did you report to the head of SID that
11  you felt you had been treated poorly at the hands
12  of Brian Dacey or Sonya Aleman?
13  A   I did not.
14  Q   Did you speak with anyone within
15  Correctional Medical Services to complain about
16  the way in which you were treated?
17  A   I did not.
18  Q   When did you call the F.B.I. after the
19  meeting that you had with Brian Dacey and Sonya
20  Aleman on May 28, 2003?
21      MR. SAVAGE:  Objection.
22  A   When what?
23  Q   Did you call the F.B.I. after your
24  meeting with Brian Dacey and Sonya Aleman on

```
 1    May 28th?
 2        A    Yes.
 3        Q    When did you do that?
 4        A    At the end of my shift.
 5        Q    And when would that have been?
 6        A    3:30, 4:00.
 7        Q    And whom did you speak with?
 8        A    Krista Snyder.
 9        Q    Was that in person or on the phone?
10        A    Phone.
11        Q    What did you tell her?
12        A    I told her about the conversation.
13        Q    What did you tell her about the
14    conversation?
15        A    I told her I thought I had been set up
16    to give out information, and I wasn't sure why
17    they were asking for that information, and that
18    they used her name, and that I was nervous about
19    what the consequences were going to be.
20        Q    Did you tell her who you felt set up by?
21        A    I believe I used the generic SID.
22        Q    What other information did you
23    communicate to Krista Snyder during that telephone
24    conversation about your meeting on the 28th?
```

1  facility; therefore, CMS, in addition, fired me;
2  and I believe in effect the Sheriff's Department
3  fired me.
4      Q   You were employed by the Correctional
5  Medical Services, correct?
6          MR. SAVAGE: Objection. These were
7  the first questions on the first day.
8      A   Yes.
9      Q   Is it your claim that Sheriff Cabral
10 interfered with your employment relationship with
11 CMS?
12     A   I don't have the complaint in front of
13 me, but yes.
14     Q   And how did they do that specifically --
15 how did she do that specifically?
16     A   Repeat your question, please.
17     Q   How is it specifically that Sheriff
18 Cabral interfered with your employment
19 relationship with Correctional Medical Services?
20     A   She barred me from the facility,
21 preventing me from doing my work.
22     Q   Did you notify the F.B.I. that you were
23 barred from the House of Correction?
24     A   I certainly did.

| | | |
|---|---|---|
| 1 | Q | When did you do that, Mrs. Porter? |
| 2 | A | At about 6:15 when I was leaving the facility. |
| 4 | Q | Your meeting with Mary Ellen Mastrorilli occurred at what time? |
| 6 | A | Before 3:00. |
| 7 | Q | Were you escorted out of the building or were you allowed to finish your shift and gather your belongings? |
| 10 | | MR. SAVAGE: Objection. |
| 11 | A | I was allowed to gather my belongings. |
| 12 | Q | So what time did you actually leave the facility, if you recall? |
| 14 | A | Approximately 6:00 p.m. |
| 15 | Q | Who did you call? |
| 16 | A | Krista Snyder. |
| 17 | Q | Did you speak with her? |
| 18 | A | I did. |
| 19 | Q | Was that on the phone or in person? |
| 20 | A | On the phone. |
| 21 | Q | What did you communicate with her during this telephone conversation? |
| 23 | A | That I was barred from the facility. |
| 24 | Q | Did you tell them why or tell her why, |

```
 1   rather?
 2       A    Yes.
 3       Q    What did you say to her?
 4       A    For speaking with an outside agency.
 5       Q    Did you say anything else to her?
 6       A    I said a lot to her, and I couldn't tell
 7   you exactly what it was right now.
 8       Q    How long did the conversation last?
 9       A    About -- probably about five minutes,
10   five to ten minutes.
11       Q    Other than communicating to her that you
12   had been barred to the facility for speaking with
13   an outside agency, what else can you recall about
14   what you spoke to her about -- what you told her,
15   rather?
16       A    It was about -- about that.  That's -- I
17   just remember speaking about that.  She said she
18   would get back to me.
19       Q    Did you ask her to do anything?
20       A    No.
21       Q    When she said she was going to get back
22   to you, what did she say to you?
23       A    She said she would get back to me.
24       Q    Did she tell you what she would get back
```

1   to you about?
2       A    I had just given her the information
3   that I was barred for speaking with an outside
4   agency.  The outside agency I spoke with was the
5   F.B.I., and she was going to talk to someone, I'm
6   not sure what, and help me to proceed with
7   whatever I was going to do next.
8       Q    Did she get back to you?
9       A    Yes.
10      Q    When?
11      A    That night, after I got home.
12      Q    Was it a phone conversation or in
13  person?
14      A    Phone.
15      Q    What did she say to you; what did you
16  say to her?
17      A    She asked me to repeat what had been
18  said to me in the meeting, and she told me that --
19  or she asked me if I could come in in the morning
20  to a meeting.
21      Q    Anything else that was said between the
22  two of you on that phone conversation?
23      A    It's a blur.
24      Q    What meeting did she ask you to attend

1  in the morning?
2      A    I went to a meeting at the Justice
3  Department and --
4      Q    Where was it located?
5      A    At the courthouse, the federal
6  courthouse.
7      Q    The Moakley Courthouse?
8      A    Yes.
9      Q    Who did you go there with, who did you
10 travel to the courthouse with?
11     A    I met Krista and -- Krista Snyder and
12 Maureen Robinson at the courthouse.
13     Q    You drove there by yourself?
14     A    Yes.
15     Q    After you met Krista Snyder and Maureen
16 Robinson at the courthouse, where did you go?
17     A    Inside.
18     Q    To where?
19     A    I think the 6th floor, but I'm not sure.
20 It's a maize, and I'm not really sure, but I think
21 the 6th floor, a conference room similar to this.
22     Q    Who did you meet with?
23     A    Steve Huggard, Maureen, Krista, I think
24 three other -- two or three other people, and the

```
 1              MS. CAULO:  No.
 2       Q     How long did the meeting last,
 3  Mrs. Porter, with the U.S. Attorneys Office?
 4       A     I think about an hour.
 5       Q     This is on June 11th?
 6       A     Yes.  Perhaps longer, but at least an
 7  hour.
 8       Q     At the close of the meeting was there a
 9  course of action that was suggested?
10       A     I believe they suggested that I have an
11  attorney.
12       Q     Did they suggest who you should have as
13  an attorney?
14       A     No.
15       Q     Why did they suggest you needed an
16  attorney?
17       A     I felt that I was illegally barred, and
18  the agents that I had been working with felt that
19  I was illegally barred, and I thought that in that
20  case I best have an attorney to represent me.
21       Q     What advice did they provide you?
22       A     To find an employment attorney.
23       Q     Did they indicate that they were going
24  to take some action separately from their advice
```

```
 1      A    Excuse me?
 2      Q    Were you aware where your personnel file
 3   was kept?
 4      A    Yes.
 5      Q    Where was that?
 6      A    At the House of Correction.
 7           MR. SAVAGE:  Objection.  We covered
 8   this the last time.
 9           MS. CAULO:  I don't think we did.
10      Q    It's your testimony that you did not
11   accompany Maureen Robinson to the House of
12   Correction on June 11, 2003?
13      A    Definitely not.
14      Q    Did you speak with her about -- did she
15   ever communicate with you about what occurred when
16   she went there?
17      A    Yes.
18      Q    And what was that conversation?
19      A    That when she got there, she was kept
20   waiting for a while, and that she asked to see
21   Donna Jurdak, and Donna was in a meeting, and then
22   Donna came out and spoke to her.
23      Q    Did she tell you what information was
24   communicated between she and Donna Jurdak at that
```



**U.S. Department of Justice**

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

Main Reception: (617) 748-3100

John Joseph Moakley United States Courthouse
1 Courthouse Way
Suite 9200
Boston, Massachusetts 02210

June 28, 2005

**BY FAX & REGULAR MAIL**

Ellen M. Caulo
Deputy General Counsel
Suffolk County Sheriff's Department
200 Nashua Street
Boston, MA 02114

    Re:    <u>Sheila Porter v. Andrea Cabral, et al.</u>, Civ. A. No.: 04-11935-DPW –
Information Request of April 29, 2005 and June 10, 2005 Subpoenas to Special
Agents Maureen Robinson and Christa Snyder

Dear Attorney Caulo,

    I am writing to inform you that, pursuant to 28 C.F.R. § 16.21, *et seq.*, I have decided not to authorize the testimony or production of documents from Special Agents Maureen Robinson and Christa Snyder of the Federal Bureau of Investigation ("FBI"), or the production of documents from the FBI, which you have requested on behalf of the defendants, Andrea Cabral, *et al.*, in the above-captioned matter.

    Specifically, your letter of April 29, 2005, requests any and all information related to the placing of a wire or recording device on Suffolk County House of Correction (HOC) inmate Rene Rosario, in or about November 2002 while he was incarcerated at the HOC. Your request further seeks any and all information regarding the cooperation of and information received from Sheila Porter, R.N., a former contract nurse working at the HOC, regarding inmate Rene Rosario and the HOC. Similarly, your subsequent subpoenas of June 10, 2005, request that FBI Special Agents Maureen Robinson and Christa Snyder provide of any and all information and documents in the possession of the FBI relating to [Ms. Porter's] cooperation with the FBI including but not limited to her communications with the FBI regarding allegations made by inmate Rene Rosario in or about May 2003, her status as an

informant for the FBI, the information she has provided to the FBI from 1999 to date, and her involvement in the placing of a recording device on inmate Rene Rosario in or about November 2002.

In response to a similar request from Ms. Porter's counsel, I have previously authorized the execution of an affidavit from Special Agent Christa Snyder confirming Ms. Porter's status as an informant concerning events at the HOC. Special Agent Snyder has also been authorized to provide trial testimony, if necessary, within the confines of the affidavit. It is my understanding that you have obtained a copy of this affidavit.

I am denying your request with respect to all information relating to Ms. Porter's communications with the FBI and interactions with any inmates. I am also denying authorization to Special Agents Maureen Robinson and Christa Snyder to provide any such information through deposition testimony or any other means. Release of this information would reveal confidential sources and investigatory records compiled for law enforcement purposes, and would interfere with enforcement proceedings or disclose investigative techniques and procedures the effectiveness of which would thereby be impaired. See 28 C.F.R. § 16.26(b)(4) and (5).

Further, while your request and subpoenas are specific in some respects, they are otherwise too broad and lack any explanation of relevance to the proceeding ("Any and all information..." "... the information she has provided to the FBI from 1999 to date..."). See 28 C.F.R. § 16.22(d). In addition to being too broad, compliance with the request and subpoenas would subject the FBI to undue burden, as provided by Fed. R. Civ. P. 45(c)(3)(A)(iv). The FBI and its Special Agents are involved in the supervision, investigation, and prosecution of thousands of criminal matters, and the potential cumulative burden to the FBI and the Department of Justice of complying with the request for testimony and documents in this case and with like requests in other cases would result in a significant and unacceptable diversion of essential resources.

2

Accordingly, I will not authorize the FBI to produce information relating to Ms. Porter's communications with the FBI and interactions with any inmates as summarized in your request, or the production of information through testimony or other means by Special Agents Maureen Robinson or Christa Snyder.

Sincerely,

Michael J. Sullivan
United States Attorney

cc:  Frank Davis – FBI
     Damon Katz – FBI
     Maureen Robinson – FBI
     Christa Snyder – FBI

3

```
 1     Q    Did you speak with the F.B.I. concerning
 2  your interview with the Boston Globe?
 3     A    I think I did.
 4     Q    You spoke with the F.B.I. prior to
 5  conducting the interview?
 6     A    I think so.
 7     Q    Did you speak with them about what you
 8  were going to talk about in the interview?
 9     A    I believe it was -- from the F.B.I.
10  point of view and for safety sake, I think I just
11  asked what I could say and what I couldn't say.
12     Q    And who was that with, that
13  conversation, if you recall?
14     A    It would have been either Krista or
15  Maureen, probably Krista.
16     Q    Prior to conducting the interview, did
17  you speak with anybody from the United States
18  Attorneys Office?
19     A    No.
20     Q    Where was the interview conducted,
21  Mrs. Porter?
22     A    I was at home on my telephone.
23     Q    It was a phone interview?
24     A    Yes.
```