UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHEILA PORTER,<br><br>  Plaintiff,<br><br>v.<br><br>ANDREA CABRAL, ET AL.,<br><br>  Defendants. | CIVIL ACTION<br>NO. 04-11935-DPW |

**MEMORANDUM OF GLOBE NEWSPAPER COMPANY, INC. IN SUPPORT OF MOTION TO MODIFY PROTECTIVE ORDER**

Globe Newspaper Company, Inc. (the "Globe") submits this memorandum of law in support of its motion to modify the Protective Order entered in this case on March 9, 2005. More specifically, the Globe requests that sections 1(b) (vi) and (ix) be stricken from the Protective Order in order to permit public disclosure of testimony concerning the allegations in plaintiff's complaint. Reduced to essentials, the Globe maintains that because of the public interest in the allegations of this case, the public official and governmental status of three of the defendants, as well as disclosures made in public filings since the Protective Order was entered, good cause does not exist for continued application of the Protective Order to sworn testimony concerning this action.

### I.    FACTUAL AND PROCEDURAL BACKGROUND

#### A.    The allegations of plaintiff's complaint

Plaintiff Sheila Porter commenced this action on September 3, 2004. Plaintiff's amended complaint alleges that while employed as a nurse practitioner assigned to the Suffolk County House of Correction ("HOC"), she acted as a confidential informant for the FBI, providing information concerning activities that she believed violated the law and/or posed a risk to public

safety and health. Plaintiff's complaint alleges that the defendants terminated her in retaliation for revealing this information to the FBI.

According to plaintiff, she was a confidential informant for the FBI for approximately four years. Her complaint alleges that in late 2002, at the FBI's request, she placed a recording device on an inmate of the HOC who later was transferred to another institution. Amended Complaint, ¶ 43. Several months later, in mid-May 2003, plaintiff saw the inmate back at HOC. The inmate -- who is not identified in the complaint -- showed plaintiff bruises on his body that he said had been inflicted by a guard. Id., ¶¶ 56-57. Plaintiff alleges that she reported her observations and her concerns for the inmate's safety to HOC staff. Id. ¶ 58.

Approximately 10 days after this incident, plaintiff saw the inmate in the infirmary once again with injuries to his head. The inmate told plaintiff that a guard had placed and held the heel of his boot against the inmate's head. Plaintiff alleges that she reported the suspected abuse to the Suffolk County Sheriff's Office (the "Sheriff's Office"). She also alleges that at the inmate's request, she relayed his concerns to the FBI, with whom the inmate claimed he had been cooperating. Id. ¶¶ 59-60. According to plaintiff, within days she was terminated for talking to an "outside agency." Id. ¶¶ 60-65.

The complaint also alleges that defendant Andrea Cabral, Sheriff of Suffolk County ("Sheriff Cabral") publicly issued certain statements about plaintiff. Those public statements included: (a) a Press Statement that responded to an August 25, 2004 *Boston Globe* article and stated in part: "Ms. Porter was asked to leave the House of Correction because she violated Department regulations and contractual obligations. She is clearly biased and has her own agenda for speaking out at this time." (see Exhibit C to the Memorandum in Support of the Motion to Quash filed by defendants Sheriff Cabral, the Sheriff's Office and Suffolk County); (b) Sheriff Cabral's appearance on the *"Greater Boston"* television show stating that plaintiff was not a whistleblower and "clearly had her own agenda"; and (c) statements attributed to Sheriff Cabral's spokesperson in the October 29, 2004 edition of *The Boston Globe Magazine* asserting that plaintiff's allegations were "100% ridiculous … [t]hat's why you haven't seen any

follow up [after the election]." Amended Complaint, ¶¶ 87-94.

B.  **The Protective Order**

On March 3, 2005, the parties filed a Stipulation to Enter Protective Order, providing that the exchange of discovery between the parties would be governed by the terms of a proposed Protective Order filed with the court. The proposed Protective Order (entered by the court on March 9, 2005) set forth nine categories of "Confidential Information" as follows:

> (i) all medical-related documents relating to Inmate R.R.; (ii) all documents contained in R.R.'s institutional file from the Suffolk County House of Correction; (iii) all documents containing information protected by the CORI Statute, ...; (iv) all documents containing personnel information about current or former employees of the defendant; (v) all documents relating to the investigation performed into Inmate R.R.'s allegations; (vi) *all statements taken under oath at any proceeding concerning the allegations in the complaint*; (vii) all documents containing the Plaintiff's medical information; (viii) the Plaintiff's personnel file; and (ix) *all documents containing the Plaintiff's prior testimony taken under oath at any proceeding.*

Protective Order, § 1(b) (emphasis added).

C.  **Public disclosures made after the Protective Order**

Since the protective order was entered, public filings in this case made by defendants Sheriff Cabral, the Sheriff's Office, and Suffolk County have disclosed the following:

- The FBI has provided defendants with an affidavit of Special Agent Christa J. Snyder verifying that "[b]eginning in 1999, Sheila Porter provided information to the FBI, on a confidential basis, about events at the Suffolk County House of Correction," including on May 20, 2003 and on May 29, 2003 (when she provided information about being questioned by Sheriff's investigators about providing information to the FBI) (see Affidavit of Christa J. Snyder, attached as Exhibit E to the Memorandum in Support of the Motion to Compel filed by defendants Sheriff Cabral, the Sheriff's Office and Suffolk County ("Defendants' Motion to Compel").

- The identity of the inmate on whom plaintiff placed a recording device has been

disclosed as Rene Rosario (see June 28, 2005 letter from United States Attorney Michael J. Sullivan to the Suffolk County Sheriff's Department, attached as Exhibit D to Defendants' Motion to Compel).

- An Incident Report prepared by an investigator for the Sheriff's Office recounting information received from the FBI about injuries suffered by inmate Rosario, Rosario's role as a key witness in a federal trial involving corrections officers from the Nashua Street Jail, and the FBI's statement that it would consider an assault on Rosario by a corrections officer as tampering with a federal witness (attached as Exhibit H to Defendants' Motion to Compel).

- In addition, according to filings by Sheriff Cabral, the Sheriff's Office and Suffolk County, discovery taken in the case has revealed the following:
    
    o Plaintiff was contacted by FBI Special Agent Maureen Robinson in late 1999 or early 2000 and asked if she would provide information concerning potentially illegal activities at the HOC and the Sheriff's Office. (Defendants' Motion to Compel at 3, citing Plaintiff's Deposition, Vol. 1, at 90, attached to Motion to Compel).
    
    o Shortly thereafter, plaintiff began providing information to Special Agents Robinson and Snyder concerning suspected physical abuse of inmates and drug dealing. (Id., citing Plaintiff's Deposition, Vol. 1 at 105-106, attached to Motion to Compel).
    
    o According to plaintiff, she had a verbal agreement with the FBI that she would provide information to the Special Agents and they would protect her identity. (Id., citing Plaintiff's Deposition, Vol. 1 at 106-107, attached to Motion to Compel).
    
    o Plaintiff estimated that she provided information to the FBI forty to fifty times a year from late 1999 or early 2000 until she was barred from the HOC on June 10, 2003. (Id., citing Plaintiff's Deposition, Vol. 1 at 153-

54, attached to Motion to Compel).

- In or about October 2002, Special Agent Snyder asked plaintiff to place a recording device on HOC inmate Rene Rosario for the purpose of recording issues of threats or abuse that Inmate Rosario alleged were happening at the HOC. (Id. at 4, citing Plaintiff's Deposition, Vol. 1, at 134-35, 138, attached to Motion to Compel).

- Plaintiff placed the recording device on Inmate Rosario in the Medical Unit at the HOC and later removed it and returned it to the Special Agents. (Id., citing Plaintiff's Deposition, Vol. 1 at 128, 137, 149, attached to Motion to Compel).

- The FBI had plaintiff sign a release and advised her that Paul DeFazio, an employee of the Sheriff's Office, was to be her emergency contact. (Id., citing Plaintiff's Deposition, Vol. 1 at 134-35, 138, attached to Motion to Compel).

- On or about May 19, 2003, plaintiff encountered Inmate Rosario in a cell at the Medical Unit of the HOC. Rosario informed plaintiff that he had been physically assaulted by an officer and showed her what he alleged were the injuries he had sustained. (Id. & n. 2).

- On or about May 20, 2003, plaintiff phoned Special Agent Snyder and informed her of Inmate Rosario's allegations. (Id., citing Plaintiff's Deposition, Vol. 1 at 234, attached to Motion to Compel).

- On or about May 21, 2003, Special Agent Snyder told Sheriff's Office Investigator Stan Wojtkonski that a member of the HOC medical staff had phoned her to report that an examination of Inmate Rosario had revealed bruises on his neck, chest and under his arms. (Id. at 4-5).

- On or about May 23, 2003 Suffolk County Sheriff's Office Investigators Brian Dacey and Sonya Aleman interviewed plaintiff about her knowledge

- of Inmate Rosario's allegations, prompting plaintiff to telephone Special Agent Snyder to complaint about the investigators' conduct. (Id. at 5).

  o On June 10, 2003, Deputy Superintendent Mary Ellen Mastrorelli informed plaintiff in the presence of Donna Jurdak (Correctional Medical Services, Inc.'s Health Services Administrator) that plaintiff was barred from the HOC. (Id. at 5, citing Plaintiff's Deposition, Vol. 2 at 349-51, attached to Motion to Compel). Plaintiff subsequently discussed the action with Special Agents Snyder and Robinson, Assistant United States Attorney Stephen Huggard and two other individuals. The Special Agents told plaintiff that they believed she had been illegally barred from the HOC and recommended that she retain an employment lawyer. (Id., citing Plaintiff's Deposition, Vol.2 at 352-53, 357, attached to Motion to Compel). On June 11, 2003, Special Agent Robinson retrieved plaintiff's personnel file from the HOC. (Id., citing Plaintiff's Deposition, Vol. 2, at 362-63; Deposition of Donna Jurdak at 150, 152-53, attached to Motion to Compel).

  o Before being interviewed by the Boston Globe on or about August 25, 2004, plaintiff spoke to the FBI about the parameters of what she could publicly reveal about being an FBI informant. (Id., Plaintiff's Deposition, Vol. 2 at 369, attached to Motion to Compel).

More recently, on August 17, 2005, Cabral was quoted in a *Boston Globe* editorial as stating that plaintiff's dismissal resulted from her "failure to properly report and otherwise document an inmate's allegation of abuse to the department." (*See* Exhibit A hereto).

## II.   ARGUMENT

A.   **The Proponents of the Protective Order Bear the Burden of Demonstrating Good Cause for Its Continued Application to Testimony Concerning the Case.**

In *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984), the Supreme Court held that

judicial orders restricting a party's ability to disseminate information obtained through discovery in a civil case do not offend the First Amendment provided that the orders are, *inter alia*, based on a showing of "good cause." 467 U.S. at 37. *See also Anderson v. Cryovac*, 805 F.2d 1, 6-7 (1st Cir. 1986). The Court's ruling was based in large part on the potential for damage to reputational and privacy interests caused by abuses of liberal discovery rules:

> Because of the liberality of pretrial discovery permitted by Rule 26(b)(1), it is necessary for the trial court to have the authority to issue protective orders conferred by Rule 26(c). *It is clear from experience that pretrial discovery by depositions and interrogatories has a significant potential for abuse.* This abuse is not limited to matters of delay and expense; *discovery also may seriously implicate privacy interests of litigants and third parties.* The Rules do not distinguish between public and private information. Nor do they apply only to parties to the litigation, as relevant information in the hands of third parties may be subject to discovery. ...
>
> *There is an opportunity, therefore, for litigants to obtain-- incidentally or purposefully--information that not only is irrelevant but if publicly released could be damaging to reputation and privacy.* The government clearly has a substantial interest in preventing this sort of abuse of its processes.

467 U.S. 34-35 (footnotes omitted) (emphasis added).

As the First Circuit held in *Anderson*, the *Seattle Times* Court "did not hold that a discovery protective order could never offend the first amendment." 805 F.2d at 7. To the contrary, "[t]here is the potential for an infringement of the first amendment whenever the government prohibits or restrains free speech or publication." 805 F.2d at 6. Accordingly, "first amendment considerations cannot be ignored in reviewing discovery protective orders." 805 F.2d at 7. *See generally Public Citizen v. Liggett Group, Inc.*, 858 F.2d. 775, 789 (1st Cir. 1988) (citations omitted) ("[O]rdinarily (in the absence of good cause) a party receiving discovery materials might make them public.").

Under *Seattle Times*, however, those First Amendment considerations are satisfied by compliance with the good cause standard of Rule 26(c). 805 F.2d at 7. As the First Circuit has made clear, "[a] finding of good cause must be based on a particular factual demonstration of potential harm, not on conclusory statements." *Anderson*, 805 F.2d at 7. *See also F.T.C. v.*

LITDOCS/612009.1

*Standard Financial Management Corp.*, 830 F.2d 404, 412 (1st Cir. 1987) ("We continue to believe that '[a] finding of good cause [to impound documents] must be based on a particular factual demonstration of potential harm, not on conclusory statements.'").

Because the trial court is in the best position to weigh fairly the competing needs and interests of parties affected by discovery, the Rule "confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required." *Seattle Times*, 467 U.S. at 36. Those who favor continuing the Protective Order nevertheless bear the burden of establishing that good cause exists to keep confidential testimony given or produced in the case. "As a general proposition, pre-trial discovery must take place in the public unless compelling reasons exist for denying the public access to the proceedings.'" *Public Citizen*, 858 F.2d at 790. "Any other conclusion effectively would negate the good cause requirement of Rule 26 (c): Unless there is a presumptive right to disseminate discovery materials, the party seeking to protect the materials would have no need for a judicial order since the public would not be allowed to examine the materials in any event." *In re "Agent Orange" Product Liability Litigation*, 821 F.2d 139, 145 (2d Cir. 1987).

**B.    There Is No Good Cause for Applying the Protective Order to Testimony Concerning the Case.**

Because this case involves allegations of wrongdoing by public officials and public entities, there has not been (nor can there be) a "particular factual demonstration of potential harm" to reputational or privacy interests (the two considerations cited by *Seattle Times* as potentially warranting entry of a protective order) if testimony in the case became public. The testimony at issue concerns allegations against a sitting public official and a governmental entity that has been the subject of intense and prolonged controversy. Reputational interests clearly do not outweigh the public's interest in examining and understanding sworn testimony concerning such allegations. *See generally New York Times Co. v. Sullivan*, 367 U.S. 254, 273 (1964) ("If neither factual error nor defamatory content suffices to remove the constitutional shield from criticism of official conduct, the combination of the two elements is no less inadequate.").

Nor is there any conceivable privacy interest implicated by the lifting the Protective Order insofar as it applies to testimony produced in the case. "When the subject-matter of the publicity is of legitimate public concern, there is no invasion of privacy." *Restatement (Second) of Torts*, § 652D, cmt. d (1977). "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes." *Mills v. State of Alabama*, 384 U.S. 214, 218-19 (1966). *See generally Monitor Patriot Co. v. Roy*, 401 U.S. 265, 277 (1971) (as matter of constitutional law, a charge of public misconduct can never be irrelevant to an official's or a candidate's fitness for office); *Standard Financial Management*, 830 F.2d at 412 (good cause standard for impoundment of judicial records is "correspondingly elevated" when case involves matters of significant public concern).

Concerns about the parties' fair trial rights also do not warrant continuance of the Protective Order as applied to pretrial testimony in this case. While "specific instances of massive and potentially harmful publicity" can in some cases support a finding of good cause, *Anderson*, 805 F.2d at 8, the mere fact that a case has generated some publicity, or that jurors have obtained some knowledge about a case, does not demonstrate a realistic threat to a defendant's fair trial rights. *United States v. Stackpole*, 811 F.2d 689, 697 (1st Cir. 1987). *See also Patton v. Yount*, 467 U.S. 1025, 1035 (1984) ("[T]he relevant question is not whether the community remembered the case, but whether the jurors ... had such fixed opinions that they could not judge impartially the guilt of defendant[s]").

Through jury voir dire, "a court can identify those jurors whose prior knowledge of the case would disable them from rendering an impartial verdict." *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 15 (1986). Emphatic jury instructions, brief continuances and, in extreme cases, even a change of venue are approved alternative means of protecting fair trial interests. *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 563-64, 602-603 (1976). *See also In re Perry*,

LITDOCS/612009.1

859 F.2d 1043, 1050 (1st Cir. 1988) ("If prejudice of the magnitude described in *Nebraska Press Ass'n* to an interest as paramount as the Sixth Amendment right to a fair trial cannot justify a protective order, then much less will mere embarrassment to a defendant stemming from disclosure of a vigorous defense of an unpopular cause, or even the possible effect on a still hypothetical criminal prosecution, justify this order).

Moreover, nothing in the publicity that has accompanied this case, or in the public record, demonstrates that every piece of pretrial testimony, if publicly revealed, would pose a threat to the defendant's fair trial rights. The Protective Order's blanket application to all pretrial testimony therefore is not supported by good cause. *See generally Seattle Times*, 467 U.S. at 32, quoting, *Procunier v. Martinez*, 416 U.S. 396, 413 (1974) (considering whether "the limitation of First Amendment freedoms [is] no greater than is necessary or essential to the protection of the particular governmental interest involved" (internal quotations omitted); *Siedle v. Putnam Investments, Inc.*, 147 F.3d 7, 12 n.6 (1st Cir. 1998) (applying good cause standard for impoundment of court records and concluding that redacted versions of documents sanitized of sensitive materials should be made available to the public).[1]

The disclosures about the case that already have occurred and inevitably will continue to occur -- including the public filing of deposition excerpts and statements to the press by or on behalf of parties -- further support modification of the Protective Order. Indeed, since public confidence in the Sheriff's Office requires the governmental defendants to publicly defend their conduct in office, continuation of the Protective Order with respect to testimony only increases

---

[1] The fact that the Protective Order was the result of a stipulation does not alter the governing constitutional analysis or preclude members of the public (including the Globe) from seeking to modify the Order. A stipulation is no substitute for a "particular factual demonstration of potential harm" and cannot trump the First Amendment standards governing the issuance of Protective Orders. *See generally CBS v. Young*, 522 F.2d 234, 237 (6th Cir. 1975) (press had standing to challenge protective order to which it was not a party); *Application of Dow Jones & Co., Inc.*, 842 F.2d 603, 607 (2nd Cir.), *cert. denied*, 488 U.S. 946 (1988) ("It is hard, in fact, to imagine that there are no willing speakers. Without them there would be no need for a restraining order; it would be superfluous."). *See also Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219 (6th Cir. 1996) (consensual protective order that failed to satisfy good cause standard did not justify court order barring prohibiting publication of materials by the press).

the risk of selective and potentially misleading accounts of the case. Under these circumstances, the burden of showing good cause for the continuation of the Protective Order cannot be met, and an order modifying the Protective Order is well within the discretion of the Court.

### III.  CONCLUSION

For the foregoing reasons, Globe Newspaper Company, Inc. requests that its motion to modify the Protective Order be granted and that sections 1(b) (vi) and (ix) be stricken from the Protective Order in order to permit public disclosure of discovery exchanged or provided by the parties consisting of testimony given by witnesses concerning the allegations in plaintiff's complaint.

**OF COUNSEL:**

David E. McCraw, Esq.
**The New York Times Company**
229 West 43rd Street
New York, NY 10036
(212) 556-4031

**GLOBE NEWSPAPER COMPANY, INC.,**

By its attorneys,

/s/Jonathan M. Albano
Jonathan M. Albano, BBO#013850
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA  02110-1726
(617) 951-8000

Dated: August 23, 2005

LITDOCS/612009.1



THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING

GLOBE EDITORIAL

# Cabral's critics

The Boston Globe

August 17, 2005

A CIVIL lawsuit filed by a jailhouse nurse against the Suffolk County Sheriff's Department cites "a deeply troubled institution" characterized by a "continuing pattern of criminal conduct by employees." But the suit, like others aimed at Suffolk County Sheriff Andrea Cabral, doesn't capture the full picture.

The nurse, Sheila Porter, alleges that jail officials barred her from the South Bay House of Correction in June 2003 after discovering that she had informed the FBI about an assault on a prisoner by a guard. Porter had served as an FBI informant at the troubled jail for at least two years prior to Cabral's arrival in December 2002. According to news reports, Cabral denied to a grand jury that Porter was terminated for speaking with federal officials. Cabral is now reportedly the subject of a federal probe to determine whether she lied under oath, a serious charge. The sheriff is sticking to her guns. On Monday she said that Porter's dismissal was necessary to maintain the jail's integrity because of the nurse's "failure to properly report and otherwise document an inmate's allegation of abuse to the department." Porter's suit claims that she did inform jail officials, both verbally and in writing, about the abuse.

Clearly, there will be much to sort through in or out of court. But the public should not forsake Cabral yet. She inherited the "deeply troubled institution," where physical and sexual abuse of inmates by corrections officers were all too common. She did not create it. Cabral is a no-nonsense manager who insists on professionalism and accountability. She is trying to reform an institution that was riddled with patronage before her arrival. Her political skills have been questioned before, with cause, but not her integrity.

The public will be the victim of any turf war between Suffolk County and federal officials. The history of corruption at the South Bay and Nashua Street facilities may be sufficient to warrant ongoing federal attention, including the use of informants. But the last thing needed would be a system that allows abuse inside the walls to be reported to federal agents for use in a possible long-range probe yet ignores local officials with the power to stop it immediately.

Strong, reform-minded management is not always welcome. Ten correction officers at the Nashua Street Jail are also suing Cabral, claiming that she stripped them of deputy sheriff perks because of their union activities and support for Cabral's opponent in last year's sheriff's race. Cabral is the rare elected official who doesn't reward political supporters with jobs. It seems unlikely she would demote employees solely for political purposes. Cabral's troubles could reveal more about the political motivations of her detractors than her skills as a prison administrator. ■

© Copyright 2005 The New York Times Company

EXHIBIT A

http://www.boston.com/news/globe/editorial_opinion/editorials/articles/2005/08/17/cabrals...    8/18/2005