```
 1                              Volume:    I

 2   CERTIFIED ORIGINAL          Pages:     1-248
     LEGALINK BOSTON
 3                               Exhibits:  1-5

 4              UNITED STATES DISTRICT COURT

 5           FOR THE DISTRICT OF MASSACHUSETTS

 6                          NO. 04-11935-DPW

 7   - - - - - - - - - - - - - - - - - - - - - - x

 8   Sheila J. Porter,

 9                  Plaintiff,

10        v.

11   Andrea Cabral, Suffolk County

12   Sheriff's Department Suffolk County,

13   and Correctional Medical Services, Inc.,

14                  Defendants.

15   - - - - - - - - - - - - - - - - - - - - - - x

16

17           DEPOSITION OF SHEILA J. PORTER

18              Wednesday, May 18, 2005

19                     10:10 a.m.

20   ADLER, COHEN, HARVEY, WAKEMAN & GUEKGUEZIAN

21               230 Congress Street

22            Boston, Massachusetts 02110

23

24   Reporter: Lori-Ann London, RPR
```

1   surprised, and that was okay.
2       Q    When do you recall actually making
3   contact with F.B.I. Agent Robinson?
4       A    The next day.
5       Q    And this was sometime in late 1999,
6   early 2000?
7       A    Yes.
8       Q    Can you be any more specific as to the
9   time frame?
10      A    No.
11      Q    Okay.  What did you discuss when you had
12  a conversation with her?
13      A    I believe the first conversation Maureen
14  explained that they were looking for some
15  information, and that they understood that I might
16  have some information that they needed, and I
17  believe my reaction to that was, "In what areas?"
18      Q    What did she say?
19      A    She indicated three areas of concern:
20  Sexual abuse of the females, physical abuse of
21  inmates, and drug use or abuse within the
22  facility.
23      Q    How did Maureen Robinson understand that
24  you may have some information that they were

```
 1              MR. SAVAGE:  Well, again -- or not
 2   again.  You're not to answer any question
 3   concerning Agent Robinson that involves you
 4   revealing --
 5              THE STENOGRAPHER:  I'm sorry, I
 6   can't hear you.
 7              MR. SAVAGE:  You're not to answer
 8   any question concerning your conversations with
 9   Agent Robinson or the F.B.I. that involves you
10   revealing specific cooperation as to particular
11   individuals.
12              MS. CAULO:  Why are you instructing
13   her not to answer?  What's the basis for that?
14              MR. SAVAGE:  Privilege under the law
15   for an informant relating to the privacy and the
16   safety of both those informed against and those
17   informing.  In addition, I mean, it's not even
18   potentially likely to lead to any relevant
19   evidence, but that's the instruction, privilege.
20              MS. CAULO:  We have a protective
21   order in this case.  I suggest that's not an
22   appropriate instruction to give.
23              MR. SAVAGE:  I hear you.
24              MS. CAULO:  We'll have to suspend
```

1  and go seek Judge Woodlock.
2           MR. SAVAGE:  Okay, that's fine, or
3  you could go to another topic, since we're not
4  going to finish today, and we could do it in an
5  orderly fashion, whatever you want to do.
6           MS. HARVEY:  Just so it's clear, so
7  that if we have to go to Judge Woodlock, are you
8  instructing her not to answer as to any specific
9  case or only those that remain open?
10          MR. SAVAGE:  Any specific case of
11 cooperation on an individual.  Obviously it
12 doesn't change the safety and privacy calculation
13 if the investigation is over.
14          MS. HARVEY:  Well, I think that the
15 protective orders will cover -- I mean, I think
16 we've all agreed to adhere to that protective
17 order.  I think -- I think we could proceed and
18 have Judge Woodlock decide later.
19          MS. CAULO:  That's fine.
20          MR. SAVAGE:  Whatever way you want
21 to do it.
22          MS. CAULO:  Well, no.  We certainly
23 need to go there.  I mean, you have presented your
24 client in an extensive complaint, and that's part

```
 1   of the basis in suggesting that we were on notice
 2   of this.  So I think it's certainly something that
 3   we're entitled to.
 4             MR. SAVAGE:  On notice of what?
 5             MS. CAULO:  You have suggested in
 6   allegations in your complaint that the Department
 7   and CMS were on notice of her involvement in
 8   providing information to the F.B.I.
 9             MR. SAVAGE:  Oh, sure.  You can ask
10   about that; go right ahead.
11             MS. CAULO:  And we're entitled to
12   explore that, and in order to explore that --
13             MR. SAVAGE:  I think you should.
14             MS. CAULO:  -- and in order to
15   explore that fully, Joe, if I may, it's important
16   for us to seek from your client the kind of
17   information that she provided so that we can then
18   confer with other sources and to see whether or
19   not she in fact did so.
20             MR. SAVAGE:  You can make your
21   inquiry about the kind of information.
22             MS. CAULO:  That's what I'm doing.
23      Q    What information -- what did you
24   discuss; what information did she ask you to
```

1   provide -- let me -- in this first meeting in the
2   parking lot at South Bay, what did she ask you to
3   provide?
4       A   Information concerning specific
5   allegations of physical abuse that they had.
6       Q   And what were those allegations?
7       A   They were allegations of physical abuse
8   at the hands of corrections officers, and I cannot
9   give you the names.
10      Q   Are you not giving me the names per the
11  instruction of your counsel?
12      A   Yes.
13      Q   Where were those corrections officers
14  employed, at what facility?
15      A   South Bay.
16      Q   House of Correction?
17      A   Yes, House of Correction.  I'm sorry.
18      Q   Did she provide you with the names of
19  those officers?
20      A   No.
21      Q   Did she provide you with the names of
22  inmates who had made allegations concerning these
23  officers?
24      A   Yes.

1  meeting.
2      Q    What did you do?
3      A    I agreed to provide ongoing information.
4      Q    Well, how did you communicate with
5  Miss Robinson?
6      A    Either I called her or she called me,
7  and I can't tell you which it was.
8      Q    Okay.  Did you meet face-to-face or was
9  this encounter over the phone?
10     A    Yes.
11          MR. SAVAGE:  Yes, which?
12     A    Yes, it was over the phone; this
13 conversation was over the phone.
14     Q    What did you say and what did she say?
15     A    I said I had thought about it and I
16 agreed to provide information, and she said that
17 was great.  And I couldn't tell you what else -- I
18 believe she set up another face-to-face at that
19 time.
20     Q    During that conversation in which you
21 indicated that you were willing to provide
22 information to the F.B.I. and, specifically,
23 Maureen Robinson, did you discuss the arrangements
24 for how that was to be done at that phone call

1   A   Yes.
2   Q   Did you do that in a face-to-face
3   meeting?
4   A   Yes.
5   Q   What was discussed; what were the
6   arrangements?
7   A   That I could contact them anytime by
8   phone, and I could speak with them by phone or
9   meet them in person.
10  Q   You said "them." Who besides Maureen
11  Robinson were you allowed to contact?
12  A   At first I believe it was just Maureen,
13  and then there was a second agent.
14  Q   Who was that?
15  A   Krista Snyder.
16  Q   Let's start with Maureen first. What
17  contact information did she provide to you; how
18  were you supposed to get ahold of her?
19  A   She gave me her business card, and then
20  also gave me -- the business card had the office
21  number on it, and she gave me her extension, which
22  I also wrote on the card.
23  Q   What specific information did she ask
24  you to provide?

```
 1       A     Any information that I had concerning
 2   cases that might come up from time to time,
 3   allegations of abuse, sexual or physical,
 4   allegations of drug selling or drug dealing.
 5       Q     Did she give you any instructions as to
 6   how to perform this service for the F.B.I.?
 7       A     She read a -- a paper that gave me the
 8   dos and don'ts, but I don't -- I guess it was
 9   instructions.  I'm trying to remember what it was
10   called.  Each -- each year I had this piece of
11   paper read to me.
12       Q     Each year...
13       A     That I continued --
14       Q     To provide --
15       A     -- doing --
16       Q     I'm sorry.
17       A     That I continued providing information.
18       Q     What was this piece of paper?
19       A     It talked about whether or not I was
20   freely -- that I wasn't being coerced to do this;
21   that I wasn't being paid to do this; I wasn't -- I
22   didn't disclose it to anyone; I didn't speak to
23   the news media and say, By the way...
24       Q     By the way what?
```

```
 1       Q    And those were...
 2       A    Sexual abuse, physical abuse, drug
 3  dealing.
 4       Q    Were you instructed by the F.B.I. not to
 5  provide that same information to the Sheriff's
 6  Department?
 7       A    Never.
 8       Q    So Ms. Robinson didn't tell you, "Report
 9  to us, but don't report to the Sheriff's
10  Investigation Division"?
11       A    Correct.
12       Q    Did she ever tell you that you should
13  report this information to the Sheriff's
14  Investigation Division?
15       A    Yes.
16       Q    She did tell you that?
17       A    Yes.
18       Q    What did she say?
19       A    That was along with the admonitions that
20  tell you not to disclose to this person, and it
21  was, of course, you can report to SID or, you
22  know, things that you need to report, you can
23  report.
24       Q    Is that how it was communicated to you:
```

1   Of course you can report things to SID, of course
2   you can report things you need to report --
3       A   I don't --
4       Q   -- what was --
5       A   My understanding is all I can tell you.
6   My understanding is that I could report things to
7   SID that I needed to report, not all the
8   information that I gathered would be something I
9   would report to SID.
10      Q   Certainly there were things that you
11  were required to report to the institution, the
12  site, where you were working?
13      A   Yes.
14      Q   And those were requirements by your
15  employment with Correctional Medical Services,
16  correct?
17      A   Yes.
18      Q   And those were also required of you by
19  virtue of you working inside a correctional
20  facility, correct?
21      A   Yes.
22      Q   You were required to report to the
23  Department unusual events, correct?
24      A   Correct.

1    Q    You were required to report to the
2  Department instances in which you felt that an
3  inmate had been physically abused, correct?
4    A    Correct.
5    Q    You were required to report to the
6  Department instances in which you felt that an
7  inmate had been sexually abused, correct?
8    A    Correct.
9    Q    And you knew that for the ten years or
10 so that you worked at the Suffolk County House of
11 Correction, correct?
12   A    I knew that.
13   Q    In fact, you received training, you
14 indicated earlier, on report writing, correct?
15   A    Yes.
16   Q    That report writing training was
17 conducted by the Suffolk County Sheriff's
18 Department, right?
19   A    Yes.
20   Q    And you were instructed on what
21 information to contain within a report?
22   A    Yes.
23   Q    You were instructed on when you needed
24 to report?

1   A   Yes.
2   Q   What was that instruction on when you
3   needed to report?
4   A   When I had -- when I personally had
5   reason to believe, either through seeing or a
6   report, that there was abuse of some variety going
7   on or that there was an issue.
8   Q   So if you were a percipient witness and
9   had firsthand information about abuse, you were
10  required to report?
11  A   Yes.
12  Q   And if an inmate informed you they had
13  been abused, you would be required to report?
14  A   Yes.
15  Q   And if you were informed by someone else
16  that an inmate had made allegations, you would be
17  required to report, correct?
18  A   No.
19  Q   So if it came to you from someone else,
20  you're not required to report?
21  A   No, because I have no idea what --
22  whether that's the inmate's allegation or not.
23  Q   So the F.B.I. didn't instruct you not to
24  comply with the requirements of your obligations

```
 1   as a nurse practitioner at the Suffolk County
 2   House of Correction or your obligations as a nurse
 3   practitioner employed by Correctional Medical
 4   Services, correct?
 5        A    Correct.
 6        Q    Did you notify Correctional Medical
 7   Services that the F.B.I. wanted you to provide
 8   information to them?
 9        A    Yes.
10        Q    Whom did you report that to?
11        A    I believe that the day I went in that we
12   had an interim health service administrator, I
13   think that it was Eileen Mageary, who at the time
14   was working for -- I'm sorry, did you say CMS
15   or did you say --
16        Q    I said CMS, but I should have said CHS.
17        A    CHS --
18        Q    Pardon me.
19        A    -- yes.
20             I went in and spoke with the acting
21   health service administrator, and I believe it was
22   Eileen Mageary, but I'm not positive of the time
23   frame there.  And I do remember that the regional
24   manager happened to be there at the facility that
```

```
 1      Q    Why was it taken off?
 2      A    It was only supposed to be on a
 3   specified time; the battery would have run out.
 4      Q    Who told you that?
 5      A    Krista.
 6      Q    What else did she tell you about the
 7   wire?
 8      A    How to put it on; how to take it off.
 9      Q    In 2000 how many times did you provide
10   information to the F.B.I.?
11      A    40 or 50.
12      Q    To whom in the F.B.I.?
13      A    Maureen or Krista.
14      Q    How?
15      A    Telephone or face to face.
16      Q    What information was communicated?
17      A    Information about suspected sexual
18   abuse, physical abuse, or drug use.
19      Q    Each time that you communicated this
20   information to Maureen Robinson and Krista Snyder,
21   did you also communicate the information to the
22   Suffolk County Sheriff's Department?
23      A    Sometimes, yes; sometimes, no.
24      Q    What times did you not?
```

1   A   Hearsay information that I had only a --
2   a report but no real knowledge or no belief one
3   way or the other, just no way to determine. I
4   heard a lot of things, and I reported what I heard
5   and let other people figure it out. If it was
6   something that I knew, something that the inmate
7   told me about himself, it was reported within the
8   House of Correction.
9   Q   Was that your criteria in terms of when
10  you reported things to SID; if it was hearsay
11  information, you didn't; if it was information
12  communicated to you directly from an inmate, then
13  you did?
14  A   Hearsay about another inmate, I probably
15  would not. An inmate telling me himself that he
16  had been abused, yes.
17  Q   You would report that to SID?
18  A   Yes.
19  Q   And you did?
20  A   Yes.
21  Q   Over the course of the nine years that
22  you were working at the House of Correction, you
23  did that how often?
24  A   A lot. Probably three or four times a

                                                                    153

1    A    15, maybe.  I don't know.  Maybe more.
2    Q    You spoke to Steve Jacobs regularly?
3    A    Yes.
4    Q    You spoke to Paul DeFazio?
5    A    Yes.
6    Q    What other names?
7    A    Brenda.
8    Q    Brenda Garcia?
9    A    Yeah.  Another Steve.  Let's see.  I can
10   tell you what they look like, but I don't remember
11   their names.  I'm sorry.  There are some that I
12   know better than others.
13   Q    You understood that it was their
14   responsibility to investigate allegations of
15   officer misconduct?
16   A    Yes.
17   Q    And that in so doing they would
18   oftentimes require the assistance of and
19   cooperation of medical personnel?
20   A    Yes.
21   Q    In 2001 do you recall how many times you
22   provided information to the F.B.I.?
23   A    About the same the entire time.
24   Q    What do you mean about the same the

Sheila J. Porter                                                05/18/2005

154

```
 1   entire time?
 2       A    Probably 40 or 50 times a year all four
 3   years.  Sometimes the same information with more
 4   information concerning the same incident,
 5   sometimes different things.
 6       Q    Do you recall specific incidents or
 7   specific illegal activities that you provided
 8   information on?
 9       A    Yes.
10       Q    What are those?
11       A    I really can't answer that.
12       Q    But the categories, not --
13       A    The categories?
14       Q    The types of incidents.
15       A    Sure.  The same categories, physical
16   abuse of an inmate, sexual abuse of an inmate, and
17   possible drug dealing or drug use/abuse.
18       Q    Was the drug use/abuse, did that involve
19   officers as well?
20       A    It could.
21       Q    Did it?
22       A    Yes.
23       Q    The physical abuse allegations, that
24   involved allegations of misconduct of officers on
```