UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-11935DPW

| | |
|---|---|
| SHEILA J. PORTER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ANDREA CABRAL, SUFFOLK | ) |
| COUNTY SHERIFF'S DEPARTMENT, | ) |
| SUFFOLK COUNTY, and | ) |
| CORRECTIONAL MEDICAL | ) |
| SERVICES, INC., | ) |
| | ) |
| Defendants. | ) |

## DEFENDANT CORRECTIONAL MEDICAL SERVICES, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

The plaintiff, Sheila Porter, alleges that the defendant, Correctional Medical Services, Inc. ("CMS"), terminated her in breach of her employment contract with CMS and CMS' contract with defendant Suffolk County for the provision of inmate healthcare services, and in violation of her federal and state constitutional rights. She seeks redress from CMS under the Federal and Massachusetts Civil Rights Acts - 42 U.S.C § 1983 (Count I) and M.G.L. c. 12 § 11H and 11I (Count VII) - and for CMS' alleged breaches of contract (Counts IV and V), termination in violation of public policy (Count VI), and intentional infliction of emotional distress (Count VIII). CMS contends that there is no genuine issue of material fact as to any of the claims against it and that CMS is entitled to summary judgment as a matter of law.

<u>**ARGUMENT**</u>

**I.    SUMMARY JUDGMENT STANDARD**

Summary judgment should be granted where all of the relevant pleadings, viewed in the light most favorable to the non-moving party, present no genuine issues of material fact such that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Alan Corp. v. International Surplus Lines Insurance Co.,* 22 F. 3d 339, 342 (1st Cir. 1994).  Where the moving party makes an initial showing that there exists no genuine issue of material fact, the non-moving party must set forth specific facts to establish a genuine triable issue; it cannot rely "merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medin-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).  "Where there is a failure of proof of an element essential to the party's case, there is no 'genuine issue as to any material fact' within the meaning of the Rule, since such a complete failure 'renders all other facts immaterial.'" *Ruffino v. State Street Bank and Trust Company*, 908 F. Supp. 1019, 1028 n.4 (1st Cir. 1995), quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

**II.    FEDERAL CIVIL RIGHTS ACT (42 U.S.C. § 1983) (COUNT I)**

In Count I of the Amended Complaint, plaintiff seeks redress from CMS under 42 U.S.C. § 1983.  Plaintiff essentially alleges that CMS terminated the plaintiff while acting under the color of state law, and in doing so deprived plaintiff of her First Amendment and state constitutional rights to free speech.  For the following reasons, the plaintiff's 42 U.S.C. § 1983 claim against CMS fails.

Section 1983 "provides a remedy for deprivations of rights secured by the Constitution and laws of the United States when that deprivation takes place 'under color of any statute, ordinance, regulation, custom or usage, of any State ....'" *Lugar v. Edmonson Oil Co.,* 457 U.S.

922, 924 (1982), quoting 42. U.S.C. § 1983.  "In cases under § 1983, 'under color' of law has

consistently been treated as the same thing as the 'state action' required under the Fourteenth

Amendment."  *United States v. Price*, 383 U.S. 787, 794, n.7 (1966).  As such, "the ultimate

issue in determining whether a person is subject to suit under § 1983 is the same question posed

in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights

'fairly attributable to the State?'"  *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982), quoting

*Lugar*, 457 U.S. at 937.  Conduct can be "fairly attributable" to the state both directly via a

public entity and indirectly via a private entity.  See *Barrios-Velasquez. v. Asociacion de*

*Empleados Del Estado Libre Asociado de Puerto Rico,* 84 F. 3d 487, 491(1st Cir. 1996).

When the party claimed to have violated § 1983 is a private entity, the inquiry is whether

that party's conduct "rises to the level of state action."  *Id.* at 492.  A private entity does not

violate § 1983 if the challenged action results from the entity's exercise of "private choice" and

not from the state's "influence or coercion."  *Id.*  A private entity's conduct is actionable only

where the entity "conspires with" or is acting as a "willful participant[] in joint activity with the

state or its agents."  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970).   "It is 'only in rare

circumstances' that private parties can be viewed as state actors."  *Estades-Negroni v. CPC*

*Hospital San Juan Capestrano*, 412 F.3d 1, 4 (1st Cir. 2005), quoting *Harvey v. Harvey*, 949 F.2d

1127, 1130 (11th Cir. 1992).[1]

---

[1] Generally, three tests are employed to determine whether a private party fairly can be characterized as a "state actor":  the Nexus/State Compulsion test based on *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974) and *Blum v. Yaretsky*, 457 U.S. 991 (1982), the Symbiotic Relationship/Joint Action test based on *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961); and the Public Function test based on *Jackson*, 419 U.S. 345 (1974).  As explained in the following paragraph, the plaintiff has failed to allege with any specificity the facts which allegedly convert CMS' acts into "state action."  As such, plaintiff's allegations do not even permit an analysis under any of these three tests.

A.    **The Plaintiff Has Neither Alleged Nor Set Forth Specific Facts In Support of Her Claim That CMS Was Acting Under the Color of State Law When CMS Terminated Her**

It is undisputed in this case that CMS, a corporation headquartered in St. Louis, is a private entity.  See **Exhibit B**, Deposition of Ann Mack, pp. 25-28; **Exhibit A**, Amended Complaint, ¶ 10.  In the Amended Complaint, the plaintiff merely alleges that "[i]n depriving Mrs. Porter of her clearly established constitutional rights, the Defendants acted under the color of state law…."  See **Exhibit A**, Amended Complaint, ¶107.  The plaintiff fails to plead with any specificity the relationship between the public defendants and CMS that allegedly converts CMS into a state actor.  See *Tauvar v. Bar Harbor Cong. Of the Jehovah's Witnesses, Inc.*, 633 F. Supp. 741, 747 (D. Me. 1985), *affirmed* 787 F. 2d 579 (1st Cir. 1986), *cert. denied* 479 U.S. 1038 (1987).  "For purposes of satisfying the § 1983 requirement of action under color of state law, the plaintiff must plead in some detail, through reference to material facts, the relationship or nature of the cooperation between the state actors and private individuals."  *Id.*  For this reason alone, summary judgment is appropriate as to Count I.

The only nexus between CMS and the Sheriff's Department with respect to the plaintiff's termination is that the plaintiff's termination from the Suffolk County House of Corrections ("SCHOC") was precipitated by the Suffolk County Sheriff's Department's ("Sheriff's Department") barring of the plaintiff from the SCHOC.  See **Exhibit B,** Deposition of Ann Mack, pp. 122.  The Sheriff's Department had its reasons for barring the plaintiff, reasons which related to its internal policies and its law enforcement and custodial mission at the SCHOC.  It is undisputed that the Sheriff's Department's decision to bar the plaintiff, and the reasons therefore, were not discussed with CMS ahead of time.  See **Exhibit F,** Deposition of Donna Jurdak, pp. 131-137; **Exhibit E**, Deposition of Sheila Porter, Vol. II, p. 426-427; **Exhibit**

**B**, Deposition of Ann Mack, pp. 99-102.  CMS had to terminate the plaintiff from the SCHOC because when she was barred she could no longer enter the site to work.  See **Exhibit B**, Deposition of Ann Mack, p. 122.  CMS did not want to terminate the plaintiff because she was a good nurse practitioner.  See **Exhibit B,** Deposition of Ann Mack, p. 135; **Exhibit F,** Deposition of Donna Jurdak, p. 136.   If CMS had had another nurse practitioner position open in Massachusetts, it would not have had to terminate the plaintiff; it could have transferred her to another site.  See **Exhibit B,** Deposition of Ann Mack, pp. 129-133; **Exhibit E**, Deposition of Sheila Porter, Vol. II, p. 434.  When another nurse practitioner position did become available at one of CMS' sites in Massachusetts three months later, CMS offered it to the plaintiff and the plaintiff was rehired.  See **Exhibit E,** Deposition of Sheila Porter, Vol. II., pp. 436, 439; **Exhibit B,** Deposition of Ann Mack, pp. 82-83, 222.  It is clear, therefore, that CMS did not "conspire[]" with" or act as a "willful participant" with the Sheriff's Department when it terminated the plaintiff.  *Adickes*, 398 U.S. at 152.

> **B.**     **The Plaintiff Cannot Raise the Inference of State Action Through the Facts She Has Alleged**

All of the allegations that the plaintiff does assert in her Amended Complaint that she might argue raise an inference of state action on the part of CMS have been proved inaccurate, and the plaintiff has raised no issue of material fact to refute the witnesses' testimony on these issues.  For example, the plaintiff alleges that her "termination was directed and/or authorized by Defendant Cabral."  See **Exhibit A**, Amended Complaint, ¶ 62.  In fact, the evidence is very clear that while Sheriff Cabral ordered that the plaintiff be barred from the SCHOC, neither Sheriff Cabral nor any of the other public defendants played any role in CMS' decision to terminate the plaintiff's employment with CMS.  See **Exhibit I**, Deposition of Andrea Cabral, Vol. I pp. 135-136; **Exhibit B**, Deposition of Ann Mack, pp. 122, 145-146.  The plaintiff also

alleges that "the Department and CMS were common law and joint employers of Mrs. Porter."
See **Exhibit A**, Amended Complaint, ¶17. This allegation is also completely without merit.

"A joint employer relationship exists where two or more employers exert significant
control over the same employees and share or co-determine those matters governing essential
terms and conditions of employment." *Rivera-Vega v. ConAgra, Inc.*, 70 F. 3d 153, 163 (1st Cir.
1995), quoting *Holyoke Visiting Nurses Ass'n v. NLRB,* 11 F. 3d 302, 306 (1st Cir. 1993). A
number of factors are used in determining the existence of joint employer status, including:
supervision of the employees' day-to-day activities, authority to hire, fire, or discipline
employees; authority to promulgate work rules, conditions of employment, and work
assignments; ultimate power over changes in employer compensation, benefits and overtime; and
authority over the number of employees. See *Holyoke Visiting Nurses Ass'n*, 11 F. 3d at 306;
*Rivas v. Federacion de Asociaciones Pecuarias de Puerto Rico,* 929 F.2d 814 (1st Cir. 1991).

It is clear that CMS was Mrs. Porter's only employer. See **Exhibit E**, Deposition of
Sheila Porter, Vol. II, p. 349, 382. The plaintiff was hired by CMS, trained by CMS, paid by
CMS, supervised by CMS employees, and evaluated by CMS. CMS also provided the plaintiff
with the Employee Success Guide, an employee manual that essentially guided all CMS
employees with respect to the policies, procedures and terms and conditions of their employment
with CMS. Further, CMS maintained the plaintiff's personnel file, provided her with benefits
and authorized the plaintiff's vacation time and sick days. See **Exhibit D,** Deposition of Sheila
Porter, Vol. I, pp. 18, 19, 21, 23, 26, 29, 62-63, 82-83; **Exhibit E,** Deposition of Sheila Porter,
Vol. II, pp. 407-408, 410; **Exhibit F,** Deposition of Donna Jurdak, pp. 15, 18, 24. The plaintiff
had no employment relationship with Suffolk County, the Suffolk County Sheriff's Department
("Sheriff's Department") or Sheriff Andrea Cabral. See **Exhibit B,** Deposition of Ann Mack, pp.

33, 37; **Exhibit D**, Deposition of Sheila Porter, Vol. I, p. 27.   The Suffolk County Sheriff's Department did not hire the plaintiff, contribute to the plaintiff's 401(k) plan, pay the plaintiff's salary, or participate in evaluating the plaintiff's job performance or determining whether she would receive a pay raise, and the plaintiff did not contact the Sheriff's Department when she wanted to take vacation time or a sick day.  See **Exhibit D,** Deposition of Sheila Porter, Vol. I., pp. 18, 19, 22, 23, 27, 62-63.  Furthermore, the Sheriff's Department had no input into the day-to-day medical decisions the plaintiff made with respect to inmates at the facility.  In fact, even the inmates' medical records were kept by CMS and the Sheriff's Department could only gain access to these records with an authorization.  See **Exhibit D**, Deposition of Sheila Porter, Vol. I., pp. 41, 43.  Based on these undisputed facts, it is clear that no joint employment relationship existed between CMS and the Sheriff's Department regarding the plaintiff.

The plaintiff may argue that because she received some training from the Sheriff's Department and was required to follow the institutional policies of the SCHOC this constitutes some evidence of "joint employment" so as to create an issue of fact regarding state action.  This argument is specious, particularly when considered in the context of the plaintiff's work environment.

The Suffolk County Sheriff's Department runs the SCHOC, which is a county jail that houses male and female prisoners serving time for various crimes.  See **Exhibit A,** Amended Complaint, ¶ 7.  CMS had a contract with the Sheriff's Department to provide medical services to the prisoners at the SCHOC and other county facilities.  Pursuant to the contract, CMS staffed the jail's Health Services Unit with medical professionals; the plaintiff was one of these medical professionals.  See **Exhibit C**, Suffolk County/CMS Standard Contract.

There is no factual dispute that the SCHOC's mission is to keep the prisoners in its custody and to ensure the safety of the prisoners, guards, visitors and people who work in the SCHOC; anyone who enters the SCHOC is subject to search and must follow the SCHOC rules to ensure their, and others', safety. See **Exhibit A,** Amended Complaint, ¶ 7. Neither the SCHOC, nor any other correctional facility for that matter, could ensure the safety of the people within it (or carry out their custodial mission of keeping the prisoners locked inside) without exerting this level of control over all of the people who enter its doors. This is one duty or responsibility that the Sheriff's Department could not contract out, or delegate, to CMS. As such, the plaintiff, like any other contract worker, as a prerequisite to working at the SCHOC, had to obtain security clearance, receive training on various safety and security issues, and agree to follow SCHOC policies. See **Exhibit D,** Deposition of Sheila Porter, Vol. I., pp. 32-35; **Exhibit F,** Deposition of Donna Jurdak, p. 42. To argue that these facts, without more, makes the plaintiff a "joint employee" of the Suffolk County Sheriff's Department ignores the realities of the correctional setting and would effectively convert every contracted worker in every correctional facility in the country into a joint employee.

There is absolutely no evidence of a joint enterprise between CMS and the Sheriff's Department, nor is there any evidence of joint control over the plaintiff's employment by CMS and the Sheriff's Department to support an argument that the plaintiff was a joint employee of both entities. The plaintiff, therefore, has failed to prove that CMS either "conspire[d] with" or acted as a "willful participant[] in joint activity with the state or its agents" in terminating the plaintiff. *Adickes*, 398 U.S. at 152. For all of the foregoing reasons, it is clear that the plaintiff has not plead any facts, set forth any evidence, or raised any inferences to prove that CMS acted

under color of state law when it terminated the plaintiff. As such, summary judgment with respect to Count I of the plaintiff's Amended Complaint should be entered in CMS' favor.

### III.     BREACH OF CONTRACT CLAIMS (COUNTS IV AND V)

In Count IV of the Amended Complaint, the plaintiff alleges that CMS breached its contract with the plaintiff, as set forth in CMS' "Corrective Action" policy,[2] regarding the plaintiff's "rights to, among other things, warnings, discussions and notice before adverse action was taken against her." See **Exhibit A**, Amended Complaint, ¶ 119. In addition, the plaintiff alleges that CMS failed to follow its own requirements of obtaining the requisite manager approvals and communicating the decision to the plaintiff before effecting her termination.

In Count V of the Amended Complaint, the plaintiff alleges that CMS breached its contract with Suffolk County and/or the Sheriff's Department regarding the provision of healthcare services to the SCHOC by failing to act lawfully with respect to the plaintiff, who was allegedly an intended beneficiary of the contract. With respect to CMS, the unlawful conduct of which the plaintiff complains is CMS' breach of its contract with the plaintiff pursuant to CMS' Employee Success Guide, the breach of that contract being CMS' failure to give warnings and notice, obtain requisite manager approvals and rectify the plaintiff's barring from the SCHOC. For the following reasons, the plaintiff is incapable of proving her breach of contract claims against CMS.

### A.     CMS' Employee Success Guide Did Not Create a Contract of Employment With the Plaintiff

Under certain circumstances, employee handbooks or personnel manuals, as well as employer's other policy statements, may create express or implied contractual obligations

---

[2] CMS' "Corrective Action" policy is an employment policy contained within CMS' Employee Success Guide. See **Exhibit H**, CMS' Employee Success Guide, Revised January 2002, p. 17-19.

between the employer and its employees.  See *O'Brien v. New Eng. Tel. & Tel. Co.*, 422 Mass. 686, 691-94 (1996); *Jackson v. Action for Boston Cmty. Dev. Inc.*, 403 Mass. 8, 12-14 (1988).  In determining whether an employee manual or other similar document is binding as a contract, the central inquiry is whether, under the circumstances, the employee reasonably believed that the terms of the document "constituted the terms or conditions of employment**,** equally binding on employee and employer." *Derrig v. Wal-Mart Stores, Inc.*, 942 F. Supp. 49, 55 (D. Mass. 1996), citing *O'Brien*, 422 Mass. at 694 (1996); see also *Ferguson v. Host International, Inc.*, 53 Mass. App. Ct. 96, 101-102 (2001).

The Supreme Judicial Court of Massachusetts has held, as a matter of law, that a manual will be considered a contract if the employer and employee negotiated its terms or if the manual stated a term of employment.  *O'Brien*, 422 Mass. at 692.  Where the terms of the manual were not negotiated and no term of employment was stated, an employee may still reasonably believe the manual created a contract under certain circumstances.  *Id.*  If the employee reasonably believed that the employer was presenting the manual as a statement of the conditions under which her employment would continue, a contract may be found.  *Id.* at 693 (e.g. the employer did not specifically state that it reserved the right to unilaterally modify the provisions of the contract).  If special attention is called to the manual by having the employee sign it, assent to it or acknowledge its terms, a contract might be found.  *Jackson*, 403 Mass. at 14-15; *O'Brien*, 422 Mass. at 693.  If the manual states that it provides merely "guidance" as to the employer's policies, but other language in the manual suggests otherwise, a contract may be found.  *O'Brien*, 422 Mass. at 693.

While the *Ferguson* court held that a disclaimer "buried in the general introductory portion of a manual" cannot preclude enforcement of manual as a contract where the disclaimer

is the "functional equivalent of fine print," it further stated that if the employer includes "in a very prominent position … an appropriate statement that there is no promise of any kind by the employer contained in the manual [and] that regardless of what the manual says or provides, the employer promises nothing," then the manual may not "be capable of being construed by the court as a binding contract." *Ferguson,* 53 Mass. App. Ct. at 103, quoting *Wooley v. Hoffman-LaRoche Inc.*, 99 N.J. 284, 299, *modified on other grounds*, 101 N.J. 10 (1985); see also *Hillstrom v. Best Western TLC Hotel*, 265 F.Supp. 2d 117, 129 (D. Mass. 2003) (no contract was created where manual acknowledgement form and introduction to manual state that manual was offered "as a matter of information only," policies described "[were] not conditions of employment," and employer "reserved the right to modify, revoke, suspend, terminate or change any and all such policies]" at any time).

Under the circumstances of this case, the plaintiff could not have reasonably believed that the terms of CMS' "Corrective Action" policy, contained within CMS' Employee Success Guide "constituted the terms or conditions of employment**,** equally binding on employee and employer." *Derrig*, 942 F. Supp. at 55. No evidence has been offered to suggest that the plaintiff negotiated with CMS regarding the terms of the Employee Success Guide or the "Corrective Action" policy contained therein. The Employee Success Guide does not include any term of employment for the plaintiff. See **Exhibit H,** CMS' Employee Success Guide, Revised January 2002. Both the "Important Notice" at the beginning of the Employee Success Guide and the acknowledgment form that the plaintiff was required to sign upon receipt of the Employee Success Guide explicitly state that CMS retains the right to modify the policies contained in the Employee Success Guide as it deems necessary. See **Exhibit H,** CMS' Employee Success Guide, Revised January 2002, p. 5; **Exhibit G,** Acknowledgment Form, dated May 22, 2002.

The "Important Notice" further makes clear that any changes made to the policies within the Employee Success Guide are solely in the discretion of CMS. See **Exhibit H**, CMS' Employee Success Guide, Revised January 2002, p. 5. While CMS did draw special attention to the Employee Success Guide by requiring the plaintiff to sign an acknowledgment form stating she would familiarize herself with its terms, the acknowledgment form that the plaintiff signed explicitly states: "I understand that this Guide does not constitute a contract of employment. I understand that I have the right to resign from employment at CMS at any time and for any reason, and that CMS has the same right to terminate my employment at any time, with or without cause." See **Exhibit G,** Acknowledgment Form, dated May 22, 2002.

Furthermore, the "Important Notice" in the Employee Success Guide explicitly states that the policies contained therein "are only guidelines." See **Exhibit H,** CMS' Employee Success Guide, Revised January 2002, p. 5. That the policies are mere guidelines is supported by the discretionary language CMS used in its "Corrective Action" policy: "CMS has established a policy of progressive action, *where practical* … CMS *reserves the prerogative* to take progressive disciplinary action *or to immediately terminate employment if appropriate under all circumstances* …Corrective Action *may* take place in the following ways …" See **Exhibit H,** CMS' Employee Success Guide, Revised January 2002, p. 17 (emphasis added). Finally, analogous to the facts of the *Hillstrom* case and distinguishable from the facts of the *Ferguson* case, the "Important Notice" in the Employee Success Guide, which is unmistakably set off from the rest of the Employee Success Guide on its own page, unambiguously states: "CMS retains the absolute right to modify or revise these policies based upon professional and business concerns. These policies are only guidelines and information for employees and may or may not apply depending on individual circumstances. The *Employee Success Guide* is not an

employment contract and should not be construed as such." See **Exhibit H,** CMS' Employee

Success Guide, Revised January 2002, p. 5.  Notably, the plaintiff conceded in her deposition

that she received and read the Employee Success Guide, and that she never signed a contract of

employment with CMS.  See **Exhibit D,** Deposition of Sheila Porter, Vol. I, pp. 23, 82-83;

**Exhibit E**, Deposition of Sheila Porter, Vol. II, pp. 407-408.  As such, the Employee Success

Guide cannot be construed to have been an employment contract capable of being breached by

CMS for the purposes of either Count IV or Count V.

> **B.** **Even If the Employee Success Guide Is Held To Be a Contract, CMS Did Not Breach Any Provisions of the Employee Success Guide With Respect to the Plaintiff**

Even if this court were to hold that the Employee Success Guide and the "Corrective

Action" policy contained therein created an employment contract, the plaintiff is cannot show

that any breach occurred.  The plaintiff alleges in Count IV that the "Corrective Action" policy

entitled her to warnings, discussions, requisite manager approvals, and notice before adverse

action was taken against her.  However, CMS explicitly states in its "Corrective Action" policy

that it would only use its policy of progressive action "where practical," and that it "reserves the

prerogative to take progressive disciplinary action or to immediately terminate employment if

appropriate under all circumstances."  See **Exhibit H**, CMS' Employee Success Guide, Revised

January 2002, p. 17.

More importantly, the "Corrective Action" policy contains a specific provision entitled

"Institutional Action," which is the only provision of this policy that applied in the plaintiff's

case.  See **Exhibit B**, Deposition of Ann Mack, pp. 213-214, 220.  In the event that an employee

is barred from an institution, this provision states that "CMS will *attempt* to resolve the situation

*as soon as practical,*" but "[l]oss of institution access normally results in termination of

employment by CMS, as security clearance/access is a precondition of employment by CMS."
See **Exhibit H,** CMS' Employee Success Guide, Revised January 2002, p. 19 (emphasis added).
This language clearly does not make any promises or obligate CMS to take any specific action.
However, in keeping with this provision, CMS attempted to resolve the plaintiff's barring from
the SCHOC as soon as practical.  After the plaintiff was barred, both Jurdak and Mack spoke
with Mastrorilli to find out why the plaintiff had been barred and what could be done, if
anything, to reverse the decision.  See **Exhibit F**, Deposition of Donna Jurdak, pp. 136-137;
**Exhibit B**, Deposition of Ann Mack, pp. 102-103, 114, 215-216.  In response, Mastrorilli
explicitly told Mack that the decision to bar the plaintiff could not be changed.  See **Exhibit B**,
Deposition of Ann Mack, p. 103.  Subsequently, as forewarned in the "Institutional Action"
provision, the plaintiff was terminated.  However, when another position within CMS in
Massachusetts became available three months later, it was offered to the plaintiff and she was
rehired.  See **Exhibit E**, Deposition of Sheila Porter, Vol. II, pp. 436, 439; **Exhibit B**, Deposition
of Ann Mack, pp. 82-83, 222.  As such, even if the statement "CMS will attempt to resolve the
situation as soon as practical" found within the "Institutional Action" provision of the
"Corrective Action" policy is construed to be a contractual promise, the plaintiff is incapable of
demonstrating that CMS breached the provision by not "attempt[ing] to resolve the situation as
soon as practical."[3]   Because the plaintiff is incapable of making a showing that the Employee
Success Guide created an employment contract, that the "Corrective Action" policy created any
contractual promises, or that CMS breached any promises it might have made in the Employee
Success Guide, summary judgment with respect to Count IV is appropriate.

---

[3] In Count V, plaintiff claims that the Employee Success Guide also obligated CMS to rectify plaintiff's being
barred from the SCHOC.  No such obligation appears in the Employee Success Guide.  In the event of a barring, the
Employee Success Guide states only that, "CMS will attempt to resolve the situation as soon as practical."  See

   **C.    Even If the Employee Success Guide Was Held To Be a Contract, and CMS
           Was Held To Have Breached That Contract, the Breach of the Employee
           Success Guide Would Not Result In the Breach of CMS' Contract With
           Suffolk County**

In order to prove her breach of contract claim in Count V, which alleges that CMS

breached its contract with Suffolk County for the provision of healthcare services, the plaintiff

must proffer evidence that: 1) CMS breached its alleged contract with the plaintiff set forth in the

Employee Success Guide, 2) the alleged breach of the Employee Success Guide constituted a

breach of the healthcare services contract between CMS and Suffolk County, and 3) the plaintiff

was an intended beneficiary of that contract.  As stated previously with respect to Count IV, the

plaintiff is incapable of showing that the Employee Success Guide constituted an employment

contract capable of being breached, or that any promises made in the Employee Success Guide,

if considered to be a contractual obligations by this Court, were breached.

   Even if this Court were to find that the plaintiff has made a sufficient showing of the

existence of a contract in the Employee Success Guide and a breach of that contract by CMS, the

plaintiff cannot demonstrate that breach of the Employee Success Guide resulted in a breach of

the healthcare services contract between CMS and Suffolk County.  The only employment-

related laws that the contract between CMS and Suffolk County requires CMS to abide by while

under contract are those involving Workers' Compensation and discrimination in employment.

See **Exhibit C**, Suffolk County/CMS Standard Contract and Comprehensive Healthcare Services

agreement, Part Eight, p. 49.  There is no language contained in the contract that even suggests

that a breach of a contract between CMS and one of its employees results in a breach of the

contract between CMS and Suffolk County.  See **Exhibit C**, Suffolk County/CMS Standard

---

**Exhibit H,** CMS' Employee Success Guide, Revised January 2002, p. 19.  CMS' statement that it will "attempt to
resolve the situation" cannot reasonably be construed to mean that it is "required to rectify" the plaintiff's barring.

Contract and Comprehensive Healthcare Services agreement. As such, the plaintiff cannot sustain her burden of proof that CMS breached its contract with Suffolk County.

> **D.    Plaintiff Was Not a Third Party Beneficiary of the Contract Between CMS and Suffolk County and As Such Cannot Enforce That Contract**

In order for a third party to enforce a contract under Massachusetts law, "it must appear from 'the language and circumstances of the contract' that the parties to the contract 'clearly and definitely' intended the beneficiaries to benefit from the promised performance." *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 230 (1st Cir. 2005), quoting *Miller v. Mooney*, 431 Mass. 57 (2000). "The mere fact that [the plaintiff] would likely benefit from such an agreement does not, by itself, show that [the plaintiff] was an intended rather than an incidental beneficiary. *Massachusetts Eye & Ear Infirmary,* 412 F.3d at 230, citing *Miller*, 431 Mass. 57. Nothing in the language of the contract between CMS and Suffolk County indicates that the plaintiff was intended to be a third party beneficiary of the contract for the provision of healthcare services. See **Exhibit C**, Suffolk County/CMS Standard Contract and Comprehensive Healthcare Services agreement. As such, even if CMS was held to have breached its contract with Suffolk County, the plaintiff has no right to enforce that contract. Therefore, summary judgment is appropriate with respect to Count V of the plaintiff's Amended Complaint.

## IV.    TERMINATION IN VIOLATION OF PUBLIC POLICY (COUNT VI)

In Count VI, the plaintiff alleges that CMS violated public policy encouraging people to work with law enforcement officials when it terminated the plaintiff for cooperating with the FBI. The plaintiff's claim fails for the following reasons.

Redress is available for a termination in violation of public policy in cases where an at-will employee is terminated for: 1) asserting a legally guaranteed right (e.g. filing a worker's compensation claim), 2) for doing what the law requires (e.g. serving on a jury), or 3) for refusing to do what the law forbids (e.g. committing perjury). *Smith-Pfeffer v. Superintendant of the Walter E. Fernald State School*, 404 Mass 145, 149-150 (1989). The Supreme Judicial Court of Massachusetts has stated that an employer who discharges an employee because the employee threatened to report the employer's criminal conduct to the authorities, or cooperated with law enforcement by testifying against a fellow employee, would be examples of termination in violation of public policy. *Mello v. Stop & Shop Companies, Inc.*, 402 Mass. 555, 559 (1988). Furthermore, the SJC has held that even where the law does not require an employee to cooperate with law enforcement officials, it is the public policy of this Commonwealth to encourage cooperation with ongoing criminal investigations. *Flesner v. Technical Communications Corporation*, 410 Mass. 805, 810 (1991). Nevertheless, an employee claiming termination in violation of public policy must provide facts in support of her claimed reason for her discharge; a mere assertion or speculation as to the reason for her discharge is not sufficient to create a dispute of material fact concerning the reason for discharge. *Shea v. Emmanuel College*, 425 Mass. 761, 763-764 (1997), citing *Doe v. Liberty Mut. Ins. Co.*, 423 Mass. 366, 368 (1996).

The plaintiff has proffered no evidence that the reason CMS terminated the plaintiff was because she cooperated with law enforcement officials. The undisputed facts demonstrate that CMS terminated the plaintiff because she had been barred from the SCHOC and the plaintiff had no nurse practitioner vacancies in other facilities in which to place the plaintiff. See **Exhibit B**, Deposition of Ann Mack, pp. 129, 133; **Exhibit E**, Deposition of Sheila Porter, Vol. II, pp. 348-

349.  That the plaintiff's termination was an anticipated result of her being barred from the SCHOC is supported by the language in the Employee Success Guide which states that, "[l]oss of institution access normally results in termination of employment by CMS, as security clearance/access is a precondition of employment by CMS."  See **Exhibit H**, CMS' Employee Success Guide, Revised January 2002, p. 19.  Furthermore, it would be illogical to infer that CMS terminated the plaintiff in retaliation for the plaintiff's cooperation with the FBI, where CMS was not the target of the FBI's investigation and the plaintiff's cooperation with the FBI would have no detrimental effect on CMS.  If this was the reason for CMS' termination of the plaintiff, there would have been no reason for CMS to attempt to locate another position for the plaintiff at another site or to hire her back four months later when a position became available. Because the plaintiff is incapable of showing that CMS terminated the plaintiff for anything other than legitimate and lawful reasons, the plaintiff's claim fails and CMS is entitled to summary judgment with respect to Count VI as a matter of law.

## V.    MASSACHUSETTS CIVIL RIGHTS ACT (M.G.L. c.12 §§ 11H, 11I) (COUNT VII)

In Count VII, the plaintiff alleges that CMS interfered with the plaintiff's state constitutional right to free speech using economic coercion in the form of denying the plaintiff vacation time, 401K benefits and further employment.  For the following reasons, the plaintiff's claim fails.

Massachusetts General Laws, chapter 12, section 11I states, "[a]ny person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H, may institute … a civil action for injunctive

and other appropriate equitable relief …."  Section 11H provides that the interference must be made by "threats, intimidation, or coercion."

Historically, "a showing of an actual or potential physical confrontation accompanied by a threat of harm" was necessary to establish threats, intimidation or coercion.   However, the Supreme Judicial Court of Massachusetts has recently held that coercion is "not limited to actual or attempted force," and "in certain circumstances, economic coercion, standing alone, may be actionable…." *Lecrenski Bros. Inc. v. Johnson*, 312 F. Supp. 2d 117, 122 (D. Mass. 2004) (requirement of coercion was sufficiently pled where plaintiffs/operators of a bus company alleged that defendant/police officer made it difficult to operate their business, resulting in the loss of at least one bus contract, after they hired a number of employees of Russian heritage), citing *Buster v. George W. Moore, Inc.*, 438 Mass. 635 (2003).

While the Supreme Judicial Court of Massachusetts has not yet clearly defined the boundaries of actionable economic coercion, it has at the very least required that the interference with the plaintiff's constitutional rights occur through the deprivation of the plaintiff's secured rights, generally pursuant to a contract.  See *Willits v. Roman Catholic Archbishop of Boston*, 411 Mass. 202, 210 (1991) (no economic coercion where school did not renew yearly employment contract with teacher who attempted to create teacher's association because school exercised its discretion under terms of employment it chose to offer teachers and "[t]here was no improper interference by the defendant with a secured right"); *Redgrave Boston Symphony Orchestra, Inc.,* 399 Mass. 93, 95 (1987) (economic coercion existed where BSO cancelled performances in which Redgrave was to appear as narrator pursuant to her contract with BSO after BSO subscribers expressed disapproval of her political views). [4]  As such, an at-will

---

[4] In 1989, the United States District Court of Massachusetts interpreted the SJC's *Redgrave* decision in *Karetnikova v. Trustees of Emerson College,* 725 F. Supp. 73, 77-78 (D. Mass 1989) as indicating that cancellation of a "future

employee whose employment was not secured by any contract right, would not have an actionable claim for economic coercion. See *Webster v. Motorola*, 418 Mass. 425, 430 (1994) (no economic coercion where defendants allegedly threatened to interfere with plaintiff's right to privacy by conditioning plaintiff's at-will employment on submission to random drug testing, because at-will employees had no contract right to their positions).

With respect to the instant case, the plaintiff has acknowledged that prior to her barring by the Sheriff's Department, she did not feel threatened, intimidated or coerced by CMS. See **Exhibit E,** Deposition of Sheila Porter, Vol. II, p. 447. As such, her allegations of threats, intimidation and coercion apparently only relate to CMS' act in terminating the plaintiff. The plaintiff actually alleges that CMS interfered with the plaintiff's constitutional right to free speech through economic coercion in the form of denying the plaintiff vacation time, 401K benefits and further employment. The plaintiff is essentially alleging that the economic coercion was the termination of her employment. The plaintiff has not demonstrated, however, that she had any secured right in her future employment with CMS. See *Willits*, 411 Mass. at 210. The plaintiff did not have an employment contract with CMS – she was an at-will employee that could be terminated at anytime with or without cause. See **Exhibit H**, CMS' Employee Success Guide, Revised January 2002, p. 5; **Exhibit G**, Acknowledgment Form, dated May 22, 2002; and argument set forth in Section III of this memorandum of law.

Even if this Court were to hold that the plaintiff did have a secured right in her future employment with CMS, the plaintiff has failed to set forth any evidence that CMS  terminated

---

economic relationship" was sufficient to constitute economic coercion. *Id.* In doing so, the District Court held that a professor at Emerson College on tenure-track sufficiently alleged economic coercion when she was denied tenure and promotion because of her conservative speech and publication on political views. In that case, the professor was allegedly coerced not to exercise her First Amendment rights not by the cancellation of her contract, but by the preclusion of her opportunity to enter into one (i.e. via a tenured position). Nevertheless, this is the only case that has suggested that economic coercion might be actionable in the absence of an already secured right pursuant to a contract.

the plaintiff's employment in an attempt to interfere with her right to free speech.  The evidence clearly demonstrates that the plaintiff was terminated by CMS because she had been barred from the SCHOC and CMS had no other nurse practitioner vacancies in Massachusetts in which it could place her.  See **Exhibit B**, Deposition of Ann Mack, pp. 129, 133; **Exhibit E**, Deposition of Sheila Porter, Vol. II, pp. 348-349.  Because the plaintiff has failed to demonstrate any actionable economic coercion or interference of her constitutional right to free speech by CMS, the plaintiff cannot sustain her burden of proof as to Count VII and summary judgment is appropriate as a matter of law.

## VI.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (COUNT VIII)

In Count VIII, the plaintiff alleges that CMS knowingly engaged in extreme and outrageous conduct toward the plaintiff and intended to cause, or should have known it would lead to, the plaintiff's emotional distress.  The plaintiff does not state with any specificity the conduct of CMS she is alleging was extreme and outrageous.  The plaintiff merely refers to "the above-described conduct." See **Exhibit A,** Amended Complaint, ¶ 137.  Presumably, the "above described conduct" the plaintiff is referring to is her allegation throughout the Amended Complaint that CMS, without prior warnings and without first attempting to rectify plaintiff's being barred from the Suffolk County House of Corrections facility, wrongly terminated her employment and in doing breached its contract with her and violated her constitutional rights. The plaintiff's claim fails for the following reasons.

### A.    The Exclusivity Provision of the Massachusetts Workers' Compensation Act Precludes Plaintiff's Intentional Infliction of Emotional Distress Claim

The Massachusetts Workers' Compensation Act ("MWCA") at M.G.L. c. 152, § 24 provides that "an employee waives his right of action at common law with respect to 'an injury

that is compensable under this chapter.'" *Hamilton v. Baystate Medical Education and Research Foundation, Inc.*, 866 F. Supp. 51, 56 (D. Mass. 1994).[5]  A compensable injury is a "personal injury arising out of and in the course of [an employee's] employment."  M.G.L. c. 152, § 26. "Common law actions are thus barred where the plaintiff is shown to be an employee, his condition is shown to be a 'personal injury' within the meaning of the [WCA] and the injury is shown to have arisen 'out of and in the course of employment.'"  *Hamilton*, 866 F. Supp. at 56, quoting *Foley v. Polaroid Corporation*, 381 Mass. 545 (1980).  It is undisputed that the plaintiff was an employee of CMS.  See **Exhibit E**, Deposition of Sheila Porter, Vol. II, p. 382.

The MWCA defines the term "personal injury" to include any mental or emotional disability "where the predominant contributing cause of such disability is an event or a series of events occurring within any employment."  M.G.L. c. 152, §1 (7A).  Under Massachusetts law, an emotional injury that arises "out of the termination process" or "in the course of termination" is considered to be "personal injury arising out of and in the course of employment" for purposes of the MWCA.  See *Hamilton*, 866 F. Supp. at 56 (emotional distress compensable under MWCA where conduct that allegedly injured employee was employer's failure to notify employee of termination), citing *Bertrand v. Quincy Market Cold Storage & Warehouse Company*, 728 F. 2d 568 (1st Cir. 1984) (emotional distress compensable under MWCA where conduct that allegedly injured employee was letter terminating employee that was part of series of events that began while plaintiff was still an employee); see also *Arnaud v. Chapdelaine Truck Center, Inc.*, 836 F. Supp. 41, 44 (D. Mass. 1993)(emotional distress compensable under MWCA where conduct that allegedly injured employee was demotion and ultimate termination); *Lennon v. Walsh*, 798 F. Supp. 845, 848 (D. Mass. 1992) (employee's claim for emotional distress

---

[5] There is an exception to preemption if the employee expressly reserves his right to bring common law causes of action.  M.G.L. c. 152, §24.  The plaintiff has neither asserted nor demonstrated that she has reserved her right to sue

compensable under MWCA where conduct that allegedly injured employee was wrongful termination); *Parisi v. Trustees of Hampshire College*, 711 F. Supp. 57, 63 (D. Mass. 1989) (same); *Flynn v. New England Telephone Company*, 615 F. Supp. 1205, 1209 (D. Mass. 1985) (same); *Simmons v. Merchants Mutual Ins. Co.*, 394 Mass. 1007 (1985) (same).

In this case, the presumed basis for the plaintiff's claim for emotional distress is that CMS, without prior warnings and without first attempting to rectify plaintiff's being barred from the SCHOC, terminated the plaintiff's employment in violation of her constitutional rights. As such, the alleged actions of CMS which inflicted emotional harm were part of a "series of events within [her] employment." M.G.L. c. 152, § 1 (7A). That series of events began with the plaintiff's barring from the SCHOC, and CMS's alleged failure to rectify the same, and ended with her alleged wrongful termination. In bringing her claim for intentional infliction of emotional distress, the plaintiff is seeking recovery for a "personal injury arising out of and in the course of [an employee's] employment," which is exclusively compensable under the MCWA. M.G.L. c. 152, § 26. [6] Accordingly, summary judgment must issue in favor of CMS on the plaintiff's common law claim for intentional infliction of emotional distress.

### B. Plaintiff Has Not Set Forth Facts Sufficient to Meet the Requirements of a Claims for Intentional Infliction of Emotional Distress

Even if the court were to find that the MWCA did not preclude the plaintiff's claim for intentional infliction of emotional distress on the present summary judgment record, the plaintiff has not set forth sufficient facts to meet the requirements of the claim. To prevail on a claim for

outside the Workers' Compensation Act, and thus this exception is not applicable in her case.
[6] Even if the plaintiff, in opposition, claims that her intentionally inflicted emotional distress arose solely from the act of her being terminated, her claim would still be precluded by the MWCA. The MWCA provides that a mental or emotional disability "arising principally out of a bona fide, personnel action including a transfer, promotion, demotion, or termination," will be considered a "personal injury" within the MWCA where the personnel action "is the *intentional* infliction of harm." *Mass. Gen. Laws ch. 152, §1 (7A)* (emphasis included); see also *Green v. Wyman-Gordon*, 422 Mass. 551, 557 (1996) (citing ch. 152, §1(7A) for proposition that intentionally inflicted emotional harm is compensable under the MWCA, even when result of bona fide personnel action).

23

intentional infliction of emotional distress, the plaintiff must show that: "(1) the defendant intended to inflict emotional distress or knew or had to know that emotional distress would result from the conduct; (2) the conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community; (3) the defendant's actions caused the plaintiff's distress; and (4) the plaintiff's distress was severe and of a nature that no reasonable person could be expected to endure it." *Ruffino v. State Street Bank & Trust Co.*, 908 F. Supp. 1019, 1049 (D. Mass 1995), citing *Agis v. Howard Johnson Co.*, 371 Mass. 140, 144-145 (1976).

The plaintiff is incapable of demonstrating that CMS' conduct in terminating her, even without warning or before first attempting to rectify her being barred from the Suffolk County House of Corrections facility, was conduct that was "extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community." *Ruffino*, 908 F. Supp. at 1049. In *Hamilton v. Baystate Medical Education and Research Foundation, Inc.*, 866 F. Supp. 51, 56 (D. Mass 1994), the Court held that the alleged conduct of the plaintiff's employer, in failing to follow pre-termination procedures prior to terminating the plaintiff and failing to notify the plaintiff that he had been terminated, did not "rise to the required level of outrageousness" as a matter of law. *Id.*, citing *Richey v. American Automobile Association*, 380 Mass. 835 (1980) (holding that the conduct of plaintiff's supervisor in terminating the plaintiff after attempting to verify plaintiff's excessive absences did not make out a plausible case of outrage); and *Mathias v. Beatrice Foods Co.*, 23 Mass. App. Ct. 915 (1986) (holding that where the complaint alleged that the employer gave the plaintiff a poor performance review, increased his sales goals by 42% and pressured him to take early retirement, the conduct was not extreme and outrageous).

Furthermore, even if this Court were to accept the plaintiff's allegations that she was terminated in violation of her civil rights, "the mere fact that the defendants' conduct may turn out to be violative of the plaintiff's civil rights does not, in and of itself, necessitate a finding that the conduct is sufficiently egregious to state a claim for intentional infliction of emotional distress." *Edsall v. Assumption College*, 367 F.Supp. 2d 72, 80 (D. Mass. 2005), quoting *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 319 (D. Mass. 1997), citing *Marques v. Fitzgerald*, 99 F.3d 1, 6-7 (1st Cir. 1996)). Because the plaintiff is incapable of meeting all of the elements of her claim for intentional infliction of emotional distress, summary judgment must issue in favor of CMS with respect to Count VII.

## CONCLUSION

For the foregoing reasons, the plaintiff cannot meet her burden of proof on the Amended Complaint claims for redress from CMS under either the Federal or Massachusetts Civil Rights Acts - 42 U.S.C § 1983 (Count I) and M.G.L. c. 12 § 11H and 11I (Count VII), or her claims for breaches of contract (Counts IV and V), termination in violation of public policy (Count VI), and intentional infliction of emotional distress (Count VIII). As a result, CMS respectfully requests that this Court allow CMS' motion for summary judgment with respect to all of the plaintiff's claims against CMS.

The Defendant,
CORRECTIONAL MEDICAL
SERVICES, INC.,
By its attorneys,
   /s/ Alexandra B. Harvey
Alexandra B. Harvey, BBO # 548944
Jennifer A. Norton, BBO # 658878
ADLER, COHEN, HARVEY,
WAKEMAN & GUEKGUEZIAN, LLP
230 Congress Street
Boston, MA 02110
(617) 423-6674