UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHEILA PORTER,           )<br>    Plaintiff           )<br>                          )<br>    v.                    )<br>                          )<br>ANDREA CABRAL, SUFFOLK    )<br>COUNTY SHERIFF'S DEPARTMENT, )<br>SUFFOLK COUNTY, and       )<br>CORRECTIONAL MEDICAL      )<br>SERVICES, INC.            )<br>    Defendants            )<br>                          ) | Civil Action No. 04-11935-DPW |

**DEFENDANTS ANDREA CABRAL, SUFFOLK COUNTY SHERIFF'S DEPARTMENT AND SUFFOLK COUNTY STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1**

Pursuant to Local Rule 56.1, Defendants hereby submit the following statements of material facts, each of which they contend is undisputed:

1. The Plaintiff Sheila Porter ("Mrs. Porter") is a former contract worker and nurse practitioner employed by Defendant Correctional Medical Services, Inc. ("CMS") at the Suffolk County House of Correction ("HOC"). (Amended Complaint).

2. Defendant Andrea J. Cabral was appointed Suffolk County Sheriff on November 29, 2002 to complete the remaining term of Sheriff Richard J. Rouse who retired in November 2002. (Deposition of Andrea Cabral ("Cabral"), May 6 2005, pg. 12, attached hereto as Exhibit 25).

3. All contractors, vendors, volunteers and interns are required to comply with SCSD policies including Policy S-220, Employee Code of Conduct. (Affidavit of Gerard Horgan ("Horgan"), attached hereto as Exhibit 7).

4. The Suffolk County Sheriff's Department (SCSD) has the authority to discipline its employees for violations of its policies. At all relevant times the SCSD maintained procedures for disciplining its employees. (Affidavit of Michael Harris ("Harris"), attached hereto as Exhibit 8).

5. The SCSD does not discipline contract workers, vendors, volunteers or interns. (Harris Affidavit, Exhibit 8).

6. Barring is the standard mechanism for removing contract workers, vendors, volunteers, and interns from the SCSD. (Horgan Affidavit, Exhibit 7).

7. Contract workers, vendors, volunteers or interns who are barred are not entitled to a hearing. ( Horgan Affidavit, Exhibit 7).

8. Both prior to and during the Cabral Administration numerous contractors and vendors were barred from the SCSD. None received a hearing. (Horgan Affidavit, Exhibit 7).

9. At all relevant times there existed a division within the SCSD that was responsible, among other things, for investigating allegations of inmate abuse – the Sheriff's Investigation Division ("SID"). (Horgan Affidavit, Exhibit 7). Mrs. Porter was aware of SID and understood its role in investigating allegations of inmate abuse. (Deposition of Sheila Porter ("Porter"), May 18 & 26, 2005, pgs.151, 153, attached hereto as Exhibit 11).

10. Mrs. Porter frequently reported allegations of inmate abuse to SID during the period of time that she worked at the HOC. (Porter Deposition, pgs.151-152, Exhibit 11).

**Medical Care at the Suffolk County House of Correction**

11. At all relevant times health care services at the HOC were provided by a private company pursuant to a contract with Suffolk County. (Horgan Affidavit, Exhibit 7).

12. From January 2001 to approximately April 2005 Defendant CMS was responsible for the coordination and provision of health care services at the HOC pursuant to a contract with Suffolk County. Prior to CMS, Correctional Healthcare Solutions, Inc. ("CHS") was responsible for the coordination and provision of health care services at the HOC pursuant to a contract with Suffolk County. (Horgan Affidavit, Exhibit 7).

13. There was no employment relationship between Suffolk County and CMS. The only relationship between Suffolk County and CMS was a contract to provide health care services at the HOC. (Deposition of Ann Mack ("Mack"), May 3, 2005, pg. 33, attached hereto as Exhibit 14).

14. The contracts between Suffolk County and CMS and CHS required that CMS and CHS maintain certain staffing levels at the HOC for the provision of health care services at the HOC. CMS and CHS interviewed and hired the staff necessary to maintain those staffing levels and provide the medical care at the HOC. (Horgan

    Affidavit, Exhibit 7; Mack Deposition, pgs. 33-34, 37-38, attached hereto as Exhibit 14).

15. At all relevant times CMS employed a Health Service Administrator ("HSA") who had responsibility for arranging all levels of healthcare and the delivery of health services provided to the inmates incarcerated at the HOC. (Mack Deposition, pgs.35-36, Exhibit 14; Deposition of Donna Jurdak ("Jurdak"), June 20, 2005, pg.20 attached hereto as Exhibit 15).

16. The HSA was also responsible for management of the Health Services Unit at the HOC and budgetary issues relative to the coordination and provision of health care services at the HOC. (Jurdak Deposition, pg. 20, Exhibit 15).

17. In 2003 CMS employed Donna Jurdak ("Jurdak") as the HSA at the HOC. (Mack Deposition, pg. 60, Exhibit 14; Jurdak Deposition, pg. 16, Exhibit 15).

18. HSA Jurdak knew that the SCSD had the right to bar CMS employees from the HOC at any time. (Jurdak Deposition, pg.80, Exhibit 15). During the period of time that HSA Jurdak worked at the HOC a number of CMS employees were barred from the HOC. None were provided with a hearing. (Jurdak Deposition, pgs. 82-83, Exhibit 15).

19. HSA Jurdak knew that all CMS employees were required to comply with the policies of the SCSD, including S220. (Jurdak Deposition, pg. 42, Exhibit 15).

20. HSA Jurdak was aware of her obligation to report allegations of inmate abuse to SID and she frequently reported allegations of inmate abuse to SID during the period of time that she worked at the HOC. (Jurdak Deposition, pgs. 45-47, Exhibit 15).

21. HSA Jurdak informed her CMS medical staff, including Mrs. Porter, of their obligation to report allegations of inmate abuse to SID. (Jurdak Deposition, pgs.45-47, Exhibit 15).

22. SID frequently asked CMS medical staff, including Jurdak and Mrs. Porter, for written reports. The SCSD had an "incident report" form, which was to be used for written reports. (Jurdak Deposition, pg. 50, Exhibit 15). HSA Jurdak never felt intimidated or deterred from making such reports to SID. (Jurdak Deposition, pg. 50, Exhibit 15).

23. Mrs. Porter never told HSA Jurdak that she felt uncomfortable in reporting officer misconduct to SID or deterred from doing so. (Jurdak Deposition, pgs. 58-59, 105, Exhibit 15).

24. At all relevant times CMS employed a Medical Director who was responsible for clinical decision regarding health care services at the HOC. (Mack Deposition, pg.35-36, 62, Exhibit 14; Jurdak Deposition, pgs. 19-20, Exhibit 15).

25. In 2003 CMS employed Dr. Carl Singletary as the Medical Director at the HOC. (Mack Deposition, pg. 62, Exhibit 14; Jurdak Deposition, pgs. 23-24, Exhibit 15).

26. Decisions regarding the specific medical care and treatment provided to inmates, including the necessity of diagnostic testing or hospitalization, were made by CMS without input from the SCSD. (Porter Deposition pgs.40-42, Exhibit 11; Mack Deposition, pgs.264-268, Exhibit 14; Jurdak Deposition, pgs. 68, 70, Exhibit 15).

27. CMS was responsible for purchasing all the supplies (e.g. medication, narcotics, syringes, bandages, etc.) necessary for the daily delivery of health care services at the HOC.  The SCSD provided the space for the Health Services Unit and purchased some large pieces of equipment (e.g. x-ray machine & dentist chair). (Horgan Deposition, pgs.158-159, Exhibit 6; Mack Deposition, pg. 269, Exhibit 14).

28. The SCSD provided security and escort for the medical staff and inmates to facilitate the provision of medical care by CMS to the inmates. (Horgan Deposition, Exhibit 10)

29. In 2003, Interdisciplinary Progress Notes was the form used by the medical staff at the HOC to document encounters with inmates in the inmates' medical records. (Mack Deposition, pgs. 186-187, Exhibit 14).

30. Medical staff at the HOC are required to document all medical encounters with inmates in the inmate's medical records, using Interdisciplinary Progress Notes. (Mack Deposition, pgs. 279-281, Exhibit 14; Porter Deposition pgs. 46-48, Exhibit 11; Jurdak Deposition, pgs. 34-35, Exhibit 15).

31. The medical provider at the HOC maintains all inmate medical records.  Between January 2001 and approximately April 2005 CMS maintained the medical records for inmates incarcerated at the HOC. (Mack Deposition, pgs. 281, Exhibit 14; Jurdak Deposition, pg. 14, Exhibit 15; Porter Deposition, pg. 43, Exhibit 11; Horgan Deposition, pg. 160, Exhibit 10).

32. The SCSD requires and performs background checks on all contractors, vendors, interns and volunteers working at the HOC. (Mack Deposition, pgs.54, Exhibit 14).

33. The contracts negotiated between Suffolk County and CMS and CHS provided that the SCSD reserved the unilateral right to bar any CMS/CHS employee from

4

  the HOC. (Horgan Affidavit, Exhibit 7; Horgan Deposition, pg. 154, Exhibit 10; Mack Deposition, pg. 270, Exhibit 14).

34. The contracts negotiated between Suffolk County and CMS and CHS provided that CMS and CHS employees were required to comply with all SCSD policies. (Horgan Affidavit, Exhibit 7; Jurdak Deposition, pg. 42, Exhibit 15).

35. Mrs. Porter was aware of her obligation to comply with the policies of the SCSD. (Porter Deposition, pg. 84, Exhibit 11).

36. As an employee of CMS and nurse practitioner at the HOC, Mrs. Porter was required to report allegations of inmate abuse to the SCSD. (Horgan Affidavit, Exhibit 7).

37. Mrs. Porter was aware of her obligation to report allegations of inmate abuse to SID. (Porter Deposition, pgs. 220-221, Exhibit 11).

**Mrs. Porter's Employment Status**

38. Mrs. Porter was hired by CHS and worked as a nurse practitioner for CHS at the HOC from August 1994 until January 2001. (Porter Deposition, pg. 15, Exhibit 11)

39. Mrs. Porter was hired by CMS and worked as a nurse practitioner for CMS at the HOC from January 2001 to June 10, 2003. (Mack Deposition, pg. 53, Exhibit 14; Porter Deposition, pg. 14, Exhibit 11).

40. CMS terminated Mrs. Porter on or about June 10, 2003. (Mack Deposition, pgs. 85, 121, Exhibit 14).

41. CMS made the decision to terminate Mrs. Porter because CMS did not have a position available for her. (Mack Deposition, pgs.221-222, Exhibit 14).

42. Currently CMS has contracts to provide health care services at the Essex County Correctional Facility and all the state prisons within the Department of Corrections. (Mack Deposition, pgs. 29-30, Exhibit 14).

43. CMS rehired Mrs. Porter in October 2003, once a position became available, to work as a full time nurse practitioner at the Essex County House of Correction. Mrs. Porter worked for CMS as a nurse practitioner at the Essex County House of Correction from October 2003 until March 2004 when she resigned. (Mack Deposition, pgs. 79, Exhibit 14; Porter Deposition, pg. 14, Exhibit 11).

44. The SCSD was aware that barring a CMS/CHS employee from the HOC did not mean they were terminated by their employer (CMS/CHS). CMS/CHS could

place the employee at another facility where they had a contract to provide services. (Horgan Deposition, pgs. 154-155, Exhibit 6).

45. From January 2001 through June 10, 2003 CMS paid Mrs. Porter's salary and contributed to her 401(k) plan. (Porter Deposition pgs. 17-18, Exhibit 11; Mack Deposition pg. 53, Exhibit 14; Exhibit 16).

46. CMS provided Mrs. Porter with W-2 forms for the time period of her employment. (Exhibit 18).

47. From January 2001 through June 10, 2003 CMS determined Mrs. Porter's salary, vacation and sick leave and controlled her hours, work schedule and assignments. (Porter Deposition, pgs. 17-18, Exhibit 11; Mack Deposition, pg.53, Exhibit 14; Exhibit 17).

48. From January 2001 through June 10, 2003 CMS evaluated Mrs. Porter's performance as a nurse practitioner and maintained her personnel file. The performance evaluations were used by CMS, among other things, as a tool to determine Mrs. Porter's salary. (Porter Deposition, pgs. 19, 21-23, & 408, Exhibit 11; Mack Deposition, pgs. 63-64, Exhibit 14).

49. CMS provided Mrs. Porter with the CMS Employee Success Guide that sets forth, among other things, the personnel policies, disciplinary process, rules and benefits concerning her employment with CMS. (Mack Deposition, pgs. 191-195, Exhibit 14; Porter Deposition, pgs.23-24, Exhibit 11).

50. The CMS Employee Success Guide provides that it is not an employment contract and should not be construed as such. (Exhibit 19; Porter Deposition, pg. 408, Exhibit 11).

51. The CMS Employee Success Guide provides that the "institution may temporarily or permanently withdraw access from anyone who works in or enters the institution….Loss of institution access normally results in termination of employment by CMS as security clearance/access is a precondition of employment by CMS." (Exhibit 19; Mack Deposition, pg.214).

52. Mrs. Porter never signed a contract of employment with CMS. (Porter Deposition, pg. 407, Exhibit 11).

53. Mrs. Porter never signed an employment contract with Suffolk County or the SCSD. (Harris Affidavit, Exhibit 8).

54. Suffolk County and the SCSD did not interview or hire Mrs. Porter. The SCSD did not provide Mrs. Porter with a copy of the SCSD Employee Handbook. (Harris Affidavit, Exhibit 8; Porter Deposition, pgs. 25, 27, Exhibit 11).

6

55. The SCSD does not maintain a personnel file for Mrs. Porter. (Harris Affidavit, Exhibit 8).

56. Suffolk County and the SCSD did not pay Mrs. Porter's salary, contribute to her 401 (k) plan or provide her with a W-2 form. (Harris Affidavit, Exhibit 8; Porter Deposition, pgs.18-19, Exhibit 11).

57. Suffolk County and the SCSD did not evaluate Mrs. Porter's performance as a nurse practitioner or participate in the evaluation process conducted by CMS. (Porter Deposition, pg. 22, Exhibit 11).

58. Suffolk County and the SCSD did not determine Mrs. Porter's salary, vacation and sick leave nor exercised any control over her hours, work schedule, and assignments. (Harris Affidavit, Exhibit 8; Porter Deposition, pgs. 61-64, 71-73 , Exhibit 11).

59. Mrs. Porter was not a member of any union or collective bargaining unit at the SCSD. (Harris Affidavit, Exhibit 8; Porter Deposition, pg. 339, Exhibit 11).

60. Mrs. Porter was not covered by the terms of any collective bargaining agreement negotiated by unions representing Suffolk County employees working at the SCSD and Suffolk County. (Harris Affidavit, Exhibit 8).

61. Mrs. Porter knew that the SCSD retained the right to bar CMS employees from the HOC. (Exhibit 1; Porter Deposition, pgs. 78-79, Exhibit 11; Exhibit 19).

62. Mrs. Porter reported to the CMS HSA concerning administrative matters pertaining to her work as a nurse practitioner. (Porter Deposition, pgs. 38, Exhibit 11; Jurdak Deposition, pgs. 20-21, Exhibit 15).

63. Mrs. Porter reported to the CMS Medical Director concerning clinical issues pertaining to her work as nurse practitioner. (Porter Deposition, pgs. 38, Exhibit 11; Jurdak Deposition, pg. 19, Exhibit 15).

**The Rene Rosario Allegations**

64. On May 19, 2003 an inmate at the HOC, Rene Rosario, alleged that an unidentified correction officer had physically assaulted him. Inmate Rosario made these allegations after he was transported to the Medical Housing Unit after complaining of hearing voices. (Deposition of Viktor Theiss ("Theiss"), May 24, 2005 Deposition pgs. 57-58, attached hereto as Exhibit 24; Porter Deposition, pgs. 170, 177, Exhibit 11).

65. Shortly after his arrival at the Medical Housing Unit, Inmate Rosario told the correction officer on duty that he wanted to speak with SID. (Theiss Deposition,

pgs. 57-58, Exhibit 24; Deposition of Brian Dacey ("Dacey"), June 16, 2005, pgs. 38-39, attached hereto as Exhibit 20).

66. The correction officer immediately contacted SID and informed them that Inmate Rosario wanted to speak with them. SID investigators Brian Dacey ("Dacey") and Sonya Aleman ("Aleman") responded to the Medical Housing Unit at approximately 1:50 p.m., interviewed Inmate Rosario and opened an investigation into his allegations. (Dacey Deposition, pgs. 38-39, Exhibit 20).

67. On May 19, 2003 Mrs. Porter was on duty as a nurse practitioner at the HOC. (Porter Deposition, pg.196, Exhibit 11).

68. Shortly after his arrival at the Medical Housing Unit, Inmate Rosario called Mrs. Porter over to his cell. Inmate Rosario told Mrs. Porter that he had been assaulted by a correction officer and showed her the injuries that he allegedly sustained as a result of the alleged assault. In her capacity as a nurse practitioner, Mrs. Porter made specific observations of Inmate Rosario's physical condition through the window of the cell door. (Porter Deposition, pgs. 196-197, Exhibit 11).

69. Mrs. Porter did not document her observations of Inmate Rosario's physical condition and his statements concerning how he was allegedly injured in Rosario's medical records. Mrs. Porter did not report Inmate Rosario's allegations to SID. (Porter Deposition, pgs. 195 & 201, Exhibit 11).

70. Mrs. Porter did not inform any of the other medical professionals who conducted examinations and assessments of Inmate Rosario after his arrival on the Medical Housing Unit on May 19, 2003 about her specific observations of his physical condition and his allegations that he was assaulted. (Porter Deposition, pgs. 201, 206-207, Exhibit11).

71. On May 19, 2003 Mrs. Porter informed her supervisor, CMS employee and HSA Donna Jurdak, that Rene Rosario was back at the HOC and in the infirmary on Medical Observation Assessment, A level ("MOA") status and that he was alleging that an officer had assaulted him. After some discussion, Mrs. Porter and Ms. Jurdak decided that Ms. Jurdak should communicate this information to SCSD Deputy Superintendent Mary Ellen Mastrorilli ("Mastrorilli"). (Porter Deposition, pgs. 223-224, Exhibit 11).

72. Mrs. Porter wanted Mastrorilli to convey the information to SID for investigation. (Porter Deposition, pgs. 224-225, Exhibit 11).

73. Mrs. Porter was aware that Inmate Rosario had asked the correction officer on duty in the Medical Housing Unit to contact SID for him. (Porter Deposition, pg. 403, Exhibit 11).

74. There was nothing specific on May 19, 2003 that caused Mrs. Porter to believe that SID would not investigate Inmate Rosario's allegations. (Porter Deposition, pg. 405, Exhibit 11).

75. On May 19, 2003 HSA Jurdak phoned Mastrorilli and reported what Mrs. Porter had told her. Mastrorilli requested that the Mrs. Porter submit a confidential report concerning her contact with the inmate. (Deposition of Mary Ellen Mastrorilli ("Mastrorilli"), June 27, 2005, pg. 52, attached hereto as Exhibit 22).

76. On May 19, 2003 Mrs. Porter knew that Mastrorilli had requested that she write and submit a report concerning her encounter with Inmate Rosario. (Porter Deposition, pg. 227-228, Exhibit 11; Jurdak Deposition, pgs. 100-101, Exhibit 15).

77. Mrs. Porter was familiar with the SCSD Incident Report Form and used that form to submit reports to SID during the period of time that she worked at the HOC. (Porter Deposition, pgs. 424-425, Exhibit 11).

78. On May 19, 2003 CMS employee and Physician's Assistant Beth Bringola ("PA Bringola") conducted a physical examination of Inmate Rosario and observed visible bruising on his left bicep. PA Bringola did not observe an injury to Inmate Rosario's chest. She documented this encounter and her observations of Rosario's physical condition in Inmate Rosario's medical records on May 19, 2003. (Dacey Deposition, pg. 85, Exhibit 20; Porter Deposition, pgs. 210-211, Exhibit 11).

79. On May 19, 2003 CMS employee and Licensed Practical Nurse Craig Meekins observed only a bruise on Inmate Rosario's left bicep. (Dacey Deposition, pg. 81, Exhibit 20).

80. Mrs. Porter was not present for PA Bringola's examination of Inmate Rosario. Mrs. Porter did not speak with PA Bringola about the results of the examination nor did she review the medical note concerning that examination that PA Bringola placed in Rosario's medical records. (Porter Deposition, pgs. 195, 201, 210 & 213, Exhibit 11).

81. On May 20, 2003 Mrs. Porter contacted FBI Special Agent Christa Snyder ("Agent Snyder") and informed her about Inmate Rosario's allegations and the Plaintiff's concerns that Inmate Rosario was currently incarcerated at the HOC. (Porter Deposition, pg. 234, Exhibit 11).

82. Mrs. Porter contacted Agent Snyder about Inmate Rosario's allegations because of her prior involvement with Inmate Rosario and her ongoing involvement with the FBI not because she had any distrust of SID or SID personnel under the Cabral Administration. (Porter Deposition, pg.330-331, Exhibit 11).

9

83. On May 21, 2003 SID Investigator Stan Wojtkonski ("Wojtkonski") had a conversation with Agent Snyder outside the Nashua Street Jail. During this conversation, Agent Snyder informed Wojtkonski that a member of the medical staff at the HOC, whom Snyder did not identify, had contacted her on the evening of May 20, 2003. Agent Snyder said this person told her that they had witnessed an examination of Inmate Rosario on May 19, 2003 conducted by a person named "Beth". Agent Snyder said this person told her that they had witnessed bruising to Inmate Rosario's neck, chest and arms that they did not feel was consistent with self-inflicted wounds. Agent Snyder asked to be kept updated on the status of the Rosario investigation. (Affidavit of Stan Wojtkonsi, attached hereto as Exhibit 21).

84. With the exception that her encounter with Inmate Rosario occurred at approximately 12:30 on May 19, 2003, Exhibit 23 accurately records the information that Mrs. Porter provided to Investigators Dacey and Aleman on May 22, 2003. (Porter Deposition, pgs. 261-266, Exhibit 11).

85. On May 22, 2003 SID investigators Dacey and Aleman were in the Medical Unit reviewing Inmate Rosario's medical records in conjunction with their investigation of his allegations, when Mrs. Porter approached them. Mrs. Porter provided Dacey and Aleman with some information concerning her encounter with Inmate Rosario on May 19, 2003 and her observations of his alleged injuries. (Dacey Deposition, pgs. 93, 96, 119, Exhibit 20; Exhibit 23; Porter Deposition, pgs. 261-266, Exhibit 11).

86. During this meeting Mrs. Porter informed Dacey and Aleman that she had a report about her encounter with Inmate Rosario on her home computer. (Dacey Deposition, pgs. 116-117, Exhibit 20).

87. Mrs. Porter did not provide Investigators Dacey and Aleman with a copy of any report at that time nor did she provide them with a copy of a document entitled "Interdisciplinary Progress Notes" concerning her encounter with Inmate Rosario that she had written and that was dated May 19, 2003. (Dacey Deposition, pgs.116, Exhibit 20; Porter Deposition, pgs. 255-256, Exhibit 11).

88. On May 23, 2003 Agent Snyder called Investigator Wojtkonski to inquire about the status of SID's investigation into Inmate Rosario's allegations. Investigator Wojtkonski informed her that two SID investigators had been working on the case for the past several days and had interviewed Inmate Rosario and taken photographs of his injuries on May 22, 2003. Investigator Wojtkonski informed Agent Snyder that investigators had not found the injuries that had been reported to Agent Snyder by her confidential source. Investigator Wojtkonski informed Agent Snyder that no member of the nursing staff had submitted reports to SID concerning injuries that had been incurred by Inmate Rosario. Investigator Wojtkonski assured Agent Snyder that no staff member would be hindered from speaking with an outside law enforcement agency, but the staff member still had

10

an obligation to report incidents directly to the SCSD and SID. Agent Snyder assured Wojtkonski that if the confidential source contacted her again she would advise it to report the incident directly to the Department. (Wojtkonski Affidavit, Exhibit 21).

89. Investigator Dacey spoke with Agent Snyder during this same time period to update her on the status of SID's investigation into Inmate Rosario's allegations and to see if she required any information. Agent Snyder indicated that she did not. (Dacey Deposition, pg.169, 170, Exhibit 20).

90. On May 28, 2003 Mastrorilli received a copy of a two-page document entitled "Interdisciplinary Progress Notes" that was authored by Mrs. Porter and that was dated May 19, 2003 (Exhibit 5) concerning her encounter with Inmate Rosario on May 19, 2003. (Mastrorilli Deposition, pgs, 24, 26; Exhibit 22).

91. Mrs. Porter did not provide the document entitled "Interdisciplinary Progress Notes" directly to Mastrorilli on May 19, 2003 or at any time thereafter because it did not occur to her to do so. (Porter Deposition, pgs. 228-230, Exhibit 11).

92. On May 28, 2003 SID received a copy of a two-page document entitled "Interdisciplinary Progress Notes" that was authored by Mrs. Porter and that was dated May 19, 2003 (Exhibit 5) concerning her encounter with Inmate Rosario on May 19, 2003. (Dacey Deposition, pg. 113, Exhibit 20).

93. On May 28, 2003, Investigators Dacey and Aleman conducted a follow up interview with Mrs. Porter concerning the information contained in the document entitled "Interdisciplinary Progress Notes" dated May 19, 2003. (Dacey Deposition, pgs. 122-123, Exhibit 20; Exhibit 12).

94. At the close of the interview, Investigator Dacey asked Mrs. Porter if she knew when Agent Snyder was contacted. Mrs. Porter acknowledged that she had contacted Agent Snyder on or about May 20, 2003. (Dacey Deposition, pgs. 132-133, Exhibit 20; Exhibit 12).

95. Investigator Dacey was not instructed by Sheriff Cabral or anyone at the SCSD to ask Mrs. Porter whether she was the individual who contacted the FBI. (Dacey Deposition pgs. 98-99, 123; Porter Deposition, pgs.287-288, Exhibit 11; Theiss Deposition pg. 239, Exhibit 24).

96. Investigators Dacey and Aleman did not tell Mrs. Porter that she would be barred from the HOC if she did not answer their questions. Investigators Dacey and Aleman did not tell Mrs. Porter that she would lose her job if she did not answer their questions. (Porter Deposition pgs.304-305, Exhibit 11).

97. SID closed its investigation into Inmate Rosario's allegations on or about June 4, 2003 after concluding that his allegations of physical abuse could not be sustained. (Theiss Deposition, pgs. 73-74, 83-84, Exhibit 24).

98. After the SID investigation was closed, Deputy Superintendent and Chief of SID Viktor Theiss ("Theiss") informed Agent Snyder that SID had concluded its investigation into Inmate Rosario's allegations and were unable to sustain them. The FBI never conducted its own investigation into Inmate Rosario's allegations nor brought any charges against any corrections officers in connection with those allegations. (Theiss Deposition, pgs. 241-242, Exhibit 24).

99. Sheriff Cabral first became aware of Inmate Rosario's allegations and SID's investigation into those allegations after SID completed their investigation on or about June 4, 2003. Theiss briefed Sheriff Cabral on the results of the investigation and Mrs. Porter's involvement. (Theiss Deposition, pgs. 83-84, Exhibit 24; Deposition of Andrea Cabral, May 6, 2005, pgs. 57-59, 65, Exhibit 25).

100. Theiss also informed Sheriff Cabral that during the course of the SID investigation it was learned that Mrs. Porter had provided information regarding Inmate Rosario's allegations to the FBI. (Cabral Deposition, pg. 59, Exhibit 25).

**The Barring of Mrs. Porter**

101. Sheriff Cabral decided to revoke Mrs. Porter's security clearance and bar her from the HOC because Mrs. Porter failed to document her observations of Inmate Rosario's physical condition in his medical record, failed to provide a confidential report in a timely manner as requested, and the document that was submitted ten days later was written on Interdisciplinary Progress Notes, appeared to be a medical note and it was dated the date of the incident as though that was the date that treatment was rendered. (Cabral Deposition, pgs. 86-87, Exhibit 25).

102. The Sheriff is solely responsible for the decision to bar individuals from the SCSD. (Horgan Affidavit, Exhibit 7).

103. Sheriff Cabral was not aware that Mrs. Porter was an informant for the FBI at the time that she made the decision to bar her from the HOC. (Cabral Deposition, pg.187, Exhibit 25).

104. Sheriff Cabral did not consult with CMS before making the decision to bar Mrs. Porter from the HOC. (Cabral Deposition pgs.71-72, Exhibit 25).

105. There are no provisions in the contract between the SCSD and CMS requiring that the Sheriff notify or consult with CMS prior to making her decision to bar a CMS employee nor are there any provisions granting a CMS employee a

right to a hearing by the SCSD before or after they are barred from the HOC. (Horgan Affidavit, Exhibit 7).

106. On or about June 10, 2003 Sheriff Cabral communicated her decision to bar Mrs. Porter and her reasons for doing so to Chief of Staff Elizabeth Keeley (Keeley). (Cabral Deposition, pgs.72-74, Exhibit 25; Keeley Deposition, pgs. 54-55, Exhibit 9)

107. On or about June 10, 2003, Keeley communicated Sheriff Cabral's decision to bar Mrs. Porter to Mastrorilli and asked her to inform Mrs. Porter that she was barred. (Keeley Deposition, pg.57, Exhibit 9).

108. Keeley also informed Mastrorilli that Mrs. Porter was being barred for multiple violations of Policy S-220 including, failure to document a medical file, failure to file a timely report, and sharing confidential inmate information outside of the Department. (Keeley Deposition, pg. 62, Exhibit 9).

109. On June 10, 2003 Mastrorilli informed Mrs. Porter that she was barred from the HOC. Instead of communicating all of the reasons for the barring, Mastrorilli only advised Mrs. Porter that she was barred for communicating confidential inmate information to an outside agency. (Mastrorilli Deposition, pg 34, Exhibit 22).

**Statements in the Media Concerning Mrs. Porter**

110. On or about August 24, 2004 Mrs. Porter granted Boston Globe reporter Andrea Estes an interview concerning, inter alia, her barring from the HOC, her involvement with the FBI and her intention to file a lawsuit. The article was published in the Boston Globe on or about August 25, 2004. In that article Mrs. Porter alleged that she had been "fired" by the SCSD in retaliation for providing information to the FBI. (Porter Deposition, pgs.364, 370, Exhibit 11; Exhibit 13).

111. On or about August 25, 2004 Mrs. Porter granted a television interview with WCVB-Channel 5 concerning, inter alia, her barring from the HOC and her involvement with the FBI. (Porter Deposition, pg. 372, Exhibit 11).

112. Mrs. Porter believed that the SCSD would respond to the article about her published in the Boston Globe on or about August 25, 2004. (Porter Deposition, pg. 371, Exhibit 11).

113. In response to Mrs. Porter's interviews with the Boston Globe and WCVB-Channel 5, the SCSD issued a Press Statement on or about August 25, 2004. Sheriff Cabral did not author the Press Statement but reviewed its content and authorized its issuance. (Keeley Deposition, pg.176 Exhibit 9; Cabral Deposition, pgs.164-165, Exhibit 26; Exhibit 4).

13

114. Mrs. Porter testified that the portion of the Press Statement that stated: "The Sheriff's Department did not fire Ms. Porter. She was employed by Correctional Medical Services and was fired by them for reasons that are known to Ms. Porter and CMS", is defamatory because the way it is phrased it suggests that there were reasons other than the action taken by the SCSD that formed the basis for her termination by CMS. (Porter Deposition, pg.382-383, Exhibit 11).

115. Mrs. Porter testified that the sentence in the Press Statement: "She is clearly biased and has her own agenda for speaking out at this time" is defamatory because 4 to 5 family members or friends mentioned to her that it struck them as implying a racial issue. (Porter Deposition, pgs. 383-384, Exhibit 11).

116. When Mrs. Porter first saw the Press Statement she did not think that it implied a racial bias but only thought of it when she heard other people's comments. She doesn't know whether that sentence in the Press Statement implies racial bias. (Porter Deposition, pg. 384-385, Exhibit 11).

117. Mrs. Porter knows that the word "biased" has a number of different meanings and doesn't necessarily mean racial bias. (Porter Deposition, pg. 422, Exhibit 11).

118. Mrs. Porter believes that the term "agenda" was defamatory and damaged her reputation because it called into question her motives and suggested that they were political. (Porter Deposition, pg. 387, 393, Exhibit 11).

119. Mrs. Porter's ability to obtain employment was not affected by any statements made by Sheriff Cabral. (Porter Deposition, pg. 389-390, Exhibit 11).

120. Prior to August 25, 2004 neither Sheriff Cabral nor the SCSD had issued any public statements concerning the barring of Mrs. Porter from the HOC on June 10, 2003. (Porter Deposition, pgs.371-372, Exhibit 11).

121. On or about September 8, 2004 Sheriff Cabral participated in a televised debate with Stephen Murphy, her opponent for the Office of Suffolk County Sheriff that was broadcast on the WGBH –TV program Greater Boston. (Exhibit 2).

122. Mrs. Porter was not identified by name during the debate. (Exhibit 2).

123. Mrs. Porter did not watch the debate and does not know anyone who watched the debate. (Porter Deposition, pgs.390, 392, Exhibit 11).

124. The only person Mrs. Porter spoke with about the debate was her 97 year-old aunt who listened to the debate. Her only comments to Mrs. Porter about the debate were: "I heard them talking about you on television" and that the election

that was the subject of the debate was in Suffolk County and Mrs. Porter could not vote there. (Porter Deposition, pgs. 391, Exhibit 11).

125. The primary election for the office of Suffolk County Sheriff was held on September 14, 2004.

126. Sheriff Cabral defeated her opponent, Stephen Murphy in the primary election. Sheriff Cabral had no opponent in the general election and was accordingly elected to the office of Suffolk County Sheriff on November 2, 2004.

127. In an article published in the Boston Globe Magazine on October 31, 2004 two statements are attributed to Steven Tompkins ('Tompkins"), press spokesperson for the SCSD. One sentence attributes a statement to Sheriff Cabral. None of these statements mention Mrs. Porter by name, nor is she identified by name in the article. (Exhibit 3).

128. The two statements attributed to Mr. Tompkins are: "Those allegations were 100 percent ridiculous. That's why you haven't seen any follow-up [after the election]." (Exhibit 3).

129. Sheriff Cabral did not authorize Steve Tompkins to make the statements quoted in the Boston Globe Magazine. (Cabral Deposition, pg. 149, 152 ,Exhibit 26).

130. The sentence in the article attributing a statement to Sheriff Cabral is: "Cabral says the allegations are all politically motivated." (Exhibit 3).

131. None of the statements attributed to Sheriff Cabral damaged the Plaintiff's personal or professional reputation. (Porter Deposition, pg 400-403)

132. Since her appoint in November 2002, Sheriff Cabral has made numerous changes in staffing, training and investigations of misconduct. (Exhibit 27, Defendant Andrea Cabral's Supplemental Response to Plaintiff's Second Set of Interrogatories).

                      Respectfully submitted
                      Andrea Cabral, Suffolk County Sheriff's
                      Department and Suffolk County
                      By their attorney

                      /s/ Ellen M. Caulo
                      Ellen M. Caulo
                      BBO# 545250
                      Deputy General Counsel
                      Suffolk County Sheriff's Department

                                        200 Nashua Street
                                        Boston, MA 02114
                                        (617) 961-6681

Date:   October 17, 2005