## BROADCAST TRANSCRIPT

Video Monitoring Services of America, Inc.
10400 Linn Station Road
Louisville, KY 40223
(502) 318-8400
(502) 239-6473 (FAX)

Date    September 08, 2004
Time    07:00 PM - 07:30 PM
Station WGBH-TV (OBS)
Location Boston
Program Greater Boston

**EMILY ROONEY**, host:

Tuesday, September 14th, is primary day for a number of state and county offices. One of the most hotly contested races is that of Suffolk County sheriff. There is no Republican running, which means next week's primary will determine the winner.

Joining me tonight are the two candidates. Incumbent Suffolk County sheriff, Andrea Cabral, who was appointed to the office by then acting governor James Swift in 2002. And Boston City Councilor at large, Stephen Murphy, who has served on the council since 1996.

Welcome to you both.

**Ms. ANDREA CABRAL** (Sheriff Incumbent): Thank you very much.

**Mr. STEPHEN MURPHY** (City Councilor): Thank you.

**ROONEY:** I should just say that our debate tonight will be an open discussion with o time limits on answers. Although, our producers in the booth will help make sure both candidates get an equal amount of time. All right.

**Mr. MURPHY:** Thank you.

**ROONEY:** Starting with you, Andrea. Unlike other states where the sheriff is the chief law enforcement officer for

the county, that's not the structure here in Massachusetts. So, describe what the duties are of the sheriff.

**Ms. CABRAL**: Statutorily. In other words, in terms of the law it is care, custody, and control of inmates and pretrial detainees. Pretrial detainees are people who are held on bail awaiting the outcome of the criminal cases, and inmates are people who are doing short, post conviction sentences at the house of correction.

Now, traditionally in Massachusetts they are only limited to correctional facilities and are not first responders, but we, however,m have been, in an ongoing public safety campaign, partnering with the Boston police and the MBTA police to increase the presence and visibility during certain times, because we have hit such a high spike in crime. And we are actually doing more in terms of community partnership to use the resources of the department to go beyond just what happens inside the walls.

**ROONEY**: Do you think, Stephen, there is a way for the sheriff to do more in terms of law enforcement when really, as Andrea said, statutorily that's not the way it's set up here in Massachusetts.

**Mr. MURPHY**: Well, there is a way to do more within the statute, I think. And that's to bring the sheriff's department into a position of real relevance as a partner in the fight against crime around our communities. And that is part of what my campaign is about. It's about taking the sheriff's department and corrections to another level and involving communities and involving partnerships that right now aren't there.

So, I am looking to work within the statute, which says that we do have care, custody, and control of the inmate population. Detainees and inmates in Suffolk County and county corrections. Most of those people are going to be getting out of those facilities anywhere between 13 months and 30 months, because 3-0 months is the maximum amount of time.

I think it is our duty to try to give them tools and, I guess, benefits that they don't have when they go in. They've committed a crime and they've gone in behind bars.

We are going to try to give them something that they didn't have while they are in there, rehabilitative services, so that when they come out they are better able to navigate society.

**ROONEY**: The budget for the office is somewhere in the neighborhood of $88 million. Would you describe, Andrea, your role is largely one of that of a financial officer?

**Ms. CABRAL**: No. It certainly isn't. Clearly, management of the budget is a huge part of what the sheriff's department does, but in terms of how you manage the facility internally there is much more. And how you deal with the outside communities that you serve and how you handle inmates on reentry.

**Mr. MURPHY** mentioned rehabilitative services. We currently have, I think, among the most comprehensive inmate programming and reentry services, I think, in the state. I've added two reentry programs since I have been sheriff, of the three that exist now.

And we have a very comprehensive adult basic education program, advanced college courses, vocational training, life skills, and what I call the humanities programing in the department. And it does serve, and it has been serving--we actually have results, because we have been able to study these programs--to reduce recidivism. It makes the public safer.

But you also have to have internal mechanisms to professionalize the office. We currently have the most stringent hiring standards in the history of this department, and the most stringent training standards. People cannot become officers until the graduate an eight week training academy. And that's after they go through some very stringent review and testing in order to be offered the job by me in the first place.

**ROONEY**: Stephen, you've been critical of Andrea's operation of the finances of the offices.

**Mr. MURPHY**: Right.

**ROONEY**: That she deferred payments into the pension fund after having to pay out some $5 million for a sexual

harassment suit brought by a prior sheriff.

**Mr. MURPHY**: Right.

ROONEY: But you sat here on our set, when you were running for treasurer, and said you can't blame the incoming officer for being burdened with something that their predecessor handed them. And that--you were specifically talking about what Shannon O'Brien, you know, had.

**Mr. MURPHY**: Had from Joe Malone or was handing off?

ROONEY: Yes. Both.

**Mr. MURPHY**: Well, I think I have to disagree a little bit with the sheriff. It's a, roughly, $90 million operation. It's mission is one of correction and how we manage those funds, how we work day to day to work within that budget or to go out and find external funding in whatever form or source we can directly impacts whether or not we can get those services to the people who need them and that impacts public safety.

And I have maintained in this campaign that I do not believe that the department is being run well. And I think that if you take a look at how the Stern Commission, which framed the argument about what the sheriff needed to do to pull the department out of its problematic position, I guess, would agree. The Stern Commission called for a number of things and I don't think those have been done.

ROONEY: Would you care to the criticisms of the Stern Report, the reform report that came out a couple of years ago and you were basically handed?

**Ms. CABRAL**: Absolutely. Absolutely. And I think that sort of inherent in Mr. MURPHY's answer was no real answer. You are absolutely correct. This was a $5 million settlement that I inherited. I had to manage that budget without layoffs, and I did that. Legislatures defer funding of pensions all the time in tough physical times. It does not mean that the money doesn't get paid. In this case the money recently did get paid, but what's very important is that I worked with the legislature to get a $2 million supplemental appropriation to offset that, but I cut $1.7 million, just enough--in FY03 alone, in wasteful

SP 204

SP 205

spending.

The first thing I did was I froze all management pay increases. Froze their longevity payments, their sick time buy back. We actually ended FY--we entered FY05 in the black. This is from a multimillion dollar deficit in November of 2003. My question is how would Mr. MURPHY have done it differently?

ROONEY: How would you have? Because she was under criticism from the Republican administration...

Mr. MURPHY: Of course.

ROONEY: and the Romney administration for doing that, but there was some partisan politics in that too. What would you have done?

Mr. MURPHY: Well, first of all, what you have to do is go back to the fact that what was done was in violation of state statute. And you cannot take money that does not belong to you. The money that was taken to use and payoff that strip search settlement is the employer contribution to the employee pension funds. Now, people are working there, they're entitled--they put some of their money aside for pension funds, the sheriff or any agency head is supposed to match that money. That money does not belong to the sheriff, never did--

ROONEY: How would you have paid the settlement?

Mr. MURPHY: Oh, I would have worked financially. I was not thrust in the position. I tried to be thrust into the position when I applied for the thing. I would have worked it differently. In business we do things differently, and I had seven years in the private sector. And one of the things I would have done is been on the phone to out subcontractors and supplier to see if we could defer our payments, or if we could knock down payments that were due on a monthly basis.

There are some big accounts over there. We never even went in that direction. In the meantime, we took over a bunch of our friends from the district attorney's office, we hired them at a rate, and then immediately bumped them up to another rate. And that was born out in the media.

There were people that received $15,000, $20,000, and $25,000 per year pay increases.

So, if you are faced with a $5 million deficit and then you go on and pad the payroll, bringing your friends over...

**ROONEY**: Do you want to quickly respond to that?

**Ms. CABRAL**: I do.

**Mr. MURPHY**: ...that is not financial management--not managing responsibly.

**Ms. CABRAL**: I'll try to make two or three quick points. first of all, in terms of what was done with the pension, **Mr. MURPHY** repeatedly refers to it as taking money. There was no money taken. And this was not money over which we have any control. So, we paid the bills that we had with the money that we had while we worked studiously to gain additional revenue.

But **Mr. MURPHY** sits here as someone against whom there have been federal tax liens for a business that he owned, which he did not--he had employee withholding, and there were some issues with that with the federal government. That speaks to a lack of management. I was trying to manage a debt that I inherited, not mismanaging a business that I owned.

**Mr. MURPHY** repeatedly talks about pay increases and bring over friends from the district attorney's office. Again, it's wrong. I brought over managers, proven managers. My chief of staff is the former acting district attorney of Suffolk County district attorney's office. These are people, who with Ralph Martin and others, turned that district attorney's office around, and we replicated that model.

The raises that he speaks of? He knows better. He knows it's inaccurate. That's Rule 15-F. That is a city of Boston policy. When everyone is hired they are started at the first step and first grade of pay until the city of Boston puts them at the pay that they were promised. That is the complete accounting--that's Peoplesoft Accounting. We have nothing to do with that whatsoever. Not a person has gotten a raise.

SP 206

**ROONEY**: All right, let me ask about this.

**Ms. CABRAL**: Not a person has gotten a raise.

**Mr. MURPHY**: That is not the case at all. People come over from the district attorney's and they are making a certain figure and then they immediately get a $15,000 or $20,000 pay increase the day after they go one. That is a pay increase. That is financial mismanagement.

And we--this isn't stuff that I brought forward. This is stuff that I read about after deciding to run for office. This came out in February or March. I was unaware of this stuff until somehow it appeared in one of the Boston papers. And every time I mention something that I see or hear in a Boston paper I am being told that I fabricated it and that is just not the case.

**ROONEY**: I think we are clear on both of those positions.

Andrea, you have been accused of flip flopping. You were a Democrat and then a Republican and now a Democrat. Have you done that for political expediency and what do you consider yourself now?

**Ms. CABRAL**: No, I think if I were to have made the politically expedient decision I would have waited--stayed as a Republican, waited until the general election, where there would be a much higher voter turn out and took advantage of more time to raise more money and so forth. I mean, this was clearly both a personal and a professional decision, and I have been very candid when asked about it.

As a private citizen entering into this position I was focused on doing the job. And I have been very candid about saying the magnitude of import that party affiliation has was not readily apparent to me when I initially took the job, and I was focused on doing the job. The things that became apparent to me both in terms of my personal and political beliefs and my ability to establish a relationship that would bring the professional resources to the department led to my decision.

And the thing I felt worst about was my conversation--my initial conversation with Jane Swift, and I made sure that I

SP 207

7

called her before I made the decision. I am very comfortable with my decision and I stick by it. But that was not the reason why I was appointed to the position of sheriff. I was appointed because I was the most qualified person to do the job.

ROONEY: Steve, you have been critical of Andrea's flip flopping, but you too have been accused of doing things for political expediency; seeking any office that's open, treasurer, the 9th district city council at large.

Mr. MURPHY: I never sought the 9th district.

ROONEY: You were in there briefly.

Mr. MURPHY: I did--I floated a balloon about that. But I did run for school council.

ROONEY: What is wrong with changing a party affiliation? What's the critical issue there?

Mr. MURPHY: I think the critical issue is that Andrea would not be sitting here as the sheriff of Suffolk County had she not switched parties to get the job. Andrea had left the district attorney's office in March of 2004. And I don't know what she was doing between March and October, but she was out seeking employment somewhere. So, Andrea was going out, seeking a job from the governor, and she pretty much said that she would do what the governor wanted her to do to get that job.

I was also asked if I would consider changing party, and I have deep rooted beliefs in the Democratic party. I though at that point in time when I chose not to change party affiliation that my chances of appointment were gone. And in terms of political expediency, I happen to believe that the track record of this administration is so bad, whether I am running in the Democratic primary or not, I think I have a decent chance to upset the incumbent, coming in either September or November.

I just think Suffolk County can do better. And I have offered a plan--I've offered a five point plan on how to do that, improving employee morale, improving offender outcomes, financially managing the facility better, increasing training, and a couple of other issues.

SP 208

8

**ROONEY**: Andrea, you are a black female in a traditionally all white male system. How big an issue is race in this race and in the job that you hold?

**Ms. CABRAL**: Well, certainly, because we are in America, I think race plays a role in everything. I don't necessarily believe--if it;s an issue it's an issue for the other person, in my view. I think that what the people really want is leadership and I don't think that it matters as much now, perhaps, as it did before, the color of the skin of the person who's providing that leadership.

But what I will say is, with regard to Mr. MURPHY's last comment, if you listen closely to his answer, what he said to you is that I got the job because I agreed--I would have done anything to get the job. And then he said that he was asked. Mr. MURPHY, in his literature, and I have heard him publicly, has gone so far ass to say that he was offered the job as sheriff.

I know for a fact, and I know the people who said it publicly--

**Mr. MURPHY**: No you don't. You weren't the offerer of the job.

**Ms. CABRAL**: And I absolutely know for a fact people who have said it, that he wasn't offered.

**Mr. MURPHY**: She was not in my interview process, and this is ridiculous.

**Ms. CABRAL**: Excuse me.

**ROONEY**: wait a minute. One of you finish the thought. Are you saying he was or wasn't?

**Ms. CABRAL**: Please show some courtesy, Mr. MURPHY.

**Mr. MURPHY**: I'm councilor Murphy, by the way, sheriff. Just so you know, I've been elected for three months.

**ROONEY**: Just finish the thought.

**Ms. CABRAL**: Thank you. Mr. MURPHY was not ever led to

SP 209

SP 210

believe to get the job of sheriff. Whether he was asked to switch parties or not. The Stern Commission Report was issued in October of 2002 and the Stern Commission was very clear. And given Mr. MURPHY's political career, he was exactly not the person to be appointed sheriff.

ROONEY: I want to get back to the point--

Mr. MURPHY: I want to get this straight.

ROONEY: I want to get back to the point that I raised, because you had been endorsed by the Reverend Eugene Rivers. He says he believes a white man will better serve the black community in Boston. What does he mean by that.

Mr. MURPHY: I don't think he exactly said that. I think he said--I've been talking to Eugene Rivers. Remember, I have been chairman of public safety for the Boston City Council for five of the eight years that I have been on there. And I have been at the table with Mayor Manino and Commissioner Evans and the clergy that have been trying to make a difference in the crime problems that we have been having in this city for the past five or six years.

What Reverend Rivers has said is that he has listened to my pitch and he thinks that we can do better in corrections, that I can use the Boston police model of community policing and take it to the corrections. And that's where I want to go. I am going to partner with institutions to get GED and literacy programs that aren't available right now, I am going to partner with hospitals to get drug treatment and alcohol treatment programs that aren't available right now, I am going to partner with the building trades to get apprenticeship opportunities to get people who are in our custody and are coming out in--

ROONEY: So, you don't think that he was saying that the community would listen to a, you know, a white guy versus a black female?

Mr. MURPHY: I think what he was saying is that I have been there and at the table and working and sharing and cooperating with the community for the last five years. I think what I heard him say is that he hasn't seen the sheriff in the 22 months since she's been sheriff. Now, election time comes up and she shows up..

ROONEY: How do you read that endorsement? And I'm going to ask you too, how your own management people, the jail people have not endorsed you and yet Eugene Rivers has turned to Steve Murphy. Jail officers.

Ms. CABRAL  I'll take those two separately. I think it's ironic because Ella Baker House, which Eugene Rivers runs is a partner with the Boston reentry initiative and has ben for some time. And Reverend Rivers has seen me. There is no question about that, but I don't think his endorsement speaks to anything but his own personal opinion. I think that Reverend Rivers--I will leave it at this, because I don't wish to show him the same disrespect that he showed me in his comments. That Reverend Rivers is a well-known figure in Boston and I leave it to the voters the extent as to whether his endorsement matters to them or doesn't matter, to form their own opinion.

ROONEY: The jail officers--

Ms. CABRAL: But with regard to the jail officers, we are talking about 122 people out of 1,100 employees. Mr. Murphy has consistently touted this is a full union endorsement. More than half of them didn't even show up to vote. The more important thing is that with my largest union, 419, that represents the officers at the South Bay House of Corrections, they signed a two-year contract with me at no pay increases. My civilian union, which represents approximately 180 people, signed a contract with me at no pay increases. Those are votes of confidence.

When you add to that--there is a cadre of officers, there is no question--a cadre of officers who would love dearly for Mr. MURPHY to become sheriff, because things would return to the way they were. And there are people that flourish under a patronage and cronies system.

I have to make one more small comment. What Mr. MURPHY says about programming and services is absolutely untrue. There are GED programs, EDP, Sped, abuse and substance programming. He has consistently, consistently misrepresented and fabricated the level of programming that's offered.

ROONEY: I want to--I want to get a question in here, but I

SP 211

SP 212

want you to respond to that.

**Mr. MURPHY:** sure.

ROONEY: A lot of what people care about in the community right now is what's going on with gang violence. And you have said that a lot of this has to do with the fact that there is no rehabilitation in prison, and these prisoners are being released and just doing the same old thing all over again.

**Mr. MURPHY:** Right. We can do better.

ROONEY: But is that true? Is it county prisons or is it the state prisons that are--

**Mr. MURPHY:** It could be both, but I think we can do better at the county level. And I have talked to several of the institutional partners who have made a difference in public safety in Boston, with Mayor Manino, with Commissioner Evans, and Commissioner O'Toole, and they have never been asked to partner up with the Suffolk County sheriff's department. And they've been asked, as a candidate Steve Murphy, hopefully Sheriff Steve Murphy, to take corrections to a new level.

Another--I would like to if I could respond.

ROONEY: Yes, please.

**Mr. MURPHY:** The 122 to one vote, there were 123 people that did cast a ballot. One hundred twenty-two of them voted for change, for reform in their own department. The other union that she talks about that took a zero percent pay increase for two years, they also gave up drug testing for one full year of their two year term. Now, here's the thing--and I think that's an endangerment of public safety.

Here we are, we have federal investigations ongoing, which I might add, this sheriff is not cooperating with the federal government. We're firing cooperative witnesses. And the part of the--the genesis of that is that people are smuggling drugs into the building. And now you have jail officers, who used to be tested every year, now only half of them have to be tested every year. That's a major concession, it impacts public safety, it's wrong headed,

SP 213

we're going in the wrong direction.

**ROONEY**: OK, and we have to get back to the issue here, which is about the whistle blower. Part of this Stern Commission Report was reform, and you would think that reform would mean listening to those within your department who brought complaints to you. People were cooperating with the FBI, another person was talking about prisoner abuse, and both those people no longer have those jobs. You have been accused of firing people for essentially going around you, whistle blowing to the FBI and others. What happened there?

**Ms. CABRAL**: Well, before--if I may, before I answer that I want to say this. And I think FDR said it best when he said the repetition of a lie does not make it the truth. And Mr. MURPHY has repeatedly misrepresented--the drug testing that he spoke of just now, absolutely untrue. Absolutely untrue.

Now, with regard to your question, neither of those people was a whistle blower. I am able to speak about one of the individuals, but not the other. We have a policy, and it is good human resources policy, we don't talk about people who are barred. In the case of the first person, that person was barred and not fired. She was not employed. We don't talk about people who are barred or terminated. That's just the policy.

But with regard to the second person that you read about, this was a person that testified in the federal trial of officers accused of beating up an inmate with tourettes syndrome. He testified that he had literally violated policies hundreds of times and had covered up inmate abuse hundreds of times. This is not an officer that I would have back, whether he cooperated with the federal government in testifying to avoid indictment himself. This is not someone that I would have back into the institution. That is the very reason I was brought into the institution.

But the other thing that I would ask Mr. MURPHY is that the focus has consistently been, in this race, on Mr. MURPHY's criticisms, for which he is never asked to offer real proof, and no focus on what he has accomplished, or failed to accomplish as a city councilor or the chair of public safety, and those things are leaders.

SP 214

ROONEY: OK, let me ask, Steve Murphy, as sheriff would you have held on to those two employees knowing as much as you do about the case.

Mr. MURPHY: First of all, the inherent unfairness of the whole thing. The sheriff talks about the fact that we don't talk about these policies, not because they have a policy, but because it's convenient for the sheriff not to talk about that one. We have a 61-year-old grandmother, who was operating under Sheriff Rouse's memorandum that said, 'Federal investigators are in the building and I wish that you all would cooperate with them to get to the root of why they are here.'

We change sheriffs. This new sheriff comes in, brings a whole group of people, none of them with any corrections experience, all trial attorneys, all courtroom lawyers, and they are running a $90 million agency--

ROONEY: Do you have corrections experience?

Mr. MURPHY: No, mam, I don't, but I am a manager, and the Stern Commission said the sheriff should be a leader and a manager. And the Stern Commission said that the number one or number two person should be a corrections expert. That hasn't happened under this watch. We have the top three people coming over from the DA's office, they were courtroom attorneys, they are way in over their head, and they changed a policy of cooperation with the federal government, and never notified employees.

So, this 61-year-old grandmother is operating under the same memorandum that Sheriff Rouse put out in 2001, when the federal investigation started, and they pulled the rug out from under her now. And there is a potential obstruction of justice charge against several of the employees.

ROONEY: I'm at a loss. Is this one of the employees that you are not supposed to be talking about?

Mr. MURPHY: And it's a sad state.

Ms. CABRAL: I absolutely should be able to respond to this because this level of recklessness would be highly

indicative to voters as to the type of manager Mr. MURPHY would be. He knows absolutely nothing about the facts of either cases, except for what he has read in the newspapers, unless he's had interviews with these people, who clearly had their own agenda.

For someone who presumes to be the leader of the largest sheriff's department in the county--the commonwealth rather, to sit and talk about employee terminations, where he was not present at the hearings,m he has absolutely no idea what went into the decision making, and to do it for political expediency speaks to a level of recklessness that I think voters will reject. He does not know what he is talking about.

Mr. MURPHY: All this--

Ms. CABRAL: Excuse me, Mr. MURPHY.

He does not know what he is talking about and he does not have the facts. The only reason why I spoke about the second employee versus the first is because the second employee testified in a court of law and what he testified to is a matter of public record.

ROONEY: OK. I want you to respond to that quickly.

Mr. MURPHY: I happen to know the interests of fairness, and the interests of fairness were not followed here. You change the conditions and you don't tell the employees what you are doing. You have a person who is doing her duty, cooperating with a federal grand jury investigation at the FBI level, and who is terminated for speaking to any outside agency.

We have the director of training who simply went in a told his superiors that they were not--their people were not ready for the DNC for public safety issues. He was fired because he was portraying the department in a bad light. What happens is you have these things, these missives come from down on high and there's bullying and there is a lot of other intimidation that goes on there by people that have no background in corrections and no business, frankly, running a $90 million correctional institution.

ROONEY: We are actually out of time already, but you each

SP 215

have a minute here to establish a priority you would have in office or you can go back and talk about one of the points you have already raised.

But I will start with you, Mr. MURPHY.

Mr. MURPHY: Well, 22 months ago the Stern Commission came out and said we needed major reforms in four areas in the Suffolk County Sheriff's Department, financial mismanagement, there was a federal investigation into prisoner abuse, there was low employee morale, the Stern Commission suggested that the sheriff should be a leader who manages, someone who could bring people together, bring resources in for that department, and make it fulfill its mission. I maintain that 22 months later that that mission has failed under this sheriff and this administration. There are not--there is no corrections professional at the top tier of this, there are three lawyers from the district attorney, federal investigations continue, prisoner abuse continues, financial mismanagement continues.

And the voters of Suffolk County have, for the first time in 18 years, have an opportunity to take matters into their own hands. We have had two Republican appointed sheriffs in the last two terms and it's time for the voters to take it back. And I am looking for their vote on September 14th.

ROONEY: Stephen Murphy, thank you very much.

Andrea Cabral.

Ms. CABRAL: Again, repetition of a lie does not make it true. I think the voters need to take a clear, whether you are looking at this program, any other program on which I've been with my opponent, or anything that he has done publicly where we have been in the same room and ask yourself, when has he ever told you why he should has been sheriff? What qualifies him to be sheriff? He has never answered that question. His tact has been to level unfounded criticism as a mechanism for distracting voters from the fact that he is a serial office seeker.

He has run for a different office every year for the last five years. This office is just a matter of opportunity for Mr. MURPHY. He has no background, he has no criminal

SP 216

16

justice experience, he is not an attorney. I work with people who know corrections, and who every day move forward to make that a model. What we have done in 20 months is unprecedented in this department. I am asking the voters to keep me on as sheriff so that I can continue the work that I started.

ROONEY: All right, we are out of time. The election is next Tuesday for Suffolk County.

Ms. CABRAL: Thanks very much.

ROONEY: Stephen Murphy and Andrea Cabral, thanks for being with us. Thanks for coming tonight.

Mr. MURPHY: Thank you.

ROONEY: All right. That's it for GREATER BOSTON.

###