1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

VOL:  I
PAGES: 1-202
EXHIBITS: 1-6

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

*. * * * * * * * * * * * * * *
SHEILA J. PORTER,                    *
              Plaintiff              *
        -vs-                         *   Civil Action
ANDREA CABRAL; SUFFOLK COUNTY        *   No. 04-11935-DPW
SHERIFF'S DEPARTMENT; SUFFOLK        *
COUNTY and CORRECTIONAL MEDICAL      *
SERVICES, INC.,                      *
              Defendants             *
* * * * * * * * * * * * * * * * *

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER


    DEPOSITION OF ELIZABETH KEELEY, ESQUIRE, a
witness called on behalf of the Plaintiff, in the
above-captioned matter, said deposition being
taken pursuant to the Federal Rules of
Civil Procedure, before Patricia M.
McLaughlin, a Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the offices of Goodwin Procter
LLP, Exchange Place, Boston, Massachusetts, on
Wednesday, May 11, 2005, commencing at 10:08 a.m.


            McLAUGHLIN & ASSOCIATES COURT REPORTERS
                92 DEVIR STREET, SUITE 304
                MALDEN, MASSACHUSETTS  02148
                    781.321.8922
                WWW.E-STENOGRAPHER.COM

54

1    violations to decide what action would be

2    taken.

3    Q    I believe you testified before that you had

4         an opinion about what action should be taken;

5         is that right?

6    A    Yes.

7    Q    What was your opinion?

8    A    My opinion was that we should bar her from

9         the facility.

10   Q    And you related that to Sheriff Cabral?

11   A    Yes.

12   Q    Did you tell her what that opinion was based

13        on?

14   A    I told her it was based on what I had just

15        related and the concerns that a nurse would

16        not document a medical file; that that was

17        for me pretty egregious; that not documenting

18        something contemporaneous with what you hear

19        or see is pretty significant, particularly in

20        light of the context of an investigation into

21        allegations of officer misconduct or

22        excessive force or intentional abuse.

23   Q    Was this the first time that Sheriff Cabral

24        was made aware of Mrs. Porter's involvement

1          in the Rosario matter?

2                    MS. CAULO:   Objection.

3     A    I don't know when she became aware.  I know

4          that in that conversation she had recently

5          had conversation with Viktor Theiss, and I

6          don't know to what extent Nurse Porter came

7          up in that conversation.  But she seemed to

8          be aware of what I was discussing.

9     Q    What did Sheriff Cabral say in response to

10         your opinion?

11    A    I recall at one point she asked me, well, how

12         does that happen; if we are to bar her, how

13         does that happen.

14    Q    What did you say in response?

15    A    My memory is I said that we notify the

16         individual and then a written notice is given

17         to the shift commander.

18    Q    Did she say anything else with regard to

19         Miss Porter at this time?

20    A    I recall that she said that she should be

21         barred.

22    Q    Did she explain why she thought that she

23         should be barred?

24    A    I don't recall what she said.  I know we

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

57

1    on the morning of June 10th, then it would

2    have been within a matter of hours that I

3    called her.

4    Q    Tell me everything you remember about that

5    conversation with Miss Mastrorilli.

6    A    The first conversation I had with her, I

7    called her, and I told her that the decision

8    had been made to bar Sheila Porter.  And my

9    memory is that she said, okay, fine.  That

10    was the extent of the conversation.

11    Q    Did you tell her why Miss Porter was being

12    barred?

13    A    I don't think so.  Not in that conversation,

14    no.

15    Q    How did you leave it with Miss Mastrorilli?

16    A    I think I left it like that.

17    Q    You instructed her to bar Miss Porter?

18    A    Yes.

19    Q    Do you remember anything else about that

20    conversation other than you telling

21    Miss Mastrorilli that the decision had been

22    made to bar Miss Porter?

23    A    No, my memory is that that's what the

24    conversation -- Mary Ellen may have said

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

62

1       flipped through some more pages, and I

2       remember telling her her failure to file a

3       timely report, her failure to document a

4       medical file.  And I remember that -- again,

5       I'm not sure of the order, but it was failure

6       to document a medical file, failure to file a

7       timely report.

8              I may have mentioned that her failure to

9       file a report -- my memory is that I said

10      this:  That failure to file a report

11      interfered with an ongoing investigation;

12      that her report was inconsistent with other

13      reports of what people claim to have seen in

14      terms of injuries to Rene Rosario, so that it

15      was not a credible report.

16             I remember hesitating, because I wasn't

17      sure whether I wanted to say this, but I

18      remember pausing.  And I said, "And you can

19      share with her that because Rene Rosario has

20      been talking about his role as an informant

21      and he has mentioned her name in the context

22      of cooperating with the FBI, that the

23      department could not assure her personal

24      safety."

176

1   Q    Do you know whether or not the criminal

2        investigation is still ongoing?

3   A    I think it is, yes.

4   Q    Are you familiar with a statement that was

5        released to the press on August 25th, 2004,

6        concerning Mrs. Porter that was released on

7        behalf of the Sheriff's Department?

8   A    I know of a statement we made.  I'm not

9        exactly sure that's the date, but we did

10       release a statement in August of 2004.

11  Q    Did you have any role in drafting that

12       statement?

13  A    Yes.

14  Q    How would you describe your role?

15  A    How did I do it?

16  Q    What was your role?  Did you physically draft

17       the statement?

18  A    I went to my computer and typed it on the

19       screen.

20  Q    You drafted the statement?

21  A    I did.

22  Q    Did you receive input from anybody to

23       determine what should go into that statement?

24  A    Yes.