Sheila J. Porter                                              05/18/2005

|   |   |   |
|---|---|---|
| 1 | Volume: | I |
| 2 | **CERTIFIED ORIGINAL** Pages: | 1-248 |
|   | **LEGALINK BOSTON** | |
| 3 | Exhibits: | 1-5 |

```
4              UNITED STATES DISTRICT COURT

5            FOR THE DISTRICT OF MASSACHUSETTS

6                              NO. 04-11935-DPW

7   - - - - - - - - - - - - - - - - - - - - - - - x

8   Sheila J. Porter,

9                   Plaintiff,

10       v.

11  Andrea Cabral, Suffolk County

12  Sheriff's Department Suffolk County,

13  and Correctional Medical Services, Inc.,

14                  Defendants.

15  - - - - - - - - - - - - - - - - - - - - - - - x

16

17            DEPOSITION OF SHEILA J. PORTER

18              Wednesday, May 18, 2005

19                    10:10 a.m.

20    ADLER, COHEN, HARVEY, WAKEMAN & GUEKGUEZIAN

21              230 Congress Street

22            Boston, Massachusetts 02110

23

24  Reporter:  Lori-Ann London, RPR
```

LegaLink Boston
(617) 542-0039

Sheila J. Porter, Vol. 2                                           05/26/2005

249

1                                              Volume:    II

2       CERTIFIED ORIGINAL                     Pages:     249-462
        LEGALINK BOSTON
3                                              Exhibits:  6-10

4                    UNITED STATES DISTRICT COURT

5                   FOR THE DISTRICT OF MASSACHUSETTS

6                                         NO. 04-11935-DPW

7       - - - - - - - - - - - - - - - - - - - - - - - x

8       Sheila J. Porter,

9                       Plaintiff,

10          v.

11      Andrea Cabral, Suffolk County

12      Sheriff's Department Suffolk County,

13      and Correctional Medical Services, Inc.,

14                      Defendants.

15      - - - - - - - - - - - - - - - - - - - - - - - x

16

17          CONTINUED DEPOSITION OF SHEILA J. PORTER

18                   Thursday, May 26, 2005

19                          9:05 a.m.

20      ADLER, COHEN, HARVEY, WAKEMAN & GUEKGUEZIAN

21                    230 Congress Street

22                 Boston, Massachusetts 02110

23

24      Reporter:   Lori-Ann London, RPR


                              LegaLink Boston
                              (800) 822-3376

Sheila J. Porter                                         05/18/2005

14

1   Healthcare facilities on a per diem basis, where
2   were you employed?
3       A    At Essex County, full time.
4       Q    From when to when?
5       A    October to March.
6       Q    October of 2003?
7       A    I'm sorry.  Yes.
8       Q    Till March of...
9       A    2004.
10      Q    Prior to Essex County -- that was CMS,
11  correct?
12      A    Yes.
13      Q    Prior to working full time with CMS at
14  Essex County, where were you employed?
15      A    Suffolk County House of Correction.
16      Q    By whom?
17      A    CMS.
18      Q    Correctional Medical Services?
19      A    Correct.
20      Q    How long were you employed by
21  Correctional Medical Services?
22      A    From January of 2001 until June 10th,
23  2003.
24      Q    What were your duties and

LegaLink Boston
(617) 542-0039

1   responsibilities while you were working for CMS at
2   the Suffolk County House of Correction?
3       A    Similar to what I explained earlier,
4   primary care medicine of incarcerated males and
5   females, so physical exams, chronic care, sick
6   call. I usually -- I usually had the
7   responsibility of taking care of the females at
8   the facility. So I did the same thing in the
9   unit, which is on the 10th floor, for the females.
10      Q    Prior to your employ by CMS -- which
11  commenced in January of 2001; is that correct?
12      A    Correct.
13      Q    -- by whom were you employed?
14      A    CHS, Correctional Healthcare Solutions.
15      Q    And where were you working --
16      A    The same --
17      Q    -- when you were employed by
18  Correctional Healthcare Solutions?
19      A    The same facility, at Suffolk County
20  House of Correction.
21      Q    And what was the time of your employment
22  by Correctional Healthcare Solutions?
23      A    I believe it was August of 1994 until
24  they -- until CMS took over in 2001.

1   A   Yes.

2   Q   Who paid your salary from January of
3   2001 through June of 2003?

4   A   Correctional Medical Services.

5   Q   How were you paid; that is to say, how
6   did you receive your check?

7   A   I believe Correctional Medical Services
8   was direct deposit with a check stub to the
9   facility.

10  Q   And how was the process by which your
11  check was directly deposited accomplished; did you
12  fill out some paperwork?

13  A   Yes.

14  Q   And who provided you with that
15  paperwork?

16  A   It would have been the health service
17  administrator.

18  Q   Health service administrator is an
19  employee of whom?

20  A   Correctional Medical Services.

21  Q   And during the period of time that you
22  were employed by Correctional Medical Services and
23  working at the House of Correction, who was the
24  health service administrator?

18

1   A   Donna Jurdak. I don't remember -- she
2   was there and gone and back again, and I'm not
3   sure of the exact time frame, but I believe she
4   was there when -- when CMS took over for CHS.
5   Q   That would have been the health service
6   administrator who provided you with the paperwork
7   to facilitate the direct deposit of your check
8   from CMS?
9   A   Through the company.
10  Q   Did you receive any benefits from CMS
11  while you were employed by them from January of
12  2001 through June of 2003?
13  A   Yes.
14  Q   What were those benefits?
15  A   401(k) plan.
16  Q   And who contributed to that 401(k) plan?
17  A   I did and CMS did.
18  Q   Did you have any life insurance?
19  A   No.
20  Q   Did you have any health benefits?
21  A   No.
22  Q   No health benefits whatsoever from CMS?
23  A   No.
24  Q   Did the Suffolk County Sheriff's

Sheila J. Porter                                          05/18/2005

                                                                  19

1   Department contribute to your 401(k) plan?
2        A    No.
3        Q    Did the Suffolk County Sheriff's
4   Department pay your salary?
5        A    No.
6        Q    Who maintained your personnel file, to
7   your knowledge, while you were employed by
8   Correctional Medical Services from January of 2001
9   through June of 2003?
10       A    Correctional Medical Services.
11       Q    Where was it located, the personnel
12  file?
13       A    The exact location?
14       Q    Yes.
15       A    In a file cabinet in the administrative
16  assistant's office.
17       Q    And the administrative assistant was
18  employed by whom?
19       A    CMS.
20       Q    What was her name?
21       A    Sandra Sousa.
22       Q    I'm sorry?
23       A    Sandra Sousa.
24       Q    You indicated earlier that Donna Jurdak

Sheila J. Porter                                                05/18/2005

21

1   the infirmary at the Suffolk County -- at the
2   Suffolk County House of Correction --
3       A   Yes.
4       Q   -- for CMS?
5       A   Yes.
6       Q   And it's fair to say that Dr. Singletary
7   was in charge of the medical piece of care
8   provided to inmates incarcerated at the Suffolk
9   County House of Correction?
10      A   Yes.
11      Q   Were you evaluated in terms of your job
12  performance while you were employed by CMS from
13  January of 2001 to June of 2003?
14      A   Yes.
15      Q   Who conducted those evaluations?
16      A   Dr. Singletary.
17      Q   Any other employee of CMS involved in
18  the evaluation process for you during that time
19  period?
20      A   I don't think so.
21      Q   Was Donna Jurdak involved?
22      A   I'm not sure.
23      Q   Okay.  Did you ever speak with Donna
24  Jurdak concerning your evaluations?

1  A  Yes.
2  Q  And what was the -- what was that about?
3  A  "It's time to get your evaluation done."
4  Q  Did any member of the Suffolk County
5  Sheriff's Department participate in your
6  evaluation?
7  A  No.
8  Q  What was the process of evaluation like?
9  A  It was a form with questions to be
10 answered and goals to be set.
11 Q  Who provided you with the form, what
12 entity?
13 A  CMS.
14 Q  Did you fill out the form?
15 A  I didn't, the physician did.
16 Q  Dr. Singletary?
17 A  Yes.
18 Q  Was the form filled out in consultation
19 with you or by him alone?
20 A  By him with review by me later.
21 Q  So after the evaluation form was
22 completed, you would have an opportunity to
23 discuss the results of that evaluation with him?
24 A  Yes.

1    Q    And what were the evaluation forms used
2  for by CMS?
3    A    As a tool for deciding pay increases, as
4  a tool for determining any weaknesses that might
5  show up in someone's performance and with goals
6  for corrective measures.
7    Q    Did anyone from the Suffolk County
8  Sheriff's Department have any input into your
9  salary or pay increase?
10   A    No.
11   Q    Did anybody from the Suffolk County
12 Sheriff's Department have any input in terms of
13 your goals or corrective behavior?
14   A    No.
15   Q    What's the Employee Success Guide?
16   A    It's the booklet handed out -- there was
17 a booklet handed out when CMS took over as the
18 provider of medical care, and I believe there was
19 an update handed out while I was at the facility.
20   Q    When you say CMS took over as the
21 provider for healthcare, when they assumed the
22 contract --
23           THE STENOGRAPHER:  Wait a minute.
24 Can you start again?

1    Q    -- when they assumed the contract for
2 the provision of healthcare services after
3 Correctional Healthcare Services was no longer
4 providing it?
5    A    Yes.
6    Q    Okay. Is it fair to say that the
7 Employee Success Guide provided to you by CMS set
8 forth some of the terms and conditions of your
9 employment with CMS?
10   A    Yes.
11   Q    Were you ever provided with an employee
12 handbook from the Suffolk County Sheriff's
13 Department?
14   A    Documents, not necessarily in handbook
15 form.
16   Q    What documents are you referring to?
17   A    Training documents.
18   Q    What kinds of training documents?
19   A    The one that just happens to jump out at
20 me is one called Downing a Duck, which is a story
21 form used in training. And there were -- I'm
22 trying to think of the names of the -- we would
23 get a packet, a whole packet of information from
24 the facility with each training and retraining;

1   what's contraband in the facility, what you can
2   do, what you can't do, what your duties and
3   responsibilities are.
4        Q    Well, your duties and responsibilities
5   were dictated by the terms of your employment with
6   Correctional Medical Services, correct?
7        A    Outside of that, your duty is to not
8   bring in -- meaning not to bring in contraband; if
9   you have a relative in the facility, you have to
10  notify someone; things of that nature.
11       Q    So you're provided with information from
12  the Suffolk County House of Corrections concerning
13  security?
14       A    Yes.
15       Q    Contraband?
16       A    Yes.
17       Q    What constitutes contraband?
18       A    Yes.
19       Q    But you were not provided with something
20  called an employee handbook, correct?
21       A    Correct.
22       Q    You were also provided with policies at
23  some point from the Suffolk County House of
24  Correction -- strike that. We'll get back to that

1  Healthcare Services, you indicated that Anne Mack
2  hired you, right?
3       A    Yes.
4       Q    She was employed by Correctional
5  Healthcare Services?
6       A    Yes.
7       Q    Prior to you being hired by Correctional
8  Medical Services in January of 2001, were you
9  interviewed by anybody from the Suffolk County
10 Sheriff's Department?
11      A    No.
12      Q    You were not hired by the Suffolk County
13 Sheriff's Department, correct?
14      A    No.
15      Q    When you were hired by Correctional
16 Healthcare Services by Anne Mack, were you
17 interviewed by anyone from the Suffolk County
18 Sheriff's Department?
19      A    No.
20      Q    At the time that you were working for
21 Correctional Healthcare Services from
22 approximately 1994 through December of 2000, you
23 were not hired by the Suffolk County Sheriff's
24 Department, correct?

Sheila J. Porter                                          05/18/2005

                                                                  38

1   a peer counselor if we had issues in the facility.
2        Q    Are you finished?
3        A    I can't think of any more at the moment.
4        Q    Okay. If you had issues concerning your
5   -- your job as a nurse practitioner, whom would
6   you discuss those issues with?
7        A    The health service administrator and the
8   medical director.
9        Q    Did the health service administrator
10  have an office in the infirmary?
11       A    Yes.
12       Q    How about the medical director?
13       A    Yes.
14       Q    To your knowledge, were there -- did any
15  Suffolk County Sheriff's Department noncustody
16  staff, noncorrectional officer, have an office in
17  the infirmary?
18       A    Yes.
19       Q    Who was that?
20       A    For a time, Bill Ferney, who was a
21  deputy -- an assistant deputy, I believe.
22       Q    Anybody else?
23       A    Custodial staff how? What level are we
24  speaking about?

40

1    Q    Okay. Who makes the decision if an
2 inmate has to go to the hospital, who makes that
3 determination?
4    A    The provider working with the person.
5    Q    Does the Suffolk County Sheriff's
6 Department have any input on whether or not an
7 inmate is sent to the hospital from a medical
8 standpoint?
9    A    No.
10   Q    Other than a medical standpoint, what's
11 that input?
12   A    How the person is going to get there,
13 the medical reason.
14   Q    When you say the medical reason, what do
15 you mean?
16   A    It's usually a determination -- they try
17 to make a determination whether or not it's a
18 bogus trip.
19   Q    Who makes the assessment or the
20 diagnosis of the injuries or the --
21   A    The provider.
22   Q    That would be you?
23   A    Sometimes. There would be someone above
24 me, unless it's -- unless it's a life or death

41

1  emergency, someone else would make the final
2  decision. I would make the recommendation.
3       Q    In making those recommendations, who
4  would you consult with?
5       A    The medical director, and if he wasn't
6  available, whoever was on call.
7       Q    Would you ever consult in making those
8  medical decisions with a member of the Suffolk
9  County Sheriff's Department?
10      A    No.
11      Q    Who decides if diagnostic testing is
12 indicated or required?
13      A    The provider.
14      Q    Do those -- are those determinations
15 ever made with input from the Suffolk County
16 Sheriff's Department?
17      A    Occasionally.
18      Q    Under what circumstances?
19      A    Drug abuse.
20      Q    What do you mean?
21      A    Where it's believed that the inmate has
22 taken illegal substances while in the facility.
23 Sexual attacks.
24      Q    Under those circumstances with -- when

Sheila J. Porter                                          05/18/2005

42

```
 1   there's a belief that an inmate may have ingested
 2   a narcotic or a controlled substance within the
 3   facility, how does the Suffolk County Sheriff's
 4   Department make a determination as to whether or
 5   not a diagnostic test is indicated?
 6        A    There are certain tests that we didn't
 7   do, they did.
 8        Q    Those are urine tests?
 9        A    Yes.
10        Q    Random urines?
11        A    Yes.
12        Q    I'm talking about nursing decisions,
13   medical care decisions, within the facility.  Who
14   makes the decision as to what kinds of diagnostic
15   testings are indicated when an inmate presents
16   with a particular condition?
17        A    The provider.
18        Q    What if there is a necessity to consult
19   with a specialist, who makes those determinations?
20        A    The provider.
21        Q    A few moments ago we spoke briefly about
22   documentation and the SOAP protocol.
23        A    Yes.
24        Q    Where are encounters with inmates
```

LegaLink Boston
(617) 542-0039

1  documented in the medical sense, in the medical
2  context?
3      A    In the medical context, in the medical
4  record.
5      Q    Who maintains those medical records?
6      A    The company, CMS.
7      Q    And previously CHS?
8      A    CHS.
9      Q    Who has access to those records?
10     A    Medical personnel and, with certain
11 exceptions, the Sheriff's Department.
12     Q    How does the Sheriff's Department gain
13 access to the medical records?
14     A    Through the medical records clerk and
15 the health service administrator.
16     Q    Do they need to seek permission?
17     A    Yes.
18     Q    They need to get authorization in order
19 to access the records?
20     A    I'm not sure the sheriff does.
21     Q    I'm not asking about the sheriff.
22 Employees of the department.
23     A    I think there might be someone that's
24 authorized without that, but I am actually not

```
 1      A    It's an incident report form.
 2      Q    Is it called "Incident Report Form"?
 3      A    I'm not really sure.  I think so.  I'm
 4  not really sure.
 5      Q    Is it different than a progress note?
 6      A    Yes.
 7      Q    What are progress notes?
 8      A    Progress notes are a form that are used
 9  to document and -- document patient encounters of
10  one kind or another.
11      Q    And those progress notes that are used
12  to document patient encounters of one form or
13  another, they are filed in an inmate's medical
14  chart, correct?
15      A    Yes.
16      Q    What's the purpose of documentation,
17  Mrs. Porter?
18      A    To provide a timely and accurate picture
19  of the health and the healthcare of a particular
20  person.
21      Q    What are they used for?
22      A    They?
23      Q    What are the progress notes, the
24  documentation of these encounters with inmates,
```

Sheila J. Porter                                                    05/18/2005

47

1   what are they used for in the medical chart?
2       A   It's to provide an accurate record.
3       Q   For whom?
4       A   Other medical providers.
5       Q   Would they be utilized by a medical
6   provider who is the next provider to see the
7   inmate after an encounter?
8       A   They may be.
9       Q   Are there any implications of the
10  absence of documentation that you're aware of?
11          MR. SAVAGE: If you understand the
12  question.
13      Q   Do you understand the question?
14      A   It's pretty broad.
15      Q   Well, have you received training on
16  documentation?
17      A   I answered that. Yes, I have.
18      Q   Okay. And that training was provided to
19  you by Correctional Medical Services, right?
20      A   Among others.
21      Q   And Correctional Healthcare Services?
22      A   Yes.
23      Q   And while you were in nursing school?
24      A   Yes.