Sheila J. Porter                                           05/18/2005

48

```
 1      Q    And getting your master's?
 2      A    Yes.
 3      Q    As part of your training in
 4 documentation and the necessity for documentation,
 5 have you ever been trained on the implications of
 6 the absence of proper documentation?
 7      A    Yes.
 8      Q    And what I'm asking you are, what are
 9 the implications of the absence of proper
10 documentation?
11      A    If it's not written down, you didn't do
12 it.
13      Q    If it's not written down, you didn't do
14 it?
15      A    Correct.
16      Q    Is that your answer?
17      A    Yes.
18      Q    If it's not written down, it didn't
19 happen?
20      A    No, you didn't do it.  It's specific to
21 the person documenting or not documenting.
22      Q    So if it's not written down, then the
23 information was not communicated to you?
24      A    Right.
```

LegaLink Boston
(617) 542-0039

```
1        A    Staffing protocols?
2        Q    Well, there are -- strike that.
3             When you worked at the Suffolk
4   County House of Correction from January of 2001 to
5   June of 2003, what was your schedule?
6        A    I believe at that time it was from about
7   7:30 to 3:30 or 4:00.
8        Q    7:30 to 3:30 or 4:00.  And what days did
9   you work?
10       A    Monday through Friday.
11       Q    How did the Suffolk County Sheriff's
12  Department dictate that you, Sheila Porter,
13  reported to the Suffolk County House of Correction
14  Monday through Friday from 7:30 to 3:00 or 3:30?
15       A    I would have started earlier; I wasn't
16  able to because of the Suffolk County Sheriff's
17  Department's rule about when sick call could
18  start.
19       Q    I see.  So is that written someplace; is
20  that indicated someplace, in some document?
21       A    I'm not sure.
22       Q    So that's the extent, from your
23  perspective, as to how the Sheriff's Department
24  dictated the days of the week that you worked and
```

1   the hours that you worked?
2       A    Weekend days -- it wasn't as easy to get
3   the work done then, so I suppose it depends on the
4   -- more the hours that you could start, how long a
5   time you could work, how late you could see
6   someone. So if you start early or if you wanted
7   to finish later, Suffolk County said, You can't
8   see someone after this time.
9       Q    Did you have to -- how did you account
10  for your hours while you worked at the Suffolk
11  County House of Correction for Correctional
12  Medical Services?
13      A    Time clock.
14      Q    You punched in?
15      A    Yes.
16      Q    What if you wanted a day off, what would
17  you do?
18      A    I would speak to the health service
19  administrator.
20      Q    Did you consult with the Suffolk County
21  Sheriff's Department?
22      A    No.
23      Q    What if you were sick and couldn't come
24  to work on a day, what would you do?

63

```
 1     A    I would call in.
 2     Q    To whom?
 3     A    The health service administrator.
 4     Q    Would you inform the Suffolk County
 5   Sheriff's Department that you couldn't come in?
 6     A    No.
 7     Q    Okay.  How many nurse practitioners
 8   worked Monday through Friday, 7:30 to 3:30, if I'm
 9   getting that correct?
10     A    One.
11     Q    One nurse practitioner.
12          How many other nurse practitioners
13   were employed by Correctional Medical Services at
14   the Suffolk County House of Correction?
15     A    Another designation.  There was one
16   other person at the same level, but not a nurse
17   practitioner.
18     Q    And what's the distinction; who is that
19   person and what was the difference?
20     A    Physician's assistant.
21     Q    Okay.  And who was that?
22     A    Beth Bringola, B-R-I-N-G-O-L-A.
23     Q    Was her job and her responsibilities
24   similar to yours?
```

Sheila J. Porter                                           05/18/2005

64

1     A    Yes.
2     Q    And she was employed by CMS as well,
3  correct?
4     A    Yes.
5     Q    Okay. Did she work Monday through
6  Friday, 7:30 to 3:30?
7     A    No.
8     Q    What were her hours, if you know?
9     A    I think 7:00 to 3:30 or 4:00, but four
10 days a week.
11    Q    Okay. With the exception of that one
12 day, you had similar schedules, correct?
13    A    Yes.
14    Q    Okay. Were you -- did you have -- were
15 you able to take lunch?
16    A    Yes.
17    Q    Were you able to take breaks?
18    A    I think I was allowed.
19    Q    Okay. And how would you coordinate your
20 lunch schedule and if you took a break, with whom?
21    A    According to the schedule of the health
22 service -- of the health service unit.
23    Q    With the health service administrator?
24    A    There was a time between 11:30 and 1:00

LegaLink Boston
(617) 542-0039

1   the time that you signed those interrogatories?
2       A    This answer, which doesn't sound like
3   what you just said.
4       Q    The hours and dates that she worked was
5   dictated by the contract entered into between the
6   HOC and CMS.
7            MR. SAVAGE:  Are you asking her
8   whether that was part of her answer?
9       Q    Yes, I'm asking you whether that was
10  part of your answer.
11      A    Part of my answer, yes.
12      Q    Okay.  Where in the contract with CMS
13  does it indicate that you, Sheila Porter, was to
14  work five days a week, 7:30 to 3:30?
15      A    I never saw the contract.
16      Q    Okay.  So how is it then that the hours
17  and days that you work were dictated by the
18  contract entered into between, as you put it, the
19  House of Correction and Correctional Medical
20  Services?
21      A    My answer would involve that the
22  contract, to my understanding, includes the number
23  of hours for each position.
24      Q    And that's what I'm inquiring about,

1  your understanding, because you answered this
2  question based upon your understanding. So what
3  is your understanding?
4     A   My understanding is that the contract
5  required X-amount of hours of mid-level provider,
6  physician coverage, nurse coverage, and that was a
7  contract entered into by both the House of
8  Correction and CMS.
9     Q   And how CMS was going to provide those
10 levels of care was up to CMS, correct?
11    A   The levels, yes.
12    Q   And whom they chose to staff in those
13 particular positions was up to CMS, correct?
14    A   After security clearance was fulfilled,
15 yes.
16    Q   Did you understand my question?
17         MR. SAVAGE: And she answered it.
18    A   It couldn't be filled with just anyone.
19         MR. SAVAGE: There's no question
20 pending.
21    Q   I asked you whom CMS determined would
22 fill those staffing considerations was up to CMS,
23 correct? I didn't ask you about security. I
24 asked you who CMS designated to fill those

73

1  particular staffing levels was up to CMS, correct?
2       A    Yes, with the same thought.  You asked
3  my impression.
4       Q    The contract, to your knowledge, didn't
5  indicate that Sheila Porter needed to work five
6  days a week, 7:30 to 3:30, correct?
7       A    Correct.
8       Q    Okay.  You also indicated in your
9  testimony today additional ways in which you
10 believe the Suffolk County Sheriff's Department
11 dictated the hours and days that you worked,
12 right?  A few moments ago you just indicated
13 various ways in which you believe that dictated
14 the hours and days that you worked at the Suffolk
15 County House of Correction.
16      A    Yes.
17      Q    Does that now complete the answer to
18 this interrogatory.
19           (Pause.)
20      A    I believe it completes the answer to (i)
21 of No. 7.
22      Q    Okay.  You also provided an answer in
23 response to this same interrogatory that -- I'm
24 quoting from it -- "Her treatment of inmates was

Sheila J. Porter                                       05/18/2005

78

```
 1   Correctional Healthcare Services?
 2        A    Yes.
 3        Q    Medical personnel employed by
 4   Correctional Medical Services?
 5        A    Yes.
 6        Q    Do you recall their names?
 7        A    Some.
 8        Q    Which ones do you recall?
 9        A    Chuck Theall --
10        Q    Chuck Theall?
11        A    Yes.
12             -- Richard Goodman, Faith Jones.
13   Those names just are in my head right now.  I'm
14   not sure if there are others.
15        Q    How were you made aware, other than
16   your -- how were you made aware formally that the
17   Suffolk County Sheriff's Department retained the
18   ability to bar contract workers?
19        A    I'm not sure what you mean.
20        Q    Does the Employee Success Guide issued
21   to you by Correctional Medical Services indicate
22   that the institutional facility retains the right
23   to bar medical personnel?
24        A    Yes.
```

1    Q    So you were on notice when you received
2  the Employee Success Guide that the institution
3  could bar medical personnel, correct?
4    A    Yes.
5    Q    You also knew that from your own
6  personal experience --
7    A    Yes.
8    Q    -- while working for CHS and CMS at the
9  Suffolk County House of Correction, right?
10   A    Yes.
11   Q    To your knowledge, were the persons that
12  you just identified and any other contract worker
13  that you're aware of that was barred, were they
14  ever provided with a hearing by the Suffolk County
15  Sheriff's Department?
16   A    I don't know what constitutes a hearing.
17  I personally participated in one.
18   Q    Which one was that?
19   A    Richard Goodman.
20   Q    Was that a hearing conducted by the
21  Suffolk County Sheriff's Department?
22   A    Yes.
23   Q    What were the circumstances?
24   A    Mr. Goodman was accused of inappropriate

```
 1  please, Mrs. Porter.
 2             (Pause.)
 3       Q    And, actually, there's a page before
 4  that, if you will.  I'm sorry.  The page before
 5  that, page 71, entitled "Institutional Policies."
 6  Do you see that?
 7       A    Yes.
 8       Q    Have you seen that before; are you
 9  familiar with this?
10             (Witness perusing document.)
11       A    Yes.
12       Q    You're aware from the Success Guide that
13  a failure to comply with institutional security
14  policies, that is, the policies of the facility
15  where you are working at, could result in your
16  termination by Correctional Medical Services,
17  right?
18       A    Yes.
19       Q    You're also aware that the facility
20  itself or the institution retained the right to
21  bar you for security violations?
22       A    Yes.
23       Q    All right.  I direct your attention to
24  page 72, under the paragraph No. 2, "While on
```

Sheila J. Porter
05/18/2005

151

1    A    Hearsay information that I had only a --
2  a report but no real knowledge or no belief one
3  way or the other, just no way to determine.  I
4  heard a lot of things, and I reported what I heard
5  and let other people figure it out.  If it was
6  something that I knew, something that the inmate
7  told me about himself, it was reported within the
8  House of Correction.
9    Q    Was that your criteria in terms of when
10  you reported things to SID; if it was hearsay
11  information, you didn't; if it was information
12  communicated to you directly from an inmate, then
13  you did?
14    A    Hearsay about another inmate, I probably
15  would not.  An inmate telling me himself that he
16  had been abused, yes.
17    Q    You would report that to SID?
18    A    Yes.
19    Q    And you did?
20    A    Yes.
21    Q    Over the course of the nine years that
22  you were working at the House of Correction, you
23  did that how often?
24    A    A lot.  Probably three or four times a

LegaLink Boston
(617) 542-0039

```
 1   month.
 2       Q    And these reports that you provided to
 3   SID, were they verbal or written?
 4       A    Both.
 5       Q    Did SID investigators also come to speak
 6   with you regarding cases they were investigating?
 7       A    Yes.
 8       Q    And would they talk with you in the
 9   infirmary?
10       A    Sometimes.
11       Q    Would they ask you to come down to the
12   SID office to speak with them?
13       A    Yes.
14       Q    The investigators would seek your
15   cooperation?
16       A    Yes.
17       Q    And they would want your information in
18   order to determine if an officer had engaged in
19   misconduct, right?
20       A    Correct.
21       Q    And the investigators whom you worked
22   with over the course of the nine years while you
23   were employed by CMS at the House of Correction,
24   how many were there, approximately?
```

| | | |
|---|---|---|
| 1 | A | 15, maybe. I don't know. Maybe more. |
| 2 | Q | You spoke to Steve Jacobs regularly? |
| 3 | A | Yes. |
| 4 | Q | You spoke to Paul DeFazio? |
| 5 | A | Yes. |
| 6 | Q | What other names? |
| 7 | A | Brenda. |
| 8 | Q | Brenda Garcia? |
| 9 | A | Yeah. Another Steve. Let's see. I can |

10  tell you what they look like, but I don't remember
11  their names. I'm sorry. There are some that I
12  know better than others.
13      Q   You understood that it was their
14  responsibility to investigate allegations of
15  officer misconduct?
16      A   Yes.
17      Q   And that in so doing they would
18  oftentimes require the assistance of and
19  cooperation of medical personnel?
20      A   Yes.
21      Q   In 2001 do you recall how many times you
22  provided information to the F.B.I.?
23      A   About the same the entire time.
24      Q   What do you mean about the same the

1  Q    When?
2  A    May 19th.
3  Q    Prior to May 19th, were you aware of
4  Mr. Rosario ever claiming to hear voices?
5  A    Yes.
6  Q    And what were those circumstances?
7  A    That was one of the mental health
8  issues.
9  Q    When did you become aware that
10 Mr. Rosario was in the infirmary on May 19th?
11 A    I saw him walked through the entrance to
12 the medical housing unit, back to the medical
13 housing unit, on May 19th just before noontime.
14 Q    Okay.  Prior to seeing him being walked
15 into the medical housing unit in the back of the
16 infirmary just before noon on May 19th, were you
17 aware that he was in the Suffolk County House of
18 Correction?
19 A    I'm not sure.  I recall surprise when he
20 returned to the facility, but I don't know if it
21 was then, and I recall surprise at seeing him come
22 down, walk by me, but I was surprised because of
23 his appearance.  I'm not sure if it's the first
24 time I saw him that incarceration or not.

1   Could you identify it again, please?
2       A    Mental Observation, A level.  A level
3   would be the top, where you have the johnny on,
4   you get the mattress taken away, no utensils, that
5   kind of thing.  The next level is B, MOB, and the
6   person can only be moved from A to B by a mental
7   health worker.
8       Q    And what did that mean if he was MOA?
9       A    That he was either homicidal or
10  suicidal.
11      Q    Now, while you were next to his cell
12  door looking through the window speaking to him,
13  what exactly does he tell you?
14      A    He told me that an officer had injured
15  him, and that he tried to get seen, that he tried
16  to get down to the medical housing unit to get
17  seen, and then he decided to say that he was
18  hearing voices and that he needed to go
19  downstairs, and -- I think he tried to get seen
20  first, and then he waited for the person he said
21  injured him to go to lunch, and then he told the
22  other officer that was still in the unit that he
23  was hearing voices and needed to go to mental
24  health.

```
 1  injury was to assess what the injuries might in
 2  fact be and the extent of them?
 3       A    If indeed I examined him, yes, it would
 4  have been.
 5       Q    Wouldn't a physical examination have
 6  been necessary at that time in sound nurse
 7  practitioner judgment to commence that evaluation?
 8       A    Someone did examine him.
 9       Q    When did Beth Bringola examine
10  Mr. Rosario?
11       A    Sometime after I was at -- that I
12  stopped at the cell.
13       Q    When?
14       A    I don't know.
15       Q    Were you present?
16       A    No.
17       Q    When did you record your observations of
18  Mr. Rosario in his medical records pertaining to
19  the encounter that you have just testified about?
20       A    I didn't.
21       Q    You did not?
22       A    I didn't record them in the medical
23  record.  I recorded them, but not in the medical
24  record.
```

```
 1        Q    Why didn't you record them in the
 2   medical records?
 3        A    Because I wrote a report, not a medical
 4   note.
 5        Q    Why didn't you record your observations
 6   in the medical record?
 7        A    Because I didn't do the exam.
 8        Q    You had an encounter with
 9   Inmate Rosario, right?
10        A    I did.
11        Q    That encounter occurred in the
12   infirmary, correct?
13        A    Yes.
14        Q    You were on duty as a nurse practitioner
15   at that time, correct?
16        A    Yes.
17        Q    You saw him, Mr. Rosario, in your
18   capacity as a nurse practitioner, correct?
19        A    Yes.
20        Q    He had been sent to the infirmary on MOA
21   status?
22        A    Correct.
23        Q    He told you he had been injured, right?
24        A    Yes.
```

1   Q   He told you he had been physically
2   assaulted by an officer?
3   A   Yes.
4   Q   You observed what he showed you to be
5   his injuries?
6   A   I did.
7   Q   You have described those injuries today
8   as reddish marks on the upper bicep and contiguous
9   chest area?
10  A   I did.
11  Q   You've described the circumference of
12  those injuries, right?
13  A   I did.
14  Q   Wouldn't that be the kind of information
15  that would be important to document in a chart
16  pursuant to the nursing protocols that you have
17  been trained on?
18  A   No.
19  Q   Why not?
20  A   I didn't do a physical exam. I wasn't
21  in the room, I was not able to ask him the
22  questions that I needed to ask him, and I didn't
23  conduct a thorough exam.
24  Q   And who --

201

1  happened, and I did not see him until I returned
2  from lunch.
3     Q  Well, you know that the physical
4  examination wasn't conducted until Beth Bringola
5  did it sometime after you had your encounter with
6  Mr. Rosario, correct?
7     A  I believe it was after.  It could have
8  been while I was at lunch.
9     Q  Did he indicate that he had been
10 examined by Beth Bringola?
11    A  I didn't ask him.
12    Q  In any event, you didn't communicate any
13 of this information to Beth Bringola personally,
14 correct?
15    A  Correct.
16    Q  And you didn't record any of these
17 observations of Mr. Rosario or your communications
18 with him in the medical chart?
19    A  Correct.
20    Q  But clearly your conversation with him
21 and your interaction with him concerned his
22 medical condition; isn't that fair?
23    A  Yes.
24    Q  So is it your testimony that as a nurse