1           MS. CAULO:  I don't know.

2           MR. SAVAGE:  Well, when you say

3    paragraph 4, what are you referring to?

4           MS. CAULO:  I'm referring to the

5    last line that ends in "injuries."

6           MR. SAVAGE:  Okay.

7       A   Yes, it's correct.

8       Q   Paragraph 4 is correct.  Paragraph 4,

9    meaning the paragraph ending with the word

10   "injuries," that's correct?  Mrs. Porter, there

11   was a question there.  I just want to make sure

12   that your answer --

13      A   Oh, I'm sorry.

14      Q   That final paragraph ending with the

15   word "injuries," is that correct?  The information

16   communicated -- I want to make sure that your

17   answer is confined to the paragraph that I asked

18   you to look at.

19      A   Yes.

20      Q   All right.  Let's turn to the second

21   page of this report, please.  The first paragraph

22   on page 2 beginning with "Nurse Porter," with the

23   exception of "Nurse Practitioner Porter," is the

24   information contained in there accurate?

```
 1    A    I believe so.
 2    Q    Yes?
 3    A    Yes.  Yes, I believe so.
 4              MR. SCHUMACHER:  Can I ask what
 5    exhibit that was?
 6              MS. CAULO:  6.
 7    Q    Mrs. Porter, did you contact the F.B.I.
 8    after this interview on May 22nd?
 9              (Witness and counsel conferring off
10              the record.)
11              MR. SAVAGE:  That's yes or no.
12    Q    Do you understand my question,
13    Mrs. Porter?
14    A    Yes, and I don't know the answer to
15    that.
16    Q    Did you --
17    A    On the 22nd?
18    Q    Yes.
19    A    I don't know.
20    Q    Did you contact them on the -- did you
21    contact them --
22              MR. SAVAGE:  Well, before you ask
23    another question, can I talk to her for a second?
24              MS. CAULO:  Sure.
```

1    say it was unidentified.
2        Q    What did this person say to you?
3        A    That I was wanted in SID.
4        Q    Did you ask why?
5        A    No.
6        Q    Why not?
7        A    It happened all the time.
8        Q    So it wasn't unusual for you to be
9    called down to SI -- to be asked to come to SID to
10   speak with an investigator?
11       A    No.
12       Q    When on the 28th, do you recall, did you
13   get this phone call?
14       A    I have no idea.
15       Q    What time did you go down?
16       A    I don't know.
17       Q    Did anyone come up to escort you?
18       A    No.
19       Q    How did you get to the SID offices?
20       A    With a pass key, and then I knocked on
21   the door.  I can't open their door, but I knew
22   where it was.  I went down the back stairs,
23   through the door, and knocked on the door.
24       Q    And when you knocked on the door and

1  gained entrance to the SID office, who did you
2  speak with?
3      A    Brian and Sonya.
4      Q    Who else was there?
5      A    Lots of people in the office.
6      Q    Who were present -- which individuals
7  were present in the SID office?
8      A    I don't know.
9      Q    How many people were there, if you
10 recall?
11     A    I don't recall. There are four or five
12 cubicles there. There were at least two other
13 people; I believe they were both male; and I don't
14 remember at this point in time who they were.
15     Q    What occurred when Brian Dacey and Sonya
16 Aleman greeted you?
17     A    They indicated that they wanted to talk
18 to me, and we went into a small room to the right.
19     Q    And describe that room, please.
20     A    A windowless, small room.
21     Q    Was there any furniture in there?
22     A    A table and some chairs.
23     Q    Had you been in that room before?
24     A    Yes.

1    Q    When?

2    A    A couple of times, but the time -- the
3    last time I remember being in that room was when I
4    was asked to provide testimony about a nurse that
5    worked for -- I don't remember if that was CMS or
6    CHS.

7    Q    Had you ever been interviewed in that
8    room before?

9    A    I don't think so, except that one -- the
10   one time, perhaps another time, but not -- not
11   interviewed per se.  I had my -- the time before
12   when I was there my health service administrator
13   was with me.

14   Q    So when you arrived down in SID and were
15   greeted by Brian Dacey and Sonya Aleman, did they
16   tell you why they wanted you to come down and
17   speak with them?

18   A    I don't recall.

19   Q    What did they tell you?

20   A    I don't recall.  I remember being
21   escorted into the room on the right.

22   Q    How were you escorted into the room; did
23   they touch you?

24   A    I don't believe so.

```
 1      Q    Did they ask you to come into the room
 2  and speak with them?
 3      A    Yes.
 4      Q    Once you went into the room to speak
 5  with them, what did they say to you?
 6      A    They told me they wanted to talk about
 7  Rene, and that they had received my report, and
 8  they had some more questions.
 9      Q    Is that when you understood what the
10  purpose for the interview was?
11      A    Yes.
12      Q    And Brian Dacey and Sonya Aleman were
13  the two investigators that you had spoken with
14  about Rene Rosario some six days earlier, correct?
15      A    Correct.
16      Q    Who instructed them to speak with you?
17           MR. SAVAGE:  Objection.
18      A    I don't know.
19      Q    What's the basis for the allegation in
20  your complaint that Sheriff Cabral instructed or
21  directed them to speak with you?
22           MR. SAVAGE:  Objection.
23      A    I don't know at this point in time
24  specifically who gave them direction to speak with
```

1  me.
2       Q    So you don't have any basis to allege
3  that Sheriff Cabral directed them to summons you
4  to the SID office?
5            MR. SAVAGE:  Objection.
6       A    I'm not sure what you want me to say to
7  that.
8       Q    I'm asking you what's the factual basis
9  for the allegation in your complaint that Sheriff
10 Cabral directed SID investigators that you be
11 summonsed to the office to be interviewed?
12           MR. SAVAGE:  Objection.
13      A    She's the sheriff and has ultimate
14 responsibility.
15      Q    Did they tell you that they were
16 interviewing you at the request of Sheriff Cabral?
17      A    I don't recall.
18      Q    Did they tell you that the Sheriff
19 wanted them to ask you some additional questions?
20      A    I don't recall.
21      Q    Did anybody mention the Sheriff's name
22 when you were in the SID office?
23      A    I do not recall.
24      Q    Certainly that's something you would

1  report?
2      A   They said, "We just got this."
3      Q   Did they indicate what that meant when
4  we -- we just got this, that it meant that day,
5  the day before?
6              MR. SAVAGE:  Objection.
7      A   I -- I don't know.
8      Q   What did you interpret it to mean?
9      A   That they just got it.
10     Q   Okay. Well, what did they ask you about
11 the report?
12     A   About the bruise on the arm and the
13 bruise on the chest. They told me that they had
14 documentation of the bruise on the arm but not on
15 the chest. I explained what I saw, as I did the
16 first time I saw them.
17     Q   When I ask you how the interview was
18 conducted, was it a question and answer or did
19 they ask you for a narrative?
20             MR. SAVAGE:  Was she done answering
21 the question?
22     Q   Were you done answering?
23     A   Yes.
24     Q   When I asked you how the interview was

1  conducted, was it done in a question-answer format
2  or did they ask you to give a narrative about your
3  interaction with Mr. Rosario on the 19th?
4     A    Some of each.
5     Q    What did they ask you and what
6  information did you provide?
7     A    We discussed the paper that was in front
8  of me at the time.
9     Q    And that's the document that has been
10 marked here as Exhibit No. 5, I believe?
11    A    Yes.
12    Q    And that's the --
13    A    Well, I'm not sure.  Yes.  I don't know
14 what number.
15    Q    That's this document right here that I'm
16 placing before you, Exhibit No. 5?
17              (Document exhibited to witness.)
18              (Witness perusing document.)
19    A    With all of its parts to it.
20    Q    Sure.  And they had that with them in
21 the interview room on the 28th?
22    A    I think so.
23    Q    Did they show it to you?
24    A    I'm not really sure.  I think they did.

1      MR. SAVAGE: Objection.

2    A   Not the words, the tone of voice and the
3 questions asked.

4    Q   The questions being, Did you contact
5 Krista Snyder?

6    A   Yes.

7    Q   When did you contact her?

8    A   Yes.

9    Q   What time did you contact her?

10   A   Yes.

11   Q   Did they threaten you that you would
12 lose your job if you didn't answer their
13 questions?

14   A   No.

15   Q   Did anybody ever tell you that you would
16 be barred from the facility or lose your job if
17 you didn't answer their questions?

18      MR. SAVAGE: Objection.

19      (Witness and counsel conferring off
20      the record.)

21      MR. SAVAGE: We need to take a
22 break.

23      MS. CAULO: Fine.

24   Q   Mrs. Porter, how did the interview

1   conclude?
2           MR. SAVAGE:  I'm sorry, did she ever
3   answer the last question?
4           MS. CAULO:  You know, I'm not sure.
5   What was the last question?
6           MR. SAVAGE:  Let's just make sure
7   the transcript is clean and --
8           MS. CAULO:  Sure.  Thank you.
9           (Question read.)
10      A    No.
11      Q    So neither Brian Dacey nor Sonya Aleman
12  during their interview of you on May 28 told you
13  that if you did not answer their questions that
14  you would be barred from the facility?
15      A    Correct.
16      Q    How did the interview conclude,
17  Mrs. Porter?
18      A    I don't recall.
19      Q    Where did you go when you left the SID
20  office?
21      A    Back upstairs.
22      Q    To the infirmary?
23      A    Yes.
24      Q    Was Donna Jurdak working that day?

1  any member of SID, subsequent to Sheriff Cabral
2  taking office that caused you to feel -- prior to
3  May of 2003 that caused you to feel there was a
4  lack of trust?
5       A     Just with the former member.
6       Q     And the former member you're referring
7  to is whom?
8       A     Paul DeFazio.
9       Q     So after Sheriff Cabral came into office
10 in the end of October of 2002, did you have any
11 contact with any member of SID other than Paul
12 DeFazio that caused you to feel there was a lack
13 of trust with SID?
14      A     Could you --
15      Q     Sure.
16      A     -- back that up again, please?
17      Q     After Sheriff Cabral assumed office at
18 the end of October of 2002, who other than Paul
19 DeFazio did you have contact with in SID that
20 caused you to feel there was a lack of trust with
21 SID?
22      A     I'm not sure.
23      Q     Did you have any interactions with
24 anybody that caused you to not trust them, to not

1    want to contact them?
2        A    I believe that the incident with Rene
3    was in November of 2002, and that required
4    knowledge of people in the House of Correction,
5    and because he was back again, I was concerned,
6    and I really didn't know who I could trust on the
7    issue, and because of my previous involvement with
8    Rene and my ongoing involvement with the F.B.I., I
9    took the other route.
10       Q    Turning to the last page of this report,
11   page 3, the paragraph beginning, We asked
12   Ms. Porter to elaborate on this," does that
13   accurately reflect the information that you
14   provided to Brian Dacey and Sonya Aleman?
15       A    Not exactly.
16       Q    What is not accurate?
17       A    I wouldn't have said, "The relationship
18   went sour." The relationship, there was an issue
19   with it, but I wouldn't have said it went sour.
20   His problem was not with me.
21               (Witness perusing document.)
22       A    I was incorrect about the timing of the
23   incident with Rene.
24       Q    It should reflect what?

1           MR. SAVAGE: Objection.
2      A    Right now I -- I would assume that
3  anyone is entitled to a hearing.
4      Q    You had personal knowledge of other
5  medical personnel being barred from the House of
6  Correction, correct?
7      A    I did.
8      Q    To your knowledge, were any of those
9  individuals provided with a hearing?
10     A    I guess it's a different -- it depends
11 on the -- the -- I want to say the definition.
12 Have people been given the opportunity to explain
13 charges? Yes. Is that a hearing? I'm not sure
14 how you would refer to it.
15     Q    Did you ask to explain what it seemed to
16 have been alleged that you had done?
17     A    No.
18     Q    You weren't a member of a union at the
19 Suffolk County Sheriff's Department, correct?
20     A    No.
21     Q    You weren't a -- a civilian -- strike
22 that.
23          You weren't a teacher employed by
24 the Department?

1  her.
2     Q    Did they talk at all, to your knowledge,
3  about the reasons for your barring and your
4  interaction with Rene Rosario and your
5  communication with the F.B.I.?
6     A    I don't know that.
7     Q    You were interviewed by the Boston Globe
8  on or about August 24th of 2004?
9     A    Yes.
10    Q    How was that interview arranged,
11  Mrs. Porter?
12         MS. CAULO:  Why don't we take a
13  break right now.
14         THE WITNESS:  Do I need to answer
15  that question first?
16         MS. CAULO:  I'll withdraw the
17  question.  I'll get back to it.  Thank you.
18         (Off record.)
19    Q    Mrs. Porter, just prior to the break I
20  was asking you about the article that was
21  published of the interview that you provided to
22  the Boston Globe in August of 2004.
23    A    Yes.
24    Q    Do you recall that interview?

| | | |
|---|---|---|
| 1 | Q | Who was present at your house? |
| 2 | A | Me. |
| 3 | Q | Was anybody else present at your house? |
| 4 | A | No. |
| 5 | Q | Who was conducting the interview over |
| 6 | | the telephone; who was asking you the questions? |
| 7 | A | I don't remember her name, a reporter. |
| 8 | Q | Andrea Estes? |
| 9 | A | Yes. |
| 10 | Q | You were quoted in the article?  There |
| 11 | | were quotes attributed to you in the article, were |
| 12 | | there not? |
| 13 | A | Yes. |
| 14 | Q | Did you tell the Boston Globe reporter |
| 15 | | that you were fired by the Suffolk County |
| 16 | | Sheriff's Department? |
| 17 | A | I don't know. |
| 18 | Q | Was there a photograph of you in the |
| 19 | | article? |
| 20 | A | Yes. |
| 21 | Q | Who took it? |
| 22 | A | A photographer, a male. |
| 23 | Q | And where was it taken? |
| 24 | A | At my house. |

371

```
 1        Q    Were you told that the Globe was going
 2   to contact the Suffolk County Sheriff's Department
 3   to get a response to your story?
 4        A    I don't remember.  I don't -- I don't
 5   remember.
 6        Q    Did you think that the Department would
 7   respond to the interview that was being published
 8   in the Boston Globe?
 9        A    Yes.
10        Q    Prior to August 25th of 2004, the story
11   that appeared in the Globe, had the circumstances
12   surrounding your barring from the House of
13   Correction been the subject of any media stories?
14             MR. SAVAGE:  Objection.
15        A    I don't know.
16        Q    To your knowledge, had you seen any
17   stories in the media concerning the circumstances
18   surrounding your barring from the House of
19   Correction in 2003 prior to the interview that you
20   gave in August of 2004?
21        A    No.
22        Q    And prior to August 25 of 2004, to your
23   knowledge, had anybody from the Suffolk County
24   Sheriff's Department commented publicly about your
```

1  barring from the House of Correction in 2003?
2      A    To my knowledge, no.
3      Q    And prior to August 25th of 2004 had
4  Sheriff Cabral commented about you publicly to the
5  media?
6      A    Not to my knowledge.
7      Q    Were you given an opportunity to review
8  the story before it went to print?
9      A    No.
10     Q    And just so the record is clear, you're
11 not aware of any documents being provided to the
12 Boston Globe?
13     A    I'm not aware of any, no.
14     Q    Were you interviewed by Channel 5, WCVB
15 Channel 5 --
16     A    Yes.
17     Q    -- shortly after this piece went to
18 print in the Boston Globe?
19     A    Yes.
20     Q    How was that interview arranged?
21     A    Same thing.
22     Q    When you say same thing...
23     A    The television station called my
24 attorneys.

1           MS. HARVEY:  June 10.
2      Q    June 10th, rather.
3           MS. CAULO:  Thank you for that
4  clarification.
5      Q    You were employed by Correctional
6  Medical Services.  That's what the second sentence
7  says, correct?
8      A    The first half of the second sentence.
9      Q    And that's accurate, correct?
10     A    Yes.
11     Q    And you were fired by Correctional
12 Medical Services, correct?
13     A    Yes.
14     Q    So I'm just trying to identify the
15 statements within that paragraph No. 1 that you
16 feel are defamatory.
17     A    The way in which it's stated.
18     Q    And what is the sinister motive that you
19 feel is being attributed to you?
20     A    I'm not sure what that one is.
21     Q    You're not sure what what is?
22     A    What the -- what was supposed to be the
23 reason that I was fired.  This looks -- to me and
24 to the people that heard the report that spoke

1   with me, this looked like they didn't know why I
2   was fired. That was some other reason not having
3   anything to do with the Sheriff's Department.
4       Q    What persons did you speak with about
5   this press statement?
6       A    The people that talked to me in my
7   family, my friends, people that saw the interview.
8       Q    Well, what did they say to you?
9       A    They were upset.
10      Q    Well, what did they say to you about
11  what they interpreted that statement to mean?
12      A    Precisely as if they didn't know.
13      Q    And that's the reason why you allege
14  that that portion of that statement is defamatory?
15      A    Yes.
16      Q    Turning to paragraph No. 2, what
17  statements within paragraph No. 2 do you contend
18  are defamatory?
19      A    Clearly biassed and has her own agenda
20  for speaking out at this time.
21      Q    What does that sentence mean to you,
22  "She is clearly biassed and has her own agenda for
23  speaking out at this time"?
24      A    Clearly biassed how? I can -- I can