1  tell you that some people that heard the report
2  felt that there was a racial issue.
3      Q   Which people?
4      A   Family members, friends.
5      Q   Who are they?
6      A   My children, my husband, friends that
7  live in my town, people that happened to see this
8  that know me and not anything else about anything.
9      Q   So who are the friends that saw this and
10 drew the conclusion that it implied some sort of
11 racial bias?
12     A   One of my closest friends, whose name is
13 another Donna, Donna Moore, Donna Desjardins now.
14     Q   What did she say to you?
15     A   "What was that all about?"
16     Q   What in that statement led those people
17 to conclude that it implied a racial bias?
18     A   That was -- that was just how the
19 statement struck them.
20     Q   How many people did it strike that you
21 spoke with that that statement implied a racial
22 bias?
23     A   Four or five specifically.
24     Q   When you read that statement, did it

1  strike you as implying that you had a racial bias?
2    A    I didn't think of it.
3    Q    When did you think of it, if you thought
4  of it at all?
5    A    When I heard other people's comments.
6    Q    And when you heard other people's
7  comments, what did that make you think about the
8  statement?
9    A    It made me think, I hope that wasn't the
10 truth.
11    Q    Do you think that's what it implies?
12    A    I don't know.
13    Q    Other than "clearly biassed," what else
14 in that sentence do you allege is defamatory?
15    A    My own agenda for speaking out at this
16 time.  I had no agenda for speaking out at that
17 time, except that someone called me and asked for
18 my story.
19    Q    Did you feel that your reputation had
20 been damaged?
21    A    Yes.
22    Q    Did you hope to accomplish by speaking
23 to the Globe and to Channel 5 that you would
24 restore your reputation that you felt had been

1   agenda, my own agenda was the same thing it always
2   had been, and it had nothing to do with time.  It
3   was not political, it wasn't -- it had nothing to
4   do with anything else that was going on except my
5   personal story, period.  This indicates it had
6   some other -- some other time frame established,
7   that it was for some other reason.
8       Q    And I'm asking you what other reason do
9   you think that this implies?
10      A    I believe it was at the time there was
11  an election coming up.
12      Q    And what did you think -- what was that
13  connection; how was that relevant to whether you
14  interpreted this as defamatory?
15      A    Well, interestingly enough, it wasn't
16  relevant because I don't even live in that county,
17  but what it meant to me was that I was politically
18  motivated somehow to do this while she was running
19  for -- while Sheriff Cabral was running for
20  election.
21      Q    Were you aware when that election was
22  happening?
23      A    No.
24      Q    How has that statement damaged your

```
 1   obtain employment?
 2        A    I'm not sure about that one.
 3        Q    You're not sure that it did or you're
 4   not -- what are you not sure about?
 5        A    I don't know if it did.
 6        Q    Did it affect your ability to obtain
 7   employment with UMass Correctional Healthcare?
 8        A    I don't know.
 9        Q    Well, were you hired by UMass
10   Correctional Healthcare?
11        A    I was.
12        Q    Was this statement ever discussed with
13   them?
14        A    Yes.
15        Q    What was -- what were the discussions?
16        A    The discussion was around all of the
17   publicity that had happened, and this was --
18   what's the date of this?  I'm sorry.
19        Q    August 25th, 2004.  August 25th, 2004.
20        A    I had already been hired.
21        Q    You had already been hired?
22        A    (Witness nodded.)
23        Q    So it didn't affect your obtaining
24   employment with UMass Correctional Healthcare?
```

1   A   My 97-year-old aunt heard it.

2   Q   What did she tell you?

3   A   She told me -- she is legally blind and
4   she was listening to the conversation, and she
5   said, "I heard them talking about you on
6   television," and she commented again about --
7   she's a savvy lady -- and she commented about
8   there was a -- there was something I believe about
9   politi -- about politics in that, and she said,
10  "Isn't that Suffolk County?"  And I said yes.  And
11  she said, "Well, so, you can't vote there."

12  Q   Well, other than your 97-year-old aunt,
13  who else talked to you about the debate that was
14  televised on Greater Boston Channel 2 between
15  Sheriff Cabral and Stephen Murphy?

16  A   That one's kind of an outstanding one in
17  my mind.  I don't remember anything else in
18  particular, but that was pretty outstanding.

19  Q   Do you know anybody who actually watched
20  the debate?

21  A   My aunt.

22  Q   Other than your 97-year-old aunt.

23         MR. SAVAGE:  She's blind.

24  Q   You're right, she's blind.

1    A    She listened to the debate.  She can
2    see, but not a lot.
3              MS. CAULO:  Duly noted.
4    Q    How about, do you know anybody who
5    watched it, not anybody else who watched it?
6    A    Not specifically, no.
7    Q    What are the statements that you say
8    Sheriff Cabral made about you during that debate
9    that were defamatory?
10   A    I've seen the transcript, but off the
11   top of my head, I don't remember which things came
12   from which interview, which newspaper reports.
13   I -- I have seen a transcript of that, but I don't
14   recall which things were said that time, and there
15   were other newspaper reports, and I'm not sure
16   which is which.
17   Q    Well, when did you conclude that
18   statements attributed to Sheriff Cabral were
19   defamatory?
20   A    Every time I heard one.
21   Q    And which one -- I'm asking you, which
22   one, what statements are we talking about?
23   A    The thing about the bias and agenda kept
24   showing up, and the -- my motives were called into

1   question on more than one occasion.
2   Q   And specifically what do you contend
3   that Sheriff Cabral said about your motives?
4   A   That I was politically motivated and it
5   had more to do with her than it had to do with me.
6   Q   Who did you discuss -- strike that.
7       When did you first see -- so you
8   never saw the televised debate?
9   A   No.
10  Q   When did you become aware -- other than
11  your 97-year-old aunt telling you that she heard
12  the debate, did anybody else tell you they saw it?
13  A   No.
14  Q   When did you see the transcript?
15  A   I don't recall.
16  Q   Who provided that to you?
17  A   It came from Channel 2. I believe the
18  attorneys sent for it, but I don't know.
19  Q   So sitting here today, you can't tell me
20  what statements Sheriff Cabral made during a
21  televised debate with Stephen Murphy broadcast on
22  Channel 2 that you allege were defamatory?
23  A   Specifically, as I said, there was more
24  than one interview, there was more than one time

                                                                      400

1     Q    You may have approached them to ask
2  their opinion about what they felt?
3     A    Um-hm.
4     Q    And what was the -- what were the
5  opinions that you solicited from these people?
6     A    I didn't solicit an opinion.  I asked
7  them if they had read it and some had, some
8  hadn't.  The ones that hadn't, did.
9     Q    Did these people think less of you after
10 having read this article?
11    A    No.
12    Q    Did you feel that your reputation
13 amongst that community that you have in Upton was
14 damaged by the -- by this article?
15    A    I didn't think it was helped.
16    Q    Did you think it was damaged?
17    A    I don't know.
18    Q    Did you think that your professional --
19 strike that.
20         Did you speak with anybody in your
21 professional community, if you will, about the
22 statements in the Boston Globe Magazine?
23    A    A few people that I worked with had seen
24 it.

Sheila J. Porter, Vol. 2                                       05/26/2005

401

1   Q   And what were those conversations?
2   A   One of them was, "You keep showing up
3   everywhere." Another one asked about the
4   political motivation. Those are the only
5   things -- I remember those two in particular, but
6   I don't remember others specifically.
7   Q   Did any of the statements that we've
8   been discussing call into question your
9   professional abilities as a nurse practitioner?
10  A   Yes.
11  Q   Which ones and how did they do it?
12  A   I believe that when someone calls into
13  question my motives for doing something, for
14  working with the F.B.I. or for doing whatever I
15  was doing, and states that my motives are
16  political for talking about it, that calls into
17  question whether my motives for doing such things
18  were altruistic or political or some other
19  sinister kind of motive.
20  Q   And how did that damage your
21  professional reputation as a nurse practitioner?
22  A   I don't think that that's one of the
23  qualifications and qualities that you look for in
24  a nurse practitioner working for you.

LegaLink Boston
(800) 822-3376

1    Q    Did anybody tell you that they thought
2  less of you as a nurse practitioner because of
3  what they read?
4    A    No.
5    Q    Did anybody that you know of personally
6  and professionally inform you they felt less of
7  you because of what they read?
8    A    I did have one person that I worked for
9  say, "Enough is enough.  Haven't you been in the
10 paper enough?"
11   Q    Other than that statement -- and was
12 that somebody at Correctional -- at your current
13 position at UMass Correctional Healthcare?
14   A    Yes.
15   Q    Did she tell you that she felt less of
16 you?
17   A    I thought that statement indicated that
18 that might be a problem, yes.
19   Q    Other than that, has anybody indicated
20 that they felt that your reputation or your
21 character was now impugned as a result of this;
22 that they felt less of you; that they felt you had
23 been diminished in their eyes?
24            MR. SAVAGE:  Objection.

1    A    No.

2    Q    Did you consider yourself a whistle-
3  blower when you provided the information regarding
4  Rene Rosario to the F.B.I. in May of 2003?

5    A    Yes.

6    Q    Why?

7    A    I believed that there was wrongdoing
8  inside the facility, and I reported it to an
9  agency that could, in my opinion, take care of it.

10   Q    What did you report to the F.B.I. in May
11 of 2003 that the Sheriff's Investigation Division
12 was not already investigating?

13   A    They weren't investigating at the time
14 it happened, I didn't believe.

15   Q    Were you aware that Rene Rosario asked a
16 unit officer to contact SID for him?

17   A    Yes.

18   Q    Were you aware that Rene Rosario asked
19 Gayle Bartley to contact SID for him?

20   A    No.

21   Q    That was on May 19th.

22   A    I didn't -- I wasn't aware that he asked
23 Gayle.

24   Q    And you didn't speak to the F.B.I. until

405

1  A   My belief that it might not happen. I
2  don't know how else to explain it to you.
3  Q   Was there anything specific on that date
4  that led you to conclude that SID would not
5  investigate the allegations made by Rene Rosario?
6  A   Nothing specific on that date.
7         MS. HARVEY: To save time, while she
8  looks through her stuff, do you want me to start,
9  and then if she has -- rather than take a break?
10 We can take a break if you want, but I'm ready to
11 start if you want me to start.
12        MR. SAVAGE: I'd like to take five
13 minutes --
14        MS. HARVEY: Yeah.
15        MR. SAVAGE: -- but I've got to get
16 an end point to this because we're -- we've been
17 more than -- the rule gives you seven hours.
18        MS. CAULO: I understand. I
19 understand, Joe.
20        MR. SAVAGE: We're way beyond --
21        MS. HARVEY: We can take the break
22 and let her finish.
23        MS. CAULO: I think I'm done, but I
24 just wanted to --

1  anything that's been done, but if I ask a question
2  that does seem out of context, just let me know
3  and I'll try to put it in more context.
4              Did you ever sign a contract of
5  employment with Correctional Medical Services?
6       A    No.
7       Q    You understood that you were an employee
8  at will with Correctional Medical Services during
9  your employment with them up until June of 2003?
10             MR. SAVAGE: Objection to the extent
11 that's asking her for a legal conclusion.
12      Q    You can answer.
13      A    I understood I was an employee of.
14      Q    Okay. And looking at what was marked as
15 Exhibit 4, I just wanted to establish, because I'm
16 not sure you were asked this on the first day of
17 your deposition, is that your signature on
18 Exhibit 4?
19      A    Yes, it is my signature.
20      Q    Thank you.
21             And this document, Exhibit 4, is an
22 acknowledgment that you received the CMS Employee
23 Success Guide that was previously marked as
24 Exhibit 3, correct?

1                  (Document exhibited to witness.)
2        A    Yes.
3        Q    And you read the Employee Success Guide
4   when you got it?
5        A    Perhaps not right away, but yes.
6        Q    At some point you did?
7        A    I did.
8        Q    I'm asking you to turn to page 5,
9   please.  Page 5 says, "Important Notice," and can
10  you read the section out loud that is underlined?
11                 (Discussion off the record.)
12       Q    Could you please read the sentence that
13  is underlined on page 5 of the Employee Success
14  Guide?
15       A    Certainly.  "The Employee Success Guide
16  is not an employment contract and should not be
17  construed as such."
18       Q    And you read that sentence prior to
19  June 10th of 2003, correct?
20       A    I did.
21       Q    During your employment with CMS up until
22  2003, were you evaluated on an annual basis?
23       A    Yes.
24       Q    Who did the evaluations?

1            MS. HARVEY:  I'll be very happy to
2   do it your way, but then you're going to object,
3   I'm certain, but...
4        Q    In your testimony last week you advised
5   that the reason that you did not want to perform
6   an examination on Mr. Rosario was because you had
7   advocated for him in the past and you were
8   concerned about appearing biassed; is that
9   correct?
10       A    That's one reason.
11       Q    Okay.  Now, when you use the word
12  "biassed" do you mean racially biassed?
13       A    No.
14       Q    So the word biassed can have a number of
15  different meanings, you would agree?
16       A    Yes.
17       Q    Just because Mr. Rosario is a person of
18  color doesn't mean that you would be racially
19  biassed against him if you use the word "biassed"
20  in that context?
21       A    Correct.
22       Q    Now, you've testified that you gave the
23  report that has been marked as Exhibit 5, that you
24  gave this report to Donna Jurdak on May 22 or

1    A    No.
2    Q    I mean, was this a conversation where
3 you were trying to follow up on what had happened
4 to the report, or was it a conversation where this
5 just happened to come up?
6         MR. SAVAGE:  Objection.
7    A    I don't know.  I'd be guessing.
8    Q    Prior to May 19, 2003, had you ever
9 submitted an incident report regarding alleged
10 inmate abuse on the form of an Interdisciplinary
11 Progress Note?
12   A    Yes.
13   Q    And how many times had you done that?
14   A    Over the course of my employment I've
15 done it many times, and I couldn't give you a
16 ballpark figure.
17   Q    Have you also submitted incident reports
18 on different forms?
19   A    Yes.
20   Q    What other types of forms have you used?
21   A    Departmental Incident Report Forms.  I
22 don't -- I think it might even be called Incident
23 Report.
24   Q    So the Sheriff's Department has a

```
 1   specific form called an "Incident Report"?
 2        A    Yes.
 3        Q    How would you make the determination
 4   back in say the period of 2000 to June of 2003 as
 5   to what type of form you would use when you were
 6   reporting a significant event?
 7        A    The paper that was available at the time
 8   I was writing it.
 9        Q    On the day of the barring, June 10th,
10   2003, when you left Donna Jurdak's office after
11   having that meeting with Donna Jurdak, Mary Ellen
12   Mastrorilli, and yourself, did Ms. Jurdak and
13   Ms. Mastrorilli stay in the office?
14        A    I believe they did.
15        Q    And do you know what conversation they
16   might have had after you left?
17             MR. SAVAGE:  Objection.
18        A    I -- I only know what I was told.  I was
19   not in the room.  I did not stay in the room.
20        Q    Did you have a conversation with Donna
21   Jurdak about what occurred in the room after you
22   left?
23        A    She came into the office and told me
24   what she had said to Mary Ellen.
```