```
                                              VOL:  I
                                         PAGES: 1-295
                                       EXHIBITS: 1-15


              UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * *
SHEILA J. PORTER,              *
               Plaintiff       *
       -vs-                    *  Civil Action
ANDREA CABRAL; SUFFOLK COUNTY  *  No. 04-11935-DPW
SHERIFF'S DEPARTMENT; SUFFOLK  *
COUNTY and CORRECTIONAL MEDICAL*
SERVICES, INC.,                *
               Defendants      *
* * * * * * * * * * * * * * * *




     DEPOSITION OF ANN MACK, a witness
called on behalf of the Plaintiff, in the
above-captioned matter, said deposition being
taken pursuant to the Federal Rules of
Civil Procedure, before Patricia M.
McLaughlin, a Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the offices of Goodwin Procter
LLP, Exchange Place, Boston, Massachusetts, on
Tuesday, May 3, 2005, commencing at 10:05 a.m.





          McLAUGHLIN & ASSOCIATES COURT REPORTERS
                92 DEVIR STREET, SUITE 304
                MALDEN, MASSACHUSETTS  02148
                      781.321.8922
                 WWW.E-STENOGRAPHER.COM
```

29

| | | |
|---|---|---|
| 1 | Q | Do you know how many facilities |
| 2 | | approximately? |
| 3 | A | I think we have nine statewide prison systems |
| 4 | | and 50 jails. It changes. We pick up |
| 5 | | contracts, and we lose contracts. |
| 6 | Q. | Does CMS currently service correctional |
| 7 | | facilities in Massachusetts? |
| 8 | A | Yes. |
| 9 | Q | Which ones are those? |
| 10 | A | Essex County Correctional Facility. |
| 11 | Q | Any in New England besides Massachusetts? |
| 12 | A | The State of Maine, the Maine Department of |
| 13 | | Corrections. |
| 14 | Q | Any others in Maine? |
| 15 | A | Cumberland County in Maine, Portland, Maine. |
| 16 | Q | Any others in New England? |
| 17 | A | No. |
| 18 | Q | In the last, say, five years, what additional |
| 19 | | prison facilities in Massachusetts has CMS |
| 20 | | provided services for? |
| 21 | A | The prison systems would be the Massachusetts |
| 22 | | Department of Corrections and Vermont. |
| 23 | Q | Which specific facilities within the |
| 24 | | Department of Corrections in Massachusetts? |

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

| | | |
|---|---|---|
| 1 | A | All of the state prisons within the |
| 2 | | Massachusetts Department of Corrections. |
| 3 | Q | How many of them are there? |
| 4 | A | Approximately 20. They closed a couple. |
| 5 | Q | So CMS has provided services for all 20 or so |
| 6 | | facilities within the Massachusetts |
| 7 | | Department of Corrections system? |
| 8 | A | Right, the prisons. |
| 9 | Q | Jails as well besides state correctional |
| 10 | | facilities? |
| 11 | A | The jails would have been Essex County. We |
| 12 | | had a contract with Suffolk County, and we |
| 13 | | previously had a contract with Franklin |
| 14 | | County, a small jail. In New England, we had |
| 15 | | the statewide prison system in Vermont. |
| 16 | Q | You report to work in Middleton; is that |
| 17 | | right? |
| 18 | A | Yes. |
| 19 | Q | How many people work in the Middleton office? |
| 20 | A | Two. |
| 21 | Q | You and somebody else? |
| 22 | A | Yes. |
| 23 | Q | Who is the other employee? |
| 24 | A | Bonnie Roberts, Bonnie Roberts Clark. |

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

```
 1    Q    What's her position?
 2    A    She's an administrative coordinator.
 3    Q    So she's not somebody you would have spoken
 4         to regarding the substance of your testimony
 5         today?
 6    A    I would have talked to her about -- I talked
 7         to her about specific details around the
 8         payroll system.  She's real familiar with the
 9         T3 system, the computerized payroll system.
10         She does training for that in the field.
11         When we have new facilities or new staff,
12         she'll provide training.
13    Q    How long has Miss Roberts Clark been with
14         CMS?
15    A    I believe it's ten years.
16    Q    So are most of CMS's employees in the field,
17         so to speak, rather than at your corporate
18         office?  When I say in the field, I mean at
19         the various correctional facilities.
20    A    The majority of the CMS staff work in various
21         states inside the correctional facilities,
22         yes.
23    Q    How does it come to pass that CMS begins
24         providing medical services for a correctional
```

32

1   facility?
2 A The correctional facility will put out a
3   Request For Proposal, an RFP, and various
4   vendors will respond. You submit a proposal.
5   There is a selection committee. A decision
6   is made to award a contract, and a contract
7   award is made.
8 Q So it's a common practice for prisons to
9   subcontract the medical treatment or medical
10  facilities in their prison?
11 A I'm not sure what the percentage of statewide
12  prison systems are that privatize their
13  medical services programs. Maybe 40 percent,
14  and that's a guess.
15 Q So the Request for Proposal is put out, and
16  what does CMS do in response to that Request
17  for Proposal?
18 A We have a sales department that would begin
19  gathering documentation to prepare putting a
20  proposal together. They'll have a bid
21  meeting, and various members from sales and
22  operations will attend that bid meeting. And
23  that's the opportunity where you have to ask
24  questions, and then there will be a tour of

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

| | | |
|---|---|---|
| 1 | | the facility or facilities, put the documents |
| 2 | | together and develop your proposal. |
| 3 | Q | And the documents are the proposal or the |
| 4 | | bid? |
| 5 | A | Yes, and any required documents per the RFP. |
| 6 | Q | Could you describe CMS's employment |
| 7 | | relationship with a prison once you receive a |
| 8 | | contract with a particular prison? |
| 9 | | MS. HARVEY: Objection. Go ahead. |
| 10 | A | We don't have an employment relationship with |
| 11 | | a county or a state jurisdiction. It's |
| 12 | | purely a contract to provide services. Staff |
| 13 | | that function under our contract are |
| 14 | | employees or independent contractors of CMS, |
| 15 | | and there is no employee relationship with |
| 16 | | the county or state Department of |
| 17 | | Corrections. |
| 18 | Q | Does the prison have any say in terms of who |
| 19 | | is hired to fill particular positions? |
| 20 | A | Not often. From time to time, the management |
| 21 | | positions, such as the administrator or the |
| 22 | | regional medical director, they would like to |
| 23 | | be -- they request to have, not an interview, |
| 24 | | but to meet that person and get a feel for |

34

|    |   |                                                                      |
|----|---|----------------------------------------------------------------------|
| 1  |   | their background and their experience and see                       |
| 2  |   | if there will be a fit.  It's an unusual                             |
| 3  |   | environment.  It's not for everybody.                                |
| 4  | Q | CMS comes in and says here is who we suggest                         |
| 5  |   | will be our team, so to speak?                                       |
| 6  | A | Most often, we don't, but from time to time,                         |
| 7  |   | our clients will be involved in at least                             |
| 8  |   | reviewing who we propose as management staff.                        |
| 9  | Q | Does the prison have any say as to whether or                        |
| 10 |   | not particular individuals are acceptable or                         |
| 11 |   | not?                                                                 |
| 12 | A | They have say most often around credentials.                         |
| 13 | Q | What do you mean by that?                                            |
| 14 | A | If we are looking at a physician who is going                        |
| 15 |   | to work at the facility to provide primary                           |
| 16 |   | care, they will want someone who is board                            |
| 17 |   | certified or board eligible in internal                              |
| 18 |   | medicine, family medicine, emergency medicine                        |
| 19 |   | and not cardiology, something to do with a                           |
| 20 |   | specific separate board.                                             |
| 21 | Q | The individuals that CMS provides for these                          |
| 22 |   | prisons, they go to work in a prison                                 |
| 23 |   | infirmary?  Is that how it's categorized?                            |
| 24 | A | It depends on the site.  It's an area within                         |

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

35

1    the facility where health services is
2    provided.
3  Q  Fair enough. Could you describe the
4    organizational structure within that area
5    where the health services are provided?
6    Let's talk in particular about Suffolk County
7    just to narrow things down for.
8  A  At Suffolk County, the organizational
9    structure would be the health services
10   administrator, and that's the lead of the
11   health services team. There is also a site
12   medical director, a site director of mental
13   health, and those three are the members of
14   the team that are responsible to manage the
15   services.
16 Q  What does the health services administrator
17   do?
18 A  Her role is to monitor the day-to-day
19   operations of the facility in the health
20   services department to ensure that quality
21   care is being provided, to ensure that access
22   to care is happening, to ensure that all the
23   staff that we bring on board are licensed and
24   qualified to provide the services that we

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

| | | |
|---|---|---|
| 1 | | hire them for. They're responsible to |
| 2 | | communicate with the client on a day-to-day |
| 3 | | basis regarding concerns related to health |
| 4 | | services or day-to-day operations. |
| 5 | Q | How about the site medical director, what's |
| 6 | | that individual's job responsibilities? |
| 7 | A | Site medical director is basically the health |
| 8 | | authority that makes clinical decisions |
| 9 | | around the services that are being provided, |
| 10 | | and that person works in conjunction with the |
| 11 | | health service administrator to make sure |
| 12 | | that the medical services that an inmate |
| 13 | | population requires is being provided. |
| 14 | Q | How about the site director of mental health? |
| 15 | A | They are over the mental health department |
| 16 | | and is responsible to ensure that the mental |
| 17 | | health services that we are providing in that |
| 18 | | facility are consistent with what we are |
| 19 | | required to provide.  We provide services |
| 20 | | consistent with the standards of the National |
| 21 | | Commission on Correctional Healthcare, and |
| 22 | | that facility is accredited by CMS through |
| 23 | | the National Commission on Correctional |
| 24 | | Healthcare. |

| | | |
|---|---|---|
| 1 | Q | Do all three of these individuals report to |
| 2 | | CMS corporate, if you will? |
| 3 | A | The medical director has an indirect to our |
| 4 | | regional medical director. The health |
| 5 | | service administrator has a direct report to |
| 6 | | the regional jail manager, and the regional |
| 7 | | jail manager would report to me. |
| 8 | Q | What other CMS employees -- job titles now, |
| 9 | | not actual individuals yet -- would have been |
| 10 | | working in the Suffolk County House of |
| 11 | | Corrections during the term of your contract |
| 12 | | with them? |
| 13 | A | Position titles? |
| 14 | Q | Sure. |
| 15 | A | Physician assistant, nurse practitioner, |
| 16 | | staff physician, dentist, dental assistant, |
| 17 | | medical records clerks, phlebotomists, social |
| 18 | | workers, discharge planners, mental health |
| 19 | | liaison. |
| 20 | Q | Approximately how many individuals working |
| 21 | | for CMS would have been in the prison? |
| 22 | A | There, I believe there were about 45, maybe |
| 23 | | 50, which would be either employees or |
| 24 | | independent contractors or a subcontractor. |

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

38

1  Q    Who determines whether an individual is an
2       employee, an independent contractor or a
3       subcontractor?
4  A    It depends on -- that's a hiring status.
5       Physicians generally are independent
6       contractors, but if they are medical
7       directors, then they are employees. In a
8       subcontract, a subcontractor would be someone
9       that provides more of a program, like a
10      dental subcontractor. An employee would be a
11      direct employee.
12 Q    When did CMS first start providing medical
13      services to the Suffolk County House of
14      Corrections?
15 A    I think it was in July of 2001.
16 Q    How did that come about?
17 A    I believe it was in a response for to Request
18      For Proposals.
19 Q    So Suffolk sent out a Request for Proposal?
20 A    Yes.
21 Q    And CMS submitted a bid?
22 A    Right.
23 Q    And presumably, that bid was accepted?
24 A    Right.

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

| | | |
|---|---|---|
| 1 | Q | But not hired to work for CMS as a general |
| 2 | | matter but rather to work specifically in |
| 3 | | that prison? |
| 4 | A | No, she was employed by CMS and specifically |
| 5 | | to work for CMS in the health services unit |
| 6 | | at that jail. |
| 7 | Q | Was she a full-time employee? |
| 8 | A | I believe she was full time, doing four |
| 9 | | ten-hour days. |
| 10 | | MR. SCHUMACHER: Let the record reflect |
| 11 | | that I'm asking Mrs. Porter not to indicate |
| 12 | | anything. |
| 13 | | THE WITNESS: She was full time. |
| 14 | Q | What was her salary? |
| 15 | A | Most nurse practitioners at that site or |
| 16 | | around this region made probably around $35, |
| 17 | | $33 an hour. |
| 18 | Q | Did she receive full benefits? |
| 19 | A | Yes, she would have as a full-time employee. |
| 20 | Q | What did those benefits generally include? |
| 21 | A | Health insurance, dental insurance. She |
| 22 | | would have a co-pay to both of those, dental |
| 23 | | and vision. 401(k) opportunity. Then her |
| 24 | | other benefits included pay time off days. |

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

| | | |
|---|---|---|
| 1 | Q | Was she required to undergo a background |
| 2 | | check? |
| 3 | A | All correctional facilities require anyone |
| 4 | | entering a facility, whether or not it's an |
| 5 | | employee of ours or a vendor that we're |
| 6 | | bringing in that's going to read X rays, |
| 7 | | services or whatever, to complete a |
| 8 | | background check. |
| 9 | Q | What is your understanding of what goes into |
| 10 | | a background check? |
| 11 | A | Every jurisdiction does it differently. I'm |
| 12 | | not sure how indepth Suffolk County's |
| 13 | | background check is. It wouldn't be |
| 14 | | something that we would be involved in. |
| 15 | Q | The prison performs the background check -- |
| 16 | A | Right. |
| 17 | Q | -- rather than CMS? |
| 18 | A | The jail. |
| 19 | Q | Thank you. Were you personally involved in |
| 20 | | Sheila's hiring this last time? Excuse me. |
| 21 | | Were you personally involved in Sheila's |
| 22 | | hiring when CMS received the Suffolk County |
| 23 | | contract? |
| 24 | A | I don't remember. |

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

60

1          Suffolk County House of Corrections?
2     A    The medical unit where the bulk of the health
3          services is provided out of is pretty much
4          located centrally within that facility on the
5          second floor.
6     Q    Who did Mrs. Porter or to?
7     A    She reported to the health service
8          administrator.
9     Q    Who was that during her tenure with CMS, say
10         starting in the beginning of 2001?
11    A    I think most of that time Donna Jurdak was
12         the administrator at that facility.
13    Q    Was there anyone else that was the heal
14         services administrator at that facility
15         during this time?  The period of time we're
16         talking about is the beginning of 2001 to
17         June of 2003.
18    A    I'm not sure.
19    Q    You know Mrs. Jurdak was, and there may have
20         been other individuals as well?
21    A    This is a small industry, and a lot of us
22         have all worked together.  And a lot us
23         worked with Correctional Healthcare
24         Solutions.  So it's not real clear to me on

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

| | | |
|---|---|---|
| 1 | | health services administrator? |
| 2 | A | Yeah, and to the medical director on clinical |
| 3 | | issues. |
| 4 | Q | For medical issues, she would have reported |
| 5 | | to the medical director, and for personnel or |
| 6 | | administrative-type matters, she would have |
| 7 | | reported to the health service administrator; |
| 8 | | is that right? |
| 9 | A | Yes. |
| 10 | Q | And the medical director at the time, who was |
| 11 | | it for CMS? |
| 12 | A | At what time? |
| 13 | Q | Between the beginning of 2001 and 2003. |
| 14 | A | I believe for that entire period it was |
| 15 | | Dr. Carl Singletary. |
| 16 | Q | Is Dr. Singletary still employed with CMS? |
| 17 | A | No. |
| 18 | Q | Do you know when he left? |
| 19 | A | I'd say approximately eight months ago. |
| 20 | Q | What were the circumstances of his departure? |
| 21 | A | He resigned. He took a position elsewhere. |
| 22 | Q | Do you know why he resigned? |
| 23 | A | No. |
| 24 | Q | Do you know where he's working now? |

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

| | | |
|---|---|---|
| 1 | A | I don't. |
| 2 | Q | Is he working at U. Mass. Medical in |
| 3 | | Worcester? |
| 4 | A | He may be. |
| 5 | | MR. SCHUMACHER: This may be a good time |
| 6 | | for a five-minute break. |
| 7 | | (Whereupon, a brief recess was held.) |
| 8 | | BY MR. SCHUMACHER: |
| 9 | Q | Miss Mack, you talked a little bit about this |
| 10 | | before. How would you describe Miss Porter's |
| 11 | | work performance for CMS? |
| 12 | A | Sheila did a great job clinically. She had |
| 13 | | exceptional clinical skills. She worked well |
| 14 | | as a team member at that facility. I don't |
| 15 | | believe we had any problems with her |
| 16 | | performance whatsoever. |
| 17 | Q | Did she receive the performance reviews that |
| 18 | | you described earlier? |
| 19 | A | The health service administrator would have |
| 20 | | been responsible to do her performance |
| 21 | | evaluation, and in that, she would have also |
| 22 | | received a merit increase, an annual merit |
| 23 | | increase. |
| 24 | Q | Do you know whether or not Mrs. Porter was |

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

|    |   |                                                                 |
|----|---|-----------------------------------------------------------------|
| 1  |   | reviewed while she was at CMS?                                  |
| 2  | A | It would be the expectation that she would                      |
| 3  |   | have. Whether or not the administrator did                      |
| 4  |   | that, I don't know that.                                        |
| 5  | Q | Is it your testimony that it's entirely up to                   |
| 6  |   | the health services administrator whether or                    |
| 7  |   | not to review an employee?                                      |
| 8  | A | It is their requirement to perform an                           |
| 9  |   | evaluation of staff prior to submitting a                       |
| 10 |   | request for a merit increase. Sheila                            |
| 11 |   | received merit increases showing good                           |
| 12 |   | performance.                                                    |
| 13 | Q | What does that indicate to you then?                            |
| 14 | A | It would be my understanding that -- she                        |
| 15 |   | reported directly to Donna Jurdak -- that if                    |
| 16 |   | she received a 3 percent merit increase, that                   |
| 17 |   | she had good performance in her job duties at                   |
| 18 |   | that site.                                                      |
| 19 | Q | And the fact that she received her merit                        |
| 20 |   | increase, does that indicate to you that she                    |
| 21 |   | received a performance review?                                  |
| 22 | A | Not necessarily, although a performance                         |
| 23 |   | review was required to be performed on all                      |
| 24 |   | staff by their supervisor.                                      |

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

| | | |
|---|---|---|
| 1 | | employee's signature, Sheila J. Porter? |
| 2 | A | Yes. |
| 3 | Q | Do you recognize the name below that? |
| 4 | A | Connie Surpitski. |
| 5 | Q | Who is Miss Surpitski? |
| 6 | A | She is the health service administrator at |
| 7 | | Essex County. |
| 8 | Q | And Essex County is the facility where |
| 9 | | Mrs. Porter was rehired to work in in |
| 10 | | approximately October, 2003; is that right? |
| 11 | A | Yes. |
| 12 | Q | So does this indicate to you that CMS |
| 13 | | reimbursed Mrs. Porter for her travel |
| 14 | | expenses for this conference? |
| 15 | A | Yes. |
| 16 | Q | And you're aware that Mrs. Porter attended |
| 17 | | this conference even though she had been at |
| 18 | | the time terminated by CMS -- |
| 19 | | MS. HARVEY: Objection. |
| 20 | Q | -- is that right? |
| 21 | A | She was working for CMS obviously at the time |
| 22 | | that she attended this conference. We |
| 23 | | generously reimbursed her to attend. |
| 24 | Q | Well, the date that the form was submitted is |

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

```
 1   Q   It was before the September, '03,
 2       communication; is that right?
 3   A   Yes.
 4   Q   Now, at some point, Mrs. Porter was
 5       terminated from CMS, right?
 6   A   I believe she's still currently working for
 7       us.
 8   Q   But at some point she was terminated from
 9       CMS, right?
10   A   In June of '03, yes.
11   Q   What were the circumstances surrounding that
12       termination?
13   A   Sheila was barred from the correctional
14       facility from the county.  Sheila was denied
15       access to the facility.  Based on that, we
16       had no position for Sheila.
17   Q   Why was she barred from the facility?
18   A   We don't know the specifics around why she
19       was barred.  I wasn't in attendance in the
20       meeting.  Donna Jurdak was.
21   Q   When you say we, who are you referring to?
22   A   CMS.
23   Q   So your testimony is CMS does not know why
24       Sheila Porter was barred from the facility?
```

121

1   Q   Did CMS talk to -- did CMS conduct an
2       internal investigation as to these
3       allegations?
4   A   No.
5   Q   Did CMS talk to any of the employees on site
6       within the medical facility at the House of
7       Corrections concerning these allegations?
8   A   No, I don't think so.
9   Q   Was Dr. Singletary asked if he knew what had
10      happened?
11  A   Not from me.
12  Q   By CMS?
13  A   Possibly by Donna. I don't know what Donna's
14      communications were at the site.
15  Q   But CMS didn't launch a formal internal
16      investigation as to these allegations, right?
17  A   No.
18  Q   Now, at some point subsequent to receiving
19      this information, CMS had made the decision
20      to terminate Mrs. Porter, right?
21  A   That's correct.
22  Q   I think you testified that it was made on the
23      same day; is that right?
24  A   It might have been the following day.

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922