186

```
 1        was to see whether or not she should have
 2        counsel with her when she talks to the FBI?
 3             MS. HARVEY:  Objection.  Beyond the
 4        scope.
 5   A    (Witness nods.)
 6   Q    Is that a yes?
 7   A    Yes.
 8   Q    And the determination was she didn't need
 9        counsel?
10             MS. HARVEY:  Objection.  Don't answer
11        the question.
12             MR. SCHUMACHER:  Fair enough.  Strike
13        that.  Let's take a quick five-minute break.
14             (Whereupon, a brief recess was held.)
15             (Document marked Exhibit No. 12.)
16        BY MR. SCHUMACHER:
17   Q    Miss Mack, I'm handing you what has been
18        marked as Exhibit No. 12.  I also have a copy
19        for counsel.  Take a second to look at that.
20        Have you ever seen this document before,
21        Miss Mack?
22   A    It doesn't look familiar to me.
23   Q    This is a document entitled "Correctional
24        Medical Services Interdisciplinary Progress
```

```
 1         Notes". Are you familiar with that caption?
 2    A    The form.
 3    Q    What does that caption denote?
 4    A    It's a progress note that clinical providers
 5         document for patient encounters.
 6    Q    Where do Interdisciplinary Progress Notes --
 7         where are they normally filed?
 8    A    In the innate's health services record or
 9         their medical record.
10    Q    This particular document, the patient's name
11         is Rene Rosario, and the date is 5/29/03. On
12         the bottom, it is signed by Sheila Porter.
13         I'll represent to you that this document was
14         contained in Mrs. Porter's personnel file at
15         CMS.
16         Do you have any knowledge that it was,
17         in fact, contained in her personnel file?
18    A    I have no knowledge of that.
19    Q    This is the first time that you learned that
20         this document was in her personnel file?
21    A    Yes.
22    Q    Are progress -- are you familiar with the
23         phrase, incident reports?
24    A    Yes.
```

| | | |
|---|---|---|
| 1 | | documents should go into an employee's |
| 2 | | personnel file based on general guidance |
| 3 | | provided by the company? |
| 4 | A | There are requirements of must be contained |
| 5 | | in personnel files, but administrators may |
| 6 | | put extraneous documents in that file as well |
| 7 | | just for the purpose of having somewhere to |
| 8 | | put it as it relates to personnel. |
| 9 | | MR. SCHUMACHER: Let's mark another |
| 10 | | exhibit. |
| 11 | | (Document marked Exhibit No. 13.) |
| 12 | Q | The Court Reporter has handed you Exhibit |
| 13 | | No. 13. Do you recognize this document? |
| 14 | A | Yes. |
| 15 | Q | What is Exhibit 13? |
| 16 | A | An Employee Success Guide. |
| 17 | Q | Is that what you have referred to on a couple |
| 18 | | of occasions today? |
| 19 | A | Yes. |
| 20 | Q | On the second page, it says, "Revised: |
| 21 | | January, 2002." Do you see that? |
| 22 | A | Yes. |
| 23 | Q | What's the purpose of the employee handbook? |
| 24 | A | The purpose of the handbook is to inform CMS |

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

| | | |
|---|---|---|
| 1 | | personnel of specific employment policies, |
| 2 | | benefits, compensation policies, |
| 3 | | responsibilities as it relates to their |
| 4 | | employment with CMS. |
| 5 | Q | Who created this employee handbook? |
| 6 | A | I don't know. |
| 7 | Q | You don't know who at CMS is responsible? |
| 8 | A | We may have consulted with an outside group |
| 9 | | to put a document together for us. I don't |
| 10 | | know that or whether it was done internally. |
| 11 | Q | Who is responsible for formulating the |
| 12 | | policies that are reflected here in the |
| 13 | | handbook? |
| 14 | A | The human resources department. |
| 15 | Q | So that's Mr. Price? |
| 16 | A | No, it would be above him. It would be under |
| 17 | | Sally Powers, the executive vice-president of |
| 18 | | human resources. |
| 19 | Q | So that's the national level? |
| 20 | A | Yes. |
| 21 | Q | And is a copy of this document, the success |
| 22 | | guide, distributed to all new CMS employees? |
| 23 | A | Yes. |
| 24 | Q | across the country? |

| | | |
|---|---|---|
| 1 | A | That's the responsibility of the HSA, yes. |
| 2 | Q | Were you involved at all in the creation of |
| 3 | | the policies that are contained in this |
| 4 | | document? |
| 5 | A | No. |
| 6 | Q | So you really had no role in the creation of |
| 7 | | this success guide? |
| 8 | A | No. |
| 9 | Q | This is an extensive document; would you |
| 10 | | agree? |
| 11 | A | I don't know what constitutes extensive to |
| 12 | | you. It's kind of a subjective -- |
| 13 | Q | How many pages is it? |
| 14 | A | 70 some odd. |
| 15 | Q | 70 some odd pages, and is it fair to say that |
| 16 | | this lays out what an employee can expect |
| 17 | | working at CMS? |
| 18 | A | That's a general definition, yes. |
| 19 | Q | It lays out CMS employment policies in some |
| 20 | | detail? |
| 21 | A | Yes. |
| 22 | Q | And it lays out, for instance, CMS |
| 23 | | compensation policies there in Section 2? |
| 24 | A | Yes. |

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

1  Q   And the employee benefits available to CMS
2      employees in Section 3?
3  A   Yes.
4  Q   And there is also a section for employee
5      responsibilities and guidelines, right?
6  A   Yes.
7  Q   And there are policies in here on everything
8      from CMS's harassment policies to the flex
9      spending accounts that are available to CMS
10     and even things such as CMS no smoking areas
11     that are available to employees?  Those are
12     among the topics covered in this guide; is
13     that right?
14 A   Yes.
15 Q   When do new employees receive this document?
16 A   During orientation.
17 Q   How soon after they begin work at CMS is
18     that?
19 A   Within the first few weeks.
20 Q   And are employees expected to read the
21     Employee Success Guide?
22 A   Yes.
23 Q   In fact, the last page contains an
24     acknowledgement page that they, in fact, read

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

```
 1            the guide, correct?
 2     A      That's correct.
 3                MR. SCHUMACHER:  Can we mark an exhibit?
 4                (Document marked Exhibit No. 14.)
 5     Q      I have handed you Exhibit No. 14.  Do you
 6            recognize the two documents contained in
 7            Exhibit No. 14?
 8     A      Yes.
 9     Q      What are they?
10     A      They're acknowledgement of review and receipt
11            of the CMS Employee Success Guide.
12     Q      And these are documents that contain
13            Mrs. Porter's acknowledgements that she has
14            reviewed the Employee's Success Guide in both
15            2001 and 2002; is that right?
16     A      Yes.
17     Q      And this acknowledgement and authorization
18            page says, among other things, "I hereby
19            receipt of the CMS Employee Success Guide.  I
20            agree to familiarize myself with the guide's
21            contents and to abide by the policies
22            contained in it."  I understand there is
23            other language contained there too.
24                Did I read that correctly?
```

214

1   entitled "Institutional Action," correct?
2 A Correct.
3 Q It says, "It must also be noted that the
4   institution may temporarily or permanently
5   withdraw access from anyone who works in or
6   enters the institution. In the event of such
7   withdrawal of access, CMS will attempt to
8   resolve the situation as soon as practical.
9   Loss of institution access normally results
10  in termination of employment by CMS as
11  security clearance/access is a precondition
12  of employment by CMS."
13      Did I read that right?
14 A Yes.
15 Q And this deals with the situation where an
16  institution withdraws access for a CMS
17  employee to work in that facility?
18 A Or bars them from the facility, yes.
19 Q And that's what happened in this case, right?
20 A That's correct.
21 Q Mrs. Porter was barred from the facility?
22 A That's correct.
23 Q Did CMS attempt to resolve the situation as
24  soon as practical?

```
 1              they can't work there.
 2        Q     So they have to be terminated from CMS?
 3        A     In this case?
 4        Q     No, generally.
 5        A     I think it could vary and may vary.
 6        Q     What does it vary based on?
 7        A     The circumstances around whether or not there
 8              are other positions, depending on what they
 9              are barred for.  If someone was barred for
10              having contraband in the facility, if there
11              was a drug deviation that that person was
12              involved in, would they be barred?  It would
13              be immediate termination.
14        Q     If the circumstances can vary, then isn't it
15              the case that it wasn't mandatory, that it is
16              not mandatory for CMS to terminate an
17              employee that has been barred?
18              MS. HARVEY:  Objection.
19        A     They will be terminated if we don't have
20              another position for them.  If we have
21              something available and we can move them to
22              another facility and it's not a reportable
23              event, something that we report to the DEA
24              because it's a drug deviation or something
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

| | | |
|---|---|---|
| 1 | | why this person would be reported or reported |
| 2 | | to the board. Then as in the case with |
| 3 | | Sheila, we rehired her and put her in another |
| 4 | | position when a position became available. |
| 5 | Q | Three or four months later? |
| 6 | A | When a position became available. |
| 7 | Q | The inquiries that you made at the time that |
| 8 | | she was terminated was you called two |
| 9 | | correctional facilities, correct? |
| 10 | A | That's correct. |
| 11 | Q | In Massachusetts? |
| 12 | A | With the understanding that that's what she |
| 13 | | wanted. |
| 14 | Q | What was the understanding based on? |
| 15 | A | Her conversation with Donna, and with the |
| 16 | | understanding that even when we offered Essex |
| 17 | | to her it was too far, she wanted to |
| 18 | | reconsider or she wanted to consider the |
| 19 | | three 12-hour shifts. |
| 20 | Q | That was later in time. I'm talking about -- |
| 21 | A | That was for that position at Essex County. |
| 22 | Q | Just so I'm clear, so when she was -- |
| 23 | A | I made it clear. We have been clear. |
| 24 | Q | I'm not sure that it is clear. When she was |

264

1         paychecks?
2    A    A lot is electronically deposited.
3    Q    What if they're not?
4    A    I believe they get sent to the site
5         administrator, and they get disseminated from
6         her.
7    Q    So they are distributed on site?
8    A    Yes, if it's not an electronic deposit.
9    Q    Who is it that determines a nurse
10        practitioner's daily schedule at a facility
11        for which you're providing services?
12   A    The administrator would be responsible to
13        identify the schedules of all clinical staff,
14        and the DON would do the schedules or
15        assignments for the nurses. It's really an
16        assignment, more than a schedule.
17   Q    Who is the DON?
18   A    The director of nurses.
19   Q    That's a CMS employee?
20   A    Yes.
21   Q    Who determines which inmates a nurse
22        practitioner would have access to on a daily
23        basis?
24   A    If the nurse practitioner's assignment is

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

|    |   |                                                                  |
|----|---|------------------------------------------------------------------|
| 1  |   | sick call, then there is a list of patients                      |
| 2  |   | that had submitted sick slips that needed to                     |
| 3  |   | be seen, so there would be a list, plus the                      |
| 4  |   | charts. If it's males, the inmates are                           |
| 5  |   | brought down to the unit. They are brought                       |
| 6  |   | into the exam room one by one.                                   |
| 7  |   | If it's chronic clinic, it's the same                            |
| 8  |   | thing. A list is generated of inmates that                       |
| 9  |   | need to be seen for the chronic disease, and                     |
| 10 |   | they will we seen down in the medical unit.                      |
| 11 |   | We did set up a satellite health service                         |
| 12 |   | unit at Suffolk for the females. We would                        |
| 13 |   | have had generated a sick list or a chronic                      |
| 14 |   | list for the nurse practitioner to see the                       |
| 15 |   | females in that unit as well.                                    |
| 16 | Q | So if an inmate requires medical attention or                    |
| 17 |   | seeks medical attention, he or she requests a                    |
| 18 |   | sick slip; is that right?                                        |
| 19 | A | Yes, it's called unimpeded access to care.                       |
| 20 |   | It's another policy. It's another HCNC                           |
| 21 |   | standard.                                                        |
| 22 | Q | Who provides the inmate with that sick slip?                     |
| 23 | A | The sick slips, depending on the units, are                      |
| 24 |   | in the unit or the nurses, when they go out                      |

```
 1            to every unit, every day several times a day,
 2            have the slips on their cart.  The inmate can
 3            also come out and come to the cart and
 4            request to be seen, and she can write a
 5            written list of patients to be seen.
 6     Q      And then a list is prepared?
 7     A      Then they come back to the unit, triage the
 8            list, triage the slips, and lists are
 9            prepared.
10     Q      Who prepares the lists in terms of who is
11            seen on a daily basis?
12     A      Most often, it's the nurse.
13     Q      The nurses themselves determine who they will
14            see on a daily basis?
15     A      No, the nurse takes all of the slips or any
16            other lists that they have from being out in
17            the unit.  They triage the list depending on
18            what the complaint is, and they prepare sick
19            lists for the next day.
20     Q      Can an inmate see a nurse anytime of the day
21            that he or she desires?
22     A      You and I can't.
23     Q      But an inmate?
24     A      If it's an emergency, an inmate can be
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

| | | |
|---|---|---|
| 1 | | brought directly down to the medical unit. |
| 2 | | If it's an immediate emergency, where they |
| 3 | | are not mobile, then it's called a man down |
| 4 | | at Suffolk County, and they deploy health |
| 5 | | services staff to go directly to where that |
| 6 | | inmate is located. |
| 7 | Q | What if it's not an emergency, if it's just |
| 8 | | routine? |
| 9 | A | And they want to be seen?  They can put in a |
| 10 | | sick slip. |
| 11 | Q | Who determines when that inmate will be seen? |
| 12 | A | The nurse that triages the slips. |
| 13 | Q | Are there specific hours within the day that |
| 14 | | inmates are seen for medical care? |
| 15 | A | Based on the way -- yeah, it depends on the |
| 16 | | flow of the facility, but sick call can be |
| 17 | | done anytime during the day, so an inmate can |
| 18 | | come in anytime during the day. |
| 19 | Q | So there aren't specific hours when inmates |
| 20 | | can receive routine medical care? |
| 21 | A | Well, it can't be when they are locked in for |
| 22 | | count.  It wouldn't be when they are having |
| 23 | | their meals delivered to the unit.  It's |
| 24 | | often not when they have programs or visits, |

268

| | | |
|---|---|---|
| 1 | | because we somewhat accommodate around other |
| 2 | | schedules if it's routine care. |
| 3 | Q | It can be any other time? |
| 4 | | MS. HARVEY: During the day? |
| 5 | A | During the day for just routine care and |
| 6 | | sometimes into the evening. Monday through |
| 7 | | Friday, often there was a physician there or |
| 8 | | a second nurse practitioner that would cover |
| 9 | | evening hours that an inmate could go down |
| 10 | | and receive. |
| 11 | Q | Would an inmate have to be accompanied by a |
| 12 | | corrections officer if he or she wanted |
| 13 | | medical care? |
| 14 | A | It depends on their security status. I'm not |
| 15 | | real familiar with Suffolk's requirement |
| 16 | | around escorts. |
| 17 | Q | So maybe, maybe not, or you're not sure? |
| 18 | A | I'm not sure. |
| 19 | Q | Who provided the medical equipment that a |
| 20 | | nurse practitioner would use on a daily |
| 21 | | basis? |
| 22 | A | It depends on what equipment you're talking |
| 23 | | about. |
| 24 | Q | Any medical equipment at the Suffolk County |

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

269

| | | |
|---|---|---|
| 1 | | House of Corrections that a nurse |
| 2 | | practitioner may need to use on a daily |
| 3 | | basis, who provides that equipment? |
| 4 | A | Large equipment was already there, exam |
| 5 | | tables, fetoscopes. We bought pulse |
| 6 | | oximeters. CMS was responsible for other |
| 7 | | small durable equipment. |
| 8 | Q | So CMS purchased some equipment. The large |
| 9 | | equipment that you described earlier, who |
| 10 | | bought those pieces of equipment? |
| 11 | A | I think those came -- when they built that |
| 12 | | new facility. |
| 13 | Q | So the county provided those large pieces of |
| 14 | | equipment; is that right. |
| 15 | | MS. CAULO: Objection. |
| 16 | A | Some of it. The dialysis chairs were |
| 17 | | provided by our dialysis vendor, and the |
| 18 | | various equipment as needed, we became |
| 19 | | responsible to purchase. |
| 20 | Q | So CMS bought some equipment, and the county |
| 21 | | bought some equipment; is that fair to say? |
| 22 | A | That's correct. |
| 23 | Q | I believe you testified that Mrs. Porter's |
| 24 | | employment records are kept on the site of |

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

| | | |
|---|---|---|
| 1 | | the prison facility; is that right? |
| 2 | A | The employee's personnel records are kept in |
| 3 | | the health service administrator's office. |
| 4 | Q | And that's on site at the prison? |
| 5 | A | That's at the jail in the health service |
| 6 | | unit. |
| 7 | Q | The decision whether or not to lock out a CMS |
| 8 | | employee, that's entirely at the whim of the |
| 9 | | House of Corrections; is that right? |
| 10 | | MS. CAULO: Objection to the term, whim. |
| 11 | A | Clearly, the county must have criteria |
| 12 | | regarding barring an inmate. |
| 13 | Q | It's solely within their discretion? |
| 14 | A | Our contract with Suffolk County identifies |
| 15 | | that the county has the right to bar the |
| 16 | | entrance of any employee at any point in |
| 17 | | time. |
| 18 | Q | It's solely within their discretion? |
| 19 | A | I don't know if solely within their |
| 20 | | discretion is in that language. |
| 21 | Q | Are they required to consult with CMS prior |
| 22 | | to barring an employee? |
| 23 | A | I believe they have the right to bar access |
| 24 | | without consulting with us. |

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

279

1   on a partner's desk, I can't do anything
2   about that. I tried to do the best I could
3   to get it to you in plenty of time for you to
4   review it before the deposition, and that
5   will be our position.
6       If you have any further discovery
7   issues, we can certainly try to work it out
8   on paper rather than having to bring this
9   witness back.
10              CROSS-EXAMINATION
11  BY MS. CAULO:
12  Q   My name is Ellen Caulo, Deputy General
13      Counsel. I'm here representing Sheriff
14      Andrea Cabral, Suffolk County Sheriff's
15      Department and Suffolk County.
16          What is the obligation of CMS medical
17      staff to document encounters with inmates?
18          MS. HARVEY: Objection. Beyond the
19      scope. Go ahead.
20  A   Staff are required and instructed on inmate
21      encounters they are to provide documentation
22      on the progress note forms. It's supposed to
23      be dated and timed and clearly outline
24      through the subjective information, objective

280

| | | |
|---|---|---|
| 1 | | findings, any assessment that they identify |
| 2 | | in a plan. It should really be provided on |
| 3 | | the progress note. |
| 4 | Q | That's the reference to the acronym, SOAP, |
| 5 | | that list? |
| 6 | A | Yes. |
| 7 | Q | Mr. Schumacher had introduced Exhibit No. 12 |
| 8 | | which is a progress note, which you |
| 9 | | identified. Is that the document that you |
| 10 | | just referred to that a CMS medical employee |
| 11 | | should utilize to document encounters with |
| 12 | | inmates? |
| 13 | A | Medical encounters with inmates, yes. |
| 14 | Q | Should all encounters with inmates be |
| 15 | | documented? |
| 16 | A | We really encourage all encounters. There |
| 17 | | are circumstances when an inmate comes up and |
| 18 | | he asks for when his medication is going to |
| 19 | | be, when he'll start on his new medication, |
| 20 | | they wouldn't document that. But if someone |
| 21 | | gets involved in evaluating a patient and |
| 22 | | there is an assessment that is made, then |
| 23 | | they need to document through that SOAP |
| 24 | | format their findings. |

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

| | | |
|---|---|---|
| 1 | Q | Would you expect that an encounter that |
| 2 | | included conversations between a CMS medical |
| 3 | | staff person and an inmate relating to |
| 4 | | injuries that an inmate allegedly sustained |
| 5 | | perhaps at the hand of an officer, would that |
| 6 | | be something that you would expect would be |
| 7 | | recorded and documented in an |
| 8 | | interdisciplinary progress note? |
| 9 | | MS. HARVEY: Objection. Scope. |
| 10 | A | I think the expectation would be that that |
| 11 | | would be documented on a progress note and an |
| 12 | | incident report to the county. |
| 13 | Q | Let me just ask you further about the |
| 14 | | interdisciplinary progress note. Once a CMS |
| 15 | | medical staff person records what you have |
| 16 | | just described, where does this document go? |
| 17 | A | In the inmate's health record. |
| 18 | Q | Who maintains that? |
| 19 | A | We do. |
| 20 | Q | We being CMS? |
| 21 | A | Yes. |
| 22 | Q | Who has access to them? |
| 23 | A | That's when the confidentiality standard goes |
| 24 | | into play, and health services staff only. |

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922