14

1      year and-a-half.

2          Q.     When did you leave?

3          A.     That I can't tell you exactly.

4          Q.     All right.

5          A.     And I worked for a different company

6      out of corrections for about a year and-a-half,

7      and then I came back to Suffolk County House of

8      Corrections.

9          Q.     Do we have an idea when that was, what

10     year that was?   Was that in 1999?

11         A.     Somewhere around there.  It might have

12     been in 1998.  Somewhere around that area it was.

13         Q.     All right.

14         A.     And I left there for the Bristol House

15     of Correction for about a year.  I transferred I

16     should say.

17         Q.     Were you still working for the same

18     employer?

19         A.     Yes.

20         Q.     And what employer was that?

21         A.     CMS.

22         Q.     All right.  So while working for CMS

23     approximately July of 1998 at the Suffolk County

24     House of Correction you then transferred to

1    another site while still working for Correctional

2    Medical Services?

3        A.    Yes.

4        Q.    At some point did you return back to

5    the Suffolk County House of Correction?

6        A.    Yes.

7        Q.    When was that?

8        A.    About a year later, it may have been

9    1998, 1999, 2000 somewhere in that area.

10       Q.    And your employer at that time was?

11       A.    CMS.

12       Q.    Was the Suffolk County House of

13    Correction a work site?

14       A.    Yes.

15       Q.    Were you employed by the Suffolk County

16    Sheriff's Department?

17       A.    No.

18       Q.    While you were working at the Suffolk

19    County House of Correction for CMS, approximately

20    1998 to 1999, what was your position?

21       A.    Health Service Administrator.

22       Q.    And did you consistently work for CMS

23    at the Suffolk County House of Correction from

24    your most recent return in 1998 or 1999 until you

16

1    left in 2003?

2        A.    Yes.

3        Q.    And during that period of time what was

4    your position?

5        A.    Health Service Administrator.

6        Q.    Why did you leave the employ of CMS in

7    November of 2003?

8        A.    For a position at M.C.I. Norfolk with

9    UMass which was a lot closer to home for me

10   rather than drive into Boston from North

11   Attleboro, it is like 15 minutes so, it is a lot

12   nicer.

13       Q.    Were your reasons for leaving, did they

14   have anything to do with the work site, the

15   Suffolk County House of Correction?

16       A.    No, I actually liked working at

17   Suffolk.  I had employed all of the employees so

18   it is kind of nice to have your staff and build

19   that up as I had and have everyone there that you

20   know you employed them.

21       Q.    I want to direct your attention at

22   least initially from the period of time from 1999

23   or so to 2003 while you were working for CMS at

24   the House of Correction.  You indicated that your

19

1    qualifications that were required of a Director

2    of Nursing?  Did they have to have a particular

3    professional license?

4         A.    She was a Registered Nurse.

5         Q.    And why was it that you were

6    responsible for the supervision of the Physicians

7    Assistants and the Nurse Practitioners?

8         A.    Well, again, that is not, I mean she

9    would help with the coordination of care, so she

10   would be involved with talking with it, nurse

11   practitioners, PA's, if they needed to do say

12   something extra, but the physicians ultimately

13   were the person that the physicians assistants

14   and nurse practitioners answered to clinically.

15         As far as operations, I was more over

16   everyone.

17         Q.    So on medical and clinical issues,

18   physicians assistants and nurse practitioners

19   would report to the Director of Medicine?

20         A.    Yes, the Medical Director, yes.

21         Q.    Would that be fair?

22         A.    Yes, the Medical Director, yes.

23         Q.    You said you would be responsible

24   operationally.  Could you describe specifically

20

1    what that entailed, what kinds of

2    responsibilities fell to you and who would report

3    to you and on what kinds of matters?

4        A.    I was responsible to ensure the

5    delivery of health care to all of the inmates by

6    NCCHC standards which meant from the time that

7    they entered until the time that they were

8    discharged whether it be, you know, their intake

9    process, the physical exams, the sick calls, the

10   chronic disease, discharge planning.  I was also

11   responsible for budgetary type issues.

12       Q.    Were you responsible for personnel

13   related issues as well?

14       A.    Yes.

15       Q.    You indicated though in terms of which

16   of the nursing staff reported to whom, that you,

17   that the Director of Nursing had the L.P.N.'s and

18   the R.N.'s report to them but the PA's and the

19   Nurse Practitioners reported to you and why was

20   that?

21       A.    To me and the Medical Director.

22       Q.    Okay.

23       A.    I would say together.

24       Q.    And what matters -- what matters were

COPLEY COURT REPORTING

21

1    reported, would they report to you on as opposed

2    to the Medical Director?

3        A.    Probably operational things to me.

4        Q.    What does that mean?

5        A.    You know, whether the sick call was

6    behind, whether the physicals were behind, if

7    there were any issues with inmates in particular,

8    we had males and females, so there were a variety

9    of issues with some of them.  You know whether it

10   be that they needed more care than we could give

11   them or they needed to be in the Health Services

12   Unit because we had an infirmary there.

13       Q.    Okay.

14       A.    That is pretty much it.

15       Q.    Where was your office located?

16       A.    In the unit.

17       Q.    In the Health Services Unit?

18       A.    Yes.

19       Q.    And you indicated there is an infirmary

20   there, can you describe that setup please?

21       A.    It is kind of shaped like an oval.  You

22   walk into the unit into the Outpatient Department

23   and there were two doors and once you went

24   through the two doors on either side of the right

23

1    medical unit.  The Medical Director would do

2    rounds every day.  It was treated like an

3    inpatient unit.

4         Q.    What security staff were assigned to

5    the inpatient area?

6         A.    Just one.

7         Q.    Where would the nurses, L.P.N.'s, nurse

8    practitioners, physicians assistants, where would

9    they be during their day?  Would they be in the

10   infirmary?

11        A.    Outpatient.

12        Q.    They would be in the outpatient area?

13        A.    Yes.

14        Q.    Who was the Director of Nursing if you

15   recall at this time 1992 to 1993?

16        A.    Ann Rabbitt.

17        Q.    Was she there continuously do you

18   recall?

19        A.    I hired her.  I can't say exactly when

20   she started but until I left, yes.

21        Q.    And who was the Director of Medicine if

22   you recall?

23        A.    Carl Singletary.

24        Q.    And again, was he there during the

COPLEY COURT REPORTING

24

1    period of time that we have been discussing?

2         A.    Yes.

3         Q.    Who did you report to, Mrs. Jurdak,

4    organizationally within Correctional Services?

5         A.    Ann Mack.

6         Q.    What was her title during this period?

7         A.    Regional Administrator.

8         Q.    Who is Nancy Lawrence?

9         A.    At one point I was answering to Nancy

10   Lawrence.  She was also a Regional Administrator

11   and she had moved -- her area became Vermont.  So

12   I no longer reported to her.  I reported to Ann

13   Mack.

14        Q.    What was the next level in the

15   organizational change at CMS who would Nancy

16   Lawrence report to?

17        A.    At the time I reported to Nancy

18   Lawrence, she reported to Ann Mack.

19        Q.    And I see and at some point you

20   indicated that you reported to Ann Mack directly?

21        A.    Yes.

22        Q.    When did that take place?  Was that

23   before or after Nancy Lawrence?

24        A.    After.

COPLEY COURT REPORTING

34

1    on a form but again if they had something to add,

2    they may write on progress notes.

3        Q.    What kinds of information gets included

4    in an inmate's medical records?

5        A.    Medical information.

6        Q.    What is the purpose of the

7    documentation?

8        A.    Medical history.

9        Q.    What else?

10       A.    Mostly history, it is a source that you

11   look at if you need to know an inmate's medical

12   history or you need to share it with an outside

13   hospital or a provider maybe at a different

14   facility.

15       Q.    Would a provider of medical services at

16   the House of Correction who is the next person to

17   see an inmate, would they look at an inmates

18   medical chart to see what care had been provided

19   earlier?

20       A.    I am sure that they would do that

21   sometimes, yes.

22       Q.    Would that be a purpose of

23   documentation as well?

24       A.    Yes, it is history, it is still

35

1    history.

2        Q.    If you could define for me what history

3    is?

4        A.    Medical history is any encounter that

5    the inmates have with medical prior to today,

6    when they see them today.

7        Q.    You say any encounter that an inmate

8    had with medical?

9        A.    Yes.

10       Q.    Are only encounters with medical that

11   involve a hands-on physical examination, are

12   those the only kinds of encounters that get

13   documented?

14       A.    Yes.

15       Q.    What if an inmate reports to a nurse

16   practitioner that he has been physically

17   assaulted by an officer and shows the nurse

18   practitioner his injury and the nurse

19   practitioner makes observation of those injuries

20   including size, coloration, would that

21   information be expected to be documented in the

22   medical records?

23           MR. SCHUMACHER:    Objection.

24       A.    Yes, yes.

42

1          Q.    Did the Suffolk County Sheriff's

2     Department provide any training different than

3     security training, training in the area of

4     medicine or nursing?

5          A.    No.

6          Q.    Were CMS employees required to comply

7     with the Suffolk County Sheriff's Department's

8     policies and procedures?

9          A.    Yes.

10         Q.    And all of their policies and

11    procedures?

12         A.    Yes.

13         Q.    Are you familiar with the Sheriff's

14    Department's Policy S-220 which is the Employee

15    Code of Conduct?

16         A.    Yes.

17         Q.    Was that a policy that you were

18    required to comply with as a CMS employee?

19         A.    Yes.

20         Q.    Was Mrs. Porter required to comply with

21    that?

22         A.    All employees would be.

23         Q.    All employees of CMS would be required

24    to comply with that policy?

COPLEY COURT REPORTING

1    has been abused, they would come and want to see

2    the medical documentation that we had around

3    that, but if my nurses or employees, nurse

4    practitioners, physicians assistants, physicians,

5    anybody, phlebotomists had something reported to

6    them, it was really me that decided that that

7    needed to be reported.  Of course, I am sure that

8    Suffolk County wanted you to report all of those

9    things as well, but it was never told to me that

10    that was something that employees had to do, it

11    was more my feelings that there was a lot of

12    abuse going on at Suffolk County and in many of

13    my staff meetings, I would tell people that those

14    things need to be reported to SID either by you

15    or by me.  I will be glad to do it if you are

16    uncomfortable.

17        Q.    You told your staff if they had

18    information about allegations of abuse of an

19    inmate that they were required to report it to

20    SID or to you?

21        A.    Right.

22        Q.    Did you tell that to Mrs. Porter?

23        A.    I am sure she was at some of my

24    meetings.

46

1    Q.    Would you have expected that she would

2    have been aware of the reporting requirements to

3    SID by virtue of the years that she had been

4    working at the Suffolk County House of

5    Correction?

6    A.    I am sure many times they came to her

7    for reports, yes.

8    Q.    You indicated many times you would

9    report it to SID, are you familiar with the

10   Sheriff's Investigation Division?

11   A.    Well, that changed hands towards the

12   end of my employment there, but previous to that,

13   I was very comfortable with the SID staff there.

14   Q.    I am asking you what is your knowledge

15   of what the Sheriff's Investigation Department

16   does and what their responsibilities are within

17   the Suffolk County Sheriff's Department?

18   A.    Internal investigations I guess.

19   Q.    Did they investigate allegations of

20   abuse of inmates by officers?

21   A.    I can't say that they do but that is

22   what my understanding would be.

23   Q.    And certainly did you have occasion

24   during the years that you worked at the Suffolk

47

1    County House of Correction to report allegations

2    of abuse to the Sheriff's Investigation Division?

3         A.    Yes.

4         Q.    How frequently did you do that if you

5    recall?

6         A.    Quite often actually.

7         Q.    How would you make that report,

8    verbally or in person or would you put it in

9    writing?

10        A.    It would depend for me personally, if I

11   suspected something, I would verbally report it

12   usually and be asked usually to write it in a

13   report.

14            If staff came to me and reported

15   something, I normally would ask them if they

16   wanted to go to SID or they wanted me to go or

17   they wanted us to go together.  So many times I

18   would report it for nursing staff who were

19   generally uncomfortable with reporting things of

20   that nature.

21        Q.    And why were they uncomfortable?

22        A.    I think they were afraid of the

23   officers retaliating.  They had to work with

24   them, and I am quite certain and actually some of

50

1    I knew that it was a game that they played and it

2    wasn't important to me.

3        Q.    Did it ever deter you from reporting

4    these matters to the Sheriff's Investigation

5    Division?

6        A.    Not at all.

7        Q.    You indicated earlier that you would go

8    down in person to SID and make your report and

9    often times you were asked for a written report?

10       A.    Most of the time the employee would be

11   asked for a written report, yes.

12       Q.    And what would form would that written

13   report take?

14       A.    Suffolk County had an incident report

15   form that was their form but we didn't always

16   have them available and so people would write on

17   a plain piece of paper like that or they would

18   write on a progress note or they would, you know,

19   some plain, whether it was lined or unlined

20   paper.

21       Q.    Would it be addressed to a particular

22   person and state what it was regarding?

23       A.    No.

24       Q.    And state whom it was from?

58

1     report to SID on occasions without informing you?

2          A.     I am sure.

3          Q.     And you hadn't imposed any requirement

4     on her to report to you first for you to assess

5     whether or not she should go to SID?

6          A.     No, no.

7          Q.     That was something that you felt

8     comfortable with Mrs. Porter making a

9     determination?

10         A.     Any employee.

11         Q.     Do you know whether or not Mrs. Porter

12    was comfortable reporting allegations of abuse to

13    SID?

14              MR. SCHUMACHER:   Objection.

15         A.     I wouldn't know that.

16         Q.     Did she ever express to you that she

17    felt uncomfortable in reporting to the Sheriff's

18    Investigation Division?

19         A.     I don't think so.

20         Q.     Did she ever express to you that she

21    felt she had a lack of trust in the Sheriff's

22    Investigation Division?

23         A.     Sheila personally -- I can't say she

24    ever personally said that.  I think there were a

59

1       lot of us who felt that way at times.

2           Q.    I am asking specifically in this

3       instance about Mrs. Porter?

4           A.    I can't say that she ever said that.

5           Q.    Previously you indicated that you never

6       felt deterred from reporting to SID by conduct of

7       officers.

8               To your knowledge did Mrs. Porter ever

9       feel deterred from reporting to SID?

10              MR. SCHUMACHER:  Objection.

11          A.    No, I don't think so.

12          Q.    Did she ever report to you any

13      instances in which she felt that she had been

14      retaliated against?

15          A.    Oh, yes, there was one.

16          Q.    What was that?

17          A.    I forgot about that until you said it.

18      Her car got damaged.

19          Q.    When was that?  Do you recall?

20          A.    I don't recall the date.

21          Q.    What do you recall about it?

22          A.    Honestly, I am not positive about the

23      instance.  I can say that I think it was the time

24      that an officer, a female officer was abused by

68

1    assigned, everybody really kind of knew what they

2    had to do and got it done.

3        Q.    Were those tasks that were done during

4    each day, were those determinations made by CMS

5    or by the Suffolk County Sheriff's Department?

6        A.    What had to be done every day?

7        Q.    Yes, yes, yes.

8        A.    By CMS.

9        Q.    What is sick call?

10       A.    Someone submits a sick slip request to

11   be seen for various things, my tooth hurts, my

12   ass aches -- whatever -- don't write that down.

13           MS. HARVEY:    Everything you say will

14   be written down.

15       A.    You know, any reason, I mean some of

16   them you can't even make heads of tails of to be

17   honest with you, but a sick slip is the inmate

18   writes down requesting to be seen by medical,

19   dental, mental health, they used it as a personal

20   way to correspond with me kind of in a grievance

21   fashion, but it is a sick slip -- it would be

22   picked up the nursing staff or dropped off by the

23   inmate.

24       Q.    Where would it be picked up by the

70

1    inmates would be seen pursuant to the sick call

2    slips that were submitted?

3        A.    Nurses.

4        Q.    Nurses?

5        A.    They always triage it in case one wrote

6    they had chest pain -- that would be considered

7    an emergency or they had a mental health problem

8    where they felt they were at risk for suicide or

9    something of that nature, they would determine it

10   would it go to the dentist, would it go to mental

11   health, would it go to the nurse practitioners,

12   would it go to the doctor.

13       Q.    And what input would the Suffolk County

14   Sheriff's Department have in that process of

15   triaging the sick slips?

16       A.    They wouldn't.

17       Q.    Were there specific times within the

18   day when an inmate could be seen for medical

19   care?

20       A.    Yes.

21       Q.    And what were those?

22       A.    Normally in the morning from like 8:00

23   to 11:00 and there would be a count and a lock

24   down time and then usually in the afternoon from

COPLEY COURT REPORTING

80

1    comfortable that all of them did that.

2        Q.    Did she have any supervisory

3    responsibilities?

4        A.    We had nurse practitioner students,

5    yes, many times we would have a nurse

6    practitioner student that she would be

7    supervising and teaching basically.

8        Q.    Did she have any responsibility to

9    report allegations of inmate abuse?

10            MR. SCHUMACHER:  Objection.

11       A.    All employees were told that.

12       Q.    Yes, she did?

13       A.    Yes.

14            MS. CAULO:  Do you want to take a

15   break?

16            THE WITNESS:  Sure.

17            (Discussion off the record.)

18       Q.    Mrs. Jurdak, are you ready?

19       A.    I am.

20       Q.    What was your understanding of the

21   Suffolk County Sheriff's Department's ability to

22   bar employees of Correctional Medical Services?

23       A.    My understanding is that they could bar

24   anyone at any time.