```
 1                                              VOL: I
                                             PAGES: 1-247
 2                                           EXHIBITS: 1-7

 3

 4              UNITED STATES DISTRICT COURT

 5            FOR THE DISTRICT OF MASSACHUSETTS

 6     * * * * * * * * * * * * * * * *
       SHEILA J. PORTER,              *
 7                  Plaintiff         *
              -vs-                    *   Civil Action
 8     ANDREA CABRAL; SUFFOLK COUNTY  *   No. 04-11935-DPW
       SHERIFF'S DEPARTMENT; SUFFOLK  *
 9     COUNTY and CORRECTIONAL MEDICAL*
       SERVICES, INC.,                *
10                  Defendants        *
       * * * * * * * * * * * * * * * *
11

12     CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

13
           DEPOSITION OF VIKTOR THEISS, ESQUIRE, a witness
14     called on behalf of the Plaintiff, in the
       above-captioned matter, said deposition being
15     taken pursuant to the Federal Rules of
       Civil Procedure, before Patricia M.
16     McLaughlin, a Certified Shorthand Reporter and
       Notary Public in and for the Commonwealth of
17     Massachusetts, at the offices of Goodwin Procter
       LLP, Exchange Place, Boston, Massachusetts, on
18     Tuesday, May 24, 2005, commencing at 10:05 a.m.

19

20

21
                McLAUGHLIN & ASSOCIATES COURT REPORTERS
22                  92 DEVIR STREET, SUITE 304
                    MALDEN, MASSACHUSETTS  02148
23                        781.321.8922
                      WWW.E-STENOGRAPHER.COM
24
```

1   have got that person in there, so that we
2   don't blow them or stumble across them
3   ourselves.
4   Q   For instance, the incident with Mr. Rosario
5       in November, 2002, when he wore a wire in the
6       Suffolk County House of Corrections, is it
7       your testimony that the Sheriff's Department
8       wasn't aware that he was doing this for the
9       FBI?
10          MS. CAULO: Objection.
11  A   I have no knowledge about that incident
12      whatsoever.
13  Q   So you don't know whether the Sheriff's
14      Department was aware of it or not?
15  A   I don't.
16          MR. SCHUMACHER: Why don't we take a
17      five-minute break.
18          (Whereupon, a brief recess was held.)
19  BY MR. SCHUMACHER:
20  Q   Mr. Theiss, at some point, did you become
21      aware that Mr. Rosario had made certain
22      allegations of abuse in May, 2003?
23  A   Yes.
24  Q   What was your understanding of what the

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

58

|    |   |                                                                 |
|----|---|-----------------------------------------------------------------|
| 1  |   | allegations were?                                               |
| 2  | A | At the outset, it wasn't clear. The                             |
| 3  |   | investigators were called by the unit officer                   |
| 4  |   | up in the infirmary, asked to respond to                        |
| 5  |   | speak to Inmate Rosario. They got a call                        |
| 6  |   | from the unit officer that an inmate wanted                     |
| 7  |   | to speak with them, and they responded up to                    |
| 8  |   | the unit. I can't remember if they were told                    |
| 9  |   | up there or the interview occurred down in                      |
| 10 |   | the SID office, but they were told that he                      |
| 11 |   | had been kicked by one of the officers in the                   |
| 12 |   | unit previous to going to the medical unit.                     |
| 13 | Q | So the allegations first came to SID's                          |
| 14 |   | attention when someone from the medical unit                    |
| 15 |   | called SID; is that right?                                      |
| 16 | A | Mark DeAngelo or DeAngelis called SID and                       |
| 17 |   | said that an inmate wanted to speak with                        |
| 18 |   | them. So they responded right away and went                     |
| 19 |   | up and spoke with Rosario.                                      |
| 20 | Q | Who determines which investigators would go                     |
| 21 |   | speak to Rosario?                                               |
| 22 | A | For something, we run. It's better to                           |
| 23 |   | respond quicker, so rather than have to ask                     |
| 24 |   | approval to go, which run kind of an                            |

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

73

| | | |
|---|---|---|
| 1 | A | The investigators went to obviously speak to |
| 2 | | the person that is making the allegations, |
| 3 | | made their physical observations of him and |
| 4 | | then proceeded to gather up the documentary |
| 5 | | evidence that would exist, the medical |
| 6 | | records, officer reports.  They would begin |
| 7 | | to conduct interviews into those that were |
| 8 | | identified as potential witnesses. |
| 9 | Q | How many incidents of allegations did |
| 10 | | Mr. Rosario make? |
| 11 | A | He ended up making two.  There was one made |
| 12 | | on the 19th and then one later made on -- I |
| 13 | | can't recall whether it was either the 28th |
| 14 | | or 29th of May. |
| 15 | Q | Both of those incidents were investigated? |
| 16 | A | Yes. |
| 17 | Q | The case summary dealing with those |
| 18 | | instances, they were sort of encapsulated |
| 19 | | together? |
| 20 | A | Correct.  They were labeled Incident 1 and |
| 21 | | Incident 2. |
| 22 | Q | Were you satisfied with the investigation? |
| 23 | A | Yes. |
| 24 | Q | What was the result of the investigation? |

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

74

```
1    A    That there was insufficient evidence to
2         sustain the allegations made by Rene
3         Rosario.
4    Q    What was that based on?
5    A    It was based on several things.  There were
6         inconsistent statements that he made as to
7         the causation of injury.  He had told the
8         investigators initially that he had been
9         kicked while sitting upright.  He later
10        stated that he was kicked while lying on his
11        bunk and his arms were down.  He told Gail
12        Bartley that he was grabbed by an officer,
13        not kicked by an officer.
14             The injuries observed weren't consistent
15        with being kicked, so they weren't -- the
16        photographs that did not show, nor did the
17        physical examination show, the serious level
18        of injury consistent with what was being
19        reported.
20             Rene Rosario himself would be a very
21        difficult witness.  He has very inherent
22        credibility issues based on his utilization
23        of the psychiatric process to generate moves
24        from units that he didn't find favorable, so
```

1            discuss ongoing investigations?
2    A    Right. Ongoing investigations, requests for
3            equipment resources, update her on
4            developments on what I was trying to
5            accomplish within the division, et cetera.
6    Q    Do you also have regular meetings with the
7            Sheriff on similar topics?
8    A    Regular, no.
9    Q    Occasional meetings with the Sheriff?
10   A    Yes, kind of catch-is catch-can. Her
11           schedule back then was even busier than it is
12           today. That's why it was important to have
13           the Chief of Staff added into the chain of
14           command, because the Chief of Staff was there
15           on a regular basis and could get all the
16           information.
17   Q    In what context did you report to the Sheriff
18           the Rosario investigation?
19   A    I don't recall how it came about.
20   Q    Do you remember how many times you spoke to
21           her about the Rosario investigation?
22   A    Once.
23   Q    A phone call, a meeting?
24   A    It would have been in person.

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

```
 1   Q   Do you remember -- did you go to her office?
 2   A   I don't remember exactly, but I'm sure that
 3       would have been where -- I didn't have much
 4       interaction with her anywhere else.
 5   Q   Was the purpose of that meeting to discuss
 6       the Rosario investigation?
 7   A   I don't believe so.  I believe it was just to
 8       update her on everything.  Obviously, she was
 9       interested in how SID was developing and the
10       changes that we were trying to implement, the
11       new staff, the training, but at the same
12       token when I had the opportunity to give her
13       updates on cases that came up, I would have
14       done so.
15   Q   When did this take place?
16   A   I don't recall exactly.
17   Q   If I tell you that the case summary is dated
18       June 4th, 2003, presumably, it would be
19       sometime after June 4th?
20   A   Again, I just don't know.
21   Q   What do you recall telling Sheriff Cabral
22       about the Rosario investigation?
23   A   Just the same synopsis I gave to the Chief of
24       Staff; here is what we found out; that there
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

1   Q   What is your understanding what took place
2       with respect to that topic?
3   A   Just if she contacted the FBI. I believe she
4       knew Krista Snyder, talked to Krista Snyder.
5   Q   Why would SID want to know whether or not
6       Mrs. Porter had contacted Miss Snyder?
7   A   My opinion it was curiosity on the part of
8       Investigator Dacey and Aleman. They knew
9       that the FBI had been contacted, and it
10      wasn't self-evident from whom.
11          She had mentioned in a previous
12      interview, she meaning Porter, that Rene had
13      had some contact with the Federal Government.
14      She brought up the wire on her own on the
15      22nd, so I think it was curiosity.
16          It wasn't a major part of their
17      investigation. They weren't ordered to do
18      it. I just think it's curiosity to close out
19      a loop, as you're doing today, and clearly,
20      it was an interesting issue, particularly
21      since what the FBI was coming back to us with
22      didn't match up with what was in the file.
23  Q   Do you recall the SID investigators then
24      report to you with regard to their

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

| | | |
|---|---|---|
| 1 | Q | You don't know if that was something they |
| 2 | | were curious about? |
| 3 | | MS. CAULO: Objection. |
| 4 | A | I don't recall. The big factors to me, like |
| 5 | | I've said all day long, were the inconsistent |
| 6 | | observations of injury. I've said it all day |
| 7 | | long. |
| 8 | Q | You mentioned earlier that during one of |
| 9 | | Investigator Wotjonski's second conversation |
| 10 | | with Krista Snyder they were discussing the |
| 11 | | Rosario allegations, and I think you |
| 12 | | testified that Krista Snyder agreed that his |
| 13 | | allegations weren't sustainable. Do you |
| 14 | | recall that? |
| 15 | | MS. CAULO: Objection. |
| 16 | A | I believe I testified that that was Stan in |
| 17 | | my conversation. I spoke with Krista Snyder. |
| 18 | Q | Tell me everything you recall about what |
| 19 | | Krista Snyder told you with regard to SID's |
| 20 | | conclusions. |
| 21 | | MS. CAULO: Objection. Asked and |
| 22 | | answered quite some time ago. |
| 23 | A | When I contacted Krista Snyder trying to get |
| 24 | | Rene Rosario moved out of our facility to |

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

| | | |
|---|---|---|
| 1 | | another facility, I reviewed with her |
| 2 | | basically what we had found, ran through the |
| 3 | | facts as we had them, the issues discussed in |
| 4 | | the conclusion and told her that I didn't see |
| 5 | | a sustainable case here.  She agreed with me. |
| 6 | Q | What did she say? |
| 7 | A | She said I agree; it sounds like you guys did |
| 8 | | a thorough job and I agree and we'll do what |
| 9 | | we can to get him sent to Concord.  In my |
| 10 | | mind, the fact that they have never done an |
| 11 | | independent investigation of theirs, which |
| 12 | | they clearly have the power to do, they never |
| 13 | | came into talk to officers, they never have |
| 14 | | charged any officer with any contact to Rene |
| 15 | | Rosario, to my mind, the absence of any |
| 16 | | investigation or action on their part on Rene |
| 17 | | indicates that they were satisfied with what |
| 18 | | we did. |
| 19 | Q | Did you discuss with Miss Snyder at this time |
| 20 | | Mrs. Porter's communications to her. |
| 21 | A | No. |
| 22 | Q | Why not? |
| 23 | A | Because it was not a big deal to me.  The |
| 24 | | fact that she communicated with the FBI, it |