**Page 1**

```
                    VOL:  II
                    PAGES: 202-397
                    EXHIBITS: 8-12

         UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * *
SHEILA J. PORTER,              *
              Plaintiff        *
         -vs-                  *  Civil Action
ANDREA CABRAL; SUFFOLK COUNTY  *  No. 04-11935-DPW
SHERIFF'S DEPARTMENT; SUFFOLK  *
COUNTY and CORRECTIONAL MEDICAL*
SERVICES, INC.,                *
              Defendants       *
* * * * * * * * * * * * * * * *

    CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

    CONTINUED DEPOSITION OF ANDREA CABRAL, ESQUIRE,
a witness called on behalf of the Plaintiff, in the
above-captioned matter, said deposition being
taken pursuant to the Federal Rules of
Civil Procedure, before Patricia M.
McLaughlin, a Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the offices of Goodwin Procter
LLP, Exchange Place, Boston, Massachusetts, on
Friday, June 24, 2005, commencing at 10:10 a.m.


         McLAUGHLIN & ASSOCIATES COURT REPORTERS
              92 DEVIR STREET, SUITE 304
              MALDEN, MASSACHUSETTS 02148
                   781.321.8922
                 WWW.E-STENOGRAPHER.COM
```

**Page 2**

```
1  APPEARANCES:
2  JOSEPH F. SAVAGE, JR., ESQUIRE
3      and
4  DAVID S. SCHUMACHER, ESQUIRE
5  GOODWIN PROCTER LLP
6  Exchange Place
7  Boston, Massachusetts 02109
8      On behalf of the Plaintiff
9  ELLEN CAULO, ESQUIRE
10 GENERAL COUNSEL
11 Suffolk County Sheriff's Department
12 200 Nashua Street
13 Boston, Massachusetts 02114
14    On behalf of the Defendants,
15    Andrea Cabral, Suffolk County
16    Sheriff's Department and Suffolk
17    County
18 ALEXANDRA B. HARVEY, ESQUIRE
19 ADLER, COHEN, HARVEY, WAKEMAN & GUEKGUEZIAN
20 230 Congress Street
21 Boston, Massachusetts 02110
22    On behalf of the Defendant,
23    Correctional Medical Services, Inc.
```

**Page 3**

```
ALSO PRESENT:

SHEILA PORTER

JAMES SWEET, GOODWIN PROCTER LLP

DENNIS D'ANGELO, GOODWIN PROCTER LLP
```

**Page 4**

```
              I N D E X

WITNESS            DIRECT  CROSS  REDIRECT  RECROSS

ANDREA CABRAL, ESQUIRE

By Mr. Savage        207
```

```
 1   Q   So what way was that an inaccurate summary of
 2       the statement provided?
 3   A   What I said in the press statement was that
 4       Sheila Porter was not terminated by the
 5       Suffolk County Sheriff's Department; she was
 6       not an employee; she was fired by CMS for
 7       reasons that are known to her and CMS.  She's
 8       clearly biased and has her own agenda for
 9       coming forward or something of that nature at
10       this time; that she was barred for violation
11       of department policy and contractual
12       obligations.
13           That's my statement.
14   Q   In what way is what they have got there
15       inaccurate?
16   A   They characterize it as Porter's cooperation
17       with the FBI, an outside agency, violated
18       department rules.  I never said anything like
19       that in the press statement.
20   Q   Do you know where they got that information?
21   A   I don't.
22   Q   Do you know who from the Sheriff's Department
23       spoke or otherwise communicated with the
24       people from Channel 5?
```

```
                                                              164
 1    A    I did.
 2    Q    Does it contain statements attributed to you?
 3    A    It contains what appears to be a voice-over
 4         or a narrative that says, "Sheriff Cabral's
 5         administration says Porter's cooperation with
 6         the FBI, an outside agency, violated
 7         department rules. They say Porter has her
 8         own agenda."
 9              I don't take that statement as
10         attributed to me. I issued a press
11         statement. That can be attributed to me.
12         How they have summarized it or the words they
13         have used, I don't think can be attributed to
14         me.
15    Q    Do you believe they have accurately
16         summarized what you issued as a press
17         statement to them?
18    A    No.
19    Q    What efforts did you make to get them to
20         correct the inaccurate summary of the
21         statement you issued?
22    A    I have never seen this before. I never saw
23         the Channel 5 report. To date, I have never
24         seen the Channel 5 report.
```

### Page 149

```
 1      the allegations were politically motivated,"
 2      there appears to be a quote from Steve
 3      Tomkins?
 4   A  Yes.
 5   Q  Who is Mr. Tomkins?
 6   A  He was the press spokesperson for the
 7      Sheriff's Department.
 8   Q  Was he authorized by you to have a discussion
 9      with Miss McCardle for this article?
10   A  He was authorized by me to have sort of a
11      background discussion with her about what it
12      was she was going to cover with me in the
13      article and to have that conversation with
14      her.
15   Q  So it was not your understanding that he was
16      going to have an on-the-record conversation?
17   A  Right, and I don't think that was his
18      understanding either.
19   Q  In your view, he was -- I'm not referring to
20      the substance, but he was not authorized to
21      have himself quoted in this article as far as
22      you were concerned?
23   A  Not as far as I was concerned.
24   Q  And he indicates here apparently that those
```

### Page 150

```
 1      allegations, in reference to the preceding
 2      sentence which includes the statement about
 3      Miss Porter, "Those allegations are a hundred
 4      percent ridiculous." Is that your position,
 5      that the allegations are a hundred percent
 6      ridiculous?
 7         MS. CAULO: Objection. I don't think
 8      it's clear from that to what extent that
 9      response was being offered, whether it's that
10      subset of allegations or a greater universe.
11      So I object to the premise underlying the
12      question.
13   A  Ask the question again. I'm not sure what
14      you're asking.
15   Q  Do you understand your spokesman to be
16      referring in the sentence that says, "Those
17      allegations were a hundred percent
18      ridiculous," to be referring to the
19      allegations in the preceding sentence?
20   A  I understand them to be referring to the
21      allegations in the reporter's question. I
22      have no way of knowing whether or not what is
23      in the preceding sentence is an accurate
24      reflection of what was in the question.
```

### Page 151

```
 1   Q  And do you believe that the allegations
 2      contained in the preceding sentence are, in
 3      fact, a hundred percent ridiculous?
 4   A  So you're not asking me about his quote?
 5   Q  I'm not.
 6   A  You're just asking me my opinion of what --
 7   Q  I am.
 8   A  I wouldn't characterize them as ridiculous.
 9      I would say that I disagree with them.
10   Q  Did you have any conversations with
11      Mr. Tomkins about what he was quoted as
12      saying after the article of Exhibit 10 was
13      published?
14   A  Yes.
15   Q  What did you say to him, and what did he say
16      to you?
17   A  We had an -- I don't recall exactly what was
18      said by me and exactly what was said by him,
19      but I know that I indicated that I didn't
20      expect that he would be quoted in the
21      article. He indicated that he didn't expect
22      that he would be quoted in the article. He
23      believed what he was giving her was what
24      commonly known as on background, so he was
```

### Page 152

```
 1      surprised to see it in the article himself.
 2   Q  Did he indicate that he was misquoted?
 3   A  No, I don't believe so, but I think there was
 4      more to his answer than what's published
 5      there. I don't think -- to the extent that
 6      you take that as part of his response, I
 7      think that he said that.
 8   Q  Was he authorized by you to indicate on
 9      background that the allegations were a
10      hundred percent ridiculous?
11   A  No, it doesn't work that way with the press
12      spokesperson. Press people develop
13      relationships with members of the press and
14      have regular informal conversations with them
15      about a number of stories, some of which get
16      published and some of which don't. Usually,
17      it's understood the difference between an
18      individual's opinion and when they are
19      speaking in their professional capacity.
20         In this case, I assume there was a
21      misunderstanding. The way that you described
22      it is not the way that press people work,
23      because they deal with the press so
24      frequently and have established professional
```