# EXHIBIT 1

1

1

2                                         VOLUME I
                                          PAGES: 1-75
                                          EXHIBITS: 1-3
3                       UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF MASSACHUSETTS

4                                         C.A. NO. 04-11935-DPW

5       _____

6       SHEILA J. PORTER,
              Plaintiff,
        vs.

7

8       ANDREA CABRAL; SUFFOLK COUNTY
        SHERIFF'S DEAPRTMENT; SUFFOLK
        COUNTY AND CORRECTIONAL MEDICAL
9       SERVICES, INC.,
              Defendants,

10      _____

11          CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

12

13          DEPOSITION of STEVEN WAYNE TOMPKINS, a witness

14      called on behalf of the Plaintiff in the above-captioned

15      matter, said deposition being taken pursuant to

16      Massachusetts Rules of Civil Procedure, by and before

17      Jean Wiseman, a Certified Shorthand Reporter, and Notary

18      Public in and for the Commonwealth of Massachusetts, at

19      the law offices of GOODWIN, PROCTOR, LLP, Exchange Place,

20      Boston, Massachusetts, on Tuesday, June 28, 2005,

21      commencing at 10:00 o'clock in the a.m.

22              MCLAUGHLIN & ASSOCIATES COURT REPORTERS
                      92 Devir Street, Suite 304
23                    Malden, Massachusetts 02148
                           781-321-8922

24

6

1    attorney.  Does that make sense?

2        A    Sure.

3        Q    You'll have an opportunity to read the

4    transcript of today's deposition and make any corrections

5    or changes you think are necessary and then you'll sign

6    it and it will be sent back to us, okay?

7        A    Okay.

8        Q    What did you do to prepare for today's

9    deposition?

10       A    I spoke with Attorney Caulo.

11       Q    And did you speak with anyone else besides

12   counsel?

13       A    No.

14       Q    Did you review any documents to prepare for the

15   deposition?

16       A            **REDACTED**

17       Q

18

19       A    Yes.

20       Q    **REDACTED**

21

22       A    I thought it was necessary, just to make sure.

23       Q

24       A            **REDACTED**

10

1    contact?

2        A    She called and asked if we were involved in the

3    grand jury testimony?

4        Q    Do you remember who called you?

5        A    Andrea Estes.

6        Q    Were you familiar with Ms. Estes before this

7    call?

8        A    Oh, yes.

9        Q    Through your position as spokesman --

10       A    Oh, yeah.  Just through the job, not socially.

11       Q    And she asked you whether anyone from the

12   department had testified before the grand jury?

13           MS. CAULO:  Objection.  You may answer.  I was

14   objecting because it was not his testimony.

15       Q    That's fine.  And I just want to make clear your

16   counsel may object to the form of my question for one

17   reason or another.  You can answer the question unless

18   your lawyer specifically instructs you not to answer.

19       A    Okay.  Can you repeat the question?

20       Q    Of course.  Well, was Ms. Estes contacting you

21   to inquire whether or not there was a grand jury

22   investigation?

23       A    Yes, was the department involved with the grand

24   jury.

1       Q    How did you respond?

2       A    I told her I didn't know.  I had no knowledge of

3  that.

4       Q    Did the reporter mention Sheila Porter's name to

5  you?  Is that how you first became acquainted with Sheila

6  Porter?

7       A    I believe so.

8       Q    Did you take any steps to determine whether or

9  not there was a grand jury investigation at that time?

10      A    Yes.

11      Q    What did you do?

12      A    I called our chief of staff, Elizabeth Keeley.

13      Q    And what did you say to her and what did she say

14  to you?

15      A    I told her that I was contacted by a reporter

16  inquiring as to whether or not we were involved in a

17  grand injury situation.

18      Q    How did she respond?

19      A    She said that we don't discuss whether or not we

20  are involved in grand jury.

21      Q    Did she tell you whether or not the department

22  was involved in the grand jury investigation?

23      A    I don't recall.

24      Q    Did you come away with that conversation with

24

1    were you aware of the existence of a grand jury

2    investigation concerning Ms. Porter?

3        A    When the article came out was I aware of a grand

4    injury?  I believe that Andrea Estes called me on the

5    24th.  I believe she called me the day before the article

6    came out.  So at that point after I talked to Andrea

7    Estes and Chief Keeley I had an idea that something was

8    going on that involved Ms. Porter.

9        Q    I'm sorry.  So was there another conversation

10   that you had with Ms. Estes, a third conversation?

11       A    No.

12       Q    So she called you, but was she not able to reach

13   you?  In other words, you testified that on August 2004

14   Ms. Estes called you asking for information and then you

15   called her back.

16       A    It was the same day.

17       Q    Okay.  So, again, we are just talking about the

18   two conversations; is that right?

19       A    Right.

20       Q    And the conversation occurred the day before the

21   Globe article came out?

22       A    I believe so to the best of my recollection

23       Q    So around August 24th, 2004 if I represent to

24   you that the article came out on the 25th?

29

1    Janet Wu.

2        Q    Did the press statement constitute the

3    department's response to Janet Wu's request for an

4    interview?

5        A    Yes.

6        Q    So it was determined not to make the sheriff

7    available for an interview at that time?

8        A    I wasn't involved in that discussion, so I don't

9    know what they decided to do.  I was just sent a press

10   statement to forward on to Janet Wu.

11       Q    What role did you have in drafting the press

12   statement?

13       A    Zero.  None.

14       Q    Were you in the room when the statement was

15   being drafted?

16       A    No.

17       Q    Who drafted the statement?

18       A    I don't know.  I wasn't there.

19       Q    And you have no idea who was involved in the

20   drafting of the statement?

21       A    I do not.

22       Q    So at some point the statement -- how did the

23   statement come into your possession?

24       A    It was faxed to my office.

50

1    time than the department was going to give them.

2        Q    Were you referring to any other allegations

3    besides those three in your statement that's quoted on

4    page 32 of this story?

5        A    No, I was not.

6        Q    You weren't referring to Nurse Practitioner

7    Sheila Porter's allegations?

8        A    No, I was not.

9        Q    See in the article your statement appears

10   directly after a description of Nurse Practitioner

11   Porter's allegations.  Is that fair to say?

12       A    That's what's in the article, yes.

13       Q    And do you agree that a fair reading of this

14   quote is that it relates to Nurse Practitioner Porter's

15   allegations.  Isn't that fair to say?

16            MS. CAULO:  Objection.

17       A    Define fair reading.

18       Q    Well, isn't it fair to say that someone who is

19   reading this article would believe that your quote

20   relates to Nurse Practitioner Porter's allegations?

21       A    I can't answer that intelligently.

22       Q    You don't think that anybody would believe that

23   your quote relates directly to the sentence before it?

24       A    I can't answer that question.  I don't know

64

1    A    A number of the same questions that you have

2    been asking me this morning.

3    Q    Can you describe generally what the topics were?

4    A    My job description, the articles that you have

5    talked about here -- those sorts of things.

6    Q    Were you asked anything else other than what I

7    have asked you here today?

8    A    Principally it was pretty much the same line of

9    questioning.

10   Q    Were you shown any documents?

11   A    Yes.  The same two that you have shown me.

12   Q    The articles and the press statement.

13   A    Yes.

14   Q    Were you shown any other documents?

15   A    I was just shown three and I believe it was

16   these three.

17   Q    Now, you were quoted recently concerning an

18   issue about some former deputy sheriffs who had their

19   badges taken.  Do you recall that?

20   A    Yes, I do.

21   Q    What were the circumstances of your comments in

22   that article?

23   A    What do you mean what were the circumstances?

24   Q    How did it come to pass that you were quoted in

75

1    COMMONWEALTH OF MASSACHUSETTS

2    COUNTY OF SUFFOLK

3            I, JEAN WISEMAN, Shorthand Reporter and

4    Notary Public duly commissioned and qualified in

5    and for the Commonwealth of Massachusetts, do

6    hereby certify that the foregoing deposition of STEVEN

7    TOMPKINS was taken before me at the time and place

8    therein designated; that the proceedings of said

9    deposition were stenographically reported by me, and that

10   the foregoing pages, numbered 1 through 72, constitutes a

11   true and correct transcription of said proceedings as

12   had.

13           I FURTHER CERTIFY that I am not a relative

14   or employee or attorney or counsel of any of the parties,

15   nor a relative or employee of such attorney or

16   counsel, or financially interested in the foregoing

17   action.

18           WITNESS MY HAND AND SEAL THIS, THE _____ DAY

19   OF JULY, 2005, BOSTON, SUFFOLK COUNTY, COMMONWEALTH OF

20   MASSACHUSETTS.

21   _____
     JEAN WISEMAN
22   Court Reporter, Notary Public,
     My commission expires:
23   May 19, 2009

24

75

1    COMMONWEALTH OF MASSACHUSETTS

2    COUNTY OF SUFFOLK

3                I, JEAN WISEMAN, Shorthand Reporter and

4    Notary Public duly commissioned and qualified in

5    and for the Commonwealth of Massachusetts, do

6    hereby certify that the foregoing deposition of STEVEN

7    TOMPKINS was taken before me at the time and place

8    therein designated; that the proceedings of said

9    deposition were stenographically reported by me, and that

10   the foregoing pages, numbered 1 through 72, constitutes a

11   true and correct transcription of said proceedings as

12   had.

13                I FURTHER CERTIFY that I am not a relative

14   or employee or attorney or counsel of any of the parties,

15   nor a relative or employee of such attorney or

16   counsel, or financially interested in the foregoing

17   action.

18                WITNESS MY HAND AND SEAL THIS, THE ____ DAY

19   OF JULY, 2005, BOSTON, SUFFOLK COUNTY, COMMONWEALTH OF

20   MASSACHUSETTS.

21   _____
     JEAN WISEMAN
22   Court Reporter, Notary Public,
     My commission expires:
23   May 19, 2009

24

# EXHIBIT 2

GOODWIN | PROCTER

David S. Schumacher
617.570.1911
dschumacher@
goodwinprocter.com

Goodwin Procter LLP
Counsellors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

August 4, 2005

**By Facsimile and First-Class Mail**

Ellen M. Caulo, Esq.
Suffolk County Sheriff's Department
Office of the General Counsel
200 Nashua Street
Boston, MA 02114

Re:    **Sheila J. Porter v. Andrea Cabral, et al., No. 04-11935-DPW**

Dear Ms. Caulo:

# REDACTED

. I
note that these materials are clearly within the scope of Mrs. Porter's first document request,
including, without limitation, Request No. 43.

Thank you for your attention to this matter.

Very truly yours,

David S. Schumacher

cc:    Sheila J. Porter
       Alexandra B. Harvey, Esq.
       Joseph F. Savage Jr.

LIBA/1571898.1

# EXHIBIT 3




# Suffolk County Sheriff's Department

**ANDREA J. CABRAL**
**SHERIFF**

|  |  |
|---|---|
| Jail | House of Correction |
| 200 Nashua Street | 20 Bradston Street |
| Boston, MA 02114 | Boston, MA 02118 |
| (617) 635-1100 | (617) 635-1000 |

August 4, 2005

David S. Schumacher, Esq.
Goodwin Proctor LLP
Exchange Place
Boston, MA 02109

    **RE:**   **Sheila J. Porter v. Cabral, et al., No.-11935-DPW**

Dear Attorney Schumacher:

# REDACTED

    Mr. Tompkins' *errata* sheet clarifying this response and any other responses in his deposition testimony of June 28, 2005 will be forthcoming.

Very truly yours,

*Ellen M. Caulo*

Ellen M. Caulo

cc.    Alexandra B. Harvey, Esq.

# EXHIBIT 4

GOODWIN | PROCTER

David S. Schumacher
617.570.1911
dschumacher@
goodwinprocter.com

Goodwin Procter LLP
Counsellors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

August 8, 2005

**By Facsimile and First-Class Mail**

Ellen M. Caulo, Esq.
Suffolk County Sheriff's Department
Office of the General Counsel
200 Nashua Street
Boston, MA 02114

Re:    **Sheila J. Porter v. Andrea Cabral, et al., No. 04-11935-DPW**

Dear Ms. Caulo:

Thank you for your August 4th letter concerning

# REDACTED

Please produce to us this document and any other document that Mr. Tompkins reviewed to prepare for his deposition.

Very truly yours,

David S. Schumacher

cc:    Sheila J. Porter
       Alexandra B. Harvey, Esq.
       Joseph F. Savage Jr.

# EXHIBIT 5

GOODWIN | PROCTER

David S. Schumacher
617.570.1911
dschumacher@
goodwinprocter.com

Goodwin Procter LLP
Counsellors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

August 22, 2005

**By Facsimile and First-Class Mail**

Ellen M. Caulo, Esq.
Suffolk County Sheriff's Department
Office of the General Counsel
200 Nashua Street
Boston, MA  02114

Re:    **Sheila J. Porter v. Andrea Cabral, et al., No. 04-11935-DPW**

Dear Ms. Caulo:

I have not heard back from you regarding my August 4th letter requesting interviews with Sheriff Department employees.  Please let me know if we may interview these individuals.

You have also not yet responded to my request in the August 4th letter to produce copies of any correspondence between Sheriff Cabral and/or the Suffolk County Sheriff's Department and the government concerning Mrs. Porter that has not been previously produced.  Please do so.

Finally, please produce any documents that Mr. Tompkins reviewed to prepare for his deposition, as mentioned in my August 4th and August 8th letters.

Thank you.

Very truly yours,

David S. Schumacher

cc:    Sheila J. Porter
       Alexandra B. Harvey, Esq.
       Joseph F. Savage Jr.

LIBA/1576151.1

# EXHIBIT 6

GOODWIN | PROCTER

David S. Schumacher
617.570.1911
dschumacher@
goodwinprocter.com

Goodwin Procter LLP
Counsellors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

August 25, 2005

**By Facsimile and First-Class Mail**

Ellen M. Caulo, Esq.
Suffolk County Sheriff's Department
Office of the General Counsel
200 Nashua Street
Boston, MA  02114

Re:    **Sheila J. Porter v. Andrea Cabral, et al., No. 04-11935-DPW**

Dear Ms. Caulo:

I am in receipt of Mr. Tompkins' errata sheet.  First, please supplement this errata sheet
providing reasons for the changes, which are substantive in nature.  *See* Fed. R. Civ. P. 30(e).

# REDACTED

        If you are withholding these notes on attorney-client or work-product privilege
grounds, please note that, under Federal Rule of Evidence 612, any writing used to refresh a
witness's memory prior to providing testimony is discoverable.  This is the case even if the
writing was prepared by counsel.  *See, e.g., Redvanly v. Nynek Corp.*, 152 F.R.D. 460 (S.D.N.Y.
1993).

Thank you for your attention to this matter.

Very truly yours,

David S. Schumacher

cc:    Sheila J. Porter
       Alexandra B. Harvey, Esq.
       Joseph F. Savage Jr.

LIBA/1576983.1

# EXHIBIT 7

74

1    PLEASE ATTACH TO THE DEPOSITION OF STEVEN TOMPKINS

2    CASE:  PORTER VS. CABRAL, ET AL    DATE TAKEN:  6-28-05

3                        ERRATA SHEET

4    Please refer to page 73 for errata sheet

5    instructions and distribution instructions.

6        Page   Line    Change                    Reason

7        6      16            REDACTED

8        _____

9        6      19        REDACTED

10       6      20        REDACTED

11       _____

12       _____

13       7      6         REDACTED

14       _____      _____

15       _____

16              I have read the foregoing transcript

17   of my deposition and except for any corrections or

18   changes noted above, I hereby subscribe to the

19   transcript as an accurate record of the statements

20   made by me.

21       Executed this 24 day of August , 2005.

22       Steve Tompkins
         (Witness Name)

23

24

# EXHIBIT 8



# Suffolk County Sheriff's Department



**ANDREA J. CABRAL**
**SHERIFF**

| Jail | House of Correction |
|---|---|
| 200 Nashua Street | 20 Bradston Street |
| Boston, MA 02114 | Boston, MA 02118 |
| (617) 635-1100 | (617) 635-1000 |

August 26, 2005

David S. Schumacher, Esq.
Goodwin Proctor, LLP
Exchange Place
Boston, MA 02109

**RE:**   _Sheila J. Porter v. Andrea Cabral, et al., No. 04-11935_

Dear Attorney Schumacher:

I am in receipt of your correspondence dated August 24 & 25, 2005 regarding the errata sheets from Sheriff's Department witnesses. I will review those errata sheets and if a substantive change was made to an answer previously provided, the errata sheet will be supplemented with an explanation.

Mr. Dacey's errata sheet was signed and mailed to you on August 12, 2005, approximately three weeks beyond the 30-day requirement. I fail to see how your client was prejudiced by this delay and will not withdraw Mr. Dacey's errata sheet. Once Mr. Theiss has signed his errata sheet I will seek leave of Court to submit it if you object to its receipt.

Regarding your request for the notes reviewed by Mr. Tompkins and any other witnesses that were prepared by counsel, it is the Defendants' position that those notes are protected by the attorney-client and work-product privileges. Accordingly they will not be produced.

Very truly yours,

Ellen M. Caulo

cc. Alexandra B. Harvey, Esq.

# EXHIBIT 9

## PRESS STATEMENT

The Suffolk County Sheriff's Department issues the following statement in response to the allegations made by a former contract worker in a Boston Globe story.

1. The Sheriff's Department did not fire Ms. Porter.  She was employed by Correctional Medical Services and was fired by them for reasons that are known to Ms. Porter and CMS.

2. Ms. Porter was asked to leave the House of Correction because she violated Department regulations and contractual obligations.  She is clearly biased and has her own agenda for speaking out at this time.

3. Sheriff Cabral's administration has worked cooperatively and effectively with local, state, and federal authorities on a number of investigations and continues to do so. It would be inappropriate for the Department to comment on any pending investigations.

4. Since November 2002, the Sheriff's Department has thoroughly investigated every complaint filed by an inmate, and has proactively investigated wrongdoing by officers that has resulted in 34 officers being terminated and dozens disciplined.

5. Sheriff Cabral has addressed and remedied the concerns raised in the Stern Commission report.  She has installed video recording on cameras throughout the HOC, established an off site training academy that to date has trained 70 new correctional officers, expanded the training curriculum and conducted specialized training for over 200 veteran officers.  The Department also successfully partnered with Boston Police and the Secret Service during the recent DNC.

Contact Director of Communications
Steve Tompkins
617-828-5134

000991

# EXHIBIT 10

**HE FUTURIST:** WHY RAY KURZWEIL EXPECTS TO LIVE FOREVER

THE
BOSTON
# Globe

10.31.04 /// MAGA



**A SUBURBAN UTOPIA**
Was Six Moon Hill in
Lexington a Success?

PLUS
Miss Conduct on
Mistaken Identity

The Milkman Cometh

Collegiate Clash on
Bush vs. Kerry



Look who's taken over our embattled
police, prison, and sheriff's departments.
Is it a coincidence women are now in charge?

# The New Enforcers

BY ELAINE MCARDLE



**CALLING THE SHOTS** (from left):
State correction commissioner
Kathleen Dennehy, Boston police
commissioner Kathleen O'Toole,
and Suffolk sheriff Andrea Cabral.

## Calling the Shots
CONTINUED FROM PAGE 23

agency — to audit the department and make recommendations. She welcomed the media, including 60 tes and MTV, to film segments at the jail, so blic could see what went on.

"She's a very stand-up woman. She knew where she was going. She set it out to us," DeRosa says. "And she comes out and explains her mission — everybody loves that. She's bringing everybody back together again."

Well, not everybody. On a September morning two weeks before the primary, at the Suffolk County House of Correction in Boston, there are at least four vehicles in the employee parking lot sporting stickers for Cabral's opponent, City Councilor Stephen Murphy. A black SUV with two Murphy stickers is parked right next to the front door.

"It doesn't bother me in the least," Cabral says firmly. Really? "Nope. Nope. It doesn't bother me because I know why I'm here. I know the job I'm doing, and I said from the day I walked through the door, I am not playing to the people who like the status quo, who thrive on chaos, who don't like change because they flourish in a system that's politically driven and laden with patronage. I'm not here for you. I'm here for everybody else."

She is a large presence, usually one of the tallest people in any room, and broad. High-energy, Ca-

bral clears a space, physically and psychically. She manages to dress both tastefully and with flair. One day it's a bright-green flowing jacket, a long string of pearls, hair pulled into a tight bun, a bit of eye makeup and lipstick. She's a gifted speaker, with the rolling cadences of a good trial lawyer. Where the columnists and political insiders got Cabral wrong was in quickly tagging her as a naif. "I probably understand better than most people exactly how it works," she says of the system she wants to change. "The fact I don't agree with it and don't accept it is a separate issue."

Several allegations popped up just before the primary: The Boston Retirement Board accused her of shortchanging her employees' retirement fund by $1.3 million; and a nurse at the Suffolk County House of Correction said she had been fired by Cabral's administration after it learned she was helping the FBI look into inmate abuse. "Those allegations were 100 percent ridiculous," says Steve Tompkins, the sheriff's spokesman. "That's why you haven't seen any follow-up [after the election]." Cabral was also accused of refusing Iraq war veterans their vacation benefits and firing two whistle-blowers, including the nurse. Cabral says the allegations were all politically motivated. One of the so-called whistle-blowers was a former guard who testified to covering up inmate abuse.

"He is not getting back in here," she says. "It is

just that simple." As for the veterans, they had already taken vacations after their service, and to give them more, she argued, would bankrupt her already cash-strapped department. Still, it looked bad. Why not take the savvier step and give in? "Making these decisions because they're politically expedient — and this is the irony — is exactly what got the department in trouble before," she says. Later, she adds, "It is really easy to do the wrong thing for the right reason. Then it's just a hop, skip, and a jump to doing the wrong thing for the wrong reason."

Faced with a funding crisis, her predecessor, Rouse, had laid off 130 employees. Cabral paid off Suffolk County's $5.2 million share of the $10 million settlement arising from the strip-search suit without losing a single worker. Her approach has garnered powerful allies, including Barbara Lee, wealthy patron of women in politics, and Senator Edward Kennedy, who taped phone messages to voters supporting Cabral. These days, Cabral, who switched from Republican to Democrat last year, is stumping hard for John Kerry, and she gave a thunderous speech at the Democratic National Convention before a group Lee started, the Revolutionary Women.

"More is always expected of us," Cabral told the cheering crowd. "We must exceed those expectations. Be agents of change. Lead the rebellion. Fight for and empower each other."







# EXHIBIT 11

THE BOSTON GLOBE    B2  City & Region    WEDNESDAY, AUGUST 25, 2004

# Nurse fired from jail job speaks out

## Says she helped FBI probe alleged abuse of inmates

**By Andrea Estes**
GLOBE STAFF

A longtime nurse at the Suffolk County House of Correction says she was ordered off the property and later fired after Sheriff Andrea J. Cabral's administration discovered she was helping the FBI investigate allegations of inmate abuse at the troubled institution.

Sheila J. Porter, 61, who worked for a private company that provides medical services to the jail, said she was labeled *persona non grata* at the facility after she told the FBI in May 2003 that an inmate who had worn a recording device for the federal agency had been beaten and was in danger.

After Porter was banned from the facility, her employer, Correctional Medical Services Inc., fired her.

Until then, her evaluations had been stellar, said her lawyers, Joseph F. Savage Jr. and Jennifer M. Goddard.

"They quoted a regulation that said you're not supposed to speak with an outside agency," said Porter, who spoke publicly yesterday for the first time since her termination in June 2003. "They said: 'At the close of this business day, you will no longer be welcome at the House of Correction.' The words are very well etched in my mind.

"I stood up and said 'OK, thank you' and walked out and packed up nine years of things," she said in an interview with the Globe, choking back tears. "I loved the job."

Just six months earlier, Cabral had been chosen by Governor Jane Swift to overhaul the department after allegations of abuse led her predecessor, Richard Rouse, to retire early. Cabral has frequently taken credit for restoring credibility to the department.

Three months after Porter was the nurse said, she appeared before a criminal grand jury that she was told federal prosecutors had convened to investigate her termination. No charges have been filed.

Rouse, during whose tenure eight correctional officers were indicted and several civil suits filed,


GLOBE STAFF PHOTO/JOHN BOHN

"I loved the job," said Sheila J. Porter, at home in Upton. The former longtime nurse at the Suffolk County House of Correction said she plans to file suit against the sheriff's department.

had cooperated with the FBI, announcing in 1999 that federal authorities were launching an investigation into alleged prisoner abuse. Porter said her supervisors knew she was aiding authorities.

Cabral yesterday declined to comment on Porter's allegations. The sheriff is locked in a campaign battle with Boston City Councilor Stephen J. Murphy before a Sept. 14 primary.

Said Cabral spokesman Steven Tompkins: "I don't know anything about a grand jury. The department has always cooperated with and worked with federal authorities on investigations and will continue to do so. Sheila was a contractor, not an employee of the department. Beyond that, I'm not going to comment further on Sheila Porter."

Samantha Martin, spokeswoman for US Attorney Michael J. Sullivan, would not comment on the grand jury investigation. FBI spokeswoman Gail Marcinkiewicz said she would not discuss whether Porter was an FBI informant.

Porter, who said she plans to file a civil suit against the sheriff's department, said she started providing information to the FBI in 1999 after an agent contacted her at home.

Through her work as a nurse practitioner on floors housing female inmates, she said, she had learned that a prisoner had become pregnant after a sexual encounter with one of her guards. She also discovered that other female prisoners had been sexually abused, she said.

"There were several episodes of probable abuse, physical abuse of inmates," said Porter, who is now working at two other correctional facilities. "With that, one has to be very careful. The inmate will always say it's a correction officer, and the correction officer will always say it was not. I had occasion to see people after such abuse, and I didn't make the judgment whether it was true or false. I just reported what I saw."

In addition to sexual and physical abuse, Porter said she reported evidence of drug trafficking and the "code of silence" that kept the abuse hidden. She testified in court and before the Stern Commission, which investigated the management of the Department in 2001.

Eight guards were indicted between May and July 2001 and charged with beating inmates and covering up the assaults. Four officers pleaded guilty, two were convicted, and two were acquitted.

Porter did not testify in those cases, but provided background information to authorities, her lawyers said.

Porter said that she continued to work for the FBI after Cabral took office in December 2002, but she declined to provide specific details.

"There are a lot of things that happened," she said. "I can't share them with you because the investigations are ongoing."

> 'I didn't make the judgment whether it was true or false. I just reported what I saw.'
>
> SHEILA J. PORTER

But the new administration was unaware of her involvement with the FBI until May 2003, she said. A prisoner who had worn a wire at Porter's request and was a witness in a federal case turned up at the infirmary with bruises on his chest and arm. She said he told her he had been beaten by a guard. Porter, who thought he had been removed from the facility for his protection, reported the abuse immediately. Ten days later, the inmate showed up again at the infirmary, this time with head injuries, she said. She reported the abuse again to jail personnel and to federal authorities, she said, urging agents to transfer him from the facility.

Within days after speaking to the FBI, Porter was called to the sheriff department's special investigations unit, where she was quizzed about her contact with the FBI, she said.

She was soon summoned to meet with a deputy superintendent of the jail, who read from the employee code of conduct, which bans contact with any "outside agency," and informed her that she was forever banned from the premises, she said.

# EXHIBIT 12

```
 1                                      VOL:   I
                                     PAGES: 1-202
 2                                   EXHIBITS: 1-6

 3

 4

                  UNITED STATES DISTRICT COURT
 5
              FOR THE DISTRICT OF MASSACHUSETTS
 6
       * * * * * * * * * * * * * * * * *
 7     SHEILA J. PORTER,                 *
                         Plaintiff       *
 8         -vs-                          *   Civil Action
       ANDREA CABRAL; SUFFOLK COUNTY     *   No. 04-11935-DPW
 9     SHERIFF'S DEPARTMENT; SUFFOLK     *
       COUNTY and CORRECTIONAL MEDICAL   *
10     SERVICES, INC.,                   *
                         Defendants      *
11     * * * * * * * * * * * * * * * * *

12       CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

13

14         DEPOSITION OF ELIZABETH KEELEY, ESQUIRE, a
       witness called on behalf of the Plaintiff, in the
15     above-captioned matter, said deposition being
       taken pursuant to the Federal Rules of
16     Civil Procedure, before Patricia M.
       McLaughlin, a Certified Shorthand Reporter and
17     Notary Public in and for the Commonwealth of
       Massachusetts, at the offices of Goodwin Procter
18     LLP, Exchange Place, Boston, Massachusetts, on
       Wednesday, May 11, 2005, commencing at 10:08 a.m.

19

20

21           McLAUGHLIN & ASSOCIATES COURT REPORTERS
                   92 DEVIR STREET, SUITE 304
22             MALDEN, MASSACHUSETTS  02148
                        781.321.8922
23               WWW.E-STENOGRAPHER.COM

24
```

176

1    Q    Do you know whether or not the criminal

2         investigation is still ongoing?

3    A    I think it is, yes.

4    Q    Are you familiar with a statement that was

5         released to the press on August 25th, 2004,

6         concerning Mrs. Porter that was released on

7         behalf of the Sheriff's Department?

8    A    I know of a statement we made.  I'm not

9         exactly sure that's the date, but we did

10        release a statement in August of 2004.

11   Q    Did you have any role in drafting that

12        statement?

13   A    Yes.

14   Q    How would you describe your role?

15   A    How did I do it?

16   Q    What was your role?  Did you physically draft

17        the statement?

18   A    I went to my computer and typed it on the

19        screen.

20   Q    You drafted the statement?

21   A    I did.

22   Q    Did you receive input from anybody to

23        determine what should go into that statement?

24   A    Yes.

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

177

1   Q   Who did you speak to?

2   A   Before I started typing, there was a meeting

3       with myself, the Sheriff, General Counsel,

4       Anne Powers, and off and on, Steve Tomkins

5       was in the room.

6   Q   What about Viktor Theiss?  Was he involved in

7       the drafting of the statement?

8   A   I don't believe so, no.  I don't recall him

9       being involved.

10         MR. SCHUMACHER:  Can you mark that.

11         (Document marked Exhibit No. 6.)

12       BY MR. SCHUMACHER:

13   Q   I'm handing you what's been marked as

14       Exhibit 6.  Do you recognize this document?

15   A   Yes.

16   Q   Is this the press statement that you drafted

17       that we were just discussing?

18   A   Yes.

19   Q   Under No. 2, it reads, "Mrs. Porter was asked

20       to leave the House of Correction because she

21       violated department regulations and

22       contractual obligations."  The department

23       regulations that you were referring to, are

24       those the ones that we have discussed today

1            C E R T I F I C A T E

2           COMMONWEALTH OF MASSACHUSETTS

3   DEPOSITION OF:   ELIZABETH KEELEY

4          WEDNESDAY, MAY 11, 2005

5   RE:   PORTER V. CABRAL, ET AL

6     CASE NO. 04-11935-DPW

7       I, PATRICIA M. McLAUGHLIN, a Certified Shorthand Reporter and Notary Public in and

8 for the Commonwealth of Massachusetts, do hereby certify as follows:

9       1.  That ELIZABETH KEELEY, ESQUIRE, the witness whose testimony is hereinbefore set

10 forth, was duly recorded by me on Wednesday, May 11, 2005;

11       2.  That such testimony was transcribed by me and is a true and accurate record of

12 the testimony given by the said witness, to the best of my knowledge, skill and ability;

13       3.  I further certify that I am neither attorney for, nor related to or employed by

14 any of the parties, nor financially interested in this matter; and

15       4.  That a dash as used through this transcript is meant to represent an

16 interruption in thought or between a question and answer.

17       IN WITNESS THEREOF, I hereunto set my hand and Notarial seal this 25th day of May,

18 2005.

19

20        Patricia M. McLaughlin
         Notary Public

21         My Commission Expires:
        May 4, 2012

22

23

24

   McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922