# EXHIBIT 1

VOL: I
PAGES: 1-118
EXHIBITS: 1-4

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * *
SHEILA J. PORTER,                        *
                    Plaintiff            *
        -vs-                             *
ANDREA CABRAL; SUFFOLK COUNTY            *   Civil Action
SHERIFF'S DEPARTMENT; SUFFOLK            *   No. 04-11935-DPW
COUNTY and CORRECTIONAL MEDICAL          *
SERVICES, INC.,                          *
                    Defendants           *
* * * * * * * * * * * * * * * *

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

    DEPOSITION OF MARY ELLEN MASTRORILLI, a witness
called on behalf of the Plaintiff, in the
above-captioned matter, said deposition being
taken pursuant to the Federal Rules of
Civil Procedure, before Patricia M.
McLaughlin, a Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the offices of Goodwin Procter
LLP, Exchange Place, Boston, Massachusetts, on
Monday, June 27, 2005, commencing at 10:05 a.m.

McLAUGHLIN & ASSOCIATES COURT REPORTERS
92 DEVIR STREET, SUITE 304
MALDEN, MASSACHUSETTS  02148
781.321.8922
WWW.E-STENOGRAPHER.COM

1      to her?

2    A    She told me that Nurse Practitioner

3      Sheila Porter had observed suspicious

4      bruising on an inmate, suspicious injuries or

5      suspicious bruising, on an inmate by the name

6      of Rene Rosario.  I then said to Donna,

7      "Please tell Sheila to write a confidential

8      report on her observations, and once I

9      receive that report I will give it to my

10      boss," who was Superintendent Patrick

11      Bradley, "and I will also forward a copy of

12      the report to SID."

13    Q    Was anyone else present for that

14      conversation?

15    A    No.

16    Q    Do you remember what was Miss Jurdak's

17      reaction to that?

18    A    She said that she would tell Sheila to write

19      the report.

20    Q    Was there any other conversation that you can

21      recall between the two of you at that time?

22    A    I don't recall any further conversation

23      beyond that.

24    Q    I take it you didn't specify a particular

30

```
 1          Theiss on June 10th?
 2      A   Yes.
 3      Q   He then directed you to go get the reasons
 4          for barring Miss Porter from the Chief of
 5          Staff?
 6      A   Yes.
 7          MS. CAULO:  Objection.
 8      Q   Who is the Chief of Staff?
 9      A   Elizabeth Keeley.
10      Q   Did you have some contact with Miss Keeley?
11      A   Yes, I did.
12      Q   Do you recall, was it in person or was it on
13          the telephone?
14      A   I don't recall specifically.  I want to say
15          that it was in person, but I don't
16          specifically recall the details.
17      Q   What's your best memory of what you said to
18          her and what she said to you in that
19          conversation about barring Miss Porter?
20      A   My best recollection is that I told her that
21          Viktor told me to move forward with the bar,
22          but that I was unclear as to the reasons for
23          it or what I should say to Sheila in barring
24          her and that Viktor directed me to talk to
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

31

```
1              her about it, so I'm here for my direction.
2       Q     What did she say to you?
3       A     She said to me, well, clearly Sheila has
4              divulged confidential patient information to
5              an outside agency, and that's grounds for her
6              to be barred.
7       Q     What else was said in that conversation, if
8              anything?
9       A     The only other thing that I can recall, we
10             may have had some discussion about the S220
11             policy, and the S220 policy is the policy
12             having to do with rules and regulations
13             governing employee actions.
14      Q     And what's your best memory of what portion
15             of S220 was discussed with Miss Keeley?
16      A     There were a couple of paragraphs in that
17             policy that spoke to employees divulging
18             confidential inmate information to an outside
19             agency without authorization and that
20             specifically based on that language I could
21             bar her.
22                  (Document marked Exhibit No. 4.)
23      Q     Miss Mastrorilli, is it your best
24             recollection that you and Miss Keeley had a
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

1     physical copy of S220 during your

2     conversation or that she was describing to

3     you the provision that related to discussion

4     of confidential information?

5  A   I don't recall actually myself having a copy

6     of the policy.  I did later on when I met

7     with Sheila and barred her.  At the moment

8     that Chief Keeley and I were discussing it, I

9     don't recall being in possession of the

10    policy.  Chief Keeley may have been, but I

11    don't recall that I was.

12  Q   Is it your memory that you left the meeting

13    with Chief Keeley with a specific provision

14    in mind that was the basis for barring

15    Miss Porter?

16       MR. KILEY:  Objection.

17       MS. CAULO:  Objection.

18  A   Yes.

19       MR. KILEY:  My memory is the testimony

20    was that she wasn't sure whether it was a

21    meeting or a telephone call.

22    BY MR. SAVAGE:

23  Q   Fair enough.  Is it your best memory that you

24    concluded your encounter, whether it was by

33

1        phone or in person, with Miss Keeley with an

2        understanding of a specific provision under

3        which Miss Porter would be barred?

4            MS. CAULO:   Objection.

5   A   Yes.

6   Q   So what did you do next after that

7        conversation?

8   A   I contacted Donna Jurdak, and I said -- I

9        called her up, and I think I asked her to

10       come to my office.  Then when she was in my

11       office, I said, Donna, I'm going to have to

12       bar Sheila Porter today, and I want you to be

13       in the office with me when we do this; the

14       way it will work is, Donna, you and I will go

15       to your office; you will then call Sheila in;

16       I will bar her; I will read from the policy,

17       and that will be that.

18   Q   So what happened next?

19   A   This conversation with Donna took place at

20       about 12 noon.  I asked when does Sheila's

21       tour of duty end for the day.  Donna told me

22       that her shift normally ends around 3, 3:30,

23       but it's not unusual for her to work longer,

24       to work until 5, 5:30.  So I said, okay, I'll

34

1       come to your office at 3 o'clock and we'll

2       meet with Sheila and I'll bar her.

3    Q  What happened next?

4    A  At 3 o'clock, I went to the office, Donna's

5       office. Donna called Sheila in, and I

6       started my conversation by saying something

7       like, Sheila, I need to have a very

8       uncomfortable conversation with you this

9       afternoon. I said it has recently come to my

10      attention that you have divulged confidential

11      medical information with an outside agency

12      and as a result I'm going to have to bar you.

13      I said contract employees are held to the

14      same rules and regulations as county

15      employees.

16          I opened the policy, and I read one or

17      two paragraphs having to do with information

18      being given to outside agencies without

19      authorization. I read those paragraphs, and

20      then I asked is there anything that you'd

21      like to say in your defense or is there

22      anything that in any way would you like to

23      respond. Sheila was very upset, said no,

24      stood up and left the office.

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

35

1    Q    Did you have some conversation either in that

2          meeting or in the first contact you had with

3          Miss Jurdak where she objected to the idea

4          that you were going to bar Miss Porter, she

5          meaning Miss Jurdak objected?

6    A    I don't recall.  I know that Donna felt badly

7          about the situation because she valued Sheila

8          as an employee, but I don't recall

9          resistance, no.

10   Q    At that point, were you giving Miss Porter to

11         your understanding the truthful reasons that

12         she was being barred?

13            MS. CAULO:  Objection.

14   A    Yes.

15   Q    Let me show you what's been marked as

16         Exhibit 4 and specifically I'll direct you to

17         the second page of it.  First, do you

18         recognize Exhibit 4?

19   A    Yes, I do.

20   Q    What do you recognize it as?

21   A    This is the S220 policy having to do with the

22         employee code of conduct.  It's the policy

23         that I had with me the day that I barred her.

24   Q    And turning to the second page of that

36

1          document, is the provision that you refer to

2          in barring her contained on that page?

3      A   Yes, it is.

4      Q   Which provision is that?

5      A   I believe it's Provision C, Confidential

6          Communications.

7      Q   And did you read all or part of Paragraph C

8          to Miss Porter when you barred her?

9      A   Yes, I did.

10     Q   Do you recall what portion you read?

11     A   I believe I read C1 and C2A.  I believe those

12         are the only two sections that I read.

13             MR. KILEY:  May I have a moment, please,

14         with my client.

15             MR. SAVAGE:  Sure.

16             (Witness and counsel conferred.)

17             MR. KILEY:  Can we stay off the record?

18             MR. SAVAGE:  Yes.

19             (Discussion held off the record.)

20         BY MR. SAVAGE:

21     Q   Miss Mastrorilli, you indicated that you

22         would have shared with Miss Porter the

23         contents of Paragraph C1 and 2A?

24     A   Yes.

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

```
 1    Q    And the document you have in front of you

 2         appears to be a document dated October 1,

 3         2001?

 4    A    That's right.

 5    Q    Is it your understanding that these have been

 6         periodically revised?

 7    A    They are normally revised annually.

 8    Q    Is it your best memory as you sit here today

 9         that C1 and 2A is the same in substance here

10         as to what you conveyed to Miss Porter on

11         June 10th of 2003?

12    A    Yes, it is.

13    Q    And there is nothing in C1 or 2A that

14         specifically refers to medical information,

15         is there?

16    A    No, there is not.

17    Q    So the particular policy infraction that you

18         were flagging was the sharing of confidential

19         information generally?

20    A    Yes.

21    Q    And that was based on your conversation with

22         Miss Keeley?

23              MS. CAULO:   Objection.

24    A    Yes.
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

53

1    Q    I'm not asking you what you had received,

2         Miss Mastrorilli.

3              MR. SAVAGE:  Let her finish her answer.

4         You can finish your answer.

5              THE WITNESS:  What I had received was a

6         medical progress note form, which I accepted

7         as a confidential incident report even though

8         the form wasn't technically -- an incident

9         report form is a piece of paper that is

10        blank, and it says Suffolk County

11        Sheriff's Department Incident Report.  I

12        accepted this as a confidential incident

13        report.

14   Q    When you say you accepted this, you are

15        referring to Exhibit No. 3, which is the

16        two-page document dated May 19th with

17        Miss Porter's signature on the second page?

18   A    Yes.

19   Q    When you say you accepted this, when you gave

20        the directive for Mrs. Porter to provide a

21        confidential incident report, is this what

22        you expected to receive?  When I say this,

23        Exhibit No. 3.

24             MR. SAVAGE:  Objection.

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

# EXHIBIT 2

Volume:   1
Pages:    1 - 225
Exhibits:  See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 04-11935-DPW

SHEILA PORTER,                                    )
                              Plaintiff,          )
            v.                                    )
                                                  )
ANDREA CABRAL, SUFFOLK COUNTY SHERIFF'S           )
DEPARTMENT, SUFFOLK COUNTY, and                   )
CORRECTIONAL MEDICAL SERVICES, INC., INC.,        )
                              Defendants.         )

DEPOSITION OF **DONNA L. JURDAK**, a Witness

called on behalf of the Defendants, taken

pursuant to the applicable provisions of the

Massachusetts Rules of Civil Procedure, before

Maureen Nashawaty, a Notary Public within and for

the Commonwealth of Massachusetts, held at the

Suffolk County Sheriff's Department, 200 Nashua

Street, Boston, MA, on Monday, June 20, 2005,

commencing at 10:50 a.m.

*COPLEY COURT REPORTING, Inc.*
101 Tremont Street
Boston, Massachusetts  02108
(617) 423-5841

**DISK ENCLOSED**

92

1     inmate's allegations, what was her demeanor like

2     in this instance?

3          A.    I know she was concerned when he came

4     back to Suffolk County but she was concerned when

5     any inmate was abused so it wasn't, it may be

6     that I just knew that he was brought back in and

7     maybe she was concerned more about that situation

8     that he shouldn't have been there, but I can't

9     say that she wasn't concerned about anybody that

10    she had reported being abused that they -- that

11    it may happen again for reporting it to a medical

12    person.

13         Q.    Did you detect from her when she

14    reported these allegations that she was overly

15    concerned that this was of an emergency nature,

16    something that was critical?

17         A.    Did she tell me that -- is that what

18    you said?

19         Q.    Yes, yes, yes.

20         A.    I don't think so.

21         Q.    Okay.

22         A.    I felt the urgency because I know I

23    paged the Deputy that someone knew of her

24    feelings and I couldn't reach anyone at the

93

1    facility.

2        Q.    What do you mean you sensed her

3    urgency?

4        A.    I just sensed that I needed to tell

5    someone right away.

6        Q.    What did Mrs. Porter tell you that made

7    you feel like this was urgent and that you needed

8    to tell someone right away?

9        A.    That he shouldn't have been at the

10   facility, that he was at risk for being harmed.

11       Q.    Other than he shouldn't be at the

12   facility and was at risk for being harmed, what

13   specifically did she tell you about allegations

14   that he was making concerning physical abuse?

15       A.    I don't recall.

16       Q.    Do you recall her telling you at all

17   that she had observed injuries on this inmate and

18   that he was alleging that he had been physically

19   assaulted by an officer?

20       A.    There were two different instances and

21   I can't be clear about which one and which

22   time -- if it was all in one.  You know, I can't

23   tell you.  I can't remember.

24       Q.    When you say there were two different

96

1    concerns about contacting SID?

2        A.    I don't remember that either.

3        Q.    Did she tell you whether or not she had

4    made any observations of injuries on Rene

5    Rosario?

6                MR. SCHUMACHER:  Objection.

7        A.    I don't remember.

8        Q.    How did you contact the Deputy?

9        A.    I paged her.

10       Q.    We are referencing the Deputy that

11   oversaw medical in addition to other

12   responsibilities?

13       A.    Yes.

14       Q.    Who was the Deputy?  What was the name?

15       A.    Maryellen Masterelli.

16       Q.    And you paged her instead of phoning

17   her?

18       A.    I don't believe anyone was at the

19   facility.  I didn't know, her secretary told me I

20   could page her but I  -- there was no one there,

21   I couldn't reach anyone in SID which is normally

22   what I would have done not necessarily paged the

23   Deputy and I called her office to tell her and

24   she wasn't there, and so I paged her.

97

1      Q.    Did you actually make an effort to call

2   SID first before paging Deputy Superintendent

3   Maryellen Masterelli?

4      A.    I believe so.

5      Q.    Did you leave a message for anyone in

6   SID?

7      A.    I don't know.

8      Q.    Do you recall what information you

9   communicated to SID?

10     A.    No.

11     Q.    Did Maryellen Masterelli call you back?

12     A.    Yes.

13     Q.    Do you recall that telephone

14   conversation?

15     A.    No, I can't tell you details about the

16   conversation.  I can tell you that she asked me

17   what I normally would have done and I said I

18   would report it to SID and she asked me to do

19   that and have Sheila write a report.

20     Q.    When she said to you what would you

21   normally do, normally do about what, what

22   information?

23     A.    Reporting.

24     Q.    Let me ask the question.  What

98

1    information did you communicate to Deputy

2    Superintendent Maryellen Masterelli that caused

3    her to say to you what would you normally do?

4         A.    That he had been abused before, or

5    accused officers of abusing him before, that he

6    was back at Suffolk County and Sheila felt he was

7    at risk for being there.

8         Q.    Did Mrs. Porter tell you that she had

9    made observations of physical injuries on Rene

10   Rosario?

11                MR. SCHUMACHER:  Objection.

12        A.    I don't remember.

13        Q.    Did Mrs. Porter tell you that Rene

14   Rosario had communicated to her that he had been

15   physically assaulted while he was in a unit at

16   the House of Correction?

17        A.    I don't remember.

18        Q.    Did you report to, did Mrs. Porter tell

19   you that she had done an examination of

20   Mr. Rosario?

21        A.    I don't remember.

22        Q.    Did you inform Deputy Superintendent

23   Maryellen Masterelli that Mrs. Porter had

24   examined the inmate?

109

1    No. 1 refreshes your recollection as to the

2    information communicated to you by Sheila Porter

3    on May 19th, concerning Rene Rosario?

4        A.    No.

5        Q.    Is there anything in here that suggests

6    a certain urgency or the reason why it needs to

7    be reported immediately?

8               MR. SCHUMACHER:  Objection.  The

9    document speaks for itself.

10       A.    I think all abuse to an inmate has an

11   urgency to report.

12       Q.    Did you ever at any point bring a copy

13   of a written document prepared by Sheila Porter

14   to Maryellen Masterelli?

15       A.    I actually brought a document that

16   Sheila had written to Maryellen's office,

17   Maryellen wasn't there and I left it with her

18   secretary.

19       Q.    When did you do that?

20       A.    I don't know.

21       Q.    Well, Sheila Porter is barred on June

22   10th and this document is dated May 19th.

23            Do you have a sense between those two

24   dates about when you physically brought a written

133

1       initial phone call?

2          A.      No.

3          Q.      When -- do you have a specific

4      recollection of Deputy Superintendent Masterelli

5      actually arriving at the Health Services Unit

6      that day?

7          A.      She came into my office and asked me if

8      she could speak with Sheila and I, and I said I

9      would get Sheila because she was in her office or

10     at least I thought she was and I went and got

11     Sheila and we went back to my office.

12         Q.      When you went into your office, what

13     occurred?

14         A.      Maryellen read part of a policy to

15     Sheila and I in regards to sharing information or

16     confidential information with people outside of

17     the agency and told her that she had, you know,

18     violated that policy and that she would be -- she

19     would not longer be able to work at Suffolk

20     County.

21         Q.      Prior to reading from a policy, did

22     Deputy Superintendent Masterelli say anything to

23     you or Mrs. Porter?

24         A.      I don't remember in the order in which

# EXHIBIT 3

1

2

                                    VOL:   I
                             PAGES: 1-201
                           EXHIBITS: 1-7

3

4

UNITED STATES DISTRICT COURT

5

FOR THE DISTRICT OF MASSACHUSETTS

6

7

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

8

SHEILA J. PORTER,             \*
             Plaintiff     \*
     -vs-             \*  Civil Action

9

ANDREA CABRAL; SUFFOLK COUNTY  \*  No. 04-11935-DPW
SHERIFF'S DEPARTMENT; SUFFOLK   \*

10

COUNTY and CORRECTIONAL MEDICAL \*
SERVICES, INC.,             \*

11

            Defendants    \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

12

13

14

    DEPOSITION OF ANDREA CABRAL, ESQUIRE, a witness

15

called on behalf of the Plaintiff, in the
above-captioned matter, said deposition being

16

taken pursuant to the Federal Rules of
Civil Procedure, before Patricia M.

17

McLaughlin, a Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of

18

Massachusetts, at the offices of Goodwin Procter
LLP, Exchange Place, Boston, Massachusetts, on

19

Friday, May 6, 2005, commencing at 9:40 a.m.

20

21

         McLAUGHLIN & ASSOCIATES COURT REPORTERS

22

             92 DEVIR STREET, SUITE 304
           MALDEN, MASSACHUSETTS  02148

23

               781.321.8922
           WWW.E-STENOGRAPHER.COM

24

1    whether or not -- I don't recall whether or

2    not she even got back to me.

3  Q  Give me a complete statement, if you would,

4    of the reasons why you concluded or decided

5    to give the order to bar Miss Porter.

6  A  She's a nurse working at the House of

7    Correction; pursuant to our contract with CMS

8    is told by an inmate that the inmate has been

9    abused and beaten by an officer, alleges that

10   there is physical evidence of those bruises.

11   The nurse does not document in the medical

12   record her observations of what was relayed

13   to her by the patient.

14        Upon our discovery that these

15   allegations have been made and our discovery

16   that she, in fact, was one of the first

17   people to whom the allegations had been

18   reported, we request a confidential report.

19   The confidential report is not submitted in a

20   timely manner.  It is received by us ten days

21   subsequent to it being requested.  It is not

22   in memo form to Deputy Superintendent

23   Mastrorilli, to whom the report should have

24   been addressed, from Sheila Porter.  It is on

87

```
 1              a medical record form, which has particular
 2              significance to me and it is dated on the
 3              date of the incident in the space reserved
 4              for the date as though that's when the
 5              treatment was rendered.
 6      Q       Those are your entire reasons?
 7      A       Those were my reasons.
 8      Q       And it's your testimony that it had nothing
 9              to do with the fact that Miss Porter spoke to
10              the FBI?
11      A       No.
12      Q       Did you understand or assuming these are your
13              reasons --
14              MS. CAULO:  Objection.  She just
15              testified that those were her reasons.
16      Q       What is it in the policies of the Sheriff's
17              Department that makes any of these statements
18              of reasons that you have given a basis under
19              which someone can be barred from the
20              facility?
21      A       If I can refer to Exhibit 1?
22      Q       Sure.
23      A       Just going through the policy, certainly
24              under policy statements on Page 1, first, I
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

95

1        investigation that Miss Porter had received

2        the report from the inmate and that

3        Miss Porter had reported it immediately to

4        her supervisor?

5            MS. CAULO:  Objection.

6   A   I'm not aware that that's what Mr. Theiss

7        learned in the context of the conversation.

8        What he learned was that it had been reported

9        directly to Miss Porter and Miss Porter had

10       in the reported it to SID, had not documented

11       it in the medical file, and when asked for a

12       confidential report, did not submit that

13       confidential report in a timely manner,

14       submitted it in the wrong form and appeared

15       to have backdated it.

16   Q   Would it make a difference to your decision

17       making if you were to believe that

18       Miss Porter reported this incident

19       immediately to her supervisor?

20   A   No, because the supervisor is not SID.

21   Q   Going back to your prior discussion of

22       Policy S220 and what other parts of that

23       policy you believe to have been violated that

24       justified barring Miss Porter.

96

1    A    Under L, which is Page 6 of 9 on the document
2         Bates stamped 610774, "Employees" -- and I'm
3         not indicating that Miss Porter is an
4         employee, but someone bound as a contract
5         worker to these policies -- "are required to
6         report in writing all unusual or significant
7         events regarding departmental operations of
8         security in which they are involved or about
9         which they have personal knowledge.

10            "Unless specifically authorized
11        otherwise, these reports must be submitted
12        promptly but no later than the end of the
13        employee's shift.  Reports are to be
14        submitted to the employee's immediate
15        supervisor unless otherwise instructed by the
16        investigating official or department policy."

17            Page 7 of 9 in S220, Bates stamped
18        000 -- the document is 774.  I can't really
19        read the Bates stamp on the page.  I'm sorry.
20   Q    I think it's probably 780.
21   A    Okay.  "Employees must also file a written
22        report," the same caveat with regard to
23        employees in Miss Porter's status.
24            "Employees must file a written report

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

1        had written out the information.  It wasn't

2        that it had -- it wasn't a standard form, but

3        using a medical records form versus any other

4        format of communication was significant to

5        me.

6   Q   And where is that policy written?

7   A   There is no policy here --

8   Q   When you say here, what do you mean?

9   A   There is no policy in S220 that goes to a

10       medical person or specifically a nurse's

11       obligation to document in the medical record

12       observations related to potentially treatable

13       injuries or harmful injuries to an inmate.

14         I'm talking about my understanding of

15       what the use of a medical record is, how it

16       is properly used and how a person who is in

17       the medical profession for years would know

18       that that form would be used.

19   Q   You're saying that the use of a medical

20       record form -- by that, I assume you mean the

21       interdisciplinary progress notes form?

22   A   Yes.

23   Q   The use of that form for any other purpose

24       than progress notes as to a patient violates

104

```
 1          a policy of the Sheriff's Department?
 2     A    That's not what I'm saying.
 3     Q    You indicate that it was improper for
 4          Miss Porter to report this incident to
 5          Miss Mastrorilli using this form and that
 6          that is one of the reasons that you barred
 7          her?
 8     A    Yes.
 9     Q    And the reason it's improper is contained in
10          what policy or procedure?
11     A    The reason that it's improper -- I have given
12          you the reasons in terms of my belief about
13          medical records forms and what they are used
14          for.
15               If we are going back to the policy, we
16          went through Paragraph 2 and -- excuse me.
17          We went through Paragraph 2, and Paragraph 5,
18          says, "Failure to report, false reporting or
19          interference with any employee's report may
20          result in discipline."  Backdating whatever
21          it was that she submitted in writing is also
22          significant to me.
23     Q    Let's stay with --
24     A    It's two separate things.
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

275

1         you produced the documents you were requested

2         to produce?

3  A   Right, and that was the memorandum and the

4         letter.

5  Q   In terms of Exhibit 8, are you testifying

6         that that November 6th date, 2003, is not a

7         date on which you made changes to the content

8         of this document?

9  A   Yes, that's what I'm saying.

10  Q   Is there a reason that it contains the

11         November 6th date?  Is that something that's

12         done manually, or does the computer

13         automatically put some kind of new date under

14         there?

15  A   I believe that the computer prints out the

16         date that it's printed.  I assume that it's

17         the date that it's printed.

18  Q   Is there any way to determine from this

19         document as a document when it was prepared?

20  A   Other than my truthful testimony that I

21         prepared it on the 18th of June, probably

22         not.

23  Q   So it's your memory, but the document itself

24         doesn't make that clear, I take it?

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

# EXHIBIT 4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHEILA PORTER, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 04-11935 DPW |
| | ) |
| ANDREA CABRAL, SUFFOLK COUNTY | ) |
| SHERIFF'S DEPARTMENT, SUFFOLK, | ) |
| COUNTY and CORRECTIONAL | ) |
| MEDICAL SERVICES, INC., | ) |
| Defendants. | ) |

**PLAINTIFF'S SECOND REQUEST FOR THE
PRODUCTION OF DOCUMENTS TO DEFENDANTS ANDREA CABRAL,
SUFFOLK COUNTY SHERIFF'S DEPARTMENT, AND SUFFOLK COUNTY**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure Plaintiff

Sheila Porter ("Mrs. Porter") hereby requests that Defendants Andrea Cabral, Suffolk

County Sheriff's Department, and Suffolk County (collectively, "Defendants") produce

for inspection and copying the documents and/or tangible items (collectively

"documents"), requested herein, which are in their possession, custody, or control or the

possession, custody, or control or the possession of their agents.  The production of

documents shall take place at the offices of Goodwin Procter LLP, Exchange Place, 53

State Street, Boston, Massachusetts 02109, within thirty (30) days of service of this

Request.

**DEFINITIONS AND INSTRUCTIONS**

1.      Each of the following requests for production of documents is continuing. In the

event that Defendants become aware of any document(s) responsive to any of the

1

requests set forth below after their initial production of documents, such additional responsive document(s) should be furnished immediately to Mrs. Porter's attorneys.

2.    When responding to this request for production of documents, Defendants are requested to respond in writing and state as to each of the requests:

(a)    that there are documents responsive to the request and that they will be produced;

(b)    that there are documents responsive to the request, but that Defendants refuse to produce them because of a claim of privilege or for some other reason; or

(c)    that there are no documents responsive to the request.

3.    In producing documents pursuant to this request for production of documents, please indicate to which numbered request such document is responsive. If a document or any other item is produced pursuant to more than one request, please so designate.

4.    As to any document(s) called for in this request for production of documents which no longer exists, but which you are aware. existed at one time, please identify such document(s) by stating as to each: (i) the type of document; (ii) its general subject matter; (iii) the date of the document; and (iv) its author(s), addressee(s) and recipient(s); you are further requested to identify the last known location and the reason such document(s) is no longer in existence.

5.    If any document is not being produced in response to this request for production of documents based upon a claim of privilege or work-product protection, it is requested that, for each such document, Defendants state the nature

of and reasons supporting the claim of privilege and/or protection.

6. The term "document" refers to any and all items identified in Federal Rules of Civil Procedure Rule 34(a) and Local Rule 26.5 and includes, but is not limited to, every writing or record of every type and description (whether printed, recorded or reproduced by manual, mechanical, computer, electrical, optical, or by any other means or process) that is or has been in the possession, custody or control of Defendants or their agents, or of which Defendants have knowledge, including, but not limited to, letters, correspondence, memoranda, bills, invoices, checks, logs, diaries, calendars, journals, ledgers, daytimers, notebooks, stenographic or handwritten notes, studies, publications, books, pamphlets, pictures, drawings, maps, reports, surveys, statistical compilations, agreements, communications, reports, telegrams, summaries, computer printouts, electronic mail (e-mail), telegrams, cables, photographs, photograph negatives, films, microfilms, motion picture film, videotapes, tapes, computer discs and/or tapes, CD-ROM discs and/or tapes, voice mails, voice recordings, electronic 'or other recordings, tapings and/or transcriptions of telephone and/or other conversations, interviews, graphs, reports, notes, charts, plans, sketches, summaries, minutes, notes and/or records of meetings or conferences, summaries or reports of investigations or negotiations, opinions or reports of consultants, medical records, brochures, advertisements, circulars, press releases, any marginal comment appearing on any of the foregoing, and all other-writings or any other recorded computer and/or graphic material in whatever form and from which information can be. obtained, as translated by you if necessary into a reasonably usable form, and including copies, drafts and non-identical

reproductions of any of the foregoing, as well as anything attached, clipped or connected thereto.

7.     "Possession," "custody" and "control" shall mean the ability to transfer or obtain the requested information or document.

8.     "Communication" shall mean the transmittal of information, -in the form of facts, ideas, inquiries, requests for information or otherwise.

9.     "Any" shall include the collective as well as the singular and shall include "each," "all," and "every."

10.    The terms "all" and "each" shall both be construed as "all" and "each."

11.    The connectives "and" and "or' shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope.

12.    The singular in these requests shall be deemed to include the plural and the plural shall include the singular.

13.    The term "concerning" shall be construed to include without limitation: referring or relating to, describing, evidencing, or constituting.

14.    "You," "your" and "Defendants" shall mean and refer to Andrea Cabral, Suffolk County Sheriffs Department, and *Suffolk* County and the respective directors, officers, employees, servants, agents, representatives, subsidiaries, predecessors, successors and assigns of the Suffolk County Sheriff's Department and Suffolk County.

15.    "Department" shall mean and refer to the Suffolk County Sheriffs Department.

16.    "HOC" shall mean and refer to the Suffolk County House of Correction and its directors, officers, employees, servants, agents, representatives, subsidiaries,

4

predecessors, successors and assigns.

17.    "FBI" shall mean and refer to the Federal Bureau of Investigation and its directors, officers, employees, servants, agents, representatives, subsidiaries, predecessors and assigns.

18.    "SID" shall mean and refer to the Sheriffs Investigation Division.

19.    "CMS" shall mean and refer to Correctional Medical Services, Inc., and its directors, officers, employees, servants, agents, representatives, subsidiaries, predecessors, successors and assigns.

20.    "Answer" shall include the Defendants' Answer to Mrs. Porter's Amended Complaint.

21.    "Litigation" shall mean and refer to the lawsuit filed by Mrs. Porter against Defendants.

22.    "Commission" shall mean and refer to the Special Commission formed to investigate the Suffolk County Sheriffs Department, which Commission issued its report on October 15, 2002.

23.    Unless otherwise stated in the specific document request, the time frame for relevant documents shall be the period of Mrs. Porter's tenure at the HOC.

24.    If Defendants are aware of the existence of any document within the scope of these document requests that is not within their custody, possession, or control, please identify any such document in a written response to the request for the production of the document. In identifying a document in this fashion, it is requested that the following information be provided: (i) the name, address and telephone number of the person who has possession, custody, or control over the document; (ii) the type of document; (iii) its

general subject matter; (iv). the date of the document; and (v) its author(s), addressee(s) and recipient(s).

## DOCUMENTS TO BE PRODUCED

49.    Any and all documents concerning any defaults by Ms. Cabral on her student loans.

50.    Any and all written campaign material used or generated by Ms. Cabral or her agents, for the 2004 Suffolk County Sheriff's election.

51.    The Department's personnel file for Ms. Andrea Cabral.

52.    The Department's personnel file for Ms. Elizabeth Keeley.

53.    The Department's personnel file for Mr. Viktor Theiss.

54.    The Department's personnel file for Ms. Mary Ellen Mastrorilli.

55.    Any and all documents concerning the Department's policies about documentation required to be included in an inmate's medical records.

56.    Any and all documents concerning the Department's understanding of a medical encounter.

57.    Any and all documents authored by Mrs. Porter in the custody, control or possession of SID.

58.    The videotaped interview of Inmate R.R. that was made by the Department on or about May 22, 2003.

59.    The October 15, 2002 report issued by the Commission maintained in the Department's records.

60.    The Department's employee handbook for 2002-2004.

61.    The collective bargaining agreement for the Department's employees for 2003.

62.     Any and all minutes of the Department's policy review committee relating to the revision of policy S220, as described by Ms. Keeley at page 156 of her May 11, 2005 deposition and by Mr. Horgan at page 11 of his May 13, 2005 deposition.

63.     Any and all notes made by the Department's policy review committee members.

64.     Any and all S220 disciplinary letters related to the disciplinary actions identified on the spreadsheet bates labeled 001153 through 001173, which was produced by the Department in this litigation.

65.     Any and all documents concerning training provided to Department employees or contractors on the Code of Silence as reported on by the Commission.

66.     Any and all documents concerning training provided to Department employees or contractors on the reporting of incidents.

67.     Any and all reports, minutes or findings of the Department's "Transition Team", which is referenced in document 001081 produced by the Department.

68.     Any and all documents concerning the findings of the Massachusetts Department of Corrections audit of the Department, as described in documents 001081 and 001093 produced by the Department.

69.     Any and all notes or memorandums concerning the "personal informational interviews with staff" referenced in document 001081 produced by the Department.

70.     Any and all documents concerning the "transition review of the Investigation Division in conjunction with former Mass. State Police Lieutenant Al Pierce" referenced by Mr. Theiss at page 17 of his May 24, 2005 deposition.

71.     Any and all incident reports in the custody, control or possession of SID that are dated before such incident report was

completed, or otherwise contains inaccurate or multiple dates, including but not limited
to, all such reports identified by Brian Dacey at pages 56-58 of his June 16, 2005
deposition.

72.     Any and all documents concerning Mary Ellen Mastrorilli's recommendation of
individuals for a training position, referenced by Sheriff Cabral at pages 375-76 of her
June 24, 2005 deposition.

73.     Any and all documents concerning Mary Ellen Mastrorilli's solicitation for a
position, referenced by Sheriff Cabral at pages 376-77 of her June 24, 2005 deposition.

74.     Any and all documents concerning Mary Ellen Mastrorilli allowing the contract
with the Office of Community Corrections to lapse, referenced by Sheriff Cabral at pages
377-78 of her June 24, 2005 deposition.

75.     Any and all documents concerning Mary Ellen Mastrorilli's attempt to bar a
contract worker, referenced by Sheriff Cabral at pages 381-82 and 385 of her June 24,
2005 deposition.

76.     Any and all documents concerning "lapses" with respect to Mary Ellen
Mastrorilli's job performance, referenced by Sheriff Cabral at pages 378-79 of her June
24, 2005 deposition.

77.     Any and all documents concerning any disciplinary measures taken with respect
to Mary Ellen Mastrorilli.

78.     The letter sent by U.S. Attorney Michael Sullivan to Sheriff Cabral in December
2003 identified by Sheriff Cabral at pages 214-200 of her June 24, 2005 deposition.

79.    Inspection of the computer used by Sheriff Cabral to type and print the Memo to File allegedly dated June 18, 2003, which was produced by the Department and is bates labeled 00105 through 001053.

# EXHIBIT 5

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SHEILA PORTER, )<br><br>Plaintiff, )<br><br>v. )<br><br>ANDREA CABRAL, SUFFOLK )<br>COUNTY SHERIFF'S DEPARTMENT, )<br>SUFFOLK COUNTY and )<br>CORRECTIONAL MEDICAL SERVICES, INC., )<br><br>Defendants. ) | CIVIL ACTION NO. 04-11935 DPW |

**PLAINTIFF SHEILA PORTER'S SECOND SET OF**
**INTERROGATORIES DIRECTED TO DEFENDANTS ANDREA CABRAL,**
<u>**SUFFOLK COUNTY SHERIFF'S DEPARTMENT AND SUFFOLK COUNTY**</u>

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Sheila

Porter ("Mrs. Porter") hereby requests that Defendants Andrea Cabral, Suffolk County Sheriff's

Department and Suffolk County (collectively, the "Defendants") respond under oath to the

following Interrogatories within thirty (30) days of their service.

<u>**DEFINITIONS AND INSTRUCTIONS**</u>

1.     Each of the following Interrogatories shall be deemed to be continuing to the time

of trial, and you are requested to provide, by way of supplementary answers, such additional

information as may hereafter be obtained by you, in accordance with the Federal Rules of Civil

Procedure.  Any such supplemental responses are to be filed and served upon counsel of record for

Mrs. Porter upon receipt of such information, but not later than the time of trial.

2.     If you object to answering all or any part of any Interrogatory on the grounds of

privilege, please set forth the full grounds of such privilege including the circumstance of the

privilege and, in the case of any communication claimed to be privileged, the date, time, place,

parties to, and subject of such communication.

3.     In answering these Interrogatories, if Defendants cannot answer the Interrogatories in full after exercising due diligence to secure the information to do so, Defendants should so state and answer to the fullest extent possible, specifying and explaining their inability to answer the remainder of the Interrogatory, and stating whatever information or knowledge they have concerning the unanswered portion.

4.     When the identification of any person is requested by these Interrogatories, please provide to the extent known the person's full name, present or last known address, and the person's present or last known place of employment.

5.     When the identification of any document is requested by these Interrogatories, please provide, to the extent known, information about the type of document; its general subject matter; the date of the document; the identities of all of the author(s), addressee(s) and recipient(s); and the current location of the document.

6.     When the identification of any oral communication is requested by these Interrogatories, please identify such communication in complete detail including, but not limited to, the date and time of the communication, the full name of each participant and witness to such communication, the substance of each communication, and the means or device by which such communication was accomplished (if not in person).

7.     When requested to identify an occurrence, incident, fact, or circumstance, for any answer to these Interrogatories, please identify each and every occurrence, incident, and circumstance on which reliance will be based should any trial be held concerning the subject of such answer, including the following information concerning each and every occurrence, incident, fact, or circumstance:  (i) the date of each; (ii) the place of each; (iii) the identity of each and every person who participated in or has knowledge of each; (iv) the identity of each person present; (v) the source of your knowledge; and (vi) the identification of any and all documents supporting your answer.

8.     The term "document" refers to any and all items identified in Federal Rule of Civil Procedure Rule 34(a) and Local Rule 26.5(C)(2), and includes, but is not limited to, every writing

or record of every type and description (whether printed, recorded or reproduced by manual, mechanical, computer, electrical, optical, or by any other means or process) that is or has been in the possession, custody or control of Defendants or their agents, or of which Defendants have knowledge, including but not limited to letters, correspondence, memoranda, bills, invoices, checks, logs, diaries, calendars, journals, ledgers, notebooks, stenographic or handwritten notes, studies, publications, books, pamphlets, pictures, drawings, maps, reports, surveys, statistical compilations, agreements, communications, reports, telegrams, summaries, computer printouts, electronic mail, telegrams, cables, photographs, films, microfilms, motion picture film, videotapes, tapes, computer discs and/or tapes, CD-ROM discs and/or tapes, voice mails, voice recordings, electronic or other recordings, tapings and/or transcriptions of telephone and/or other conversations, interviews, graphs, reports, notes, charts, plans, sketches, summaries, minutes, notes and/or records of meetings or conferences, summaries or reports of investigation or negotiations, opinions or reports of consultants, medical records, brochures, advertisements, circulars, press releases, any marginal comment appearing on any of the foregoing, and all other writings or any other recorded computer and/or graphic material in whatever form and from which information can be obtained, as translated by Defendants if necessary into a reasonably usable form, and including copies, drafts and non-identical reproductions of any of the foregoing, as well as anything attached, clipped or connected thereto.

9.    "Possession," "custody" and "control" shall mean the ability to transfer or obtain the requested information or document.

10.    "Communication" shall mean, in accordance with Local Rule 26.5(C)(1), the transmittal of information, in the form of facts, ideas, inquiries, requests for information or otherwise.

11.    "Any" shall include the collective as well as the singular and shall include "each," "all," and "every."

12.    The terms "all" and "each" shall both be construed as all and each.

-3-

13.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope.

14.    The singular in these requests shall be deemed to include the plural and the plural shall include the singular.

15.    The term "concerning" shall mean, in accordance with Local Rule 26.5(C)(7), referring to, describing, evidencing, supporting or constituting.

16.    "You," "your" and "Defendants" shall mean and refer to Andrea Cabral, Suffolk County Sheriff's Department and Suffolk County and the respective directors, officers, employees, servants, agents, representatives, subsidiaries, predecessors, successors and assigns of the Suffolk County Sheriff's Department and Suffolk County.

17.    "CMS" shall mean and refer to Correctional Medical Services, Inc., and its directors, officers, employees, servants, agents, representatives, subsidiaries, predecessors, successors and assigns.

18.    "FBI" shall mean and refer to the Federal Bureau of Investigation and its directors, officers, employees, servants, agents, representatives, subsidiaries, predecessors and assigns.

19.    "HOC" shall mean and refer to the Suffolk County House of Correction and its directors, officers, employees, servants, agents, representatives, subsidiaries, predecessors, successors and assigns.

20.    "SID" shall mean and refer to the Sheriff's Investigation Division.

21.    "Answer" shall include the Defendants' Answer to Mrs. Porter's Amended Complaint.

22.    "Litigation" shall mean and refer to the lawsuit filed by Mrs. Porter against the Defendants.

23.    "Describe in detail" means to provide fair and reasonable notice of the information known or available to you concerning the item in question. To the extent necessary

-4-

to provide such notice, "describe in detail" means to provide a factual summary setting forth the substance of, and identifying any person participating in, witnessing or having knowledge (whether first-hand or otherwise) of any fact, action, occurrence, conduct, event, circumstance or communication concerning the item in question.

24.    The phrase "state the basis," shall mean, in accordance with Local Rule 26.5(C)(8), the following:

    a.    identify each and every document (and, where pertinent, the section, article, or subparagraph thereof), which forms any part of the source of your information regarding the alleged facts or legal conclusions referred to by the Interrogatory;

    b.    identify each and every communication which forms any part of the source of your information regarding the alleged facts or legal conclusions referred to by the Interrogatory;

    c.    state separately the acts or omissions to act on the part of any person (identifying the acts or omissions to act by stating their nature, time and place, and identifying the persons involved) which form any part of your information regarding the alleged facts or legal conclusions referred to by the Interrogatory; and

    d.    state separately any other fact or facts which form the basis of your information regarding the alleged facts or conclusions referred to in the Interrogatory.

## INTERROGATORIES

1. Explain any procedure by which computers at the Department automatically affix the date a document is printed into any portion of the body of the document, including:

    (i) Whether or not Sheriff Cabral's computer automatically affixes the date that a document is printed into the header portion of each page following the first page of a document, as she testified at her deposition on pages 270 and 275-76; and

    (ii) Whether or not Brian Dacey's computer "automatically changes the date" on a document to the date that it is printed, as he testified at his deposition on page 80.

2. Describe the circumstances surrounding Sheriff Cabral's separation from the Suffolk County District Attorney's Office, including:

    (i) The alleged "impropriety" committed by the Suffolk County District Attorney's Office, as Sheriff Cabral testified on page 298 of her deposition;

    (ii) Any allegations of wrongdoing on the part of the Suffolk County District Attorney's Office by Sheriff Cabral and/or her agents;

    (iii) The amount of sick leave Sheriff Cabral received;

    (iv) The terms and conditions of the separation agreement entered into between Sheriff Cabral and the Suffolk County District Attorney's Office.

4. Identify any Department employee and/or contract worker who was disciplined in any way by the Department for violations related to reporting incidents, describe the nature of the violation, and describe discipline imposed.

5. Describe the steps taken to implement the Stern Commission's recommendations, including the recommendation to "aggressive[ly] attack [] the code of silence that prevents staff members from reporting the misconduct of fellow staff members."

6. Identify any Department rules, policies or procedures related to a nurse practitioner's responsibilities with respect to documenting observations in an inmate's medical chart.

-6-

7.    Identify each Department employee who was aware that Sheila Porter communicated with the FBI prior to May 19, 2003.

8.    Describe the reasons for Mrs. Porter's barring Sheriff Cabral and the representatives of the Department provided at the June 16, 2003 meeting attended by representatives of the Department, the FBI and the Office of the United States Attorney.

9.    Describe all measures taken to notify CMS that Mrs. Porter was barred from the HOC.

10.    Identify the individuals within the Department who had authority to bar contract workers from the HOC in June 2003.

11.    Identify the Department employee who was the source for the statement "Sheriff Cabral's administration says Porter's cooperation with the FBI – an outside agency – violated Department rules" contained in the August 25, 2004 WCVB television report on Mrs. Porter and the Department.

                        Respectfully submitted,

                        **SHEILA PORTER,**

                        By her attorneys,


                        Joseph F. Savage, Jr., BBO #443030
                        David S. Schumacher, BBO #647917
                        GOODWIN PROCTER LLP
                        Exchange Place
                        53 State Street
                        Boston, Massachusetts 02109
                        (617) 570-1000

Dated:   June 30, 2005                        LIBA/1562457.1

                            -7-

# EXHIBIT 6

# GOODWIN | PROCTER

David S. Schumacher
617.570.1911
dschumacher@
goodwinprocter.com

Goodwin Procter LLP
Counsellors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

August 25, 2005

**By Facsimile and First-Class Mail**

Ellen M. Caulo
Deputy General Counsel
Suffolk County Sheriff's Department
200 Nashua Street
Boston, MA  02114

Re:  **Sheila J. Porter v. Andrea Cabral, et al., No. 04-11935-DPW**

Dear Ellen:

We have received and reviewed the responses of Andrea Cabral, Suffolk County Sheriff's Department ("SCSD") and Suffolk County (collectively, "Suffolk Defendants") to Mrs. Porter's Second Set of Interrogatories ("Interrogatories"), Second Request for Production of Documents ("Requests") and Request for Admissions ("RFAs").  Your responses are deficient for the reasons described below.  Please supplement your responses accordingly.

**Documents Authored by Mrs. Porter in SID's Possession**

Request 57 seeks any documents authored by Mrs. Porter in SID's possession.  The Suffolk Defendants claim that Mrs. Porter was barred because of the form, content and timeliness of her reporting of the May 19, 2003 Rene Rosario incident.  Having made Mrs. Porter's reporting a central issue in this case, Mrs. Porter is entitled to <u>all</u> reports she has written in SID's possession. In response, you object and direct Mrs. Porter to your response to Request No. 18, where you improperly ask her to "recall specific instances in which she provided reports."  It is not Mrs. Porter's burden to produce documents responsive to legitimate discovery requests—particularly those as central as Request Nos. 18 and 57.  Moreover, the SCSD was able to locate at least one additional document responsive to Request No. 18.  *See* Bates No. 1437.  Please produce all responsive documents or confirm that there are no additional documents responsive to these requests.

GOODWIN | PROCTER

Ellen M. Caulo
August 25, 2005
Page 2

**Other Requests Related to Reporting**

As described above, the SCSD has raised the issue of the propriety of Mrs. Porter's reporting in this case. Thus, Mrs. Porter requested any documents related to training provided to SCSD employees or contractors on the reporting of incidents. You objected to this request, notwithstanding testimony from Sheriff Cabral that such training occurred. *See* Deposition of Andrea Cabral, June 24, 2005, p. 321. Please produce these documents.

Similarly, Request No. 71 seeks any incident reports in SID's control that are dated in the same way that SCSD employees allege Mrs. Porter dated her May 19, 2003 report. Brian Dacey admitted that such reports exist. These documents are highly relevant to Mrs. Porter's claims and should be produced immediately.

Mrs. Porter also requested an explanation of how computers at the SCSD automatically affix the date a document is printed onto a document, rather than the day it was allegedly written and requested an inspection of Sheriff Cabral's computer in this regard. *See* Interrogatory No. 19; Request No. 79. You responded that "it is [Sheriff Cabral]'s understanding that it is an option within Microsoft Word that inserted the current date (November 6, 2003) in the header." A similar response was provided for Mr. Dacey. The request does not seek Sheriff Cabral's "understanding," but rather an explanation as to how—and whether—the computers function in a way consistent with Ms. Cabral's and Mr. Dacey's testimony. Please supplement this response. In addition, I urge you to reconsider your refusal to allow counsel for Mrs. Porter to conduct an inspection of the relevant computers to confirm the veracity of these responses.

Finally, RFA Nos. 3 and 5 request that the Suffolk Defendants admit that, prior to May 2003, SID received incident reports from Mrs. Porter and others written on Interdisciplinary Progress Notes paper. You claim that you cannot admit or deny this RFA "without the name of a specific SID investigation pursuant to which the reports were submitted." As described above, this is an improper objection. The information is in the possession of the SCSD—not Mrs. Porter—and is relevant to the claims and defenses in this case. Please supplement your responses. Similarly, please supplement your response to RFA No. 6 with respect to contractors.

**Employee Handbook and Collective Bargaining Agreement**

You object to Requests 60 and 61, which seek the Department's employee handbook and collective bargaining agreement, on the ground that Mrs. Porter was not a SCSD employee. You repeat this objection in other responses. Whether Mrs. Porter was a SCSD employee as a matter of law has yet to be determined in this case. Thus, it is wholly improper for you to withhold discoverable materials on this ground. As for your additional objection to Request No. 61, it is sufficient to produce the collective bargaining agreement that covers SCSD medical employees.

LIBA/1576165.1

GOODWIN | PROCTER

Ellen M. Caulo
August 25, 2005
Page 3

## Policy Review Committee Minutes and Notes Related to Policy S220

You claim in Response No. 62 that there are no policy review committee minutes relating to the revision of Policy S220. Yet you have produced numerous documents related to the revision of this policy, including a document authored by Ms. Keeley indicating that the current policy was revised "for the feds" and "has been reviewed by the policy review committee." *See* Email From Elizabeth Keeley to Andrea Cabral, 12/2/04, Bates No. 1189. Moreover, Ms. Keeley testified that this policy would not have been amended without discussion. *See* Deposition of Elizabeth Keeley, May 11, 2005, p. 156. Thus, it is difficult to believe that there are no policy review committee minutes related to the revision of Policy S220. Please confirm that this is the case, or produce such minutes. Similarly, if there are any notes related to such changes, please produce those as well in response to Request No. 63. I note in this regard that Ms. Keeley testified that "we keep notes of our Policy Review meetings." *Id.*

## Policy S220 Violations

The spreadsheet listing individuals who violated Policy S220 contains only limited information regarding the particular offense at issue. Instead of requesting the entire files for all of these offenses, Mrs. Porter limited her request to the discipline letters that were sent to each offender. Even so limited, this request was met with specious objections. The conduct that resulted in discipline for other individuals who violated Policy S220 is obviously relevant to the claims and defenses in this case. Please produce these documents.

In addition, you objected to Interrogatory No. 4, which seeks the identity of employees and/or contract workers who have been disciplined for reporting violations. The relevance of this request is self-evident. Moreover, because the SCSD maintains a spreadsheet of all S220 violations it should not be difficult to identify those related to reporting. Mrs. Porter is willing to limit the time period of the request to a reasonable period of time that will provide a representative sample, such as the ten years preceding her barring.

## Code of Silence

You object to Request No. 65, which seeks any documents related to training provided to SCSD employees or contractors on the Code of Silence, as reported by the Stern Commission. The existence *vel non* of a Code of Silence is relevant to Mrs. Porter's § 1983 claim against the SCSD. As such, any training provided in this regard is highly relevant. Sheriff Cabral testified that SCSD employees "are specifically trained on . . . the inappropriateness and unacceptability of any sort of retaliatory behavior and the need to respect their ethical obligations as officers." *See* Cabral deposition, p. 321. Please produce documents evidencing this training.

LIBA/1576165.1

GOODWIN | PROCTER

Ellen M. Caulo
August 25, 2005
Page 4

Interrogatory No. 5 requests a description of any steps taken to implement the Stern Commission's recommendations, including the recommendation to "aggressive[ly] attack[] the code of silence that prevents staff members from reporting the misconduct of fellow staff members." You disingenuously object on the ground that Mrs. Porter did not "specifically identify" the applicable Stern Commission recommendations. While Mrs. Porter is entitled to a response related to <u>all</u> of the recommendations, she will limit her request to the one that she quoted in Interrogatory No. 5, related to the code of silence. Please supplement your response.

Similarly, any deficiencies within SID with respect to the ability of SCSD employees and contractors to report incidents is relevant to this claim. As such, Request No. 70 seeks the report generated by Viktor Theiss, and any other documents related to his review of SID. Please produce these documents.

### Documents Related to Mary Ellen Mastrorilli

You objected to all discovery requests related to Ms. Mastrorilli, including her personnel file (Request 54) and documents related to incidents referred to by Sheriff Cabral at her deposition (Requests 72-77). Obviously Ms. Mastrorilli is a central figure in this case. Indeed, the objections are particularly frivolous in light of <u>your questions</u> to her at her deposition. *See* Deposition of Mary Ellen Mastrorilli, June 27, 2005, pp. 102-109. Please produce these documents. Alternatively, please confirm that you will not introduce any evidence related to the information sought by Requests 54 or 72-77 at trial.

### Press Statements

You claim that you cannot respond to RFA No. 17 because the Suffolk Defendants "do not know what statements in particular the Plaintiff is referring to . . ." The statements Mrs. Porter is referring to are those that have been repeated in numerous depositions in this case:

(i)     "Said Cabral spokesman Steven Tompkins: I don't know anything about a grand jury. The department has always cooperated with and worked with federal authorities on investigations and will continue to do so. Sheila was a contractor, not an employee of the department. Beyond that, I'm not going to comment further on Sheila Porter." Estes, A., "Nurse Fired From Jail Job Speaks Out; Says She Helped FBI Probe Alleged Abuse of Inmates," *Boston Globe*, p. B2, August 25, 2004.

(ii)    "Sheriff Cabral's administration says Porter's cooperation with the FBI – an outside agency – violated Department rules. They say Porter has her own agenda." *WCVB-TV report*, August 25, 2004.

4

GOODWIN | PROCTER

Ellen M. Caulo
August 25, 2005
Page 5

(iii)  "A nurse at the Suffolk County House of Correction said she had been fired by Cabral's administration after it was learned she was helping the FBI look into inmate abuse. 'Those allegations were 100 percent ridiculous,' says Steve Tompkins, the sheriff's spokesman. 'That's why you haven't seen any follow-up [after the election].' . . . Cabral says the allegations were all politically motivated. One of the so-called whistle-blowers was a former guard who testified to covering up inmate abuse." McCardle, E., "Calling the Shots," *Boston Globe Magazine*, p. 20, October 29, 2004.

**Sheriff Cabral's Student Loans, Personnel File, Separation from the Suffolk District Attorney's Office and Campaign Material**

Several discovery requests seek information that bear directly on Sheriff Cabral's credibility. Request No. 49 seeks any documents related to defaults by Ms. Cabral on her student loans; Request No. 50 seeks any written campaign material used by Sheriff Cabral in the 2004 election; Request No. 51 seeks her personnel file from the SCSD; Interrogatory No. 2 (continuously 20) requests that she describe the circumstances surrounding her departure from the Suffolk County District Attorney's Office. One of the crucial issues in this case is whether Sheriff Cabral testified truthfully that Mrs. Porter was barred from the HOC for reporting reasons rather than because she spoke with the FBI. As such, it is certainly relevant if Sheriff Cabral has previously been accused of being less than truthful in other contexts. Moreover, Sheriff Cabral repeatedly accused Mrs. Porter of having an "agenda," a phrase that has racial overtones. It is therefore relevant if Sheriff Cabral has previously made accusations of racial prejudice. Please produce these documents

**Elizabeth Keeley & Viktor Theiss's Personnel Files**

Finally, Requests 52 and 53 seek the personnel files of Elizabeth Keeley and Viktor Theiss. Mr. Keeley and Mr. Theiss are two key decision-makers in the SCSD who were instrumental in Mrs. Porter's barring. Please produce these documents.

Please provide a response to this letter by September 1st.

Very truly yours,

David S. Schumacher

GOODWIN | PROCTER

Ellen M. Caulo
August 25, 2005
Page 6


cc:    Sheila J. Porter
        Alexandra B. Harvey
        Joseph F. Savage Jr.