# EXHIBIT 7

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SHEILA PORTER,<br>Plaintiff<br><br>v.<br><br>ANDREA CABRAL, SUFFOLK<br>COUNTY SHERIFF'S DEPT.,<br>SUFFOLK COUNTY and<br>CORRECTIONAL MEDICAL<br>SERVICES, Inc., | CIVIL ACTION NO: 04-11935DPW |

**DEFENDANTS, ANDREA CABRAL, SUFFOLK COUNTY SHERIFF'S DEPARTMENT
AND SUFFOLK COUNTY'S RESPONSE TO PLAINTIFF'S SECOND REQUEST FOR
PRODUCTION OF DOCUMENTS**

Defendants Andrea Cabral, Suffolk County Sheriff's Department and Suffolk County
hereby respond to Plaintiff's second request for production of documents pursuant to Federal
Rules of Civil Procedure, 26 and 34.

### GENERAL OBJECTIONS

1.  Defendant Objects to each request to the extent that they seek information protected by
    the attorney-client privilege and/or work product doctrine or any other applicable
    privilege or immunity.  In the event that the Defendants produce any privileged
    information, such production is inadvertent and not intended as a waiver or any privilege.

2.  Defendant objects to each request to the extent that they seek information not within the
    Defendant's possession, custody or control.

3.  Defendant objects to each request to the extent that they call upon the Defendant to
    produce information already mad available for review, inspection and copying.

4.  Defendant objects to each request to the extent that they seek information that is equally
    available to both parties.

5.  Defendant objects to each request to the extent that they are overly broad, duplicative,
    vague and ambiguous and unduly burdensome.

6.      Defendant objects to each request to the extent that they call for the production of

information that is not relevant to the subject matter of this litigation and is not

reasonably calculated to lead to the discovery of relevant information.

**REQUEST NO. 49:**

Any and all documents concerning any defaults by Ms. Cabral on her student loans.

**RESPONSE TO REQUEST NO. 49:**

Objection.  Request No. 49 is overly broad, unduly burdensome and not reasonably

calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 50:**

Any and all written campaign material used or generated by Ms. Cabral or her agents for

the 2004 Suffolk County Sheriff's election.

**RESPONSE TO REQUEST NO. 50:**

Objection.  Request No. 50 is overly broad, unduly burdensome, vague and ambiguous

and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 51:**

The Department's personnel file for Ms. Cabral.

**RESPONSE TO REQUEST NO. 51:**

Objection.  Request No. 51 is not reasonably calculated to lead to the discovery of

admissible evidence.  Further objection is made on the basis that it seeks information that is

personal and confidential.

**REQUEST NO. 52:**

The Department's personnel file for Ms. Keeley.

**RESPONSE TO REQUEST NO. 52:**

Objection. Request No. 52 is not reasonably calculated to lead to the discovery of admissible evidence. Further objection is made on the basis that it seeks information that is personal and confidential.

**REQUEST NO. 53:**

The Department's personnel file for Mr. Theiss.

**RESPONSE TO REQUEST NO. 53:**

Objection. Request No. 53 is not reasonably calculated to lead to the discovery of admissible evidence. Further objection is made on the basis that it seeks information that is personal and confidential.

**REQUEST NO. 54:**

The Department's personnel file for Ms. Mary Ellen Mastrorilli.

**RESPONSE TO REQUEST NO. 54:**

Objection. Request No. 54 is not reasonably calculated to lead to the discovery of admissible evidence. Further objection is made on the basis that it seeks information that is personal and confidential.

**REQUEST NO. 55:**

Any and all documents concerning the Department's policies about documentation required to be included in an inmate's medical records.

**RESPONSE TO REQUEST NO. 55:**

Objection. Request No. 55 is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections see documents bate stamped: 001435-001436 (SCSD NSJ Manual of Policies and Procedures for Health Services, Section H. Health Services)

**REQUEST NO. 56:**

Any and all documents concerning the Department's understanding of a medical encounter.

**RESPONSE TO REQUEST NO. 56:**

Objection. Request No. 56 is overly broad, unduly burdensome, vague and ambiguous, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections see documents bate stamped: 001435-001436 (SCSD NSJ Manual of Policies and Procedures for Health Services, Section H. Health Services). See also documents previously produced to Plaintiff by Defendant Correctional Medical Services including CMS Policy and Procedures Manual for Suffolk County House of Correction, CMS RFP for Comprehensive Healthcare Services at the Suffolk County Sheriff's Department, and CMS New Employee Orientation materials.

**REQUEST NO. 57:**

Any and all documents authored by Ms. Porter in the custody, control or possession of SID.

**RESPONSE TO REQUEST NO. 57:**

Objection. Request No. 57 is overly broad and unduly burdensome in that it seeks documents for a significant period of time (the Plaintiff began working for Correctional Healthcare Solutions at the HOC in approximately 1994) prior to the relevant time period of the allegations set forth in the Plaintiff's complaint. Further objection is made on the basis that Request No. 57 is not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections, please refer to Defendants' response to Request No. 18 in Plaintiff's First Request for Production of Documents.

**REQUEST NO. 58:**

The videotaped interview of Inmate R.R. that was made by the Department on or about May 22, 2003.

**RESPONSE TO REQUEST NO. 58:**

The Defendants have already produced the videotaped interview of Inmate R.R. made by the Department on or about May 22, 2003.

**REQUEST NO. 59:**

The October 15, 2002 report issued by the Commission maintained in the Department's records.

**RESPONSE TO REQUEST NO. 59:**

Objection. Request No. 59 is vague and ambiguous regarding what the Plaintiff means by "maintained in the Department's records." Further objection is made on the basis that the Plaintiff has a copy of the October 15, 2002 report issued by the Commission and said report is readily available from public sources.

**REQUEST NO. 60:**

The Department's employee handbook for 2002-2004.

**RESPONSE TO REQUEST NO. 60:**

Objection. Request No. 60 is not reasonably calculated to lead to the discovery of admissible evidence as the Plaintiff was an employee of Correctional Medical Services, Inc. and not the Suffolk County Sheriff's Department.

**REQUEST NO. 61:**

The collective bargaining agreement for the Department's employees for 2003.

**RESPONSE TO REQUEST NO. 61:**

Objection. Request No. 61 is overly broad and unduly burdensome in that in 2003 there were seven different unions and six separate collective bargaining agreements. Further objection is made on the basis that Request No. 61 is not reasonably calculated to lead to the discovery of admissible evidence as the Plaintiff acknowledged in her deposition, Vol. 2, lines 8-11, that she was not a member of a collective bargaining unit at the Suffolk County Sheriff's Department.

**REQUEST NO. 62:**

Any and all minutes for the Department's policy review committee relating to the revision of policy S220, as described by Ms. Keeley at page 156 of her May 11, 2005 deposition and by Mr. Horgan at page 11 of his May 13, 2005 deposition.

**RESPONSE TO REQUEST NO. 62:**

Objection.  Request No. 62 is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to these objections the Defendants state that there are no policy review committee minutes relating to the revision of Policy S220 as described by Ms. Keeley at page 156 of her May 11, 2005 deposition, in their possession, custody or control.

**REQUEST NO. 63:**

Any and all notes made by the Department's policy review committee members.

**RESPONSE TO REQUEST NO. 63:**

Defendants object to request no. 63 as the information sought is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 64:**

Any and all S220 disciplinary letters related to the disciplinary actions identified on the spreadsheet bates labeled 001153 through 001173, which was produced by the Department in this litigation.

**RESPONSE TO REQUEST NO. 64:**

Objection.  Request No. 64 is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  Further objection is made due to the confidential personnel information sought through this request.  Defendants further object because the information sought involves discipline imposed on individuals who are employees of the Suffolk County Sheriff's Department and members of collective bargaining units, and

therefore not similarly situated to the Plaintiff who was a contract nurse and employee of Correctional Medical Services working at the HOC.

**REQUEST NO. 65:**

Any and all documents concerning training provided to Department employees or contractors on the Code of Silence as reported on by the Commission.

**RESPONSE TO REQUEST NO. 65:**

Objection. Request No. 65 is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 66:**

Any and all documents concerning training provided to Department employees or contractors on the reporting of incidents.

**RESPONSE TO REQUEST NO. 66:**

Objection. Request No. 66 is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 67:**

Any and all reports, minutes or findings of the Department's "Transition Team", which is referenced in document 001081 produced by the Department.

**RESPONSE TO REQUEST NO. 67:**

Objection. Request No. 67 is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 68:**

Any and all documents concerning the findings of the Massachusetts Department of Corrections audit of the Department, as described in documents 001081 and 001093 produced by the Department.

**RESPONSE TO REQUEST NO. 68:**

Objection. Request No. 68 is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 69:**

Any and all notes or memorandums concerning the "personal informational interviews with staff" referenced in document 001081 produced by the Department.

**RESPONSE TO REQUEST NO. 69:**

Objection. Request No. 69 is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 70:**

Any and all documents concerning the "transition review of the Investigation Division in conjunction with former Mass. State Police Lieutenant Al Pierce" referenced by Mr. Theiss at page 17 of his May 24, 2005 deposition.

**RESPONSE TO REQUEST NO. 70:**

Objection. Request No. 70 is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 71:**

Any and all incident reports in the custody, control or possession of SID that are dated before such incident report was completed or otherwise contained inaccurate or multiple dates, including but not limited to, all such reports identified by Brian Dacey at page 56-58 of his June 16, 2005 deposition.

**RESPONSE TO REQUEST NO. 71:**

Objection. Request No. 71 is vague, overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 72:**

Any and all documents concerning Mary Ellen Mastrorilli's recommendation of individuals for a training position, referenced by Sheriff Cabral at pages 375-76 of her June 24, 2005 deposition.

**RESPONSE TO REQUEST NO. 72:**

Objection.  Request No. 72 is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 73:**

Any and all documents concerning Mary Ellen Mastrorilli's solicitation for a position referenced by Sheriff Cabral at pages 376-77 of her June 24, 2005 deposition.

**RESPONSE TO REQUEST NO. 73:**

Objection.  Request No. 73 is overly broad, unduly burdensome and not likely to lead to the discovery of relevant and admissible evidence.

**REQUEST NO. 74:**

Any and all documents concerning Mary Ellen Mastrorilli's allowing the contract with the Office of Community Corrections to lapse, referenced by Sheriff Cabral at pages 377-78 of her June 24, 2005 deposition.

**RESPONSE TO REQUEST NO. 74:**

Objection.  Request No. 74 is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of relevant and admissible evidence.

**REQUEST NO. 75:**

Any and all documents concerning Mary Ellen Mastrorilli's attempt to bar a contract worker, referenced by Sheriff Cabral at pages 381-82 and 385 of her June 24, 2005 deposition.

**RESPONSE TO REQUEST NO. 75:**

Objection. Request No. 74 is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of relevant evidence.

**REQUEST NO. 76:**

Any and all documents concerning "lapses" with respect to Mary Ellen Mastrorilli's job performance referenced by Sheriff Cabral at pages 378-79 of her June 24, 2005 deposition.

**RESPONSE TO REQUEST NO. 76:**

Objection. Request No. 76 is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 77:**

Any and all documents concerning any disciplinary measures taken with respect to Mary Ellen Mastrorilli.

**RESPONSE TO REQUEST NO. 77:**

Objection. Request No. 77 is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST NO. 78:**

The letter sent by U.S. Attorney Michael Sullivan to Sheriff Cabral in December 2003 identified by Sheriff Cabral at pages 214-200 of her June 24, 2005 deposition.

**RESPONSE TO REQUEST NO. 78:**

See document bate stamped: 001434 previously produced to Plaintiff.

**REQUEST NO. 79:**

Inspection of the computer used by Sheriff Cabral to type and print the Memo to File allegedly dated June 18, 2003, which was produced by the Department and is bates labeled 00105 through 001053.

**RESPONSE TO REQUEST NO. 79:**

Objection. Request No. 79 is not reasonably calculated to lead to the discovery of relevant and admissible evidence.

Respectfully Submitted for Defendants
Suffolk County Sheriff's Department,
Andrea Cabral and Suffolk County,
By their Attorney,

DATE:  8/16/05

Ellen M. Caulo
Deputy General Counsel
BBO# 545250
Suffolk County Sheriff's Department
200 Nashua Street
Boston, MA 02114
(617) 989-6681

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a true and accurate copy of the foregoing Response to Plaintiff's Second Request for Production of Documents to be served upon all counsel of record by first class mail, postage prepaid, this 16th day of August 2005.

Ellen M. Caulo

# EXHIBIT 8

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SHEILA PORTER,<br>Plaintiff<br><br>v.<br><br>ANDREA CABRAL, SUFFOLK COUNTY<br>SHERIFF'S DEPARTMENT, SUFFOLK<br>COUNTY and CORRECTIONAL<br>MEDICAL SERVICES, INC.,<br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION NO: 04-11935DPW

### DEFENDANTS SUFFOLK COUNTY SHERIFF'S DEPARTMENT AND SUFFOLK COUNTY'S RESPONSE TO PLAINTIFF'S SECOND SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 33, the Defendants Suffolk County Sheriff's Department and Suffolk County hereby respond to Plaintiff's Second Request for Interrogatories. Numbered paragraphs reflect Plaintiff's request as well as a continuation from Plaintiff's First Set of Interrogatories.

### GENERAL OBJECTIONS

1. The Defendants object to each of the Plaintiff's Interrogatories to the extent that they seek information protected by the attorney/client privilege and/or the work product doctrine, or any other applicable privilege or immunity. In the event that the Defendants produce any privileged information, such production is inadvertent and not intended as a waiver of any privilege.

2. The Defendants object to each of the Plaintiff's Interrogatories to the extent that they seek information not within the Defendants' possession, custody or control.

3. The Defendants object to each of the Plaintiff's Interrogatories to the extent that they are overly broad, duplicative, vague and ambiguous, and unduly burdensome.

4. The Defendants object to each of the Plaintiff's Interrogatories to the extent that they call for the production of information that is not relevant to the subject matter of this litigation and is not reasonably calculated to lead to the discovery of relevant information.

5. The Defendants object to each of the Plaintiff's Interrogatories to the extent that they otherwise seek to impose obligations different from or beyond those contained in the

Federal Rules of Civil Procedure and the Local Rules of the District Court for the District of Massachusetts.

## INTERROGATORY NO. 1 (continuously No. 19):

Explain any procedure by which computers at the Department automatically affix the date a document is printed into any portion of the document, including:

    (i)    Whether or not Sheriff Cabral's computer automatically affixes the date that a document is printed into the header portion of each page following the first page of a document, as she testified at her deposition on pages 270 and 275-76; and

    (ii)    Whether or not Brian Dacey's computer "automatically changes the date" on a document to the date that it is printed, as he testified at his deposition on page 80.

## RESPONSE TO INTERROGATORY NO. 1 (continuously No. 19):

Objection. Interrogatory No. 1 (continuously No. 19) is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Subject to these objections:

    (i)    Defendants Suffolk County and Suffolk County Sheriff's Department respond that when Sheriff Cabral opened the document, referenced as Exhibit No. 8 in her deposition testimony on pages 270 and 275-276, on her computer and printed it on November 6, 2003 it is their understanding that it is an option within Microsoft Word that inserted the current date (November 6, 2003) in the header;

    (ii)    Defendants Suffolk County and Suffolk County Sheriff's Department respond that the Microsoft Word memo template used by Brian Dacey to create the document referenced in his deposition on page 80 has a function that automatically inserted the current date when he opened and printed the document.

## INTERROGATORY NO. 2 (continuously no. 20):

Describe the circumstances surrounding Sheriff Cabral's separation from the Suffolk County District Attorney's Office, including:

(i)    The alleged "impropriety" committed by the Suffolk County District Attorney's Office, as Sheriff Cabral testified on page 298 of her deposition;

(ii)   Any allegations of wrongdoing on the part of the Suffolk County District Attorney's Office by Sheriff Cabral and/or her agents;

(iii)  The amount of sick leave Sheriff Cabral received;

(iv)   The terms and conditions of the separation agreement entered into between Sheriff Cabral and the Suffolk County District Attorney's Office.

**RESPONSE TO INTERROGATORY NO. 2 (continuously no. 20):**

Objection.  Interrogatory No. 2 (continuously No. 20) is not reasonably calculated to lead to the discovery of admissible evidence. Further objection is made on the basis that certain of the subparts request personal information that is private and confidential.  Subject to these objections, Defendants Suffolk County and Suffolk County Sheriff's Department respond that Sheriff Cabral did not testify on page 298 of her deposition to any alleged "impropriety" committed by the Suffolk County District Attorney's Office.

**INTERROGATORY NO. 3:**

There is no interrogatory no. 3 listed in the Plaintiff's Second Request for Interrogatories.

**INTERROGATORY NO. 4 (continuously No. 21):**

Identify any Department employee and/or contract worker who was disciplined in any way by the Department for violations related to reporting incidents, describe the nature of the violation, and, describe discipline imposed.

**RESPONSE TO INTERROGATORY NO. 4 (continuously No. 21):**

Objection.  Interrogatory No. 4 (continuously No. 21) is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence in that it sets forth no time frame and therefore seeks information for an unlimited period of time prior to the relevant time period of the allegations in the complaint. This time period involves several different administrations in the Suffolk County Sheriff's Department and potentially hundreds of employees.  Further the information sought involves discipline imposed on

individuals who are employees of the Suffolk County Sheriff's Department and members of collective bargaining units, and therefore not similarly situated to the Plaintiff who was a contract nurse and employee of Correctional Medical Services working at the HOC. Further objection is made on the grounds that the Department does not and cannot impose discipline on contract workers.

**INTERROGATORY NO. 5 (continuously no. 22):**

Describe the steps taken to implement the Stern Commission's recommendations, including the recommendation to "aggressive[ly] attack[] the code of silence that prevents staff members from reporting the misconduct of fellow staff members."

**RESPONSE TO INTERROGATORY NO. 5 (continuously no. 22):**

Objection. Interrogatory No. 5 (continuously No. 22) is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence in that it does not specifically identify which of the numerous recommendations made by the Stern Commission, other than to "aggressive[ly] attack[] the code of silence that prevents staff members from reporting the misconduct of fellow staff members", Plaintiff is referring to. Subject to these objections Defendants Suffolk County and Suffolk County Sheriff's Department refer the Plaintiff to pages 315- 327 of Sheriff Cabral's deposition taken on June 24, 2005.

**INTERROGATORY NO. 6 (continuously No. 23):**

Identify any Department rules, policies or procedures related to a nurse practitioner's responsibilities with respect to documenting observations in an inmate's medical chart.

**RESPONSE TO INTERROGATORY NO. 6 (continuously No. 23):**

Objection. Request No. 6 (continuously No. 23) is overly broad, unduly burdensome, vague and ambiguous. Subject to these objections, Defendants Suffolk County and Suffolk County Sheriff's Department respond see documents bate stamped: 001435-001436: (SCSD Nashua Street Jail Manual of Policies and Procedures for Health Services, Section H. Health Services)

**INTERROGATORY NO. 7 (continuously no. 24):**

Identify each Department employee who was aware that Sheila Porter communicated with the FBI prior to May 19, 2003.

**RESPONSE TO INTERROGATORY NO. 7 (continuously no. 24):**

Objection. Interrogatory No. 7 (continuously No. 24) is vague, overly broad and unduly burdensome in that it does not define what is meant by the term "aware" and "communicated" and seeks information for a period of years prior to the relevant time period of the allegations contained in the Plaintiff's complaint. Defendants Suffolk County and Suffolk County Sheriff's Department further object to the extent that the information sought is in the possession of the Plaintiff. Subject to these objections Suffolk County and Suffolk County Sheriff's Department respond that the following employees inferred that Sheila Porter communicated with the FBI prior to May 19, 2003, because Richard Dimeo and Paul DeFazio learned that the FBI had directed the wiring of an inmate and Sheila Porter had attached the recording device to the inmate: Richard Dimeo and Paul DeFazio. Defendants Suffolk County and Suffolk County Sheriff's Department further respond that Neville Arthur inferred that Sheila Porter had communicated with the FBI prior to May 19, 2003 based upon a conversation with the FBI.

**INTERROGATORY NO. 8 (continuously no. 25):**

Describe the reasons for Mrs. Porter's barring Sheriff Cabral and the representatives of the Department provided at the June 16, 2003 meeting attended by representatives of the Department, the FBI and the Office of the United States Attorney.

**RESPONSE TO INTERROGATORY NO. 8 (continuously no. 25):**

Defendants Suffolk County Sheriff's Department and Suffolk County respond that they do not have a specific recollection of the reasons for the Plaintiff's barring provided to the representatives of the FBI and the Office of the United States Attorney at the June 16, 2003 meeting and refer the Plaintiff to pages 229-234 of Defendant Andrea Cabral's deposition taken on June 24, 2005; pages 169-171 of Elizabeth Keeley's deposition taken on May 26, 2005; and pages 226-228 of Viktor Theiss's deposition taken on May 24, 2005

**INTERROGATORY NO. 9 (continuously No. 26):**

Describe all measures taken to notify CMS that Mrs. Porter was barred from the HOC.

**RESPONSE TO INTERROGATORY NO. 9 (continuously no. 26):**

Defendants Suffolk County and Suffolk County Sheriff's Department object to interrogatory No. 9 (continuously No. 26) on the grounds that Federal Rules of Civil Procedure 33 permits 25 interrogatories to be served upon parties. Plaintiff previously requested 18 interrogatories that were responded to by Defendants Andrea Cabral, Suffolk County Sheriff's Department and Suffolk County. Interrogatory No. 9 (continuously No. 26) is outside of the scope of discovery allowed under Rule 33 and therefore not applicable.

**INTERROGATORY NO. 10 (continuously No. 27):**

Identify the individuals within the Department who had authority to bar contract workers from the HOC in June 2003.

**RESPONSE TO INTERROGATORY NO. 10 (continuously No. 27):**

Defendants Suffolk County and Suffolk County Sheriff's Department object to interrogatory No. 10 (continuously No. 27) on the grounds that Federal Rules of Civil Procedure 33 permits 25 interrogatories to be served upon parties. Plaintiff previously requested 18 interrogatories that were responded to by Defendants Andrea Cabral, Suffolk County Sheriff's Department and Suffolk County. Interrogatory No. 10 (continuously No. 27) is outside of the scope of discovery allowed under Rule 33 and therefore not applicable.

**INTERROGATORY NO. 11 (continuously No. 28):**

Identify the Department employee who was the source for the statement "Sheriff Cabral's administration says Porter's cooperation with the FBI – an outside agency – violated Department rules" contained in the August 25, 2004 WCVB television report on Mrs. Porter and the Department.

**RESPONSE TO INTERROGATORY NO. 11 (continuously No. 28):**

Defendants Suffolk County and Suffolk County Sheriff's Department object to interrogatory No. 11 (continuously No. 28) on the grounds that Federal Rules of Civil Procedure 33 permits 25 interrogatories to be served upon parties. Plaintiff previously requested 18 interrogatories that were responded to by Defendants Andrea Cabral, Suffolk County Sheriff's Department and Suffolk County. Interrogatory No. 11 (continuously No. 28) is outside of the scope of discovery allowed under Rule 33 and therefore not applicable.

Respectfully Submitted for Defendants
Andrea Cabral, Suffolk County Sheriff's
Department and Suffolk County

DATE: **8/15/05**

Ellen M. Caulo
BBO# 545250
Deputy General Counsel
Suffolk County Sheriff's Department
200 Nashua Street
Boston, MA 02114
(617) 989-6681

## VERIFICATION

I, Gerard Horgan, hereby state that the answers contained in the foregoing are true and correct to the best of my information and belief. To the extent the responses are not based on personal knowledge, they are based upon reasonable investigation of records in my possession, custody or control and upon information collected and made available to me by others.

Signed under the pains and penalties of perjury this 15th day of August 2005.

Gerard Horgan
Superintendent
Suffolk County House of Correction
Suffolk County Sheriff's Department

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a true and accurate copy of the foregoing Response to Plaintiff's Second Set of Interrogatories to be served upon all counsel of record by first class mail, postage prepaid, this 16th day of August 2005.

Ellen M. Caulo

# EXHIBIT 9



# Suffolk County Sheriff's Department



|                          |                          |
|--------------------------|--------------------------|
| Jail                     | House of Correction      |
| 200 Nashua Street        | 20 Bradston Street       |
| Boston, MA 02114         | Boston, MA 02118         |
| (617) 635-1100           | (617) 635-1000           |

**ANDREA J. CABRAL**
SHERIFF

September 7, 2005

David S. Schumacher, Esq.
Goodwin Proctor, LLP
Exchange Place
Boston, MA  02109

**RE:    Sheila J. Porter v. Andrea Cabral, et al., No. 94-11935-DPW**

Dear Attorney Schumacher:

I am writing in response to your correspondence dated August 25, 2005 identifying what you believed to deficient responses by Defendants Andrea Cabral, Suffolk County Sheriff's Department and Suffolk County to the Plaintiff's Second Request for Interrogatories, Second Request for Production of Documents and Request for Admissions.

**Documents Authored by Mrs. Porter in SID's Possession**

As stated previously, this request is unduly burdensome, overly broad and not reasonably calculated to lead to the discovery of admissible evidence.  SID does not file reports by the author of the report.  Without specific information relating to the identity of a particular investigation or instance in which the Plaintiff provided a written document to SID it is virtually impossible to locate any such reports.  Nor can the Defendants confirm that there are no additional documents responsive to this request.   Moreover, the time period encompassed by your request dates back to 1994, nine years before the relevant time period set forth in the complaint; a time period that includes two prior administrations in the Suffolk County Sheriff's Department.  Additionally, while the Defendants did locate and produce a document, see bate stamped: 001437, responsive to Request No. 18 (per our continuing obligation), it was not a document authored by the Plaintiff.

**Other Requests Related to Reporting**

As stated previously, Request No. 66 is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.  Your request is not narrowed in terms

of time period or the specific nature of the training provided. Further the Plaintiff has acknowledged her obligation to report allegations of abuse of inmates by officers to SID and to document an inmate's medical file. The Plaintiff has not asserted or alleged that her failure to document Rene Rosario's medical file with her observations, her failure to report Rene Rosario's allegations to SID immediately or her failure to provide a confidential written report in a timely fashion when requested was in any way related to training provided by the Department. Furthermore, the training that Sheriff Cabral testified about on p. 321 of her June 24, 2005 deposition concerned the nine-week training academy for new correction officers. The Plaintiff has failed to demonstrate how the training of new correction officers as described by Sheriff Cabral on p. 321 of her deposition is relevant to her claims against the Suffolk Defendants.

As stated previously, Request No. 71 is vague, unduly burdensome, overly broad and not reasonably calculated to lead to the discovery of admissible evidence. Your request is not narrowed in terms of time period or the types of incident reports sought. Further Mr. Dacey did not admit that there are incident reports in SID's control dated in the same way that SCSD employees allege that the Plaintiff dated her May 19, 2003 report. In response to the following question: "As to Exhibit 3 where you failed to change the date, how may other incident reports did you treat in a similar circumstance where you failed to change the date?" (Dacey Deposition p. 57), Mr. Dacey responded, "I would say minimal, few. I can't recall I wouldn't be able to give you an accurate number. I'd have to check my records and see if any of them still have the date that the report was initiated rather than when it was printed. Again, I'm not necessarily looking at the top of this report when I print out my reports." (Dacey deposition p. 57-58) To the extent that those reports exist and can be identified as such, there is simply no way of retrieving them from SID without examining each piece of paper in every investigation conducted by SID. Further, the Plaintiff has not demonstrated how these reports are highly relevant to the Plaintiff's claims particularly where she testified that she wrote and dated a report on Interdisciplinary Progress Notes on May 19, 2003 although she did not provide it to the Department on that date or on May 22, 2003 when she first spoke with Mr. Dacey. The Department did not receive the May 19, 2003 Interdisciplinary Progress Notes written by the Plaintiff until May 28, 2003.

As stated previously, Interrogatory No. 19 is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding these objections, the Defendants have responded fully and completely regarding how Microsoft Word affixed the date on the documents testified to by Sheriff Cabral and Brian Dacey.

As stated previously, Request No. 79 is not reasonably calculated to lead to the discovery of admissible evidence. The Defendants decline to allow counsel for the Plaintiff to conduct an inspection of Sheriff Cabral's computer, which is the only computer identified for inspection in Request 79.

As stated previously, SID does not file reports by the author of the report. Accordingly, the Defendants are unable to admit or deny the Request for Admissions Nos. 3, 5 and 6. Further, the Defendants do not agree that such information is relevant to the claims and defenses in this case.

## Employee Handbook and Collective Bargaining Agreement

Contrary to your assertion, the Defendants' objection to Request No. 61 which sought the production of the "collective bargaining agreement for Department employees for 2003" was not on the grounds that the Plaintiff was not a SCSD employee, although the evidence, including the deposition testimony of the Plaintiff and CMS Area-Vice President Ann Mack, clearly demonstrates that she was not. Rather, the Defendants' objection to Request No. 61 was premised on the fact that in 2003 there were seven different unions at the Department and six separate collective bargaining agreements. As the Plaintiff acknowledged in her deposition, she was not a member of any union at the Suffolk County Sheriff's Department nor was she a member covered by any of the collective bargaining agreements. Your request for the collective bargaining agreement that covers SCSD medical employees is similarly objectionable because the Plaintiff, by her own admission, was not a member of such collective bargaining unit. Further, the SCSD medical employees covered by such collective bargaining agreement work at the Nashua Street Jail and the Plaintiff never worked at the Nashua Street Jail. Regardless of your contention that the employment status of the Plaintiff is a question of law to be determined in this case, there is no dispute that she was not a member of any collective bargaining unit at the SCSD and therefore your request for the collective bargaining agreements for employees at the Suffolk County Sheriff's Department are not reasonably calculated to lead to the discovery of admissible evidence.

As stated previously, Request No. 60 (Employee Handbook) is not reasonably calculated to lead to the discovery of relevant evidence because the Plaintiff was an employee of Correctional Medical Services and not the Suffolk County Sheriff's Department. The evidence established thus far, in particular from the Plaintiff's own deposition and that of CMS Area-Vice President Ann Mack, clearly demonstrates that the Plaintiff was an employee of CMS, not the Suffolk County Sheriff's Department. Further, the Plaintiff was never provided with a Suffolk County Sheriff's Department Employee Handbook while she worked at the HOC. She was however provided with the CMS Employee Success Guide by her employer CMS. Nor has the Plaintiff in her deposition or interrogatory answers asserted that she relied on any provision of the Suffolk County Sheriff's Department Employee Handbook or that it is relevant to the allegations in her complaint.

**Policy Review Committee Minutes and Notes Related to Policy S220**

Request No. 62 sought policy review committee meeting minutes relating to the revision of Policy S220, "as described by Ms. Keeley at p. 156 of her May 11, 2005 deposition." Ms. Keeley did not, as you suggest, testify that Policy S220 would not have been amended without discussion. Rather, in response to your questions concerning the deletion of the "deeply held moral or religious convictions" clause of Policy S220 (Keeley deposition, p. 155), Ms. Keeley responded on p. 156 of her deposition, "[s]omething of that nature would have not just been deleted without discussion. I would have - we keep notes of our Policy Review meetings. I just don't recall. There are minutes of the meetings. I just don't recall the discussions on this." There are no policy review committee meeting minutes pertaining to the deletion of the "deeply held moral or religious convictions" clause in Policy S220. Further, there are no policy review committee meeting minutes pertaining to the revision of Subsection C, "Confidential Communications" as testified to by Ms. Keeley on p. 156 of her deposition. Defendants have

already produced Policy Review Committee Meeting Minutes pertaining to the revision of Policy S220, see documents bate stamped: 001183-001188.

As stated previously, Request No. 63 is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**Policy S220 Violations**

As stated previously, Request No. 64 is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. There is no dispute that the Plaintiff was not a member of any collective bargaining unit at the SCSD and therefore not entitled to the just cause protections set forth in the collective bargaining agreements. Contrary to your bald assertion, the Plaintiff has failed to demonstrate how discipline imposed on SCSD employees and collective bargaining unit members for unspecified violations of Policy S220 are relevant to the barring of the Plaintiff, a contract nurse and employee of CMS who was not a member of any collective bargaining unit at the SCSD. Further, Request No. 64 seeks confidential personnel information relating to individuals not remotely connected to this litigation.

Any purported relevance of Interrogatory No. 21 is completely attenuated by the failure to provide a reasonably limited time frame (ten years prior to the Plaintiff's barring includes two prior administrations of the Suffolk County Sheriff's Department) and the fact that the information sought relates to the SCSD employees and collective bargaining unit members, of which the Plaintiff is neither. Disciplinary decisions made by prior Sheriffs in prior administrations cannot be attributed to Sheriff Cabral. Furthermore, employee discipline is kept within an employee's personnel file. To the extent that the Plaintiff's request includes the names of employees who have received discipline for violating Policy S220, the Defendants object on the grounds of confidentiality. Finally, the spreadsheet was created from information that already existed, nor is there one category of S220 violations entitled "reporting."

**Code of Silence**

The Plaintiff's unsupported allegations in her complaint notwithstanding, nowhere in her deposition or her interrogatory answers does she assert that her failure to document Rene Rosario's medical records, failure to immediately report Rene Rosario's allegations to SID and failure to timely submit a confidential written report when requested were due to the existence of an undefined Code of Silence or her fear of retaliation. Further, the Plaintiff herself testified in her deposition that she wanted the confidential written report requested by Deputy Superintendent Mastrorelli to be provided to SID. The Plaintiff has also failed to demonstrate how the training of new correction officers as described by Sheriff Cabral on p. 321 of her deposition is relevant to her §1983 claim against the SCSD.

The Stern Commission issued a lengthy report concerning its review of the operations and management of the Suffolk County Sheriff's Department that identified a number of specific findings and recommendations. Those specific findings and recommendations concerned the following areas: organizational structure and management; policies, procedures and practices; physical plant and security issues; hiring, promotions and other human resource issues; labor-

4

management relations; financial management and fiscal controls; training; and internal and external accounting, the majority of which are completely irrelevant to the Plaintiff's allegations. Nor has the Plaintiff demonstrated how the Stern Commission Report or any of its findings and recommendations is relevant to the allegations in her complaint. Further Interrogatory No. 22 assumes that the Department is bound by the findings of the Stern Commission and that its report is admissible. As such it is the Defendants' position that the Plaintiff is not entitled to a description of steps taken by the Department to implement any of the Stern Commission's recommendations. Further, the specific recommendation of the Stern Commission pertaining to the Code of Silence is found in Section H. Accountability, 2. Internal Investigations, (8): "The Department should attempt to penetrate the existing code of silence at every turn." Without waiving these objections, or accepting the Stern Commission's findings regarding the "Code of Silence" the Defendants respond to Interrogatory No. 22 by referring the Plaintiff to pgs. 312-327 of Sheriff Cabral's deposition testimony.

Finally, to the extent that Request No. 70 has been narrowed to request documents relating to the review of SID by Viktor Theiss regarding "deficiencies within SID with respect to the ability of SCSD employees and contractors to report incidents," the Defendants fail to see how any purported deficiencies in SID identified by Viktor Theiss and Lieutenant Pierce in their transition review are relevant to the "ability of SCSD employees and contractors to report incidents." Nor has the Plaintiff alleged that purported deficiencies within SID were the reason that she did not report Rene Rosario's allegations immediately to SID. Further, the Plaintiff has failed to establish how the results of a review of SID conducted prior to the relevant time period of the allegations in the Plaintiff's complaint are relevant to her claims, particularly where the SID personnel who conducted the investigation into Rene Rosario's allegations and interviewed the Plaintiff were not included in that review nor were they even employed by the SCSD at the time of the review.

## Documents Relating to Mary Ellen Mastrorelli

The Plaintiff has completely failed to demonstrate how the personnel file of Ms. Mastrorelli, who is not a defendant in this litigation, which contains confidential and private information, is in any way related to the allegations in her complaint. Accordingly, the Defendants decline to produce it.

As stated previously, Request Nos. 72-76 are overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving these objections, Defendants will produce non-privileged documents within its possession, custody and control.

In response to Request No. 77, there are no documents concerning disciplinary measures taken against Ms. Mastrorelli within the Defendants possession, custody or control.

## Press Statements

The Defendants admit that they did not contact the Boston Globe concerning the publication of the statements set forth in (i) and (iii) of the Plaintiff's Request for Admissions No. 17. The

5

Defendants admit that they did not contact WCVB Channel 5 concerning its broadcast of the statements set forth in (ii) of the Plaintiff's Request for Admissions No. 17.

### Sheriff Cabral's Student Loans, Personnel Files, Separation from the Suffolk County District Attorney's Office and Campaign Material

The Plaintiff has completely failed to demonstrate how Requests Nos. 49-51 and Interrogatory No. 20 are reasonably calculated to lead to the discovery of admissible evidence. Request No. 49 concerns documents relating to defaults by Sheriff Cabral on her student loans which occurred over ten years ago and which have been completely repaid in full. Request No. 50 seeks written campaign material from Sheriff Cabral's 2004 campaign for Sheriff of Suffolk County, which commenced in 2004 subsequent to the Plaintiff's barring from the HOC. Request No. 51 seeks Sheriff Cabral's personnel file from the SCSD, which contains confidential and private information dating back to 1986. Similarly, Interrogatory No. 20 requested that the Sheriff describe in detail the circumstances surrounding her separation from the Suffolk County District Attorney's Office, which occurred more than one year before the relevant time period of the allegations in the Plaintiff's complaint and six months before Sheriff Cabral was sworn in as Suffolk County Sheriff. (The subject matter of Interrogatory No. 20 is the focus of a pending Motion to Quash a subpoena duces tecum issued by the Plaintiff to the Suffolk County District Attorney's Office seeking Sheriff Cabral's personnel file.) None of these requests are relevant to the Plaintiff's claim that she was illegally barred from the Suffolk County House of Correction on June 10, 2003. Contrary to the Plaintiff's assertion, whether Sheriff Cabral has "previously been accused of being less than truthful in other contexts" (notably what those other contexts are and when they occurred remain undefined), is not relevant to whether she testified truthfully concerning her reasons for barring the Plaintiff nor is it admissible evidence. Further the word "agenda" is hardly "a phrase that has racial overtones." Accordingly, the Defendants decline to produce this information.

### Personnel Files of Elizabeth Keeley and Viktor Theiss

The Plaintiff has completely failed to demonstrate how the personnel files of Ms. Keeley and Mr. Theiss, neither of whom is a defendant in this litigation, which contain confidential and private information are in any way related to the allegations in her complaint. Accordingly, the Defendants decline to produce them.

Very truly yours,

*Ellen Caulo*

Ellen M. Caulo


cc:     Alexandra B. Harvey, Esq.

# EXHIBIT 10

Sheila J. Porter                                05/18/2005

```
                                                        1
 1                              Volume:    I

 2                              Pages:     1-248

 3                              Exhibits:  1-5

 4              UNITED STATES DISTRICT COURT

 5          FOR THE DISTRICT OF MASSACHUSETTS

 6                      NO. 04-11935-DPW

 7   - - - - - - - - - - - - - - - - - - - - - x

 8   Sheila J. Porter,

 9                      Plaintiff,

10        v.

11   Andrea Cabral, Suffolk County

12   Sheriff's Department Suffolk County,

13   and Correctional Medical Services, Inc.,

14                      Defendants.

15   - - - - - - - - - - - - - - - - - - - - - x

16

17           DEPOSITION OF SHEILA J. PORTER

18              Wednesday, May 18, 2005

19                    10:10 a.m.

20     ADLER, COHEN, HARVEY, WAKEMAN & GUEKGUEZIAN

21                230 Congress Street

22            Boston, Massachusetts 02110

23

24   Reporter:   Lori-Ann London, RPR
```

Sheila J. Porter                                    05/18/2005

125

1    you were providing information to the F.B.I. on an

2    ongoing basis?

3        A    Mr. DeFazio came to me as a liaison

4    concerning Rene Rosario.

5        Q    Who was a liaison, you or Mr. DeFazio?

6        A    Mr. DeFazio.

7        Q    And what do you mean by liaison?

8        A    He was my contact person in case of

9    emergency during some meetings I had with Rene

10    Rosario.

11        Q    What do you mean by contact person in

12    case of emergency?

13        A    Excuse me?

14            (Witness and counsel conferring off

15            the record.)

16            MS. CAULO:  Let the record reflect

17    that Mrs. Porter is communicating with her

18    attorney.

19        A    During that time, I had been asked to

20    place a wire on Inmate Rosario, and I had an

21    emergency contact at the facility, and at least

22    one other, perhaps two other, SID people knew of

23    my existence and what I was doing, but Paul was

24    the name I had in case there was an emergency, in

Sheila J. Porter                                    05/18/2005

126

1   case there was a problem.

2        Q    Who asked you to con -- who asked you to

3   place a wire on Inmate Rene Rosario in November of

4   2002?

5        A    Krista Snyder.

6        Q    And who is she?

7        A    An F.B.I. agent.

8        Q    And you indicated earlier that initially

9   you were providing information to Maureen

10  Robinson.  When did you begin providing

11  information to F.B.I. Agent Krista Snyder?

12       A    They were frequently together.  Maureen

13  was part of it, but it happened that it was Krista

14  that I spoke to.

15       Q    Is it fair to say shortly after you

16  agreed to provide information on an ongoing basis

17  to the F.B.I. you were working with Maureen

18  Robinson and Krista Snyder from the F.B.I.?

19       A    Correct.

20       Q    So when did Krista Snyder contact you

21  regarding placing a wire -- and by a wire, you

22  mean recording device?

23       A    Yes.

24       Q    -- on Inmate Rene Rosario?

Sheila J. Porter                                    05/18/2005

177

1    Could you identify it again, please?

2        A    Mental Observation, A level.  A level

3    would be the top, where you have the johnny on,

4    you get the mattress taken away, no utensils, that

5    kind of thing.  The next level is B, MOB, and the

6    person can only be moved from A to B by a mental

7    health worker.

8        Q    And what did that mean if he was MOA?

9        A    That he was either homicidal or

10   suicidal.

11       Q    Now, while you were next to his cell

12   door looking through the window speaking to him,

13   what exactly does he tell you?

14       A    He told me that an officer had injured

15   him, and that he tried to get seen, that he tried

16   to get down to the medical housing unit to get

17   seen, and then he decided to say that he was

18   hearing voices and that he needed to go

19   downstairs, and -- I think he tried to get seen

20   first, and then he waited for the person he said

21   injured him to go to lunch, and then he told the

22   other officer that was still in the unit that he

23   was hearing voices and needed to go to mental

24   health.

215

1    did you -- when in time did you see Gayle Bartley?

2         A    I continued my journey to the ladies

3    room, came back and talked to Gayle Bartley.  Then

4    I -- well, I first had to find out who was on duty

5    in the infirmary, I told her, and I told Donna

6    Jurdak.

7         Q    Her, meaning Gayle Bartley?

8         A    Yes.

9         Q    Okay.  And after you -- how soon after

10   you told Gayle Bartley did you tell Donna Jurdak?

11        A    Immediately.

12        Q    What's immediately?  Can you give me a

13   time frame as to when this occurred on May 19th?

14        A    All before 1:00.

15        Q    You saw Mr. Rosario sometime between

16   12:30 and 1:00, and you spoke to Gayle Bartley and

17   you spoke to Donna Jurdak before 1:00?

18        A    Yes.

19        Q    What did you tell Donna Jurdak?

20        A    That Rene was back; that he was saying

21   he was injured by an officer; that he had a bruise

22   on his arm; that I had told Gayle -- that he had

23   come down on MOA; that I had told Gayle; and that

24   I needed to report it to somebody; and I wanted it

Sheila J. Porter                                    05/18/2005

226

1   made the decision to go above them because of past

2   experiences, and I wrote my report and I did not

3   call SID at that time.

4        Q    Okay.  And as part of your answer a few

5   moments ago, you indicated that you perhaps

6   expected Mary Ellen Mastrorilli to provide the

7   information to SID, perhaps to one or two of the

8   new investigators that had just come on board,

9   correct?

10       A    I thought she might, yes.

11       Q    And that would have been okay?

12       A    I was hoping it would be.

13       Q    In fact, that's where the information

14  should go, correct?

15       A    Yes.

16       Q    When did you -- you indicated that you

17  authored this document sometime in the afternoon

18  of May 19th?

19       A    Yes.

20       Q    Where did you do it?

21       A    In my office.

22       Q    At...

23       A    Suffolk County House of Correction.

24       Q    What did you do with it after you

Sheila J. Porter                                    05/18/2005

227

1    finished writing it?

2        A    I was going to give it to Donna, but she

3    had left the facility, so I put it in my briefcase

4    and took it with me.

5        Q    To home?

6        A    Yes.

7        Q    Why didn't you leave it on her desk or

8    in her office?

9        A    I didn't want to leave it anywhere.

10       Q    Why not provide it to Mary Ellen

11   Mastrorilli directly that day?

12       A    I had left it with Donna that she would

13   do it and that's what I --

14       Q    That she would do what?

15       A    That she would pass it on to Mary Ellen.

16       Q    Is it your testimony that you told Donna

17   you were going to write a report and that's what

18   she was going to provide to Mary Ellen?

19       A    She called Mary Ellen and told her what

20   I had -- and reiterated what I had told her.  Mary

21   Ellen asked her to have me write a report.  I was

22   already writing a report, but she passed that

23   information on to me, and so I said I would -- I

24   would get it to her.

Sheila J. Porter                                    05/18/2005

228

1      Q    Were you present during the conversation

2   that Donna Jurdak had with Mary Ellen Mastrorilli?

3      A    No.

4      Q    When after that phone conversation did

5   Donna Jurdak come to you and tell you that Mary

6   Ellen had requested a report?

7      A    Before she left the facility.

8      Q    Were you already in the process of

9   writing the report?

10     A    Yes.

11     Q    Did you ask her to wait and say, "I'm

12  almost finished with it.  I can give it to you in

13  a moment"?

14     A    No, I wasn't almost finished with it.

15  She had an appointment; she was leaving.

16     Q    Once you finished the report -- strike

17  that.

18          You were aware then on the 19th,

19  according to your testimony, that Mary Ellen

20  Mastrorilli had requested a written report?

21     A    Yes.

22     Q    So why once you finished it didn't you

23  bring it to where Mary Ellen Mastrorilli's office

24  was?

Sheila J. Porter                                      05/18/2005

229

1      A     It didn't occur to me.

2      Q     Had you ever provided reports to Mary

3    Ellen Mastrorilli before?

4      A     No.

5      Q     Did you know who she was?

6      A     Yes.

7      Q     Had you had conversations with her about

8    your responsibilities and her job before?

9      A     Yes.

10     Q     So there's nothing that prevented you

11   from providing that written document to her on

12   May 19th, right?

13     A     No.

14     Q     Okay.  When did you give this document

15   to Donna Jurdak?

16     A     I honestly am not sure.  Before the end

17   of the week is all I can tell you.  By Friday I'm

18   not sure we didn't cross paths for one reason or

19   another, and I know she had it by Friday.  I can't

20   tell you whether it was Thursday or Friday.

21     Q     What day of the week was that; do you

22   know?  What number day?  This was on the 19th.

23   When --

24     A     I think the 19th was a Monday.

234

1    Q    Okay. Well, have you used that term
2  before?
3    A    I have no idea.
4    Q    Mrs. Porter, when did you -- when did
5  you call the F.B.I. regarding the information that
6  Rene Rosario had provided to you?
7    A    Probably on the 19th.
8    Q    When you say probably, could it have
9  been the 20th?
10    A    I think I made the phone call on the
11  19th, but I didn't talk to anyone.
12    Q    When did you talk to someone regarding
13  the allegations that Mr. Rosario had made to you?
14    A    I think the 20th.
15    Q    And whom did you speak with?
16    A    Krista.
17    Q    Krista Snyder?
18    A    Um-hm.
19    Q    How did you contact them?
20    A    Phone.
21    Q    What did you tell them?
22    A    What Rene told me.
23    Q    Had you already completed the document
24  that's been identified as Exhibit No. 5?

Sheila J. Porter, Vol. 2                                      05/26/2005

295

1     A    I had the feeling that the interview was

2  not about my report.

3     Q    Why did you have that feeling?

4     A    As I said, their demeanor changed; they

5  both leaned forward; they were asking me not about

6  Rene, but about conversations with the F.B.I.

7     Q    Had they finished asking you about Rene

8  Rosario and your interaction with him on the 19th?

9              MR. SAVAGE:  Objection.

10    A    The questioning changed.

11    Q    Was there any additional information

12  that you had about Mr. Rosario that they didn't

13  ask you about?

14    A    Yes.

15    Q    What was that?

16    A    How is he.

17    Q    They didn't ask you how he was?

18    A    No.

19    Q    You had seen him on the 22nd and he was

20  fine; is that right?

21              MR. SAVAGE:  Objection.

22    A    Yes.

23    Q    When they asked you whether or not you

24  had called Krista, where were they in the room?

Sheila J. Porter, Vol. 2                                    05/26/2005

296

1          A    Across from me at the table.

2          Q    Were they still seated?

3          A    Yes.

4          Q    Describe to me how their demeanor

5     changed.

6          A    I specifically recall Brian leaning

7     forward and asking me in a different tone, "And

8     when did you first call Krista?"   (Demonstrating.)

9          Q    What was his tone of voice before he

10    asked that question?

11         A    Conversational, information seeking.

12         Q    And what was his tone when he asked you

13    whether or not you had called Krista?

14         A    I felt, threatening.

15         Q    I didn't ask you how you felt.  I asked

16    you what his tone was.

17              MR. SAVAGE:  No, she answered the

18    question.

19         A    I felt that that was the tone,

20    threatening.

21         Q    Did he raise his voice?

22         A    No, he lowered it.

23         Q    Did he yell?

24         A    No.

# EXHIBIT 11

# Suffolk County Sheriff's Department
## Sheriff's Investigation Division (SID)
## Incident Report

Page 1 of 2

| | |
|---|---|
| SID Incident #: | N/A |
| Date of Incident: | 5/23/03 |
| Time of Incident: | Approx. 1330 hours |
| Incident Location: | HOC |
| (HOC, NSJ, or Other) | |

| | |
|---|---|
| Reporting Investigator: | Stan Wojtkonski |
| Type of Incident: | Phone conversation |
| Investigation # (if any): | N/A |
| Date Report Filed: | 5/23/03 |

**Unit or Street Address:**

SID Office via phone

**Other SID Investigators Involved:**

Brian Dacey, Stephen Jacobs, Russell Roberts

**SCSD Staff Members Involved:**

N/A

**Inmates Involved:**

R▮▮▮▮▮, #▮▮▮▮▮▮▮

**Narrative**

On May 23, 2003, at approximately 1330 hours, Investigator Russell Roberts informed Investigator Wojtkonski that he had Special Agent Crysta Snyder on the line, and she wished to speak with him. Investigator Wojtkonski got on the phone with S/A Snyder, who asked him for an update on the investigation looking into I/M ▮▮ R▮▮▮▮'s complaint of being assaulted by a corrections officer on 5/19/03. Investigator Wojtkonski informed her that two SID investigators had been working on the case for the past several days. She was also informed that I/M R▮▮▮▮ was interviewed by SID investigators on 5/22/03, and pictures of his injuries were taken. At this time, S/A Snyder was informed that investigators had not found the injuries that her confidential source had reported to her, on the throat and chest of I/M R▮▮▮▮. Investigator Wojtkonski informed S/A Snyder that the evidence gathered so far, including the injuries that were photographed, did not seem to correspond to I/M R▮▮▮▮'s statement that he was kicked. S/A Snyder was notified that investigators were continuing to interview witnesses, and should have results from the investigation next week.

Investigator Wojtkonski also notified S/A Snyder that a possible complication of this investigation had arisen. On 5/21/03, S/A Snyder had notified Investigator Wojtkonski that a member of the Suffolk County Sheriff's Department had witnessed a physical examination of I/M R▮▮▮▮ on 5/19/03 and reported to the FBI that these injuries did not look like they were self inflicted. The confidential source had notified the FBI that an officer could have caused them. Investigator Wojtkonski told S/A Snyder that no members of the nursing staff had submitted reports to SID concerning injuries that had been incurred by I/M R▮▮▮▮. S/A Snyder stated that when the medical staff member reported the incident to her, she assured the medical staff person that she would notify SID. However, S/A Snyder maintained that she could not reveal to Investigator Wojtkonski the identity of this medical staff member due to confidentiality. Investigator Wojtkonski explained that if this was the case, then there were several members of the medical staff that had failed to report these injuries to SID. Furthermore, the one person who seems to have reported it

Reporting Investigator's Signature            Date

Supervisor's Name and Signature          Date

Narrative

to the FBI, and was told that there complaint would be forwarded to SID, cannot be substantiated because of FBI confidentiality. Investigator Wojtkonski assured S/A Snyder that no staff member would ever be hindered from speaking with an outside law enforcement agency, but speaking with an outside agency does not absolve a staff member of his or her responsibility to report incidents directly to the Sheriff's Department and SID. S/A Snyder assured Investigator Wojtkonski that if confidential sources contacted her regarding other matters, she would make sure to inform them to also report the incident directly to the Sheriff's Department. END REPORT.

# EXHIBIT 12





**SHERIFF'S INVESTIGATION DIVISION**

# Memo

To:      I/M R██████ ████████ FILE

From:  Investigator Sonya Aleman

Date:   May 29, 2003

Re:      May 28, 2003 Interview of Sheila Porter, Nurse Practitioner (Second Interview)

On Wednesday, May 28, 2003 at approximately 11:15 a.m., Investigator Brian Dacey and I met with Sheila Porter, NP in the SCHC SID Office. This was our second interview with Ms. Porter, the first being on Thursday, May 22, 2003. The purpose of this interview was to have a follow-up conversation in regards to her written account of the I/M R███ incident. SID received her report earlier that same day.

We asked Ms. Porter to give us an account of her involvement with I/M R████ on Monday, May 19, 2003. She knew that I/M R████ was coming to the Infirmary, and once in the Unit, he made eye contact with her. Ms. Porter commented that "R██ looks totally different when he hears voices", and that she began to wonder if in fact something else was going on. She explained to us that "when an inmate's hearing voices, he doesn't look at anyone except over their shoulders [to where the voices are coming from]."

It was not until Ms. Porter returned from lunch, approximately 12:30 – 1:00 p.m., that she spoke with I/M R█████. Ms. Porter stated that she never entered I/M R████'s cell and that the entire conversation took place through the window on the door. I/M R█████ told Ms. Porter that he was afraid, wanted "outta there", and that he had purposely waited for the Officer (who had allegedly asaulted him) to go to lunch before telling the other Officer that he was hearing voices. I/M R█████ had never told her specifically what had happened to him, only that he had been assaulted by a "C/O" and that the "C/O" hurt him. Ms. Porter had heard from other people what had happened and that the officer had called him a "snitch", although no one told her whom exactly it was. Ms. Porter's explanation for not knowing any detailed information was because she opposed having the SERT Team escort her into I/M R█████'s cell, due to his MOA Status.

I/M R█████ exposed his bruises to Ms. Porter by removing his "johnny" from his left shoulder and
Bicep area. We asked her to explain to us in detail what she observed. Ms. Porter stated that she had observed a bruise on the left upper chest/shoulder/bicep area. She commented that part of the bruise that extended from his upper arm was, "contiguous to his bicep". The bruise was as if, "somebody grabbed him...a hard grab or kick with force and almost abraded...not bleeding but close", similar to an Indian burn. As far as the placement of his injury, it did not make her think that it was self-inflicted. Ms. Porter informed us that the above observations were done "informally" and therefore not documented.

We asked Ms. Porter if I/M R█████ had mentioned anything to do with Captain Scoby, and she replied, "No." She added that, "He doesn't know the name of the person who assaulted him. He usually says if it's a white shirt or a blue shirt...all he knows is that it was a C/O."

Ms. Porter then approached Gayle Bartley, a Mental Health worker regarding I/M R█████. She stated to Ms. Bartley, "I think there's more to this story...if you need anymore information, come talk to me." Ms. Porter expressed to us that "there's something going on".

Ms. Porter spoke to Donna Jurdak, Medical Services Administrator, around the same time period. According to her, Ms. Jurdak knew some of the history between her and I/M R█████. Ms. Jurdak was also aware that Ms. Porter was not comfortable with giving her report to SID. As a result, Ms. Jurdak took her written report directly to Mary Ellen Mastorilli, Deputy Superintendent of Support Services. Ms. Mastorilli took all pertinent information from Ms. Jurdak. In the meantime, according to Ms. Porter, I/M R█████ had spoken to Craig Meekins, LPN. He, in turn had Beth Bringola, PA conduct I/M R█████'s formal examination. Ms. Porter's informal examination had been done independently of this one. We inquired as to why I/M R█████'s alleged injury to his left chest/shoulder area had not been mentioned in Ms. Bringola's report. Ms. Porter stated that Ms. Bringola saw I/M R█████'s arm and not his chest/shoulder area.

Ms. Porter was then asked if she knew when Krista Snyder from the F.B.I was contacted. She replied, "Why do you ask? Did I say that I knew Krista or ever contacted her?" We replied that Ms. Snyder had been in contact with our office. In addition, due to the fact that there were no medical reports written by her in I/M R█████'s file and the manner in which she had approached us on Thursday, May 22nd in the Medical Unit, the connection became clear. Ms. Porter stated that the call was placed outside of this facility, between 4:30 p.m. and 5:00 p.m., on Monday, May 19, 2003. There was even a possibility that the call was made the following day. When asked why she notified the F.B.I and not SID, Ms. Porter answered that there was a, "lack of trust here at SID" and so she decided to contact Ms. Snyder.

000643

We asked Ms. Porter to elaborate on this. She told us that she used to have a contact here at SID, but then their professional relationship went sour. He was laid off, was re-hired, and currently works in the Education Department. Ms. Porter said, "There's a lot of old stuff..." in terms of her involvement with I/M R████ and SID. According to her, I/M R████'s last incident occurred sometime in the Summer of 2002. It was an issue that had to do with the Nashua Street facility. In regards to the allegations that I/M R████ was making, Ms. Porter stated, "R███ should never have come here" and "If the job were done, he [I/M R██████] would not be here."

We were notified that I/M R██████ had been placed in the Infirmary again on Friday, May 23 until today's date. During this last visit, he asked Ms. Porter if "they were going to get him outta here?" Ms. Porter clarified "outta here" to mean anywhere other than South Bay or Nashua Street. She went on to state that I/M R██████ was not asking to be released, only to be transferred. She ended by commenting that I/m R██████ "...certainly was not crazy right now; I've seen him so."

Investigator Dacey has read and reviewed the above report. He has found it to be a true and accurate summary of events. End of report.