# EXHIBIT 13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

VOL:  I
PAGES: 1-247
EXHIBITS: 1-7

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * *
SHEILA J. PORTER,                    *
              Plaintiff              *
        -vs-                         *     Civil Action
ANDREA CABRAL; SUFFOLK COUNTY        *     No. 04-11935-DPW
SHERIFF'S DEPARTMENT; SUFFOLK        *
COUNTY and CORRECTIONAL MEDICAL      *
SERVICES, INC.,                      *
              Defendants             *
* * * * * * * * * * * * * * *

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

    DEPOSITION OF VIKTOR THEISS, ESQUIRE, a witness
called on behalf of the Plaintiff, in the
above-captioned matter, said deposition being
taken pursuant to the Federal Rules of
Civil Procedure, before Patricia M.
McLaughlin, a Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the offices of Goodwin Procter
LLP, Exchange Place, Boston, Massachusetts, on
Tuesday, May 24, 2005, commencing at 10:05 a.m.

McLAUGHLIN & ASSOCIATES COURT REPORTERS
92 DEVIR STREET, SUITE 304
MALDEN, MASSACHUSETTS  02148
781.321.8922
WWW.E-STENOGRAPHER.COM

1          just won't have enough evidence to meet that

2          bar to face an arbitration.

3     Q    If the investigator concludes that there are

4          insufficient facts to sustain the allegation,

5          is that the end of it essentially?

6     A    Correct.

7     Q    Do you have the right to overturn that

8          conclusion?

9     A    Who?

10    Q    Do you have authority to overturn that

11         conclusion?  Can you read a report and say,

12         oh, I think he got on it wrong?

13    A    Absolutely.

14    Q    Take another look at it?

15    A    Correct, and I meet weekly with the Chief of

16         Staff to update our investigations, and we go

17         over kind of our findings.

18    Q    If you could estimate, how many case

19         summaries, say, a month are prepared?

20    A    Five or six a month.

21    Q    If the investigator concludes that there are

22         sufficient facts to sustain the allegation,

23         what happens next?

24    A    In consultation with the Chief of Staff,

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

# EXHIBIT 14

**Page 1**

VOL: I
PAGES: 1-217
EXHIBITS: 1-14

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * *

SHEILA J. PORTER,         *
          Plaintiff      *
     -vs-                 *   Civil Action
ANDREA CABRAL; SUFFOLK COUNTY   *   No. 04-11935-DPW
SHERIFF'S DEPARTMENT; SUFFOLK   *
COUNTY and CORRECTIONAL MEDICAL *
SERVICES, INC.,          *
          Defendants     *

* * * * * * * * * * * * * * *

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

DEPOSITION OF BRIAN DACEY, a witness
called on behalf of the Plaintiff, in the
above-captioned matter, said deposition being
taken pursuant to the Federal Rules of
Civil Procedure, before Patricia M.
McLaughlin, a Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the offices of Goodwin Procter
LLP, Exchange Place, Boston, Massachusetts, on
Thursday, June 16, 2005, commencing at 10:10 a.m.

McLAUGHLIN & ASSOCIATES COURT REPORTERS
92 DEVIR STREET, SUITE 304
MALDEN, MASSACHUSETTS 02148
781.321.8922
WWW.E-STENOGRAPHER.COM

**Page 2**

APPEARANCES:

JOSEPH F. SAVAGE, JR., ESQUIRE

     and

ANTHONY A. ORLANDI

GOODWIN PROCTER LLP

Exchange Place

Boston, Massachusetts 02109

     On behalf of the Plaintiff

ELLEN CAULO, ESQUIRE

GENERAL COUNSEL

Suffolk County Sheriff's Department

200 Nashua Street

Boston, Massachusetts 02114

     On behalf of the Defendants,

     Andrea Cabral, Suffolk County

     Sheriff's Department and Suffolk

     County

JENNIFER A. NORTON, ESQUIRE

ADLER, COHEN, HARVEY, WAKEMAN & GUEKGUEZIAN

230 Congress Street

Boston, Massachusetts 02110

     On behalf of the Defendant,

     Correctional Medical Services, Inc.

**Page 3**

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| BRIAN DACEY | | | | |
| By Mr. Savage | 5 | | | |

**Page 4**

| No. | Exhibit | Page |
|---|---|---|
| 1 | Stern Commission Report | 5 |
| 2 | Memorandum dated June 10, 2003 | 20 |
| 3 | Incident Report dated May 19, 2003 | 45 |
| 4 | Documents Bates stamped Nos. 000633 and 000634 | 56 |
| 5 | Memorandum dated May 22, 2003 | 69 |
| 6 | Memorandum dated June 5, 2003 | 78 |
| 7 | Memorandum dated June 5, 2003 | 84 |
| 8 | SID Incident Report dated May 22, 2003 | 92 |
| 9 | Interdisciplinary Progress Notes | 113 |
| 10 | Memorandum dated May 29, 2003 | 122 |
| 11 | Memorandum dated June 4, 2003 | 161 |
| 12 | Medical Records, consisting of four pages | 174 |
| 13 | Handwritten notes | 193 |
| 14 | Memorandum dated May 23, 2003 | 211 |

**49**

accurate listing of the staff members that
you knew to be involved on May 19th, 2003?

A   Correct.  On May 19th, 2003, the only staff
members that I knew were to be involved were
the medical staff that I had observed when I
observed the medical records and Mark
DeAngelis, who was the unit officer.  I
believe I learned from the logbook in the
medical unit who had transported
Inmate Rosario down to the medical unit.

Q   So now, it's your best memory that you know
for a fact that the date that this report was
filed was not May 19th?

A   No, I'm going to change that.  It probably
was filed on that May 19th, yet I know I
added names after May 19th to be inclusive of
our entire investigation, who was involved as
far as staff members went.  So those names
could have been added at a later date.  Such
as Robert Murphy and Scott Smith on May 19th,
I didn't necessarily know that they were
involved, as well as Nurse Sheila Porter
because her name was not in any medical
record.

**50**

Q   So you went back and altered this after you
filed it on May 19?

MS. CAULO:  Objection.

A   I didn't alter it.

Q   You added to it?

A   I added staff members involved to be
inclusive.

Q   Is there an earlier version of this that was
prepared on May 19th that has no entry for
staff members involved?

A   An earlier printed version?

Q   Yes.

A   No.

Q   When was the first time that this was
printed?  By this, I mean Exhibit 3.

A   Probably at the end of our investigation.

Q   So the first time that this document was
printed would be sometime in June of '03?

A   At the end of May, early June.

Q   But the date that it reflects that it was
filed is May 19th of '03?

A   The date that it was filed is the date that
it was opened.  This report was generated on
the 19th on my computer.  Names were added at

**51**

1   a later date as I learned all the staff
2   members who had been involved.

3   Q   When is the last date that you added
4       information to this report after May 19th?

5   A   Again, it would have been at the end of our
6       investigation, which would have been at the
7       end of May or early June.

8   Q   So you were adding information to this report
9       in late May and early June?

10  A   Just adding the other staff members that we
11      learned who had had contact with
12      Inmate Rosario.

13  Q   Looking at this document as it is, where it
14      says the date the report is filed, what does
15      it mean to file a report?

16  A   Again, we didn't have a folder for each case
17      at that time.  This was on my computer until
18      the end of our investigation when everything
19      was printed out.

20  Q   What does it mean to file a report?

21  A   Generally or as part of the department?

22  Q   If those are different, why don't you tell me
23      both?

24  A   I'm just talking -- I don't know generally in

**52**

1   your business what you do.  The date the
2   report filed, again, this was a new form that
3   was created.  It wasn't filed anywhere.  This
4   was on our computer.  It was a working
5   investigation.

6   Q   Would you agree with me that someone reading
7       this report and seeing "date report filed"
8       and then reading information below it would
9       reasonably conclude that that was the
10      information known on the date that the report
11      was purportedly filed?

12  A   Someone might, yes.

13  Q   When you say someone might, wouldn't you
14      think virtually everyone would?

15      MS. CAULO:  Objection.  You may answer.

16  A   I don't know.

17  Q   Is there any indication on this document that
18      would make someone think that any information
19      was added after May 19th?

20  A   Is there any indication?  I'm sorry.

21  Q   On this document that there is any
22      information contained within the document
23      that was added after May 19th?

24  A   There is no indication, no.

77

know?

Again, the narrative portion of what we had learned from Inmate Rosario is the part of that I'm saying that it's a true and accurate summary.

Q    Which pages or paragraphs of 635 through 637 of Exhibit 5 are you saying you meant to say were true and accurate?

A    The parts where I --

Q    Just tell me which parts. It's in front of you. Just go through and tell us which parts.

A    How do you want me to characterize it?

Q    Say Page 1, 2, 3, Paragraphs 10, 12 and 15, however you are comfortable.

A    The third paragraph, I was there. When I left the room in that fourth paragraph, I didn't hear that question. The photographing, I was present for, and the following, "We asked Inmate Rosario to begin his account from the day he arrived." It's the second page, third paragraph, "We asked Inmate Rosario to begin his account from the day he arrived."

78

Again, I think I've said consistently that the part where Inmate Rosario offered information summarizing his alleged assault is the part of the summary of the true and accurate summary of events.

Q    Do you know how long the interview with Mr. Rosario took?

A    No, I don't.

Q    Did there come a later point at the end of May when you interviewed Miss Porter?

A    We interviewed her two times.

Q    And the second time, how long did that interview take?

A    I don't recall.

Q    Give me your best estimate sitting here.

A    Maybe 15, 20 minutes.

Q    Is it longer or shorter than this interview of Mr. Rosario?

A    I recall this being long because -- Rosario's being long, because initially he had refused to talk to us. We took two sets of photographs. This was much longer. Rene Rosario's interview was much longer.

(Document marked Exhibit No. 6.)

79

1    Q    I show you what's been marked as
2         Exhibit No. 6 and ask you if you recognize
3         that document.
4    A    Yes, I do.
5    Q    What do you recognize it to be?
6    A    A memo outlining our investigation,
7         Investigator Sonya Aleman and my
8         investigation, of Craig Meekins, LPN, on May
9         22nd, 2003.
10   Q    Did you accurately reflect what Mr. Meekins
11        said to you on May 22nd, 2003, in this
12        report, which is Exhibit No. 6?
13   A    I believe so, yes.
14   Q    Now, this is an interview that occurred on
15        May 22nd, but you didn't prepare the report
16        until June 5th?
17   A    That's what I have dated, yes.
18   Q    We know your dates aren't accurate. So what
19        I'm wondering is: Did you prepare this
20        report --
21        MS. CAULO:  Objection.
22   Q    Strike that. What date did you prepare this
23        report?
24   A    I prepared this report, I believe, right

80

1         after I spoke to Nurse Meekins.
2    Q    Right after as on May 22nd?
3    A    Correct.
4    Q    Then why is it dated on June 5th?
5    A    As you can see by the date, 06/05/03, that
6         changes the date. It automatically changes
7         the date unless you cross that out and type
8         in the dates. So when I printed that on
9         June 5th, 2003, that is why that date
10        reflects it.
11   Q    So you say there is an automatic device that
12        prints on the to-from memos records the date
13        as the date the document is printed?
14   A    If I change the date, then it will reflect
15        that date, but I have no way of knowing. I
16        know I wrote this report before 6/5/03.
17   Q    Going back to Exhibit 3 --
18   A    That does not change.
19   Q    I take it that your --
20   A    That does not automatically change.
21   Q    The technology does not automatically change
22        the date and the date filed?
23   A    Not on that incident report, no.
24   Q    So it's impossible to tell from Exhibit 6

# EXHIBIT 15

# Memorandum

**To:**     File

**CC:**    Elizabeth Keeley

**From:** Sheriff Andrea Cabral

**Date:** 6/18/03

**Re:**    Conversation with United States Attorney Michael Sullivan



---

On Monday, June 16th, I, Chief of Staff Elizabeth Keeley and SID Director Viktor Theiss met with United States Attorney Michael Sullivan, First Assistant Gerard Leone, Public Corruption Unit Chief Steve Huggins, FBI Supervising Agent Ken (last name not recalled), and a fourth man whose name I also cannot recall, but who I believe is also affiliated with the FBI. On June 18, 2003, I received a message that United States Attorney Michael Sullivan had called with a request that I call him back. To the best of my recollection, I returned his call at approximately 4:00 p.m., after I returned to the House of Correction from the Nashua Street Jail.

For the purpose of clarity, the following should be noted: In the course of the June 16 meeting, which lasted two hours, among many other statements, comments and questions was the disclosure by Steve Huggins that he had send FBI Agent Maureen Robinson to the South Bay House of Correction several days earlier to investigate a possible violation of a federal statute making it a felony for an employer to punish someone because s/he has spoken to the FBI. When she came to the House of Correction, Maureen Robinson had Sheila Porter with her. Ms. Porter had already been banned from the Department and Agent Robinson stated that she was there to interview Porter's supervisor, Donna Jurdak.

When I first questioned Huggins as to why Robinson would have ever thought it was appropriate to bring Porter into the facility, Huggins responded that Porter was there to help Robinson get her personnel file. I stated to Huggins that a simple written request and release from Porter would have resulted in the file being readily turned over and would have avoided the significant issues created by Porter's appearance in the facility in the company of an FBI agent who showed her badge and immediately identified herself. Huggins had no response as to why the former tact was not taken.

1

*November 6, 2003*

It was not until later in the conversation – in anger – that he disclosed the real reason for Robinson's appearance. It remains quite unclear to me how Huggins and Robinson could have reasonably believed Porter's presence was necessary or appropriate to an FBI agent's investigation of a possible felony complaint.

In the June 18th call, U.S. Attorney Sullivan stated that the FBI wanted to do follow-up interviews with Donna Jurdak, a CMS contract staffer and Deputy Superintendent of HOC Program Services Mary Ellen Mastrorilli. Jurdak was the supervisor of former CMS contract nurse Sheila Porter and Mastrorilli had the conversation with Nurse Porter wherein she was informed that she would no longer be assigned to the Suffolk County Sheriff's Department. U.S. Attorney Sullivan asked if I had a problem with either woman being interviewed (or re-interviewed in the case of Jurdak.) I told him I did not and took no position either way as the decision to consent to the interview rested solely with each individual. I told Sullivan that we had specifically declined to advise Donna Jurdak several days prior when she called seeking guidance as to whether she should speak with FBI Agent Robinson.

U.S. Attorney Sullivan stated that because Nurse Porter was an FBI informant and information disclosed by us in the June 16th meeting had called her credibility into question, the FBI was interested in "protecting her" and wanted to see if there was any corroboration of Porter's complaint to the FBI that the cancellation of her assignment to the Department was due to the fact that she had provided them with information.

(It should be noted that in the June 16th meeting, I, Chief of Staff Keeley and SID Director Theiss discussed issues of Porter's credibility that arose in SID's investigation of an inmate allegation that he had been struck by an officer. These credibility issues were discussed because Porter was initially described by the U.S. Attorney – in response to a direct question - as being the sole source of information that the Department was "punishing" those who spoke with the FBI. In fact, it was this allegation that apparently led to the meeting being scheduled.)

I expressed my surprise at his statement as I thought we had made it clear the previous day that Nurse Porter had been removed for other reasons, but stated that the FBI could conduct whatever consensual interviews they saw fit.

U.S. Attorney Sullivan stated that he had three options: 1) To let the matter drop; 2) to conduct further interviews that either would or would not bolster Nurse Porter's credibility; or, if potential interviewees declined to be interviewed, to 3) convene a Grand Jury into the matter.

I then expressed my "shock" that a Grand Jury would even be considered on such a matter. I told Sullivan that it would be unprecedented in my 15 years

2

001051

November 6, 2003

experience as a former prosecutor for the U.S. Attorney and the FBI to convene a grand jury, ostensibly for the purpose of investigating a potential felony, but in reality for the purpose of protecting and preserving an informant's credibility for future cases. U.S. Attorney Sullivan stated that the FBI has a history of vigorously protecting its informants – sometimes to its own detriment. I responded that their zealousness was legendary and because of that, I was extremely concerned about the direction this matter was taking. I assured Sullivan that my concern was not at all due to any belief or even apprehension that Porter had been told by DS Mastrorilli she was being moved out because she spoke with the FBI, but because of the unprecedented nature of the investigation.

I then asked Sullivan outright to confirm my suspicion that this had nothing to do with the FBI's ability to investigate an inmate complaint, but strictly concerned Porter. He confirmed. I then stated that he clearly intended to make the Department a target of a grand jury inquiry if staff did not agree to be interviewed. Sullivan responded that he "would not call the Department a target just yet." I stated that it clearly could become one in short order and again expressed my shock that such lengths would be taken and contemplated to protect an informant's credibility. I also stated that I could only assume that Sheila Porter was very central to some investigation, that the approach being taken was highly unusual and that I would appreciate being told what the real story was. Sullivan stated that it had nothing to do with anything except the FBI's desire to protect Sheila Porter. (Though I did not say it, I found the fact that Sullivan himself called quite unusual.)

I also stated to Sullivan that, since the decision to end Porter's assignment was mine and something for which I would readily take responsibility, I would naturally be an individual target of any investigation. He did not dispute my perception, but reiterated that he would not use the word "target."

The conversation then turned to the June 16th conversation and the stated assurances by Supervising FBI Agent Ken (last name not recalled) that he would always keep me informed about any ongoing investigations involving the Department, that he wanted to freely exchange information and maintain a healthy professional relationship. I questioned the impact of Sullivan's disclosures on that relationship. Sullivan stated that he did not see the Department's status as a potential target of a federal grand jury inquiry as an impediment to good relations.

I then stated to Sullivan that, while I had not said so at the meeting, I felt strongly that many of the comments from Steve Huggins and the Supervising FBI Agent were condescending and patronizing. (I made it clear to Sullivan that I was speaking only about Huggins and the Supervising FBI Agent and that I had discerned nothing but courtesy and calm from him, Leone and the third FBI representative.) I cited several examples. I stated that I was not the only one who noticed it and I questioned whether a different sheriff would have been spoken to in

3

001052

November 6, 2003

such a manner. Sullivan stated that the tone of the conversation had been the subject of some subsequent "internal discussion." While he stated he would leave Ken's apology for him to give, Sullivan apologized for Huggins' behavior, saying it was not the first time he had behaved or spoken inappropriately. I told Sullivan that the totality of the circumstances were of concern to me as they indicated zealousness and not objectivity.

Sullivan asked whether Jurdak and Mastrorilli should be contacted through me. Given our earlier conversation regarding my status as a potential target, I thought the question odd. I told him the FBI could contact them directly. He also asked if SID interviewed Donna Jurdak. I did not know and so stated. He asked if I would find out and provide any written reports to the FBI. I told him I thought it was an inappropriate request given the nature of the investigation, its goal of protecting Sheila Porter's credibility and my apparent status as a potential target.

We ended the conversation with the customary pleasantries.

4

# EXHIBIT 16



**SHERIFF'S
INVESTIGATION
DIVISION**

# Memo



To:      I/M R███ █████████ FILE

From:  Investigator Brian Dacey

Date:   06/05/03

Re:      May 22, 2003 Interview of Craig Meekins, LPN

---

On Thursday, May 22, 2003, Investigator Sonya Aleman and I interviewed nurse Craig Meekins, L.P.N. in the Infirmary concerning his knowledge of the alleged assault upon inmate R███ R████ by an unidentified correction officer on May 19, 2003.

Nurse Meekins reported to Investigator Aleman and me that he saw Inmate R███ █████████ on May 19, 2003 at approximately 12:00 noon when he was brought from the 1-4-2 unit to the Infirmary and placed on M.O.A. status.  R█████ told Meekins that he had had a problem with an officer in the unit and that he wanted to speak with S.I.D.  R█████ complained of pain to his left arm only and to nowhere else.  Meekins stated that the only injury he observed was a bruise on R█████'s left bicep.  Meekins then had Physician's Assistant Beth Bringola examine R████'s arm.  Meekins then reported to C/O DeAngelis, who was assigned to the infirmary's front desk, that Inmate R████ wished to speak with SID investigators.  DeAngelis phoned S.I.D. End of Report.

Investigator Sonya Aleman has read and reviewed the above report.  She has found it to be a true and accurate summary of events.

000638

# EXHIBIT 17

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHEILA PORTER,<br><br>       Plaintiff,<br><br>v.<br><br>ANDREA CABRAL, SUFFOLK COUNTY<br>SHERIFF'S DEPARTMENT, SUFFOLK,<br>COUNTY and CORRECTIONAL<br>MEDICAL SERVICES, INC.,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)   CIVIL ACTION NO. 04-11935 DPW<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF'S REQUESTS FOR ADMISSIONS TO DEFENDANTS ANDREA CABRAL, SUFFOLK COUNTY SHERIFF'S DEPARTMENT AND SUFFOLK COUNTY

Pursuant to Rule 36 of the Federal Rules of Civil Procedure Plaintiff Sheila Porter ("Mrs. Porter") submits to Defendants Andrea Cabral, Suffolk County Sheriff's Department and Suffolk County ("Suffolk Defendants") the following Requests for Admissions, to be answered in writing and under oath within 30 (30) days of service of these Requests.

### INSTRUCTIONS

(A)    Each Request for Admission is to be answered under oath, under penalty of perjury.

(B)    The information sought in these Requests for Admissions is not limited to your personal knowledge but extends as well to any knowledge or information available to you or known to your attorneys, agents, or potential witnesses on your behalf.

(C)    If an objection is made to any of the following requests for admissions, the reason therefor shall be stated. The answer shall specifically deny the matter or set forth,

1

in detail, the reasons why the answering party cannot truthfully admit or deny the matter.

A denial shall fairly meet the substance of the requested admission, and when good faith

requires that a party qualify an answer or deny only a part of the matter of which an

admission is requested, the party shall specify so much of it as true and qualify or deny

the remainder. Mass. R. Civ. P. 36(a).

     (D)    If you contend that any information is sought by these Requests for

Admissions is protected by the attorney/client privilege or another claimed privilege or

the work-product doctrine, please furnish sufficient information to identify clearly each

privileged or protected item of information and state all reasons for your claim of

privilege.

**DEFINITIONS**

     (A)    "You," "your" and "Defendants" shall mean and refer to Andrea Cabral,

Suffolk County Sheriffs Department, and *Suffolk* County and the respective directors,

officers, employees, servants, agents, representatives, subsidiaries, predecessors,

successors and assigns of the Suffolk County Sheriff's Department and Suffolk County.

     (B)    "HOC" shall mean and refer to the Suffolk County House of Corrections.

     (C)    "Department" shall mean and refer to the Suffolk County Sheriff's

Department.

     (D)    "SID" shall mean and refer to the Sheriff's Investigative Division at the

Department.

2

## REQUESTS FOR ADMISSIONS

1.      Admit that, prior to May 2003, Mrs. Porter had never been disciplined in any way by the Department with respect to her reporting of incidents she observed at the HOC.

2.      Admit that, prior to May 2003, Mrs. Porter had never been disciplined in any way by the Department for any reason whatsoever.

3.      Admit that, prior to May 2003, SID received incident reports from Mrs. Porter written on Interdisciplinary Progress Notes paper.

4.      Admit that SID has received incident reports from Mrs. Porter that were not submitted on SID incident report forms.

5.      Admit that, prior to May 2003, SID received reports from other employees and/or contract workers written on Interdisciplinary Progress Notes paper.

6.      Admit that SID has received incident reports from Department employees or contractors that were not submitted by the end of the employee or contractor's shift.

7.      Admit that SID has received incident reports from Department employees or contractors that were not submitted on SID incident report forms.

8.      Admit that none of these employees or contractors referenced in Requests No. 5, 6 and 7 were disciplined in any way by the Department for failing to submit incident reports by the end of their shift or for submitting incident reports on forms other than SID incident report forms.

9.      Admit that Department employees, including Brian Dacey and Sonya Aleman, recorded observations of injuries on Rene Rosario related to Mr. Rosario's allegations of abuse on or about May 19, 2003 that were inconsistent with the

observations of Craig Meekins and Beth Bringola.

10.     Admit that none of the Department employees referenced in Request No. 9 were disciplined in any way by the Department related to their observations of injuries on Rene Rosario.

11.     Admit that a code of silence that prevents staff members from reporting the misconduct of fellow staff members, as described in the Stern Commission Report, existed in the HOC prior to November 2002.

12.     Admit that a code of silence that prevents staff members from reporting the misconduct of fellow staff members, as described in the Stern Commission Report, existed in the HOC in June 2003.

13.     Admit that a code of silence that prevents staff members from reporting the misconduct of fellow staff members, as described in the Stern Commission Report, exists in the HOC today.

14.     Admit that the Department was aware that Mrs. Porter communicated with the FBI prior to May 2003.

15.     Admit that, if the version of S-220 that is currently in effect were in effect in May 2003, Mrs. Porter would not have violated sections I(C)(1) and I(L) of that policy.

16.     Admit that the Department failed to provide written notice to CMS that it had barred Mrs. Porter.

17.     Admit that neither Sheriff Cabral nor the Department took no steps to correct any inaccuracies or misstatements contained in (i) the August 25, 2004 Boston Globe article concerning Mrs. Porter and the Department; (ii) the August 25, 2004 WCVB television report concerning Mrs. Porter and the Department; (iii) the October 29,

4

2004 Boston Globe Magazine profile on, inter alia, Sheriff Cabral.

Respectfully submitted,

**SHEILA PORTER,**

By her attorneys,

Joseph F. Savage, Jr., BBO #443030
David S. Schumacher, BBO #647917
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, Massachusetts 02109
(617) 570-1000

Dated:   June 30, 2005

LIBA/1562113.1

# EXHIBIT 18

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHEILA PORTER,<br>Plaintiff<br><br>v.<br><br>ANDREA CABRAL, SUFFOLK<br>COUNTY SHERIFF'S<br>DEPARTMENT and<br>CORRECTIONAL MEDICAL<br>SERVICES, INC.,<br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION NO: 04-11935DPW

### DEFENDANTS ANDREA CABRAL, SUFFOLK COUNTY SHERIFF'S DEPARTMENT AND SUFFOLK COUNTY'S RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS

Pursuant to Federal Rules of Civil Procedure 36, Defendants Andrea Cabral, Suffolk County Sheriff's Department and Suffolk County, by and through their attorney, Ellen Caulo, hereby respond to Plaintiff's Request for Admissions. Numbered paragraphs of Defendant's response match those of the Plaintiff's request.

**ADMISSION NO. 1:**

Admit that, prior to May 2003, Mrs. Porter had never been disciplined in any way by the Department with respect to her reporting of incidents she observed at the HOC.

**RESPONSE TO ADMISSION NO. 1:**

Defendants admit that prior to May 2003, the Suffolk County Sheriff's Department had never disciplined Mrs. Porter, an employee of Correctional Healthcare Solutions/Correctional Medical Services and a contract nurse working at the Suffolk County House of Correction, with respect to her reporting of incidents she had observed at the HOC.

**ADMISSION NO. 2:**

Admit that, prior to May 2003, Mrs. Porter had never been disciplined in any way by the Department for any reason whatsoever.

**RESPONSE TO ADMISSION NO. 2:**

Defendants admit that prior to May 2003, the Suffolk County Sheriff's Department had never disciplined Mrs. Porter, an employee of Correctional Healthcare Solutions/Correctional Medical Services and a contract nurse working at the Suffolk County House of Correction.

**ADMISSION NO. 3:**

Admit that, prior to May 2003, SID received incident reports from Mrs. Porter written on Interdisciplinary Progress Notes paper.

**RESPONSE TO ADMISSION NO. 3:**

Objection as to relevance. Further answering, the Defendants admit that SID has received written documents including reports from Mrs. Porter. The Defendants are unable to admit or deny the remaining averments contained in Request No. 3 without the name of a specific SID investigation pursuant to which the reports were submitted.

**ADMISSION NO. 4;**

Admit that SID has received incident reports from Mrs. Porter that were not submitted on SID incident report forms.

**RESPONSE TO ADMISSION NO. 4:**

Objection as to relevance. Further answering, the Defendants admit that SID has received written documents including reports from Mrs. Porter that were not written on Incident Report forms.

**ADMISSION NO. 5:**

Admit that, prior to May 2003, SID received reports from other employees and/or contract workers written on Interdisciplinary Progress Notes paper.

**RESPONSE TO ADMISSION NO. 5:**

Objection as to relevance. Further answering, the Defendants state they are unable to admit or deny the remaining averments in Request No. 5 without the names of a specific SID investigation pursuant to which the reports were submitted.

**ADMISSION NO. 6:**

Admit that SID has received incident reports from Department employees or contractors that were not submitted by the end of the employee or contractor's shift.

**RESPONSE TO ADMISSION NO. 6:**

Objection as to relevance. Further answering, the Defendants admit that SID has received incident reports from Department employees that were not submitted by the end of the employee's shift. The Defendants are unable to admit or deny the remaining averments contained in Request No. 6 without the name of a specific SID investigation pursuant to which said reports were submitted.

**ADMISSION NO. 7:**

Admit that SID has received incident reports from Department employees or contractors that were not submitted on SID incident report forms.

**RESPONSE TO ADMISSION NO. 7:**

Objection as to relevance. Answering further, the Defendants admit that SID has received written reports from Department employees and contract workers that were not submitted on Incident Report forms. The Defendants deny the remaining averments contained in Request No. 7.

**ADMISSION NO. 8:**

Admit that none of these employees or contractors referenced in Requests No. 5, 6 and 7 were disciplined in any way by the Department for failing to submit incident reports by the end of their shift or for submitting incident reports on forms other than SID incident report forms.

**RESPONSE TO ADMISSION NO. 8:**

Objection as to relevance. Further answering, the Defendants state that the Department does not discipline contract workers. The Defendants deny the remaining averments contained in Request No. 8.

**ADMISSION NO. 9:**

Admit that Department employees, including Brian Dacey and Sonya Aleman, recorded observations of injuries on Rene Rosario related to Mr. Rosario's allegations of abuse on or about May 19, 2003 that were inconsistent with the observations of Craig Meekins and Beth Bringola.

**RESPONSE TO ADMISSION NO. 9:**

The Defendants deny the averments contained in Request No. 9.

**ADMISSION NO. 10:**

Admit that none of the Department employees referenced in Request no. 9 were disciplined in any way by the Department related to their observations of injuries on Rene Rosario.

**RESPONSE TO ADMISSION NO. 10:**

The Defendants admit that neither Brian Dacey nor Sonya Aleman nor any Department employee was disciplined in any way by the Department related to their observations of injuries on Rene Rosario on or about May 19, 2003.

**ADMISSION NO. 11:**

Admit that a code of silence that prevents staff members from reporting the misconduct of fellow staff members, as described in the Stern Commission Report, existed in the HOC prior to November 2002.

**RESPONSE TO ADMISSION NO. 11:**

The Defendants deny the averments contained in Request No. 11.
**ADMISSION NO. 12:**

Admit that a code of silence that prevents staff members from reporting the misconduct of fellow staff members, as described in the Stern Commission Report, existed in the HOC in June 2003.

**RESPONSE TO ADMISSION NO. 12:**

The Defendants deny the averments contained in Request No. 12.

**ADMISSION NO. 13:**

Admit that a code of silence that prevents staff members from reporting the misconduct of fellow staff members, as described in the Stern Commission Report, exists in the HOC today.

**RESPONSE TO ADMISSION NO. 13:**

The Defendants deny the averments contained in Request No. 13.
**ADMISSION NO. 14:**

Admit that the Department was aware that Mrs. Porter communicated with the FBI prior to May 2003.

**RESPONSE TO ADMISSION NO. 14:**

The Defendants deny the averments contained in Request No. 14.

**ADMISSION NO. 15:**

Admit that, if the version of S-220 that is currently in effect were in effect in May 2003, Mrs. Porter would not have violated sections I(C)(1) and I(L) of that policy.

**RESPONSE TO ADMISSION NO. 15:**

The Defendants deny the averments contained in Request No. 15.

**ADMISSION NO. 16:**

Admit that the Department failed to provide written notice to CMS that it had barred Mrs. Porter.

**RESPONSE TO ADMISSION NO. 16:**

The Defendants admit that the Department did not provide written notice to CMS that it had barred Mrs. Porter.

**ADMISSION NO. 17:**

Admit that neither Sheriff Cabral nor the Department took no steps to correct any inaccuracies or misstatements contained in (i) the August 25, 2004 Globe article concerning Mrs. Porter and the Department; (ii) the August 25, 2004 WCVB television report concerning Mrs. Porter and the Department; (iii) the October 29, 2004 Boston Globe Magazine profile on, inter alia, Sheriff Cabral.

**RESPONSE TO ADMISSION NO. 17:**

The Defendants are unable to admit or deny the averments contained in Request No. 17 because they do not know what statements in particular the Plaintiff is referring to by the terms "inaccuracies or misstatements".

Respectfully Submitted
For the Defendants Andrea Cabral,
Suffolk County Sheriff's
Department and Suffolk County
By,

_(signature)_

Gerard Horgan
Superintendent
Suffolk County House of Correction
Suffolk County Sheriff's Department

Objections by counsel:

DATE: __8/14 05__

_(signature)_

Ellen M. Caulo
BBO # 545250
Deputy General Counsel
Suffolk County Sheriff's Department
200 Nashua Street
Boston, MA 02114
(617) 989-6681

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a true and accurate copy of the foregoing Response to Admissions to be served upon all counsel of record by hand and first class mail, postage prepaid this __14th__ day of August, 2005.

_(signature)_

Ellen M. Caulo

# EXHIBIT 19



| | |
|---|---|
| **Topic:** | **REPORT OF THE SPECIAL COMMISSION on the SUFFOLK COUNTY SHERIFF'S DEPARTMENT** |
| **Dates:** | October 15, 2002 |
| **Present:** | Commission Members: Donald K. Stern, Chair, Mauricia Alvarez, Ralph I. Fine, Karen F. Green, Michael W. Neighbors Michael A. O'Toole, J. Owen Todd |

By Appointment of the Governor of the Commonwealth of Massachusetts

**TABLE OF CONTENTS**

ACKNOWLEDGMENTS

I. EXECUTIVE SUMMARY

    A. Introduction
    B . Background
    C. Scope of Investigation
    D. Methodology
    E. Major Findings
    F. Major Recommendations
    G. Overall Conclusion

II. SPECIFIC FINDINGS & RECOMMENDATIONS

    A. Organizational Structure and Management Issues
    B. Operational Policies, Procedures, and Practices
    C. Physical Plant and Security Issues
    D. Labor-Management Relations
    E. Staffing
    F. Fiscal Issues
    G. Training
    H. Accountability

    1. Inmate Grievances
    2. Internal Investigations
    3. Internal Audits & External Controls

III. CONCLUSION

BIOGRAPHIES



EXHIBIT
Cabral
9
6/24/05 DAW

## ACKNOWLEDGMENTS

I first want to acknowledge the tremendous work of the Commission members. Each made a significant and unique contribution to what was a time-consuming and, at times, difficult task. And, since the Commission members served without compensation, I want to thank their respective law firms (as well as my own law firm, Bingham McCutchen LLP) and employers for supporting this pro bono effort.

One Commission member deserves special mention, however, because his particular background and because he had to travel from his home in Colorado for meetings. In making recommendations to the Governor, when she was selecting the members of the Commission, I was determined to get an expert with a national reputation on local jails and with no particular ties to Massachusetts, to

> Inadequate Training

The content and length of the Department's in-service training program fails to conform to the minimum professional requirements of the American Correctional Association (ACA). Importantly, current training fails to train personnel in the use of force continuum, pursuant to which different degrees of force are used depending on the circumstances - training that is now viewed by correction professionals as important to the effective and appropriate use of force. Similarly, despite the previous incidents of sexual misconduct, staff members still do not receive any in-service training relevant to the issues of cross-gender supervision or sexual misconduct.

> Disconnect between Policies and Practice

For the most part, the Department now has well-conceived, written policies in place. However, many of these policies have not been uniformly implemented throughout the Department. For example, a recent policy change requires the videotaping of all planned uses of force; yet the practice is inconsistent. The lack of policy implementation results from a variety of factors, including an ineffective organizational structure, inadequate training, lack of buy-in by staff, and the absence of internal controls to monitor and evaluate performance and compliance with Department policies.

-6-

> A Lack of Accountability

The Department has voluntarily sought accreditation from the ACA and from a national association that accredits jail health care. However, there are few, if any, formal systems for internally monitoring implementation of, or auditing day-to-day compliance with, written policies and procedures. This lack of internal controls results in an ongoing failure to implement policies and monitor performance.

Moreover, the Department operates in a sort of fiscal netherworld, funded by the State and and yet not fully accountable to either. For example, the two "canteen" funds discussed later in this Report generate millions of dollars of revenue and operate as an off-budget fund, a situation ripe for abuse.

F. Major Recommendations

In an effort to make the Department more open, to limit the possibility for abuse of inmates, and to provide a blueprint for improving overall operations at both institutions, the Commission recommends:

> The Sheriff should lead the Department, assuring a sound organizational structure and effective management systems.

While certain responsibilities can be delegated, the Sheriff must lead the Department. He should involve himself in all major decisions, and assure that policies and procedures are uniformly implemented and followed. Among other things, he should: (a) move his office into one of the facilities; (b) regularly attend management team meetings; (c) set an example for supervisors by regularly visiting the facilities on all shifts; and (d) convey interest in Department operations by meeting with staff at their posts.

> Department managers should strengthen their relations with staff.

The chain of command, with high-level, decision-making authority concentrated at each facility,

should be respected. Supervisors should have the support of the administration, but also be held accountable for any failure to exercise their responsibilities. The administration should regularly obtain staff input before implementing policies and procedures and devise uniform methods for monitoring their implementation. Ongoing operations meetings, including uniformed and civilian staff, training staff, and supervisors, should provide an ongoing means of two-way communication between administrators and staff.

-7-

> The Department should develop clear standards for the hiring, evaluation and promotion of employees.

Standards for the hiring, evaluation and promotion of employees should take precedence over politics. The Department should develop a formal and objective recruitment process to attract a more diverse applicant pool, including more female and minority candidates. An objective performance appraisal system should be implemented for all employees. Promotions should be based on merit,

not politics or friendship. In addition, the Sheriff should adopt a policy that does not permit political contributions to his campaign from Department employees or members of their immediate families.

> Both the Department and the officer unions urgently need to improve the current state of labor/management relations.

The present situation is unacceptable and a barrier to improved operations at the Jail and HOC. The Department and the officer unions should eliminate conduct that perpetuates the strained relations between them and immediately start to cooperate for the good of the entire Department.

> The Sheriff should take all feasible steps to merge the Department's operations.

The Sheriff should work to merge the operations of the Department. Most importantly, he should seek one uniformed officer union for both facilities and thereby obtain needed flexibility in the staff assignment process. The Commission recognizes that this recommendation will be difficult to implement given the attitude of many staff members, who identify more with their own union and individual facility than with the Department as a whole. Indeed, we detected some outright hostility between employees assigned to the Jail and employees assigned to the HOC, with each group viewing the other negatively. Until the institutions are fully merged and management has the ability to move staff seamlessly between facilities, it will be difficult for the Sheriff to resolve many of the operational problems at the Jail and the HOC. Legislation may be required to accomplish this important change.

> The Department should improve training programs for personnel.

Many improvements in the content and amount of training provided to Department staff remain to be implemented. Facing budgetary constraints, it will be difficult for the Department to meet the requirements of the ACA. However, training and retraining are essential to the effective operations of any correctional facility. Therefore, among other things, the Department should: (a) at a minimum meet the in-service training requirements of the ACA; and (b) provide new or enhanced in-service training on the appropriate use of force, the prevention of sexual misconduct, and cross-gender supervision.

-8-

> The Department should assure that all substantive policies are fully and uniformly implemented.

The Department should take steps to ensure that seemingly well-conceived, written policies are uniformly and fully implemented. To accomplish this objective, the Department needs to address other issues, including: (a) an inadequate organizational structure, (b) insufficient training, (c) poor morale and lack of buy-in to policies by affected staff, and (d) the absence of internal controls to monitor and evaluate performance and compliance with Departmental policies.

> The Department should encourage the support of custodial staff for inmate programs.

Modern corrections recognizes the importance of inmate programs to the overall mission of the Department; the custodial staff of the Department does not. While the Sheriff has demonstrated his commitment to such programs, further steps need to be taken to gain the support of custodial staff for such programs so that they can accomplish their objectives.

> The Department should continue to institute policies and procedures to minimize the possibility of sexual misconduct and physical abuse.

While the Department has taken several steps to address the issues of sexual misconduct and physical abuse, further action is necessary. For example, the Department should have a stand-alone policy prohibiting sexual misconduct, and corresponding training designed to prevent it. Likewise, the Department should include the concept of, and training on, a continuum of force in its use of force policy, including alternatives to force and measured responses to inmate conduct.

The Commission also recommends that the new women's modular facility intended to house 300 women inmates at the HOC not be used for that purpose. Its design is inappropriate for the housing of women and may facilitate, rather than reduce, the opportunities for the type of sexual misconduct that has occurred in the past.

> The Department, together with others, should ensure that allegations of physical and sexual abuse and other serious criminal misconduct are properly investigated and prosecuted.

The Department responded to the alleged incidents of physical abuse and sexual misconduct by terminating those employees directly involved. Many of these employees, however, were reinstated after successful union grievances, despite the existence of federal indictments against them. were not prosecuted at all, though there were state court findings of probable cause to believe that the officers had committed crimes. The Department can, and has, taken steps to

-9-

strengthen its internal investigations and, therefore, its ability to defend against union grievances. The Department needs the cooperation of others, however, to ensure that allegations of criminal misconduct by staff are properly investigated and, where appropriate, prosecuted. The Commission urges unions, arbitrators and state prosecutors to consider the corrections implications of their decisions. Continued employment and non-prosecution of officers charged with sexual misconduct and physical abuse sends a dangerous message to staff and inmates alike – there are no consequences for staff misconduct, even when it is alleged to be criminal misconduct.

> The Department should take steps to become more open and increase its internal and external accountability.

The Commission urges an aggressive attack on the code of silence that prevents staff members from reporting the misconduct of fellow staff members. The Commission also believes that the Department could benefit from greater fiscal accountability and urges the State to assume control of the Department's fiscal operations, as it has assumed control for the fiscal operations of some other county sheriff's departments. The new Sheriff should work towards making the Department

more open. Among other things, the Sheriff should consider forming a citizens advisory group.

G. Overall Conclusion

As noted in the Commission's Report, the Department has made strides in improving policies, procedures and operations since revelation of the allegations of abuse, patronage, lack of leadership and mismanagement. Yet there remain many areas in which significant improvement is essential. These improvements must be made at a time of severe budgetary constraints and under new leadership. However, with leadership committed to excellence, the cooperation of the unions and staff, appropriate technical assistance and internal and external mechanisms to monitor Department operations, the Commission believes that the Jail and the HOC could become model correctional facilities.

-10-

## II. SPECIFIC FINDINGS & RECOMMENDATIONS

A. ORGANIZATIONAL STRUCTURE AND MANAGEMENT

FINDINGS

* The Sheriff has delegated too much of his authority and has too little direct involvement with staff and operational issues.

Since the Sheriff has the ultimate legal and political responsibility for safe operation of the two facilities, it is not surprising that he would play the leading role in dealing with the external environment and setting the vision for the Department. The Sheriff's relationships with the community and the Legislature are important to the Department's success. It is apparent, that the Sheriff has delegated too much of the operational authority.

While he has concentrated on the job of establishing a clear vision, goals, and objectives, the Sheriff has not played an active role in monitoring the implementation of that vision. He rarely walks through the facilities (including housing areas and other functional areas inside the facilities). Moreover, while the Sheriff could play a much more active role in management of the Department through his management team meetings, he attended only about a third of these meetings in 2001. The absence of the Sheriff at management meetings reinforces the perception that the Sheriff is not the primary decision-maker in the Department and reduces his opportunities to monitor operations. Likewise, the practice of having general counsel sign all policies and procedures may well contribute to the perception of the Sheriff as a hands-off manager.

A prime example of the degree to which the Sheriff is removed from daily operations is the actual geographic location of his office at a courthouse rather than at either of the two institutions. While this location serves to facilitate the Sheriff's proximity to lawmakers important to the Department, he is physically remote from his executive staff as well as from the Jail and the HOC.

* The Department's organizational structure insulates the Sheriff from any involvement in operations and fosters the perception that he is an absentee executive.

The current organizational structure has all management and operational units reporting up to the Sheriff through the Special Sheriff. This serves to insulate the Sheriff from any direct decision making. Although delegation is an important administrative skill, the size of the Department does not warrant the level of delegation that has occurred. The current structure also places institutional operations - the very heart of what the Department is about - one step removed from the Sheriff. This undermines the importance and stature of the operating units - the HOC and the Jail.

# EXHIBIT 20

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SHEILA PORTER, | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION NO. 04-11935 DPW |
| ANDREA CABRAL, SUFFOLK COUNTY SHERIFF'S DEPARTMENT, SUFFOLK COUNTY, and CORRECTIONAL MEDICAL SERVICES, INC., | ) | |
| Defendants. | ) | |

### PLAINTIFF'S FIRST REQUEST FOR THE
### PRODUCTION OF DOCUMENTS TO DEFENDANTS ANDREA CABRAL, SUFFOLK COUNTY SHERIFF'S DEPARTMENT, AND SUFFOLK COUNTY

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff Sheila

Porter ("Mrs. Porter") hereby requests that Defendants Andrea Cabral, Suffolk County Sheriff's

Department, and Suffolk County (collectively, "Defendants") produce for inspection and

copying the documents and/or tangible items (collectively "documents"), requested herein,

which are in their possession, custody, or control. The production of documents shall take place

at the offices of Testa, Hurwitz & Thibeault, 125 High Street, Oliver Street Tower, Boston,

Massachusetts 02110, within thirty (30) days of service of this Request.

### DEFINITIONS AND INSTRUCTIONS

1.      Each of the following requests for production of documents is continuing. In the event

that Defendants become aware of any document(s) responsive to any of the requests set forth

below after their initial production of documents, such additional responsive document(s) should

be furnished immediately to Mrs. Porter's attorneys.

2.      When responding to this request for production of documents, Defendants are requested to respond in writing and state as to each of the requests:

      (a)      that there are documents responsive to the request and that they will be produced;

      (b)      that there are documents responsive to the request, but that Defendants refuse to produce them because of a claim of privilege or for some other reason; or

      (c)      that there are no documents responsive to the request.

3.      In producing documents pursuant to this request for production of documents, please indicate to which numbered request such document is responsive. If a document or any other item is produced pursuant to more than one request, please so designate.

4.      As to any document(s) called for in this request for production of documents which no longer exists, but which you are aware existed at one time, please identify such document(s) by stating as to each: (i) the type of document; (ii) its general subject matter; (iii) the date of the document; and (iv) its author(s), addressee(s) and recipient(s); you are further requested to identify the last known location and the reason such document(s) is no longer in existence.

5.      If any document is not being produced in response to this request for production of documents based upon a claim of privilege or work-product protection, it is requested that, for each such document, Defendants state the nature of and reasons supporting the claim of privilege and/or protection.

6.      The term "document" refers to any and all items identified in Federal Rules of Civil Procedure Rule 34(a) and Local Rule 26.5 and includes, but is not limited to, every writing or record of every type and description (whether printed, recorded or reproduced by manual, mechanical, computer, electrical, optical, or by any other means or process) that is or has been in the possession, custody or control of Defendants or their agents, or of which Defendants have

knowledge, including, but not limited to, letters, correspondence, memoranda, bills, invoices, checks, logs, diaries, calendars, journals, ledgers, daytimers, notebooks, stenographic or handwritten notes, studies, publications, books, pamphlets, pictures, drawings, maps, reports, surveys, statistical compilations, agreements, communications, reports, telegrams, summaries, computer printouts, electronic mail (e-mail), telegrams, cables, photographs, photograph negatives, films, microfilms, motion picture film, videotapes, tapes, computer discs and/or tapes, CD-ROM discs and/or tapes, voice mails, voice recordings, electronic or other recordings, tapings and/or transcriptions of telephone and/or other conversations, interviews, graphs, reports, notes, charts, plans, sketches, summaries, minutes, notes and/or records of meetings or conferences, summaries or reports of investigations or negotiations, opinions or reports of consultants, medical records, brochures, advertisements, circulars, press releases, any marginal comment appearing on any of the foregoing, and all other writings or any other recorded computer and/or graphic material in whatever form and from which information can be obtained, as translated by you *if* necessary into a reasonably usable form, and including copies, drafts and non-identical reproductions of any of the foregoing, as well as anything attached, clipped or connected thereto.

7.    "Possession," "custody" and "control" shall mean the ability to transfer or obtain the requested information or document.

8.    "Communication" shall mean the transmittal of information, in the form of facts, ideas, inquiries, requests for information or otherwise.

9.    "Any" shall include the collective as well as the singular and shall include "each," "all," and "every."

10.   The terms "all" and "each" shall both be construed as "all" and "each."

11.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside its scope.

12.    The singular in these requests shall be deemed to include the plural and the plural shall include the singular.

13.    The term "concerning" shall be construed to include without limitation:  referring to, describing, evidencing, or constituting.

14.    "You," "your" and "Defendants" shall mean and refer to Andrea Cabral, Suffolk County Sheriff's Department, and Suffolk County and the respective directors, officers, employees, servants, agents, representatives, subsidiaries, predecessors, successors and assigns of the Suffolk County Sheriff's Department and Suffolk County.

15.    "Department" shall mean and refer to the Suffolk County Sheriff's Department.

16.    "HOC" shall mean and refer to the Suffolk County House of Correction and its directors, officers, employees, servants, agents, representatives, subsidiaries, predecessors, successors and assigns.

17.    "FBI" shall mean and refer to the Federal Bureau of Investigation and its directors, officers, employees, servants, agents, representatives, subsidiaries, predecessors and assigns.

18.    "SID" shall mean and refer to the Sheriff's Investigation Division.

19.    "CMS" shall mean and refer to Correctional Medical Services, Inc., and its directors, officers, employees, servants, agents, representatives, subsidiaries, predecessors, successors and assigns.

20.    "Answer" shall include the Defendants' Answer to Mrs. Porter's Amended Complaint.

21.    "Litigation" shall mean and refer to the lawsuit filed by Mrs. Porter against Defendants.

22.    "Commission" shall mean and refer to the Special Commission formed to investigate the

Suffolk County Sheriff's Department, which Commission issued its report on October 15, 2002.

23.    Unless otherwise stated in the specific document request, the time frame for relevant

documents shall be the period of Mrs. Porter's tenure at the HOC.

24.    If Defendants are aware of the existence of any document within the scope of these

document requests which is not within their custody, possession, or control, please identify any

such document in a written response to the request for the production of the document.  In

identifying a document in this fashion, it is requested that the following information be provided:

(i) the name, address and telephone number of the person who has possession, custody, or

control over the document; (ii) the type of document; (iii) its general subject matter; (iv) the date

of the document; and (v) its author(s), addressee(s) and recipient(s).

## DOCUMENTS TO BE PRODUCED

1.      Any and all documents referenced in Defendants' Initial Disclosure Statement.

2.      Any and all documents concerning an organizational chart of the Department as it has existed since January 1, 2003.

3.      Any and all documents concerning Mrs. Porter's performance while working at the HOC, including, without limitation, any assessment(s) and/or evaluation(s).

4.      Mrs. Porter's personnel file and any and all documents concerning such file.

5.      Any and all documents concerning Mrs. Porter's Interdisciplinary Progress Notes since April 1, 2003.

6.      Any and all documents concerning the Code of Silence, as reported on by the Commission.

7.      Any and all documents concerning steps taken by you in response to the Commission's report to implement any of the changes recommended by the Commission.

8.      Any and all documents concerning any investigation(s) conducted by the FBI concerning the HOC and/or the Department.

9.      Any and all documents concerning the ability of individuals who work at the HOC or the Department to cooperate with the FBI and/or any other outside agency investigating the HOC and/or Department.

10.     Any and all documents concerning any policy or practice of encouraging Department personnel to assist the FBI in its investigation(s) of the HOC and/or the Department.

11.     Any and all documents concerning the terms and conditions of Mrs. Porter's assignment to the HOC.

12.    Any and all policies with which you required Mrs. Porter to comply during her tenure at the HOC.

13.    Any and all Department and/or HOC policies that you provided to Mrs. Porter.

14.    Any and all documents concerning the Department's S220 Policy.

15.    Any and all documents concerning any policies and/or practices in effect during Mrs. Porter's tenure at the HOC concerning the reporting of suspected inmate abuse and/or inmate injuries.

16.    Any and all documents concerning any policies and/or practices in effect during Mrs. Porter's tenure at the HOC concerning confidentiality of inmate medical information.

17.    Any and all documents concerning any policies and/or practices in effect during Mrs. Porter's tenure at the HOC concerning any guidelines or limitations imposed on workers at the HOC in communicating with persons or entities outside the Department concerning HOC and/or Department matters.

18.    Any and all documents concerning reports received by you from or on behalf of Mrs. Porter concerning suspected inmate abuse and/or investigations of physical or sexual harm of inmates during Mrs. Porter's tenure at the HOC.

19.    Any and all documents concerning Mrs. Porter's cooperation with the FBI.

20.    Any and all documents concerning the dates and times on which Mrs. Porter submitted, and/or the Department received, two reports of suspected inmate abuse in or around May or June 2003.

21.    Any and all documents concerning the investigation by you into Mrs. Porter's reports of suspected inmate abuse in or around May or June 2003.

22.    Any and all documents concerning the wiring of an HOC inmate performed by Mrs. Porter in 2002 at the request of the FBI.

23.    Any and all documents concerning the SID meeting with Mrs. Porter in or about May or June 2003.

24.    Any and all documents concerning communications between you and the FBI concerning Mrs. Porter.

25.    Any and all documents concerning any SID investigations of individuals who work, or have worked, at the HOC and who were cooperating, or had cooperated, with the FBI.

26.    Any and all documents concerning the decision to terminate and/or bar Mrs. Porter from HOC premises.

27.    Any and all documents concerning the meeting on or about June 10, 2003 (and/or preparations for that meeting) during which Mrs. Porter was told she was barred from the HOC premises, including, but not limited to, any notes or memos or any communications between Defendants and CMS.

28.    Any and all documents concerning your decision to terminate and/or bar any person from working at the HOC for the same reasons for which Mrs. Porter was terminated and/or barred.

29.    Any and all documents concerning other individuals who have engaged in activities similar to those activities engaged in by Mrs. Porter, and who were not terminated and/or barred from the HOC, including, but not limited to, any documents concerning the decision not to terminate and/or bar such individuals.

30.    Any and all documents concerning the reasons for the barring of the nurses referenced in Defendants' Automatic Disclosures.

31.    Any and all documents regarding concerns on your part for Mrs. Porter's safety, including, but not limited to, any communications regarding such concerns.

32.    Any and all documents, including, but not limited to drafts, memos and communications concerning the written statement released to WCVB-TV, Channel 5 on or about August 25, 2004.

33.    Any and all documents concerning Mrs. Porter, including, but not limited to, notes, created for, used or reviewed by Andrea Cabral in preparation for her September 8, 2004 political debate with Stephen Murphy.

34.    Any and all documents concerning Andrea Cabral's interview with The Boston Globe Magazine, published on October 29, 2004, including, but not limited to, any documents created or reviewed in preparation for the interview.

35.    Any and all documents concerning and/or supporting your statements that Mrs. Porter has is not a whistleblower.

36.    Any and all contracts between Defendants and CMS.

37.    Any and all documents concerning communications between or among any of the individuals identified in Defendants' Initial Disclosure Statement concerning Mrs. Porter.

38.    Any and all documents concerning communications between you and CMS concerning Mrs. Porter.

39.    Any and all documents concerning communications between you and any person or entity (except CMS) concerning Mrs. Porter and/or this Litigation.

40.    Any and all documents concerning your coverage under any insurance policy.

41.    Any and all documents concerning your document retention policies, including, but not limited to, your electronic mail ("e-mail") retention policies.

9

42.     Any and all documents that you intend to offer as evidence at the trial of this litigation.

43.     Any and all documents from potential or prospective witnesses, including, but not limited to, notes, transcripts of interviews and/or conversations, deposition transcripts, statements, affidavits -- whether sworn or unsworn -- or any other documents concerning the individual's knowledge of any matters at issue in this Litigation.

44.     Any and all documents that you have given or intend to give each person whom you expect to call as an expert witness on your behalf at the trial of this Litigation.

45.     Any and all documents, including all correspondence and drafts of the documents, you have received from any expert witness you have retained in this Litigation.

46.     Any and all documents concerning the testimony of any expert witness whom you intend to call at the trial of this Litigation.

47.     Any and all documents concerning any knowledge or information possessed and/or statements made by any individual whom you believe has been witness to, or has knowledge of, any matters at issue in this Litigation.

48.     Any and all documents, including, but not limited to, written statements, transcriptions, oral statements, notes, correspondence, memoranda and/or reports that were not addressed by the requests stated above but that you contend support any of the defenses stated in your Answer.

Respectfully submitted,

**SHEILA PORTER,**

By her attorneys,

Joseph F. Savage, BBO #443030
Jennifer M. Goddard, BBO #631144
Maura M. Jakola, BBO #654695
Testa, Hurwitz & Thibeault, LLP
125 High Street, Oliver Street Tower
Boston, MA 02110
617-248-7000

Dated: December 17, 2004

9771\1.3142714_1

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail (by hand) on 12/17/04

11

# EXHIBIT 21

Citation                    Search Result          Rank 1 of 4              Database
4/1/03 BOSTONG B1                                                           BOSTONG

4/1/03 Boston Globe B1
2003 WLNR 3412007

                              Boston Globe (MA)
                 Copyright (c) 2003, Globe Newspaper Company

                          April 1, 2003

Section: Metro/Region

TWO GUARDS ACQUITTED IN BEATINGS

Francie Latour, Globe Staff

In a dramatic end to a four-year investigation of the state's largest county **corrections** system, a federal jury yesterday cleared two of three **Suffolk** County jail guards who were charged with beating inmates and covering up the episodes.

Two years after the men were indicted, the jury acquitted veteran officers Thomas Bethune Jr. and William Benson, both 51, of all charges.

Benson was cleared in a case that brought forth one of the prosecution's most dramatic witnesses: Leonard Gibson, who suffers from Tourette's syndrome and testified that he was beaten by Benson and another guard inside the medical unit of the Nashua Street Jail.

The jury, which deliberated for two days, returned guilty verdicts against Brian Bailey, 31. Bailey was convicted of using excessive force, obstructing justice, perjury, and conspiracy in the beating of Nikolas Dais, a suicidal pretrial detainee. Bailey was acquitted of one conspiracy charge.

Dais was the only one of three alleged victims not to take the stand.

Bailey's sentencing was set for July 7.

In a trial that encompassed three defendants and 15 counts, more than a minute elapsed before US District Court Judge Reginald C. Lindsay read off the second of Benson's two not-guilty verdicts. When it came, Benson lowered his head and he began to tremble, wiping tears from his eyes.

"After four long years, it's gratifying they finally got the truth," Benson said outside the courtroom. In the moments between his two verdicts, Benson said, "My whole life was in front of me."

Stephen Pfaff, the lawyer for Bethune, said, "It's been a long, long time,"

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4/1/03 BOSTONG B1

referring to the investigation that began in 1999. "I was nervous, like everyone else, but confident that the jury would do the right thing."

Following Benson's firing in 1999, a private arbitrator ordered the Sheriff's Department to reinstate him with back pay. Bethune, who was suspended without pay following the 2001 indictment, may also return to the department.

But a sheriff's spokesman said yesterday that neither Benson nor Bethune will return until department lawyers review their trial testimony.

Gibson expressed shock at Benson's acquittal. "Surprised? Of course I'm surprised. He's guilty," he said. "He's one of the ones who beat me. . . . If he can get away with that, what's to stop him from doing it again?"

Bailey, Benson, and Bethune each took the stand in their own defense, denying the charges and telling jurors that they never witnessed any beatings while employed as guards at the jail.

Three other veteran guards, who were named in the original indictment, Eric J. **Donnelly**, Anthony Nuzzo, and Melvin Massucco III pleaded guilty to all of the brutality and conspiracy charges against them before the case went to trial and are scheduled to be sentenced in June.

Another indicted officer and former lieutenant, Randall Sutherland, is expected to plead guilty in April.

US Attorney Michael Sullivan said that the two acquittals did not undermine the basis of the lengthy investigation.

"I don't see it as a serious blow at all," Sullivan said. "Proof beyond a reasonable doubt is an extremely high standard, and the defendants were members of a law enforcement agency. . . . Looking back on it, I'm not sure there's anything we could've or would've done differently."

Sullivan would not comment on the prosecution's most controversial witness, Michael Ross, a former guard who kept his badge for two years despite failing the department's training academy and its use-of-force exam.

Ross was the only witness whose testimony implicated all three officers on trial. In exchange for his testimony and for pleading guilty to a misdemeanor, prosecutors agreed to ignore any other crimes Ross may have committed while he was a guard, and to recommend a one-year sentence.

But in two days of withering cross-examination by defense attorneys, Ross repeatedly contradicted himself and often said he could not remember testimony he had given the previous day.

TYPE: MET

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4/1/03 BOSTONG B1

---- INDEX REFERENCES ----

Language:  EN

OTHER INDEXING:  (BEATINGS; COURT; DAIS; NASHUA STREET JAIL; NIKOLAS DAIS;
SHERIFFS DEPARTMENT)  (Anthony Nuzzo; Bailey; Bailey, Benson; Benson; Bethune;
Brian Bailey; Eric J. Donnelly; Gibson; GUARDS ACQUITTED; Leonard Gibson; Melvin
Massucco; Michael Ross; Michael Sullivan; Proof; Randall Sutherland; Reginald C.
Lindsay; Ross; Stephen Pfaff; Sullivan; Thomas Bethune Jr.; William Benson)
(PRISON ASSAULT TRIAL )

EDITION: THIRD

Word Count: 804
4/1/03 BOSTONG B1

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 22



| Chapter I | Policy #: | References: |
|---|---|---|
| Administration/Management | S220 | G.L. c.149, Section 185; 268A 103 CMR 910.08; 924.02; 973.07; 943.09 3-ACI-3-4017; 4067; 4173; 4268 3-ALDF-1C-23; 3A-07; 3E-08 |

| | Date of Issue: January 1, 2000 | Approved: |
|---|---|---|
| Personnel Code of Conduct | Date Revised: April 2005 | Andrea J. Cabral, Sheriff |

*Page 1 of 9*

## Purpose

As employees of the Department, we have an important mission in the criminal justice system. We provide an essential public service and are responsible for the care, custody, and control of sentenced inmates and pre-trial detainees while maximizing public safety and minimizing costs to the taxpayer. The Sheriff has set a very high standard of performance and all staff is responsible and accountable to the public. The importance of working with integrity and creativity is paramount even when the work is challenging and the resources are limited. You are a member of a staff dedicated to providing efficient and effective correctional and re-entry services to the communities of Suffolk County.

This policy codifies the rules governing standards of conduct and ethical behavior expected of all employees, contractors and volunteers of the Department.

## Policy Statements

I.   These rules are issued as general directives and do not attempt to cover each and every contingency that may arise during an employee's service while employed by the Department.

II.  Nothing in these standards shall be construed to relieve an employee of his or her primary responsibilities concerning the safekeeping and custodial care of inmates/detainees, or from an employee's constant obligation to render good judgment, full and prompt obedience to all provisions of the law and all other lawful orders and directives.

III. All employees, contractors and volunteers are subject to the provisions of these rules.

IV.  Improper or illegal conduct will not be tolerated, whether or not it is specifically mentioned or described in these rules.

V.   Acceptance of appointment with the Department shall be acknowledgment of an employee's agreement to abide by this and every other policy, procedure and post order issued by the Department.

VI.  Nothing in these rules is intended to conflict with the laws of the Commonwealth, or to infringe upon the constitutional rights of any employee.



EXHIBIT
Keeley
5/11/05 PMM

001116



Employee Code of Conduct                                                    Page 2 of 9

**I.    General Guidelines**

A.   *Standards of Public Service*

1.   An employee's position with this Department is one of responsibility and public trust. As such, and in order to maintain the dignity and public perception of the Department, all employees must be discreet and prudent not only in their professional capacities, but in personal relationships, personal associations and places frequented.

2.   An employee's uniform, badge, identification or other official insignia shall be used only as is required in the course of his/her official duties.

3.   All employees are required to conform their behavior to the ethical standards spelled out in G.L. c.268A.

B.   *Appointment, Employment, Termination of Service*

1.   Selection for appointment to a position with the Department is based in part on statements contained in the employment application form. Discovery that any statement is false may lead to an employee's immediate termination.

2.   All employees shall be photographed as necessary for identification purposes. Identification badges must be clearly worn at all times while on duty. Identification photographs may be retaken as needed to keep them current.

3.   All employees regardless of employment status (e.g., leave of absence or suspension) must report within 72 hours in writing to the Director of Personnel any change in residential address, home telephone number, person to notify in case of emergency, or any other pertinent personnel data.

4.   A minimum of two (2) weeks written notice of resignation to the Superintendent and Director of Personnel is required.

5.   Employees must report all other paid employment to the Director of Personnel. Failure to do so is grounds for discipline.

C.   *Confidential Communications*

1.   The affairs of the Department or persons in custody are confidential, and any discussion on these subjects shall be limited to that which is necessary in the performance of an employee's duties, and shall only be shared with persons authorized to receive such information. Any unauthorized disclosure of confidential information shall constitute just cause for disciplinary action. Communications to law enforcement agencies regarding the commission or possible commission of any criminal offense are not confidential. Employees may report suspected illegal activity to law enforcement without notifying a facility Superintendent, Chief of Staff or Superintendent of the Training and Intelligence Division (TID), if it is done in accordance with Paragraphs L (1) and L (2) below.

2.   An inmate's or detainee's criminal history and related information is protected by the provisions of the Criminal Record Offender Information (CORI) Act, detailed in G.L. c.6, §172 et seq., and may only be released to authorized persons in accordance with S153, Criminal Offender Record Information.

3.   An employee's personal information, e.g. address, telephone, SSN is also confidential and will not be released without authorization from the employee or under subpoena or a court order, unless dissemination of such information is required in the ordinary course of Department business.

4. Written or electronic information generated by any division of the Department may or may not qualify as a public record eligible for release outside the Department. Except as is specifically authorized by Department policy or procedure, internal information may not be released outside the Department unless and until authorized by the General Counsel or her designee.

5. Details of any Department investigation are confidential and the release of any information, unless authorized by a Superintendent, will be grounds for discipline. However, if the employee is the focus of the investigation, he/she may disclose any such information with his/her union representative and/or attorney to assist in his/her own defense.

6. Official records, papers, reports or copies of same shall not be removed from any Department facility without specific instruction or prior permission from the Superintendent except as is necessary for the performance of one's duties.

D. *Interactions with Public*

1. Employees shall be courteous and professional in all public contact that may arise in the course of their duties.

2. Tours:
   a) Formal tours of the institution may be arranged through the office of the Chief of External Affairs (COEA) or facility Superintendent.
   b) Unless assigned to the office of the COEA, employees may conduct tours only with prior approval of the facility Superintendent.

3. Employees are encouraged to publish or speak on subjects related to their position but must first obtain approval from the Chief of Staff.

E. *Interactions with the Media*

1. Only the Sheriff or the Chief of External Affairs, or their designee, may make statements to the media or release news statements or bulletins concerning the business of the Department.

2. The Superintendent reserves the right to determine whether or not the media will be permitted into any facility.

3. Media access to employees or inmates/detainees is governed by S130, Inmate Media Access and S131, Public Information and Media Access.

F. *Interactions with the Other Employees*

1. The mission of the Department requires cooperation between and among employees. Therefore staff must be considerate and courteous in all their working relationships.

2. Employees shall not foster discontent or engage in any activity that could lower the morale of another employee or disrupt the work environment, and will be discreet in the discussion of personal matters.

3. An employee may not inspect or have access to another employee's personal information, personnel file or other official documents unless it is necessary in the official performance of their duties.

4. Employees may not conduct investigations unless approved by a facility Superintendent and/or the Superintendent of TID. Reporting truthful information of the commission or possible commission of a crime regarding Departmental operations or security to appropriate law enforcement agencies in accordance with Paragraphs L(1) and L(2) below, shall not be construed as conducting an investigation.

G. *On-Duty Interactions with Inmates*

1. When interacting with inmates or detainees, employees must act solely in the furtherance of the Department's two-fold mission to provide for the custody and care of inmates and detainees.

2. Staff shall protect inmates/detainees from physical, emotional or sexual abuse, corporal punishment, personal injury, disease, property damage, discrimination and harassment.

3. Employees shall be professional, objective and unbiased in the application and enforcement of Department policies, procedures, post orders and relevant standards.

4. Employees shall not discuss Department business with, or in the presence of, inmates/detainees except as is required by their duties.

5. Employees must never express to an inmate/detainee a personal opinion regarding another employee or inmate or detainee, whether positive or negative.

6. Personal employee information shall not be discussed with, or in the presence of, inmates or detainees.

7. Employees must not give inmates/detainees the impression that staff are in conflict with one another, since such impression may lead to manipulative behavior.

8. Employees should not disclose the nature of an inmate/detainees' offense(s), or any visits with SID or outside law enforcement agencies, unless authorized to do so.

9. Except when expressly required by their duties, employees shall not intercede or act on behalf of an inmate/detainee's custody status with this Department or any another agency without prior approval of the facility Superintendent. Reporting truthful information of the commission or possible commission of a crime regarding Departmental operations and security to law enforcement in accordance with Paragraph L(1) and L(2) below shall not be construed as interceding or acting on behalf of an inmate/detainee's custody status.

10. Employees are prohibited from all forms of bartering, buying or selling, directly or indirectly with inmates/detainees.

11. Employees shall not accept a fee, gift, gratuity or any item of value from an inmate/detainee.

12. Employees shall not provide any fee, gift, gratuity, or any item of value to an inmate/detainee except as is required in the performance of their duties or as otherwise authorized by a facility Superintendent.

*H. Off-Duty Interaction with Inmates*

1. It is recommended that employees not associate with, accompany, correspond or have an intimate or personal relationship with any inmate/detainee or former inmate/detainee of any state or county facility except as is required in the course of one's duties. If however, an employee has or intends to have such contact or relationship they must first notify the facility Superintendent in writing.

2. Any other contact with a former inmate/detainee not covered by paragraph H (1) must also be reported in writing to the Superintendent.

3. Employees must notify the Superintendent if a relative or personal friend is committed to a Department facility. Employees are exempt from reporting contact with relatives after their release from Department custody.

4. The purpose of this notice requirement is to lessen any potential embarrassment to, and avoid any suggestion of impropriety by any employee, contractor or volunteer.

*I. Interaction with Inmates/Detainees' Friends or Family*

1. Any employee contact with an inmate/detainee's relatives or friends that results in the receipt of information relative to the commission or possible commission of a crime regarding Departmental operations or security must be reported in writing to a facility Superintendent, Chief of Staff or Superintendent of TID within twenty-four (24) hours or may be reported to the appropriate law enforcement agency in accordance with Paragraph L (1) and L (2) below.

2. Employees shall not accept a fee, gift, gratuity or any item of value from an inmate/detainee's family, friends, or any person acting on their behalf.

3. Employees shall not provide any fee, gift, gratuity, or any item of value to an inmate/detainee's family, friends, or any person acting on his/her behalf except as is required in the performance of their duties or as otherwise instructed by the Superintendent.

4. Conversation with inmates/detainees' visitors shall be limited to that which is required by an employee's duties.

## J. Fitness for Duty

1. Drug Policy

   Use of illegal drugs and abuse of alcohol or prescription medication are incompatible with service in a law enforcement agency, and such conduct will be dealt with in accordance with S215, <u>Drug Free Workplace</u>.

   a) The Department will not tolerate the presence of illegal drugs or alcohol on its premises, nor will it tolerate any of its employees reporting for duty or engaging in official business of the Department while under the influence of alcohol or drugs.

   b) Any employee who, under doctor's care or otherwise, is required to take medication while on duty that may affect their performance in any way must report this fact to their supervisor and the Superintendent.

   c) No employee may dispense or give medicine of any type, prescribed or not to an inmate/detainee unless:

      i. the medication is administered in accordance with Health Services Policy #20, <u>Medication Administration</u> by a licensed nurse, physician or dentist or expressly authorized by the Superintendent or designee.

2. Disability Or Need For Accommodation

   a) Any health problem, injury, or restriction which may affect an employee's job performance, or for which an employee may require an accommodation, must be medically documented and reported to the Director of Personnel.

   b) Such documentation must satisfy the following requirements:

      i. is an original;

      ii. be written on the stationery of the health care provider;

      iii. contain an original signature of the health care provider;

      iv. clearly state the specific physical restrictions the employee has due to the illness or injury;

      v. specify the expected duration of the restriction(s).

      vi. Division managers shall consult with the Director of Personnel on accommodations for work-related injuries and for non-work-related injuries.

      vii. is subject to review and resubmission every ninety (90) days.

3. Length Of Work Day

   a) No employee may work for the Department for more than sixteen (16) hours in a twenty-four (24) hour period, and after working sixteen hours must not work in any capacity for eight (8) hours before returning to duty. This prohibition shall include regular shifts, overtime, training, community affairs events, paid details and outside employment.

   b) If an employee is suspended for any reason, he/she may not work an overtime shift or work a detail during the twenty-four hour (24) period comprising said suspension.

4. Conduct On Duty

   a) Employees must not engage in any activity while working, which might interfere or distract them from the performance of their duties.

   b) Personal televisions, radios, cameras, CD, DVD or tape players and any other electronic devices are strictly prohibited inside the Jail, HOC, and all other SCSD programs unless authorized by the facility Superintendent.

   c) Reading materials other than official Department publications is prohibited while posted in a housing unit or control center unless authorized by the facility Superintendent.

d) Cell phones are prohibited inside the Jail and HOC unless authorized by the facility Superintendent.

e) The misuse of Department equipment or telephones and the generation of unauthorized charges will require restitution and may subject the employee to discipline.

5. Conduct Off-Duty

a) All employees regardless of their employment status, e.g. on leave of absence or suspension must report in writing any involvement with law enforcement officials including but not limited to an investigation, arrest, issuance of a restraining order or court appearance.

   i. Such reports shall be made to the facility Superintendent within 24 hours of the involvement with law enforcement officials, or prior to the commencement of the employee's next shift, whichever is sooner. Employees need not report contacts with law enforcement officials that consist of reporting information regarding the commission or possible commission of a crime regarding Departmental operations or security in accordance with Paragraph L (1) and L (2) below.

   ii. If the facility Superintendent is unavailable, reports shall be made to the Deputy Superintendent or Assistant Deputy Superintendent at the appropriate facility.

   iii. Employees may be required to produce copies of police reports and restraining orders.

b) All employees must be circumspect in their choice of associates, as even casual interaction with criminals, or with individuals engaged in illicit or illegal activities is inconsistent with employment with the Department.

K. *Department Property and Equipment*

1. Employees are responsible for the care, control and security of Department property.

2. If an employee's identification, badge, key card, or uniform articles, which bear official Department insignia, are lost, stolen or otherwise unaccounted for, a written report shall be filed immediately with TID.

3. Department property shall include equipment, supplies, the physical plant and any items issued to employees on a permanent or temporary basis.

4. Employees must promptly report the loss, damage, destruction, or discovered malfunction of any Department property. If responsible for the loss, damage, destruction or malfunction, an employee may be prosecuted, disciplined and/or required to make restitution.

5. Department letterhead is for official Department use only. Memoranda or reports intended solely for internal communication should be written on blank white paper, either with or without computer-generated headings. The unauthorized use or waste of Department letterhead or other materials is prohibited.

6. Equipment issued for any period of time must be returned in good condition.

7. Upon separation from service for any reason, employees must return all issued equipment, badges, key cards, identification cards, policy and training manuals and any other Department property in their possession.

L. *Reports*

1. Employees must report suspected criminal activity to a facility Superintendent, Chief of Staff or Superintendent of TID; unless the employee has a reasonable belief that such an internal report would result in retaliation by the employer.

2. If an employee reasonably believes that making an internal report of suspected criminal activity would result in retaliation by the employer, then the employee must immediately make an external report to the Boston Police Department, the Massachusetts State Police, or the Federal Bureau of Investigation. The employee will not be subject to discipline or retaliation by the employer for the act of reporting as long as the reporting is consistent with this paragraph and Paragraph L (1) above.

3. Employees are required to report in writing all significant events regarding Departmental operations or security in which they are involved or about which they have personal knowledge. These reports must be submitted promptly, but no later than the end of the employee's shift unless specifically authorized otherwise. Reports are to be submitted to the immediate supervisor, unless instructed otherwise by an investigating official or Department policy.

4. Employees must also file a written report whenever ordered to do so by any supervisor, member of SID any other Department official authorized to conduct an investigation.

5. Employees must be truthful and cooperate if requested by SID any other office or individual appointed to conduct an investigation) to submit to an interview whether or not the employee has previously submitted an oral or written report.

6. All reports generated in the course of an employee's duties are to be treated as confidential communications in accordance with paragraph C (2) (d).

7. Failure to report, false reporting, incomplete reporting or inappropriately collaborating or interfering with another employee in the preparation of a report may result in discipline or criminal prosecution.

### M. Attendance

1. Regular and punctual attendance is expected of all employees and excessive absenteeism or tardiness will be dealt with firmly in accordance with policies S207, S208 and S209, Managing Attendance, and S211, Unauthorized Absence.

2. Employees may not exchange duties or swap days or hours of work without prior authorization of their Shift Commander (uniformed) or immediate supervisor (non-uniformed).

3. While off-duty and if advised by any means that an emergency exists at any Department facility, all executive staff members, uniformed officers and medical staff must contact their respective supervisor and report for duty if so ordered.

### N. Administrative Procedures

1. It is the responsibility of each employee to have a working knowledge of the policies contained within the employee policy manual, and to understand and comply with the rules and procedures detailed therein.

2. If an employee does not understand a regulation, policy or an order, the employee is expected to seek explanation or clarification from his/her immediate supervisor.

3. All employees must scan official bulletin boards (for the presence of official orders, issued policies or notices) when reporting for, and departing from duty.

4. Any person tampering with, removing, defacing, or marking such orders or notices shall be subject to disciplinary action.

5. After any absence from his/her regularly-scheduled shift, an employee shall inquire of his/her supervisor whether any important information was disseminated during his/her absence.

## II. Offenses

If it is determined that an employee has committed any one of the following offenses or violated any Department policy, procedure or post order he/she is subject to discipline, up to and including termination:

A. Physical abuse of an inmate/detainee

B. Sexual contact with an inmate/detainee

C. Possession of illegal drugs or alcohol while on duty or in any Department facility or vehicle

D. A positive hair sample or urinalysis drug test

E.   Sexual harassment of anyone
F.   Conviction of any crime
G.   Possession of prescription medicine while on duty or in any Department facility/vehicle without prior approval of the Superintendent
H.   Acceptance of drugs/alcohol from, or delivery to, an inmate/detainee or employee
I.   Giving false statements orally or in writing while under oath or on an employment application or during an investigation
J.   Assault and/or battery on another person
K.   Assisting an inmate or detainee to escape or attempt to escape
L.   Use of excessive force
M.   Under the influence of drugs/alcohol when reporting for or while on duty
N.   Improper conduct
    1.   Conduct unbecoming of an officer (uniformed personnel)
    2.   Unprofessional conduct (non-uniformed personnel)
O.   Submission of a misleading, incorrect or false report (either oral or written)
P.   Possession of contraband within any Department facility or vehicle
Q.   Accepting contraband from, or delivering contraband to, an inmate, detainee or employee, contractor or volunteer
R.   Valid arrest or incarceration by a law enforcement agency
S.   Disrespect or insubordination:
    1.   To a superior in the presence of inmates/detainees;
    2.   To a superior in the presence of subordinates; or
    3.   To a superior
T.   Acts in a discourteous, disrespectful or insolent manner towards another person while on duty
U.   Inappropriate familiarity
    1.   With an inmate/detainee
    2.   With a fellow employee, contractor or volunteer
    3.   With visitors or the public
V.   Damage to property
    1.   Willful damage to Department property
    2.   Negligent use, misuse, abuse or misappropriation of Department property
W.   Improper/inappropriate attire:
    1.   Out of uniform (uniformed personnel)
    2.   Unprofessional attire (non-uniformed personnel)
    3.   Uncleanliness in person, dress or demeanor
X.   Unauthorized absence
    1.   AWOL (absence without leave)
    2.   Misuse of sick leave
    3.   Tardiness
    4.   Abuse of sick leave
Y.   Offenses against public safety
    1.   Unauthorized absence from or abandonment of a post
    2.   Neglect or dereliction of duty
    3.   Fighting or quarreling with fellow employees
    4.   Sleeping while on duty
    5.   Allowing an inmate/detainee to escape
    6.   Violation of health and/or safety rules

III.   Waivers and Modifications
    A.   *Emergency*
        Provisions of these and other rules may be temporarily waived or modified in an emergency situation by order of the Sheriff or Superintendent.

 Employee Code of Conduct

*Collective Bargaining Agreement*
Nothing in these rules shall be construed to conflict with any relevant collective bargaining agreements.

C.  *Authority*
If any article, section, subsection, sentence, clause or phrase in this or other Department policy, procedure or post order is for any reason held to be unconstitutional, contrary to statute, exceeds the authority of the Sheriff or the Superintendent, or is otherwise inoperative, such decision shall not affect the validity of any other part of said policy, procedure or post order.

001124

# EXHIBIT 23

1

2

VOL:  I
PAGES: 1-202
EXHIBITS: 1-6

3

4

5

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

6

7

8

9

10

11

* * * * * * * * * * * * * * * *
SHEILA J. PORTER,                   *
                Plaintiff           *
         -vs-                       *   Civil Action
ANDREA CABRAL; SUFFOLK COUNTY       *   No. 04-11935-DPW
SHERIFF'S DEPARTMENT; SUFFOLK       *
COUNTY and CORRECTIONAL MEDICAL     *
SERVICES, INC.,                     *
                Defendants          *
* * * * * * * * * * * * * * * *

12

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

13

14

15

16

17

18

19

DEPOSITION OF ELIZABETH KEELEY, ESQUIRE, a
witness called on behalf of the Plaintiff, in the
above-captioned matter, said deposition being
taken pursuant to the Federal Rules of
Civil Procedure, before Patricia M.
McLaughlin, a Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the offices of Goodwin Procter
LLP, Exchange Place, Boston, Massachusetts, on
Wednesday, May 11, 2005, commencing at 10:08 a.m.

20

21

22

23

McLAUGHLIN & ASSOCIATES COURT REPORTERS
92 DEVIR STREET, SUITE 304
MALDEN, MASSACHUSETTS  02148
781.321.8922
WWW.E-STENOGRAPHER.COM

24

33

1    correctional officers and the civilian staff

2    that were part of 209, was in 285, were

3    entitled to certain union protections.  So if

4    the discipline, if the behavior or violations

5    was a certain level of seriousness, our first

6    step would be to put them out, give them a

7    letter that they are placed on administrative

8    leave without pay and actually escort them

9    from the facility.  Then we would conduct an

10   investigation and have a hearing and

11   determine the level of discipline that should

12   be imposed.

13       We were still new to having established

14   procedures.  So it really depended upon the

15   circumstances.  It depended upon the

16   department violation.

17   Q    Were those procedures outlined in the

18        collective bargaining agreement?

19   A    Some of them are, yes.

20   Q    At the time were they written down anywhere

21        else besides the collective bargaining

22        agreement?

23   A    Well, S220 speaks to the fact that the

24        department will make a determination or

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

1    Q    When did that occur?

2    A    It was an ongoing process, but the final

3         version was completed or submitted to the

4         collective bargaining units at the end of

5         February.

6    Q    Did you have any role in the revision of

7         Policy S220?

8    A    Yes, I'm a member of the Policy Review

9         Committee.

10   Q    Why don't you briefly take me through the

11        mechanics of how a policy might come to be

12        revised or altered?

13   A    They're reviewed annually typically on the

14        month, each year on the same month, and the

15        Policy Review Committee, which consists of

16        myself, General Counsel, the two

17        superintendents and a senior lawyer assigned

18        to Human Resources Division, meet monthly and

19        review policies.  If the policy has a

20        particular specific relationship to one

21        aspect of the operation of the department, we

22        will ask meet in the month before the meeting

23        to have a member of that department whose

24        operation is impacted by the policy review

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

153

1    Q    Was the revision of Policy S220 related in

2         any way to the incident surrounding

3         Mr. Rosario and Mrs. Porter?

4    A    We had -- I would have to say, yes, there was

5         some connection, and we considered what

6         occurred during that investigation and the

7         conduct of Nurse Porter and our looking at

8         certain sections of the policy.

9    Q    Did you conclude that the policy should be

10        changed in part because of what transpired

11        with respect to Miss Porter?

12             MS. CAULO:  Objection.

13   A    I think we agreed that there needed to be

14        more clarification in certain sections of the

15        policy.  We removed other areas.  We edited

16        so that it was clear to employees the

17        expectations.  Yes, I'd have to say so there

18        would be more clarification to employees,

19        people that work for the department.

20   Q    Which areas needed clarification?

21   A    The one area concerning confidential

22        communications.

23   Q    Did any other areas in your mind need

24        clarification?

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

156

 1          those discussions?

 2    A    Something of that nature would have not just

 3          been deleted without discussion.  I would

 4          have -- we keep notes of our Policy Review

 5          meetings.  I just don't recall.  There are

 6          minutes that are kept of the meetings.  I

 7          just don't recall the discussion on this.

 8          I'd have to think about it.

 9              MR. SCHUMACHER:  Ellen, that's something

10          that we are going to be requesting, the

11          minutes of the Policy Review meeting with

12          respect to the recent revision of S220.

13          BY MR. SCHUMACHER:

14    Q    Under the second page, which is Bates stamped

15          001117, Subsection C, "Confidential

16          Communications," that's an area that you

17          testified changed; is that right?

18    A    Yes.

19    Q    And what was the substance of the changes

20          under Section C?

21    A    Well, I know we took out some paragraphs, and

22          we indicated specifically that communications

23          to law enforcement agencies regarding the

24          commission or possible commission of any

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

# EXHIBIT 24



5/22/03 BOSTONG B4

5/22/03 Boston Globe B4
2003 WLNR 3416679

Boston Globe (MA)
Copyright (c) 2003, Globe Newspaper Company

May 22, 2003

Section: Metro/Region

SUFFOLK SHERIFF WAS IN DEFAULT ON SCHOOL LOANS

Yvonne Abraham, Globe Staff

Suffolk County Sheriff Andrea J. Cabral, who just made headlines with her switch to the Democratic Party, had defaulted on her college and law school student loans in the late 1980s.

According to court documents, Cabral was found in default for failing to pay nearly $6,500 in loans and interest to Boston College, where she earned a bachelor of arts degree in 1981, and Suffolk University Law School, where she earned her law degree in 1986. Boston College won a judgment against Cabral for $4,134 in 1988, and Suffolk won a judgment against her for $2,344 in 1989.

Cabral, who said she struggled financially years ago, paid off both debts in 1994.

In an interview with the Globe, the sheriff said she was not proud of the defaults, but said she was unable to keep up with her bills when she first got out of law school, and earned a low salary as an assistant district attorney.

"I've always acknowledged the default and judgment on the student loans. I've never denied them when asked," she said. "It's not something I'm particularly proud of. What I will say is that there's a context. I was working as a public servant, an assistant DA. I started at $20,000. What I don't apologize for is having a job as a public servant that paid so little I couldn't afford to meet basic bills, pay rent, and pay my loans."

Originally from Providence, Cabral, 43, became a staff attorney at the Suffolk County sheriff's department after graduating from law school, working on bail reduction cases at the Charles Street Jail. The following  year, she began as an assistant district attorney in Middlesex County, where she handled felony cases in Middlesex Superior Court. She worked there until 1991, when she moved to the office of the attorney general, civil rights division. In 1993, she joined the office of Suffolk District Attorney Ralph Martin II.

In Martin's office, Cabral was director of Roxbury District Court's Family Violence Project, then, in 1994, became chief of the domestic violence unit.

That was the year she finally cleared her college debts, with her family's help, she said.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"As soon as I was in position to do that, with help from my family, they were paid off," Cabral said. "I'm not proud of the fact that it happened, but I'm very proud of my career in public service, and for doing what I did for very little money."

In 1998, she was promoted to chief of district courts and community prosecutions.

Martin, a Republican, became a mentor for Cabral. He recommended her to then-Acting Governor Jane Swift  to fill the sheriff's post, left vacant by the departure of Richard Rouse last November. Cabral agreed to change her party registration from Unenrolled to Republican as a condition of her appointment, and promised Swift she would run for election in 2004 as a Republican.

Cabral has been a hot political commodity over the past week or so, since news of her intention to shift her party allegiance from the Republicans to the Democrats leaked out. Friends of Cabral said she was unhappy with her relations with Governor Mitt Romney and other Republicans, particularly in the face of her difficulties paying a $5 million settlement against her department for treatment of women at the Nashua Street Jail.

Republicans had been trying to persuade Cabral to stay in the party, while Democrats, including US Senator Edward M. Kennedy, had encouraged the switch. She announced her intentions to become a Democrat in Kennedy's Capitol Hill office Tuesday.

In the wake of her announcement, Republicans accused Cabral of switching parties so that it would be easier for her to win re-election in heavily Democratic Suffolk County next year.

Cabral would not comment on accusations that she was changing party registration for political purposes. So far, she has raised less than $5,000 for her upcoming race, which could require hundreds of thousands of dollars. As a Democrat, she may face a primary battle against Boston City Councilor Steven Murphy, who has spent years building up a political network and coralling donors.

PHOTO

 ANDREA J. CABRAL Paid $6,500 debt in '94

    TYPE: MET

                    ---- INDEX REFERENCES ----

NEWS SUBJECT:  (Judicial (1JU36); Legal (1LE33); Education (1ED85))

REGION:  (United Kingdom (1UN38); Massachusetts (1MA15); Europe (1EU83); USA (1US73); Americas (1AM92); England (1EN10); New England (1NE37); North America (1NO39); Western Europe (1WE41))

Language:  EN

OTHER INDEXING:  (BOSTON CITY; BOSTON COLLEGE; CHARLES STREET JAIL; DA; DEMOCRATS; FAMILY VIOLENCE PROJECT; MIDDLESEX SUPERIOR COURT; NASHUA STREET JAIL; PHOTO; ROXBURY DISTRICT COURT; SHERIFF; SUFFOLK; SUFFOLK UNIVERSITY LAW SCHOOL)  (Andrea J. Cabral; Cabral; Edward M. Kennedy; Jane Swift; Kennedy; Martin; Mitt Romney; Originally; Ralph Martin; Republicans; Richard Rouse; Steven Murphy; Swift)  (NAME

©  2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 25

Citation                          Search Result              Rank 8 of 11           Database
8/12/04 BOSTONH 25                                                                  MANEWS

8/12/04 Boston Herald 25
2004 WLNR 1138997

Boston Herald (MA)
Copyright (c) 2004 Boston Herald. All rights reserved.

**August 12, 2004**


Section: News

Not very re-fined! Cabral keeps paying for finance blunders

Ann E. Donlan

Suffolk County Sheriff **Andrea Cabral**'s campaign is becoming quite accustomed to doing business with the state's campaign finance watchdog - and so is its checkbook.

Cabral's campaign mailed fund-raising postcards in April to potential supporters that listed endorsements by five public employees.

The state **Office of Campaign and Political Finance** conducted a review that led the campaign to recently pay the state a $500 fine.

"This office considers political fund raising by non-elected public employees to be a matter of serious concern," wrote OCPF Director Michael J. Sullivan in a letter to Cabral.

"The campaign regrets the error that it made," said campaign spokesman Matt O'Malley.

Cabral has come under fire for refusing to award vacation and sick time to members of the armed services employed by her department while they serve overseas, and withholding payments from the Boston Retirement Fund.

Cabral also recently suspended an employee for using a department truck to deliver office furniture to her campaign office during work hours.

The OCPF's letter noted that Cabral's campaign paid the Sheriff's Department $150 to resolve that incident.

"I think she knows the law. She just simply flouts the law," said Cabral's opponent in the Sheriff's race, Boston City Councilor Stephen Murphy.

Caption: CABRAL: Recently hit with OCPF fine for $500.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 26

Citation                    Search Result          Rank 12 of 18          Database
  '03 BOSTONG B3                                                           MANP

4/5/03 Boston Globe B3
2003 WLNR 3459018

Boston Globe (MA)
Copyright (c) 2003, Globe Newspaper Company

**April 5, 2003**


Section: Metro/Region

US JUDGE FINES SUFFOLK SHERIFF'S OFFICE WOMEN ARE OWED $5M IN SETTLEMENT

Francie Latour, Globe Staff

Castigating the Suffolk County Sheriff's Department and the city of Boston for playing "a shell game" at the expense of  victims, a federal judge yesterday held Suffolk County in contempt for failing to pay a $5 million settlement owed to women who were illegally strip-searched at the Nashua Street jail.

Ruling on behalf of 1,500 women who were illegally strip-searched by Suffolk j  l guards, US District Court Judge Nancy Gertner imposed a series of fines that start at $3,000 per day and increase by $1,000 a day for each week the settlement goes unpaid.

Combined with interest penalties that have been mounting since November, county officials could owe close to a half-million dollars in addition to the settlement amount if the money isn't paid by May 7, the date of the next court hearing.

Lawyers for the Sheriff's Department agreed last year to pay $5 million to settle a 1999 federal lawsuit filed by the women. But now they say that the Sheriff's Department doesn't have the money and that Boston, as the county seat, is liable for any judgment against the county.

As lawyers for the city and the Sheriff's Department bitterly argued over who presides over the antiquated county government structure, Gertner expressed disbelief at the maze of obscure statutes each side cited in denying responsibility.

"You know, I don't think someone could have written this as fiction," Gertner said.

"I won't have people play games with me," she said. "Suffolk County or the S  iff's Department, whoever it is, someone is going to pay this money."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4/5/03 BOSTONG B3

'ertner rejected a move by lawyers for the Sheriff's Department to withdraw as the defendant's attorney.

After the hearing, the city's chief lawyer, Merita A. Hopkins, said that city officials were prepared to go to court to determine who represents the county.

Hopkins said the sheriff had a number of options to pay the money: Asking the state for a supplemental budget, building the cost into next year's budget, or tapping a $25 million pool of the sheriff's funds Hopkins said has not been earmarked.

Sheriff Andrea **Cabral** said yesterday there was no money for the settlement, and she accused city officials of blocking her efforts to obtain emergency funds from the state by refusing to sign a loan application.

The stalemate hinges on the city of Boston's role as the county seat. When the lawsuit was filed, it named two defendants: Boston and Suffolk County. The city was named because the women were arrested by Boston police before they were taken to the jail and strip-searched.

When the city and Sheriff's Department agreed to settle the case for $10 million, each promised to pay $5 million. The city paid its share last fall.

But the rest of the money went unpaid after an unwritten agreement between s  .e officials and former sheriff Richard J. Rouse to secure state funds was not carried out. Rouse retired on Nov. 30, the day the money was due.

The Boston City Council and the mayor serve as county commissioners, providing about 5 percent of the sheriff's budget and handling payroll and other bookkeeping for the department. Both **Cabral** and the plaintiffs' lawyer, Howard Friedman, argued that unlike other counties that have been abolished, Suffolk County still operates under the county structure.

According to **Cabral**, the city paid the bill for two lawsuits filed against the county in the late 1990s. In one case, the city paid $90,000 to a woman alleging discrimination by the sheriff; in another case, the city paid $25,000 to settle a lawsuit. **Cabral** conceded that the sheriff's office has made payments in lawsuits in which the amounts were smaller.

But city officials pointed to the past four years of litigation in the **strip-search** case. From the time the suit was filed, they said, lawyers for the Sheriff's Department have represented the county. When the case was settled, they said, the sheriff's lawyers signed the agreement knowing they were responsible for securing their share of $5 million.

"When we said Suffolk County, everyone knew that meant the Suffolk County Sheriff's Department," said Eve A. Piemonte- Stacey of the city's law c  .rtment.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4/5/03 BOSTONG B3

    "The only thing in Suffolk County is the Sheriff's Department," she said.
·_ _'s only when they suddenly decide this bill is too big to pay that they
decide to invoke this idea of a county commissioner."


                    ---- INDEX REFERENCES ----

NEWS SUBJECT:  (Legal (1LE33); Government Litigation (1GO18))

REGION:  (United Kingdom (1UN38); Massachusetts (1MA15); Europe (1EU83); USA
(1US73); Americas (1AM92); England (1EN10); New England (1NE37); North America
(1NO39); Western Europe (1WE41))

Language:  EN

OTHER INDEXING:  (**CABRAL**; COURT; NASHUA STREET; SETTLEMENT; SHERIFF; SHERIFF
ANDREA **CABRAL**; SUFFOLK; SUFFOLK COUNTY; SUFFOLK COUNTY SHERIFF; SUFFOLK COUNTY
SHERIFFS DEPARTMENT)  (Eve A. Piemonte; FINES SUFFOLK SHERIFF; Gertner; Hopkins;
Howard Friedman; Merita A. Hopkins; Nancy Gertner; Richard J. Rouse; Rouse)
(SUFFOLK COUNTY; POLICE; RULING )

EDITION: THIRD

W^rd Count: 874
    /03 BOSTONG B3


ʟ  OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.