UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SHEILA J. PORTER, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | |
| | ) | CIVIL ACTION NO. 04-11935-DPW |
| ANDREA CABRAL, SUFFOLK | ) | |
| COUNTY SHERIFF'S DEPARTMENT, | ) | |
| SUFFOLK COUNTY, and | ) | |
| CORRECTIONAL MEDICAL | ) | |
| SERVICES, INC., | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## PLAINTIFF SHEILA PORTER'S RESPONSE TO DEFENDANTS ANDREA CABRAL, SUFFOLK COUNTY SHERIFF'S DEPARTMENT AND SUFFOLK COUNTY STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1

Pursuant to Local Rule 56.1, Plaintiff Sheila Porter ("Mrs. Porter") hereby submits her

response to Defendants Andrea Cabral, Suffolk County Sheriff's Department and Suffolk

County's ("Suffolk Defendants") Statement of Undisputed Facts:

1.     The Plaintiff Sheila Porter ("Mrs. Porter") is a former contract worker and nurse
       practitioner employed by Defendant Correctional Medical Services, Inc. ("CMS") at the
       Suffolk County House of Correction ("HOC").  (Amended Complaint).

       **Mrs. Porter admits that she was an employee of CMS but states that she was a joint**

**employee with the SCSD.  *See* Declaration of Sheila Porter ("Porter Decl."), ¶¶ 23-39**

**(Exhibit ("Ex.") 1).**

2.     Defendant Andrea J. Cabral was appointed Suffolk County Sheriff on November 29,
       2002 to complete the remaining term of Sheriff Richard J. Rouse who retired in
       November 2002.  (Deposition of Andrea Cabral ("Cabral"), May 6 2005, pg. 12, attached
       hereto as Exhibit 25).

       **Admitted**

3.    All contractors, vendors, volunteers and interns are required to comply with SCSD policies including Policy S-220, Employee Code of Conduct. (Affidavit of Gerard Horgan ("Horgan"), attached hereto as Exhibit 7).

**Mrs. Porter states that there is a dispute as to whether CMS employees were required to comply with Policy S220. Mrs. Porter states that, while the current version of Policy S220 states that all contractors must adhere to its terms, the version in effect in June 2003 did not contain this clause. *See* Policy S-220 (in effect in June 2003) (Ex. 20); *see also* Policy S-220 (currently in effect) (Ex. 31).**

4.    The Suffolk County Sheriff's Department (SCSD) has the authority to discipline its employees for violations of its policies. At all relevant times the SCSD maintained procedures for disciplining its employees. (Affidavit of Michael Harris ("Harris"), attached hereto as Exhibit 8).

**Admitted**

5.    The SCSD does not discipline contract workers, vendors, volunteers or interns. (Harris Affidavit, Exhibit 8).

**Disputed. The SCSD has the authority to discipline contract workers short of barring them. For instance, a contract worker's supervisor may be instructed to speak with the contract worker, or a warning letter may be issued. *See* Deposition of Elizabeth Keeley ("Keeley dep."), p. 139 (Ex. 21).**

6.    Barring is the standard mechanism for removing contract workers, vendors, volunteers, and interns from the SCSD. (Horgan Affidavit, Exhibit 7).

**Admitted**

7.    Contract workers, vendors, volunteers or interns who are barred are not entitled to a hearing. ( Horgan Affidavit, Exhibit 7).

**Denied to the extent that the contract worker is a joint employee of the contractor and the SCSD.**

8.    Both prior to and during the Cabral Administration numerous contractors and vendors were barred from the SCSD. None received a hearing. (Horgan Affidavit, Exhibit 7).

**Admitted**

9.    At all relevant times there existed a division within the SCSD that was responsible, among other things, for investigating allegations of inmate abuse - the Sheriff's Investigation Division ("SID"). (Horgan Affidavit, Exhibit 7). Mrs. Porter was aware of SID and understood its role in investigating allegations of inmate abuse. (Deposition of Sheila Porter ("Porter"), May 18 & 26, 2005, pgs. 151, 153, attached hereto as Exhibit 11).

**Admitted**

10.   Mrs. Porter frequently reported allegations of inmate abuse to SID during the period of time that she worked at the HOC. (Porter Deposition, pgs. 151-152, Exhibit 11).

**Admitted**

## Medical Care at the Suffolk County House of Correction

11.   At all relevant times health care services at the HOC were provided by a private company pursuant to a contract with Suffolk County. (Horgan Affidavit, Exhibit 7).

**Admitted**

12.   From January 2001 to approximately April 2005 Defendant CMS was responsible for the coordination and provision of health care services at the HOC pursuant to a contract with Suffolk County. Prior to CMS, Correctional Healthcare Solutions, Inc. ("CHS") was responsible for the coordination and provision of health care services at the HOC pursuant to a contract with Suffolk County. (Horgan Affidavit, Exhibit 7).

**Admitted**

13.   There was no employment relationship between Suffolk County and CMS. The only relationship between Suffolk County and CMS was a contract to provide health care services at the HOC. (Deposition of Ann Mack ("Mack"), May 3, 2005, pg. 33, attached hereto as Exhibit 14).

**Denied.  *See* Response 22, *infra*.**

14.   The contracts between Suffolk County and CMS and CHS required that CMS and CHS maintain certain staffing levels at the HOC for the provision of health care services at the HOC. CMS and CHS interviewed and hired the staff necessary to maintain those staffing levels and provide the medical care at the HOC. (Horgan Affidavit, Exhibit 7; Mack Deposition, pgs. 33-34, 37-38, attached hereto as Exhibit 14).

**Admitted.  The SCHOC also required and performed background checks on**

**all proposed CMS employees.  *See* Deposition of Gerard Horgan ("Horgan dep.")**

**(Ex. 4), pp. 144-145;** *see* **Deposition of Ann Mack ("Mack dep.") (Ex. 3), pp. 34-35, 51-52.**

15.   At all relevant times CMS employed a Health Service Administrator ("HSA") who had responsibility for arranging all levels of healthcare and the delivery of health services provided to the inmates incarcerated at the HOC.  (Mack Deposition, pgs. 35-36, Exhibit 14; Deposition of Donna Jurdak ("Jurdak"), June 20, 2005, pg. 20 attached hereto as Exhibit 15).

      **Admitted**

16.   The HSA was also responsible for management of the Health Services Unit at the HOC and budgetary issues relative to the coordination and provision of health care services at the HOC.  (Jurdak Deposition, pg. 20, Exhibit 15).

      **Admitted**

17.   In 2003 CMS employed Donna Jurdak ("Jurdak") as the HSA at the HOC.  (Mack Deposition, pg. 60, Exhibit 14; Jurdak Deposition, pg. 16, Exhibit 15).

      **Admitted**

18.   HSA Jurdak knew that the SCSD had the right to bar CMS employees from the HOC at any time.  (Jurdak Deposition, pg. 80, Exhibit 15).  During the period of time that HSA Jurdak worked at the HOC a number of CMS employees were barred from the HOC. None were provided with a hearing.  (Jurdak Deposition, pgs. 82-83, Exhibit 15).

      **Admitted**

19.   HSA Jurdak knew that all CMS employees were required to comply with the policies of the SCSD, including S220.  (Jurdak Deposition, pg. 42, Exhibit 15).

      **Disputed**.  *See* **Response to Statement 3** *supra*.

20.   HSA Jurdak was aware of her obligation to report allegations of inmate abuse to SID and she frequently reported allegations of inmate abuse to SID during the period of time that she worked at the HOC.  (Jurdak Deposition, pgs. 45-47, Exhibit 15).

      **Admitted**

21.   HSA Jurdak informed her CMS medical staff, including Mrs. Porter, of their obligation to report allegations of inmate abuse to SID.  (Jurdak Deposition, pgs. 45-47, Exhibit 15).

**Admitted.  Ms. Jurdak told her staff that they could either report directly to SID or they could report to her and she would report to SID.  *See* Jurdak dep. p. 45 (Ex. 2).**

22.    SID frequently asked CMS medical staff, including Jurdak and Mrs. Porter, for written reports.  The SCSD had an "incident report" form, which was to be used for written reports.  (Jurdak Deposition, pg. 50, Exhibit 15).  HSA Jurdak never felt intimidated or deterred from making such reports to SID.  (Jurdak Deposition, pg. 50, Exhibit 15).

**Mrs. Porter admits that SID frequently asked CMS medical staff, including Ms. Jurdak and Mrs. Porter, for written reports.  Mrs. Porter admits that the SCSD had an incident report form that could be used for written reports but the forms were often not available to CMS staff, so CMS staff often filed reports on progress notes or plain paper.  *See* Jurdak dep., pp. 36-37, 50 (Ex. 2).  The SCSD does not care about the form used to report incidents.  *See* Horgan dep., p. 101 (Ex. 4); Deposition of Elizabeth Keeley ("Keeley dep."), pp. 99-100 (Ex. 21); Deposition of Mary Ellen Mastrorilli ("Mastrorilli dep."), p. 54 (Ex. 7).  Mrs. Porter admits that Ms. Jurdak never felt intimidated from making such reports to SID but other CMS staff often were.  *See* Jurdak dep. pp. 47-48 (Ex. 2).**

23.    Mrs. Porter never told HSA Jurdak that she felt uncomfortable in reporting officer misconduct to SID or deterred from doing so.  (Jurdak Deposition, pgs. 58-59, 105, Exhibit 15).

**Admitted**

24.    At all relevant times CMS employed a Medical Director who was responsible for clinical decision regarding health care services at the HOC.  (Mack Deposition, pg. 35-36, 62, Exhibit 14; Jurdak Deposition, pgs. 19-20, Exhibit 15).

**Admitted**

25.    In 2003 CMS employed Dr. Carl Singletary as the Medical Director at the HOC.  (Mack Deposition, pg. 62, Exhibit 14; Jurdak Deposition, pgs. 23-24, Exhibit 15).

**Admitted**

26.     Decisions regarding the specific medical care and treatment provided to inmates, including the necessity of diagnostic testing or hospitalization, were made by CMS without input from the SCSD.  (Porter Deposition pgs. 40-42, Exhibit 11; Mack Deposition, pgs. 264-268, Exhibit 14; Jurdak Deposition, pgs. 68, 70, Exhibit 15).

**Denied.  *See* Porter Decl., ¶ 24 (Ex. 1).**

27.     CMS was responsible for purchasing all the supplies (e.g. medication, narcotics, syringes, bandages, etc.) necessary for the daily delivery of health care services at the HOC.  The SCSD provided the space for the Health Services Unit and purchased some large pieces of equipment (e.g. x-ray machine & dentist chair).  (Horgan Deposition, pgs. 158-159, Exhibit 6; Mack Deposition, pg. 269, Exhibit 14).

**Disputed to the extent that Statement 27 suggests that the large pieces of equipment purchased by the SCSD, such as X-Ray machines, dialysis machines and dental chairs, were not necessary for the daily delivery of health care services at the HOC.  *See* Horgan dep. pp. 159-60 (Ex. 4); Mack dep. p. 269 (Ex. 3).**

28.     The SCSD provided security and escort for the medical staff and inmates to facilitate the provision of medical care by CMS to the inmates.  (Horgan Deposition, Exhibit 10)

**Admitted**

29.     In 2003, Interdisciplinary Progress Notes was the form used by the medical staff at the HOC to document encounters with inmates in the inmates' medical records.  (Mack Deposition, pgs. 186-187, Exhibit 14).

**Disputed to the extent that Statement 29 suggests that this was the exclusive use of Interdisciplinary Progress Notes.  These Notes were often also used to report incidents to SID.  *See* Jurdak dep., pp. 36-37, 50 (Ex. 2).**

30.     Medical staff at the HOC are required to document all medical encounters with inmates in the inmate's medical records, using Interdisciplinary Progress Notes.  (Mack Deposition, pgs. 279-281, Exhibit 14; Porter Deposition pgs. 46-48, Exhibit 11; Jurdak Deposition, pgs. 34-35, Exhibit 15).

**Admitted to the extent that "medical encounters" are defined as hands-on physical examinations, sick calls, chronic disease visits and emergency treatment.  Only these medical encounters were required to be documented in an inmate's**

**medical records.  *See* Jurdak dep. pp. 33, 35-36 (Ex. 2); Porter Decl. ¶¶. 1).  Mrs.**

**Porter was not required to record her observations of Inmate Rosario on May 19,**

**2003 in his medical file.   *See* Jurdak dep., pp. 36, 38 (Ex. 2).**

31.    The medical provider at the HOC maintains all inmate medical records.  Between January 2001 and approximately April 2005 CMS maintained the medical records for inmates incarcerated at the HOC.  (Mack Deposition, pgs. 281, Exhibit 14; Jurdak Deposition, pg. 14, Exhibit 15; Porter Deposition, pg. 43, Exhibit 11; Horgan Deposition, pg. 160, Exhibit 10).

**Mrs. Porter admits that the medical provider at the HOC maintains all**

**inmate medical records, and that CMS did so from 2001 through 2005.  Mrs. Porter**

**further states that inmates' medical records were maintained at the SCHOC and**

**are kept there for 30 years, regardless of which medical provider maintains a**

**contract with the SCHOC.  *See* Horgan dep., p. 161 (Ex. 4).  Mrs. Porter states that**

**Donna Jurdak testified that she often witnessed SCSD employees viewing inmates'**

**medical records without authorization.  *See* Jurdak dep. p. 66 (Ex. 2).**

32.    The SCSD requires and performs background checks on all contractors, vendors, interns and volunteers working at the HOC.  (Mack Deposition, pgs. 54, Exhibit 14).

**Admitted**

33.    The contracts negotiated between Suffolk County and CMS and CHS provided that the SCSD reserved the unilateral right to bar any CMS/CHS employee from the HOC. (Horgan Affidavit, Exhibit 7; Horgan Deposition, pg. 154, Exhibit 10; Mack Deposition, pg. 270, Exhibit 14).

**Admitted**

34.    The contracts negotiated between Suffolk County and CMS and CHS provided that CMS and CHS employees were required to comply with all SCSD policies.  (Horgan Affidavit, Exhibit 7; Jurdak Deposition, pg. 42, Exhibit 15).

**Disputed.  Counsel cannot find such a reference in these contracts.**

35.    Mrs. Porter was aware of her obligation to comply with the policies of the SCSD.  (Porter Deposition, pg. 84, Exhibit 11).

Mrs. Porter states that there is a dispute as to whether CMS employees were required to comply with Policy S220.  Mrs. Porter states that, while the current version of Policy S220 states that all contractors must adhere to its terms, the version in effect in June 2003 did not contain this clause.  *See* **Policy S-220 (in effect in June 2003) (Ex. 20);** *see also* **Policy S-220 (currently in effect) (Ex. 29).**

36.    As an employee of CMS and nurse practitioner at the HOC, Mrs. Porter was required to report allegations of inmate abuse to the SCSD.  (Horgan Affidavit, Exhibit 7).

**Admitted to the extent that Mrs. Porter was allowed to report allegations of inmate abuse either directly to SID or to her supervisor.  *See* Jurdak dep., p. 45 (Ex. 2).**

37.    Mrs. Porter was aware of her obligation to report allegations of inmate abuse to SID. (Porter Deposition, pgs. 220-22 1, Exhibit 11).

**Admitted**

**Mrs. Porter's Employment Status**

38.    Mrs. Porter was hired by CHS and worked as a nurse practitioner for CHS at the HOC from August 1994 until January 2001.  (Porter Deposition, pg. 15, Exhibit 11)

**Disputed to the extent that this statement suggests that the Suffolk County Sheriff's Department ("SCSD") had no role in hiring Mrs. Porter.  The SCSD provided CMS with precise staffing needs for all of its positions, including nurse practitioners, and it required and performed a background check on all of the proposed CMS staff members, including Mrs. Porter.  *See* Horgan dep, pp. 144-145 (Ex. 4);** *see* **Mack dep., pp. 34-35, 51-52 (Ex. 3);** *see* **Response to Suffolk County Request for Proposal (Ex. 43).**

39.    Mrs. Porter was hired by CMS and worked as a nurse practitioner for CMS at the HOC from January 2001 to June 10, 2003.  (Mack Deposition, pg. 53, Exhibit 14; Porter Deposition, pg. 14, Exhibit 11).

       **Admitted**

40.    CMS terminated Mrs. Porter on or about June 10, 2003.  (Mack Deposition, pgs. 85, 121, Exhibit 14).

       **Admitted**

41.    CMS made the decision to terminate Mrs. Porter because CMS did not have a position available for her.  (Mack Deposition, pgs. 221-222, Exhibit 14).

       **Disputed.  Mrs. Porter disputes that CMS was required to terminate Mrs. Porter because the CMS Success Guide clearly indicates that CMS has discretion whether or not to terminate an employee who has been barred from a facility.  *See* Employee Success Guide, p. 19 (Ex. 47).  Mrs. Porter also disputes that CMS made the decision to terminate her.  Ms. Mack testified that it was the SCSD, not CMS, who terminated Mrs. Porter; Ms. Mack testified that CMS merely "processed" the termination and CMS' agent stated that "That decision was made for them by the entity."  *See* Mack dep., pp. 73, 122, 127, 134, 146 (Ex. 3).  Moreover, CMS has stated that "No one at CMS made a decision to terminate Mrs. Porter's employment."  Response to Mrs. Porter's First Set of Interrogatories, No. 1 (Ex. 50).**

42.    Currently CMS has contracts to provide health care services at the Essex County Correctional Facility and all the state prisons within the Department of Corrections.  (Mack Deposition, pgs. 29-30, Exhibit 14).

       **Admitted**

43.    CMS rehired Mrs. Porter in October 2003, once a position became available, to work as a full time nurse practitioner at the Essex County House of Correction.  Mrs. Porter worked for CMS as a nurse practitioner at the Essex County House of Correction from October 2003 until March 2004 when she resigned.  (Mack Deposition, pgs. 79, Exhibit 14; Porter Deposition, pg. 14, Exhibit 11).

       **Mrs. Porter admits that she was rehired by CMS in October 2003 and worked at the Essex County HOC from October 2003 until March 2004, when she resigned.  Mrs. Porter disputes that this was the first position anywhere at CMS to**

**become available between June 10, 2003 and October 2003.** *See* **Mack dep., pp. 168, 170, 172 (Ex. 3).**

44.  The SCSD was aware that barring a CMS/CHS employee from the HOC did not mean they were terminated by their employer (CMS/CHS). CMS/CHS could place the employee at another facility where they had a contract to provide services. (Horgan Deposition, pgs. 154-155, Exhibit 6).

  **Disputed. The CMS Success Guide states that "loss of institution access normally results in termination of employment by CMS."** *See* **CMS Success Guide, p. 19 (Ex. 47). Mrs. Porter admits that CMS/CHS could place a barred employee at another facility.**

45.  From January 2001 through June 10, 2003 CMS paid Mrs. Porter's salary and contributed to her 401(k) plan. (Porter Deposition pgs. 17-18, Exhibit 11; Mack Deposition pg. 53, Exhibit 14; Exhibit 16).

  **Admitted.**

46.  CMS provided Mrs. Porter with W-2 forms for the time period of her employment. (Exhibit 18).

  **Admitted**

47.  From January 2001 through June 10, 2003 CMS determined Mrs. Porter's salary, vacation and sick leave and controlled her hours, work schedule and assignments. (Porter Deposition, pgs. 17-18, Exhibit 11; Mack Deposition, pg. 53, Exhibit 14; Exhibit 17).

  **Disputed. The SCSD provided CMS with precise staffing needs for all of its positions, including nurse practitioners.** *See* **Horgan dep., pp. 157-58 (Ex. 4). The SCSD also set the times that inmates could be seen for medical care.** *See* **Jurdak dep., pp. 70-71 (Ex. 2); Porter Decl. ¶ 25 (Ex. 1).**

48.  From January 2001 through June 10, 2003 CMS evaluated Mrs. Porter's performance as a nurse practitioner and maintained her personnel file. The performance evaluations were used by CMS, among other things, as a tool to determine Mrs. Porter's salary. (Porter Deposition, pgs. 19, 21-23, & 408, Exhibit 11; Mack Deposition, pgs. 63-64, Exhibit 14).

**Mrs. Porter admits that she received annual evaluations from CMS but states that her performance was also witnessed and evaluated by SCSD employees, including Ms. Mastrorilli and Superintendent Gerard Horgan.  *See* Horgan dep., pp. 55-56 (Ex. 4); *see* Porter Decl., ¶ 26 (Ex. 1).  Mrs. Porter states that the personnel file was kept at the HOC.  *Id*., ¶ 27.**

49.    CMS provided Mrs. Porter with the CMS Employee Success Guide that sets forth, among other things, the personnel policies, disciplinary process, rules and benefits concerning her employment with CMS.  (Mack Deposition, pgs. 191-195, Exhibit 14; Porter Deposition, pgs. 23-24, Exhibit 11).

**Admitted**

50.    The CMS Employee Success Guide provides that it is not an employment contract and should not be construed as such.  (Exhibit 19; Porter Deposition, pg. 408, Exhibit 11).

**Admitted.  Mrs. Porter states that, despite this boilerplate clause, she believed that she had entered into a contractual relationship with CMS.  See Porter Decl., ¶ 30 (Ex. 1).**

51.    The CMS Employee Success Guide provides that the "institution may temporarily or permanently withdraw access from anyone who works in or enters the institution....Loss of institution access normally results in termination of employment by CMS as security clearance/access is a precondition of employment by CMS." (Exhibit 19; Mack Deposition, pg. 214).

**Admitted**

52.    Mrs. Porter never signed a contract of employment with CMS.  (Porter Deposition, pg. 407, Exhibit 11).

**Disputed.  Mrs. Porter admits that she did not sign a contract of employment with CMS, but she believes that she had a contractual relationship with CMS.  See Porter Decl., ¶ 30 (Ex. 1).**

53.    Mrs. Porter never signed an employment contract with Suffolk County or the SCSD. (Harris Affidavit, Exhibit 8).

**Admitted**

54.    Suffolk County and the SCSD did not interview or hire Mrs. Porter.  The SCSD did not provide Mrs. Porter with a copy of the SCSD Employee Handbook.  (Harris Affidavit, Exhibit 8; Porter Deposition, pgs. 25, 27, Exhibit 11).

**Mrs. Porter admits that the SCSD did not interview her or provide her with a copy of the SCSD Employee Handbook.  Mrs. Porter disputes that the SCSD did not hire her because it provided CMS with precise staffing needs for all of its positions, including nurse practitioners, and it required and performed a background check on all of the proposed CMS staff members, including Mrs. Porter.  *See* Horgan dep., pp. 144-145 (Ex. 4); *see* Mack dep., pp. 34-35, 51-52 (Ex. 3)**

55.    The SCSD does not maintain a personnel file for Mrs. Porter. (Harris Affidavit, Exhibit 8).

**Admitted**

56.    Suffolk County and the SCSD did not pay Mrs. Porter's salary, contribute to her 401 (k) plan or provide her with a W-2 form.  (Harris Affidavit, Exhibit 8; Porter Deposition, pgs. 18-19, Exhibit 11).

**Admitted**

57.    Suffolk County and the SCSD did not evaluate Mrs. Porter's performance as a nurse practitioner or participate in the evaluation process conducted by CMS.  (Porter Deposition, pg. 22, Exhibit 11).

**Mrs. Porter admits that the SCSD did not participate in CMS' formal reviews of her performance but disputes that the SCSD had no role in evaluating her performance.  *See* Response to Statement 48 *supra*.**

58.    Suffolk County and the SCSD did not determine Mrs. Porter's salary, vacation and sick leave nor exercised any control over her hours, work schedule, and assignments.  (Harris Affidavit, Exhibit 8; Porter Deposition, pgs. 61-64, 71-73 , Exhibit 11).

**Disputed.  *See* Response to Statement 47 *supra***

59.    Mrs. Porter was not a member of any union or collective bargaining unit at the SCSD. (Harris Affidavit, Exhibit 8; Porter Deposition, pg. 339, Exhibit 11).

**Admitted**

60.     Mrs. Porter was not covered by the terms of any collective bargaining agreement negotiated by unions representing Suffolk County employees working at the SCSD and Suffolk County.  (Harris Affidavit, Exhibit 8).

**Admitted**

61.     Mrs. Porter knew that the SCSD retained the right to bar CMS employees from the HOC. (Exhibit 1; Porter Deposition, pgs. 78-79, Exhibit 11; Exhibit 19).

**Admitted**

62.     Mrs. Porter reported to the CMS HSA concerning administrative matters pertaining to her work as a nurse practitioner.  (Porter Deposition, pgs. 3 8, Exhibit 11; Jurdak Deposition, pgs. 20-21, Exhibit 15).

**Admitted**

63.     Mrs. Porter reported to the CMS Medical Director concerning clinical issues pertaining to her work as nurse practitioner.  (Porter Deposition, pgs. 38, Exhibit 11; Jurdak Deposition, pg. 19, Exhibit 15).

**Admitted**

## The Rene Rosario Allegations

64.     On May 19, 2003 an inmate at the HOC, Rene Rosario, alleged that an unidentified correction officer had physically assaulted him.  Inmate Rosario made these allegations after he was transported to the Medical Housing Unit after complaining of hearing voices. (Deposition of Viktor Theiss ("Theiss"), May 24, 2005 Deposition pgs. 57-58, attached hereto as Exhibit 24; Porter Deposition, pgs. 170, 177, Exhibit 11).

**Admitted**

65.     Shortly after his arrival at the Medical Housing Unit, Inmate Rosario told the correction officer on duty that he wanted to speak with SID.  (Theirs Deposition, pgs. 57-58, Exhibit 24; Deposition of Brian Dacey ("Dacey"), June 16, 2005, pgs. 38-39, attached hereto as Exhibit 20).

**Admitted**

66.     The correction officer immediately contacted SID and informed them that Inmate Rosario wanted to speak with them.  SID investigators Brian Dacey ("Dacey") and Sonya Aleman ("Aleman") responded to the Medical Housing Unit at approximately 1:50 p.m., interviewed Inmate Rosario and opened an investigation into his allegations.  (Dacey Deposition, pgs. 38-39, Exhibit 20).

**Admitted**

67.    On May 19, 2003 Mrs. Porter was on duty as a nurse practitioner at the HOC.  (Porter Deposition, pg. 196, Exhibit 11).

**Admitted**

68.    Shortly after his arrival at the Medical Housing Unit, Inmate Rosario called Mrs. Porter over to his cell.  Inmate Rosario told Mrs. Porter that he had been assaulted by a correction officer and showed her the injuries that he allegedly sustained as a result of the alleged assault.  In her capacity as a nurse practitioner, Mrs. Porter made specific observations of Inmate Rosario's physical condition through the window of the cell door. (Porter Deposition, pgs. 196-197, Exhibit 11).

**Mrs. Porter disputes that the observations she made of Mr. Rosario on May 19, 2003 constituted a medical examination.  *See* Response to Statement 30 *supra*. Mrs. Porter admits the remainder of Statement 68.**

69.    Mrs. Porter did not document her observations of Inmate Rosario's physical condition and his statements concerning how he was allegedly injured in Rosario's medical records.  Mrs. Porter did not report Inmate Rosario's allegations to SID.  (Porter Deposition, pgs. 195 & 201, Exhibit 11).

**Mrs. Porter admits that she did not document her observations in Rosario's medical records.  Mrs. Porter states that she was not required to do so.  *See* Response to Statement 30 *supra*.  Mrs. Porter disputes that she did not report Rosario's allegations to SID.  Mrs. Porter immediately reported her observations to Ms. Jurdak on May 19, 2003, in accordance with Policy S-220 and Ms. Jurdak's policy as HSA, and she wrote a report of this incident that was provided to Deputy Superintendent Mastrorilli, who provided the report to SID.  *See* Porter Decl., ¶ 11-13 (Ex. 1); Policy S-220 (Ex. 20); Jurdak dep., p. 45 (Ex. 2); Mastrorilli dep., p. 27 (Ex. 7).  Mrs. Porter wanted the report to be reviewed by SID.  *See* Porter Decl., ¶ 12 (Ex. 1).  In addition, on May 22, 2003, Ms. Porter approached SID investigators Dacey and Aleman and was interviewed concerning her observations.  *See***

14

Deposition of Brian Dacey ("Dacey dep.") p. 93 (Ex. 8)). **She was interviewed for a**

**second time by SID investigators on May 28, 2003.** *See* **SID Interview Memo, #642-**

**644 (Ex. 12).**

70.    Mrs. Porter did not inform any of the other medical professionals who conducted
       examinations and assessments of Inmate Rosario after his arrival on the Medical Housing
       Unit on May 19, 2003 about her specific observations of his physical condition and his
       allegations that he was assaulted.  (Porter Deposition, pgs. 201, 206-207, Exhibit 11).

       **Disputed.  Mrs. Porter reported her encounter to mental health professional**

**Gayle Bartley.  *See* Porter Decl., ¶ 10 (Ex. 1).**

71.    On May 19, 2003 Mrs. Porter informed her supervisor, CMS employee and HSA Donna
       Jurdak, that Rene Rosario was back at the HOC and in the infirmary on Medical
       Observation Assessment, A level ("MOA") status and that he was alleging that an officer
       had assaulted him.  After some discussion, Mrs. Porter and Ms. Jurdak decided that Ms.
       Jurdak should communicate this information to SCSD Deputy Superintendent Mary Ellen
       Mastrorilli ("Mastrorilli").  (Porter Deposition, pgs. 223-224, Exhibit 11).

       **Admitted**

72.    Mrs. Porter wanted Mastrorilli to convey the information to SID for investigation.
       (Porter Deposition, pgs. 224-225, Exhibit 11).

       **Admitted**

73.    Mrs. Porter was aware that Inmate Rosario had asked the correction officer on duty in the
       Medical Housing Unit to contact SID for him.  (Porter Deposition, pg. 403, Exhibit 11).

       **Admitted**

74.    There was nothing specific on May 19, 2003 that caused Mrs. Porter to believe that SID
       would not investigate Inmate Rosario's allegations.  (Porter Deposition, pg. 405,
       Exhibit 11).

       **Admitted.  Mrs. Porter states that she had concerns about the extent of SID's**

**investigation of the Rosario allegations or whether it would investigate the**

**allegations at all.  *See* Porter Decl, ¶ 12 (Ex. 1).**

75.    On May 19, 2003 HSA Jurdak phoned Mastrorilli and reported what Mrs. Porter had told
       her.  Mastrorilli requested that the Mrs. Porter submit a confidential report concerning her

contact with the inmate. (Deposition of Mary Ellen Mastrorilli ("Mastrorilli"), June 27, 2005, pg. 52 attached hereto as Exhibit 22).

> **Admitted**

76. On May 19, 2003 Mrs. Porter knew that Mastrorilli had requested that she write and submit a report concerning her encounter with Inmate Rosario. (Porter Deposition, pg. 227-228, Exhibit 11; Jurdak Deposition, pgs. 100-101, Exhibit 15).

> **Admitted**

77. Mrs. Porter was familiar with the SCSD Incident Report Form and used that form to submit reports to SID during the period of time that she worked at the HOC. (Porter Deposition, pgs. 424-425, Exhibit 11).

> **Admitted. Mrs. Porter states that she was not required to use this form to submit her report. *See* Response to Statement 22; Porter Decl. ¶ 13 (Ex. 1)**

78. On May 19, 2003 CMS employee and Physician's Assistant Beth Bringola ("PA Bringola") conducted a physical examination of Inmate Rosario and observed visible bruising on his left bicep. PA Bringola did not observe an injury to Inmate Rosario's chest. She documented this encounter and her observations of Rosario's physical condition in Inmate Rosario's medical records on May 19, 2003. (Dacey Deposition, pg. 85, Exhibit 20; Porter Deposition, pgs. 210-211, Exhibit 11).

> **Admitted. Mrs. Porter states that PA Bringola was only instructed by LPN Craig Meekins to examine Rosario's arm—not his shoulder or chest. Mrs. Porter further states that Investigator Dacey observed marks on Rosario's bicep <u>and</u> his shoulder. *See* Dacey dep., p. 81 (Ex. 8).**

79. On May 19, 2003 CMS employee and Licensed Practical Nurse Craig Meekins observed only a bruise on Inmate Rosario's left bicep. (Dacey Deposition, pg. 81, Exhibit 20).

> **Admitted. *See* Response to Statement 78 *supra*.**

80. Mrs. Porter was not present for PA Bringola's examination of Inmate Rosario. Mrs. Porter did not speak with PA Bringola about the results of the examination nor did she review the medical note concerning that examination that PA Bringola placed in Rosario's medical records. (Porter Deposition, pgs. 195, 201, 210 & 213, Exhibit 11).

> **Admitted**

81.  On May 20, 2003 Mrs. Porter contacted FBI Special Agent Christa Snyder ("Agent Snyder") and informed her about Inmate Rosario's allegations and the Plaintiffs concerns that Inmate Rosario was currently incarcerated at the HOC.  (Porter Deposition, pg. 234, Exhibit 11).

       **Admitted**

82.  Mrs. Porter contacted Agent Snyder about Inmate Rosario's allegations because of her prior involvement with Inmate Rosario and her ongoing involvement with the FBI not because she had any distrust of SID or SID personnel under the Cabral Administration. (Porter Deposition, pg. 330-331, Exhibit 11).

       **Disputed.  Mrs. Porter contacted Agent Snyder because she was concerned about  Rosario's presence in the HOC.  *See* Porter Decl., ¶ 15 (Ex. 1).  Mrs. Porter disputes that did not have any distrust of SID under the Cabral Administration; Mrs. Porter states that she did not know who she could trust at SID at this time.  *Id.*, ¶ 12.**

83.  On May 21, 2003 SID Investigator Stan Wojtkonski ("Wojtkonski") had a conversation with Agent Snyder outside the Nashua Street Jail.  During this conversation, Agent Snyder informed Wojtkonski that a member of the medical staff at the HOC, whom Snyder did not identify, had contacted her on the evening of May 20, 2003.  Agent Snyder said this person told her that they had witnessed an examination of Inmate Rosario on May 19, 2003 conducted by a person named "Beth".  Agent Snyder said this person told her that they had witnessed bruising to Inmate Rosario's neck, chest and arms that they did not feel was consistent with self-inflicted wounds.  Agent Snyder asked to be kept updated on the status of the Rosario investigation.  (Affidavit of Stan Wojtkonsi, attached hereto as Exhibit 21).

       **Mrs. Porter admits that Mr. Wojtkonski's account of his conversations with Agent Snyder is reflected in Statement 83.  Mrs. Porter cannot admit that Mr. Wojtkonski's account of Agent Snyder's statements are undisputed facts.  Mrs. Porter is seeking Agent Snyder's testimony regarding these communications and other topics.  *See Porter v. U.S.D.O.J*, No. 05-12022-DPW .**

84.  With the exception that her encounter with Inmate Rosario occurred at approximately 12:30 on May 19, 2003, Exhibit 23 accurately records the information that Mrs. Porter provided to Investigators Dacey and Aleman on May 22, 2003.  (Porter Deposition, pgs. 261-266, Exhibit 11).

**Admitted**

85.    On May 22, 2003 SID investigators Dacey and Aleman were in the Medical Unit reviewing Inmate Rosario's medical records in conjunction with their investigation of his allegations, when Mrs. Porter approached them.  Mrs. Porter provided Dacey and Aleman with some information concerning her encounter with Inmate Rosario on May 19, 2003 and her observations of his alleged injuries.  (Dacey Deposition, pgs. 93, 96, 119, Exhibit 20; Exhibit 23; Porter Deposition, pgs. 261-266, Exhibit 11).

   **Mrs. Porter disputes that she only provided Dacey and Aleman with "some" information concerning her encounter with Rosario on May 19, 2003.  Mrs. Porter provided Dacey and Aleman with all pertinent information concerning her observations of Rosario and his allegations of abuse during the May 22, 2003 interview.  See Porter Decl., ¶ 16. (Ex. 1).**

86.    During this meeting Mrs. Porter informed Dacey and Aleman that she had a report about her encounter with Inmate Rosario on her home computer.  (Dacey Deposition, pgs. 116-117, Exhibit 20).

   **Disputed.  See Porter Decl., ¶ 16 (Ex. 1).**

87.    Mrs. Porter did not provide Investigators Dacey and Aleman with a copy of any report at that time nor did she provide them with a copy of a document entitled "Interdisciplinary Progress Notes" concerning her encounter with Inmate Rosario that she had written and that was dated May 19, 2003.  (Dacey Deposition, pgs. 116, Exhibit 20; Porter Deposition, pgs. 255-256, Exhibit 11).

   **Admitted**

88.    On May 23, 2003 Agent Snyder called Investigator Wojtkonski to inquire about the status of SID's investigation into Inmate Rosario's allegations.  Investigator Wojtkonski informed her that two SID investigators had been working on the case for the past several days and had interviewed Inmate Rosario and taken photographs of his injuries on May 22, 2003.  Investigator Wojtkonski informed Agent Snyder that investigators had not found the injuries that had been reported to Agent Snyder by her confidential source.  Investigator Wojtkonski informed Agent Snyder that no member of the nursing staff had submitted reports to SID concerning injuries that had been incurred by Inmate Rosario.  Investigator Wojtkonski assured Agent Snyder that no staff member would be hindered from speaking with an outside law enforcement agency, but the staff member still had an obligation to report incidents directly to the SCSD and SID.  Agent Snyder assured Wojtkonski that if the confidential source contacted her again she would advise it to report the incident directly to the Department.  (Wojtkonski Affidavit, Exhibit 21).

**Mrs. Porter admits that Mr. Wojtkonski's account of his conversations with Agent Snyder is reflected in Statement 88. Mrs. Porter cannot admit that Mr. Wojtkonski's account of Agent Snyder's statements are undisputed facts. Mrs. Porter is seeking Agent Snyder's testimony regarding these communications and other topics. *See Porter v. U.S.D.O.J*, No. 05-12022-DPW .**

89.    Investigator Dacey spoke with Agent Snyder during this same time period to update her on the status of SID's investigation into Inmate Rosario's allegations and to see if she required any information. Agent Snyder indicated that she did not. (Dacey Deposition, pg. 169, 170, Exhibit 20).

**Mrs. Porter admits that Mr. Dacey's account of his conversations with Agent Snyder is reflected in Statement 89. Mrs. Porter cannot admit that Mr. Dacey's account of Agent Snyder's statements are undisputed facts. Mrs. Porter is seeking Agent Snyder's testimony regarding these communications and other topics. *See Porter v. U.S.D.O.J*, No. 05-12022-DPW .**

90.    On May 28, 2003 Mastrorilli received a copy of a two-page document entitled "Interdisciplinary Progress Notes" that was authored by Mrs. Porter and that was dated May 19, 2003 (Exhibit 5) concerning her encounter with Inmate Rosario on May 19, 2003. (Mastrorilli Deposition, pgs, 24, 26; Exhibit 22).

**Disputed. Ms. Mastrorilli testified that she could not recall the date that she received Mrs. Porter's report of her May 19, 2003 encounter with Rosario. *See Mastrorilli dep., p. 24 (Ex. 7).***

91.    Mrs. Porter did not provide the document entitled "Interdisciplinary Progress Notes" directly to Mastrorilli on May 19, 2003 or at any time thereafter because it did not occur to her to do so. (Porter Deposition, pgs. 228-230, Exhibit 11).

**Disputed. Mrs. Porter did not give her May 19, 2003 report directly to Ms. Mastrorilli because she was following Ms. Jurdak's protocol in providing the report directly to her supervisor. *See* Porter Decl., ¶¶ 11-13 (Ex. 1); *see* Response to Statement 21 *supra*.**

92.    On May 28, 2003 SID received a copy of a two-page document entitled "Interdisciplinary Progress Notes" that was authored by Mrs. Porter and that was dated May 19, 2003 (Exhibit 5) concerning her encounter with Inmate Rosario on May 19, 2003.  (Dacey Deposition, pg. 113, Exhibit 20).

      **Admitted**

93.    On May 28, 2003, Investigators Dacey and Aleman conducted a follow up interview with Mrs. Porter concerning the information contained in the document entitled "Interdisciplinary Progress Notes" dated May 19, 2003.  (Dacey Deposition, pgs. 122-123, Exhibit 20; Exhibit 12).

      **Mrs. Porter admits that she was interviewed for a second time by Dacey and Aleman on May 28, 2003.  She disputes that the purpose of this interview was to review the information contained in her May 19, 2003 report.  Rather, it was apparent to her that the purpose of this interview was to inquire about her relationship with the FBI.  *See* Porter Decl., ¶ 17 (Ex. 1).**

94.    At the close of the interview, Investigator Dacey asked Mrs. Porter if she knew when Agent Snyder was contacted.  Mrs. Porter acknowledged that she had contacted Agent Snyder on or about May 20, 2003.  (Dacey Deposition, pgs. 132133, Exhibit 20; Exhibit 12).

      **Admitted**

95.    Investigator Dacey was not instructed by Sheriff Cabral or anyone at the SCSD to ask Mrs. Porter whether she was the individual who contacted the FBI.  (Dacey Deposition pgs. 98-99, 123; Porter Deposition, pgs. 287-288, Exhibit 11; Theiss Deposition pg. 239, Exhibit 24).

      **Disputed.  Mr. Dacey testified that, prior to the May 28, 2003 interview, SID Investigator Steve Jacobs instructed Mr. Dacey to attempt to elicit an admission from Mrs. Porter that she communicated with Agent Snyder.  *See* Dacey dep., p. 103 (Ex. 8).**

96.    Investigators Dacey and Aleman did not tell Mrs. Porter that she would be barred from the HOC if she did not answer their questions.  Investigators Dacey and Aleman did not tell Mrs. Porter that she would lose her job if she did not answer their questions.  (Porter Deposition pgs. 304-305, Exhibit 11).

20

**Admitted**

97.    SID closed its investigation into Inmate Rosario's allegations on or about June 4, 2003 after concluding that his allegations of physical abuse could not be sustained. (Theiss Deposition, pgs. 73-74, 83-84, Exhibit 24).

   **Mrs. Porter admits that the Case Summary prepared by Dacey regarding the**

**May 19, 2003 Rosario allegations is dated June 4, 2003 and that Dacey concluded**

**that the allegations could not be sustained.**

98.    After the SID investigation was closed, Deputy Superintendent and Chief of SID Viktor Theiss ("Theiss") informed Agent Snyder that SID had concluded its investigation into Inmate Rosario's allegations and were unable to sustain them. The FBI never conducted its own investigation into Inmate Rosario's allegations nor brought any charges against any corrections officers in connection with those allegations. (Theiss Deposition, pgs. 241-242, Exhibit 24).

   **Mrs. Porter admits that Mr. Theiss' account of his conversation with Agent**

**Snyder is reflected in Statement 98. Mrs. Porter cannot admit that Mr. Theiss'**

**account is an undisputed fact. Mrs. Porter is seeking Agent Snyder's testimony**

**regarding these communications and other topics. *See Porter v. U.S.D.O.J*, No. 05-**

**12022-DPW. Mrs. Porter admits that the FBI never brought charges against any**

**corrections officers in connection with the Rosario allegations.**

99.    Sheriff Cabral first became aware of Inmate Rosario's allegations and SID's investigation into those allegations after SID completed their investigation on or about June 4, 2003. Theiss briefed Sheriff Cabral on the results of the investigation and Mrs. Porter's involvement. (Theiss Deposition, pgs. 83-84, Exhibit 24; Deposition of Andrea Cabral, May 6, 2005, pgs. 57-59, 65, Exhibit 25).

   **Disputed. Viktor Theiss testified that he does not know when he briefed**

**Sheriff Cabral about the Rosario investigation or Mrs. Porter's involvement. *See***

**Theiss dep., p. 84 (Ex. 18). Sheriff Cabral testified that she first learned of these**

**matters "after the investigation was complete" but she could not recall the date. *See***

**Deposition of Andrea Cabral ("Cabral dep.") pp. 56-57 (Ex. 16).**

100.  Theiss also informed Sheriff Cabral that during the course of the SID investigation it was learned that Mrs. Porter had provided information regarding Inmate Rosario's allegations to the FBI.  (Cabral Deposition, pg. 59, Exhibit 25).

> **Admitted**

## The Barring of Mrs. Porter

101.  Sheriff Cabral decided to revoke Mrs. Porter's security clearance and bar her from the HOC because Mrs. Porter failed to document her observations of Inmate Rosario's physical condition in his medical record, failed to provide a confidential report in a timely manner as requested, and the document that was submitted ten days later was written on Interdisciplinary Progress Notes, appeared to be a medical note and it was dated the date of the incident as though that was the date that treatment was rendered. (Cabral Deposition, pgs. 86-87, Exhibit 25).

> **Disputed.  Mrs. Porter was barred because she reported Rosario's allegations**
>
> **of abuse to the FBI.  *See* Mastrorilli dep., p. 34 (Ex. 7); Jurdak dep., p. 133 (Ex. 1);**
>
> **Porter Decl., ¶ 19 (Ex. 1).**

102.  The Sheriff is solely responsible for the decision to bar individuals from the SCSD. (Horgan Affidavit, Exhibit 7).

> **Disputed.  Statement 102 is directly contradicted by Superintendent**
>
> **Horgan's deposition testimony in this case.  *See* Horgan dep., pp. 88-89 (Ex. 4).**

103.  Sheriff Cabral was not aware that Mrs. Porter was an informant for the FBI at the time that she made the decision to bar her from the HOC.  (Cabral Deposition, pg. 187, Exhibit 25).

> **Disputed.  Sheriff Cabral testified that she was aware that Mrs. Porter had**
>
> **provided information to a FBI agent.  *See* Cabral dep., p. 187 (Ex. 16).**

104.  Sheriff Cabral did not consult with CMS before making the decision to bar Mrs. Porter from the HOC.  (Cabral Deposition pgs. 71-72, Exhibit 25).

> **Admitted**

105.  There are no provisions in the contract between the SCSD and CMS requiring that the Sheriff notify or consult with CMS prior to making her decision to bar a CMS employee nor are there any provisions granting a CMS employee a right to a hearing by the SCSD before or after they are barred from the HOC.  (Horgan Affidavit, Exhibit 7).

**Admitted**

106. On or about June 10, 2003 Sheriff Cabral communicated her decision to bar Mrs. Porter and her reasons for doing so to Chief of Staff Elizabeth Keeley (Keeley). (Cabral Deposition, pgs. 72-74, Exhibit 25; Keeley Deposition, pgs. 5455, Exhibit 9)

> **Disputed. Mrs. Porter admits that on or about June 10, 2003, Sheriff Cabral had a meeting with Ms. Keely at which time the decision to bar Mrs. Porter was made. Mrs. Porter disputes that Sheriff Cabral communicated her reasons for barring to Ms. Keeley at that time. Rather, Ms. Keeley testified that she provided for Ms. Cabral the reasons that <u>she</u> believed that Mrs. Porter should be barred— including because Mrs. Porter contacted the FBI about the Rosario allegations. However, Ms. Keeley testified that she could not recall what Sheriff Cabral's specific reasons were for barring Mrs. Porter. *See* Keeley dep., pp. 43, 51-52, 54, 71, 73 (Ex. 21).**

107. On or about June 10, 2003, Keeley communicated Sheriff Cabral's decision to bar Mrs. Porter to Mastrorilli and asked her to inform Mrs. Porter that she was barred. (Keeley Deposition, pg. 57, Exhibit 9).

> **Disputed. On June 10, 2003, Viktor Theiss contacted Ms. Mastrorilli and told her to carry out the barring of Mrs. Porter. Ms. Mastrorilli asked what she should tell Mrs. Porter the reasons were for the barring. Mr. Theiss told her to contact Ms. Keeley. Ms. Mastrorilli contacted Ms. Keeley, who told her that Mrs. Porter should be barred because she disclosed allegedly confidential communications regarding Rosario to an outside agency—the FBI. *See* Mastrorilli dep. pp. 29-33 (Ex. 7).**

108. Keeley also informed Mastrorilli that Mrs. Porter was being barred for multiple violations of Policy S-220 including, failure to document a medical file, failure to file a timely report, and sharing confidential inmate information outside of the Department. (Keeley Deposition, pg. 62, Exhibit 9).

**Disputed. At no point did Ms. Keeley or anyone else tell Ms. Mastrorilli that Ms. Porter was to be barred for any reason other than that she disclosed allegedly confidential communications regarding Rosario to an outside agency—the FBI. *See* Mastrorilli dep. pp. 29-33, 97-98 (Ex. 7); *see* Response to Statement 107 *supra*.**

109. On June 10, 2003 Mastrorilli informed Mrs. Porter that she was barred from the HOC. Instead of communicating all of the reasons for the barring, Mastrorilli only advised Mrs. Porter that she was barred for communicating confidential inmate information to an outside agency. (Mastrorilli Deposition, pg 34, Exhibit 22).

**Disputed. *See* Responses to Statements 107-108 *supra*.**

## Statements in the Media Concerning Mrs. Porter

110. On or about August 24, 2004 Mrs. Porter granted Boston Globe reporter Andrea Estes an interview concerning, inter alia, her barring from the HOC, her involvement with the FBI and her intention to file a lawsuit. The article was published in the Boston Globe on or about August 25, 2004. In that article Mrs. Porter alleged that she had been "fired" by the SCSD in retaliation for providing information to the FBI. (Porter Deposition, pgs. 364, 370, Exhibit 11; Exhibit 13).

**Mrs. Porter disputes that she stated that she had been "fired" by the SCSD.**

**Mrs. Porter admits the remainder of Statement 110.**

111. On or about August 25, 2004 Mrs. Porter granted a television interview with WCVB-Channel 5 concerning, inter alia, her barring from the HOC and her involvement with the FBI. (Porter Deposition, pg. 372, Exhibit 11).

**Admitted**

112. Mrs. Porter believed that the SCSD would respond to the article about her published in the Boston Globe on or about August 25, 2004. (Porter Deposition, pg. 371, Exhibit 11).

**Admitted**

113. In response to Mrs. Porter's interviews with the Boston Globe and WCVB-Channel 5, the SCSD issued a Press Statement on or about August 25, 2004. Sheriff Cabral did not author the Press Statement but reviewed its content and authorized its issuance. (Keeley Deposition, pg. 176 Exhibit 9; Cabral Deposition, pgs. 164-165, Exhibit 26; Exhibit 4).

**Admitted**

114. Mrs. Porter testified that the portion of the Press Statement that stated: "The Sheriff's Department did not fire Ms. Porter. She was employed by Correctional Medical Services and was fired by them for reasons that are known to Ms. Porter and CMS", is defamatory because the way it is phrased it suggests that there were reasons other than the action taken by the SCSD that formed the basis for her termination by CMS. (Porter Deposition, pg. 382-383, Exhibit 11).

**Admitted**

115. Mrs. Porter testified that the sentence in the Press Statement: "She is clearly biased and has her own agenda for speaking out at this time" is defamatory because 4 to 5 family members or friends mentioned to her that it struck them as implying a racial issue. (Porter Deposition, pgs. 383-384, Exhibit 11).

**Disputed.  See Porter Decl., ¶ 31 (Ex. 1).**

116. When Mrs. Porter first saw the Press Statement she did not think that it implied a racial bias but only thought of it when she heard other people's comments. She doesn't know whether that sentence in the Press Statement implies racial bias. (Porter Deposition, pg. 384-385, Exhibit 11).

**Disputed.  See Porter Decl., ¶ 31 (Ex. 1).**

117. Mrs. Porter knows that the word "biased" has a number of different meanings and doesn't necessarily mean racial bias. (Porter Deposition, pg. 422, Exhibit 11).

**Mrs. Porter admits that, standing alone, the word biased may have different meanings, but when used in conjunction with an accusation that the person has "an agenda," the implication is that that person is a racist.  See Porter Decl., ¶ 31 (Ex. 1).**

118. Mrs. Porter believes that the term "agenda" was defamatory and damaged her reputation because it called into question her motives and suggested that they were political. (Porter Deposition, pg. 387, 393, Exhibit 11).

**Disputed.  See Response to Statement 117 supra.**

119. Mrs. Porter's ability to obtain employment was not affected by any statements made by Sheriff Cabral. (Porter Deposition, pg. 389-390, Exhibit 11).

**Mrs. Porter admits that Sheriff Cabral's statements did not keep her from being hired by UMass Correctional Healthcare. She does not know if it affected her ability to otherwise obtain employment.**

120.    Prior to August 25, 2004 neither Sheriff Cabral nor the SCSD had issued any public statements concerning the barring of Mrs. Porter from the HOC on June 10, 2003. (Porter Deposition, pgs. 371-372, Exhibit 11).

**Mrs. Porter is not aware of any public statements concerning her barring issued by Sheriff Cabral or the SCSD prior to August 25, 2004.**

121.    On or about September 8, 2004 Sheriff Cabral participated in a televised debate with Stephen Murphy, her opponent for the Office of Suffolk County Sheriff that was broadcast on the WGBH -TV program Greater Boston. (Exhibit 2).

**Admitted**

122.    Mrs. Porter was not identified by name during the debate. (Exhibit 2).

**Admitted**

123.    Mrs. Porter did not watch the debate and does not know anyone who watched the debate. (Porter Deposition, pgs. 390, 392, Exhibit 11).

**Admitted**

124.    The only person Mrs. Porter spoke with about the debate was her 97 year-old aunt who listened to the debate. Her only comments to Mrs. Porter about the debate were: "I heard them talking about you on television" and that the election that was the subject of the debate was in Suffolk County and Mrs. Porter could not vote there. (Porter Deposition, pgs. 391, Exhibit 11).

**Admitted**

125.    The primary election for the office of Suffolk County Sheriff was held on September 14, 2004.

**Admitted**

126.    Sheriff Cabral defeated her opponent, Stephen Murphy in the primary election. Sheriff Cabral had no opponent in the general election and was accordingly elected to the office of Suffolk County Sheriff on November 2, 2004.

**Admitted**

127. In an article published in the Boston Globe Magazine on October 31, 2004 two statements are attributed to Steven Tompkins ('Tompkins"), press spokesperson for the SCSD. One sentence attributes a statement to Sheriff Cabral. None of these statements mention Mrs. Porter by name, nor is she identified by name in the article. (Exhibit 3).

**Mrs. Porter disputes that only one sentence attributes a statement to Sheriff Cabral. Immediately after Sheriff Cabral claims that Mrs. Porter's allegations were "politically motivated," Mrs. Porter is referred to as a "so-called whistle-blower[]." *See* SCSD Exhibit 3. Moreover, Mr. Tompkins was authorized to speak with the Boston Globe concerning this profile on Sheriff Cabral's behalf in his capacity as Communications Director and he admits making the statements that were quoted in the article. Finally, Mr. Tompkins made no attempt to correct the statements once they appeared in print. *See* Deposition of Steve Tompkins ("Tompkins dep."), pp. 40-51 (Ex. 45)..**

128. The two statements attributed to Mr. Tompkins are: "Those allegations were 100 percent ridiculous. That's why you haven't seen any follow-up [after the election]." (Exhibit 3).

**Admitted**

129. Sheriff Cabral did not authorize Steve Tompkins to make the statements quoted in the Boston Globe Magazine. (Cabral Deposition, pg. 149, 152 Exhibit 26).

**Disputed. *See* Response to Statement 127. Moreover, Pages 149 and 152 of the Cabral deposition do not address this issue.**

130. The sentence in the article attributing a statement to Sheriff Cabral is: "Cabral says the allegations are all politically motivated." (Exhibit 3).

**Disputed. *See* Response to Statement 127.**

131. None of the statements attributed to Sheriff Cabral damaged the Plaintiff s personal or professional reputation. (Porter Deposition, pg 400-403)

> **Disputed.  Mrs. Porter testified that she did not know if her personal or professional reputation was damaged by Sheriff Cabral's defamatory statements but she "didn't think it was helped."  *See* Porter dep., pp. 400-03.**

132.   Since her appoint in November 2002, Sheriff Cabral has made numerous changes in staffing, training and investigations of misconduct.  (Exhibit 27, Defendant Andrea Cabral's Supplemental Response to Plaintiffs Second Set of Interrogatories).

> **Mrs. Porter admits that Sheriff Cabral has instituted changes in staffing, training and investigations of misconduct but disputes that she has sufficiently addressed the Stern Commission's recommendation that the SCSD aggressively attack the code of silence that is pervasive at the SCSD.  *See* Porter Decl., ¶¶ 32-33 (Ex. 1).**

Respectfully submitted,

SHEILA PORTER

By her attorneys,

*/s/ Joseph F. Savage, Jr.*
Joseph F. Savage Jr. (443030)
David S. Schumacher (647917)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA  02109599
(617) 570-1000

Dated: November 14, 2005

LIBA/1644575.1

28