UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHEILA PORTER<br><br>               Plaintiff,<br><br>    v.<br><br>ANDREA CABRAL, SUFFOLK COUNTY SHERIFF'S DEPARTMENT, SUFFOLK COUNTY, and CORRECTIONAL MEDICAL SERVICES<br><br>               Defendant. | Civil Action No.04-11935-DPW |

## SHEILA PORTER'S OPPOSITION TO CORRECTIONAL MEDICAL SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT

Joseph F. Savage Jr. (BBO # 443030)
David S. Schumacher (BBO # 647917)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA  02109
(617) 570-1000

Attorneys for Plaintiff Sheila Porter

November 14, 2005

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................ 1

FACTUAL BACKGROUND ......................................................................................... 3

ARGUMENT ................................................................................................................... 7

I.   MRS. PORTER IS ENTITLED TO A JURY TRIAL ON HER SECTION 1983
     CLAIMS ................................................................................................................. 7

II.  SUMMARY JUDGMENT IS INAPPROPRIATE ON MRS. PORTER'S BREACH OF
     CONTRACT CLAIM .......................................................................................... 12

     A.  The CMS's Employee Success Guide Created a Contract of Employment With
         Mrs. Porter. ................................................................................................... 12

     B.  CMS Breached the Provisions of the Employee Success Guide With Respect to Mrs.
         Porter .............................................................................................................. 17

III. SUMMARY JUDGMENT SHOULD NOT BE GRANTED ON THE THIRD-PARTY
     BENEFICIARY COUNT .................................................................................... 20

IV.  MRS. PORTER IS ENTITLED TO A JURY TRIAL ON HER TERMINATION IN
     VIOLATION OF PUBLIC POLICY CLAIM .................................................... 22

V.   THERE IS A GENUINE ISSUE OF FACT AND CMS IS NOT ENTITLED TO
     JUDGMENT AS A MATTER OF LAW ON MRS. PORTER'S COUNT FOR
     VIOLATIONS OF THE MASSACHUSETTS CIVIL RIGHTS ACT ............... 27

     A.  CMS Interfered With Mrs. Porter's Rights Via Economic Coercion ............ 28

         1.  Mrs. Porter Had a Secured Right in Future Employment With CMS ..... 29

         2.  CMS Engaged in Coercion By Interfering with Mrs. Porter's Secured Right in
             Her Future Employment ........................................................................... 29

         3.  Even if Porter is Deemed to Have Been an At-Will Employee, CMS's Conduct
             Still Constitutes Economic Coercion Because it Denied Her Benefits She Was
             Legally Entitled To ................................................................................... 30

         4.  CMS's Conduct Constituted a Pattern of Harassment and Retaliation That
             Satisfies the Requirement of the MCRA ................................................. 30

B.  CMS's Conduct Had the Effect of Interfering With Mrs. Porter's First Amendment Rights ........................................................................................................................... 32

VI. COUNT VIII:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS................. 32

CONCLUSION ...................................................................................................................... 33

Plaintiff Sheila J. Porter ("Mrs. Porter") hereby submits her Opposition to Correctional Medical Services, Inc.'s ("CMS") Motion for Summary Judgment.

## **INTRODUCTION**

This is an action for, *inter alia*, federal and state civil rights violations arising out of CMS' unlawful termination of Mrs. Porter, a highly successful nurse practitioner who had performed exemplary service for CMS and its predecessor in the Suffolk County House of Corrections ("HOC") for nine years.

On June 11, 2003, CMS terminated Mrs. Porter for exercising her First Amendment rights to communicate with law enforcement officials potential inmate abuse at the HOC. The termination came directly on the heels of Mrs. Porter being barred from the HOC by the Suffolk County Sheriff Department ("SCSD") for the same reason. CMS compounded this unconstitutional act by altering internal documents in a clumsy attempt to sanitize its conduct, all the while making virtually no attempt to discover whether or not the SCSD's allegations of wrongdoing had any merit.

It is apparent that, in terminating Mrs. Porter, CMS was acting as an agent for the SCSD, a state agency. CMS terminated Mrs. Porter immediately upon learning that her security clearance was revoked at the HOC. But CMS made virtually no attempt to learn the reasons underlying the SCSD's actions and conducted no investigation of its own. Rather, after a single one-minute phone call with SCSD officials, CMS terminated Mrs. Porter. Throughout this litigation, CMS has claimed that it had no choice but to end Mrs. Porter's employment with the company. CMS has taken the position that nobody at the company made the decision to terminate Mrs. Porter and that they merely "processed" the termination. These admissions make

clear that CMS was acting in concert with the state, mechanically and inexorably finishing the job that the SCSD set in motion.

CMS' unlawful conduct is confirmed by its actions subsequent to Mrs. Porter's termination. CMS forged internal documents in an attempt to make it appear as though Mrs. Porter's supervisor, Donna Jurdak, had recommended her termination, when, in fact, the opposite was true. CMS also backdated the request for termination form by more than a month, to make it appear contemporaneous with the termination. In addition, Mrs. Porter's stellar performance reviews from CMS were mysteriously missing from her personnel file when she retrieved it from CMS. Finally, CMS' callous treatment of Mrs. Porter—failing to ever call her to tell her that she had been terminated, making belated and insufficient efforts to find her another position at the company—confirm that CMS was merely doing the bidding of the state in an attempt to appease an important client.

CMS' Motion for Summary Judgment should be denied in its entirety, save for one claim. There is a genuine dispute of fact whether CMS acted jointly with the state in terminating Mrs. Porter for communicating with the FBI, thus precluding summary judgment on Mrs. Porter's § 1983 and termination in violation of public policy claims. There are also fact issues on whether CMS breached the terms of its employee handbook, an implied contract between CMS and Mrs. Porter, and whether CMS violated Mrs. Porter's civil rights via economic and moral coercion, in contravention of the Massachusetts Civil Rights Act.[1]

---

[1]    Mrs. Porter dismisses her claim for intentional infliction of emotional distress against CMS.

# FACTUAL BACKGROUND[2]

Mrs. Porter is a nurse practitioner with 36 years of experience in the nursing field.  *See* Declaration of Sheila Porter ("Porter Decl."), ¶ 2 (attached as Exhibit ("Ex.") 1 to the Declaration of David S. Schumacher).  Mrs. Porter began working in the HOC in 1994.  Mrs. Porter was widely regarded as a superior nurse practitioner.  *See* Deposition of Donna Jurdak ("Jurdak dep."), p. 28 (Ex. 2) (Mrs. Porter was "probably the best nurse practitioner that ever worked for me"); *see* Deposition of Ann Mack ("Mack dep."), p. 52 (Ex. 3) ("She did a great job as a nurse practitioner for us, particularly in women's healthcare"); *see* Deposition of Gerard Horgan ("Horgan dep.") (Ex. 4), p. 55 ("she was a good nurse practitioner.  She's someone who provided good care to the inmates.")**.**  Mrs. Porter received excellent performance reviews and received the highest allowable merit raise each year that she was at CMS.  *See* Jurdak dep., p. 205 (Ex. 2).  Moreover, Mrs. Porter was publicly commended for extraordinary service on at least two occasions.  *See* Letter from Gerard Horgan to Nancy Lawrence, dated August 26, 2002 and Memo from Donna Jurdak to, *inter alia*, Sheila Porter, dated December 28, 1994 (Ex. 5)

In 1999 Mrs. Porter was approached by FBI agents and asked to provide information to the FBI on a confidential basis regarding unlawful activities such as physical and sexual abuse of inmates and drug use at the HOC.  *See* Affidavit of Christa J. Snyder ("Snyder affidavit") (Ex. 6); *see* Porter Decl., ¶ 4 (Ex. 1).  Mrs. Porter agreed to do so and provided confidential information to the FBI until her barring in June 2003.  *Id.*

One inmate who Mrs. Porter had worked with in connection with a FBI investigation was Rene Rosario.  *Id.*, ¶ 5.  On May 19, 2003, she observed Mr. Rosario in a cell in the infirmary at the HOC where she worked.  *Id.*, ¶ 7.  Mr. Rosario told Mrs. Porter that he had been abused by a

---

[2]    In addition to the following Factual Background, Mrs. Porter relies on her Response to CMS' Statement of Undisputed Facts, which Mrs. Porter incorporates by reference herein.

corrections officer on the previous evening. *Id.* Mrs. Porter witnessed Mr. Rosario's injuries through the window of his cell door. *Id.* Mr. Rosario requested that Mrs. Porter contact FBI Agent Snyder, with whom both were acquainted, and tell her what happened. *Id.*

Mrs. Porter immediately reported this incident to her supervisor, Ms. Jurdak, among others. *Id.*, ¶¶ 10-11. Mrs. Porter also contacted Agent Snyder and related what Mr. Rosario told her. *Id.*, ¶ 15. Ms. Jurdak immediately reported the incident to HOC Deputy Superintendent Maryellen Mastrorilli. *See* Jurdak dep., pp. 92-93, 96-98 (Ex. 2). Ms. Mastrorilli asked Ms. Jurdak to have Mrs. Porter send her a report detailing her observations. *See* Deposition of Mary Ellen Mastrorilli, p. 12 (Ex. 7). Mrs. Porter wrote the report that day and submitted it to Ms. Jurdak shortly thereafter, who forwarded the report to the attention of Ms. Mastrorilli. *See* May 19, 2003 Report (attached as Ex. A to Porter Decl.); Porter Decl., ¶¶ 13-14 (Ex. 1); Jurdak dep., p. 109 (Ex. 2). In addition, Mrs. Porter sought out the Sheriff's Investigative Division ("SID") officers investigating the Mr. Rosario allegations and reported her encounter with Mr. Rosario. *See* Porter Decl., ¶ 16; *see* Deposition of Brian Dacey ("Dacey dep."), p. 93 (Ex. 8).

During the course of the Rosario investigation, SCSD officials came to learn that Mrs. Porter had contacted the FBI to report the allegation of inmate abuse. *See* Memo from Ms. Mastrorilli to Patrick Bradley, # 748 (Ex. 9); SID Incident Report, #791 (Ex. 10); SID Incident Report, # 789-90 (Ex. 11); Memo from Sonya Aleman, #642 (Ex. 12). SID officials conducted a second interview with Mrs. Porter, during which Mrs. Porter admitted, under intense questioning, that she had communicated her encounter with Mr. Rosario to the FBI. *See* Porter Decl., ¶ 17 (Ex. 1); Memo from Sonya Aleman, # 642-44 (Ex. 12).

Less than two weeks later, on June 10, 2003, Mrs. Porter was asked to report to Ms. Jurdak's office for a meeting with Ms. Jurdak and Ms. Mastrorilli. *See* Porter Decl, ¶ 19 (Ex. 1).

During this meeting, Ms. Mastrorilli told Mrs. Porter that she was barred from the HOC, effective immediately. *Id.* The only reason provided for the barring was that Mrs. Porter violated SCSD Policy S-220, the Employee Code of Conduct, by sharing confidential information with an outside agency—the FBI. *Id.*; *see* Mastrorilli dep., pp. 33-34 (Ex. 7); Jurdak dep., p. 133 (Ex. 2).

That afternoon, Ms. Jurdak contacted Ann Mack, CMS Regional Vice-President, to tell her what had transpired. *See* Jurdak dep., pp. 177-78 (Ex. 2). By no later than the next day, CMS terminated Mrs. Porter. *See* Mack dep., pp. 121-22 (Ex. 3). The sum total of CMS' efforts to investigate the circumstances concerning Mrs. Porter's barring consisted of one phone call between Ms. Mack and Ms. Mastrorilli, which may have lasted as little as under a minute. *See* Mack dep., pp. 102-03 (Ex. 3). Moreover, nobody from CMS ever contacted Mrs. Porter to tell her that she had been terminated by the company; Mrs. Porter only discovered this a month later via a letter from her 401(k) provider. *See* Porter decl., ¶ 21 (Ex. 1).

After Mrs. Porter was terminated, CMS forged internal documents to make it appear that her termination adhered to CMS policies and was not the result of joint activity with the SCSD. CMS policy requires that a supervisor effectuate an employee's termination. *See* Employee Success Guide, pp. 17-19 (Ex. 47). But Mrs. Porter's supervisor, Donna Jurdak, never terminated Mrs. Porter from CMS. After Mrs. Porter was barred, Ms. Jurdak removed her from the HOC payroll, but she was never told that Mrs. Porter was terminated altogether from CMS. *See* Jurdak dep., pp. 179-84 (Ex. 2). Approximately a month later, Ms. Jurdak was instructed by CMS Regional Vice-President Ann Mack and Director of Human Resources Sterling Price to (1) file a form requesting that Mrs. Porter be terminated from CMS and (2) backdate the form to

June 10, 2003, to make it contemporaneous with CMS' termination of Mrs. Porter. *Id.* pp. 177, 184, 190.

Ms. Jurdak refused to abide by these improper instructions because she did not believe that Mrs. Porter's alleged conduct warranted termination from CMS. *Id.*, p. 184. She refused to affirmatively recommend Mrs. Porter's termination, instead filing a form merely stating that Mrs. Porter was being terminated by CMS because she had been barred from the HOC. *See* First Request for Termination (Ex. 48). That form was never signed by CMS management. *Id.* Instead, a second Request for Termination form was filled out. This form contains the following sentence: "The Suffolk County House of Correction administration has barred Miss Porter from the facility and consequently I am recommending her termination for lack of access to the facility." Second Request for Termination (Ex. 49). Ms. Jurdak testified that "I didn't write that." *See* Jurdak dep., p. 189 (Ex. 2). Nevertheless, this form was signed and dated by CMS management officials. *See* Second Request for Termination (Ex. 49).

In addition, when Mrs. Porter recovered her personnel file from CMS, her stellar performance evaluations were missing. *See* Porter decl., ¶ 20 (Ex. 1)

CMS terminated Mrs. Porter without even checking if there was another position available somewhere else within the company. Upon Ms. Jurdak's urging, Ms. Mack eventually placed phone calls to CMS' Essex and Franklin county facilities to see if full-time positions were available. *See* Jurdak dep., p. 221 (Ex. 2); Mack dep., p. 127 (Ex. 3). But she did not check if part-time or per diem positions were available, nor did she look into whether positions were available at any of CMS' facilities outside of Massachusetts, even though it is likely there was availability at other sites. *See* Mack dep., pp. 127, 167-68, 170, 172 (Ex. 3). Mrs. Porter would

have considered such positions if Ms. Mack had contacted her, but she never did.  *See* Porter decl., ¶ 22 (Ex. 1).

## ARGUMENT

The summary judgment standard is familiar.  Summary judgment is the exception, not the rule, and must be denied when there is a genuine dispute of any material fact.  *See* Fed. R. Civ. P. 56(c); *Perez v. Volvo Car Corp.*, 247 F.3d 303, 310 (1st Cir. 2001).  In determining whether a genuine dispute of material fact exists, the Court must view all evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor.  *See* *O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir.1993).

## I.   MRS. PORTER IS ENTITLED TO A JURY TRIAL ON HER SECTION 1983 CLAIMS

As an initial matter, it is important to note the extremely limited grounds upon which CMS moves for summary judgment.  CMS does not take issue with the fact that Mrs. Porter's constitutional rights were violated.[3]  Rather, it argues that it is not responsible for this violation because it was not acting under color of state law when it terminated her.[4]  However, CMS was acting under color of state law because government employees were deeply involved in Mrs. Porter's termination.

In order to establish that a private company was acting under color of state law, a plaintiff must show that that company was a "willful participant in joint activity with the State or its

---

[3] To the extent that CMS may at some point take issue with whether there was a constitutional violation, Mrs. Porter hereby incorporates by reference her arguments on this issue in her Opposition to Defendants Andrea Cabral, Suffolk County Sheriff's Department and Suffolk County's Motion for Summary Judgment.

[4] CMS argues that Mrs. Porter fails to even allege that CMS acted under color of state law.  On the contrary, Mrs. Porter's complaint clearly alleges that the County controlled many aspects of her work performance, and that CMS terminated Mrs. Porter immediately upon her barring.  *See* Compl. ¶¶ 18, 72.  In any event, this is a motion for summary judgment, and under Federal Rule of Civil Procedure 56(c), a Court may consider the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits in deciding a motion for summary judgment.

agents." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970).  Courts have developed a number of tests to determine when a private company is a willful participant with the State.  For example, under the "state compulsion" test, a private party is a state actor if the State exercised coercive power or provides significant encouragement, either overt or covert, such that the choice must in law be deemed to be that of the State.  *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 170-71 (1970).  Under the "symbiotic relationship" (close nexus) test, a private party is a state actor if "[t]he State has so far insinuated itself into a position of the interdependence with [the private entity] . . . that it must be recognized as a joint participant in the challenged activity."  *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961).  Likewise, under the "joint participation" test, a private party is a state actor if the private party jointly engaged with state officials in the prohibited act.  *Adickes*, 398 U.S. at 152.  Any conspiracy, or an agreement or meeting of the minds to violate federally protected rights, between the private party and the government toward a common goal is sufficient.  *See NCAA v. Tarkanian*, 488 U.S. 179, 194-95 (1988).  Even action that may fall short of a conspiracy may satisfy the test, so long as there is a substantial degree of cooperative action.  *Sable Comm. v. Pacific Tel. &Tel. Co.*, 890 F.2d 184, 189 (9th Cir. 1989).  Under any of these tests, the dispositive inquiry in employment cases such as the present case is whether the State was sufficiently involved in the decision to terminate Mrs. Porter.  *See Cunningham v. Southlake Ctr. for Mental Health, Inc.*, 924 F.2d 106, 106-08 (7th Cir. 1991); *Berweger v. County of Orange*, 121 F. Supp.2d 334, 344-46 (S.D.N.Y).

In the present case, the State was sufficiently involved in the decision to terminate Mrs. Porter because the State's decision to bar Mrs. Porter from the HOC inexorably triggered CMS's right to terminate Mrs. Porter.  CMS improperly attempts to create a firewall between the

decision to bar Mrs. Porter from HOC, and the decision to terminate her. However, the two events cannot be viewed separately because CMS admits that, once the SCSD barred Mrs. Porter from the HOC, Mrs. Porter's termination from CMS was a *fait accompli*.

It is undisputed that Mrs. Porter was an outstanding nurse practitioner and an extremely valuable employee for CMS. *See* pp. 1-2 *supra*. As CMS Regional Vice-President Ann Mack testified, "[s]he did a great job as a nurse practitioner for us, particularly in women's healthcare. We believe that she was an asset for that program." *See* Mack dep., p. 52 (Ex. 3). Nevertheless, no later than one day after the SCSD barred Mrs. Porter, CMS terminated her employment. *Id.*, pp. 121-22. CMS' failed to object to the barring or to the lack of notice preceding the barring because it knew it was acting merely as a state agent and such objection would be fruitless.

CMS has repeatedly stated that, the decision to termination Mrs. Porter was made not by CMS, but rather by the SCSD. Ms. Mack testified that "[w]e had no choice but to terminate her employment with CMS since she had no ability to enter the facility" *Id.*, p.122. She also testified that "CMS didn't have a choice as to what we could do with Sheila. We didn't have a position. She wasn't allowed access to the facility." *Id.* at 127. CMS has gone so far as to state that "Sheila Porter was not terminated by CMS." *Id.*, p. 73 (emphasis added); *see* CMS' Responses to Mrs. Porter's Interrogatories, No. 1 (Ex. 50) ("[n]o one at CMS made a decision to terminate Mrs. Porter's employment"). CMS explains that there is a distinction between the decision to terminate and the termination process. It was the SCSD that made the decision to terminate; CMS merely processed the termination. *See* Mack dep., p.146 (Ex. 3) ("we really processed the termination, we didn't want to terminate Sheila"). As counsel for CMS explained on the record during Mrs. Mack deposition, "[t]hat decision [to terminate] was made for them by the entity." *Id.*, p. 134.

Thus, CMS has disclaimed any responsibility for terminating Mrs. Porter, indicating that CMS was acting as a mere functionary of the state in separating Mrs. Porter from the company. The evidence confirms that the state was more than sufficiently involved in the decision to terminate Mrs. Porter—indeed, CMS' "decision was made for them" by the state. *Id.*

Further evidence of CMS' unconstitutional conduct is found in its attempts to cover up its actions. As described above, CMS attempted to cover up its unconstitutional actions by forging documents under the name of Mrs. Porter's supervisor, Donna Jurdak, to make it look like Ms. Jurdak recommended Mrs. Porter's termination on June 10, 2003. *See* Jurdak dep., pp. 179-184, 190 (Ex. 2); *see* Requests for Termination (Exs. 48 and 49). In fact, Mrs. Jurdak did not believe Mrs. Porter should be terminated for her actions and refused to affirmatively recommend her termination. *See* Jurdak dep., p. 184 (Ex. 2). Nevertheless, a "Request for Termination" form was created under Ms. Jurdak's name, falsely stating that Ms. Jurdak recommended Mrs. Porter's termination and backdating the document by a month to June 10, 2003, when Mrs. Porter was terminated. *See* Ex. 49. The attempt to make it appear that the firing was something other than coordinated state-private activity not only failed but reflects that CMS knew what it was doing was wholly intertwined with the SCSD's actions.

CMS's lack of control over the decision to terminate is further demonstrated by the pro-forma steps that CMS took once Suffolk County decided to bar Mrs. Porter. When CMS management officials learned that Mrs. Porter had been barred by the SCSD, CMS did virtually nothing to contest the decision. After Mrs. Porter was barred, her supervisor, Ms. Jurdak, immediately contacted Ms. Mack. *See* Jurdak dep., p. 139 (Ex. 2). Ms. Mack contacted Ms. Mastrorilli to find out what happened. During this one-minute phone call, Ms. Mastrorilli explained that Mrs. Porter had been barred because she had disclosed confidential

communications to an outside agency. *See* Mastrorilli dep., p. 45 (Ex. 7). Ms. Mack was aware

that the agency in question was the FBI. *See* Mack dep., p. 101 (Ex. 3). Immediately thereafter,

Mrs. Porter was terminated from CMS. *Id.*, pp. 121-22.

Thus, CMS made no effort to advocate on Mrs. Porter's behalf, but instead made a single

phone call from Ms. Mack to Ms. Mastrorilli—a call that may have lasted under a minute long—

to inquire as to what happened and—astonishingly—when it learned that Mrs. Porter was being

barred for exercising her First Amendment rights, CMS merely processed the termination that

the SCSD set in motion. *Id.*, pp. 102-03.[5]

Ms. Mack did not contact Mrs. Porter to get her side of the story. *Id.*, p. 138. CMS did

not conduct even the slightest investigation into the circumstances of the barring. *Id.*, pp. 113-

14. Ms. Mack explained that "we weren't in a place to start any investigation or to dispute

whether or not that was an appropriate decision by the county." *Id.*, p. 139. It is apparent that,

once the SCSD terminated Mrs. Porter from CMS, the company was only too willing to wash its

hands of this valuable employee.[6]

This evidence is more than adequate to raise an issue of fact genuinely in dispute as to

whether the state was sufficiently involved in the decision to terminate Mrs. Porter, such that

CMS was a state actor. Indeed, this evidence shows that the State was deeply involved in the

decision to terminate Mrs. Porter because—in fact, it was the State that made the decision to

---

[5]    Several weeks after the barring, counsel for Mrs. Porter wrote a demand letter to CMS, complaining about her
       treatment. In response to this letter, CMS counsel placed one additional phone call to the SCSD to discuss the
       barring. *See* CMS' Responses to Mrs. Porter's First Set of Interrogatories, No. 7 (Ex. 50); *see also* Mack dep.,
       pp. 114-15 (Ex. 3).

[6]    CMS's belated, flimsy efforts to find Mrs. Porter another position at another correctional facility does nothing
       to alter the conclusion that the SCSD was sufficiently involved in the decision to terminate. Even though,
       upon Ms. Jurdak's urging, Ms. Mack contacted correctional facilities in Essex and Franklin counties to see if a
       full-time position was available, the fact remains that CMS did nothing to contest the SCSD's decision to
       remove Mrs. Porter from the HOC.

terminate altogether.  As a result, CMS was a joint participant in the State's unconstitutional

conduct, and may be held liable under Section 1983.[7]

## II.     SUMMARY JUDGMENT IS INAPPROPRIATE ON MRS. PORTER'S BREACH OF CONTRACT CLAIM

Count IV of Mrs. Porter's Amended Complaint alleges that CMS breached its contract

with Mrs. Porter by terminating her contrary to the provisions of its handbook.  CMS is not

entitled to summary judgment on this count.

### A.     The CMS' Employee Success Guide Created a Contract of Employment With Mrs. Porter

Employee handbooks can create contractual obligations between an employer and

employee.  *O'Brien v. New England Tel. & Tel. Co.*, 422 Mass. 686, 691 (1996); *Jackson v.*

*Action for Boston Cmty. Dev., Inc.*, 403 Mass. 8, 13 (1988).  The terms of an employee handbook

therefore may form an implied contract.  Employee handbooks have come under greater scrutiny

by the Massachusetts courts, as "[t]he idea that an employer may ignore promises made in a

personnel manual is in increasing disfavor in this country."  *O'Brien*, 422 Mass. at 691.  "While

an employer might deny expressly agreeing to contractual obligations, where its conduct is in

conformity with procedures set forth in its own manual, an implied-in-fact contract may exist."

*Derrig v. Wal-Mart Stores*, 942 F.Supp. 49, 54 (D. Mass. 1996), relying on *O'Brien*, 422 Mass.

at 692.

To determine whether an employee handbook constitutes an implied contract, two central

inquiries must be posed: (1) did the employee believe that the employee manual she was given

constituted the terms or conditions of employment, equally binding on employee and employer;

and (2) if so, was the employee's belief reasonable under the circumstances.  *See Derrig*, 942 F.

---

[7]     CMS also argues that it is not liable because it was not a joint employer.  This is not the test for determining

12

Supp. at 55; *O'Brien*, 422 Mass. at 692-93.  Reasonableness as to an employee's belief stems

from "the language of the [employee handbook] policies and the way in which the policies are

circulated and communicated to its employees." *Salvas v. Wal-Mart Stores, Inc.*, No. 013645,

2004 WL 3120680, *3 (Mass. Sup. Ct. Dec. 24, 2004), citing to *O'Brien*, 422 Mass. at 694.

To assist in the reasonableness analysis, all circumstances are considered, including: (1)

when the handbook was presented to the employee and whether the employee continued to work

for the employer thereafter; (2) if the handbook initially was distributed at employee orientation,

and whether the policies contained in the handbook were communicated to the employee during

orientation; (3) how often the employer distributed the handbook; (4) whether the handbook

covered many different aspects of the employment; (5) whether the employer adhered to the

handbook's provisions and thereby evidenced an intention to be bound; (6) how the policies

contained in the handbook are implemented; (7) whether the employee signed the manual or

otherwise acknowledged an understanding of its terms; (8) whether the handbook contained an

employer disclaimer; (9) whether the employer called special attention to the handbook; and (10)

whether there was any negotiation over the terms of the handbook.  *Hinchey v. NYNEX Corp.*,

144 F.3d 134, 141 (1st Cir. 1998); *Jackson*, 403 Mass. at 14-15; *Salvas*, 2004 WL 3120680, *4

n. 7.  The factors do not represent a mechanical checklist and the existence of one or more

factors is not determinative.  *O'Brien*, 422 Mass. at 692.

CMS maintains that Mrs. Porter could not have reasonably believed that the CMS'

Employee Success Guide, and the terms contained therein, constituted an employment contract.[8]

On the contrary, a careful review of all of the above circumstances indicates that Mrs. Porter's

---

Section 1983 liability.  In any event, as discussed below, CMS and Suffolk County were joint employers.

[8]    Defendant CMS does not dispute that Mrs. Porter believed that the CMS' Employee Success Guide constituted
the terms and conditions of her employment with CMS.  *See* Porter decl., ¶ 30 (Ex. 1).  Mrs. Porter therefore
will not address the first prong to the two-part inquiry discussed above.

belief that both she and CMS would be bound by the policies set forth in the CMS' Employee Success Guide was reasonable. At the very least, questions of fact exist as to whether or not it was reasonable for Mrs. Porter to believe that CMS was contractually bound by the CMS' Employee Success Guide and its policies. *See Salvas*, 2004 WL 3120680, *4 (summary judgment inappropriate where employees' reasonable belief in dispute that they were contractually entitled to meal and rest breaks pursuant to handbook – "the record before the court creates a dynamic tension between how far written policies and practices inuring to the benefit of employees and deemed 'non-negotiable' by [the employer] can be deemed contractual in nature…and are matters for the development of evidence at trial…."). Summary judgment therefore should be denied with respect to CMS' breach of contract argument.

Application of the *Hinchey* factors demonstrates that Mrs. Porter was reasonable in believing that the Employee Success Guide was a binding contract between her and CMS. The Employee Success Guide was presented to Mrs. Porter at the inception of her employment with CMS, and CMS distributed a copy of the Guide on an annual basis. *See* Mack dep., pp. 56, 194, 196 (Ex. 3); *see also Ferguson v. Host Int'l.*, 53 Mass. App. Ct. 96, 102 (2001) (stating that "the mere fact of the manual's distribution suggests its importance"). At the outset of her employment, CMS required Mrs. Porter to attend an orientation. *See* Mack dep., p. 56 (Ex. 3). During the orientation, the Employee Success Guide "is reviewed so [the new employees] understand the terms and conditions around employment with CMS . . ." *Id.*, p. 56. To be sure, the CMS' Employee Success Guide, which is more than 70 pages long, addresses virtually every aspect of a CMS employee's employment, including "Compensation Policies," "Appearance and Conduct," "Performance Evaluations," "Corrective Action," and "Employee Responsibilities – Reporting for Work." *See* Employee Success Guide (Ex. 47). Such detail, coupled with the

14

mandatory language found in the Employee Success Guide, suggests its binding nature. *See Derrig*, 942 F.Supp. at 55.

At the conclusion of the Employee Success Guide, Mrs. Porter was required to sign an acknowledgement page stating that she understood the terms and policies contained therein and to return same to the Site Manager. *See* Porter decl., ¶ 30 (Ex. 1); *see* Acknowledgement Form, *id.* (Ex. D). "[A] finding that the terms of a personnel manual are part of an employee's contract would be supported if the employee signed the manual, manifested assent to it, or acknowledged understanding of its terms…." *O'Brien*, 422 Mass. at 693. Also, of course, Mrs. Porter continued to work for CMS after her initial receipt of the Employee Success Guide. *See* Porter Decl., ¶ 3 (Ex. 1).

CMS contends that in terminating Mrs. Porter's employment, it merely followed the policy set forth in the "Corrective Action" section of the Employee Success Guide. Assuming CMS truly followed this policy, such action evidences CMS' intent to be bound by the Employee Success Guide. CMS cannot, and should not, be permitted to have it both ways. "An employer may not, on one hand, rely on the mandatory nature of policies it spells out in a manual as the reason for its termination of an employee, and then, on the other hand, deny the contractual force of its manual when it comes to obligations the document might impose on the employer." *Derrig*, 942 F.Supp. at 55. As Ann Mack testified, any CMS termination "has to be consistent with our Employee Success Guide." Mack dep., p. 112 (Ex. 3). There is no dispute that CMS evidenced an intent to be bound by the terms of its handbook. Similarly, CMS drew special attention to the Employee Success Guide when it allegedly terminated Mrs. Porter based on the provision entitled "Institutional Action" contained in the Success Guide; indicating the importance CMS placed on its Employee Success Guide.

In its Memorandum, CMS attributes much significance to the fact that Mrs. Porter did not negotiate with CMS regarding the terms of the Employee Success Guide or the "Corrective Action" policy. The Supreme Judicial Court has noted, however, that the absence of contract negotiation over the manual does not foreclose the possibility that a contract exists. *See O'Brien*, 422 Mass. at 692. The fact that the CMS' Employee Success Guide was not the subject of negotiation between Mrs. Porter and CMS "is neither significant nor surprising" as "[n]egotiation of the terms of a company-wide manual for nonunion employees is not likely and is not an essential precondition of the enforceability of the employer's obligations stated in the manual." *Id.*

CMS also emphasizes the language contained in the Employee Success Guide to argue that CMS retained the right to modify the policies contained in the Guide at its discretion. CMS' unilateral right supports Mrs. Porter's reasonable belief that the Employee Success Guide outlined her conditions of employment. *See* Porter Decl., ¶ 30; *see O'Brien*, 422 Mass. at 692-93 (opining that "if an employee reasonably believed that the employer was offering to continue the employee's employment on the terms stated in the manual, the employee's continuing to work after receipt of the manual would be in the nature of an acceptance of an offer of a unilateral contract….").

In short, the CMS employee handbook was presented to Mrs. Porter at the outset of her employment; its terms were discussed at length during Mrs. Porter's orientation; Mrs. Porter was required to sign an acknowledgement that she read it; it was redistributed each time it was updated, at which time Mrs. Porter had to re-acknowledge that she read the new guide; the handbook covers virtually every aspect of Mrs. Porter's employment; and CMS paid special attention to its "Institutional Action" provision in terminating Mrs. Porter. The evidence

demonstrates that the CMS' Employee Success Guide constituted an implied contract between Mrs. Porter and CMS, and that Mrs. Porter reasonably believed that the Guide represented a binding agreement between them. At the very least, several questions of fact remain as to whether or not the CMS' Employee Success Guide created a contract, such as the extent to which CMS adhered to the handbook's provisions, how the policies contained therein were implemented and to what extent CMS called special attention to the handbook.

**B.     CMS Breached the Provisions of the Employee Success Guide With Respect to Mrs. Porter**

In terminating Mrs. Porter, CMS violated the implied contract created by the Employee Success Guide. There is no dispute that Mrs. Porter was not provided an opportunity to correct her alleged misconduct, contrary to the "progressive discipline" provisions of the Employee Success Guide. *See* Employee Success Guide, pp. 17-19 (Ex. 47); Porter Decl., ¶ 21; Mack dep., pp. 200-09 (Ex. 3).

CMS argues that it is entitled to summary judgment on this count based on a single paragraph tucked away at the end of the "Corrective Action" section of the handbook. In this provision, entitled "Institutional Action," which states that, in the event an employee is barred from an institution, "CMS will attempt to resolve the situation as soon as practical. Loss of institution access normally results in termination of employment by CMS, as security clearance/access is a precondition of employment by CMS." Employee Success Guide, p. 19 (Ex. 47) (emphasis added). There is a genuine issue of fact concerning whether CMS adhered to this contractual provision. First, CMS made no attempt to "resolve" Mrs. Porter's barring as soon as practical. Second, on its face, this provision does not require CMS to terminate a barred employee; rather, the company has discretion whether or not to retain the employee.

CMS breached its contractual obligations to Mrs. Porter when it failed to investigate, let alone resolve, Mrs. Porter's barring from the HOC. The record is clear that CMS simply accepted and implemented the SCSD's unlawful decision. By all accounts, Mrs. Porter was an exceptional nurse practitioner who provided an invaluable service to the HOC for nine years. *See, e.g.*, Jurdak dep., p. 28 (Ex. 2). ("[Mrs. Porter] is probably the best Nurse Practitioner that ever worked for me as far as a relationship with a staff as well as inmates."). Yet when CMS learned that this valuable employee had been barred, its attempts to "resolve" the barring were nonexistent.

There is no dispute that all CMS did was solicit the SCSD's explanation and, knowing that Mrs. Porter was barred because she communicated with the FBI, still terminated her. *See* Mack dep., p. 101 (Ex. 3). CMS never investigated the circumstances of the barring. *Id.*, pp. 113-14.[9] Neither Ms. Mack nor anyone else within CMS management ever contacted Mrs. Porter to get her side of the story, even though Ms. Mack had worked with Mrs. Porter for approximately 20 years. *Id.*, pp. 50, 138. *See id.* ("Q. Weren't you curious to get Mrs. Porter's side of the story? A. No, I wasn't curious."). At the very least, there is a genuine issue of fact concerning whether CMS' efforts to "attempt to resolve the situation as soon as practical" were satisfied by the single phone call from Ms. Mack to Ms. Mastrorilli.[10]

Nor can it be argued that CMS had no alternative but to terminate Mrs. Porter's employment. The language contained in the CMS' Employee Success Guide is discretionary: "[l]oss of institution access <u>normally</u> results in termination…." *See* Employee Success Guide, p.

---

[9]    Desperate to locate additional efforts to resolve Mrs. Porter's barring, CMS also points to Ms. Jurdak's questions to Ms. Mastrorilli during the meeting at which Mrs. Porter was barred. Ms. Jurdak's comments to Ms. Mastrorilli are better characterized as mere frustration with what had transpired than an attempt to "resolve" the situation. *See* Jurdak dep., pp. 136-37 (Ex. 2).

19 (Ex. 47) (emphasis added).  No CMS policy or requirement <u>mandated</u> Mrs. Porter's termination.  Given this discretion in terminating a barred employee, Mrs. Porter certainly presented a sympathetic case for retention, not termination.  Indeed, barring normally results in termination because "security clearance/access is a precondition of employment by CMS."  *Id.* While Mrs. Porter had lost her security clearance at Suffolk, the circumstances of her barring suggest that she could have easily obtained security clearance at another institution, *see* Jurdak dep., p. 198 (Ex. 2), as opposed to, say, a CMS employee who provided narcotics to an inmate. *See* Ex. 23.  Ultimately Mrs. Porter did obtain security clearance at other correctional facilities. *See* Porter Decl., ¶ 22.  She was never a security risk.  *Id.*

It is apparent that CMS simply had no interest in retaining Mrs. Porter after she was barred from the HOC.  Only after Ms. Jurdak contacted her did Ms. Mack contact other CMS facilities to see if other positions were available.  *See* Jurdak dep., p. 221 (Ex. 2); Mack dep., p. 127 (Ex. 3).  Ms. Mack only inquired if they had full-time positions available.  *See* Mack dep., p. 127 (Ex. 3).  She never inquired about the availability of part-time or per-diem positions at these facilities, nor did she place calls to any facilities in the 26 other states that CMS serviced.  Ms. Mack never contacted Mrs. Porter to see if she would have considered a part-time or per diem position or an out of state position, even though there was likely availability at other facilities *Id.*, pp. 167-68, 170, 172 .  Mrs. Porter certainly would have considered such offers.  *See* Porter Decl., ¶ 22 (Ex. 1).  Indeed, she ultimately did accept such positions.

In summary, there is at least a genuine issue of fact regarding whether an implied contract existed between CMS and Mrs. Porter and whether CMS breached the terms of that contract by

---

[10]    As mentioned above, CMS counsel made one additional phone call to SCSD counsel of unknown content and only after receiving a demand letter from counsel for Mrs. Porter.  Even CMS does not claim that this belated contact was an attempt to "resolve" the situation that was done as soon as practical.

failing to "attempt to resolve the situation as soon as practical" and by terminating Mrs. Porter. Thus, summary judgment should not be granted to CMS on Count IV.

## III.    SUMMARY JUDGMENT SHOULD NOT BE GRANTED ON THE THIRD-PARTY BENEFICIARY COUNT

Count V of the Amended Complaint alleges that CMS breached its obligations under its contract with the SCSD, to Mrs. Porter.  Summary judgment should not be granted on this count. Mrs. Porter has raised a genuine issue of material fact that CMS breached its agreement to act lawfully with respect to Mrs. Porter.  The contract between the parties provides that "[t]he Contractor shall keep himself fully informed of all . . . State and Federal laws, which in any manner affect the work herein specified.  The Contractor shall at all times observe and comply with said . . . laws . . ."  *See* Suffolk County-CMS Contract, § 11.6 (Ex. 42).

First and foremost, CMS breached this provision of the contract by unlawfully terminating Mrs. Porter, violating her civil rights and acting contrary to a clearly-defined public policy.  *See* Section I *infra* and IV *supra*.  Moreover, the CMS Response to the Request for Proposal ("Response to RFP"), which the County ultimately adopted as the contract, provides that "CMS will, <u>upon written request of the Official,</u> remove from service under this contract any individual in the Contractor's employ who the Official determines to be disorderly, careless, or incompetent or to be employed in violation of the terms of this contract."  CMS Response to RFP, p. 8-1 (emphasis added) (Ex. 43); *see also* Suffolk County-CMS Contract, Art. 1, § 2.2 (Ex. 42).  It is undisputed that CMS removed Mrs. Porter from the SCSD even though it never received a written request to do so.  *See* Mack dep., pp. 121-22 (Ex. 3); *see also* Cabral dep., p. 79 (Ex. 16) ("I'm not sure that CMS was given a written notice.  I think that was supposed to be done.").

Mrs. Porter has raised a genuine issue of material fact that she was a third-party beneficiary of these contractual provisions. A party claiming to be a third-party beneficiary to a contract must show that the contracting parties "intended to give her the benefit of the promised performance." *Anderson v. Fox Hill Village Homeowners Corp.*, 424 Mass. 365, 366 (1997).[11] For a party to be an intended beneficiary, it "must appear from 'the language and circumstances of the contract' that the parties to the contract 'clearly and definitely' intended the beneficiaries to benefit from the promised performance." *Miller v. Mooney*, 431 Mass. 57, 62 (2000) (quoting *Anderson*, 424 Mass. at 366-67).[12]

In the present case, the language of the contract itself raises a genuine issue of material fact that CMS and the County clearly and definitely intended Mrs. Porter to benefit from the CMS-County contract. In its response to Suffolk County's RFP, CMS provided a staffing grid, which included the precise number of staff members who would fill each position and the average salary for each position. *See* Response to RFP, p. 8-6 (Ex. 43). "Nurse practitioner"— Mrs. Porter's position—was one of the items specifically included in this contract. *Id.* CMS promised to staff "2.4" full-time nurse practitioner positions. *Id.* There was no question that Mrs. Porter would fill one of these positions. When CMS submitted its response to the RFP, Mrs. Porter was already working at the HOC for CMS' predecessor, CHS. Ms. Mack testified that it was "fairly obvious" that Mrs. Porter would stay at the HOC when CMS took over and

---

[11] State law governs this contract dispute. *See Southland Corp. v. Keating*, 465 U.S. 1, 23 (1984).

[12] Courts have recognized that employees of independent contractors may be a third-party beneficiary of the contract between the independent contractor and a customer if the contracting parties intended for a particular promise to benefit the employee. *See G.W. Equip. Co., Inc. v. Massachusetts Port Authority*, 63 Mass. App. Ct. 1112, 2005 WL 937052, *2 (Apr. 22, 2005) (unpublished decision) (noting that a jury found against a customer and for an independent contractor's employee who injured himself on a ladder provided by the customer, because the employee was a third-party beneficiary of the customer's promise to the independent contractor to provide a safe ladder, and the customer breached this obligation to the employee).

that she "advocated for her to be retained." *See* Mack dep., p. 52 (Ex. 3); *see* Porter Decl., ¶ 3 (Ex. 1).

> Moreover, CMS included the following promises in the contract:
>
> CMS follows these guiding principles in developing and managing human resources:
>
> ****
>
> We trust our employees and expect them to trust us. When trust has been breached, we discuss it openly.
>
> ****
>
> We handle disciplinary matters and terminations with respect and dignity. There are no bad employees—just bad selections or matches.

Response to RFP, p. 4-24-25 (Ex. 43). This provision raises a genuine issue of material fact that the contracting parties intended procedures for disciplining and terminating employees to benefit the development and management of employees.

In sum, these provisions raise a genuine issue of material fact that Mrs. Porter was an intended beneficiary of the CMS-Suffolk County contract, which CMS breached by failing to act lawfully, and terminating Mrs. Porter prior to receiving written notice from the SCSD, which, in fact, was never provided. Therefore, summary judgment should not be granted on the third-party beneficiary count.

## IV.    MRS. PORTER IS ENTITLED TO A JURY TRIAL ON HER TERMINATION IN VIOLATION OF PUBLIC POLICY CLAIM

Summary judgment should not be granted on Count VI, Mrs. Porter's claim that CMS terminated her in violation of public policy. While an at-will employee may generally be terminated at any time for any reason or for no reason at all, *Upton v. JWP Businessland*, 425 Mass. 756, 757 (1997), the Supreme Judicial Court has recognized an exception when the discharge is for reasons that violate public policy. *DeRose v. Putnam Mgmt. Co., Inc.*, 398 Mass.

205 (1986) (holding that cause of action established when an employee is fired for disobeying employer's instruction to testify falsely at a trial). Under this public policy exception, "[r]edress is available for employees who are terminated for asserting a legally guaranteed right (*e.g.*, filing workers' compensation claim), for doing what the law requires (*e.g.*, serving on a jury), or for refusing to do that which the law forbids (*e.g.*, committing perjury)." *Smith-Pfeffer v. Superintendent of the Walter E. Fernald State School*, 404 Mass. 145, 149-50 (1989).

To establish a claim of wrongful termination in violation of public policy, a plaintiff must show that (1) she was an at-will employee; (2) who was terminated; (3) for reasons contrary to a clearly established public policy. *Upton*, 425 Mass. at 757. Whether the employee's termination falls within the public policy exception is a question for the judge to decide. *Smith-Pfeffer*, 404 Mass. at 151. Summary judgment is improper when the employer's motive for terminating the employee is a disputed issue of fact. When a jury could draw inferences from the evidence that are contrary to the employer's stated rationale for the termination, summary judgment is improper. *Flesner v. Technical Communications Corp.*, 410 Mass. 805, 811-12 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986)); *Sweat v. Miller Brewing Co.*, 708 F.2d 655, 657 (11th Cir. 1983).

There is no question that Mrs. Porter was an at-will employee who was terminated. *See, e.g.*, Mack dep., pp. 121-22 (Ex. 3). There is no dispute that Mrs. Porter cooperated with law enforcement officials when she reported the Rosario allegations to the FBI. *See* Porter Decl., ¶ 15 (Ex. 1); Affidavit of Krista Snyder, ¶¶ 3-4 (Ex. 6). As CMS concedes, cooperating with law enforcement and whistleblowing both fall under the public policy exception. *See Flesner*, 410 Mass. at 810, 811 n.3 (finding that plaintiff's termination for cooperating with customs officials in investigating employer's actions fit the public policy exception); *Clark v. South Middlesex*

*Opportunity Council, Inc*, 2000 WL 1299269 *3 (Mass. Superior, May 4, 2000) (stating that it would violate public policy if plaintiff was fired for cooperating with a state agency in uncovering that her employer was submitting false information to the state agency). The exception applies to employees terminated for performing important public deeds even when the law does not explicitly require them to act. *Flesner*, 410 Mass. at 810; *Shea v. Emmanuel College*, 425 Mass. 761, 763 (1997) (endorsing the use of public policy doctrine to protect whistleblowers against wrongful termination); *Smith v. Mitre Corp.*, 949 F.Supp. 943, 950 (D. Mass. 1997) (same).

The only question, then is whether Mrs. Porter was terminated for reasons contrary to clearly established public policy.  There is a genuine issue of material fact regarding CMS's reasons for terminating Mrs. Porter.  Mrs. Porter was terminated no later than the day after she was barred from the SCHOC.  *See* Mack dep., pp. 121-22 (Ex. 3).  CMS was aware when it terminated Mrs. Porter that the SCSD's reason for barring her was because Mrs. Porter contacted the FBI concerning allegations of inmate abuse.  *Id.*, pp.86, 100-01.

Moreover, CMS has taken the position that it had no role in Mrs. Porter's termination because the decision was made for them by the SCSD.  Indeed, CMS' corporate representative testified that CMS had "no choice" but to terminate Mrs. Porter after she was barred from the HOC for communicating with the FBI.  *See* Mack dep., pp. 122, 127 (Ex. 3).  CMS has gone so far as to testify that "<u>[n]o one at CMS made a decision to terminate Mrs. Porter's employment</u>," that, in fact, it was the SCSD that terminated Mrs. Porter, not CMS, and CMS' role was reduced to merely "processing" the termination.  *See* CMS' Responses to Mrs. Porter's First Set of Interrogatories, No. 1 (Ex. 50).; *see* Mack dep., pp. 73, 134, 139, 146 (Ex. 3).  *See id.*, p. 134 (counsel for CMS stated that the company's "decision was made for them by the entity.").

CMS cannot lay all responsibility for terminating Mrs. Porter at the feet of the SCSD, while at the same time avoid the consequences of the SCSD's—and its own—actions in terminating Mrs. Porter because she cooperated with law enforcement.  There is no question that, but for Mrs. Porter's cooperation with the FBI, she would not have been terminated by CMS. *See Tighe v. Career Systems Development Corp.*, 915 F.Supp. 476, 485 (D. Mass. 1996) (stating that to meet the causation requirement, the plaintiff must show that the defendant "would not have discharged her but for her conduct protected by the public policy," or in other words, that the protected activity was a "substantial or motivating factor in the adverse employment decision").

Additional evidence of CMS' unconstitutional actions is found in its conduct subsequent to their decision to terminate Mrs. Porter.  For example, all of Mrs. Porter's CMS evaluations— which by all accounts were outstanding—were unaccountably missing from her personnel file when it was provided to Mrs. Porter.  *See* Porter Decl., ¶ 20 (Ex. 1); *see* Mack dep., p. 68 (Ex. 3). In addition, as described above, CMS forged a request to terminate Mrs. Porter under Ms. Jurdak's name.  CMS policy requires that an employee's supervisor carry out an employee's termination.  In Mrs. Porter's case, Mrs. Jurdak was not told to terminate Mrs. Porter from CMS in the wake of her barring.  Indeed, while Ms. Jurdak removed Mrs. Porter from the Suffolk HOC payroll, she was not told at the time that Mrs. Porter was terminated altogether from CMS. *See* Jurdak dep., pp. 179-84 (Ex. 2).  It was not until a conference call with CMS Regional Vice-President Ann Mack and Director of Human Resources Sterling Price, approximately a month later, that Ms. Jurdak was told that Mrs. Porter was to be terminated and, indeed, that Ms. Jurdak had to file a request for Mrs. Porter's termination.  *Id.*, p. 177, 184.  Ms. Jurdak refused to do so because she did not believe that the termination was justified.  *Id.*, p. 184.  Instead, Ms. Jurdak

merely wrote on the form that Ms. Porter had been barred from the HOC. *Id.*; *see* First Request for Termination (Ex. 48). Nevertheless, someone at CMS drafted a form under Ms. Jurdak's name stating that Ms. Jurdak was requesting Mrs. Porter's termination. *See* Second Request for Termination (Ex. 49). Ms. Jurdak testified that she did not fill out this form and that the form that she did fill out was not executed by CMS management. *See* Jurdak dep., p. 190 (Ex. 2). These actions raise a genuine dispute of fact about whether CMS was attempting to cover up their unconstitutional termination of Mrs. Porter.

Defendant claims that it would be illogical to infer that CMS terminated Mrs. Porter in retaliation for her cooperation with the FBI because CMS was not the target of the FBI's investigation and because Mrs. Porter's cooperation with the FBI would have no detrimental effect on CMS. As an initial matter, there is no evidence in the record to demonstrate whether or not CMS was investigated by the FBI. Even if CMS is correct, it would have been in CMS interest to maintain a good working relationship with the SCSD, a major client. Upon learning that the SCSD barred Mrs. Porter, a jury could properly conclude that CMS would not want to jeopardize its relationship with the SCSD by retaining Mrs. Porter.

The circumstances surrounding CMS' immediate termination of Mrs. Porter certainly suggest a desire to wash its hands of a suddenly undesirable employee. As described above, CMS did not investigate the circumstances of Mrs. Porter's barring or even contact her to find out what happened. *See* Mack dep., pp. 113-14, 138 (Ex. 3). When CMS lost the HOC contract in 2005, each employee was personally notified that they were terminated at the HOC site, in addition to receiving letters in the mail. *Id.*, p. 46. Mrs. Porter, one of CMS' best nurse practitioners, received neither of these required steps; indeed, Mrs. Porter only found out that she was terminated from CMS more than a month after the fact, via a letter from her 401(k) provider.

*See* Porter Decl., ¶ 21 (Ex. 1). Finally, as described above, CMS' attempts to find Mrs. Porter another position at CMS were less than cursory.

In opposing summary judgment, Mrs. Porter need not prove CMS's true motives in terminating her. Rather, Mrs. Porter need only raise a material issue of fact as to whether CMS was cooperating with and shared the SCSD's unlawful intent in termination Mrs. Porter for reasons contrary to public policy. *See Flesner*, 410 Mass. at 811-12. If the facts are in dispute concerning a termination, the company is not entitled to summary judgment merely because it advances a legitimate rationale for its actions. *Id*. While mere conjecture is not enough, *Shea*, 425 Mass. at 763-64, here there is evidence that CMS fired her specifically because of her cooperation with the FBI. Indeed, CMS simply found out the reason for the SCSD's barring and, despite being in violation of basic public policy, callously implemented the termination of Mrs. Porter. Mrs. Porter's claim thus differs from that in *Shea*, where the court found no factual dispute existed when plaintiff testified she had no facts to support her claim and the record contained no evidence to support her claim. *Shea*, 425 Mass. at 764. As such, Mrs. Porter's claim should be submitted to a fact-finder to determine whether CMS terminated Mrs. Porter in violation of public policy.

## V.    THERE IS A GENUINE ISSUE OF FACT AND CMS IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON MRS. PORTER'S COUNT FOR VIOLATIONS OF THE MASSACHUSETTS CIVIL RIGHTS ACT

Defendant's motion should be denied with respect to Mrs. Porter's claim under the Massachusetts Civil Rights Act ("MCRA"). To establish a claim under the MCRA, a plaintiff must prove that (1) their exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by "threats,

intimidation or coercion." *See* M.G.L. c.12 § 11(I), (H); *Swanset Dev. Corp. v. City of Taunton*, 423 Mass. 390, 395 (1996); *Bally v. Northeastern Univ.,* 403 Mass. 713, 717 (1989).

Here, there is no question that Mrs. Porter's communication with the FBI was a matter of public concern and was thus protected. *Acciavatti v. Professional Services Group, Inc.*, 982 F.Supp. 69, 78 n.6 (D. Mass. 1997) ("Massachusetts law treats whistleblowing as protected speech because its subject matter is typically of public concern"); *Flesner*, 410 Mass. at 810 (noting that whistleblowing is a high priority public policy). CMS interfered with Mrs. Porter's First Amendment right to speak with law enforcement was interfered with by CMS by terminating her employment.

CMS claims that it is entitled to summary judgment because Mrs. Porter has no secured right in her continued employment with CMS and thus cannot show economic coercion by CMS and that Mrs. Porter cannot show that CMS's actions were intended to interfere with her First Amendment rights. CMS is incorrect on both counts.

### A.    CMS Interfered With Mrs. Porter's Rights Via Economic Coercion

The Massachusetts Supreme Judicial Court has defined the term "coercion" in the MCRA as "the application to another of such force, <u>either physical or moral</u>, as to constrain him to do against his will something he would not otherwise have done." *Planned Parenthood League of Massachusetts, Inc. v. Blake*, 417 Mass. 467, 474 (1994). The standard to be applied is whether a reasonable person would be threatened, intimidated, or coerced by the defendant's actions. *Id.* at 474-75.

As Defendant concedes, courts have recognized that non-physical coercion, such as economic coercion, is actionable under the MCRA . *See Broderick v. Roache*, 803 F.Supp. 480, 486-87 (D. Mass. 1992) (listing cases and noting that actual or potential physical duress often

serves as a proxy for threats, intimidation or coercion because it is easily identified, but it is not required under the MCRA); *Buster v. George W. Moore, Inc.*, 438 Mass. 635, 646-47 (2003) ("we have recognized that coercion may take various forms, and we have not limited its scope to actual or attempted physical force. For example, we have suggested that coercion may be found where one party deprives another of rights due under a contract, or makes it impossible, due to sexual harassment, for another to continue her employment") (internal citations omitted); *Willitts v. Roman Catholic Archbishop of Boston*, 411 Mass. 202, 210 (1991).

       1.     <u>Mrs. Porter Had a Secured Right in Future Employment With CMS</u>

As described above, Mrs. Porter had a secured right in future employment with CMS based on the contractual relationship created by the CMS Employee Success Guide. *See* Section II *supra*.

       2.     <u>CMS Engaged in Coercion By Interfering with Mrs. Porter's Secured Right in Her Future Employment</u>

The termination of a contracted employee may constitute grounds for an MCRA claim. *See Acciavatti*, 982 F.Supp. at 78 (finding that when defendants cancelled a future economic relationship with plaintiff because his speech negatively impacted defendants, that retaliatory behavior constituted the requisite intimidation, threat, or coercion under the MCRA); *Buster*, 438 Mass. at 647 n.17 ("actual or prospective breach of contract constitutes 'coercion' under the act"); *Carvalho v. Town of Westport*, 140 F.Supp.2d 95, 102 (D. Mass. 2001) (holding that police chief's threat to discipline police officer if he made public statements about lawsuit against town, followed by demotion of officer, could constitute "threats, intimidation, or coercion" under MCRA).

Here, CMS does not deny that it terminated her employment immediately following the exercise of her First Amendment right to speak with the FBI. Because Mrs. Porter was a contracted employee, she had a secured right in her continued employment with CMS.

> 3.    Even if Porter Is Deemed to Have Been an At-Will Employee, CMS's Conduct Still Constitutes Economic Coercion Because it Denied Her Benefits She Was Legally Entitled To

Although an adverse employment decision alone (such as termination) in the case of an at-will employee is not sufficient to constitute economic coercion under the MCRA, here CMS' treatment of Mrs. Porter went beyond a mere negative employment decision. Therefore even if this Court finds Mrs. Porter to have been an at-will employee, she can still show that CMS engaged in economic coercion.  Because Mrs. Porter had a right to those benefits, CMS engaged in economic coercion when they denied her the benefits. *See Howcroft v. City of Peabody*, 51 Mass. App. Ct. 573, 594 (2001) (denying summary judgment where defendants denied plaintiff benefits to which he was entitled); *Broderick*, 803 F.Supp. at 486-87 (denying summary judgment where defendants denied plaintiff a promotion to which he was entitled and subjected him to unjustified disciplinary proceedings).

> 4.    CMS's Conduct Constituted a Pattern of Harassment and Retaliation That Satisfies the Requirements of the MCRA

Economic coercion is not the only form of non-physical actions that satisfy the requirements of MCRA. The Supreme Judicial Court defined "coercion" as "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." *Blake*, 417 Mass. at 474; *Swanset Dev. Corp.*, 423 Mass. at 396 (same).  Courts have recognized that a pattern or scheme of harassment and retaliation, even non-physical, would be actionable under the MCRA if it induced the plaintiff to give up secured rights. *Broderick*, 803 F.Supp. at 487 (denying summary judgment and finding

material issue of fact whether the city, by denying the plaintiff a promotion to which he was

entitled, refusing to grant him permission to practice law in his off-duty hours and subjecting him

to unjustified disciplinary proceedings, attempted to threaten, coerce or intimidate the plaintiff);

*Howcroft*, 51 Mass. App. Ct. at 594 (denying summary judgment and finding a material issue of

fact whether the defendants engaged in a pattern of harassment and intimidation to suppress

plaintiff's free speech rights by arbitrarily enforcing rules against plaintiff, denying him benefits

to which he was entitled, harassing him by telling him to "shut up" and attempting to suspend

him).

Here, CMS engaged in a pattern of retaliation against Mrs. Porter for speaking to the

F.B.I. By terminating her employment after she was unjustifiably and unlawfully barred from the

premises, CMS retaliated against Mrs. Porter for exercising her First Amendment right to free

speech. CMS's conduct during and after Mrs. Porter's termination was so unjustifiably harsh that

it amounted to moral coercion. Despite Mrs. Porter's nine years of exemplary service to CMS,

immediately following the barring CMS terminated Mrs. Porter without conducting an

investigation into why she was barred. CMS did not contact her to discuss the possibility of other

kinds of positions, nor did CMS seek out part time or out of state positions for her. Additionally,

CMS did not even contact Mrs. Porter to tell her she was fired. CMS's actions are clearly

retaliation for speaking with the FBI and not merely for being barred; had CMS viewed her

barring as the only problem, CMS could have undertaken a host of alternative, less severe

responses. CMS did not follow its own guidelines (corrective action process) in terminating her

employment. CMS supervisor Ann Mack knew the reason she was barred from the facility, and

admitted that other barrings have in the past been far more serious than Mrs. Porter's.

**B.    CMS's Conduct Had the Effect of Interfering With Mrs. Porter's First Amendment Rights**

Under the MCRA, the plaintiff need not show that the defendant specifically intended to interfere with a secured right of the plaintiff's. It is enough that the defendant's conduct had such an effect. The MCRA does not include a state of mind requirement. 42. U.S.C. 1983, the parallel federal statute upon which the MCRA is patterned, also does not require specific intent. In fact, § 1983 requires only the degree of intent "that makes a [person] responsible for the natural consequences of his actions." *Redgrave v. Boston Symphony Orchestra, Inc.*, 399 Mass. 93, 99 (1987) (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961), and explaining how 1983's intent requirement is analogous to MCRA's).

Additionally, Mrs. Porter need not show that CMS' actions were intended to prevent her from speaking out in the future. The courts have upheld MCRA claims based on interference with a plaintiff's First Amendment rights via incidences of retaliation for prior speech even in cases where no opportunity for future adverse speech exists. *Acciavatti*, 982 F.Supp. at 79 (citing cases). Similarly, Massachusetts courts and the United States District Court of Massachusetts have recognized claims under the MCRA when the defendant's conduct consisted of retaliation for a single instance of protected speaking. *Id.* Therefore, Mrs. Porter may make out an MCRA claim for interference with her free speech rights based on retaliation for her speaking to the FBI.

**VI.    COUNT VIII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

Mrs. Porter dismisses Count VIII of the Amended Complaint.

## <u>CONCLUSION</u>

For the above-stated reasons, Mrs. Porter requests that the Court deny CMS' Motion for Summary Judgment in its entirety, with the exception of Count VIII.

Respectfully Submitted,

SHEILA J. PORTER,

By her attorneys,


*/s/ Joseph F. Savage*
Joseph F. Savage, Jr. (BBO #443030)
David S. Schumacher (BBO #647917)
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109-2881
(617) 570-1000

Dated: November 14, 2005

LIBA/1647482.1

33