UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SHEILA PORTER

      Plaintiff,

   v.

ANDREA CABRAL, SUFFOLK COUNTY
SHERIFF'S DEPARTMENT, SUFFOLK
COUNTY, and CORRECTIONAL MEDICAL
SERVICES

      Defendant.

Civil Action No.04-11935-DPW

## SHEILA PORTER'S OPPOSITION TO THE
## SUFFOLK DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Joseph F. Savage Jr. (BBO # 443030)
David S. Schumacher (BBO # 647917)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA  02109
(617) 570-1000

Attorneys for Plaintiff Sheila Porter

November 14, 2005

Table of Contents

Page

INTRODUCTION..................................................................................................1

FACTUAL BACKGROUND ...............................................................................3

ARGUMENT ........................................................................................................8

I.    MRS. PORTER IS ENTITLED TO A JURY TRIAL ON HER SECTION
      1983 CLAIMS...........................................................................................7
      A.    Mrs. Porter Has Raised A Genuine Issue of Material Fact That She
            Was Deprived of Her Federal Rights.............................................7
            1.    Mrs. Porter Has Raised a Genuine Issue of Material Fact That
                  She Was Barred Because She Exercised Her First Amendment
                  Right to Communicate with Law Enforcement .....................8
            2.    There is a Genuine Issue of Material Fact Whether the Suffolk
                  Defendants Would Have Barred Mrs. Porter for Reasons
                  Other Than Communicating With the FBI............................12
            3.    There is a Genuine Issue of Material Fact Whether Mrs.
                  Porter's First Amendment Rights are Outweighed by the
                  SCSD's Interest in Efficient Reporting................................20
      B.    Mrs. Porter Has Raised A Genuine Issue Of Material Fact That
            Suffolk County Is Liable For This Deprivation of Her Federal Rights..........22
            1.    The "Confidential Communications" Section of Policy S-220,
                  as it Existed in June 2003, Was Unconstitutional ...............22
            2.    An Unconstitutional Code of Silence Existed at the SCSD ..................23
                  a.    Stern Commission Report ........................................23
                  b.    Baron Case.................................................................24
                  c.    The SCSD Has Admitted That There is a Code of
                        Silence in the Department ........................................25
                  d.    SCSD Employees Have Stated that the Code of Silence
                        Exists ........................................................................27
                  e.    Deposition Testimony From This Case Confirms that
                        the Custom and Policy of a Code of Silence Still Exists ...........30
      C.    Mrs. Porter Has Raised A Genuine Issue Of Material Fact That
            Sheriff Cabral Is Liable For The Deprivation of Mrs. Porter's Federal
            Rights ............................................................................................32

Table of Contents

Page

II.    SUMMARY JUDGMENT SHOULD NOT BE GRANTED ON MRS.
       PORTER'S CLAIM UNDER THE WHISTLEBLOWER STATUTE, M.G.L.
       C. 149, § 185, BECAUSE DISPUTED ISSUES OF MATERIAL FACT
       EXIST WITH RESPECT TO WHETHER MRS. PORTER WAS AN
       EMPLOYEE OF SUFFOLK COUNTY ........................................................................35

III.   SUMMARY JUDGMENT IS NOT APPROPRIATE FOR THE BREACH
       OF CONTRACT CLAIM BECAUSE THERE IS A GENUINE ISSUE OF
       MATERIAL FACT CONCERNING WHETHER MRS. PORTER, A JOINT
       EMPLOYEE OF THE SCSD, HAD A RIGHT TO A HEARING .............................41

IV.    A JURY COULD CONCLUDE THAT SUFFOLK COUNTY BREACHED
       ITS CONTRACT WITH CMS, AND THAT MRS. PORTER WAS A
       THIRD-PARTY BENEFICIARY OF THIS CONTRACT .........................................43

V.     MRS. PORTER IS ENTITLED TO A JURY TRIAL ON HER CLAIM
       UNDER THE MASSACHUSETTS CIVIL RIGHTS ACT ....................................46
       A.    Mrs. Porter Exercised Her Constitutional Rights ...............................48
       B.    Ms. Cabral Interfered With the Exercise of Mrs. Porter's First
             Amendment Rights Through Threats, Intimidation and Coercion ...............48

VII.   THE SUFFOLK DEFENDANTS ARE NOT ENTITLED TO JUDGMENT
       AS A MATTER OF LAW ON MRS. PORTER'S DEFAMATION COUNT............51
       A.    The Statements Were Defamatory By Nature.....................................52
       B.    The Statements Were Factual Assertions .........................................54
       C.    The Statements Sufficiently Identify Mrs. Porter................................56
       D.    The Statements in the Article Can Be Attributed to Cabral. ....................58

VIII.  SUMMARY JUDGMENT SHOULD NOT BE GRANTED ON THE
       INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS COUNT .................59

IX.    THERE IS A GENUINE ISSUE OF MATERIAL FACT REGARDING
       MRS. PORTER'S CLAIM FOR TORTIOUS INTERFERENCE WITH
       ADVANTAGEOUS RELATIONS ...........................................................................62

CONCLUSION ...............................................................................................................64

Plaintiff Sheila J. Porter ("Mrs. Porter") hereby submits her Opposition to Andrea Cabral, Suffolk County Sheriff's Department and Suffolk County's ("Suffolk Defendants") Motion for Summary Judgment.

## INTRODUCTION

This is an action for federal and state civil rights violations arising out of the Suffolk County Sheriff Department's ("SCSD") unlawful barring of Mrs. Porter, a nurse practitioner with 36 years of experience, from the Suffolk County House of Corrections ("HOC"). The only reason provided to Mrs. Porter by the SCSD for her barring, confirmed by each individual present at the meeting, was that she had reported allegations of inmate abuse to an "outside agency"—the Federal Bureau of Investigation ("FBI"). Mrs. Porter had indeed exercised her First Amendment rights and reported these allegations to the FBI, consistent with her status as a FBI informant for four years, during which time she cooperated with the FBI on a confidential basis, providing the FBI with information related to potential civil rights violations at the HOC. Mrs. Porter had serious concerns that an inmate, who was also known as a FBI informant, had been sent back to the institution where he cooperated with the FBI on a criminal investigation, and was now claiming that he was abused. While Mrs. Porter reported her encounter with this inmate to the SCSD, she also had a responsibility to notify the FBI of these allegations.[1]

To make matters worse, after Mrs. Porter again exercised her First Amendment rights, this time, responding to a newspaper reporter's questions about her barring, Ms. Cabral engaged in a vicious smear campaign against Mrs. Porter. Ms. Cabral defamed Mrs. Cabral on numerous occasions, on television and in the *Boston Globe*, claiming that Mrs. Porter's allegations were

---

[1] Immediately after she was barred, Correctional Medical Service, Inc. ("CMS"), the private company for whom Mrs. Porter worked, learned that Mrs. Porter had been barred from the HOC for communicating with the FBI and terminatated her employment.

"100% ridiculous," that she was "not a whistleblower," that her allegations were "politically motivated" and that there had been "no follow up" by independent law enforcement agencies to her claims. All of these statements were utterly false. But Ms. Cabral was not satisfied with calling Mrs. Porter a liar. Instead, she insinuated that Mrs. Porter was a racist as well, claiming that she had "an agenda" and that she was "biased." Thus, instead of reinstating Mrs. Porter and apologizing for a lapse of judgment, Ms. Cabral compounded this unlawful conduct by publicly ruining Mrs. Porter's good name.

There is no dispute that Mrs. Porter was told that she was barred from the HOC solely because she informed the FBI about the abuse allegations. In the wake of Mrs. Porter's lawsuit, however, undoubtedly aware that the basis for Mrs. Porter's barring was patently unconstitutional, the Suffolk Defendants dreamed up a new basis for Mrs. Porter's barring. The Suffolk Defendants now claim that Mrs. Porter was actually barred because of a variety of issues related to the form, timing and content of her <u>internal</u> reporting of the inmate's allegations.

There are a number of problems with this post-hoc rationalization. First and foremost, there is <u>no</u> contemporaneous evidence that Mrs. Porter was barred for reporting reasons, in stark contrast to the mountain of evidence that she was barred because she talked to the FBI. Moreover, <u>none</u> of the reasons currently advanced by the Suffolk Defendants provided a valid basis for Mrs. Porter's barring. First and foremost, there is no dispute that, upon learning of the abuse allegations, Mrs. Porter immediately reported the allegations to her immediate supervisor, Donna Jurdak, who, in turn, immediately reported to a SCSD deputy superintendent. To cite another example, Ms. Cabral claims that Mrs. Porter was barred, in part, because her internal report of the abuse allegations appeared on a medical form rather than on a Sheriff's Investigative Division ("SID") Incident Report form. That the Suffolk Defendants are seriously

claiming that a highly successful nurse practitioner had her security clearance revoked for using the wrong piece of paper only highlights how weak their current position is.

The Suffolk Defendants' Motion for Summary Judgment should be denied in its entirety. There is, at least, a genuine issue of material fact concerning the reasons that Mrs. Porter was barred from the HOC, precluding summary judgment on her Section 1983 claims. In addition, the evidence demonstrates that the SCSD exercised significant control over Mrs. Porter's employment such that she was a joint employee of both CMS and the SCSD. Thus, summary judgment is inappropriate for Mrs. Porter's claims under, *inter alia*, the Massachusetts Whistleblower Statute. Summary judgment should be denied on the remaining claims as well, for the reasons explained below.

## **FACTUAL BACKGROUND**[2]

Mrs. Porter is a nurse practitioner with 36 years of experience who was unlawfully barred from her job at the SCSD and terminated from CMS for speaking to the FBI. *See* Declaration of Sheila Porter ("Porter Decl."), ¶ 2 (attached as Exhibit ("Ex.") 1 to the Declaration of David S. Schumacher).

Mrs. Porter began working in the Suffolk County House of Corrections ("HOC") in 1994. Mrs. Porter was widely regarded as a superior nurse practitioner. *See* Deposition of Donna Jurdak ("Jurdak dep."), p. 28 (Ex. 2) (Mrs. Porter was "probably the best nurse practitioner that ever worked for me"); *see* Deposition of Ann Mack ("Mack dep."), p. 52 (Ex. 3) ("She did a great job as a nurse practitioner for us, particularly in women's healthcare"); *see* Deposition of Gerard Horgan ("Horgan dep.") (Ex. 4), p. 55 ("she was a good nurse practitioner. She's someone who provided good care to the inmates."). Mrs. Porter received excellent performance

---

[2] In addition to the following Factual Background, Mrs. Porter relies on her Response to the Suffolk Defendants' Statement of Undisputed Facts, which Mrs. Porter incorporates by reference herein.

reviews and received the highest allowable merit raise each year that she was at Correctional

Medical Services ("CMS"). *See* Jurdak dep., p. 205 (Ex. 2). Moreover, Mrs. Porter was publicly

commended for extraordinary service. *See* Letter from Gerard Horgan to Nancy Lawrence,

dated August 26, 2002 and Memo from Donna Jurdak to, *inter alia*, Sheila Porter, dated

December 28, 1994 (Ex. 5).

In 1999 Mrs. Porter was approached by FBI agents and asked to provide them with

information on a confidential basis regarding possibly unlawful activities such as physical and

sexual abuse of inmates and drug use at the HOC. *See* Affidavit of Christa J. Snyder ("Snyder

affidavit") (Ex. 6); *see* Porter Decl., ¶ 4 (Ex. 1). Mrs. Porter agreed and provided information

until her barring in June 2003. *Id.*

On May 19, 2003, Mrs. Porter observed Rene Rosario, an inmate that she had worked

with in a prior FBI investigation, in a cell in the infirmary at the HOC. *See* Porter Decl., ¶¶ 5, 7.

Mr. Rosario told Mrs. Porter that he had been abused by a corrections officer. *Id.* Mrs. Porter

witnessed bruising on Mr. Rosario through the window of his cell door. *Id.* Mr. Rosario

requested that Mrs. Porter contact FBI Agent Snyder and tell her what happened. *Id.*

Mrs. Porter contacted Agent Snyder and related what Mr. Rosario told her. *Id.*, ¶ 15.

Mrs. Porter also immediately reported this incident to her supervisor at the SCSD, Ms. Jurdak,

among others. *Id.*, ¶¶ 10-11. Ms. Jurdak, in turn, immediately reported the incident to HOC

Deputy Superintendent Maryellen Mastrorilli. *See* Jurdak dep., pp. 92-93, 96-98 (Ex. 2). Ms.

Mastrorilli asked Ms. Jurdak to have Mrs. Porter send her a report detailing her observations.

*See* Deposition of Mary Ellen Mastrorilli, p. 12 ("Mastrorilli dep.") (Ex. 7). Mrs. Porter wrote

the report that day and submitted it to Ms. Jurdak, who forwarded the report to the attention of

Ms. Mastrorilli. *See* Porter Decl., ¶¶ 13-14 (Ex. 1); *see* May 19, 2003 Report, *id.* (Ex. A to

Porter Decl.); Jurdak dep., p. 109 (Ex. 2). In addition, Mrs. Porter sought out the Sheriff's Investigative Division ("SID") officers investigating the Mr. Rosario allegations and reported her encounter with Mr. Rosario. *See* Porter Decl., ¶ 16; *see* Deposition of Brian Dacey ("Dacey dep."), p. 93 (Ex. 8). Mrs. Porter did not disclose that she had spoken to the FBI.

SCSD officials came to suspect that Mrs. Porter had contacted the FBI to report the allegation of inmate abuse. *See* Memo from Mastrorilli to Patrick Bradley, # 748 (Ex. 9); SID Incident Report, #791 (Ex. 10); SID Incident Report, # 789-90 (Ex. 11). Accordingly, SID officials conducted a second interview with Mrs. Porter, during which Mrs. Porter admitted, under intense and misleading questioning, that she had communicated her encounter with Mr. Rosario to the FBI. *See* Porter Decl., ¶ 17 (Ex. 1); Memo from Sonya Aleman, # 642-44 (Ex. 12).

Less than two weeks later, on June 10, 2003, Mrs. Porter was asked to report to Ms. Jurdak and Deputy Superintendent Mastrorilli and was told by Ms. Mastrorilli that she was barred from the HOC, effective immediately. *See* Porter Decl, ¶ 19 (Ex. 1). The only reason provided for the barring was that Mrs. Porter shared confidential information with an outside agency—the FBI—in violation of Policy S-220, the SCSD Employee Code of Conduct. *Id.*; *see* Mastrorilli dep., pp. 33-34 (Ex. 7); Jurdak dep., p. 133 (Ex. 2).

By no later than the next day, CMS secretly terminated Mrs. Porter. *See* Mack dep., pp. 121-22 (Ex. 3). When CMS learned of Mrs. Porter's barring, it made one to the SCSD, which may have lasted as little as under a minute. *Id.*, pp. 102-03 (Ex. 3). Mrs. Porter only discovered that she was terminated a month later via a letter from her 401(k) provider. *See* Porter Decl., ¶ 21 (Ex. 1).

While it is undisputed that the sole basis for barring Mrs. Porter that was ever communicated to her was for her decision to speak to the FBI, the SCSD never attempted to explain that there was some other, lawful, basis for her barring. Instead, after the press began examining Ms. Cabral's conduct, Ms. Cabral publicly defamed Mrs. Porter on at least three occasions, claiming that Mrs. Porter had made up her allegations and was essentially a liar, because, according to the Sheriff, Mrs. Porter was "clearly biased" had "her own agenda," was "not a whistleblower," and that her allegations were "politically motivated and "100 percent ridiculous." *See* SCSD Press Statement, # 991 (Ex. 13); Transcript of Debate Between Ms. Cabral and Steven Murphy, pp. 13-15 (Ex. 14) ; E. McCardle, "The New Enforcers," *Boston Globe Magazine*, October 31, 2004, p.32 (Ex. 15). As support for this final claim, Ms. Cabral's press spokesman explained "[t]hat's why you haven't seen any follow up [after the election]." *See* October 31, 2004 article (Ex. 15).

These claims are demonstrably false. For example, the Office of the United States Attorney for the District of Massachusetts ("USAO") in fact "followed up" with an investigation into the circumstances surrounding Mrs. Porter barring as early as June 16, 2003. *See* Deposition of Andrea Cabral ("Cabral dep."), p. 197 (Ex. 16). Indeed,

REDACTED    REDACTED    REDACTED    REDACTED

**ARGUMENT**

The summary judgment standard is familiar. Summary judgment is the exception, not the

rule, and must be denied when there is a genuine dispute of any material fact. *See* Fed. R. Civ. P.

56(c); *Perez v. Volvo Car Corp.*, 247 F.3d 303, 310 (1st Cir. 2001). In determining whether a

genuine dispute of material fact exists, the Court must view all evidence in the light most

favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor. *See*

*O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir.1993).

## I.    MRS. PORTER IS ENTITLED TO A JURY TRIAL ON HER SECTION 1983 CLAIMS

### A.    Mrs. Porter Has Raised A Genuine Issue of Material Fact That She Was Deprived of Her Federal Rights

The First Amendment to the United States Constitutions provides that "Congress shall

make no law . . . abridging the freedom of speech." U.S. Const. amend. I.[3] Mrs. Porter has

raised a genuine issue of material fact that her First Amendment rights were violated when she

was barred from the HOC in retaliation for reporting abuse of inmate Rene Rosario to the FBI.

Therefore, summary judgment is not appropriate.[4]

There are three elements to a § 1983 retaliation claim under the First Amendment: (1) the

plaintiff spoke on a matter of public concern, *Connick v. Myers*, 461 U.S. 138, 147-48 (1983);

---

[3] This provision is made applicable to the States by the Fourteenth Amendment. *See* U.S. Const. Am. IX

[4] The Suffolk Defendants fail to address Mrs. Porter's Fourteenth Amendment Due Process rights. Mrs. Porter also was deprived of those rights when the County deprived her of her property interest in her job without providing a hearing. Numerous Courts have recognized that government employees may have a property interest in their job if they have a legitimate expectation that they will be entitled to that job. *See Perry v. Sindermann*, 408 U.S. 593, 599-601 (1972); *Gomez v. Rodriguez*, 344 F.3d 103, 111 (1st Cir. 2003); *Figueroa-Serrano v. Ramos-Alverio*, 221 F.3d 1, 6-7 (1st Cir. 2000). As discussed below, Mrs. Porter was an employee of Suffolk County. When the County terminated this employment, the due process clause required that Mrs. Porter be provided notice and a hearing. *See Mathews v. Eldridge*, 424 U.S. 319, 339-40 (1976).

(2) the plaintiff's speech caused the state to take the adverse action, *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 286-87 (1977); and (3) the private interest in speaking on a matter of public concern is not outweighed by the government's interest in promoting the efficiency of public services. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). The Suffolk Defendants concede that there is a genuine issue of material fact as to the first factor.[5]

> 1.     Mrs. Porter Has Raised a Genuine Issue of Material Fact That She Was Barred Because She Exercised Her First Amendment Right to Communicate with Law Enforcement

Turning to the second step, Mrs. Porter has raised a genuine issue of material fact that the Suffolk Defendants took adverse action because Mrs. Porter engaged in constitutionally protected activity. The Suffolk Defendants merely assert in a conclusory fashion that there is no disputed issue of fact because the Suffolk Defendants barred Mrs. Porter for legitimate reasons. *See* Def. Mem., pp. 7-8. However, Suffolk Defendants completely ignore the burden-shifting causation analysis required by *Mt. Healthy*, which precludes such conclusory assertions. Under *Mt. Healthy*, a plaintiff has the initial burden of showing that she engaged in protected behavior and that this behavior was a substantial or motivating factor in the decision to take the adverse action. *See Mt. Healthy*, 429 U.S. at 287. If a plaintiff makes such a showing, the burden then shifts to the defendants to show by a preponderance of the evidence that they would have taken the same adverse action even in the absence of the protected conduct. *Id.*

Mrs. Porter has raised a genuine issue of material fact that her communications with the FBI were a substantial or motivating factor in the decision to bar her from the HOC. Indeed, that

---

[5] It is important to note that, even though Mrs. Porter shows below that she was a joint employee of both CMS and the County, such a showing is not necessary for her to state a First Amendment claim. Mrs. Porter merely must show that the adverse action taken against her was reasonably likely to deter a person from engaging in such speech. *See Coszalter v. City of Salem*, 320 F.3d 968, 976 (9th Cir. 2003). The Suffolk Defendants do not, and cannot, dispute that the actions taken against Mrs. Porter were reasonably likely to deter her from engaging in speech, as her barring from the HOC prevented her from fulfilling her duties, and led to her termination.

is precisely what she was told when she was barred, and nothing about those circumstances supports a determination or inference that the SCSD was lying when they told her why she was barred. *See* Porter Decl., ¶ 19 (Ex. 1); Mastrorilli dep., pp. 33-34 (Ex. 7); Jurdak dep., p. 133 (Ex. 2). Mrs. Porter was a model employee, who was never disciplined before she spoke to the FBI. *See* Jurdak dep., p. 28 (Exhibit 2). Mrs. Porter regularly received outstanding reviews and always received a full merit raise. *Id.*, p. 205; *see* Mack dep., p. 64, 75 (Exhibit 3); *id.* p. 74 (Mrs. Porter's termination had nothing to do with her job performance).

The evidence indicates that SCSD officials became alarmed when they learned that Mrs. Porter was speaking to the FBI. For instance, in a memorandum from Deputy Superintendent Mastrorilli to Superintendent Patrick Bradley, Ms. Mastrorilli reflected the SCSD's custom and practice of punishing those who report misconduct upon learning from SID Director Viktor Theiss that Mrs. Porter's had been in contact with the FBI:

> [Theiss] told me that the FBI had told him that they received a confidential report from a woman named Sheila Porter * * * * I then said to Victor: '<u>I don't know how you feel about it, but I think it is highly inappropriate for a contract employee to contact the FBI about a Suffolk County inmate without our knowledge.</u>' Victor wholeheartedly agreed. <u>I then said I would bar her</u> from entering right now. He told me not to do anything yet until he got back to me."

*See* Memo from Ms. Mastrorilli to Patrick Bradley, # 748 (Ex. 9) (emphasis added).

SID officials were also concerned that Mrs. Porter exercised her First Amendment Rights. On May 21, 2003, SID Investigator Stan Wotjkonski met with FBI Agent Snyder on an unrelated matter. During their meeting, Agent Snyder expressed her concern about the Rosario allegations. *See* SID Incident Report (Ex. 10). On May 23, 2003, Mr. Wotjkonski had another conversation with Agent Snyder during which he expressed his mistaken concern that Agent Snyder's source had not reported this encounter to the SCSD. *See* SID Incident Report (Ex. 11).

According to Agent Snyder, during this call, Mr. Wotjkonski "stated that SID believed that they knew the identity of the source who provided the information" and suggested that "it could be a problem" because Mrs. Porter had supposedly not reported her information to the SCSD. *See* Memorandum from Christa J. Snyder (Ex. 19). While Agent Snyder again did not reveal its source, SID immediately suspected that it was Mrs. Porter who contacted the FBI. *See* Deposition of Viktor Theiss ("Theiss dep."), pp. 87-88 (Ex. 18).

SID decided to trap Mrs. Porter in an interview once they became suspicious. Even though Mrs. Porter had already sought out SID investigators and provided them with all pertinent information concerning her encounter with Mr. Rosario, and even though SID was in possession of her May 19, 2003 report, Mrs. Porter was summonsed to a small office at SID for another interview on May 28, 2003. *See* Porter Decl., ¶¶ 16-17 (Ex. 1); *see* Dacey dep., p. 93 (Ex. 8). Just prior to the interview, SID Investigator Steve Jacobs instructed Investigator Dacey to attempt to elicit a confession from Mrs. Porter that she contacted the FBI. *See* Dacey dep., pp. 102-03 (Ex. 8).

Beginning with some misdirection, the first five minutes of this interview focused on Mrs. Porter's encounter with Mr. Rosario, and, of course, there was no new information to provide, nor was any needed by SID for its investigation of the Rosario allegations. *See* Porter Decl., ¶ 17 (Ex. 1). For the remaining portion of the interview—between 10 to 25 minutes— Investigator Dacey interrogated Mrs. Porter. *Id.* The tenor of the interview changed considerably. *Id.* Dacey's tone was harsh and accusatory and he leaned forward while asking these questions. *Id.* Mrs. Porter felt extremely uncomfortable and threatened during this interview. *Id.* Mr. Dacey did not say that SID was aware of Mrs. Porter's contact with the FBI and wanted to know more about it for some lawful reason. Nor did Mr. Dacey even directly ask

Mrs. Porter if she had communicated with the FBI. Instead, applying a standard interrogation technique, Mr. Dacey asked when Mrs. Porter <u>first</u> spoke to "Christa"— a sneaky attempt to trick Mrs. Porter into either revealing something she had never discussed with SID before or perhaps cause her to falsely deny it. *Id.* Mrs. Porter candidly told Dacey that she had indeed contacted Agent Snyder about the Rosario allegations despite being concerned about her promises of confidentiality with the FBI. *Id.; see* Memo re: May 28, 2003 Interview With Mrs. Porter (Ex. 12). It is obvious that the sole purpose of this interview was to find out if Mrs. Porter had spoken with the FBI. *Id.*

Having obtained confirmation from Mrs. Porter of her contacts with the FBI, less than two weeks later, Mrs. Porter was barred from the HOC. Deputy Superintendent Mastrorilli was given the task of carrying out the barring of Mrs. Porter. On or about June 10, 2003, SID Director Theiss followed up on his earlier conversation with Ms. Mastrorilli and told her that she could carry out the barring. *See* Mastrorilli dep., p. 29 (Ex. 7). When Ms. Mastrorilli asked what the grounds for the barring should be, Mr. Theiss told her to contact Chief-of-Staff Elizabeth Keeley. *Id.* Ms. Mastrorilli did so. *Id.*, pp. 30-31. During this conversation, Ms. Mastrorilli testified that Ms. Keeley told her "<u>clearly Sheila has divulged confidential patient information to an outside agency, and that's grounds for her to be barred.</u>" *Id.*, p. 31 (emphasis added). Ms. Mastrorilli testified that the <u>only</u> reason she was told to bar Mrs. Porter was because she divulged information to the FBI. *Id.*, pp. 97-98. Thus, when Ms. Mastrorilli barred Mrs. Porter, this was the only reason she provided. *See* Porter Decl. ¶ 19; Mastrorilli dep., pp. 20-21 (Exhibit 7); Jurdak dep., p. 133 (Ex. 2). In her deposition, Ms. Mastrorilli testified as to what she said to Mrs. Porter at the time:

> I said it has recently come to my attention that you have divulged
> confidential medical information with an outside agency and as a

result I'm going to have to bar you. . . I opened the policy [S-220],
and I read one or two paragraphs having to do with information
being given to outside agencies without authorization.

*See* Mastrorilli dep. pp. 33-34 (Ex. 7). The specific policy provisions she read to Mrs. Porter

provide as follows:

> *Confidential Communications:* (1) the affairs of the Department or
> persons in custody are confidential, and any discussion on these
> subjects shall be limited to that which is necessary in the
> performance of an employee's duties and shall only be shared with
> persons authorized to receive such information. (2) Any
> unauthorized disclosure of confidential information by an
> employee shall constitute just cause for disciplinary action.

*See* Policy S-220, p. 2, #775 (Ex. 20); *see* Mastrorilli dep., p. 36 (Ex. 7).[6] Importantly, Chief of

Staff Keeley <u>admits</u> that Mrs. Porter's communications with the FBI were one reason for Mrs.

Porter's barring that she discussed with Ms. Cabral and communicated to Ms. Mastrorilli when

she instructed Ms. Mastrorilli to bar Mrs. Porter. *See* Keeley dep., pp. 51-52, 62-63 (Ex. 21).

These facts are sufficient to raise a genuine issue of material fact that Mrs. Porter has

satisfied her burden of showing that her speaking to the FBI was a substantial or motivating

factor in the County Defendant's decision to bar her.

> 2.    <u>There is a Genuine Issue of Material Fact Whether the Suffolk Defendants
>        Would Have Barred Mrs. Porter for Reasons Other Than Communicating
>        With the FBI</u>

After deciding to bar Mrs. Porter for speaking to the FBI, it is apparent that the Suffolk

Defendants scrambled to manufacture a "legitimate" reason to justify the barring. The Suffolk

Defendants now claim that Mrs. Porter was actually barred not because she talked to the FBI, but

rather because of various problems related to Mrs. Porter's internal reporting of the Rosario

---

[6] Ms. Mastrorilli testified that, at the time of barring, she did not know that Mrs. Porter was an informant for the
FBI. If she had known, she testified that "I believe I would have questioned the barring . . . the appropriateness of
barring someone who is working with law enforcement." *See* Mastrorilli dep., p. 38 (Ex. 7)

allegations. In stark contrast to the voluminous evidence that the SCSD was extremely

concerned about Mrs. Porter's communications with the FBI, and that she was in fact barred for

this reason, there is <u>no</u> contemporaneous evidence in the record that the form, timing or content

of Mrs. Porter's internal report were the basis for her barring. Rather, all of the evidence

supporting the SCSD's current position comes from deposition testimony provided

approximately two years after the barring. It is apparent that the current reasons advanced for

the barring are little more than a post-hoc rationalization on the part of SCSD officials to cover

up their unconstitutional conduct. Certainly Mrs. Porter is entitled to have the jury weigh the

credibility of the SCSD's witnesses, to determine if, ɛ

REDACTED          REDACTED          

Once the burden shifts to the Suffolk Defendants, they utterly fail to offer any basis for

concluding that they would have reached the same decision to bar Mrs. Porter even if she had not

reported inmate abuse to the FBI, let alone that there is no disputed issue of fact on this point.

SCSD witnesses have provided inconsistent "legitimate" reasons for barring Mrs. Porter. For

example, Ms. Cabral provided four reasons for the barring: (1) there was no notation of Mrs.

Porter's encounter with Rosario in his medical file; (2) a confidential report was requested but

not submitted by the end of the shift but rather 10 days later; (3) the report was submitted on the

wrong form; and (4) the report was backdated. *See* Cabral dep., p. 86-87 (Ex. 16).

Chief of Staff Keeley, however, stated that she discussed with Ms. Cabral and instructed

Ms. Mastrorilli that there were four <u>additional</u> reasons for the barring (1) she had communicated

confidential information to the FBI; (2) she had interfered with an ongoing investigation; (3) the

information in the report was inconsistent with other information; and (4) she could not ensure Mrs. Porter's safety if it was revealed within the SCSD that she had spoken to the FBI. *See* Keeley dep., pp. 62-63 (Ex. 21). Superintendent Gerard Horgan testified that he was told that Mrs. Porter's violations also included "failure to report possible wrongdoing, failure to obey an order, confidential communications and the fact that there was false documentation provided." *See* Horgan dep., pp. 18-19 (Ex. 4) (Emphasis added). Mr. Horgan testified that Ms. Keeley told him that Mrs. Porter refused to provide a report to Ms. Mastrorilli, saying "I'm not talking to you. I'm talking to the FBI." *Id.*, p. 57.

These conflicting reasons that SCSD witnesses provide for the barring strongly suggest that these are pretextual and that, in fact, Mrs. Porter was barred from the HOC solely because she spoke with the FBI. [7]

Moreover, the Suffolk Defendants cannot point to one similarly situated individual who was barred for similar alleged clerical errors in their paper-work. *See* Keeley dep., pp. 142-43 (Ex. 21). Indeed, Ms. Jurdak testified that she could not recall a single other instance where an employee of CMS or its predecessor, Correctional Healthcare Solutions, was barred for reporting-type problems. *See* Jurdak dep., p. 169 (Ex. 2). Similarly, Ms. Mastrorilli testified that the timeliness and form of internal reporting is never a sufficient reason to bar a contract employee. *See* Mastrorilli dep., p. 39 (Ex. 7). Of all the SCSD employees who have been terminated since 1999, not one has been for conduct similar to what Mrs. Porter allegedly did. *See* SCSD Spreadsheet of Policy S-220 Violations, pp. 1-3, # 1153-1155 (Ex. 22). Moreover,

---

[7] While the evidence specific to Mrs. Porter herself is sufficient to raise a genuine issue of material fact suggesting that her speaking to the FBI was a substantial or motivating factor in the decision to bar her, this conclusion becomes all the more convincing when the decision is put in context. As discussed below in greater detail, the HOC has well documented history of retaliating against individuals for reporting prisoner abuse by enforcing a Code of Silence. Thus, Mrs. Porter's case is not unique.

when SCSD employees actually did commit reporting infractions, they were given appropriately light discipline. *See id.*, #1157 (employee who failed altogether to report that someone was injured received written warning); *id.*, #1158 (employee who failed to submit a written report received only oral discipline); *id.*, #1156 (three-day suspension for employee who witnessed injuries to an inmate but submitted a report three days late and failed to report on the injuries sustained).

Moreover, other CMS employees who were barred committed infractions that are substantially more serious than Mrs. Porter's alleged violations. For example, CMS employees have been barred for carrying stun guns, for having inappropriate contacts with inmates, and for providing contraband to an inmate. *See* # 762-63 (stun gun); # 754, # 996-1002 (inappropriate contact); # 1137-38 (contraband) (Ex. 23). Indeed, as recently as February 2005, a CMS employee who improperly housed an inmate in the medical unit without notifying the medical director and without documenting this incident in any way received only a three-day barring. *See* Letter from Gerald Walsh to John Hewit-Morey, dated February 16, 2005, # 1065 (Ex. 24).

Even if the Suffolk Defendants could overcome the fact that the alleged reporting errors clearly are post-hoc justifications for the barring (which they cannot), when each of these purported reporting errors is examined, it becomes apparent that there is, at a minimum, a disputed issue of material fact as to whether the Suffolk Defendants would have barred Mrs. Porter based on these reasons had she not spoken to the FBI.

As an initial matter, there is no dispute that the SCSD never conducted an investigation into Mrs. Porter's purported reporting errors. *See* Theiss dep., p. 168 (Exhibit 18); *see* Dacey dep., pp. 131-32 (Ex. 8). No one at SID discussed Ms. Porter's internal reporting with Ms. Porter's supervisor, Ms. Jurdak, or with Deputy Superintendent Mastrorilli, who requested the

report from Mrs. Porter, before she was barred. *See* Dacey dep., pp. 131-32 (Ex. 8). Indeed, the information Ms. Keeley had when she and Sheriff Cabral decided to bar Mrs. Porter was incomplete. For instance, Ms. Keeley admits that she was not aware that Ms. Porter immediately reported her encounter with Mr. Rosario to her supervisor. *See* Keeley dep., pp. 111-12 (Ex. 21). Moreover, Ms. Keeley was under the mistaken impression that SID had requested a report from Mrs. Porter, when it had not. *Id.*, pp. 48-49, 102-03; *see* Dacey dep., p. 180 (Ex. 8).

Ms. Cabral's first purported justification for barring Mrs. Porter is that she violated medical reporting requirements. However, Mrs. Porter has raised a genuine issue of material fact as to whether such reporting requirements even exist, let alone whether Mrs. Porter violated any such requirements. Indeed, Mrs. Porter herself, a nurse practitioner with 36 years of experience, testified that she did not have to record her observations in Mr. Rosario's medical chart because her encounter did not rise to the level of an examination. *See* Porter Decl., ¶ 9 (Ex. 1). Moreover, the Suffolk Defendants have been unable to point to any written policy regarding documenting medical files that Mrs. Porter in any way violated. *See, e.g.*, Cabral dep., p. 103 ("There is no policy in S220 that goes to a medical person or specifically a nurse's obligation to document in the medical record observations related to potentially treatable injuries or harmful injuries to an inmate.") (Ex. 16). Indeed, the only person qualified to determine whether Mrs. Porter had such a responsibility concluded that she did not. *See* **REDACTED**

It goes without saying that Mrs. Porter could not violate a policy that did not exist. As the Superintendent of the HOC testified, "[o]ur policies are written. We don't have unwritten policies" and that nobody would be disciplined for conduct not contained in a written policy. *See* Horgan dep., p. 94 (Ex. 4).

**REDACTED**

Even if such reporting requirements existed, Mrs. Porter has raised a genuine issue of material fact as to whether she violated any such requirements. Ms. Jurdak testified that an observation like Mrs. Porter's did not have to go in an inmate's medical record. *See* Jurdak dep., pp. 35-36 (Ex. 2). Ms. Jurdak testified that it was satisfactory for Mrs. Porter to either write a progress note <u>or</u> an incident report in this situation. *Id.*, p. 38. In any event, as Mrs. Porter explained, her encounter with Mr. Rosario was not a medical encounter. *See* Porter Decl. ¶¶ 8-9 (Ex. 1). Thus, there is a disputed issue of material fact as to whether the Suffolk Defendants would have barred Mrs. Porter for violating medical reporting requirements.

Defendants next assert that they barred Mrs. Porter for failing to report Mr. Rosario's allegations of abuse in a timely manner. Mrs. Porter has raised a genuine issue of material fact as to whether the Suffolk Defendants would have barred her for untimely reporting absent her speech to the FBI. While Policy S-220 requires that all employees who witness unusual events must submit written reports by the end of their shift, there is no evidence that this rule was ever enforced. On the contrary, Ms. Jurdak testified that the rule "<u>wasn't enforced.</u>" Jurdak dep., p. 55 (Ex. 2) (Emphasis added). She explained that the rule "was nothing that they stuck to. Even when I wrote them myself, Steve Jacobs, for one, many times would come up and say he would be back for it a day or two later and never came back for it." *Id.*, p. 54. Ms. Jurdak testified that she is not aware of other CMS/CHS employees barred or disciplined for reporting-type issues. *Id.*, p. 169. Ms. Mastrorilli also testified that any errors in the timing of a report is never of sufficient seriousness to warrant barring. *See* Mastrorilli Dep., p. 39 (Ex. 7). Indeed, in the course of the Rosario investigation itself, there were instances of untimely reporting by a number of other SCSD employees, none of which resulted in any discipline at all, much less a barring or termination. *See* #659 (Dacey's incident report of his May 29, 2003 encounter with Rosario not

reported until June 3rd); # 686 and 688 (corrections officers' incident reports submitted late); # 690 (Captain Scoby's Incident Report of a May 19th incident not submitted until May 25th (Ex. 25). It is apparent that the "end of shift" rule was not adhered to and was advanced as a pretext for the true reason for Mrs. Porter's barring. Particularly where, as here, Mrs. Porter made an oral report before the end of her shift to her supervisor and a Deputy Superintendent of the SCSD, the end-of-shift rule could not have been a basis for her barring.

The Suffolk Defendants' argument that Mrs. Porter was barred because of the form she used is similarly specious. However, there is also a genuine issue of material fact as to whether the Suffolk Defendants would have barred Mrs. Porter for this reason had she not spoken to the FBI. The SCSD has no policy on the proper form to be used. In addition, Ms. Mastrorilli admitted that the form of Mrs. Porter's report did not matter. She testified that:

> What I had received was a medical progress note form, which I accepted as a confidential incident report even though the form wasn't technically -- an incident report form is a piece of paper that is blank, and it says Suffolk County Sheriff's Department Incident Report. I accepted this as a confidential incident report.

Mastrorilli dep., p. 53 (Ex. 7) (emphasis added). Ms. Mastrorilli continued that "I expected a confidential report. The format mattered little to me. What was important to me was the information contained. I couldn't have cared less about what piece of paper it was written on." *Id.*, p. 54. Ms. Jurdak also testified that the form of the report did not matter, stating that "normally something that is reported would have been on an incident report or many times nurses used the progress note as an incident report for SID." Jurdak dep. pp. 36-37 (Ex. 2). Similarly, Ms. Jurdak testified that "Suffolk County had an incident report form that was their form but we didn't always have them available and so people would write on a plain piece of paper like that or they would write on a progress note or they would, you know, some plain, whether it was lined or unlined paper." *Id.*, p. 50. In short, the County did not care about the

form used to report incidents. *See also* Horgan dep., p. 101 (Ex. 4) ("It could have been sent in an email, but we have to be notified of it"); Keeley Dep., pp. 98-99 (Ex. 21); Mastrorilli Dep., p. 54 (Ex. 7). Moreover, Mrs. Porter reported in a similar fashion before and not been disciplined or even told that her reporting was incorrect. *See* Porter Decl. ¶ 13; *see id.*, Ex. B (examples of reports Mrs. Porter previously submitted to SID on interdisciplinary progress notes forms). This evidence raises a genuine issue of material fact as to whether the Suffolk Defendants would have barred Mrs. Porter absent her protected activity.

Finally, the Suffolk Defendants rely on the fact that Mrs. Porter backdated reports. Ironically, while Mrs. Porter absolutely did not backdate her report, Investigator Dacey himself admitted to backdating memoranda in the investigation of Mr. Rosari's injuries. *see* Porter Decl., ¶¶ 13-14. Mr. Dacey filed an incident report dated May 19, 2003 yet admitted that information was added after May 19, 2003 and he did not change the date—the very definition of backdating. *See* Dacey Incident Report, dated May 19, 2003 (Ex. 26) ; *see* Dacey dep. pp. 46, 48-49, 52 (Ex. 8).[8]

In short, under the second *Mt. Healthy* step, Mrs. Porter has raised a genuine issue of material fact as to both whether her speaking to the FBI was a substantial or motivating factor in the County Defendant's decision to bar her, and as to whether the Suffolk Defendants can satisfy their burden of showing that they would have barred Mrs. Porter even absent the protected activity.

---

[8] Similarly, there is a Final Case Report dated June 4, 2003, but some of the memoranda are dated June 4, 2003. *Id.*, pp. 162-63. While Mr. Dacey blames a computer error for this, resolution of this factual issue is not appropriate on summary judgment. It is also apparent that Ms. Cabral herself backdated at least one memorandum. A memorandum to file authored by Ms. Cabral bears a date of June 18, 2003. *See* Cabral Memo to File (Ex. 27). On subsequent pages, however, the date November 6, 2003 appears in the header. *Id.* No reasonable explanation has been provided for this apparent instance of backdating. It should be noted that **REDACTED**        **REDACTED**

3.    There is a Genuine Issue of Material Fact Whether Mrs. Porter's First
Amendment Rights are Outweighed by the SCSD's Interest in Efficient
Reporting

Under the final step, the so-called *Pickering* balance, the State bears the burden of

justifying the discharge on legitimate grounds. *See Rankin v. McPherson*, 483 U.S. 378, 388

(1987); *Connick*, 461 U.S. at 150. In conducting the *Pickering* balance, the Court's

consideration of the speech will not occur in a vacuum—the time, place, and manner of the

expression are relevant. *Rankin*, 483 U.S. at 388. The pertinent factors include whether the

statement impairs discipline by superiors or harmony among co-workers, has a detrimental

impact on close working relationships for which personal loyalty and confidence are necessary,

or impedes the performance of the speaker's duties or interferes with the regular operation of the

enterprise. *See Pickering*, 391 U.S. at 570-73; *Rankin*, 483 U.S. at 388.

In the present case, there is, at a minimum, a disputed issue of fact as to whether the State

has satisfied its burden of showing that Mrs. Porter's private speech rights were outweighed by

the public interest of the State in the promoting the efficiency of public services through its

employees. The Suffolk Defendants spend precisely four lines on this argument, concluding

perfunctorily that "the care and custody of inmates outweighs the public's interest in hearing the

speech." *See* Def. Mem., p. 7. The Suffolk Defendants cannot be serious (and likely are not, as

the precisely four lines they devote to this argument demonstrates) It is preposterous to suggest

that the efficiency of public services was hampered at all in this case, much less that this interest

outweighs the public interest in having law enforcement authories informed about potential

abuse of an inmate at a correctional facility.

Indeed, the reason that Mrs. Porter informed the FBI about Rene Rosario's bruises was to promote inmate safety.[9] It is the height of hypocrisy to attempt to justify retaliating against Mrs. Porter for reporting abuse to the FBI on the grounds that the termination promoted inmate safety. If the Suffolk Defendants are serious in their assertion that they terminated Mrs. Porter because her conduct endangered inmate safety, there is, at a minimum, a factual dispute as to whether her conduct actually promoted or endangered inmate safety. Given the well-documented history of the Code of Silence at the HOC, *see infra* § B(2), Mrs. Porter has a strong case that Rene Rosario was better off having Mrs. Porter inform the FBI about his allegations than having her report those allegations on a different piece of paper. *See Berweger v. County of Orange*, 121 F. Supp.2d 334 (S.D.N.Y. 2000) (holding that a medical service employee of an independent contractor who was terminated after complaining about poor mental health treatment at the prison raised a genuine issue of material fact suggesting that he was terminated in retaliation for exercising his First Amendment rights).

In short, Mrs. Porter has, at a minimum, raised a genuine issue of material fact suggesting that she was deprived of her First Amendment rights when she was barred from the HOC in retaliation for speaking to the FBI.

---

[9] Despite the County's suggestion that Mrs. Porter's purported reporting errors endangered Rene Rosario, he never was endangered by her steps to report his allegations of abuse. The opposite was true. Ms. Jurdak testified that Mrs. Porter reported to Ms. Jurdak that Mr. Rosario was in danger of being harmed, and that Ms. Jurdak understood the urgency in passing Mrs. Porter's allegations of abuse up the chain of command. Jurdak Dep., pp. 92-93 (Ex. 2). When Ms. Jurdak could not reach anybody at SID, she contacted Ms. Mastrorilli. *See* Jurdak Dep., p. 96, 103-04 (Ex. 2) ("I couldn't reach anyone at the facility and I felt an urgency to what she was telling me, that I needed to share that information with someone at Suffolk County."). Ms. Jurdak testified that Ms. Mastrorilli responded by telling Ms. Jurdak to have Mrs. Porter write a report, but Jurdak did not indicate that the report had to be confidential, or specify a time frame for completion of the report. *See* Jurdak dep., 99 (Ex. 2); Mastrorilli dep., p. 13 (Ex. 7). To be sure, Mr. Theiss testified that oral reporting to a supervisor, which Mrs. Porter did in this case, was sufficient. *See* Theiss dep., pp. 108-09(Ex. 18). Moreover, Theiss testified that SID's investigation was not prejudiced by alleged untimeliness of reporting. *Id.*, p. 207.

**B.    Mrs. Porter Has Raised A Genuine Issue Of Material Fact That Suffolk County Is Liable For This Deprivation of Her Federal Rights[10]**

Suffolk County is liable for the deprivation of Mrs. Porter's First Amendment rights because it had both a policy and a custom that were responsible for the deprivation of Mrs. Porter's rights. *See Monell v. Dept. of Social Services*, 436 U.S. 658, 691 (1978). This custom or policy can be established by a single act and can be imposed by policymakers under the Sheriff herself. *See Baron v. Suffolk County Sheriff's Dep't*, 402 F.3d 225 (1st Cir. 2005).

    1.    The "Confidential Communications" Section of Policy S-220, as it Existed in June 2003, Was Unconstitutional

First, the SCSD told Mrs. Porter that it was depriving Mrs. Porter's job for violating Policy S-220, the employee code of conduct. S-220 provides that "[a]ny unauthorized disclosure of confidential information by an employee shall constitute just cause for disciplinary action." *See* Policy S-220, p. 2, #775 (Ex. 20). At the time of Mrs. Porter's barring, there was no exception to this clause for disclosing confidential information to an outside law enforcement official. *Id.*; *see* Cabral dep., p. 40 (Ex. 16). Subsequent to Mrs. Porter's barring and the wide disclosure of this unlawful policy, this provision of Policy S-220 was changed to reflect that an individual <u>may</u> report confidential communications to an outside law enforcement agency and may do so without reporting to the SCSD, as long as the individual has a reasonable fear that retaliation would result from reporting the misconduct internally. *See* "New" Policy S-220 (effective April 2005), §§ C(1), L(1) and (2) (Ex. 29); *see* Keeley dep., p. 153 (Ex. 21).[11]

---

[10] The Suffolk Defendants do not, and cannot, argue that Suffolk County is entitled to qualified immunity. *See Leatherman v. Tarrant Co.*, 507 U.S. 163, 166 (1993).

[11] It must be noted that there is a genuine dispute of material fact concerning whether Mrs. Porter was required to abide by Policy S-220 at all. The Suffolk Defendants repeatedly state that CMS employees were required to abide by this policy, and Superintendent Horgan testified to same in his affidavit. Counsel is aware of no provision of the Suffolk County-CMS contract, the Suffolk County Request for Proposal, the CMS Response to the RFP or CMS' internal policies and procedures that require CMS employees to abide by the SCSD Code of Conduct. It is undisputed that the version of S-220 in effect in May 2003 only applied to "employees." *See* "Old" Policy S-220, p.

The policy in effect when Mrs. Porter was barred, on its face, improperly prevented Mrs. Porter from exercising her constitutional free-speech rights to report allegations of wrongdoing to law enforcement officials. Moreover, it cannot seriously be disputed that this policy was responsible for the deprivation of Mrs. Porter's rights, as Mrs. Porter was told that this policy was the basis for her termination when she was terminated. *See* Porter Decl. ¶ 19 (Ex. 1). Thus, as a result of this policy, Suffolk County is liable for Mrs. Porter's unconstitutional termination.

2.    An Unconstitutional Code of Silence Existed at the SCSD

In addition, the SCSD maintained an unconstitutional custom that punished individuals who reported employee misconduct or spoke out against SCSD officials. Evidence of this Code of Silence is overwhelming and Mrs. Porter's barring and termination were part of that custom. To be sure, summary judgment should not be awarded to the Suffolk Defendants pursuant to Mrs. Porter's § 1983 claim for municipal liability.

a.    *Stern Commission Report*

In the fall of 2001, Governor Swift appointed a Special Commission to investigate and report on the operations and management of the SCSD in the wake of a rash of allegations of inmate abuse. *See* Report of the Special Commission on the Suffolk County Sheriff's Department ("Stern Commission Report") (Ex. 30), Executive Summary. The Stern Commission Report issued on October 15, 2002. The Report was critical of a number of aspects of the SCSD. Among its major recommendations was "an aggressive attack on the code of silence that prevents staff members from reporting the misconduct of fellow staff members." *Id.*,

---

1 (Ex. 20). It is also undisputed that, subsequent to Mrs. Porter's barring, the policy was updated to state that "contractors" were now subject to the provisions of S-220. *See* "New" Policy S-220, p. 1, Policy Statement III (Ex. 29). This strongly indicates that contractors were not required to abide by S-220 prior to April 2005. This change in policy alone justifies denying the Suffolk Defendants' Motion on the § 1983 claim and a part of the Suffolk Defendants' broader effort to treat Mrs. Porter as "an employee" when it helps them but not when seekign to avoid accountability for their conduct towards her.

p. 10 (Emphasis added). The Report found that "[s]taff maintain a code of silence due to concern about retaliation." *See id.*, p. 66. The Stern Commission recommended as follows:

> The Department should attempt to penetrate the existing code of silence at every turn. The Department should emphasize at the earliest point in training and orientation for new employees (not just uniformed staff) the difference between loyalty to the department and loyalty to their co-workers. It must be emphatically stated that while loyalty to co-workers can be a desirable trait, it ceases to be a good thing when it extends to covering up misfeasance and malfeasance by falsifying reports, lying to or refusing to cooperate with supervisors and other investigators, and simply keeping silent when information needs to be brought to the fore.

*Id.*, pp. 71-72. The Commission recommended a full-day of training and orientation on the Code of Silence and advised that the "Department must ensure that employees who do come forward with information are fully protected from retaliation by other officers and are supported by the administration." *Id.*.

        b.    *Baron* Case

The Stern Commission is far from alone in concluding that a Code of Silence exists at the SCSD. A jury found that the SCSD violated the civil rights of a corrections officer, Bruce Baron, when it retaliated against him for reporting misconduct. In *Baron v. Suffolk Co. Sheriff's Dept.*, a corrections officer was harassed and forced to quit his job after he broke the "code of silence," the same retaliatory custom to which Mrs. Porter was subjected, by reporting misconduct of fellow officers. 402 F.3d 225, 229 (1st Cir. 2005). The First Circuit affirmed the District Court's (Saris, J.) denial of the SCSD' Motion for Judgment as a Matter of Law/Motion for New Trial, finding that a jury could reasonably conclude that the Code of Silence constituted a custom that was responsible for the retaliation against Mr. Baron. *See id.* at 237-39. The *Baron* court also found that a jury could reasonably conclude that SCSD policymakers had

constructive knowledge of the retaliation because they should have known about the Code of

Silence and the consequences of violating it. *See id.* at 240-42; *see also Jeffes v. Barnes*, 208

F.3d 49, 62 (2d Cir. 2000) (holding that a reasonable jury could conclude that a Code of Silence

existed, and that it constituted an unconstitutional custom); *Sharp v. City of Houston*, 164 F.3d

923, 935 (5th Cir. 1999) (same); *Ware v. Jackson County*, 150 F.3d 873, 882-83 (8th Cir. 1998)

(same); *Gomez v. Vernon*, 255 F.3d 1118, 1126-27 (9th Cir. 2001) (same).

Similarly here, Mrs. Porter has raised a genuine issue of material fact as to whether the

Code of Silence constituted a custom that was responsible for Mrs. Porter's termination and that

County policy-makers had actual and constructive knowledge of this custom.

c.    *The SCSD Has Admitted That There is a Code of Silence in the
      Department*

Moreover, the SCSD itself has admitted that a Code of Silence exists inside the

Department in a number of arbitration briefs when the SCSD was defending disciplinary action it

had taken against a corrections officer. For instance in *Suffolk County Sheriff v. Joseph Upton*,

the SCSD's credited the testimony of former Special Sheriff and Superintendent John Brassil,

who testified that an inmate's allegations of abuse were credible based upon, *inter alia*, "the

officer's 'Blue Wall of Silence,' which precludes officers from making statements against one

another." *See* Post Hearing Brief of Employer, *Suffolk County Sheriff & AFSCME* (Joseph

Upton), #J-51, p. 6 (Ex. 31) (emphasis added). The SCSD also admitted that employees collude

in writing reports and are reluctant to report against employees who control their jobs. *Id.* The

SCSD described specific retaliatory action taken against an employee who reported the inmate's

abuse claims: he was publicly derided as a rat, including the display of a dummy with "Rat

McCallum" written on its forehead. *Id.*, p. 7. The SCSD provided the following example of the

Code of Silence:

> When inmates are physically injured, the officers cover their tracks
> by claiming the inmate was injured during a proper use of force, and
> by submitting use of force reports. In cases where use of force
> reports have been completed, the officer generally gets the benefit
> of the doubt.

*Id.*

In another arbitration brief, the SCSD credited the testimony of SID investigator Neville

Arthur: "Investigator Arthur testified that in his experience as an investigator, officers are

reluctant to come forward or to testify against other officers. He stated that this was true, in his

experience, in serious cases as well as trivial matters." Suffolk County's Post-Hearing Brief,

*AFSCME and Suffolk County*, No. E-237 (Robert Parise), pp. 48-49 (8/20/01) (Ex. 32).

Investigator Arthur specifically testified about "the existence of a code of silence." *Id.*, p. 49.

The SCSD stated that the evidence "suggests that the code of silence does in fact exist," citing

numerous examples where employees were retaliating against for reporting the misconduct of

other employees *Id.*, p. 50 (emphasis added).

Finally, the SCSD made the following statement about the Code of Silence in a March

22, 2002 brief:

> Investigator Arthur was faced with a common problem among
> investigators in a correctional setting. In general officers are very
> reluctant to get involved in or assist management in the
> investigation of one of their own. Known as the 'Blue Wall of
> Silence' in some circles, law enforcement, and correction officers
> generally do not talk or offer information to investigators about
> other officers who could face discipline. Any officer perceived as
> doing so is considered a 'rat' or an 'informer'."

Post-Hearing Brief of Employer, *Suffolk County Sheriff & AFSCME*, No. #-236 (David

DiCenso), p. 11 (emphasis added) (Ex. 33); *see id.* (stating that inmates who inform or provide

investigators with information are labeled as 'rats' or 'snitches' and could be in danger).[12]  These

admissions are binding on the SCSD and summary judgment should be denied on these grounds

alone.

> d.    *SCSD Employees Have Stated that the Code of Silence Exists*

Numerous present and former SCSD employees have admitted that a Code of Silence

exists within the Department.  For instance, the *Baron* decision was based, in part, on the

following admission of former Superintendent Richard Feeney concerning the Code of Silence:

> Q.  Are you aware of any code of silence between the fellow
> officers reporting violations on each other?
>
> A.  Yes.
>
> Q.  What is the - - what is the code of silence?
>
> A.  Lack of reporting to protect each other.
>
> Q.  And when Officer Baron reported Sergeant Curtis, did he
> violate that?
>
> A.  Yes.

Deposition of Richard Feeney, *Baron v. Hickey*, No. 01-10143-PBS, April 16, 2002, pp. 38-39

(Ex. 35).  This admission of the existence of a Code of Silence by the Superintendent of the HOC

occurred less than 14 months before Mrs. Porter was barred.

Other SCSD employees have testified that a Code of Silence exists at the HOC.  For

instance, Deyanira Feliz is a current SCSD employee who has experienced retaliation for

breaking the code.  Ms. Feliz, a corrections officer with 16 years experience at the HOC,

observed a course of improper intimate conduct between a corrections officer and several female

---

[12]  Nor can the SCSD credibly claim that the Code of Silence has been eradicated by the current administration.
Indeed, the SCSD's current training documents refer to the "ramifications of the Code of Silence."  *See* Suffolk
County Sheriff's Department Training Materials, #1494 (Ex. 34).

inmates. *See* Verified Amended Complaint, *Feliz v. Suffolk County House of Correction*, Massachusetts Commission Against Discrimination ("MCAD"), No. 99-131745, pp. 1-2 (Ex. 36). Ms. Feliz reported these incidents to her superiors in both oral and written form. *Id.*, p. 2. Despite corroborating reports from other officers, the SCSD initially took no action at all against the corrections officer. *Id.* Instead, the SCSD retaliated against Ms. Feliz for lodging these complaints. *Id.*

First, the SCSD turned a blind eye while Ms. Feliz was subjected to a three-year campaign of abuse and sexual harassment at the hands of the corrections officer she reported and his cronies. *Id.* The SCSD further retaliated against Ms. Feliz by transferring her twice after she lodged these truthful reports. *Id.* By this point, Ms. Feliz was fearful of reporting additional misconduct she observed concerning this corrections officer: "I figured that if I kept on pushing it . . . I would either get fired, terminated, or to be honest with you, I would be found dead." *See* Oral Interview of Deyanira Feliz in *Feliz v. Suffolk County Sheriff's Department House of Correction*, No. 99-131745, October 31, 2000, p. 121 (Ex. 36); *see id.*, pp. 114-121, 144-145 (detailing harassment and nonresponse by SCSD).

Worse, just four days after Ms. Feliz filed an action with MCAD, she received a notice from the SCSD threatening her with disciplinary action. *See* Complaint, p. 2 (Ex. 36). This notice was crudely backdated to make it appear as though it was written before the MCAD complaint. *Id.* The egregious treatment of Ms. Feliz demonstrates all aspects of the Code of Silence: abuse of inmates, staff-on-staff retaliation and management-staff retaliation.

Paul Davis is another former SCSD employee to experience the Code of Silence. In his capacity as a corrections officer at the HOC, Mr. Davis witnessed several incidents where excessive force was used on an inmate. *See* Complaint, *Davis v. Suffolk County, et al.*, No. 04-

11851-WGY, pp. 4-7 (Ex. 37). While he initially failed to accurately report on these incidents, Mr. Davis eventually testified truthfully in *United States v. Donnelly*, a federal criminal prosecution of some of the officers who used excessive force. *Id.* Mr. Davis was terminated by the SCSD immediately after his testimony in this case. *Id.* Mr. Davis testified as follows: "I knew the 'code of silence' was contrary to the way I was <u>officially</u> trained; however, I was equally well aware that the 'code of silence' was the <u>unofficial</u> policy of the Department." Affidavit of Paul Davis, *Davis v. Suffolk County, et al.,* p. 2 (Ex. 38) (Emphasis in original).

Martin Michelman is another former SCSD employee to experience harsh retribution for speaking out against the current administration. Mr. Michelman had a distinguished record of service for the SCSD, being promoted a number of times until before being named Deputy Superintendent of Training and Special Operations. *See* Complaint, *Martin K. Michelman v. Suffolk County, et al*, No. 05-CV-11577-RGS, ¶ 5 (Ex. 39). In 2004, Mr. Michelman informed SCSD employees that he believed that the Department was unprepared for the Democratic National Convention that summer. *Id.,* ¶ 8. In particular, he suggested that the 70 employees receive specialized security training in the event of civil unrest. *Id.,* Mr. Michelman communicated his position to numerous people, including his staff and his superiors, SID Chief Theiss and Chief of Staff Keeley and Superintendent Horgan. *Id.,* ¶¶ 9, 11-15. One day after Mr. Michelman voiced his concerns to his staff, Ms. Keeley informed him that he was being terminated for his "insubordination." *Id.,* ¶ 21. Ms. Cabral ordered the termination. *Id.,* ¶ 22. Not surprisingly, the same trio of decision-makers—Ms. Cabral, Ms. Keeley and Mr. Theiss—were responsible for silencing both Mrs. Porter and Mr. Michelman after they spoke out against the SCSD.

In addition, former Deputy Superintendent Marie Lockhart testified in another proceeding on October 10, 2002 that she believed there was an "informal" Code of Silence at the HOC whereby employees do not report the misconduct of other employees because they "do not want to be labeled 'rats' and 'snitches.'" *See* Deposition of Marie Lockhart in *John Doe v. Sheriff Richard J. Rouse, et al.*, October 10, 2002, p. 36 (Ex. 40).

> e.  *Deposition Testimony From This Case Confirms that the Custom and Policy of a Code of Silence Still Exists*

There is also extensive deposition testimony from this case regarding the existence of the Code of Silence. Donna Jurdak testified how corrections officers often lied to protect each other, stating that "[i]f the officer says this is brown, the other – all other officers will swear to it. It doesn't matter if it is brown, red or blue – if it is brown – it is brown. Everyone will say the same thing." Jurdak dep., p. 215 (Ex. 2). Employees would go so far as to write up reports together. *See id.* at 216. And the employees made it clear to anyone entering the HOC that they should not report any misconduct, informing them "that you are in their house, you know, you shouldn't really interfere with that." *Id.*, pp. 48-49; *see id.*, pp. 58-59 ("I think there were a lot of us who felt [that there was a lack of trust in the SID] at times."). The nurses got the message loud and clear. Ms. Jurdak testified that many nurses were uncomfortable reporting abuse because:

> they were afraid of the retaliating. They had to work with them, and I am quite certain and actually some of them have said that, they wouldn't talk about officers, even though the inmate may have told them exactly who it was, they would tell me but they wouldn't tell the SID people directly.

*Id.*, pp. 47-48 . Ms. Jurdak also testified that "in my opinion, officers can be pretty intimidating to nursing staff. I wouldn't necessarily say that I was intimidated by them, but I could justify

and understand the nurses feelings for that." *Id.*, p. 49. Ms. Jurdak herself admitted that she was

afraid that she would be barred if she spoke to the FBI. *Id.*, p. 150.

And indeed, even before Ms. Porter was barred pursuant to the Code of Silence, when she

broke the code on a previous occasion, she paid the price. Her automobile was damaged right

after she testified against a SCSD official. *See* Porter Decl., ¶ 32 (Ex. 1); *see* Jurdak dep., pp. 59-

60 (Ex. 2). Moreover, Chief-of-Staff Keeley testified that one of the reasons she believed Mrs.

Porter should be barred was because the SCSD could no longer ensure her safety once it was

known amongst the SCSD employees that Mrs. Porter was a FBI informant. *See* Keeley dep., p.

53 (Ex. 21); *id.* p. 62 ("because Rene Rosario has been talking about his role as an informant

and he has mentioned her name in the context of cooperating with the FBI, that the department

could not assure her personal safety."). Mr. Rosario also paid the price. Mr. Theiss testified that

he was concerned that some officers might retaliate against Mr. Rosario for speaking about his

cooperation with the FBI. *See* Theiss Deposition, pp. 42-43 (Exhibit 18). Mr. Theiss went so far

as to make efforts to transfer Mr. Rosario out of the HOC, which were eventually successful.

*See* Theiss dep., p. 43. This further confirms the widespread knowledge of this custom of

retaliation at the SCSD.

This deposition testimony concerning the Code of Silence is consistent with the

declaration of Mrs. Porter. In that declaration, Mrs. Porter states that:

> There is no question in my mind that there was a Code of Silence
> at the HOC in June 2003 that discourages individuals from
> speaking out about the misconduct of staff or otherwise being
> critical of the SCSD. The Code of Silence takes the form of both
> staff-on-staff retaliation and management-staff retaliation. I
> personally saw retaliation against people who spoke out about
> abuses or problems at the SCSD, including Deyanira Feliz and
> Bruce Baron. On at least one occasion I was personally retaliated
> against when, after testifying in a criminal trial against a SCSD
> employee, extensive damage was inflicted on my car while it was

parked at the HOC. Numerous portions of the car were smashed
with a tire iron, which was found at the scene. $2000 damage was
inflicted on my car. I believe that my barring from the HOC was
in retaliation for reporting inmate abuse to the FBI. I saw no
evidence that the Code of Silence went away after Sheriff Cabral
came into office; if anything, there was increased retaliation
against anyone who spoke out against the Sheriff or her
administration.

Porter Decl. ¶¶ 32-33 (Ex. 1).

In sum, the evidence from *Baron*, the County's own admissions, the Stern Commission
Report, the extensive deposition testimony in this case, Mrs. Porter's declaration, and the
evidence of other employees subjected to the Code of Silence at a minimum raise a genuine issue
of material fact as to whether there was a custom of retaliation. In light of this extensive
evidence of the existence of a custom of enforcing the Code of Silence through retaliation, the
Suffolk Defendants' conclusory claim that Mrs. Porter cannot establish municipal liability fall
flat.

**C.    Mrs. Porter Has Raised A Genuine Issue Of Material Fact That Sheriff
Cabral Is Liable For The Deprivation of Mrs. Porter's Federal Rights**

Defendants do not, and cannot, argue that Sheriff Cabral is not liable for the deprivation
of Mrs. Porter's federal rights. Such an argument would fail because Sheriff Cabral personally
participated in the wrongful conduct. *See Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576,
581-82 (1st Cir. 1994) (recognizing that a public official may be held liable under Section 1983
based on her own actions); *Diaz v. Martinez*, 112 F.3d 1, 4 (1st Cir. 1997) (same). It is
undisputed that Sheriff Cabral made the decision to bar Mrs. Porter. *See, e.g.*, Cabral dep., p. 72
(Ex. 16); *see also* Keeley dep., p. 43 (Ex. 21).

Even if Sheriff Cabral had not been personally involved, a reasonable jury could find that
Sheriff Cabral is liable for the deprivation of Mrs. Porter's First Amendment rights because there

is a genuine issue of material fact as to whether Sheriff Cabral was deliberately indifferent to the unconstitutional conduct of subordinate officers.[13] *See Diaz*, 112 F.3d at 4; *Camilo-Robles v. Zapata*, 175 F.3d 41, 44 (1st Cir. 1999); *Barreto-Rivera v. Medina-Vargas*, 168 F.3d 42, 48-49 (1st Cir. 1999); *Rogan v. Menino*, 175 F.3d 75, 78 (1st Cir. 1999). The elements of a deliberate indifference claim are that there was (1) a grave risk of harm; (2) actual or constructive knowledge of that risk; and (3) a failure to take easily available measures to address the risk. *See Camilo-Robles v. Hoyos*, 151 F.3d 1, 7 (1st Cir. 1998). Further, a plaintiff must show causation, which is an affirmative connection between the officer's conduct and her subordinates' constitutional violations. *See id.* A causal link can be established if there exists a known history of widespread abuse sufficient to alert the officer to the ongoing violations. *See Maldonado-Denis*, 23 F.3d at 582.

In the present case, there was a grave risk of harm. Not only was there the potential for employees to be terminated, but there was a distinct possibility that inmates could be injured or even killed if the Code of Silence was not eliminated. Moreover, there is a genuine issue of material fact as to whether Sheriff Cabral had actual or constructive knowledge of that risk. There is extensive evidence that she knew, or, at a minimum, should have known, about the enforcement of the Code of Silence. *See, e.g., Baron*, 402 F.3d at 229; *see* Stern Commission Report (Ex. 30). In addition, a reasonable jury could conclude that there were easily available measures that could have been taken to address the risk. Even a minimal inquiry into the reasons for Mrs. Porter's termination would have revealed that she had reported inmate abuse to the FBI. Finally, there is, at a minimum, a disputed issue of material fact as to whether there existed a

---

[13]  Similarly, even if a miscommunication occurred as to the "true" reasons for Mrs. Porter's barring—and there is at least a genuine issue of fact concerning Sheriff Cabral's reasons for the barring—there is a genuine dispute of fact about whether she was deliberately indifferent to the unconstitutional actions of her subordinates.

known history of widespread abuse sufficient to alert the officer to the ongoing violations. Once

again, the Code of Silence is well documented. *See* Section (B)(2) *supra*.

Recognizing the difficulties they face in arguing that Sheriff Cabral is not liable for the

deprivation of Mrs. Porter's federal rights, Sheriff Cabral instead focuses on qualified immunity.

However, she fares no better here because Mrs. Porter has raised a genuine issue of material fact

that Sheriff Cabral's conduct violated clearly established statutory or constitutional rights of

which a reasonable person would have known. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002);

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Singer v. Maine*, 49 F.3d 837, 844 (1st Cir.

1995). The First Circuit has enunciated a three part test to determine if an official is entitled to

qualified immunity: (1) has the plaintiff alleged a violation of a constitutional right; (2) were the

contours of the right were sufficiently established at the time of the alleged violation; and (3)

would an objectively reasonable official have believed that the action taken or omitted violated

that right. *See Hatch v. Department for Children, Youth and Their Families*, 274 F.3d 12, 20 (1st

Cir. 2001).

In the present case, as discussed above, Mrs. Porter has raised a genuine issue of material

fact as to whether there was a violation of her constitutional rights. Moreover, she has raised a

genuine issue of material fact that the contours of those rights were sufficiently established at the

time of the alleged violation such that an objectively reasonable official would have believed that

the action taken or omitted violated that right because "[i]t has long been established that a

government employee's right to speak on issues of public concern is protected from retaliation if

the speech does not disrupt the administration of the government." *Catletti v. Rampe*, 334 F.3d

225, 231 (2nd Cir. 2003) (quotation omitted); *see also Cooper v. Smith*, 89 F.3d 761, 766 (11th

Cir. 1996).[14] As discussed above, Mrs. Porter's speech did not disrupt the administration of government by endangering inmates. On the contrary, it promoted inmate safety. Therefore, Sheriff Cabral is not entitled to qualified immunity.

## II.    SUMMARY JUDGMENT SHOULD NOT BE GRANTED ON MRS. PORTER'S CLAIM UNDER THE WHISTLEBLOWER STATUTE, M.G.L. C. 149, § 185, BECAUSE DISPUTED ISSUES OF MATERIAL FACT EXIST WITH RESPECT TO WHETHER MRS. PORTER WAS AN EMPLOYEE OF SUFFOLK COUNTY

The only element of the Massachusetts Whistleblower Statute, M.G.L. ch. 149, §185, contested by the SCSD in their motion is that Mrs. Porter was not an employee of Suffolk County or the SCSD.[15] The Massachusetts Whistleblower Statute prohibits an employer from retaliating against its employees for engaging in certain protected conduct. As the Suffolk Defendants recognize, an employee of one company can be deemed a "joint employee" of a second entity for purposes of anti-discrimination law if that second entity possesses a sufficient indicia of control over the employee's employment. *See* Defendants' Memorandum, pp. 14-15.

The determination as to whether or not a joint employment relationship exists is "essentially a factual question," and courts rely on "a host of factors" to make such a determination. *See Rivera-Vega v. ConAgra, Inc.*, 70 F.3d 153, 163 (1st Cir. 1995). While Defendants' articulation of these basic principles is accurate, their application is flawed and short-sighted, both factually and legally.[16] A proper review of *all* of the applicable factors

---

[14] Moreover, Sheriff Cabral's liability as a supervisor was clearly established because "it is equally well settled that a deliberately indifferent police supervisor may be held liable for the constitutional violations of [her] subordinates." *Camilo-Roble*, 151 F.3d at 6.

[15] Thus, the Suffolk Defendants do not take issue with the fact that Mrs. Porter was retaliated against for disclosing to a public body illegal practices and/or providing information to the FBI in the course of its investigation into the SCSD.

[16] Defendants rely almost exclusively on *Orell v. UMass Mem'l. Med. Ctr.*, 203 F.Supp.2d 52 (D. Mass. 2002), to support their argument that Mrs. Porter was not a joint employee of Suffolk County. *See* Defendants' Memorandum, pp. 14-17. While the *Orell* opinion highlights some factors that Courts consider when assessing whether an entity is a joint employer, Defendants' argument suggests that these factors are outcome-determinative.

indicates that Mrs. Porter was a joint employee of both CMS and the SCSD.  At the very least, it

is clear that significant factual disputes exist with respect to Mrs. Porter's employee status, thus

precluding summary judgment in the SCSD's favor on this count.

A joint employer relationship exists where two or more employers "exert significant

control over the same employees and share or co-determine those matters governing essential

terms and conditions of employment." *Holyoke*, 11 F.3d at 306; *Rivera-Vega*, 70 F.3d at 163.  In

*Holyoke*, the question was whether Holyoke Visiting Nurses Association ("Holyoke"), a non-

profit healthcare provider was a joint employer of nurses contracted to it by a referral agency,

O'Connell Inc.  The First Circuit found that there was "substantial evidence" to support [the

NLRB's] finding that Holyoke was indeed a joint employer of the O'Connell nurses.  *Holyoke*,

11 F.3d at 306.

While the First Circuit acknowledged that "a number of relevant considerations" should

be taken into account to assess whether or not joint employment status exists, it highlighted

several factors to support the joint employment determination.  *See Holyoke*, 11 F.3d at 306, and

cases cited.  For instance, Holyoke retained the right to reject any nurse it did not want and

monitored the performance of the referred nurses.  Moreover, the Court noted that Holyoke

assumed supervision over the referred nurses as the nurses reported to Holyoke's office where

they received certain supplies, the day's work assignments, and patient files.  Holyoke conceded

that in the eyes of the patients, the referred O'Connell nurses were perceived as Holyoke

employees.

---

On the contrary, the enumerated factors in *Orell* represent but a few of the many factors considered in a joint employment analysis.  *See Holyoke Visiting Nurses Assoc. v. NLRB*, 11 F.3d 302, 306 (1st Cir. 1993).  Accordingly, Plaintiff addresses all of the relevant considerations in this portion of her Opposition.

*Holyoke* teaches that an entity may be found to be a joint employer based on the evaluation of the degree to which it possesses, or shares with the other entity, effective control over the following factors: (1) the authority to hire or fire employees; (2) the supervision of the employees' day-to-day activities; (3) the promulgation of work rules and conditions of employment, work assignments, and issuance of operating instructions; (4) the authority to discipline; (5) the right to approve and refuse employees; and (6) the maintenance of records. *See Holyoke*, 11 F.3d at 306-307; *Rivas v. Federacion De Asociaciones Pecuaria*, 929 F.2d 814, 820-21 (1st Cir. 1991); *see also NLRB v. Solid Waste Services, Inc.*, 38 F.3d 93, 94 (2d Cir. 1994). The application of the above factors to the present record demonstrates that, at the very least, there is a genuine issue of fact regarding the amount of control Suffolk County exercised over Mrs. Porter's terms of employment. *See Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964) (reversing Court of Appeals that joint employer relationship did not exist between worksite employer, Greyhound, and service employer – "And whether Greyhound possessed sufficient indicia of control to be an "employer" is essentially a factual issue . . . ."); *Rivera-Vega*, 70 F.3d at 163 (affirming district court's finding that reasonable cause existed to support joint employer status based on application of "host of" factors.)

First, contrary to Defendants' assertion that they did not "hire the CMS employees who worked at the HOC...," the record reveals otherwise. While CMS provides healthcare workers to the HOC, Defendants dictate the qualification requirements of the healthcare workers. *See* Mack dep., pp. 34-35 (Ex. 3); *see also* Suffolk County Request for Proposal ("RFP"), pp. 24-25 (Ex. 41). They review the credentials of the potential healthcare workers, administer background checks, and possess the right to reject any healthcare worker they do not want. *See* Mack dep., pp. 51-52, 54 (Ex. 3); *see* Horgan dep., pp. 144-146 (Ex. 4).

Moreover, Defendants' contention that they "did not fire CMS employees" is highly misleading because they terminated Mrs. Porter's employment with Suffolk County, which directly led to Mrs. Porter's termination from CMS immediately thereafter. Without any prior discussion or consultation with CMS, Ms. Mastrorilli informed Mrs. Porter that she was barred from the HOC premises. *See* Mastrorilli dep., pp. 33-34 (Ex. 7). CMS terminated Mrs. Porter's employment with CMS no later than one day after she was barred. *See* Mack dep., pp. 121-122 (Ex. 3). CMS maintains that it had no alternative but to terminate Mrs. Porter's employment based on the Suffolk Defendants' actions. Mack dep., p. 127 (Ex. 3). Indeed, CMS Regional Vice-President Ann Mack testified that "no one at CMS made a decision to terminate Mrs. Porter's employment" and that CMS "really processed the termination; we did not want to terminate Sheila." *Id.* at 146.

Second, there is a genuine issue of fact concerning the amount of day-to-day supervision that the SCSD maintained over Mrs. Porter. Mrs. Porter, her supervisor, Donna Jurdak, and Mrs. Porter's co-workers worked exclusively at the HOC. *See* Mack dep., pp. 52-53, 59 (Ex. 3). Mrs. Porter recorded her work time by punching in and out of the time clock at the HOC. *Id.* at p. 263. She received her paychecks at the HOC. *Id.* at pp. 263-264. The SCSD required Mrs. Porter to wear an identification card to gain access and travel throughout the facility, and determined Mrs. Porter's lunch hour and breaks. *Id.* at 262. Defendants also supplied the medical equipment necessary for Mrs. Porter to perform her responsibilities as a nurse, such as radiology equipment and a dialysis machine. Horgan dep., pp. 159-160 (Ex. 4); *see* Suffolk County RFP, pp. 25-26 (Ex. 41). Furthermore, no distinction was made between the CMS referred nurses and the HOC staff. The HOC inmates certainly regarded Mrs. Porter and her colleagues as HOC employees. Porter Decl., ¶ 29 (Ex. 1).

The SCSD had significant input on the medical care that was to be provided to an inmate. First, the SCSD dictated to CMS the precise medical services to be provided at the HOC. *See* Suffolk County RFP, pp. 30-31 (Ex. 41). The SCSD was also involved with medical care on a daily basis. For example, CMS medical staff were sometimes told not to use certain bandages if it was believed that the inmate was a suicide risk. *See* Porter Decl., ¶ 24 (Ex. 1). As another example, if there was a security concern with the inmate, medical staff would be instructed by the SCSD not to treat the inmate with certain ointments or petroleum or Ben Gay, all of which could be used to harass correctional officers. *Id.*

Third, Defendants promulgated Mrs. Porter's work rules, assignments and conditions of employment. At the outset of her employment at the HOC, Defendants required Mrs. Porter to attend an HOC orientation. *See* Mack dep., p. 58 (Ex. 3). Mrs. Porter underwent substantial training on security-related matters and how to act in the event of an emergency at the behest of the HOC. *Id.* Periodically, the SCSD conducted training programs for medical staff on issues other than security. Mrs. Porter and her colleagues oftentimes attended these training programs. Porter Decl., ¶ 28 (Ex. 1). As HOC Superintendent Gerard Horgan testified, "we let CMS know what rules we expect them to abide by, so that they can perform efficiently at the House of Corrections." Horgan dep., p. 148 (Ex. 4).

The SCSD also dictated Mrs. Porter's daily schedule. There were only certain hours in the day that Mrs. Porter could treat inmates. *See* Porter Decl., ¶ 25 (Ex. 1). Each morning upon arrival at the HOC, Mrs. Porter reviewed the patient list and charts of inmates that she would see that day. *Id.* She worked according to hours set forth by the HOC regarding sick call and physical examinations. *Id.* Mrs. Porter was assigned to treat female inmates. *Id.* The SCSD insisted that female inmates be seen on a separate floor instead of in the standard medical unit.

*Id.* The SCSD also determined which days and times that Mrs. Porter could go to that separate

floor, and the SCSD provided an officer to staff the clinic on the women's floor. *Id.*

Fourth, the SCSD maintained the absolute right to bar any CMS employee, *see* RFP (Ex.

41) ("[a]ll decisions of the [SCSD] relating to a security consideration of any kind are final . . ."),

and, of course, did in fact bar Mrs. Porter without prior notice to CMS. Indeed, there is no

dispute that the SCSD's stated reason for barring Mrs. Porter was for alleged violations of a

SCSD Policy, S-220, the Employee Code of Conduct. *See* Theiss dep., pp. 156-57 (Ex. 18).

Fifth, Defendants cannot credibly argue that their role with respect to Mrs. Porter and her

colleagues' employment was insignificant or routine. They dictated precise staffing levels at the

HOC. *See* Suffolk County-CMS Contract, FTE Listing (Ex. 42); SCSD RFP, pp. 27-29 (Ex. 41).

As Mr. Horgan testified, the SCSD "want[s] [the nurses] to coincide with our shifts. We want a

certain level of staffing . . . ." Horgan dep., p. 157 (Ex. 4). In addition, the SCSD dictated

minimum salary requirements for certain staff, *see* RFP, p. 29 (Ex. 41), and, in its response to the

RFP, CMS provided the SCSD with average salaries of each position it would fill. *See* Response

to RFP, p. 8-6 (Ex. 43). Moreover, as stated above, Defendants also administered background

checks on all potential healthcare workers. Horgan dep., p. 145 (Ex. 4).

Sixth, Defendants maintained the records which Mrs. Porter needed to adequately

perform her job responsibilities. Inmates' medical records are maintained at the HOC. *See*

Horgan dep., p. 161 (Ex. 4). These records are kept at the HOC for 30 years, whether or not the

inmate remains at the facility. *Id.* While there was a policy that access to the records is limited

to CMS personnel, Donna Jurdak testified that SCSD employees in SID reviewed inmates'

medical files. Jurdak dep., p. 66 (Ex. 2). Moreover, Mrs. Porter's personnel files are also kept at

the HOC. Mack dep., p. 47 (Ex. 3).

Finally, while not necessary on the facts here, public policy favors a broad interpretation of the terms "employer" and "employee." In *Orell*, the decision on which Defendants heavily rely, the Court acknowledged that the term "employer" should be interpreted "broadly in order to further the congressional objective of affording equality of employment opportunity." *Orell*, 203 F.Supp.2d at 62. A hyper-technical application of the term "employer" should be rejected; instead "the term 'employer' is sufficiently broad to encompass any party who significantly affects access of any individual to employment opportunities, regardless of whether that party may technically be described as an 'employer' of an aggrieved individual as that term has generally been defined at common law." *Carparts Distrib. Center, Inc., v. Automotive Wholesaler's Assoc. of New England, Inc.*, 37 F.3d 12, 17 (1st Cir. 1994); *see also Barone v. Hackett*, 602 F. Supp. 481, 483 (D. R.I. 1984) (noting that employer liability for discrimination "is not limited to the entity which issues pay checks to the employee."). This public policy is completely consistent with the reality here that were an employer with respect to Mrs. Porter.

In short, the evidence indicates that Mrs. Porter was a joint employee of both CMS and the SCSD. At the very least, there are numerous genuine fact issues regarding her employee status. Thus, summary judgment should not be granted to the SCSD on Mrs. Porter's Massachusetts Whistleblower Statute claim.

### III.    SUMMARY JUDGMENT IS NOT APPROPRIATE FOR THE BREACH OF CONTRACT CLAIM BECAUSE THERE IS A GENUINE ISSUE OF MATERIAL FACT CONCERNING WHETHER MRS. PORTER, A JOINT EMPLOYEE OF THE SCSD, HAD A RIGHT TO A HEARING

With respect to Mrs. Porter's breach of contract claim against Suffolk County and the Suffolk County Sheriff's Department ("SCSD"), Defendants contend summary judgment should be granted based on the sole argument that Mrs. Porter was not an employee of Suffolk County or the SCSD. Defendants' argument fails because there is, at the very least, a genuine issue of

material fact concerning whether Mrs. Porter was a joint employee of both CMS and the Suffolk Defendants. *See* Section II *supra.*

As the Suffolk Defendants acknowledge, employee handbooks or policies can create contractual obligations between employers and employees. *See id.; see also O'Brien v. New England Tel. & Tel. Co.*, 422 Mass. 686, 691 (1996). Defendants cannot credibly argue that they barred Mrs. Porter because she violated Policy S220, set forth in the "Employee Code of Conduct," yet then contend that Mrs. Porter was not a joint employee of Suffolk County and the SCSD. Defendants cannot, and should not, be permitted to have it both ways. "An employer may not, on one hand, rely on the mandatory nature of policies it spells out in a manual as the reason for its termination of an employee, and then, on the other hand, deny the contractual force of its manual when it comes to obligations the document might impose on the employer." *Derrig v. Wal-Mart Stores*, 942 F.Supp. 49, 55 (D. Mass. 1996).

Policy S-220 provides as follows: "[i]f it is determined that, by a preponderance of the evidence presented either at a formal hearing convened by the Sheriff or an informal hearing conducted by the Superintendent or his designee...." *See* Policy S-220, p. 7, #780 (Ex. 20). It is undisputed that Mrs. Porter was barred, without a hearing, from the HOC for violating Policy S-220, the Employee Code of Conduct. *See* Mastrorilli dep., pp. 30-31 (Ex. 7); *see* Porter Decl., ¶ 19 (Ex. 1). The Suffolk Defendants concede that the "right to a hearing articulated in Policy 220 is exclusively conferred upon employees." Defendants' Memorandum, p. 19. Because Mrs. Porter did not receive a hearing prior to being barred, summary judgment should be denied with respect to the breach of contract claim.

## IV.    A JURY COULD CONCLUDE THAT SUFFOLK COUNTY BREACHED ITS CONTRACT WITH CMS, AND THAT MRS. PORTER WAS A THIRD-PARTY BENEFICIARY OF THIS CONTRACT

Mrs. Porter has raised a genuine issue of material fact that the Suffolk Defendants breached its contract with CMS, and that Mrs. Porter was a third-party beneficiary of this contract.  First, the County breached both its agreement to act lawfully with respect to Mrs. Porter and its promise to provide written notice that it was barring a CMS employee.  The contract between the parties provides, of course, that it was made "subject to all laws of the Commonwealth of Massachusetts."  *See* Suffolk County-CMS Contract, § 11.1 (Ex. 42).  The County breached this provision by unlawfully barring Mrs. Porter for exercising her First Amendment rights, *see* Section I *infra*, and/or by failing to provide Mrs. Porter with a hearing and due process as required by Policy S220.  *See* Section III *infra*.

The County also breached its contract with CMS by failing to give notice to Mrs. Porter that she was being barred.  The CMS Response to the RFP, which Suffolk County ultimately adopted as the contract, provides that "CMS will, upon written request of the Official, remove from service under this contract any individual in the Contractor's employ who the Official determines to be disorderly, careless, or incompetent or to be employed in violation of the terms of this contract."  Response to RFP, p. 8-1 (emphasis added) (Ex. 43); *see also* Suffolk County-CMS Contract, Art. 1, § 2.2 (Ex. 42).  The County indisputably breached this provision.  Indeed, Sheriff Cabral concedes as much:

> Q:    Your understanding as you sit here today is that the process followed here was consistent with the process previously followed?
>
> A:    I believe that there was one aspect that wasn't.  I'm not sure that CMS was given a written notice.  I think that was supposed to be done.

Cabral dep., p 79 (Exhibit 16).

The reason for written notice is plain: it allows the employee to receive due process and permits CMS to explain to the SCSD the full circumstances such that a barring may be unnecessary. While Mrs. Porter was barred for exercising her constitutional rights, if she had in fact been terminated for "backdating" or writing on the wrong form, notice to CMS would have permitted Mrs. Porter and CMS to explain that these accusations were completely inaccurate. Here, of course, the SCSD had its own unlawful reasons for termination and had no intent on meeting its contractual notice obligation and thus risk having its pretextual justification for the barring exposed.

In addition, Mrs. Porter has raised a genuine issue of material fact that she was a third-party beneficiary of these contractual provision. A party claiming to be a third-party beneficiary to a contract must show that the contracting parties "intended to give her the benefit of the promised performance." *Anderson v. Fox Hill Village Homeowners Corp.*, 424 Mass. 365, 366 (1997).[17] For a party to be an intended beneficiary, it "must appear from 'the language and circumstances of the contract' that the parties to the contract 'clearly and definitely' intended the beneficiaries to benefit from the promised performance." *Miller v. Mooney*, 431 Mass. 57, 62 (2000) (quoting *Anderson*, 424 Mass. at 366-67).[18]

In the present case, the language of the contract itself raises a genuine issue of material fact that CMS and the County clearly and definitely intended Mrs. Porter to benefit from the

---

[17] State law governs this contract dispute. *See Southland Corp. v. Keating*, 465 U.S. 1, 23 (1984).

[18] Contrary to the impression left by the Suffolk Defendants that Mrs. Porter must show she was an employee, which as discussed above she was, Courts have recognized that employees of independent contractors may be a third-party beneficiary of the contract between the independent contractor and a customer if the contracting parties intended for a particular promise to benefit the employee. *See G.W. Equip. Co., Inc. v. Massachusetts Port Authority*, 63 Mass. App. Ct. 1112, 2005 WL 937052, *2 (Apr. 22, 2005) (unpublished decision) (noting that a jury found against a customer and for an independent contractor's employee who injured himself on a ladder provided by the customer, because the employee was a third-party beneficiary of the customer's promise to the independent contractor to provide a safe ladder, and the customer breached this obligation to the employee).

CMS-County contract. In its response to Suffolk County's RFP, CMS provided a staffing grid, which included the precise number of staff members who would fill each position and the average salary for each position. *See* Response to RFP, p. 8-6 (Ex. 43). "Nurse practitioner"—Mrs. Porter's position—was one of the items specifically included in this contract. *Id.* CMS promised to staff "2.4" full-time nurse practitioner positions. *Id.* There was no question that Mrs. Porter would fill one of these positions. When CMS submitted its response to the RFP, Mrs. Porter was already working at the HOC for CMS' predecessor, CHS. Ms. Mack testified that it was "fairly obvious" that Mrs. Porter would stay at the HOC when CMS took over and that she "advocated for her to be retained." *See* Mack dep., p. 52 (Ex. 3); *see* Porter Decl., ¶ 3 (Ex. 1).

Moreover, the Suffolk Defendants received from CMS the following promises in the contract:

> CMS follows these guiding principles in developing and managing human resources:
>
> ****
>
> We trust our employees and expect them to trust us. When trust has been breached, we discuss it openly.
>
> ****
>
> We handle disciplinary matters and terminations with respect and dignity. There are no bad employees—just bad selections or matches.

Response to RFP, p. 4-24-25 (Ex. 43). This provision reflects that the contracting parties intended procedures for disciplining and terminating employees to benefit the development and management of employees.

In sum, these provisions raise a genuine issue of material fact that Mrs. Porter was an intended beneficiary of the CMS-County contract, which the County breached by failing to act

lawfully, failing to provide a hearing, and failing give notice prior to barring Mrs. Porter.

Therefore, the County Defendant's motion for summary judgment on Count V should be denied.

## V.   MRS. PORTER IS ENTITLED TO A JURY TRIAL ON HER CLAIM UNDER THE MASSACHUSETTS CIVIL RIGHTS ACT

Ms. Cabral's motion should be denied with respect to Mrs. Porter's claim under the

Massachusetts Civil Rights Act ("MCRA"). There is a genuine issue of material fact concerning

whether Ms. Cabral violated Mrs. Porter's civil rights with at least three actions: (1) the

interrogation of Mrs. Porter on May 28, 2003; (2) Ms. Cabral's barring of Mrs. Porter; and (3)

Ms. Cabral's repeated defamatory comments regarding Mrs. Porter. Defendants only address the

first of these three incidents. Defendants do not and cannot contest that Ms. Cabral barring and

defaming of Mrs. Porter violated the MCRA. For this reason alone summary judgment should

not be granted on Mrs. Porter's MCRA count. Even if these actions were contested, there is a

genuine issue of material fact concerning whether the three actions described above violated the

MCRA, thus precluding summary judgment on this count.

To establish a claim under the MCRA, a plaintiff must prove that (1) their exercise or

enjoyment of rights secured by the Constitution or laws of either the United States or of the

Commonwealth, (2) has been interfered with, or attempted to be interfered with, and (3) that the

interference or attempted interference was by "threats, intimidation or coercion." *See* M.G.L.

c.12 § 11(I), (H); *Swanset Dev. Corp. v. City of Taunton*, 423 Mass. 390, 395 (1996); *Bally v.

Northeastern Univ.*, 403 Mass. 713, 717 (1989).

The coercion element has been defined as "the application to another of such force, *either

physical or moral*, as to constrain him to do against his will something he would not otherwise

have done." *Planned Parenthood League of Massachusetts, Inc. v. Blake*, 417 Mass. 467, 474

(1994). The standard to be applied is whether a reasonable person would be threatened, intimidated, or coerced by the defendant's actions. Id. at 474-75.

This coercion need not take the form of a physical confrontation—a MCRA claim may be raised based on economic or moral coercion. *See Broderick v. Roache*, 803 F.Supp. 480, 486-87 (D. Mass 1992) (listing cases and noting that actual or potential physical duress often serves as a proxy for threats, intimidation or coercion because it is easily identified, but it is not required under the MCRA); *Buster v. George W. Moore, Inc.*, 438 Mass. 635, 646-47 (2003) ("we have recognized that coercion may take various forms, and we have not limited its scope to actual or attempted physical force. For example, we have suggested that coercion may be found where one party deprives another of rights due under a contract, or makes it impossible, due to sexual harassment, for another to continue her employment") (internal citations omitted); *Swanset Dev. Corp. v. Taunton*, 423 Mass. at 396 n.11 (assuming without deciding the point that "coercion which does not involve physical force might violate the [a]ct" and defining coercion as "the use of physical *or moral* force to compel [another] to act or assent") (emphasis added).

Moreover, a pattern or scheme of harassment and retaliation, even non-physical, may constitute unlawful intimidation actionable under the MCRA. *See, e.g., Broderick*, 803 F.Supp. at 487 (denying summary judgment and finding material issue of fact whether the city, by denying the plaintiff a promotion to which he was entitled, refusing to grant him permission to practice law in his off-duty hours and subjecting him to unjustified disciplinary proceedings, attempted to threaten, coerce or intimidate the plaintiff); *Howcroft v. City of Peabody*, 51 Mass. App. Ct. 573, 594 (2001) (denying summary judgment and finding a material issue of fact whether the defendants engaged in a pattern of harassment and intimidation to suppress plaintiff's free speech rights by arbitrarily enforcing rules against plaintiff, denying him benefits

to which he was entitled, harassing him by telling him to "shut up" and attempting to suspend him).

Finally, a plaintiff need not show that the defendant specifically intended to violate her civil rights—it is enough that such violation is the result of the defendant's actions. *See Redgrave v. Boston Symphony Orchestra, Inc.*, 399 Mass. 93, 99 (1987); *see Monroe v. Pape*, 365 U.S. 167 (1961) (§ 1983, on which the MCRA is based, does not have an intent requirement). All that is required is that "the natural effect of the defendant's action" violates the plaintiff's civil rights. *Redgrave*, 399 Mass. at 99.

### A. Mrs. Porter Exercised Her Constitutional Rights

The first element of Mrs. Porter's MCRA claim is easily satisfied. There is no question that Mrs. Porter's communication with the FBI was a matter of public concern and was thus protected. *Acciavatti v. Professional Services Group, Inc.*, 982 F.Supp. 69, 78 n.6 (D. Mass. 1997) ("Massachusetts law treats whistleblowing as protected speech because its subject matter is typically of public concern"); *Flesner v. Technical Communications Corp.*, 410 Mass. 805, 810 (1991) (noting that whistleblowing is a high priority public policy).

### B. Ms. Cabral Interfered With the Exercise of Mrs. Porter's First Amendment Rights Through Threats, Intimidation and Coercion

There is a dispute of fact on whether Ms. Cabral interfered with Mrs. Porter's First Amendment right to speak with law enforcement via threats, intimidation and coercion when Mrs. Porter was subjected to the May 28th interrogation, when Ms. Cabral barred Mrs. Porter and when she subsequently defamed her.

As described above, after the SCSD became suspicious that Mrs. Porter had contacted the FBI to report the Rosario allegations of abuse, Mrs. Porter was summonsed to a small office

within SID for an interview. *See* Porter Decl., ¶ 16-17 (Ex. 1). Attempting to lull Mrs. Porter

into a false sense of security, the interview began with generic questions about the Rosario

allegations—information SID already had in its possession. Porter Decl., ¶ 17. At this point,

Investigatory Dacey began to interrogate Mrs. Porter. *Id.* The tenor of the interview changed

considerably, as Mr. Dacey's tone grew harsh and accusatory and he leaned forward while

asking his questions. *Id.* Mrs. Porter felt extremely uncomfortable and threatened during this

interview. *Id.* Mr. Dacey used an interrogation technique of not asking Mrs. Porter directly if

she had communicated with the FBI, but rather asked when she first spoke to "Christa"— a

sneaky attempt to trick Mrs. Porter into revealing something she had never discussed with SID

before or perhaps cause her to falsely deny it. *Id.* Mrs. Porter truthfully responded that she had

contacted the FBI. *Id.*.

Ms. Cabral testified that, within a matter of days, SID Chief Theiss told her about Mrs.

Porter's admission:

> In the context of talking about the investigation, he also talked
> about Sheila Porter and the fact that one of the investigators had
> gotten a call from an FBI agent, named Krista Snyder, with a K,
> indicating that the FBI had received information that an inmate had
> been allegedly beaten by an officer and that ultimately, in the
> course of the investigation, they learned that that person was Sheila
> Porter.

*See* Cabral dep., pp. 58-59 (Ex. 16). Thus, there is a dispute of fact as to whether Ms. Cabral

implicit approval of or willful blindness to, the SID interrogation of Mrs. Porter—which was of a

threatening nature—interfered with Mrs. Porter's First Amendment rights.

Second, of course, Ms. Cabral made the decision to bar Mrs. Porter from the HOC, and

the reason given to Mrs. Porter for the barring was that she communicated with an outside

agency—the FBI. There is a dispute of fact whether this action violated Mrs. Porter's First

Amendment rights via economic coercion. *See Buster v. George W. Moore, Inc.*, 438 Mass. 635, 646-47 (2003).[19] Moreover, suspensions and other disciplinary actions like Mrs. Porter's barring can be part of a scheme of harassment that constitutes unlawful intimidation under the MCRA. *See Howcraft*, 51 Mass. App. Ct at 594 (finding that defendant's attempt to suspend plaintiff was part of pattern of harassment and intimidation to suppress plaintiff's free speech rights); *Broderick*, 803 F.Supp. at 487 (finding that defendant's subjecting plaintiff to unjustified disciplinary proceedings was retaliation aimed at threatening, coercing or intimidating the plaintiff); *Dawn v. City of Boston*, 2002 WL 487161 at *6 (D. Mass. 2002) (finding that defendant's placing employee on administrative leave may constitute part of a scheme of intimidation and retaliation under the MCRA). Ms. Cabral was well aware, or had an obligatio nto be aware, of the custom and practice of retaliation at the SCSD.

Third, subsequent to the barring, Ms. Cabral publicly and repeatedly smeared Mrs. Porter. Ms. Cabral's bottom line is that Mrs. Porter is someone who makes up false accusasions for peronal motives—a liar with an agenda. Ms. Cabral stated that "[Mrs. Porter] is clearly biased and has her own agenda for speaking out at this time," *see* Cabral Press Statement (Ex. 13), that Mrs. Porter was not a whistleblower and "clearly had" her "own agenda," *see* Transcript of Debate Between Cabral and Steven Murphy (Ex. 14), that Mrs. Porter's allegations were "all politically motivated" and that her "allegations were 100 percent ridiculous, [t]hat's why you haven't seen any follow up [after the election]." *See Boston Globe Magazine* (Ex. 15). There is a dispute of fact whether these statements, which were demonstrably false, interfered with Mrs.

---

[19] As described in Sections II and III *supra*, it is a fact issue whether Mrs. Porter was a joint employee of the SCSD and whether the SCSD breached the provisions of Policy S-220 by failing to provide Mrs. Porter with a hearing prior to barring her.

Porter's First Amendment rights using moral coercion. *See Swanset*, 423 Mass. at 396 and n. 11.[20]

## VII.    THE SUFFOLK DEFENDANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON MRS. PORTER'S DEFAMATION COUNT

Defendant's motion should be denied with respect to Mrs. Porter's claim for defamation against Ms. Cabral. As described above, after Ms. Cabral unlawfully barred Mrs. Porter, she proceeded to repeatedly and publicly defame her. *See* REDACTED (Ex. 17). First Ms. Cabral and the SCSD issued a written statement to Channel 5 indicating that Mrs. Porter was not telling the truth and stating that Mrs. Porter "is clearly biased and has her own agenda for speaking out at this time" and was barred because "she violated Department regulations and contractual obligations"—statements that Channel 5 broadcast to millions of viewers. *See* Press Statement (Ex. 13); *see* Transcript of Channel 5 Report (Ex. 44). Shortly thereafter, during a televised political debate during the campaign for Suffolk County Sheriff, Ms. Cabral stated that Mrs. Porter was not a whistleblower and that Mrs. Porter "clearly had" her "own agenda." *See* Transcript of Debate between Cabral and Steven Murphy (Ex. 14). Third, Ms. Cabral claimed that Mrs. Porter's allegations were "politically motivated" and claimed, through her spokesman, that these "allegations were 100 percent ridiculous...[t]hat's why you haven't seen any follow up [after the election]." *See Boston Globe Magazine* article (Ex. 15).

---

[20]    Ms. Cabral claims that she cannot be liable under the MCRA because there is no municipal liability under the Act. Municipal liability is not dispositive of the issue, however. A public official such as Cabral may be liable under the MCRA as an individual, regardless of whether the municipal office she works for can also be held liable. *See, e.g., Fletcher v. Szostkiewicz*, 190 F.Supp.2d 217, 230 (D.Mass 2002) (upholding MCRA claim against Mayor in his individual capacity); *Howcroft*, 51 Mass. App. Ct. at 593-94 (denying summary judgment on MCRA claim against police department officials in their individual capacity). Furthermore, the Massachusetts Supreme Judicial Court has never ruled on this question. Defendant Cabral cites only a Massachusetts Appellate Court opinion for the proposition that there is no municipal liability under the MCRA. *Howcroft v. City of Peabody*, 51 Mass. App. Ct. 573 (2001).

Summary judgment should not be granted with respect to any of these defamatory statements. Generally, a motion for summary judgment on a defamation claim will not be allowed unless the "statement complained of is not reasonably capable of being understood in a defamatory sense to the discredit of plaintiff in minds of a considerable and respectable class of the community." *Wagner v. City of Holyoke*, 241 F.Supp.2d 78, 101 (D. Mass 2003) (quoting *Ingalls v. Hastings & Sons Pub. Co.*, 304 Mass. 31 (1939)). Moreover, "[t]he question ... whether a publication is defamatory or not, being dependent upon the effect produced upon the public or a considerable part of it, is one particularly fit for trial by jury." *Id.* True statements of fact or statements of pure opinion are by law not defamatory. *Id.* In a defamation claim, the plaintiff must show that the defamatory words published by the defendant were "of and concerning" the plaintiff. *New England Tractor-Trailer Training of Connecticut, Inc. v. Globe Newspaper Co.*, 395 Mass. 471, 474 (1985).

### A.    The Statements Were Defamatory By Nature

A statement is defamatory if it holds the target up to "contempt, hatred, scorn, or ridicule or tend[s] to impair her standing in the community, at least to her discredit in the minds of a considerable and respectable class in the community." *Stanton v. Metro Corp.*, 357 F.Supp.2d 369, 376 (D. Mass 2005) (quoting *Yohe v. Nugent*, 321 F.3d 35, 40 (1st Cir. 2003)). Generally, defamatory meaning is an issue of law to be decided by the Court. *Jones v. Taibbi,* 400 Mass. 786, 792 (1987); *Albright v. Morton,* 321 F.Supp.2d 130, 135 (D. Mass. 2004). If the court determines that a reasonable person could interpret the statement as having both a defamatory and non-defamatory meaning, the character of the statement becomes a question of fact for the jury. *Jones*, 400 Mass. at 792

Ms. Cabral devotes precisely three lines in its Memorandum to arguing that the statements directed at Mrs. Porter were not defamatory by nature. *See* Def. Memorandum, p. 29. There is at least a dispute of fact as to whether the statements held her up to contempt, hatred, scorn or ridicule.

First and foremost, all of the statements in one way or another call Mrs. Porter a liar. By claiming that Mrs. Porter was biased and had her own agenda, that she was politically motivated and that her charges were "100% ridiculous," the unmistakable implication is that Mrs. Porter's charges are <u>untrue</u> and is motivated by some personal and selfish goals. Clearly this holds Mrs. Porter up to contempt, hatred, scorn or ridicule. *See Bennett v. City of Holyoke*, 230 F. Supp. 2d 207, 230 (D. Mass. 2002) (denying summary judgment and finding the two statements that the plaintiff was a "leading problem causer[]" and "has been a problem for years [and] . . . has constantly worked to undermine the morale of this department" sufficiently defamatory in nature to reach the jury).

In fact, Mrs. Porter was not lying about her allegations. The United States Attorney conducted a two-year investigation surrounding the circumstances of Mrs. Porter's barring.

REDACTED                        REDACTED              17). Indeed,

the very existence of this investigation exposes the falsity of the statement "that's why you haven't seen any follow up [after the election]." This statement was obviously meant to imply that Mrs. Porter was a liar because law enforcement authorities were not investigating her barring from the SCSD. In fact, the opposite was true. Worse, at the time he made this statement, Ms. Cabral's press spokesman admitted that, he "had an idea that something was

going on" with respect to a criminal investigation of the Porter barring based on his conversation

with Chief-of-Staff Keeley and others. *See* Deposition of Steven Tompkins ("Tompkins dep."),

p. 24 (Ex. 45). As the U.S. Attorney noted,

REDACTED

Por    REDACTED

     But Ms. Cabral did not merely call Mrs. Porter a liar. Rather, there is a genuine dispute

of fact as to whether she was also calling Mrs. Porter a racist. Ms. Cabral repeatedly claimed

that Mrs. Porter was "biased" and had an "agenda." Coming from Ms. Cabral, who is of a

different race than Mrs. Porter, these statements could reasonably be understood to have racial

overtones. *See* Porter Decl., ¶ 31 (Ex. 1). Indeed, Ms. Cabral as previously stated that "race

plays a role in everything" in America. *See* Transcript of Debate, p. 9 (Ex. 14). She also told

U.S. Attorney Sullivan that sh    REDACTED    REDACTED

REDACTED    REDACTED    [21] Ms. Cabral conceded in

her deposition that these words are subject to interpretation by the listener. *See* Cabral dep., p.

150 (Ex. 16).

## B.    The Statements Were Factual Assertions

    Ms. Cabral claims that certain of the statements are not defamatory because they merely

presented her opinion. This is incorrect. The Press Release included false assertions of fact, or at

the very least opinions based on non-disclosed facts.

    Ms. Cabral's statements could reasonably be interpreted as presenting facts, not mere

opinion. It is a fact whether or not Mrs. Porter was biased and had her own motives for her

---

[21]    The statement that Mrs. Porter had violated "contractual obligations" was also false. Defendants have not
provided evidence of a single contractual obligation between Mrs. Porter and CMS, Mrs. Porter and the SCSD or the
SCSD and CMS that Mrs. Porter violated, because there is none.

statements. Statements of opinion enjoy constitutional protection from defamation claims because overstatement and embellishment have infiltrated modern speech. *See Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 128 (1st Cir. 1997) ("The First Amendment's shielding of figurative language reflects the reality that exaggeration and non-literal commentary have become an integral part of social discourse."). Thus, courts have often stated that defamation claims cannot lie based on "imaginative expression" or "rhetorical hyperbole," *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990), or "figurative language that no reasonable person would believe presented facts." *Levinsky's*, 127 F.3d at 128. The statements in the press release, however, do not contain such imaginative language suggesting exaggeration or inaccuracy. Rather, the statement that Mrs. Porter is a liar making false allegations and has her own improper and biased motives for making her statements was clearly meant to be taken literally as an assertion of fact—not hyperbole.

Nor does the press release contain any cautionary language, such as "suggested" or "suspicion." *See National Ass'n of Government Employees v. Buci Television, Inc.*, 118 F.Supp.2d 126, 130-31 (D. Mass 2000) ("To distinguish a provably-false factual assertion from a protected opinion, a court must analyze the offending statement in context, taking into account the medium of expression and any cautionary or subjective words utilized by the writer."); *Lyons v. Globe Newspaper Co.*, 415 Mass. 258, 263-64 (1993). Rather, Ms. Cabral used words of certainty, such as "clearly." Ms. Cabral's statements do not signal to the listener or reader that there is reason to doubt the accuracy and sincerity of the statements, and therefore they are factual assertions capable of damaging Mrs. Porter's reputation.

Even if the statements are construed as opinion, they are not constitutionally protected. *Levinsky's, Inc*, 127 F.3d at 127 ("The First Amendment does not inoculate all opinions against

the ravages of defamation suits."). The First Amendment prohibits only those defamation actions "based on loose, figurative language that no reasonable person would believe presented facts." *Id.* at 128. A statement in the form of an opinion that implies the existence of facts which are capable of being proven true or false can be actionable. See *Milkovich,* 497 U.S. at 18-19; *see also* Restatement (Second) of Torts § 566 (1977). Here, the statement that Mrs. Porter is making 100% ridiculous allegations because she is clearly biased and has her own agenda implies the existence of underlying facts known to Ms. Cabral regarding Mrs. Porter's objectives in making her allegations.

Here, Ms. Cabral did not disclose the facts on which she based her statement that Mrs. Porter had her own motives for bringing a lawsuit. Given her position as Sheriff with supervisory authority over Mrs. Porter, it would be reasonable for the listener to assume that Ms. Cabral had conducted a reasonable investigation, had established what had happened, and had in her possession facts upon which she based her statement that were not publicly known. It would therefore also be reasonable for a listener to take Cabral's statement as fact and not come to a contrary conclusion. *See Riley v. Harr*, 292 F.3d 282, 290 (1st Cir. 2002) (distinguishing mere statements of opinion from cases in which the speaker has information, unavailable to the listener, upon which to base his statement). To be sure, Ms. Cabral did not disclose that she did absolutely nothing but listen to a brief rendition of Mrs. Porter's alleged transgressions from Mr. Theiss months before launching her defamatory statement. *See* Cabral dep., pp. 58-59 (Ex. 16).

### C.    The Statements Sufficiently Identify Mrs. Porter

While Ms. Cabral does not indicate who it was she was calling "ridiculous" with a "bias" and "an agenda," she nonetheless argues that she is entitled to summary judgment because certain of the statements did not identify Mrs. Porter by name. But a plaintiff in a defamation

suit need not be identified by name in the statement. *See New England Tractor-Trailer Training of Connecticut, Inc.*, 395 Mass. at 482 (holding that it was a "question of fact whether the article reasonably could be understood as referring to [plaintiff], ... although no explicit reference to [plaintiff] is made"); *Lahr v. Adell Chemical Co., Inc.*, 300 F.2d 256, 259 (1st Cir. 1962) ("It has never been held in defamation that a plaintiff must be identified by name"); *Stanton v. Metro Corp.*, 357 F.Supp.2d 369, 375 (D. Mass. 2005) ("A statement need not explicitly refer to the plaintiff in order to satisfy the "of and concerning" element of the claim.").

Rather, as is evident from the above-cited authorities, a plaintiff need only show that the alleged defamatory statement published by the defendant was "of and concerning" the plaintiff. *See New England Tractor-Trailer Training of Conn., Inc.*, 395 Mass. at 474. A statement is "of and concerning" the plaintiff if (1) defendant intended the statement to refer to plaintiff and it was so understood or (2) persons could reasonably interpret defendant's statement to refer to plaintiff and defendant was negligent in publishing it in such a way that it could be so understood. *Id.* at 483.

There is simply no question, and at least a dispute of fact, that Ms. Cabral was referring to Mrs. Porter as the person who "clearly had" an "agenda" and was "not a whistleblower." Though not identified by name, Mrs. Porter was identified as the woman barred from the SCSD for "cooperating with the FBI." *See* Transcript of Debate, p.13 (Ex. 14). It was also reasonable for a listener to interpret Cabral's statements as referring to Mrs. Porter, because it was publicly known, based on newspaper and television reports, that Mrs. Porter was barred from the SCSD for cooperating with the FBI. Moreover, the statements in the *Boston Globe* article were also "of and concerning" Mrs. Porter. The statements referenced a nurse at the Suffolk County House of Corrections who had been fired by the Cabral administration after it learned she was helping the

FBI look into inmate abuse. At the time the article ran, Mrs. Porter had been identified as this very person in both newspaper and television articles. Simply put, Mrs. Porter was the only person who could possibly fit the description provided. Moreover, the statement that "the allegations were 100 percent ridiculous" <u>immediately</u> followed the discussion of Mrs. Porter and her allegations. *See Boston Globe Magazine* article, p. 32 (Ex. 15). The only reasonable interpretation is that this statement referred to Mrs. Porter.

### D.     The Statements in the Article Can Be Attributed to Cabral.

Finally, Ms. Cabral argues that the statement that Mrs. Porter's "allegations were 100 percent ridiculous...[t]hat's why you haven't seen any follow up [after the election]" cannot be attributed to her. But Ms. Cabral is liable for these statements, which were made by her press spokesman, on the doctrine of respondeat superior. *See, e.g., Beriont v. GTE Laboratories, Inc.,* 60 Mass. App. Ct. 1108, *3 and n. 3 (2003) (applying respondeat superior to a defamation claim); *Ellis v. Safety Ins. Co.,* 41 Mass. App. Ct. 630, 635 n.6 (1996) (same).

Whether an employer is liable under a theory of respondeat superior for an employee's defamatory statements depends on whether the alleged defamation was made within the scope of the employee's employment. *Beriont,* 60 Mass. App. Ct. 1108, *3 n.3. This inquiry turns on three factors: whether the conduct (1) is of the kind the employee is employed to perform; (2) occurs substantially within the authorized time and space limits; and (3) is motivated, at least in part, by a purpose to serve the employer. *See Wang Labs., Inc. v. Business Incentives, Inc.,* 398 Mass. 854, 859 (1986).

Here, all three requirements are met for holding Ms. Cabral vicariously liable. Steve Tompkins was an authorized spokesman for Cabral, employed to make statements on her behalf.

*See* Tompkins dep., pp. 41-42, 47 (Ex. 45).[22]  Mr. Tompkins clearly made the statements during

his employment.  *Id.*  And it is a fair inference that Mr. Tompkins was motivated to serve his

employer by portraying her in a flattering light, as the article does.  Thus, Tompkins' statement

was within the scope of his employment, and Defendant Cabral as his employer is vicariously

liable for his defamatory statements.  Ms. Cabral at no point sough to correct these statements,

thus adopting them.

For all of these reasons, summary judgment should not be granted on Mrs. Porter's

defamation count.

## VIII.  SUMMARY JUDGMENT SHOULD NOT BE GRANTED ON THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS COUNT

Defendant's motion should be denied with respect to Mrs. Porter's claim for intentional

infliction of emotional distress ("IIED").  There is a dispute concerning whether, by

unconstitutionally barring Mrs. Porter and then smearing her with defamatory remarks, Ms.

Cabral's conduct was extreme and outrageous.  As such, summary judgment is inappropriate.

To make a claim of IIED, the plaintiff must prove that (1) the defendant intended to inflict

emotional distress or knew or should have known that emotional distress was likely to

result from her conduct; (2) the conduct was "extreme and outrageous;" (3) the defendant's

---

[22]    Mr. Tompkins tried to claim in his deposition that, while he was authorized to speak to the *Globe* reporter, he was not authorized to make the defamatory statements that appear in the article.  *See* Tompkins dep., pp. 46-47 (Ex. 45).  These unsupported, self-serving statements are entitled to no weight.  To be sure, neither Mr. Tompkins nor anybody else at the SCSD took any steps after the story ran to correct the allegedly unauthorized statement.  *See* Tompkins dep., p. 51 (Ex. 45).  Moreover, Mr. Tompkins' credibility is in question.  For example, Mr. Tompkins testified that he had no role whatsoever in preparing the above-referenced press release, even though Elizabeth Keeley testified that he participated in meetings when the release was drafted.  *See* Tompkins dep., p. 29 (Ex. 45); Keeley dep., pp. 176-77 (Ex. 21).  Moreover, Mr. Tompkins was quoted in a *Boston Globe* article saying that he "didn't know anything about a grand jury" even though he admitted that, on the day the article ran, he "had an idea that something was going on with Mrs. Porter."  *See* Estes, A., "Nurse Fired From Jail Job Speaks Out," *Boston Globe*, August 25, 2004, p. B2 (Ex. 46); *see* Tompkins dep., p. 24 (Ex. 45).  In addition, Mr. Tompkins demonstrated an inability to testify truthfully about basic things such as how he prepared for his deposition, claiming

**REDACTED**              **REDACTED**

59

actions caused plaintiff's emotional distress; and (4) the plaintiff's emotional distress was severe. *Agis v. Howard Johnson Company*, 371 Mass. 140, 145 (1976) (quoting Restatement (Second) of Torts § 46 (1965). The "extreme and outrageous" element of an IIED claim has been read to require that the conduct be of "a high order of reckless ruthlessness or deliberate malevolence." *Conway v. Smerling*, 37 Mass. App. Ct. 1, 8 (1994).

In ruling on a motion for summary judgment, the Court must first determine whether the defendant's conduct may reasonably be regarded as "extreme and outrageous." If reasonable minds could differ on that issue, it is a jury question. *See Caputo v. Boston Edison Company*, 924 F.2d 11, 14 (D. Mass. 1991) (citing comment h, Restatement (Second) of Torts (1965) § 46)). Courts have also recognized that the jury is entitled to view the defendant's conduct in the most negative light possible given the factual record. *Foley v. Polaroid Corp.*, 400 Mass. 82, 100 (1987) ("In considering whether a plaintiff has made out a claim for intentional infliction of emotional distress, we have said that the trier of fact 'would be entitled to put as harsh a face on the [defendant's actions] as the basic facts would reasonably allow.'") (citing *Richey v. American Auto. Ass'n,* 380 Mass. 835, 839 (1980)).

Mrs. Porter's claim meets the requirement of "extreme and outrageous" conduct. Defamatory or otherwise embarrassing statements may constitute sufficiently extreme and outrageous conduct to support an IIED claim. *See, e.g., Tech Plus, Inc. v. Ansel*, 59 Mass. App. Ct. 12, 26 (2003), review denied, 440 Mass. 1108 (2003) (finding that a defamatory statement accusing plaintiff of being anti-Semitic could form the basis for an IIED claim). Here, Ms. Cabral repeatedly made defamatory remarks about Mrs. Porter, publicly shaming her for speaking out against the SCSD by calling her a liar and a fraud, as described in Section VII,

**REDACTED**            **REDACTED**      **REDACTED**

*supra.* These public statements were a harsh, unnecessary means of retaliating against Mrs. Porter for speaking out. Instead of merely defending her own actions and the position of the SCSD, Ms. Cabral publicly portrayed Mrs. Porter as a troublemaker and a racist who was out only to sabotage a public official. The fact that Ms. Cabral made numerous defamatory remarks shows that Ms. Cabral was acting out of malevolence toward Mrs. Porter and not merely a desire to set the record straight, nor were they a "slip of the tongue" followed by an apology.

Mrs. Porter's barring from the HOC also constitutes extreme and outrageous conduct. *See Agis,* 371 Mass. at 145 (finding that jury could reasonably find employer's conduct in inappropriately firing employee to constitute extreme and outrageous behavior). Ms. Cabral immediately barred Mrs. Porter from the HOC upon learning that Mrs. Porter was speaking to the FBI. Mrs. Porter's conduct was lawful and indeed socially beneficial, not something that would warrant termination or barring from the premises. As discussed in Section I(A) *supra*, the fabricated reasons Ms. Cabral now gives for the barring are alleged clerical errors that never occurred and have never before been the basis for barring a worker.

Ms. Cabral's reliance on *Conway v. Smerling* is unavailing. In *Conway*, the court held the defendant's conduct was not extreme or outrageous because the defendant was gracious to the plaintiff and did not shame or harass the plaintiff. *Conway,* 37 Mass. App. Ct. at 9. In contrast, here Ms. Cabral has repeatedly been malicious toward Mrs. Porter, publicly shaming her and barring her from her place of work for lawfully speaking to law enforcement officials, after allowing Mrs. Porter to be exposed to a harassing and demeaning "investigation."

Even if the barring or each defamatory statement alone does not rise to the requisite level of extreme and outrageous conduct, viewed together the actions do meet that requirement. Massachusetts courts have recognized that repeated acts of harassment can constitute extreme

and outrageous conduct for purposes of IIED claims even when each act alone would be insufficient. *See, e.g., Boyle v. Wenk*, 378 Mass. 592, 595 (1979) ("The flaw in [plaintiff]'s argument is that he isolates each individual incident and ignores the fact that the jury are entitled to draw reasonable inferences from the totality of circumstances…Repeated harassment…may compound the outrageousness of incidents which, taken individually, might not be sufficiently extreme to warrant liability for infliction of emotional distress."). Here, the emotionally damaging nature of Ms. Cabral's remarks and actions is magnified by the fact that they were made numerous times.

Summary judgment is inappropriate because there is an issue of fact as to whether Ms. Cabral's conduct constituted extreme and outrageous behavior. *Doe v. Town of Plymouth*, 825 F.Supp. 1102, 1110 (D.Mass 1993) (finding that where outrageousness of conduct is disputed, and details surrounding the conduct is disputed, summary judgment is inappropriate). Ms. Cabral has failed to show that no reasonable person could find that her conduct was extreme and outrageous under the circumstances, and therefore Mrs. Porter's claim for intentional infliction of emotional distress should be submitted to a jury.

## IX.  THERE IS A GENUINE ISSUE OF MATERIAL FACT REGARDING MRS. PORTER'S CLAIM FOR TORTIOUS INTERFERENCE WITH ADVANTAGEOUS RELATIONS

Finally, summary judgment should not be granted on Mrs. Porter's claim for tortious interference with advantageous relations.  To make out such a claim, the plaintiff must prove: (1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such a relationship; (3) the defendant's intentional and improper interference with it; and (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct.  *Laser Labs, Inc. v. ETL Testing Laboratories, Inc.*, 29 F. Supp. 2d 21, 23 (D. Mass. 1998)/

Mrs. Porter's independent contractor relationship with the SCSD satisfies the first element of the test for tortious interference with advantageous relations. The First Circuit has held that "Massachusetts case law indicates that this tort claim does not require a finding that the plaintiff was an employee, but rather encompasses independent contractors as well." *Speen v. Crown Clothing Corp.*, 102 F.3d 625, 634 (1st Cir. 1996). There is no question that Ms. Cabral was aware that Mrs. Porter was employed by CMS, which was under contract with the SCSD. *See, e.g.*, Cabral dep., p. 86 (Ex. 16).

Ms. Cabral's conduct rises to the level of intentional and improper interference. Massachusetts courts have a broad scope of what constitutes improper conduct for purposes of establishing tortious interference with advantageous relations. Plaintiff need only show "improper" interference. *See United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 816 (Mass. 1990).[23] Conduct is improper "when interference resulting in injury to another is wrongful by some measure beyond the fact of interference itself." *Id.*

Defendant's liability may arise from improper motives or from the use of improper means. *Id.* By improperly barring Ms. Porter, by failing to follow the notice provisions in the contract with CMS, and then by making disparaging remarks about her, clearly under *United Truck* there is at least an issue of fact as to whether Defendant Cabral's actions were "improper" in both conduct and means.

The burden is on Ms. Cabral to plead and prove justification for her conduct. *See Ross v. Wright*, 286 Mass. 269, 271-72 (1934); *Steranko v. Inforex, Inc.*, 5 Mass. App. Ct. 253, 273

---

[23] *United Truck* changed the law, which previously required "malicious" interference. *See, e.g., Lemire v. Silva,* 104 F. Supp. 2d 80, 95 (D. Mass. 2000) ("Malicious interference is not required in a claim for interference with an advantageous relationship; improper interference is sufficient."); *James L. Miniter Ins. Agency, Inc. v. Ohio Indem. Co.,* 112 F.3d 1240, 1250 (1st Cir. 1997) ("The Supreme Judicial Court of Massachusetts has indicated that the third element requires merely an improper interference, and not a malicious one.").

(1977). Defendant Cabral has not met this burden. She made no effort to justify the faulty

procedure (no notice) and there is a factual dispute about her motives. As described above, Ms.

Cabral's current reasons for barring Mrs. Porter as post-hoc rationalizations entitled to little

weight. And she has no explanation whatsoever for the defamatory comments. Construing the

evidence in the light most favorable to Mrs. Porter, there is at least a genuine issue of material

fact whether Ms. Cabral tortiously interfered with Mrs. Porter's advantageous relations. Thus,

summary judgment should not be granted.

## CONCLUSION

For the foregoing reasons, Mrs. Porter requests that the Court deny the Suffolk

Defendants' Motion for Summary Judgment in its entirety.

Respectfully submitted,

SHEILA PORTER

By her attorneys,

*/s/ Joseph F. Savage, Jr.*
Joseph F. Savage Jr. (BBO # 443030)
David S. Schumacher (BBO # 647917)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA  02109
(617) 570-1000

Dated: November 14, 2005
LIBA/1647483.1