# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SHEILA J. PORTER

           Plaintiff,

    v.

ANDREA CABRAL, SUFFOLK COUNTY
SHERIFF'S DEPARTMENT, SUFFOLK
COUNTY and CORRECTIONAL MEDICAL
SERVICES, INC.

           Defendants.

Civil Action No. 04-11935-DPW

## DECLARATION OF SHEILA PORTER

I, Sheila Porter, hereby declare and state under the pains and penalties of perjury that the following is true and correct:

1.      My name is Sheila Porter. I make this Declaration of my own personal knowledge.

2.      I have been a nurse and/or nurse practitioner for the last 36 years. I have been an instructor and guest lecturer at the Framingham State College School of Nursing in the RN to BSN program for six years. I am on an Advisory Committee for a local vocational school and I serve as a guest lecturer in the school's Health Services Program there. I have recently presented a program on nurse practitioner training at a national correction health conference for the University of Massachusetts as well as at correctional facilities staffed by UMass Correctional Health.

3.      I worked as a nurse practitioner in the Suffolk County House of Corrections ("HOC") for nine years. From 2001-2003 I was employed by Correctional Medical Services,

Inc. ("CMS"). I received high marks on my performance evaluations from CMS, resulting in full

merit salary increases each year. I also received commendations from the SCSD for my work

while I was there. I believe that I was very highly regarded as a nurse practitioner at the HOC.

A number of corrections officers sought me out personally with medical issues. Prior to working

for CMS I worked at the HOC for Correctional Health Services, Inc. ("CHS"). When CMS won

the HOC contract, I expected to remain at the HOC and was in fact retained as a nurse

practitioner at the HOC.

      4.     In 1999 I was approached by the FBI and asked to provide them with information

concerning possible civil rights violations at the HOC. Between 1999 and June 2003 I provided

information to the FBI periodically on these topics.

      5.     In November 2002 I assisted the FBI in an investigation at the HOC. I placed a

recording device on and later removed it from an inmate, Rene Rosario.

      6.     I believe that it was known among various people within the Suffolk County

Sheriff's Department ("SCSD") that I had an ongoing relationship with the FBI and that Mr.

Rosario and I cooperated with the FBI during the November 2002 incident.

      7.     On May 19, 2003, I was walking to the ladies room in the medical unit at the

HOC when I observed Mr. Rosario in a cell in the infirmary. Mr. Rosario called me over to his

cell and told me that he had been abused by a corrections officer on the previous evening. Mr.

Rosario pulled his "johnny" off his shoulder and showed me his injuries. I observed bruises to

his upper arm and chest through the cell window. Mr. Rosario told me that he had told

corrections officers that he was "hearing voices" telling him to commit suicide in order to be

transferred to the infirmary, where he did not believe he would be harmed. Mr. Rosario asked

me to communicate that he had been abused to FBI Agent Christa Snyder, who he had worked

with previously and who was one of my primary contacts at the FBI. Mr. Rosario was scared that he would be harmed again by corrections officers because of his history with the FBI. He had asked to be transferred out of the HOC.

8.    I did not conduct a medical examination of Mr. Rosario. At no time did Mr. Rosario tell me that he was in pain or that he wished to have medical treatment; rather, he only sought me out to inform me what happened and to have me pass this information on to Agent Snyder. In addition, because of my previous interactions with Mr. Rosario and my belief that people in the SCSD were aware that we had cooperated with the FBI, I did not believe that I should be involved in administering medical treatment to Mr. Rosario. Finally, I knew that PA Beth Bringola was on duty and was available to examine Mr. Rosario.

9.    Based on my 36 years of experience as a nurse practitioner, I do not believe that my interaction with Mr. Rosario constituted a medical encounter that needed to be included in his medical chart. I did not conduct a hands-on physical examination of Mr. Rosario.

10.    I immediately reported my encounter to Gayle Bartley, a mental health professional in the medical unit. I told Ms. Bartley that, while Mr. Rosario would claim that he was hearing voices to attempt suicide, she should ask Mr. Rosario about other issues going on related to his cooperation with law enforcement against corrections officers.

11.    I next reported this encounter to my supervisor, Donna Jurdak. In addition, I told Ms. Jurdak that I did not believe that Mr. Rosario should have been transferred back to the HOC, where he previously cooperated with the FBI on a well-publicized investigation and trial of inmate abuse.

12.    I had concerns about whether SID would conduct a thorough investigation of Mr. Rosario's allegations because of Mr. Rosario's history as an informant. I believed that, at best,

3

their investigation would be cursory and determine that there was nothing to Mr. Rosario's allegations. For these reasons, I believed that a top-level official at the SCSD should immediately be made aware of Mr. Rosario's allegations. Despite my concerns, I intended to write a report detailing my encounter with Mr. Rosario for SID to review.

13.    Ms. Jurdak agreed with me and decided to and did contact Deputy Superintendent Mary Ellen Mastrorilli, who had jurisdiction over the medical unit. Ms. Jurdak told me later that day that she had reported my encounter to Ms. Mastrorilli and that Ms. Mastrorilli requested a report from me. I completed the report that afternoon. I wrote the report on an in Interdisciplinary Progress Notes form. I had filed reports with the Sheriff's Investigative Division ("SID") on Progress Notes on numerous occasions previously, and I had never been told that I should not report incidents on these forms. A copy of my May 19, 2003 Report is attached as Exhibit A. Copies of other reports I have submitted to SID on interdisciplinary progress notes forms are attached as Exhibit B.

14.    Ms. Jurdak had left the HOC by the time I finished my report. Because the report contained the sensitive matters described above, I did not want to leave the report on Ms. Jurdak's desk. I took the report home. I believe that I provided the report to Ms. Jurdak within a couple of days but no later than by the end of the week.

15.    On May 19, 2003, I attempted to contact Agent Snyder concerning Mr. Rosario's allegations. I was not able to reach her. I spoke with Agent Snyder on May 20, 2003 about his allegations. I told Agent Snyder that I did not believe that Mr. Rosario should be at the HOC.

16.    On May 22, 2003, I observed SID investigators in the medical unit interviewing medical staff. I approached these investigators and informed them that I had information concerning Mr. Rosario's allegations. I told them everything about my encounter with Mr.

Rosario on May 19, 2003. The investigators asked me if I had filed a report. I told them that I

had prepared a report but had inadvertently left it on top of my computer at home, but that it

would be provided to Ms. Mastrorilli as soon as possible. I was not asked to file a report with

SID. My May 19, 2003 report contained substantially the same information that I told the SID

investigators on May 22nd. I did not tell the SID investigators at this time that I had contacted the

FBI.

17.    On May 28, 2003, I was contacted by SID investigators Dacey and Aleman and

asked to report to SID for another interview. I was placed in a small room for this interview.

During the first five minutes of the interview I was asked about what Mr. Rosario had told me on

May 19, 2003. For the remaining portion of the interview—between 10 to 25 minutes—I was

asked about my communications with the FBI. During this portion of the interview, the tenor of

the interview changed considerably. Mr. Dacey's tone was much more harsh and accusatory.

He leaned forward while asking these questions. I felt extremely uncomfortable and threatened

during this interview. Mr. Dacey asked me "When did you 1st speak to Christa?" even though I

had never told them that I had contacted Agent Snyder. He stated that he wanted to determine

when I first spoke to Christa. Even though I felt like I was being tricked into admitting

something, and even though I was concerned about violating my promises of confidentiality to

the FBI, I told the investigators the truth about my communications with Agent Snyder. I believe

that the sole purpose of this interview was solely to find out if I had contacted the FBI about the

Rosario allegations.

18.    On May 29, 2003, I again encountered Mr. Rosario. He again told me that he had

been abused and threatened by corrections officers. He again showed me his injuries. I wrote a

report about this encounter on an Interdisciplinary Progress Notes form and provided this report

to SID. My reporting of the May 29, 2003 incident was substantially the same as my reporting of the May 19, 2003 incident. A copy of my May 29, 2003 Report is attached as Exhibit C.

19.    On June 10, 2003, I was summonsed to Ms. Jurdak's office for a meeting with Ms. Jurdak and Ms. Mastrorilli. During this meeting, Ms. Mastrorilli read from a portion of Policy S-220 regarding the disclosure of confidential communications. I was told that I was barred from the HOC, effective immediately, for disclosing confidential communications to an outside agency—the FBI. I packed my belongings and left the HOC. At no time did I receive a hearing of any kind for my supposed violations of Policy S-220.

20.    On June 11, 2003, I called Ms. Jurdak to request my personnel file. I drove to the HOC and Ms. Jurdak met me outside, at which time she provided me with my personnel file. At no time did I re-enter the HOC. My performance evaluations were missing from my personnel file.

21.    I understand now that I was terminated by CMS immediately after I was barred from the HOC. However, at the time, while I knew that I could not work in the HOC, nobody told me that I was terminated altogether from CMS. I never received "progressive discipline" from CMS. I did not know that I had been terminated until I received materials from the administrator of my 401(k) plan concerning the closing of that account.

22.    I do not believe that CMS made any serious attempts to inquire about or resolve my situation with the HOC. Moreover, I do not believe that CMS made a real effort to offer me another position in the company, even though I was regarded as an excellent nurse practitioner. I would have considered a per diem position or a position in another state, but I was never asked. I later received security clearance from other correctional facilities and do not believe that I was a security risk in any way.

6

23.    The SCSD has the ability to impose discipline on contract workers short of barring them. For instance, SCSD officials can direct CMS supervisors to speak with contract workers about misconduct and provide them with warnings. In addition, the SCSD can temporarily bar contract workers pending further investigation. I personally witnessed these forms of discipline while I was at the HOC.

24.    The SCSD did have input on the medical care that could be provided to an inmate. For example, we were sometimes told not to use certain bandages if it was believed that the inmate was a suicide risk. As another example, if there was a security concern with the inmate, we would be instructed not to treat the inmate with certain ointments or petroleum or Ben Gay, all of which could be used to harass correctional officers.

25.    The SCSD also controlled our work schedule. There were only certain hours in the day that we could treat inmates. Each morning upon arrival at the HOC, I would review the patient list and charts of inmates that I would see that day. I worked according to hours set forth by the HOC regarding sick call and physical examinations. I was assigned to treat female inmates. The SCSD insisted that female inmates be seen on a separate floor instead of in the standard medical unit. The SCSD also determined which days and times I could go to that separate floor, and the SCSD provided an officer to staff the clinic on the women's floor.

26.    While I was formally evaluated by CMS supervisors, my performance was informally monitored and evaluated by SCSD officials, such as Deputy Superintendent Mastrorilli and Superintendent Horgan. I received commendations for my performance from the SCSD on more than one occasion.

27.    My personnel file was maintained at the HOC.

7

28.    The SCSD conducted training programs for medical staff on issues besides security. For instance, there were occasional programs regarding diseases such as tuberculosis or AIDS. In addition, Department of Public Health Officials were occasionally brought in to put on seminars and programs.

29.    I believe that the inmates considered me to be an employee of the HOC. Certainly I don't recall any inmate ever saying anything to me about my status as an independent contractor.

30.    While I understand that I never signed a contract of employment with CMS, I believed that I had a contractual relationship with the company. I was required to review the entire Employee Success Guide and sign a form acknowledging that I had done so, both when I started and each year that it was updated. A copy of my acknowledgement form is attached as Exhibit D. The Success Guide was discussed at length during my initial orientation with CMS. I believed that the employee handbook set forth the terms and conditions of my employment with CMS.

31.    By claiming that I was biased and had an agenda, I believe that Sheriff Cabral and the SCSD were implying that I was racially biased. While the words "bias" and "agenda," standing alone, may have different meanings, when used together, I believe they are meant to convey that I was a racist.

32.    There is no question in my mind that there was a Code of Silence at the HOC in June 2003 that discourages individuals from speaking out about the misconduct of staff or otherwise being critical of the SCSD. The Code of Silence takes the form of both staff-on-staff retaliation and management-staff retaliation. I personally saw retaliation against people who spoke out about abuses or problems at the SCSD, including Deyanira Feliz and Bruce Baron. On

at least one occasion I was personally retaliated against when, after testifying in a criminal trial against a SCSD employee, extensive damage was inflicted on my car while it was parked at the HOC. Numerous portions of the car were smashed with a tire iron, which was found at the scene. $2000 damage was inflicted on my car.

33.    I believe that my barring from the HOC was in retaliation for reporting inmate abuse to the FBI. I saw no evidence that the Code of Silence went away after Sheriff Cabral came into office; if anything, there was increased retaliation against anyone who spoke out against the Sheriff or her administration.

I declare under the pains and penalties of perjury that the foregoing is true and correct. Executed on November 11, 2005.


                         /s/ Sheila Porter
                         Sheila Porter

# EXHIBIT A

CORRECTIONAL MEDICAL SERVICES

INTERDISCIPLINARY PROGRESS NOTES

Patient Name _____ **REDACTED** _ I.D. **REDACTED**    Institution _____

| DATE | TIME | NOTES | SIGNATU |
|------|------|-------|---------|
| 5/19/03 | | On May 19th just before noon, the CO @ the front desk in the health unit reported that inmate **REDACTED** was coming down on MOA because he was hearing voices and he was threatening to harm himself. Shortly after, inmate **REDACTED** was indeed brought to the MHU and placed on MOA. This nurse was reported to Mental Health. On my return from level 1 I was called by T.L. **REDACTED** 's cell and he spoke to me — Mr **REDACTED** is known to me from previous incarceration. He was dressed in the blue quilted "MOA" gown. He pointed to bruises and abrasions on his left upper arm and chest. He stated "look what the CO did. I was ~~scaned~~ ERROR scared. I waited until he went to level 1 and told the other CO I was hearing voices and was going to kill myself." The bruised and abraided areas were approximately 10cm on his chest and 10-15 cm on his (L) upper arm. He reported these conversations to mr HSA and | SP 199 |

CORRECTIONAL MEDICAL SERVICES

INTERDISCIPLINARY PROGRESS NOTES

REDACTED          REDACTED

Patient Name _____  I.D. # _____  Institution _____

| DATE | TIME | NOTES | SIGNATURE |
|------|------|-------|-----------|
| | | wrote this report. | |
| | | Mr. REDACTED did not know the name of the CO that he claimed had injured him. He did not explain anything else about the incident at that time as he didn't want to call attention to himself at that time. I witnessed the bruises and observed through the door. The bruising appeared consistent with a recent injury — that is fresh bruising within the past few hours. I reported to the mental health person that Mr. REDACTED may have different issues than previously expressed. | |
| | | Sheila Ervin RNC ??? | |

SP 200

# EXHIBIT B

IRECTIONAL MEDICAL SERVICES

## INTERDISCIPLINARY PROGRESS NOTES

**REDACTED**    **REDACTED**

ent
ne    I.D. # [REDACTED]    Institution SCHOC

**REDACTED**

| TE | TIME | NOTES | SIGNATURE |
|----|------|-------|-----------|
| 4/6/01 | | S. "won down" c/o chest pain states c/p struck him in (L) chest this AM (approx 10⁵⁰ or 10⁴⁵) states two CD's in room. Threw clothing + property on floor, and both walked into toilet. States he feels "pressure/pain in the stomach/chest" and left the cell O₂ SP 140/86 P80 very tender to (L) ant chest, neg works or lesions noted. Chest clear all fields to auscultation. Cardiac A&R very gallops or murmurs. A: Chest wall pain P: Motrin 600 mg per bid p.r.n. X 14 days ___ Nurse Peter RN | |

CORRECTIONAL MEDICAL SERVICE

### INTERDISCIPLINARY PROGRESS NOTES
### REDACTED

| | | | | |
|---|---|---|---|---|
| Patient Name | REDACTED | I.D. # | Institution | SEHOC |

REDACTED

| DATE | TIME | NOTES | SIGNATURE |
|---|---|---|---|
| 7/30/01 | | _(handwritten clinical note, largely illegible)_ ... has been coming to the infirmary for his meds @ work and is still wearing a soft collar, ordered for several days only. He was consulted @ the time of the order (7/11) to wear the collar only during the day and to wean it occasionally (stopping in 2 days) ... Inmate consulted again to stop continuous use of the collar while he was in the MHU (7/20 - 7/25). This NP spoke c the med director to consult about the collar. He stated that the collar should be retrieved as long as there was no observed ... seen by Dr. + by NP 7/30 - both determined collar not necessary. Inmate was asked to return the collar today 7/30. He refused. He had an "interpreter" ... inmate ... Creole French ... inmate speaks + understands English. The collar was ... voluntarily given ... SEH Com ... REDACTED ... written to unit 141- The report following use of force is in the ... | _(signature illegible)_ NP |

FORM #7113 8/94

CORRECTIONAL MEDICAL SERVICE

INTERDISCIPLINARY PROGRESS NOTES

| Patient Name | ✓ REDACTED | I.D. # | | Institution |
|---|---|---|---|---|

| DATE | TIME | NOTES | SIGNATURE |
|---|---|---|---|
| 7/24/01 | cont | The inmate has repeatedly told medical (provider) and correction staff that he was injured by CO# REDACTED and "the second officer (identified as CO#). He insists the injuries were on 4/23/01 but cannot explain that he has been to another facility, and has also reported an assault by 4 inmates between the time of the alleged injury, and the current complaint of neck pain, a time lapse of 100 days. REDACTED In summary inmate X has had multiple episodes of subjective complaints. He has accused particular officers of inflicting injury in April that had not (whatsoever) until July. He has been committed to a psychiatric facility during this time and on extensive report reveals no complaints of neck pain. He has been examined by 3 nurse practitioners and two doctors, none of whom were able to substantiate his complaint of neck pain with objective findings. End of report | Sheila R... Lee NP |

CORRECTIONAL MEDICAL SERVI(

### INTERDISCIPLINARY PROGRESS NOTES

| Patient Name | **REDACTED** | I.D. # _____ | Institution _____ |

| DATE | TIME | NOTES | SIGNATURE |
|------|------|-------|-----------|

and forward. He stated that his
nose was broken, that he didn't
"want money or a law suit, but
who will take care of my 12 children
if these injuries prevent me from
working"? He was told he did not
have a broken nose. He then pointed
to his forehead and said "see these
marks". That is where the CO's
banged my head, I need an
MRI above severe injuries. When
questioned he again stated he was
injured on 4/30/01. This NP became concerned
about this mental status, since his
physical exam was benign except
for mild tenderness in the SCM area
bilat. His neuro exam was grossly
normal but the patient was not
cooperative. He was admitted to the
MHU when he was examined by Dr.
Tingley and cleared, and was discharged
by mental health clearance. His
complaints have become increasingly
bizarre including "my face extensively
bled and its swollen." I will continue
to wean the soft collar but has a benign exam

FORM #7115 8/94

SP 129

CORRECTIONAL MEDICAL SERVIC[ES]

**INTERDISCIPLINARY PROGRESS NOTES**

| Patient Name | REDACTED | I.D. # | Institution |
|---|---|---|---|

| DATE | TIME | NOTES | SIGNATURE |
|---|---|---|---|
| 7/4/01 | | cont. There were no visible signs of injury + no marks, bruises noted. Vital signs were all within normal limits and no treatment was deemed necessary at this time. Shortly after that day, REDACTED again, went to BSH 5/25 on a civil commitment and remained through 7/3/01. @ which time he returned to SLHOC and was placed on MOA status in the MHU. Note on MH note with note by Dr. Mughy on 7/5/01 concerning his HACo. Exam Cx/eval. On 7/8, [patient] appeared concerning neck pain which he stated was from "the injury on 6/23/01" The inmate was seen by Dr. Smith who noted "good range of motion with no neck injury. On 7/11/01 [patient] seen by the NP complaining that CO's "squeezed and broke his neck". He had mild tenderness upper shoulder + neck without spasm. He was given Naproxen and a soft collar to encourage relaxing the muscles. An X-ray done 7/13 was neg for fracture or deformity. He was seen again by the NP on 7/20/01. He appeared wearing the collar, held his head back | |

footer: SP 130

CORRECTIONAL MEDICAL SERVI~

## INTERDISCIPLINARY PROGRESS NOTES

Patient Name: REDACTED REDACTED    I.D. #: _____    Institution: SCHOC

| DATE | TIME | NOTES | SIGNATURE |
|------|------|-------|-----------|
| 7/24/01 | | Inmate REDACTED admitted to this institution 3/9/01, had been complaining of neck pain since 7/6/01 2° to injuries he claims were sustained in a forced move on 4/30/01. At that time, REDACTED was housed in the Med Housing Unit following his return from Bridgewater State Hospital on 4/19/01 (admitted to BSH 3/23/01). REDACTED was being disruptive in the clinic area and was moved to the MHU. He was subsequently seen by Jean Jene LPN + the Med Ob following use of force sheet documents "No complaints, no marks, no bruises noted No treatment required." REDACTED was discharged from the infirmary on the 23rd. He voiced no further complaints of injury at that time. Several notes by MH clinicians report complaints of headaches, but in conversation with psych problem. He voiced no complaint of injury to the clinicians. On 5/7/01 the REDACTED was seen by this practitioner for a report of assault by 4 other inmates in which. He claimed to have been "grabbed and punched in the face, arms, chest, and kidney area." | |

CHS 058



## Correctional Healthcare Solutions, Inc.

### PROGRESS NOTES

| DATE | TIME | PROGRESS NOTE (SOAP Format) |
|------|------|------------------------------|
| 11/8/00 | 4PM | (after returning from seeing inmate in 131, wrist sgt called to ask if there were a med reason not to place inmate in restraint chair. I replied that there was no med reason not to place him in the chair. Shortly after, inmate brought to wait in straps, screaming obscenities, and stating "see what they do to you?" "Don't get you medical attention. See what they do?" Inmate had blood @ corner of mouth, but not reformed by this NP @ this time. @ 4PM when passing through MHU, inmate saw me & pointed to his face. He had small lac inside lower lip c contusion pale...cont'd (L) cheek (L) neck (L) upper arms. Contusions upper arm. Swollen (R) hand C F K & TM - abrasions wrists and consistent c cuff line. Chipped (R) front tooth? may have been chipped prior to today. ___ Statile Peter KNP |

NAME: ~~REDACTED~~ ___ ID#: _____ LOCATION: 8CTOC

SP 139

# EXHIBIT C

CORRECTIONAL MEDICAL SERVICES

INTERDISCIPLINARY PROGRESS NOTES

| Patient Name | REDACTED | I.D. # REDACTED | Institution |
| --- | --- | --- | --- |

| DATE | TIME | NOTES | SIGNATURE |
| --- | --- | --- | --- |
| 5/29/63 | | On 5/29/63, notified that inmate R. had been brought to MHU following an alleged incident with a CO. Inmate R. REDACTED to have been injured by a CO. When I was walking by the cell REDACTED told me he was brought down during the night. He stated that a CO had put his heel on the inmate's forehead, and held him down. When other CO came into the room the CO put his foot down on floor, so the incident was not witnessed. REDACTED pointed to his forehead where a 2cm x 2cm bruised, abraided area was observed. Slight swelling noted, no drainage. Observation through door — did not enter the cell. REDACTED voiced no complaints of dizziness & denies change in vision. | Sheila Potter RN GW |

SP 190

# EXHIBIT D

# ACKNOWLEDGMENT

I hereby acknowledge receipt of the **January 2002**, CMS *Employee Success Guide.* I agree to familiarize myself with the Guide's contents. I realize that the Guide contains Company policies and procedures, but is not intended to be a complete and exhaustive explanation of those policies and procedures. I also understand that CMS reserves the right to change its policies and procedures as it decides necessary. I understand that this Guide does not constitute a contract of employment. I understand that I have the right to resign from employment at CMS any time and for any reason, and that CMS has the same right to terminate my employment at any time, with or without cause.

I also understand that should I leave the employ of CMS, any Paid Time-Off taken but not earned will be deducted from my final paycheck, where applicable and appropriate, according to the published schedule herein.

I agree to return this Guide upon completion of my employment.

*Date:* 5/30/02

*Your Signature:* Sheila J. Porter

*Your Printed Name:* Sheila J. Porter

*Facility:* SCHOC

✎ PLEASE <u>RETURN THIS PAGE</u> TO YOUR SITE MANAGER



# EXHIBIT 2

Volume:    1
Pages:     1 - 225
Exhibits:  See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 04-11935-DPW

SHEILA PORTER,                          )
                         Plaintiff,     )
           v.                           )
                                        )
ANDREA CABRAL, SUFFOLK COUNTY SHERIFF'S )
DEPARTMENT, SUFFOLK COUNTY, and         )
CORRECTIONAL MEDICAL SERVICES, INC.,  INC., )
                         Defendants.    )

DEPOSITION OF **DONNA L. JURDAK**, a Witness

called on behalf of the Defendants, taken

pursuant to the applicable provisions of the

Massachusetts Rules of Civil Procedure, before

Maureen Nashawaty, a Notary Public within and for

the Commonwealth of Massachusetts, held at the

Suffolk County Sheriff's Department, 200 Nashua

Street, Boston, MA, on Monday, June 20, 2005,

commencing at 10:50 a.m.

*COPLEY COURT REPORTING, Inc.*
101 Tremont Street
Boston, Massachusetts  02108
(617) 423-5841

**DISK ENCLOSED**

24

1    period of time that we have been discussing?

2         A.    Yes.

3         Q.    Who did you report to, Mrs. Jurdak,

4    organizationally within Correctional Services?

5         A.    Ann Mack.

6         Q.    What was her title during this period?

7         A.    Regional Administrator.

8         Q.    Who is Nancy Lawrence?

9         A.    At one point I was answering to Nancy

10   Lawrence.  She was also a Regional Administrator

11   and she had moved -- her area became Vermont.  So

12   I no longer reported to her.  I reported to Ann

13   Mack.

14        Q.    What was the next level in the

15   organizational change at CMS who would Nancy

16   Lawrence report to?

17        A.    At the time I reported to Nancy

18   Lawrence, she reported to Ann Mack.

19        Q.    And I see and at some point you

20   indicated that you reported to Ann Mack directly?

21        A.    Yes.

22        Q.    When did that take place?  Was that

23   before or after Nancy Lawrence?

24        A.    After.

28

1      Q.    Do you currently work together with

2   Mrs. Porter?

3      A.    She works one day a week at MCI

4   Norfolk.  She is per diem.  If she could work

5   more, I would take her more and some weeks she

6   can't come.

7      Q.    How would you characterize your

8   relationship with Mrs. Porter?

9      A.    She is probably the best Nurse

10  Practitioner that ever worked for me as far as a

11  relationship with a staff as well as inmates.

12     Q.    I was going to ask you about her --

13     A.    And her job.

14     Q.    I was going to ask you about her

15  abilities in a moment.

16          My first question is how would you

17  characterize your relationship with her both

18  personally and professionally?

19     A.    Professionally, like I said, she is

20  probably the best nurse practitioner, like I

21  said.

22          And personally I have always like

23  Sheila.  We have traveled and done some things

24  together like that for work so...

33

1          A.    Yes.

2          Q.    What is the significance, strike that.

3                What encounters with inmates get

4    documented, Mrs. Jurdak, in your experience as an

5    R.N. in HSA?

6          A.    Sick calls, physicals exams, chronic

7    disease visits, emergency treatment, pretty much

8    that is it.

9          Q.    Where are they documented?

10         A.    In the medical record.

11         Q.    And what are interdisciplinary progress

12   notes?

13         A.    Those are the progress notes written

14   when the provider sees the patient.

15         Q.    You mentioned that certain encounters

16   that you just identified get documented?

17         A.    Yes.

18         Q.    Are the interdisciplinary progress

19   notes used for that documentation?

20         A.    Yes, as well as there was a place to

21   document on sick calls, but emergencies would be

22   documented there on the progress notes.  They

23   might have something to add that would be in the

24   progress notes.  History of physicals were done

35

1    history.

2        Q.    If you could define for me what history

3    is?

4        A.    Medical history is any encounter that

5    the inmates have with medical prior to today,

6    when they see them today.

7        Q.    You say any encounter that an inmate

8    had with medical?

9        A.    Yes.

10       Q.    Are only encounters with medical that

11   involve a hands-on physical examination, are

12   those the only kinds of encounters that get

13   documented?

14       A.    Yes.

15       Q.    What if an inmate reports to a nurse

16   practitioner that he has been physically

17   assaulted by an officer and shows the nurse

18   practitioner his injury and the nurse

19   practitioner makes observation of those injuries

20   including size, coloration, would that

21   information be expected to be documented in the

22   medical records?

23            MR. SCHUMACHER:    Objection.

24       A.    Yes, yes.

36

1        Q.    What if that information was observed

2    and obtained without doing a hands-on physical

3    examination, should that information be

4    documented in the medical records?

5        A.    Probably on an incident report if that

6    person wasn't the one doing the physical exam.

7        Q.    What if, strike that.

8              Wouldn't it be important for that

9    information to be included in a medical record

10   for the next person who either does a physical

11   examination or sees the inmates to have that

12   information?

13       A.    Not necessarily.  For example, a nurse

14   could be on a seg unit and the inmate claims that

15   he has been abused and the nurse may write an

16   incident report -- well, she is supposed to write

17   an incident report so it can be investigated but

18   she wouldn't necessarily write a nursing note.

19   If he was seen by a provider like a nurse

20   practitioner or a physician, then probably there

21   would be a note or if they were brought down to

22   the medical unit and seen by a nurse as an exam,

23   there would be a note in the record but normally

24   something that is reported would have been on an

1    incident report or many times nurses used the

2    progress note as an incident report for SID.

3        Q.    I will get there in a few moments.

4              What if an inmate was brought down to

5    the Health Services Unit claiming that he was

6    hearing voices?

7        A.    Right.

8        Q.    And when he arrives in the Health

9    Services Unit, he speaks to a nurse practitioner

10   and says I am not hearing voices I actually was

11   physically assaulted by an officer, here are my

12   injuries, the inmate communicates this

13   information to the nurse practitioner and the

14   inmate shows the nurse practitioner his bruises

15   and the nurse practitioner makes observations of

16   those injuries and the inmate has yet to be

17   examined, would it be important for that

18   information to be documented in the inmate's

19   medical records?

20            MR. SCHUMACHER:    Objection.

21       A.    When he is examined, yes.

22       Q.    I mean that information right then?

23       A.    Not necessarily, no.

24       Q.    Wouldn't it be important for the person

38

1    that does the examination to know what was

2    observed by the nurse practitioner who had seen

3    him upon his arrival in the Health Services Unit?

4            MR. SCHUMACHER:  Objection.

5        A.    If they came to the unit for the

6    purpose of being examined, then that person

7    should be writing a progress note.

8        Q.    Right, what I am suggesting to you is

9    an inmate who comes under the guise of a mental

10   health problem hearing voices not a medical

11   problem?

12       A.    Normally the mental health staff would

13   document what the MIS said.

14       Q.    But if this is the first medical

15   provider that sees the inmate upon his arrival?

16       A.    I would say they may either write a

17   note or an incident report whatever the provider

18   felt was necessary or if that person was going to

19   be the one to examine them at some future time,

20   then maybe wait and put it all in the progress

21   note then or report it verbally to whoever is

22   going to examine him, I would say an incident

23   report definitely.

24       Q.    You mentioned previously NCCHC

1   standards?

2       A.    Yes.

3       Q.    What are those?

4       A.    National Commission on Correctional

5   Health Care.  There is a group of standards that

6   you have to comply with involving medical care,

7   usually direct care, you know, it dictates what

8   type of care, how often.  For instance, physicals

9   have to be done periodically by age on intake,

10  those kinds of things.

11      Q.    Do those standards at all have any

12  impact on documentation and charting?

13      A.    There is a standard about charting but

14  it is pretty general, it doesn't really get into

15  specifics about, you know, it just says

16  encounters will be, you know, medical encounters

17  will be documented in the chart.

18      Q.    Do those standards say only medical

19  encounters that involve a physical examination

20  will be documented?

21      A.    No, no, anything, I don't think it is

22  specific like that at all.

23      Q.    Okay.  I don't know if we have covered

24  this with your testimony on training, you

44

1      Q.    What things were you required to

2   report?

3      A.    Well, to be honest, I don't think I was

4   ever told that I needed to report certain things

5   that it was required to report.  Unusual behavior

6   by an inmate or suspicion that they were under

7   the influence, those things may have been told to

8   me, sharps that were missing from the unit, I

9   would need to report, that was all part of my

10  orientation there.  As far as security, was I

11  told that I needed to report anything else, no.

12  I don't think so.

13     Q.    Well, you indicated earlier that the

14  factual scenario that I gave to you an inmate

15  reporting that they were physically abused by an

16  officer and a nurse practitioner observing

17  injuries and having an opportunity to describe

18  those injuries, that is something that you said

19  would be required to report in an incident

20  report.

21          I am asking you what the basis for your

22  understanding is why you need to do that?

23     A.    SID many times will come to the medical

24  unit after a forced move or an inmate claiming he

COPLEY COURT REPORTING

45

1    has been abused, they would come and want to see

2    the medical documentation that we had around

3    that, but if my nurses or employees, nurse

4    practitioners, physicians assistants, physicians,

5    anybody, phlebotomists had something reported to

6    them, it was really me that decided that that

7    needed to be reported.  Of course, I am sure that

8    Suffolk County wanted you to report all of those

9    things as well, but it was never told to me that

10   that was something that employees had to do, it

11   was more my feelings that there was a lot of

12   abuse going on at Suffolk County and in many of

13   my staff meetings, I would tell people that those

14   things need to be reported to SID either by you

15   or by me.  I will be glad to do it if you are

16   uncomfortable.

17        Q.    You told your staff if they had

18   information about allegations of abuse of an

19   inmate that they were required to report it to

20   SID or to you?

21        A.    Right.

22        Q.    Did you tell that to Mrs. Porter?

23        A.    I am sure she was at some of my

24   meetings.

COPLEY COURT REPORTING

47

1   County House of Correction to report allegations

2   of abuse to the Sheriff's Investigation Division?

3        A.    Yes.

4        Q.    How frequently did you do that if you

5   recall?

6        A.    Quite often actually.

7        Q.    How would you make that report,

8   verbally or in person or would you put it in

9   writing?

10       A.    It would depend for me personally, if I

11  suspected something, I would verbally report it

12  usually and be asked usually to write it in a

13  report.

14             If staff came to me and reported

15  something, I normally would ask them if they

16  wanted to go to SID or they wanted me to go or

17  they wanted us to go together.  So many times I

18  would report it for nursing staff who were

19  generally uncomfortable with reporting things of

20  that nature.

21       Q.    And why were they uncomfortable?

22       A.    I think they were afraid of the

23  officers retaliating.  They had to work with

24  them, and I am quite certain and actually some of

48

1    them have said that, they wouldn't talk about

2    officers, even though the inmate may have told

3    them exactly who it was, they would tell me but

4    they wouldn't tell the SID people directly.

5         Q.    Would you tell them directly instead

6    then?

7         A.    Oh, yes.

8         Q.    SID?

9         A.    Oh, yes.

10        Q.    So that information would be reported

11   by you just maybe not by the person who observed

12   it?

13        A.    Right.

14        Q.    What instances of retaliation in your

15   experience at the Suffolk County House of

16   Correction do you recall happening for a nurse or

17   a medical staff person who provided information?

18        A.    There were sometimes when a nurse would

19   get in the elevator and the elevator would go up

20   and down and up and down and up and down and the

21   door would never open.

22              And that elevator was controlled

23   from -- auto control -- and I can remember that

24   happening to me actually many times that I would

49

1    get in the elevator and go up to the 12th floor

2    and just sit there and the door would not open

3    and go to the first floor and not open, it is

4    kind of a scary thing actually but I knew what

5    was going on and it never bothered me personally,

6    but I know that there were nurses that it did

7    bother and also comments that were made by

8    correctional staff, that you are in their house,

9    you know, you shouldn't really interfere with

10   that.

11            They can be pretty -- in my opinion,

12   officers can be pretty intimidating to nursing

13   staff.  I wouldn't necessarily say that I was

14   intimidated by them, but I could justify and

15   understand the nurses feelings for that.

16       Q.    The instances that you just described

17   when you were in the elevator, was there ever a

18   relationship when you got in an elevator and you

19   had just reported something and you drew a

20   connection between being stuck in the elevator?

21       A.    I definitely drew connections.

22       Q.    What instances can you recall now?

23       A.    Nothing specific.  I can't tell you

24   when or who.  It wasn't important to me.  I mean

50

1    I knew that it was a game that they played and it

2    wasn't important to me.

3        Q.    Did it ever deter you from reporting

4    these matters to the Sheriff's Investigation

5    Division?

6        A.    Not at all.

7        Q.    You indicated earlier that you would go

8    down in person to SID and make your report and

9    often times you were asked for a written report?

10       A.    Most of the time the employee would be

11   asked for a written report, yes.

12       Q.    And what would form would that written

13   report take?

14       A.    Suffolk County had an incident report

15   form that was their form but we didn't always

16   have them available and so people would write on

17   a plain piece of paper like that or they would

18   write on a progress note or they would, you know,

19   some plain, whether it was lined or unlined

20   paper.

21       Q.    Would it be addressed to a particular

22   person and state what it was regarding?

23       A.    No.

24       Q.    And state whom it was from?

54

1    come after it.  Usually it wasn't something that

2    I worried about.  I -- either the employee took

3    it to them -- if they brought it to me I would

4    make sure that it got where it had to go but

5    necessarily if something was reported to me, I

6    didn't -- I went back to the employee and told

7    them they needed to write an incident report or

8    whatever happened -- I didn't necessarily follow

9    up with the employee.

10        Q.    Okay.

11        A.    If they didn't provide a report to SID,

12   SID would be up looking for it.

13        Q.    Did you have any understanding that

14   reports were supposed to be completed by the end

15   of a shift?

16        A.    I think later on I did.  I think after

17   this whole incident someone had said, you know,

18   it was supposed to be given at the end, but that

19   was nothing that they stuck to.  Even when I

20   wrote them myself, Steve Jacobs for one, many

21   times would come up and say he would be back for

22   it a day or two later and never came back for it.

23        Q.    Steve Jacobs, who was he?

24        A.    I believe he was the Director of SID at

55

1    the time.

2        Q.    What time frame was that?

3        A.    When I was there, I can't tell you

4    exactly when that happened.  But there were times

5    where I reported things to Steve.  He was

6    probably the most -- the person that I got to

7    know the best in relationship to SID and so I

8    felt most comfortable probably going to him.

9        Q.    When you said after this whole

10   incident, you became aware that there was some

11   requirement to report promptly, what do you mean

12   by that?

13       A.    The incident where Sheila was barred

14   from the facility.

15       Q.    And were you aware that that

16   requirement existed?  It just wasn't enforced

17   previously?

18       A.    I don't know if I was to be honest.  I

19   don't know if I knew that there was something in

20   writing that said it had to be provided by the

21   end of the shift.

22       Q.    Okay.

23       A.    It wasn't enforced.

24       Q.    Would it be important for, would it be

58

1    report to SID on occasions without informing you?

2         A.    I am sure.

3         Q.    And you hadn't imposed any requirement

4    on her to report to you first for you to assess

5    whether or not she should go to SID?

6         A.    No, no.

7         Q.    That was something that you felt

8    comfortable with Mrs. Porter making a

9    determination?

10        A.    Any employee.

11        Q.    Do you know whether or not Mrs. Porter

12   was comfortable reporting allegations of abuse to

13   SID?

14              MR. SCHUMACHER:  Objection.

15        A.    I wouldn't know that.

16        Q.    Did she ever express to you that she

17   felt uncomfortable in reporting to the Sheriff's

18   Investigation Division?

19        A.    I don't think so.

20        Q.    Did she ever express to you that she

21   felt she had a lack of trust in the Sheriff's

22   Investigation Division?

23        A.    Sheila personally -- I can't say she

24   ever personally said that.  I think there were a

59

1    lot of us who felt that way at times.

2        Q.    I am asking specifically in this

3    instance about Mrs. Porter?

4        A.    I can't say that she ever said that.

5        Q.    Previously you indicated that you never

6    felt deterred from reporting to SID by conduct of

7    officers.

8             To your knowledge did Mrs. Porter ever

9    feel deterred from reporting to SID?

10            MR. SCHUMACHER:  Objection.

11       A.    No, I don't think so.

12       Q.    Did she ever report to you any

13   instances in which she felt that she had been

14   retaliated against?

15       A.    Oh, yes, there was one.

16       Q.    What was that?

17       A.    I forgot about that until you said it.

18   Her car got damaged.

19       Q.    When was that?  Do you recall?

20       A.    I don't recall the date.

21       Q.    What do you recall about it?

22       A.    Honestly, I am not positive about the

23   instance.  I can say that I think it was the time

24   that an officer, a female officer was abused by

60

1    another officer and Sheila reported that and saw

2    that they had been hit, abused and medically saw

3    her for her medical.  I am not positive that that

4    was the instance but I think it was.

5         Q.    Well, what information do you recall

6    about Mrs. Porter's car allegedly being damaged?

7    Can you tell me about that please?

8         A.    When I left work, I many times would

9    drive right past where Sheila used to park, and

10   she stopped me and showed me her car.

11        Q.    And what did she show you?

12        A.    Oh, it was bashed in, dents all over

13   it, the light broke I think.  I don't remember

14   specifics, you know, exactly what was wrong with

15   the car now but I think it was a crow bar or some

16   kind of a metal thing on the ground too right

17   next to the car.

18        Q.    What did she say to you about it?

19        A.    I don't remember.

20        Q.    How did you come to conclude that it

21   was -- that the car was damaged for retaliation

22   for something that Mrs. Porter had done in terms

23   of reporting an incident reporting an officer?

24        A.    We may have had conversation about

66

1    copy what he needed.

2        Q.    Would SID just be allowed to go into

3    the records room and get files themselves?

4        A.    No, no one was allowed to do that but

5    did it happen, absolutely, it was one of my pet

6    peeves there.

7        Q.    When can you recall it happened?

8        A.    Just that it was reported to me.  I

9    never saw them myself.  I think people tended to

10   be good when I was around but it was reported to

11   me that there were officers in that room.

12       Q.    Officers or SID?

13       A.    Either or.

14       Q.    What can you tell us about those

15   instances when you said it was reported?

16       A.    Nothing specific just that they were in

17   there.  One thing that I would know specific it

18   happened a few times they are in there copying

19   things to do with their union.  The union leader

20   person would be in there copying things.

21       Q.    Using the copying machine?

22       A.    Yes.

23       Q.    Was it ever reported to you that

24   officers were obtaining, looking at inmates

70

1    inmates would be seen pursuant to the sick call

2    slips that were submitted?

3        A.    Nurses.

4        Q.    Nurses?

5        A.    They always triage it in case one wrote

6    they had chest pain -- that would be considered

7    an emergency or they had a mental health problem

8    where they felt they were at risk for suicide or

9    something of that nature, they would determine it

10   would it go to the dentist, would it go to mental

11   health, would it go to the nurse practitioners,

12   would it go to the doctor.

13       Q.    And what input would the Suffolk County

14   Sheriff's Department have in that process of

15   triaging the sick slips?

16       A.    They wouldn't.

17       Q.    Were there specific times within the

18   day when an inmate could be seen for medical

19   care?

20       A.    Yes.

21       Q.    And what were those?

22       A.    Normally in the morning from like 8:00

23   to 11:00 and there would be a count and a lock

24   down time and then usually in the afternoon from

71

1    like 1:00 to 2:30.  I am pushing it because we

2    used to fight about that too.  That was one of my

3    big fights with security is that the access was

4    limited so we would get as much as we could out

5    of it but usually 2:30.

6         Q.    To, I'm sorry?

7         A.    No, until -- 1:00 to 2:30.

8         Q.    And in the morning it would be?

9         A.    Like 8:00 to 11:00, 11:30, somewhere in

10   that area.

11        Q.    And you indicated the fight you would

12   have with security.

13        A.    Yes.

14        Q.    Were there any restrictions or

15   limitations placed upon CMS medical staff's

16   ability to treat inmates by the Sheriff's

17   Department?

18        A.    Oh, yes, in that sense.

19        Q.    What was that?

20        A.    Well, just because they wouldn't call

21   anyone over if it was close to count time.

22        Q.    Was count time something that they

23   needed to account for all of the inmates who are

24   incarcerated on a particular unit?

1   inmate's allegations, what was her demeanor like

2   in this instance?

3       A.    I know she was concerned when he came

4   back to Suffolk County but she was concerned when

5   any inmate was abused so it wasn't, it may be

6   that I just knew that he was brought back in and

7   maybe she was concerned more about that situation

8   that he shouldn't have been there, but I can't

9   say that she wasn't concerned about anybody that

10  she had reported being abused that they -- that

11  it may happen again for reporting it to a medical

12  person.

13      Q.    Did you detect from her when she

14  reported these allegations that she was overly

15  concerned that this was of an emergency nature,

16  something that was critical?

17      A.    Did she tell me that -- is that what

18  you said?

19      Q.    Yes, yes, yes.

20      A.    I don't think so.

21      Q.    Okay.

22      A.    I felt the urgency because I know I

23  paged the Deputy that someone knew of her

24  feelings and I couldn't reach anyone at the

93

1    facility.

2        Q.    What do you mean you sensed her

3    urgency?

4        A.    I just sensed that I needed to tell

5    someone right away.

6        Q.    What did Mrs. Porter tell you that made

7    you feel like this was urgent and that you needed

8    to tell someone right away?

9        A.    That he shouldn't have been at the

10    facility, that he was at risk for being harmed.

11        Q.    Other than he shouldn't be at the

12    facility and was at risk for being harmed, what

13    specifically did she tell you about allegations

14    that he was making concerning physical abuse?

15        A.    I don't recall.

16        Q.    Do you recall her telling you at all

17    that she had observed injuries on this inmate and

18    that he was alleging that he had been physically

19    assaulted by an officer?

20        A.    There were two different instances and

21    I can't be clear about which one and which

22    time -- if it was all in one.  You know, I can't

23    tell you.  I can't remember.

24        Q.    When you say there were two different

94

1   incidents, did both of them involve allegations

2   of physical abuse, do you remember?

3       A.    I am not sure.  I am not sure if one of

4   them was that she feared for it or that both of

5   them involved him complaining about being abused.

6       Q.    Do you have a recollection of where

7   this conversation took place the first time when

8   you were advised by Mrs. Porter?

9       A.    I think it was in my office.

10      Q.    When Mrs. Porter advised you that Rene

11  Rosario was back in the institution and she had

12  concerns for his safety, do you recall where that

13  conversation took place?

14      A.    In my office.

15      Q.    At the Health Services Unit at the

16  House of Correction?

17      A.    Yes.

18      Q.    Do you recall what time of day it was?

19      A.    No.

20      Q.    Do you recall specifically what she

21  told you?

22      A.    That she was fearful that he was back

23  there and he shouldn't be there that she felt he

24  was at risk.

1    concerns about contacting SID?

2        A.    I don't remember that either.

3        Q.    Did she tell you whether or not she had

4    made any observations of injuries on Rene

5    Rosario?

6                    MR. SCHUMACHER:    Objection.

7        A.    I don't remember.

8        Q.    How did you contact the Deputy?

9        A.    I paged her.

10       Q.    We are referencing the Deputy that

11    oversaw medical in addition to other

12    responsibilities?

13       A.    Yes.

14       Q.    Who was the Deputy?   What was the name?

15       A.    Maryellen Masterelli.

16       Q.    And you paged her instead of phoning

17    her?

18       A.    I don't believe anyone was at the

19    facility.  I didn't know, her secretary told me I

20    could page her but I  -- there was no one there,

21    I couldn't reach anyone in SID which is normally

22    what I would have done not necessarily paged the

23    Deputy and I called her office to tell her and

24    she wasn't there, and so I paged her.

1    Q.    Did you actually make an effort to call

2    SID first before paging Deputy Superintendent

3    Maryellen Masterelli?

4    A.    I believe so.

5    Q.    Did you leave a message for anyone in

6    SID?

7    A.    I don't know.

8    Q.    Do you recall what information you

9    communicated to SID?

10   A.    No.

11   Q.    Did Maryellen Masterelli call you back?

12   A.    Yes.

13   Q.    Do you recall that telephone

14   conversation?

15   A.    No, I can't tell you details about the

16   conversation.  I can tell you that she asked me

17   what I normally would have done and I said I

18   would report it to SID and she asked me to do

19   that and have Sheila write a report.

20   Q.    When she said to you what would you

21   normally do, normally do about what, what

22   information?

23   A.    Reporting.

24   Q.    Let me ask the question.  What

98

1    information did you communicate to Deputy

2    Superintendent Maryellen Masterelli that caused

3    her to say to you what would you normally do?

4        A.    That he had been abused before, or

5    accused officers of abusing him before, that he

6    was back at Suffolk County and Sheila felt he was

7    at risk for being there.

8        Q.    Did Mrs. Porter tell you that she had

9    made observations of physical injuries on Rene

10   Rosario?

11               MR. SCHUMACHER:   Objection.

12       A.    I don't remember.

13       Q.    Did Mrs. Porter tell you that Rene

14   Rosario had communicated to her that he had been

15   physically assaulted while he was in a unit at

16   the House of Correction?

17       A.    I don't remember.

18       Q.    Did you report to, did Mrs. Porter tell

19   you that she had done an examination of

20   Mr. Rosario?

21       A.    I don't remember.

22       Q.    Did you inform Deputy Superintendent

23   Maryellen Masterelli that Mrs. Porter had

24   examined the inmate?

99

1          A.    I don't remember saying that.

2          Q.    Did you tell Deputy Superintendent

3     Masterelli that Mrs. Porter had noticed

4     suspicious bruising upon her examination of the

5     inmate?

6          A.    I don't remember any specific

7     conversation with Maryellen.  I know I spoke to

8     her.  I know I paged her.  I know she asked me to

9     have Sheila write a report and what I would

10    normally do when I report an inmate or suspected

11    inmate abuse but I can't remember any other part.

12    I don't remember what I told her or what she may

13    have said to me other than that.

14         Q.    You indicated that Deputy

15    Superintendent Masterelli asked you to have

16    Mrs. Porter complete a report?

17         A.    Yes.

18         Q.    Did she describe to you what report she

19    wanted?

20         A.    No.

21         Q.    Did she tell you that she wanted a

22    confidential incident report?

23         A.    I don't think so.

24         Q.    What did you take report to mean when

1    Q.    When did she provide you with a report?

2    A.    I don't remember.

3    Q.    Was it the next day?

4    A.    It may have been.  It could have been

5    two days later, three days later, I really don't

6    remember when, and I do know that there is

7    something, I don't remember either -- it was a

8    time when her mother was ill and there was a time

9    when she had a grandchild and I know she had to

10   leave the facility unexpectedly and I don't

11   remember if it was that time or not.

12   Q.    You remember those specifics?

13   A.    I remember she had to leave because she

14   was having a grandchild, I don't know if it was

15   related to that particular time.  I know there

16   was another time around that time when her mother

17   was ill too.

18   Q.    But you don't remember the specifics of

19   what Mrs. Porter told you?

20   A.    No.

21   Q.    What was your purpose in calling Deputy

22   Superintendent Masterelli?

23   A.    I couldn't reach anyone at the facility

24   and I felt an urgency to what she was telling me,

104

1      that I needed to share that information with

2      someone at Suffolk County.

3          Q.    And the urgency that you felt, you

4      can't recall specifically what she said to you

5      that led you to conclude that there was an

6      urgency?

7                  MR. SCHUMACHER:  Objection.

8          A.    Only that he was at the facility and

9      she felt he was at risk.

10         Q.    Okay.

11         A.    You know, I took all accusations or

12     reports from staff seriously enough to report

13     them, and I couldn't report this, you know, there

14     was no one there for me to report it to and I did

15     feel that this was something that needed to be

16     reported right away.

17         Q.    Was it unusual that Mrs. Porter came to

18     you as opposed to going to SID directly or going

19     to the Deputy Superintendent directly?

20                 MR. SCHUMACHER:  Objection, asked and

21     answered.

22         A.    No, she may very well if I called SID

23     and they wanted to see her gone down there and

24     spoken to them but I didn't reach anyone.

No. 1 refreshes your recollection as to the information communicated to you by Sheila Porter on May 19th, concerning Rene Rosario?

A.   No.

Q.   Is there anything in here that suggests a certain urgency or the reason why it needs to be reported immediately?

MR. SCHUMACHER:  Objection.  The document speaks for itself.

A.   I think all abuse to an inmate has an urgency to report.

Q.   Did you ever at any point bring a copy of a written document prepared by Sheila Porter to Maryellen Masterelli?

A.   I actually brought a document that Sheila had written to Maryellen's office, Maryellen wasn't there and I left it with her secretary.

Q.   When did you do that?

A.   I don't know.

Q.   Well, Sheila Porter is barred on June 10th and this document is dated May 19th.

Do you have a sense between those two dates about when you physically brought a written

133

1    initial phone call?

2        A.    No.

3        Q.    When -- do you have a specific

4    recollection of Deputy Superintendent Masterelli

5    actually arriving at the Health Services Unit

6    that day?

7        A.    She came into my office and asked me if

8    she could speak with Sheila and I, and I said I

9    would get Sheila because she was in her office or

10   at least I thought she was and I went and got

11   Sheila and we went back to my office.

12       Q.    When you went into your office, what

13   occurred?

14       A.    Maryellen read part of a policy to

15   Sheila and I in regards to sharing information or

16   confidential information with people outside of

17   the agency and told her that she had, you know,

18   violated that policy and that she would be -- she

19   would not longer be able to work at Suffolk

20   County.

21       Q.    Prior to reading from a policy, did

22   Deputy Superintendent Masterelli say anything to

23   you or Mrs. Porter?

24       A.    I don't remember in the order in which

136

1   Q. What was Mrs. Porter's reaction?

2   A. She said, okay, and got up and left.

3   Q. Did she ask any questions?

4   A. No.

5   Q. Did she say anything other than okay,

6 and got up and left?

7   A. I don't remember her saying anything.

8   Q. Did you -- what was your reaction?

9   A. Shock.  Kind of sadness that she would

10 be barred.  It was like I said, she was one of

11 the best workers that I had.

12   Q. Did you say anything to Deputy

13 Superintendent Masterelli?

14   A. I asked her what it was about.  I said

15 what the heck is going on.

16   Q. When did you ask her that?

17   A. While she was there.

18   Q. Was Mrs. Porter still in the room?

19   A. No.

20   Q. When Mrs. Porter left you stayed in the

21 room?

22   A. In my office, yes.

23   Q. In your office?

24   A. Yes.

137

1      Q.    And what was the conversation that you

2  had with Deputy Superintendent Masterelli at that

3  time?

4      A.    She said she wished she had more

5  information but that was all she had.

6      Q.    When she said she wished she had more

7  information, that was all she had, was that in

8  response to a question that you posed?

9      A.    When I asked her what was going on.

10     Q.    And other than saying she wished she

11  had more information but that was all she had,

12  did she say anything else?

13     A.    No.

14     Q.    Did you say anything else?

15     A.    Just that, you know, I didn't want to

16  lose her.

17     Q.    Have you described --

18     A.    It would be a loss to the unit, you

19  know.

20     Q.    Have you described the total of sum and

21  substance of the conversation that you had with

22  Deputy Superintendent Masterelli after

23  Mrs. Porter left the room?

24     A.    Yes, I don't remember anything else.

139

that I had to leave and that I felt bad about
that.

Q.    Did you contact anybody at CMS?

A.    After I left?

Q.    That same day, June 10th?

A.    Yes.

Q.    Who did you contact?

A.    Ann.

Q.    Ann Mack?

A.    Yes.

Q.    How did you contact her?

A.    Cell phone.  I don't know if I beeped
her or I just called her -- I think I called her
office on my cell phone.  I know I was on my cell
phone.

Q.    Did you actually have an opportunity to
speak with her that day?

A.    Yes.

Q.    What did you tell her?

A.    That Sheila had been barred from the
facility.

Q.    Did you tell her the reasons why?

A.    I told her what Maryellen had told her.

Q.    Which was?

150

1       A.    The day after she was barred, they came

2    to Suffolk County actually -- a woman came to

3    Suffolk County and wanted to speak with me.

4       Q.    Who was that woman?

5       A.    Oh, I forget her name.

6       Q.    Was her name Maureen Robinson?

7       A.    Yes.

8       Q.    And her position -- is she an FBI

9    agent?

10       A.    Yes.

11       Q.    How did you become aware that FBI Agent

12    Maureen Robinson was at the House of Correction

13    and wanted to speak to you?

14       A.    I was in a meeting with Maryellen.  I

15    don't remember what the meeting was, but there

16    was a whole roomful of people and Deputy Lockhart

17    came and called me there and she said the FBI is

18    in the lobby and they want to speak to you, and

19    my first reaction to be honest is, oh, Christ,

20    now I am going to be barred from the facility.

21       Q.    Why did you think that?

22       A.    Because that is how I felt like she

23    talked with the FBI and now she doesn't work here

24    any more.  And I was a little uncomfortable.  I

1          A.     No.

2          Q.     Are you aware of any CMS or CHS

3    employees who were disciplined in any way related

4    to reporting types of issues?

5          A.     No.

6          Q.     Did the subject of a CMS or CHS

7    employees reporting of incidents, did that ever

8    come up at all, did that ever come to your

9    attention as the administrator?

10         A.     No.

11         Q.     Okay.  Did anyone from the department

12   ever say I need to speak with you regarding the

13   way that one of your nurses or nurse

14   practitioners reported a certain incident?

15         A.     Actually there was a nurse at one time

16   who they asked about an incident, evidently she

17   had been the nurse that saw an inmate after use

18   of force and they weren't happy with her report

19   because she hadn't -- they didn't feel that she

20   told them everything that she knew.

21         Q.     Do you remember when?

22         A.     That is the only time I remember that

23   being a problem.

24         Q.     Do you remember what happened in that

177

1   Was it more than like a week later, a month

2   later, a year later?

3        A.    I think it was more like a month later.

4        Q.    After speaking with Miss Mack this one

5   time, did you have any subsequent conversations

6   with Miss Mack about what happened with Miss

7   Porter?

8        A.    No.  I think at some point I might have

9   asked her if she had anything else that Sheila

10  could do.

11       Q.    I will ask you about that in a minute,

12  for now I am asking you about the circumstances

13  surrounding why Miss Porter was barred.  Have you

14  had any other conversations with her besides the

15  initial conversation when you called Miss Mack

16  and the three-way conversation -- was Miss Mack

17  on this three-way conversation?

18       A.    Yes.

19       Q.    Any other conversations regarding what

20  happened to Miss Porter with Miss Mack?

21       A.    No, although I remember at one point

22  she said that she had spoken to Maryellen and

23  Maryellen didn't have any more information for

24  her, I mean she was trying to find out what

178

happened and she didn't.

Q.    Do you know when she told you that?

A.    No, it was probably shortly after.

Q.    After your meeting that you had with Miss Masterelli in which Miss Porter was barred, I believe you testified that you recall one additional conversation that you had with Miss Masterelli about the situation?

A.    Yes, I know I had one, at least one about it.

Q.    And do you remember when that conversation took place, the second one?

A.    I think it was awhile after, and the reason I say that is I know that the conversation was about how much Sheila was missed in the unit and that things were a little behind because she wasn't there, and I had more information about it from Sheila at that point, so I think it was awhile after it happened.

Q.    Do you know if CMS investigated the circumstances under which Miss Porter was barred?

A.    Other than Ann calling.

Q.    Ann calling Miss Masterelli?

A.    Right.

179

1      Q.  Now at some point, Miss Porter was

2  terminated from CMS, is that right?

3      A.  Their payroll system, it is, when I go

4  in and you take someone out of the payroll

5  system, the words that they used are terminated,

6  termination versus, you know, there is no barred,

7  there is no barred, so when I did that, it really

8  terminates her from payroll is what it is.

9      Q.  Take me through that -- how did it come

10  to pass that you were terminating Miss Porter

11  from payroll?

12      A.  Actually I have to do that fairly soon

13  after that happens, because she would show up on

14  payroll, I would have to request her last check

15  and all of that, so I did payroll and when I did

16  payroll I probably ERF'd her out of the system.

17      Q.  You mentioned ERF'd a couple of times,

18  do you know what that is referring to?

19      A.  That is the system that they used.  I

20  forget what it stands for now.

21      Q.  ERF?

22      A.  Yes.

23      Q.  Okay.

24      A.  But you go into the system, the payroll

180

1    systems on the computer, you go into Sheila,

2    let's say, and there is a place to do promotions

3    and resignations and that stuff but when they

4    leave the term is termination out of that system,

5    so whether they leave on their own or they are

6    fired, it is the same.

7        Q.    You have to physically type something

8    into a computer?

9        A.    Yes.

10        Q.    And the reason for that is to remove

11    them from payroll?

12        A.    Yes, and you have choices that you more

13    or less pick the choices, you don't really have a

14    place that you can write on, you can't write

15    anything that you want, you just have certain

16    choices.

17        Q.    And you recall doing that with respect

18    to Miss Porter?

19        A.    Yes.

20        Q.    Did anyone tell you to, instruct you to

21    ERF her out of the system?

22        A.    I don't remember if someone asked me to

23    do that because I have to do that for any

24    employee that leaves under any circumstances or

181

1    transfers to another site.

2             I do remember being asked to do the

3    request for termination.

4        Q.    So what is a request for termination?

5        A.    It is a different form that I don't

6    necessarily remember doing for everyone, so it

7    bothered me, and that is what the three-way

8    conversation was about.

9        Q.    You had the three-way conversation and

10   that was with you and Mr. Price and Miss Mack, is

11   that right?

12       A.    Yes.

13       Q.    And this is approximately a month

14   after?

15       A.    It was awhile after, I know that.

16   Because I did, I had already done, I had already

17   taken her out of the payroll system, and

18   Mr. Price was requesting that I do a termination,

19   a request for termination.

20       Q.    So you hadn't yet done a request for

21   termination?

22       A.    No.

23       Q.    And what is the purpose of a request

24   for termination?

182

1     A.    Normally I did it when I was

2    disciplining someone and they were being

3    terminated.

4     Q.    So in other words, you were requesting

5    -- go ahead.

6     A.    It shows like a progress, like there

7    was a place to write in that you did verbal

8    discipline, that you did written discipline, and

9    now that you were requesting termination, because

10    you couldn't just fire someone, you had to go

11    through a process where it got, you know, it went

12    to Ann Mack from there and she would have to sign

13    off on it before the person would actually be

14    terminated.  So it was a request to do a

15    termination but you couldn't do a termination

16    until they made sure, probably until they made

17    sure that all of the steps in the discipline

18    policy had been followed, you know, someone had

19    been verbally counseled and written counseled and

20    twice I think it was for CMS and then terminated

21    for the reason within a certain time frame so

22    this was kind of a strict policy on that.

23     Q.    Until you had this three-way

24    conversation, did you believe that Miss Porter

183

1    had been terminated from CMS, in other words, she

2    was fired from CMS?

3         A.    No, I believe she was barred from the

4    facility.

5         Q.    What is the distinction in your mind?

6         A.    Well, the distinction in my mind is you

7    can't come back to Suffolk to work but you can go

8    to another CMS facility if another position was

9    available.

10        Q.    Did anyone ever tell you that

11   Miss Porter had been fired from CMS, excuse me,

12   let me give you a time frame -- before your

13   three-way conversation with Mr. Price and

14   Ms. Mack, did anyone ever tell you that not only

15   was Miss Porter barred from the House of

16   Correction in Suffolk but that she was terminated

17   all together from CMS?

18             MS. HARVEY:    Objection.

19        A.    No.

20        Q.    Did Miss Mack ever instruct you to tell

21   Miss Porter that she was terminated from CMS all

22   together?

23        A.    No.

24        Q.    And this three-way conversation that

1    you have mentioned, do you remember how it came

2    about?

3         A.    I remember that they called me and it

4    was Sterling who was requesting that I fill out

5    this form -- that I didn't do this form.

6         Q.    The form is -- what is the form?

7         A.    The request, well, it had other things

8    on it, but I think if I am correct the title was

9    Request for Termination or something -- it

10   probably wasn't the name of the form but that was

11   on there.

12        Q.    And he asked you to fill out that form

13   with respect to Mrs. Porter?

14        A.    Yes.

15        Q.    Did he tell you anything else about it?

16        A.    Well, I kind of gave him a hard time

17   because I didn't feel like she was terminated.  I

18   wasn't terminating her.  I didn't want to request

19   that she was terminated because she had been

20   barred from the facility.  I knew that meant she

21   couldn't work there but I wasn't going to be the

22   one that requested her termination so I wrote on

23   the form, they insisted that I did it, so I wrote

24   on the form that she had been barred from the

189

1    House of Correction's administration barring her

2    from this facility".

3         Do you see that?

4    A.    Yes.

5    Q.    Is that what you wrote on that day do

6    you believe?

7    A.    I know that I wrote -- I mean I don't

8    know if that is what I wrote; but I wrote that

9    she was being terminated due to -- from the

10   barring from Suffolk County.

11   Q.    And on the bottom under Regional

12   Manager Approval and Human Resources Review there

13   are two lines for signatures but those aren't

14   filled out, isn't that right?

15   A.    Right.

16        MR. SCHUMACHER:  Mark that as an

17   exhibit please.

18            (Exhibit No. 3, Memo, 6/10/03, was so

19                marked.)

20   Q.    Okay.  Take a look at the document that

21   the Court Reporter is handing you.

22   A.    I didn't write that.

23   Q.    Let me ask you about this document.

24        Do you recognize this document, Exhibit

190

1    3 that has been put in front of you?

2        A.    No.

3        Q.    This is a document that is

4    substantially the same as Exhibit No. 2.  It is a

5    memorandum reportedly dated June 10th, 2003 from

6    you to Ann Mack and Sterling Price and again the

7    subject is recommendation for termination and

8    again the employee is Sheila Porter under -- in

9    the body of the memorandum, it states, "The

10   Suffolk County House of Correction administration

11   has barred Miss Porter from the facility and

12   consequently I am recommending her termination

13   for lack of access to the facility".

14            Did you write those words?

15       A.    No.

16       Q.    How do you know that?

17       A.    I just know I didn't.  I argued with

18   them.  I would have never written I am

19   recommending her termination.  I just wouldn't

20   have done it.  I was adamant about it.  If I have

21   to fill out this form, I will fill it out but I

22   am putting down what happened.

23       Q.    Do you believe what you wrote is more

24   consistent with Exhibit No. 2 than with Exhibit

198

1      A.    Usually it was a bad offense, bringing

2   in the stun gun, having relations with an inmate,

3   things that would not allow them to work at

4   another facility.

5      Q.    Do you remember any situations where a

6   CMS or CHS employee was barred from the facility

7   and then given another position within the

8   company at another facility?

9      A.    I know Maria, what is her last name,

10   she went to work at Concord but I'm not sure if

11   it was a CMS facility at the time or she was

12   barred from CHS or CMS so I can't tell you that.

13   It may have been from one company to the other.

14      Q.    So you believe that for the other

15   employees that were barred, that their offenses

16   were so serious if you will that it would prevent

17   them from working at other facilities?

18            MS. CAULO:   Objection.

19      A.    Security-wise they wouldn't have been

20   able to work in another facility.

21            If you have relations with an inmate,

22   you are not going to work at another facility.

23   They are not going to allow that.

24      Q.    What about for Miss Porter's alleged

199

1    violations?

2              MS. CAULO:   Objection.

3              MS. HARVEY:   Objection.

4    Q.    Would you believe that that --

5    A.    I don't believe it is a bad thing.

6    Q.    Why don't you believe it is a bad

7    thing?

8              MS. CAULO:   Objection.

9    A.    Why don't I?

10   Q.    Yes.

11   A.    I think that Sheila was only trying to

12   help, trying to protect the inmates and that she

13   was doing her job by reporting things like that.

14   Q.    After Miss Porter was barred from the

15   Suffolk House of Correction, did she ever

16   indicate to you that she would like to continue

17   to work for CMS at another facility if one was

18   available?

19   A.    She did ask me that.  If I knew if

20   there were any other positions open and I asked

21   Ann because I didn't know.

22   Q.    And how did Miss Mack respond?

23   A.    I think when I asked her, there was

24   nothing -- there was nothing available.

205

1    performance, you know, went above and beyond went

2    with a 3 percent increase and sometimes you could

3    request more and you didn't always get it and

4    people who had to improve or had something that

5    was lacking would get less of an increase.

6         Q.    Do you recall whether or not Sheila

7    Porter received merit increases while she was

8    working at the House of Corrections at CMS?

9         A.    I believe she did, yes.

10        Q.    Do you know where she fell in the

11   range?

12        A.    I am sure she was a 3 percent.

13        Q.    Is the performance review -- is that a

14   document that you fill out?

15        A.    Yes.

16        Q.    And what would you do with the

17   performance review once it was completed?

18        A.    We would put a copy in the record.

19        Q.    What record?

20        A.    In the employee's record.

21        Q.    The personnel file?

22        A.    Well, actually probably put the

23   original in there and we would either fax or send

24   and we sent stuff to the corporate office all of

1    required to report to anybody besides Miss Mack

2    in the CMS chain of command?

3         A.    No.

4         Q.    Were you required to report to a

5    Regional Jail Manager?

6         A.    Not the Deputy Superintendent who

7    oversaw medical.

8         Q.    Are you familiar with an individual

9    named Marilyn Morningstar?

10        A.    She probably after Nancy Lawrence was

11   the Regional Administrator.  I think she filled

12   in for a while.  But I don't -- I wasn't under

13   Marilyn Morningstar, I had probably left.  I may

14   have been at Bristol then.  I know she did that

15   at one point.  I don't think I ever reported to

16   her.

17        Q.    Was the individual that you directly

18   reported to Ann Mack?

19        A.    At one time it was, yes.

20        Q.    What was Ann Mack's position?

21        A.    Regional Administrator.

22        Q.    Was it your understanding then that the

23   chain of command was that you were to report to

24   the Regional Administrator?

215

1        A.    No.

2        Q.    Okay.  Are you familiar with the phrase

3    Code of Silence with regard to the Suffolk County

4    House of Corrections?  Have you ever heard that

5    phrase before?

6        A.    Officers?   Maybe between the officers.

7        Q.    I'm asking if you have ever heard that

8    phrase before.

9        A.    Yes, I have heard that.  I have heard

10    that but I don't know where I have heard that.

11        Q.    Okay.

12        A.    I think it is kind of "officers" say

13    it, you know, between each other.

14              If the officer says this is brown, the

15    other -- all other officers will swear to it.  It

16    doesn't matter if it is brown, red or blue -- if

17    it is brown -- it is brown.  Everyone will say

18    the same thing.

19        Q.    You were asked some questions about

20    whether CMS medical employees were reluctant to

21    come forward and report on other things they have

22    observed about other CMS employees, do you

23    remember that?

24        A.    Uh huh.

1       Q.    I'm sorry, you have to answer yes or

2  no?

3       A.    Yes.

4       Q.    Did you have any understanding while

5  you were at the Suffolk County House of

6  Corrections as to whether corrections officers

7  were reluctant to come forward and report on

8  things that they had observed with respect to

9  other corrections officers?

10      A.    I wouldn't even know that.  They could

11  have.  I wouldn't even know.

12      Q.    When what you were describing to me

13  before what you meant by Code of Silence, your

14  example if one of the guards says it is brown,

15  then it is brown -- what do you base that on?

16      A.    I have actually seen officers all sit

17  in the same room and write out reports together.

18      Q.    What do you mean by that?

19      A.    All write the same things, all compare

20  notes.  I have actually seen that happen, and I

21  don't think it happened -- I mean I don't know if

22  it happens all of the time but I have actually

23  seen it happen.

24      Q.    Was that to make sure that the

221

1    A.    I don't think so.  I think I asked Ann

2    because I wouldn't have known that.

3    Q.    Okay.  And so you then had a phone

4    conversation with Ann Mack in which you asked her

5    if there would be any other positions open in

6    Massachusetts for Miss Porter?

7    A.    Right.

8    Q.    And what did Miss Mack advise you?

9    A.    I think she said that she didn't know

10   of any.  She would look into it and if there was,

11   she would let me know but I didn't think there

12   was any at the time.

13   Q.    Did you tell Miss Porter that you

14   checked into it and there were no positions

15   available?

16   A.    I may have.

17   Q.    At some point did you become aware that

18   Miss Porter was speaking with people at CMS about

19   a position that had become available?

20   A.    I wasn't aware until she had actually

21   accepted a position there.  I don't think I knew

22   that until she said she was going to be working

23   at Essex.

24   Q.    Did you keep in touch with Miss Porter

222

1    during the summer months of July and August of

2    2003?

3         A.    I don't know if I talked to her.    I

4    mean I talked to her but I don't know if I talked

5    to her in July and August.    We would go sometimes

6    periods without talking.

7                   MS. HARVEY:    Thank you.

8                   MS. CAULO:    No.

9                   MR. SCHUMACHER:    I have a one

10   question for clarification on that.

11

12   **RECROSS EXAMINATION**

13   **BY MR. SCHUMACHER:**

14        Q.    When you approached Ann Mack about what

15   positions would be available, may be available,

16   did you ask her about positions in Massachusetts

17   or did you just ask her if there are other

18   positions available, if you recall?

19        A.    I don't think I asked for any state in

20   particular.    I think I just asked her if there

21   were positions probably assuming that I meant

22   wherever they had contracts in the area.

23        Q.    And did you, do you know if CMS had

24   contracts elsewhere in New England besides