# EXHIBIT 3

```
 1                                              VOL:  I
                                              PAGES: 1-295
 2                                            EXHIBITS: 1-15

 3

 4                UNITED STATES DISTRICT COURT

 5             FOR THE DISTRICT OF MASSACHUSETTS

 6   * * * * * * * * * * * * * * * *
     SHEILA J. PORTER,                    *
 7                      Plaintiff         *
                 -vs-                     *   Civil Action
 8   ANDREA CABRAL; SUFFOLK COUNTY        *   No. 04-11935-DPW
     SHERIFF'S DEPARTMENT; SUFFOLK        *
 9   COUNTY and CORRECTIONAL MEDICAL      *
     SERVICES, INC.,                      *
10                      Defendants        *
     * * * * * * * * * * * * * * * *

11

12

13

14        DEPOSITION OF ANN MACK, a witness
     called on behalf of the Plaintiff, in the
15   above-captioned matter, said deposition being
     taken pursuant to the Federal Rules of
16   Civil Procedure, before Patricia M.
     McLaughlin, a Certified Shorthand Reporter and
17   Notary Public in and for the Commonwealth of
     Massachusetts, at the offices of Goodwin Procter
18   LLP, Exchange Place, Boston, Massachusetts, on
     Tuesday, May 3, 2005, commencing at 10:05 a.m.

19

20

21

22        McLAUGHLIN & ASSOCIATES COURT REPORTERS
               92 DEVIR STREET, SUITE 304
23            MALDEN, MASSACHUSETTS  02148
                    781.321.8922
24              WWW.E-STENOGRAPHER.COM
```

28

1    A    Approximately five years.

2    Q    What was your position there?

3    A    Director of clinical services.

4    Q    Where did you work prior to Goldberg Medical

5         Associates?

6    A    I was in graduate school.  I was part time at

7         New England Medical Center.

8    Q    What did you get your graduate degree in?

9    A    Family and community nursing, family nurse

10        practitioner.

11   Q    What does CMS do?

12   A    CMS contracts with county sheriff

13        departments, county commissioner offices,

14        state departments of corrections to provide

15        medical services, psychiatric services,

16        dental services in correctional facilities

17        all over the country.

18   Q    Does CMS only service correctional

19        facilities?

20   A    Yes.

21   Q    Approximately how many correctional

22        facilities does it service?

23   A    Right now, I think we serve about 230,000

24        inmates, 225,000 inmates, in about 27 states.

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

29

```
1     Q     Do you know how many facilities
2           approximately?
3     A     I think we have nine statewide prison systems
4           and 50 jails.  It changes.  We pick up
5           contracts, and we lose contracts.
6     Q     Does CMS currently service correctional
7           facilities in Massachusetts?
8     A     Yes.
9     Q     Which ones are those?
10    A     Essex County Correctional Facility.
11    Q     Any in New England besides Massachusetts?
12    A     The State of Maine, the Maine Department of
13          Corrections.
14    Q     Any others in Maine?
15    A     Cumberland County in Maine, Portland, Maine.
16    Q     Any others in New England?
17    A     No.
18    Q     In the last, say, five years, what additional
19          prison facilities in Massachusetts has CMS
20          provided services for?
21    A     The prison systems would be the Massachusetts
22          Department of Corrections and Vermont.
23    Q     Which specific facilities within the
24          Department of Corrections in Massachusetts?
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

34

1        their background and their experience and see

2        if there will be a fit. It's an unusual

3        environment. It's not for everybody.

4    Q    CMS comes in and says here is who we suggest

5        will be our team, so to speak?

6    A    Most often, we don't, but from time to time,

7        our clients will be involved in at least

8        reviewing who we propose as management staff.

9    Q    Does the prison have any say as to whether or

10       not particular individuals are acceptable or

11       not?

12   A    They have say most often around credentials.

13   Q    What do you mean by that?

14   A    If we are looking at a physician who is going

15       to work at the facility to provide primary

16       care, they will want someone who is board

17       certified or board eligible in internal

18       medicine, family medicine, emergency medicine

19       and not cardiology, something to do with a

20       specific separate board.

21   Q    The individuals that CMS provides for these

22       prisons, they go to work in a prison

23       infirmary? Is that how it's categorized?

24   A    It depends on the site. It's an area within

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

35

1          the facility where health services is

2          provided.

3     Q    Fair enough.  Could you describe the

4          organizational structure within that area

5          where the health services are provided?

6          Let's talk in particular about Suffolk County

7          just to narrow things down for.

8     A    At Suffolk County, the organizational

9          structure would be the health services

10         administrator, and that's the lead of the

11         health services team.  There is also a site

12         medical director, a site director of mental

13         health, and those three are the members of

14         the team that are responsible to manage the

15         services.

16    Q    What does the health services administrator

17         do?

18    A    Her role is to monitor the day-to-day

19         operations of the facility in the health

20         services department to ensure that quality

21         care is being provided, to ensure that access

22         to care is happening, to ensure that all the

23         staff that we bring on board are licensed and

24         qualified to provide the services that we

46

1    A    Chances are the vast majority are with Prison

2         Health Services.

3    Q    I'm asking if you are aware whether they are

4         or not.

5    A    I wasn't at the site and wouldn't know

6         specific individuals that were or weren't

7         retained by them.

8    Q    Were these employees notified that they were

9         being terminated by CMS due to losing the

10        contract?

11   A    Yes.

12   Q    What form did that notice -- how was that

13        notice communicated?

14   A    Through our human resources department.

15   Q    So somebody called them presumably or sent

16        them a letter?

17   A    They were notified verbally at the site once

18        the decision was made that the county was

19        awarding the contract to PHS, and then they

20        received letters in the mail.

21   Q    Does CMS keep files on all of its employees?

22   A    Original documents for employee files are

23        kept at the sites.  We have two files.  You

24        have the personnel file with the credentials

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

47

1          and the licensure and the training, and we

2          have a medical file.  That would be your TB

3          test and your worker's comp. related

4          documents, medically-related stuff, return to

5          work slips, things of confidential nature

6          that would be kept separately.

7     Q    Are both of these files kept on site at the

8          various sites?

9     A    Yes.

10    Q    But they are CMS's files, right?

11    A    Yes.

12    Q    Who decides what documents go in these files?

13    A    We have a checklist of required documents in

14         the files.

15    Q    How long are these documents kept?  How long

16         are the employee files maintained?

17    A    When we lose a contract or if an employee

18         leaves CMS for whatever reason, the original

19         file is forwarded to the corporate office.

20    Q    How long is it maintained at the corporate

21         office?

22    A    I don't know the exact number of years, but

23         we also have an archive file where they will

24         go to.  I don't know the exact number of

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

50

1          administrator goes into the payroll system

2          and inputs the information for the increase.

3     Q    Does CMS ever remove documents from

4          employee's files for any reason?

5     A    I wouldn't think so.  It may happen from time

6          to time.

7     Q    Under what circumstances might it happen?

8     A    Not necessarily remove, but review.  We

9          continually do a quality review of our

10         personnel records just to make sure that the

11         content of the files is accurate.

12    Q    In the course of that review, would documents

13         be removed?

14    A    Nothing would be removed that wouldn't be put

15         back in it.

16    Q    I assume you're familiar with Sheila Porter,

17         the plaintiff in this case?

18    A    Very familiar.

19    Q    You have known her for a number of years, I

20         take it?

21    A    Probably 20, 16.

22    Q    When did Mrs. Porter begin working at CMS?

23         Was it when CMS got the contract with

24         Suffolk?

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

51

1   A   Yes.

2   Q   How did it come to pass that she came to CMS?

3   A   She was previously working at the jail under

4       Correctional Healthcare Solutions.

5   Q   When CHS lost the contract, did someone from

6       CMS approach Mrs. Porter and ask if she would

7       stay on at the prison?

8   A   We have a human resource staff and clinical

9       program staff that come from the corporate

10      office during a transition, and they meet

11      with any of the existing staff, give out

12      application for employment forms and meet

13      with the staff around consideration of

14      employment.  I'm sure at that time that's

15      what happened with Sheila.

16  Q   What's the criteria that CMS considers in

17      determining whether to keep somebody on in a

18      prison situation like this?

19  A   The criteria would be dependent upon what our

20      contractual agreement is with the county for

21      staffing.  We have a contractual obligation

22      to provide specific FTE, full-time equivalent

23      positions.  Licensure, experience,

24      appropriate credentials would be requirements

52

1           of bringing someone on board.

2       Q   With respect to Mrs. Porter, why did CMS

3           determine that it wanted to have her continue

4           as a nurse practitioner at Suffolk County?

5       A   Sheila has experience in correctional

6           healthcare.  It's fairly obvious.  I have a

7           familiarity with Sheila.  I think Sheila has

8           joked a couple of times to me that I have

9           hired her five times.  We have a relationship

10          that goes way back, a working relationship

11          that I never had a problem with Sheila's

12          performance.  She did a great job as a nurse

13          practitioner for us, particularly in women's

14          healthcare.  We believe that she was an asset

15          for that program.  I would have advocated for

16          her to be retained.

17      Q   What position was she hired for at the

18          Suffolk County House of Corrections when CMS

19          received the contract?

20      A   Nurse practitioner.

21      Q   To be clear, she was hired specifically to

22          work at the House of Corrections, the Suffolk

23          County House of Corrections?

24      A   Yes.

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

53

1    Q    But not hired to work for CMS as a general

2           matter but rather to work specifically in

3           that prison?

4    A    No, she was employed by CMS and specifically

5           to work for CMS in the health services unit

6           at that jail.

7    Q    Was she a full-time employee?

8    A    I believe she was full time, doing four

9           ten-hour days.

10          MR. SCHUMACHER:  Let the record reflect

11         that I'm asking Mrs. Porter not to indicate

12         anything.

13         THE WITNESS:  She was full time.

14    Q    What was her salary?

15    A    Most nurse practitioners at that site or

16           around this region made probably around $35,

17           $33 an hour.

18    Q    Did she receive full benefits?

19    A    Yes, she would have as a full-time employee.

20    Q    What did those benefits generally include?

21    A    Health insurance, dental insurance.  She

22           would have a co-pay to both of those, dental

23           and vision.  401(k) opportunity.  Then her

24           other benefits included pay time off days.

54

```
1    Q    Was she required to undergo a background
2         check?
3    A    All correctional facilities require anyone
4         entering a facility, whether or not it's an
5         employee of ours or a vendor that we're
6         bringing in that's going to read X rays,
7         services or whatever, to complete a
8         background check.
9    Q    What is your understanding of what goes into
10        a background check?
11   A    Every jurisdiction does it differently.  I'm
12        not sure how indepth Suffolk County's
13        background check is.  It wouldn't be
14        something that we would be involved in.
15   Q    The prison performs the background check --
16   A    Right.
17   Q    -- rather than CMS?
18   A    The jail.
19   Q    Thank you.  Were you personally involved in
20        Sheila's hiring this last time?  Excuse me.
21        Were you personally involved in Sheila's
22        hiring when CMS received the Suffolk County
23        contract?
24   A    I don't remember.
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

56

1    A    Not that often, but from time to time per

2         their request.  If we have an opening,

3         certainly, we would make a consideration.  If

4         we don't have a position available, then it

5         wouldn't occur.

6    Q    Does CMS provide orientation and training for

7         its new employees?

8    A    Yes.

9    Q    Do they do this for Mrs. Porter?

10   A    Yes, an orientation checklist is to be

11        completed and placed in her personnel file.

12   Q    Could you generally describe what the

13        orientation entails?

14   A    It would be review of the orientation

15        manuals.  There are two orientation manuals,

16        so that the employee would be familiar with

17        CMS policy and procedure, and it would be

18        review of the Employee Success Guide, so they

19        understand the terms and conditions around

20        employment with CMS and the signature that

21        there is acknowledgement of that.

22             I think for a nurse practitioner it also

23        includes review of clinical pathways and

24        anything related to chronic disease

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

58

1    A    It varied from time to time.  I'm not real

2         familiar with the specifics of what the

3         county offers, but we have an initial

4         security training on the dos and don'ts with

5         inmates and what to be aware of and safety in

6         the workplace.

7    Q    So you're aware that Suffolk would have

8         offered or required orientation and training,

9         but you're not familiar with the specifics of

10        that; is that fair to say?

11   A    Yes, I wouldn't have been involved.  It would

12        be the administrator who would be working

13        with their training director or the deputy

14        superintendent over medical to establish

15        security and training requirements, and

16        basically, in any jail or correctional

17        facility, that's related to things like

18        hostage taking and contraband, what you don't

19        bring into the facility, and most things that

20        are related to staff safety.

21   Q    So the CMS health services administrator at

22        that facility would be more familiar with the

23        orientation and training that the

24        correctional facility offers?

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

59

1   A    Yes.

2   Q    What were Mrs. Porter's job responsibilities

3        at Suffolk?

4   A    Sheila's role would have been to serve as a

5        primary healthcare provider, as a mid-level

6        provider to work within her licensure to see

7        inmates, and basically, she would do sick

8        call and see inmates that would put a request

9        to be seen slip in for various complaints.

10       She would also do chronic care clinic.

11            I know Sheila particularly did a lot of

12       the women's healthcare and sick care, GYN,

13       some OB.  She would also be involved in a

14       reviewing of some of the diagnostic tests

15       that she would have ordered on staff.

16   Q    Where did she report to work?  I'm not trying

17       to trick you.  Where did she show up to work

18       in the morning?

19   A    That's an easy question.  We employed her to

20       work for us at the Suffolk County House of

21       Corrections.

22   Q    So the Suffolk County House of Corrections?

23   A    Yes.

24   Q    Where was the medical facility within the

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

64

1        reviewed while she was at CMS?

2   A   It would be the expectation that she would

3        have.  Whether or not the administrator did

4        that, I don't know that.

5   Q   Is it your testimony that it's entirely up to

6        the health services administrator whether or

7        not to review an employee?

8   A   It is their requirement to perform an

9        evaluation of staff prior to submitting a

10        request for a merit increase.  Sheila

11        received merit increases showing good

12        performance.

13   Q   What does that indicate to you then?

14   A   It would be my understanding that -- she

15        reported directly to Donna Jurdak -- that if

16        she received a 3 percent merit increase, that

17        she had good performance in her job duties at

18        that site.

19   Q   And the fact that she received her merit

20        increase, does that indicate to you that she

21        received a performance review?

22   A   Not necessarily, although a performance

23        review was required to be performed on all

24        staff by their supervisor.

68

1      particular instance?

2   A   No.

3   Q   Was that ever a problem that cropped up with

4      respect to Donna?

5   A   Not that I'm aware of.

6   Q   Did Mrs. Porter receive her merit increases

7      while she was at CMS?

8   A   Yes.

9   Q   Besides Mrs. Porter, are you aware of any

10      other instance where an employee received a

11      merit increase without first receiving a

12      performance review?

13         MS. HARVEY:  Objection.

14   Q   You can answer the question unless your

15      attorney specifically instructs you not to

16      answer the question.

17   A   I have no knowledge of that.

18   Q   Are you aware of any specific instance

19      besides Mrs. Porter's situation?

20   A   No, I'm not.

21         MR. SCHUMACHER:  Would you mark this as

22      Exhibit 2.

23         (Document marked Exhibit No. 2.)

24      BY MR. SCHUMACHER:

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

73

1          performance that you're aware of?

2     A    We received several other commendations.  I'm

3          not sure whether or not Sheila's name was

4          ever identified in it.  I don't believe it

5          was.

6     Q    This 2002 commendation, that was placed in

7          Mrs. Porter's personnel file, correct?  Would

8          it surprise you if I told you we found it in

9          Mrs. Porter's personnel file?

10    A    It wouldn't surprise me?  No.

11    Q    When Mrs. Porter was fired, did it have

12         anything to do with her job performance?

13              MS. HARVEY:  Objection.

14    A    Sheila Porter wasn't fired.

15    Q    Was she terminated?

16    A    Sheila Porter was not terminated by CMS.

17    Q    Well, on June 9th, she was an employee for

18         CMS, correct?

19    A    Yes.

20    Q    And on June 11th, she wasn't an employee for

21         CMS, was she?

22    A    No.

23    Q    So at some point, her employment with CMS was

24         terminated, right?

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

74

1    A    Yes.

2    Q    And did that termination have anything to do

3         with her job performance?

4    A    No.

5    Q    You testified earlier that CMS was satisfied

6         with Mrs. Porter's job performance; is that

7         right?

8    A    That's correct.

9    Q    I don't want to put words in your mouth, but

10        I think you testified that she was an

11        excellent nurse practitioner; is that right?

12   A    She was a very good nurse practitioner, a

13        great clinician.

14   Q    How was she generally regarded by other CMS

15        employees?

16   A    I can't speak of others.

17   Q    Do you know how her work performance was

18        regarded in general by other CMS employees?

19   A    Everyone considered Sheila a good

20        practitioner at that facility to my

21        knowledge.

22   Q    Was she hard working?

23   A    Sheila is a hard worker.

24   Q    Did she report to work on time?

75

1    A    To my knowledge, Sheila reported to work on

2         time.

3    Q    Did she maintain good relationships with

4         other people she worked with?

5    A    I believe Sheila maintained good

6         relationships with others.

7    Q    Technically, in terms of her delivery of

8         medical services, she did a good job with

9         that as well?

10   A    Yes.

11   Q    Did she receive merit raises every year that

12        she was at CMS?

13   A    I believe so.

14   Q    Do all CMS employees receive raises every

15        year?

16   A    All employees are reviewed every year for an

17        increase, and it can be anywhere between --

18        it's usually between zero and 3 percent.

19   Q    It can be anywhere from zero to 3 percent?

20   A    Yeah.

21   Q    3 percent is the maximum allowable raise?

22   A    It depends on the circumstance.

23   Q    In fact, did Mrs. Porter receive the maximum

24        allowable raise every year that she was at

86

1    A    The only thing that was communicated to us

2         was the conversation that Mary Ellen

3         Mastrorilli had with Donna Jurdak and Sheila

4         in the room was that Sheila was being barred

5         from the facility for violation of their

6         policy related to communicating with outside

7         agencies or something to that effect.

8    Q    Miss Jurdak was a CMS employee, correct?

9    A    Right.

10   Q    In fact, she was the health services

11        administrator for the prison?

12   A    That's correct.

13   Q    She had overall responsibility for the

14        management of the day-to-day affairs of the

15        prison from CMS's perspective; isn't that

16        right?

17   A    Yes, she was responsible for the daily

18        operations at the jail.

19   Q    And she was in the room when it was

20        communicated to Mrs. Porter that she was

21        being barred from the facility; is that

22        right?

23   A    That's correct.

24             MR. SCHUMACHER:   Let's mark an exhibit.

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

89

1          those communications between Miss Jurdak and

2          the House of Corrections?

3     A    I'm not real familiar with that.

4     Q    Are you familiar with it at all?

5     A    No.

6     Q    Is there anyone at CMS who is in a better

7          position to answer that question besides

8          Miss Jurdak, who is no longer at CMS?

9     A    No.

10    Q    Did Miss Jurdak communicate to anyone at CMS

11         the subject of this interrogatory prior to

12         June 10th, 2003?

13    A    I don't believe so.

14    Q    So is it your testimony that you hadn't heard

15         anything about these allegations prior to

16         June 10th, 2003?

17    A    I do not recall anything related to these

18         allegations prior to June, 2003.

19    Q    Who does Miss Jurdak report to?

20    A    Miss Jurdak would have reported to the

21         regional jail manager.

22    Q    Who was that?

23    A    I think at that time it was Marilyn

24         Morningstar.

100

```
1        had been locked out of the House of

2        Corrections?

3   A    I believe it was June 10th.  It was

4        June 10th.

5   Q    Was that the day that she was, in fact,

6        locked out?

7   A    Yes.

8   Q    So on the day she was locked out, CMS was

9        notified that that had happened?

10  A    Yes.

11  Q    How would CMS be made aware that she was

12       locked out?

13  A    Donna, her administrator, was made aware of

14       it right away because she was part of that

15       meeting with Deputy Superintendent

16       Mastrorilli, where it was communicated to

17       Sheila and to our administrator that she was

18       being barred from the facility.

19  Q    Did Donna report that up the food chain at

20       all?

21  A    Donna called me.

22  Q    What transpired during that conversation?

23  A    Donna told me she just walked out of a

24       meeting with Sheila and Mary Ellen
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

101

1        Mastrorilli, the deputy superintendent at

2        that time, and that Mary Ellen communicated

3        to both of them that Sheila was being barred

4        immediately from the facility based on

5        violating the county's policy about

6        communicating with outside agencies.

7           I know Donna was shocked and couldn't

8        believe it.  She said something to the effect

9        of, "What the hell," or, "Mary Ellen, what is

10       going on?  I don't understand this."  She

11       said, "I can't talk about it."  That's how it

12       was communicated to me.

13  Q   Did Donna communicate to you any of the

14       specifics about the communication with an

15       outside agency?

16  A   I believe she mentioned that there was an

17       issue regarding Sheila talking to the FBI.

18  Q   Was this the first time that you had heard

19       about any of this?

20  A   Yeah, I think this is the first time I was

21       made aware of Sheila talking to the FBI.

22  Q   The question should have been more clear.

23       This is the first time you were made aware of

24       Sheila's lockout?

102

1    A.    Absolutely.

2    Q    And her communications with the FBI --

3    A    Yeah.

4    Q    -- or any other outside agency?

5    A    Yes.

6    Q    What did you say to Miss Jurdak during that

7         conversation?

8    A    I said, "I don't understand this.  Let me

9         call Mary Ellen and see if I can talk to her

10       about this, see what's going on."

11    Q    Who is Mary Ellen?

12    A    Mary Ellen Mastrorilli was the deputy

13       superintendent at the time.  She was over

14       medical.

15    Q    What do you mean, she was over medical?

16    A    Her responsibility was to manage the medical

17       department for the jail.

18    Q    Did you, in fact, call Mary Ellen?

19    A    I did.

20    Q    When?

21    A    I think it was within an hour.  It was the

22       same day.

23    Q    Did you reach her?

24    A    I did.

103

1    Q    What was the substance of that conversation?

2    A    I said, "Mary Ellen, I just spoke with Donna,

3         and I understand there is a situation that

4         Sheila is barred from the facility.  Can we

5         talk about it?"  She said, "I can't talk

6         about it.  It won't change.  I can't change

7         it.  She violated county policy."  That was

8         pretty much the extent of our conversation.

9    Q    That exhausts your memory of the conversation

10        you had with Miss Mastrorilli?

11   A    It was short, yeah.

12   Q    Under a minute?

13   A    It may have been.

14   Q    A couple of minutes tops?

15   A    Yeah.

16   Q    What did you do after speaking with

17        Miss Mastrorilli?

18   A    Probably called Donna back.

19   Q    Do you remember the substance of that

20        conversation?

21   A    I believe I said it doesn't look like we're

22        able to change matters here; she's barred

23        from the facility; and there's nothing we can

24        do about it.

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

112

1    Q    Is he above you in the organizational

2         structure of CMS?

3    A    No.

4    Q    Sort of a lateral-type position?

5    A    No, our human resources department in the

6         corporate office has assigned various

7         directors to certain regions.  He has been

8         assigned to be the resource for human

9         resources to this region.

10   Q    Who is it at CMS that makes the ultimate

11        decision of whether or not to terminate an

12        individual, one of its employees?

13   A    I think basically it's the administrator.

14        It's the person that is responsible to

15        oversee that staff member.

16   Q    The health services administrator?

17   A    If it's a staff person, yes.

18   Q    Do they have unfettered discretion whether or

19        not to terminate someone?

20   A    It depends on the circumstances.  It has to

21        be consistent with our Employee Success

22        Guide.

23   Q    Are there circumstances where the health

24        service administrator would have unfettered

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

113

1           discretion to terminate a staff person?

2     A     No, I don't believe so.

3     Q     In all circumstances, there would be some

4           oversight by other individuals at CMS as to

5           that decision?

6     A     Yes.

7     Q     You don't recall whether or not you called

8           Sterling Price or whether you instructed

9           Donna to call Sterling Price.  Do you recall

10          having a conversation with Sterling Price

11          about this?

12    A     I can't recall a hundred percent, but

13          vaguely, I recall talking to Sterling about

14          whether or not we had any other opportunity

15          to work with Sheila around this barring

16          situation with the county.  Basically, I knew

17          the answer, but maybe I didn't want to give

18          up on it.  We have been in this industry long

19          enough to know, all of us at CMS, Sheila, to

20          know that if you're barred from an

21          institution, you're barred from an

22          institution and they have the power and the

23          control to hold us to that.

24    Q     Did CMS investigate the circumstances of the

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

114

1   barring?

2 A No, we basically went on the communication

3   from Donna and the communication to me that

4   Sheila was being barred for a violation of

5   county policy.

6 Q Did CMS attempt to make any determinations as

7   to whether the barring was justified?

8 A I believe I attempted to when I called Mary

9   Ellen, and she said that she wasn't in a

10   position to discuss the matter.

11 Q I'm sorry.  Did you want to finish your

12   answer?

13 A Todd Aschbacher, our attorney n the follow-up

14   weeks made a call to one of the attorneys at

15   Suffolk.  I want to say her name was Ann

16   Powers.  I'm not sure what her name was, but

17   we did call one of the county attorneys to

18   discuss the matter.  We were told that by no

19   means were they going to change the position

20   on it.

21 Q Were these the only two calls that were made

22   on CMS's behalf with regard to this incident?

23 A Yes.

24 Q Why was the second call made?

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

115

1    A    I personally don't know what prompted it.

2    Q    Was it on CMS's own initiative?

3    A    I don't know.

4    Q    If we could take a look at the Interrogatory

5         Responses -- I'm not sure what number it has

6         been marked as.  If you could take a look at

7         Exhibit No. 7, approximately in the middle of

8         the of the response, it starts, "Todd

9         Aschbacher of CMS spoke with an attorney for

10        the HOC after receiving the demand letter

11        from Mrs. Porter's counsel to see if the HOC

12        was interested in discussing and

13        reconsidering its decision to lockout

14        Mrs. Porter, but was advised that they were

15        not interested in doing so."

16             Does that refresh your recollection as

17        to why the second call was made?

18    A    Yes, it does.

19    Q    Do you remember now that it was prompted by a

20        letter from Mrs. Porter's counsel?

21    A    Yes.

22    Q    As opposed to being on CMS's own volition?

23             MS. HARVEY:  Objection.

24    A    I wasn't a hundred percent clear what

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

121

| | | |
|---|---|---|
| 1 | Q | Did CMS talk to -- did CMS conduct an |
| 2 | | internal investigation as to these |
| 3 | | allegations? |
| 4 | A | No. |
| 5 | Q | Did CMS talk to any of the employees on site |
| 6 | | within the medical facility at the House of |
| 7 | | Corrections concerning these allegations? |
| 8 | A | No. I don't think so. |
| 9 | Q | Was Dr. Singletary asked if he knew what had |
| 10 | | happened? |
| 11 | A | Not from me. |
| 12 | Q | By CMS? |
| 13 | A | Possibly by Donna. I don't know what Donna's |
| 14 | | communications were at the site. |
| 15 | Q | But CMS didn't launch a formal internal |
| 16 | | investigation as to these allegations, right? |
| 17 | A | No. |
| 18 | Q | Now, at some point subsequent to receiving |
| 19 | | this information, CMS had made the decision |
| 20 | | to terminate Mrs. Porter, right? |
| 21 | A | That's correct. |
| 22 | Q | I think you testified that it was made on the |
| 23 | | same day; is that right? |
| 24 | A | It might have been the following day. |

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

122

1    Q    No later than the following day?

2    A    Right.

3    Q    Who made that termination?

4    A    I think in consult with our director of human

5         resources, we had no choice but to terminate

6         her employment with CMS since she had no

7         ability to enter the facility.

8    Q    Which CMS employees were involved in the

9         decision to terminate Mrs. Porter?

10   A    It would have been me, Donna Jurdak and, most

11        likely, Sterling Price.

12   Q    Would any other employees have been involved

13        in that decision?

14   A    No, I don't think so.

15   Q    Counsel?

16   A    Probably not at that point.

17   Q    If you can refer to the interrogatory

18        responses again, we're looking at

19        Interrogatory No. 8 this time.  Take a look

20        at it.  "The interrogatories describe in

21        detail all communications within CMS" --

22        there is a parenthetical -- "since June 1,

23        2003, concerning Mrs. Porter's employment

24        status with CMS and/or her being barred from

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

127

```
1              Mrs. Porter after she was locked out?
2       A    CMS didn't have a choice as to what we could
3              do with Sheila.  We didn't have a position.
4              She wasn't allowed access to the facility.
5              We didn't have a position for her.  We can't
6              put her on any payroll anywhere.  She's not
7              working for us.  We don't have the
8              contractual hours.  We are already covering
9              those hours everywhere.
10      Q    What did you base your belief that you didn't
11             have a position for her on?
12      A    Just communicating around any open positions.
13             That's easy.
14      Q    So what did you do?
15      A    We communicated with Essex County, Franklin
16             County.  Those positions were filled.  Those
17             were the two contracts we had in
18             Massachusetts.
19      Q    Essex County, and what was the other?
20      A    Franklin.
21      Q    Which facilities are those?
22      A    Essex and Franklin.
23      Q    That's their title, the Essex House of
24             Corrections and the Franklin House of
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

134

1          terminating someone and the decision as to

2          the termination.  Obviously, she was

3          terminated.  She's tried to explain to you

4          ten different ways.  You're asking her for

5          hours about that process.  The process to

6          terminate her is made.

7               Did they want to?  Did they make the

8          decision that she shouldn't work there

9          anymore?  No.  That decision was made for

10         them by the entity.

11              MR. SCHUMACHER:  The record will reflect

12         that she testified a number of times earlier

13         today that she wasn't terminated; that nobody

14         at CMS terminated her without making the

15         decisions that you just stated.

16              MS. HARVEY:  That's correct, because

17         there is two different distinctions here.

18         I'm sorry if you don't see it.  We see it.  I

19         don't like you implying that anybody has been

20         untruthful.  If you look at other answers,

21         you'll see very clearly the distinction that

22         was made by CMS and Miss Mack, who signed

23         these answers.

24              THE WITNESS:  I've clearly communicated

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

138

1    A    Yes.

2    Q    You talked to Miss Jurdak and you made the

3         call to Miss Mastrorilli, right?

4    A    Right.

5    Q    Did you contact Mrs. Porter to ask her what

6         happened?

7    A    No.

8    Q    Why not?

9    A    I didn't see that it was our place.

10   Q    Why not?

11   A    Because there was no opportunity to have her

12        allowed back into the facility since the

13        county had made a decision on barring her.

14   Q    Weren't you curious to get Mrs. Porter's side

15        of the story?

16   A    Our contract with the county clearly

17        identifies that they have the right to bar

18        any our employees from entering the facility.

19   Q    Weren't you curious to get Mrs. Porter's side

20        of the story?

21   A    No, I wasn't curious.

22   Q    You didn't think CMS had a responsibility to

23        get its employee's side of the story?

24             MS. HARVEY:  Objection.

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

139

1     A    We were in a position where Sheila was not

2           going to be allowed to re-enter the facility.

3           So we weren't in a place to start any

4           investigation or to dispute whether or not

5           that was an appropriate decision by the

6           county.

7     Q    So it's your testimony that you instructed

8           Miss Jurdak to communicate to Mrs. Porter

9           that she had been terminated by CMS?

10    A    That was her responsibility.

11    Q    Did you communicate that to her?

12    A    Yes.

13    Q    Did that, in fact, happen?

14    A    Presumably.

15    Q    Do you know if it happened or not?

16    A    I haven't spoken with Donna about it.

17    Q    Did you ever follow up with her to say did

18          you follow up on my instructions to speak

19          with Mrs. Porter to tell her that she was

20          terminated?

21    A    No, I have multiple staff that report to me.

22          If I had to call to follow up on instructions

23          that I gave to anybody, then there would have

24          to be ten of me.

146

1          resources, and then the decision would be

2          determined.

3    Q     Who makes the recommendation for termination?

4    A     It's under the direction of human resources

5          specialists.  The decision to process the

6          termination in this case, because we really

7          processed the termination, we didn't want to

8          terminate Sheila, was determined by the three

9          of us talking, and Donna was given

10         instruction to terminate, which she did.  She

11         had to enter it into the system, and it was

12         entered into our T3 PeopleSoft system for

13         payroll to terminate Sheila, which has to

14         done at the site.  It has to be done at the

15         facility.

16   Q     If you communicated to a health services

17         administrator that he or she was supposed to

18         inform an employee that they were terminated

19         and that never happened, would that be

20         grounds for discipline on behalf of the

21         health services administrator?

22              MS. HARVEY:  Objection.  Beyond the

23         scope.

24   A     It depends on the circumstances around it.

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

163

```
 1              draft, so we would have gotten clarification

 2              on --

 3      Q       Do you believe this first document is a

 4              draft?

 5      A       I don't know.

 6      Q       On both documents -- let's look at the signed

 7              document.  The signed document is the

 8              official recommendation for termination; is

 9              that right?

10      A       That's right.

11      Q       About a third of the way down the page, it

12              says, "Date of verbal counseling," and it

13              says, "None"; is that right?

14      A       That's right.  That's if you're following our

15              Employee Success Guide disciplinary process

16              for a verbal warning, then written warnings,

17              then an final warning and then a

18              recommendation for termination.

19      Q       And under date of written counseling and date

20              of final written warning, it also says

21              "none," right?

22      A       That's right.

23      Q       And that's because, in fact, there was no

24              verbal counseling, written counseling or any
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

164

1              final written warning in this case, right?

2      A      Right.

3      Q      Before Mrs. Porter was terminated on June 10

4              or June 11, 2003, was she actually offered

5              another position with CMS?

6      A      No.

7      Q      And that's because you determined you had no

8              other nurse practitioner positions available

9              in Massachusetts?

10     A      Right.

11             MR. SCHUMACHER:  Let's mark as an

12             exhibit, Exhibit 10.

13             (Document marked Exhibit No. 10.)

14     BY MR. SCHUMACHER:

15     Q      This exhibit contains pages from the bid that

16             was submitted to Suffolk County from CMS.  I

17             have the whole bid here.  I chose not to

18             reproduce the whole thing and cut a couple of

19             trees.  If you can take a look at the couple

20             of pages selected, primarily the first three

21             pages.

22     A      (Witness complies.)

23             MS. HARVEY:  David, you know that the

24             bid that I produced was the original 2001.

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

167

1        year.

2    Q   Understood.

3    A   It was rebid again in a little over a year.

4    Q   Did CMS provide healthcare services to fewer

5        facilities at the time of the second bid?

6    A   We may have.

7    Q   Do you know whether it did or not?

8    A   We may have.  I'm not sure.

9    Q   Was it still the largest provider of

10       correctional healthcare services in the

11       country?

12   A   At that point we may have been more

13       consistent in revenue with our competitor.

14   Q   Were you in the top two or three?

15   A   Top two.

16   Q   And you provided facilities, at least at the

17       time of this bid, you provided facilities in

18       Massachusetts, correct?

19   A   Yes.

20   Q   Out of all these facilities that were

21       available to CMS, it's your testimony that

22       there were no nurse practitioner positions

23       able to Mrs. Porter?

24       MS. HARVEY:  Objection.

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

168

1    A    Out of what facilities?

2    Q    Out of all the facilities that CMS had in the

3          country as of June, 2003, were there nurse

4          practitioner positions available?

5    A    There were probably openings in some of the

6          various places, states.

7    Q    What you looked at is whether there were

8          positions available in Massachusetts, right?

9    A    Yeah.

10    Q    And it's your testimony that there were only

11          two counties and there were no nurse

12          practitioner positions available?

13    A    Yes.

14    Q    Did you inquire as to surrounding states as

15          to whether there were nurse practitioner

16          positions available?

17    A    No, it was communicated that Sheila only

18          wanted something local.

19    Q    Who communicated that?

20    A    Donna.

21    Q    When?

22    A    Donna had called me and inquired as to

23          whether or not we still had any other

24          positions available for Sheila.

170

1          made it apparent that she would be open to

2          that.

3     Q    Certainly, CMS never inquired as to whether

4          there were surrounding positions available in

5          states other than Massachusetts for Sheila at

6          this time?

7     A    No, we didn't investigate that.  We didn't,

8          but, in fact, when it was time to offer

9          Sheila the position at Essex County, she

10         thought that was too far.

11    Q    That was four months later?

12    A    Three, four.

13    Q    Three or four?

14    A    Three or four.

15         MS. HARVEY:  Three.

16    Q    Counsel says three.  Three or four.

17    A    Yeah.  It would take time for her to get a

18         license in another state.  It's not something

19         that can happen overnight.  If she had

20         inquired, we would have investigated.  We

21         would have been open to putting her in one of

22         those other positions.  She was strong

23         clinically.

24    Q    But on your own, it's nothing that you

172

1              practitioner hours.

2        Q    Did you ask whether there were any per diem

3              positions available as well?

4        A    No.

5        Q    Why not?

6        A    I don't know.  I was trying to find her a

7              full-time job.

8        Q    If the option was --

9        A    I was told she was looking for a position

10             with U. Mass.  She was looking for a position

11             closer to home.

12       Q    I'm still focusing on when she terminated,

13             immediately prior to when--

14       A    I'm just explaining why I didn't hire her as

15             a PRN, because I know she wanted full-time

16             opportunities.

17       Q    Did you know that on June 10 of 2003?

18       A    That's what we were looking into.

19       Q    I understand that.  But did you know that was

20             the only position that Mrs. Porter would

21             accept at that point?

22       A    No.

23       Q    And you didn't investigate whether or not per

24             diem positions were available?

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

194

1    Q    And the employee benefits available to CMS

2           employees in Section 3?

3    A    Yes.

4    Q    And there is also a section for employee

5           responsibilities and guidelines, right?

6    A    Yes.

7    Q    And there are policies in here on everything

8           from CMS's harassment policies to the flex

9           spending accounts that are available to CMS

10         and even things such as CMS no smoking areas

11         that are available to employees?  Those are

12         among the topics covered in this guide; is

13         that right?

14    A    Yes.

15    Q    When do new employees receive this document?

16    A    During orientation.

17    Q    How soon after they begin work at CMS is

18         that?

19    A    Within the first few weeks.

20    Q    And are employees expected to read the

21         Employee Success Guide?

22    A    Yes.

23    Q    In fact, the last page contains an

24         acknowledgement page that they, in fact, read

196

1    A   Yes.

2    Q   Are employees asked to affirm and sign that

3         they have reviewed and read the Employee

4         Success Guide every year that they are at

5         CMS?

6    A   I know it's upon hire, and it's probably upon

7         release of a revised handbook.

8    Q   So the guide is revised from time to time?

9    A   Yes.

10   Q   Do you know how often it's revised?

11   A   No.

12   Q   Who would know how often it's revised?

13   A   Probably the human resources department,

14        executive vice-president.

15   Q   Who are they?

16   A   By name?

17   Q   Yes.

18   A   Sally Powers, executive vice-president of

19        human resources.

20   Q   Where is Miss Powers located?

21   A   St. Louis, corporate office.

22   Q   Would Mr. Price be familiar with whether or

23        not the guide is updated from year to year?

24   A   He would be.  I don't know if he would have

200

corrective action, where practical, to

facilitate improvement in conduct and

performance.  This assures that employees are

fairly informed regarding problems and have

an opportunity to correct deficiencies before

more serious action is taken."

What's the purpose of this statement?

MS. HARVEY:  Objection.  Beyond the

scope.  Form.  Go ahead.

A     It basically states that our policy -- this

corrective action lays out to employees that

there may be a process of progressive

corrective action and they can familiarize

themselves with it in this document.

Q     It doesn't say in the paragraph that I just

stated that there may be a policy of

corrective action.  It just says that CMS has

established a policy of progressive

corrective action; is that right?

A     Yes.

MS. HARVEY:  Where practical.

MR. SCHUMACHER:  I'm sorry?

MS. HARVEY:  Where practical.  The

qualification was more consistent with what

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

201

she said.

    MR. SCHUMACHER:  If that's your interpretation, that's fine.

BY MR. SCHUMACHER:

Q    Later in the document, it lays out what corrective action consists of; is that right? It's on the same page.  I believe it begins about halfway down?

A    "Verbal counseling versus written counseling, versus final written warning."

Q    The first step is verbal counseling in corrective action; is that right?

A    There are various steps, but in basic corrective action, there is verbal counseling.  There is written counseling, a final written warning, and then a recommendation for termination.

    Beyond that, there are reasons for termination that are immediate actions for termination that result in recommendations for termination, so there is two processes.

Q    We'll get there.  Don't worry.  You'll have plenty of opportunity to speak about that. Who determines whether corrective action

McLAUGHLIN & ASSOCIATES COURT REPORTERS—781.321.8922

202

takes place or not with respect to an
employee?

A    The administrator.

Q    Is it the administrator?

A    They are responsible to employ corrective
action.  They are trained during their
orientation that that's part of their
responsibility.

Q    So when an administrator learns that
something has happened or that a staff member
has done something under certain
circumstances, they're supposed to employ
corrective action; is that right?

A    That's correct.

Q    And the first step is, where practical, this
verbal counseling, right?

A    Right.

Q    And that consists of a confidential
face-to-face counseling session; it's clearly
stated where and how the behavior is
unacceptable.  I'm not quoting here.  I'm
just paraphrasing.  The administrator and the
employee are supposed to agree on the
corrective action, and that's supposed to be

203

documented in the employee's personnel file;
is that right?

A    Yes.

Q    And beyond that, the next step is written
counseling; is that correct?

A    Yes.

Q    In what circumstances would written
counseling be required beyond verbal
counseling?

A    It depends on the behavior or the deficiency
or the action.

Q    Is it if the behavior escalates in some way
or isn't corrected?

A    Repeated behavior on the same issue, if
someone is tardy all the time.

Q    After the verbal counseling, that behavior
continues or escalates?

A    That's right.

Q    In that situation, there may be written
counseling as well?

A    That's right.

Q    And the written counseling contains a written
description to be signed by the employee and
the supervisor, reviewed in a face-to-face

204

discussion and then follow-up conversations
are supposed to occur to show whether
progress has taken place; is that right?

A    Right.

Q    And the next step on the hierarchy is a final
written warning; is that right?

A    That's right.

Q    When might a final written warning be
required?

A    Repeat occurrences of the same event, a
significant occurrence around judgment error.
It could a clinical error.  It could be a
personal issue.  It could be breach of
confidentiality, inmate confidentiality.  It
could be a host of things.

Q    The health services administrator has
discretion based on his or her training as to
whether behavior requires corrective action;
is that right?

A    And they would communicate with the director
of human resources to determine what level
that discipline would fall in.

Q    The final written warning, that is a written
description of the behavior that's prepared

205

on a final written warning memorandum; the
behavior is reviewed in a face-to-face
meeting, and then -- I believe I'm quoting
here.  "An employee will normally receive a
final written warning as the last step before
recommendation for termination action is
initiated."

   Did I read that right and does that
fairly describe what constitutes the final
written warning step?

A    Yeah, and really, it's when you're taking
someone through the normal corrective action
process.  You go from a verbal to a written,
to a final written.

Q    And the final step is a recommendation for
termination?

A    Yes.

Q    And that occurs presumably if the behavior is
still not corrected after the final written
warning?

A    Yes.

Q    In this case, the supervisor prepares a
written termination recommendation, meets
confidentially with the employee to

206

1       communication the decision, and then the

2       recommendation is made; is that right?

3    A   That's right.

4    Q   And you'd admit that none of these corrective

5       action policies were followed with respect to

6       Mrs. Porter, correct?

7           MS. HARVEY:  Objection.

8    A   Yeah, she wouldn't fall under the category of

9       corrective action since that action regarding

10      termination is under the category of

11      immediate action or termination, which would

12      a recommendation for termination.

13   Q   I'll ask you a couple of questions about

14      immediate action or termination in a minute,

15      but it is fair to say Mrs. Porter didn't

16      receive any verbal counseling with respect to

17      her alleged infractions; is that right?

18   A   I'm not sure if there were any counseling

19      documents in her personnel record that Donna

20      may have produced.

21   Q   Do you have any knowledge as to whether

22      Mrs. Porter ever received verbal counseling?

23   A   No.

24   Q   Did she receive written counseling?

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

207

| | | |
|---|---|---|
| 1 | A | In regards to? |
| 2 | Q | In regards to the events leading to her |
| 3 | | termination. |
| 4 | A | Oh, no. |
| 5 | Q | Did she receive a final written warning? |
| 6 | A | I thought you meant if she had any related to |
| 7 | | practice issues or personnel issues. |
| 8 | Q | No, I'm talking about for the reason why she |
| 9 | | was terminated? |
| 10 | A | Oh, okay. |
| 11 | Q | Did she ever receive a final written warning? |
| 12 | A | No, she wouldn't have. |
| 13 | Q | I believe one of the earlier exhibits did |
| 14 | | show a document entitled Recommendation for |
| 15 | | Termination; is that right? |
| 16 | A | Right. |
| 17 | Q | But it doesn't appear that there was a |
| 18 | | meeting that's described under the |
| 19 | | Recommendation for Termination section on |
| 20 | | Page 18 with respect to Mrs. Porter; is that |
| 21 | | right? |
| 22 | | MS. HARVEY: Objection. |
| 23 | A | This identifies that recommendations for |
| 24 | | termination are reviewed with regional |

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

208

1    management, which it was, with me, and the

2    director of human resources, which it was,

3    with Sterling.  The supervisor prepares a

4    written termination recommendation, after

5    approval is secured meets with the employee

6    to verbally communicate the termination

7    decision.  That's the administrator's

8    responsibility.

9  Q   Did Miss Jurdak meet confidentially with

10     Mrs. Porter to verbally communication the

11     termination decision?

12 A   I don't know that for certain, but that is

13     her responsibility as the administrator

14     there.  And that is the expectation.

15 Q   So your testimony is that with respect to

16     Mrs. Porter it was required that CMS follow

17     the processes and procedures outlined in the

18     recommendation for terminations section; is

19     that right?

20         MS. HARVEY:  Objection.

21 A   Well, the only thing we would review with

22     Sheila would be a communication to say you've

23     been terminated.  She doesn't review or she

24     doesn't sign or she doesn't have to have

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

209

knowledge of our form that goes in her file
as a matter of process.  That's just a matter
of the process.

On a termination, she's verbally
communicated with by the administrator that
she's terminated.

Q    So all of the procedures outlined in the
paragraph entitled "Recommendation for
Termination" were followed in Mrs. Porter's
case, right?

MS. HARVEY:  Objection.

A    I will that Donna would have communicated
verbally that Sheila was terminated prior to
the final -- there appears to be a lag when
the recommendation for termination was
signed, but in regards to preparing a
recommendation for termination and
communicating with human resources that
occurred and with regards to having that
document for her file, that occurred.

And in regards to the responsibility to
communicate the termination with Sheila, that
was Donna's responsibility.

Q    So it's your expectation and belief that the

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

262

1    A    Something that happened over at

2         Nashua Street, some intake activities that I

3         don't know the particulars on, but I know

4         there was some issues with the officers

5         there.  We didn't provide services at that

6         facility.  It was something around strip

7         searches.

8    Q    Excuse me?

9    A    I believe it was something around stripe

10        searches.

11   Q    When CMS was providing medical services for

12        the House of Corrections at Suffolk, how did

13        the employees physically gain access to the

14        prison on a daily basis?

15             MS. HARVEY:  Objection.  Scope.

16   A    Prior to someone being hired, they have a

17        background check.  They receive an ID.  They

18        have to wear their ID, and they can go

19        through the main entrance of the facility

20        with an active ID.

21   Q    I believe you testified earlier that the CMS

22        regional corporate office in Massachusetts is

23        in Middleton; is that right?

24   A    That's correct.

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

263

1    Q    Do CMS employees have any reason to visit the

2        corporate office in Middleton?

3    A    From time to time.

4    Q    For what?

5    A    We would have meetings around -- we'd have

6        regional management meetings.  We would have

7        some of the HSAs there.  A training --

8    Q    How about nurse practitioners?

9    A    Really, no, not often.

10    Q    So virtually, all of their time for CMS would

11        be spent at the facility to which they were

12        providing services?

13    A    Yes.

14    Q    How do CMS employees record their time, their

15        hours?

16    A    They have a swipe card.  They have an

17        electronic time clock.  When they come in,

18        they swipe in, and when they leave, they

19        swipe out.

20    Q    That's also at the prison?

21    A    Yes, so there is accountability for hours

22        that people are on site at the correctional

23        facility.

24    Q    Where do CMS employees receive their

264

1              paychecks?

2       A      A lot is electronically deposited.

3       Q      What if they're not?

4       A      I believe they get sent to the site

5              administrator, and they get disseminated from

6              her.

7       Q      So they are distributed on site?

8       A      Yes, if it's not an electronic deposit.

9       Q      Who is it that determines a nurse

10             practitioner's daily schedule at a facility

11             for which you're providing services?

12      A      The administrator would be responsible to

13             identify the schedules of all clinical staff,

14             and the DON would do the schedules or

15             assignments for the nurses.  It's really an

16             assignment, more than a schedule.

17      Q      Who is the DON?

18      A      The director of nurses.

19      Q      That's a CMS employee?

20      A      Yes.

21      Q      Who determines which inmates a nurse

22             practitioner would have access to on a daily

23             basis?

24      A      If the nurse practitioner's assignment is

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

269

1        House of Corrections that a nurse

2        practitioner may need to use on a daily

3        basis, who provides that equipment?

4    A   Large equipment was already there, exam

5        tables, fetoscopes.  We bought pulse

6        oximeters.  CMS was responsible for other

7        small durable equipment.

8    Q   So CMS purchased some equipment.  The large

9        equipment that you described earlier, who

10       bought those pieces of equipment?

11   A   I think those came -- when they built that

12       new facility.

13   Q   So the county provided those large pieces of

14       equipment; is that right.

15           MS. CAULO:  Objection.

16   A   Some of it.  The dialysis chairs were

17       provided by our dialysis vendor, and the

18       various equipment as needed, we became

19       responsible to purchase.

20   Q   So CMS bought some equipment, and the county

21       bought some equipment; is that fair to say?

22   A   That's correct.

23   Q   I believe you testified that Mrs. Porter's

24       employment records are kept on the site of

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

# EXHIBIT 4

1                                          VOL:  I
                                      PAGES: 1-172
2                                    EXHIBITS: 1-4

3

4              UNITED STATES DISTRICT COURT

5           FOR THE DISTRICT OF MASSACHUSETTS

6     * * * * * * * * * * * * * * * *
      SHEILA J. PORTER,              *
7                   Plaintiff        *
                 -vs-                *   Civil Action
8     ANDREA CABRAL; SUFFOLK COUNTY  *   No. 04-11935-DPW
      SHERIFF'S DEPARTMENT; SUFFOLK  *
9     COUNTY and CORRECTIONAL MEDICAL *
      SERVICES, INC.,                *
10                  Defendants       *
      * * * * * * * * * * * * * * * *

11

12

13

14        DEPOSITION OF GERARD HORGAN, a witness
      called on behalf of the Plaintiff, in the
15    above-captioned matter, said deposition being
      taken pursuant to the Federal Rules of
16    Civil Procedure, before Patricia M.
      McLaughlin, a Certified Shorthand Reporter and
17    Notary Public in and for the Commonwealth of
      Massachusetts, at the offices of Goodwin Procter
18    LLP, Exchange Place, Boston, Massachusetts, on
      Friday, May 13, 2005, commencing at 10:05 a.m.

19

20

21

22        McLAUGHLIN & ASSOCIATES COURT REPORTERS
              92 DEVIR STREET, SUITE 304
23           MALDEN, MASSACHUSETTS  02148
                   781.321.8922
24             WWW.E-STENOGRAPHER.COM

18

```
1            Rosario; that she was involved in the
2            situation and that she briefed the Sheriff
3            and ultimately the decision was made to
4            inform CMS that we were going to bar
5            Sheila Porter from the facility.
6      Q    Did Miss Keeley tell you in this conversation
7            the reasons why Miss Porter was barred?
8      A    Yes, she did.
9      Q    What did she tell you?
10               MS. CAULO:  Objection.  Beyond the
11           scope.
12     Q    You can answer.
13     A    There were several reasons.  She indicated at
14           the time she was relatively new to her
15           position, so when this came to her attention,
16           she looked at a policy manual, looked at
17           Policy S220 and basically went down through
18           the policy in a chronological manner to
19           determining what, if any, policy violations
20           there may be.
21               And the things that she indicated were
22           part of the decision were the fact that there
23           was an attempt to impede an investigation,
24           failure to report possible wrongdoing,
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

19

1        failure to obey an order, confidential

2        communications and the fact that there was

3        false documentation provided.

4   Q   Did she tell you what the false documentation

5        was?

6   A   Basically that Sheila Porter -- Elizabeth's

7        understanding was that Sheila Porter had an

8        interaction with Inmate Rosario through a

9        cell door; that she made some observations

10       about possible injuries; that there was no

11       note in the medical administrative record

12       that this had happened, that she had had

13       interaction.  She then indicated later on

14       that it was a different type of interaction

15       with Mr. Rosario.

16  Q   What do you mean by a different type of

17       interaction?

18  A   A more thorough medical examination as

19       opposed to through a cell door, through a

20       window.

21  Q   I'm confused.  Did she that Miss Porter

22       conducted that medical examination, the

23       thorough medical examination?

24  A   No, that she claimed that she had.

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

55

```
 1              after you arrived at the House of

 2              Corrections; is that fair to say?

 3       A      Yes.

 4       Q      What was your impression of Miss Porter?

 5       A      That she was a good nurse practitioner.

 6              She's someone who provided good care to the

 7              inmates.  I know that she advocated to have

 8              the women have their own clinic up in the

 9              10th floor.  We were constantly grappling

10              with the issue of getting the female inmates

11              equal access to medical care, because they're

12              housed on the 10th and 11th floor of

13              Building 1, it's difficult to bring them

14              downstairs to the clinic.

15                   We also have concerns about having male

16              and female inmates together.  Donna Jurdak,

17              who was the health services administrator at

18              the time, had come to me and said that Sheila

19              wanted to reestablish the clinic at the back

20              of the 1102 unit, which we had provided the

21              office space to do.

22                   That wasn't Sheila's only function, but

23              she was primarily the NP that cared for the

24              women.  And she also cared for the inmates.
```

56

```
 1      Q     So you implemented her recommendation that

 2            their be a separate unit for the female

 3            inmates who were treated by the medical

 4            staff?

 5      A     Yes.

 6      Q     Were you satisfied with her job performance?

 7      A     Yes.

 8      Q     Did she have a good reputation among the

 9            staff?

10      A     She had a reputation of a qualified nurse

11            practitioner, someone who would put in the

12            hours that were necessary.  She would ensure,

13            even if there were a lot of inmates on the

14            list, that she would see them all and make

15            sure they got care.

16      Q     Did you ever have any problems with

17            Miss Porter with respect to her job

18            performance?

19      A     No.

20      Q     I believe you testified that you weren't

21            aware that she had had any communications

22            with the FBI until the summer of 2003; is

23            that right?

24      A     Yes.
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

```
 1    Q    You were unaware that Miss Porter was
 2         involved in any way with Inmate Rosario's
 3         allegations in May, 2003, until after she was
 4         barred?
 5    A    Yes.
 6    Q    And again, this was during your conversation
 7         with Mr. Bradley and/or Miss Mastrorilli?
 8    A    Yes.
 9    Q    You weren't involved in the decision to bar
10         Miss Porter?
11    A    No.
12    Q    What do you know about the circumstances of
13         Miss Porter's barring?
14              MS. CAULO:  Objection.  Beyond the
15         scope.  You can answer.
16    A    I know that there was a concern that when
17         Mary Ellen Mastrorilli spoke to Sheila Porter
18         about allegations that Mr. Rosario was making
19         that -- I'm quoting Mary Ellen, who is
20         quoting Sheila.  Mary Ellen asked Sheila we
21         need a report if there is any allegation of
22         wrongdoing so we can look into it.  Sheila's
23         response was, "I'm not talking to you.  I'm
24         talking to the FBI."
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

```
 1            leaves it up to the medical company to
 2            determine what disciplinary measures should
 3            be taken with respect to infractions that
 4            might take place?
 5        A   More often than not, yes.
 6        Q   Although there are situations where you can
 7            bar those independent contractors under
 8            egregious circumstances?
 9                MS. CAULO:   Objection.
10        A   Yes.
11        Q   In those situations, where independent
12            contractors are barred, who has the authority
13            to make the decision to bar an independent
14            contractor?
15        A   The Sheriff's Department makes the decision
16            to bar.  It's not a termination.  It's just
17            not letting them into the facility.
18        Q   I understand.  I'm trying to determine which
19            position, which individual, has that
20            authority to make that decision.
21        A   Generally, a deputy superintendent can do it,
22            or the superintendent can do it.
23        Q   Or the sheriff, his or herself, I take it?
24        A   Yes, generally, it would be done under the
```

1          deputy superintendent's name, but anyone from

2          deputy super or above has that ability.

3   Q   Is the Sheriff required to signoff on that

4          determination?

5   A   No.

6   Q   Are you aware of other circumstances, other

7          than Miss Porter's, where the Sheriff

8          personally made the decision to bar an

9          independent contractor?

10   A   She would have been briefed -- typically, the

11          chain of command will go I'll speak with the

12          Chief of Staff, who will speak with the

13          Sheriff to brief her on it before at any time

14          there is a major discipline coming down for

15          employees or contractors.

16             As far as specific ones, we haven't had

17          one at the House of Correction -- I think

18          there was one person that the company decided

19          to bar since I have been back. So I don't

20          have specific knowledge. It wouldn't

21          surprise me.

22   Q   I'm asking about your entire tenure at the

23          House of Corrections or at the jail. Are you

24          aware of other situations other than

94

1                    scope.

2        A    I don't think it was.

3        Q    Did Nurse Practitioner Porter violate any

4             unwritten policies of the Sheriff's

5             Department?

6                    MS. CAULO:   Objection.

7        A    Our policies are written.   We don't have

8             unwritten policies.

9        Q    So nobody would be disciplined for conduct

10            that wasn't contained in a policy?

11       A    That's correct.

12                   MR. SCHUMACHER:  Now, we can mark S220.

13                   (Document marked Exhibit No. 2.)

14       Q    I'm handing you what has been marked as

15            Exhibit 2 for this deposition.   Take a second

16            to review it.

17       A    Yes.

18       Q    Are you familiar with this document?

19       A    Yes.

20       Q    What is it?

21       A    It was the version of S220 that was in effect

22            in 2003.

23       Q    The first reason that you understand

24            Miss Porter was barred for was for impeding a

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

101

1    past.  If this allegation were to have

2    happened on May 19th, she could have written

3    a report to SID, to Deputy Superintendent

4    Mastrorilli, that wouldn't have had to get

5    into all this.  "Please be advised that I saw

6    Inmate Rene Rosario on this time on this

7    date, and he indicated that he was beaten by

8    officer or excessive force was used by

9    officers.  I would like this matter to be

10   investigated."  That would have covered it.

11   This doesn't cover it.

12   Q    That should have been written on an incident

13        report?

14   A    It could be sent in an E-mail, but we have to

15        be notified of it.  It's something that you

16        would prefer to have on an incident report.

17        This doesn't tell you that there is an

18        allegation of wrongdoing.  I mean, it's more

19        medical, how big the bruises were.

20   Q    So the form doesn't matter then?

21            MS. CAULO:  Objection.

22   A    That's not what I said.

23   Q    You said it could be in an E-mail or an

24        incident report; is that right?  The

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

144

1    Q    And then companies would submit an RFP?

2    A    A response to it, yes.

3    Q    And then the prison chooses which, if any, of

4         those RFPs to accept?

5    A    Yes.

6    Q    We talked about the contract.  Once an RFP is

7         accepted, is that considered the contract, or

8         is there another document that's the

9         contract?

10   A    There is additional documentation that goes

11        along with it, but the RFP spells out what

12        the minimum level of care that we expect for

13        lack of a better word.  So when we have

14        questions on a contract issue with CMS or

15        PHS, we'll typically refer to the RFP.

16   Q    Does the prison have input on the positions

17        that should be filled with respect to an RFP?

18   A    As far as the staffing levels, yes.  As far

19        as interviewing -- again, another difference

20        between contract and our employees, medical

21        or the jail, the deputy superintendent or the

22        ADS conducts every nurse's interview.  Here,

23        we don't do that.

24             At the jail, the health service

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

1          administrator is part of the command staff

2          meetings.  Here, that's not the case.  We

3          have a staffing grid that says we expect to

4          have six nurses on in the day shift, six in

5          the evenings and two on midnights.  We expect

6          there to be so many position hours during the

7          course of the week, so many NP hours and so

8          many PA hours during the course of the week.

9              And we leave that up to the health

10         services administrator to administer that.

11         Who it is, as long as they meet our minimum

12         qualifications, as long as we're getting good

13         healthcare, we kind of take a step back from

14         that.

15    Q    So you tell them what you want and you let

16         them fill those positions?

17    A    Yes.

18    Q    Do you require a background check for any

19         independent contractor that would work in the

20         prison?

21    A    Yes.

22    Q    Who administers that background check?

23    A    Generally, it's SID.  They fill out an

24         application.  A Board of Probation will be

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

146

1            run on them.  It's a criminal record check.

2            I'll refer to it as a BOP.  That could be run

3            by SID.  It could always be run by our LEAPS

4            coordinator.  She'll run a number of those as

5            well.  It just depends who is available at

6            the time.

7     Q    If it turns out that a proposed contractor

8            has a criminal record, does the prison have

9            the authority not to employ that person?

10          MS. CAULO:  Objection.

11          MS. HARVEY:  Objection.

12     A    We would look -- I mean, if someone had open

13            warrants, we wouldn't want them in there.  If

14            someone had defaults, we wouldn't want them

15            working there.  Do we have people that have

16            criminal records working in there?  Yeah.

17     Q    If red flags are raised on a proposed

18            independent contractor, does the prison have

19            the authority to not allow that contractor to

20            work in the prison?

21     A    If a nurse just got out of Walpole for

22            murder, we probably wouldn't want her in

23            there, or Framingham, yes.

24     Q    Nurse practitioners, where do they report to

1        time.

2   Q   Is there orientation and training that is

3        provided by the House of Corrections to new

4        independent contractors in the medical

5        services area?

6   A   They're given a limited number of policies,

7        the policies that we think are crucial, and

8        they are given a tour usually by the HSA or

9        one of the nurses to show them around the

10       buildings.  It's a big facility, so it's easy

11       to get lost when you're first there.  They

12       are given generally a brief orientation, but

13       I would say they're abiding by CMS's rules.

14       And we let CMS know what rules we expect them

15       to abide by, so that they can perform

16       efficiently at the House of Corrections.

17   Q   Is it your understanding that they are

18       trained as well before they start to work in

19       the prison?

20          MS. CAULO:  Objection.

21          MS. HARVEY:  Objection.

22   Q   Is it your understanding that medical

23       personnel would receive training with respect

24       to providing medical care in a prison before

1            administered exclusively by CMS?

2      A     Not all the time.  There may be training

3            classes that we have that we may invite them

4            to participate in.  There informal

5            orientation that's given usually by someone

6            of rank.  Sometimes it's the medical

7            supervisor who is a sergeant or a captain

8            that will say "here is the rules; here is

9            your policy; read them to make sure you

10           understand them; if you have any questions

11           about security, you can come and ask me about

12           it".

13               But it's completely different than the

14           training that our staff goes through.

15      Q    Do you provide guidance to CMS in terms of

16           what you expect in terms of training for

17           medical personnel?

18      A    There is language in the contract that talks

19           about the training that they provide us.  As

20           part of the contract, they provide mental

21           health training to our employees.  I know

22           they have hepatitis shots and things like

23           that, but I don't think there is any

24           guidelines to say they need to go to 40 hours

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

152

```
 1              correctional environment?

 2      A       No, I mean, they have to abide by their

 3              continuing education credits that are needed

 4              by their license, but as far as we require,

 5              no.

 6      Q       That's what I'm asking.  You just have the

 7              initial training before they first start

 8              working?

 9      A       No, they get our policy, and they are told

10              here is our policies; if you have any

11              questions, let me know.

12      Q       So you don't know anything about any other

13              training that CMS employees receive before

14              starting at the prison?

15      A       No.

16      Q       Would anybody else within the department know

17              about that training?

18      A       I mean, we don't require any training.

19              Basically, the nurses or the medical staff

20              have to be able to provide the care.  How CMS

21              or PHS provides that, that's up to them.  If

22              there is a problem with performance, that's

23              when we get involved.  If there is an issue

24              with a nurse doing something he or she
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

157

1          the nurses and/or the inmates so that proper

2          medical care can be given.

3     Q    Do you know how they record their time?

4     A    There is a time clock in the infirmary.

5     Q    Do you know where they receive their

6          paychecks?

7     A    I think its comes from CMS corporate

8          headquarters.  I guess it's probably

9          St. Louis where they are based out of.

10    Q    Do you know would determines a nurse

11         practitioner's daily schedule?

12    A    The health service administrator.

13    Q    Is that solely up to the health services

14         administrator?

15    A    Well, yes, if the health service

16         administrator were to say we only want the

17         nurse practitioner to work on the midnight

18         shift and our staffing levels were so low

19         that it would be problematic to wake inmates

20         up and bring them down.

21              But absent that, the only hours that we

22         require are nursing hours.  We want them to

23         coincide with our shifts.  We want a certain

24         level of staffing, but as far as when the

1       nurse practitioner works, when the doctor

2       works, that's up to the HSA.  As long as the

3       medical care is being given, that's what we

4       care about.

5   Q   You don't require anything in terms of who

6       provides the positions, but you have

7       requirements in terms of the hours the

8       infirmary is operating under?

9   A   There is a staffing grid that we give in the

10      RFP.  It talks about -- for example, we want

11      a nurse practitioner there seven days a week.

12      It doesn't say anything about the hours.  We

13      expedite medical care.  There will be times

14      during a lockdown or during a major count

15      that, unless it's an emergency, medical care

16      won't be gien, but generally speaking, we

17      allow the medical company to work within the

18      parameters of the facility and run the show

19      medically.

20   Q   Who provides the equipment that medical

21      personnel use?

22   A   As far as things like syringes, Band-Aids,

23      things like that, that's CMS.  The day-to-day

24      supplies are given by CMS or PHS.  Now, it's

```
 1            PHS.  We'll provided the infrastructure-type
 2            of equipment, such as dentist chair, X ray
 3            equipment, things like that, but when it
 4            comes to other supplies, whether it be ace
 5            bandages or any medicine or any narcotics,
 6            any diabetic medication, needles, syringes,
 7            taking care of the medical waste, that's all
 8            CMS or PHS.
 9     Q      So it's a mix in terms of the provision of
10            equipment?
11                 MS. CAULO:   Objection.
12                 MS. HARVEY:   Objection.
13     A      That's not what I said.
14     Q      I don't mean to mischaracterize.
15     A      I think basically what we do is we give them
16            office space and some of the infrastructure
17            things they need to do.  We put the roof over
18            their head and put the lights on and say run
19            the show.
20     Q      What types of infrastructure do you provide?
21            You mentioned a dentist chair.  What other
22            examples of equipment would you provide to
23            CMS?
24     A      We provide them office space so they can give
```

160

```
 1              the care.  We provide them with an X ray

 2              machine.  There is a dialysis machine that we

 3              provide, but again, it's just some of the

 4              main, big-ticket, infrastructure type of

 5              things that we provide.

 6       Q      Heavy-duty equipment, if you will?

 7       A      Yeah.

 8       Q      Independent contractors, are they required to

 9              follow internal department policies?

10              MS. CAULO:  Objection.  Asked and

11              answered.

12       A      Yes, they are.

13       Q      I have one more brief area, and then we'll be

14              done.  By the way, who maintains custody of

15              an inmate's medical records?

16       A      The medical provider.

17       Q      So an inmate's medical record is within the

18              possession, custody and control, if you will,

19              of whoever the medical provider is at the

20              time?

21       A      Yes, there is a medical records area that's

22              extremely secure, and our staff doesn't have

23              access to that.

24       Q      I imagine there are special procedures that
```

161

1       would have to be followed in order for the

2       prison to be able to access an inmate's

3       medical record?

4  A    Basically, it would be unusual.  In the event

5       of a situation like this, if there were

6       allegations being made, we would probably

7       want investigations to be able to look at any

8       injuries or alleged injuries he or she may

9       have received, yes.

10  Q    Do you know how long an inmate's record is

11       kept at the facility?

12  A    30 years.

13  Q    So even after an inmate is long gone, his or

14       her records will be there for 30 years?

15  A    Yes.

16  Q    Is that kept on site at the facility?

17  A    Yes, right now, we're running out of room,

18       but we keep it on site.

19  Q    You first came to the House of Corrections

20       in -- you returned to the Suffolk County

21       House of Corrections in November of 2003; is

22       that right?

23  A    Yes.

24  Q    You have been there ever since?

161

```
 1              would have to be followed in order for the

 2              prison to be able to access an inmate's

 3              medical record?

 4      A       Basically, it would be unusual.  In the event

 5              of a situation like this, if there were

 6              allegations being made, we would probably

 7              want investigations to be able to look at any

 8              injuries or alleged injuries he or she may

 9              have received, yes.

10      Q       Do you know how long an inmate's record is

11              kept at the facility?

12      A       30 years.

13      Q       So even after an inmate is long gone, his or

14              her records will be there for 30 years?

15      A       Yes.

16      Q       Is that kept on site at the facility?

17      A       Yes, right now, we're running out of room,

18              but we keep it on site.

19      Q       You first came to the House of Corrections

20              in -- you returned to the Suffolk County

21              House of Corrections in November of 2003; is

22              that right?

23      A       Yes.

24      Q       You have been there ever since?
```

# EXHIBIT 5



## Suffolk County Sheriff's Department



Jail
200 Nashua Street
Boston, MA 02114
(617) 635-1100

House of Correction
20 Bradston Street
Boston, MA 02118
(617) 635-1000

RICHARD J. ROUSE
SHERIFF

BRIAN BYRNES
SPECIAL SHERIFF

August 26, 2002

Nancy Lawrence, Regional Manager
Correctional Medical Services
12647 Olive Boulevard
Saint Lewis, MI   63141-9052

Dear Nancy,

I am writing this letter to express the gratitude of the Suffolk County Sheriff's Department for the commendable job performed by NP Sheila Porter. RN  Marie Matalunis and LPN Craig Meekins in saving inmate Leroy Ford's life.

On Friday, August 9th in the booking room while inmate Leroy Ford was being processed for release the medical staff responded to a man down. Marie Matalunis was the first nurse to respond. She found inmate Leroy Ford conscious but complaining of chest pain; she immediately called for assistance. Craig Meekins and Sheila Porter responded to assist Marie along with several correctional officers. Mr. Ford lost consciousness and suffered cardiac arrest. He was revived by your nursing staff and the correctional officers and sent out by EMS to BMC.

Nancy, these individuals are truly dedicated to their work and we are happy to have them on site at the Suffolk County House of Correction.

Sincerely yours,

Gerard Horgan,
Deputy Superintendent

cc:  Donna Jurdak, Health Services Administrator
Sheila Porter
Marie Matalunis
Craig Meekins



**Correctional Healthcare Solutions, Inc.**
*innovative health care management*

# MEMORANDUM

**TO:**   Cathy Willis, RN, Sheila Porter, NP, Mary Bottary-Golden, RN
D. Feliz, Corrections Officer

**FROM:**   Donna Jurdak, RN, Administrator
Maria Vega, RN, Nursing Supervisor

**DATE:**   December 28, 1994

**RE:**   Emergency Response on 12/23/94, evening shift

We would like to recognize your excellent performance and timely response concerning the man-down in the lobby on 12/23/94 evening shift.

This near tragic incident was assessed and appropriate emergency care was rendered by you, the medical staff. You demonstrated knowledge and successful technique in emergency CPR on the necessitation of the 73 year old female civilian.

This individual is doing well at the hospital facility to date.

**cc:**   John Twomey, Supt.
Anthony Leggiero, Lt.
Ann Mack, Regional Administrator, FNP