# EXHIBIT 6

## AFFIDAVIT

I, Christa J. Snyder, aver the following to be true and correct to the best of my knowledge:

1.      I am a Special Agent of the Federal Bureau of Investigation (FBI), currently assigned to the Boston Division;

2.      Beginning in 1999, Sheila Porter provided information to the FBI, on a confidential basis, about events at the Suffolk County House of Corrections (HOC);

3.      Sheila Porter was providing this information as of the date of her dismissal from HOC;

4.      On May 20, 2003, and one or more other dates, Sheila Porter provided information to the FBI about events at HOC;

5.      On or about May 29, 2003, Sheila Porter provided information to the FBI about her having been questioned by Sheriff's investigators regarding her previously having provided information to the FBI.

I declare the foregoing is true to the best of my knowledge.  Signed under pains and penalties of perjury, this _7_ day of _June_, 2005.

_Christa J. Snyder_
Christa J. Snyder
Special Agent
Federal Bureau of Investigation
Boston, Massachusetts

SP 218

# EXHIBIT 7

```
 1                                        VOL:  I
                                       PAGES: 1-118
 2                                     EXHIBITS: 1-4

 3

 4              UNITED STATES DISTRICT COURT

 5          FOR THE DISTRICT OF MASSACHUSETTS

 6

 7    *  *  *  *  *  *  *  *  *  *  *  *  *  *
      SHEILA J. PORTER,                       *
 8                        Plaintiff           *
               -vs-                           *     Civil Action
 9    ANDREA CABRAL; SUFFOLK COUNTY           *     No. 04-11935-DPW
      SHERIFF'S DEPARTMENT; SUFFOLK           *
10    COUNTY and CORRECTIONAL MEDICAL         *
      SERVICES, INC.,                         *
11                        Defendants          *
      *  *  *  *  *  *  *  *  *  *  *  *  *  *

12

13    CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

14

15        DEPOSITION OF MARY ELLEN MASTRORILLI, a witness
      called on behalf of the Plaintiff, in the
16    above-captioned matter, said deposition being
      taken pursuant to the Federal Rules of
17    Civil Procedure, before Patricia M.
      McLaughlin, a Certified Shorthand Reporter and
18    Notary Public in and for the Commonwealth of
      Massachusetts, at the offices of Goodwin Procter
19    LLP, Exchange Place, Boston, Massachusetts, on
      Monday, June 27, 2005, commencing at 10:05 a.m.

20

21

22        McLAUGHLIN & ASSOCIATES COURT REPORTERS
               92 DEVIR STREET, SUITE 304
23           MALDEN, MASSACHUSETTS  02148
                    781.321.8922
24              WWW.E-STENOGRAPHER.COM
```

12

```
 1              to her?
 2      A       She told me that Nurse Practitioner
 3              Sheila Porter had observed suspicious
 4              bruising on an inmate, suspicious injuries or
 5              suspicious bruising, on an inmate by the name
 6              of Rene Rosario.  I then said to Donna,
 7              "Please tell Sheila to write a confidential
 8              report on her observations, and once I
 9              receive that report I will give it to my
10              boss," who was Superintendent Patrick
11              Bradley, "and I will also forward a copy of
12              the report to SID."
13      Q       Was anyone else present for that
14              conversation?
15      A       No.
16      Q       Do you remember what was Miss Jurdak's
17              reaction to that?
18      A       She said that she would tell Sheila to write
19              the report.
20      Q       Was there any other conversation that you can
21              recall between the two of you at that time?
22      A       I don't recall any further conversation
23              beyond that.
24      Q       I take it you didn't specify a particular
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

13

1          time frame for that report to be completed in

2          that conversation?

3     A    I did not.  No, I did not specify.

4     Q    After that conversation did you next have

5          some communications with anyone else on that

6          topic?

7     A    I believe I told my boss, Patrick Bradley,

8          that Donna had come to me sharing

9          Sheila Porter's observations, and I believe I

10         told him the action that I took, which was to

11         ask for a written report to be submitted.

12    Q    And do you think you had an oral conversation

13         or a written communication with Mr. Bradley

14         or both?

15    A    I can't specifically recall.  I may have told

16         him verbally and then followed up with a

17         written report just to keep him informed.

18              (Document marked Exhibit No. 1.)

19    Q    Miss Mastrorilli, I have put in front of you

20         what's been marked as Exhibit No. 1 and I ask

21         if you recognize that document.

22    A    Yes, I do.

23    Q    What do you recognize it to be?

24    A    I recognize it to be an E-mail from me to my

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

20

```
 1          recall?
 2     A    I can't recall what was on his message beyond
 3          the fact that he wanted me to call him and
 4          speak to him.
 5     Q    You may or may not have known the topic of
 6          what you were calling him back on?
 7     A    That's correct.
 8     Q    And as you sit here today, give me your best
 9          memory of what it is he said to you when you
10          called him back?
11     A    I believe he said to me do you realize that
12          one of our contract employees sent a
13          confidential report to the FBI without our
14          knowledge, without our authorization.  I
15          said, no, I did not realize that.  He told me
16          then that the FBI received a confidential
17          report from a woman named Sheila Porter, who,
18          of course, was our nurse practitioner.
19          According to this memo --
20     Q    Give me your best memory.
21     A    So I said, no, I didn't realize that
22          Sheila Porter had sent a confidential report
23          to the FBI about suspicious bruising.  I said
24          in response to that information, I said
```

21

1    that's -- I have a problem with an employee

2    sending outside confidential information --

3    sending confidential information to an

4    outside employee, should I now do what I need

5    to do to bar this employee.  He said, no, let

6    me talk it over with the Chief of Staff.

7  Q  You indicated in the report that he

8    wholeheartedly agreed with you.  What do you

9    remember him saying in terms of him

10    expressing his agreement?

11  A  He was in agreement that an employee should

12    not send confidential information to an

13    outside agency and that that is, in fact,

14    grounds for barring.

15  Q  He's agreeing with both components of that;

16    he's agreeing with your assessment that this

17    isn't right to send it to an outside agency

18    and that your response to that should be

19    barring?

20     MS. CAULO:  Objection.

21  A  Yes.

22  Q  When you offered to bar Mrs. Porter, what is

23    it he responded back to you?

24  A  He said don't do anything yet; let me talk it

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

24

1    from Miss Jurdak that you had requested on

2    May 19th?

3  A  Yes, I did receive it.

4    (Document marked Exhibit No. 3.)

5  Q  Miss Mastrorilli, I'll show you what's been

6    marked as Exhibit No. 3, and it appears to be

7    a three-page document.  I'd start by asking

8    you if you recognize the second two pages,

9    which appear to be Bates stamped 746 and 747.

10  A  Yes, I do recognize these pages.

11  Q  What do you recognize those pages to be?

12  A  This was the report that I had been waiting

13    for from Sheila that Donna Jurdak delivered.

14  Q  I take it when you received the report it was

15    not blacked out in various spots as this

16    document is, correct?

17  A  That's correct.

18  Q  And do you remember when you received the

19    report?  Do you remember the date?

20  A  I don't remember the exact date, but I

21    believe it was about ten days to two weeks

22    after I had requested it.

23  Q  When you received it, do you recall whether

24    it had the stamp "confidential" at the top,

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

27

1        remember what I did in this case, but it's

2        likely that he received the original.

3   Q   In addition to Mr. Bradley, did you provide a

4        copy to anyone else?

5   A   I don't specifically remember.  I may have

6        given a copy to Viktor Theiss.  I may have

7        slid a copy under his door, but I don't

8        specifically recall.

9   Q   Did you keep a copy for yourself?

10   A   I believe I did.

11   Q   Did you read the report when you received it?

12   A   Yes, I did.

13   Q   Other than forwarding copies or

14        originals as you've described to us, did you

15        take any other action?

16   A   No.

17   Q   At any time during this time period that

18        we're referring to, did you ask anyone to

19        initiate or cause an investigation of

20        Miss Porter?

21   A   No.

22   Q   Do you remember how you received the back two

23        pages of this three-page document of

24        Exhibit 6?  Do you know who delivered it to

```
 1              receiving this.  I believe some time had
 2              passed.
 3        Q     So what is the next event then that you
 4              remember as it relates to the barring of
 5              Miss Porter?
 6        A     The next thing I recall is Viktor Theiss
 7              telling me that I can move forward and bar
 8              Sheila Porter, and I said, okay, but what am
 9              I going to bar her for; what should I tell
10              her.  He told me talk to the Chief of Staff;
11              the Chief of Staff will tell you.
12        Q     Was that a telephone call or a meeting that
13              you had with Mr. Theiss?
14        A     I don't recall.
15        Q     Was it close in time to when you actually met
16              with Miss Porter and barred her?
17        A     Yes.
18        Q     Is it the same day?
19        A     It was the same day, yes.
20        Q     If I suggest to you that the day that
21              Miss Porter was barred was June 10th of 2003,
22              is that consistent with your memory?
23        A     Yes, it is.
24        Q     So you had some conversation with Viktor
```

30

1        Theiss on June 10th?

2    A    Yes.

3    Q    He then directed you to go get the reasons

4        for barring Miss Porter from the Chief of

5        Staff?

6    A    Yes.

7          MS. CAULO:  Objection.

8    Q    Who is the Chief of Staff?

9    A    Elizabeth Keeley.

10    Q    Did you have some contact with Miss Keeley?

11    A    Yes, I did.

12    Q    Do you recall, was it in person or was it on

13        the telephone?

14    A    I don't recall specifically.  I want to say

15        that it was in person, but I don't

16        specifically recall the details.

17    Q    What's your best memory of what you said to

18        her and what she said to you in that

19        conversation about barring Miss Porter?

20    A    My best recollection is that I told her that

21        Viktor told me to move forward with the bar,

22        but that I was unclear as to the reasons for

23        it or what I should say to Sheila in barring

24        her and that Viktor directed me to talk to

31

1        her about it, so I'm here for my direction.

2   Q   What did she say to you?

3   A   She said to me, well, clearly Sheila has

4        divulged confidential patient information to

5        an outside agency, and that's grounds for her

6        to be barred.

7   Q   What else was said in that conversation, if

8        anything?

9   A   The only other thing that I can recall, we

10        may have had some discussion about the S220

11        policy, and the S220 policy is the policy

12        having to do with rules and regulations

13        governing employee actions.

14   Q   And what's your best memory of what portion

15        of S220 was discussed with Miss Keeley?

16   A   There were a couple of paragraphs in that

17        policy that spoke to employees divulging

18        confidential inmate information to an outside

19        agency without authorization and that

20        specifically based on that language I could

21        bar her.

22        (Document marked Exhibit No. 4.)

23   Q   Miss Mastrorilli, is it your best

24        recollection that you and Miss Keeley had a

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

32

```
1          physical copy of S220 during your

2          conversation or that she was describing to

3          you the provision that related to discussion

4          of confidential information?

5     A    I don't recall actually myself having a copy

6          of the policy.  I did later on when I met

7          with Sheila and barred her.  At the moment

8          that Chief Keeley and I were discussing it, I

9          don't recall being in possession of the

10         policy.  Chief Keeley may have been, but I

11         don't recall that I was.

12    Q    Is it your memory that you left the meeting

13         with Chief Keeley with a specific provision

14         in mind that was the basis for barring

15         Miss Porter?

16              MR. KILEY:  Objection.

17              MS. CAULO:  Objection.

18    A    Yes.

19              MR. KILEY:  My memory is the testimony

20         was that she wasn't sure whether it was a

21         meeting or a telephone call.

22    BY MR. SAVAGE:

23    Q    Fair enough.  Is it your best memory that you

24         concluded your encounter, whether it was by
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

33

```
1              phone or in person, with Miss Keeley with an
2              understanding of a specific provision under
3              which Miss Porter would be barred?
4                  MS. CAULO:  Objection.
5      A       Yes.
6      Q       So what did you do next after that
7              conversation?
8      A       I contacted Donna Jurdak, and I said -- I
9              called her up, and I think I asked her to
10             come to my office.  Then when she was in my
11             office, I said, Donna, I'm going to have to
12             bar Sheila Porter today, and I want you to be
13             in the office with me when we do this; the
14             way it will work is, Donna, you and I will go
15             to your office; you will then call Sheila in;
16             I will bar her; I will read from the policy,
17             and that will be that.
18     Q       So what happened next?
19     A       This conversation with Donna took place at
20             about 12 noon.  I asked when does Sheila's
21             tour of duty end for the day.  Donna told me
22             that her shift normally ends around 3, 3:30,
23             but it's not unusual for her to work longer,
24             to work until 5, 5:30.  So I said, okay, I'll
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

34

```
 1          come to your office at 3 o'clock and we'll

 2          meet with Sheila and I'll bar her.

 3     Q    What happened next?

 4     A    At 3 o'clock, I went to the office, Donna's

 5          office.  Donna called Sheila in, and I

 6          started my conversation by saying something

 7          like, Sheila, I need to have a very

 8          uncomfortable conversation with you this

 9          afternoon.  I said it has recently come to my

10          attention that you have divulged confidential

11          medical information with an outside agency

12          and as a result I'm going to have to bar you.

13          I said contract employees are held to the

14          same rules and regulations as county

15          employees.

16               I opened the policy, and I read one or

17          two paragraphs having to do with information

18          being given to outside agencies without

19          authorization.  I read those paragraphs, and

20          then I asked is there anything that you'd

21          like to say in your defense or is there

22          anything that in any way would you like to

23          respond.  Sheila was very upset, said no,

24          stood up and left the office.
```

36

1          document, is the provision that you refer to

2          in barring her contained on that page?

3     A    Yes, it is.

4     Q    Which provision is that?

5     A    I believe it's Provision C, Confidential

6          Communications.

7     Q    And did you read all or part of Paragraph C

8          to Miss Porter when you barred her?

9     A    Yes, I did.

10    Q    Do you recall what portion you read?

11    A    I believe I read C1 and C2A.  I believe those

12         are the only two sections that I read.

13              MR. KILEY:  May I have a moment, please,

14         with my client.

15              MR. SAVAGE:  Sure.

16         (Witness and counsel conferred.)

17              MR. KILEY:  Can we stay off the record?

18              MR. SAVAGE:  Yes.

19         (Discussion held off the record.)

20    BY MR. SAVAGE:

21    Q    Miss Mastrorilli, you indicated that you

22         would have shared with Miss Porter the

23         contents of Paragraph C1 and 2A?

24    A    Yes.


McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

38

1    Q    At that point had anyone at the Suffolk

2          County Sheriff's Department told you that

3          Miss Porter had had previous circumstances

4          where she was called upon to share

5          information with the FBI?

6    A    No.

7    Q    And if you had known that, would that have

8          changed your view as to whether she should

9          have been barred?

10          MS. CAULO:  Objection.

11    A    Yes, it would have.

12    Q    In what way would it have changed your view?

13    A    I believe I would have questioned the

14          barring.

15    Q    To determine whether people at the

16          Suffolk County Sheriff's Office had known

17          about her previous activities?

18    A    That and also the appropriateness of barring

19          someone who is working with law enforcement.

20    Q    Were there any circumstances surrounding

21          either the timing or form of Miss Porter's

22          report to you of the Rene Rosario

23          observations that she made that would have

24          justified in your mind barring her?

39

1    A    No.

2    Q    In your experience supervising the medical

3         unit are you aware of whether circumstances

4         surrounding the timing or form of reports

5         would be of sufficient seriousness to warrant

6         barring someone?

7    A    No.

8    Q    What's, in your experience, the typical

9         sanction if there is a problem with either

10        the form of a report or the timeliness of a

11        report?

12            MS. CAULO:   Objection.

13   A    I supposed taking an employee's entire work

14        history into account it could range from a

15        verbal warning up to and including

16        discipline, termination.

17   Q    Whose decision is that?

18   A    Depending on the severity of the sanction, it

19        could be the immediate supervisor or it could

20        go as high as the Sheriff in the case of

21        termination or barring.

22   Q    After you had your meeting with Miss Porter,

23        did you communicate to anyone that you had

24        had that meeting?

45

1   Q    Did you have a conversation after Miss Porter

2        was barred with anyone from CMS calling to

3        inquire as to the basis for the barring?

4   A    I don't have specific recollection, but it

5        would not have been unusual for me to speak

6        with Ann Mack.  Ann Mack was the regional

7        vice-president.  It's likely that Ann Mack

8        and I would have had a conversation.

9   Q    Do you have a memory of what the substance of

10       that conversation was?

11  A    I think -- again, I don't have a specific

12       memory, but I believe what I told her is that

13       Sheila was barred because of giving

14       confidential information to an outside

15       agency.

16  Q    Are you aware of whether there are any

17       contractual or other procedures between the

18       Suffolk County Sheriff's Department and CMS

19       in terms of notice and other procedural

20       actions that are supposed to be taken when

21       someone is barred?

22  A    I was not aware of those procedural actions.

23  Q    Do you know whether the Suffolk County

24       Sheriff's Office did anything in terms of

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

53

```
 1    Q    I'm not asking you what you had received,

 2         Miss Mastrorilli.

 3              MR. SAVAGE:  Let her finish her answer.

 4         You can finish your answer.

 5              THE WITNESS:  What I had received was a

 6         medical progress note form, which I accepted

 7         as a confidential incident report even though

 8         the form wasn't technically -- an incident

 9         report form is a piece of paper that is

10         blank, and it says Suffolk County

11         Sheriff's Department Incident Report.  I

12         accepted this as a confidential incident

13         report.

14    Q    When you say you accepted this, you are

15         referring to Exhibit No. 3, which is the

16         two-page document dated May 19th with

17         Miss Porter's signature on the second page?

18    A    Yes.

19    Q    When you say you accepted this, when you gave

20         the directive for Mrs. Porter to provide a

21         confidential incident report, is this what

22         you expected to receive?  When I say this,

23         Exhibit No. 3.

24              MR. SAVAGE:  Objection.
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

54

```
1      A    I expected a confidential report.  The format

2           mattered little to me.  What was important to

3           me was the information contained.  I couldn't

4           have cared less about what piece of paper it

5           was written on.

6      Q    I didn't ask you --

7               MR. SAVAGE:  Will you please let her

8           answer.

9      Q    I'm sorry.  I cut you off, Miss Mastrorilli.

10          It was not my intention.

11     A    For all intents and purposes, that was a

12          confidential incident report for me.

13     Q    I appreciate that.  I understand that you

14          didn't necessarily care what the form was,

15          but when you said a confidential incident

16          report, you did not intend for this two-page

17          document; is that correct?

18              MR. SAVAGE:  Objection.

19     A    I really can't say.  I mean, up until I saw

20          this report, I don't think that I have ever

21          seen an interdisciplinary progress note form.

22          So when I gave the directive to Donna, I gave

23          it to her in language that I was familiar

24          with, which was an incident report form.  So
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

97

1     the day?

2          MS. CAULO:  No, we're not here for the

3     day, Joe.

4  A  My best recollection is I met with her in her

5     office.  I don't recall exactly.

6  Q  Did you have a discussion with her concerning

7     the barring of Sheila Porter?

8  A  Yes.

9  Q  How long was this meeting?  How long did it

10    take?

11 A  I believe it was very brief, five to ten

12    minutes.

13 Q  And during this five- or ten-minute meeting,

14    the Chief of Staff provided to you reasons

15    why Miss Porter should be barred?

16 A  Yes.

17 Q  Did she discuss with you Miss Porter's

18    failure to file a timely report?

19 A  No.

20 Q  Did she discuss with you Miss Porter's

21    failure to document Mr. Rosario's medical

22    file?

23 A  No.

24 Q  Did she discuss with you the concerns about

98

1          the inconsistent nature of the information

2          contained within the May 19th document and

3          observations of other persons who had seen

4          Mr. Rosario?

5     A    No.

6     Q    Did you take any notes of this meeting,

7          Miss Mastrorilli?

8     A    I don't recall taking notes, no.

9     Q    Your recollection is that Miss Keeley was

10         looking through S220 while she was discussing

11         with you the reasons for the barring of

12         Miss Porter?

13    A    I don't exactly recall.  I'm thinking that

14         she did, but I don't have a specific

15         recollection.  I don't know that I would have

16         pulled out the policy on my own, and I don't

17         think I would have done that on my own and

18         read it to Sheila.  So I'm thinking that the

19         chief and I must have discussed it.

20    Q    When you say must have discussed it, S220?

21    A    The policy, yes.

22    Q    Do you recall having a conversation with the

23         Chief of Staff sometime in June after

24         Miss Porter was barred regarding the meeting

# EXHIBIT 8

```
 1                                        VOL:   I
                                        PAGES: 1-217
 2                                      EXHIBITS: 1-14

 3

 4              UNITED STATES DISTRICT COURT

 5           FOR THE DISTRICT OF MASSACHUSETTS

 6

 7     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
       SHEILA J. PORTER,                  *
 8                      Plaintiff         *
                  -vs-                    *   Civil Action
 9     ANDREA CABRAL; SUFFOLK COUNTY      *   No. 04-11935-DPW
       SHERIFF'S DEPARTMENT; SUFFOLK      *
10     COUNTY and CORRECTIONAL MEDICAL    *
       SERVICES, INC.,                    *
11                      Defendants        *
       *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
12

13      CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

14

15        DEPOSITION OF BRIAN DACEY, a witness
       called on behalf of the Plaintiff, in the
16     above-captioned matter, said deposition being
       taken pursuant to the Federal Rules of
17     Civil Procedure, before Patricia M.
       McLaughlin, a Certified Shorthand Reporter and
18     Notary Public in and for the Commonwealth of
       Massachusetts, at the offices of Goodwin Procter
19     LLP, Exchange Place, Boston, Massachusetts, on
       Thursday, June 16, 2005, commencing at 10:10 a.m.
20

21

22           McLAUGHLIN & ASSOCIATES COURT REPORTERS
                  92 DEVIR STREET, SUITE 304
23                MALDEN, MASSACHUSETTS  02148
                       781.321.8922
24                 WWW.E-STENOGRAPHER.COM
```

1    Q    That isn't the question that I meant to ask.

2    A    I'm sorry.

3    Q    When the incident report has a date that it's

4         filed, is it your policy and practice that

5         that's the truthful date that it was filed?

6    A    I'm sorry.   Read that again.

7             (Reporter read question as recorded.)

8             I can't say that that's the truthful

9         date that it's filed.

10   Q    So on occasion, you put dates that are

11        different than the date that it's filed in

12        the section that says "date report filed"?

13   A    I don't recall when I wrote this report.   I

14        know I have the date in there, but there are

15        times when I may have put the date --

16   Q    So the date that's written in --

17             MS. CAULO:   Have you finished your

18        answer?

19   A    My practice at that time is different

20        slightly now.   I believe at this time we were

21        writing the day of the incident and the date

22        of the report filed as the same date, not

23        necessarily when I actually filed the report.

24   Q    So it's possible that this report is

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

48

1        you put that the date the report filed to be

2        the same date of the incident?

3  A   Not necessarily my policy.

4  Q   There were occasions when that happened?

5  A   Again, I was new in the department.  These

6        were new incident reports that had been

7        created by our department at the time.

8  Q   Is there anything else in this report that

9        you believe may be inaccurate?

10      MS. CAULO:  Objection.  I don't believe

11       the witness has testified that that is

12       inaccurate.

13      MR. SAVAGE:  I said may be.

14      MS. CAULO:  You may answer.

15  A   I don't know.

16  Q   You don't know if this report is accurate?

17  A   I haven't read it in full.

18  Q   Take your time.

19  A   I believe it to be accurate, with the

20       exception that I may have added staff members

21       involved at a later date as I learned of more

22       staff members.

23  Q   So it's your testimony that the section that

24       says "staff members involved" is not an

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

```
 1            accurate listing of the staff members that

 2            you knew to be involved on May 19th, 2003?

 3       A    Correct.  On May 19th, 2003, the only staff

 4            members that I knew were to be involved were

 5            the medical staff that I had observed when I

 6            observed the medical records and Mark

 7            DeAngelis, who was the unit officer.  I

 8            believe I learned from the logbook in the

 9            medical unit who had transported

10            Inmate Rosario down to the medical unit.

11       Q    So now, it's your best memory that you know

12            for a fact that the date that this report was

13            filed was not May 19th?

14       A    No, I'm going to change that.  It probably

15            was filed on that May 19th, yet I know I

16            added names after May 19th to be inclusive of

17            our entire investigation, who was involved as

18            far as staff members went.  So those names

19            could have been added at a later date.  Such

20            as Robert Murphy and Scott Smith on May 19th,

21            I didn't necessarily know that they were

22            involved, as well as Nurse Sheila Porter

23            because her name was not in any medical

24            record.
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

52

1           your business what you do.  The date the

2           report filed, again, this was a new form that

3           was created.  It wasn't filed anywhere.  This

4           was on our computer.  It was a working

5           investigation.

6     Q     Would you agree with me that someone reading

7           this report and seeing "date report filed"

8           and then reading information below it would

9           reasonably conclude that that was the

10          information known on the date that the report

11          was purportedly filed?

12    A     Someone might, yes.

13    Q     When you say someone might, Wouldn't you

14          think virtually everyone would?

15              MS. CAULO:  Objection.  You may answer.

16    A     I don't know.

17    Q     Is there any indication on this document that

18          would make someone think that any information

19          was added after May 19th?

20    A     Is there any indication?  I'm sorry.

21    Q     On this document that there is any

22          information contained within the document

23          that was added after May 19th?

24    A     There is no indication, no.

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

80

1           after I spoke to Nurse Meekins.

2      Q    Right after as on May 22nd?

3      A    Correct.

4      Q    Then why is it dated on June 5th?

5      A    As you can see by the date, 06/05/03, that

6           changes the date.  It automatically changes

7           the date unless you cross that out and type

8           in the dates.  So when I printed that on

9           June 5th, 2003, that is why that date

10          reflects it.

11     Q    So you say there is an automatic device that

12          prints on the to-from memos records the date

13          as the date the document is printed?

14     A    If I change the date, then it will reflect

15          that date, but I have no way of knowing.  I

16          know I wrote this report before 6/5/03.

17     Q    Going back to Exhibit 3 --

18     A    That does not change.

19     Q    I take it that your --

20     A    That does not automatically change.

21     Q    The technology does not automatically change

22          the date and the date filed?

23     A    Not on that incident report, no.

24     Q    So it's impossible to tell from Exhibit 6

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

81

1          when the document was actually prepared?

2    A    My typical practice is to type my reports

3          after -- within that day or the day following

4          my interviews.

5    Q    If you go down to the middle of the report,

6          am I reading accurately the sentence that

7          said, "Meekins stated that the only injury he

8          observed was a bruise on R's left bicep"?

9    A    That's correct.

10   Q    Is that what Meekins said to you?

11   A    That's what I can recall.  I don't recall

12         necessarily what he said to me, but that's

13         what I put in my report following our

14         interview.

15   Q    Was that consistent with your observations of

16         the injuries?

17   A    I observed three light marks on his left

18         bicep and one up on his shoulder.

19   Q    Meekins stated that the only injury he

20         observed was a bruise on R's left bicep.  I

21         take it then his observations were not

22         accurate as far as you were concerned?

23              MS. CAULO:  Objection.

24   A    Well, that was his observation.

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

93

```
1    Q    In your investigation of the allegations by
2         Rene Rosario, did you interview Mrs. Porter?
3    A    Yes.
4    Q    How many times?
5    A    Twice.
6    Q    When was the first time?
7    A    May 22nd, I believe, 2003.
8    Q    What were the circumstances of that
9         interview?
10   A    We were in the medical unit making copies of,
11        I believe, the medical record at the time,
12        and Miss Porter was also in the medical unit
13        and intimated that she knew about Rene
14        Rosario or knew why we were there.
15   Q    When you say intimated, what did she say to
16        you and what did you say to her?
17   A    I don't recall.  Just that she knew why we
18        were here, to talk to Rene.
19   Q    Did she initiate the conversation or did you?
20   A    I believe she did.
21   Q    Who was present when she initiated this
22        conversation?
23   A    Investigator Aleman.
24   Q    And yourself?
```

102

1           had contacted Agent Snyder.  I didn't know

2           whether it was an inmate or a staff member at

3           that point.  It was in the back of my mind.

4           It wasn't the target or the focus of our

5           investigation.  It was just to find out who

6           assaulted Rene Rosario, if anyone assaulted

7           Rene Rosario.

8      Q    What was your conversation with Mr. Jacobs

9           about the topic of Miss Porter?

10     A    Just prior to going into the interview, he

11          asked us what we were doing.  I don't think

12          he knew who we were interviewing.  I said,

13          oh, we finally got Nurse Rosario's report; we

14          just have follow-up questions for her.  I

15          said to him words to the effect, my best

16          recollection, I think she phoned the FBI, and

17          he said, well, see if she'll tell you in

18          there.

19     Q    I think you said in your answer

20          Nurse Rosario.  I assume you meant

21          Nurse Porter?

22     A    I'm sorry.  Nurse Porter

23     Q    That's what you meant?

24     A    It was.

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

103

```
 1      Q    In your conversation with Mr. Jacobs, who

 2           else was present?

 3      A    Just he and I.

 4      Q    Was it a prearranged meeting?

 5      A    No, no, it was impromptu.

 6      Q    What caused him to ask the question, if you

 7           know?

 8      A    What caused him to ask --

 9      Q    The question, what are you doing?

10      A    We had someone in the interview room, and he

11           just wanted to know who are you guys

12           interviewing.  It was a standard, general

13           question.

14      Q    And your response was what?

15      A    We finally got a report from Nurse Porter,

16           and we are interviewing her regarding her

17           report.

18      Q    And some conversation about her and the FBI?

19      A    I said I think she might have been the one

20           who contacted the FBI, and he said, well, see

21           if she'll tell you in there.

22      Q    Why was it important to you and Mr. Jacobs to

23           see if Miss Porter would tell you if she was

24           the one who contacted the FBI?
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

128

| | | |
|---|---|---|
| 1 | Q | You don't have a memory? |
| 2 | A | I don't know if she offered it or whether it |
| 3 | | was asked.  I honestly don't. |
| 4 | Q | Up at the top of that page, the third line |
| 5 | | down, there is a sentence that says, |
| 6 | | "Miss Porter stated that she observed a |
| 7 | | bruise on the left upper chest/shoulder/bicep |
| 8 | | area."  Is it your memory that that's what |
| 9 | | she said? |
| 10 | A | I remember more the contiguous to the bicep. |
| 11 | | I don't know whether Sonya was summarizing or |
| 12 | | paraphrasing at that point.  I don't recall. |
| 13 | Q | So your best memory is Miss Porter may or may |
| 14 | | not have said shoulder? |
| 15 | A | Again, I think Sonya might have included |
| 16 | | that.  This is her report.  This is her |
| 17 | | summary.  I don't know. |
| 18 | Q | You say it's her report and her summary, but |
| 19 | | you've also told us that you say -- |
| 20 | A | I don't recall at this point.  At that time, |
| 21 | | I said it was a true and accurate summary of |
| 22 | | the events as told to us. |
| 23 | Q | When, in fact, Miss Porter never mentioned |
| 24 | | shoulder at all, did she? |

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

131

```
 1    A    I don't recall whether she had told me
 2         anything or whether I had known anything
 3         about that.
 4    Q    Subsequent to that, what, if anything, do you
 5         know about Miss Porter's contact about
 6         Miss Jurdak?
 7    A    Other than what's in Sonya Aleman's report, I
 8         think that's basically what I knew about
 9         Miss Jurdak.
10    Q    When you say basically, is there something
11         else?
12    A    No, I can't recall honestly, other than
13         what's in Sonya's report.
14    Q    Did you ever speak to Miss Jurdak about any
15         topic relating to Rene Rosario's allegations
16         or Mrs. Porter's report?
17    A    No, I don't believe we did.
18    Q    When you say "we" --
19    A    I didn't.
20    Q    Are you aware of anyone else who did?
21    A    No, when I said we, I was thinking about
22         Sonya since we did the investigation
23         together.
24    Q    Just to keep the record as clear as we can,
```

132

| | | |
|---|---|---|
| 1 | | the same question as to Miss Mastrorilli, did |
| 2 | | you or anyone else speak to her in connection |
| 3 | | with the investigation of Rene Rosario's |
| 4 | | allegations and Mrs. Porter's reporting? |
| 5 | A | I did not, and I don't know whether anyone |
| 6 | | else did. |
| 7 | Q | Without reference to your report, what do you |
| 8 | | remember Miss Porter saying to you about her |
| 9 | | contact with Miss Jurdak? |
| 10 | A | I didn't have a recollection until I reread |
| 11 | | Sonya's report. |
| 12 | Q | Do you have a recollection now, or is it just |
| 13 | | whatever the report says? |
| 14 | A | What's in the report is my best memory. |
| 15 | Q | Do you have any specific memory independent |
| 16 | | of that interview with Miss Porter that day |
| 17 | | beyond what's in this report? |
| 18 | A | I have some specific memory, sure. |
| 19 | Q | What do you recall about it? |
| 20 | A | I recall that she came down.  It was a |
| 21 | | cordial interview.  We discussed what she had |
| 22 | | learned from Rosario, what she had observed |
| 23 | | from Rosario, whether she had any knowledge |
| 24 | | about any threats Rosario was alleging had |

```
1          conclusion of your investigation of
2          Mr. Rosario's allegations, did you receive
3          any follow-up contact from anyone in the
4          Sheriff's Office about that investigation?
5     A    No.
6     Q    Were you ever asked to make a report, a
7          recommendation, based on your findings
8          concerning Miss Porter?
9     A    No.
10    Q    At some point in time, did you come to learn
11         that some adverse actions had been taken as
12         to Miss Porter?
13            MS. CAULO:  Objection.
14    A    I don't recall when.  I know it was several
15         weeks following our conclusion of the
16         investigation, that Nurse Porter had been
17         barred from the institution.
18    Q    How did you learn that?
19    A    I don't recall.
20    Q    You have zero recollection of how you learned
21         that?
22    A    I imagine it was through someone in SID, but
23         I don't recall who it was.  I don't recall
24         whether it was Viktor or Steve Jacobs.
```

162

```
 1              interviewed, documents received and a

 2              conclusion.

 3        Q     And it's the case summary of the Rene Rosario

 4              investigation?

 5        A     Correct.

 6        Q     Is this the case summary that was provided to

 7              Mr. Theiss?

 8        A     Yes.

 9        Q     Is it provided with any -- was it provided

10              with any attachments to Mr. Theiss, or was it

11              just this document?

12        A     I believe the entire file went with all our

13              interview memos, the incident report, all the

14              documents we had received.  I believe we put

15              it in an actual file and turned it over.

16        Q     So some of the interview reports are dated

17              the day after this is dated, right?

18        A     I'm sorry?

19        Q     This Exhibit 11 appears to be dated June 4th.

20              Haven't we been examining some memos of

21              interviews that are dated June 5th?

22              MS. CAULO:  Objection.

23        A     My explanation was when I printed out those

24              reports -- as you can see, I wrote out the
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

163

1          date here, June 4th, 2003, rather than using

2          the zero six zero, what have you, and I

3          explained that our computers change the date

4          automatically when the document is pulled up

5          and printed.  It automatically changes the

6          date.  So when -- I wrote this on June 4th.

7          I don't know when I printed it.  It might

8          have been June 5th when I printed the entire

9          packet.

10    Q    Can you flip back to maybe 10?

11    A    Yes.

12    Q    What's the date on that?

13    A    May 29th, 2003.

14    Q    So that --

15    A    Written out.  That would not change.

16    Q    But you have no idea when this was printed

17         either?

18              MS. CAULO:  What is this?

19              MR. SAVAGE:  I'm sorry.  Exhibit 10.

20    A    No.  That's different from the 06/05/03,

21         correct?  This one is written out in May and

22         spelled out in May 29, 2003.

23    Q    Directing your attention to Exhibit 11, the

24         second page, do you see there is an entry

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

164

1   about Sheila Porter?

2  A Yes.

3  Q Would you read into the record the last

4   sentence of the May 28th, '03, entry?

5  A Sure.  "Admitted that she phoned FBI to

6   report the May 19th incident."

7  Q So that you obtained through your

8   interrogation an admission of Miss Porter on

9   May 28th, right?

10    MS. CAULO:  Objection.

11  A Through our conversation with her on

12   May 28th, 2003, it was learned that she had

13   contact with the FBI.

14  Q Of course, it doesn't say it quite that way,

15   does it?

16    MS. CAULO:  Objection.  The document

17   speaks for itself.  Sorry, Joe.

18  Q That's all right.  It says she,

19   quote-unquote, admitted it?

20  A Yes.

21  Q Is that's a confession, right?

22    MS. CAULO:  Objection.

23  A It was admitted.  It's an answer to a

24   question.

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

165

1    Q    And you put in your case summary of the Rene

2         Rosario injuries the information that

3         Miss Porter had admitted contacting the FBI,

4         correct?

5    A    Yes.

6    Q    So that was significant to your report on the

7         Rene Rosario situation?

8              MS. CAULO:  Objection.

9    A    I think I put it in again, because I was

10        curious when I asked the question.  It was my

11        summary of that conversation with her.

12   Q    Mr. Dacey, this report is five or six pages,

13        summarizing numerous interviews in a sort of

14        headline type of fashion?

15   A    Correct.

16   Q    So was it your intention to put only the most

17        important information into this case summary?

18             MS. CAULO:  Objection.  You may answer.

19   A    Again, I don't know what my intention was.

20        There were summaries of the interviews at the

21        time.

22   Q    It's fair to say, is it not, that you chose

23        to put some things in and leave things out?

24        This doesn't purport to be every single thing

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

177

```
 1              paragraph is somewhere in the paperwork that

 2              was attached to the case summary?

 3       A      Yes.

 4       Q      Did you have any conversations with anybody

 5              at Bridgewater or Plymouth or Dukes or

 6              Hampden about Mr. Rosario?

 7       A      No, I didn't, no.

 8       Q      Did anyone involved in this investigation

 9              have any conversations with them?

10       A      I don't know.

11       Q      To your knowledge, were there any reports

12              written of any conversations with anyone at

13              those places?

14       A      No.

15       Q      Did you write a report of your conversation

16              with Miss Snyder?

17       A      No.

18       Q      Is there a reason that you didn't write a

19              report of your conversation with Miss Snyder?

20       A      It was a very brief telephone conversation.

21              I typically don't write reports on all the

22              telephone conversations I have with law

23              enforcement agencies.

24       Q      Is that because it was on the telephone that
```

```
 1      A    No.

 2      Q    At some point did you ask her for the report

 3           that she indicated to you she was already

 4           writing?

 5      A    I believe in our first interview she

 6           mentioned that she had a report or we asked

 7           for a report.  I don't recall the exact -- I

 8           think Sonya asked if we could have the

 9           report.  I don't recall whether she said she

10           started one or --

11      Q    I'll show you what's marked as Exhibit 12 and

12           ask you if you recognize any of those pages.

13      A    Yes, they appear to be medical notes from

14           Rene Rosario's file at the Suffolk County

15           House of Corrections.

16      Q    Specifically, those are four pages, is it

17           not?

18      A    Yes.

19      Q    Just so we can kind of keep track of them,

20           since they don't have numbers on the bottom

21           of them, can you give me a one-sentence

22           description of each page?

23      A    The first page is dated 5/20, '03, 10:15 a.m.

24           It appears to be a medical not written by
```

# EXHIBIT 9

**Suffolk County Sheriff's Department**
**Custody Assessment and**
**Program Services Division**
*20 Bradston Street*
**Boston, MA 02118**
**617-635-1000 x6502**

# Memo

To:    Supt. Patrick Bradley

From:  Mary Ellen Mastrorilli, Deputy Superintendent

Date:  5/23/2003

Re:    Nurse Practitioner Sheila Porter

---

On Monday, May 19, 2003 Health Services Administrator Donna Jurdak came to my office to inform me of the observations of Nurse Practitioner Sheila Porter as a result of a routine medical examination she conduction on Inmate R███ ██████ (#████████). She related to me that Ms. Porter noticed "suspicious bruising" on the upper arms of Inmate R██████. I directed her to tell Sheila Porter to document her findings in a confidential incident report and give the report to me. Administrator Jurdak agreed to do so. I have no reason to believe that Ms. Jurdak did not carry through this directive, as she has always complied with my requests in the past; however, she did not deliver the report to me as of yet.

On Thursday, May 22 at approximately 6PM I retrieved my voice mail messages. One message was to call Victor Theiss on his cell phone. I contacted Victor and he told me that the FBI told him that they received a confidential report from a woman named Sheila Porter. He said the FBI told him the report contained information describing bruises on Inmate R████'s body, specifically, on the arms and in the neck and chest areas. Vic went on to say those finding are peculiar in light of the fact that he had been looking at digital photos of Rosario which showed one bruise on the left bicep. I then said to Victor: "I don't know how you feel about it, but I think it is highly inappropriate for a contract employee to contact the FBI about a Suffolk County inmate without our knowledge." Victor wholeheartedly agreed. I then said I would bar her from entering right now. He told me not to do anything yet until he got back to me.

000748

# EXHIBIT 10

# Suffolk County Sheriff's Department
## Sheriff's Investigation Division (SID)
## Incident Report

Page 1 of 1

| | | |
|---|---|---|
| SID Incident #: | N/A | |
| Date of Incident: | 5/21/03 | |
| Time of Incident: | Approx 0930 hours | |
| Incident Location: (HOC, NSJ, or Other) | NSJ | |

| | |
|---|---|
| Reporting Investigator: | Stan Wojtkonski |
| Type of Incident: | Conversation with FBI |
| Investigation # (if any): | N/A |
| Date Report Filed: | 5/23/03 |

**Unit or Street Address:**

200 Nashua Street, in front of NSJ.

**Other SID Investigators Involved:**

Viktor Theiss, Deputy Superintendent of SID

**SCSD Staff Members Involved:**

Unknown Medical Staff member

**Inmates Involved:**

I/M ▓▓▓ R▓▓▓, #▓▓▓▓▓

**Narrative**

On May 21, 2003, at approximately 0930 hours, Investigator Stan Wojtkonski exited Nashua Street Jail and approached a car in front of the facility driven by Special Agent Curtis Snyder of the FBI, and contained S/A Julia Cowley of the FBI as a passenger. The purpose of this interaction was to provide S/A Cowley with discoverable materials related to an ongoing criminal case in U.S. District Court that had been jointly investigated by SID and the FBI. During this exchange, S/A Snyder informed Investigator Wojtkonski that she had received a call at approximately 5:00 pm last night (5/20/03), from a member of the medical staff at the Sheriff's Department. S/A Snyder stated that this person told her that they had witnessed an examination of I/M R▓▓▓▓. S/A Snyder stated that a person named "Beth" had performed this medical examination. This person informed S/A Snyder that they had witnessed bruising to I/M Rosario's neck, chest, and under his arm that they did not feel was consistent with self inflicted wounds. According to S/A Snyder, the observation of I/M R▓▓▓'s injuries disturbed this medical staff member enough that she notified S/A Snyder about them. S/A Snyder would not reveal the identity of the medical staff member, but stated that if SID investigators interviewed medical staff, they should be able to ascertain the person's identity. S/A Snyder stated that I/M R▓▓▓ was a key witness in a federal trial that had just occurred involving several corrections officers from Nashua Street Jail. If I/M R▓▓▓'s injuries were proven to be from a corrections officer, then the FBI would consider the assault to be tampering with a federal witness. S/A Snyder asked that she be kept updated on the R▓▓▓ investigation. Investigator Wojtkonski then returned back to Nashua Street Jail, where he was attending First Responder Training with other members of SID. At the next break, Investigator Wojtkonski notified Deputy Superintendent of SID Viktor Theiss of the conversation he just had with S/A Snyder. END REPORT

| | | |
|---|---|---|
| Reporting Investigator's Signature | | Date |
| Supervisor's Name and Signature | | Date |

000791