# EXHIBIT 16

VOL:  I
PAGES: 1-201
EXHIBITS: 1-7

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * *  *
SHEILA J. PORTER,              *
                Plaintiff      *
    -vs-                       *    Civil Action
ANDREA CABRAL; SUFFOLK COUNTY  *    No. 04-11935-DPW
SHERIFF'S DEPARTMENT; SUFFOLK  *
COUNTY and CORRECTIONAL MEDICAL*
SERVICES, INC.,                *
                Defendants     *
* * * * * * * * * * * * * * *  *
```

DEPOSITION OF ANDREA CABRAL, ESQUIRE, a witness
called on behalf of the Plaintiff, in the
above-captioned matter, said deposition being
taken pursuant to the Federal Rules of
Civil Procedure, before Patricia M.
McLaughlin, a Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the offices of Goodwin Procter
LLP, Exchange Place, Boston, Massachusetts, on
Friday, May 6, 2005, commencing at 9:40 a.m.

McLAUGHLIN & ASSOCIATES COURT REPORTERS
92 DEVIR STREET, SUITE 304
MALDEN, MASSACHUSETTS  02148
781.321.8922
WWW.E-STENOGRAPHER.COM

40

1        parameters of your question.

2            Let me see if there is anything else

3        that mentions outside law enforcement.

4   Q   When you say anything else that mentions

5        outside law enforcement, that doesn't mention

6        outside law enforcement, does it?

7   A   No, it doesn't.

8   Q   I didn't know what you meant by anything

9        else.

10   A   I don't see anything in this policy that

11        mentions contact with outside law

12        enforcement.

13   Q   I think you've testified already -- but

14        correct me if I misunderstood -- that this is

15        the only place that would be?  By this I mean

16        Exhibit No. 1.

17   A   I could not truthfully say this is the only

18        place it would be.  The policies are

19        voluminous.  This is the only place I would

20        expect to find it.

21   Q   These are your policies; you're the sheriff?

22   A   They are.

23   Q   And you think the policy concerning

24        cooperation with outside law enforcement is

56

1           of a policy with regard to that.

2     Q     I think your previous answer was you learned

3           of Mr. Rosario coming back to the

4           institution -- strike that.  What were the

5           circumstances under which you learned

6           Mr. Rosario had come back to the institution?

7     A     After the SID investigation was complete and

8           I was having a conversation with chief of

9           SID, Victor Theiss, about the results of that

10          investigation.

11    Q     Do you have a date on that?

12    A     I don't.

13    Q     Can you mark it in relation to other events?

14    A     It was sometime prior to the point at which

15          Sheila Porter was barred.  I just don't have

16          an exact.

17    Q     If we accept as the first reported incident

18          to be May 9th and the date of Miss Porter's

19          barring to be --

20              MS. CAULO:  May 19th?

21    Q     I'm sorry.  Thank you.  And Miss Porter's

22          barring to be June 10th, is it sometime in

23          that time frame?  Is that consistent with

24          your memory?

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

57

1    A    That's fair to say.

2    Q    Can you, working back from the point at which

3         Miss Porter was barred, give us a sense of

4         how long before that that you learned of it?

5    A    I really can't.  It was not a scheduled

6         meeting.  What happened was there were many

7         times when I would see Chief Theiss and get

8         an update on what was going on with SID,

9         because I was so busy, and I was in and out

10        of the department so frequently, that I would

11        take whatever opportunities were present to

12        catch up outside of formal meetings, which

13        were sometimes difficult to schedule.

14   Q    So your best memory is that your first

15        awareness that Inmate Rosario was back was in

16        one of these informal meetings with

17        Mr. Theiss?

18   A    Yes.

19   Q    Was anyone else present for that meeting?

20   A    No.

21   Q    What did he say to you, and what did you say

22        to him?

23   A    We had a discussion about the investigation

24        into Rene Rosario's allegations that he had

1    been beaten by an officer.  Mr. Theiss told

2    me that the allegations came to our attention

3    on the day that they were made through an

4    officer to whom Mr. Rosario had reported.

5    That officer reported it to SID.

6         SID began an investigation immediately

7    into the accusations.  They interviewed all

8    the people who were involved either as

9    witnesses or people who were present and

10    interviewed Mr. Rosario, videotaped the

11    interview, took digital photographs of the

12    areas where he alleged he was hurt and got

13    copies of the --

14         At the time that he made the report, he

15    was in the infirmary, so they went and got

16    copies of the medical records with regard to

17    Mr. Rosario's treatment and did a full

18    investigation.

19    Q    What else did he say?

20    A    In the context of talking about the

21    investigation, he also talked about Sheila

22    Porter and the fact that one of the

23    investigators had gotten a call from an FBI

24    agent, named Krista Snyder, with a K,

1    indicating that the FBI had received

2    information that an inmate had been allegedly

3    beaten by an officer and that ultimately, in

4    the course of the investigation, they learned

5    that that person was Sheila Porter.

6    He indicated to me that there was

7    nothing in the medical record documenting her

8    observations of that; that she was asked to

9    write a confidential report pursuant to the

10    policy; that a confidential report was not

11    received until ten days later; and that that

12    report appeared to be backdated to the date

13    of the actual incident; and that it was on

14    what I call Interdisciplinary Progress Notes

15    or medical record form as opposed to the

16    standard memo form for a confidential report.

17    Q    What else did he say?

18    A    That's essentially what the conversation was

19    about.

20    Q    He didn't share with you SID's conclusions as

21    to what had happened to Mr. Rosario?

22    A    Oh, no, he indicated that he didn't believe

23    that the allegations could be sustained

24    because the observations -- it was due to a

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

```
 1    A    No, not to my recollection.

 2    Q    What were the circumstances under which this

 3         issue was raised with you on either June 9th

 4         or June 10th?

 5    A    I received -- I believe it was a phone call

 6         from Elizabeth Keeley.  There were probably a

 7         couple of other departmental matters that we

 8         discussed, and she asked me what my response

 9         was going to be to the issue involving Sheila

10         Porter.  My recollection is that I sort of

11         spoke my thoughts out loud.  I said she's the

12         nurse who did not document and used the

13         medical form in a confidential report, didn't

14         submit a confidential report, and I sort of

15         gave a litany.  I said I believe that she

16         should be barred from the institution.

17    Q    Your memory is that Miss Keeley initiated the

18         call or the meeting?

19    A    That's my memory of it, yeah.

20    Q    She initiated with an inquiry as to what you,

21         Andrea Cabral's, response to the report about

22         Miss Porter was going to be?

23    A    She didn't initiate it that way.

24    Q    Just give us your best memory of what you
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

1    Q    Your understanding as you sit here today is

2         that the process followed here was consistent

3         with the process previously followed?

4    A    I believe that there was one aspect that

5         wasn't.  I'm not sure that CMS was given a

6         written notice.  I think that that was

7         supposed to be done.

8    Q    When did you come to learn that that part of

9         process had been violated?

10   A    I have no idea when I learned that.  It's

11        been quite a while.

12   Q    When did you learn what process was followed

13        at all?

14   A    I'm not entirely sure, but I believe it might

15        have been the day after she was barred when

16        she came back to the facility in the custody

17        of an FBI agent, because that brought the

18        issue sort of to my attention.

19   Q    So on June 10th, whatever process was

20        followed as to Miss Porter, the next you

21        learn about what has happened is on

22        June 11th?

23   A    I believe so, yes.

24   Q    Just to close the loop here, so the entirety

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

86

1          whether or not -- I don't recall whether or

2          not she even got back to me.

3    Q    Give me a complete statement, if you would,

4          of the reasons why you concluded or decided

5          to give the order to bar Miss Porter.

6    A    She's a nurse working at the House of

7          Correction; pursuant to our contract with CMS

8          is told by an inmate that the inmate has been

9          abused and beaten by an officer, alleges that

10         there is physical evidence of those bruises.

11         The nurse does not document in the medical

12         record her observations of what was relayed

13         to her by the patient.

14              Upon our discovery that these

15         allegations have been made and our discovery

16         that she, in fact, was one of the first

17         people to whom the allegations had been

18         reported, we request a confidential report.

19         The confidential report is not submitted in a

20         timely manner.  It is received by us ten days

21         subsequent to it being requested.  It is not

22         in memo form to Deputy Superintendent

23         Mastrorilli, to whom the report should have

24         been addressed, from Sheila Porter.  It is on

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

87

1        a medical record form, which has particular

2        significance to me and it is dated on the

3        date of the incident in the space reserved

4        for the date as though that's when the

5        treatment was rendered.

6    Q   Those are your entire reasons?

7    A   Those were my reasons.

8    Q   And it's your testimony that it had nothing

9        to do with the fact that Miss Porter spoke to

10       the FBI?

11   A   No.

12   Q   Did you understand or assuming these are your

13       reasons --

14          MS. CAULO:  Objection.  She just

15       testified that those were her reasons.

16   Q   What is it in the policies of the Sheriff's

17       Department that makes any of these statements

18       of reasons that you have given a basis under

19       which someone can be barred from the

20       facility?

21   A   If I can refer to Exhibit 1?

22   Q   Sure.

23   A   Just going through the policy, certainly

24       under policy statements on Page 1, first, I

1      had written out the information.  It wasn't

2      that it had -- it wasn't a standard form, but

3      using a medical records form versus any other

4      format of communication was significant to

5      me.

6   Q   And where is that policy written?

7   A   There is no policy here --

8   Q   When you say here, what do you mean?

9   A   There is no policy in S220 that goes to a

10     medical person or specifically a nurse's

11     obligation to document in the medical record

12     observations related to potentially treatable

13     injuries or harmful injuries to an inmate.

14          I'm talking about my understanding of

15     what the use of a medical record is, how it

16     is properly used and how a person who is in

17     the medical profession for years would know

18     that that form would be used.

19   Q   You're saying that the use of a medical

20     record form -- by that, I assume you mean the

21     interdisciplinary progress notes form?

22   A   Yes.

23   Q   The use of that form for any other purpose

24     than progress notes as to a patient violates

187

1   A    I knew that Miss Porter had provided

2        information to an FBI agent.  I did not know

3        that Miss Porter was an informant.

4   Q    I think I used the word, cooperated, with,

5        but you knew she had cooperated in terms of

6        wiring up Rene Rosario and you knew she had

7        provided information to the FBI.  Is there

8        anything else you knew?

9   A    No, I knew that she had provided information

10        to the FBI, but it was not -- her wiring of

11        Rene Rosario was not significant to me.  It's

12        not unusual in law enforcement to have a

13        medical person do something like that to make

14        sure that it can be done in a safe and

15        confidential area and to make sure no harm

16        comes to the person in the course of them

17        buying wired.

18            For all I knew, this was a one-time

19        provision of information with regard to his

20        allegations.  It was not unusual at all to

21        me.  We use nurses all the time to do various

22        things, to take samples and so forth in the

23        context of criminal investigations to that

24        they're done well.

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

1    which is hardly a definitive denial of that.

2    Q    That was a conversation that occurred in the

3    June 18th meeting?

4    A    That was a conversation that occurred

5    subsequent to June 18th.

6    Q    I'm saying June 18th.  I think June 16th was

7    the meeting; June 18th was the phone call.

8    Does that sound about right?

9    A    It may be.

10   Q    Was it in the context of the phone call, or

11   has it been well subsequent to 2003 that he

12   made those statements?

13   A    No, it was in the context of the phone call.

14   Q    You had a meeting on June 16th with Michael

15   Sullivan and others.  You had a telephone

16   conversation with him on June 18th, 2003.

17   Have you had any other personal contact with

18   Michael Sullivan concerning the investigation

19   of the barring of Sheila Porter?

20   A    I believe he responded to my June 16th letter

21   about a year later.

22   Q    You said June 16th letter.

23   A    Whatever the date was.  The letter came after

24   the conversation, which I think we agreed was

# EXHIBIT 17



SEP 2 9 2004

**U.S. Department of Justice**

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

September 28, 2005

Walter Prince, Esq.
Prince Lobel Glovsky & Tye, LLP
585 Commercial Street
Boston, MA 02109-1024

# REDACTED

CONFIDENTIAL

001656

**REDACTED**

CONFIDENTIAL

001657

# REDACTED

Very truly yours,

MICHAEL J. SULLIVAN
United States Attorney

By: JOHN T. MCNEIL
Assistant U.S. Attorney

cc. Michael J. Sullivan, United States Attorney
    Michael K. Loucks, First Assistant U.S. Attorney

CONFIDENTIAL

001658

# EXHIBIT 18

1

VOL:  I
PAGES: 1-247
EXHIBITS: 1-7

2

3

4

UNITED STATES DISTRICT COURT

5

FOR THE DISTRICT OF MASSACHUSETTS

6

* * * * * * * * * * * * * * *
SHEILA J. PORTER,                        *

7

                    Plaintiff            *

                -vs-                      *     Civil Action

8

ANDREA CABRAL; SUFFOLK COUNTY            *     No. 04-11935-DPW
SHERIFF'S DEPARTMENT; SUFFOLK            *

9

COUNTY and CORRECTIONAL MEDICAL          *
SERVICES, INC.,                          *

10

                    Defendants           *
* * * * * * * * * * * * * * *

11

12

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

13

14

DEPOSITION OF VIKTOR THEISS, ESQUIRE, a witness
called on behalf of the Plaintiff, in the
above-captioned matter, said deposition being

15

taken pursuant to the Federal Rules of
Civil Procedure, before Patricia M.

16

McLaughlin, a Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of

17

Massachusetts, at the offices of Goodwin Procter
LLP, Exchange Place, Boston, Massachusetts, on

18

Tuesday, May 24, 2005, commencing at 10:05 a.m.

19

20

21

McLAUGHLIN & ASSOCIATES COURT REPORTERS

22

92 DEVIR STREET, SUITE 304
MALDEN, MASSACHUSETTS  02148

23

781.321.8922
WWW.E-STENOGRAPHER.COM

24

42

1    Q    At the time you didn't have concerns about

2         his personal safety?

3              MS. CAULO:  Objection as to what time

4         frame.

5              MR. SCHUMACHER:  The time frame we have

6         been talking about for the last ten minutes,

7         which was May and June of 2003.

8    A    No, I didn't have any serious concerns for

9         his safety.

10   Q    Did you have any concerns for his safety?

11   A    Yes, in the sense that the more he talked

12        about working with the FBI, the more he made

13        allegations that were not sustainable, that

14        there might be a risk to him that someone

15        would retaliate against him.  That's why we

16        try not to have inmates housed that testify

17        against staff, et cetera.

18             Did I have an actual concrete concern?

19        No.  Did I have a person that was going to

20        harm him?  No.  For caution's sake or

21        safety's sake, I think it's a wiser course to

22        have somebody housed elsewhere.  You just

23        avoid the problems all together, because I

24        don't have the ability to police the actions

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

43

1        of every individual officer on a 24-hour

2        basis.  It's not like we can be everywhere at

3        all times.  It's safer to have a person just

4        out of the department.

5   Q   In addition to the resources that SID had to

6        expend on this guy, you had concerns about

7        his personal safety?

8   A   Generic concern, yes.  Again, not a specific

9        concern.  There wasn't specific officers

10      identified that were targeting him, but yes,

11      a generic concern for his safety as someone

12      who had cooperated and testified.

13  Q   Indeed, you did make efforts to have him

14      transferred, correct?

15  A   Yes, I did.

16  Q   What were those efforts?

17  A   I contacted Krista Snyder and asked for her

18      assistance, because since he had cooperated

19      with them and they might have resources that

20      we wouldn't, it was not easy to transfer

21      Rosario within the county system.  He had

22      been previously transferred to a number of

23      institutions, sentenced to a number of

24      institutions and not had an easy time.

84

1   Q   Do you remember -- did you go to her office?

2   A   I don't remember exactly, but I'm sure that

3       would have been where -- I didn't have much

4       interaction with her anywhere else.

5   Q   Was the purpose of that meeting to discuss

6       the Rosario investigation?

7   A   I don't believe so.  I believe it was just to

8       update her on everything.  Obviously, she was

9       interested in how SID was developing and the

10      changes that we were trying to implement, the

11      new staff, the training, but at the same

12      token when I had the opportunity to give her

13      updates on cases that came up, I would have

14      done so.

15   Q   When did this take place?

16   A   I don't recall exactly.

17   Q   If I tell you that the case summary is dated

18      June 4th, 2003, presumably, it would be

19      sometime after June 4th?

20   A   Again, I just don't know.

21   Q   What do you recall telling Sheriff Cabral

22      about the Rosario investigation?

23   A   Just the same synopsis I gave to the Chief of

24      Staff; here is what we found out; that there

00087

1    before the Rosario allegations came about?

2  A   No, I hadn't.

3  Q   That was the first time you became aware that

4     there was a person named Sheila Porter?

5  A   Correct.

6  Q   How did her name come up with respect to the

7     Rosario allegations?

8  A   I believe I testified earlier that it first

9     came up when Stan was approached by

10    Agent Snyder.  She relayed information that

11    they had received a report that Rene Rosario

12    had been assaulted and that he had injuries

13    about his chest, neck and arm area, and that

14    struck us as odd, because by that point the

15    medical records had been received, reviewed.

16    The photographs had been taken -- photographs

17    hadn't been taken at that point.  Basically,

18    he had been physically observed and medical

19    records had been reviewed that didn't

20    indicate injuries to that extent.  The

21    injuries that we were aware of at that point

22    were localized to the arm region.

23  Q  How is it that Miss Porter's name came up in

24    this context?

88

1    A    When Stan came back in from that interaction,

2          I believe he had to provide information to

3          the FBI.  He had some documents they were

4          looking for in another case, so he had ducked

5          out of the training that we were all at to

6          provide those and came back in to report his

7          interaction, because it was unusual in the

8          sense that he was aware that we were looking

9          into Rene Rosario and we had kind of all --

10         Since everybody had been around there,

11         we were talking, just kind of brainstorming

12         the case, and he mentioned what the FBI had

13         told him, to let the investigators know there

14         is this other allegation out there.  When he

15         said "that's not what we have up to date; I

16         wonder where they are getting this from,"

17         because they wouldn't tell Stan who the

18         source of the information was.  I believe

19         Steve Jacobs commented it may be

20         Sheila Porter; she had some connection with

21         Rene Rosario possibly having do in the past

22         with a wire that he wore.

23    Q    Was this the conversation with Steve Jacobs

24          that you mentioned before?

93

1              Subsequently, as I stated earlier, I

2    found out from Brian that she had

3    approached -- they were up in the infirmary

4    gathering information, looking to get

5    documentation, et cetera, and she approached

6    them while they were up there.  They had not

7    sought her out.

8    Q    During this interview on May 22nd -- does

9         that sound right when the interview with

10        Miss Porter took place?

11   A    That's what the reports indicate.

12   Q    Was she asked by the SID investigators to

13        document her findings?

14   A    I don't know if she was asked to document

15        them.  Brian informed me that he recalls to

16        the best of his ability that he asked "well,

17        if you saw this, we don't have a report; we

18        need a report".  She said "I have one; it's

19        at home on my computer; I don't have it with

20        me".

21   Q    In the interview memo, in the memo that

22        Mr. Dacey and/or Miss Aleman wrote reflecting

23        the first interview with Miss Porter, does

24        anything in that document indicate that SID

94

```
 1            requested that Miss Porter write a report

 2            concerning her observations?

 3    A       No, I don't believe I saw that in that memo.

 4    Q       Are there any other documents prepared by SID

 5            investigators that indicate that Miss Porter

 6            was asked by SID to write a report concerning

 7            her observations?

 8    A       No, I don't believe so.

 9    Q       Was Mrs. Porter cooperative with SID during

10            the interview?

11    A       You'd have to ask Brian or Sonya.  The report

12            doesn't indicate that she was uncooperative.

13    Q       You never heard that she was uncooperative?

14    A       No.

15    Q       Indeed, you just said she sought them out;

16            isn't that right?

17    A       Correct.

18    Q       Did any of Mrs. Porter's statements to the

19            investigators form the basis of their

20            conclusions with respect to the

21            sustainability of the allegations?

22    A       Yes, the subsequent interview with

23            Miss Porter, Investigator Dacey commented on

24            the manner in which she approached them.  It
```

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

1   person, detailing who, what, when, where, why

2   how, action taken.

3   Q   Would it be required that the report be

4       addressed to someone in SID?

5   A   If we specifically asked for it.  There are

6       many incident reports, to-froms, generated to

7       lieutenants, captains, superintendents,

8       deputy superintendents.  I have the power

9       under the policy to require any staff to

10      write a report to me.

11  Q   Would it have been sufficient in your mind if

12      she had submitted the report to her

13      supervisor rather than to SID?

14          MS. CAULO:  Objection.  It calls for

15      speculation.  You may answer.

16  A   If she had written a report and generated it

17      to her supervisor in a timely fashion, that

18      would have been sufficient.  That happens

19      currently today.  If an officer engages in an

20      action in a unit, observes certain things,

21      writes it to the lieutenant, that's

22      sufficient.  We don't then ask them to

23      rewrite a report to SID unless there is

24      glaring deficiencies in the report, which

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

1    sometimes we do note.

2         Sometimes officers are way too vague in

3    their reports.  They'll put "I observed, for

4    example, an inmate assault another inmate;

5    the inmate was restrained, taken to

6    segregation for disciplinary proceedings".

7    That doesn't tell you anything.  An assault

8    could have been a pushing.  It could have

9    been an outright fistfight.  It could have

10   been used with a weapon.  We would then tell

11   that officer "we need you to be more

12   specific; what was the nature of the

13   assault".  There would either be a new

14   to-from or we would either have a taped

15   interview and have our own report.  One way

16   or another, we're going to have a report with

17   the specific details.

18   Q    But it would have been sufficient if she

19        wrote that report to her supervisor and it

20        didn't necessarily have to be addressed to

21        someone in SID; is that fair to say?

22   A    Yes, in a timely fashion.

23   Q    In a timely fashion?

24   A    Yes.

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

156

1          take very seriously.  The medical records are

2          critical to us.  Even today, we use them all

3          the time to help assess credibility of

4          inmates, whether cases warrant -- what level

5          of resources to give to them.  It's an

6          unbelievably important tool.  They are just

7          absolutely vital documents.  Omitting

8          information from them that could be, should

9          be in them is very serious.

10    Q    What were the underlying facts concerning

11         Mrs. Porter's conduct that you reported to

12         Mrs. Keeley and Sheriff Cabral?  I think we

13         have touched on them at various points.  I

14         just want to get a sense of what you told

15         them you understood that Mrs. Porter had

16         done.

17    A    Again, I don't recall the specifics of the

18         conversation.  So much time has gone by and

19         so much has occurred.

20    Q    As best you can recall.

21    A    Again, only the vague generalities of we

22         talked about the case, and a big factor in

23         the case was observations of injuries that no

24         one else saw that weren't documented in the

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

157

1   medical records.  That would have been

2   discussed.

3 Q Do you recall discussing anything that

4   Mrs. Porter did besides her alleged failure

5   to document in the medical record what she

6   observed?

7 A I don't.

8 Q Do you know if Mrs. Keeley or Sheriff Cabral

9   received any information from any sources

10   besides you concerning what Mrs. Porter

11   allegedly did?

12    MS. CAULO:  Objection.  If you know.

13 A I don't.

14 Q Would it surprise you to learn that they

15   based their decision with respect to

16   Mrs. Porter entirely on the information they

17   received from you?

18    MS. CAULO:  Objection.

19 A You'd have to ask them.

20 Q Would it surprise you if you learned that?

21    MS. CAULO:  Objection.

22 A Again, I don't know.  I know I spoke to them.

23   I know we spoke about the case, but that is

24   all I know.

168

1    A    No.

2    Q    You don't recall or it didn't come up?

3    A    I don't recall.

4    Q    Was SID asked to investigate whether or not

5          Mrs. Porter should be barred?

6    A    No.

7    Q    In other words, were you asked to investigate

8          the circumstances concerning Mrs. Porter's

9          alleged conduct?

10    A    No.

11    Q    Did anyone interview Mrs. Porter and say is

12          this what happened?

13    A    The only interviews I'm aware of are the ones

14          that we conducted.

15    Q    And those were with respect to the Rosario

16          allegations?

17    A    Correct.

18    Q    Did anyone interview Mrs. Porter with respect

19          to the reasons why she was barred?

20    A    I don't know.

21    Q    Do you have an understanding as to why

22          Mrs. Porter was barred?

23    A    I wasn't a part of that decision-making

24          process.

207

```
 1    A    We can infer that it's dated May 25 and he's
 2         talking about something that occurred on
 3         May 19 that he didn't do it by the end of his
 4         shift.
 5              (Whereupon, a brief recess was held.)
 6         BY MR. SCHUMACHER:
 7    Q    Just to close the loop on the whole
 8         timeliness of reporting issues, in your mind,
 9         what would have been different if SID had
10         received Mrs. Porter's report on May 19th?
11              MS. CAULO:  Objection.
12    A    I don't know how to answer that.
13    Q    Well, her alleged untimeliness of her
14         reporting did it prejudice the investigation
15         in any way?
16    A    No.
17    Q    Do you believe that the investigation would
18         have been conducted any differently had SID
19         received her report on May 19th?
20              MS. CAULO:  Objection.
21    A    Yes.
22    Q    In what way?
23    A    We would have interviewed her sooner.
24    Q    She was interviewed on the 22nd, but you
```

209

1          to what should go in a medical file and what

2          shouldn't?

3     A    To the best of my knowledge, no.

4     Q    In your mind that was significant though; is

5          that fair to say?

6     A    Yes.

7     Q    Whether or not it was contained in Policy

8          S220?

9     A    Correct.

10    Q    Do you know if the fact that Mrs. Porter

11         didn't place the document in Mr. Rosario's

12         medical file -- did that violate any policies

13         of the Sheriff's Department?

14    A    I'm not aware of any.

15    Q    We've talked about the alleged inconsistent

16         information that was contained in

17         Mrs. Porter's report.  We have talked about

18         that at length.  You'd agree that the medical

19         observation following use of force form, that

20         refers a large bruise; is that right?

21    A    On the left arm.

22    Q    It's your memory that Mrs. Porter's report

23         discusses bruises in two places?

24    A    Yes.

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

# EXHIBIT 19

(Rev. 01-31-2003)

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE                    **Date:** 06/02/2003

**To:** Boston                    **Attn:** CIU

**From:** Boston
      C-1
      **Contact:** Christa J. Snyder

**Approved By:** █████████████

**Drafted By:** Snyder Christa J ███

**Case ID #:** █████████ (Pending)

**Title:** ███████████

**Synopsis:** To summarize information pertaining to individual.

**Details:** ████████████████████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

On approximately 05/23/2003, I spoke to ████████████ on the telephone, and ████████████ stated that SID believed that they knew the identity of the source who provided the information. ████████ then identified ████████████ as the individual. ████████████ then stated that it could be a problem because the individual did not report the alleged assault to Suffolk County Sheriff's Department. I told ████████████ that it was not appropriate for SID to attempt to determine who the source was, and that the source was informed that the I would report the

UPLOADED

WITH/TEXT _____✓_____

WITHOUT/TEXT _____

BY _____

DATE _____

To: Boston   From: Boston
Re: ███████              06/02/2003

information to SID. ███████ then stated that he did not think
it would be a problem in the end. The identity of the source was
neither confirmed or denied by me.

On 05/29/2003, individual contacted me and stated that
investigators from Suffolk County House of Correction interviewed
individual regarding the allegations that ████████was assaulted.
The interview was conducted in the Sheriff's Investigative
Division's office area. The investigators seemed annoyed that the
Federal Bureau of Investigation was involved in the case, and
seemed to be interrogating individual. In a poorly veiled attempt
to mislead the source, the investigators asked source "Why did
you notify Christa?" Individual stated, "Why, did I say Christa
was notified?" Individual was very surprised at their line of
questioning. This was a ploy by SID to deceive individual in
hopes that individual would identify oneself as a source of the
FBI. Individual identified the investigators and BRIAN Last Name
Unknown and a female who formerly worked for the Massachusetts
Department of Social Services.

# EXHIBIT 20

| Chapter I | Policy #: | References: | |
|---|---|---|---|
| | | G.L. c.268A<br>103 CMR 910.08; 924.02; 973.07; 943.09<br>3-ACI-3-4067; 4173; 4268<br>3-ALDF-1C-23; 3A-07; 3E-08 | Page 1 of 9 |
| | S220 | | |
| Person... | Date of Issue:<br><br>January 1, 2000 | Approved:<br><br>*Melissa J. Harand* | |
| **Employee Code<br>of Conduct** | Date Revised:<br><br>October 1, 2001 | General Counsel | |

## Purpose

This policy codifies the rules governing standards of conduct and ethical behavior expected of all employees of the department.

## Policy Statements

I.  These rules are issued as general directives and do not attempt to cover each and every contingency that may arise during the performance of an employee's duties while employed by the Department.

II. Nothing in any part of these rules shall be construed to relieve an employee of his or her primary responsibilities concerning the safekeeping and custodial care of inmates, or from an employee's constant obligation to render good judgment, full and prompt obedience to all provisions of the law, and to all orders neither illegal, hazardous to oneself or others, nor in conflict with deeply-held moral or religious convictions.

III. All employees are subject to the provisions of these rules.

IV. Improper conduct negatively affecting or reflecting upon the Department in any way will not be tolerated whether or not it is specifically mentioned and described in these rules.

V.  Acceptance of appointment with the department shall be acknowledgment of an employee's agreement to abide by these and all other rules.

VI. Nothing in these rules is intended to conflict with the laws of the Commonwealth, or to infringe upon the constitutional rights of any employee.

## Procedures

I.  **General Guidelines**
    A.  *Standards of Public Service*
        1.  An employee's position with this department is one of responsibility and public trust. As such, and in order to maintain the dignity and public perception of the department, all employees must be discreet and prudent not only in their professional capacities, but in personal relationships, personal associations and places frequented (see policy S239, <u>Sexual Harassment</u>).
        2.  An employee's uniform, badge, identification or other official insignia shall be used only as is required in the course of his/her official duties, and then only discreetly and not for personal gain.

000774

3. All employees are required to conform their behavior to the ethical standards spelled out in G.L. c.268A.

**B. Appointment, Employment, Termination of Service**

1. Selection for appointment to a position with the Department is based in part on statements contained in the employment application form. Discovery that any statement is false may lead to an employee's immediate discharge.
2. All employees shall be photographed for identification purposes. Identification photographs may be retaken as needed to keep them current.
3. All employees must report promptly in writing to the Director of Personnel any change in residential address, home telephone number, person to notify in case of emergency, or any other pertinent personnel data.
4. A minimum of two (2) weeks notice of resignation is required.

**C. Confidential Communications**

1. The affairs of the Department or persons in custody are confidential, and any discussion on these subjects shall [be] limited to that which is necessary in the performance of an employee's duties and shall only be shared with persons authorized to receive such information.
2. Any unauthorized disclosure of information by an employee shall constitute just cause for discipline.
   a) An inmate's (or detainee's) related information is protected by the provisions of the Offender Information (CORI) Act, detailed in G.L. c.6 and may only be released to authorized persons in accordance with Offender Record Information.
   b) An employee's home address, telephone, SSN) are considered confidential and released without authorization from the individual, a subpoena, or court order unless dissemination of such information is required in the ordinary course of department business.
   c) Written or electronic information generated by any division of the Department may or may not qualify as a public record eligible for release outside the Department. Except as is specifically authorized by Department policy or procedure, internal information may not be released outside the department unless and until the General Counsel or her designee has so authorized.
   d) Release of any information pertinent to an on-going department investigation will be considered interference and will be disciplined accordingly. However, if the employee is the focus of the investigation, he/she may disclose any such information to his/her union representative and/or attorney to assist in his/her own defense.

3. Official records, papers, reports or copies of same shall not be removed from the institution without specific instruction or prior permission from the Superintendent except as is necessary for the performance of one's duties.

**D. Interactions with Public**

1. Employees shall be courteous and professional in all public contact that may arise in the course of their duties.

000775

2. It is not inconceivable that an employee may encounter a member of the public who fails to treat the employee with the same courtesy. In such instances, employees are to retain their composure and refer the individual to their supervisor.
3. Tours:
   a) Formal tours of the institution may be arranged through the Office of Community Affairs and Project Development.
   b) Unless assigned to the CAPD office, employees may conduct tours only with prior approval of the Superintendent.
   c) Personal visitors of staff may be admitted to the facility but shall be escorted by staff and are generally restricted from inmate housing areas

4. No employee may give a public address or publish a writing that in any way holds the author out as a representative of the Department without the prior approval of the Special Sheriff.

E.  *Interactions with the Media*
   1. Only the Sheriff or his Office of Communications may make statements to the media or release news statements or bulletins concerning the business of the department.
   2. The Department reserves the right to determine whether or not the media will be permitted on the premises.
   3. Media access to employees is governed by S130, **Inmate Media Access** and S131, **Public Information Policy and Procedures**.

F.  *Interactions with the Other*
   1. The mission of the Department requires cooperation between and among employees, and therefore staff must be considerate and courteous in their working relationships.
   2. An employee shall not foster discontent or engage in any activity that could lower the morale of another employee and must be discreet in the discussion of personal matters.
   3. An employee may not inspect other employee's personnel information or other official documents, other than as is necessary in the official performance of their duties.
   4. It is inappropriate for employees to attempt to influence, temper or rescind disciplinary action against another employee except through their union representatives.

G.  *On-Duty Interactions With Inmates*
   1. When interacting with inmates, employees must act solely in the furtherance of the Department's two-fold mission:  CUSTODY and CARE.
   2. Such interaction with inmates shall provide protection from physical, emotional or sexual abuse, corporal punishment, personal injury, disease, property damage, discrimination and harassment.
   3. Employee conduct shall be professional, objective, and unbiased in the application and enforcement of Department policies, rules and regulations.
   4. Employees shall not discuss Department business with, or in the presence of, inmates except as is required by their duties.

5. Employees must never express to an inmate a personal opinion, whether positive or negative, regarding another employee.

6. Personal employee information shall not be discussed with, or in the presence of, inmates.

7. Employees must not give inmates the impression that staff are in conflict with one another, since such impression may lead to attempts at manipulative behavior.

8. Employees shall not make reference to the nature of an inmate's offense(s), or to any visits with SID or outside law enforcement agencies, in the presence of any other inmate.

9. Except as is expressly required by their duties, employees shall not intercede or act on behalf of an inmate's custody status (with this Department or any another agency) without prior approval of the Superintendent.

10. Employees are prohibited from all forms of bartering, buying or selling, directly or indirectly, with inmates.

11. Employees shall not accept a fee, gift, gratuity or any item of value from an inmate.

12. Employees shall not provide any fee, gift, gratuity, or any item of value to an inmate except as is required in the performance of their duties or as otherwise instructed by the Superintendent.

H.  **Off-Duty Interaction** With Inmates

1. Employees must not associate with, communicate, correspond or consort with any inmate or former inmate, except in the course of one's regular duties, without first informing the Superintendent in writing.

2. Any other contact with an inmate not covered by paragraph H1, above, must also be reported in writing.

3. Employees must notify the Superintendent if a relative or personal friend is committed to this facility. Employees are exempt from reporting contact with relatives after their release from Department custody.

4. The purpose of this notice requirement is to lessen any potential embarrassment to, and avoid any suggestion of impropriety by, the employee concerned.

I.  **Interaction With Inmates' Friends Or Family**

1. Any contact with an inmate's relatives or friends must be reported in writing to the Superintendent.

2. Employees shall not accept a fee, gift, gratuity or any item of value from an inmate's family, friends, or any person acting on their behalf.

3. Employees shall not provide any fee, gift, gratuity, or any item of value to an inmate's family, friends, or any person acting on his/her behalf except as is required in the performance of their duties or as otherwise instructed by the Superintendent.

4. Conversation with inmate's visitors shall be limited to that which is required by an employee's duties.

J.  **Fitness For Duty**

1. Drug Policy
   Use of illegal drugs and abuse of alcohol or prescription medication are incompatible with service in a law enforcement agency, and such conduct will be dealt with in accordance with S215, **Drug Free Workplace**.

S220: Employee Code of Conduct                              Page 5 of 9

    a) The department will not tolerate the presence of illegal drugs or alcohol on its premises, nor will it tolerate any of its employees reporting for duty or engaging in official business of the Department while under the influence of alcohol or drugs.

    b) Any employee who, under doctor's care or otherwise, is taking any medication while on duty which may affect their performance in any way must report this fact to their supervisor and the Superintendent.

    c) No employee may dispense or give medicine of any type (prescribed or not) to an inmate unless:

        i. the medication is administered in accordance with **Health Services Policy #20, Medication Administration** by a licensed nurse, physician or dentist; or

        ii. expressly authorized by the Superintendent or designee

2. Disability Or Need For Accommodation

    a) Any health problem, injury, or restriction which may affect an employee's job performance, or for which an employee may require an accommodation, must be medically documented and disclosed to his/her division manager.

    b) Such documentation must meet the following requirements:

        i. be an original;

        ii. be written on the letterhead of the health care provider;

        iii. contain an original signature of the health care provider;

        iv. clearly state the specific limitations the employee has due to the illness or injury;

        v. list the expected duration of the condition;

        vi. Division managers will consult with the Director of Workers' Compensation on accommodations for work-related injuries, and with the Director of Personnel on accommodations for non-work-related injuries.

3. Length Of Work Day

    a) No officer may work more than sixteen (16) hours in a twenty-four (24)-hour period, and must not work in any capacity for eight (8) hours before returning to duty.

    b) This prohibition shall include regular shifts, overtime, training, community affairs events, and paid details.

    c) Should an employee be suspended for any reason, he/she may not work in any capacity during the twenty-four (24) hour period comprising said suspension day.

4. Conduct On Duty

    a) Employees must not engage in any amusement or activity while working which might interfere with the performance of duties.

    b) Televisions, radios, CD or tape players and the like are strictly prohibited from any control centers, and employees shall not use such devices while in the units.

    c) Reading material other than official department publications is prohibited while posted in a housing unit or control center.

    d) Cell phones are prohibited inside the institution unless issued by the department.

    e) Penalties for the misuse of department telephones and the generation of unauthorized charges may include restitution as well as discipline.

5. Conduct Off-Duty
   a) All employees must report any involvement with law enforcement officials pertaining to an investigation, arrest, or court appearance.
      i. Such reports shall be made to the Special Sheriff within 24 hours of the involvement with law enforcement officials, or prior to the commencement of the employee's next shift, whichever is sooner.
      ii. If the Special Sheriff is unavailable, reports shall be made to the Superintendent or Shift Commander at the appropriate institution.

   b) All employees must be circumspect in their choice of associates, and even casual interaction with known criminals, or with individuals engaged in unsavory activities, is inconsistent with employment by the department.

K. *Department Property And Equipment*
   1. Employees are responsible for the use, control, and security of Department property.
   2. If an employee's _____ uniform articles which bear official Department ins_____ise unaccounted for, a written report shall be filed imm_____ Investigation Division (SID).
   3. Department property shal_____plies, the physical plant and any items issued to employee_____ary basis.
   4. Employees must repo_____ destruction, or discovered malfunction of any_____le for the loss, damage, destruction or mal_____cuted, disciplined and/or required to make restitution.
   5. Department letterhead is for offici_____ use only. However, memoranda or reports intended solely for internal commun_____ion will use blank white paper, either with or without computer-generated headings.
   6. Equipment issued for any period of time must be returned in good condition.
   7. At the time of termination of employment for any reason, employees must return issued equipment, badges, key cards, identification cards, policy and training manuals, and any other county property in their possession.

L. *Reports*
   1. Employees are required to report in writing all unusual or significant events regarding Departmental operations or security in which they are involved or about which they have personal knowledge
      a) Unless specifically authorized otherwise, these reports must be submitted promptly, but no later than the end of the employee's shift.
      b) Reports are to be submitted to the employee's immediate supervisor, unless instructed otherwise by the investigating official or department policy.
      c) Uniformed employees in posts requiring maintenance of a log book must maintain written records of ALL events that occur on their shift, whether or not unusual or significant.

2. Employees must also file a written report whenever ordered to do so by any supervisor, SID, or any other department official authorized to conduct an investigation.

3. Whether or not the employee has previously submitted an oral or written report, employees must be truthful and cooperate if requested by SID (or any other office or individual appointed to conduct an investigation) to submit to an interview.

4. All reports generated in the course of an employee's duties are to be treated as confidential communications in accordance with paragraph C(2d), above.

5. Failure to report, false reporting, or interference with any employee's report may result in discipline or, in some cases, criminal prosecution.

M. Attendance

1. Regular and punctual attendance is expected of all employees, and excessive absenteeism or tardiness will be dealt with firmly in accordance with policies S207, S208 and S209, Managing Attendance, and S211, Unauthorized Absence.

2. Employees may not exchange duties, swap days or hours of work without prior authorization of their Shift Commander (uniformed) or immediate supervisor (non-uniformed).

3. While off-duty and within the Commonwealth of Massachusetts, if informed by any means that an emergency exists at the institution, any uniformed officer must contact the institution and offer assistance.

N. Administrative Procedures

1. It is the responsibility of every employee to maintain a working knowledge of the policies contained with the department's policy manual, and to understand and comply with the rules set forth in this code of conduct.

2. When an employee does not understand a regulation, policy or an order, the employee is expected to seek explanation or clarification from his/her immediate supervisor.

3. All employees must scan official bulletin boards when reporting for, and departing from duty, for the presence of official orders or notices.

4. Any person tampering with, removing, defacing, or marking such orders or notices without authorization shall be subject to disciplinary action.

5. After any absence from his/her regularly-scheduled shift, an employee shall inquire of his/her supervisor whether any important information was disseminated during his/her absence.

II. Offenses

If it is determined that, by a preponderance of the evidence presented either at a formal hearing convened by the Sheriff or an informal hearing conducted by the Superintendent or his designee, an employee has committed any one of the following offenses, he/she is subject to discipline, up to and including termination:

A. Physical abuse of an inmate
B. Sexual contact with an inmate
C. Possession of illegal drugs/alcohol while on/in department premises/vehicle
D. A positive hair sample or urinalysis drug test

E. Sexual harassment of a subordinate employee
F. Conviction of any crime
G. Possession of drugs within the institution without authorization
H. Acceptance of drugs/alcohol from, or delivery to, an inmate
I. Giving false statements under oath or on an employment application
J. Assault and/or battery on a fellow employee
K. Assisting an inmate to escape or attempt to escape
L. Use of excessive force
M. Under the influence of drugs/alcohol when reporting for, or while on, duty
N. Improper conduct
    1. Conduct unbecoming of an officer (uniformed personnel)
    2. Unprofessional conduct (non-uniformed personnel)
O. Submission of a misleading, incorrect, or false report (either oral or written)
P. Possession of contraband within the institution
Q. Accepting contraband from, or delivering contraband to, an inmate
R. Valid arrest or incarceration by a law enforcement agency
S. Disrespect or insubordination:
    1. To a superior in the presence of inmates
    2. To a superior in the presence of subordinates
    3. To a superior
T. Discourtesy, disrespect, or use of abusive language (in decreasing order of severity):
    1. To the public
    2. To a subordinate
    3. To any Department employee
    4. To any Department employee in the presence of inmates or employees
    5. To any Department employee
U. Inappropriate familiarity (in decreasing order of severity)
    1. With an inmate
    2. With a fellow employee
    3. With visitors or the public
V. Damage to property (in decreasing order of severity)
    1. Willful damage to county or any other property in the custody of the Department
    2. Negligent use, misuse, or misappropriation of, county or any other property in the custody of the Department Violation of Department policy (in decreasing order of severity).
    3. Failure to obey lawful oral or written order of a superior
    4. Failure to report a hazardous condition and take remedial action
    5. Interference with an investigation
    6. Failure to timely submit required reports/documentation
    7. Failure to report violations of Department rules, regulations, policies, or procedures committed in your presence or of which you had personal knowledge
    8. Failure to properly supervise subordinates, to discipline or recommend disciplinary charges, or to take proper action with subordinates
    9. Interference of off-duty employment with Department duties
    10. Failure to report change of residential address or telephone number to the Director of Personnel within five days of change
    11. Violation of any other Department rule, regulation, policy, or procedure (cite specific policy reference in charge)

W. Improper/inappropriate attire:
   1. Out of uniform (uniformed personnel)
   2. Unprofessional attire (non-uniformed personnel)
   3. Uncleanliness in person or dress
X. Unauthorized absence
   1. AWOL (absence without leave)
   2. Misuse of sick leave
   3. Tardiness
   4. Abuse of sick leave
Y. Offenses against public safety
   1. Unauthorized absence from, or abandonment of, post
   2. Neglect or dereliction of duty
   3. Inefficiency
   4. Fighting or quarreling with fellow employees
   5. Sleeping on duty
   6. Allowing an inmate to escape
   7. Violation of health and/or safety rules

III. **Waivers And Modifications**
   A. *Emergency*
      Provisions of these and other rules may be waived or modified in an emergency situation by order of the Sheriff or the Superintendent.

   B. *Collective Bargaining Agreement*
      Nothing in these rules shall be construed to conflict with any relevant collective bargaining agreement.

   C. *Authority*
      If any article, section, subsection, sentence, clause or phrase of these or other Department policies, procedures or other orders is for any reason held to be unconstitutional, contrary to statute, in excess of the authority of the Sheriff or the Superintendent, or otherwise inoperative, such decision shall not affect the validity of any other part of this policy.