# EXHIBIT 26

# Suffolk County Sheriff's Department
## Sheriff's Investigation Division (SID)
## Incident Report

Page 1 of ▓▓▓

........................................................................................

| SID Incident #: | 03H002 | Reporting Investigator: | Brian Dacey |
| Date of Incident: | May 19, 2003 | Type of Incident: | Alleged Assault; Threats |
| Time of Incident: | | Investigation # (if any): | |
| Incident Location: | HOC | Date Report Filed: | May 19, 2003 |
| (HOC, NSJ, or Other) | | | |

**Unit or Street Address:**

1-4-2 Unit

**Other SID Investigators Involved:**

Sonya Aleman

**SCSD Staff Members Involved:**

C/O Robert Murphy; C/O Scott Smith; Lt. Scott MacDonald; C/O Keith Storlazzi; C/O Janine Handrahan; C/O Julio Bello; C/O Mark DeAngelis; Capt. Charles Scoby; Nurse Craig Meekins; Physician's Assistant Beth Bringola; Nurse Sheila Porter; Gayle Bartley, LICSW

**Inmates Involved:**

Inmate R▓▓ R▓▓

**Narrative**

On Monday, May 19, 2003 Investigator Sonya Aleman and I responded to the Infirmary to investigate Inmate ▓▓▓ R▓▓'s allegations of physical assault and verbal threat by corrections officers.

R▓▓ reports that while housed on the 1-4-2 Unit on Monday, May 19, 2003, an unidentified correction officer entered his cell and kicked him once in the left arm. We observed three small individual slight red marks on his inner left bicep and one faint red mark on his left shoulder. R▓▓ did not complain or indicate the presence of any other injuries.

R▓▓ also reports that while housed in the Infirmary on Monday, May 19, 2003, Captain Charles Scoby appeared at his cell door and through the glass window threatened him by saying, "You're not going to make it here; you'll be leaving in a body bag."

Further investigation to follow. End of report.

Investigator Aleman has read and reviewed the above report. She has found it to be a true and accurate summary of events.

_____
Reporting Investigator's Signature                    Date

_____
Supervisor's Name and Signature                      Date

000632

# EXHIBIT 27

# Memorandum

**To:**  File

**CC:**  Elizabeth Keeley

**From:** Sheriff Andrea Cabral

**Date:** 6/18/03

**Re:**  Conversation with United States Attorney Michael Sullivan

---

# REDACTED

1

November 6, 2003

# REDACTED

2

001051

*November 6, 2003*

# REDACTED

3

November 6, 2003

**REDACTED**

4

# EXHIBIT 28

# Suffolk County Sheriff's Department



**ANDREA J. CABRAL**
SHERIFF

Jail
200 Nashua Street
Boston, MA 02114
(617) 635-1100

House of Correction
20 Bradston Street
Boston, MA 02118
(617) 635-1000

January 6, 2004

Kevin D. Constantine
Special Agent
Federal Bureau of Investigation
One Center Plaza
Suite 600
Boston, MA  02108

# REDACTED

Very truly yours,

Anne P. Powers
General Counsel
(617) 989-6665

001266

# EXHIBIT 29

| Chapter I<br><br>Administration / Management | Policy #:<br><br>S220 | References:<br>**G.L.** c.149, Section 185; 268A<br>103 **CMR** 910.08; 924.02; 973.07;<br>943.09<br>3-**ACI**-3-4017; 4067; 4173; 4268<br>3-**ALDF**-1C-23; 3A-07; 3E-08 | *Page 1 of 9* |
|---|---|---|---|
| Personal Standards<br><br>of Conduct | Date of Issue:<br>**January 1, 2000**<br>Date Revised:<br>April 2005 | Approved:<br><br>Andrea J. Cabral, Sheriff | |

## Purpose

As employees of the Department, we have an important mission in the criminal justice system. We provide an essential public service and are responsible for the care, custody, and control of sentenced inmates and pre-trial detainees while maximizing public safety and minimizing costs to the taxpayer. The Sheriff has set a very high standard of performance and all staff is responsible and accountable to the public. The importance of working with integrity and creativity is paramount even when the work is challenging and the resources are limited. You are a member of a staff dedicated to providing efficient and effective correctional and re-entry services to the communities of Suffolk County.

This policy codifies the rules governing standards of conduct and ethical behavior expected of all employees, contractors and volunteers of the Department.

## Policy Statements

I.  These rules are issued as general directives and do not attempt to cover each and every contingency that may arise during an employee's service while employed by the Department.

II.  Nothing in these standards shall be construed to relieve an employee of his or her primary responsibilities concerning the safekeeping and custodial care of inmates/detainees, or from an employee's constant obligation to render good judgment, full and prompt obedience to all provisions of the law and all other lawful orders and directives.

III.  All employees, contractors and volunteers are subject to the provisions of these rules.

IV.  Improper or illegal conduct will not be tolerated, whether or not it is specifically mentioned or described in these rules.

V.  Acceptance of appointment with the Department shall be acknowledgment of an employee's agreement to abide by this and every other policy, procedure and post order issued by the Department.

VI.  Nothing in these rules is intended to conflict with the laws of the Commonwealth, or to infringe upon the constitutional rights of any employee.



Employee Code of Conduct

res

## General Guidelines

### A. *Standards of Public Service*

1. An employee's position with this Department is one of responsibility and public trust. As such, and in order to maintain the dignity and public perception of the Department, all employees must be discreet and prudent not only in their professional capacities, but in personal relationships, personal associations and places frequented.

2. An employee's uniform, badge, identification or other official insignia shall be used only as is required in the course of his/her official duties.

3. All employees are required to conform their behavior to the ethical standards spelled out in G.L. c.268A.

### B. *Appointment, Employment, Termination of Service*

1. Selection for appointment to a position with the Department is based in part on statements contained in the employment application form. Discovery that any statement is false may lead to an employee's immediate termination.

2. All employees shall be photographed as necessary for identification purposes. Identification badges must be clearly worn at all times while on duty. Identification photographs may be retaken as needed to keep them current.

3. All employees regardless of employment status (e.g., leave of absence or suspension) must report within 72 hours in writing to the Director of Personnel any change in residential address, home telephone number, person to notify in case of emergency, or any other pertinent personnel data.

4. A minimum of two (2) weeks written notice of resignation to the Superintendent and Director of Personnel is required.

5. Employees must report all other paid employment to the Director of Personnel. Failure to do so is grounds for discipline.

### C. *Confidential Communications*

1. The affairs of the Department or persons in custody are confidential, and any discussion on these subjects shall be limited to that which is necessary in the performance of an employee's duties, and shall only be shared with persons authorized to receive such information. Any unauthorized disclosure of confidential information shall constitute just cause for disciplinary action. Communications to law enforcement agencies regarding the commission or possible commission of any criminal offense are not confidential. Employees may report suspected illegal activity to law enforcement without notifying a facility Superintendent, Chief of Staff or Superintendent of the Training and Intelligence Division (TID), if it is done in accordance with Paragraphs L (1) and L (2) below.

2. An inmate's or detainee's criminal history and related information is protected by the provisions of the Criminal Record Offender Information (CORI) Act, detailed in G.L. c.6, §172 et seq., and may only be released to authorized persons in accordance with S153, Criminal Offender Record Information.

3. An employee's personal information, e.g. address, telephone, SSN is also confidential and will not be released without authorization from the employee or under subpoena or a court order, unless dissemination of such information is required in the ordinary course of Department business.

4. Written or electronic information generated by any division of the Department may or may not qualify as a public record eligible for release outside the Department. Except as is specifically authorized by Department policy or procedure, internal information may not be released outside the Department unless and until authorized by the General Counsel or her designee.

5. Details of any Department investigation are confidential and the release of any information, unless authorized by a Superintendent, will be grounds for discipline. However, if the employee is the focus of the investigation, he/she may disclose any such information with his/her union representative and/or attorney to assist in his/her own defense.

6. Official records, papers, reports or copies of same shall not be removed from any Department facility without specific instruction or prior permission from the Superintendent except as is necessary for the performance of one's duties.

D. *Interactions with Public*

1. Employees shall be courteous and professional in all public contact that may arise in the course of their duties.

2. Tours:
   a) Formal tours of the institution may be arranged through the office of the Chief of External Affairs (COEA) or facility Superintendent.
   b) Unless assigned to the office of the COEA, employees may conduct tours only with prior approval of the facility Superintendent.

3. Employees are encouraged to publish or speak on subjects related to their position but must first obtain approval from the Chief of Staff.

E. *Interactions with the Media*

1. Only the Sheriff or the Chief of External Affairs, or their designee, may make statements to the media or release news statements or bulletins concerning the business of the Department.

2. The Superintendent reserves the right to determine whether or not the media will be permitted into any facility.

3. Media access to employees or inmates/detainees is governed by S130, Inmate Media Access and S131, Public Information and Media Access.

F. *Interactions with the Other Employees*

1. The mission of the Department requires cooperation between and among employees. Therefore staff must be considerate and courteous in all their working relationships.

2. Employees shall not foster discontent or engage in any activity that could lower the morale of another employee or disrupt the work environment, and will be discreet in the discussion of personal matters.

3. An employee may not inspect or have access to another employee's personal information, personnel file or other official documents unless it is necessary in the official performance of their duties.

4. Employees may not conduct investigations unless approved by a facility Superintendent and/or the Superintendent of TID. Reporting truthful information of the commission or possible commission of a crime regarding Departmental operations or security to appropriate law enforcement agencies in accordance with Paragraphs L(1) and L(2) below, shall not be construed as conducting an investigation.

G. *On-Duty Interactions with Inmates*

1. When interacting with inmates or detainees, employees must act solely in the furtherance of the Department's two-fold mission to provide for the custody and care of inmates and detainees.

2. Staff shall protect inmates/detainees from physical, emotional or sexual abuse, corporal punishment, personal injury, disease, property damage, discrimination and harassment.

3. Employees shall be professional, objective and unbiased in the application and enforcement of Department policies, procedures, post orders and relevant standards.

4. Employees shall not discuss Department business with, or in the presence of, inmates/detainees except as is required by their duties.

5. Employees must never express to an inmate/detainee a personal opinion regarding another employee or inmate or detainee, whether positive or negative.

6. Personal employee information shall not be discussed with, or in the presence of, inmates or detainees.

7. Employees must not give inmates/detainees the impression that staff are in conflict with one another, since such impression may lead to manipulative behavior.

8. Employees should not disclose the nature of an inmate/detainees' offense(s), or any visits with SID or outside law enforcement agencies, unless authorized to do so.

9. Except when expressly required by their duties, employees shall not intercede or act on behalf of an inmate/detainee's custody status with this Department or any another agency without prior approval of the facility Superintendent. Reporting truthful information of the commission or possible commission of a crime regarding Departmental operations and security to law enforcement in accordance with Paragraph L(1) and L(2) below shall not be construed as interceding or acting on behalf of an inmate/detainee's custody status.

10. Employees are prohibited from all forms of bartering, buying or selling, directly or indirectly with inmates/detainees.

11. Employees shall not accept a fee, gift, gratuity or any item of value from an inmate/detainee.

12. Employees shall not provide any fee, gift, gratuity, or any item of value to an inmate/detainee except as is required in the performance of their duties or as otherwise authorized by a facility Superintendent.

H. *Off-Duty Interaction with Inmates*

1. It is recommended that employees not associate with, accompany, correspond or have an intimate or personal relationship with any inmate/detainee or former inmate/detainee of any state or county facility except as is required in the course of one's duties. If however, an employee has or intends to have such contact or relationship they must first notify the facility Superintendent in writing.

2. Any other contact with a former inmate/detainee not covered by paragraph H (1) must also be reported in writing to the Superintendent.

3. Employees must notify the Superintendent if a relative or personal friend is committed to a Department facility. Employees are exempt from reporting contact with relatives after their release from Department custody.

4. The purpose of this notice requirement is to lessen any potential embarrassment to, and avoid any suggestion of impropriety by any employee, contractor or volunteer.

I. *Interaction with Inmates/Detainees' Friends or Family*

1. Any employee contact with an inmate/detainee's relatives or friends that results in the receipt of information relative to the commission or possible commission of a crime regarding Departmental operations or security must be reported in writing to a facility Superintendent, Chief of Staff or Superintendent of TID within twenty-four (24) hours or may be reported to the appropriate law enforcement agency in accordance with Paragraph L (1) and L (2) below.

2. Employees shall not accept a fee, gift, gratuity or any item of value from an inmate/detainee's family, friends, or any person acting on their behalf.

3. Employees shall not provide any fee, gift, gratuity, or any item of value to an inmate/detainee's family, friends, or any person acting on his/her behalf except as is required in the performance of their duties or as otherwise instructed by the Superintendent.
4. Conversation with inmates/detainees' visitors shall be limited to that which is required by an employee's duties.

J.  *Fitness for Duty*
1. Drug Policy
   Use of illegal drugs and abuse of alcohol or prescription medication are incompatible with service in a law enforcement agency, and such conduct will be dealt with in accordance with S215, Drug Free Workplace.
   a) The Department will not tolerate the presence of illegal drugs or alcohol on its premises, nor will it tolerate any of its employees reporting for duty or engaging in official business of the Department while under the influence of alcohol or drugs.
   b) Any employee who, under doctor's care or otherwise, is required to take medication while on duty that may affect their performance in any way must report this fact to their supervisor and the Superintendent.
   c) No employee may dispense or give medicine of any type, prescribed or not to an inmate/detainee unless:
      i. the medication is administered in accordance with Health Services Policy #20, Medication Administration by a licensed nurse, physician or dentist or expressly authorized by the Superintendent or designee.
2. Disability Or Need For Accommodation
   a) Any health problem, injury, or restriction which may affect an employee's job performance, or for which an employee may require an accommodation, must be medically documented and reported to the Director of Personnel.
   b) Such documentation must satisfy the following requirements:
      i. is an original;
      ii. be written on the stationery of the health care provider;
      iii. contain an original signature of the health care provider;
      iv. clearly state the specific physical restrictions the employee has due to the illness or injury;
      v. specify the expected duration of the restriction(s).
      vi. Division managers shall consult with the Director of Personnel on accommodations for work-related injuries and for non-work-related injuries.
      vii. is subject to review and resubmission every ninety (90) days.
3. Length Of Work Day
   a) No employee may work for the Department for more than sixteen (16) hours in a twenty-four (24) hour period, and after working sixteen hours must not work in any capacity for eight (8) hours before returning to duty. This prohibition shall include regular shifts, overtime, training, community affairs events, paid details and outside employment.
   b) If an employee is suspended for any reason, he/she may not work an overtime shift or work a detail during the twenty-four hour (24) period comprising said suspension.
4. Conduct On Duty
   a) Employees must not engage in any activity while working, which might interfere or distract them from the performance of their duties.
   b) Personal televisions, radios, cameras, CD, DVD or tape players and any other electronic devices are strictly prohibited inside the Jail, HOC, and all other SCSD programs unless authorized by the facility Superintendent.
   c) Reading materials other than official Department publications is prohibited while posted in a housing unit or control center unless authorized by the facility Superintendent.

    d) Cell phones are prohibited inside the Jail and HOC unless authorized by the facility Superintendent.

    e) The misuse of Department equipment or telephones and the generation of unauthorized charges will require restitution and may subject the employee to discipline.

5. Conduct Off-Duty

    a) All employees regardless of their employment status, e.g. on leave of absence or suspension must report in writing any involvement with law enforcement officials including but not limited to an investigation, arrest, issuance of a restraining order or court appearance.

       i. Such reports shall be made to the facility Superintendent within 24 hours of the involvement with law enforcement officials, or prior to the commencement of the employee's next shift, whichever is sooner. Employees need not report contacts with law enforcement officials that consist of reporting information regarding the commission or possible commission of a crime regarding Departmental operations or security in accordance with Paragraph L (1) and L (2) below.

      ii. If the facility Superintendent is unavailable, reports shall be made to the Deputy Superintendent or Assistant Deputy Superintendent at the appropriate facility.

      iii. Employees may be required to produce copies of police reports and restraining orders.

    b) All employees must be circumspect in their choice of associates, as even casual interaction with criminals, or with individuals engaged in illicit or illegal activities is inconsistent with employment with the Department.

K. *Department Property and Equipment*

1. Employees are responsible for the care, control and security of Department property.
2. If an employee's identification, badge, key card, or uniform articles, which bear official Department insignia, are lost, stolen or otherwise unaccounted for, a written report shall be filed immediately with TID.
3. Department property shall include equipment, supplies, the physical plant and any items issued to employees on a permanent or temporary basis.
4. Employees must promptly report the loss, damage, destruction, or discovered malfunction of any Department property. If responsible for the loss, damage, destruction or malfunction, an employee may be prosecuted, disciplined and/or required to make restitution.
5. Department letterhead is for official Department use only. Memoranda or reports intended solely for internal communication should be written on blank white paper, either with or without computer-generated headings. The unauthorized use or waste of Department letterhead or other materials is prohibited.
6. Equipment issued for any period of time must be returned in good condition.
7. Upon separation from service for any reason, employees must return all issued equipment, badges, key cards, identification cards, policy and training manuals and any other Department property in their possession.

L. *Reports*

1. Employees must report suspected criminal activity to a facility Superintendent, Chief of Staff or Superintendent of TID; unless the employee has a reasonable belief that such an internal report would result in retaliation by the employer.
2. If an employee reasonably believes that making an internal report of suspected criminal activity would result in retaliation by the employer, then the employee must immediately make an external report to the Boston Police Department, the Massachusetts State Police, or the Federal Bureau of Investigation. The employee will not be subject to discipline or retaliation by the employer for the act of reporting as long as the reporting is consistent with this paragraph and Paragraph L (1) above.

001121

3. Employees are required to report in writing all significant events regarding Departmental operations or security in which they are involved or about which they have personal knowledge. These reports must be submitted promptly, but no later than the end of the employee's shift unless specifically authorized otherwise. Reports are to be submitted to the immediate supervisor, unless instructed otherwise by an investigating official or Department policy.

4. Employees must also file a written report whenever ordered to do so by any supervisor, member of SID any other Department official authorized to conduct an investigation.

5. Employees must be truthful and cooperate if requested by SID any other office or individual appointed to conduct an investigation) to submit to an interview whether or not the employee has previously submitted an oral or written report.

6. All reports generated in the course of an employee's duties are to be treated as confidential communications in accordance with paragraph C (2) (d).

7. Failure to report, false reporting, incomplete reporting or inappropriately collaborating or interfering with another employee in the preparation of a report may result in discipline or criminal prosecution.

M. *Attendance*

1. Regular and punctual attendance is expected of all employees and excessive absenteeism or tardiness will be dealt with firmly in accordance with policies S207, S208 and S209, Managing Attendance, and S211, Unauthorized Absence.

2. Employees may not exchange duties or swap days or hours of work without prior authorization of their Shift Commander (uniformed) or immediate supervisor (non-uniformed).

3. While off-duty and if advised by any means that an emergency exists at any Department facility, all executive staff members, uniformed officers and medical staff must contact their respective supervisor and report for duty if so ordered.

N. *Administrative Procedures*

1. It is the responsibility of each employee to have a working knowledge of the policies contained within the employee policy manual, and to understand and comply with the rules and procedures detailed therein.

2. If an employee does not understand a regulation, policy or an order, the employee is expected to seek explanation or clarification from his/her immediate supervisor.

3. All employees must scan official bulletin boards (for the presence of official orders, issued policies or notices) when reporting for, and departing from duty.

4. Any person tampering with, removing, defacing, or marking such orders or notices shall be subject to disciplinary action.

5. After any absence from his/her regularly-scheduled shift, an employee shall inquire of his/her supervisor whether any important information was disseminated during his/her absence.

II.   Offenses
      If it is determined that an employee has committed any one of the following offenses or violated any Department policy, procedure or post order he/she is subject to discipline, up to and including termination:

A. Physical abuse of an inmate/detainee
B. Sexual contact with an inmate/detainee
C. Possession of illegal drugs or alcohol while on duty or in any Department facility or vehicle
D. A positive hair sample or urinalysis drug test

001122

E.  Sexual harassment of anyone
F.  Conviction of any crime
G.  Possession of prescription medicine while on duty or in any Department facility/vehicle without prior approval of the Superintendent
H.  Acceptance of drugs/alcohol from, or delivery to, an inmate/detainee or employee
I.  Giving false statements orally or in writing while under oath or on an employment application or during an investigation
J.  Assault and/or battery on another person
K.  Assisting an inmate or detainee to escape or attempt to escape
L.  Use of excessive force
M.  Under the influence of drugs/alcohol when reporting for or while on duty
N.  Improper conduct
    1.  Conduct unbecoming of an officer (uniformed personnel)
    2.  Unprofessional conduct (non-uniformed personnel)
O.  Submission of a misleading, incorrect or false report (either oral or written)
P.  Possession of contraband within any Department facility or vehicle
Q.  Accepting contraband from, or delivering contraband to, an inmate, detainee or employee, contractor or volunteer
R.  Valid arrest or incarceration by a law enforcement agency
S.  Disrespect or insubordination:
    1.  To a superior in the presence of inmates/detainees;
    2.  To a superior in the presence of subordinates; or
    3.  To a superior
T.  Acts in a discourteous, disrespectful or insolent manner towards another person while on duty
U.  Inappropriate familiarity
    1.  With an inmate/detainee
    2.  With a fellow employee, contractor or volunteer
    3.  With visitors or the public
V.  Damage to property
    1.  Willful damage to Department property
    2.  Negligent use, misuse, abuse or misappropriation of Department property
W.  Improper/inappropriate attire:
    1.  Out of uniform (uniformed personnel)
    2.  Unprofessional attire (non-uniformed personnel)
    3.  Uncleanliness in person, dress or demeanor
X.  Unauthorized absence
    1.  AWOL (absence without leave)
    2.  Misuse of sick leave
    3.  Tardiness
    4.  Abuse of sick leave
Y.  Offenses against public safety
    1.  Unauthorized absence from or abandonment of a post
    2.  Neglect or dereliction of duty
    3.  Fighting or quarreling with fellow employees
    4.  Sleeping while on duty
    5.  Allowing an inmate/detainee to escape
    6.  Violation of health and/or safety rules

III.  Waivers and Modifications
    A.  *Emergency*
        Provisions of these and other rules may be temporarily waived or modified in an emergency situation by order of the Sheriff or Superintendent.

001123

*Collective Bargaining Agreement*
Nothing in these rules shall be construed to conflict with any relevant collective bargaining agreements.

C.  *Authority*
If any article, section, subsection, sentence, clause or phrase in this or other Department policy, procedure or post order is for any reason held to be unconstitutional, contrary to statute, exceeds the authority of the Sheriff or the Superintendent, or is otherwise inoperative, such decision shall not affect the validity of any other part of said policy, procedure or post order.

# EXHIBIT 30

# REPORT OF THE SPECIAL COMMISSION

## on the

# SUFFOLK COUNTY SHERIFF'S DEPARTMENT

## October 15, 2002

### Commission Members

**Donald K. Stern, Chair**

**Mauricia Alvarez**

**Ralph I. Fine**

**Karen F. Green**

**Michael W. Neighbors**

**Michael A. O'Toole**

**J. Owen Todd**

**By Appointment of the Governor of the Commonwealth of Massachusetts**

strengthen its internal investigations and, therefore, its ability to defend against union grievances. The Department needs the cooperation of others, however, to ensure that allegations of criminal misconduct by staff are properly investigated and, where appropriate, prosecuted. The Commission urges unions, arbitrators and state prosecutors to consider the corrections implications of their decisions. Continued employment and non-prosecution of officers charged with sexual misconduct and physical abuse sends a dangerous message to staff and inmates alike – there are no consequences for staff misconduct, even when it is alleged to be criminal misconduct.

> *The Department should take steps to become more open and increase its internal and external accountability.*

The Commission urges an aggressive attack on the code of silence that prevents staff members from reporting the misconduct of fellow staff members. The Commission also believes that the Department could benefit from greater fiscal accountability and urges the State to assume control of the Department's fiscal operations, as it has assumed control for the fiscal operations of some other county sheriff's departments. The new Sheriff should work towards making the Department more open. Among other things, the Sheriff should consider forming a citizens advisory group.

## G.    Overall Conclusion

As noted in the Commission's Report, the Department has made strides in improving policies, procedures and operations since revelation of the allegations of abuse, patronage, lack of leadership and mismanagement. Yet there remain many areas in which significant improvement is essential. These improvements must be made at a time of severe budgetary constraints and under new leadership. However, with leadership committed to excellence, the cooperation of the unions and staff, appropriate technical assistance and internal and external mechanisms to monitor Department operations, the Commission believes that the Jail and the HOC could become model correctional facilities.

- <u>The Department's utilization of the Office of Employee Relations to manage all communications between management and labor has impeded communications and increased animus within the Department.</u>

Department policy provides that all communications between management and labor should be conducted through the Office of Employee Relations. In general, it is sound labor relations practice to put forward negotiators who do not have the final authority to make major decisions. This allows for decision-makers to gauge the pulse of negotiations through their intermediaries and reduces the time that top administrators need to spend in sometimes long and unfruitful discussions. There are times, however, when the gravity or timing of the issue -- or simple perceptions about who is making decisions and why -- demand a departure from standard procedures. Some direct communication would have allowed for unfiltered information to be received by the Sheriff or Special Sheriff regarding the unions' operational concerns and willingness to accept furloughs and deferred compensation.

Similarly, the Sheriff, Special Sheriff, and the Superintendent do not appear to attend regularly-scheduled labor-management meetings on a routine or even occasional basis. The complete lack of formal contact with these officials is a sore point for the unions and contributes to animosity.

- <u>The officers' unions, particularly Local 419 at the HOC, consistently undermine the Sheriff's efforts to improve morale.</u>

The Department presents management challenges due to its size and the complexity of managing two completely separate facilities. Any efforts to improve communication are, therefore, extremely valuable and contribute to overall coordination, as well as to morale, within the Department. The Sheriff has attempted to do just this with an internal staff newsletter, staff appreciation luncheons and staff awards ceremonies.

Regrettably, the union leadership of the officers' unions, especially Local 419 at the HOC, has not supported these efforts. The luncheons were used by the unions to demonstrate "wastefulness" on the part of the Sheriff. Union leaders picketed a recent award ceremony in an effort to demonstrate a lack of support for the Sheriff. Some employees elected to forego attendance even though they were to receive awards. Other employees felt intimidated by the union actions and chose not to attend. In the process, any efforts to improve morale were undermined.

30

SID staff appear to understand the need to develop more trusting relationships with inmates, in order to gather better information from an intelligence perspective as well as to ensure that they are apprised of all incidents of serious wrongdoing by officers.

- Proactive investigation by SID is currently being hampered.

SID staff receive all use of force reports and videotapes, and review them the same day.   These documents and tapes are reviewed for evidence of inappropriate actions and may be used as for staff training in the future.  Despite the requirement that videotapes be made of all planned use of force incidents, since December 2001, there were less than five tapes at the HOC and less than ten at the Jail, indicating that all planned use of force incidents were not being taped.  When SID administrators note use of force reports without the requisite videotapes, they have started to bring the issue to the attention of supervisors. This is an excellent example of proactive attention to a very important issue.

It is absolutely appropriate and important that SID monitor these routine reports and tapes.   Not every inmate is willing to file a formal complaint against an officer, and this may be the only way that an incident of excessive force will be discovered.   Nevertheless, there are limitations on the probative value of this documentation.  Questions have been raised in the context of at least one of the highly publicized excessive force incidents about the veracity and independence of reports filed by officers, especially after use of force incidents.  The current practice surrounding report writing is unstructured and presents opportunities for staff to communicate with others who may or may not have been directly involved in the incident, including union officials.  Staff are expected to complete incident reports before the conclusion of their shifts.   There is no formal system of supervisors assigning report writing responsibility and separating staff while the reports are being written.   Some union representatives counsel employees to write incident reports as lacking in detail as possible.

- Staff maintain a code of silence due to concern about retaliation.

Staff consistently expressed concern that if they reported misconduct of fellow staff, they could expect retaliation from their peers in the form of a slower response time by the emergency response team in the event the officer required back-up.  Although there was no indication that this has occurred, the fear is very real. The Department has taken steps to minimize the opportunities for staff to maintain a code of silence.  For example, the department has implemented a practice of photographing inmates following a use of force.  Also, the composition of SERT teams is constantly changing, which reduces the bonding that can lead to a code of silence.

abuse of inmates by staff violates federal and state laws, as well as institutional rules and should clarify that retaliation by staff is forbidden. Unless the Department adopts a policy explicitly providing that SID investigations constitute exhaustion of remedies, the guidebook should also inform inmates that if their complaint is investigated by SID, they need to also file a grievance to protect their rights to recover in court.

7.    **The Department should adopt a policy requiring that all participants and witnesses to an incident or use of force prepare individual reports without prior consultation with others.**

The purpose of incident reports is for staff who participated in or who observed incidents to document their actions and observations as they recall them. Inconsistencies in various reports regarding the same incident can be used by supervisors to evaluate the situation. Reports written after consultation or cooperatively with other staff result in sanitized documents, giving supervisors nothing to evaluate. The preparation of incident reports should not give cause for officers to consult with union officials as supervisors should be able to respond to staff questions in this regard.

8.    **The Department should attempt to penetrate the existing code of silence at every turn.**

The Department should emphasize at the earliest point in training and orientation for new employees (not just uniformed staff) the difference between loyalty to the department and loyalty to their co-workers. It must be emphatically stated that while loyalty to co-workers can be a desirable trait, it ceases to be a good thing when it extends to covering up misfeasance and malfeasance by falsifying reports, lying to or refusing to cooperate with supervisors and other investigators, and simply keeping silent when information needs to be brought to the fore.

The Department should conduct a full-day training and orientation session that is scenario-based, with discussions of various actual and hypothetical ethical situations that employees could encounter. It should include everything from what the employee should do with respect to minor transgressions (e.g., observing a co-worker providing a minor but unauthorized favor for an inmate or bringing an item to work that is prohibited), as well as the obviously more major ones (e.g., knowledge that a fellow officer is having a sexual relationship with an inmate or is bringing drugs into the facility). It should also explain how inmates can manipulate officers to break minor rules, and then use this knowledge of their minor wrongdoing to coerce the officers into more substantial violations. Further training should be geared towards veteran staff.

Although the goal is for staff to recognize the harm that misbehavior, illegal actions, or policy violations can cause the institution as a whole and therefore to be preventative, the disciplinary consequences of participating in a code of silence must be emphasized as well. For example, there could be reference to the disciplinary action recently taken against an officer who said that he would not provide information even if he did know something about the situation being investigated. It should also be emphasized that consequences for minor transgressions, if admitted to supervisors at an early stage, will be geared to corrective action and counseling, whereas the potential harm and consequences will be far greater if the issue is not dealt with early on. The Department must ensure that employees who do come forward with information are fully protected from retaliation by other officers and are supported by the administration. Union officials should also publicly denounce the code of silence indicating that they will not support such cover-ups.

9.      **SID should expand its range of available findings.**

SID records and statistics should indicate when policy violations are confirmed, even when the underlying complaint is not sustained. This practice would help managers to impose the appropriate discipline, allow SID to keep track of these officers in the event of future claims against them, and alert the administration and training divisions about the extent to which certain policies are not being implemented appropriately.

10.     **The Department should routinely provide to SID reports of disciplinary actions taken against officers for violating institutional rules.**

This information should be computerized in a database and cross-referenced with current investigations. Department administrators should find ways to seek SID's input into operations, including giving SID managers some say into SERT assignments and into the training curriculum. The training program should incorporate information about SID's role, about staff obligations to bring complaints about employee wrongdoing to SID, and about the kinds of actions and inactions that can lead to investigations and discipline.

11.     **The Department and the District Attorney's Office should together establish a protocol for the timely referral for investigation, and, where appropriate, prosecution, of allegations of sexual abuse, serious physical abuse, and other felonious conduct.**

The Department and the District Attorney's Office need to strengthen their relationship and establish a clear protocol regarding the referral of cases for investigation and prosecution. It appears that the 2001 memorandum of understanding on this subject has not been implemented. This protocol should

72

# EXHIBIT 31

COMMONWEALTH OF MASSACHUSETTS

ARBITRATION

SUFFOLK COUNTY SHERIFF    ]
                    Employer   ]
&                            ]        GRIEVANCE # J-51
                            ]
AFSCME, COUNCIL 93, LOCAL 1134  ]
JOSEPH UPTON                  ]
                    Grievant   ]        BEFORE JOHN CANAVAN,
                                ARBITRATOR

POST HEARING BRIEF OF EMPLOYER

**BACKGROUND**

Joseph Upton (hereinafter the Grievant) was terminated from his position of Jail Officer because he witnessed an assault on an inmate and aided in its cover-up. Following the assault, an extensive investigation was conducted. The investigation concluded that the inmate, Leonard Gibson, was assaulted and that Lt. Eric Donnelly and Officer William Benson were the assailants. The investigation further determined that the Grievant was present in the control booth, fifteen feet away from the door to the inmate's cell during the assault, and that he failed to report the assault and participated in its cover-up. A disciplinary hearing was conducted on December 6, 1999; the Grievant was present with union representatives, but chose not to testify. The Hearing Officer concluded there was just cause for discipline, up to and including termination. (Joint Ex.3). The Grievant was terminated on December 29, 1999. (Joint Ex. 6). In addition to the Grievant, two officers and one nurse were terminated from the Suffolk County Sheriff's Department (the Department) for their role in this incident. The floor supervisor was demoted two ranks and suspended. The Department requests that the Arbitrator take

arrays as the assailants. Haugh also testified that Gibson stated that Joseph Upton was present in the control booth while the assault took place, and that Upton was assigned to the medical unit control booth on the night in question. Haugh further testified that there were no visual impediments between the control booth and the door to Gibson's cell.

Former Special Sheriff and Superintendent John Brassil, a thirty-two year veteran of the Suffolk County Sheriff's Department, also testified on behalf of the Department. Mr. Brassil testified that he had reviewed Joint Ex. 1, including all attachments and had concluded that Joseph Upton had violated numerous policies of the department and that he agreed with the Sheriff's decision to terminate Joseph Upton. (Brassil test. p. 123) Specifically, Mr. Brassil testified that Leonard Gibson's allegation of abuse was credible based upon the following: Physician's Assistant O'Rourke's opinion that Gibson's wounds were consistent with an assault; The officer's failure to write reports for behavior which would have required the writing of reports, such as Gibson's swearing at the officers, threatening the officers, disrupting the unit, banging on his cell door, banging his bed[1]; The officers' obvious collusion in the reports they finally wrote when ordered to do so, specifically, each officer's statement that Gibson's swearing was not Tourette induced; The runners' obvious reluctance to make statements against the very officers who control whether or not they keep their very lucrative jobs; and, The officer's "Blue Wall of Silence", which precludes officers from making statements against one another. Mr. Brassil testified that the proper course of action for Joseph Upton was for him to make a notation in the logbook regarding the assault, notify his supervisor, and write a report. Incidentally, these

---

[1]    Joseph Upton reported "[i]nmate several times attempted to disrupt feeding, and only after his insulent [sic] remark towards staff was he ordered to his cell . . . During duration of feeding, inmate became disruptive and non-compliant."; Eric Donnelly reported "Inmate Gibson continued to call Officer Benson a "fat fuck" . . . [and stated to Donnelly] Fuck you, I hope someone in your family gets a fucking disorder."; Whitfield reported that Gibson stated "he (Deputy Benson) is a fat fuck and thinks he is a tough fuck."; Benson reported that "Gibbons [sic] sat down and started calling Officer Benson a fat fuck and a tough guy . . . [after being sent to his cell] Inmate Gibbons [sic]

are the precise actions which Officer George McCallum took when he learned of the assault, notwithstanding the price he would later pay.

## ARGUMENT

Who defends the victim when his purported protectors become his assailants? This is a case of officer on inmate assault. The officers deny the assault, the inmate swears the assault occurred. The Union will argue "how dare you believe an inmate over an officer." This is the crux of this case, and of every officer on inmate assault case. In a cloistered environment such as a correctional facility, when officers assault inmates, as they sometimes do, who is in a position to report the assault? Officers and inmates. Jack Brassil testified that both officers and inmates are reluctant to report officers' assaults on inmates. (Brassil testimony pp. 111-14). This arbitrator saw first-hand the price officers pay when they report an officer's misconduct. All Officer George McCallum did was make a note in the logbook that Leonard Gibson claimed he was beaten, call a nurse, and report the claim to his supervisor. For that, he was subject to writing on the walls of the Jail calling him a rat, and the infamous dummy with "Rat McCallum" written on the forehead. (McCallum testimony pp. 46-49.)

In cases of alleged officer violence against an inmate, all of the evidence should be carefully weighed. Although most of the officers who work at the Suffolk County Sheriff's Department are hard-working professionals, a few are not, and these are the few at whose hands inmates suffer assaults. When inmates are physically injured, the officers cover their tracks by claiming the inmate was injured during a proper use of force, and by submitting use of force reports. In cases where use of force reports have been completed, the officer generally gets the benefit of the doubt. That is not this case. In this case, no officer reported a proper use of force,

started banging the door calling Officer Benson a tough guy and a fat fuck. Gibbons [sic] also stated that he would

# EXHIBIT 32

## COMMONWEALTH OF MASSACHUSETTS

| | |
|---|---|
| In The Matter Of:  )  )  AFSCME, Council 93, Local 419,  )  (Robert Parise, Grievant)  )  )  and  )  )  SUFFOLK COUNTY  )  ) | John J. Mark, Arbitrator  Grievance No. E-237 |

### SUFFOLK COUNTY'S POST-HEARING BRIEF

#### Introduction

Robert Parise (the grievant) was terminated as a corrections officer with the Suffolk County Sheriff's Department (the department) on August 27, 1999 for numerous violations of departmental policy arising from an investigation into his inappropriate sexual contact with two [then] inmates of the Suffolk County House of Correction (HOC). Specifically, after an exhaustive investigation and internal disciplinary hearing at which he had private counsel and union representation, the department determined that the grievant had sexual relations (including kissing, fondling, oral sex and intercourse) with inmate Ellen Wilson, that he digitally penetrated inmate Karen Passinisi's vagina with his fingers while she was sleeping, and that he tied inmate Passinisi to her bed with wires from television headphones and assaulted her with them. Additionally, the grievant refused to comply with a direct order from Superintendent John Haack, given under the threat of termination, to submit to a saliva swab DNA test to determine whether his DNA matched that of semen contained on a towel produced by inmate Wilson, who claimed to have used a towel to wipe up the semen after her encounters with the grievant and another officer, David Mojica. The investigation led not only to the grievant's termination, but also the termination of Officer Richard Powers (appealing decision through arbitration), Officer David DiCenso (appealing decision through arbitration) and Officer David Mojica (AFSCME Council 93, Local 419 (the Union) voted to withdraw arbitration after state ordered DNA paternity test established that there was a 99.966% probability that Mojica was the father of inmate Wilson's daughter, who was conceived while she was incarcerated at the HOC).

Despite his knowledge that a serious incident had taken place and despite the statement Lubell made to him upon his return to the unit, the grievant never filed any type of report about Lubell's statement. Not only did he not file any report, he never even told anybody about the statement until the Basile disciplinary hearing which did not take place until approximately one month after the incident (*Id.* at pp. 114 – 115, M # 44).

The last, but certainly not least, point worth noting concerning the grievant's testimony about the Lubell incident is that **he admitted to lying under oath** during the Basile disciplinary hearing. (T # 9, p. 124). He claimed that he lied under oath because then Special Sheriff Jack Brassil had threatened him with his job. Specifically, the grievant was asked the following:

By Attorney Davin

| | |
|---|---|
| Q: | …You stated during that conversation had coerced you; had asked you to lie about your testimony, is that correct? |
| A: | Pretty much. |
| Q: | And did you lie? |
| A: | Yes. |
| Q: | So under oath at the Parise Hearing you lied? I'm sorry, at the Basile Hearing. I apologize. |
| A: | Yes. |
| Q: | You lied under oath? |
| A: | Yes. |
| … | |
| Q: | At the Basile Hearing you gave false testimony because you felt your job was on the line? |
| A: | That's right. |

(T # 9, pp. 124 – 125).

If the grievant was willing to lie under oath at a proceeding involving another officer because he thought his job might be in jeopardy, then he would certainly provide false testimony under oath in the instant arbitration proceeding, where there can be no doubt that his job is in jeopardy. The grievant has every motive to lie, and a review of his testimony from the instant hearing reveals that he has done so. He lied about his job application. He lied about using a sick day. He lied about asking a colleague to use the LEAPS terminal. He lied about coming forward and testifying against other officers. Most notable, however, the grievant lied about Ellen Wilson and he lied about Karen Passinisi. He was not a witness whose testimony can be believed.

## VII. The Code of Silence

It is hard to imagine another proceeding where such a tangential issue has received so much attention as the "Code of Silence" has received in the instant matter. Admittedly, Investigator Arthur testified that in his experience as an investigator, officers are reluctant to

come forward or to testify against other officers. He stated that this was true, in his experience, in serious cases as well as trivial matters.[20]  What seems to have gotten lost in the breadth of the testimony in this case, however, is that the department has not alleged that another employee witnessed any of the sexual misconduct in issue, with the exception of Richard Powers. The testimony has revealed that the sexual misconduct often took place in remote areas (bathroom in the back of the unit and stairwell between 10th and 11th floors), while other staff and inmates were away from the unit (usually for lunch), during the midnight shift while other inmates were locked in their cells and the officer worked alone in the unit and, on one occasion, while another officer served as a lookout.  The Arbitrator does not need to conclude that a code of silence exists or does not exist to rule on this case.

The reality likely lies somewhere between the extreme positions taken by Neville Arthur (on the existence of a code of silence) and by Jack Sullivan and Ann McAuliffe (on the absence of a code of silence). Officer Rachel Fuller, a union witness, appeared to testify straightforwardly on this issue. The following exchanges took place during Officer Fuller's testimony on this issue:

By Arbitrator

Q:     There is an issue here that – the best terminology I hear is a "wall of silence" that people who are correctional officers, no matter what, you don't testify against any other correctional officers, no matter what. Would you say that is in existence?
A:     I guess it could be.
Q:     It could be?
A:     Yes.
...
Q:     Would you ever look the other way and let something like this happen?
A:     No. I probably couldn't, no. (emphasis added) (T. # 7, pp. 37-38).
...

By Attorney Stanton

Q:     Isn't it fair to say that officers are reluctant to come forward and report other officers?
A:     ...Yes. I would agree, yes. Yes, you would be.

Q:     Wouldn't it also be fair to say that when one officer comes forward and tells on another officer that he or she would be somewhat ostracized?
A:     I would say that could happen, yes.

---

[20] Arthur's testimony that officers are reluctant to report even trivial misconduct is corroborated by Union President Jack Sullivan, who gave impassioned testimony on his feelings about officer misconduct and what he believed other officers would do concerning their knowledge of officer misconduct (especially involving sex or drugs). Sullivan acknowledged, however, that he would not report minor violations. This aspect of his testimony is consistent with Arthur's.

[21] The Arbitrator may recall the long pause this witness gave before answering this question.

Q:      Is that no matter what the misconduct is?

A:      I guess. I would imagine maybe, yes, they are picked on a little bit for doing that, no matter what it is. It's hard to do, you know.

Q:      Would that person who came forward be considered a rat?

A:      Could be, yes.

...

By Attorney Wessels:

Q:      As to the code of silence, do you have any reason to believe that officers, correctional officers at the House of Correction would turn their head and allow an officer to sexually assault a female inmate here?

A:      I guess it could happen.

In addition to calling Jack Sullivan to testify on the issue on the code of silence, the union submitted numerous arbitration and disciplinary hearing decisions to support its position that officers freely come forward against other officers to report misconduct. A review of many of these decisions, however, actually undermines this position, and suggests that the code of silence does in fact exist.

An example of this is the arbitration decision involving Officer Jose Diaz, who was terminated for using excessive force on an inmate in 1997. The arbitration decision, standing alone, would lead one to believe that Officer Bailey reported Diaz' misconduct, which he witnessed, as he was required to do. What actually transpired, however, is far different. Despite his first hand observations of Diaz kicking an inmate, Officer Bailey initially reported nothing. When he did write a report, he did not reveal that he observed Diaz kick the inmate. It was not until the department pressed him that he wrote, in a second report, what he actually observed. (M ## 51 – 54). Shortly after writing this second report, Officer Bailey was ridiculed in an anonymous cartoon circulated at the House of Correction, which depicted him as a cross between a rat and a stool pigeon (M # 56).

Another document submitted by the union that clearly undermines its position on this matter is the Hearing Officer's Report on the matter of Correction Officer John McPhail. Again, the union submitted this to show that officers have come forward and reported misconduct on the part of other officers. The Hearing Officer's decision and the transcript from this hearing (M #

# EXHIBIT 33

# COMMONWEALTH OF MASSACHUSETTS
## ARBITRATION

SUFFOLK COUNTY SHERIFF    ]
       Employer      ]
&                 ]       **GRIEVANCE  # E-236**
                  ]
AFSCME, COUNCIL 93,     ]
LOCAL 419, DAVID DICENSO  ]
      Grievant      ]     **BEFORE MICHAEL C. RYAN, ESQ.**
                   **ARBITRATOR**

# POST HEARING BRIEF OF EMPLOYER

## INTRODUCTION

Management maintains the right to discipline an employee, up to and including discharge.  The only limitation on this right is that, pursuant to the Collective Bargaining Agreement, the discipline must be for just cause.  The term "just cause" is nebulous and is difficult to define or determine.  <u>Black's Law Dictionary</u> defines just cause as "based on reasonable grounds"; "fair, adequate, reasonable cause."  <u>Black's Law Dictionary</u> 862 (6th. ed. 1990). The arbitrator must decide whether the discipline imposed by the Suffolk County Sheriff's Department was reasonable or whether it was "arbitrary, capricious or discriminatory."

In the case at issue, the Union filed a grievance, pursuant to the Collective Bargaining Agreement, alleging that the employer did not have just cause to discharge the Grievant. The grievance was denied at Steps I and II of the grievance procedure and the Union submitted it to arbitration. A series of hearings took place before Arbitrator Michael C. Ryan (alternating between AFSCME and The Nashua Street Jail) on August 2, 2001, August 15, 2001, September 4, 2001, October 3, 2001, December 4, 2001 and February 8, 2002. (Ellen Wilson testified on

which she was housed, the cell number and the time of day the incidents occurred (Vol. 2, P. 18, L. 2-20).

Ms. Wilson stated that although she and the Grievant never engaged in sexual intercourse, they often fondled each other's genitals and engaged in open mouth kissing. (Vol. 2, P. 19, L. 6-10). Ms. Wilson also told investigator Arthur that she could describe the Grievant's penis, she claimed the Grievant's penis was extremely small and 'child-like.' (Vol. 2, P. 19, L. 14-21).

Investigator Arthur interviewed the Grievant on July 2, 1999. The Grievant was informed of the allegations against him and was asked to write a report in response to the claims against him. The Grievant denied any involvement of a sexual nature, but did admit that Ellen Wilson was making sexual advances towards him. (JX-1 attachment 23).

Investigator Arthur then began the arduous process of interviewing the other officers and inmates that were in the unit at the time Ms. Wilson engaged in the sexual conduct with the Grievant. However, Investigator Arthur was faced with a common problem among investigators in a correctional setting. In general officers are very reluctant to get involved in or assist management in the investigation of one of their own. Known as the 'Blue Wall of Silence' in some circles, law enforcement, and correction officers generally do not talk or offer information to investigators about other officers who could face discipline. Any officer perceived as doing so is considered a 'rat' or an 'informer.' *Cracking theCode of Silence in Corrections; by Keith L. Martin Assistant Editor; CorrectionsConnection.com.*

Similarly, inmates are very reluctant to provide investigators with information about officers for fear of retribution. Regrettably, inmates who inform or provide investigators with information are labeled as 'rats' or 'snitches' and they could be in danger. (Vol. 2, P. 21, L. 14-

# EXHIBIT 34





001494





001496



001497



001498

001499

# EXHIBIT 35

1

VOLUME:  I
PAGES: 1-44
EXHIBITS: None


UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
*  *  *  *  *  *  *  *  *  *  * )
BRUCE BARON,                     )
          Plaintiff              )
                                 )
    vs.                          ) CIVIL ACTION
                                 ) NO.  01-10143-
DANIEL HICKEY, SUFFOLK COUNTY    )      PBS
SHERIFF'S DEPARTMENT, AND        )
SHERIFF OF SUFFOLK COUNTY,       )
          Defendants             )
*  *  *  *  *  *  *  *  *  *  * )
```


DEPOSITION OF RICHARD JAMES FEENEY,
a witness called on behalf of the plaintiff,
taken pursuant to the provisions of the
Massachusetts Rules of Civil Procedure, before
Joanne M. Doyle, Registered Merit Reporter, CSR
No. 108793, and Notary Public in and for the
Commonwealth of Massachusetts, at the offices of
DiMento & Sullivan, 7 Faneuil Marketplace,
Boston, Massachusetts 02109-1649 on Tuesday,
April 16, 2002, commencing at 10:05 a.m.


----------

HENNESSEY CORP., d/b/a
ROBERT H. LANGE COMPANY
50 Congress Street
Boston, Massachusetts 02109
617-523-1874 * 800-645-6807 * Fax 617-523-7343

38

1    would go to so you know who they actually went

2    to, they were actually filed properly.  As I said

3    before, I'd get complaints that would just come,

4    you know, on a piece of paper.

5  Q.  So there was no way of actually monitoring

6    whether the complaints were investigated and

7    actually properly handled?

8  A.  No.  I think they were always monitored, but now

9    you actually know someone actually files a

10    harassment complaint.

11  Q.  Is another improvement that it takes out the SID

12    unit as the first investigative unit?

13  A.  No, I don't believe so.

14  Q.  Are you aware of any code of silence between the

15    fellow officers reporting violations on each

16    other?

17  A.  Yes.

18  Q.  What is the -- what's the code of silence?

19  A.  Lack of reporting to protect each other.

20  Q.  And when Officer Baron reported Sergeant Curtis,

21    did he violate that?

22  A.  Yes.

23  Q.  Are you aware of any incidents of any other

24    violations of this code of silence?

1  A.  Yes.

2  Q.  What other incidents are you aware of?

3  A.  There's been many.

4  Q.  What's the most recent one?

5  A.  I can't think of any.  I can't think of them

6      right now, but there's been others where officers

7      come forwards.  There were reports, written

8      reports of other officers.

9  Q.  And how were those reports handled?

10 A.  Same way.  If a report's written, it's given to

11     the investigative people to look into the alleged

12     incident and then they come back with an

13     investigation.

14 Q.  Are those reports handled by the SID?

15 A.  Yes.

16 Q.  So presently if an officer wants to report

17     another officer, that officer would go to SID?

18 A.  No.  It would still go through the chain of

19     command.  It goes to their supervisor, the shift

20     command, through the deputies, depending on what

21     it is.  If it has to be looked into, it goes to

22     the investigative division.

23 Q.  That's the policy now?

24 A.  Yes.