# EXHIBIT 36

THE COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

```
_____
                              )
Deyanira Feliz,               )
         Complainant          )
                              )
v.                            )    Docket no. 99-131745
                              )
Suffolk County House of Correction, )
         Respondent           )
_____)
```

**Complainant's Verified Amended Complaint,**
**Statement of Facts**
**and Rebuttal to Respondent's Answer**

NOW COMES the Complainant, Correctional Officer Deyanira Feliz ("Officer Feliz"), to offer this Verified Amended Complaint, Statement of Facts and Rebuttal to the Answer filed by the Respondent Suffolk County House of Correction ("House of Correction") as follows:

A. Amended Complaint

I, Officer Deyanira Feliz, believe that I was subjected to both sexual harassment and racial and sexual discrimination on the basis of race, color and sex by the acts and omissions of my employer, the House of Correction, which conduct violates provisions of Massachusetts General Laws ("MGL") chapter 151B.

I have been continuously employed by the House of Correction since November of 1989 as a Correctional Officer and have been assigned to the facility at South Bay for all times relevant to this Complaint (from the onset of 1996 to the present).

My specific complaint arises from the response of the House of Correction to my repeated oral and written reports, beginning in March of 1996, of continuously improper intimate conduct between Correctional Officer Richard Powers ("Officer Powers") and several female inmates at the House of Correction continuing over three years, (see documents described below).  Officer Powers is the brother of Michael Powers who was the powerful and influential President of the correctional officers union during much of the period of his Richard Powers' misconduct as described herein.

The authorities at the House of Correction have ignored my reports of Powers' misconduct despite the corroborative reports of other officers who are also women of color, and despite the authorities' receipt of a sheaf of sexually explicit love letters written by Powers to one of the female inmates.  Moreover, as detailed below, the authorities have allowed Powers to engage in three years of continuous retaliatory slander, abuse and sexual harassment of me.  Emboldened by this toleration, Powers' commenced an improper relationship with another female inmate under my supervision in 1999, and conflicts over his abuse of authority with her culminated on April 15, 1999 when Powers assaulted me and slammed a steel prison door upon my arm, causing injury which required medical attention.

While tolerating and encouraging Powers' misconduct, the House of Correction has retaliated against me by twice transferring me after I lodged reports against Powers.  Most recently, Superintendent Haack has threatened me with disciplinary action in a Written Warning sent <u>four days after</u> I lodged my original complaint with the MCAD on July 1, 1999 but crudely back-dated to suggest that it was written beforehand; the pretext for Superintendent's warning was that I argued with Powers during his April 15th assault, see documentation below.

The <u>discriminatory racial and sexual animus</u> of the House of Corrections authorities, who are overwhelmingly white males, is

2

apparent in their readiness to ignore and to retaliate against minority female officers such as myself who have reported the improper and sexually exploitive conduct of white male correctional officers with female inmates who are largely black and Hispanic.

Powers' slanderous and degrading castigation has been unrelenting for three years as he has called me a "crazy bitch" whose "dirty ass" betrayed an allegedly profligate week-end sex life; and his slurs were heard continuously by other officers, our superiors, and the inmates who I am charged with controlling and disciplining. The authorities' toleration of that protracted slander, culminating in their toleration of his April, 1999 assault upon me, amounts to sexual harassment in that it created a bitterly hostile working environment. Though I consider myself a strong person, I became isolated and increasingly depressed in this environment; the authorities' retaliation against me and their tolerance of Powers' protracted misconduct caused me serious emotional and mental distress.

The largely black and Hispanic female inmates whose sexual exploitation by white male officers has been so long tolerated at the House of Correction are not parties to this action but they are inevitably drawn into it. I intend to call a number of inmates as witnesses in proceedings of this case along with several correctional officers and staff who will come forward to corroborate the allegations detailed below. Frankly, I am quite fearful of the retaliatory actions which those defenseless women will face in the wake of this Complaint. I implore the Commission to consider how those inmates might be protected against House of Corrections officials whose past conduct offers ample basis to fear their retaliatory action. While I intend to also protect their interests in this action, I would draw little satisfaction from vindication of my rights by this Commission if it came at the price of the exploited women inmates' safety.

3

### B.    Statement of Facts

1.    Officer Deyanira Feliz has served ten years as a Correctional Officer, employed since 1989 in that capacity by the Suffolk County House of Correction; she has been twice been commended for saving life on the job, receiving a letter of commendation and a award for life-saving intervention in 1994 and 1998.  (See: letters of commendation and award, attached hereto at tab no. 1).

2.    The present controversy began in 1996 when Officer Feliz, after observing a troubling course of misconduct by fellow Correctional Officer Richard Powers ("Officer Powers") informed Powers early in March of 1996 that she had observed him engaged in frequent and improperly intimate conduct with a female inmate, Lucy Diaz, who was confined in Officer Feliz' unit and Feliz warned Officer Powers to desist.

3.    Specifically, Officer Powers' improper conduct as observed by Feliz almost daily, included, _inter alia_: entering Diaz' cell early in the morning to bring her coffee while Diaz was only partially clothed; taking Diaz out of her assigned unit on special "details" with Powers alone while the other prisoners in the unit were locked in their cells; personally giving Diaz tee shirts, bras, underwear, sneakers; bringing special food to Diaz in her cell; disclosing confidential matters pertaining to professional staff members and correctional operations in the institution; exercising in the female inmates' weight area with his shirt off while in Diaz' presence; eating and talking with Diaz alone at the kitchen table of the I.D.H. area; and especially taking Diaz alone out of her assigned unit into an unused classroom on the eleventh floor of the institution, a classroom containing mattresses on the floor.

4.    When Officer Feliz warned Officer Powers that his course of conduct with the inmate, Lucy Diaz, was contrary to the rules of the institution, was unprofessional and destructive to discipline

4

in her unit where other inmates could see the favoritism shown Diaz, Powers angrily denounced Officer Feliz and told her to mind her own business and continued his course of intimate and improper conduct with the inmate Diaz.

5.    In the face of Powers' hostile intransigence, Officer Feliz reported his behavior to her superiors on or about March 6, 1996, and she also made a written report on Powers' misconduct to the responsible officer of the Special Investigation Department (the "SID") at the facility.  (See: Officer Feliz, Report to Mr. Jacob of SID, dated March 6, 1996, attached hereto at tab no. 2).

6.    Officer Feliz, in making these oral and written reports of misconduct by Officer Powers to her superiors, acted in compliance with the guidelines published by the House of Correction.  (See: Suffolk County Sheriff's Department, Discrimination (guideline) no. S238, dated February 15, 1995, attached hereto at tab no. 3).

7.    The SID in its "investigation" of Powers' conduct, heard testimony from several other Correctional Officers; and it is known that at least two other female officers confirmed Officer Feliz' observations of Powers' intimate and improper conduct with the inmate Diaz.

8.    Nonetheless, the House of Correction and its SID took no action against Officer Powers and left him on duty as the eleventh floor "program officer" where he continued to have unfettered access to the inmate Lucy Diaz on "special details" outside her eleventh floor unit and Powers continued in his improper intimacy with that prisoner in full view of numerous other inmates, Correctional Officers, and their supervisors.  Officer Feliz was never informed as to the results of the so-called SID "investigation" into Powers' reported misconduct in 1996.

9.    It was instead Officer Feliz who was immediately reassigned out of her unit on the eleventh floor and sent instead to a form

5

of institutional exile at Building Four of the House of
Correction; she protested both orally and in writing against this
reassignment.  (See: Officer Feliz, letter to Deputy Supt. Feeney,
March 6, 1996, attached hereto at tab no. 4).

10.  It should be noted that the brother of Officer Richard Powers
is Correctional Officer Michael Powers who held the powerful post
as President of the Correctional Officers' union at the time of
Officer Feliz' report and for many months afterward.

11.  It is believed on the basis of credible eyewitness reports
that other Officers at the House of Correction also utilized the
eleventh floor classroom frequented by Officer Powers and the
inmate Diaz for improper liaisons with other female inmates.  It
is also believed on the basis of credible reports that the
majority of the officers engaged in this exploitive misconduct are
white while the female inmates who have submitted to them are
disproportionately black or Hispanic.

12.  It should be noted that several officers, allegedly including
Powers, were recently suspended following accusations that several
of them were engaged in sexual relations with Ellen Wilson,
another female inmate who became consequently pregnant; several of
those officers (not including Officer Powers) reportedly refused
to submit to DNA testing to establish the paternity of Ms.
Wilson's expected child.  (See: newspaper accounts, including:
*Boston Herald*: July 7, 1999; *Boston Globe*: July 8, 1999, pg. B2;
July 23, 1999, pg. B4; August 26, 1999, pg. B3; all attached
hereto at tab no. 5).

13.  Officer Powers, following his victorious emergence from the
SID investigation, commenced a sustained and public pattern of
vitriolic abuse and defamation of Officer Feliz, which included:
routinely referring to Feliz as "crazy", deranged or mentally ill;
and continuous sexual invective as Powers called Officer Feliz a

6

"bitch" and often stated that she had a "dirty ass" as a result of implied sexual adventures on her days off.

14.  Officer Powers made these slanderous and sexually derogatory denunciations of Officer Feliz on a daily basis for three years from the time of Feliz' report in March of 1996 through June of 1999, making these statements in the presence of inmates, other officers, and their superiors at the House of Corrections.

15.  At no time did Officer Powers' superiors act to restrain his outrageous, demeaning, and hurtful conduct toward Officer Feliz; though Powers was eventually transferred to another unit at the facility, it did not halt his continuing course of intimate misconduct with the inmate Lucy Diaz.

16.  Lucy Diaz received numerous love letters believed written by Officer Powers and mailed from outside the House of Correction; those letters made explicit reference to frequent sex between them at the institution, to Diaz favored "details" there, and to a nickname by which Officer Powers was known and called among favored female inmates; moreover, many of the letters contained money orders payable to Lucy Diaz.  (See: unsigned letters to Lucy Diaz, attached hereto at tab nos. 6 through 8).

17.  While the Diaz letters are unsigned, the following passages suggest that they were written by a correctional officer and point more specifically to Officer Powers, by then working at another unit of the institution:

> Hi Lucy my beautiful girl.  I love you with all my heart.  I hope you read my last letter and understood everything I said to you.  You will be out in 8 months, not 20 years.  Stay at South Bay (House of Correction), keep your detail and stop stressing out...I will see you everyday and waive and tell you I love you so much.  You know Lucy just think at lease (sic) you see me everyday when other inmates dont see their lovers till they get out.

(see letter at tab no. 6, page 1, 2).

7

"Hi Lucy my beautiful girl.  I miss you with all my heart and love you the same.  Your sister was talking a lot of shit about me or about both of us.  <u>You really dont need that you have enough to put up with being with those magget (sic) inmates and c/o's</u> (correctional officers).  <u>You were right in a way its good I'm not up there all the time because I do bug out I think I bug out more than you and we would probaly (sic) be caught fucking around because I get to a point I dont care when I fuck around at visits</u>.  You will be out soon then we can fuck around any time and anywhere.

(See: letter at tab no. 7. page 1, note that Lucy Diaz' sister, Sandra Diaz, was also confined at the House of Correction).

18.  Lucy Diaz, was released from the House of Corrections in 1998, but the sexually charged love letters sent to her were later given by several inmates to Officer Feliz in the presence of another correctional officer. (See: additional letters to Diaz, attached hereto together at tab no. 8).

19.  After Lucy Diaz' departure, Officer Powers shifted his amorous attention to another female prisoner, Ellen Wilson.

20.  In April of 1999, Ellen Wilson was, like Lucy Diaz before her, assigned to a residential women's unit supervised by Officer Feliz.

21.  Officer Feliz observed that Powers' conduct toward Ellen Wilson followed his previous pattern with Diaz as he provided Wilson with special foods and clothing, engaged in intimate interaction, and frequently took her out of the unit on "special details" alone with him while her fellow prisoners were confined to their cells, in a continuous course of conduct contrary to rules of the facility and destructive to discipline in Feliz unit where other prisoners could scarcely avoid noticing Wilson's special status.

22.  Though Officer Powers' course of improper intimate conduct with inmate Wilson was plainly visible to numerous other officers

8

and their supervisors at the facility, at no time did any superior or supervisor take any action to admonish, punish or deter Officer Powers from that misconduct.

23.   On April 15, 1999, Wilson was in segregation following a urine test which indicated that she was using illicit drugs while incarcerated at the House of Correction.

24.   Indeed, over 10% of female inmates were in segregation for illicit drug use at that time, far greater than the proportion of male inmates similarly punished for continuing drug use inside the institution and indicative of the fact that women prisoners were somehow obtaining drugs in the institution with considerable ease and frequency.

25.   That day, April 15, 1999, Officer Feliz was on duty at her tenth floor unit and was calling segregation inmates including Ellen Wilson back into their unit from the recreation area so that another group of inmates (detainees) could take recreation in accord with the daily schedule.

26.   As inmate Wilson lingered in the recreation area, Officer Powers confronted Officer Feliz and told her in a loud voice that Wilson had his permission to remain out of the unit in order to talk with him and complete a personal phone call.

27.   When Officer Feliz replied that inmate Wilson was assigned to her unit and was obliged to return to the unit like other segregation prisoners, Officer Powers exploded in rage, telling Feliz that he could give permission for such activities by Wilson and "what the fuck you have nothing to do with my inmates!".

28.   Later, Officer Powers brought Wilson back to the Feliz' unit and opened the door; but as Officer Feliz began to close the door, Powers screamed, "don't fucking close the door on me.  Go to whoever you want. I don't give a fuck about you." and Powers then

9

slammed the door on the left arm of Officer Feliz, causing her pain and a bruising injury. (See: Officer Feliz, report of April 15th incident to Deputy Supt. Langelow, dated April 15, 1999, attached hereto at tab no. 9).

29. After Powers' assault, Officer Feliz was examined by both medical personnel at the House of Correction and indeed her bruises were photographed by SID officers. (See: medical report also attached hereto at tab no. 9).

30. Officer Feliz, received no satisfactory reply to her report of Powers' assault upon her; instead, she was immediately transferred out of her unit while Powers remained in place; consequently, Officer Feliz became increasingly concerned that Powers would be emboldened by his superiors' tolerance and would engage in yet more violent attacks.

31. On April 21, 1999, six days after Powers' assault, Officer Feliz brought the Lucy Diaz love letters to her superiors at the House of Correction and specifically to Deputy Supt. Langelow.

32. Deputy Superintendent Langelow, upon reading the letters, asked Feliz if they were originals and when assured they were Langelow snatched them back from Feliz, saying, "they're not signed and you can't prove anything with them". Despite Langelow's contrary promise, the original letters were never returned to Officer Feliz. (See: Officer Feliz, two letters to Deputy Supt. Langelow, dated April 21, 1999, attached hereto at tab no. 10).

33. Despite Officer Feliz' reports and her transmittal of the Diaz love letters, no investigation of Powers' conduct was undertaken, nor did Deputy. Supt. Langelow the SID or any other authorities bother to compare the handwriting in the letters to that of Officer Powers which could be readily found in his daily

10

entries into unit log books and other documents maintained by
officers at the House of Correction.

34.   The SID unit did call Feliz and several other officers to
question them about the letters, but the principal investigative
interest shown by Deputy Superintendent Langelow and SID was to
learn whether copies of the love letters seized by Langelow
existed and to identify the inmates and officers who might know
the contents of the seized letters.

35.   No punishment of any kind was or has ever been visited upon
Officer Powers in connection with his improper conduct with inmate
Lucy Diaz or his assault and battery upon Officer Feliz.

36.   In the months after the Powers' assault, Officer Feliz
received numerous calls from unidentified male callers using
internal staff phones within the institution during May of 1999.
(See: Officer Feliz, letters to Capt. Connolly and Sgt. Gallo,
dated May 7 and May 12, 1999, attached hereto at tab no. 11).

37.   In the ensuing weeks after his assault upon Officer Feliz,
Officer Powers continued and intensified his long-standing daily
practice of calling Feliz a "crazy bitch" and a sexual profligate
who came to work with a "dirty ass" in front of inmates, other
officers and his open defamation and humiliation of Officer Feliz
was unchallenged by the authorities at the House of Corrections.

38.   Officer Feliz, recognizing that Powers' conduct was tolerated
and that she was effectively condemned by the authorities for
reporting on him, became increasingly isolated, depressed and
fearful of further physical attacks.

39.   Officer Feliz entered into treatment for mounting depression
and trauma with a psychologist Dr. Eric Brown; and her treatment
and medication for these disorders continues to this date. (See:

11

Dr. Eric Brown, letter dated July 30, 1999, attached hereto at tab no. 12).

40.  On July 1, 1999, Officer Feliz, despairing of any official action to protect her from Officer Powers assaultive, defamatory and humiliating attacks upon her and angered by the continuing toleration of obviously improper conduct of officers such as Powers toward female inmates, Feliz lodged the present complaint with the Massachusetts Commission Against Discrimination ("MCAD"). (See: Complaint, attached hereto at tab no. 13).

41.  That same day the MCAD assigned an investigator to the case and informed the House of Correction so that the agency could make reply to Officer Feliz' complaint.  (See: MCAD letter to Feliz, dated July 1, 1999, also attached hereto at tab no. 13).

42.  On July 7, 1999, _four days after_ lodging her MCAD Complaint and nearly three months after Powers' April 15th assault, Officer Feliz received a letter of _Written Warning_ from Superintendent John Haack at the House of Correction, in that letter no mention was made of Feliz' injuries by Powers or Powers' misconduct with female inmates, but Officer Feliz was admonished for yelling at Powers during his assault and warned that,

> This type of misconduct between staff is completely unacceptable, especially when it takes place in the presence of other staff members and inmates.  Your conduct on April 15, 1999 was a clear violation of Suffolk County Sheriff's Department Policy S-220.01; .06; .07; and .15(1)(a), and will not be tolerated.  Please note that future misconduct of this nature will result in more severe discipline, up to an including your termination from the Suffolk County Sheriff's Department.

See: Supt. John Hack, letter to Officer Feliz, dated June 23, 1999, attached hereto at tab no. 14).

43.  The House of Corrections crudely attempted to disguise the retaliatory purpose of the Written Warning as a means to

12

discourage and punish Officer Feliz Complaint for her Complaint to
the MCAD by dating the letter "July 23, 1999", indicating that it
was written just _before_ her MCAD Complaint, but the postmark on
the envelope containing the letter shows that it was mailed on
July 5, immediately _after_ she lodged the Complaint. (See: copy of
envelope with postmark, also attached hereto at tab no. 14).

44.  Beginning on July 7, 1999, three months after Officer Powers'
assault on Feliz, newspaper articles appeared prominently in the
_Boston Herald_ and the _Boston Globe_ in which inmate Ellen Wilson
denounced several officers, including Powers, for engaging in sex
with her and causing her to become pregnant while she was
incarcerated at the House of Correction. (See: newspaper articles
attached hereto at tab no. 5).

45.  To date, no serious investigation has been undertaken to
probe the continuous course of exploitive misconduct by Officer
Powers which I and other female officers have complained of in
oral and written reports to our superiors since early 1996.


### C. Rebuttal in Reply to Respondent's Answer

The Complainant, Officer Feliz, makes specific reply to the
denials, prevarications, and evasions which mark the Response of
the House of Correction to her original (July 1, 1999) Complaint
as follows:

46.  The House of Correction has for the first time admitted in
its Response that Officer Feliz provided her superiors, "with
letters containing sexual content purportedly written to an inmate
at the Suffolk County House of Correction by a correction officer
there"; but it denies that it failed to adequately address this
matter because, "the correction officer involved was

13

suspended for a period of ten days".  (See: Response at page 1, attached hereto at tab no. 15).

47.  The House of Correction Response is illuminating in that the Response is the first open acknowledgment that a correctional officer was in fact the author of the sex letters to inmate Diaz; certainly supervisors such as Deputy Superintendent Langelow, who tore the letters from the hands of Officer Feliz over six months ago, and other supervisors have always previously held that the letters "prove nothing" and do not point to any officer because they were not signed.

48.  Now, for the first time, the House of Correction acknowledges the specific misconduct of Officer Powers which Officer Feliz brought so insistently to her superiors' attention three and one-half years ago, as the Respondent admits,

> ...that Officer Richard Powers has been disciplined for the action specifically referenced in the Complaint, and is currently the subject of investigations being conducted by the Suffolk County Sheriff's Department and the Suffolk County District Attorney's office.

(Response, pg. 2).

48.  At the same time, the Response is misleading in that it fails to say when Officer Powers was suspended; certainly no disciplinary action was taken against him in the six months after Officer Feliz provided the letters to her superiors.  It was Feliz, not Powers, who was transferred against her will after her reports in 1996, leaving Powers with free access to the inmate to whom the letters were written.

49.  It is false to state that the House of Corrections has "adequately addressed" the matter of Powers' misconduct; for Powers continued the same routine course of improperly intimate and exploitive behavior with inmate Lucy Diaz in 1996-98 long

14

after Feliz' 1996 report and did likewise with inmate Ellen Wilson long after Feliz' April 1999 report.

50.   Indeed, the Response is itself internally illogical and inconsistent; for if "ten days suspension" of Powers at some unspecified time was sufficient to "adequately address" the misconduct reported by Officer Feliz in 1996, why then is Powers now the subject of a far more serious investigation involving not only the Sheriff's Department but also the District Attorney?

51.   Similarly contorted is the House of Correction's acknowledgment of the accuracy of Officer Feliz' reports on Powers' misconduct; while at the same time the Respondent complains that Officer Feliz, "failed to avail herself of the Department's policy for reporting acts of sexual harassment and/or discrimination and thus failed to properly put the Department on notice of her complaint. (Response, at pg. 2).

52.   It is false to state that Officer Feliz was not transferred in a discriminatory way or for an "unlawful purpose" and that she was not harmed by transfers in 1996 and 1999 which she protested. (See: Response, at pg. 1).  Those transfers followed immediately upon her reports of misconduct by Powers with inmates Diaz and Wilson.  The transfers were intended to discourage her reporting and to cast a negative light upon her credibility among officers and inmates and to some extent succeeded in that aim.  Notable too is the fact that the miscreant, Powers, was not transferred in the wake of Officer Feliz' reports.

53.   The House of Corrections denies "verbal harassment of her" (Response, at pg. 1); but the facts of Powers' relentless public slander and its toleration by the authorities for three and one-half years will be proven by testimony of other officers at the institution.

15

54.  The House of Corrections in its Response denies that Officer
Feliz was discriminated against on grounds of sex or race.  That
denial is undone by the facts of the institution's tolerance of
sexual exploitation of largely minority women prisoners by white
male officers, the refusal of supervisors to credit reports of
that misconduct by Officer Feliz and other minority female
officers, the tolerance of Officer Powers' protracted public
slander of Officer Feliz, and the retaliatory response of the
institution against Feliz for her accounts of Powers' misconduct,
and most recently the pre textual nature of the Written Warning
issued to Feliz immediately after her MCAD Complaint.  These
documented actions speak persuasively of a discriminatory animus.

55.  Finally, while the House of Corrections provides no time
frame for its "suspension" and "investigation" of Powers, it has
apparently only commenced three and one-half years after the onset
of reports of Powers' misconduct by Feliz and other female
officers.   It seems inescapable that the institution's long
delayed action has been triggered by recent press revelations that
one of the inmates so intimately involved with Powers became
pregnant after sex with at least four male officers (including
Powers) while imprisoned at the Suffolk County House of
Corrections. (see: articles attached hereto at tab no. 5).

56.  While these press revelations have embarrassed the House of
Correction, Officer Feliz does not underestimate the tradition of
cover-up and concealment there nor the capacity of the institution
to intimidate its employees and inmates into silence.


## VERIFICATION

     The undersigned Complainant states that she is the
party named as such in this Verified Amended Complaint,
Statement of Facts and Rebuttal, that she is familiar with
the facts recounted therein, and states that the same are

true based on her personal knowledge, except for those matters stated on information and those which she believes to be true, based upon the information and documents available to her.


SWORN TO under the pains and penalties of perjury this _____ day of September, 1999.


_____

Deyanira Feliz,
Complainant


Deyanira Feliz,
by her attorney,

_____                    _____
(dated)                                  James P. Brady, Esq.
                                         (BBO # 556984)

                                         149 High Street
                                         Hingham, MA  02043
                                         (781) 749-3114
                                         (781) 740-2319 (FAX)

17

1

I
1 - 182

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                          Superior Court Department
                                          of the Trial Court

DEYANIRA FELIZ,                    )
                                   )
          Complainant,             )
                                   )
V.                                 )   Civil Action No.:
                                   )   99-131745
SUFFOLK COUNTY SHERIFF'S DEPARTMENT)
HOUSE OF CORRECTION,               )
                                   )
          Respondent.              )


          THE ORAL INTERVIEW OF DEYANIRA FELIZ,

held pursuant to Notice, and the applicable provisions of

the Federal Rules of Civil Procedure, before Suzanne French,

a Court Reporter and Notary Public, within and for the

Commonwealth of Massachusetts, at the Suffolk County House

of Correction, 20 Bradston Street, Boston, Massachusetts, on

Tuesday, October 31, 2000, commencing at 10:16 o'clock a.m.

ORIGINAL

2

APPEARANCES

On Behalf of Suffolk County Sheriff's Department:

MAUREEN STANTON, ATTY.
Assistant General Counsel
Suffolk County Sheriff's Department
House of Correction
20 Bradston Street
Boston, MA  02118
(617) 635-1100X330

ROSE E. KING, Atty.
Assistant General Counsel
IRENE DALEY-HORGAN, Atty.
Suffolk County Sheriff's Department
Jail
200 Nashua Street
Boston, MA  02114
(617) 635-1000 x330


On behalf of the Witness:

JAMES P. BRADY, ESQ.
Attorney at Law
149 High Street
Hingham, MA  02043
(781) 749-3114

114

1  A  Definitely.

2  Q  How so does it make your more?

3  A  How so, it makes my job difficult -- more

4 difficult because it's like, if I tell the inmate something

5 or, you know, she's just like: "Oh"?  You know, ignores it,

6 because she knows she can get away with it.

7  Q  And you described this whole pattern to the SID in

8 March of '96 orally?

9  A  Yes, I did.

10  Q  Now, did you have occasion to talk with -- Let me

11 ask you this.

12    After you made this report to the SID, in writing

13 and orally, and after Officers Bynum and Hodge testified

14 about this pattern between -- this conduct between --

15 between Powers and Inmate Diaz, what did you expect would

16 happen?

17  A  I expect the department to either reprimand them

18 to take action, you know, what was the report I have given

19 them as the other two officers' report.

20  Q  They said they'd reprimand Powers?

21  A  At least, you know.

22  Q  And, in fact, was Powers reprimanded?

23  A  No, he wasn't.

24  Q  Not reprimanded.

25    What -- What, fm any, disciplinary action was

1    taken against Powers after your report?

2         A    None.  I -- I was the one who got transferred out

3    of the unit after I reported him.

4         Q    When were you transferred out of the unit?

5         A    Right after the report, my March 6th--

6         Q    The same day?

7         A    I believe, yeah.  The next day, when I came in, I

8    was assigned to another unit.

9         Q    You were transferred.

10             What about Powers, was he left -- was he

11   transferred out?

12        A    He was left right up there on the 11th floor.

13        Q    So, he -- Do you know if -- Did Powers continue to

14   have access to Lucy Diaz in that unit?

15        A    He was right on the 11th floor.

16        Q    Did Diaz remain in his--

17        A    She remained in--

18        Q    -- direct supervision IDH?

19        A    Yeah.

20        Q    So, the reaction of the Sheriff's authorities,

21   hearing this report from three female officers about Powers,

22   was to leave him there and to transfer you out of the unit;

23   is that right?

24        A    Yes.

25        Q    Did you talk to Officer Bynum and Officer Hodge

116

1    about the -- the result of this so-called investigation by

2    SID afterwards?

3         A    The result?  What result?

4         Q    No.  I mean, did you talk to them about the fact

5    that Powers was left there with Lucy Diaz and you were

6    transferred out?

7         A    Yes, we did.

8         Q    What did -- What, if anything, do you recall them

9    telling you?

10             What was their reaction?

11        A    They couldn't believe it.

12             I mean, it was like, you know -- And that's -- I

13   guess, that's why a lot of people were afraid to -- or are

14   afraid to come forward with a lot of stuff that goes on in

15   there.

16        Q    Did they have any idea where the SID and the

17   authorities would leave Powers there?

18        A    Oh, yeah.  They have a pretty good idea, like I

19   have a pretty good idea.

20        Q    What's -- What idea did they have?

21             Did they share with you what their thinking was?

22        A    Basically, we all felt about the same.

23        Q    Which was what?

24        A    Which was what?  You know, they shoved it under

25   the rug.

117

1          I mean, look what we're talking about.  We're
2   talking about Powers.  Who's Powers?
3          Mikey Powers' brother.
4     Q    And Mikey Powers--
5     A    Mikey Powers is the president of the union.
6          So, I guess, that's why.
7     Q    Politically connected?
8     A    Very politically connected.
9     Q    Did -- What was your feeling about this
10  afterwards?  I mean, apart from--
11    A    Powers--
12    Q    -- apart from your analysis about what happened,
13  what was your feeling about it in terms of emotional
14  feelings?
15    A    My emotional feelings?  I can't even begin to
16  explain them.
17         I was -- I just got depressed, withdrawal.
18         I just like felt very -- I felt very -- I would
19  say -- I felt like I wasn't worth anything.
20    Q    Let me ask you, when you were transferred out of
21  that unit immediately after the report on Powers' conduct,
22  were you happy to go to another unit?  Were you glad to be
23  somewhere else?
24    A    In a way, I was glad to be out of there.
25         But, I don't think that they way they did it, it

118

was like punching me instead of, you know, -- I mean, you

2    report an officer and, you're saying that the officer's

3    doing this and this and this with an inmate, they pull me

4    out, I'm saying like:  "Why am I being punished instead of

5    him being punished."

6        Q    Yeah.  Did you, in fact, protest your assignment

7    in writing?

8        A    Yes, I did.

9        Q    You submitted a report protesting your assignment;

10   didn't you?

11       A    Yes, I did.

12       Q    Moved to another building?

13       A    Um-hmm.

14       Q    Was that because the other building was an

15   inferior place to do duty?

16       A    Oh, no.  Oh, no.  No.  It wasn't -- It wasn't

17   because it was unfit or because -- I have no problem working

18   the male population, and I don't care where they put me.

19            But, it was because the way they did it.

20       Q    Now, you've testified that after this March '96

21   report, Powers engaged in a sustained pattern of harassment

22   to you?  Sexual harassment on the job?

23       A    Yes.

24       Q    You testified that -- that more than 50 times, I

25   think you testified?

119

1       A       Yes.

2       Q       There were incidents where he called you:  "A

3       crazy bitch.  A dirty ass bitch.  You come back from New

4       York with a dirty ass."

5               And you testified that he made these statements in

6       front of supervisors, in the elevators, in the hallways?

7       A       Yes.

8       Q       And in lobbies?

9       A       Yes.

10      Q       In front of supervisors at the institution?

11      A       Yes, I did.

12      Q       Did these supervisors, at any point, to your

13      knowledge, pull Powers aside or say to you: "We're very

14      disturbed about this pattern"?

15      A       No.

16      Q       Do you know of any action that was ever taken to

17      discourage Powers from this?

18      A       No.  I don't know.

19      Q       And this continued?  Powers' pattern continued?

20      A       Yes.  For about three years.

21      Q       For about three years regularly?

22      A       Yes.

23      Q       Now, you testified that you made two reports, at

24      least one of them in writing to Lieutenant Santiago about

25      this pattern of harassment?

120

A    Yes.

Q    Did anything come about as a result of your complaint?

A    No.

Q    So, putting together the inaction of the department and their -- their tolerance of supervisors is this pattern for harassment, with the complete -- with the response to the March 6th report.

MS. STANTON:  I'm just going to object to that characterization of the department tolerating this type of -- Just make your question a little bit clearer without characterizing.

MR. BRADY:  Okay.

BY MR. BRADY:

Q    If you put together the fact that this pattern of harassment continued, without any apparent -- without any apparent effort to restrain it by the department, with the department's response to the March 6th reports on Powers from you and Officer Hodge and Bynum, you put those things together, did you draw any -- did you put those things together in your mind and draw any conclusions about the department's attitude toward you and Powers?

A    Yes, definitely.

Q    Now, what conclusions did you draw from that?

A    That this guy was very well politically connected

121

1    that I wasn't going to get anything that -- that the

2    department itself just shoved it under the rug, and they

3    didn't want to hear it.

4         And I -- The -- It wasn't worth for me to bring it

5    up forward.

6         Q    Did you have any apprehension as to any negative

7    consequences for you if you continued to push this issue--

8         A    Yeah.

9         Q    -- of Powers' mistreatment of you and his behavior

10   toward inmates?

11        A    Yeah.  I figured that if I kept on pushing it, or

12   something like that, I would either get fired, terminated,

13   or to be honest with you, I would be found dead.

14        Q    Now, you've talked -- you've testified about a

15   pattern of what you called sky writing, which you observed

16   in '97 -- at the end of '97, or the beginning of '98, -- I'm

17   sorry.  I don't have a date on that.

18        Do you know about when this sky writing, or was

19   there more than one incident where you saw Powers sky

20   writing to Diaz?

21        A    It was -- There was one incident, which was the

22   the I mentioned.  And I think there was about two more.

23        I did not see who he was writing to at that

24   particular moment.

25        Q    This -- This sky writing that took place, could

144

1      A    Yes.

2      Q    And does it describe the fact that he's called you

3  a bitch repeatedly since then?

4      A    Yes.

5      Q    Now, what disciplinary action that -- that week,

6  April 15th, against Powers?

7      A    None whatsoever.

8      Q    No action taken?

9      A    No action was taken.

10     Q    Did you submit, on the 21st -- When did you bring

11  in the letters to Lungelow?

12     A    I believe it was the 21st.

13     Q    The 21st.

14         And did you provide these two letters to Lungelow,

15  both to Superintendent Lungelow on April 21st, these two

16  reports about these letters?

17     A    Yes, I did.

18     Q    What was Lungelow's response when you brought

19  these letters in?  This is six days after you'd been

20  assaulted, injured, been -- already been examined by the

21  authorities, and shown to have been injured.

22         And after your report on Powers' conduct, six days

23  later, you bring in these letters?

24     A    Um-hmm.

25     Q    What was Lungelow's response when you gave her the

145

1   letters?

2        A    I gave her a copy at that time.

3        Q    You gave her copies of the letters?

4        A    I gave her copies of the letters.

5             And she -- she refused to accept the copies saying

6   that she wanted to see the originals.

7        Q    She wanted the original letters.

8        A    So, I gave her the originals for her to look.

9             And she took a look at them.  And she says:

10  "Well, this -- this doesn't prove anything.  They're not

11  signed."

12       Q    Not signed.

13       A    That's when I--

14       Q    All these -- All these letters are handwritten; is

15  that correct?

16       A    Right.

17            That's when I told her about the log book.

18            And I says: "Well, compare log books.  Come get an

19  expert."

20       Q    Compare his handwriting to the log books?

21       A    Right.

22       Q    What did she say?

23       A    She just took the letters, and actually took the

24  originals from me.

25            She says: "I want the original.  Can't prove

# EXHIBIT 37

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

04  11851 WGY

PAUL DAVIS,

    Plaintiff,

    vs.

SUFFOLK COUNTY, SUFFOLK
COUNTY SHERIFF'S DEPARTMENT,
and ANDREA CABRAL (in her official
capacity).

    Defendants.

MAGISTRATE JUDGE Alexander

Civil Action No.

COMPLAINT

RECEIPT # ___
AMOUNT $ 150
SUMMONS ISSUED (Y)
LOCAL RULE 4.1 ___
WAIVER FORM ___
MCF ISSUED ___
BY DPTY. CLK. ___
DATE 8/25/04

## PARTIES

1. Paul Davis, a resident of Mansfield, Massachusetts, was unlawfully terminated from his employment with the Department for truthfully reporting unlawful beatings of inmates to federal authorities.

2. Defendant Suffolk County Sheriff Department (the "Department") is responsible, inter alia, for ensuring the safety of inmates and personnel at the Suffolk County House of Correction (the "HOC") and the Nashua Street Jail (the "Jail") and lawfully operating its correctional facilities.

3. Defendant Suffolk County is a Massachusetts county government, of which the Department, the Jail and the HOC are instrumentalities. All references in this Complaint to the Jail, the HOC and the Department also refer to Suffolk County. The defendant Suffolk County and the defendant Suffolk County Sheriff's Department are "persons" within the meaning of 42 U.S.C. § 1983.

1

4.   Defendant Andrea Cabral has been Sheriff of Suffolk County since approximately December 2002, when she was appointed to that position following the resignation of Richard Rouse amidst widespread allegations of inmate abuse by Department personnel, mismanagement, retaliation and other alleged unlawful activities.   Defendant Cabral is responsible for the operations of the Department, the HOC and the Jail, including the establishment of the Department's policies and practices.  Defendant Cabral, upon information and belief, is a resident of the Commonwealth of Massachusetts.

## JURISDICTION AND VENUE

5.   This Court has jurisdiction over this case pursuant to 28 U.S.C. §1331 insofar as the action arises under the Constitution and laws of the United States.  Mr. Davis invokes pendent jurisdiction of this Court on all issues presented.

6.   Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(1) insofar as the Defendants reside in the Commonwealth of Massachusetts and pursuant to 28 U.S.C. §1391(b)(2) insofar as a substantial part of the events giving rise to this suit occurred in this district.

## BACKGROUND

7.   The Suffolk County Sheriff's Department in its operation fosters a "code of silence" which serves to hide unlawful actions by its employees and repress reporting of misconduct, while enabling Department management to remain blind to the actual facts regarding incidents which occur within its facilities with patternlike repetition.

8.   The Department has failed to abide by instructions from the Special Commission that investigated the operations of the Department in 2002, to eradicate the code of silence and retaliatory practices. In its report, the Special Commission "urge[d] an aggressive attack on the

code of silence that prevents staff members from reporting the misconduct of fellow staff members" and advised that the "Department must ensure that employees who do come forward with information are fully protected from retaliation by other officers and are supported by the administration."

9.    Mr. Davis was one of the many victims of the Department's pattern of retaliation. The Department terminated him because he shared misconduct by his fellow officers with the Federal Bureau of Investigation and testified truthfully under oath about that misconduct in this Courthouse.

10.    The Defendants' conduct violates federal and state laws as outlined below. Mr. Davis seeks compensation for damages resulting from his discharge, and punitive damages in an amount that will convince the Defendants to institute procedures to facilitate the accurate reporting of incidents occurring within the jail and eradicate the code of silence.


## STATEMENT OF FACTS

I.    **Those Who Break the Code of Silence Suffer Retaliation by The Department**

11.    While Mr. Davis was employed by the Department, employees were coerced into following the code of silence, afraid of retribution and harassment by management and co-workers.

12.    The Department has victimized those who do not heed the code of silence.

13.    One example of another Department guard who, like Mr. Davis, experienced the Department's retribution is Bruce Baron. After reporting a supervisor for violating HOC rules, Mr. Baron was forced by the HOC to resign in 1998. The supervisor, however, only received a three-day suspension and then came back to work.

14. The Department's Investigative Department did not look into Mr. Baron's reports of over 30 incidents of harassment by his co-workers and management, which occurred after Mr. Baron had reported his supervisor to the HOC.

15. After a trial in this Court, in May 2003 a jury awarded Mr. Baron $500,000 in emotional distress damages as a result of the Department's retaliatory policies and practices.

16. After the jury award to Mr. Baron, the Boston Globe reported that his attorney had stated: *"Apparently, the code of silence still exists."*

17. The Department similarly victimized Mr. Davis by discharging him for breaking the code of silence.

**II.    Mr. Davis Participated in Implementing the Department's Code of Silence at the Direction of his Superior Officers in the Department**

18. On one (1) occasion in 1998 and on three (3) occasions in 1999, Mr. Davis was a participant in incidents involving the control of recalcitrant and/or disruptive inmates within the HOC together with other officers in the Department.

19. In each of the incidents, physical force was used against the inmate or inmates involved by members of the Department, but Mr. Davis did not either participate in the use of this force, nor himself use any excessive, illegal or unauthorized physical force against any of the inmates.

20. He did however, after the encounters were concluded, write reports on three (3) occasions which omitted certain salient details of the incidents and in that respect provided an inaccurate and false depiction of the event. On each of these occasions, these reports were written at the direction of Mr. Davis' shift superior or supervisor, who had personal knowledge of the entirety of the subject matter and who received the completed report, reviewed and approved it, often approvingly using the phrase "good report."

4

21.     On the remaining occasion, Mr. Davis was questioned by a Department investigator about Davis' observations regarding several officers attempt to restrain an unruly inmate a week earlier.  Mr. Davis responded truthfully about his own involvement in the matter but followed the earlier directions of his supervisors and did not accurately report or include any improper actions by his fellow officers or his supervisors and exaggerated the actions of the inmate either in answering the investigator's questions or in completing a report made after the interview done at investigator's specific direction.

22.     All of these actions were taken by Mr. Davis because they were mandated by the Department's "code of silence" and its policy of retaliating against any who violated its tenets.

23.     Mr. Davis also feared adverse job action, by the Department, ostracization by his co-workers, and intimidation from his supervisors if he contravened the "code of silence" and related these events he actually witnessed fully and completely in the contemporaneous reports filed at the direction of superiors.

24.     The culture bred by the "de facto" enforcement of the unwritten but pervasive code of silence by the Department and Mr. Davis' supervisors represents poor management policy by enabling groups within the Department who believe they may selectively enforce only those rules which they deemed appropriate; an insidious practice which debases the corrections profession and suppresses the flow of accurate information regarding the actual operation of and conditions within the Department's facilities.

25.     The maintenance of a code of silence breeds unethical behavior, encourages abuse and cover-ups, while promoting disrespect of staff and increasing the potential inmate retaliation against corrections officers.

26.    Enforcement and maintenance of this "code of silence" is violative of the First Amendment to the United States Constitution in that it inhibits or suppresses worthwhile free speech. It also contravenes specific statutes of the Commonwealth of Massachusetts.

27.    However, when Mr. Davis was asked about certain of these incidents which occurred at the jail by agents of the Federal Bureau of Investigation, he resolved to and did speak fully, completely and truthfully regarding these matters to the agents of the federal government.

28.    Thereafter, he testified in federal court on March 5 and March 6, 2003 in the trial of United States v. Eric J. Donnelly, et. al, about the criminal use of excessive force and obstruction of justice committed by Jail lieutenants, deputy sheriffs and guards. After telling the truth, under oath both in appearances before a United States Grand Jury and later at trial (all in contravention of the Department's unwritten but very real code of silence) Mr. Davis was terminated by the Department. This termination occurred despite the Department's receipt of a written commendation of Mr. Davis acknowledging his truthful cooperation and testimony before the grand jury and at trial in that case. United States Attorney Michael J. Sullivan's letter of April 22, 2003 to Sheriff Cabral provides in relevant part:

> . . . .
> In the course of the investigation, Deputy Paul Davis was questioned before his grand jury appearance initially about his knowledge of an incident involving detainee Nikolas Dais. With no promises or inducements except the encouragement to tell the truth before the grand jury, Deputy Davis gave testimony which was important evidence against Brian Bailey for the unlawful assault of Mr. Dais and against another deputy, Anthony Nuzzo, concerning his role in the cover-up of the incident. Subsequently, under a proffer letter agreement that only precluded the government from using his words against him directly, Deputy Davis gave additional significant first-hand information about three additional incidents where officers and lieutenants used and/or authorized the use of intentional excessive force and then participated in a cover-up by writing false reports and lying to investigators from SID.
>
> Deputy Davis's truthful cooperation and testimony in the grand jury was a very significant contribution to the grand jury's ability to return the multi-count superseding indictment it did. The trial team has informed me that the fact that Deputy Davis was

6

*willing to, and did, tell the truth at the grand jury also facilitated the decision of other officers to come forward and tell the truth when faced with a grand jury subpoena.*

*I have been informed by the trial team that at trial, Deputy Davis testified fully and completely. In the course of his testimony, as you are aware, he admitted to having participated with others, including the defendants, in falsifying reports and lying to SID investigators to cover up the incidents of excessive force that he witnessed. While his proffer agreement with the government did not preclude him from being prosecuted for any incident where he himself used excessive force, the government found no such evidence throughout its investigation.*

*While we certainly understand that you must take disciplinary administrative action against Deputy Davis, you should also be advised that we have concluded that Deputy Davis was truthful and cooperative with this Office in its efforts to investigate and prosecute those supervisors and officers who repeatedly used or encouraged beatings of detainees as punishment. I am sure you agree that cases such as these cannot be prosecuted without the cooperation of officers such as Deputy Davis who, in the face of enormous pressures from his colleagues, showed a willingness to own up to his own conduct and to testify truthfully against others.*

29.    This unwarranted termination of employment was in contravention of the protections afforded Mr. Davis by the First Amendment to the United States Constitution, and contrary to the public policy of and the statutes of the Commonwealth of Massachusetts but was consistent with the operational standards and method of operating the Department.

### III.    Past Mismanagement within the Department prompted the creation of a Special Commission which investigated the continuing pattern of operating deficiencies with in the Department

30. The Department's management problems and allegations of inmate abuse by its officers led then-acting Governor, Jane Swift, to convene a Special Commission in July of 2001 to investigate and report on the the Department and its facilities. The Special Commission panel included seven independent experts with expertise in areas relevant to evaluating the Department's operations.

7

31.     In the lengthy report issued by the Special Commission (the "Report") after more than a year of investigation, the Special Commission noted that employees provided information only "reluctantly, perhaps fearful of criticism or even retaliation."

32.  The Report also discussed the Department's poor training and mismanagement of its personnel, and described the Department as a "deeply-troubled institution" in which "egregious" incidents of physical and sexual abuse by officers against inmates had occurred.

33.  The Report also concluded that the Department "continue[d] to be a disturbingly closed system in which outside input and internal and external accountability are limited" and warned that the Department should take all steps necessary to eliminate the code of silence from its facilities.

34. More to the point, the Report concluded that "[s]taff maintain a code of silence due to concern about retaliation."   The Commission also "urge[d] an aggressive attack on the code of silence that prevents staff members from reporting the misconduct of fellow staff members" and warned that the "Department should attempt to penetrate the existing code of silence at every turn."  The Commission also urged that the "Department must ensure that employees who do come forward with information are fully protected from retaliation by other officers and are supported by the administration."

**IV.     The Defendants Unlawfully Terminated Mr. Davis After He Broke the Code of Silence and Spoke Truthfully to Federal Law Enforcement Agents**

35. Despite the findings and instructions of the Special Commission, the Department has continued to maintain the retaliatory policies and practices which allow the code of silence practical at the jail to flourish.

36. Immediately after Mr. Davis' testimony in this United States Courthouse at trial of

8

<u>United States v. Donnelly et al</u> on or about March 7, 2003, he was notified of his placement on administrative leave without pay by the Department. Subsequently, on or about May 2, 2003, he appeared as ordered at a disciplinary hearing convened by the Department before the Chief of Staff of the Department. On or about July 15, 2003, he was given notice of his termination from the department for the stated reason that:

> . . .*the Hearing Officer has determined that, among other things, you filed numerous false and misleading incident reports and use of force reports; repeatedly covered up the use of excessive force by other jail officers; repeatedly failed to take affirmative or remedial action when officers used excessive force against detainees; repeatedly lied to and misled superior officers in your verbal and written reports on incidents involving excessive use of force against detainees; lied to SID investigators and interfered in SID investigations into use of excessive force by officers; initially lied to the FBI about your knowledge of and involvement in the use of excessive force and cover-up of department policies; knowingly and intentionally violated department policies; and never reported the actions of the officers to superior officers who you knew did not approve of or condone the abusive treatment of detainees.*

37. Course materials from various training sessions conducted by the Department on different occasions and attended Mr. Davis as a requirement of his employment were exhibits at his hearing along with Mr. Davis' attendance records. These Department training materials which were independently reviewed by the Stern Commission were described by that body as a "canned curriculum" which relied heavily on a basic training promulgated by the Massachusetts Sheriffs Association. They were faulted for espousing a "management-focused direction (e.g. preventing Department liability)" while failing in both purpose and practice in meeting both the "Department's or the employees' actual training needs."

38. The Stern Commission Report also criticized the Department's instruction lesson plan relied on to determine Mr. Davis' employment as both dated [last reviewed in 1994] and lacking essential components ["does not incorporate contemporary material surrounding such

issues as sexual misconduct and excessive force **and code of silence among officers."** (bolding added for emphasis)].

39. On the other hand, the hearing officer turned a blind eye to Mr. Davis' truthful trial testimony in this federal Courthouse on March 5 and 6, 2003 as well as United States Attorney Michael J. Sullivan's April 22, 2003 letter to Sheriff Cabral setting forth the government's evaluation of Mr. Davis' truthful testimony and praising him for coming forward. These actions of the Sheriff, acting through her designee, and of the Department in ending Mr. Davis' employment with the Department, are yet another instance of the bizarre operation of a personnel management system which often produces results characterized as "anomalous" by the Stern Commission.

40.    This aptly describes this scenario where the Department's full retribution was visited on Mr. Davis who was not involved in any instances of physical abuse of or use of excessive force on inmates while those actually accused of these offenses (and found probably involved by Grand Jury indictment) remain employed.

40.    Actions of the type inflicted on Mr. Davis speak volumes about the actual existence of the code of silence within the Department and its facilities while providing the dramatic and concrete evidence of the Sheriff's and her designees continued allegiance to its tenets.  It is also contrary to law.

41. Knowledge of such action speaks louder than words and blunts any efforts to penetrate the existing code of silence, make its hold on Department corrections officers and jail guards more subterranean and insidious, and nullify the practical effect of any training and orientation programs on the subject of rejecting and such "code" all as recommended by the Stern Commission.

10

42.   While on information and belief, various types of misconduct by the Department within its facilities and by its personnel are still being investigated by law enforcement agencies, Mr. Davis has again truthfully testified in this federal Courthouse as a witness for the United States in the United States in October 2003 in the case of <u>United States v. Randall Sutherland</u>.

43.   The actual reason for Mr. Davis' dismissal from the Department was his violation of its unwritten code of silence and his truthful statements to law enforcement, personnel and subsequently to grand and petit juries in connection with trials held in this Courthouse and at other proceedings in this United States District Court.

44.   Mr. Davis' dismissal is but another example of a Department pattern of reacting to allegations of impropriety, and even court findings of wrongful conduct, recalcitrantly as its refusal to make good on its $5,000,000.00 portion of a settlement to victims of an unlawful policy maintained by the Department until found in civil contempt and fined *per diem* by a Judge of this Court well illustrates.

<u>COUNT I</u>
(Violation of M.G.L. 149, § 185)
(Suffolk County, Suffolk County Sheriff's Department)

45. Mr. Davis incorporates by reference and realleges the allegations set forth in paragraphs 1 - 44 of this Complaint as if expressly set forth herein.

46. The Commonwealth of Massachusetts has long-standing laws to protect whistleblowers such as Mr. Davis from retaliation for engaging in good public deeds such as cooperating with law enforcement agencies.  One of those laws is M.G.L. c. 149, § 185, which protects persons who work for the Commonwealth or any of its instrumentalities or agents.

47. As a result of the conduct as set forth above, Mr. Davis was subjected to retaliatory action for having disclosed to law enforcement agencies information regarding activities, practices and policies of Suffolk County and the Sheriff's Department that he reasonably believed violated the law and/or posed a risk to public safety. Without question, such retaliation violated M.G.L.c. 149, § 185.

48. As a result of the Defendants' conduct, Mr. Davis has suffered injuries and damages including, but not limited to, treble lost wages and benefits, emotional distress and attorneys' fees, and is entitled to reinstatement and other equitable relief.

### COUNT II
### (Violation of 42 U.S.C. § 1983)
### (All Defendants)

49. Mr. Davis incorporates by reference and realleges the allegations set forth in paragraphs 1 - 48 of this Complaint as if expressly set forth herein.

50. Mr. Davis exercised his First Amendment Right to free speech on several occasions by speaking with law enforcement officials on matters of public concern.

51. Mr. Davis was terminated from employment for having exercised his right to speak on matters of public concern.

52. The actions of the Defendants were attributable to the policies and/or established practices of Suffolk County, the Department and Defendant Cabral.

53. As a result, Mr. Davis is entitled to compensatory and punitive damages, and attorneys' fees, and is entitled to injunctive and other equitable relief.

### COUNT III
### (Termination in Violation of Public Policy)
### (Suffolk County, Suffolk County Sheriff's Department)

54.    Mr. Davis incorporates by reference and realleges the allegations set forth in paragraphs 1- 53 of this Complaint as if expressly set forth herein.

55.    The Defendants' conduct violated the Commonwealth's established public policy of encouraging individuals to cooperate with law enforcement officials.

56. The Defendants discharged Mr. Davis because of his cooperation with a law enforcement agency.

57. Such conduct constitutes a termination in violation of public policy.

58. As a result, Mr. Davis is entitled to compensatory and punitive damages, emotional distress damages, and attorneys' fees.

**COUNT IV**
**(Massachusetts Civil Rights Act, M.G.L. c. 12 §§ 11H and 11I)**
**(All Defendants)**

59.    Mr. Davis incorporates by reference and realleges the allegations set forth in paragraphs 1- 58 of this Complaint as if expressly set forth herein.

60.    Through the above-described conduct, the Defendants interfered or attempted to interfere by threats, intimidation and/or coercion, with Mr. Davis's exercise and enjoyment of rights under the constitutions and laws of the United States and of the Commonwealth of Massachusetts.

61.    As a result, Mr. Davis has suffered injuries and damages including, but not limited to, lost wages, lost benefits, compensatory damages, emotional distress and attorneys' fees, and is entitled to injunctive and other equitable relief.

**WHEREFORE**, Mr. Davis requests that the Court:

1.    Enter judgment against the Defendants on all Counts;

2.    Reinstate Mr. Davis to his position as a jail officer with the Department continuing him on administrative leave, WITH PAY, until resolution of this controversy;

3.    Enjoin the Defendants from further engaging in the unlawful conduct stated in this Complaint;

4.    Award all rights and benefits of employment retroactively to March 2003 to Mr. Davis as if he had not been terminated and retaliated against, including, without limitation, back pay, and consequential damages in an amount to be determined at trial;

5.    Award compensatory damages, including emotional distress damages caused by the conduct of the Defendants;

6.    Award punitive and exemplary damages in an amount to be determined at trial;

7.    Award treble damages consistent with M.G.L. c. 149 § 185;

8.    Award attorneys' fees and costs in bringing this action; and

9.    Award such other relief as this Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY FOR ALL ISSUES SO TRIABLE.**

**Respectfully submitted,
Paul Davis,**
By his attorney,

George F. Gormley
George F. Gormley, P.C.
655 Summer Street
Boston, Massachusetts 02210
(617) 478-2750
BBO #204140

# EXHIBIT 38

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PAUL DAVIS,

    Plaintiff,

                       Civil Action No. 04-11851-WGY

v                   )

SUFFOLK COUNTY AND     )
ANDREA CABRAL
(in her official capacity)     )

    Defendants.

## AFFIDAVIT OF PAUL DAVIS

Now comes PAUL DAVIS, and on oath, does depose and say as follows:

    am the plaintiff in the above captioned matter.

2    From February 20, 1991 until July 15, 2003, I was employed as a jail officer at the Nashua Street Jail.

3    During the twelve (12) years that I worked at the Nashua Street Jail, I was never accused of using force incorrectly or in violation of department policy, nor did I ever use force incorrectly or in violation of department policy.

4.    While I was aware of the fact that it was the written policy of the department that officers were accountable for their own actions, even if they acted on direct orders of a supervisor, I also knew from past, personal experience that there would most likely not be individual accountability for an officer's own actions, particularly if he acted on direct orders of a supervisor. Rather, I was aware that there were specific instances where a superior officer ordered a beating, and a corrections officer carried it out. I also knew that when SID investigated the incident, the SID investigators only spoke to the lieutenant, who "took care of it."

5    At the time I testified in United States v. Donnelly, I was aware that I might be subject to discipline for my own admitted wrongdoing; however, I did not think that I would be subject to discipline for truthfully testifying at the trial of U.S. v. Donnelly.

6.    Further, contrary to Sheriff Cabral's account of Officer Murphy's testimony regarding his actions in the Dais incident, Officer Murphy did not call for the SERT

team while Officer Bailey and Officer Ross beat inmate Dais. In reality, Officer Bailey's "man down" alarm went off, and the SERT team was directed to respond to the cell by central control.

7.     Additionally, while it may be true that Officer Murphy only admitted to one incident of falsifying a report, Officer Murphy was not a member of the SERT team. Officer Murphy worked as a line officer, and eventually worked in the booking room. Officer Murphy therefore was only responsible for one particular area on a given shift, and was therefore only exposed to potential incidents with inmates in that one area. As a member of the SERT team, on the other hand, I was responsible for the entire jail during any given shift, and could easily have to respond to as many as five (5) or six (6) incidents per shift.

8.     I knew that the "code of silence" was contrary to the way I was <u>officially</u> trained; however, I was equally well aware that the "code of silence" was the <u>unofficial</u> policy of the Department.

9.     Although the Notice of Termination I received states that I was terminated because of the "egregious nature of [my] actions, and [my] repeated and flagrant disregard of departmental policies," on information and belief Sheriff chose to fire me in retaliation for my testimony in <u>United States v. Donnelly.</u>

10.     Finally, while Defendants note that Officer Murphy also testified as to his own wrongdoing and was not fired, on information and belief, Kenneth Joyner testified before the Grand Jury but was not called as a government witness at the trial of <u>United States v. Donnelly</u>. Officer Joyner was my partner during the Milliken incident, and I believe that he was also directed by SID to write a report regarding our use of leg irons on inmate Milliken. Presumably, Officer Joyner testified truthfully about that incident before the Grand Jury. Officer Joyner did not testify publicly about his involvement in that incident, though; as a result, Officer Joyner is still employed by the Suffolk County Sheriff's Department.

**SIGNED AND SUBSCRIBED UNDER THE PAINS AND PENALTIES OF PERJURY**

THIS _29_ DAY OF SEPTEMBER, 2005.

PAUL DAVIS

2

# EXHIBIT 39

UNITED STATES DISTRICT COURT
DISCTRICT OF MASSACHUSETTS

C.A. No.

MAGISTRATE JUDGE ____

```
                                    )
MARTIN K. MICHELMAN,                )
        Plaintiff,                  )
                                    )
v.                                  )
                                    )
SUFFOLK COUNTY, SUFFOLK             )
COUNTY SHERIFF'S DEPARTMENT, and    )
ANDREA J. CABRAL, IN HER OFFICIAL   )
AND INDIVIDUAL CAPACITIES           )
        Defendant.                  )
                                    )
```

RECEIPT # ____
AMOUNT $ 250
SUMMONS ISSUED ____
LOCAL RULE 4.1 ____
WAIVER FORM ____
MCF ISSUED ____
BY DPTY. CLK. ____
DATE 7/27/05

## COMPLAINT AND DEMAND FOR JURY TRIAL

A.    PRELIMINARY STATEMENT

This is an action in law and equity for damages and other relief caused by the

unlawful termination of the Plaintiff, Martin K. Michelman, from his position with the

Suffolk County Sheriff's Department.  This case is brought pursuant to 42 U.S.C. § 1983

and the First and Fourteenth Amendments of the United States Constitution.  Federal

jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343.

B.    PARTIES TO THE ACTION

1.    The Plaintiff Martin Michelman resides at 7 Northfield Road, Peabody,

Massachusetts.

2.    Defendant Suffolk County Sheriff's Department is responsible for the inmates and

personnel at certain correctional facilities located within Suffolk County.  Defendant

Suffolk County Sheriff's Department maintains an office at Jail, 200 Nashua Street, Boston, Massachusetts.

3.      Defendant Suffolk County is a Massachusetts county government of which the Department is an instrumentality.

4.      Defendant Andrea Cabral has been Sheriff of Suffolk County since approximately December 2002. At all relevant times, Defendant Cabral held the authority to remove employees of the department, including the Plaintiff. Upon information and belief, Defendant Cabral is a resident of the Commonwealth of Massachusetts.

COUNT I – WRONGFUL TERMINATION--
42 U.S.C. § 1983

5.      During the relevant period of time, Plaintiff was employed to work in the Suffolk County Sheriff's Department. As of June 1, 2004, Plaintiff served in the position of Deputy Superintendent of Training and Special Operations.

6.      As Deputy Superintendent of Training and Special Operations, Plaintiff was an at-will employee.

7.      In the Spring of 2004, planning and preparations were underway for security during the period in which DNC convention activities would occur in Boston.

8.      In or about March, April and/or May 2004, at a number of meetings, Plaintiff made statements to the effect that he believed that more staff, than was planned, should be trained and assigned to assist the department in an emergency situation, and that different types of training, than was planned, be provided.

9.      At a meeting on or about April 30, 2004, Plaintiff suggested that 70 individuals receive perimeter control training, but Deputy Superintendent of Investigations Theiss rejected the suggestion.

2

10.    With regard to the Jail and House of Corrections, the plan in place was to staff the Jail and the House of Corrections with a few more staff than usual, and rely on the Boston Police or Metrolec (a combination of city and town police who do not ordinarily work together), to assist in an emergency situation at the prison(s). According to the plan, the Boston Police Department or Metrolec contingent would be stationed a few miles away at Madison Park High School.

11.    In or about mid-May 2004, Plaintiff spoke with Richard Wells, Deputy Chief of the Milton Police, Commanding Officer of the Metrolec Special Tactics and Response Division. Wells told Plaintiff that the House of Corrections had to be more thoroughly fortified, with a greater presence of staff and dogs. The conversation confirmed for Plaintiff that more staff, than planned, was necessary. Plaintiff informed his superiors concerning the conversation with Wells. In addition, Plaintiff was present at a meeting in which Wells communicated his suggestion for a stronger security presence to Deputy Superintendent of Investigations Theiss.

12.    On or about May 24, 2004, Elizabeth Keeley, Chief of Staff wrote an e-mail to Plaintiff stating, "Thank you for being responsive to the training needs for our DNC preparation. However, we are **not** going to have a tactical response team, therefore, we are not in need of nor are we going to have any tactical training in preparation for the DNC." Plaintiff discussed this e-mail with others.

13.    On or about May 21, 2004, Plaintiff met with Captain Scaduto and discussed options for training in preparation for the DNC convention. On or about May 23, 2004, Captain Scaduto sent Superintendent Horgan a memorandum advocating that Plaintiff's suggestions for training be implemented.

3

14.    On or about June 10, 2004, Plaintiff conducted a command staff training in preparation for the DNC convention events in July. The goal of the training was to prepare the staff to protect and control the Jail and the House of Corrections, in an emergency situation in the context of the DNC convention. Plaintiff truthfully communicated the plans as they stood at the time.

15.    In light of Plaintiff's statements concerning the plans, some of the participants became concerned that that the plans were insufficient to guarantee the safety of the prisons. They asked why the department was not doing more to prepare for emergency situations. They further asked whether Deputy Superintendent Theiss was responsible for the plan. They asked what they should do about their concerns about the plan, and Plaintiff responded that they should speak with the Superintendent.

16.    Plaintiff made his statements in the interest of public health and safety.

17.    Based on the Plaintiff's statements made on or about June 10, 2005, Defendant Cabral decided to effectuate Plaintiff's termination.

18.    On June 11, 2004, Plaintiff met in the morning with Deputy Superintendent of Investigations Theiss and Superintendent of the House of Corrections Horgan. At this meeting, they said that they received telephone calls from participants in the class who said that Plaintiff said that the Department was not doing enough in preparation for the DNC, that the department was insufficiently prepared, and that if they did not like it, they should call the Superintendent. They said words to the effect that even if Plaintiff did not agree with the plan, that he should not have expressed any disapproval of the plan. Plaintiff was instructed not to speak at the subsequent command staff meeting concerning the DNC.

19.     On June 11, 2004, after the command staff meeting, Plaintiff met again with Theiss, Horgan and Superintendent of the Jail Sumpter. They asked Plaintiff to explain what happened in the class and Plaintiff did so.

20.     As of June 11, 2004, Plaintiff was placed on administrative leave without pay.

21.     By a letter dated June 11, 2004, written by Elizabeth Keeley, Chief of Staff at the Suffolk County Sheriff's Department, Plaintiff was informed that there would be a hearing to determine whether there was just cause to terminate his employment. The letter stated: "Your conduct at this training constituted insubordination as you presented the Department in an unfavorable light in its preparedness for the DNC events."

22.     The June 11, 2004 letter contained a number of other false and pretextual reasons for initiating Plaintiff's termination.

23.     A pre-termination hearing was scheduled. However, Plaintiff had no legal or contractual right to a pre-termination hearing.

24.     On June 16, 2004, a pre-termination hearing took place before Hearing Officer Charles Abate. At the hearing, Defendants advanced numerous false and pretextual reasons for termination.

25.     By letter dated June 21, 2004, Mr. Michelman was informed that "hearing officer Charles Abate has determined that there is just cause for your termination from the Suffolk County Sheriff's Department."

26.     Defendant Cabral was the final decision maker, who was responsible for initiating Plaintiff's termination.

27.     Defendant Cabral has, on other occasions, retaliated against other employees based on their First Amendment protected speech and/or political affiliation.

28.     By letter dated April 26, 2005, James M. Davin, Deputy General Counsel for the

Suffolk County Sheriff's Department, stated that Plaintiff was "not entitled to a hearing."

29.     Plaintiff was terminated in violation of his First Amendment rights to freedom of

speech and association, as implemented by 42 U.S.C. § 1983.

30.     As a result of the unlawful termination, Plaintiff suffered lost pay and benefits,

and suffered emotional distress, for which he seeks compensation.

**Wherefore, the Plaintiff requests that this Court order:**

a.     that the Defendant(s) compensate Plaintiff for any loss of wages and/or
benefits incurred as a result of his termination;

b.     that the Plaintiff be awarded an amount of money which will fairly
compensate him for his emotional and physical pain and suffering;

c.     that the Plaintiff be awarded attorney's fees and costs.

d.     that the Defendant Sheriff Cabral be ordered to pay the Plaintiff punitive
damages.

e.     that the Defendants pay the Plaintiff interest on any judgment entered
from the time of filing of this suit;

f.     such relief as may be just and proper and/or which will make the Plaintiff
whole.

THE PLAINTIFF DEMANDS A JURY TRIAL ON ALL COUNTS OF HIS
COMPLAINT.

The Plaintiff,
By his Attorneys

Kevin G. Powers, BBO #405020
Robert S. Mantell, BBO #559715
Rodgers, Powers & Schwartz
18 Tremont Street, Suite 500
Boston, MA 02108
(617) 742-7010

Michelman complaint

# EXHIBIT 40

# In The Matter Of:

*John Doe   v.*
*Sheriff Richard J. Rouse, et al.*

---

*Marie B. Lockhart*
*Vol. 1, October 10, 2002*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA   02110*
*(617) 426-2432*

Original File LOCKHART.V1, 109 Pages
Min-U-Script® File ID: 3427803764

**Word Index included with this Min-U-Script®**

Page 29

I do have files for each employee as well.

Q: What is that file called, do you know?

A: The deputy superintendent's files.

[4] Q: This is something separate and apart from

[5] the personnel file.

[6] A: Yes.

[7] Q: Separate and apart from the background file

[8] that SID keeps for each person.

[9] A: Yes.

[10] Q: This is kept in your office by you.

[11] A: Yes.

[12] Q: Do you have a file as to David Mojica?

[13] A: Yes.

[14] Q: Do you have one of Parise?

[15] A: Yes.

[16] Q: Powers and DiCenso?

[17] A: Yes.

[18] Q: What's in those files?

[19] A: Things in those files could be assignments

[20] when they first came to work with the Department,

[21] any shift or day off changes, any disciplinary

[22] procedures imposed against any staff member. Copies

[23] of their receipt of the Departmental issued

[24] policies, medical documentation.

Page 30

[1] Q: Let's get back to No. 7, the supervision of

[2] COs. As far as the chain of command on each shift,

[3] we have the front line COs. Who do they report to?

[4] A: Initially, all staff on the shift report to

[5] the shift commander. Once the correction officers

[6] are assigned, they report to their immediate

[7] supervisor, who could be a sergeant or a lieutenant

[8] depending on where they are assigned.

[9] Q: And then the sergeant or lieutenant would

[10] report to the captain.

[11] A: Yes. And if there was no captain, they

[12] would report directly to shift commander.

[13] Q: And if there was a captain, the captain

[14] would report to the shift commander, who would in

[15] turn would report to you.

[16] A: Yes.

[17] Q: Are you in constant communication with the

[18] shift commanders when you're in the office?

[19] A: Yes.

[20] Q: Let me ask you some questions about the

[21] supervision. We talked with Mr. Horgan about what

[22] he called an early alarm system, where the COs

[23] notify each over if there's going to be an

[24] unannounced visit or a visit by a supervisor. Are

Page 31

[1] you familiar with that?

[2] A: I am.

[3] Q: Are the supervisors called "white shirts"?

[4] A: Yes.

[5] Q: Why is that?

[6] A: We wear white shirts.

[7] Q: When the white shirts come into a building,

[8] is there an early alarm system, to your knowledge?

[9] A: Yes.

[10] Q: Does the early alarm system defeat the

[11] purpose of the surprise or unannounced visits?

[12] A: Yes.

[13] Q: Does that cause you some concern about

[14] whether you or your supervisors are actually getting

[15] an accurate picture of what's going on in the unit?

[16] A: Yes.

[17] Q: Have you devised any way around this early

[18] alarm system?

[19] A: Well, there's nothing really in place. You

[20] know, you try to visit different areas of the

[21] building at different times of the day, different

[22] days of the week, so that you're not — so that you

[23] don't have a pattern. Then what that does is, you

[24] may get to a few units before the alarm is sounded

Page 32

[1] that you're actually there.

[2] Q: Are you able to tell the difference in

[3] terms of a unit that hasn't been forewarned and one

[4] that has?

[5] A: Most definitely.

[6] Q: How?

[7] A: I may walk in on somebody reading a

[8] newspaper, and they know that newspapers are not

[9] allowed in my facility. I've walked in on people

[10] playing cards, and you just walk in on people doing

[11] what they're not supposed to be doing.

[12] Q: Have you walked in on people having

[13] conversations with inmates that they shouldn't?

[14] A: No.

[15] Q: Have you walked in on inmates having joking

[16] conversations with COs?

[17] A: Yes.

[18] Q: Have you told the CO not to do that?

[19] A: No.

[20] Q: Why not?

[21] A: Because it depends on what the content of

[22] the conversation is.

[23] Q: Let's get back to the surprise visits here.

[24] Is there any other way that you can circumvent this

Page 33

[1] early warning system that you know is in place?
[2] A: Short of changing my radio frequency or
[3] being able to catch the person that's doing it, no.
[4] Q: Has there been any attempt to discipline
[5] anyone that's been doing it?
[6] A: Because of the way it's done, we don't have
[7] a way of tracking who is doing it.
[8] Q: Why not?
[9] A: Short of changing our whole radio system,
[10] there's no way.
[11] Q: You can't detect who's making the noises on
[12] the radio to the other people.
[13] A: Correct.
[14] Q: You can't tell the sources.
[15] A: You can't tell what radio number is
[16] transmitting.
[17] Q: When you're walking up to these units, for
[18] example, you're going up to the women's unit, do you
[19] hear on your radio the early alarm system working?
[20] A: What I usually end up hearing and what I
[21] usually do is, if I hear — not just for me, but for
[22] my supervisor walking into a building, if I hear
[23] them doing their signal on the radio, I'll wait a
[24] couple of minutes, and then I'll blow into my radio

Page 34

[1] to try and defer, to confuse them as to where the
[2] supervisor is going.
[3] Q: The blowing into the radio — how does the
[4] system work? Just briefly what do they do?
[5] A: You blow one long time and that means
[6] they're in Building 1, the tower. Three means
[7] they're going in Building 3.
[8] Q: What about the specific floor or unit? Do
[9] they blow 10 times for the 10th floor?
[10] A: No, because they don't know where you're
[11] going. You get on the elevator.
[12] Q: But that one blow will tell everyone in
[13] Building 1 to be on guard.
[14] A: Yes.
[15] Q: And when you go up onto the women's unit
[16] after that alert system, you find everything in good
[17] order usually, right?
[18] A: Usually.
[19] Q: Because they've been warned that you're
[20] going to come; is that right?
[21] A: Yes.
[22] Q: Are you aware of any literature or
[23] information from these various professional groups
[24] as a way around this system or a way to prevent it?

Page 35

[1] A: No, I'm not aware.
[2] Q: Are you a member of any professional
[3] organizations relating to corrections? I don't know
[4] if there are such things.
[5] A: We have the American Correctional
[6] Association, which I'm a member of that; and there
[7] are others, but I'm not a member.
[8] Q: From the ACA, do you get a flyer from them
[9] or a pamphlet from them on a monthly or yearly
[10] basis?
[11] A: We do get books or magazines on different
[12] instances.
[13] Q: When you get those books or magazines, have
[14] any of them related to this early warning system and
[15] what you can do to prevent it?
[16] A: I don't recall.
[17] Q: Other than varying your course or blowing
[18] in to try and distract the folks, is there anything
[19] else that you can do to prevent them from alarming
[20] each other?
[21] A: Short of changing the radio system, no.
[22] Q: You knew in 1998 and all the supervisors,
[23] the white shirts, knew this system was in effect,
[24] right?

Page 36

[1] A: Yes.
[2] Q: It's been in effect since, in fact, you
[3] were a shift commander, right?
[4] A: Yes.
[5] Q: When you were a CO, did you do it?
[6] A: No. When I was a CO, we didn't have
[7] radios, so...
[8] Q: If you could, you would have — I withdraw
[9] the question. As far as the reports you get, would
[10] you say it's very infrequent that a CO will report
[11] an incident relating to another CO?
[12] A: Yes.
[13] Q: Is that the term that we call the "code of
[14] silence" among the COs?
[15] A: I wouldn't say we have a code of silence.
[16] Q: Are you familiar with that term?
[17] A: I am familiar with that term.
[18] Q: Is there some sort of code of silence at
[19] the House of Correction?
[20] A: No. I think that correction officers do
[21] not want to be labeled "rats" and "snitches."
[22] Q: Does that result in this informal code
[23] where they try not to tell on each other?
[24] A: Yes.

Marie B Lockhart  -cv-11935-DPW    Document 137-10    Filed 11/14/2005    Page 61 of 62
Vol. 1, October 10, 2002
John Doe   v.
Sheriff Richard J. Rouse, et al.

Page 37

[1] **Q:** Do you have a name for this system or the
 act that this occurs?
**A:** No.

[5] **Q:** Do you call it anything?
[5] **A:** No.

[6] **Q:** You knew in 1998 that they have this system
[7] where they're unlikely to rat each other out, and
[8] you also knew they had an early alarm system, right?
[9] **A:** Yes.

[10] **Q:** Are you aware of anything else that the COs
[11] had in place to thwart your efforts to supervise?
[12] **A:** No.

[13] **Q:** Is there anything you've done or initiated
[14] to circumvent this code where they won't tell on
[15] each other?

[16] **A:** There's nothing that I have done.
[17] Corrections staff have told on each other at certain
[18] times and have had to deal with certain
[19] consequences. Now sometimes I may get an anonymous
[20] letter under my door with no one's name or no one's
[21] signature, just "Deputy, you might want to look at
[22] X, Y, Z."

[23] **Q:** Were you getting those back in 1998, 1999?
[24] **A:** No.

Page 38

[1] **Q:** When you get an anonymous tip, are you
[2] interested in following up on it?

[3] **A:** Most definitely.

[4] **Q:** Do some of them turn out to be legitimate?

[5] **A:** Yes.

[6] **Q:** If someone had given you an anonymous tip
[7] that three of your officers were having sex with an
[8] inmate, would you have investigated it?

[9] **A:** Most definitely.

[10] **Q:** Were you aware that there was — withdraw
[11] that question. Getting back to the issue of
[12] supervision, are there any policies or procedures in
[13] writing that tell the white shirts how to do their
[14] jobs?

[15] **A:** I know there is a job description.

[16] **Q:** For each different position, right?

[17] **A:** Yes.

[18] **Q:** Other than that, the position description,
[19] which by the way we've marked a variety of them in
[20] this case, are there any written SOPs or manuals
[21] that tell, for example, a lieutenant how he's
[22] supposed to supervise his employees?

[23] **A:** No.

[24] **Q:** Do you in your department of operations

Page 39

[1] have a specific SOP or a policy manual?

[2] **A:** I have the same policy manual.

[3] **Q:** You have this same manual that relates to
[4] everyone there that we've marked as Exhibit 7,
[5] right?

[6] **A:** Yes.

[7] **Q:** Are there any specific policies in here
[8] that relate to your specific department? I know
[9] they apply to all the employees, but take a look.

[10] **A:** (Witness reviews documents) Well, I would
[11] say inmate management, custody, and security.

[12] **MS. KING:** Can we go off the record for a
[13] minute.

[14] **MR. DONOVAN:** Sure.

[15] (Discussion off the record)

[16] **Q:** Understanding that Exhibit 7 is the policy
[17] manual in effect in or about 1998 and 1999, are
[18] there any things in there specifically about how
[19] you're supposed to supervise and how you're supposed
[20] to monitor people and do those activities?

[21] **A:** (Witness reviews documents) There's a
[22] policy that tells us — tells a staff person what to
[23] do when we admit an inmate to our facility.

[24] **Q:** What I'm really asking is, is there a

Page 40

[1] policy in there that tells the lieutenants,
[2] captains, the white shirts, how they're supposed to
[3] go about their duties?

[4] **A:** You're asking me if there's a policy that
[5] says, "Okay, at 9:00 you're supposed to" —

[6] **Q:** Well, just generally how they're supposed
[7] to supervise the people under their control. These
[8] policies tell you to do everything from how to
[9] admit, how to transfer when they're in custody. I
[10] understand that. But my question is more specific.
[11] Is there a policy that says to the white
[12] shirts, "Here's how you're supposed to go about your
[13] activities in supervising the people underneath
[14] you"?

[15] **A:** No.

[16] **Q:** Other than the policy description which
[17] outlines the duties and responsibilities of a
[18] captain, for example, that would be the entire
[19] document that would tell them how to actually
[20] supervise COs, right?

[21] **A:** Yes.

[22] **Q:** Is there any central — we talked earlier
[23] about these incident reports. You talk about having
[24] them in a daily log and individual employee file.

Page 109

[1]              COMMONWEALTH OF MASSACHUSETTS)

SUFFOLK, SS. )

[5]     I, Kathleen M. Madden, Professional Court
Reporter and Notary Public in and for the
[5] Commonwealth of Massachusetts, hereby certify that
[6] there came before me on the 10th day of October,
[7] 2002, at 2:04 p.m., the person hereinbefore named,
[8] who was by me duly sworn to testify to the truth and
[9] nothing but the truth of her knowledge touching and
[10] concerning the matters in controversy in this cause;
[11] that she was thereupon examined upon her oath, and
[12] her examination reduced to typewriting under my
[13] direction; and that the deposition is a true record
[14] of the testimony given by the witness.
[15]     I further certify that I am neither attorney or
[16] counsel for, nor related to or employed by, any
[17] attorney or counsel employed by the parties hereto
[18] or financially interested in the action.
[19]     In witness whereof, I have hereunto set my hand
[20] and affixed my notarial seal this day of
[21] October, 2002.
[22]
[23]     Notary Public
[24] My commission expires 9/12/2008