# EXHIBIT 41

# Request for Proposal (RFP) Distribution Memo

**TO:**

| | |
|---|---|
| GARY MCWILLIAMS | Sales and Marketing |
| ANN MACK | Area Vice President |
| TERRE MARSHALL | Regional Manager |
| KAREN FRICK | Controller |
| KATHY AMICO | VP Clinical Program Services |
| CATHY TOEDEBUSCH | Clinical Programs |
| LAURA MULLINS | Purchasing |
| REED HEFLIN | Pharmacy/Managed Care |
| ROBERT FELLMAN | Network Development |
| MEL MAHONEY | General/Professional Liability |
| TODD ASCHBACHER | Legal |
| SUSAN SILVER | Human Resources |
| JOYCE BRENK | Recruiting |
| CARRIE SPEERS | UM |
| GARY STEINER | MIS |
| LARRY ROBINSON | CPS |
| ARLENE OSTROFF | SIMKISS |

**FROM:**  Ann Mack / Christine Giorgi

**DATE:**  November 17, 2000

**RE:**  SUFFOLK COUNTY, MA RFP

Attached is the RFP for the above-referenced facility. Please return any comments/ questions to Ann Mack, Ext. 2031 and all proposal documents to Christine Giorgi, Sales Department, 4th Floor, Extension 9123.

| COMMENTS DUE BY : | November 30, 2000 |
|---|---|

If anyone in your department (not listed above) requires a copy of the RFP, please make additional copies as needed.

Thank you in advance for your help with this project.

C: Brenda Grober – Memo Only



**To the Prospective Bidder:**

The Suffolk County Sheriff's Department / City of Boston invites you to submit a proposal to provide comprehensive healthcare services to Suffolk County.

Responses must be prepared in accordance with this Request for Proposals and the following attachments, which are incorporated herein and made a part thereof:

Please submit the following documents in a sealed envelope no later than December 11, 2000, 12:00 PM EST, to:

> **Suffolk County House of Correction**
> **20 Bradston Street**
> **Boston, MA 02118**
> **ATTN: Bill Sweeney, Contract Manager**
>
> 1. Proposal form with original signature of bidder
> 2. Qualification Statement with original signature of bidder and notarization
> 3. Certificate of Authority (CM-06) (corporations only)
> 4. Bid deposit in the form of a **bid bond, certified check, treasurer's or cashier's check** payable to the City of Boston in the amount of one percent of the total value of the proposal.
> 5. Proposal for Comprehensive Healthcare Services
> 6. Vendor Profile
> 7. Vendor Information Form with W-9 tax form
> 8. Living Wage Forms (LW-2 and LW-8)
> 8. Pricing Proposal - **In separate sealed envelope marked "Pricing Proposal"**

The outside of the envelope should read:

Name and address of Bidder      Proposal for Healthcare Services
                                December 11, 2000; 12:00 PM EST

**Note:** A performance bond in the form of a **bid bond, certified check, treasurer's or cashier's check** payable to the **City of Boston** in the amount of one million five hundred thousand dollars ($1,500,000.00) shall be required of the successful bidder.

<u>Again, failure to follow these instructions may result in a defective bid.</u>

Please feel free to contact me with any questions or concerns relating to this bid at (617) 635-1000 Ext. 2133. Thank you again for your interest.

Bill Sweeney
Contract Manager

A. For the period provided in this contract, the Contractor agrees to provide professional comprehensive health care services to the inmates confined to the Institution in accordance with the terms and conditions contained herein.

B. The Contractor shall conform, in accordance with the provisions of this contract, to all determinations and directions of the Official concerning any question which may arise relating to the performance of services hereunder, provided that questions of the necessity for and type of medical treatment shall be within the sole province of the Contractor. The Official shall have the right to determine the standards of the aforementioned medical treatment.

C. A security clearance, including but not limited to a criminal record check, shall be required of all employees of the Contractor before they will be allowed into the Institution. Such security clearance will not be unreasonably denied. The Contractor shall, upon written request of the Official, remove from service under this contract any individual in the Contractor's employ who the Official determines to be disorderly, careless, or incompetent or to be employed in violation of the terms of this contract. The Contractor shall promptly replace any such individual so removed with an employee of the Contractor who shall also be subject to the approval of the Official.

D. The Contractor shall keep full and accurate accounts and records in connection with the services provided under this contract. Except as otherwise provided in this contract, all such records or copies thereof shall be the property of the department, but shall be in the custody of and maintained by the Contractor during the term of this contract. The Contractor shall retain originals and/or copies of such records for a minimum period of seven (7) years which may be audited by the City at any time during regular business hours at the Institution or at such other place as may be designated by the Official.

Medical, dental, and mental health records shall be maintained for each inmate at the Institution in conformance with professional and required standards of confidentiality and shall be retained for a period of time as required by the laws of the Commonwealth of Massachusetts. Original inmate medical, dental, and mental health records shall be surrendered to the Official at the termination of this contract.

E. The Contractor shall comply with the Commonwealth of Massachusetts Department of Correction Minimum Standards for County Correctional Facilities, the Department of Public Health Standards for Correctional Facilities, American Correctional Association, and other related standards and regulations.

F. Staff Qualifications: In general all staff qualifications must meet the requirements of the Massachusetts Board of Registration in Medicine, the Board of Registration in Nursing, National Commission on Correctional Health Care (NCCHC) and other applicable regulations. In addition, the following minimum requirements shall apply.

(1) Physicians

a. Medical Director:  The Contractor shall provide a full-time Medical Director who is Board Certified in one of the following: Family Practice, Internal Medicine, Surgery, Emergency Medicine.

b. Primary Care Physicians:  All primary care physicians (physicians responsible for daily sick call) shall be Board Eligible or Board Certified in Family Practice, Internal Medicine, Surgery, or Emergency Medicine.  Physicians who have not graduated from a medical school accredited in the United States shall have performed their residency in the United States. It is preferred that physician(s) designated as the senior physician and/or medical director of the Institution obtain staff privileges for the hospital serving as the designated emergency hospital for the Institution.

c. Specialty Physicians:  Physicians who provide specialty services either on-site at the Institution, or off-site through a prearranged agreement with the Contractor, shall be Board Certified or Board Eligible in their respective specialty.

(2) Nursing

All nursing personnel must have graduated from an accredited R.N. or L.P.N. program and hold applicable licenses.

(3) Other

All other ancillary personnel (X-Ray Technicians, Physical Therapists, Occupational Therapist, Phlebotomists, and Nursing Assistants) must meet applicable Massachusetts's regulatory requirements and community certification/training standards.  Use of inmate help for any duties other than housekeeping is prohibited.  Correctional officers are not to be involved in the distribution of medications or the medical treatment of inmates.

G.  To enable the Contractor to furnish health care services at the Institution, the City agrees as follows:

(1) Except as may be otherwise provided in this contract, to provide the Contractor with adequate facilities at the Institution completely equipped and ready to operate, together with such heat, light, electricity, telephones, and other utilities services, and temporary storage space for bio-hazard medical waste, as may be reasonably required for the efficient performance of this contract.  It is understood and agreed that the Contractor will reimburse the department by way of invoice credit for any telephone charges that do not relate to the services provided under this contract.

(2) To provide building maintenance services, vermin extermination services, and non-biohazard rubbish removal from the health care services area(s), and shall be responsible for all maintenance of and any repairs to all equipment which has been provided by and which is the property of the City.

# EXHIBIT 42

# STANDARD CONTRACT
## CITY OF BOSTON/COUNTY OF SUFFOLK

(FORM CM 10 and 11)

CONTRACT NO. _____

**DEPARTMENT - INVOICE MAILING ADDRESS**
Suffolk County House of Correction
20 Bradston Street
Boston, MA 02118

**SERVICE LOCATION ADDRESS**
Suffolk County House of Correction
20 Bradston Street
Boston, MA 02118

**CONTRACTOR'S NAME AND ADDRESS**
Correctional Medical Services, Inc.
12647 Olive Boulevard
St. Louis, MO 63141

PLEASE
INCLUDE
ZIP
CODE

| BY | Account | Fund | Org | Program | Sub-CI | Project/Grant | Amount |
|----|---------|------|-----|---------|--------|---------------|--------|
| 1997 | 7MM1 | 200 | 811127 | 0000 | 0000 | SUF01041 | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

FIN or SSN    431281312

Vendor ID _____

DESCRIPTION OF SERVICES FOR WHICH CITY/COUNTY AGREES TO PAY IF RENDERED IN ACCORDANCE WITH THE CONTRACT DOCUMENTS

ATTACHED AND/OR INCORPORATED BY REFERENCE (continue on separate 8½" x 11" sheet(s) if necessary)
*Comprehensive inmate medical services at the Suffolk County House of Correction*

**TERM**

(M/D/YY)

1/1/01

thru

12/31/03

TOTAL
AMOUNT
NOT TO
EXCEED

* INSERT BASIS OF COMPENSATION: $ _____ PER HOUR / $ _____ PER DIEM

**AUDITOR**

APPROVED AS TO AVAILABILITY OF AP-
ROPRIATION OR PURSUANT TO ARTICLE
12.2 OF THE GENERAL CONDITIONS

IN THE AMOUNT OF

$ 0.00

_____
SIGNATURE

_____
DATE

**CONTRACTOR**

AGREES TO PROVIDE THE SERVICES AS
INDICATED IN ACCORDANCE WITH THESE
CONTRACT DOCUMENTS. (IF CORPORA-
TION, ATTACH AUTHORITY TO SIGN.)

_____
SIGNATURE

Executive Vice President
TITLE

February 6, 2001
DATE

**AWARDING AUTHORITY/OFFICIAL**

ATTACH APPROVED LETTER OF
AWARD AND OTHER REQUIRED
DOCUMENTS.

_____
SIGNATURE

_____
DATE

**ATTACHMENTS: (✓ CHECK ALL APPLICABLE DOCUMENTS ATTACHED)**

- [ ] AWARD LETTER
- [ ] ADVERTISEMENT
- [ ] DETERMINATION TO USE RFP
- [ ] JUSTIFICATION FOR REQ. CONTRACTS
- [ ] LIVING WAGE FORMS
- [ ] BID OPENING CERTIFICATE

- [ ] REGISTER OF PROPOSALS
- [ ] BID RESPONSE FORM
- [ ] PROPOSAL/APPLICATION
- [ ] CONTRACTOR CERTIFICATION
- [ ] PURCHASE DESCRIPTION/
  SPECIFICATIONS
- [ ] EVALUATION CRITERIA (RFP'S)

- [ ] PERFORMANCE BOND
- [ ] CERTIFICATE OF AUTHORITY
- [ ] NO-RISK CERTIFICATE
- [ ] INSURANCE CERTIFICATE(S)
- [ ] REQUIREMENTS CONTRACTS
  GENERAL CONDITIONS
- [ ] SPECIAL AGREEMENT(S)

Approved as to form by Corporation Counsel May, 1999
No payment will be made until the original copy of the executed contract is filed with the Auditing Department

FORM CM 11

## CITY OF BOSTON/COUNTY OF SUFFOLK
## STANDARD CONTRACT GENERAL CONDITIONS

**ARTICLE 1 – DEFINITION OF TERMS:**
1.1 The following terms or pronouns used in their stead wherever they appear in these Contract documents shall be construed as follows:
1.1.1 "City" shall mean the City of Boston or the County of Suffolk.
1.1.2 "Contract" and "Contract Documents" shall include, as applicable, all Advertisements, Invitations for Bids, Requests for Proposals, Applications, Purchase Description/Specifications, Evaluation Criteria, Performance Bonds, General Conditions/Special Agreements/Requirements Contract General Provisions, letter to the Mayor of Boston concerning the award of the Contract, and all amendments thereto, which documents are incorporated herein by reference.
1.1.3 "Contractor" shall mean the individual, partnership, corporation or other entity to whom this Contract is awarded.
1.1.4 "Official" shall mean the awarding authority/officer acting on behalf of the City in the execution of this Contract.

**ARTICLE 2 – PERFORMANCE:**
2.1 The Contractor shall conform to all determinations and directions, with provisions of this Contract, of the Official concerning all questions which may arise relating to the performance of services under this Contract.
2.2 The Contractor shall, upon written request of the Official, remove from City premises and replace all individuals in the Contractor's employ whom the Official determines to be disorderly, careless or incompetent or to be employed in violation of the terms of this Contract.
2.3 All work papers, reports, questionnaires and other written materials prepared or collected by the Contractor in the course of completing the work to be performed under this Contract shall at all times be the exclusive property of the City. The Contractor shall not use such materials for any purposes other than the purpose of this Contract without the prior written consent of the Official.

**ARTICLE 3 – ACCEPTANCE OF SERVICE:**
3.1 The City shall have a reasonable opportunity to inspect all service performed by and work product of the Contractor and accept or reject such service or work product.

**ARTICLE 4 – TIME:**
4.1 It is understood and agreed that all specified times or periods of performance are of the essence of this Contract.

**ARTICLE 5 – COMPENSATION:**
5.1 The Contractor may, in the absence of a payment schedule, periodically submit to the Official invoices, itemizing service, labor and expenses for which compensation is due and requesting payment for services rendered by the Contractor during the period covered by the invoice.
5.2 Thereupon the Official shall estimate the value of services accepted by the City, and City shall pay to the Contractor such amount less sums retained under the provisions of Article 6 of these General Conditions.
5.3 The City shall pay in full and complete compensation for services performed under this Contract in an amount not to exceed the amount shown on the face of this Contract paid in accordance with the rate indicated or in accordance with a prescribed schedule.
5.4 In the event that this Contract provides for reimbursement by the City to the Contractor for travel or other expenses, the Contractor shall submit such proposed expenses to the Official for approval prior to the incurrence of such expenses, unless the Contract specifically provides otherwise.
5.5 The Contractor shall furnish such information, estimate or vouchers relating to the services or to documentation of labor or expenses as may be requested by the Official.

**ARTICLE 6 – RELATIONSHIP WITH THE CITY**
6.1 The Contractor is retained solely for the proposes of and to the extent set forth in this Contract. Contractor's relationship to the City during the term of this Contract shall be that of an independent Contractor. The Contractor shall have no capacity to involve the City in any contract nor to incur any liability on the part of the City. The Contractor, its agents or employees shall not be considered as having the status or pension rights of an employee; provided that the Contractor shall be considered an employee for the purpose of General Laws c. 268A (the Conflict of Interest Law). The Contractor shall not be liable for any personal injury to or death of the Contractor, its agents or employees.
6.2 Unless all the terms and conditions for the delivery or provision of goods or services shall require written approval of or direction by the Official prior to the incurrence of any liability by the writing incorporated herein by reference, such delivery of goods or services shall require written approval of or direction by the Official prior to the incurrence of any liability by the City.
6.3 All alterations or additions, material or otherwise, to the terms and conditions of this Contract must be in writing and signed by the Official and Contractor and filed with the City Auditor.
6.4 Any waiver, expressed or implied, by the City or the Official of any rights, terms or conditions of this Contract shall not operate to waive such rights, terms or conditions or any other rights, terms or conditions, beyond the specific instance of waiver.

**ARTICLE 7 – ASSUMPTION OF LOSS AND LIABILITY:**
7.1 The Contractor shall pay and be exclusively responsible for all debts for labor and material contracted for by Contractor for the rental of any appliance or equipment hired by Contractor and/or for any expense incurred on account of services to be performed once performance of services if the service or work product fails to conform to specifications.
7.2 The Contractor shall bear all loss resulting from any cause before performance of services is completed and after performance of services if the service or work product fails to conform to specifications.
7.3 The Contractor shall assume the defense of and hold the City, its officers, agents or employees, harmless from all suits and claims against them or any of them arising from any act or omission of the Contractor, its agents or employees in any way connected with performance under this Contract.

**ARTICLE 8 – REMEDIES OF THE CITY:**
8.1 If the Contractor shall provide services in a manner which is not to the satisfaction of the Official, the Official may request that the Contract refurnish services at no additional cost to the City until approved by the Official. If the Contractor shall fail to provide services or shall provide services which are not satisfactory to the Official, the Official, in the alternative, may make any reasonable purchase or Contract to purchase services in substitution for those due from the Contractor. The City may deduct the cost of any substitute Contract or nonperformance of services together with incidental and consequential damages from the Contract price and shall withhold such damages from sums due or to become due to the Contractor.
8.2 If the damages sustained by the City as determined by the Official exceed sums due or to become due, the Contractor shall pay the difference to the City upon demand.
8.3 The Contractor shall not be liable for any damages sustained by the City due to the Contractor's failure to furnish services when the terms of this Contract if such failure is in fact caused by the occurrence of a contingency the nonoccurrence of which was a basic assumption under which this Contract was made, including but not necessarily limited to a state of war, act of enemies, embargoes, expropriation or labor strike or any unanticipated federal, state, or municipal governmental regulation or order, provided that the Contractor has notified the Official in writing of such cause within fourteen (14) days after its occurrence.
8.4 This Contract may be terminated at any time for the convenience of the City at the option of the Official by delivering or mailing to the Contractor at the Contractor's business address a written notice of termination setting forth the date, not less than seven (7) days after the date of such delivery or mailing, when such termination shall be effective. In the event of such termination for convenience, the Contractor shall be compensated for services rendered to the effective date of said termination in accordance with the rates of compensation specified in this Contract.

**ARTICLE 9 – REMEDIES OF CONTRACTOR:**
9.1 If damages, other than loss on nonconforming services or on services not performed, are actually sustained by the Contractor due to any act or material omission for which the City is legally responsible, the City may allow a sum equal to the amount of such damages sustained by the Contractor as determined by the Official in writing, provided the Contractor shall have delivered to the Official a detailed written statement of such damages and cause thereof within thirty (30) days after the act or material omission by the City.

**ARTICLE 10 – PROHIBITION AGAINST ASSIGNMENT:**
10.1 The Contractor shall not assign, delegate, subcontract or in any way transfer any interest in this Contract without prior written consent of the Official.

**ARTICLE 11 – COMPLIANCE WITH LAWS AND PUBLIC POLICY:**
11.1 This Contract is made subject to all laws of the Commonwealth of Massachusetts.
11.2 The Contractor shall provide, at its sole expense, all necessary licenses, permits or other authorizations required by the City, the Commonwealth of Massachusetts or any other governmental agency with proper jurisdiction.
11.3 The Contractor shall where applicable take out and maintain during the term of this Contract such Worker's Compensation insurance as may be reasonably necessary to protect the Contractor from claims under General Laws c. 152 (the Worker's Compensation Law).
11.4 The Contractor agrees and shall require any subcontractor to agree not to discriminate in connection with the performance of work under the Contract against any employee or applicant for employment because of sex, race, religious creed, national origin or age. The Contractor agrees and shall require any subcontractor to agree to post in conspicuous places notices to be provided by the Massachusetts Commission Against Discrimination, setting forth provisions of the Fair Employment Practice Law of the Commonwealth.
11.5 The Contractor's attention is called to General Laws c. 268A (the Conflict of Interest Law). The Contractor shall not act in collusion with any City officer, agent, employee or any other party, nor shall the Contractor make gifts regarding this Contract or any other matter in which the City has a direct and substantial interest.
11.6 The Contractor shall keep himself fully informed of all City Ordinances and Regulations, and State and Federal laws, which in any manner affect the work herein specified. The Contractor shall at all times observe and comply with said ordinances, regulations or laws, and shall protect and indemnify the City, its officers, agents and employees against any claim or liability arising from or based on the violations of such ordinances, regulations or laws, caused by the negligent actions of the Contractor, his agents, or employees.
11.7 In furtherance of the Mayor's Executive Order "Minority and Women Business Enterprise Development" dated December 31, 1987 and the Ordinance entitled "Promoting Minority and Women Owned Business Enterprises in the City of Boston" (Ordinances of 1987, Chapter 14), it is understood and agreed by the Contractor, and the Contractor by the execution of this Contract so certifies, as follows: (1) That the contractor shall actively solicit bids for the subcontracting of goods and services from certified minority and women businesses; (2) That in reviewing substantially equal proposals the Contractor shall give additional consideration to the award of subcontracts to certified minority and women bidders.

**ARTICLE 12 – AVAILABLE APPROPRIATION:**
12.1 This Contract is subject to the availability of an appropriation therefor.
12.2 If the Contract is funded under a grant with the Federal Government, it is being executed without further appropriation pursuant to General Laws c. 44, s.53A.
12.3 When the amount of the City Auditor's certification of available funds is less than the face amount of the Contract, the City shall not be liable for any claims or requests for payment by the Contractor which would cause total claims or payments under this Contract to exceed the amount so certified.
12.4 Unless otherwise expressly provided in a writing incorporated herein by reference, the amount certified by the City Auditor as available funds under this Contract may be increased or decreased by the Official with the written approval of such change by the City Auditor. In the event of any decrease in the amount certified, the Contractor shall be compensated for services rendered to the effective date of such reduction, in accordance with the rates of compensation specified in this Contract.

**ARTICLE 13 – RELEASE OF CITY ON FINAL PAYMENT:**
13.1 Acceptance by the Contractor of payment from the City for final services under this Contract shall be deemed to release forever the City from all claims and liabilities, except those which the Contractor notifies the Official in writing within six (6) months after such payment.

**SUFFOLK COUNTY FTE LISTING**

Professional Fees

| Position | FTE | Hourly Rate |
|---|---|---|
| Medical Director | 1.00 | |
| Staff Physician | 1.40 | |
| Psychiatrist | 0.60 | |
| Dentist | 1.00 | |
| Dietician | 0.012 | |
| Optometrist | 0.15 | |

4.162

Exempt Personnel

| Position | FTE | Annual Salary |
|---|---|---|
| H.S.A. | 1.00 | |
| A.H.S.A. | 1.00 | |
| Dir. MH- PhD | 1.00 | |
| Psych MH | 1.00 | |
| Psych MH | 1.00 | |
| | 0.00 | |

5.00

Non-exempt Personnel

| Position | FTE | Shift | Hourly Rate | Shift Diff. | Total Rate |
|---|---|---|---|---|---|
| RN | 1.40 | 1 | | | |
| LPN | 6.60 | 1 | | | |
| RN | 1.40 | 2 | | $1.00 | |
| LPN | 6.60 | 2 | | $1.00 | |
| RN | 1.40 | 3 | | $1.50 | |
| LPN | 1.40 | 3 | | $1.50 | |
| | | | | | |
| ID/DPH Nurse .8 FTE paid by Sta | 0.80 | | | | |
| MH Case Worker | 0.875 | 1 | | | |
| Psych MH | 0.40 | 1 | | | |
| Psych MH | 0.40 | 2 | | | |
| MH Liaison | 1.00 | 1 | | | |
| Soc. Serv. Liaison | 0.50 | 1 | | | |
| Admin. Assist. | 1.00 | 1 | | | |
| Admin. Assist. | 1.00 | 2 | | | |
| MR Clerk | 1.40 | 1 | | | |
| MR Clerk | 1.00 | 2 | | | |
| Dental Asst | 1.00 | 1 | | | |
| NP | 1.40 | 1 | | | |
| NP | 1.00 | 2 | | | |
| PA | 0.40 | 2 | | | |

30.975

TOTAL FTEs            40.137

TOTAL FTEs > .75      32.000

# EXHIBIT 43



**TABLE OF CONTENTS**

CORRECTIONAL MEDICAL SERVICES

## COMMUNICATION

Prior to the contract implementation, we will conduct an "Expectations" Session with Gerard Horgan, Deputy Superintendent, William Ferney, Assistant Deputy Superintendent, and other SCSD representatives as deemed necessary, as well as Ann Mack, Area Vice President, and various CMS personnel. The purpose of this session is to identify or re-affirm program priorities, and discuss the program issues that can realistically be accomplished during the first 30, 60 and 90 days of service delivery. Beginning with the "Expectations" Meeting and throughout the term of the contract, Ann Mack will maintain a responsibility in monitoring the status of the CMS medical services program as the liaison to the SCSD, Deputy Superintendents. It is to CMS' advantage that Ms. Mack functions out of the CMS regional office that is located 20 miles north of Boston in Middleton, Massachusetts.

Based on the results we have gathered during the past year, when using this process, clients have identified the benefits as:

- Clear communication and understanding of initial program objectives
- Time tables are assigned to objectives
- Expectations regarding reporting are defined

In addition, the site management team can now focus their efforts on the set of prioritized objectives. Client satisfaction improves, service transition issues, which increase or cause disruption in the daily delivery of care are significantly reduced, and the monitoring of service delivery is clarified.

## HUMAN RESOURCES/RECRUITMENT

The CMS Human Resources Department identifies, recruits, and places healthcare personnel to provide the best possible healthcare service to our clients. Training, professional development programs, and performance reviews improve staff performance, maximizing client benefits while removing the need to manage healthcare personnel and resources.

Through careful recruiting and effective human resource management, CMS minimizes employee turnover and the accompanying disruption of service. Over the past 9 months, our company-wide turnover rate was as follows:

- Administrative Staff (H.S.A./D.O.N.)- 22%
- LPN and RN - 38%
- Medical Directors - 6.5%

These figures remain low for the correctional healthcare industry. Continuity of care is also improved by our high percentage of long-term employees. CMS follows these guiding principles in developing and managing human resources:

CORRECTIONAL MEDICAL SERVICES

- Because we value our relationships, we treat customers as long-term partners and each other with candor and respect.
- We treat employees with the same level of respect we would want them to use with our customers.
- We view our employees as valuable assets of the company.
- We trust our employees and expect them to trust us. When trust has been breached, we discuss it openly.
- We understand and respect the time constraints of field-based employees who serve our customers.
- We treat each candidate we speak with on the telephone or in an interview as though he or she is a valued customer.
- We handle disciplinary matters and terminations with respect and dignity. There are no bad employees—just bad selections or matches.
- We respect the confidences of employees and the confidentiality of employee matters.
- We provide perspective to the organization on how to value and protect our human capital.

These principles guide us in developing practical programs such as the following, which support staff retention:

- Management development training
- Leadership development training
- Clinical in-service training
- Employee benefits
- Career advancement opportunities
- Concentrated focus on reducing turnover rates

## CMS RETENTION PROGRAM

As our credo states, "Dedicated People Making A Difference," CMS is committed to retaining the highest quality personnel to ensure a smooth operation daily at each of our sites. There are many initiatives CMS utilizes at national and regional levels that contribute to the retention of personnel and job satisfaction.

### Employee Orientation and Education

CMS provides orientation to new employees that highlight correctional healthcare and client-specific facilities' policies and procedures, ensuring that each new employee is productive from the first days on the job. Education, in-service training, and other professional development opportunities improve the service that our clients receive from our staff while also reducing turnover, enhancing retention and improving continuity of care. We ensure that all CMS personnel meet the training requirements for NCCHC accreditation.

CORRECTIONAL MEDICAL SERVICES

# PART EIGHT: COMPREHENSIVE HEALTHCARE SERVICES PROGRAM

In addition to the other contract documents attached hereto, the contract for comprehensive health care services for inmates confined to the Suffolk County House of Correction shall contain the following terms and conditions:

## I.    TERM OF THE CONTRACT

CMS understands that the contract shall be for a period of three (3) years commencing on January 1, 2001.

## II.   DEFINITIONS

CMS comprehends the definitions and terms as outlined in this section of the RFP.

## III.   PERFORMANCE

A. For the period provided in this contract, CMS agrees to provide professional, comprehensive health care services to the inmates confined to the Institution in accordance with the terms and conditions outlined in the RFP.

B. CMS will conform, in accordance with the provisions of this contract, to all determinations and directions of the SCSD concerning any question which may arise relating to the performance of services hereunder, provided that questions of the necessity for and type of medical treatment shall be within the sole province of the CMS. CMS understands that the SCSD shall have the right to determine the standards of the aforementioned medical treatment.

C. CMS will require a security clearance, including but not limited to a criminal record check, of all employees of CMS before they will be allowed into the Institution. Such security clearance will not be unreasonably denied. CMS will, upon written request of the Official, remove from service under this contract any individual in the Contractor's employ who the Official determines to be disorderly, careless, or incompetent or to be employed in violation of the terms of this contract. CMS will promptly replace any such individual so removed with an employee of CMS who shall also be subject to the approval of the SCSD.

D. CMS will keep full and accurate accounts and records in connection with the services provided under this contract. Except as otherwise provided in this contract, all such records or copies thereof shall be the property of the department, but shall be in the custody of and maintained by CMS during the term of this contract. CMS will retain originals and/or copies of such records for a minimum period of seven (7) years which may be audited by the City at any time during regular business hours at the Institution or at such other place as may be designated by the Official.

CORRECTIONAL MEDICAL SERVICES

| Position | Hours/ Week | FTE | Average Salary |
|---|---|---|---|
| Health Administrator | 40 | 1.0 | █████ |
| Assistant Health Service Administrator | 40 | 1.0 | █████ |
| Physician/Medical Director | 96 | 2.4 | █████ |
| Nurse Practitioner | 96 | 2.4 | █████ |
| Physician's Assistant | 16 | 0.4 | █████ |
| Psychiatrist | 24 | 0.6 | █████ |
| Director of Mental Health | 40 | 1.0 | █████ |
| Psych/(LICSW or LMHC w/Forensic Psychologist) | 112 | 2.8 | █████ |
| MH Case Worker | 35 | 0.875 | █████ |
| Mental Health Liaison | 40 | 1.0 | █████ |
| Social Services Liaison | 20 | 0.5 | █████ |
| Optometrist | 6 | 0.15 | █████ |
| Dentist | 40 | 1.0 | █████ |
| Dental Assistant | 40 | 1.0 | █████ |
| ID/DPH Nurse (I.D.-Infectious Disease) | 32 | 0.8 | █████ |
| RN | 168 | 4.2 | █████ |
| LPN | 584 | 14.6 | █████ |
| Administrative Assistant | 80 | 2.0 | █████ |
| Medical Records Clerks | 96 | 2.4 | █████ |
| Dietician | 2 hrs/mo | 0.0125 | █████ |
| TOTAL | 1,605.5 | 40.1375 | |

The chart on the following page is a sample weekly schedule for personnel coverage. Based on utilization and service needs, the personnel may be moved from one shift to another. Permanent personnel allocation changes will be reviewed with the Deputy Superintendent, prior to the implementation of change. It is our desire to maintain a degree of flexibility in staffing specific service areas and shifts in order to assure the most favorable response and prompt delivery of services to meet the needs of the SCHOC.

# EXHIBIT 44

A10  FIRED NURSE SPEAKS-TAPE                    Duration: 1:31

10381 purple 1:30 (205310) 8/25/04 BRUNNER  — *11pm News*

VIDEO AND ARCHIVE: SOT SHEILA PORTER, NURSE PRACTITIONER;
EXTERIOR OF SUFFOLK COUNTY HOUSE OF CORRECTIONS; INTERIOR OF
JAIL; MORE SOT PORTER; MORE INTERIOR OF JAIL; SHOT OF
SHERRIF ANDREA CABRAL; MORE EXT. OF HOUSE OF CORRECTIONS;
PREPRO; MORE SOT PORTER; PREPRO; MORE SOT PORTER    (MJC)

---pkg---

(35:31)
[CG :NEW @ 11 - HEAD\Sheila Porter\Nurse Practitioner]
"I believe I was fired for cooperating with the FBI."

61-YEAR-OLD SHEILA PORTER IS A NURSE PRACTITIONER.  FOR 9-
YEARS, SHE WAS EMPLOYED BY THE COMPANY THAT PROVIDED MEDICAL
STAFF TO THE SUFFOLK COUNTY HOUSE OF CORRECTIONS.
LAST JUNE - SHE WAS ABRUPTLY FIRED.
BUT TO LEARN HER STORY, YOU NEED TO GO BACK ABOUT 4-YEARS OR
SO... WHEN SHE RECIEVED A CALL-- AT HOME --FROM THE FBI
ASKING FOR HELP-- WITH INFORMATION.

"we discussed the on-going problem w/female sex abuse, with
occasional physical abuse of male prisoners and a problem
w/drugs in the facility."

THOSE ARE SOME OF THE REASONS SHERIFF ANDREA CABRAL WAS
BROUGHT INTO THE TROUBLED INSTITUTION TWO-YEARS AGO.

BUT ACCORDING TO PORTER, WITHIN DAYS OF REPORTING ABUSE TO
THE FBI AND HER BOSSES, SHE WAS FIRED.
(PRE-PRO)
SHERIFF CABRAL'S ADMINISTRATION SAYS PORTER'S COOPERATION
WITH THE FBI --AN OUTSIDE AGENCY-- VIOLATED DEPARTMENT
RULES. tHEY SAY PORTER HAS HER OWN AGENDA.

(28:23)
"My only agenda in doing what I did to begin with was doing
what I felt was the right thing.  I was called by the FBI
and as far as I was concerned for me, there was no other
choice but to do what I was asked to do. I saw things that
were wrong and I reported it."

(PRE-PRO)
THE DEPARTMENT SAYS THEY HAVE INVESTIGATED EVERY reported

**A10 FIRED NURSE SPEAKS-TAPE**                    Duration: 1:31

COMPLAINT... PORTER SAYS, THEY MAY HAVE, BUT...

(32:10)
"...when I was there, I saw no significant changes in what
was going on."

*8/26/04*
*Eye Opener News*
*5 AM*

A22  FIRED NURSE SPEAKS-TAPE 1                    Duration: 0:51

*No Footage*

[Anchor:ED]{***ED***}
[TAKE: SH/ESS
NAME: EYE]{***SH/ESS***}
 A nurse says she was unjustly fired from her job last year after she provided information to the F-B-I.
[TAKE VO]{***VO***}
[CG :ET-1 line\Nurse Says She Was Unjustly Fired]
 61-year-old Sheila Porter worked as a nurse practitioner for the Suffolk County Jail.
 The F-B-I called her about four years ago to discuss problems within the facility.
 Porter cooperated by reporting instances of prisoner abuse, but was abruptly fired last June.
 Sheriff Andrea Cabral's administration says Porter's discussion violated department regulations.
 Porter says she did what she thought was right.
[TAKE SOT]{***SOT FULL***}
[Duration:0:17]
[CG :EThead- 2 line\Sheila Porter\Nurse Practitioner]
[TAKE: CONT VO]{***CONT VO***}
 Sheriff Cabral has not responded to the allegations -- and Porter says she may sue.

Case 1:04-cv-11935-DPW   Document 104-11   Filed 11/14/2005   Page 20 of 41

*(handwritten)* 3/20/04 Eyeopener eye news - 6:30 An

A18 FIRED NURSE SPEAKS-TAPE 1                    Duration: 0:51

*(handwritten)* No footage

[Anchor:ED]{***ED***}
[TAKE: SH/ESS
NAME: EYE]{***SH/ESS***}
    A nurse says she was unjustly fired from her job last
year after she provided information to the F-B-I.
[TAKE VO]{***VO***}
[CG :ET-1 line\Nurse Says She Was Unjustly Fired]
    61-year-old Sheila Porter worked as a nurse
practitioner for the Suffolk County Jail.
    The F-B-I called her about four years ago to discuss
problems within the facility.
    Porter cooperated by reporting instances of prisoner
abuse, but was abruptly fired last June.
    Sheriff Andrea Cabral's administration says Porter's
discussion violated department regulations.
    Porter says she did what she thought was right.
[TAKE SOT]{***SOT FULL***}
[Duration:0:17]
[CG :EThead- 2 line\Sheila Porter\Nurse Practitioner]
[TAKE: CONT VO]{***CONT VO***}
    Sheriff Cabral has not responded to the allegations --
and Porter says she may sue.

# EXHIBIT 45

1

VOLUME I
PAGES: 1-75
EXHIBITS: 1-3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO. 04-11935-DPW

SHEILA J. PORTER,
       Plaintiff,

vs.

ANDREA CABRAL; SUFFOLK COUNTY
SHERIFF'S DEAPRTMENT; SUFFOLK
COUNTY AND CORRECTIONAL MEDICAL
SERVICES, INC.,
       Defendants,

_____

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

_____

       DEPOSITION of STEVEN WAYNE TOMPKINS, a witness

called on behalf of the Plaintiff in the above-captioned

matter, said deposition being taken pursuant to

Massachusetts Rules of Civil Procedure, by and before

Jean Wiseman, a Certified Shorthand Reporter, and Notary

Public in and for the Commonwealth of Massachusetts, at

the law offices of GOODWIN, PROCTOR, LLP, Exchange Place,

Boston, Massachusetts, on Tuesday, June 28, 2005,

commencing at 10:00 o'clock in the a.m.

MCLAUGHLIN & ASSOCIATES COURT REPORTERS
92 Devir Street, Suite 304
Malden, Massachusetts 02148
781-321-8922

6

1    attorney.  Does that make sense?

2        A    Sure.

3        Q    You'll have an opportunity to read the

4    transcript of today's deposition and make any corrections

5    or changes you think are necessary and then you'll sign

6    it and it will be sent back to us, okay?

7        A    Okay.

8        Q    What did you do to prepare for today's

9    deposition?

10       A    I spoke with Attorney Caulo.

11       Q    And did you speak with anyone else besides

12   counsel?

13       A    No.

14       Q    Did you review any documents to prepare for the

15   deposition?

16

17                    **REDACTED**

18

19                    **REDACTED**

20

21                    **REDACTED**

22

23                    **REDACTED**

24

1      were you aware of the existence of a grand jury

2      investigation concerning Ms. Porter?

3          A    When the article came out was I aware of a grand

4      injury?  I believe that Andrea Estes called me on the

5      24th.  I believe she called me the day before the article

6      came out.  So at that point after I talked to Andrea

7      Estes and Chief Keeley I had an idea that something was

8      going on that involved Ms. Porter.

9          Q    I'm sorry.  So was there another conversation

10     that you had with Ms. Estes, a third conversation?

11         A    No.

12         Q    So she called you, but was she not able to reach

13     you?  In other words, you testified that on August 2004

14     Ms. Estes called you asking for information and then you

15     called her back.

16         A    It was the same day.

17         Q    Okay.  So, again, we are just talking about the

18     two conversations; is that right?

19         A    Right.

20         Q    And the conversation occurred the day before the

21     Globe article came out?

22         A    I believe so to the best of my recollection

23         Q    So around August 24th, 2004 if I represent to

24     you that the article came out on the 25th?

29

1     Janet Wu.

2        Q    Did the press statement constitute the

3     department's response to Janet Wu's request for an

4     interview?

5        A    Yes.

6        Q    So it was determined not to make the sheriff

7     available for an interview at that time?

8        A    I wasn't involved in that discussion, so I don't

9     know what they decided to do.  I was just sent a press

10    statement to forward on to Janet Wu.

11       Q    What role did you have in drafting the press

12    statement?

13       A    Zero.  None.

14       Q    Were you in the room when the statement was

15    being drafted?

16       A    No.

17       Q    Who drafted the statement?

18       A    I don't know.  I wasn't there.

19       Q    And you have no idea who was involved in the

20    drafting of the statement?

21       A    I do not.

22       Q    So at some point the statement -- how did the

23    statement come into your possession?

24       A    It was faxed to my office.

40

1    A    Not to my knowledge.

2    Q    Did you make any efforts?

3    A    No, sir.

4    Q    Would that be within your duties as head of

5    communications to do so?

6    A    To contact the media?

7    Q    Well, yes.   If there's a situation where there

8    might be inaccuracies in a story, print or electronic,

9    would it be within your capacity as director of

10   communications to contact the media and report any

11   inaccuracies?

12   A    That's correct, yes, sir.

13   Q    And you don't recall doing so with respect to

14   this story?

15   A    That's correct.

16   Q    Or with respect to the Globe article that ran

17   earlier this day.

18       MR. CAULO:   Objection.   Asked and answered.

19   A    That's correct.

20   Q    Are you familiar with an article that ran in the

21   Boston Globe Magazine in October of 2004 a couple of

22   months later?

23   A    Yes, I am.

24   Q    Were you contacted with respect to that profile

41

of Sheriff Cabral?

A    Yes, sir.

Q    Who contacted you?

A    Elaine McArdle.

Q    Who is Elaine McArdle?

A    The reporter that wrote the piece.

Q    When did she contact you?

A    We had a number of conversations throughout the summer leading up to that story, so I honestly don't recall the first time that she contacted me, but we had a series of conversations throughout the summer mostly logistics insofar as getting the sheriff together with the two other law enforcement officials that she was going to talk about in that story.

Q    Approximately how many conversations did you have with Ms. McArdle that summer?

A    This is a guess.  I would say five or six.

Q    Were any of those conversations substantive conversations in terms of the substance of the story as opposed to just scheduling types of conversations?

A    Some background information, yes.

Q    Were you authorized to speak with the Boston Globe and Ms. McArdle concerning the profile?

A    Yes, sir.

42

1      Q      That was, again, within your job description to

2      do so?

3      A      That's correct.

4      Q      Did you do anything to prepare for the interview

5      with Ms. McArdle that you had -- any of the interview

6      with Ms. McArdle that you had?  And when I say interview,

7      I mean the conversations that you had with her.

8      A      No.

9      Q      Did you talk to anybody at the sheriff's

10     department concerning the subject matter of the profile?

11     A      To the extent that Elaine wanted to do a piece

12     on the new face of law enforcement in the city of Boston,

13     but that was the extent of it.

14     Q      What did Ms. McArdle say the first time she

15     contacted you, if you recall?

16     A      That she was interested in doing a piece on the

17     sheriff, the commissioner of the Department of

18     Corrections, Commissioner Dennehy, and Commissioner

19     O'Toole from the Boston Police Department, that she had

20     an interest in writing about the new face of law

21     enforcement given the fact that they were all female.

22     Q      And I take it that she wished to speak with the

23     sheriff concerning that article?

24     A      That's correct.

43

Q    Did you contact anybody at the sheriff's
department in response to Ms. McArdle's request?

A    Generally when I have a request I will contact
either the sheriff's assistant, Elizabeth Conroy, to see
what the schedule will allow as far as the sheriff being
scheduled on something, and I may have a conversation
with the sheriff to see if they were even interested in
doing or complying with whatever the request is for an
interview.

Q    Do you recall if that's what you did on this
occasion?

A    I don't recall, but more than likely that's what
I did in the natural order of things.

Q    As best you can remember today tell me
everything that you told Ms. McArdle concerning the
substance of the profile that she was writing?

A    Everything?

Q    Yeah, as best you can remember.  What did she
want to know and what did you tell her?

A    How many employees we had at the department, how
long the sheriff had been in.  She asked me some
questions about Tom DeRosa, one of my officers, how tall
he was, how much he weighed, how long he worked at the
department.

44

1      She asked me a question about the campaign and

2   allegations made during the campaign insofar as it

3   involved the sheriff.  I'm sure she asked me some other

4   background information about the department, but I don't

5   recall.

6      Q    Which allegations did she ask you about?

7      A    I don't think she actually named anyone

8   specifically.  Last summer we were dealing with a wealth

9   of issues during the campaign and so she asked me about

10   allegations.  I don't recall her asking me about the

11   military situation which was one of the things we were

12   dealing with or pension funds or Ms. Porter.

13      Q    So you don't have a specific recollection of her

14   asking you anything concerning Ms. Porter?

15      A    That's correct.

16      Q    Do you remember telling her anything about Ms.

17   Porter?

18      A    No.

19      Q    Who from the department -- by the way, was

20   Elaine McArdle the only person writing the story?

21      A    Yes, sir.

22      Q    Who from the department ended up speaking with

23   Ms. McArdle or anyone else at the Globe concerning this

24   besides yourself?

45

1        A    The sheriff.

2        Q    Anyone else besides you and the sheriff?

3        A    She may have reached out to Elizabeth Conroy

4    once again for scheduling, but I don't know.

5        Q    Let's mark this as the next exhibit.

6                        (Tompkins Exhibit 3 was marked

7                         for identification.)

8        Q    The reporter is handing you what I believe has

9    been marked as Exhibit No. 3.  Take a look briefly at

10   this document.  I have a couple of questions for you.

11   That was the Globe Sunday Globe article.  Do you

12   recognize this document?

13       A    Yes.

14       Q    What do you recognize it to be?

15       A    Boston Globe Magazine article.

16       Q    Is this the Elaine McArdle article that was the

17   result of yours and Sheriff Cabral's conversations with

18   her in the summer of 2004?

19       A    Yes.

20       Q    Did you read the article after it came out?

21       A    Yes.

22       Q    I direct your attention to page 32.  You can see

23   in the lower left-hand corner of the page there's a tiny

24   little number.

1         A    I got it.

2         Q    And the second column in the middle there reads:

3    "Several allegations popped up just before the primary.

4    The Boston Retirement Board accused her of shortchanging

5    her employees' retirement fund by 1.3 million, and a

6    nurse at the Suffolk County House of Corrections said she

7    was fired by the Cabral administration after it was

8    learned that she was helping the FBI look into inmate

9    abuse."  Do you see that?

10        A    Yes, sir.

11        Q    And the article goes on to say:  "Those

12    allegations were 100 percent ridiculous," says Steve

13    Tompkins the sheriff's spokesmen.  "That's why you

14    haven't seen any follow-up [after the election]."  Do you

15    see that?

16        A    Yes, I do.

17        Q    Did you say that to Ms. McArdle?

18        A    Yes, I did.

19        Q    Do you recall sitting here today saying that to

20    Ms. McArdle?

21        A    Yes, I do.

22        Q    And were you authorized to speak on the record

23    by Sheriff Cabral concerning this profile?

24        A    Well, I wasn't authorized by Sheriff Cabral to

1     speak about this.  In fact, I didn't know that anything

2     in this article would be attributed to me.

3              Elaine did not make me aware of the fact that

4     she was going to use anything that I said to her in the

5     article.  So was I authorized?  In the capacity of my job

6     that's my job.  Specifically, as it pertains to this

7     article, no.

8         Q    Did Ms. McArdle tell you that nothing that

9     transpired in your conversation with her would be quoted

10    in the article?

11        A    The article wasn't about me, so we never talked

12    about it.  When she called and asked for background

13    information and that sort of thing as she did -- I

14    believe somewhere in here she talked about the fact that

15    Tommy DeRosa is 6'6" and how much he weighs and he had

16    been in the department for a number of years.  She did

17    not attribute that to me, but it's in the article.  So it

18    never crossed my mind that anything that was said was for

19    attribution.

20        Q    Do you have any reason to believe that you would

21    not be directly quoted in the article?

22        A    It never crossed my mind.  I didn't think I

23    would be.  I wasn't asked any questions that I thought

24    was going to make it into the light of day insofar as

48

1    being attributed to me.

2        Q    But you didn't have a specific understanding

3    with Ms. McArdle that you wouldn't be directly quoted,

4    did you?

5            MR. CAULO:  Objection.  You may answer.

6        A    No.

7        Q    And you understand that in your capacity as

8    communications director I assume when you are speaking

9    with various media representatives sometimes you are

10   speaking to them on background and sometimes you are

11   speaking with them to be quoted in their stories; is that

12   right?

13       A    That's correct.

14       Q    What was the purpose of your statement:  "Those

15   allegations were 100 percent ridiculous.  That's why you

16   haven't seen any follow-up [after the election]"?

17       A    It was in response to her question on the

18   allegations that came up during the campaign season.

19       Q    Presumably in speaking with Ms. McArdle you

20   wanted the media to publish the sheriff department's

21   position on the article to the public.  Is that fair to

22   say?

23           MS. CAULO:  Objection.

24       A    I don't understand your question.

49

```
 1        Q    In speaking with Ms. McArdle was it your purpose

 2   to provide information to Ms. McArdle that she would

 3   publish in the Boston Globe?

 4        A    That wasn't my purpose.  I was answering

 5   questions that she had asked me insofar as what I thought

 6   would just be background information for the article, if

 7   I'm answering your question.

 8        Q    Fair enough.  When you said those allegations

 9   were 100 percent ridiculous which allegations were you

10   referring to?

11        A    The retirement board, the water bill and the

12   military situation.

13        Q    What was the retirement board situation?

14        A    Well, as stated here that the department and the

15   sheriff had shortchanged employees of the department

16   because of nonpayment of certain bills to the pension

17   board.

18        Q    What was the water situation?

19        A    Another allegation that cropped up that said

20   that we hadn't paid our water bill and that the water was

21   being shut off.

22        Q    What was the military situation?

23        A    That we had some returning personnel coming back

24   from Iraq that felt they should be given more vacation
```

1    time than the department was going to give them.

2         Q    Were you referring to any other allegations

3    besides those three in your statement that's quoted on

4    page 32 of this story?

5         A    No, I was not.

6         Q    You weren't referring to Nurse Practitioner

7    Sheila Porter's allegations?

8         A    No, I was not.

9         Q    See in the article your statement appears

10   directly after a description of Nurse Practitioner

11   Porter's allegations.  Is that fair to say?

12        A    That's what's in the article, yes.

13        Q    And do you agree that a fair reading of this

14   quote is that it relates to Nurse Practitioner Porter's

15   allegations.  Isn't that fair to say?

16             MS. CAULO:  Objection.

17        A    Define fair reading.

18        Q    Well, isn't it fair to say that someone who is

19   reading this article would believe that your quote

20   relates to Nurse Practitioner Porter's allegations?

21        A    I can't answer that intelligently.

22        Q    You don't think that anybody would believe that

23   your quote relates directly to the sentence before it?

24        A    I can't answer that question.  I don't know

1    that.

2         Q    What steps did you take to correct this

3    inaccurate statement that's here in the story?

4              MS. CAULO:  Objection.  You may answer.

5         A    None.

6         Q    Well, how many times did you call Ms. McArdle

7    and say:  Hey, I wasn't talking about Nurse Practitioner

8    Porter; I was talking about somebody else?

9         A    I don't recall ever doing that.

10        Q    You don't recall whether you did or not?

11        A    I don't recall doing it, no.

12        Q    There's nothing in this paragraph concerning the

13   water bill situation or the military vacation time

14   situation, is there?

15             MS. CAULO:  Objection.  You may answer.

16        A    I'm looking at the -- well, it says here that

17   Cabral was also accused of refusing Iraq war veterans of

18   their vacation benefits.

19        Q    Fair enough.  So subsequent to your quote there

20   is the reference to the military vacation situation,

21   right?

22        A    That's correct.

23        Q    But nothing in here about the water bill

24   situation, correct?

74

1    PLEASE ATTACH TO THE DEPOSITION OF STEVEN TOMPKINS

2    CASE:  PORTER VS. CABRAL, ET AL    DATE TAKEN:  6-28-05

3                        ERRATA SHEET

4    Please refer to page 73 for errata sheet

5    instructions and distribution instructions.

6    Page    Line    Change                        Reason

7    6 _____ **REDACTED** _____

8    _____

9    6 _____ **REDACTED** _____

10   6 _____

11   _____ **REDACTED** _____

12   _____

13   7 _____

14   _____ **REDACTED** _____

15   _____

16            I have read the foregoing transcript

17   of my deposition and except for any corrections or

18   changes noted above, I hereby subscribe to the

19   transcript as an accurate record of the statements

20   made by me.

21   Executed this _24_ day of _August_ , 2005.

22   _Steve Tompkins_

23   (Witness Name)

24

# EXHIBIT 46

THE BOSTON GLOBE    B2 **City & Region**    WEDNESDAY, AUGUST 25, 2004

# Nurse fired from jail job speaks out

## Says she helped FBI probe alleged abuse of inmates

By Andrea Estes
GLOBE STAFF

A longtime nurse at the Suffolk County House of Correction says she was ordered off the property and later fired after Sheriff Andrea J. Cabral's administration discovered she was helping the FBI investigate allegations of inmate abuse at the troubled institution.

Sheila J. Porter, 61, who worked for a private company that provides medical services to the jail, said she was labeled *persona non grata* at the facility after she told the FBI in May 2003 that an inmate who had worn a recording device for the federal agency had been beaten and was in danger.

After Porter was banned from the facility, her employer, Correctional Medical Services Inc., fired her. Until then, her evaluations had been stellar, said her lawyers, Joseph F. Savage Jr. and Jennifer M. Goddard.

"They quoted a regulation that said you're not supposed to speak with an outside agency," said Porter, who spoke publicly yesterday for the first time since her termination in June 2003. "They said: 'At the close of this business day, you will no longer be welcome at the House of Correction.' The words are very well etched in my mind.

"I stood up and said 'OK, thank you' and walked out and packed up nine years of things," she said in an interview with the Globe, choking back tears. "I loved the job."

Just six months earlier, Cabral had been chosen by Governor Jane Swift to overhaul the department after allegations of abuse led her predecessor, Richard Rouse, to retire early. Cabral has frequently staked credit for restoring credibility to the department.

Three months after Porter was fired, the nurse said, she appeared before a criminal grand jury that she was told federal prosecutors had convened to investigate her termination. No charges have been filed.

Rouse, during whose tenure eight correctional officers were indicted and several civil suits filed,



GLOBE STAFF PHOTO/JOHN BOHN

"I loved the job," said Sheila J. Porter, at home in Upton. The former longtime nurse at the Suffolk County House of Correction said she plans to file suit against the sheriff's department.

had cooperated with the FBI, announcing in 1999 that federal authorities were launching an investigation into alleged prisoner abuse. Porter said her supervisors knew she was aiding authorities.

Cabral yesterday declined to comment on Porter's allegations. The sheriff is locked in a campaign battle with Boston City Councilor Stephen J. Murphy before a Sept. 14 primary.

Said Cabral spokesman Steven Tompkins: "I don't know anything about a grand jury. The department has always cooperated with and worked with federal authorities on investigations and will continue to do so. Sheila was a contractor, not an employee of the department. Beyond that, I'm not going to comment further on Sheila Porter."

Samantha Martin, spokeswoman for US Attorney Michael J. Sullivan, would not comment on the grand jury investigation. FBI spokeswoman Gail Marcinkiewicz said she would not discuss whether Porter was an FBI informant.

Porter, who said she plans to file a civil suit against the sheriff's department, said she started providing information to the FBI in 1999 after an agent contacted her at home.

Through her work as a nurse

practitioner on floors housing female inmates, she said, she had learned that a prisoner had become pregnant after a sexual encounter with one of her guards. She also discovered that other female prisoners had been sexually abused, she said.

"There were several episodes of probable abuse, physical abuse of inmates," said Porter, who is now working at two other correctional facilities. "With that, one has to be very careful. The inmate will always say it's a correction officer, and the correction officer will always say it was not. I had occasion to see people after such abuse, and I didn't make the judgment whether it was true or false. I just reported what I saw."

In addition to sexual and physical abuse, Porter said she reported evidence of drug trafficking and the "code of silence" that kept the abuse hidden. She testified in court and before the Stern Commission, which investigated the management of the Department in 2001.

Eight guards were indicted be-

tween May and July 2001 and charged with beating inmates and covering up the assaults. Four officers pleaded guilty, two were convicted, and two were acquitted.

Porter did not testify in those cases, but provided background information to authorities, her lawyers said.

Porter said that she continued to work for the FBI after Cabral took office in December 2002, but she declined to provide specific details.

"There are a lot of things that happened," she said. "I can't share them with you because the investigations are ongoing."

> 'I didn't make the judgment whether it was true or false. I just reported what I saw.'
>
> SHEILA J. PORTER

But the new administration was unaware of her involvement with the FBI until May 2003, she said. A prisoner who had worn a wire at Porter's request and was a witness in a federal case turned up at the infirmary with bruises on his chest and arm. She said he told her he had been beaten by a guard. Porter, who thought he had been removed from the facility for his protection, reported the abuse immediately. Ten days later, the inmate showed up again at the infirmary, this time with head injuries, she said. She reported the abuse again to jail personnel and to federal authorities, she said, urging agents to transfer him from the facility.

Within days after speaking to the FBI, Porter was called to the sheriff department's special investigations unit, where she was quizzed about her contact with the FBI, she said.

She was soon summoned to meet with a deputy superintendent of the jail, who read from the employee code of conduct, which bans contact with any "outside agency," and informed her that she was forever banned from the premises, she said.