# EXHIBIT 1

1

```
1                           Volume:    I

2                           Pages:     1-248

3                           Exhibits:  1-5

4            UNITED STATES DISTRICT COURT

5          FOR THE DISTRICT OF MASSACHUSETTS

6                           NO. 04-11935-DPW

7    - - - - - - - - - - - - - - - - - - - - x

8    Sheila J. Porter,

9                    Plaintiff,

10        v.

11   Andrea Cabral, Suffolk County

12   Sheriff's Department Suffolk County,

13   and Correctional Medical Services, Inc.,

14                    Defendants.

15   - - - - - - - - - - - - - - - - - - - - x

16

17          DEPOSITION OF SHEILA J. PORTER

18          Wednesday, May 18, 2005

19                  10:10 a.m.

20    ADLER, COHEN, HARVEY, WAKEMAN & GUEKGUEZIAN

21            230 Congress Street

22          Boston, Massachusetts 02110

23

24   Reporter:  Lori-Ann London, RPR
```

Sheila J. Porter                                      05/18/2005

88

1     Q      -- correct?

2            Mrs. Porter, when were you first

3  contacted by the Federal Bureau of Investigation

4  while you worked at the Suffolk County House of

5  Correct in the employ of Correctional Medical

6  Services?

7     A      When I was first contacted, I wasn't in

8  the employ of Correctional Medical Services.

9     Q      Were you in the employ of Correctional

10 Healthcare Services?

11    A      Yes, I was.

12    Q      When was that?

13    A      I believe it was late 1999 or early

14 2000.

15    Q      Who contacted you?

16    A      Maureen Robinson.

17    Q      How did she contact you?

18    A      She left a message on my home answering

19 machine.

20    Q      How did she have your number?

21    A      I didn't ask.

22    Q      Did you call her back?

23    A      Yes, I did.

24    Q      From home or from some other location?

Sheila J. Porter                                          05/18/2005

89

1     A    I called back immediately, but it was in

2  the evening and I didn't get an answer, I got an

3  answering machine.  The next day I -- I think I

4  called from home, but to be honest with you, I

5  don't remember where I called from.

6     Q    Did you know of Agent Robinson before

7  she left a message on your home voice mail?

8     A    No.  It --

9     Q    What was your reaction when --

10          MR. SAVAGE:  One at a time.

11          MS. CAULO:  I'm sorry.

12          MR. SAVAGE:  Were you done?

13    Q    Please finish.

14    A    I don't know where I am here.  What

15  question are you asking?

16          MR. SAVAGE:  I think she asked did

17  you know Agent Robinson --

18          THE WITNESS:  No.

19          MR. SAVAGE:  -- before she called

20  you.  Your answer was no.

21          MS. CAULO:  Thank you, Joe.

22    Q    What was your reaction when you received

23  that voice mail message?

24    A    I'll leave the vernacular out.  I was

Sheila J. Porter                                    05/18/2005

90

1    surprised, and that was okay.

2        Q    When do you recall actually making

3    contact with F.B.I. Agent Robinson?

4        A    The next day.

5        Q    And this was sometime in late 1999,

6    early 2000?

7        A    Yes.

8        Q    Can you be any more specific as to the

9    time frame?

10       A    No.

11       Q    Okay.  What did you discuss when you had

12   a conversation with her?

13       A    I believe the first conversation Maureen

14   explained that they were looking for some

15   information, and that they understood that I might

16   have some information that they needed, and I

17   believe my reaction to that was, "In what areas?"

18       Q    What did she say?

19       A    She indicated three areas of concern:

20   Sexual abuse of the females, physical abuse of

21   inmates, and drug use or abuse within the

22   facility.

23       Q    How did Maureen Robinson understand that

24   you may have some information that they were

Sheila J. Porter                                    05/18/2005

91

1    looking for?

2        A    I'm sure she read the newspaper.

3        Q    Well, I'm asking you.  Did she explain

4    that?

5        A    She said that I was referred to them,

6    and she did not give me the information by whom.

7        Q    So she said you were referred --

8        A    Yes.

9        Q    -- your name --

10       A    Yes.

11       Q    -- was referred to them?

12       A    Yes.

13       Q    Them meaning the F.B.I.?

14       A    Yes.

15       Q    You just mentioned media reports.  What

16   media reports are you referring to?

17       A    There had been a few articles in the

18   paper during that time concerning an inmate that

19   had become pregnant, another report about officers

20   that were suspended for a suggestion of sexual

21   abuse in the female unit, and I believe there was

22   an article about that time, but I'm not sure of

23   the time frame, about an ongoing dispute between a

24   female officer and a male officer concerning

Sheila J. Porter                                          05/18/2005

92

1    issues of sexual abuse in the female unit.

2         Q     The female inmate that you just

3    referenced who was pregnant, that's Ellen Wilson?

4         A     Yes.

5         Q     The officers that were suspended were

6    suspended rather for sexual abuse of inmates in

7    the female unit, were those officers involved with

8    the allegations made by Ellen Wilson and others?

9         A     Yes.

10        Q     Those officers were suspended pursuant

11   to disciplinary action taken by the Suffolk County

12   Sheriff's Department, correct?

13        A     Yes.

14        Q     The matters in which -- strike that.

15              The matters that you just identified

16   that were reported on in the media, those matters

17   were being investigated by the Suffolk County

18   Sheriff's Department, correct?

19        A     Yes.

20        Q     And as a result of an investigation

21   conducted by the Suffolk County Sheriff's

22   Department, officers involved in those allegations

23   were disciplined, correct?

24        A     Yes.

Sheila J. Porter                                              05/18/2005

93

1    Q    Some were terminated, correct?

2    A    Yes.

3    Q    David DiCensco was terminated?

4    A    I don't know David.

5    Q    Robert Parise was terminated?

6    A    Yes.

7    Q    David Mojica was terminated?

8    A    Yes.

9    Q    Mark Vaughn was terminated?

10   A    Different set of circumstances, yes.

11   Q    Richard Powers was terminated?

12   A    No.

13   Q    Was he terminated?

14   A    No.

15   Q    Was he disciplined?

16   A    Yes.

17   Q    Was he suspended?

18   A    Yes.

19   Q    Okay.  You indicated there were some

20   media reports that was the subject of your

21   conversation with F.B.I. Agent Maureen Robinson

22   concerning an ongoing dispute between a female

23   officer and a male officer regarding issues of

24   sexual abuse in the female unit?

Sheila J. Porter                                    05/18/2005

94

1      A     I didn't say that was the conversation

2   we had.  You asked me what had appeared in the

3   media.

4      Q     Okay, I apologize.

5            Was that something that you talked

6   about with Maureen Robinson?

7      A     I think perhaps as part of that same

8   issue, but not specifically.

9      Q     Okay.  I'm sorry, I understood your

10  response to me earlier, in which I asked you what

11  you talked about, that you talked about matters

12  that were covered in the media.

13           MR. SAVAGE:  I don't think that's

14  what she said.

15           MS. CAULO:  Okay.

16      Q     What did you talk about with Maureen

17  Robinson in that first phone call after she

18  indicated to you that you were someone who they

19  thought they could get information from?

20      A     Sexual abuse of the females, physical

21  abuse of males or inmates, and possible drug or --

22  use and abuse within the facility.

23      Q     Within the House of Correction?

24      A     Yes.

Sheila J. Porter                                      05/18/2005

95

1      Q    Okay.  To your knowledge, was the

2    possible use of drugs and drug abuse within the

3    House of Correction, was that already being

4    investigated by the Suffolk County Sheriff's

5    Department?

6      A    I have no knowledge of that.

7      Q    Did you provide information to the

8    Sheriff's Investigation Division about drug use

9    within the House of Correction?

10     A    Not specifically, no.

11     Q    What do you mean not specifically?

12     A    Well, there were incidences of overdoses

13   within the facility, and I may have cared for the

14   inmates, and, yes, there were reports written

15   about that.

16     Q    Had you provided information to the

17   Sheriff's Investigation Division regarding the

18   allegations made by Ellen Wilson and the

19   allegations of sexual abuse of females?

20     A    Yes.

21     Q    Okay.  And you had provided that

22   information prior to your conversation with

23   Maureen Robinson?

24     A    Both.

Sheila J. Porter                                          05/18/2005

96

1       Q     Both before and after?

2       A     Yes.

3       Q     Okay.  What did Maureen Robinson ask you

4    to do during this initial phone conversation?

5       A     To speak with her in person.

6       Q     Did you do that?

7       A     Yes.

8       Q     When was that?

9       A     Within a few days.  I'm not sure.

10   Again, I -- I couldn't tell you the date.

11      Q     Where did this conversation take place?

12      A     In a parking lot.

13      Q     Where?

14      A     South Bay, the shopping area.

15      Q     Where the Stop & Shop is and the Home

16   Depot?

17      A     I think so.

18      Q     Is that the parking lot you're talking

19   about?

20      A     Yes.

21      Q     Shopping center?

22      A     Yes.

23      Q     What was that conversation you had with

24   F.B.I. Agent Robinson at that time?

Sheila J. Porter                                              05/18/2005

97

1          MR. SAVAGE:  Well, again -- or not

2     again.  You're not to answer any question

3     concerning Agent Robinson that involves you

4     revealing --

5          THE STENOGRAPHER:  I'm sorry, I

6     can't hear you.

7          MR. SAVAGE:  You're not to answer

8     any question concerning your conversations with

9     Agent Robinson or the F.B.I. that involves you

10    revealing specific cooperation as to particular

11    individuals.

12         MS. CAULO:  Why are you instructing

13    her not to answer?  What's the basis for that?

14         MR. SAVAGE:  Privilege under the law

15    for an informant relating to the privacy and the

16    safety of both those informed against and those

17    informing.  In addition, I mean, it's not even

18    potentially likely to lead to any relevant

19    evidence, but that's the instruction, privilege.

20         MS. CAULO:  We have a protective

21    order in this case.  I suggest that's not an

22    appropriate instruction to give.

23         MR. SAVAGE:  I hear you.

24         MS. CAULO:  We'll have to suspend

Sheila J. Porter                                    05/18/2005

98

1    and go seek Judge Woodlock.

2              MR. SAVAGE:  Okay, that's fine, or

3    you could go to another topic, since we're not

4    going to finish today, and we could do it in an

5    orderly fashion, whatever you want to do.

6              MS. HARVEY:  Just so it's clear, so

7    that if we have to go to Judge Woodlock, are you

8    instructing her not to answer as to any specific

9    case or only those that remain open?

10             MR. SAVAGE:  Any specific case of

11   cooperation on an individual.  Obviously it

12   doesn't change the safety and privacy calculation

13   if the investigation is over.

14             MS. HARVEY:  Well, I think that the

15   protective orders will cover -- I mean, I think

16   we've all agreed to adhere to that protective

17   order.  I think -- I think we could proceed and

18   have Judge Woodlock decide later.

19             MS. CAULO:  That's fine.

20             MR. SAVAGE:  Whatever way you want

21   to do it.

22             MS. CAULO:  Well, no.  We certainly

23   need to go there.  I mean, you have presented your

24   client in an extensive complaint, and that's part

Sheila J. Porter                                    05/18/2005

99

1    of the basis in suggesting that we were on notice

2    of this.  So I think it's certainly something that

3    we're entitled to.

4                    MR. SAVAGE:  On notice of what?

5                    MS. CAULO:  You have suggested in

6    allegations in your complaint that the Department

7    and CMS were on notice of her involvement in

8    providing information to the F.B.I.

9                    MR. SAVAGE:  Oh, sure.  You can ask

10   about that; go right ahead.

11                   MS. CAULO:  And we're entitled to

12   explore that, and in order to explore that --

13                   MR. SAVAGE:  I think you should.

14                   MS. CAULO:  -- and in order to

15   explore that fully, Joe, if I may, it's important

16   for us to seek from your client the kind of

17   information that she provided so that we can then

18   confer with other sources and to see whether or

19   not she in fact did so.

20                   MR. SAVAGE:  You can make your

21   inquiry about the kind of information.

22                   MS. CAULO:  That's what I'm doing.

23       Q    What information -- what did you

24   discuss; what information did she ask you to

Sheila J. Porter                                          05/18/2005

100

1   provide -- let me -- in this first meeting in the

2   parking lot at South Bay, what did she ask you to

3   provide?

4        A     Information concerning specific

5   allegations of physical abuse that they had.

6        Q     And what were those allegations?

7        A     They were allegations of physical abuse

8   at the hands of corrections officers, and I cannot

9   give you the names.

10       Q     Are you not giving me the names per the

11  instruction of your counsel?

12       A     Yes.

13       Q     Where were those corrections officers

14  employed, at what facility?

15       A     South Bay.

16       Q     House of Correction?

17       A     Yes, House of Correction.  I'm sorry.

18       Q     Did she provide you with the names of

19  those officers?

20       A     No.

21       Q     Did she provide you with the names of

22  inmates who had made allegations concerning these

23  officers?

24       A     Yes.

Sheila J. Porter                                      05/18/2005

                                                                    101

1      Q      Were you familiar with those inmates?

2      A      Some.

3      Q      Who are they?

4             MR. SAVAGE:   No.

5      Q      What did she ask you to do?

6      A      At the first meeting it was, Do you know

7      these people.

8      Q      And when you say "these people," the

9      only names she provided you were the names of the

10     inmates?

11     A      At that first meeting, I'm not even sure

12     I got names or if that was just a general meeting.

13     I think I got names of inmates.  I don't think I

14     got the names of officers.

15     Q      What else did she communicate to you

16     during that initial meeting?

17     A      She asked if I would be interested in

18     providing ongoing information to them.

19     Q      And what did you say?

20     A      That I would think about it and get back

21     to her.

22     Q      What did she say to that?

23     A      Fine, she would call me back.

24     Q      Was that the extent of the conversation

Sheila J. Porter                                05/18/2005

102

1    that you had with Maureen Robinson on this initial

2    face-to-face meeting?

3         A    I believe so.

4         Q    She provided you with information that

5    she was conducting an investigation into

6    allegations of physical abuse by officers at the

7    House of Correction on inmates; is that fair?

8         A    To the best of my recollection, that was

9    the first.

10        Q    And she provided you with the names of

11   inmates?

12        A    I believe so.

13        Q    And she asked you if you'd be willing to

14   cooperate and provide information?

15        A    Yes.

16        Q    And you asked her -- you indicated that

17   you needed some time to think about it?

18        A    Correct.

19        Q    Is that the extent of the conversation?

20        A    I believe so.

21        Q    When was the next time that you had

22   contact with Maureen Robinson or any other agent

23   of the Federal Bureau of Investigation?

24        A    Probably within a few days of that first

Sheila J. Porter                                    05/18/2005

103

1    meeting.

2        Q    What did you do?

3        A    I agreed to provide ongoing information.

4        Q    Well, how did you communicate with

5    Miss Robinson?

6        A    Either I called her or she called me,

7    and I can't tell you which it was.

8        Q    Okay.  Did you meet face-to-face or was

9    this encounter over the phone?

10       A    Yes.

11            MR. SAVAGE:  Yes, which?

12       A    Yes, it was over the phone; this

13   conversation was over the phone.

14       Q    What did you say and what did she say?

15       A    I said I had thought about it and I

16   agreed to provide information, and she said that

17   was great.  And I couldn't tell you what else -- I

18   believe she set up another face-to-face at that

19   time.

20       Q    During that conversation in which you

21   indicated that you were willing to provide

22   information to the F.B.I. and, specifically,

23   Maureen Robinson, did you discuss the arrangements

24   for how that was to be done at that phone call

Sheila J. Porter                                    05/18/2005

104

1    that you just testified about?

2        A    I remember setting up another meeting.

3    I'm not sure if we discussed arrangements beyond

4    that.

5        Q    When was the next meeting?

6        A    Again, within a few days.

7        Q    Where did it take place?

8        A    I think that that was in the same

9    parking lot.

10       Q    And what was discussed during this

11   next -- and actually the second face-to-face

12   meeting with Maureen Robinson?

13       A    Yes.

14       Q    What was discussed during this second

15   face-to-face meeting with Maureen Robinson?

16       A    To be honest with you, these are -- the

17   meetings and the telephone calls are blurred, and

18   I am not sure what happened when.  I can tell you

19   some of the things that happened, but I cannot say

20   whether it was that meeting or another meeting.

21       Q    Well, at some point did you discuss with

22   Maureen Robinson the manner in which you would

23   provide information and how that would be

24   effectuated?

Sheila J. Porter                                    05/18/2005

105

1        A    Yes.

2        Q    Did you do that in a face-to-face

3    meeting?

4        A    Yes.

5        Q    What was discussed; what were the

6    arrangements?

7        A    That I could contact them anytime by

8    phone, and I could speak with them by phone or

9    meet them in person.

10       Q    You said "them."  Who besides Maureen

11   Robinson were you allowed to contact?

12       A    At first I believe it was just Maureen,

13   and then there was a second agent.

14       Q    Who was that?

15       A    Krista Snyder.

16       Q    Let's start with Maureen first.  What

17   contact information did she provide to you; how

18   were you supposed to get ahold of her?

19       A    She gave me her business card, and then

20   also gave me -- the business card had the office

21   number on it, and she gave me her extension, which

22   I also wrote on the card.

23       Q    What specific information did she ask

24   you to provide?

Sheila J. Porter                                          05/18/2005

106

1       A     Any information that I had concerning

2    cases that might come up from time to time,

3    allegations of abuse, sexual or physical,

4    allegations of drug selling or drug dealing.

5       Q     Did she give you any instructions as to

6    how to perform this service for the F.B.I.?

7       A     She read a -- a paper that gave me the

8    dos and don'ts, but I don't -- I guess it was

9    instructions.  I'm trying to remember what it was

10   called.  Each -- each year I had this piece of

11   paper read to me.

12      Q     Each year...

13      A     That I continued --

14      Q     To provide --

15      A     -- doing --

16      Q     I'm sorry.

17      A     That I continued providing information.

18      Q     What was this piece of paper?

19      A     It talked about whether or not I was

20   freely -- that I wasn't being coerced to do this;

21   that I wasn't being paid to do this; I wasn't -- I

22   didn't disclose it to anyone; I didn't speak to

23   the news media and say, By the way...

24      Q     By the way what?

Sheila J. Porter                                        05/18/2005

107

1        A    I just spoke with the F.B.I.  There were

2    about 10 or 12 items, and I couldn't tell you what

3    else was on that specific paper.

4        Q    Did they provide you --

5        A    Admonitions.  I'm sorry.  That name just

6    came to me, admonitions.

7        Q    Were you provided with a copy of that?

8        A    No.

9        Q    Were you asked to sign anything?

10       A    No.

11       Q    Did you have an informant agreement with

12   them?

13       A    Verbal.

14       Q    What was that verbal agreement?

15       A    That I would provide information to

16   them, and they would protect my identity.

17       Q    Did you have scheduled reporting times?

18       A    No.

19       Q    So when did they expect you to report

20   the information?

21       A    When I had something to report.

22       Q    And did they give you categories of

23   information that they were looking for?

24       A    Yes.

Sheila J. Porter                                    05/18/2005

108

1      Q      And those were...

2      A      Sexual abuse, physical abuse, drug

3   dealing.

4      Q      Were you instructed by the F.B.I. not to

5   provide that same information to the Sheriff's

6   Department?

7      A      Never.

8      Q      So Ms. Robinson didn't tell you, "Report

9   to us, but don't report to the Sheriff's

10   Investigation Division"?

11      A      Correct.

12      Q      Did she ever tell you that you should

13   report this information to the Sheriff's

14   Investigation Division?

15      A      Yes.

16      Q      She did tell you that?

17      A      Yes.

18      Q      What did she say?

19      A      That was along with the admonitions that

20   tell you not to disclose to this person, and it

21   was, of course, you can report to SID or, you

22   know, things that you need to report, you can

23   report.

24      Q      Is that how it was communicated to you:

Sheila J. Porter                                    05/18/2005

109

1    Of course you can report things to SID, of course

2    you can report things you need to report --

3          A    I don't --

4          Q    -- what was --

5          A    My understanding is all I can tell you.

6    My understanding is that I could report things to

7    SID that I needed to report, not all the

8    information that I gathered would be something I

9    would report to SID.

10         Q    Certainly there were things that you

11   were required to report to the institution, the

12   site, where you were working?

13         A    Yes.

14         Q    And those were requirements by your

15   employment with Correctional Medical Services,

16   correct?

17         A    Yes.

18         Q    And those were also required of you by

19   virtue of you working inside a correctional

20   facility, correct?

21         A    Yes.

22         Q    You were required to report to the

23   Department unusual events, correct?

24         A    Correct.

Sheila J. Porter                                    05/18/2005

110

1        Q    You were required to report to the

2   Department instances in which you felt that an

3   inmate had been physically abused, correct?

4        A    Correct.

5        Q    You were required to report to the

6   Department instances in which you felt that an

7   inmate had been sexually abused, correct?

8        A    Correct.

9        Q    And you knew that for the ten years or

10  so that you worked at the Suffolk County House of

11  Correction, correct?

12       A    I knew that.

13       Q    In fact, you received training, you

14  indicated earlier, on report writing, correct?

15       A    Yes.

16       Q    That report writing training was

17  conducted by the Suffolk County Sheriff's

18  Department, right?

19       A    Yes.

20       Q    And you were instructed on what

21  information to contain within a report?

22       A    Yes.

23       Q    You were instructed on when you needed

24  to report?

Sheila J. Porter                                    05/18/2005

111

1      A    Yes.

2      Q    What was that instruction on when you

3   needed to report?

4      A    When I had -- when I personally had

5   reason to believe, either through seeing or a

6   report, that there was abuse of some variety going

7   on or that there was an issue.

8      Q    So if you were a percipient witness and

9   had firsthand information about abuse, you were

10  required to report?

11     A    Yes.

12     Q    And if an inmate informed you they had

13  been abused, you would be required to report?

14     A    Yes.

15     Q    And if you were informed by someone else

16  that an inmate had made allegations, you would be

17  required to report, correct?

18     A    No.

19     Q    So if it came to you from someone else,

20  you're not required to report?

21     A    No, because I have no idea what --

22  whether that's the inmate's allegation or not.

23     Q    So the F.B.I. didn't instruct you not to

24  comply with the requirements of your obligations

Sheila J. Porter                                          05/18/2005

112

1    as a nurse practitioner at the Suffolk County

2    House of Correction or your obligations as a nurse

3    practitioner employed by Correctional Medical

4    Services, correct?

5         A    Correct.

6         Q    Did you notify Correctional Medical

7    Services that the F.B.I. wanted you to provide

8    information to them?

9         A    Yes.

10        Q    Whom did you report that to?

11        A    I believe that the day I went in that we

12   had an interim health service administrator, I

13   think that it was Eileen Mageary, who at the time

14   was working for -- I'm sorry, did you say CMS

15   or did you say --

16        Q    I said CMS, but I should have said CHS.

17        A    CHS --

18        Q    Pardon me.

19        A    -- yes.

20             I went in and spoke with the acting

21   health service administrator, and I believe it was

22   Eileen Mageary, but I'm not positive of the time

23   frame there.  And I do remember that the regional

24   manager happened to be there at the facility that

Sheila J. Porter                                          05/18/2005

113

1   day, and she said, "I think you should talk to

2   Nancy," and I spoke with Nancy Lawrence, said I

3   had received a phone call from -- I had received a

4   phone call from the F.B.I. on my answering

5   machine, they wanted me to call back, and what

6   should I do.  My instinct was that I had to do

7   that.  And both verified that, yes, that is what

8   you should do.

9        Q    So when you said she suggested I speak

10  to the regional manager, she was Eileen Mageary?

11       A    Yes.

12       Q    And the regional manager was Nancy

13  Lawrence?

14       A    Yes.

15       Q    When in this time line of events that

16  you have just testified to did that communication

17  with CMS occur?

18       A    First day, before I -- before I made the

19  call back.

20       Q    Before you made the decision?

21       A    Yes.

22       Q    Before you even spoke with Maureen

23  Robinson --

24       A    Yes.

Sheila J. Porter                                    05/18/2005

114

1          Q      -- you had this interaction that you

2     described with Eileen Mageary?

3          A      Yes.

4          Q      After you agreed to provide information

5     on an ongoing basis to Maureen Robinson and the

6     F.B.I., did you have any further discussion about

7     that with CMS?

8                    MS. HARVEY:   CHS?

9          Q      CHS.  Sorry.  CHS.

10         A      Only in specific instances when I needed

11    to tell someone and get their assistance.

12         Q      And when was that?

13         A      Well, right off the top of my head, the

14    one that comes to mind is in the Rene Rosario

15    incident, but there could have been other times.

16         Q      Well, in late 1999 or 2000, you get a

17    phone call from Maureen Robinson, correct?

18         A      Correct.

19         Q      And it was just a phone call; it didn't

20    tell you what she wanted, correct?

21         A      Yes, it did.

22         Q      What did it say again?  I'm sorry.

23         A      That they wanted to speak to me; that

24    they had my name and they wanted to speak to me

Sheila J. Porter                                    05/18/2005

                                                                    115

1    about a number of matters at the House of

2    Correction.

3         Q     And it was after that phone call that

4    you had the contact with Eileen Mageary and Nancy

5    Lawrence that you've just described?

6         A     Yes.

7         Q     Up until on or about May 19th of 2003

8    with inmate Rene Rosario, when in between those

9    events did you have contact with anybody from CHS

10   relative to your providing information to the

11   F.B.I.?

12        A     That wasn't the first contact with Rene

13   Rosario, and both the health service administrator

14   and the medical director were involved in an

15   earlier -- what do you call it -- I had dealt with

16   Rene earlier, and I required the cooperation of

17   both the health service administrator and the

18   medical director in that instance.

19        Q     Would that have been in or about

20   November of 2002?

21        A     Yes.

22        Q     Between late '99, early 2000 and

23   November of 2002, when did you discuss your

24   ongoing cooperation with the F.I.B with anyone at

Sheila J. Porter                                    05/18/2005

116

1    CHS?

2        A    I couldn't give you dates and times.

3    Again, I needed cooperation occasionally, and I

4    would have said, by way of that, you know, "I need

5    to contact someone on the outside," and -- but I

6    couldn't tell you in which cases, not because he

7    instructed me not to but because I can't -- I

8    can't tell you.

9        Q    Who at CHS knew that you were providing

10   information to the F.B.I. in 1999 or 2000?

11       A    Dr. Singletary.

12           MR. SAVAGE:  I'm sorry, can I hear

13   -- was the question who knew in 1999 and 2000?

14           MS. CAULO:  Correct.

15           MR. SAVAGE:  Okay.  I'm sorry.  Go

16   ahead.

17       Q    Mrs. Porter, you're not sure when you

18   had your first contact with the F.B.I., correct?

19       A    Right.

20       Q    It could have been 2000; it could have

21   been late 1999?

22       A    Right.

23       Q    So during that time period, late '99

24   through the calendar year of 2000, who knew at CHS

Sheila J. Porter                                      05/18/2005

117

1   that you were providing information to the F.B.I.?

2       A    Dr. Singletary -- specific instances,

3   perhaps not ongoing, specific instances -- so I

4   think Donna Jurdak was back by that time.

5       Q    What did Dr. Singletary know?

6           MR. SAVAGE:  I'm sorry, did you

7   complete your answer as to everybody that knew

8   through the end of 2000?

9       A    CHS.  Yes, I believe so.

10      Q    What did Dr. Singletary know?

11      A    That I was providing information in a

12  specific instance.

13      Q    And what was that?

14      A    I -- I couldn't tell you which one it

15  is.  I don't know which one was when.

16      Q    Well --

17      A    There were many.  Many.

18      Q    1999 to 2000 --

19      A    Many.

20      Q    -- during that time period -- let's step

21  back a second.

22           Did you notify anybody at the

23  Suffolk County Sheriff's Department in the latter

24  part of 1999 through the calendar year of 2000

118

1    that the F.B.I. wanted you to provide them with

2    information?

3         A    Officially, no.

4         Q    What does that mean, officially, no?

5         A    I did tell someone unofficially that the

6    F.B.I. had contacted me.

7         Q    Whom did you tell unofficially that the

8    F.B.I. --

9         A    Steve Jacobs.

10        Q    -- had contacted you?

11             MR. SAVAGE:  Let her finish her

12   question.

13        A    Sorry.

14        Q    Whom did you tell unofficially that the

15   F.B.I. had contacted you?

16        A    Steve Jacobs.

17        Q    When did you tell Steve Jacobs that

18   unofficially?

19        A    He was interviewing me about a report I

20   had made.

21        Q    And what report was that?

22        A    I don't remember.

23        Q    Well, what were the circumstances

24   surrounding your communicating to Steve Jacobs of

Sheila J. Porter                                    05/18/2005

119

1    the Sheriff's Investigation Division that you were

2    providing information to the F.B.I.?

3         A    I don't remember which specific thing.

4    I reported a lot of things to the Sheriff's over

5    nine years.  Steve and I spoke frequently.  I

6    accompanied him to court frequently.  On one of

7    those occasions, I commented to him unofficially

8    that they had called, and that they were looking

9    for information.  I can't be more specific than

10   that because I don't remember if it was more

11   specific than that.  It was an informal comment

12   that I made during one of these encounters with

13   Steve.

14        Q    Did he ask you more questions about it?

15        A    No.

16        Q    Did you tell him that you were providing

17   information on an ongoing basis to the F.B.I.?

18        A    No.

19        Q    Did you tell him that it was on a

20   particular matter that you were providing

21   information?

22        A    No.

23        Q    You told him that the F.B.I. had

24   contacted you?

Sheila J. Porter                                          05/18/2005

120

1      A    Yes.

2      Q    What did you tell him about what that

3   contact was about?

4      A    Just that they were looking for

5   information.

6      Q    So you didn't communicate to him that

7   this was one of a number of contacts that you were

8   getting on a regular basis from the F.B.I.?

9      A    I think it was at the beginning.  I

10   don't think it was after a number; I think it was

11   early on.

12      Q    Did you indicate to him -- did you tell

13   Steve Jacobs that you had agreed to provide

14   information to the F.B.I. on an ongoing basis?

15      A    No.

16      Q    Who was the next person that you told

17   from the Suffolk County Sheriff's Department that

18   you were providing information to the F.B.I.,

19   whether informally or formally?

20      A    Paul DeFazio.

21      Q    When was that?

22      A    2002.

23      Q    And what were the circumstances

24   surrounding that communication with Paul DeFazio?

Sheila J. Porter                                    05/18/2005

121

1      A    He was involved with the initial Rene

2  Rosario contact, and he was the liaison that I had

3  between the Sheriff's Department and the F.B.I.

4      Q    Let's step back for a second.

5           When did you first meet Paul

6  DeFazio?

7      A    When he was hired, I did his

8  preemployment physical.

9      Q    Okay.  And was that sometime in the

10 summer of 2001?

11     A    I believe so.

12     Q    And he was hired as what; what was his

13 job at the department?

14     A    It had something to do with SID, but I'm

15 not sure what his job title was.

16     Q    Okay.  From 2001 through 2002, did you

17 communicate frequently -- or did you communicate

18 with Paul DeFazio?

19     A    Yes.

20     Q    And what were the nature of those

21 contacts?

22     A    I don't remember.  He frequently came up

23 to the unit; I couldn't say specifically why; but,

24 yes, I ran into him in the facility.  I don't

Sheila J. Porter                                    05/18/2005

122

1    remember if it was a specific investigation or

2    anything that he was doing.

3        Q    Well, did you have contact with him in

4    his official capacity as an employee of the

5    department working for the Sheriff's Investigation

6    Division?

7        A    I don't know.

8        Q    Were there occasions that you provided

9    him with information that you were required to do

10   when you suspected physical abuse or sexual abuse

11   of inmates?

12       A    He wouldn't have been the one that got

13   the information.

14       Q    Who would have been the one who got the

15   information?

16       A    Usually one of the investigators, Steve

17   Jacobs or -- I believe there was another Steve,

18   and there was a -- there were four people that

19   worked down there.  There was a woman and -- three

20   males and a female that were the people that we

21   usually reported to.

22       Q    When you say "we" usually reported to

23   you, are you referring to you and other members of

24   the medical staff?

Sheila J. Porter                                        05/18/2005

123

1      A    Yes.

2      Q    And were these verbal reports or written

3  reports?

4      A    Both.

5      Q    You yourself provided verbal and written

6  reports to the Sheriff's Investigation Division?

7      A    Yes.

8              MR. SAVAGE:  Do you want to pick a

9  logical point, Ellen, in the next ten minutes or

10  so to --

11              MS. CAULO:  Whenever.  Why don't we

12  leave it right here.  We can pick up.

13              (Lunch recess taken at 12:50 p.m.)

14              (Back on the record at 1:40 p.m.)

15      Q    Mrs. Porter, I believe that when we left

16  off I was inquiring about your communication with

17  Paul DeFazio?

18      A    Yes.

19      Q    And Mr. DeFazio is an employee of the

20  Suffolk County Sheriff's Department, correct?

21      A    I believe so.

22      Q    At the time that you first became aware

23  of him, was that in his capacity as an employee of

24  the Suffolk County Sheriff's Department?

Sheila J. Porter                                                    05/18/2005

124

1      A      Yes.

2      Q      And the context of this -- of my

3  questions to you was whom within the department

4  did you notify in 2001 to -- well, strike that.

5              I believe you testified that

6  sometime in the latter part of 1999 through 2000

7  you may have notified Steve Jacobs that on a

8  particular occasion the F.B.I. had contacted you?

9      A      Yes.

10     Q      Is that a fair characterization of your

11 testimony?

12     A      Yes.

13     Q      You did not, however, inform Mr. Jacobs

14 that you were in an ongoing relationship with the

15 F.B.I. providing them information on an ongoing

16 basis?

17     A      I don't believe I did.

18     Q      Other than Mr. Jacobs, whom within the

19 Suffolk County Sheriff's Department did you notify

20 that you were providing information to the F.B.I.

21 on an ongoing basis?

22     A      The next person -- well, the person that

23 knew it was Paul DeFazio, and that was in 2002.

24     Q      Okay.  And how did Mr. DeFazio know that

Sheila J. Porter                              05/18/2005

125

1  you were providing information to the F.B.I. on an

2  ongoing basis?

3      A    Mr. DeFazio came to me as a liaison

4  concerning Rene Rosario.

5      Q    Who was a liaison, you or Mr. DeFazio?

6      A    Mr. DeFazio.

7      Q    And what do you mean by liaison?

8      A    He was my contact person in case of

9  emergency during some meetings I had with Rene

10  Rosario.

11      Q    What do you mean by contact person in

12  case of emergency?

13      A    Excuse me?

14            (Witness and counsel conferring off

15            the record.)

16          MS. CAULO:  Let the record reflect

17  that Mrs. Porter is communicating with her

18  attorney.

19      A    During that time, I had been asked to

20  place a wire on Inmate Rosario, and I had an

21  emergency contact at the facility, and at least

22  one other, perhaps two other, SID people knew of

23  my existence and what I was doing, but Paul was

24  the name I had in case there was an emergency, in

Sheila J. Porter                                    05/18/2005

126

1   case there was a problem.

2        Q    Who asked you to con -- who asked you to

3   place a wire on Inmate Rene Rosario in November of

4   2002?

5        A    Krista Snyder.

6        Q    And who is she?

7        A    An F.B.I. agent.

8        Q    And you indicated earlier that initially

9   you were providing information to Maureen

10  Robinson.  When did you begin providing

11  information to F.B.I. Agent Krista Snyder?

12       A    They were frequently together.  Maureen

13  was part of it, but it happened that it was Krista

14  that I spoke to.

15       Q    Is it fair to say shortly after you

16  agreed to provide information on an ongoing basis

17  to the F.B.I. you were working with Maureen

18  Robinson and Krista Snyder from the F.B.I.?

19       A    Correct.

20       Q    So when did Krista Snyder contact you

21  regarding placing a wire -- and by a wire, you

22  mean recording device?

23       A    Yes.

24       Q    -- on Inmate Rene Rosario?

Sheila J. Porter                                    05/18/2005

127

1      A      Perhaps in October of 2002.

2      Q      What did she ask you to do; how did this

3  conversation happen?

4      A      She asked me if I knew Rene, and I knew

5  him from -- I believe that this was already his

6  second incarceration at Suffolk; but, again, one

7  of those things, I did his intake physical, and I

8  knew the name as a person that had -- that had

9  been at the institution.  And she asked me if I

10  knew any more about him, and I really didn't at

11  that point in time.  And she told me that Rene was

12  -- had been a witness in a Federal investigation

13  at the jail, at the Suffolk County jail, and that

14  he claimed that he had had some issues around that

15  since that time.

16           The question that I'm answering

17  again so I can -- I'm lost.

18      Q      Have you finished your answer on that?

19           MR. SAVAGE:  She's lost.

20      A      I'm not sure what the question --

21      Q      Let me ask you another question.

22      A      Okay.

23      Q      We'll get back.

24           Krista Snyder asked you to place a

128

1    recording device on Inmate Rene Rosario.

2         A    Yes.

3         Q    And I was asking you what exactly did

4    she communicate to you and what did she ask you to

5    do.

6         A    She asked me to place the wire on Rene

7    and -- to place it and retrieve it -- to record

8    some issues of threats or abuse that he alleged

9    were happening at the House of Correction.

10        Q    Is that the purpose that F.B.I. Agent

11   Snyder articulated to you for the reason why the

12   wire was to be placed on Inmate Rosario?

13        A    Yes.

14        Q    Where did this conversation take place

15   between you and Krista Snyder?

16        A    I think that one was in a coffee shop at

17   the same -- at the same South Bay Plaza.

18        Q    Who else was present?

19        A    Maureen.

20        Q    Maureen Robinson?

21        A    Yes.

22        Q    Any other persons present?

23        A    No.

24        Q    Prior to that conversation, was that the

Sheila J. Porter                                    05/18/2005

129

1    first time that they had asked you to place a

2    recording device on Inmate Rene Rosario?

3        A    Yes.

4        Q    Was that the first time that they had

5    asked you to place a recording device on any

6    individual, inmate or otherwise?

7        A    Yes.

8        Q    Prior to this conversation, had you done

9    anything other than provide them information on an

10   ongoing basis?

11       A    No.

12       Q    What else had you done for them -- no,

13   you hadn't or you had?

14       A    No, I hadn't.

15       Q    Okay.  So this is the first time that

16   they asked you to do something other than provide

17   information?

18       A    Yes.

19       Q    Did you agree to do it?

20       A    Yes.

21       Q    When did they tell you it was going to

22   happen?

23       A    They were trying to arrange a time.  I

24   believe I was going to a conference, and I was

Sheila J. Porter                                        05/13/2005

130

1    going to be out of the facility at part of the

2    time, so it had to be a time when I was there at

3    the beginning and the end and I would be there

4    while he had the wire on in case there was an

5    issue.

6        Q    Why were they asking you to do it?

7        A    Because I would have had a way to place

8    it without -- without being seen.

9        Q    What do you mean?

10       A    I'm a nurse practitioner, and I could --

11   I could place a wire in the process of an

12   examination.

13       Q    Did they indicate to you that that's

14   what they wanted you to do, to place the recording

15   device on him in the process of a medical

16   examination?

17       A    They left it up to me how I did it, but

18   that was the understanding.  I didn't have a

19   specific instruction, except the actual physical

20   placement; this is up, this is down, this is

21   front, this is back.

22       Q    When did it -- when did this occur?

23       A    A little over --

24            MR. SAVAGE:  Which this, the

131

1   conversation or the wiring?

2        Q     When did the wiring of Rene Rosario

3   occur?

4        A     In November.  It was about a month and a

5   half I think after the initial contact about it.

6        Q     Approximately a month and a half after

7   you were asked by Krista Snyder the wiring

8   actually took place?

9        A     Yes.

10       Q     Where in the facility, the Suffolk

11  County House of Correction, did it take place?

12       A     My exam room.

13       Q     And where was that located?

14       A     In the health service unit.

15       Q     Not in the infirmary -- not in the

16  satellite office --

17       A     No.

18       Q     -- on the upper floor.

19       A     No.

20       Q     In the infirmary?

21       A     Yes.

22       Q     How was Mr. Rosario brought to the

23  infirmary, if you know?

24       A     He came down for a sick call, and I

Sheila J. Porter                                          05/18/2005

132

1    don't remember -- I don't remember the issue.

2        Q    Was it your understanding that he would

3    arrange to go down for a sick call --

4        A    Yes.

5        Q    -- and that would be the means by which

6    he would appear in the infirmary?

7        A    Yes.

8        Q    And how was that information

9    communicated to Mr. Rosario?

10       A    I don't know.

11       Q    How was Mr. Rosario informed that that's

12   what he should do in order for the recording

13   device to be placed on him?

14       A    I believe he spoke with Krista.

15       Q    Were you aware in November of 2002 that

16   Mr. Rosario had been an informant for the F.B.I.?

17       A    That was -- this episode was his

18   informing.  He was a witness -- I'm not sure that

19   that rises to informant.  Informant he became when

20   he agreed to wear the wire.

21       Q    Who was present in your exam room in the

22   infirmary on the date that you placed the

23   recording device on Rene Rosario?

24       A    Rene and myself.

Sheila J. Porter                                    05/18/2005

133

1      Q      Was anyone from the Suffolk County
2  Sheriff's Department involved in the wiring of
3  Rene Rosario?
4      A      Any actual wiring?
5      Q      Yes.
6      A      No.
7      Q      Was anyone from the Suffolk County
8  Sheriff's Department involved in the facilitation
9  of the wiring of Mr. Rosario?
10     A      Yes.
11     Q      Who?
12     A      Paul DeFazio.
13     Q      And how was Paul DeFazio involved in the
14 facilitation of the placing of the recording
15 device on Rene Rosario?
16     A      This piece is a little -- I'm not sure
17 of this piece.  I'm not sure if he had the device
18 in the facility.
19              MR. SAVAGE:  She's not asking you to
20 guess.  So if the answer is I don't know --
21     A      Okay.  Then I don't -- I'm not sure.
22              MR. SAVAGE:  If she wants to ask you
23 to guess, then she can put that question to you.
24              THE WITNESS:  Okay.

Sheila J. Porter                                    05/13/2005

134

1       Q      Who gave you the recording device?

2       A      I had the device more than once and -- I

3  had the device outside.  I believe it was decided

4  that I couldn't bring it through the security

5  gate.  So I believe it was given to me inside the

6  facility by Paul.  I am not positive about that

7  one.

8       Q      Who decided that you couldn't bring it

9  through?

10      A      It would set off alarms.

11      Q      Who decided that it couldn't be brought

12 through?

13      A      That was a decision between -- between

14 Krista and myself; I would have set off alarms

15 with it.

16      Q      During your conversations with Krista

17 Snyder and Maureen Robinson, did they indicate

18 that anyone within the Suffolk County Sheriff's

19 Department was involved in the process to wire

20 Mr. Rosario?

21      A      Yes.  At first I didn't know whom, and I

22 had to sign a paper releasing the F.B.I. or

23 telling people at Suffolk County that I was

24 involved in this activity.

Sheila J. Porter                                    05/18/2005

135

1      Q    Do you have a copy of that?

2      A    No, I don't.

3      Q    They ask you to sign a waiver, a

4  release?

5      A    Yes.

6      Q    You said initially you didn't know who

7  was involved, but then you became aware.  When did

8  you become aware that someone within the Suffolk

9  County Sheriff's Department was involved in the

10 process to wire Rene Rosario in November of 2002?

11     A    When I talked with Paul.

12     Q    And when was that?

13     A    Before I -- sometime before I wired him,

14 I spoke with Paul, and he gave me a -- an

15 emergency phone number and his extension to

16 contact him if I needed assistance.

17     Q    Well, what did he say, other than giving

18 you his emergency contact number?

19     A    He spoke with Rene.  We -- he spoke with

20 Rene in the office.

21     Q    When?

22     A    Before I wired him.

23     Q    On the same date that you wired him?

24     A    He spoke with him more than once.  I saw

Sheila J. Porter                                    05/18/2005

136

1    him speaking to him one time I believe the day

2    before, and then he spoke with him -- because I

3    kept him down in the medical housing unit so he

4    wouldn't go back upstairs with a wire.  Two

5    occasions at least I saw him speak with Rene.

6         Q    Were you present during the

7    conversation?

8         A    No.

9         Q    Do you know what was discussed during

10   the conversation?

11        A    No.

12        Q    So how do you know that Paul DeFazio was

13   involved in the process to wire Rene Rosario?

14        A    He was my contact; he was the person I

15   was told to contact if I had any issues, any

16   emergencies, any situation.  It said right on the

17   phone number, "For emergencies."  If -- if there

18   was something that went wrong, either the --

19   someone else found the recording device, I knew

20   that I could be in trouble with it and Rene knew

21   he could.

22        Q    Who told you that Paul --

23        A    Krista and Maureen.

24        Q    Did Paul DeFazio tell you he was the

Sheila J. Porter                                    05/18/2005

137

1    contact person?

2        A    Yes --

3        Q    When --

4        A    -- he gave --

5        Q    I'm sorry.  When did that occur?

6        A    Before I put the wire on Rene.

7        Q    Before, when?  The day before?  The

8    morning of?

9        A    I don't know.

10       Q    Where did you get the wire from?

11       A    The wire came from Krista and Maureen,

12   and as I said, that piece is a little fuzzy,

13   because I didn't bring it through.  I -- I can't

14   remember exactly how that happened.

15       Q    So you don't recall from whom you

16   received the recording device that you were

17   placing on Rene Rosario?

18       A    I had it twice.

19       Q    When was the first time that you had it?

20       A    The week before when we couldn't place

21   it.

22       Q    When you say we, who is we?

23       A    The F.B.I. and I.

24       Q    Was Paul DeFazio involved in that --

Sheila J. Porter                                                     05/18/2005

138

1       A    Yes.

2       Q    -- incident?

3            How was he involved?

4       A    I just remember him as my contact

5  person.  I remember that he gave me his number.  I

6  couldn't tell you whether it was at the first of

7  it, in the middle of it.  I know it was before I

8  actually placed the wire, but I can't tell you

9  exactly when.  And he spoke with Rene while Rene

10 had the wire on.

11      Q    Was Paul DeFazio ever present during a

12 conversation between you, Maureen Robinson, and

13 Krista Snyder that concerned the wiring of Rene

14 Rosario?

15      A    No.

16      Q    Did they ever mention his name other

17 than to identify him as an emergency contact

18 person?

19      A    No.

20      Q    Did they indicate to you that they had

21 someone within the Suffolk County Sheriff's

22 Department who had approved the wiring of Rene

23 Rosario?

24      A    I didn't ask that.

Sheila J. Porter                              05/18/2005

139

1      Q    I'm asking did they indicate to you, not

2  whether you -- not you asked it.

3      A    I don't know.

4      Q    Did they indicate that anyone other than

5  Paul -- did they indicate any name of any other

6  individuals in the Suffolk County Sheriff's

7  Department, other than Paul DeFazio?

8           MR. SAVAGE:   Did they indicate what?

9      Q    Did they indicate anyone -- strike that.

10          Did they identify any Suffolk County

11 Sheriff's Department [sic], other than Paul

12 DeFazio, to you in the context of the wiring of

13 Rene Rosario?

14     A    They told me that two more people knew.

15     Q    Who were they?

16     A    I don't know.

17     Q    Did they provide you their names?

18     A    No.

19     Q    Did they tell you where they worked?

20     A    I honestly thought that one of them was

21 the sheriff.  I am not sure at this time, but

22 that's -- I thought that one of them was the

23 sheriff.

24     Q    When you say the sheriff, whom are you

Sheila J. Porter                                    05/18/2005

140

1    referring to?

2         A    Rouse.

3         Q    Richard Rouse?

4         A    Yes.

5         Q    And why did you assume it was the

6    sheriff?

7         A    Because that was brought up, but I

8    didn't know -- I signed a paper that was not

9    specific to -- for notification.  They didn't have

10   the names.  They told me they were going to

11   disclose to people, but I didn't have the names of

12   the people they were going to disclose to.

13        Q    So this paper that you have been

14   describing is something that you signed that

15   indicated --

16        A    That I --

17        Q    -- the identification of persons who

18   were going to be notified by the F.B.I. about

19   placing the wiring on Rene Rosario?

20        A    It didn't have their names.

21        Q    When you say didn't have their names,

22   did they indicate to you that there would be

23   individuals who would be notified?

24        A    Yes.

Sheila J. Porter                                    05/18/2005

141

1      Q     Were there places on this form that
2  would suggest that's where their name would be
3  placed?
4      A     I don't remember.
5      Q     Why is it that you assumed the sheriff,
6  Richard Rouse, was one of those individuals?
7      A     Because they asked me.
8      Q     What did they ask you?
9      A     If I thought Sheriff Rouse should be one
10 of the people that should be notified.
11     Q     Notified of what, of an emergency or
12 notified of the wiring?
13     A     Of my activity for the F.B.I.
14     Q     The F.I.B asked you whom you thought
15 should be notified of your involvement?
16     A     They said the name; should this be one
17 of the people.
18     Q     Should this be one of the people what?
19     A     That they notify that I was working with
20 the F.B.I.
21     Q     And which names, again, did they
22 identify?
23     A     None at that time.
24     Q     Which names did they suggest to you or

Sheila J. Porter                                    05/18/2005

142

1    ask you about?

2        A    The sheriff and people in SID, were

3    there any specific people in SID to notify or not

4    to notify.

5        Q    And what did you say?

6        A    I said I thought that the sheriff

7    probably wasn't a good one to notify at that

8    particular time, but that it was up to them.

9        Q    Do you know whether or not they notified

10   anybody within the department about the wiring of

11   Rene Rosario?

12       A    Yes, I do.

13       Q    And whom do you know that they notified?

14       A    Paul DeFazio, and at least one other

15   person in SID.

16       Q    And who was that person?

17            MR. SAVAGE:  If you can't answer,

18   you can't answer it.

19            MS. CAULO:  Are you instructing her

20   not to answer?  I don't understand.

21            MR. SAVAGE:  There's a general

22   instruction that she's not to answer anything that

23   reveals individuals against which she may have

24   provided cooperation.  If this falls in that

Sheila J. Porter                                    05/18/2005

143

1    category, she's not going to answer it.

2                MS. HARVEY:  Well, she's not being

3    asked who she provided information against.  She's

4    only being asked something that's extremely

5    relevant here, which is --

6                MS. CAULO:  Right.

7                MS. HARVEY:  -- who knew in the

8    Sheriff's Department.  You shouldn't make that

9    link for us.  If it's somebody she ended up

10   testifying against or providing information

11   against, that's something separate.

12               MR. SAVAGE:  Can I speak to her a

13   minute or...

14               MS. CAULO:  Sure.

15               MR. SAVAGE:  Let's just step

16   outside.

17               (Witness and counsel left the room.)

18               MR. SAVAGE:  You want to re-ask it

19   just so the record is clean or...

20               MS. CAULO:  Could you repeat the

21   last question, please?

22               (Question read.)

23       A    Neville, but I don't know his last name.

24       Q    Is that Neville Arthur?

144

1      A      Yes, it is.

2      Q      And how do you know that Agents Snyder

3   and Robinson contacted Mr. DeFazio and Neville

4   Arthur?

5      A      With Neville, because Krista and Maureen

6   told me, and with Paul, because I talked with

7   Paul.

8      Q      What did Krista Snyder and Maureen

9   Robinson tell you about their communication with

10  Neville Arthur?

11     A      That he knew that I would be placing a

12  wire; and that he would keep my name confidential;

13  that they knew it in case of emergencies.

14     Q      And when, if you know, in reference to

15  the actual wiring did Krista Snyder and Maureen

16  Robinson communicate this information to Neville

17  Arthur?

18     A      Before I attempted to wire him the first

19  time.

20     Q      Do you know when in relation to -- I

21  know it's before, but do you know --

22     A      It was about a week before, I think.

23     Q      Did they mention anything else about

24  their communication with Neville Arthur regarding

Sheila J. Porter                                    05/18/2005

145

1    the wiring of Rene Rosario?

2        A    I don't think I knew it was Neville at

3    the time.  I -- I know -- I knew later, but I

4    don't -- right at the time I don't think I knew

5    that it was Neville.  I think they gave me that

6    name later.  Paul was my contact.

7        Q    So you don't know whether or not they

8    informed Neville Arthur before the wiring?

9        A    I know they told me they informed two

10   people in SID; that Paul was one, and they

11   notified another person; and I didn't have that

12   name until sometime later.

13       Q    And when you say they notified them, is

14   it your understanding that Mr. DeFazio was

15   consulted regarding the propriety of wiring an

16   inmate in the House of Correction?

17       A    I have no idea.

18       Q    Well, was it your understanding that

19   they were simply notified or was it -- was it your

20   understanding that they were notified?

21       A    Yes.

22       Q    Was it your understanding that they were

23   consulted, specifically were they asked whether it

24   would be okay to wire an inmate?

Sheila J. Porter                                    05/18/2005

146

1       A      I don't know.

2       Q      Do you know whether or not the F.B.I.

3    agents asked Neville Arthur or consulted with him

4    about whether he thought it was appropriate to

5    wire an inmate in the House of Correction?

6       A      I don't know.

7       Q      To your knowledge, the F.B.I. agents

8    could simply have been notifying them that it was

9    happening; is that correct?

10      A      It could be.

11      Q      How long did Mr. Rosario wear the

12   recording device?

13      A      I think it was 24 hours perhaps, 24, 48

14   hours.

15      Q      Where was he housed when he was wearing

16   the recording device for this 24 or 48 hours?

17      A      In the medical housing unit.

18      Q      Were you working on that 24 hour or 48

19   hour period?

20      A      For the whole time?

21      Q      Not continuously, but on those two days.

22      A      Yes.

23      Q      Yes?

24      A      Yes.  I put it on; I took it off.

Sheila J. Porter                                          05/18/2005

                                                              147

1        Q    Who was present when you took it off?

2        A    Just Rene and myself.

3        Q    Who showed you how to attach the device?

4        A    Krista.

5        Q    Did you yourself ever talk with Neville

6   Arthur about placing a recording device on Rene

7   Rosario?

8        A    No.

9        Q    Before or after?

10       A    No.

11       Q    Did you yourself talk with Paul DeFazio

12   regarding placing the recording device on

13   Mr. Rosario, specifically --

14       A    Yes.

15       Q    -- about placing the device on him?

16       A    Yes.

17       Q    What was that communication?

18       A    The nuts and bolts of it I don't

19   remember.  I was --

20       Q    To the best of your memory.

21            MR. SAVAGE:  Did you finish your

22   answer?

23       A    I was focussed on what I was going to

24   do, and I knew that Paul was my contact person.  I

148

1    told him when I was going to do it, and he told me

2    how I could contact him if there was an issue and

3    when it was done --

4         Q    On the day --

5         A    -- and that's what I remember.

6         Q    I'm sorry.  On the day that you placed

7    the recording device on Mr. Rosario, was

8    Mr. DeFazio in the infirmary?

9         A    He at least walked through.  I can't

10   tell you whether he stayed or not.  I do remember

11   seeing him that day, yes.

12        Q    After you placed the recording device on

13   Mr. Rosario, did you see whether or not

14   Mr. DeFazio interacted with Mr. Rosario?

15        A    I believe he did.

16        Q    When?

17        A    I believe it was later in the day, and

18   he was using the mental health office, which is

19   inside the medical housing unit.

20        Q    Were you present during that interaction

21   between Mr. DeFazio and Mr. Rosario?

22        A    I walked by; the door was shut.

23        Q    And how do you know Mr. Rosario was

24   inside with Mr. DeFazio?

Sheila J. Porter                                    05/18/2005

149

1          A    I could see him through the window.

2          Q    Okay.  Well, that's my question.

3               Did you go into the office?

4          A    No.

5          Q    Did you ever -- did you talk with

6    Mr. DeFazio after you saw him speaking with

7    Mr. Rosario?

8          A    I don't remember.

9          Q    Did you ever ask him what was

10   communicated between himself and Mr. Rosario?

11         A    No.

12         Q    Was Mr. DeFazio present when you took

13   the wire off?

14         A    No.

15         Q    After you took the wire off, what did

16   you do with it?

17         A    That's that same fuzzy area.  I'm not

18   sure how I got it back out again.

19         Q    Did you provide it -- did you bring it

20   out and give it back to Krista Snyder?

21         A    I could have.  I really don't remember

22   how I got it in and out.  I really don't.

23         Q    Did you give it to Paul DeFazio?

24         A    I -- I just don't remember.

Sheila J. Porter                                    05/18/2005

150

1    Q    Why was it taken off?

2    A    It was only supposed to be on a

3    specified time; the battery would have run out.

4    Q    Who told you that?

5    A    Krista.

6    Q    What else did she tell you about the

7    wire?

8    A    How to put it on; how to take it off.

9    Q    In 2000 how many times did you provide

10   information to the F.B.I.?

11   A    40 or 50.

12   Q    To whom in the F.B.I.?

13   A    Maureen or Krista.

14   Q    How?

15   A    Telephone or face to face.

16   Q    What information was communicated?

17   A    Information about suspected sexual

18   abuse, physical abuse, or drug use.

19   Q    Each time that you communicated this

20   information to Maureen Robinson and Krista Snyder,

21   did you also communicate the information to the

22   Suffolk County Sheriff's Department?

23   A    Sometimes, yes; sometimes, no.

24   Q    What times did you not?

Sheila J. Porter                                            05/18/2005

151

1    A    Hearsay information that I had only a --

2    a report but no real knowledge or no belief one

3    way or the other, just no way to determine.  I

4    heard a lot of things, and I reported what I heard

5    and let other people figure it out.  If it was

6    something that I knew, something that the inmate

7    told me about himself, it was reported within the

8    House of Correction.

9    Q    Was that your criteria in terms of when

10   you reported things to SID; if it was hearsay

11   information, you didn't; if it was information

12   communicated to you directly from an inmate, then

13   you did?

14   A    Hearsay about another inmate, I probably

15   would not.  An inmate telling me himself that he

16   had been abused, yes.

17   Q    You would report that to SID?

18   A    Yes.

19   Q    And you did?

20   A    Yes.

21   Q    Over the course of the nine years that

22   you were working at the House of Correction, you

23   did that how often?

24   A    A lot.  Probably three or four times a

Sheila J. Porter                                    05/18/2005

152

1    month.

2         Q    And these reports that you provided to

3    SID, were they verbal or written?

4         A    Both.

5         Q    Did SID investigators also come to speak

6    with you regarding cases they were investigating?

7         A    Yes.

8         Q    And would they talk with you in the

9    infirmary?

10        A    Sometimes.

11        Q    Would they ask you to come down to the

12   SID office to speak with them?

13        A    Yes.

14        Q    The investigators would seek your

15   cooperation?

16        A    Yes.

17        Q    And they would want your information in

18   order to determine if an officer had engaged in

19   misconduct, right?

20        A    Correct.

21        Q    And the investigators whom you worked

22   with over the course of the nine years while you

23   were employed by CMS at the House of Correction,

24   how many were there, approximately?

Sheila J. Porter                                    05/18/2005

153

1      A     15, maybe.  I don't know.  Maybe more.

2      Q     You spoke to Steve Jacobs regularly?

3      A     Yes.

4      Q     You spoke to Paul DeFazio?

5      A     Yes.

6      Q     What other names?

7      A     Brenda.

8      Q     Brenda Garcia?

9      A     Yeah.  Another Steve.  Let's see.  I can

10   tell you what they look like, but I don't remember

11   their names.  I'm sorry.  There are some that I

12   know better than others.

13     Q     You understood that it was their

14   responsibility to investigate allegations of

15   officer misconduct?

16     A     Yes.

17     Q     And that in so doing they would

18   oftentimes require the assistance of and

19   cooperation of medical personnel?

20     A     Yes.

21     Q     In 2001 do you recall how many times you

22   provided information to the F.B.I.?

23     A     About the same the entire time.

24     Q     What do you mean about the same the

Sheila J. Porter                                    05/18/2005

154

1    entire time?

2        A    Probably 40 or 50 times a year all four

3    years.  Sometimes the same information with more

4    information concerning the same incident,

5    sometimes different things.

6        Q    Do you recall specific incidents or

7    specific illegal activities that you provided

8    information on?

9        A    Yes.

10       Q    What are those?

11       A    I really can't answer that.

12       Q    But the categories, not --

13       A    The categories?

14       Q    The types of incidents.

15       A    Sure.  The same categories, physical

16   abuse of an inmate, sexual abuse of an inmate, and

17   possible drug dealing or drug use/abuse.

18       Q    Was the drug use/abuse, did that involve

19   officers as well?

20       A    It could.

21       Q    Did it?

22       A    Yes.

23       Q    The physical abuse allegations, that

24   involved allegations of misconduct of officers on

Sheila J. Porter                                      05/18/2005

155

1    inmates?

2        A    Yes.

3        Q    Prior -- each and every time that you --

4    strike that.

5             Before providing information to the

6    F.B.I. on these occasions that you've identified,

7    did you inform correctional -- Correctional

8    Healthcare Services and then Correctional Medical

9    Care Services that you were providing the

10   information?

11       A    No.

12       Q    Did you inform the Suffolk County

13   Sheriff's Department prior to each time when you

14   called the F.B.I. or met them face-to-face to

15   provide information?

16       A    No.

17       Q    Other than the conversation that you

18   testified to earlier with Steve Jacobs, did you

19   speak with Steve Jacobs ever again about your

20   providing information to the F.B.I.?

21       A    I'm not sure.

22       Q    Other than Mr. DeFazio indicating that

23   he was an emergency contact when Rene Rosario was

24   wired, did you speak with Mr. DeFazio about your

Sheila J. Porter                                                    05/18/2005

156

1    providing information to the F.B.I.?

2          A    Yes.

3          Q    When?

4          A    In the spring of 2003.

5          Q    And what did you communicate to

6    Mr. DeFazio in the spring of 2003 regarding your

7    providing information to the F.B.I.?

8          A    We talked informally.  He was -- my

9    recollection is that he was displeased with the

10   F.B.I., and he asked me if I was still involved.

11         Q    Where did the conversation take place?

12         A    Outside in the courtyard, the courtyard

13   in the middle of the facility.

14         Q    As detailed as you can, what did he say,

15   what did you say?

16         A    He -- my recollection is that he warned

17   me to be careful working with the F.B.I. because

18   it could backfire, and he believed that he had

19   been a victim of that backfiring is the best way I

20   can think of to put it.

21         Q    I'm not asking you the best way you can

22   think of to put it.  I'm asking you specifically

23   what you said to Mr. DeFazio and what he said to

24   you.

Sheila J. Porter                                           05/18/2005

157

1       A    I couldn't tell you, except that I

2  remember an angry man who said he was disappointed

3  and felt that the F.B.I. did not hold up its end

4  of the bargain with him, and I couldn't tell you

5  what that means, but he was angry and he told me

6  to be careful because he didn't trust them.

7       Q    You said this conversation occurred in

8  the yard at the House of Correction in the spring

9  of 2003.  When in the spring of 2003?

10      A    I don't know.  He had -- he was not

11 working in the same capacity.  He was working -- I

12 don't know if he left and came back or -- he was

13 working in a different capacity.  So whenever that

14 was.  He had just come back in a different

15 capacity.  I couldn't tell you the exact -- it's

16 nine years.  I can't tell you an exact date.

17 There are some certain things that I do remember

18 the dates.  That's not one of them.

19      Q    Well, this is the spring of 2003, so --

20      A    I believe that's when it was.

21      Q    And relative to the allegations made by

22 Rene Rosario on or about May 19th, where in

23 relation to that date, May 19th, 2003, where in

24 relation to that date did you have this

Sheila J. Porter                                    05/18/2005

158

1    conversation with Paul DeFazio?

2        A    Before.

3        Q    How close in time, March, April?

4        A    I don't know.  I don't know.  Before it,

5    but I don't know.  It was between the incident in

6    November and the incident in May.

7        Q    And what prompted the conversation, to

8    your recollection?

9        A    I hadn't seen him, we met, and that was

10   what prompted the conversation.

11       Q    Other than the two conversations that

12   you've identified with Paul DeFazio and the one

13   conversation with Steve Jacobs, who else within

14   the Suffolk County Sheriff's Department did you

15   inform that you were providing information to the

16   F.B.I.?

17       A    I can't think of anyone else at the

18   moment.

19       Q    Did you ever provide written reports to

20   the F.B.I.?

21       A    No.

22       Q    Did you ever provide them with progress

23   notes?

24       A    I don't believe so.

Sheila J. Porter                                    05/18/2005

159

1    Q    Did the F.B.I. ever show you a written

2    summary of the information that you had provided

3    to them?

4    A    No.

5    Q    Did they ever ask you to review any

6    documents containing information that you had

7    provided to them?

8    A    No.

9    Q    Did you keep a journal or a notebook of

10   your contact with the F.B.I.?

11   A    No.

12   Q    No?

13   A    No.

14   Q    Okay.  You indicated Maureen Robinson

15   and Krista Snyder.  What other F.B.I. agents

16   between the latter part of 1999 and June of 2003

17   did you communicate with?

18   A    Julia Cowley.

19   Q    And what was the kind of information

20   that you provided to Julia Cowley?

21   A    Same thing, but they did different

22   things.  I think Julia is the one that

23   investigated drugs and drug abuse, and Maureen and

24   Krista investigated the abuse of power things.

Sheila J. Porter                                    05/18/2005

160

1      Q      Abuse of power things?

2      A      Yes, the sexual abuse or physical abuse,

3   and then I also talked with Kevin Constantine and

4   somebody named Kimber.  I don't -- I just --

5   that's -- I just know his name.

6      Q      Is that a first name or a last name?

7      A      First name.  He might be -- I believe

8   he's a supervisor.

9      Q      When did you speak with the individual

10   named Kimber?

11      A      Around the time -- well, I'm not sure.

12      Q      Well --

13      A      I'm not sure.  I think it -- I think it

14   had to do with Rene, but I'm not -- I'm not sure.

15   I don't know.  I remember -- you asked me who I

16   talked to.  That's what I remember.

17      Q      Was that in 2003?

18      A      I believe so.

19      Q      Was it in 2002?

20      A      I don't think so.

21      Q      Was it after you were barred from the

22   House of Correction?

23      A      I don't know.

24      Q      Keith Constantine --

Sheila J. Porter                                    05/18/2005

161

1      A    Kevin.

2      Q    Kevin, sorry.  You provided information

3   to him?

4      A    Yes.

5      Q    When did you provide information to

6   Kevin Constantine?

7      A    That was after my barring.  I may have

8   talked to him before that, but I don't think so.

9      Q    It's fair to say that the individuals --

10  the F.B.I. agents whom you communicated with

11  between latter part of 1999 through May of -- or

12  June of 2003 were Maureen Robinson, Krista Snyder,

13  and Julia Cowley?

14     A    Yes.

15     Q    You communicated with Kevin Constantine

16  after you were barred from the House of

17  Correction?

18     A    I believe so.

19     Q    And Mr. Kimber, after you were barred

20  from the House of Correction?

21     A    I'm not sure.

22     Q    Do you believe so?

23     A    I think that might have been before

24  that, in some administrative issue, but I'm not

Sheila J. Porter                                    05/18/2005

162

1    sure.  I didn't provide information to Kimber.

2    He, I think, was clarifying something, but I --

3    I'm really not sure.  I remember the name and

4    that's what I remember.

5         Q    What was the administrative issue that

6    he was clarifying that you spoke to him about?

7         A    If I remembered what I spoke to him

8    about, then I would know, but I don't -- I don't

9    remember.  I just -- I know the name and I

10   remember that it was after talking to either

11   Maureen or Krista.  They referred me up the line

12   to Kimber for something, or maybe one of them was

13   not in the office.  I don't know.  I spoke to

14   Kimber at some point in time, and I believe he's a

15   supervisor.

16        Q    Did you ever provide any documents to

17   the F.B.I.?

18        A    No.

19        Q    Did the F.B.I. ever tell you not to

20   share the information that you were providing with

21   them with the Suffolk County Sheriff's Department?

22        A    No.

23        Q    Did they ever tell you not to disclose

24   your relationship with the F.B.I.?

Sheila J. Porter

05/18/2005

163

```
 1      A    I was an informant.  They didn't tell me
 2   not to, but I was an informant.
 3      Q    So you considered yourself an informant?
 4      A    Yes.
 5      Q    Are you still providing information to
 6   the F.B.I.?
 7      A    At this moment in time I feel the way I
 8   did from the very first day I started working as a
 9   nurse.  If there is something that I see that is
10   not legal or ethical, I would report it in any way
11   that I felt I needed to; and that would happen
12   today if there was an incident that required that.
13      Q    And that would include reporting that to
14   the institution where you happen to be working --
15   would that include reporting to the institution
16   where you happen to be working?
17      A    Reporting what?
18      Q    Whatever you perceived to be unethical
19   or illegal.
20      A    Yes.
21      Q    Now, you've characterized yourself as an
22   informant.  What does that term mean to you?
23      A    It's a person who provides information
24   that may assist a law enforcement agency in
```

Sheila J. Porter                                        05/18/2005

164

1    getting to the bottom of issues that may include

2    abuse of, in my case, the abuse of prisoners, the

3    abuse of power.  If it happened in my other life,

4    I would do the same thing.

5         Q    Did you provide any of this information

6    to the Boston Police Department?

7         A    Just concerning my own issue, but other

8    than that, no.

9         Q    Did you provide the information to the

10   attorney general's office?

11        A    No.

12        Q    Are you still working with Maureen

13   Robinson and Krista Snyder?

14        A    No.

15        Q    When did that end?

16        A    As I said, that particular informant

17   status ended the day I was asked to leave Suffolk

18   County, but if I needed to contact them again, I

19   would do so.

20        Q    Have they asked you to do so in your

21   current employment on a per diem basis in Essex

22   County or in your per diem employment at the DOC

23   facilities in Shirley, Norfolk, or MCI Cedar

24   Junction?

Sheila J. Porter

05/18/2005

165

1     A    Maureen is a recruiter, and Krista works

2   with terrorism.  So the answer would be no.

3     Q    Have any other F.B.I. agents asked you

4   to provide information where you currently are

5   employed on a per diem basis?

6     A    Specifically, no.

7     Q    You indicated that the first time you

8   became aware of Inmate Rene Rosario was in the

9   course of an incarceration at the House of

10  Correction?

11     A    Yes.

12     Q    That was prior to November of 2002?

13     A    Yes.

14     Q    And the second time that you encountered

15  him was sometime prior to November of 2002?

16     A    Yes.

17     Q    Was that also in the course of his

18  incarceration at the House?

19     A    Yes.

20     Q    In between those two incarcerations, did

21  you have any contact with him?

22     A    No.

23     Q    Did you ever have any conversations with

24  the F.B.I. regarding placing a recording device on

Sheila J. Porter                                05/18/2005

234

1       Q    Okay.  Well, have you used that term

2    before?

3       A    I have no idea.

4       Q    Mrs. Porter, when did you -- when did

5    you call the F.B.I. regarding the information that

6    Rene Rosario had provided to you?

7       A    Probably on the 19th.

8       Q    When you say probably, could it have

9    been the 20th?

10      A    I think I made the phone call on the

11   19th, but I didn't talk to anyone.

12      Q    When did you talk to someone regarding

13   the allegations that Mr. Rosario had made to you?

14      A    I think the 20th.

15      Q    And whom did you speak with?

16      A    Krista.

17      Q    Krista Snyder?

18      A    Um-hm.

19      Q    How did you contact them?

20      A    Phone.

21      Q    What did you tell them?

22      A    What Rene told me.

23      Q    Had you already completed the document

24   that's been identified as Exhibit No. 5?

Sheila J. Porter                                    05/18/2005

235

1      A    Yes.

2      Q    Did you read to them from that document?

3      A    No.

4      Q    Did you tell them that you had prepared

5    a document about it?

6      A    I don't know if the subject came up.

7    Oh, I think I told them -- oh, I'm sorry, I did.

8    I told them that I had reported it to Mary Ellen.

9      Q    But you hadn't reported it to Mary

10   Ellen, had you?

11     A    Orally -- well, through my supervisor.

12     Q    You had reported information to Donna

13   Jurdak?

14     A    Yes.

15     Q    Which she told you she was going to

16   communicate to Mary Ellen?

17     A    Correct.

18     Q    And you hadn't provided that written

19   document yet, correct?

20     A    Correct.

21     Q    Did you inform them -- did you inform

22   Krista Snyder that you had prepared a written

23   document?

24     A    I don't know.

Sheila J. Porter                                        05/18/2005

236

1       Q    Did they ask to see it?

2       A    No.

3       Q    Did they ask whether or not you had

4   documented your observations in Mr. Rosario's

5   medical chart?

6       A    No.

7       Q    Did you ever provide this to the F.B.I.,

8   this meaning Exhibit No. 5?

9       A    No.

10      Q    What did Agent Snyder instruct you to

11  do?

12      A    Part of the conversation on the 20th

13  was, I said I was concerned because he was back

14  again and there appeared to be some issues.  And

15  she said, "Okay, I'll take care of it."  And I

16  believe that was a misunderstanding between us.

17      Q    She said, "I'll take care of it"?

18      A    Yes.

19      Q    What did you interpret that to mean?

20      A    Well, I -- I interpreted it that she was

21  going to try to get Rene moved.

22      Q    I see.  Did she tell you to tell SID?

23      A    I don't remember, but they never told me

24  not -- not to and I -- I honestly don't remember

Sheila J. Porter                                    05/18/2005

237

1    that piece of it.  But I remember her saying

2    something to the effect that I'll take care of it.

3        Q    Did you report this information to the

4    United States Attorney's Office?

5        A    At the time?

6        Q    On May 19th, yes.

7        A    No.

8        Q    Or May 20th?

9        A    No.

10       Q    Mrs. Porter, I want to have you look at

11   what was previously marked as Exhibit No. 2, and

12   ask you to look at interrogatory No. 8, which is

13   on page 9, and your response, which is on page 10.

14   It's right there.

15                (Document exhibited to witness.)

16                (Witness perusing document.)

17       A    What am I looking at?

18                MR. SAVAGE:  She wants you to read

19   pages 9, 10 and 11.

20       Q    I'd like you to look at the question on

21   page 9 --

22       A    Okay.

23       Q    -- all right, and then your response,

24   which is set forth right here.  (Indicating.)

249

1                              Volume:    II

2                              Pages:     249-462

3                              Exhibits:  6-10

4              UNITED STATES DISTRICT COURT

5            FOR THE DISTRICT OF MASSACHUSETTS

6                          NO. 04-11935-DPW

7    - - - - - - - - - - - - - - - - - - - - - - - x

8    Sheila J. Porter,

9                    Plaintiff,

10        v.

11   Andrea Cabral, Suffolk County

12   Sheriff's Department Suffolk County,

13   and Correctional Medical Services, Inc.,

14                    Defendants.

15    - - - - - - - - - - - - - - - - - - - - - - - x

16

17       CONTINUED DEPOSITION OF SHEILA J. PORTER

18              Thursday, May 26, 2005

19                    9:05 a.m.

20     ADLER, COHEN, HARVEY, WAKEMAN & GUEKGUEZIAN

21              230 Congress Street

22            Boston, Massachusetts 02110

23

24   Reporter:  Lori-Ann London, RPR

Sheila J. Porter, Vol. 2                                05/26/2005

266

1       A     I believe so.

2       Q     Yes?

3       A     Yes.  Yes, I believe so.

4             MR. SCHUMACHER:  Can I ask what

5    exhibit that was?

6             MS. CAULO:  6.

7       Q     Mrs. Porter, did you contact the F.B.I.

8    after this interview on May 22nd?

9             (Witness and counsel conferring off

10            the record.)

11            MR. SAVAGE:  That's yes or no.

12      Q     Do you understand my question,

13   Mrs. Porter?

14      A     Yes, and I don't know the answer to

15   that.

16      Q     Did you --

17      A     On the 22nd?

18      Q     Yes.

19      A     I don't know.

20      Q     Did you contact them on the -- did you

21   contact them --

22            MR. SAVAGE:  Well, before you ask

23   another question, can I talk to her for a second?

24            MS. CAULO:  Sure.

Sheila J. Porter, Vol. 2                          05/26/2005

267

1          MR. SAVAGE:  Short break?

2          (Counsel and witness left the room.)

3     Q    Did you --

4          MS. CAULO:  Why don't we read back

5     the last question, please.

6          (Question read.)

7     Q    Did you contact them on the 23rd

8     relative to your interview on the 22nd?

9     A    I don't know.

10    Q    Did you have any conversation with the

11    F.B.I. between -- relative between -- strike that.

12    We'll get back to that.

13         Did you see Mr. Rosario in the

14    infirmary again after your encounter with him on

15    May 19th and then the encounter that was reflected

16    on the May 22nd report?  You indicated in the

17    report that you saw Mr. Rosario for a blood draw

18    on the 22nd?

19    A    He was having a blood draw.

20    Q    Right.

21    A    I didn't do it.

22    Q    Sure.

23    A    Yes, I saw him.

24    Q    After that -- that was on the 22nd; is

Sheila J. Porter, Vol. 2                                                05/26/2005

306

1      A      Yes.

2      Q      Did you report to Donna Jurdak that you

3   felt intimidated during this interview?

4      A      I don't recall.

5      Q      Did you talk with her about the

6   interview?

7      A      Yes.

8      Q      What did you tell her?

9      A      I told her that I thought I was set up,

10  and that they were looking for information.

11     Q      What do you mean when you told Donna

12  Jurdak that you felt that you were set up?

13     A      I felt that the questions -- I felt that

14  the questions were a setup in that I was being led

15  to a certain conclusion, that I did contact the

16  F.B.I., and I wasn't sure why that was of

17  interest.

18     Q      You had contacted the F.B.I., though,

19  correct?

20     A      What time frame are we talking about?

21     Q      You just indicated that you felt that

22  you were set up; that you were being led to a

23  conclusion that you had called the F.B.I.  You had

24  called the F.B.I., had you not?

307

1     A     Yes.

2     Q     On or about May 20th?

3     A     I believe the 19th.

4     Q     When did you actually speak with Krista
5  Snyder?

6     A     Time frame?

7     Q     May 19th to the 20th.

8     A     The 20th.

9     Q     Did you tell Donna Jurdak that you felt
10  threatened in the interview?

11    A     I don't believe so.

12    Q     Did you tell her that you felt coerced?

13    A     I don't believe so.

14    Q     Did you tell her that you wanted to
15  complain about the way in which you were treated
16  by Brian Dacey and Sonya Aleman during this
17  interview?

18    A     No.

19    Q     Did you feel that you had a basis to
20  complain about the manner in which you had been
21  treated?

22    A     Yes.

23    Q     And did you in fact make such a
24  complaint?

Sheila J. Porter, Vol. 2                                    05/26/2005

308

1      A     Yes.

2      Q     To whom?

3      A     The F.B.I.

4      Q     Did you report to the superintendent of

5   the House of Correction that you felt that you had

6   been intimidated or threatened or that you were

7   complaining about the treatment at the hands of

8   Brian Dacey and Sonya Aleman?

9      A     I did not.

10     Q     Did you report to the head of SID that

11  you felt you had been treated poorly at the hands

12  of Brian Dacey or Sonya Aleman?

13     A     I did not.

14     Q     Did you speak with anyone within

15  Correctional Medical Services to complain about

16  the way in which you were treated?

17     A     I did not.

18     Q     When did you call the F.B.I. after the

19  meeting that you had with Brian Dacey and Sonya

20  Aleman on May 28, 2003?

21          MR. SAVAGE:  Objection.

22     A     When what?

23     Q     Did you call the F.B.I. after your

24  meeting with Brian Dacey and Sonya Aleman on

Sheila J. Porter, Vol. 2                                    05/26/2005

309

1    May 28th?

2        A    Yes.

3        Q    When did you do that?

4        A    At the end of my shift.

5        Q    And when would that have been?

6        A    3:30, 4:00.

7        Q    And whom did you speak with?

8        A    Krista Snyder.

9        Q    Was that in person or on the phone?

10       A    Phone.

11       Q    What did you tell her?

12       A    I told her about the conversation.

13       Q    What did you tell her about the

14   conversation?

15       A    I told her I thought I had been set up

16   to give out information, and I wasn't sure why

17   they were asking for that information, and that

18   they used her name, and that I was nervous about

19   what the consequences were going to be.

20       Q    Did you tell her who you felt set up by?

21       A    I believe I used the generic SID.

22       Q    What other information did you

23   communicate to Krista Snyder during that telephone

24   conversation about your meeting on the 28th?

Sheila J. Porter, Vol. 2                    05/26/2005

310

1      A      I -- I recall that piece of it.  I don't

2  recall if there was anything else.

3      Q      Did you speak about Mr. Rosario?

4      A      That he was still there.

5      Q      What did you say about him -- what did

6  you communicate to Ms. Snyder about Mr. Rosario?

7      A      Again, I was concerned that they were

8  asking me about the F.B.I. in connection with me,

9  and that Rene was still there.  I wasn't sure

10  whether that was all connected or whether it was a

11  separate issue.

12      Q      Did F.B.I. Agent Snyder inquire about

13  the well-being of Mr. Rosario?

14      A      I believe she may have spoken with him.

15      Q      When?

16      A      I have -- I don't have that information.

17      Q      Well, what led you to believe that she

18  may have spoken with him?

19      A      I think somewhere in the conversation

20  was that he was still in -- still at the House of

21  Correction and not in the health service unit.

22      Q      What led you to believe that she had

23  communicated with Mr. Rosario?

24      A      An assumption on my part.

Sheila J. Porter, Vol. 2                              05/26/2005

311

1      Q     Did she inquire about his health and
2  well-being?
3      A     She told me that he was there.
4      Q     So, no, she didn't inquire about his
5  health and well-being to you?
6      A     She gave me information.  I didn't give
7  her information.
8      Q     What did you complain about to F.B.I.
9  Agent Snyder about your treatment by Mr. Dacey and
10  Ms. Aleman?
11                MR. SAVAGE:  Objection.
12     A     I told her about the interview.
13     Q     Did you ask her to do anything?
14     A     No.
15     Q     Did you ask her to take any action with
16  respect to you?
17     A     I asked her what I should do next.
18     Q     What did she say?
19     A     She said there was no particular thing
20  that I had to do, and that I was probably right,
21  they were looking for information.
22     Q     Did she indicate that she had spoken to
23  anybody from the Department prior to May 28th
24  about Mr. Rosario?

Sheila J. Porter, Vol. 2

05/26/2005

312

1      A    Yes.

2      Q    Who did she say she spoke with?

3      A    I don't recall the name, but she spoke

4   to someone in SID.

5      Q    How many times did she tell you that she

6   spoke to someone in SID prior to May 28th?

7      A    I don't think she said how many times.

8   She told me that she spoke to someone.

9      Q    And what did she tell you that she spoke

10  to -- what did she tell you that she spoke to that

11  person in SID about?

12     A    Rene.

13     Q    Did she tell you that she was aware that

14  SID was conducting an investigation?

15     A    Yes.

16     Q    What did she tell you about that?

17     A    I don't -- I don't recall the specifics.

18     Q    Was that the first time that you were

19  aware that the F.B.I. knew that the Department was

20  conducting an investigation into Mr. Rosario's

21  allegations?

22     A    No.

23     Q    When were you aware -- did you tell the

24  F.B.I. that the SID was conducting an

313

1    investigation into the allegations?

2        A    Yes.

3        Q    When was that?

4        A    Probably on the 20th.

5        Q    In between the 20th and the 28th, did

6    you have any communication with the F.B.I.

7    concerning Mr. Rosario?

8        A    Yes.

9        Q    When was that?

10       A    I couldn't give you the days or dates or

11   -- more than once.

12       Q    You had more than one communication with

13   the F.B.I. between May 20th and May 28th?

14       A    I did.

15       Q    How many?

16       A    Perhaps two or three.  I'm not sure.

17       Q    With whom?

18       A    Krista.

19       Q    And what was the subject of those two or

20   three communications between you and Ms. Snyder?

21       A    Rene.

22       Q    What about Rene?

23       A    I'm not really sure.  I can't separate

24   them out.

Sheila J. Porter, Vol. 2                           05/26/2005

314

1      Q    Well, without separating them out, what

2   information did you discuss with Krista Snyder on

3   the two or three occasions that you spoke with her

4   between May 22nd and May 28th concerning Rene

5   Rosario?

6      A    His allegations, and the injuries that I

7   saw, probably the interview --

8      Q    Which interview?

9      A    On the 22nd.

10          -- and definitely the interview on

11   the 28th.

12      Q    Did you discuss with F.B.I. Agent Snyder

13   that there were differences between your

14   observations of the injuries of Mr. Rosario and

15   those seen by Beth Bringola and Gayle Bartley?

16          MR. SAVAGE:   Objection.

17      A    I don't recall.

18      Q    Well, you indicated that you discussed

19   with her your observations?

20      A    Yes.

21      Q    Did you discuss with Krista Snyder

22   observations of Mr. Rosario by any other medical

23   personnel?

24      A    I don't recall.

Sheila J. Porter, Vol. 2                              05/26/2005

315

1        Q    Is there anything that would refresh

2   your memory?

3        A    I -- I -- I don't recall.  I have -- I

4   had more than one conversation, and I had

5   conversations from the 20th on, and there was more

6   than one.  I don't recall what was said on which

7   occasion.  I don't recall saying anything about

8   anyone else's report except that Beth had done an

9   examination.

10       Q    Did she ask you about the results of

11  Beth Bringola's examination?

12       A    I don't believe so.

13       Q    Did she ask you about the results of

14  anybody else's observations or examination of Rene

15  Rosario?

16       A    I don't believe so.

17            MS. CAULO:  Mark this, please.

18            (Document marked as Exhibit No. 8.)

19       Q    Mrs. Porter, the court reporter is

20  putting before you a document marked Exhibit

21  No. 8.  I'm going to ask you to look at it and

22  tell me if you recognize it.

23            (Witness perusing document.)

24       Q    Do you recognize the document that's

Sheila J. Porter, Vol. 2                              05/26/2005

349

1    facility; therefore, CMS, in addition, fired me;

2    and I believe in effect the Sheriff's Department

3    fired me.

4         Q    You were employed by the Correctional

5    Medical Services, correct?

6              MR. SAVAGE:  Objection.  These were

7    the first questions on the first day.

8         A    Yes.

9         Q    Is it your claim that Sheriff Cabral

10   interfered with your employment relationship with

11   CMS?

12        A    I don't have the complaint in front of

13   me, but yes.

14        Q    And how did they do that specifically --

15   how did she do that specifically?

16        A    Repeat your question, please.

17        Q    How is it specifically that Sheriff

18   Cabral interfered with your employment

19   relationship with Correctional Medical Services?

20        A    She barred me from the facility,

21   preventing me from doing my work.

22        Q    Did you notify the F.B.I. that you were

23   barred from the House of Correction?

24        A    I certainly did.

Sheila J. Porter, Vol. 2
05/26/2005

350

1        Q    When did you do that, Mrs. Porter?

2        A    At about 6:15 when I was leaving the

3    facility.

4        Q    Your meeting with Mary Ellen Mastrorilli

5    occurred at what time?

6        A    Before 3:00.

7        Q    Were you escorted out of the building or

8    were you allowed to finish your shift and gather

9    your belongings?

10            MR. SAVAGE:   Objection.

11       A    I was allowed to gather my belongings.

12       Q    So what time did you actually leave the

13   facility, if you recall?

14       A    Approximately 6:00 p.m.

15       Q    Who did you call?

16       A    Krista Snyder.

17       Q    Did you speak with her?

18       A    I did.

19       Q    Was that on the phone or in person?

20       A    On the phone.

21       Q    What did you communicate with her during

22   this telephone conversation?

23       A    That I was barred from the facility.

24       Q    Did you tell them why or tell her why,

1    rather?

2        A    Yes.

3        Q    What did you say to her?

4        A    For speaking with an outside agency.

5        Q    Did you say anything else to her?

6        A    I said a lot to her, and I couldn't tell

7    you exactly what it was right now.

8        Q    How long did the conversation last?

9        A    About -- probably about five minutes,

10    five to ten minutes.

11        Q    Other than communicating to her that you

12    had been barred to the facility for speaking with

13    an outside agency, what else can you recall about

14    what you spoke to her about -- what you told her,

15    rather?

16        A    It was about -- about that.  That's -- I

17    just remember speaking about that.  She said she

18    would get back to me.

19        Q    Did you ask her to do anything?

20        A    No.

21        Q    When she said she was going to get back

22    to you, what did she say to you?

23        A    She said she would get back to me.

24        Q    Did she tell you what she would get back

Sheila J. Porter, Vol. 2                                    05/26/2005

352

1    to you about?

2         A    I had just given her the information

3    that I was barred for speaking with an outside

4    agency.  The outside agency I spoke with was the

5    F.B.I., and she was going to talk to someone, I'm

6    not sure what, and help me to proceed with

7    whatever I was going to do next.

8         Q    Did she get back to you?

9         A    Yes.

10        Q    When?

11        A    That night, after I got home.

12        Q    Was it a phone conversation or in

13   person?

14        A    Phone.

15        Q    What did she say to you; what did you

16   say to her?

17        A    She asked me to repeat what had been

18   said to me in the meeting, and she told me that --

19   or she asked me if I could come in in the morning

20   to a meeting.

21        Q    Anything else that was said between the

22   two of you on that phone conversation?

23        A    It's a blur.

24        Q    What meeting did she ask you to attend

Sheila J. Porter, Vol. 2                                     05/26/2005

353

1    in the morning?

2         A    I went to a meeting at the Justice

3    Department and --

4         Q    Where was it located?

5         A    At the courthouse, the federal

6    courthouse.

7         Q    The Moakley Courthouse?

8         A    Yes.

9         Q    Who did you go there with, who did you

10   travel to the courthouse with?

11        A    I met Krista and -- Krista Snyder and

12   Maureen Robinson at the courthouse.

13        Q    You drove there by yourself?

14        A    Yes.

15        Q    After you met Krista Snyder and Maureen

16   Robinson at the courthouse, where did you go?

17        A    Inside.

18        Q    To where?

19        A    I think the 6th floor, but I'm not sure.

20   It's a maize, and I'm not really sure, but I think

21   the 6th floor, a conference room similar to this.

22        Q    Who did you meet with?

23        A    Steve Huggard, Maureen, Krista, I think

24   three other -- two or three other people, and the

Sheila J. Porter, Vol. 2                              05/26/2005

354

1    names are not in my head right now.  I think one

2    was with the F.B.I., and the other two I believe

3    were with the U.S. Attorneys Office perhaps.

4         Q    Steve Huggard is an Assistant United

5    States Attorney, to your knowledge?

6         A    I -- he was at the time.  I think he's

7    doing something different, but he was.

8         Q    And the two other individuals whom you

9    thought were with the United States Attorneys

10   Office, do you recall their names?

11        A    As I sit here now, no, but if you put

12   their names in front of me, I might recognize

13   them.

14        Q    Were they male or female?

15        A    Male.  Maureen and Krista and myself

16   were the three females, the others were all male.

17        Q    Was there an A.S.A. named McNeil?

18        A    I don't think so.

19        Q    Was the United States Attorney Michael

20   Sullivan present?

21        A    No.

22        Q    What was discussed during this meeting?

23        A    The fact that I was barred and the

24   incidents leading up to that.

Sheila J. Porter, Vol. 2
05/26/2005

355

1      Q      Specifically, what was said?

2      A      Again, that's kind of a blur, but they

3    asked me to recount my story, which I did,

4    starting from when I first started working with

5    the F.B.I. to the day I was barred.

6      Q      Prior to that date, had you ever met

7    with Assistant United States Attorney Steve

8    Huggard?

9      A      No.

10      Q      Prior to that date, had you ever met

11    with any Assistant United States Attorney

12    concerning your involvement with the F.B.I.?

13      A      No.

14      Q      What action was -- during the course of

15    this discussion, did -- did any member of the

16    F.B.I. or the United States Attorneys Office

17    indicate that they wanted to take some action?

18      A      They indicated that they were asking me

19    questions to see if they should take any action.

20      Q      And what were they considering?

21      A      I -- I don't know.

22      Q      Well, what did they communicate to you

23    about what they were considering?

24      A      They were asking me questions concerning

Sheila J. Porter, Vol. 2                                05/26/2005

356

1    the barring, concerning my involvement, concerning

2    whether or not there was an ongoing investigation.

3         Q    Did you ask them to take any action?

4         A    No.

5         Q    Did you want something to happen?

6         A    Yes.

7         Q    What is it that you wanted to happen?

8         A    At the time I wanted my job back.

9         Q    At the time you hadn't been fired from

10   CMS; is that correct?

11        A    No, not correct.

12        Q    You were fired when?

13        A    Well --

14        Q    From CMS.

15        A    Now I know that I was fired on the 10th,

16   but I didn't know that at the time.

17             MR. SAVAGE:  You at a logical point

18   for a break?

19             MS. CAULO:  What time is it now?

20             MR. SAVAGE:  It's about twenty of,

21   11:37.

22             MS. CAULO:  A few more minutes.

23             MR. SAVAGE:  And then we're all

24   done.

Sheila J. Porter, Vol. 2

05/26/2005

357

1           MS. CAULO:   No.

2      Q    How long did the meeting last,

3   Mrs. Porter, with the U.S. Attorneys Office?

4      A    I think about an hour.

5      Q    This is on June 11th?

6      A    Yes.   Perhaps longer, but at least an

7   hour.

8      Q    At the close of the meeting was there a

9   course of action that was suggested?

10     A    I believe they suggested that I have an

11  attorney.

12     Q    Did they suggest who you should have as

13  an attorney?

14     A    No.

15     Q    Why did they suggest you needed an

16  attorney?

17     A    I felt that I was illegally barred, and

18  the agents that I had been working with felt that

19  I was illegally barred, and I thought that in that

20  case I best have an attorney to represent me.

21     Q    What advice did they provide you?

22     A    To find an employment attorney.

23     Q    Did they indicate that they were going

24  to take some action separately from their advice

Sheila J. Porter, Vol. 2

05/26/2005

358

1    to you to get an attorney?

2        A    They said that they were going to be

3    investigating.

4        Q    Did you have arrangements to have

5    another meeting with them?

6        A    No.

7        Q    Did you understand that they would get

8    back in touch with you?

9        A    No.

10       Q    Did you return to the House of

11   Correction on June 11, 2003?

12       A    Before I went to the meeting.

13       Q    Before you went to the meeting?  On

14   June 11, 2003, did you go to the House of

15   Correction?

16       A    I went to the vicinity of.  I drove to

17   Bradston Street, parked my car across the street

18   from the House of Correction, and waited for

19   Ms. Jurdak and Sandra Sousa to bring out the

20   things that I had left, and in turn gave them

21   things that I had inadvertently taken home.

22       Q    Was this after the meeting with the

23   United States Attorneys Office?

24       A    Before the meeting.

360

1    Ellen Mastrorilli to someone about Rene and that

2    she had talked to Donna on the 19th, and there was

3    a comment about Rene in that piece of paper.

4         Q    Anything else that you can recall?

5         A    No.

6         Q    Is that September of 2003?

7         A    I -- I'm not sure of the timing, but I

8    believe that's the approximate time.  I don't know

9    the date.

10        Q    Were you aware that Maureen Robinson

11   went to the House of Correction on June 11, 2003?

12             MR. SAVAGE:  Objection.

13        A    Yes.

14        Q    Did you accompany her?

15        A    No.

16        Q    Whose idea was it for Maureen Robinson

17   to go to the House of Correction on June 11, 2003?

18             MR. SAVAGE:  Objection.

19        A    I'm not sure.

20        Q    Were you present when a decision was

21   made that Maureen Robinson was going to go to the

22   House of Correction on June 11, 2003?

23             MR. SAVAGE:  Objection.

24        A    There was a discussion about getting a

Sheila J. Porter, Vol. 2

05/26/2005

361

1    copy of my personnel file.

2        Q    Who had that discussion?

3        A    I don't remember whose idea and who

4    talked about it or whether -- and I don't recall

5    who was going, whether it was Krista or Maureen or

6    whether it was the other -- I believe there was

7    another person from the F.B.I., but I don't

8    remember who it was.

9        Q    Were you involved in that discussion

10   about retrieving your personnel file?

11       A    No, because I couldn't go there.

12       Q    So how were you informed that Maureen

13   Robinson was going to go to the House of

14   Correction to retrieve your personnel file?

15            MR. SAVAGE:  Objection.

16       A    I was in the room and she left to go.

17       Q    That's what I'm saying.  Were you

18   involved in the discussion concerning retrieving

19   your personnel file?

20            MR. SAVAGE:  Asked and answered.

21       A    I was there.  I was not involved.

22       Q    You were aware that your personnel file

23   was not kept at the House of Correction, correct?

24            MR. SAVAGE:  Objection.

362

1     A     Excuse me?

2     Q     Were you aware where your personnel file

3   was kept?

4     A     Yes.

5     Q     Where was that?

6     A     At the House of Correction.

7           MR. SAVAGE:  Objection.  We covered

8   this the last time.

9           MS. CAULO:  I don't think we did.

10    Q     It's your testimony that you did not

11  accompany Maureen Robinson to the House of

12  Correction on June 11, 2003?

13    A     Definitely not.

14    Q     Did you speak with her about -- did she

15  ever communicate with you about what occurred when

16  she went there?

17    A     Yes.

18    Q     And what was that conversation?

19    A     That when she got there, she was kept

20  waiting for a while, and that she asked to see

21  Donna Jurdak, and Donna was in a meeting, and then

22  Donna came out and spoke to her.

23    Q     Did she tell you what information was

24  communicated between she and Donna Jurdak at that

Sheila J. Porter, Vol. 2
05/26/2005

369

1       Q      Did you speak with the F.B.I. concerning

2   your interview with the Boston Globe?

3       A      I think I did.

4       Q      You spoke with the F.B.I. prior to

5   conducting the interview?

6       A      I think so.

7       Q      Did you speak with them about what you

8   were going to talk about in the interview?

9       A      I believe it was -- from the F.B.I.

10  point of view and for safety sake, I think I just

11  asked what I could say and what I couldn't say.

12      Q      And who was that with, that

13  conversation, if you recall?

14      A      It would have been either Krista or

15  Maureen, probably Krista.

16      Q      Prior to conducting the interview, did

17  you speak with anybody from the United States

18  Attorneys Office?

19      A      No.

20      Q      Where was the interview conducted,

21  Mrs. Porter?

22      A      I was at home on my telephone.

23      Q      It was a phone interview?

24      A      Yes.

Sheila J. Porter, Vol. 2                          05/26/2005

375

1    was there any other advice given to you by Agent

2    Snyder?

3        A    No.

4        Q    Did you speak with the U.S. Attorneys

5    Office before doing the Channel 5 interview?

6        A    No.

7        Q    Did you speak with the U.S. Attorneys

8    Office after you conducted the interview with

9    Channel 5?

10                MR. SAVAGE:   Objection.

11       A    You mean in that proximity?

12       Q    Yes.

13       A    No.

14       Q    Did you speak with them at all

15   concerning the interview you had with Channel 5?

16       A    I don't remember if it came up in

17   subsequent meetings or not.

18       Q    How many times in total have you spoken

19   with the United States Attorneys Office?

20       A    Three, and the grand jury.

21       Q    One appearance before the grand jury?

22       A    Correct.

23       Q    And three separate meetings with

24   representatives from the United States Attorneys

Sheila J. Porter, Vol. 2                          05/26/2005

376

1    Office?

2         A    I believe so.

3         Q    How many were with United States

4    Attorney Michael Sullivan?

5         A    One.

6         Q    Who was present at that meeting?

7         A    My attorney, about five or six people,

8    gone -- gone from my memory.  Again, if I have a

9    list in front of me, I can say yes or no, but --

10        Q    Were the F.B.I. agents present?

11        A    No.

12             MR. SAVAGE:  Objection.  When you

13   say "the F.B.I. agents," what do you mean?

14        Q    Were Agents Snyder or Robinson present?

15        A    The first one.

16        Q    At the meeting with the United States

17   Attorney Michael Sullivan?

18        A    No.

19        Q    Was Ken Kaiser present during the

20   meeting with United States Attorney Michael

21   Sullivan?

22        A    I think so.

23        Q    Was Assistant United States Attorney

24   Stephen Huggard present with your meeting with

Sheila J. Porter, Vol. 2                          05/26/2005

377

1    United States Attorney Michael Sullivan?

2        A    No.

3        Q    Was Assistant United States Attorney

4    McNeil present with your meeting with

5    Mr. Sullivan?

6        A    No.

7        Q    Other than Ken Kaiser, United States

8    Attorney Michael Sullivan, your attorney, who else

9    was present?

10       A    Someone from the F.B.I.

11       Q    Was that Kevin Constantine?

12       A    Yes.

13       Q    Who else, do you recall?

14       A    I think two more people, but I don't

15   remember.

16       Q    When did it take place, if you know,

17   before or after your appearance before the grand

18   jury in September of 2003?

19       A    After.

20       Q    And between 2003 and the interview you

21   gave in August of 2004, when did it take place?

22            MR. SAVAGE:   Objection.

23       Q    If you know.

24            MR. SAVAGE:   I just don't

378

1  understand.  You're saying it occurred between

2  those two?

3              MS. CAULO:  Mrs. Porter I believe

4  just answered that the meeting with United States

5  Attorney Michael Sullivan did not occur before

6  September of 2003.

7              MR. SAVAGE:  But then you said

8  between 2003 and the interview --

9              MS. CAULO:  August of 2004.

10             MR. SAVAGE:  Ask your question.

11     Q     Do you recall when it occurred after

12  your grand jury appearance?

13     A     It was way after, but I don't know a

14  date.

15     Q     Was it in 2004?

16     A     I think so.

17     Q     What was discussed during this meeting

18  with United States Attorney Michael Sullivan?

19     A     I believe -- I pretty much was asked the

20  same questions that I had been asked in my first

21  meeting with the U.S. Attorneys Office, in the

22  grand jury, and in that meeting, maybe some

23  clarification, but it was basically what happened,

24  and, you know, what's your -- what's your story,

Sheila J. Porter, Vol. 2                              05/26/2005

379

1    which is the same story that I told on the 11th of

2    June in 2003, at the grand jury, and at the next

3    meeting with Michael Sullivan.

4        Q    Did Michael Sullivan tell you what the

5    United States Attorneys Office was going to do?

6        A    No.

7        Q    When did you first become aware of a

8    press statement that was issued by the Suffolk

9    County Sheriff's Department on or about

10   August 25th of 2004?

11       A    Could I see the press statement?

12       Q    Well, I'm asking you first of all when

13   did you become aware that the Department had

14   issued a press statement?

15       A    If it's the one I have in my mind,

16   during the interview on Channel 5.

17       Q    And how did you become aware during the

18   interview with Channel 5 that the Department had

19   issued a press statement?

20       A    It got put on the monitor for me to

21   read.

22       Q    Is that the first time that you had seen

23   it?

24       A    It was.

Sheila J. Porter, Vol. 2
05/26/2005

418

1        A     I'm not sure it was that specific.   I

2  honestly can't tell you how it was left.  I would

3  frequently say to him, I need to keep so and so

4  here; I'm concerned for their safety.  And, you

5  know, what do you need to do that for?  And

6  sometimes it was, You don't want to know.  And I

7  had told him specifically on a couple of occasions

8  that I was working with the F.B.I.  I didn't tell

9  him that it was long term, that it was ongoing,

10  but then the frequent comment was, You don't want

11  to know, and then he understood that information

12  to mean that for some security or safety reasons I

13  needed him to do that for me.

14        Q     Were any of your meetings with the

15  F.B.I. taped?

16        A     Not that I know of.

17        Q     Were any of your phone calls with the

18  F.B.I. taped?

19        A     Not that I know of.

20        Q     Did you ever submit any reports to the

21  F.B.I.?

22        A     I don't believe so.

23        Q     Did you ever give the F.B.I. any

24  documents that were in any way generated or came

419

1    from the House of Corrections?

2        A    I don't think so.

3        Q    Did you enjoy working with the F.B.I.?

4        A    Enjoy...

5        Q    Did you enjoy it?

6        A    I don't know if I ever thought about it

7    that way.

8        Q    You testified last week that you didn't

9    keep a diary regarding your discussions with the

10   F.B.I.  Did you keep a calendar that would have on

11   it dates of meetings with the F.B.I. or anything

12   else relating to the events that are relevant to

13   this lawsuit?

14       A    No.

15       Q    The cell in which Mr. Rosario was held,

16   was that a special kind of cell because of his MOA

17   status when he came down to the health services

18   unit on May 19th?

19       A    I think it was a -- I think it was a

20   cell that had a camera in it, but I'm not really

21   sure, to be honest with you.

22       Q    There were no bars in the cell, correct?

23   It was a room with a solid door and a window;

24   there were no bars that you could look through?