UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHEILA PORTER,<br>    Plaintiff<br><br>v.<br><br>ANDREA CABRAL, SUFFOLK<br>COUNTY SHERIFF'S DEPARTMENT,<br>SUFFOLK COUNTY, and<br>CORRECTIONAL MEDICAL<br>SERVICES, INC.<br>    Defendants | )<br>)<br>)<br>)<br>)  Civil Action No. 04-11935-DPW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANTS ANDREA CABRAL, SUFFOLK COUNTY SHERIFF'S DEPARTMENT AND SUFFOLK COUNTY'S MEMORANDUM IN OPPOSITION TO THE PLAINTIFF'S MOTION TO COMPEL DISCOVERY.**

**I.  INTRODUCTION**

The Plaintiff is a former contract nurse practitioner employed by Defendant Correctional Medical Services, Inc. (CMS) at the Suffolk County House of Correction (HOC). She alleges in her amended complaint that the Suffolk Defendants barred her from the HOC in retaliation for providing information to the FBI in May 2003 concerning suspected physical abuse of an inmate, Rene Rosario ("Rosario"), at the HOC. CMS was the company that provided medical care for the inmates incarcerated at the Suffolk County House of Correction (HOC) in 2003. The contract negotiated between Suffolk County and CMS provided that the Suffolk County Sheriff's Department ("Department") had the authority to bar any employee of CMS from the HOC. The Department has in fact barred a number of CMS employees from the HOC prior to and subsequent to the Plaintiff. On June 10, 2003 the Department barred the Plaintiff from the HOC.

1

Sheriff Cabral made the decision to bar the Plaintiff from the HOC because the Plaintiff failed to document her observations of Inmate Rosario's physical condition in his medical record, failed to submit a confidential report of her encounter with Inmate Rosario in a timely manner as requested, and the document that was submitted ten days later was written on Interdisciplinary Progress Notes, appeared to be a medical note and it was dated the date of the incident as though that was the date that treatment was rendered. (Deposition of Andrea J. Cabral, "Cabral", May 6, 2005 & June 24, 2005, pgs. 86-87, attached as Exhibit A).

Chief of Staff Elizabeth Keeley communicated Sheriff Cabral's decision to bar the Plaintiff to Deputy Superintendent Mary Ellen Mastrorilli and asked her to inform the Plaintiff that she was barred.  Chief of Staff Keeley also informed Deputy Superintendent Mastrorilli that the Plaintiff was being barred for multiple violations of S220 (Employee Code of Conduct Policy) including, failure to document a medical file, failure to file a timely report, and sharing confidential inmate information outside of the Department. (Deposition of Elizabeth Keeley, "Keeley", May 11, 2005, pgs. 61-64, attached as Exhibit B).

On June 10, 2003 Deputy Superintendent Mastrorilli informed the Plaintiff that she was barred from the HOC.  Instead of communicating all of the reasons for the barring, Deputy Superintendent Mastrorilli only advised the Plaintiff that she was barred for communicating confidential inmate information to an outside agency.  (Deposition of Mary Ellen Mastrorilli, "Mastrorilli", June 27, 2005, pg. 34, attached as Exhibit C; Keeley Deposition, pg. 63-64, Exhibit B).

On June 16, 2003 Sheriff Cabral, Chief of Staff Keeley and Deputy Superintendent Viktor Theiss met with United States Attorney Michael Sullivan and members of his staff and the FBI.  During this meeting[1] Sheriff Cabral and her staff informed the United States Attorney that the Plaintiff was barred from the HOC because she violated Department policy and her obligations as a nurse practitioner pertaining to her interaction with inmate Rene Rosario on or about May 19, 2003. (Cabral Deposition, pgs. 86-87, 229-231 Exhibit A).

During the course of discovery, the Defendants have responded to two sets of interrogatories and two requests for the production of documents (79 separately numbered requests).  They have produced in excess of 1, 800 pages of documents in response to the Plaintiff's request for the production of documents.  The Defendants have also made seven current or former employees available for deposition

## II.   FACTUAL BACKGROUND

The decision to bar the Plaintiff from the HOC arose out of an investigation into allegations made by HOC Inmate Rosario on May 19, 2003 that an unidentified correction officer had physically assaulted him.  Inmate Rosario made these allegations after he was transported to the Medical Housing Unit after complaining of hearing voices.  The correction officer on duty in the Medical Housing Unit immediately contacted the Sheriff's Investigation Division ("SID") and informed them that Inmate Rosario wanted to speak with them.  SID investigators Brian Dacey and Sonya Aleman responded to the Medical Housing Unit, interviewed Inmate Rosario and opened an investigation into his allegations. (SID Incident Report dated May 19, 2003, attached as Exhibit D).

---

[1] The meeting took place just six days after the Plaintiff was barred and more than one year before she filed her lawsuit.

3

During the course of that investigation, it was learned that Inmate Rosario also reported the alleged assault to the Plaintiff on May 19, 2003 in the Medical Housing Unit where she was on duty as a nurse practitioner. He also allegedly showed her the injuries that he sustained as a result of the alleged assault. (May 22, 2003 interview of Sheila Porter, Nurse Practitioner, attached as Exhibit E). The Plaintiff did not, as required by her employment as a nurse practitioner, document her observations of Rosario's physical condition and his statements concerning how he was allegedly injured in his medical records.[2] (Deposition of Sheila J. Porter, May 18, 2005, "Porter", pg. 195, attached as Exhibit H). Nor did the Plaintiff report the inmate's allegations to SID as required by Department policy. Further, the Plaintiff did not inform any of the other medical professionals who conducted examinations and assessments of Inmate Rosario after his arrival on the Medical Housing Unit on May 19, 2003 about her observations of his physical condition and his allegations that he was assaulted.[3] (Porter Deposition, pgs. 201, 206-207, Exhibit H).

Instead the Plaintiff informed her supervisor, CMS employee and Health Services Administrator Donna Jurdak, that an inmate in the infirmary was alleging that an officer had assaulted him. After some discussion, the Plaintiff and Ms. Jurdak decided that Ms. Jurdak should communicate this information to Department Deputy Superintendent Mary

---

[2] Physician's Assistant Beth Bringola ("PA Bringola") conducted a physical examination of Inmate Rosario and observed visible bruising on his left bicep. She did not observe an injury to Inmate Rosario's chest. PA Bringola documented this encounter and her observations of Inmate Rosario's physical condition in Inmate Rosario's medical records on May 19, 2003. ( May 22, 2003 Interview of Beth Bringola, P.A., Exhibit F; Medical Observation Following Use of Force form dated may 19, 2003, by Craig Meekins, LPN, Exhibit G). The Plaintiff's observation of inmate Rosario's alleged injuries are inconsistent with the aforementioned-recorded observations. (May 19, 2003 Interdisciplinary Progress Notes by Sheila Porter, NP, attached as Exhibit I).

[3] Plaintiff did tell Gayle Bartley, who conducted a mental health assessment of Inmate Rosario on May 19, 2003 that Inmate Rosario "may have different issues than previously expressed". (Exhibit I). The Plaintiff did not provide her with more specific information. (Porter Deposition, pgs. 206-207, Exhibit H).

4

Ellen Mastrorilli. (Porter Deposition, pgs. 223-224, Exhibit H). After being so advised, Deputy Superintendent Mastrorilli requested that the Plaintiff submit a confidential report concerning her contact with the inmate. (Memo re. Nurse Practitioner Sheila Porter by Mary Ellen Mastrorilli, dated May 23, 2003, attached as Exhibit J). The Plaintiff did not produce a response to this request until ten days later and instead of the confidential report requested she provided a handwritten Interdisciplinary Progress Note ("Medical Note") dated May 19, 2003, the date of her encounter with the inmate.[4] ( Mastrorilli Deposition, pg. 26, Exhibit C; Interdisciplinary Progress Notes dated May 19, 2003 by Sheila J. Porter, Exhibit I).

On May 20, 2003 the Plaintiff contacted FBI Special Agent Christa Snyder regarding Inmate Rosario's allegations and the Plaintiff's concerns that Inmate Rosario was incarcerated at the HOC. (Porter Deposition, pg. 234, 236, Exhibit H). On May 21, 2003 SID Investigator Stan Wojtkonski had a conversation with Special Agent Snyder outside the Nashua Street Jail. During this conversation, Agent Snyder informed Wojtkonski that a member of the medical staff at the HOC, whom Snyder did not identify, had contacted her on the evening of May 20, 2003. Agent Snyder said this person told her that they had witnessed an examination of Inmate Rosario conducted by a person named "Beth". Agent Snyder said this person told her that they had witnessed bruising to Inmate Rosario's neck, chest and arms that they did not feel was consistent

---

[4] The Plaintiff testified that she completed her "report" on May 19, 2003 but did not provide it to Ms. Jurdak until May 22 or 23, 2003. She did not provide it directly to Deputy Superintendent Mastrorilli on May 19, 2003 or at any time thereafter because 'it did not occur to her". Nor did the Plaintiff provide it to SID investigators Brian Dacey and Sonya Aleman on May 22, 2003 when they spoke with her in the Medical Unit concerning Inmate Rosario's allegations. (Porter Deposition, pgs. 228-229, 243-244. Exhibit H).

5

with self-inflicted wounds.[5] (SID Incident Report, dated May 21, 2003, attached as Exhibit K).

On May 22, 2003 SID investigators Dacey and Aleman were in the Medical Unit reviewing Inmate Rosario's medical records in conjunction with their investigation of his allegations, when the Plaintiff approached them about those allegations.[6] Since the Plaintiff had failed to document her encounter with Inmate Rosario in his medical records and had not filed a report with SID, she was not someone whom they had identified to interview. The Plaintiff informed them that she had a "history" with Inmate Rosario and that he had told her and others that he had worn a wire for the "feds". (May 22, 2003 interview of Sheila Porter, Nurse Practitioner, Exhibit E). The Plaintiff did not inform the investigators that she was the person who had attached the recording device to Inmate Rosario at the request of the FBI. Nor did she tell them that she had been providing information to the FBI for approximately four years and that she had contacted the FBI on May 20, 2003 regarding Inmate Rosario's allegations. (Exhibit E).

During this meeting the Plaintiff provided the investigators with some information concerning her encounter with Inmate Rosario on May 19, 2003 and her observations of his alleged injuries. She did not provide the investigators with a copy of the Interdisciplinary Progress Notes that she had allegedly written on May 19, 2003 after her encounter with Rosario and which contained more detailed information. (Porter Deposition, pgs.243-244, Exhibit H).

---

[5] The Plaintiff testified that she was not present for the physical examination of Inmate Rosario conducted by PA Bringola nor did she speak with her concerning the results of that examination or review the medical note concerning that examination that Bringola placed in Rosario's medical records. (Porter Deposition, pgs. 201, Exhibit H).
[6] They had already conducted a preliminary interview of Inmate Rosario on May 19, 2003 in his cell in the Medical Housing Unit.

6

Agent Snyder contacted Wojtkonski again on May 23, 2003 to inquire about the status of SID's investigation into Inmate Rosario's allegations. Investigator Wojtkonski informed her that two SID investigators had been working on the case for the past several days and had interviewed Inmate Rosario and taken photographs of his injuries. Wojtkonski advised Agent Snyder that investigators had not found the injuries that had been reported to Agent Snyder by her confidential source.[7] He also informed her that no member of the nursing staff had submitted reports to SID concerning injuries sustained by Inmate Rosario on May 19, 2003. Agent Snyder assured Wojtkonski that if the confidential source contacted her again she would advise it to report the incident directly to the Department. (SID Incident Report, dated May 23, 2003, attached as Exhibit L). The Plaintiff did not file a report of Rosario's allegations with SID.

The Department received the Plaintiff's May 19, 2003 Interdisciplinary Progress Notes concerning her encounter with Inmate Rosario on May 28, 2003. (Mastrorilli Deposition, pg. 26, Exhibit C). On that date, Investigators Dacey and Aleman conducted a follow up interview with the Plaintiff concerning the information contained in that document. At the close of the interview, after they had questioned the Plaintiff regarding her interaction with and observations of inmate Rosario on May 19, 2003, Investigator Dacey asked the Plaintiff if she knew when FBI Agent Snyder was contacted. The Plaintiff acknowledged that she had contacted Agent Snyder on or about May 20, 2003. (May 28, 2003 Interview of Sheila Porter, Nurse Practitioner, attached as Exhibit N).

---

[7] Investigator Dacey also spoke with Agent Snyder during this time period to update her on the status of SID's investigation into Rosario's allegations and to see if she required any further information. Agent Snyder indicated that she did not. ( Deposition of Brian Dacey, "Dacey", June 16, 2005, pg. 169,171, attached as Exhibit M).

7

SID closed its investigation into Rosario's allegations on or about June 4, 2003 after concluding that his allegations could not be sustained.

Thereafter, Sheriff Cabral was apprised of SID's investigation into the inmate's allegations and the Plaintiff's involvement in the matter. Based upon the Plaintiff's failure to document her observations of Inmate Rosario's physical condition in his medical record and her failure to provide a confidential report in a timely manner as requested, Sheriff Cabral decided to revoke her security clearance and bar the Plaintiff from the HOC on June 10, 2003. (Cabral Deposition, pgs. 86-87, Exhibit A). Barring is the standard mechanism for removing contract workers and volunteers from working at the HOC.

## DISCOVERY REQUESTS AT ISSUE

I. **Requests Related to Reporting**

Contrary to the Plaintiff's assertion, the totality of the reasons for her barring were not confined to the fact that she provided a written account of her encounter with Inmate Rosario on Interdisciplinary Progress Notes instead of a confidential incident report as requested. The Plaintiff was barred from the HOC because she did not fulfill a basic obligation of her role as a nurse practitioner: document her observations of an inmate's physical condition regarding his allegations that he was physically assaulted by a corrections officer in the inmate's medical records. Further, when directed by a Deputy Superintendent to submit a confidential incident report regarding her encounter with the inmate, she did not comply until ten days later. The document that was ultimately submitted appeared to be a medical note dated the date of the encounter, but no medical note was placed in inmate Rosario's medical records documenting the Plaintiff's

8

observations of Inmate Rosario's physical condition on that date. (Cabral Deposition, pgs. 86-87, Exhibit A).

Furthermore, the Plaintiff was a contract worker employed by CMS and assigned to work at the HOC. She was not a member of any union at the HOC nor was she covered by the terms of any collective bargaining agreement. Union members are entitled to the protections of the just cause provision in their respective collective bargaining agreements concerning the imposition of discipline. In order to sustain discipline imposed on union members through the grievance and arbitration process, the Department must be able to persuade an Arbitrator that "just cause" existed for the discipline imposed. An Arbitrator's assessment of "just cause" necessarily involves, inter alia, an evaluation of the alleged misconduct and proof thereof, the nexus between the misconduct and the employment, the reasonableness of the penalty imposed by the employer in relation to the employee's misconduct, the employee's years of service, and past disciplinary history in the context of the principles of progressive discipline. These factors and the Department's ability to withstand a challenge to the discipline imposed at arbitration, necessarily impact the level of discipline that the Department decides to impose on an employee for misconduct.

In this case, because the Plaintiff was a contract worker, Sheriff Cabral was not constrained by the dictates of just cause and the grievance and arbitration process in taking the action that she believed was appropriate in light of the Plaintiff's conduct. Accordingly, it is inapposite to compare discipline imposed on union members for violations of S220 related to reporting with the barring of the Plaintiff because they are not similarly situated. Furthermore, disciplinary decisions made by previous Sheriffs in

prior administrations have no relevance to Sheriff Cabral's determination in this instance that the Plaintiff's conduct warranted barring. Sheriff Cabral does not know what was in the mind of a prior Sheriff when decisions regarding the level of discipline to impose in a particular case were made. Those decisions cannot be attributed to Sheriff Cabral and it is inappropriate to use them to evaluate her decision to bar the Plaintiff in this instance.

### A.    Documents Authored by Mrs. Porter in SID's Possession

Upon further review the Defendants will produce documents authored by Mrs. Porter in SID's possession, which are responsive to Request No. 57. By this production the Defendants have not waived their previously stated objections to this request.

### B.    Incident Reports Filed by Others in a Similar Fashion as Mrs. Porter

Contrary to the Plaintiff's assertion, the totality of the Sheriff's reasons for her barring were not confined to the fact that the Plaintiff provided a written account of her encounter with Inmate Rosario on Interdisciplinary Progress Notes which appeared to be "backdated". The Plaintiff was barred from the HOC because she did not fulfill a basic obligation of her role as a nurse practitioner: document her observations of an inmate's physical condition in the inmate's medical records after the inmate alleged he was assaulted by a corrections officer. Further, when directed by a Deputy Superintendent to submit a confidential incident report concerning her encounter with the inmate, she did not comply until ten days later. The document that ultimately was submitted appeared to be a medical note dated the date of the encounter, but no medical note was placed in the inmate's medical records documenting the Plaintiff's encounter with the inmate pertaining to that date. (Cabral Deposition, pgs. 86-87, Exhibit A).

Request No. 71 seeks any and all incident reports in the custody or control of SID that are dated before such reports were completed or otherwise contain inaccurate or multiple dates. The Plaintiff suggests that these reports, to the extent that they exist and can be identified as such, are relevant because they are dated in the same fashion that the Plaintiff dated the handwritten Interdisciplinary Progress Notes at issue in this case. However, by the Plaintiff's own testimony, she began and completed her written account of her encounter with Inmate Rosario on May 19, 2003, the date of that encounter. She did not submit it to her CMS supervisor, Donna Jurdak, until May 22 or 23, 2003. (Porter Deposition, pg. 230, Exhibit H). The Department, who requested that the Plaintiff write a report, did not receive it until May 28, 2003. Further, even if the Defendants were able to locate documents responsive to Request No. 71, it would not bolster the Plaintiff's claim that the reasons articulated by Sheriff Cabral for her barring were pretextual. Without a demonstration that the filing of such documents was done in a factual context similar to the instant case and that Sheriff Cabral was aware of such documents being filed, the purported relevance is extremely tenuous.

The tenuous relevance of this information is underscored by the burdensome nature of the request. Documents or reports received by SID that do not warrant an investigation or are not related to an ongoing investigation are filed in a monthly folder. These monthly folders contain numerous documents pertaining to the daily operations of the Department, including Shift Rap Sheets prepared by Shift Commanders, Disciplinary Reports, Use of Force Reports, Incident Reports, Emergency Furlough Requests, and Official Requests to Visit Inmates. At present there are twelve file drawers in SID filled with monthly folders that contain tens of thousands of pages of documents that are not

filed by type of document or author. (Affidavit of Stephen F. Jacobs, attached as Exhibit O).

Documents or reports received by SID that related to an ongoing investigation or warranted the initiation of an investigation were filed according to that investigation with a corresponding number.  In approximately February 2003 all files relating to closed SID investigations (approximately fifteen file drawers) were moved from the HOC to the Nashua Street Jail for storage.  Between February 2003 and June 2003 SID initiated approximately ten investigations.  The files relating to these investigations are stored in the SID office at the HOC or the Nashua Street Jail. (Affidavit of Stephen F. Jacobs, Exhibit O).

It would require a Herculean effort to search through the tens of thousands of pages of documents maintained by SID at the HOC and the Nashua Street Jail to find any documents responsive to Request No. 71. The Plaintiff's request is unduly burdensome, overly broad and not reasonably calculated to lead to the discovery of relevant evidence.

**B.    Explanation of SCSD Computer's Dating Procedure**

The Defendants have responded fully and completely regarding how Microsoft Word affixed the date on the documents testified to by Sheriff Cabral and Brian Dacey. Neither that process nor an inspection of Sheriff Cabral 's computer is at all relevant to the dating of the Plaintiff's handwritten Interdisciplinary Progress Notes, which she claims to have completed on May 19, 2003.

**C.    Filing Reports on Interdisciplinary Progress Notes**

Upon further review, Defendants will amend their responses to Plaintiff's Request for Admissions Nos. 3 & 5.  Given the tens of thousands of pages of documents

maintained by SID at the HOC and the Nashua Street Jail, it would be virtually impossible to determine whether SID received incident reports from contractors that were not submitted by the end of the contractor's shift. Accordingly, the Defendants are unable to admit or deny the remaining averments contained in Admission No. 6.

## II.   Code of Silence Documents

The Plaintiff's unsupported allegations in her complaint notwithstanding, nowhere in her deposition testimony or her interrogatory answers does she assert that her failure to document her observations of Inmate Rosario's physical condition in his medical records, failure to report his allegations of abuse to SID and failure to timely submit a report of her encounter with Inmate Rosario when requested to do so by a Deputy Superintendent were due to the existence of an undefined Code of Silence or her fear of retaliation. Further, the Stern Commission, which reported on the status of the Department as it existed under former Sheriff Richard Rouse, recounted what they found to be a "code of silence that prevents staff members from reporting on the misconduct of fellow staff members." Nowhere in their lengthy report does the Stern Commission opine that a Code of Silence exists at the Suffolk County Sheriff's Department manifested by the Department's retaliation against its employees or contract workers for reporting the misconduct of employees. Indeed the Stern Commission noted that the Department took swift action in responding to the allegations of physical abuse and sexual misconduct by terminating the officers involved. (See Stern Commission Report at p. 9).

The Defendants do not know what the Plaintiff means by any documents that the Department provided to the FBI that "shed light on the code of silence, as described by the Stern Commission." Further the Plaintiff has not demonstrated how FBI

13

investigations of Department employees conducted prior to the Cabral Administration are relevant to the claims set forth in her complaint, particularly where the Plaintiff has never asserted that her failure to document inmate Rosario's medical records or provide a report of her encounter with inmate Rosario was because of some undefined code of silence or fear of retaliation.

## III. POLICY REVIEW COMMITTEE NOTES

The Defendants have produced all policy review committee meeting minutes, which are the official record of such meetings, pertaining to the revision of Policy S220. Further the Defendants have produced over sixty additional pages of documents pertaining to the revisions of Policy S220, Subsection C. Confidential Communications, an area on which the Plaintiff exhaustively questioned Sheriff Cabral and Chief of Staff Keeley during their depositions.

## IV. Documents Related to Sheriff Cabral's Credibility

This request is another example of the Plaintiff's relentless pursuit of information that is completely irrelevant to her claims but is intended to harass and embarrass Sheriff Cabral.[8] In support of this request counsel makes the outrageous and unsubstantiated statement, "It turns out that Ms. Cabral has engaged in acts of dishonesty in the past." Content to simply level this reckless accusation, counsel has never identified what these purported "acts of dishonesty" are, or what evidence there is to support such an outrageous accusation. Instead counsel identifies two incidents: acknowledged defaults by Sheriff Cabral on student loans more than ten years ago which have since been repaid

---

[8] Plaintiff has similarly sought the production of Sheriff Cabral's personnel files from the Suffolk County Sheriff's Department and the Suffolk County District Attorney's Office. Notably, the Plaintiff has also requested the personnel files of Chief of Staff Elizabeth Keeley and Deputy Superintendent Viktor Theiss from the Suffolk County Sheriff's Department and the Suffolk County District Attorney's Office.

14

in full and two instances in which fines were imposed on the Cabral Campaign by the Office for Campaign and Political Finance ("OCPF") during her first run for political office in 2004. Counsel never articulates how these incidents constitute "acts of dishonesty" on behalf of Sheriff Cabral or how the documents themselves are relevant to "cast doubt on Ms. Cabral's honesty". There is not a scintilla of evidence to support the suggestion that Sheriff Cabral intended to default on her student loans when she signed the loan applications. Further there is no evidence to establish that Sheriff Cabral was aware much less directed the actions that resulted in the Campaign being fined by OCPF for minor campaign violations. Indeed, the evidence is completely to the contrary.[9]

      Counsel further attempts to buttress his specious argument for these documents, which relate solely to Sheriff Cabral in her personal capacity and her Campaign, by disingenuously suggesting that they are relevant to the Plaintiff's claims for punitive damages. Counsel contends that the purported failure of Sheriff Cabral to meet her legal obligations in the past is related to the Department's liability. In support of this fanciful argument counsel makes another outrageous and unsubstantiated statement, "the SCSD has a history of refusing to meet its legal obligations" and cites the settlement in Katrina Mack et al, v. Suffolk County et al, No. 98-12511-NG. The circumstances surrounding Sheriff Cabral's efforts to facilitate the payment of the Mack settlement, which was agreed to by her predecessor Sheriff Rouse and became due the day that Sheriff Cabral took office, are completely irrelevant to the Plaintiff's claims in the instant litigation. The Plaintiff has failed to demonstrate how information pertaining to Sheriff Cabral's

---

[9] In her deposition, Sheriff Cabral testified candidly and at length concerning both her student loan defaults and the two instances in which OCPF fined her campaign for minor violations.

15

defaults on student loans and fines imposed on her Campaign are relevant to any of her claims.

## **CONCLUSION**

For all the foregoing reasons, Defendants Andrea Cabral, Suffolk County Sheriff's Department and Suffolk County respectfully request that this Court deny the Plaintiff's Motion to Compel.

Respectfully submitted
For all DEFENDANTS
By their attorney

/s/ Ellen M. Caulo
Ellen M. Caulo, BBO #545250
Deputy General Counsel
Suffolk County Sheriff's Department
200 Nashua Street
November 16, 2005                Boston, MA 02114