Sheila J. Porter     EXHIBIT H     05/18/2005

```
                                        Volume:    I
        CERTIFIED ORIGINAL              Pages:     1-248
        LEGALINK BOSTON
                                        Exhibits:  1-5

            UNITED STATES DISTRICT COUR
          FOR THE DISTRICT OF MASSACHUSETTS
                     NO. 04-11935-DPW
 - - - - - - - - - - - - - - - - - - - - - x
 Sheila J. Porter,
                   Plaintiff,
     v.
 Andrea Cabral, Suffolk County
 Sheriff's Department Suffolk County,
 and Correctional Medical Services, Inc.,
                   Defendants.
 - - - - - - - - - - - - - - - - - - - - - x

           DEPOSITION OF SHEILA J. PORTER
              Wednesday, May 18, 2005
                    10:10 a.m.
     ADLER, COHEN, HARVEY, WAKEMAN & GUEKGUEZIAN
                230 Congress Street
              Boston, Massachusetts 02110

 Reporter:  Lori-Ann London, RPR
```

LegaLink Boston
(617) 542-0039

Sheila J. Porter                                              05/18/2005

                                                                    195

1   injury was to assess what the injuries might in
2   fact be and the extent of them?
3       A    If indeed I examined him, yes, it would
4   have been.
5       Q    Wouldn't a physical examination have
6   been necessary at that time in sound nurse
7   practitioner judgment to commence that evaluation?
8       A    Someone did examine him.
9       Q    When did Beth Bringola examine
10  Mr. Rosario?
11      A    Sometime after I was at -- that I
12  stopped at the cell.
13      Q    When?
14      A    I don't know.
15      Q    Were you present?
16      A    No.
17      Q    When did you record your observations of
18  Mr. Rosario in his medical records pertaining to
19  the encounter that you have just testified about?
20      A    I didn't.
21      Q    You did not?
22      A    I didn't record them in the medical
23  record.  I recorded them, but not in the medical
24  record.

                        LegaLink Boston
                        (617) 542-0039

Sheila J. Porter                                          05/18/2005

196

1    Q    Why didn't you record them in the
2  medical records?
3    A    Because I wrote a report, not a medical
4  note.
5    Q    Why didn't you record your observations
6  in the medical record?
7    A    Because I didn't do the exam.
8    Q    You had an encounter with
9  Inmate Rosario, right?
10   A    I did.
11   Q    That encounter occurred in the
12 infirmary, correct?
13   A    Yes.
14   Q    You were on duty as a nurse practitioner
15 at that time, correct?
16   A    Yes.
17   Q    You saw him, Mr. Rosario, in your
18 capacity as a nurse practitioner, correct?
19   A    Yes.
20   Q    He had been sent to the infirmary on MOA
21 status?
22   A    Correct.
23   Q    He told you he had been injured, right?
24   A    Yes.

LegaLink Boston
(617) 542-0039

Sheila J. Porter                                    05/18/2005

201

1   happened, and I did not see him until I returned
2   from lunch.
3       Q    Well, you know that the physical
4   examination wasn't conducted until Beth Bringola
5   did it sometime after you had your encounter with
6   Mr. Rosario, correct?
7       A    I believe it was after.  It could have
8   been while I was at lunch.
9       Q    Did he indicate that he had been
10  examined by Beth Bringola?
11      A    I didn't ask him.
12      Q    In any event, you didn't communicate any
13  of this information to Beth Bringola personally,
14  correct?
15      A    Correct.
16      Q    And you didn't record any of these
17  observations of Mr. Rosario or your communications
18  with him in the medical chart?
19      A    Correct.
20      Q    But clearly your conversation with him
21  and your interaction with him concerned his
22  medical condition; isn't that fair?
23      A    Yes.
24      Q    So is it your testimony that as a nurse

Sheila J. Porter                                          05/18/2005

206

1   A   This is -- I'm not sure I talked with
2   Donna at the same time or in the same time frame.
3   So I'm not sure what I told Gayle and what I told
4   Donna. I did tell Gayle that the issues were not
5   auditory hallucinations, but that there were some
6   other issues going on, and I told Donna that I had
7   seen the bruises.
8   Q   I'm speaking specifically about what you
9   told Gayle.
10  A   Exactly what I told which one, I am --
11  at this point in time I couldn't tell you, but I
12  may have -- I may have written it down at the
13  time. I did not review that particular report
14  last night.
15  Q   Which report is that?
16  A   The one I wrote the day that it
17  happened, on the 19th.
18  Q   I see. Okay. Did you specifically
19  articulate to Gayle Bartley that Mr. Rosario had
20  said he was physically assaulted by an officer?
21  A   I don't remember.
22  Q   Did you specifically tell Gayle Bartley
23  that you observed injuries, as you have described
24  them here today, on Mr. Rosario?

LegaLink Boston
(617) 542-0039

Sheila J. Porter                                              05/18/2005

207

```
1      A    I think so.  I'm not sure.
2      Q    Didn't you tell her, that is, that his
3  issues seem to be not psychiatric, he has some
4  other issues, and if you want some more
5  information, come talk to me?
6      A    Yes.
7      Q    That's what you said to her?
8      A    That's part of what I said to her.  It
9  took longer than that but, yes, I did say that.
10     Q    Did she come and talk to you?
11     A    I don't think so.
12          (Document marked as Exhibit No. 5.)
13     Q    Before we get there, Mrs. Porter, with
14  respect to your conversation with Gayle Bartley,
15  you indicated that she didn't come and speak to
16  you?
17     A    I don't think so.  I went to her.
18     Q    No.  I mean after you provided her this
19  information, after you said to her, "I saw Rene.
20  I think there's more to the story.  If you need
21  more information, come see me."
22     A    I don't think she came to see me.
23     Q    Did you follow up with her?
24     A    No.
```

LegaLink Boston
(617) 542-0039

Sheila J. Porter                                              05/18/2005

223

1  A    In the health service unit.
2  Q    What did you say to her; what did she
3  say to you?
4  A    I told her that Rene had come down on
5  MOA because he said he was hearing voices, but
6  then when I saw him in the back, he said he wasn't
7  hearing voices; he came down because he was
8  reporting that he had been assaulted by an
9  officer, and that he waited -- I told her the
10 story that Rene told me; that he waited for the
11 officer that he said injured him to leave the unit
12 for lunch; and then he said he was hearing voices
13 so that he could get down to the -- to the health
14 service unit to see someone; and that when I
15 talked to him, he didn't appear to be having a
16 problem with his mental illness at that time; that
17 he said he wasn't hearing voices, but he came down
18 for the other reason; that he said he had been
19 assaulted and he was afraid.
20 Q    Anything else?
21 A    That Rene was back and I didn't
22 understand why he was back, and that I wanted to
23 re -- I wanted to report it; that I needed to
24 report it; and that I wanted to -- that I wasn't

Sheila J. Porter                                       05/18/2005

224

1  sure what -- what to do about it.
2      Q    Did you tell her that you had not
3  documented your encounter with him in his medical
4  chart?
5      A    No.
6      Q    At the point in time that you had this
7  conversation with Donna Jurdak, had you written
8  the document that appears before you as
9  Exhibit No. 5?
10     A    No.
11     Q    Did you ask Donna Jurdak to do anything
12 with the information that you had provided to her?
13     A    Yes.
14     Q    What was that?
15     A    We talked about it and decided that it
16 would be Mary Ellen she would report it to.  I
17 asked her to convey the information to Mary Ellen.
18     Q    And what was your sense of what Mary
19 Ellen would do with the information?
20     A    I thought she might pass it on to SID or
21 to somebody different in SID.  There were new
22 people in SID that I didn't know.  I didn't know
23 -- I wasn't sure what she was going to do with it,
24 but that's where I wanted it to go next.

                    LegaLink Boston
                    (617) 542-0039

Sheila J. Porter                                              05/18/2005

226

1  made the decision to go above them because of past
2  experiences, and I wrote my report and I did not
3  call SID at that time.
4      Q   Okay.  And as part of your answer a few
5  moments ago, you indicated that you perhaps
6  expected Mary Ellen Mastrorilli to provide the
7  information to SID, perhaps to one or two of the
8  new investigators that had just come on board,
9  correct?
10     A   I thought she might, yes.
11     Q   And that would have been okay?
12     A   I was hoping it would be.
13     Q   In fact, that's where the information
14 should go, correct?
15     A   Yes.
16     Q   When did you -- you indicated that you
17 authored this document sometime in the afternoon
18 of May 19th?
19     A   Yes.
20     Q   Where did you do it?
21     A   In my office.
22     Q   At...
23     A   Suffolk County House of Correction.
24     Q   What did you do with it after you

LegaLink Boston
(617) 542-0039

Sheila J. Porter                                      05/18/2005
                                                           227

1  finished writing it?
2      A    I was going to give it to Donna, but she
3  had left the facility, so I put it in my briefcase
4  and took it with me.
5      Q    To home?
6      A    Yes.
7      Q    Why didn't you leave it on her desk or
8  in her office?
9      A    I didn't want to leave it anywhere.
10     Q    Why not provide it to Mary Ellen
11 Mastrorilli directly that day?
12     A    I had left it with Donna that she would
13 do it and that's what I --
14     Q    That she would do what?
15     A    That she would pass it on to Mary Ellen.
16     Q    Is it your testimony that you told Donna
17 you were going to write a report and that's what
18 she was going to provide to Mary Ellen?
19     A    She called Mary Ellen and told her what
20 I had -- and reiterated what I had told her.  Mary
21 Ellen asked her to have me write a report.  I was
22 already writing a report, but she passed that
23 information on to me, and so I said I would -- I
24 would get it to her.

Sheila J. Porter                                            05/18/2005
                                                                  228

1   Q   Were you present during the conversation
2   that Donna Jurdak had with Mary Ellen Mastrorilli?
3   A   No.
4   Q   When after that phone conversation did
5   Donna Jurdak come to you and tell you that Mary
6   Ellen had requested a report?
7   A   Before she left the facility.
8   Q   Were you already in the process of
9   writing the report?
10  A   Yes.
11  Q   Did you ask her to wait and say, "I'm
12  almost finished with it.  I can give it to you in
13  a moment"?
14  A   No, I wasn't almost finished with it.
15  She had an appointment; she was leaving.
16  Q   Once you finished the report -- strike
17  that.
18      You were aware then on the 19th,
19  according to your testimony, that Mary Ellen
20  Mastrorilli had requested a written report?
21  A   Yes.
22  Q   So why once you finished it didn't you
23  bring it to where Mary Ellen Mastrorilli's office
24  was?

                    LegaLink Boston
                    (617) 542-0039

Sheila J. Porter                                        05/18/2005
                                                              229

1   A   It didn't occur to me.
2   Q   Had you ever provided reports to Mary
3   Ellen Mastrorilli before?
4   A   No.
5   Q   Did you know who she was?
6   A   Yes.
7   Q   Had you had conversations with her about
8   your responsibilities and her job before?
9   A   Yes.
10  Q   So there's nothing that prevented you
11  from providing that written document to her on
12  May 19th, right?
13  A   No.
14  Q   Okay. When did you give this document
15  to Donna Jurdak?
16  A   I honestly am not sure. Before the end
17  of the week is all I can tell you. By Friday I'm
18  not sure we didn't cross paths for one reason or
19  another, and I know she had it by Friday. I can't
20  tell you whether it was Thursday or Friday.
21  Q   What day of the week was that; do you
22  know? What number day? This was on the 19th.
23  When --
24  A   I think the 19th was a Monday.

LegaLink Boston
(617) 542-0039

Sheila J. Porter                                            05/18/2005

230

```
 1      Q    And your testimony is that you provided
 2  it to Donna Jurdak by when?
 3      A    By Friday.
 4      Q    So by the -- here's a math question
 5  again -- by the 23rd?
 6           MS. HARVEY:  23rd.
 7      A    Yes.
 8      Q    Were you -- I'm sorry.
 9      A    I think it was Thursday, but I'm not
10  positive.
11      Q    And were you working on Tuesday,
12  Wednesday, and Thursday?
13      A    To the best of my knowledge, yes.
14      Q    Was there some reason that prevented you
15  from providing this written document to Donna
16  Jurdak before the Thursday date?
17      A    I don't remember.
18      Q    Okay.  Was there some reason that
19  prevented you from giving it directly to Mary
20  Ellen Mastrorilli on Tuesday, Wednesday, or
21  Thursday?
22      A    It didn't occur to me.
23      Q    And when you provided this document to
24  Donna Jurdak, was it the original document?
```

LegaLink Boston
(617) 542-0039

Sheila J. Porter                                           05/18/2005
                                                                  234

```
 1    Q    Okay.  Well, have you used that term
 2  before?
 3    A    I have no idea.
 4    Q    Mrs. Porter, when did you -- when did
 5  you call the F.B.I. regarding the information that
 6  Rene Rosario had provided to you?
 7    A    Probably on the 19th.
 8    Q    When you say probably, could it have
 9  been the 20th?
10    A    I think I made the phone call on the
11  19th, but I didn't talk to anyone.
12    Q    When did you talk to someone regarding
13  the allegations that Mr. Rosario had made to you?
14    A    I think the 20th.
15    Q    And whom did you speak with?
16    A    Krista.
17    Q    Krista Snyder?
18    A    Um-hm.
19    Q    How did you contact them?
20    A    Phone.
21    Q    What did you tell them?
22    A    What Rene told me.
23    Q    Had you already completed the document
24  that's been identified as Exhibit No. 5?
```

LegaLink Boston
(617) 542-0039

Sheila J. Porter                                       05/18/2005
                                                              235

1   A   Yes.
2   Q   Did you read to them from that document?
3   A   No.
4   Q   Did you tell them that you had prepared
5   a document about it?
6   A   I don't know if the subject came up.
7   Oh, I think I told them -- oh, I'm sorry, I did.
8   I told them that I had reported it to Mary Ellen.
9   Q   But you hadn't reported it to Mary
10  Ellen, had you?
11  A   Orally -- well, through my supervisor.
12  Q   You had reported information to Donna
13  Jurdak?
14  A   Yes.
15  Q   Which she told you she was going to
16  communicate to Mary Ellen?
17  A   Correct.
18  Q   And you hadn't provided that written
19  document yet, correct?
20  A   Correct.
21  Q   Did you inform them -- did you inform
22  Krista Snyder that you had prepared a written
23  document?
24  A   I don't know.

LegaLink Boston
(617) 542-0039

Sheila J. Porter                                   05/18/2005
                                                        236

1   Q   Did they ask to see it?
2   A   No.
3   Q   Did they ask whether or not you had
4   documented your observations in Mr. Rosario's
5   medical chart?
6   A   No.
7   Q   Did you ever provide this to the F.B.I.,
8   this meaning Exhibit No. 5?
9   A   No.
10  Q   What did Agent Snyder instruct you to
11  do?
12  A   Part of the conversation on the 20th
13  was, I said I was concerned because he was back
14  again and there appeared to be some issues. And
15  she said, "Okay, I'll take care of it." And I
16  believe that was a misunderstanding between us.
17  Q   She said, "I'll take care of it"?
18  A   Yes.
19  Q   What did you interpret that to mean?
20  A   Well, I -- I interpreted it that she was
21  going to try to get Rene moved.
22  Q   I see. Did she tell you to tell SID?
23  A   I don't remember, but they never told me
24  not -- not to and I -- I honestly don't remember

Sheila J. Porter                                              05/18/2005

243

```
 1  Had he written in the chart?
 2       A    I don't know.
 3       Q    You certainly had not, though, right?
 4       A    I hadn't.
 5       Q    Now, you approached Brian Dacey and
 6  Sonya Aleman to tell them that you knew something
 7  about this?
 8       A    I don't know how it came about.  I
 9  really don't.
10       Q    Okay.
11       A    I don't remember.
12       Q    Did you provide them with this report?
13       A    No.
14       Q    It had been completed on the 19th,
15  correct?
16       A    Yes.
17       Q    And you had it in your possession,
18  correct?
19       A    I think so.  It may have already been
20  passed along.  I don't know.  I don't know if I
21  still had it in my possession on the 22nd or if I
22  had passed it along.
23       Q    But you didn't provide it to them,
24  correct?
```

LegaLink Boston
(617) 542-0039

Sheila J. Porter                                                05/18/2005

244

1   A   No, I didn't.
2   Q   Did you tell them that you had it?
3   A   I don't know.
4   Q   Wouldn't that have been important for
5   them to know?
6           MR. SAVAGE:  If you know.
7   A   I don't know.
8   Q   Well, they were in the infirmary
9   conducting an investigation regarding the
10  allegations made by Mr. Rosario, right?
11  A   Yes.
12  Q   They told you why they were there?
13  A   Yes.
14  Q   Why didn't you tell them that you had
15  written a document about an encounter you had with
16  him?
17  A   I don't know if I did or I didn't.  I do
18  not remember.  I may have told them.  I may have
19  told them I passed it along.  I really do not
20  remember.
21  Q   Certainly in your experience over the
22  nine years you've been at the House of Correction
23  it would have been important for the investigators
24  to know who saw the inmate making the allegations

LegaLink Boston
(617) 542-0039