# Memorandum

**To:** File
**CC:** Elizabeth Keeley
**From:** Sheriff Andrea Cabral
**Date:** 6/18/03
**Re:** Conversation with United States Attorney Michael Sullivan

---

On Monday, June 16th, I, Chief of Staff Elizabeth Keeley and SID Director Viktor Theiss met with United States Attorney Michael Sullivan, First Assistant Gerard Leone, Public Corruption Unit Chief Steve Huggins, FBI Supervising Agent Ken (last name not recalled), and a fourth man whose name I also cannot recall, but who I believe is also affiliated with the FBI. On June 18, 2003, I received a message that United States Attorney Michael Sullivan had called with a request that I call him back. To the best of my recollection, I returned his call at approximately 4:00 p.m., after I returned to the House of Correction from the Nashua Street Jail.

For the purpose of clarity, the following should be noted: In the course of the June 16 meeting, which lasted two hours, among many other statements, comments and questions was the disclosure by Steve Huggins that he had send FBI Agent Maureen Robinson to the South Bay House of Correction several days earlier to investigate a possible violation of a federal statute making it a felony for an employer to punish someone because s/he has spoken to the FBI. When she came to the House of Correction, Maureen Robinson had Sheila Porter with her. Ms. Porter had already been banned from the Department and Agent Robinson stated that she was there to interview Porter's supervisor, Donna Jurdak.

When I first questioned Huggins as to why Robinson would have ever thought it was appropriate to bring Porter into the facility, Huggins responded that Porter was there to help Robinson get her personnel file. I stated to Huggins that a simple written request and release from Porter would have resulted in the file being readily turned over and would have avoided the significant issues created by Porter's appearance in the facility in the company of an FBI agent who showed her badge and immediately identified herself. Huggins had no response as to why the former tact was not taken.

1

001050

November 6, 2003

It was not until later in the conversation – in anger – that he disclosed the real reason for Robinson's appearance. It remains quite unclear to me how Huggins and Robinson could have reasonably believed Porter's presence was necessary or appropriate to an FBI agent's investigation of a possible felony complaint.

In the June 18th call, U.S. Attorney Sullivan stated that the FBI wanted to do follow-up interviews with Donna Jurdak, a CMS contract staffer and Deputy Superintendent of HOC Program Services Mary Ellen Mastrorilli. Jurdak was the supervisor of former CMS contract nurse Sheila Porter and Mastrorilli had the conversation with Nurse Porter wherein she was informed that she would no longer be assigned to the Suffolk County Sheriff's Department. U.S. Attorney Sullivan asked if I had a problem with either woman being interviewed (or re-interviewed in the case of Jurdak.) I told him I did not and took no position either way as the decision to consent to the interview rested solely with each individual. I told Sullivan that we had specifically declined to advise Donna Jurdak several days prior when she called seeking guidance as to whether she should speak with FBI Agent Robinson.

U.S. Attorney Sullivan stated that because Nurse Porter was an FBI informant and information disclosed by us in the June 16th meeting had called her credibility into question, the FBI was interested in "protecting her" and wanted to see if there was any corroboration of Porter's complaint to the FBI that the cancellation of her assignment to the Department was due to the fact that she had provided them with information.

(It should be noted that in the June 16th meeting, I, Chief of Staff Keeley and SID Director Theiss discussed issues of Porter's credibility that arose in SID's investigation of an inmate allegation that he had been struck by an officer. These credibility issues were discussed because Porter was initially described by the U.S. Attorney – in response to a direct question - as being the sole source of information that the Department was "punishing" those who spoke with the FBI. In fact, it was this allegation that apparently led to the meeting being scheduled.)

I expressed my surprise at his statement as I thought we had made it clear the previous day that Nurse Porter had been removed for other reasons, but stated that the FBI could conduct whatever consensual interviews they saw fit.

U.S. Attorney Sullivan stated that he had three options: 1) To let the matter drop; 2) to conduct further interviews that either would or would not bolster Nurse Porter's credibility; or, if potential interviewees declined to be interviewed, to 3) convene a Grand Jury into the matter.

I then expressed my "shock" that a Grand Jury would even be considered on such a matter. I told Sullivan that it would be unprecedented in my 15 years

2

001051

November 6, 2003

experience as a former prosecutor for the U.S. Attorney and the FBI to convene a grand jury, ostensibly for the purpose of investigating a potential felony, but in reality for the purpose of protecting and preserving an informant's credibility for future cases. U.S. Attorney Sullivan stated that the FBI has a history of vigorously protecting its informants – sometimes to its own detriment. I responded that their zealousness was legendary and because of that, I was extremely concerned about the direction this matter was taking. I assured Sullivan that my concern was not at all due to any belief or even apprehension that Porter had been told by DS Mastrorilli she was being moved out because she spoke with the FBI, but because of the unprecedented nature of the investigation.

I then asked Sullivan outright to confirm my suspicion that this had nothing to do with the FBI's ability to investigate an inmate complaint, but strictly concerned Porter. He confirmed. I then stated that he clearly intended to make the Department a target of a grand jury inquiry if staff did not agree to be interviewed. Sullivan responded that he "would not call the Department a target just yet." I stated that it clearly could become one in short order and again expressed my shock that such lengths would be taken and contemplated to protect an informant's credibility. I also stated that I could only assume that Sheila Porter was very central to some investigation, that the approach being taken was highly unusual and that I would appreciate being told what the real story was. Sullivan stated that it had nothing to do with anything except the FBI's desire to protect Sheila Porter. (Though I did not say it, I found the fact that Sullivan himself called quite unusual.)

I also stated to Sullivan that, since the decision to end Porter's assignment was mine and something for which I would readily take responsibility, I would naturally be an individual target of any investigation. He did not dispute my perception, but reiterated that he would not use the word "target."

The conversation then turned to the June 16th conversation and the stated assurances by Supervising FBI Agent Ken (last name not recalled) that he would always keep me informed about any ongoing investigations involving the Department, that he wanted to freely exchange information and maintain a healthy professional relationship. I questioned the impact of Sullivan's disclosures on that relationship. Sullivan stated that he did not see the Department's status as a potential target of a federal grand jury inquiry as an impediment to good relations.

I then stated to Sullivan that, while I had not said so at the meeting, I felt strongly that many of the comments from Steve Huggins and the Supervising FBI Agent were condescending and patronizing. (I made it clear to Sullivan that I was speaking only about Huggins and the Supervising FBI Agent and that I had discerned nothing but courtesy and calm from him, Leone and the third FBI representative.) I cited several examples. I stated that I was not the only one who noticed it and I questioned whether a different sheriff would have been spoken to in

3

001052

November 6, 2003

such a manner. Sullivan stated that the tone of the conversation had been the subject of some subsequent "internal discussion." While he stated he would leave Ken's apology for him to give, Sullivan apologized for Huggins' behavior, saying it was not the first time he had behaved or spoken inappropriately. I told Sullivan that the totality of the circumstances were of concern to me as they indicated zealousness and not objectivity.

Sullivan asked whether Jurdak and Mastrorilli should be contacted through me. Given our earlier conversation regarding my status as a potential target, I thought the question odd. I told him the FBI could contact them directly. He also asked if SID interviewed Donna Jurdak. I did not know and so stated. He asked if I would find out and provide any written reports to the FBI. I told him I thought it was an inappropriate request given the nature of the investigation, its goal of protecting Sheila Porter's credibility and my apparent status as a potential target.

We ended the conversation with the customary pleasantries.

4

001053