Sheila J. Porter                                05/18/2005

```
                                                          1
 1                              Volume:    I

 2   CERTIFIED ORIGINAL        Pages:    1-248
     LEGALINK BOSTON
 3                              Exhibits:  1-5

 4           UNITED STATES DISTRICT COURT

 5        FOR THE DISTRICT OF MASSACHUSETTS

 6                      NO. 04-11935-DPW

 7   - - - - - - - - - - - - - - - - - - - - - x

 8   Sheila J. Porter,

 9                   Plaintiff,

10        v.

11   Andrea Cabral, Suffolk County

12   Sheriff's Department Suffolk County,

13   and Correctional Medical Services, Inc.,

14                   Defendants.

15   - - - - - - - - - - - - - - - - - - - - - x

16

17          DEPOSITION OF SHEILA J. PORTER

18           Wednesday, May 18, 2005

19                 10:10 a.m.

20     ADLER, COHEN, HARVEY, WAKEMAN & GUEKGUEZIAN

21             230 Congress Street

22          Boston, Massachusetts 02110

23

24   Reporter:  Lori-Ann London, RPR
```



249

1    Volume:    II

2    Pages:    249-462

3    Exhibits:  6-10

4          UNITED STATES DISTRICT COURT

5       FOR THE DISTRICT OF MASSACHUSETTS

6                   NO. 04-11935-DPW

7    - - - - - - - - - - - - - - - - - - - - - x

8    Sheila J. Porter,

9                    Plaintiff,

10        v.

11   Andrea Cabral, Suffolk County

12   Sheriff's Department Suffolk County,

13   and Correctional Medical Services, Inc.,

14                    Defendants.

15   - - - - - - - - - - - - - - - - - - - - - x

16

17       CONTINUED DEPOSITION OF SHEILA J. PORTER

18            Thursday, May 26, 2005

19                 9:05 a.m.

20      ADLER, COHEN, HARVEY, WAKEMAN & GUEKGUEZIAN

21             230 Congress Street

22          Boston, Massachusetts 02110

23

24   Reporter:  Lori-Ann London, RPR

CERTIFIED ORIGINAL
LEGALINK BOSTON

Sheila J. Porter                                    05/18/2005

61

1      A     Staffing protocols?

2      Q     Well, there are -- strike that.

3            When you worked at the Suffolk

4   County House of Correction from January of 2001 to

5   June of 2003, what was your schedule?

6      A     I believe at that time it was from about

7   7:30 to 3:30 or 4:00.

8      Q     7:30 to 3:30 or 4:00.  And what days did

9   you work?

10     A     Monday through Friday.

11     Q     How did the Suffolk County Sheriff's

12  Department dictate that you, Sheila Porter,

13  reported to the Suffolk County House of Correction

14  Monday through Friday from 7:30 to 3:00 or 3:30?

15     A     I would have started earlier; I wasn't

16  able to because of the Suffolk County Sheriff's

17  Department's rule about when sick call could

18  start.

19     Q     I see.  So is that written someplace; is

20  that indicated someplace, in some document?

21     A     I'm not sure.

22     Q     So that's the extent, from your

23  perspective, as to how the Sheriff's Department

24  dictated the days of the week that you worked and

LegaLink Boston
(617) 542-0039

Sheila J. Porter                                    05/18/2005

62

1   the hours that you worked?

2       A    Weekend days -- it wasn't as easy to get

3   the work done then, so I suppose it depends on the

4   -- more the hours that you could start, how long a

5   time you could work, how late you could see

6   someone.  So if you start early or if you wanted

7   to finish later, Suffolk County said, You can't

8   see someone after this time.

9       Q    Did you have to -- how did you account

10  for your hours while you worked at the Suffolk

11  County House of Correction for Correctional

12  Medical Services?

13      A    Time clock.

14      Q    You punched in?

15      A    Yes.

16      Q    What if you wanted a day off, what would

17  you do?

18      A    I would speak to the health service

19  administrator.

20      Q    Did you consult with the Suffolk County

21  Sheriff's Department?

22      A    No.

23      Q    What if you were sick and couldn't come

24  to work on a day, what would you do?

Sheila J. Porter                                    05/18/2005

63

1       A    I would call in.

2       Q    To whom?

3       A    The health service administrator.

4       Q    Would you inform the Suffolk County

5  Sheriff's Department that you couldn't come in?

6       A    No.

7       Q    Okay.  How many nurse practitioners

8  worked Monday through Friday, 7:30 to 3:30, if I'm

9  getting that correct?

10      A    One.

11      Q    One nurse practitioner.

12           How many other nurse practitioners

13  were employed by Correctional Medical Services at

14  the Suffolk County House of Correction?

15      A    Another designation.  There was one

16  other person at the same level, but not a nurse

17  practitioner.

18      Q    And what's the distinction; who is that

19  person and what was the difference?

20      A    Physician's assistant.

21      Q    Okay.  And who was that?

22      A    Beth Bringola, B-R-I-N-G-O-L-A.

23      Q    Was her job and her responsibilities

24  similar to yours?

Sheila J. Porter                                                05/18/2005

64

1    A    Yes.

2    Q    And she was employed by CMS as well,

3  correct?

4    A    Yes.

5    Q    Okay.  Did she work Monday through

6  Friday, 7:30 to 3:30?

7    A    No.

8    Q    What were her hours, if you know?

9    A    I think 7:00 to 3:30 or 4:00, but four

10  days a week.

11   Q    Okay.  With the exception of that one

12  day, you had similar schedules, correct?

13   A    Yes.

14   Q    Okay.  Were you -- did you have -- were

15  you able to take lunch?

16   A    Yes.

17   Q    Were you able to take breaks?

18   A    I think I was allowed.

19   Q    Okay.  And how would you coordinate your

20  lunch schedule and if you took a break, with whom?

21   A    According to the schedule of the health

22  service -- of the health service unit.

23   Q    With the health service administrator?

24   A    There was a time between 11:30 and 1:00

Sheila J. Porter                                    05/18/2005

66

1        How did the Suffolk County Sheriff's

2   Department dictate the manner in which you

3   performed your responsibilities as a nurse

4   practitioner?

5        A    Where the person could be seen dictated

6   what could be done.  For instance, if a person

7   could not be brought to the exam room but had to

8   be examined somewhere else would make a difference

9   in the exam.  Who was in the room with a security

10  issue changes the manner in which a medical exam

11  is done or can change it.

12       Could you repeat the question itself

13  again?

14       Q    Sure.  How did the Suffolk County

15  Sheriff's Department dictate the manner in which

16  you performed your responsibilities as a nurse

17  practitioner?

18       A    I think it was where I was allowed to go

19  and when and with what privacy was available.

20       Q    You just indicated that where the exam

21  could be done by security considerations might

22  dictate the extent to which --

23       A    Yes.

24       Q    -- an exam was completed?

Sheila J. Porter                                      05/18/2005

67

1     A    Yes.

2     Q    Was it within your authority as a

3 nursing provider, a nurse practitioner, that if a

4 more thorough examination was indicated that you

5 would be able to do that?

6     A    Not necessarily at that specific time.

7     Q    But later you would?

8     A    Again, it depends on the -- on the

9 circumstances.

10     Q    Well, certainly if you felt that

11 treatment was indicated, you would say so, would

12 you not?

13     A    Yes.

14     Q    And certainly if you felt that a more

15 thorough examination was indicated, based upon

16 your training and experience as a nurse

17 practitioner, you would say so, correct?

18     A    I would.

19     Q    And you would do what you could in order

20 to facilitate that the treatment be provided to

21 the inmate, correct?

22     A    Correct.

23     Q    Similarly, if you were -- strike that.

24          Similarly, if the persons who were

Sheila J. Porter                                    05/18/2005

68

1    present in a room impeded your ability to conduct

2    a thorough examination, would you take steps to

3    ensure that you had an opportunity at a later

4    point to conduct a thorough examination?

5        A    If I could.

6        Q    Did any employee of the Suffolk County

7    Sheriff's Department ever tell you that you

8    couldn't provide treatment to an inmate?

9        A    No.

10        Q    Did ever -- any -- did any employee of

11    the Suffolk County Sheriff's Department ever tell

12    you that you couldn't perform your

13    responsibilities as a nurse practitioner?

14        A    This doesn't concern what I was told; it

15    concerns the circumstances of particular

16    examinations.

17        Q    So it's fair to say on some occasions

18    you may not initially be able to do a complete --

19    a physical examination of an inmate?

20        A    Or get a complete history.

21        Q    But you would at a later date, if you

22    felt that was necessary, in order to provide

23    adequate medical care?

24        A    I or someone else, yes.

Sheila J. Porter                                05/18/2005

71

1    the time that you signed those interrogatories?

2        A    This answer, which doesn't sound like

3    what you just said.

4        Q    The hours and dates that she worked was

5    dictated by the contract entered into between the

6    HOC and CMS.

7                MR. SAVAGE:  Are you asking her

8    whether that was part of her answer?

9        Q    Yes, I'm asking you whether that was

10   part of your answer.

11       A    Part of my answer, yes.

12       Q    Okay.  Where in the contract with CMS

13   does it indicate that you, Sheila Porter, was to

14   work five days a week, 7:30 to 3:30?

15       A    I never saw the contract.

16       Q    Okay.  So how is it then that the hours

17   and days that you work were dictated by the

18   contract entered into between, as you put it, the

19   House of Correction and Correctional Medical

20   Services?

21       A    My answer would involve that the

22   contract, to my understanding, includes the number

23   of hours for each position.

24       Q    And that's what I'm inquiring about,

Sheila J. Porter                                    05/18/2005

72

1    your understanding, because you answered this

2    question based upon your understanding.  So what

3    is your understanding?

4        A    My understanding is that the contract

5    required X-amount of hours of mid-level provider,

6    physician coverage, nurse coverage, and that was a

7    contract entered into by both the House of

8    Correction and CMS.

9        Q    And how CMS was going to provide those

10   levels of care was up to CMS, correct?

11       A    The levels, yes.

12       Q    And whom they chose to staff in those

13   particular positions was up to CMS, correct?

14       A    After security clearance was fulfilled,

15   yes.

16       Q    Did you understand my question?

17            MR. SAVAGE:  And she answered it.

18       A    It couldn't be filled with just anyone.

19            MR. SAVAGE:  There's no question

20   pending.

21       Q    I asked you whom CMS determined would

22   fill those staffing considerations was up to CMS,

23   correct?  I didn't ask you about security.  I

24   asked you who CMS designated to fill those

Sheila J. Porter                                    05/18/2005

73

1   particular staffing levels was up to CMS, correct?

2        A    Yes, with the same thought.  You asked

3   my impression.

4        Q    The contract, to your knowledge, didn't

5   indicate that Sheila Porter needed to work five

6   days a week, 7:30 to 3:30, correct?

7        A    Correct.

8        Q    Okay.  You also indicated in your

9   testimony today additional ways in which you

10  believe the Suffolk County Sheriff's Department

11  dictated the hours and days that you worked,

12  right?  A few moments ago you just indicated

13  various ways in which you believe that dictated

14  the hours and days that you worked at the Suffolk

15  County House of Correction.

16       A    Yes.

17       Q    Does that now complete the answer to

18  this interrogatory.

19            (Pause.)

20       A    I believe it completes the answer to (i)

21  of No. 7.

22       Q    Okay.  You also provided an answer in

23  response to this same interrogatory that -- I'm

24  quoting from it -- "Her treatment of inmates was

Sheila J. Porter                                        05/18/2005

74

1  subject to the cooperation and/or approval of

2  corrections officers and/or their supervisors on

3  virtually a daily basis."

4            Could you explain that, please?

5      A    The officers that staffed the unit were

6  responsible for calling over the inmates.  The

7  House of Correction determined how many could be

8  there, what units could come, what units couldn't

9  come, whether or not two inmates could be seen by

10  two different providers at the same time because

11  of security issues, whether or not I could treat a

12  female on the 10th floor versus on the 2nd floor,

13  and whether or not I had the privacy to complete

14  some of the medical history.

15      Q    So location of where you could see

16  folks?

17      A    Yes.

18      Q    Timing of when you could see folks?

19      A    Yes.

20      Q    And privacy considerations in terms of

21  receiving an accurate history?

22      A    Yes.

23      Q    How did those three considerations

24  impact your treatment of inmates?

Sheila J. Porter                                    05/18/2005

75

1      A    If I can't see the inmates, I can't

2    treat them.

3      Q    You saw them ultimately, correct?  If

4    someone needed to be seen by medical, they were

5    seen, were they not?

6      A    There were multiple people scheduled on

7    a daily basis, and I may not be able to see them

8    all.

9      Q    On that particular day?

10     A    Yes.

11     Q    And then they would be seen at another

12   time, correct?

13     A    Yes.

14     Q    Certainly if in your nursing judgment

15   you felt that a particular individual needed to be

16   seen immediately, you would indicate that?

17     A    I wouldn't know.

18     Q    If the complaint was made to you, if a

19   sick call note indicated some level of an acute

20   nature, wouldn't you triage that to see that

21   individual first?

22     A    Someone else had triaged the sick slips.

23     Q    Someone else would triage the sick

24   slips, and then provide those slips to you in the

Sheila J. Porter                                    05/18/2005

76

1   order in which an individual should be seen.  Is

2   that correct?  Is that fair?

3       A    But if that unit wasn't there, that

4   person couldn't be seen.

5       Q    By you?

6       A    They were provided to us according to

7   the unit, and one unit at a time would be called

8   over --

9       Q    In terms --

10      A    -- I had no input as to which unit

11  should come over.

12      Q    In terms of the type of treatment that

13  you would administer to a particular inmate, the

14  factors that you just indicated to me, how did

15  that impact the type of treatment that you

16  provided?  For example, if you see a female inmate

17  upstairs in the satellite clinic, if you will, if

18  I could use that term, as opposed to the

19  infirmary, how did that impact the treatment that

20  you would provide to that female inmate?

21      A    If I saw the inmate on the 10th floor, I

22  might be able to do a pelvic examination, but on

23  the second floor that would be very difficult.

24      Q    But you could do it if you needed to?

LegaLink Boston
(617) 542-0039

Sheila J. Porter                                    05/18/2005

119

1   the Sheriff's Investigation Division that you were

2   providing information to the F.B.I.?

3        A    I don't remember which specific thing.

4   I reported a lot of things to the Sheriff's over

5   nine years.  Steve and I spoke frequently.  I

6   accompanied him to court frequently.  On one of

7   those occasions, I commented to him unofficially

8   that they had called, and that they were looking

9   for information.  I can't be more specific than

10  that because I don't remember if it was more

11  specific than that.  It was an informal comment

12  that I made during one of these encounters with

13  Steve.

14       Q    Did he ask you more questions about it?

15       A    No.

16       Q    Did you tell him that you were providing

17  information on an ongoing basis to the F.B.I.?

18       A    No.

19       Q    Did you tell him that it was on a

20  particular matter that you were providing

21  information?

22       A    No.

23       Q    You told him that the F.B.I. had

24  contacted you?

LegaLink Boston
(617) 542-0039

Sheila J. Porter                                    05/18/2005

120

1      A     Yes.

2      Q     What did you tell him about what that

3   contact was about?

4      A     Just that they were looking for

5   information.

6      Q     So you didn't communicate to him that

7   this was one of a number of contacts that you were

8   getting on a regular basis from the F.B.I.?

9      A     I think it was at the beginning.  I

10  don't think it was after a number; I think it was

11  early on.

12     Q     Did you indicate to him -- did you tell

13  Steve Jacobs that you had agreed to provide

14  information to the F.B.I. on an ongoing basis?

15     A     No.

16     Q     Who was the next person that you told

17  from the Suffolk County Sheriff's Department that

18  you were providing information to the F.B.I.,

19  whether informally or formally?

20     A     Paul DeFazio.

21     Q     When was that?

22     A     2002.

23     Q     And what were the circumstances

24  surrounding that communication with Paul DeFazio?

LegaLink Boston
(617) 542-0039

Sheila J. Porter                                    05/18/2005

124

1       A     Yes.

2       Q     And the context of this -- of my

3   questions to you was whom within the department

4   did you notify in 2001 to -- well, strike that.

5             I believe you testified that

6   sometime in the latter part of 1999 through 2000

7   you may have notified Steve Jacobs that on a

8   particular occasion the F.B.I. had contacted you?

9       A     Yes.

10      Q     Is that a fair characterization of your

11  testimony?

12      A     Yes.

13      Q     You did not, however, inform Mr. Jacobs

14  that you were in an ongoing relationship with the

15  F.B.I. providing them information on an ongoing

16  basis?

17      A     I don't believe I did.

18      Q     Other than Mr. Jacobs, whom within the

19  Suffolk County Sheriff's Department did you notify

20  that you were providing information to the F.B.I.

21  on an ongoing basis?

22      A     The next person -- well, the person that

23  knew it was Paul DeFazio, and that was in 2002.

24      Q     Okay.  And how did Mr. DeFazio know that

LegaLink Boston
(617) 542-0039

Sheila J. Porter                                    05/18/2005

125

1    you were providing information to the F.B.I. on an

2    ongoing basis?

3        A    Mr. DeFazio came to me as a liaison

4    concerning Rene Rosario.

5        Q    Who was a liaison, you or Mr. DeFazio?

6        A    Mr. DeFazio.

7        Q    And what do you mean by liaison?

8        A    He was my contact person in case of

9    emergency during some meetings I had with Rene

10   Rosario.

11       Q    What do you mean by contact person in

12   case of emergency?

13       A    Excuse me?

14            (Witness and counsel conferring off

15            the record.)

16            MS. CAULO:  Let the record reflect

17   that Mrs. Porter is communicating with her

18   attorney.

19       A    During that time, I had been asked to

20   place a wire on Inmate Rosario, and I had an

21   emergency contact at the facility, and at least

22   one other, perhaps two other, SID people knew of

23   my existence and what I was doing, but Paul was

24   the name I had in case there was an emergency, in

LegaLink Boston
(617) 542-0039

Sheila J. Porter                                        05/18/2005

205

1      Q      What did you tell Gayle Bartley?

2      A      I told her that he had told me he wasn't

3    hearing voices; that there were some other issues

4    going on; and that there were some physical issues

5    going on; and that that was not the whole story,

6    so...

7      Q      You told her there were some physical

8    issues going on?

9      A      Yes.

10     Q      That's your testimony today?

11     A      I'm not exactly sure how I expressed it.

12     Q      Um-hm.

13     A      I told Gayle that he was down there;

14   that he wasn't hearing voices; that he told the

15   officer he was hearing voices but he was not

16   hearing voices; or that he told me that later on.

17   That he came down because he -- he said he had

18   been -- I don't know if I said he was assaulted,

19   but he had some other issues on the unit, and he

20   came downstairs to get out of that unit, to get

21   downstairs.  And I told her that he needed an

22   examination, so...

23     Q      What kind of examination did you tell

24   her that he needed?

Sheila J. Porter                                    05/18/2005

206

1      A      This is -- I'm not sure I talked with

2  Donna at the same time or in the same time frame.

3  So I'm not sure what I told Gayle and what I told

4  Donna.  I did tell Gayle that the issues were not

5  auditory hallucinations, but that there were some

6  other issues going on, and I told Donna that I had

7  seen the bruises.

8      Q      I'm speaking specifically about what you

9  told Gayle.

10     A      Exactly what I told which one, I am --

11 at this point in time I couldn't tell you, but I

12 may have -- I may have written it down at the

13 time.  I did not review that particular report

14 last night.

15     Q      Which report is that?

16     A      The one I wrote the day that it

17 happened, on the 19th.

18     Q      I see.  Okay.  Did you specifically

19 articulate to Gayle Bartley that Mr. Rosario had

20 said he was physically assaulted by an officer?

21     A      I don't remember.

22     Q      Did you specifically tell Gayle Bartley

23 that you observed injuries, as you have described

24 them here today, on Mr. Rosario?

LegaLink Boston
(617) 542-0039

Sheila J. Porter                                          05/18/2005

207

1      A    I think so.  I'm not sure.

2      Q    Didn't you tell her, that is, that his

3    issues seem to be not psychiatric, he has some

4    other issues, and if you want some more

5    information, come talk to me?

6      A    Yes.

7      Q    That's what you said to her?

8      A    That's part of what I said to her.  It

9    took longer than that but, yes, I did say that.

10     Q    Did she come and talk to you?

11     A    I don't think so.

12          (Document marked as Exhibit No. 5.)

13     Q    Before we get there, Mrs. Porter, with

14   respect to your conversation with Gayle Bartley,

15   you indicated that she didn't come and speak to

16   you?

17     A    I don't think so.  I went to her.

18     Q    No.  I mean after you provided her this

19   information, after you said to her, "I saw Rene.

20   I think there's more to the story.  If you need

21   more information, come see me."

22     A    I don't think she came to see me.

23     Q    Did you follow up with her?

24     A    No.

Sheila J. Porter                                    05/18/2005

208

1    Q    Okay.  The court reporter has placed a

2  document in front of you.  Do you recognize what

3  that document is --

4    A    Yes.

5    Q    -- Mrs. Porter?

6          What is it?

7    A    I'm sorry.  Yes, I do.  This is the

8  report that I wrote on May 19th after Rene came

9  down to the medical housing unit.

10   Q    Did you place this report in his medical

11 chart?

12   A    No.

13   Q    Did you intend that it be placed in his

14 medical chart?

15   A    No.

16   Q    What did you intend this to be?

17   A    An incident report, a report that would

18 cover my seeing him and reporting that there was

19 some allegation of physical abuse.

20   Q    Okay.  We'll get there in a few more

21 moments.  Were you concerned at all that -- or

22 strike that.

23          Did you think it was important to

24 let other medical personnel know that Mr. Rosario

LegaLink Boston
(617) 542-0039

Sheila J. Porter                                05/18/2005

214

1    Q    What did you intend the document that's

2 been put before you and marked as Exhibit No. 5 to

3 be?

4    A    An incident report.

5    Q    For whom?

6    A    As it turns out, it was -- it was meant

7 for Mary Ellen Mastrorilli.

8    Q    Well, when did you write this?

9    A    The date it says I wrote it.

10    Q    When on May 19th --

11    A    In the afternoon.

12    Q    -- did you write it?

13          When in relation to your encounter

14 with Mr. Rosario did you write this?

15    A    Before the end of the day.

16    Q    What time did your shift end?

17    A    4:00, 4:30.  I don't know what time I

18 punched out that day.

19    Q    Well, you saw Mr. Rosario approximately

20 12:30, 1:00 in the afternoon?

21    A    Um-hm.

22    Q    How long did that encounter take place?

23    A    A minute.

24    Q    Okay.  And after that, a minute, when

Sheila J. Porter                                    05/18/2005

216

1   to -- to go to someone other than SID.

2       Q    Now, earlier today you testified that

3   you regularly reported allegations of physical

4   abuse of inmates by officers to SID?

5       A    Correct.

6       Q    From 1999 through -- strike that.

7            From 1994, right --

8       A    Correct.

9       Q    -- through 2003?

10      A    Yes.

11      Q    Why on this occasion did you not want

12  the information communicated to SID -- strike

13  that.

14           Why on this occasion did you not

15  want to go directly to SID?

16      A    Because of the previous history that I

17  had with Rene, what I knew, and my involvement

18  with him and with the F.B.I.

19      Q    Explain why that -- why you decided not

20  to go to SID because of that.

21      A    When Rene had left, was transferred the

22  time before when he was -- in November, between

23  that time and the time that he came back, I had

24  been working with the F.B.I.; I knew that Rene was

Sheila J. Porter                                    05/18/2005

217

1    still involved; I was unsure of what else was

2    going on because I had had the conversation with

3    Paul DeFazio, who was angry with the F.B.I.; and I

4    just had some reservations; I wanted to go to

5    somebody the next level up.

6         Q    Well, Paul DeFazio wasn't in SID at this

7    time, correct?

8         A    Correct.

9         Q    Okay.  And I thought you testified

10   earlier that you weren't aware until that morning

11   of May 19th that Mr. Rosario may still be working

12   with the F.B.I.?

13        A    Correct.

14        Q    And you gleaned that in your minute

15   conversation with him?

16        A    Yes.

17        Q    Okay.  Well, what other reasons -- why

18   would that have prevented you from going to SID?

19        A    I was concerned for Rene because he was

20   back again.  I didn't -- my feeling was that he

21   shouldn't have been back again.  I was very

22   concerned for him, and I was just concerned about

23   the whole issue of my working with Rene and the

24   F.B.I., and there were people in SID that knew

Sheila J. Porter                                      05/18/2005

218

1    that I both worked with the F.B.I. and with Rene,

2    and here he was back again and there were some

3    complaints again, and I just wanted to go one

4    level higher.

5        Q    Who were the people that were still in

6    SID that knew about your involvement in November

7    of 2002 that would have prevented you from going

8    down to SID to report the alleged abuse?

9        A    I thought Steve knew about it, I'm not

10   sure if he did or not, and although Paul wasn't in

11   SID specifically, he certainly knew, and he was

12   making his disappointment known to me.

13       Q    And why would that have -- why did that

14   militate for you against reporting to SID?

15       A    I was concerned for the health and

16   safety of Rene and myself.

17       Q    And what concerns did you have about

18   yourself?

19       A    I wanted to report this and make sure

20   that the information was there without going

21   through SID and without having to explain the

22   things again because of the -- the wiring and

23   things like that.  I didn't want to get back into

24   that.

Sheila J. Porter                                    05/18/2005

219

1    Q    Well, this is a serious allegation,
2    correct?
3    A    Yes.
4    Q    It's always a serious allegation when an
5    inmate accuses an officer of physical abuse,
6    correct?
7    A    It is.
8    Q    And those are investigations that the
9    department has taken seriously, correct?
10    A    Correct.
11    Q    And they investigate them, correct?
12    A    Yes.
13    Q    In fact, you've had numerous encounters
14    with -- strike that.
15         You've had numerous occasions in
16    which you have provided information to SID
17    concerning allegations of physical abuse by
18    officers on inmates, right?
19    A    Yes.
20    Q    And they have come to you looking for
21    information when they have been investigating
22    allegations of physical abuse of inmates by
23    officers, correct?
24    A    Correct.

LegaLink Boston
(617) 542-0039

Sheila J. Porter                                05/18/2005

220

1     Q    So it wasn't the subject matter that you
2     were concerned about that prevented you from
3     disclosing it immediately to SID?
4          A    It was the person.
5          Q    It was Rene Rosario?
6          A    Yes, and the relationships.
7          Q    And certainly this is something that you
8     were aware that you were obligated to report to
9     SID, correct?
10         A    Obviously.
11         Q    I don't know what the obviously refers
12    to, but I'm asking you certainly an allegation of
13    physical abuse by an inmate against an officer is
14    something you knew you were obligated to report to
15    SID, correct?
16         A    I was obligated to report it to my
17    supervisor, which I did.
18         Q    You also had obligations to report it to
19    the Sheriff's Investigation Division, did you not?
20         A    I felt that I was fulfilling my
21    obligation by reporting it to my Suffolk County
22    supervisor who would have been Mary Ellen
23    Mastrorilli at that time.
24         Q    Well, I didn't ask you whether or not

Sheila J. Porter                                        05/18/2005

223

1      A      In the health service unit.

2      Q      What did you say to her; what did she

3   say to you?

4      A      I told her that Rene had come down on

5   MOA because he said he was hearing voices, but

6   then when I saw him in the back, he said he wasn't

7   hearing voices; he came down because he was

8   reporting that he had been assaulted by an

9   officer, and that he waited -- I told her the

10  story that Rene told me; that he waited for the

11  officer that he said injured him to leave the unit

12  for lunch; and then he said he was hearing voices

13  so that he could get down to the -- to the health

14  service unit to see someone; and that when I

15  talked to him, he didn't appear to be having a

16  problem with his mental illness at that time; that

17  he said he wasn't hearing voices, but he came down

18  for the other reason; that he said he had been

19  assaulted and he was afraid.

20     Q      Anything else?

21     A      That Rene was back and I didn't

22  understand why he was back, and that I wanted to

23  re -- I wanted to report it; that I needed to

24  report it; and that I wanted to -- that I wasn't

Sheila J. Porter                                    05/18/2005

224

1    sure what -- what to do about it.

2        Q    Did you tell her that you had not

3    documented your encounter with him in his medical

4    chart?

5        A    No.

6        Q    At the point in time that you had this

7    conversation with Donna Jurdak, had you written

8    the document that appears before you as

9    Exhibit No. 5?

10       A    No.

11       Q    Did you ask Donna Jurdak to do anything

12   with the information that you had provided to her?

13       A    Yes.

14       Q    What was that?

15       A    We talked about it and decided that it

16   would be Mary Ellen she would report it to.  I

17   asked her to convey the information to Mary Ellen.

18       Q    And what was your sense of what Mary

19   Ellen would do with the information?

20       A    I thought she might pass it on to SID or

21   to somebody different in SID.  There were new

22   people in SID that I didn't know.  I didn't know

23   -- I wasn't sure what she was going to do with it,

24   but that's where I wanted it to go next.

Sheila J. Porter, Vol. 2                    05/26/2005

385

1   strike you as implying that you had a racial bias?

2       A    I didn't think of it.

3       Q    When did you think of it, if you thought

4   of it at all?

5       A    When I heard other people's comments.

6       Q    And when you heard other people's

7   comments, what did that make you think about the

8   statement?

9       A    It made me think, I hope that wasn't the

10  truth.

11      Q    Do you think that's what it implies?

12      A    I don't know.

13      Q    Other than "clearly biassed," what else

14  in that sentence do you allege is defamatory?

15      A    My own agenda for speaking out at this

16  time.  I had no agenda for speaking out at that

17  time, except that someone called me and asked for

18  my story.

19      Q    Did you feel that your reputation had

20  been damaged?

21      A    Yes.

22      Q    Did you hope to accomplish by speaking

23  to the Globe and to Channel 5 that you would

24  restore your reputation that you felt had been

Sheila J. Porter, Vol. 2                          05/26/2005

422

1          MS. HARVEY:  I'll be very happy to
2    do it your way, but then you're going to object,
3    I'm certain, but...
4        Q    In your testimony last week you advised
5    that the reason that you did not want to perform
6    an examination on Mr. Rosario was because you had
7    advocated for him in the past and you were
8    concerned about appearing biassed; is that
9    correct?
10       A    That's one reason.
11       Q    Okay.  Now, when you use the word
12   "biassed" do you mean racially biassed?
13       A    No.
14       Q    So the word biassed can have a number of
15   different meanings, you would agree?
16       A    Yes.
17       Q    Just because Mr. Rosario is a person of
18   color doesn't mean that you would be racially
19   biassed against him if you use the word "biassed"
20   in that context?
21       A    Correct.
22       Q    Now, you've testified that you gave the
23   report that has been marked as Exhibit 5, that you
24   gave this report to Donna Jurdak on May 22 or