WALTER B. PRINCE
Partner
wbprince@plgt.com
(617) 456.8003 Tel

Prince Lobel Glovsky & Tye LLP
Attorneys at Law

585 Commercial Street
Boston, MA 02109-1024
(617) 456.8000 Tel
(617) 456.8100 Fax
www.plgt.com

October 7, 2005

**By Hand Delivery**

John T. McNeil, Esq.
Assistant United States Attorney
Department of Justice
United States Attorney's Office
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210

Re:   Sheila Porter Investigation

Dear John:

Apart from the long-delayed notice of the appropriate decision by the US Attorney to close the grand jury investigation of my client, both the tone and content of your letter are deeply troubling. The issuance of such a defensive and caustic letter is highly unusual, in my experience as a former Assistant United States Attorney and as private counsel who represents clients before the federal criminal bar.

Far from dispelling the concern that this investigation was motivated by personal animus, political, or other improper impetus, your letter only reinforces my client's beliefs. You draw unwarranted conclusions from the evidence, you improperly vouch for the credibility of witnesses (including a civil litigant who is biased), and you cast unwarranted aspersions on the character and integrity of my client. It appears to be written for consumption and use by parties other than my client. Therefore, I cannot let it go unanswered.

Throughout this investigation, we have been extremely concerned about the connection and communication between your office and Sheila Porter's civil attorney, Joseph Savage. As you know, Sheila Porter testified in her civil deposition that she met with AUSA Huggard and FBI Agents Maureen Robinson and Christa Snyder on June 11, 2003, the day after she was barred. At that meeting, Porter was told that she had been illegally barred; that opinion represented an appalling rush to judgment, especially since there had been no communication with the Sheriff's Department to determine the credibility of Ms. Porter's version of the facts. Additionally, Porter was advised to seek an employment attorney. In addition to the clear impropriety of advising a potential witness to hire a civil attorney, it is clear that Porter would not have independently retained her current attorney, Joe Savage (who does not specialize or routinely practice in employment law), without the guidance of either the U.S. Attorney's office or the FBI. Joe Savage is a former Chief of the US Attorney's Public Corruption Bureau, and a friend of Steve Huggard (who initiated the grand jury investigation) who was Chief of the Public Corruption Bureau at the time. As

PRINCE . LOBEL . GLOVSKY & TYE LLP

CONFIDENTIAL                001659

J. T. McNeil, Esq.
October 7, 2005
Page 2

your office has been provided my client's memo to file, dated June 18, 2003, and her subsequent letter to US Attorney Sullivan, dated July 22, 2003, you are aware of the meeting that took place at the US Attorney's Office on June 16, 2003. The meeting was represented by then First Assistant U.S. Attorney Gerry Leone to be for the purpose of introducing the new Special Agent in Charge, Kenneth Kaiser, and to discuss ways to improve the historically strained relationship between your office, the FBI, and the Sheriff's Department. No one from the Sheriff's department was told that the meeting would involve a discussion of her decision to bar Sheila Porter. Sheila Porter's barring immediately became the sole topic of conversation, and Sheriff Cabral was asked to justify the exercise of her authority. Despite being taken completely by surprise, she, Elizabeth Keeley, and Viktor Theiss remained at the meeting and explained why Porter had been barred.

During the meeting and *after* Sheriff Cabral and her staff had been questioned about the circumstances of Porter's barring, Chief of Public Corruption Steve Huggard announced that he had *already* targeted the Sheriff's Department for investigation. He apparently made this decision the day after Sheila Porter was barred, based only on her recitation of the facts. The decision to invite my client to a meeting without first informing her that either she or members of her staff were being investigated was clearly improper. This fact, Huggard's behavior, and the tone of the meeting were "shocking" to Sheriff Cabral, and she expressed her significant concerns in the memo, a telephone conversation with and subsequent letter to US Attorney Sullivan. She expressed a specific concern about Huggard's motivation, given a prior and unrelated interaction during which she had upbraided Huggard for his disruption of an investigation. She also reiterated what was explained during the meeting, namely that Porter was not barred in retaliation for speaking to the FBI.

The facts belie any reasonable belief that Sheriff Cabral or members of her staff attempted a cover-up of the true reasons for Porter's barring. My client did not know that Porter's barring would be the topic of discussion in the June 16 meeting. Porter's conduct with regard to the Rene Rosario allegation had been documented before the meeting and her reasons for barring Porter have not changed.

Further, the meeting that occurred between US Attorney Sullivan, Attorney Savage, Sheila Porter, AUSA Steve Huggard, and certain FBI Agents, <u>while the grand jury investigation was under way and *after* Attorney Savage had filed a civil lawsuit against Sheriff Cabral seeking money damages</u>, raises serious questions of impropriety. It is our understanding that Attorney Savage - while in the presence of his client, and acting in his capacity as private counsel to a civil litigant - was permitted in that meeting to vehemently advocate pursuit of my client on federal criminal charges.

We have always questioned why Sheriff Cabral was asked by AUSA Huggard in the grand jury if she felt she had "made any mistakes" in barring Sheila Porter. The issue of mistake has no relevance to 18 USC 1513(e), which is a specific intent crime. It can, however, be quite relevant in a civil lawsuit. Further, as a condition of "resolving the matter," Steve Huggard also informed me that Sheriff Cabral, in a meeting with the US

PRINCE.LOBEL.GLOVSKY & TYE

CONFIDENTIAL                         001660

J. T. McNeil, Esq.
October 7, 2005
Page 3

Attorney and in the presence of an FBI agent who would be taking notes, would have to "be willing to admit that she made mistakes" in barring Sheila Porter.

Similar concerns were raised by your subpoena of Steve Tompkins, the Sheriff's Department spokesperson. He was not involved in Porter's barring in any way and was never so identified by any party. He was asked certain questions that were relevant only to Porter's civil claim for defamation. He was subsequently subpoenaed for a deposition in Porter's civil case and was asked the very same questions.

Strangely, while Steve Tompkins was subpoenaed to the grand jury, SID Investigator Stan Wojtkonski was not. As you know, Wojtkonski was the investigator to whom FBI Special Agent Christa Snyder first reported what the then unnamed source (Sheila Porter) told her about Rene Rosario's allegations. He immediately wrote a report of that discussion, which was part of the SID investigative file turned over to the US Attorney's Office. What Snyder recounted to Wojtkonski differs substantially from what Sheila Porter ultimately wrote and testified to. Wojtkonski's reports also detailed the Department's concern, from the very beginning, that the "source" identified as a medical staff member by Snyder, had not reported the information to SID. In fact, during a subsequent conversation with Agent Snyder, Investigator Wojtkonski assured her that "no staff member would be hindered from speaking with an outside agency, but that would not absolve the staff member of his or her responsibility to report incidents directly to the Sheriff's Department and SID." Investigator Wojtkonski wrote and filed a report regarding that conversation on the same day it occurred, May 23, 2003, which report was included in the investigative file provided to your office.

From the meeting at the US Attorney's Office on June 16, 2003 to the present, my client has been consistent regarding her reasons for barring Sheila Porter. Based upon information provided to me and my client, sometime in the fall of 2004, US Attorney Michael Sullivan acknowledged to a number of his assistants that he did not believe my client's conduct in barring Sheila Porter was criminal. Despite that, your office sought her testimony before the grand jury. (Indeed, it was the initial intention of your office that she be subpoenaed to testify on September 14th, 2004, the day of the primary election in the Sheriff's race.) Sheriff Cabral did voluntarily testify before the grand jury without the necessity of a subpoena. She also declined to assert her Fifth Amendment Rights to avoid being deposed in Sheila Porter's civil lawsuit. The Sheriff's Department provided every document sought by your office, whether informally requested or formally subpoenaed. At no time, did Sheriff Cabral or members of her Department seek to delay their responses or otherwise obstruct the grand jury process. In fact, Sheriff Cabral waived the attorney-client privilege between the Department and her General Counsel, Anne Powers, to facilitate Powers's testimony before the grand jury.

Your attempt to blame my client for the length of this investigation is just plain wrong, and perhaps understandable given your lack of responsibility for the case before being assigned to you. Your letter ignores the eight months between March and November of 2004, during which my client was led to believe that the way we could resolve the investigation and avoid subpoenas and grand jury testimony would be to change

PRINCE.LOBEL.GLOVSKY & TYE

CONFIDENTIAL        001661

J. T. McNeil, Esq.
October 7, 2005
Page 4

Department Policy S220.[1] Through me, Sheriff Cabral promptly responded to your office's repeated requests for changes in the policy language. AUSA Huggard insisted that the policy allow employees to avoid reporting alleged misconduct internally, despite the fact that such a rule would clearly violate the Code of Massachusetts Regulations. When Sheriff Cabral drafted a revision of the policy that essentially mirrored some of the language in 1513(e), Huggard insisted that she delete the word "truthful" as a descriptor for the kind of information an employee could legitimately provide. Huggard also disclosed that US Attorney Sullivan had involved himself personally in drafting of the revisions. In the fall of 2004, with no explanation, your office abandoned all interest in the policy revisions and began to pursue my client's grand jury testimony in earnest.

For the record, the Suffolk County Sheriff's Department employee conduct policy was no different from the policies of other Sheriff's Departments in the Commonwealth or that of the Department of Correction. All were drafted, as required, pursuant to the Code of Massachusetts Regulations. Sheriff Cabral never felt that the policy warranted revision, but AUSA Huggard repeatedly made it clear that if she did not acquiesce to your office's demand, he would seek an indictment against her or members of her staff. My client and certain members of her staff are former prosecutors. They are well aware of the ease with which indictments can be returned, particularly given that the federal rules do not require presentment of exculpatory evidence to the grand jury.

Based upon Huggard's threat to indict (he repeatedly advised me that we were "running out of road" and "running out of real estate" in terms of our ability to make revisions sufficiently satisfactory to the US Attorney that would preclude indictment), I advised my client to make policy changes inconsistent with those found in other sheriff's departments and the Department of Correction. No mention is made in your letter of any concern about the policy, and it is now clear that it played no real role in this matter, and was simply your office's unabashed use of its power to leverage the Sheriff's Department.

Further, had your office not issued target letters to certain personnel in January of 2004, I am certain that they would have appeared voluntarily and testified before the grand jury well before February of 2005. Additionally, at a meeting attended by Gerry Leone, Jim Farmer, Steve Huggard of your office, and Attorney Ralph C. Martin, II in early 2004, your office stated that it regretted the issuance of target letters, but that was the only device they knew of to secure someone's attention to resolve the concerns of the U.S. Attorney's Office. Everyone within the Sheriff's Department accepted this representation in good faith and attempted to meet the concerns of the U.S. Attorney's Office, as outlined above. Your office did not withdraw those target letters and seek their testimony for 13 months.

---

[1] Your office's stated claim that the Sheriff's Department's internal policy needed to be clarified to explicitly protect so-called "whistleblowers" was a pretext. Even assuming that there was a good-faith basis to believe that action was taken against Porter in order to retaliate for some lawful action by Porter, Porter was a contract worker, not an employee of the House of Corrections. As I pointed out, the FBI's own internal regulations exempt contract FBI workers from "whistleblower" status. See 28 C.F.R. § 27.2, and "A review of the FBI's Actions in Connection with Allegations Raised by Contract Linguist Sibel Edmonds," Office of the Inspector General, Office of Oversight and Review, January 2005.

PRINCE . LOBEL . GLOVSKY & TYE

CONFIDENTIAL            001662

J. T. McNeil, Esq.
October 7, 2005
Page 5

Given that lengthy delay and the enormous number of conversations and work-related decisions made in that time, it cannot be surprising that detailed recollections of conversations held nearly two years prior during a period of significant transition within the Department would be difficult. Indeed, had their recollections matched exactly, it is likely your office would have viewed that as evidence of collusion and cover-up.

That Mary Ellen Mastrorilli told Sheila Porter she was being barred for speaking to an outside agency seems to be the lynchpin of your conclusions regarding Sheriff Cabral's alleged culpability. Sheriff Cabral articulated her reasons for the barring to Elizabeth Keeley, who then instructed Mastrorilli accordingly. In her letter dated July 22, 2003, Sheriff Cabral informed US Attorney Sullivan that the decision to bar Porter was hers and that she "would readily" take responsibility for it. Thus, only her specific intent was relevant to proof of a violation of 1513(e). Sheriff Cabral never spoke to Ms. Mastrorilli regarding Sheila Porter. Your office has apparently never considered that any disconnect between what Ms. Mastrorilli was told by Elizabeth Keeley and what she subsequently said to Sheila Porter is attributable to Mastrorilli. This is puzzling given that Ms. Mastrorilli remains, to this day, the only person in the Sheriff's Department to express a desire to bar Ms. Porter specifically for speaking with the FBI – a feeling she reduced to writing in a memo that was provided to you pursuant to a grand jury subpoena. Despite that troubling fact, Ms. Mastrorilli has never been viewed as anything other than a cooperating witness by your office.

There was a clear willingness to take Ms. Mastrorilli's version of the facts at face value, right from the outset. As you know, Ms. Mastrorilli testified before the grand jury in September of 2003. After she completed her testimony, Steve Huggard "walked her out of the room" and said, "I knew you would tell the truth." This statement constitutes a remarkable endorsement of a witness whose accuracy of recollection, credibility, and history of properly following instructions was completely untested. Indeed, depositions of my clients, Elizabeth Keeley, Viktor Theiss, and even Sheila Porter, as well as others have subsequently called the reliability of her testimony into question.

It is disingenuous to claim that the onus was on Sheriff Cabral to renounce the reasons provided by Ms. Mastrorilli to Ms. Porter for her barring and that her failure to do so complicated and lengthened the grand jury investigation. My client had no way of knowing that Ms. Mastrorilli had not accurately recounted her reasons for barring Sheila Porter and therefore had no reason to adopt or disavow anything she said. More than once, Department General Counsel Anne Powers asked Steve Huggard to identify the specific issue that was causing the US Attorney's Office to perceive misconduct by my client or members of her staff. Huggard would only repeatedly say that, "something wasn't adding up." Had he been more forthcoming, Sheriff Cabral would have responded and the matter might have been resolved sooner. Once Ms. Mastrorilli had been approached by the FBI for an interview and subpoenaed to the grand jury – and this occurred three months after Porter's barring - it would have been highly inappropriate for Sheriff Cabral to question her and she didn't.

PRINCE . LOBEL . GLOVSKY & TYE

CONFIDENTIAL    001663

J. T. McNeil, Esq.
October 7, 2005
Page 6

Among your letter's most astonishing assertions is the claim that Sheriff Cabral failed to reject Ms. Mastrorilli's statements "all the while publicly criticizing Sheila Porter." It is simply false and another example of the less-than-objective approach that has unfortunately characterized the conduct of this case. Any public references to Ms. Porter by my client are within her rights to do as both a public figure, and the subject of a civil claim. The failure of your office to understand these basic tenets, and your inclination to penalize my client for the exercise of her right to defend herself are completely unsound and unprincipled.

As her deposition testimony confirms, Ms. Porter decided to seek positive media coverage for her forthcoming civil lawsuit in August of 2004, less than 3 weeks before the September 14 primary election in the Sheriff's race. More than 13 months had passed since she had been barred and it is difficult to believe the timing was inadvertent. As she testified, she consulted with the FBI before granting interviews with WCVB Channel 5 and the Boston Globe. The Globe article comprised some 17 paragraphs. In it, Ms. Porter criticized Sheriff Cabral, the Sheriff's Department, publicly disclosed her identity as a federal informant, the existence of an open grand jury investigation and the fact that she had testified. The Channel 5 story contained much of the same information.

As expected, my client was contacted for a response. She declined a request for an on-camera interview with Channel 5 or an in-person interview with the Globe. Instead, she issued a four-paragraph press statement. References to Porter were confined to the first two paragraphs - a total of four short sentences – that pointed out that Porter was fired by CMS, not the Sheriff's Department, that she was barred for policy violations and contractual obligations and that she had a motive for seeking media attention at that particular time. The only other time my client has spoken publicly and specifically about Ms. Porter was during a televised debate on WGBH. Her opponent, not she, raised the issue. The debate's host then directly questioned her about it. With typical circumspection, she confined her comments to what was written in the press statement.

Far from continuously criticizing Ms. Porter, or for that matter, criticizing her at all, Sheriff Cabral declined to respond when, in press story after press story, Sheila Porter's allegations were repeated. Even in response to the coverage of press leaks of grand jury information, she declined to do anything other than reference the reasons given in the earlier press statement and her own truthful testimony.

At no time, has my client conducted herself in a manner from which one could reasonably and fairly conclude that she had anything to hide. Despite the aforementioned leaks of grand jury information – made in clear violation of federal law – and the subsequent damage to her reputation, she honored her professional obligation and resisted intense media and other pressures to respond in kind. She held fast to that obligation despite a request made to your office five months ago to investigate the source of those leaks. Though the universe of people to whom the protected information was known should be very small and one would expect that a lengthy investigation would not be necessary, no information regarding the investigation's progress or findings has been forthcoming.

PRINCE.LOBEL.GLOVSKY & TYE

CONFIDENTIAL         001664

J. T. McNeil, Esq.
October 7, 2005
Page 7

It is also important to note that Sheriff Cabral has not allowed her strong feelings about what has occurred in the context of this matter to interfere with her professional obligation to continue to work cooperatively with the US Attorney's Office and the FBI, a duty she takes very seriously. In addition to referring appropriate cases to the FBI for investigation – one as recently as two weeks ago - her Department continues to work cooperatively on joint criminal investigations, the BRI re-entry initiative and the gang intelligence task force.

As I am sure you are aware, we were so troubled by the government's conduct in this case, we reported the matter to the Department of Justice. As I am also sure you are aware, the Public Integrity Section at Main Justice agreed to open an investigation into the handling of this matter by the U.S. Attorney's Office. If the conclusions drawn in your letter were a fair interpretation of the evidence, does it make sense that Sheriff Cabral would invite the scrutiny of a full review by the Department of Justice? Finally, it has not escaped my attention that your letter announcing the end of this investigation comes within one week of Public Integrity's opening of its investigation.

It is most unfortunate, given an objective assessment of the evidence, the attendant circumstances in this case, and the fact that the investigation has been closed that you continue to portray Sheriff Cabral as someone worthy of federal prosecution.

Sincerely,

*Walter B. Prince*

Walter B. Prince, Esq.

WBP/cs

cc – M. J. Sullivan, Esq. (by hand delivery)
     M. K. Loucks, Esq. (by hand delivery)

PRINCE.LOBEL.GLOVSKY & TYE

CONFIDENTIAL

001665