# EXHIBIT 1

1

1          Volume:    I

2          Pages:    1-248

3          Exhibits:  1-5

4          UNITED STATES DISTRICT COURT

5          FOR THE DISTRICT OF MASSACHUSETTS

6          NO. 04-11935-DPW

7  - - - - - - - - - - - - - - - - - - - - - - - x

8  Sheila J. Porter,

9          Plaintiff,

10      v.

11  Andrea Cabral, Suffolk County

12  Sheriff's Department Suffolk County,

13  and Correctional Medical Services, Inc.,

14          Defendants.

15   - - - - - - - - - - - - - - - - - - - - - - - x

16

17          DEPOSITION OF SHEILA J. PORTER

18          Wednesday, May 18, 2005

19          10:10 a.m.

20   ADLER, COHEN, HARVEY, WAKEMAN & GUEKGUEZIAN

21          230 Congress Street

22          Boston, Massachusetts 02110

23

24  Reporter:  Lori-Ann London, RPR

249

1          Volume:    II

2          Pages:     249-462

3          Exhibits:  6-10

4          UNITED STATES DISTRICT COURT

5          FOR THE DISTRICT OF MASSACHUSETTS

6                     NO. 04-11935-DPW

7  - - - - - - - - - - - - - - - - - - - - - - x

8  Sheila J. Porter,

9                    Plaintiff,

10        v.

11 Andrea Cabral, Suffolk County

12 Sheriff's Department Suffolk County,

13 and Correctional Medical Services, Inc.,

14                   Defendants.

15  - - - - - - - - - - - - - - - - - - - - - - x

16

17      CONTINUED DEPOSITION OF SHEILA J. PORTER

18           Thursday, May 26, 2005

19                 9:05 a.m.

20   ADLER, COHEN, HARVEY, WAKEMAN & GUEKGUEZIAN

21           230 Congress Street

22         Boston, Massachusetts 02110

23

24 Reporter:  Lori-Ann London, RPR

Sheila J. Porter                                          05/18/2005

19

1    Department contribute to your 401(k) plan?

2        A    No.

3        Q    Did the Suffolk County Sheriff's

4    Department pay your salary?

5        A    No.

6        Q    Who maintained your personnel file, to

7    your knowledge, while you were employed by

8    Correctional Medical Services from January of 2001

9    through June of 2003?

10       A    Correctional Medical Services.

11       Q    Where was it located, the personnel

12   file?

13       A    The exact location?

14       Q    Yes.

15       A    In a file cabinet in the administrative

16   assistant's office.

17       Q    And the administrative assistant was

18   employed by whom?

19       A    CMS.

20       Q    What was her name?

21       A    Sandra Sousa.

22       Q    I'm sorry?

23       A    Sandra Sousa.

24       Q    You indicated earlier that Donna Jurdak

Sheila J. Porter                                                        05/18/2005

21

1       the infirmary at the Suffolk County -- at the

2       Suffolk County House of Correction --

3               A     Yes.

4               Q     -- for CMS?

5               A     Yes.

6               Q     And it's fair to say that Dr. Singletary

7       was in charge of the medical piece of care

8       provided to inmates incarcerated at the Suffolk

9       County House of Correction?

10              A     Yes.

11              Q     Were you evaluated in terms of your job

12      performance while you were employed by CMS from

13      January of 2001 to June of 2003?

14              A     Yes.

15              Q     Who conducted those evaluations?

16              A     Dr. Singletary.

17              Q     Any other employee of CMS involved in

18      the evaluation process for you during that time

19      period?

20              A     I don't think so.

21              Q     Was Donna Jurdak involved?

22              A     I'm not sure.

23              Q     Okay.  Did you ever speak with Donna

24      Jurdak concerning your evaluations?

Sheila J. Porter                                    05/18/2005

22

1      A      Yes.

2      Q      And what was the -- what was that about?

3      A      "It's time to get your evaluation done."

4      Q      Did any member of the Suffolk County

5   Sheriff's Department participate in your

6   evaluation?

7      A      No.

8      Q      What was the process of evaluation like?

9      A      It was a form with questions to be

10  answered and goals to be set.

11     Q      Who provided you with the form, what

12  entity?

13     A      CMS.

14     Q      Did you fill out the form?

15     A      I didn't, the physician did.

16     Q      Dr. Singletary?

17     A      Yes.

18     Q      Was the form filled out in consultation

19  with you or by him alone?

20     A      By him with review by me later.

21     Q      So after the evaluation form was

22  completed, you would have an opportunity to

23  discuss the results of that evaluation with him?

24     A      Yes.

Sheila J. Porter                                    05/18/2005

23

1       Q      And what were the evaluation forms used

2   for by CMS?

3       A      As a tool for deciding pay increases, as

4   a tool for determining any weaknesses that might

5   show up in someone's performance and with goals

6   for corrective measures.

7       Q      Did anyone from the Suffolk County

8   Sheriff's Department have any input into your

9   salary or pay increase?

10      A      No.

11      Q      Did anybody from the Suffolk County

12  Sheriff's Department have any input in terms of

13  your goals or corrective behavior?

14      A      No.

15      Q      What's the Employee Success Guide?

16      A      It's the booklet handed out -- there was

17  a booklet handed out when CMS took over as the

18  provider of medical care, and I believe there was

19  an update handed out while I was at the facility.

20      Q      When you say CMS took over as the

21  provider for healthcare, when they assumed the

22  contract --

23              THE STENOGRAPHER:  Wait a minute.

24  Can you start again?

Sheila J. Porter                                      05/18/2005

31

1          A      Subjective, Objective, Assessment and

2     Plan.

3          Q      And what does that mean?

4          A      Subjective is what we were told,

5     Objective is what we can see, Assessment is what

6     do you think happened, and Plan is what are you

7     going to do about it.

8          Q      Did you receive training in

9     documentation and the utilization of the SOAP

10    format?

11         A      Yes.

12         Q      And what kind of training was that,

13    Mrs. Porter?

14         A      That was ongoing from -- from the

15    nursing program on; that's the documentation that

16    I've used.

17         Q      Standard in the industry?

18         A      Yes.

19         Q      You indicated a few moments ago that you

20    received some training documents from the Suffolk

21    County Sheriff's Department.  Did you receive any

22    training from the Suffolk County Sheriff's

23    Department?

24         A      Yes.

Sheila J. Porter                                           05/18/2005

32

1        Q    What kind of training, in what areas?

2        A    Actually, report writing --

3        Q    Okay.

4        A    -- security, I believe during our

5   orientation CPR was provided for an update at that

6   same time.

7        Q    Other than report writing --

8             MR. SAVAGE:  I'm not sure --

9        Q    -- security --

10            MR. SAVAGE:  -- she was done.

11            Were you done or were you still

12   thinking?

13            THE WITNESS:  I was thinking, but...

14       Q    I'm sorry.  Keep thinking.

15       A    As I said, we had a large packet of

16   information each time.  Some general rules and

17   regulations, a tour of the building, how all of

18   the access cards worked.  I think that's it.

19       Q    Okay.  Did you receive any training from

20   the Suffolk County Sheriff's Department on

21   assessment protocols, nursing assessment

22   protocols?

23       A    No.

24       Q    Did you receive any training from the

Sheila J. Porter                                          05/18/2005

33

1    Suffolk County Sheriff's Department regarding how

2    you administer chronic care?

3         A    No.

4         Q    Did you receive any training from the

5    Suffolk County Sheriff's Department regarding how

6    you administrator sick calls?

7         A    In a way, yes, when -- when they could

8    be done, where they could be done, who could come.

9         Q    Well, let me narrow the question a

10   little bit.  Did you receive any training in terms

11   of how you diagnose an inmate's ailments?

12        A    No.

13        Q    Did you receive any training concerning

14   how to conduct a physical examination --

15        A    No.

16        Q    -- on an inmate?

17        A    No.

18        Q    Did you receive any training regarding

19   how you appropriately triage sick calls from the

20   Suffolk County Sheriff's Department?

21        A    Again, partially, yes.  Because of

22   security issues, some of the triaging requires

23   that the security is met prior to -- how do I

24   explain this?  Can I give you a for instance?

Sheila J. Porter                                    05/18/2005

34

1       Q       Sure.

2       A       If there was a person who had a rope

3   around their neck, and we would not be able to go

4   in, triage, and decide what to do until all

5   security measures had been taken to ensure that we

6   wouldn't -- that our safety was -- that we would

7   be safe going in there; that it wasn't a -- a

8   bogus claim.  So, yes, some triage required that

9   security measures come first.

10      Q       Would you make routine -- would you make

11  sick calls on units?

12      A       No.

13      Q       How were sick calls done on units?

14      A       The nurses received paperwork that was

15  an inmate request for medical attention.

16      Q       And once that paperwork was received,

17  what did the nursing staff do with it?

18      A       The protocol is to triage it, read it,

19  and be sure it isn't an immediate problem, and the

20  person would be scheduled to be seen by a nurse,

21  by a mid-level provider, or by the physician.

22      Q       In those instances when there is a

23  determination made as to which provider should see

24  the inmate and triaging them, what input did the

Sheila J. Porter                              05/18/2005

35

1    Suffolk County Sheriff's Department have in that

2    process?

3        A    None.

4        Q    You indicated that you received some

5    training in report writing?

6        A    Yes.

7        Q    From the Suffolk County Sheriff's

8    Department?

9        A    Yes.

10       Q    In security-related concerns?

11       A    Yes.

12       Q    And you may have received some training

13   in updated CPR?

14       A    Um-hm.  Yes.

15       Q    Any other training?

16            MR. SAVAGE:  In addition to the

17   other things she told you?

18       Q    Yes.

19       A    I was trained there on -- on more than

20   one occasion.  It was at least a day long each

21   time, and I'm really not sure.

22       Q    Okay.

23       A    It was nine years worth of training.

24       Q    Were you required to comply with any

Sheila J. Porter                                05/18/2005

40

1        Q      Okay.  Who makes the decision if an

2   inmate has to go to the hospital, who makes that

3   determination?

4        A      The provider working with the person.

5        Q      Does the Suffolk County Sheriff's

6   Department have any input on whether or not an

7   inmate is sent to the hospital from a medical

8   standpoint?

9        A      No.

10       Q      Other than a medical standpoint, what's

11  that input?

12       A      How the person is going to get there,

13  the medical reason.

14       Q      When you say the medical reason, what do

15  you mean?

16       A      It's usually a determination -- they try

17  to make a determination whether or not it's a

18  bogus trip.

19       Q      Who makes the assessment or the

20  diagnosis of the injuries or the --

21       A      The provider.

22       Q      That would be you?

23       A      Sometimes.  There would be someone above

24  me, unless it's -- unless it's a life or death

Sheila J. Porter                                05/18/2005

41

1    emergency, someone else would make the final

2    decision.  I would make the recommendation.

3         Q    In making those recommendations, who

4    would you consult with?

5         A    The medical director, and if he wasn't

6    available, whoever was on call.

7         Q    Would you ever consult in making those

8    medical decisions with a member of the Suffolk

9    County Sheriff's Department?

10        A    No.

11        Q    Who decides if diagnostic testing is

12   indicated or required?

13        A    The provider.

14        Q    Do those -- are those determinations

15   ever made with input from the Suffolk County

16   Sheriff's Department?

17        A    Occasionally.

18        Q    Under what circumstances?

19        A    Drug abuse.

20        Q    What do you mean?

21        A    Where it's believed that the inmate has

22   taken illegal substances while in the facility.

23   Sexual attacks.

24        Q    Under those circumstances with -- when

Sheila J. Porter                                    05/18/2005

42

1    there's a belief that an inmate may have ingested

2    a narcotic or a controlled substance within the

3    facility, how does the Suffolk County Sheriff's

4    Department make a determination as to whether or

5    not a diagnostic test is indicated?

6        A    There are certain tests that we didn't

7    do, they did.

8        Q    Those are urine tests?

9        A    Yes.

10       Q    Random urines?

11       A    Yes.

12       Q    I'm talking about nursing decisions,

13   medical care decisions, within the facility.  Who

14   makes the decision as to what kinds of diagnostic

15   testings are indicated when an inmate presents

16   with a particular condition?

17       A    The provider.

18       Q    What if there is a necessity to consult

19   with a specialist, who makes those determinations?

20       A    The provider.

21       Q    A few moments ago we spoke briefly about

22   documentation and the SOAP protocol.

23       A    Yes.

24       Q    Where are encounters with inmates

Sheila J. Porter                                           05/18/2005

19

1    Department contribute to your 401(k) plan?

2         A    No.

3         Q    Did the Suffolk County Sheriff's

4    Department pay your salary?

5         A    No.

6         Q    Who maintained your personnel file, to

7    your knowledge, while you were employed by

8    Correctional Medical Services from January of 2001

9    through June of 2003?

10        A    Correctional Medical Services.

11        Q    Where was it located, the personnel

12   file?

13        A    The exact location?

14        Q    Yes.

15        A    In a file cabinet in the administrative

16   assistant's office.

17        Q    And the administrative assistant was

18   employed by whom?

19        A    CMS.

20        Q    What was her name?

21        A    Sandra Sousa.

22        Q    I'm sorry?

23        A    Sandra Sousa.

24        Q    You indicated earlier that Donna Jurdak

Sheila J. Porter                                    05/18/2005

21

1    the infirmary at the Suffolk County -- at the

2    Suffolk County House of Correction --

3        A    Yes.

4        Q    -- for CMS?

5        A    Yes.

6        Q    And it's fair to say that Dr. Singletary

7    was in charge of the medical piece of care

8    provided to inmates incarcerated at the Suffolk

9    County House of Correction?

10       A    Yes.

11       Q    Were you evaluated in terms of your job

12   performance while you were employed by CMS from

13   January of 2001 to June of 2003?

14       A    Yes.

15       Q    Who conducted those evaluations?

16       A    Dr. Singletary.

17       Q    Any other employee of CMS involved in

18   the evaluation process for you during that time

19   period?

20       A    I don't think so.

21       Q    Was Donna Jurdak involved?

22       A    I'm not sure.

23       Q    Okay.  Did you ever speak with Donna

24   Jurdak concerning your evaluations?

Sheila J. Porter                                    05/18/2005

22

1      A    Yes.

2      Q    And what was the -- what was that about?

3      A    "It's time to get your evaluation done."

4      Q    Did any member of the Suffolk County

5  Sheriff's Department participate in your

6  evaluation?

7      A    No.

8      Q    What was the process of evaluation like?

9      A    It was a form with questions to be

10  answered and goals to be set.

11      Q    Who provided you with the form, what

12  entity?

13      A    CMS.

14      Q    Did you fill out the form?

15      A    I didn't, the physician did.

16      Q    Dr. Singletary?

17      A    Yes.

18      Q    Was the form filled out in consultation

19  with you or by him alone?

20      A    By him with review by me later.

21      Q    So after the evaluation form was

22  completed, you would have an opportunity to

23  discuss the results of that evaluation with him?

24      A    Yes.

Sheila J. Porter                                   05/18/2005

23

1      Q    And what were the evaluation forms used

2   for by CMS?

3      A    As a tool for deciding pay increases, as

4   a tool for determining any weaknesses that might

5   show up in someone's performance and with goals

6   for corrective measures.

7      Q    Did anyone from the Suffolk County

8   Sheriff's Department have any input into your

9   salary or pay increase?

10      A    No.

11      Q    Did anybody from the Suffolk County

12   Sheriff's Department have any input in terms of

13   your goals or corrective behavior?

14      A    No.

15      Q    What's the Employee Success Guide?

16      A    It's the booklet handed out -- there was

17   a booklet handed out when CMS took over as the

18   provider of medical care, and I believe there was

19   an update handed out while I was at the facility.

20      Q    When you say CMS took over as the

21   provider for healthcare, when they assumed the

22   contract --

23            THE STENOGRAPHER:  Wait a minute.

24   Can you start again?

Sheila J. Porter                                    05/18/2005

31

1          A     Subjective, Objective, Assessment and

2    Plan.

3          Q     And what does that mean?

4          A     Subjective is what we were told,

5    Objective is what we can see, Assessment is what

6    do you think happened, and Plan is what are you

7    going to do about it.

8          Q     Did you receive training in

9    documentation and the utilization of the SOAP

10   format?

11         A     Yes.

12         Q     And what kind of training was that,

13   Mrs. Porter?

14         A     That was ongoing from -- from the

15   nursing program on; that's the documentation that

16   I've used.

17         Q     Standard in the industry?

18         A     Yes.

19         Q     You indicated a few moments ago that you

20   received some training documents from the Suffolk

21   County Sheriff's Department.  Did you receive any

22   training from the Suffolk County Sheriff's

23   Department?

24         A     Yes.

Sheila J. Porter                                    05/18/2005

32

1    Q    What kind of training, in what areas?

2    A    Actually, report writing --

3    Q    Okay.

4    A    -- security, I believe during our

5    orientation CPR was provided for an update at that

6    same time.

7    Q    Other than report writing --

8         MR. SAVAGE:  I'm not sure --

9    Q    -- security --

10        MR. SAVAGE:  -- she was done.

11        Were you done or were you still

12   thinking?

13        THE WITNESS:  I was thinking, but...

14   Q    I'm sorry.  Keep thinking.

15   A    As I said, we had a large packet of

16   information each time.  Some general rules and

17   regulations, a tour of the building, how all of

18   the access cards worked.  I think that's it.

19   Q    Okay.  Did you receive any training from

20   the Suffolk County Sheriff's Department on

21   assessment protocols, nursing assessment

22   protocols?

23   A    No.

24   Q    Did you receive any training from the

Sheila J. Porter

33

1    Suffolk County Sheriff's Department regarding how

2    you administer chronic care?

3        A    No.

4        Q    Did you receive any training from the

5    Suffolk County Sheriff's Department regarding how

6    you administrator sick calls?

7        A    In a way, yes, when -- when they could

8    be done, where they could be done, who could come.

9        Q    Well, let me narrow the question a

10    little bit.  Did you receive any training in terms

11    of how you diagnose an inmate's ailments?

12        A    No.

13        Q    Did you receive any training concerning

14    how to conduct a physical examination --

15        A    No.

16        Q    -- on an inmate?

17        A    No.

18        Q    Did you receive any training regarding

19    how you appropriately triage sick calls from the

20    Suffolk County Sheriff's Department?

21        A    Again, partially, yes.  Because of

22    security issues, some of the triaging requires

23    that the security is met prior to -- how do I

24    explain this?  Can I give you a for instance?

Sheila J. Porter                                           05/18/2005

34

1      Q     Sure.

2      A     If there was a person who had a rope

3   around their neck, and we would not be able to go

4   in, triage, and decide what to do until all

5   security measures had been taken to ensure that we

6   wouldn't -- that our safety was -- that we would

7   be safe going in there; that it wasn't a -- a

8   bogus claim.  So, yes, some triage required that

9   security measures come first.

10     Q     Would you make routine -- would you make

11  sick calls on units?

12     A     No.

13     Q     How were sick calls done on units?

14     A     The nurses received paperwork that was

15  an inmate request for medical attention.

16     Q     And once that paperwork was received,

17  what did the nursing staff do with it?

18     A     The protocol is to triage it, read it,

19  and be sure it isn't an immediate problem, and the

20  person would be scheduled to be seen by a nurse,

21  by a mid-level provider, or by the physician.

22     Q     In those instances when there is a

23  determination made as to which provider should see

24  the inmate and triaging them, what input did the

Sheila J. Porter                                    05/18/2005

35

1    Suffolk County Sheriff's Department have in that

2    process?

3        A    None.

4        Q    You indicated that you received some

5    training in report writing?

6        A    Yes.

7        Q    From the Suffolk County Sheriff's

8    Department?

9        A    Yes.

10        Q    In security-related concerns?

11        A    Yes.

12        Q    And you may have received some training

13    in updated CPR?

14        A    Um-hm.  Yes.

15        Q    Any other training?

16            MR. SAVAGE:  In addition to the

17    other things she told you?

18        Q    Yes.

19        A    I was trained there on -- on more than

20    one occasion.  It was at least a day long each

21    time, and I'm really not sure.

22        Q    Okay.

23        A    It was nine years worth of training.

24        Q    Were you required to comply with any

Sheila J. Porter                              05/18/2005

40

1     Q    Okay.  Who makes the decision if an

2  inmate has to go to the hospital, who makes that

3  determination?

4     A    The provider working with the person.

5     Q    Does the Suffolk County Sheriff's

6  Department have any input on whether or not an

7  inmate is sent to the hospital from a medical

8  standpoint?

9     A    No.

10     Q    Other than a medical standpoint, what's

11  that input?

12     A    How the person is going to get there,

13  the medical reason.

14     Q    When you say the medical reason, what do

15  you mean?

16     A    It's usually a determination -- they try

17  to make a determination whether or not it's a

18  bogus trip.

19     Q    Who makes the assessment or the

20  diagnosis of the injuries or the --

21     A    The provider.

22     Q    That would be you?

23     A    Sometimes.  There would be someone above

24  me, unless it's -- unless it's a life or death

Sheila J. Porter                                    05/18/2005

41

1    emergency, someone else would make the final

2    decision.  I would make the recommendation.

3         Q    In making those recommendations, who

4    would you consult with?

5         A    The medical director, and if he wasn't

6    available, whoever was on call.

7         Q    Would you ever consult in making those

8    medical decisions with a member of the Suffolk

9    County Sheriff's Department?

10        A    No.

11        Q    Who decides if diagnostic testing is

12   indicated or required?

13        A    The provider.

14        Q    Do those -- are those determinations

15   ever made with input from the Suffolk County

16   Sheriff's Department?

17        A    Occasionally.

18        Q    Under what circumstances?

19        A    Drug abuse.

20        Q    What do you mean?

21        A    Where it's believed that the inmate has

22   taken illegal substances while in the facility.

23   Sexual attacks.

24        Q    Under those circumstances with -- when

Sheila J. Porter

42

1   there's a belief that an inmate may have ingested

2   a narcotic or a controlled substance within the

3   facility, how does the Suffolk County Sheriff's

4   Department make a determination as to whether or

5   not a diagnostic test is indicated?

6        A    There are certain tests that we didn't

7   do, they did.

8        Q    Those are urine tests?

9        A    Yes.

10       Q    Random urines?

11       A    Yes.

12       Q    I'm talking about nursing decisions,

13  medical care decisions, within the facility.  Who

14  makes the decision as to what kinds of diagnostic

15  testings are indicated when an inmate presents

16  with a particular condition?

17       A    The provider.

18       Q    What if there is a necessity to consult

19  with a specialist, who makes those determinations?

20       A    The provider.

21       Q    A few moments ago we spoke briefly about

22  documentation and the SOAP protocol.

23       A    Yes.

24       Q    Where are encounters with inmates

Sheila J. Porter                                     05/18/2005

117

1    that you were providing information to the F.B.I.?

2        A    Dr. Singletary -- specific instances,

3    perhaps not ongoing, specific instances -- so I

4    think Donna Jurdak was back by that time.

5        Q    What did Dr. Singletary know?

6             MR. SAVAGE:  I'm sorry, did you

7    complete your answer as to everybody that knew

8    through the end of 2000?

9        A    CHS.  Yes, I believe so.

10       Q    What did Dr. Singletary know?

11       A    That I was providing information in a

12   specific instance.

13       Q    And what was that?

14       A    I -- I couldn't tell you which one it

15   is.  I don't know which one was when.

16       Q    Well --

17       A    There were many.  Many.

18       Q    1999 to 2000 --

19       A    Many.

20       Q    -- during that time period -- let's step

21   back a second.

22            Did you notify anybody at the

23   Suffolk County Sheriff's Department in the latter

24   part of 1999 through the calendar year of 2000

Sheila J. Porter                                    05/18/2005

118

1    that the F.B.I. wanted you to provide them with

2    information?

3        A    Officially, no.

4        Q    What does that mean, officially, no?

5        A    I did tell someone unofficially that the

6    F.B.I. had contacted me.

7        Q    Whom did you tell unofficially that the

8    F.B.I. --

9        A    Steve Jacobs.

10       Q    -- had contacted you?

11            MR. SAVAGE:  Let her finish her

12   question.

13       A    Sorry.

14       Q    Whom did you tell unofficially that the

15   F.B.I. had contacted you?

16       A    Steve Jacobs.

17       Q    When did you tell Steve Jacobs that

18   unofficially?

19       A    He was interviewing me about a report I

20   had made.

21       Q    And what report was that?

22       A    I don't remember.

23       Q    Well, what were the circumstances

24   surrounding your communicating to Steve Jacobs of

Sheila J. Porter

05/18/2005

119

1    the Sheriff's Investigation Division that you were

2    providing information to the F.B.I.?

3        A    I don't remember which specific thing.

4    I reported a lot of things to the Sheriff's over

5    nine years.  Steve and I spoke frequently.  I

6    accompanied him to court frequently.  On one of

7    those occasions, I commented to him unofficially

8    that they had called, and that they were looking

9    for information.  I can't be more specific than

10   that because I don't remember if it was more

11   specific than that.  It was an informal comment

12   that I made during one of these encounters with

13   Steve.

14       Q    Did he ask you more questions about it?

15       A    No.

16       Q    Did you tell him that you were providing

17   information on an ongoing basis to the F.B.I.?

18       A    No.

19       Q    Did you tell him that it was on a

20   particular matter that you were providing

21   information?

22       A    No.

23       Q    You told him that the F.B.I. had

24   contacted you?

Sheila J. Porter                                          05/18/2005

120

1      A    Yes.

2      Q    What did you tell him about what that

3   contact was about?

4      A    Just that they were looking for

5   information.

6      Q    So you didn't communicate to him that

7   this was one of a number of contacts that you were

8   getting on a regular basis from the F.B.I.?

9      A    I think it was at the beginning.  I

10  don't think it was after a number; I think it was

11  early on.

12     Q    Did you indicate to him -- did you tell

13  Steve Jacobs that you had agreed to provide

14  information to the F.B.I. on an ongoing basis?

15     A    No.

16     Q    Who was the next person that you told

17  from the Suffolk County Sheriff's Department that

18  you were providing information to the F.B.I.,

19  whether informally or formally?

20     A    Paul DeFazio.

21     Q    When was that?

22     A    2002.

23     Q    And what were the circumstances

24  surrounding that communication with Paul DeFazio?

Sheila J. Porter                                          05/18/2005

124

1      A     Yes.

2      Q     And the context of this -- of my

3  questions to you was whom within the department

4  did you notify in 2001 to -- well, strike that.

5            I believe you testified that

6  sometime in the latter part of 1999 through 2000

7  you may have notified Steve Jacobs that on a

8  particular occasion the F.B.I. had contacted you?

9      A     Yes.

10     Q     Is that a fair characterization of your

11 testimony?

12     A     Yes.

13     Q     You did not, however, inform Mr. Jacobs

14 that you were in an ongoing relationship with the

15 F.B.I. providing them information on an ongoing

16 basis?

17     A     I don't believe I did.

18     Q     Other than Mr. Jacobs, whom within the

19 Suffolk County Sheriff's Department did you notify

20 that you were providing information to the F.B.I.

21 on an ongoing basis?

22     A     The next person -- well, the person that

23 knew it was Paul DeFazio, and that was in 2002.

24     Q     Okay.  And how did Mr. DeFazio know that

205

1    Q    What did you tell Gayle Bartley?

2    A    I told her that he had told me he wasn't

3  hearing voices; that there were some other issues

4  going on; and that there were some physical issues

5  going on; and that that was not the whole story,

6  so...

7    Q    You told her there were some physical

8  issues going on?

9    A    Yes.

10    Q    That's your testimony today?

11    A    I'm not exactly sure how I expressed it.

12    Q    Um-hm.

13    A    I told Gayle that he was down there;

14  that he wasn't hearing voices; that he told the

15  officer he was hearing voices but he was not

16  hearing voices; or that he told me that later on.

17  That he came down because he -- he said he had

18  been -- I don't know if I said he was assaulted,

19  but he had some other issues on the unit, and he

20  came downstairs to get out of that unit, to get

21  downstairs.  And I told her that he needed an

22  examination, so...

23    Q    What kind of examination did you tell

24  her that he needed?

Sheila J. Porter                                    05/18/2005

216

1    to -- to go to someone other than SID.

2        Q    Now, earlier today you testified that

3    you regularly reported allegations of physical

4    abuse of inmates by officers to SID?

5        A    Correct.

6        Q    From 1999 through -- strike that.

7             From 1994, right --

8        A    Correct.

9        Q    -- through 2003?

10       A    Yes.

11       Q    Why on this occasion did you not want

12   the information communicated to SID -- strike

13   that.

14            Why on this occasion did you not

15   want to go directly to SID?

16       A    Because of the previous history that I

17   had with Rene, what I knew, and my involvement

18   with him and with the F.B.I.

19       Q    Explain why that -- why you decided not

20   to go to SID because of that.

21       A    When Rene had left, was transferred the

22   time before when he was -- in November, between

23   that time and the time that he came back, I had

24   been working with the F.B.I.; I knew that Rene was

Sheila J. Porter                                    05/18/2005

217

1    still involved; I was unsure of what else was

2    going on because I had had the conversation with

3    Paul DeFazio, who was angry with the F.B.I.; and I

4    just had some reservations; I wanted to go to

5    somebody the next level up.

6         Q    Well, Paul DeFazio wasn't in SID at this

7    time, correct?

8         A    Correct.

9         Q    Okay.  And I thought you testified

10   earlier that you weren't aware until that morning

11   of May 19th that Mr. Rosario may still be working

12   with the F.B.I.?

13        A    Correct.

14        Q    And you gleaned that in your minute

15   conversation with him?

16        A    Yes.

17        Q    Okay.  Well, what other reasons -- why

18   would that have prevented you from going to SID?

19        A    I was concerned for Rene because he was

20   back again.  I didn't -- my feeling was that he

21   shouldn't have been back again.  I was very

22   concerned for him, and I was just concerned about

23   the whole issue of my working with Rene and the

24   F.B.I., and there were people in SID that knew

Sheila J. Porter                                           05/18/2005

218

1    that I both worked with the F.B.I. and with Rene,

2    and here he was back again and there were some

3    complaints again, and I just wanted to go one

4    level higher.

5        Q    Who were the people that were still in

6    SID that knew about your involvement in November

7    of 2002 that would have prevented you from going

8    down to SID to report the alleged abuse?

9        A    I thought Steve knew about it, I'm not

10   sure if he did or not, and although Paul wasn't in

11   SID specifically, he certainly knew, and he was

12   making his disappointment known to me.

13       Q    And why would that have -- why did that

14   militate for you against reporting to SID?

15       A    I was concerned for the health and

16   safety of Rene and myself.

17       Q    And what concerns did you have about

18   yourself?

19       A    I wanted to report this and make sure

20   that the information was there without going

21   through SID and without having to explain the

22   things again because of the -- the wiring and

23   things like that.  I didn't want to get back into

24   that.

Sheila J. Porter                                      05/18/2005

219

1      Q    Well, this is a serious allegation,
2   correct?

3      A    Yes.

4      Q    It's always a serious allegation when an
5   inmate accuses an officer of physical abuse,
6   correct?

7      A    It is.

8      Q    And those are investigations that the
9   department has taken seriously, correct?

10     A    Correct.

11     Q    And they investigate them, correct?

12     A    Yes.

13     Q    In fact, you've had numerous encounters
14  with -- strike that.

15          You've had numerous occasions in
16  which you have provided information to SID
17  concerning allegations of physical abuse by
18  officers on inmates, right?

19     A    Yes.

20     Q    And they have come to you looking for
21  information when they have been investigating
22  allegations of physical abuse of inmates by
23  officers, correct?

24     A    Correct.

Sheila J. Porter                                    05/18/2005

223

1      A    In the health service unit.

2      Q    What did you say to her; what did she

3  say to you?

4      A    I told her that Rene had come down on

5  MOA because he said he was hearing voices, but

6  then when I saw him in the back, he said he wasn't

7  hearing voices; he came down because he was

8  reporting that he had been assaulted by an

9  officer, and that he waited -- I told her the

10  story that Rene told me; that he waited for the

11  officer that he said injured him to leave the unit

12  for lunch; and then he said he was hearing voices

13  so that he could get down to the -- to the health

14  service unit to see someone; and that when I

15  talked to him, he didn't appear to be having a

16  problem with his mental illness at that time; that

17  he said he wasn't hearing voices, but he came down

18  for the other reason; that he said he had been

19  assaulted and he was afraid.

20      Q    Anything else?

21      A    That Rene was back and I didn't

22  understand why he was back, and that I wanted to

23  re -- I wanted to report it; that I needed to

24  report it; and that I wanted to -- that I wasn't

Sheila J. Porter                                      05/18/2005

234

1      Q     Okay.  Well, have you used that term

2  before?

3      A     I have no idea.

4      Q     Mrs. Porter, when did you -- when did

5  you call the F.B.I. regarding the information that

6  Rene Rosario had provided to you?

7      A     Probably on the 19th.

8      Q     When you say probably, could it have

9  been the 20th?

10      A     I think I made the phone call on the

11  19th, but I didn't talk to anyone.

12      Q     When did you talk to someone regarding

13  the allegations that Mr. Rosario had made to you?

14      A     I think the 20th.

15      Q     And whom did you speak with?

16      A     Krista.

17      Q     Krista Snyder?

18      A     Um-hm.

19      Q     How did you contact them?

20      A     Phone.

21      Q     What did you tell them?

22      A     What Rene told me.

23      Q     Had you already completed the document

24  that's been identified as Exhibit No. 5?

383

1    with me, this looked like they didn't know why I

2    was fired.  That was some other reason not having

3    anything to do with the Sheriff's Department.

4        Q    What persons did you speak with about

5    this press statement?

6        A    The people that talked to me in my

7    family, my friends, people that saw the interview.

8        Q    Well, what did they say to you?

9        A    They were upset.

10       Q    Well, what did they say to you about

11   what they interpreted that statement to mean?

12       A    Precisely as if they didn't know.

13       Q    And that's the reason why you allege

14   that that portion of that statement is defamatory?

15       A    Yes.

16       Q    Turning to paragraph No. 2, what

17   statements within paragraph No. 2 do you contend

18   are defamatory?

19       A    Clearly biassed and has her own agenda

20   for speaking out at this time.

21       Q    What does that sentence mean to you,

22   "She is clearly biassed and has her own agenda for

23   speaking out at this time"?

24       A    Clearly biassed how?  I can -- I can

384

1    tell you that some people that heard the report

2    felt that there was a racial issue.

3        Q    Which people?

4        A    Family members, friends.

5        Q    Who are they?

6        A    My children, my husband, friends that

7    live in my town, people that happened to see this

8    that know me and not anything else about anything.

9        Q    So who are the friends that saw this and

10   drew the conclusion that it implied some sort of

11   racial bias?

12       A    One of my closest friends, whose name is

13   another Donna, Donna Moore, Donna Desjardins now.

14       Q    What did she say to you?

15       A    "What was that all about?"

16       Q    What in that statement led those people

17   to conclude that it implied a racial bias?

18       A    That was -- that was just how the

19   statement struck them.

20       Q    How many people did it strike that you

21   spoke with that that statement implied a racial

22   bias?

23       A    Four or five specifically.

24       Q    When you read that statement, did it

Sheila J. Porter, Vol. 2

385

1    strike you as implying that you had a racial bias?

2        A    I didn't think of it.

3        Q    When did you think of it, if you thought

4    of it at all?

5        A    When I heard other people's comments.

6        Q    And when you heard other people's

7    comments, what did that make you think about the

8    statement?

9        A    It made me think, I hope that wasn't the

10    truth.

11        Q    Do you think that's what it implies?

12        A    I don't know.

13        Q    Other than "clearly biassed," what else

14    in that sentence do you allege is defamatory?

15        A    My own agenda for speaking out at this

16    time.  I had no agenda for speaking out at that

17    time, except that someone called me and asked for

18    my story.

19        Q    Did you feel that your reputation had

20    been damaged?

21        A    Yes.

22        Q    Did you hope to accomplish by speaking

23    to the Globe and to Channel 5 that you would

24    restore your reputation that you felt had been

# EXHIBIT 2

```
                                    Volume:    1
                                    Pages:     1 - 225
                                    Exhibits:  See Index
```

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 04-11935-DPW

SHEILA PORTER,                                      )
                              Plaintiff,            )
              v.                                    )
                                                    )
ANDREA CABRAL, SUFFOLK COUNTY SHERIFF'S             )
DEPARTMENT, SUFFOLK COUNTY, and                     )
CORRECTIONAL MEDICAL SERVICES, INC.,  INC., )
                              Defendants.           )

DEPOSITION OF **DONNA L. JURDAK**, a Witness

called on behalf of the Defendants, taken

pursuant to the applicable provisions of the

Massachusetts Rules of Civil Procedure, before

Maureen Nashawaty, a Notary Public within and for

the Commonwealth of Massachusetts, held at the

Suffolk County Sheriff's Department, 200 Nashua

Street, Boston, MA, on Monday, June 20, 2005,

commencing at 10:50 a.m.

*COPLEY COURT REPORTING, Inc.*
101 Tremont Street
Boston, Massachusetts  02108
(617) 423-5841

**DISK ENCLOSED**

1     facility.

2          Q.     What do you mean you sensed her

3     urgency?

4          A.     I just sensed that I needed to tell

5     someone right away.

6          Q.     What did Mrs. Porter tell you that made

7     you feel like this was urgent and that you needed

8     to tell someone right away?

9          A.     That he shouldn't have been at the

10    facility, that he was at risk for being harmed.

11         Q.     Other than he shouldn't be at the

12    facility and was at risk for being harmed, what

13    specifically did she tell you about allegations

14    that he was making concerning physical abuse?

15         A.     I don't recall.

16         Q.     Do you recall her telling you at all

17    that she had observed injuries on this inmate and

18    that he was alleging that he had been physically

19    assaulted by an officer?

20         A.     There were two different instances and

21    I can't be clear about which one and which

22    time -- if it was all in one.  You know, I can't

23    tell you.  I can't remember.

24         Q.     When you say there were two different

# EXHIBIT 3

```
1                                          VOL:   II
                                         PAGES: 202-397
2                                        EXHIBITS:  8-12

3

4              UNITED STATES DISTRICT COURT

5          FOR THE DISTRICT OF MASSACHUSETTS

6

7    * * * * * * * * * * * * * * * * *
     SHEILA J. PORTER,                   *
8                      Plaintiff         *
              -vs-                       *   Civil Action
9    ANDREA CABRAL; SUFFOLK COUNTY       *   No. 04-11935-DPW
     SHERIFF'S DEPARTMENT; SUFFOLK       *
10   COUNTY and CORRECTIONAL MEDICAL     *
     SERVICES, INC.,                     *
11                     Defendants        *
     * * * * * * * * * * * * * * * * *

12

13      CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

14

15        CONTINUED DEPOSITION OF ANDREA CABRAL, ESQUIRE,
     a witness called on behalf of the Plaintiff, in the
     above-captioned matter, said deposition being
16   taken pursuant to the Federal Rules of
     Civil Procedure, before Patricia M.
17   McLaughlin, a Certified Shorthand Reporter and
     Notary Public in and for the Commonwealth of
18   Massachusetts, at the offices of Goodwin Procter
     LLP, Exchange Place, Boston, Massachusetts, on
19   Friday, June 24, 2005, commencing at 10:10 a.m.

20

21          McLAUGHLIN & ASSOCIATES COURT REPORTERS
22               92 DEVIR STREET, SUITE 304
                MALDEN, MASSACHUSETTS  02148
23                   781.321.8922
                 WWW.E-STENOGRAPHER.COM
24
```

1    upon them to proceed with matters in

2    litigation.  They tried the case.  We

3    appealed, because clearly, we didn't agree

4    with the jury's verdict.  And the U.S. Court

5    of Appeals has spoken.

6  Q    Did you indicate at one point that you were

7    going to adopt the Stern Commission Report as

8    a blueprint for how you were going to handle

9    issues in the Sheriff's Department?

10  A    Use it as a blueprint, yes.

11  Q    Is it fair to say that one of the issues

12    flagged by the Stern Commission Report is the

13    existence of an atmosphere where people who

14    reported wrongdoing were harassed?

15  A    People who reported wrongdoing feared

16    retaliation.

17  Q    Did you not view the Baron case as a

18    circumstance where at least that was being

19    alleged by Mr. Baron?

20  A    I viewed it as a circumstance where it was

21    being alleged.

22  Q    Did you, in light of you using the Stern

23    Commission Report as a blueprint to deal with

24    those allegations, make some special effort

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922