UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHEILA PORTER<br><br>        Plaintiff,<br><br>  v.<br><br>ANDREA CABRAL, SUFFOLK COUNTY<br>SHERIFF'S DEPARTMENT<br><br>        Defendant. | Civil Action No.04-11935-DPW |

## JOINT PRE-TRIAL MEMORANDUM

Pursuant to L.R. 16.5(D), Plaintiff Sheila J. Porter ("Mrs. Porter") and Defendants

Andrea Cabral, Suffolk County Sheriff's Department and Suffolk County ("Defendants") hereby

submit their Joint Pre-Trial Memorandum.

1.    **TRIAL COUNSEL**

      Counsel for the Plaintiff is:

              Joseph F. Savage, Jr.
              David S. Schumacher
              GOODWIN PROCTER LLP
              Exchange Place
              Boston, MA  02109
              (617) 570-1000

      Counsel for the Defendant is:

              Ellen M. Caulo
              James M. Davin
              Suffolk County Sheriff's Department
              200 Nashua Street
              Boston, MA 02141
              (617) 635-1100

2.     **JURY TRIAL**

This case will be tried with a jury.

3.     **CONCISE SUMMARY OF THE EVIDENCE**

A.     **EVIDENCE OFFERED BY PLAINTIFF**

Mrs. Porter is a nurse practitioner with 36 years of experience who worked at the Suffolk County House of Corrections ("HOC") from 1994 through 2003. Mrs. Porter will present evidence that she was widely regarded as a superior nurse practitioner who received excellent performance reviews. Indeed, Mrs. Porter was publicly commended by defendant Suffolk County Sheriff's Department ("SCSD") on more than one occasion for extraordinary service at the HOC.

Mrs. Porter will show that, in 1999, she was approached by FBI agents and was asked to provide them with information on a confidential basis regarding possibly unlawful activities such as physical and sexual abuse of inmates and drug use at the HOC. Mrs. Porter agreed and to provide the FBI with information until her barring in June 2003.

Mrs. Porter will present evidence that, on May 19, 2003, she observed an inmate, Rene Rosario, in a cell in the infirmary at the HOC. Mrs. Porter was familiar with Mr. Rosario from their prior cooperation with the FBI on an investigation the previous year and was concerned that Mr. Rosario was returned to the HOC where he had secretly worn a recording device. Mrs. Porter will explain that Mr. Rosario told her that he had been recently abused by a corrections officer and asked her to report this to Christa Snyder, a FBI agent who was one of Mrs. Porter's contacts at the FBI. Mrs. Porter will explain that, during this conversation, which took place through the window of his cell door, she witnessed bruising on Mr. Rosario body. Mrs. Porter did not conduct or document a medical examination of Mr. Rosario.

Mrs. Porter will present evidence that she immediately reported this incident to her supervisor at the SCSD, Donna Jurdak, among others. Mrs. Porter anticipates that Ms. Jurdak will testify that she immediately reported the incident to HOC Deputy Superintendent Maryellen Mastrorilli. Ms. Mastrorilli asked Ms. Jurdak to have Mrs. Porter send her a report detailing her observations. Mrs. Porter wrote the report that day and, within a couple of days, submitted the report to Ms. Jurdak. Ms. Jurdak will testify that she forwarded the report to the attention of Ms. Mastrorilli, who accepted the document as the confidential report that she had requested. Ms. Mastrorilli forwarded a copy to the HOC superintendent and to the Sheriff's Investigative Division ("SID"). The evidence will also show that, consistent with her arrangement with the FBI and Mr. Rosario's request, Mrs. Porter also reported Mr. Rosario's allegations to Agent Snyder. While the Court has not yet determined the scope of Agent Snyder's testimony, Mrs. Porter expects that Agent Snyder will testify that she contacted SCSD officials to discuss the FBI's concern about Mr. Rosario's allegations.

In addition to reporting this incident to her supervisor, Ms. Mastrorilli and the FBI, the evidence will show that Mrs. Porter also sought out the SID investigators who were investigating the Rosario allegations and reported her encounter with Mr. Rosario. Mrs. Porter will present evidence that the information provided to the SID investigators was entirely consistent with the information contained in the report she provided to Ms. Mastrorilli.

Mrs. Porter will demonstrate that SCSD officials were alarmed when they found out that the FBI was aware of the Rosario allegations and that they quickly suspected that Mrs. Porter was the source. Indeed, Ms. Mastrorilli will testify that, upon learning from Mr. Theiss that Mrs. Porter had reported these allegations to the FBI, she stated that Mrs. Porter should be barred for violating the SCSD policy against speaking to outside agencies. The evidence will also show

that, even though SID had already interviewed Mrs. Porter and received her report, which contained no new information, SID officials called Mrs. Porter into their offices for another interview. Mrs. Porter will present evidence that a primary, if not sole, purpose of the interview was to attempt to get her to "admit" that she had contacted the FBI about the Rosario allegations. During this interview, which Mrs. Porter will describe as intense and threatening, she forthrightly acknowledged that she had communicated her encounter with Mr. Rosario to the FBI.

Less than two weeks later, on June 10, 2003, Mrs. Porter was barred from the HOC. Mrs. Porter will present evidence that, on June 10th, Sheriff Cabral made the decision to bar Mrs. Porter and instructed Ms. Keeley to carry out the barring. Mr. Theiss spoke with Sheriff Cabral and informed her, among other things, that SID had determined that Mrs. Porter had spoken to the FBI about the Rosario allegations. They also discussed the Rosario allegations and Mr. Porter's internal reporting of her contact with Mr. Rosario. Sheriff Cabral also spoke to Ms. Keeley. Ms. Keeley will testify that, during this conversation, the barring of Mrs. Porter was discussed, including Mrs. Porter's contacts with the FBI.

Ms. Keeley contacted Deputy Superintendent Mastrorilli and instructed her to bar Mrs. Porter in accordance with SCSD Policy S-220. Ms. Mastrorilli will testify that the <u>only</u> reason she was given for the barring was that Mrs. Porter spoke with the FBI about the Rosario allegations, thus violating S-220. Later that day, Mrs. Porter was asked to report to Ms. Jurdak's office for a meeting with Ms. Jurdak and Ms. Mastrorilli. During this meeting, Ms. Mastrorilli told Mrs. Porter that she was barred from the HOC, effective immediately. Ms. Mastrorilli provided one reason for the barring: that Mrs. Porter shared confidential information with an outside agency—the FBI—in violation of Policy S-220, the SCSD Employee Code of Conduct. Within a day, Mrs. Porter was terminated from Correctional Medical Services, Inc.

Subsequent to the barring, Sheriff Cabral defamed Mrs. Porter on at least three occasions, raising the specter that Mrs. Porter was lying, incompetent and a racist motivated to lie by an unspecified private agenda. First, she issued a press release stating, falsely, that Mrs. Porter had violated contractual obligations, was clearly biased and had an agenda. Next, during a political debate, she stated that Mrs. Porter was not a whistleblower and clearly had her own agenda. Finally, in a *Boston Globe Magazine* article, Sheriff Cabral said that Mrs. Porter was politically motivated and her spokesman stated that the allegations were 100% ridiculous and had not been followed up on in any way.

Sheriff Cabral and the SCSD state that Mrs. Porter was not fired because she spoke with the FBI, but, rather, because of various internal reporting problems related to the Rosario incident. Sheriff Cabral will testify that Mrs. Porter speaking to the FBI was no factor at all in her decision to bar Mrs. Porter. Sheriff Cabral will rely on her memory of her reasons for deciding to bar Mrs. Porter. But the evidence will show that Mr. Theiss separately told both Sheriff Cabral and Chief-of-Staff Keeley that Mrs. Porter communicated with the FBI about the Rosario allegations. Similarly, on June 10, 2003, during a meeting between Sheriff Cabral and Ms. Keeley, Ms. Keeley told Sheriff Cabral that one of the reasons that she believed Mrs. Porter should be barred was that Mrs. Porter spoke with the FBI. Finally, during a meeting between Sheriff Cabral, Ms. Keeley and Mr. Theiss subsequent to Mrs. Porter's barring, Sheriff Cabral discussed that one of the two reasons that Mrs. Porter was barred was because of her communications with the FBI.

Sheriff Cabral will testify that Mrs. Porter was barred for four reasons: (1) failure to document Rosario's medical record; (2) filing an untimely report; (3) using the wrong form to report the incident; and (4) backdating her report. In their interrogatory responses, however, the

SCSD indicated that there were only three reasons for the barring, failing to include the reason concerning usage of the wrong form.  In any event, Mrs. Porter will present evidence that these reasons are merely a pretext.  First, the reasons are inconsistent with the testimony of other SCSD participants, including Mr. Theiss, Ms. Keeley and the SCSD 30(b)(6) witness (Mr. Horgan) and the defendants' interrogatory answers.  Second, the reasons have evolved over time and continue to emerge.  Third, the evidence will show that none of Sheriff Cabral's current reasons provide a valid basis to bar a contract employee.  No similarly-situated individual has been barred or disciplined for the same reasons as Mrs. Porter's alleged misconduct.  Rather, barring was reserved for those contract workers who committed far more serious offenses, such as bringing firearms into the HOC or having inappropriate contact with an inmate.  And those contract workers all had the benefit of an investigation into their misconduct and an opportunity to explain themselves.  The evidence will show that there was no investigation into Mrs. Porter's alleged misreporting, nor was she ever afforded an opportunity to explain any deficiencies that the SCSD believed existed.  Moreover, in all other cases where SCSD employees committed reporting-type infractions, the employees received only light discipline, if any—after an opportunity to state their case at a hearing.

Mrs. Porter will show that all of Sheriff Cabral's current reasons for the barring have no merit.  First, both Mrs. Porter, based on her 36 years of experience, and Ms. Jurdak, her medical supervisor, will testify that she did not violate medical reporting requirements because there no such reporting requirements exist, in Policy S-220 or otherwise.  Mrs. Porter did not have a duty to record her casual, brief interaction with Mr. Rosario in his medical file and it would not be appropriate to do so in the circumstances of not conducting an examination, speaking through a window in a door, and give Mrs. Porter's relationship with the inmate's past law enforcement

activity. Second, Ms. Porter did not file an untimely report that warranted discipline according to the SID investigator and the 30(b)(6) witness. Mrs. Porter orally reported her encounter in a timely manner because she reported her observations to Ms. Jurdak (who reported to Deputy Superintendent Mastrorilli on the same day that it occurred). Moreover, three days later, during SID's first set of interviews in the investigation, Mrs. Porter approached the investigators and told them what she knew about the Rosario allegations. Finally, on May 19, 2003, Mrs. Porter completed a written report of her encounter and submitted it to her supervisor within a couple of days. Mrs. Porter and Ms. Jurdak will both testify that the stated requirement in S-220 to file a written report by the end of one's shift was never enforced (indeed, reports by others involved in the Rosario investigation were not completed by the end of the shift), and the SCSD has never barred, fired, seriously disciplined anyone for this reason.

Third, Sheriff Cabral's statement that one of her reasons for the barring was that Mrs. Porter used the wrong form in reporting the incident is contradicted by Ms. Keeley, Mr. Theiss and Ms. Mastrorilli, who requested the report in the first place. Moreover, within the Rosario investigation itself, numerous officers filed reports on documents other than official SID incident report forms. Finally, Sheriff Cabral simply has no basis for stating that Mrs. Porter "backdated" her report, and Mrs. Porter did not in fact do so. Moreover, the lead investigator in the Rosario investigation himself admits to backdating one of his reports; thus, it is evident that this practice does form the basis for any discipline, must less a barring.

Other reasons for the barring may be offered by the SCSD or Sheriff Cabral, including not reporting the incident at all to the SCSD or reporting information that is inconsistent. Each such claim, if made, will be contradicted by supervisory-level SCSD employees.

Mrs. Porter will also present evidence that Suffolk County and the SCSD barred her in accordance with an unconstitutional policy and custom that violated her civil rights. First, Policy S-220, on its face, is unconstitutional because it forbids disclosure of confidential information outside the department—even to outside law enforcement officials. This provision of the policy was the sole "articulated" basis provided to Mrs. Porter for her barring.

Evidence will show that this was consistent with a longstanding institutional custom of retaliation against those who exercise certain First Amendment rights—discussion of possible SCSD wrongdoing. Mrs. Porter and Ms. Jurdak will both testify that they have personal knowledge of incidents where individuals who spoke out against the department experienced retaliation and that retaliation of exercising First Amendment rights was frequent and tolerated. Mrs. Porter will introduce statements by Sheriff Cabral claiming that the SCSD was implementing recommendations of the Stern Commission related to eliminating the custom of retaliation. A portion of the Stern Commission Report will be offered to show that the custom of retaliation personally observed by Ms. Jurdak and Mrs. Porter was longstanding and widespread. This will be evidence of the decision-maker being on notice. Additional evidence of notice of a custom of retaliation includes the SCSD being found liable by a jury in the *Baron* case of violating a former SCSD employee's civil rights by management of tolerating the existence of retaliation for speaking out. The verdict finding the SCSD liable for a custom of infringing First Amendment rights was announced on May 15, 2003, only 13 days before Mrs. Porter acknowledged that she spoke to the FBI and 26 days before she was barred. In June 2003, the same month that Mrs. Porter was barred, the SCSD asked for a new trial in the *Baron* case.

Moreover, the SCSD itself has affirmatively argued in legal briefs in other cases, as recently as 2002, that a custom of retaliation exists. Former top SCSD policymakers, such as

Superintendent Richard Feeney and Deputy Superintendent Marie Lockhart, have also admitted in other judicial proceedings that this custom exists. Mrs. Porter will also present evidence that a current SCSD employee, Deyanara Feliz, was retaliated against by both staff and management for reporting that a fellow corrections officer was having an inappropriate intimate relationship with an inmate. Ms. Keeley and Mr. Theiss will testify, consistent with a custom of retaliation, that the SCSD cannot guarantee the safety of individuals who cooperate with the FBI.

Mrs. Porter will present evidence of the damages she has suffered as a result of defendants' unconstitutional actions. Mrs. Porter will testify that the barring resulted in her immediate termination and an approximately four-month period of unemployment. Mrs. Porter and family members will explain that she was humiliated and embarrassed by these events, causing emotional and physical damage and distress. Medical treatment and employment records will be introduced. Mrs. Porter will testify that Sheriff Cabral and the SCSD sullied her reputation, which had previously been unblemished based on 36 years of service as a nurse practitioner, nine of which took place in the HOC, where she was universally regarded as a superior nurse practitioner. Mrs. Porter's good name was publicly and repeatedly smeared by Sheriff Cabral. Mrs. Porter will be asking the jury for compensatory and punitive damages and, ultimately, attorney's fees and prejudgment interest, and equitable relief (job reinstatement, corrective press release, notice to licensing boards).

### B. EVIDENCE OFFERED BY DEFENDANT

Plaintiff Sheila Porter is a former contract nurse practitioner employed by Defendant Correctional Medical Services, Inc. (CMS) at the Suffolk County House of Correction (HOC). Defendant Andrea J. Cabral was appointed Suffolk County Sheriff on November 29, 2002 to complete the remaining term of Sheriff Richard J. Rouse who retired in November 2002.

9

CMS was the company that provided medical care for the inmates incarcerated at the Suffolk County House of Correction (HOC) in 2003.    The contract negotiated between Suffolk County and CMS provided that the Suffolk County Sheriff's Department had the authority to bar any employee of CMS from the HOC.  The Suffolk County Sheriff's Department under the administration of Sheriff Cabral has in fact barred a number of CMS employees from the HOC. On June 10, 2003 Sheriff Andrea J. Cabral revoked Mrs. Porter's security clearance and barred her from the HOC.

Sheriff Cabral decided to revoke Mrs. Porter's security clearance and bar her from the HOC because Mrs. Porter failed to document her observations of Inmate Rene Rosario's physical condition in his medical record, failed to provide a confidential report in a timely manner as requested, and the document that was submitted ten days later was written on Interdisciplinary Progress Notes, appeared to be a medical note and it was dated the date of the incident as though the note was made contemporaneously with the observations and assessment.

The decision to bar Mrs. Porter from the HOC arose out of an investigation into allegations made by HOC inmate Rene Rosario on May 19, 2003 that an unidentified correction officer had physically assaulted him.  Inmate Rosario made these allegations after he was transported to the Medical Housing Unit due to his complaint that he was hearing voices. Rosario told the correction officer on duty in the Medical Housing Unit that he wanted to speak with the Sheriff's Investigation Division ("SID") and the correction officer immediately contacted SID.  SID investigators Brian Dacey and Sonya Aleman responded to the Medical Housing Unit, interviewed Inmate Rosario and opened an investigation into his allegations.

During the course of that investigation, it was learned that Inmate Rosario also reported the alleged assault to Mrs. Porter on May 19, 2003 in the Medical Housing Unit where she was

on duty as a nurse practitioner.  Mrs. Porter made specific observations of the size, color, location, and freshness of the injuries allegedly sustained by inmate Rosario.  However, she did not document her specific and detailed observations of Rosario's physical condition and his statements concerning how he was allegedly injured in Rosario's medical records. Further, Mrs. Porter did not report the inmate's allegations of abuse to the Department or to SID as required by Department policy. Mrs. Porter also did not inform any of the other medical professionals who conducted examinations and assessments of inmate Rosario on May 19, 2003 about the specific observations she made of his physical condition and his allegations that a correction officer assaulted him.  Nor did she inform the relevant medical staff that his reported complaint of hearing voices was a pretext to facilitate his transfer to the Medical Housing Unit.

Mrs. Porter was familiar with SID and aware that it was the entity within the SCSD that, among other things, investigated allegations of abuse of inmates by corrections officers.  In the nine years that Mrs. Porter had worked at the HOC as a nurse practitioner she had made numerous reports to SID concerning allegations of inmate abuse.

Instead Mrs. Porter informed her supervisor, CMS employee and Health Services Administrator Donna Jurdak, that an inmate in the infirmary was alleging that an officer had assaulted him.  Thereafter, Ms. Jurdak reported Mrs. Porter's encounter with inmate Rosario to Department Deputy Superintendent Mary Ellen Mastrorilli.  Ms. Mastrorilli directed Ms. Jurdak to tell Mrs. Porter to submit a confidential report concerning her contact with the inmate. Ms. Mastrorilli was not aware that Mrs. Porter had not documented her observations of inmate Rosario's physical condition in the medical records.  Mrs. Porter did not produce a response to this request until May 28, 2003 when a copy of a document entitled "Interdisciplinary Progress Notes" ("Medical Note") dated May 19, 2003 was received by Ms. Mastrorilli and SID.

SID conducted a thorough and comprehensive investigation of inmate Rosario's allegations.[1] Investigators Dacey and Aleman interviewed every corrections officer and medical staff person who had contact with inmate Rosario during the relevant time period of his allegations. Inmate Rosario was interviewed multiple times and photographs were taken of his alleged injuries. The investigators gathered reports and relevant institutional and medical records. On or about June 4, 2003 SID closed its investigation into Rosario's allegations, concluding that his allegations that a corrections officer physically assaulted him could not be sustained.

Deputy Superintendent and Chief of SID Viktor Theiss briefed Sheriff Cabral on the results of the Rosario investigation after it was concluded. In the context of this briefing, he also informed her that Mrs. Porter did not document her observations of Rosario's physical condition in his medical records, failed to submit a report of her encounter with Rosario in a timely fashion after being directed to do so, and that the document that was ultimately received on May 28, 2003 was written on Interdisciplinary Progress Notes ("Medical Notes") and dated May 19, 2003, the date of the encounter with Rosario. Mr. Theiss also informed Sheriff Cabral that Mrs. Porter had communicated with the FBI concerning inmate Rosario.

On or about June 10, 2003 Sheriff Cabral made the decision to revoke Mrs. Porter's security clearance and bar her from the HOC per the terms of the contract between CMS and Suffolk County. She took this action because she considered Mrs. Porter's failure to document her observations of Rosario's physical condition in his medical records; her failure to submit a written report of her encounter with inmate Rosario in a timely fashion after being directed to do so; and, her use of medical notes in responding to the request for a report, serious lapses in

---

[1] During the course of their investigation, Rosario made another allegation that a correction officer assaulted him. SID investigated that allegation as well and determined that it could not be sustained.

judgment. The evidence will show that Sheriff Cabral considered Mrs. Porter's actions particularly egregious given Rosario's serious allegations of abuse by a corrections officer and Sheriff Cabral's primary obligation for the care and custody of inmates committed to the HOC. Although she was aware that Mrs. Porter had communications with the FBI concerning inmate Rosario, such knowledge played no role in her decision to revoke her security clearance.

The evidence will further show that Sheriff Cabral's action in revoking Mrs. Porter's security clearance was entirely consistent with the significant and comprehensive changes that she began and continues to implement at the HOC since her appointment in November 2002. The evidence will establish that commencing in November 2002 Sheriff Cabral began to implement significant reforms at the SCSD in the areas of hiring, training, investigations, disciplinary practices, promotions, and inmate programming. The evidence will also establish that under Sheriff Cabral the SCSD continued to cooperate and collaborate in joint investigations and programs with the FBI and other outside law enforcement agencies.

Sheriff Cabral informed Chief of Staff Elizabeth Keeley that she had decided to bar Mrs. Porter and asked her to implement that decision. In communicating her decision to bar Mrs. Porter to Ms. Keeley, Sheriff Cabral noted Mrs. Porter's failure to document an inmate's medical record and her failure to file a timely report. Sheriff Cabral did not refer to Policy S220 in her conversation with Ms. Keeley nor did she tell her that Mrs. Porter should be barred because she shared confidential information outside the Department.

Ms. Keeley contacted Ms. Mastrorilli and instructed her to inform Mrs. Porter that she was barred from the HOC. Ms. Keeley advised Ms. Mastrorilli of the reasons that Ms. Keeley felt barment was appropriate, including failure to document a medical file, failure to file a timely report, the failure to file a timely report interfered with an ongoing investigation and sharing

confidential inmate information outside the Department.  Ms. Mastrorilli notified Mrs. Porter that she was barred from the HOC but only provided one reason, sharing confidential information outside the Department in violation of Policy S220.

On August 25, 2004, more than one year after Mrs. Porter was barred, Sheriff Cabral authorized the issuance of a press statement in response to allegations made by Mrs. Porter and printed in the Boston Globe, that she was illegally fired from the HOC.  On or about August 25, 2004 Mrs. Porter repeated her allegations that Sheriff Cabral had illegally fired her from the HOC in an interview televised on WCVB, Channel 5 TV.  Mrs. Porter's public accusations of illegal misconduct on behalf of Sheriff Cabral were made on the eve of her filing the instant lawsuit and a hotly contested race for Suffolk County Sheriff. Neither the Press Statement authorized by Sheriff Cabral nor any subsequent statements made by her concerning Mrs. Porter were defamatory.  Further none of the statements held Mrs. Porter up to contempt, hatred, scorn, or ridicule or tended to impair her standing in the community.

The defendants dispute Mrs. Porter's contention that SCSD officials were "alarmed" when they learned that the FBI was aware of the Rosario allegations.  In fact the evidence establishes that SID was already investigating Rosario's allegations when they became aware of the FBI's interest and that SID voluntarily updated the FBI on the status of the investigation. Further, there is no evidence that Sheriff Cabral was aware of the Rosario investigation and Mrs. Porter's role in that investigation until after it was concluded.

The defendants dispute Mrs. Porter's contention that Sheriff Cabral's reasons for barring Mrs. Porter, a contract worker, were not sufficient.  The contract between CMS and Suffolk County gave exclusive authority to the SCSD to revoke the security clearance and bar any employee of CMS from the HOC.  There is no requirement that barment only be utilized in

particular circumstances.  Further, the defendants object to the introduction of barring decisions and employee disciplinary decisions made by prior Sheriff's in prior administrations.  None of that evidence is relevant to Sheriff Cabral's decision to bar Mrs. Porter.  Moreover, any discipline imposed upon SCSD employees who are union members covered by the terms of collective bargaining agreements is not relevant to the decision by Sheriff Cabral to bar Mrs. Porter, a contract worker[2].

The defendants dispute Mrs. Porter's contention that Policy S220 (Employee Code of Conduct) is unconstitutional on its face.  The language of the policy does not forbid the disclosure of confidential information outside the Department.  The Policy specifically identifies the categories of information that are deemed confidential and prohibits the unauthorized disclosure of such information.

The defendants object to the introduction of the Stern Commission Report and other evidence of a "Code of Silence" at the HOC (Plaintiff's proposed exhibits: 63-72)[3]  The Stern Commission Report contains inadmissible hearsay and does not fall into any of the exceptions for inclusion.  See, Fed. R.Evid. 803(8)(c).  Further, the report and exhibits 63-72 concern the Suffolk County Sheriff's Department, as it existed prior to the administration of Sheriff Cabral. The introduction of the Stern Report and evidence of misconduct that occurred prior to the administration of Sheriff Cabral would be highly prejudicial to the defendants and has little probative value to the issues in the instant litigation.  Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice or confusion of the issues. Fed.R.Evid. 403.  In balancing the competing interests in this case the Court should find

---

[2] Defendants have filed a motion *in limine* with respect to this evidence and request an opportunity to be heard on its admissibility prior to trial.

[3] Defendants have filed a motion *in limine* with respect to this evidence and request an opportunity to be heard on its admissibility prior to trial.

the potential prejudice to the defendants is demonstrably greater than any potential probative value to the plaintiff. See, Wierstak v. Heffernan, 789 F.2d 968, (1st.Cir. 1986); Furtado v. Bishop, 604 F.2d 80 (1st. Cir. 1979).

4.   **STATEMENT OF FACTS TO BE SUBMITTED TO THE JURY BY STIPULATION OR ADMISSION**

1.   Sheila Porter was a contract nurse practitioner working at the Suffolk County House of Corrections from 1994-2003. Mrs. Porter was not an employee of Suffolk County. From 2001-2003 Mrs. Porter was employed by Correctional Medical Services (CMS).

2.   Andrea J. Cabral has been the Suffolk County Sheriff since November 29, 2002. She was elected as Sheriff on November 2, 2004.

3.   CMS was the company that provided healthcare services to the inmates incarcerated at the HOC pursuant to a contract with Suffolk County. The contract negotiated between Suffolk County and CMS provided that the Suffolk County Sheriff's Department ("SCSD") had the authority to revoke the security clearance of any employee of CMS and bar them from the HOC.

4.   On May 19, 2003, inmate Rene Rosario reported to Mrs. Porter that he had been physically assaulted by an unidentified corrections officer and showed her the injuries that he allegedly sustained. Mrs. Porter was on duty as a nurse practitioner when she made observations of his alleged injuries through the cell door window. Mrs. Porter did not conduct a hands-on physical examination of Mr. Rosario. Mrs. Porter did not document her observations of Rosario's physical condition in the medical record.

5.   On May 19, 2003, Mrs. Porter orally reported her contact with Rosario to her CMS supervisor, Health Services Administrator Donna Jurdak.

6.   Mrs. Porter also spoke with mental health worker Gayle Bartley concerning her encounter with Rosario.

7.   On May 19, 2003, Rosario informed SID that he had been physically assaulted by a corrections officer. SID opened an investigation into Rosario's allegations on May 19, 2003.

8.   Ms. Jurdak reported Mrs. Porter's encounter with Rosario to Deputy Superintendent Mary Ellen Mastrorilli on May 19, 2003. During this conversation, Ms. Mastrorilli directed Ms. Jurdak to tell Mrs. Porter to prepare and submit a confidential report concerning her encounter with Rosario.

9.      On or about May 20, 2003, Mrs. Porter had communications with FBI Agent Snyder concerning Rosario.

10.     On May 22, 2003, Mrs. Porter approached SID investigators Dacey and Aleman in the infirmary where they were conducting their investigation of Rosario's allegations. Mrs. Porter communicated information to them concerning her encounter with Rosario on May 19, 2003. During this meeting Mrs. Porter did not provide investigators Dacey and Aleman with any written document she had authored concerning her encounter with Rosario.

11.     Mrs. Porter provided a written document of her encounter with Rosario to Ms. Jurdak. She did not provide this document to Ms. Jurdak on May 19, 2003. This document was reviewed by Ms. Mastrorilli on May 28, 2003.

12.     On May 22, 2003, Investigators Dacey and Aleman reviewed inmate Rosario's medical record and the record did not include any medical note authored by Mrs. Porter.

13.     On May 28, 2003, SID reviewed a copy of the document written by Mrs. Porter.

14.     On or about May 21 and May 23, 2003, SID investigator Stan Wojtkonski had communications with FBI Agent Christa Snyder, during which Ms. Snyder told Mr. Wojtkonski that she had been made aware from someone within the HOC of injuries allegedly sustained by Rosario.

15.     SID conducted a follow-up interview with Mrs. Porter on May 28, 2003. During this interview, Mrs. Porter was questioned concerning the information contained in the written document she wrote concerning her encounter with Rosario. She was also asked when she had contacted Agent Snyder. Mrs. Porter responded that she had done so on or about May 20, 2003.

16.     SID concluded its investigation into Rosario's allegations on or about June 4, 2003 determining that his allegations could not be sustained.

17.     Mr. Theiss separately briefed Ms. Keeley and Sheriff Cabral about the results of the investigation.

18.     Sheriff Cabral made the decision to revoke Mrs. Porter's security clearance and bar her from the HOC. Ms. Keeley was responsible for implementing the barring.

19.     Ms. Keeley instructed Ms. Mastrorilli to inform Ms. Porter that she was barred from the HOC.

20.     One June 10, 2003, Ms. Mastrorilli informed Mrs. Porter that she was barred from the HOC. The only reason that Ms. Mastrorilli provided for the barring was that

Mrs. Porter communicated confidential communications to an outside agency, in violation of Policy S-220.

21.    There are no unwritten policies at the HOC.

22.    The SCSD does not have a policy that specifically concerns the precise type of form to report an incident on.

23.    Prior to May 2003, the SCSD had never disciplined Mrs. Porter, an employee of CHS/CMS and a contract nurse working at the HOC.

24.    Prior to May 2003, SID received written documents including reports from Mrs. Porter that were not written on Incident Report forms.

25.    SID has received incident reports from Department employees that were not submitted by the end of the employee's shift.

26.    SID has received written reports from employees and contract workers that were not submitted on Incident Report forms.

27.    In May, 2003, Sheriff Cabral was aware of the existence of the Stern Commission Report.

28.    In a press statement issued on August 25, 2004, Sheriff Cabral made the following statement: "Sheriff Cabral has addressed and remedied the concerns raised in the Stern Commission report."

29.    In May, 2003, Sheriff Cabral was aware of a jury verdict in the *Baron* case in favor of Baron and against the SCSD.

30.    Mrs. Porter did not have a contract with the SCSD or CMS.

31.    Sheriff Cabral authorized the release of a press statement in response to allegations by Mrs. Porter printed in the *Boston Globe* containing the following statements:  "Ms. Porter was asked to leave the House of Correction because she violated Department regulations and contractual obligations.  She is clearly biased and has her own agenda for speaking out at this time."

32.    During a political debate Sheriff Cabral made the following statements: (1) in response to a question "Andrea, you are a black female in a traditionally all white male system.  How big an issue is race in this race and in the job that you will hold?" Ms. Cabral said "Well, certainly, because we are in America, I think race plays a role in everything"; (2) "neither of these people was a whistle blower"; (3) "He knows absolutely nothing about the facts of either cases, except for what he has read in the newspapers, unless he's had interviews with these people, who clearly had their own agenda";

33. Sheriff Cabral made the following statement in a *Boston Globe Magazine* article: "Cabral says that the allegations were all politically motivated. One of the so-called whistle-blowers was a former guard who testified to covering up inmate abuse."

34. No SCSD employee ever contacted the *Boston Globe* subsequent to the publication of the October 31, 2004 *Boston Globe Magazine* article concerning Sheriff Cabral about that article.

35. Sheriff Cabral was aware that Mrs. Porter had an employment relationship with CMS.

36. Mrs. Porter was unemployed from June 10, 2003 through October 12, 2003.

## 5. CONTESTED ISSUES OF FACT

1. The reason or reasons why Sheriff Cabral and the SCSD revoked Mrs. Porter security clearance and barred her from the HOC.

2. The existence of a custom of retaliation within the SCSD for speaking out against the Department.

3. The existence of a custom of retaliation within the SCSD by management against staff for speaking out against the Department.

4. Sheriff Cabral's awareness of the customs described in contested issues of fact # 2 and 3.

5. Sheriff Cabral's awareness of and acquiescence in this custom.

6. Whether Mrs. Porter had ever been disciplined in any way in the nine years she served at the HOC prior to June 10, 2003.

7. Whether in 1999 Mrs. Porter was approached by the FBI and asked to provide information on a confidential basis regarding possible civil rights violations at the HOC and whether Mrs. Porter did provide such information to the FBI until she was barred on June 10, 2003.

8. Whether Sheriff Cabral was aware that Mrs. Porter provided information to the FBI from 1999-2003.

9. Whether Mrs. Porter conducted a medical examination of Mr. Rosario on May 19, 2003 that required documentation.

10. Whether Mrs. Porter reported Rosario's allegations of abuse and her knowledge of those allegations to SID and the Department on May 19, 2003.

11. Whether prior to Mrs. Porter's barring, Ms. Mastrorilli offered to Mr. Theiss to bar Mrs. Porter in accordance with SCSD policy.

12. Whether the document prepared by Mrs. Porter dated May 19, 2003 concerning her encounter with Rosario was the confidential report requested by Ms. Mastrorilli.

13. When Mrs. Porter provided the written document dated May 19, 2003 to Donna Jurdak.

14. When Ms. Mastrorilli and SID received a copy of the document prepared by Mrs. Porter.

15. Whether Ms. Mastrorilli accepted the document prepared by Mrs. Porter as the confidential report that she had requested.

16. Whether prior to re-interviewing Mrs. Porter on May 28, 2003, SID investigator Dacey had a conversation with SID investigator Jacobs and whether Jacobs said to Brian Dacey that he should see if Mrs. Porter would admit that she talked to the FBI about the Rosario allegations.

17. The substance of the conversations between Mr. Theiss, Ms. Keeley and Sheriff Cabral between May 19, 2003 and June 10, 2003.

18. The substance of the conversation between Mrs. Porter and FBI Agent Snyder on or about May 20, 2003.

19. The substance of the conversations between Agent Snyder and Stan Wojtkonski between May 20, 2003 and May 24, 2003.

20. The substance of the conversation between Ms. Keeley and Ms. Mastrorilli on June 10, 2003.

21. Whether on June 10, 2003, Policy S-220 prohibited contract workers from speaking to outside agencies such as the FBI.

22. Whether the SCSD conducted an investigation of Mrs. Porter's conduct or gave her an opportunity to explain her alleged misconduct.

23. Whether on June 16, 2003, Sheriff Cabral, Ms. Keeley and Mr. Theiss stated during a meeting with the United States Attorney and the FBI that the two main reasons for Mrs. Porter's barring were the failure to create a medical record and contacting an outside agency without reporting to the SCSD.

24.     Whether an employee or contract worker can be disciplined for conduct that is not specifically contained in a written policy.

25.     Whether a written policy exists at the HOC concerning backdating a report.

26.     Whether the SCSD has a policy that specifically concerns documenting an inmate's medical record.

27.     Whether in all other situations where a contract workers was barred, of which the parties have knowledge, prior to the barring, an investigation was conducted, some type of report was generated, and/or the contract worker was given an opportunity to explain his or her alleged misconduct.

28.     Whether any other contract worker or SCSD employee has been disciplined solely for reporting an incident on the wrong form, for filing late or for backdating a report.

29.     The number of documents that Mrs. Porter submitted to SID prior to May 2003 on Interdisciplinary Progress Notes forms.

30.     The number of documents that other contract workers submitted to SID prior to May 2003 on Interdisciplinary Progress Notes forms.

31.     Whether in May, 2003, Sheriff Cabral were aware of Deyanara Feliz' allegations of retaliation for reporting the misconduct of a SCSD employee.

32.     Whether in May, 2003, Sheriff Cabral was aware that Mr. Baron's allegations involved retaliation for reporting the misconduct of another SCSD employee.

33.     Whether prior to May, 2003, the SCSD had filed at least three legal briefs where they acknowledged that a custom existed within the SCSD of retaliation against employees or staff who spoke out against the Department.

34.     Whether Mrs. Porter violated any contractual provision between the SCSD and CMS.

35.     Whether Sheriff Cabral said or caused to be said that "Those allegations were 100 percent ridiculous.  That's why you haven't seen any follow-up [after the election]" and whether this statement referred to Mrs. Porter's allegations.

36.     Whether Mrs. Porter was terminated by CMS as a direct result of her barring from the SCSD.

37.     Whether Mrs. Porter sought counseling from a psychiatrist as a result of her barring.

6.    **JURISDICTIONAL QUESTIONS**

No jurisdictional questions exist.

7.    **ISSUES OF LAW, INCLUDING EVIDENTIARY QUESTIONS**

**Agreed-Upon Issues of Law**

**Section 1983 Claims**

A.    Whether Mrs. Porter was engaged in speech relating to a matter of public concern.

Supporting Authority:   A plaintiff engaged in speech related to a matter of public concern.  *See Connick v. Meyers*, 461 U.S. 138, 147-48 (1983); *Baron v. Suffolk Co. Sheriff's Dept.*, 402 F.3d 225, 233 (1st Cir. 2005) (holding that complaints of "violations of prison policy, retaliation for breaching the code of silence, and prison officials' failure to investigate or put a stop to that retaliation" is speech on a matter of inherit public concern); *O'Connor v. Steeves*, 994 F.2d 905 (1st Cir. 1993) (holding that speech regarding official corruption relates to a matter of public concern); *Walter v. Morton*, 33 F.3d 1240 (10th Cir. 1994) (same); *Catletti v. Rampe*, 334 F.3d 225, 230 (2d Cir. 2003) ("the question of whether County officials had retaliated against two employee-whistleblowers in violation of the First Amendment rights is a matter of public, social, or other concern to the community."); *Rodgers v. Banks*, 334 F.3d 587, 599 (6th Cir. 2003) (holding that an employee's speech about the quality of patient care at a state mental hospital related to a matter of public concern); *Taylor v. Keith*, 338 F.3d 639 (6th Cir. 2003) (holding that a police officer's complaint to superiors that a fellow officer used excessive force relates to a  matter of public concern).

B.    Whether Mrs. Porter was barred in retaliation for this speech.

Supporting Authority:  Under *Mt. Healthy City Sch. Dist. Bd. of Edu. V. Doyle*, 429 U.S. 274, 287 (1977), a plaintiff need not show that the intent to retaliate against her for exercising her free speech rights was the sole or even dominant motivation.  Rather, if there was a "mixed motivation" (*i.e.*, if Mrs. Porter was barred for legitimate and illegitimate reasons), *Mt. Healthy* requires a burden-shifting analysis.  First, a plaintiff has the burden of showing that she engaged in protected behavior and that this behavior was a "substantial factor" or a "motivating factor" in the decision to take adverse action.  *Id.*  If a plaintiff satisfies this burden, the burden then shifts to the defendants to show by a preponderance of the evidence that they would have reached the same decision even in the absence of the protected conduct.  *Id.*

C.    Whether Mrs. Porter's interest as an employee commenting on a matter of public concern outweighs the State's interest as an employer in promoting the efficiency of the public service through its employees.

Supporting Authority: *See Pickering v. Bd. of Edu.*, 391 U.S. 563, 568 (1968). The State bears the burden of justifying under this final step. *See Rankin v. McPherson*, 483 U.S. 378, 388 (1987). In conducting the *Pickering* balance, the Court's consideration of the speech will not occur in a vacuum—the time, place, and manner of the expression are relevant. *Rankin*, 483 U.S. at 388. The pertinent factors include whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise. *See Pickering*, 391 U.S. at 570-73; *Rankin*, 483 U.S. at 388.

D.    Whether Sheriff Cabral is liable as a supervisor.

Supporting Authority:    Sheriff Cabral, acting in both her individual and official capacity, was a "person" under Section 1983. *Brandon v. Holt*, 469 U.S. 464 (1985). Moreover, official conduct of local officials almost always is considered to have occurred under color of state law. *West v. Atkins*, 487 U.S. 42, 50 (1988).[4] While there is no respondeat superior liability under Section 1983, *Monell v. Dept. of Social Services*, 436 U.S. 658, 690 (1978), Sheriff Cabral is liable as a supervisor if she personally participated in the constitutional deprivation. *See Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 581-82 (1st Cir. 1994) (recognizing that a public official may be held liable under Section 1983 based on her own actions); *Diaz v. Martinez*, 112 F.3d 1, 4 (1st Cir. 1997) (same); *see also Baron*, 402 F.3d at 233.

E.    Whether Suffolk County is liable under § 1983 for violating Mrs. Porter's rights.

Supporting Authority: Counties are persons subject to Section 1983. *See Monell*, 436 U.S. at 690; *Smallwood v. Jefferson Co.*, 753 F. Supp. 657, 659 (W.D. Ky. 1991). While a County is not liable under a theory of respondeat superior, it is liable for a constitutional violation if the County (1) had a policy or custom that was responsible for the constitutional deprivation, or (2) was deliberately

---

[4] A state official is not entitled to qualified immunity if her conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Singer v. Maine*, 49 F.3d 837, 844 (1st Cir. 1995). The First Circuit has enunciated a three part test to determine if an official is entitled to qualified immunity: (1) the plaintiff has alleged a violation of a constitutional right; (2) the contours of the right were sufficiently established at the time of the alleged violation; and (3) an objectively reasonable official would have believed that the action taken or omitted violated that right. *Acevedo-Garcia v. Monroig*, Civ. 02-1139, 2003 WL 21982002 (1st Cir. Aug. 21, 2003). "It has long been established that a government employee's right to speak on issues of public concern is protected from retaliation if the speech does not disrupt the administration of the government." *Catletti*, 334 F.3d at 231; *see also Cooper v. Smith*, 89 F.3d 761 (11th Cir. 1996).

indifferent to the constitutional violation. *Monell*, 436 U.S. at 691; *McMillian v. Monroe Co.*, 520 U.S. 781, 784-86 (1997); *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989); *Baron*, 402 F.3d at 233. Evidence of a pattern of conduct, such as retaliation against staff for speaking out against the municipality, may raise an inference of municipal policy or deliberate indifference. *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989); *Powe v. Chicago*, 664 F.2d 639, 651 (7th Cir. 1981); *Jeffes v. Barnes*, 208 F.3d 49, 62 (2d Cir. 2000); *Sharp v. City of Houston*, 164 F.3d 923 (5th Cir. 1999); *Ware v. Jackson Co.*, 150 F.3d 873, 882 (8th Cir. 1998); *Gomez v. Vernon*, 235 F.3d 118 (9th Cir. 2001).[5] Mrs. Porter must show that Suffolk County was a "moving force" behind the deprivation of her constitutional rights. *Kentucky v. Graham*, 473 U.S. 159, 173 (1985).

F.      Whether Sheriff Cabral is Entitled to Qualified Immunity

The defendants contend that Sheriff Cabral is entitled to qualified immunity from personal liability for her actions in barring Mrs. Porter. The First Circuit has articulated a three-part test to determine if a governmental official is entitled to qualified immunity for performing a discretionary function: (1) whether the plaintiff's allegations, if true, establish a constitutional violation; (2) whether that right was clearly established at the time of the alleged violation; and (3) whether a similarly situated reasonable official would have understood that the challenged action violated the constitutional right at issue. See, Mihos v. Swift, 358 F.3d 91, 102 (1st. Cir. 2004).

**Tortious Interference Claim**

G.      Whether Sheriff Cabral is liable for tortiously interfering with Mrs. Porter's advantageous relations.

Supporting Authority: The elements of a tortious interference with advantageous relations claims are (1) a business relationship or contemplated contract of economic benefit; (2) the defendants had knowledge of such a relationship; (3) the defendants intentionally and improperly interfered with that relationship; and (4) the plaintiff loss of the advantages of that relationship directly resulted from the defendants' conduct. *Laser Labs, Inc. v. ETL Testing Labs, Inc.*, 29 F. Supp.2d 21, 23 (D.Mass. 1998). Conduct is improper "when interference resulting in injury to another is wrongful by some measure beyond the fact of interference itself. *See Utd. Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 816 (1990). Defendants' liability may arise from improper motive or improper means. *Id.* The burden is on Sheriff Cabral to plead and prove justification for her conduct. *See Ross v. Wright*, 286 Mass. 269, 271-72 (1934); *Steranko v. Inforex, Inc.*, 5 Mass. App. Ct. 253, 273 (1977).

---

[5]     Counties are not entitled to a qualified immunity defense. *Leatherman v. Tarrant Co.*, 507 U.S. 163 (1993).

**Defamation Claim**

H.    Whether Sheriff Cabral's statements concerning Mrs. Porter were defamatory, were of and concerning Mrs. Porter, and were false.

<u>Supporting Authority</u>: Defamation is the intentional or reckless publication, without privilege to do so, of a false statement of fact which causes damage to the plaintiff's reputation. *Corellas v. Viveiros*, 410 Mass. 314, 319 (1991). There are five elements to prove: (a) publication, with the requisite degree of fault (b) of a defamatory statement (c) of and concerning the plaintiff (d) which is false, and that (e) causes damage. *See Ravnikar v. Bogojavlensky*, 438 Mass. 627 (2003). Mrs. Porter can easily satisfy elements (a), (c), and (d), but whether the statements were "defamatory" or caused damage are closer questions.

Under the first element, the "publication" element is satisfied when a statement is communicated to a single third party other than the plaintiff, with some limited exceptions for intra-organizational hearsay that do not apply here. *Brauer v. Globe*, 351 Mass. 53, 56 (1966); *Jones v. Taibbi*, 400 Mass. 786 (1987). The degree of fault element of publication is satisfied if the plaintiff negligently or intentionally communicated the statement to a third party other than the plaintiff. *Ravnikar v. Bogojavlensky*, 438 Mass. 627, 630 (2003).

Under the second element, a publication has a defamatory meaning if, under the circumstances, it discredits the plaintiff "in the minds of any considerable and respectable segment in the community." *Draghetti*, 416 Mass. at 811, quoting *Stone v. Essex County Newspapers, Inc.*, 367 Mass. 849; *Muchnick v. Post Pub. Co.*, 332 Mass. 304 (1955). A statement "discredits" the plaintiff if it tends to injure her reputation or holds the plaintiff up to scorn, hatred, ridicule, or contempt. *Stone v. Essex*, 376 Mass. 849.

Under the third element, a statement was made "of and concerning the plaintiff" if it refers to the plaintiff or can be reasonably read as pertaining to the plaintiff. *Godbout v. Cousens*, 396 Mass. 254, 264 (1985).

Under the fourth element, a statements of fact or opinion are by law not defamatory; put another way, the statement must be susceptible of being proven false. *See Rotkiewicz v. Sadowsky*, 431 Mass. 748 (2000); *See also, Greenbelt Association v. Bresler*, 398 U.S. 6, 14 (1970) ("rhetorical hyperbole" and "vigorous epithet" protected by First Amendment). However, an opinion that implies the existence of facts which are capable of being proven true or false can be actionable. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19 (1990)**.**

Under the fifth element, a plaintiff may recover compensatory damages for actual injury, which includes loss of wages, harm to reputation, and mental suffering. *See Stone v. Essex County Newspapers, Inc.*, 367 Mass. 849, 860 (1975); *Draghetti v. Chmielewski*, 416 Mass. 808, 815 (1994). Written defamation, such

as magazine articles and press releases, constitutes libel, which is actionable without proof of economic loss. *Ravnikar v. Bogojavlensky*, 438 Mass. 627, 630 (2003).

Finally, under the doctrine of respondeat superior, which applies to defamation actions, a superior may be liable for defamatory statements of an employee if the statements were made within the scope of the employee's employment. *see Beriont v. GTE Labs., Inc.*, 60 Mass. App. Ct. 1108, *3, n. 3 (2003); *Ellis v. Safety Ins. Co.*, 41 Mass. App. Ct. 630, 635 n. 6 (1996). This inquiry turns on three factors: whether the conduct (1) is of the kind the employee is employed to perform; (2) occurs substantially within the authorized time and space limits; and (3) is motivated, at least in part, by a purpose to serve the employer. *See Wang Labs., Inc. v. Business Incentives, Inc.*, 398 Mass. 854, 859 (1986).

## Contested Issues of Law

The Sheriff's Department disputes the applicability of Mrs. Porter's statement of the following issues of law to the facts of this case:

A.    Supervisor Liability

Supporting Authority: Alternatively, a supervisor is liable if she was deliberately indifferent to the unconstitutional conduct of subordinate officers. *Diaz*, 112 F.3d at 4; *Camilo-Robles v. Zapata*, 175 F.3d 41, 44 (1st Cir. 1999); *Barreto-Rivera v. Medina-Vargas*, 168 F.3d 42, 48-49 (1st Cir. 1999); *Rogan v. Menino*, 175 F.3d 75, 78 (1st Cir. 1999). A supervisor acts with deliberate indifference if there was (1) a grave risk of harm; (2) actual or constructive knowledge of that risk; and (3) a failure to take easily available measures to address the risk. *Camilo-Robles v. Hoyos*, 151 F.3d 1, 7 (1st Cir. 1998). Further, a plaintiff must show causation, which is an affirmative connection between Sheriff Cabral's conduct and her subordinates' constitutional violations. *Id.* A causal link can be established if there exists a known history of widespread abuse sufficient to alert Sheriff Cabral to the ongoing violations. *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994).

B.    Municipal Liability

Supporting Authority: Where a final policy-maker adopts the recommendation of a subordinate to terminate an employee, and the subordinate makes the recommendation with a retaliatory motive, the County is liable for the retaliation, even if the policy-maker does not have a retaliatory motive, if the policy-maker is deliberately indifferent to the retaliatory motive of the subordinate. *See San Filippo v. Bongiovanni*, 30 F.3d 424, 446 (3d Cir. 1994) (holding that there was "a question for the fact-finder regarding whether the ultimate decision-maker acted with deliberate indifference to the plaintiff's first amendment rights by

approving the *recommendation* that the plaintiff be dismissed." (emphasis added)); *Ware v. Unified School District*, 902 F.2d 815, 820 (10th Cir. 1990) ("Notwithstanding the above indications that the board knew Geil's recommendation was in retaliation for Ware's position on the bond issue, the board made no independent investigation, asked Geil no questions about the reason for his decision, and asked Ware only one question, the answer to which it did not take into consideration.").

8.    **REQUESTED AMENDMENTS TO THE PLEADINGS**

There are no requested amendments to the pleadings.

9.    **ADDITIONAL MATTERS TO AID IN THE DISPOSITION OF THE ACTION**

The Court has not yet ruled on (1) both parties' APA actions seeking information from the FBI and Office of the United States Attorney; (2) Mrs. Porter's Petition for Disclosure of Grand Jury Transcripts; (3) Mrs. Porter's Motion to Compel Deposition Preparation Materials related to Mr. Tompkins' deposition; and (4) the defendants' Motion for Summary Judgment on Count IX (Defamation). In addition to motions *in limine* being filed under separate cover, defendants are filing a Motion to Bifurcate Pursuant to Fed.R.Civ.P. 42(b) seeking to separate the causes of action against Sheriff Cabral in her individual capacity from those against Suffolk County on a municipal liability theory, and plaintiff is filing a Motion to Decide Various Issues as a Mater of Law.

10.    **PROBABLE LENGTH OF TRIAL**

The parties expect that the trial will last approximately 8 days.

11.    **WITNESSES**

A.    **PLAINTIFF'S WITNESSES**

1.    Andrea Cabral (fact)
Suffolk County Sheriff's Department

2.    Brian Dacey (fact)
Suffolk County Sheriff's Department

3.      Gerard Horgan
        Suffolk County Sheriff's Department

4.      Donna Jurdak (fact)
        12 Hemlock Way
        North Attleboro, MA  02760

5.      Elizabeth Keeley (fact)
        Suffolk County Sheriff's Department

6.      Ann Mack (fact)
        Correctional Medical Services, Inc.

7.      Mary Ellen Mastrorilli (fact)

8.      Amy Porter (fact)
        745 Marrow Road #157
        Coventry, CT  06238

9.      John Porter (fact)
        22 Shore Drive
        Upton, MA

10.     John Porter, Jr. (fact)
        55 Carey Way
        Northboro, MA

11.     Sheila Porter (fact)
        22 Shore Drive
        Upton, MA

12.     Walter Prince (fact)
        Prince, Lobel, Glovsky & Tye

13.     Maureen Robinson (fact)
        Federal Bureau of Investigation

14.     Christa Snyder (fact)
        Federal Bureau of Investigation

15.     Donald Stern (fact)
        Bingham McCutchen LLP

16.     Michael Sullivan
        United States Attorney

17.  Viktor Theiss (fact)
     Suffolk County Sheriff's Department

18.  Government Official to Testify to June 16, 2003 Meeting

**B.  DEFENDANT'S WITNESSES**

1.  Andrea Cabral (fact)
    Suffolk County Sheriff's Department

2.  Elizabeth Keeley (fact)
    Suffolk County Sheriff's Department

3.  Viktor Theiss (fact)
    Suffolk County Sheriff's Department)

4.  Brian Dacey (fact)
    Suffolk County Sheriff's Department

5.  Sonya Aleman (fact)
    Suffolk County Sheriff's Department

6.  Stan Wojtkonski (fact)
    Suffolk County Sheriff's Department

7.  Gerard Horgan (Department operations, policies and procedures, barring
    of contract workers, vendors, and volunteers, employee discipline)
    Suffolk County Sheriff's Department

8.  Beth Bringola (fact)
    Boston, MA

9.  Gayle Bartley (fact)
    Reading, MA

10. Craig Meekins (fact)
    Plainville, MA

11. Ann Mack (fact)
    Correctional Medical Services Inc.

12. Christa Snyder (fact)
    Federal Bureau of Investigation

13. Maureen Robinson (fact)
    Federal Bureau of Investigation

14.    Steven Tompkins (fact)
       Suffolk County Sheriff's Department

15.    Elaine McCardle (fact)
       Boston Globe

16.    Gerry Leone (fact)
       Hopkinton, MA

18.    Steve Huggard (fact)
       Palmer and Dodge, LLP

19.    Michael Sullivan (fact)
       United States Attorney's Office

20.    Anthony Domagala (policies and procedures for health services at SCSD)
       Suffolk County Sheriff's Department

## 12.    DEPOSITIONS OR INTERROGATORY RESPONSES TO BE OFFERED AT TRIAL

Mrs. Porter intends to offer portions of Gerard Horgan's and Andrea Cabral's depositions at trial. Mrs. Porter intends to offer portions of Sheriff Cabral's and the SCSD and Suffolk County's interrogatory responses at trial. Defendants intend to offer portions of Mrs. Porter's interrogatory responses at trial.

## 13.    EXHIBITS

A copy of the agreed-upon exhibits is attached as Appendix A.

## 14.    MARKED ITEMS TO BE OFFERED AT TRIAL

A copy of the exhibits that are subject to objections is attached as Appendix B.

## 15.    MOTIONS IN LIMINE

The parties are filing motions *in limine* under separate cover.

## 16.    (a)  Requests for instructions with citation to supporting authority

The parties are filing requests for jury instructions under separate cover.

(b)  Proposed interrogatories or special verdict forms

The parties are filing proposed interrogatories and/or special verdict forms under separate cover.

(c)  Proposed *voir dire* questions

The parties are filing proposed *voir dire* questions under separate cover.

Respectfully Submitted,

SHEILA J. PORTER,                                 ANDREA CABRAL,
                                                  SUFFOLK COUNTY and SUFFOLK
                                                  COUNTY SHERIFF'S DEPARTMENT,

By her attorneys,                                 By its attorneys,

*Joseph F. Savage, Jr.*                           *Ellen M. Caulo*
Joseph F. Savage, Jr. (BBO #443030)               Ellen M. Caulo (BBO #545250)
David S. Schumacher (BBO #647917)                 James M. Davin (BBO #566973)
GOODWIN PROCTER LLP                               Suffolk County Sheriff's Department
Exchange Place                                    200 Nashua Street
Boston, Massachusetts 02109-2881                  Boston, MA 02141
(617) 570-1000                                    (617) 635-1100
Dated: December 9, 2005

## Appendix A: Agreed-Upon Exhibits

| Exhibit Offered By: | Exhibit Number/ Letter | Marked [yes/no] | Admitted [yes/no] | Description of Exhibit | Offered through Witness: | Date Admitted |
|---|---|---|---|---|---|---|
| Plaintiff | 1 | | | Commendation Memo from Donna Jurdak to, *inter alia*, Sheila Porter, dated December 28, 1994 | | |
| Plaintiff | 2 | | | Mrs. Porter's May 19, 2003 Report (SP199-200) | | |
| Plaintiff | 3 | | | Mrs. Porter's May 29, 2003 Report (SP 190) | | |
| Plaintiff | 4 | | | Porter's Psychiatric Records (SP61, 219-222) | | |
| Plaintiff | 5 | | | Porter's Medical Records (SP 223-29, 250-52) | | |
| Plaintiff | 6 | | | Licensure Documents (SP256-62) | | |
| Plaintiff | 7 | | | Porter's employment and tax records (SP 8-11, 16-25) | | |
| Plaintiff | 8 | | | Mrs. Porter's Resignation Letter | | |
| Plaintiff | 9 | | | Press Statement (#991) | | |
| Plaintiff | 10 | | | Tape of Debate between Sheriff Cabral and Steven Murphy | | |
| Plaintiff | 10A | | | Transcript of Debate | | |
| Plaintiff | 11 | | | Tape of 8/25/04 Report from Channel 5 | | |
| Plaintiff | 11A | | | Transcript of Report | | |
| Plaintiff | 12 | | | E. McCardle, "The New | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | Enforcers," *Boston Globe Magazine*, October 31, 2004, p. 32 | | |
| Plaintiff | 13 | | | Estes, A., "Nurse Fired From Jail Job Speaks Out Says She Helped FBI Probe Alleged Abuse of Inmates," *Boston Globe*, August 25, 2004 | | |
| Plaintiff | 14 | | | Policy S-220 in Effect in June 2003 | | |
| Plaintiff | 15 | | | Portions of Suffolk's Responses to Requests for Admission | | |
| Plaintiff | 16 | | | Portions of Suffolk's Responses to Interrogatories | | |
| Plaintiff | 17 | | | Portions of Gerard Horgan's deposition, subject to ruling on admissibility | | |
| Plaintiff | 18 | | | Portions of Andrea Cabral's deposition | | |
| Plaintiff/Defendant | 19 | | | Documents showing barrings since Sheriff Cabral took office | | |
| Defendant | 20 | | | Documents from Rosario's Medical File | | |
| Defendant | 21 | | | CMS/Suffolk Contract | | |
| Defendant | 22 | | | Copy of document written by Sheila Porter, dated May 19, | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | 2003 (#680-81) | | |
| Defendant | 23 | | | Copy of document written by Sheila Porter dated May 19, 2003 (#745-47) | | |
| Defendant | 24 | | | Copy of document written by Sheila Porter dated May 29, 2003 (# 716) | | |
| Defendant | 25 | | | Portions of Sheila Porter's Response to Interrogatories | | |

**Appendix B: Exhibits Subject to Objections**

| Exhibit Offered By: | Exhibit Number/ Letter | Marked [yes/no] | Admitted [yes/no] | Description of Exhibit | Offered through Witness: | Date Admitted |
|---|---|---|---|---|---|---|
| Plaintiff | A | | | Case Summary of Rosario Incidents (#619-24) | | |
| Plaintiff | B | | | Dacey Incident Report (#632) | | |
| Plaintiff | C | | | Summary of 5/19/Rosario Allegations (#633-34) | | |
| Plaintiff | D | | | Summary of Interview with Rosario (#635-37) | | |
| Plaintiff | E | | | SID Memo re: Interview with Meekins | | |
| Plaintiff | F | | | Memo re: Interview with Bringola | | |
| Plaintiff | G | | | Summary of 5/22 Interview with Mrs. Porter (#640-41) | | |
| Plaintiff | H | | | Memo from Sonya Aleman re: 5/28/ Interview with Mrs. Porter (#642-44) | | |
| Plaintiff | I | | | Aleman Memo re: Interview with MacDonald (#646-47) | | |
| Plaintiff | J | | | Dacey Memo re: Interview with Storlazzi (#649) | | |
| Plaintiff | K | | | Dacey Memo re: Interview with Scoby (#653-54) | | |
| Plaintiff | L | | | Dacey Memo re: Investigation | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | (#655) | | |
| Plaintiff | M | | | Dacey Incident Report (#659) | | |
| Plaintiff | N | | | Collins Incident Report (#664) | | |
| Plaintiff | O | | | Memo Following use of Force (#667) | | |
| Plaintiff | P | | | MacDonald Memo to Scoby (#683) | | |
| Plaintiff | Q | | | MacDonald Memo to SID (#684) | | |
| Plaintiff | R | | | Storlazzi Memo to SID (#686) | | |
| Plaintiff | S | | | Handrahan Memo to SID (#688) | | |
| Plaintiff | T | | | Scoby Memo to SID (#690) | | |
| Plaintiff | U | | | DeAngelis Memo to Scoby (#692) | | |
| Plaintiff | V | | | Memo from Viktor Theiss re: Investigation (#665) | | |
| Plaintiff | W | | | Memo from Ms. Mastrorilli to Patrick Bradley (#748) | | |
| Plaintiff | X | | | Mastrorilli Memo to Bradley (#750) | | |
| Plaintiff | Y | | | Mastrorilli Memo re: Mrs. Porter's Barring (#751) | | |
| Plaintiff | Z | | | Documents Showing Other Barrings pre-Cabral (#752-73, 994-1002, 1063-1028, | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | 1127-52, 1359-78, 1589-1613) | | |
| Plaintiff | AA | | | Summary Chart of Other Barrings | | |
| Plaintiff | BB | | | Wojtkonski Incident Report (#789-90) | | |
| Plaintiff | CC | | | Wojtkonski Incident Report (#791) | | |
| Plaintiff | DD | | | Cabral Letter to Sullivan (7/22/03) | | |
| Plaintiff | EE | | | Sullivan Letter to Cabral (7/25/03) | | |
| Plaintiff | FF | | | Keeley Memo to Theiss (#1059) | | |
| Plaintiff | GG | | | Memo from Viktor Theiss re:  Rosario Transfer (#1062) | | |
| Plaintiff | HH | | | Common Ground Newsletter | | |
| Plaintiff | II | | | Current Version of Policy S-220 (#1116-1124) | | |
| Plaintiff | JJ | | | Policy 134 (#1174-78) | | |
| Plaintiff | KK | | | Prince Letter to Huggard (4/6/04) | | |
| Plaintiff | LL | | | SCSD Training Documents (1444-1588) | | |
| Plaintiff | MM | | | Letter from McNeil to Prince (9/28/05) | | |
| Plaintiff | NN | | | Discipline Letters (#1666-1804) | | |
| Plaintiff | OO | | | Summary Chart of Discipline Letters | | |
| Plaintiff | PP | | | Reports by Mrs. Porter (#1805-33, SP | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | 126-91) | | |
| Plaintiff | QQ | | | Commendation Letter from Gerard Horgan to Nancy Lawrence, dated August 26, 2002 | | |
| Plaintiff | RR | | | CHS Performance Reviews | | |
| Plaintiff | SS | | | Agent Snyder 6/2/03 Memorandum | | |
| Plaintiff | TT | | | Portions of the Stern Commission Report | | |
| Plaintiff | UU | | | Portions of 3 SCSD Arbitration Briefs | | |
| Plaintiff | VV | | | Portions of Feeney Deposition | | |
| Plaintiff | WW | | | Portions of Feliz Verified Complaint | | |
| Plaintiff | XX | | | Portions of Feliz Oral Interview | | |
| Plaintiff | YY | | | Portions of Lockhart Deposition | | |
| Plaintiff | ZZ | | | Baron Verdict Form | | |
| Plaintiff | AAA | | | Baron Docket Sheets | | |
| Plaintiff | BBB | | | Baron Complaint | | |
| Plaintiff | CCC | | | Letter from Joseph Savage to Andrea Cabral, dated July 14, 2003 | | |
| Plaintiff | DDD | | | Letter from Joseph Savage to Andrea Cabral, dated July 30, 2003 | | |
| Plaintiff | EEE | | | Letter from Anne Powers to Joseph Savage, dated August 1, 2003 | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Plaintiff | FFF | | | Letter from Anne Powers to Joseph Savage, dated July 22, 2003 | | |
| Plaintiff | GGG | | | Order *In re: Grand Jury Proceeding, Viktor Theiss*, dated January 13, 2005 | | |
| Plaintiff | HHH | | | 18 U.S.C. § 1513 | | |
| Plaintiff | III | | | Massachusetts Whistleblower Statute | | |
| Defendant | JJJ | | | CMS Employee Success Guide | | |
| Defendant | KKK | | | SCSD Manual of Policies and Procedures for Health Services (#1435-36) | | |

LIBA/1658966.3