# EXHIBIT A

**Page 1**

```
                                    VOL: I
                                    PAGES: 1-202
                                    EXHIBITS: 1-6

            UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS

     * * * * * * * * * * * * * * * *
     SHEILA J. PORTER,               *
               Plaintiff             *
         -vs-                        *  Civil Action
     ANDREA CABRAL; SUFFOLK COUNTY   *  No. 04-11935-DPW
     SHERIFF'S DEPARTMENT; SUFFOLK   *
     COUNTY and CORRECTIONAL MEDICAL *
     SERVICES, INC.,                 *
               Defendants            *
     * * * * * * * * * * * * * * * *

     CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER


         DEPOSITION OF ELIZABETH KEELEY, ESQUIRE, a
     witness called on behalf of the Plaintiff, in the
     above-captioned matter, said deposition being
     taken pursuant to the Federal Rules of
     Civil Procedure, before Patricia M.
     McLaughlin, a Certified Shorthand Reporter and
     Notary Public in and for the Commonwealth of
     Massachusetts, at the offices of Goodwin Procter
     LLP, Exchange Place, Boston, Massachusetts, on
     Wednesday, May 11, 2005, commencing at 10:08 a.m.


                McLAUGHLIN & ASSOCIATES COURT REPORTERS
                    92 DEVIR STREET, SUITE 304
                    MALDEN, MASSACHUSETTS  02148
                           781.321.8922
                      WWW.E-STENOGRAPHER.COM
```

**Page 2**

```
 1   APPEARANCES:
 2   DAVID S. SCHUMACHER, ESQUIRE
 3   GOODWIN PROCTER LLP
 4   Exchange Place
 5   Boston, Massachusetts  02109
 6       On behalf of the Plaintiff
 7
 8   ELLEN CAULO, ESQUIRE
 9   GENERAL COUNSEL
10   Suffolk County Sheriff's Department
11   200 Nashua Street
12   Boston, Massachusetts  02114
13       On behalf of the Defendants,
14       Andrea Cabral, Suffolk County
15       Sheriff's Department and Suffolk
16       County
17
18   ALEXANDRA B. HARVEY, ESQUIRE
19   ADLER, COHEN, HARVEY, WAKEMAN & GUEKGUEZIAN
20   230 Congress Street
21   Boston, Massachusetts  02110
22       On behalf of the Defendant,
23       Correctional Medical Services, Inc.
24
```

**Page 3**

```
 1                    I N D E X
 2   WITNESS           DIRECT  CROSS  REDIRECT  RECROSS
 3   ELIZABETH KEELEY, ESQUIRE
 4   By Mr. Schumacher    5
```

**Page 4**

```
 1   No.    Exhibit                          Page
 2    1     Policy S220                       78
 3    2     Case Summary, dated June 4,
 4          2003                             112
 5    3     Memorandum dated May 29, 2003    115
 6    4     List of S220 Violations          143
 7    5     Policy S220, revised April,
 8          2005                             154
 9    6     Press Statement                  177
```

### Page 57

on the morning of June 10th, then it would have been within a matter of hours that I called her.

Q Tell me everything you remember about that conversation with Miss Mastrorilli.

A The first conversation I had with her, I called her, and I told her that the decision had been made to bar Sheila Porter. And my memory is that she said, okay, fine. That was the extent of the conversation.

Q Did you tell her why Miss Porter was being barred?

A I don't think so. Not in that conversation, no.

Q How did you leave it with Miss Mastrorilli?

A I think I left it like that.

Q You instructed her to bar Miss Porter?

A Yes.

Q Do you remember anything else about that conversation other than you telling Miss Mastrorilli that the decision had been made to bar Miss Porter?

A No, my memory is that that's what the conversation -- Mary Ellen may have said

### Page 58

something in response, but I don't remember.

Q Did she ask you why the decision had been made to bar Miss Porter?

   MS. CAULO: Objection. Asked and answered.

A Not to my memory, no.

Q I think you said you had two conversations with her.

A Yes.

Q When did the second conversation take place?

A My memory is several hours later she called me and said -- my memory is she called me and told me that she had told Nurse Porter that she was barred and that she, meaning Nurse Porter, had come back to her and wanted to know the reasons why. I understood from that conversation that Mary Ellen had met with Sheila Porter. I don't remember whether or not she mentioned if anyone else was present, but that she communicated and that Sheila Porter had left her office or left the meeting and had come back sometime later asking for the reasons.

   So I said to Mary Ellen, I'll get back

### Page 59

to you, and I hung up the phone.

Q So is it your understanding that Miss Mastrorilli told Mrs. Porter that she was barred? That's the first question.

A Yes.

Q Did Miss Mastrorilli tell Mrs. Porter why she was barred?

A I don't think so, because when she called me back, she said that Sheila Porter, Nurse Porter, wanted to know why and can I tell her why or what are the reasons that I should tell her.

Q It was your understanding that Miss Mastrorilli delivered the news to Mrs. Porter and then Mrs. Porter came back and asked her that?

A That's my impression, yes.

Q Do you remember her saying that? I'm trying to determine what your impression is based upon.

A Yes, I don't remember exactly what Mary Ellen said to me, but she said, "I had a meeting with Nurse Porter and I told her and she's now asking for reasons." I got the sense the

### Page 60

meeting happened, ended, and then Sheila Porter came back and asked her for the reasons; I want to know why I'm being barred.

Q And a couple of hours elapsed between those two calls; is that your recollection?

A My recollection is it was mid to late morning when I called Mary Ellen, and it was sometime in the afternoon, early afternoon, mid-afternoon when she called me back.

Q You told her you'd call her back in the second conversation --

A Yes.

Q -- or you'd get back to her?

A Yes.

Q What did you do next?

A My memory is that I called General Counsel, Anne Powers, and had a conversation with her, and after that conversation, which was very brief, I then on my desk at that time I had a large binder that had all the department policies. I remember pulling the binder over, opening it up to S220 and taking a look at S220 briefly, thumbing through it.

   And then I picked up the phone and

## 61

called Mary Ellen Mastrorilli back.

Q   What transpired during your conversation with Miss Powers?

     MS. CAULO: Objection. Attorney client.

Q   The purpose of your conversation with Miss Powers, was she relating legal advice to you at that time?

     MS. CAULO: Objection.

A   Yes.

Q   After you looked at S220, did you contact Miss Mastrorilli again?

A   Yes, I had it open in front of me. My memory is I picked up the phone, and I called Mary Ellen. And I told her the reasons that she could give or share with Sheila Porter.

Q   What were those reasons?

A   The reasons, as I recall, were she was -- you can tell her she's being barred for violations of S220. I remember that I was flipping through S220 and Section C, which has to do with -- confidential communications was first, so I may have mentioned that first; that she had communicated confidential inmate information outside the department. I

## 62

flipped through some more pages, and I remember telling her her failure to file a timely report, her failure to document a medical file. And I remember that -- again, I'm not sure of the order, but it was failure to document a medical file, failure to file a timely report.

I may have mentioned that her failure to file a report -- my memory is that I said this: That failure to file a report interfered with an ongoing investigation; that her report was inconsistent with other reports of what people claim to have seen in terms of injuries to Rene Rosario, so that it was not a credible report.

I remember hesitating, because I wasn't sure whether I wanted to say this, but I remember pausing. And I said, "And you can share with her that because Rene Rosario has been talking about his role as an informant and he has mentioned her name in the context of cooperating with the FBI, that the department could not assure her personal safety."

## 63

Q   These were all factors that you related to Miss Mastrorilli during this conversation?

A   Yes, that's my memory of what I said to her.

Q   Did you instruct her to relate this information to Mrs. Porter as the reasons for her barring?

A   I don't think I said "now tell her exactly what I just told you," but she asked me what the reasons were that she could give and that's what I told her.

Q   And these are all included in the reasons that could be related to Miss Porter?

A   Correct.

Q   Do you know if Miss Mastrorilli, in fact, did relay this information to Mrs. Porter?

A   I don't know what she said to her.

Q   Did you have any follow-up conversations with Miss Mastrorilli?

A   I recall having one.

Q   What happened during that follow-up conversation?

A   It was maybe a week or two later. It was after the meeting at the U.S. Attorney's Office. I know that. I asked her,

## 64

"Mary Ellen, did you write down the reasons that I gave you?" She said no. That was the one and only conversation I have had with Mary Ellen Mastrorilli about this since.

Q   Did you talk about anything else during this final conversation other than whether she documented the reasons that you had provided for her?

A   I don't recall, but I think that was the extent of the conversation.

Q   If I have this right, I've counted four communications with Miss Mastrorilli on or after June 10th. The first was when you called her to tell her to bar Sheila Porter?

A   Yes.

Q   The second was when Miss Mastrorilli called you back to say that Miss Porter wanted to know the reasons why she was barred, and you said you'd get back to her?

A   Correct.

Q   The third was when you called her back after speaking with General Counsel and reviewing S220.

     MS. CAULO: I object. I'm sorry.

177

| | | |
|---|---|---|
| 1 | Q | Who did you speak to? |
| 2 | A | Before I started typing, there was a meeting |
| 3 | | with myself, the Sheriff, General Counsel, |
| 4 | | Anne Powers, and off and on, Steve Tomkins |
| 5 | | was in the room. |
| 6 | Q | What about Viktor Theiss? Was he involved in |
| 7 | | the drafting of the statement? |
| 8 | A | I don't believe so, no. I don't recall him |
| 9 | | being involved. |
| 10 | | MR. SCHUMACHER: Can you mark that. |
| 11 | | (Document marked Exhibit No. 6.) |
| 12 | | BY MR. SCHUMACHER: |
| 13 | Q | I'm handing you what's been marked as |
| 14 | | Exhibit 6. Do you recognize this document? |
| 15 | A | Yes. |
| 16 | Q | Is this the press statement that you drafted |
| 17 | | that we were just discussing? |
| 18 | A | Yes. |
| 19 | Q | Under No. 2, it reads, "Mrs. Porter was asked |
| 20 | | to leave the House of Correction because she |
| 21 | | violated department regulations and |
| 22 | | contractual obligations." The department |
| 23 | | regulations that you were referring to, are |
| 24 | | those the ones that we have discussed today |

178

| | | |
|---|---|---|
| 1 | | in this deposition? |
| 2 | A | It certainly would have included S220. It |
| 3 | | may have been that other policies were |
| 4 | | discussed before I drafted this, but my |
| 5 | | recollection is I was referring to S220. |
| 6 | Q | Was she asked to leave the House of |
| 7 | | Corrections because she violated any |
| 8 | | department regulations other than S220? |
| 9 | A | I think it covers S220. Again, I don't know |
| 10 | | whether or not there were others that she |
| 11 | | violated that I wasn't aware of. |
| 12 | Q | Sitting here today, you can't identify any |
| 13 | | other regulations -- |
| 14 | A | Correct. |
| 15 | Q | -- besides S220 that she violated? |
| 16 | A | Correct. |
| 17 | Q | The contractual obligations that she |
| 18 | | allegedly violated, which ones are those? |
| 19 | A | The ones that I have spoken of in terms of |
| 20 | | our contractual relationship with CMS and the |
| 21 | | quality of medical care that we expect from |
| 22 | | their employees. |
| 23 | Q | By this phrase you're indicating that |
| 24 | | Mrs. Porter violated her contractual |

179

| | | |
|---|---|---|
| 1 | | obligations between her and CMS or between |
| 2 | | CMS and Suffolk County? |
| 3 | A | There is more than one contractual |
| 4 | | relationship. She violated the terms of the |
| 5 | | contract that exists between the employees of |
| 6 | | CMS and the Sheriff's Department. |
| 7 | Q | Which terms were those that she violated? |
| 8 | A | To provide good, competent, medical care, |
| 9 | | and -- yes. |
| 10 | Q | Any other contractual obligations that she |
| 11 | | violated? |
| 12 | A | Well, as part of that good medical care, that |
| 13 | | is what I've described previously, which is |
| 14 | | to document medical files and to provide |
| 15 | | appropriate medical treatment. So I would |
| 16 | | say that the contractual obligations that we |
| 17 | | have with CMS and as a contract worker with |
| 18 | | CMS, she has them as well. |
| 19 | Q | The next sentence states that, "She is |
| 20 | | clearly biased and has her own agenda for |
| 21 | | speaking out at this time." On what do you |
| 22 | | base the statement that Mrs. Porter is |
| 23 | | clearly biased? |
| 24 | A | Biased in that she has her own perspective on |

180

| | | |
|---|---|---|
| 1 | | what happened to her and why, and used in the |
| 2 | | sentence of "clearly biased and has her own |
| 3 | | agenda," her decision to publicize 14 months |
| 4 | | after her removal from the department |
| 5 | | suggested that she was trying to capitalize |
| 6 | | on the attention that was being focused on |
| 7 | | Sheriff Cabral and the race for Suffolk |
| 8 | | County Sheriff in the summer of 2004. |
| 9 | Q | So you believe that her agenda was to somehow |
| 10 | | affect the Sheriff's political campaign? |
| 11 | | MS. CAULO: Objection. |
| 12 | A | I think part of her agenda was to use the |
| 13 | | campaign and the attention that was focused |
| 14 | | on Sheriff Cabral and her administration to |
| 15 | | advance her particular perspective on what |
| 16 | | happened to her. I thought it was not a |
| 17 | | coincidence that she waited 14 months until |
| 18 | | there was a heated campaign going on to go |
| 19 | | public with her story. |
| 20 | Q | Just so I understand, when you say that she's |
| 21 | | clearly biased, do you just mean that she has |
| 22 | | her own interpretation and belief of why she |
| 23 | | was barred? |
| 24 | | MS. CAULO: Objection. Asked and |

Page 173

```
     overview of the investigation. That's not
     why I was going there. So I was pretty
     upset. I said to Gerry, "What the hell was
     that all about?"
 5 Q How did Mr. Leone respond?
 6 A He said, "I'm sorry. I had no idea that was
     going to happen."
 8 Q Mr. Leone said that he had no idea that this
     topic was going to be discussed at that
     meeting?
11 A He said, "I had no idea that was going to
     happen."
13 Q Did you have any further conversation with
     Mr. Leone at that time?
15 A I did sometime afterwards, after we received
     some communication from the U.S. Attorney's
     Office.
18 Q Did you have a phone call with him?
19 A Yes, I did.
20 Q What transpired during that phone call?
21 A I said again, "What's going on?" I told
     him -- I don't even remember what the
     communication was, but I told him that we had
     received something, suggesting they were
```

Page 174

```
     opening up a formal criminal investigation.
 2 Q What did you receive? Was it a written
     correspondence of some sort?
 4 A Yes.
 5 Q Was it a letter, do you know?
 6 A It was something in writing, yes.
 7 Q Do you remember who it was addressed to?
 8 A I think it was addressed to the Sheriff.
       MR. SCHUMACHER: Have we seen that,
     Ellen?
       MS. CAULO: I'm not sure exactly which
     document she's referring to. It may very
     well be the document that I indicated to you
     yesterday that will be produced.
15 Q How did Mr. Leone respond when you asked him?
16 A He was very surprised. He had no idea that
     things had progressed or were going in that
     direction, something to that effect.
19 Q How did you leave it with Mr. Leone on that
     day?
21 A I don't remember how I left it with him.
22 Q Did you have any further conversations with
     Mr. Leone about this?
24 A I don't believe so, but it's possible that we
```

Page 175

```
 1     speak one more time on the phone. But I
 2     don't have a specific memory of it.
 3 Q Have you given testimony to the Grand Jury
 4     that's been convened to investigate the
 5     circumstances of Miss Porter's barring?
 6 A Yes.
 7 Q On how many occasions?
 8 A Once.
 9 Q When was that?
10 A February 15th, 2005.
11 Q Who else from the Sheriff's Department has
12     testified before the Grand Jury?
13 A To my knowledge, Viktor Theiss,
14     Sheriff Cabral, former Deputy Superintendent
15     Mary Ellen Mastrorilli, Brian Dacey, SID
16     Investigator, Sonya Aleman, SID Investigator.
17     I'm not sure whether or not this is correct,
18     but I believe Steve Jacobs, who was at that
19     time with SID, testified. Our General
20     Counsel, Anne Powers, and Chief of External
21     Affairs, Steve Tomkins. I think that's
22     everybody.
23 Q Do you know if Paul DeFazio has?
24 A I'm not sure about that.
```

Page 176

```
 1 Q Do you know whether or not the criminal
 2     investigation is still ongoing?
 3 A I think it is, yes.
 4 Q Are you familiar with a statement that was
 5     released to the press on August 25th, 2004,
 6     concerning Mrs. Porter that was released on
 7     behalf of the Sheriff's Department?
 8 A I know of a statement we made. I'm not
 9     exactly sure that's the date, but we did
10     release a statement in August of 2004.
11 Q Did you have any role in drafting that
12     statement?
13 A Yes.
14 Q How would you describe your role?
15 A How did I do it?
16 Q What was your role? Did you physically draft
17     the statement?
18 A I went to my computer and typed it on the
19     screen.
20 Q You drafted the statement?
21 A I did.
22 Q Did you receive input from anybody to
23     determine what should go into that statement?
24 A Yes.
```

# EXHIBIT B

# GOODWIN PROCTER

Anita B. Bapooji
617.570.1998
abapooji@
goodwinprocter.com

Goodwin Procter LLP
Counsellors at Law
Exchange Place
Boston, MA 02109
T: 617.570.1000
F: 617.523.1231

June 15, 2005

Ellen M. Caulo
Suffolk County Sheriff's Department
Office of the General Counsel
200 Nashua Street
Boston, MA 02114

Re:   **Sheila J. Porter v. Andrea Cabral, et al., No. 04-11935-DPW**

Dear Ellen:

Following up on our recent conversation regarding Anne Powers, I am writing to confirm that Plaintiff is not going to depose Ms. Powers based on your representation that she would assert privilege in response to questions about Plaintiff's debarment.

Please contact me if I have misunderstood your representation on this issue.

Very truly yours,

*Anita B Bapooji / Hmk*

Anita B. Bapooji

cc:   Alexandra B. Harvey
      Joseph F. Savage Jr.

LIBA/1557519.1

# EXHIBIT C



# Suffolk County Sheriff's Department

**ANDREA J. CABRAL**
SHERIFF

Jail
200 Nashua Street
Boston, MA 02114
(617) 635-1100

House of Correction
20 Bradston Street
Boston, MA 02118
(617) 635-1000

June 20, 2005

Anita B. Bapooji, Esq.
Goodwin Procter LLP
Exchange Place
Boston, MA 02109

RE:    Sheila J. Porter v. Andrea Cabral, et al. No. 04-11935-DPW

Dear Attorney Bapooji:

In response to your letter dated June 15, 2005 I write to correct your characterization of my representation concerning any privilege that General Counsel Anne Powers would assert should she be deposed. During our recent conversation, I informed you that should you depose Ms. Powers she would assert privilege in response to questions concerning communications protected by the attorney client privilege.

Very truly yours,

Ellen M. Caulo

cc. Alexandra B. Harvey, Esq.