# EXHIBIT A

WALTER B. PRINCE
Partner
wbprince@plgt.com
(617) 456.8003 Tel

Prince Lobel Glovsky & Tye LLP
Attorneys at Law

585 Commercial Street
Boston, MA 02109-1024
(617) 456.8000 Tel
(617) 456.8100 Fax
www.plgt.com

October 7, 2005

**By Hand Delivery**

John T. McNeil, Esq.
Assistant United States Attorney
Department of Justice
United States Attorney's Office
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210

Re:   Sheila Porter Investigation

Dear John:

Apart from the long-delayed notice of the appropriate decision by the US Attorney to close the grand jury investigation of my client, both the tone and content of your letter are deeply troubling. The issuance of such a defensive and caustic letter is highly unusual, in my experience as a former Assistant United States Attorney and as private counsel who represents clients before the federal criminal bar.

Far from dispelling the concern that this investigation was motivated by personal animus, political, or other improper impetus, your letter only reinforces my client's beliefs. You draw unwarranted conclusions from the evidence, you improperly vouch for the credibility of witnesses (including a civil litigant who is biased), and you cast unwarranted aspersions on the character and integrity of my client. It appears to be written for consumption and use by parties other than my client. Therefore, I cannot let it go unanswered.

Throughout this investigation, we have been extremely concerned about the connection and communication between your office and Sheila Porter's civil attorney, Joseph Savage. As you know, Sheila Porter testified in her civil deposition that she met with AUSA Huggard and FBI Agents Maureen Robinson and Christa Snyder on June 11, 2003, the day after she was barred. At that meeting, Porter was told that she had been illegally barred; that opinion represented an appalling rush to judgment, especially since there had been no communication with the Sheriff's Department to determine the credibility of Ms. Porter's version of the facts. Additionally, Porter was advised to seek an employment attorney. In addition to the clear impropriety of advising a potential witness to hire a civil attorney, it is clear that Porter would not have independently retained her current attorney, Joe Savage (who does not specialize or routinely practice in employment law), without the guidance of either the U.S. Attorney's office or the FBI. Joe Savage is a former Chief of the US Attorney's Public Corruption Bureau, and a friend of Steve Huggard (who initiated the grand jury investigation) who was Chief of the Public Corruption Bureau at the time. As

PRINCE . LOBEL . GLOVSKY & TYE LLP

CONFIDENTIAL          001659

J. T. McNeil, Esq.
October 7, 2005
Page 2

your office has been provided my client's memo to file, dated June 18, 2003, and her subsequent letter to US Attorney Sullivan, dated July 22, 2003, you are aware of the meeting that took place at the US Attorney's Office on June 16, 2003. The meeting was represented by then First Assistant U.S. Attorney Gerry Leone to be for the purpose of introducing the new Special Agent in Charge, Kenneth Kaiser, and to discuss ways to improve the historically strained relationship between your office, the FBI, and the Sheriff's Department. No one from the Sheriff's department was told that the meeting would involve a discussion of her decision to bar Sheila Porter. Sheila Porter's barring immediately became the sole topic of conversation, and Sheriff Cabral was asked to justify the exercise of her authority. Despite being taken completely by surprise, she, Elizabeth Keeley, and Viktor Theiss remained at the meeting and explained why Porter had been barred.

During the meeting and *after* Sheriff Cabral and her staff had been questioned about the circumstances of Porter's barring, Chief of Public Corruption Steve Huggard announced that he had *already* targeted the Sheriff's Department for investigation. He apparently made this decision the day after Sheila Porter was barred, based only on her recitation of the facts. The decision to invite my client to a meeting without first informing her that either she or members of her staff were being investigated was clearly improper. This fact, Huggard's behavior, and the tone of the meeting were "shocking" to Sheriff Cabral, and she expressed her significant concerns in the memo, a telephone conversation with and subsequent letter to US Attorney Sullivan. She expressed a specific concern about Huggard's motivation, given a prior and unrelated interaction during which she had upbraided Huggard for his disruption of an investigation. She also reiterated what was explained during the meeting, namely that Porter was not barred in retaliation for speaking to the FBI.

The facts belie any reasonable belief that Sheriff Cabral or members of her staff attempted a cover-up of the true reasons for Porter's barring. My client did not know that Porter's barring would be the topic of discussion in the June 16 meeting. Porter's conduct with regard to the Rene Rosario allegation had been documented before the meeting and her reasons for barring Porter have not changed.

Further, the meeting that occurred between US Attorney Sullivan, Attorney Savage, Sheila Porter, AUSA Steve Huggard, and certain FBI Agents, <u>while the grand jury investigation was under way and after Attorney Savage had filed a civil lawsuit against Sheriff Cabral seeking money damages</u>, raises serious questions of impropriety. It is our understanding that Attorney Savage - while in the presence of his client, and acting in his capacity as private counsel to a civil litigant - was permitted in that meeting to vehemently advocate pursuit of my client on federal criminal charges.

We have always questioned why Sheriff Cabral was asked by AUSA Huggard in the grand jury if she felt she had "made any mistakes" in barring Sheila Porter. The issue of mistake has no relevance to 18 USC 1513(e), which is a specific intent crime. It can, however, be quite relevant in a civil lawsuit. Further, as a condition of "resolving the matter," Steve Huggard also informed me that Sheriff Cabral, in a meeting with the US

PRINCE.LOBEL.GLOVSKY & TYE

CONFIDENTIAL                                    001660

J. T. McNeil, Esq.
October 7, 2005
Page 3

Attorney and in the presence of an FBI agent who would be taking notes, would have to "be willing to admit that she made mistakes" in barring Sheila Porter.

Similar concerns were raised by your subpoena of Steve Tompkins, the Sheriff's Department spokesperson. He was not involved in Porter's barring in any way and was never so identified by any party. He was asked certain questions that were relevant only to Porter's civil claim for defamation. He was subsequently subpoenaed for a deposition in Porter's civil case and was asked the very same questions.

Strangely, while Steve Tompkins was subpoenaed to the grand jury, SID Investigator Stan Wojtkonski was not. As you know, Wojtkonski was the investigator to whom FBI Special Agent Christa Snyder first reported what the then unnamed source (Sheila Porter) told her about Rene Rosario's allegations. He immediately wrote a report of that discussion, which was part of the SID investigative file turned over to the US Attorney's Office. What Snyder recounted to Wojtkonski differs substantially from what Sheila Porter ultimately wrote and testified to. Wojtkonski's reports also detailed the Department's concern, from the very beginning, that the "source" identified as a medical staff member by Snyder, had not reported the information to SID. In fact, during a subsequent conversation with Agent Snyder, Investigator Wojtkonski assured her that "no staff member would be hindered from speaking with an outside agency, but that would not absolve the staff member of his or her responsibility to report incidents directly to the Sheriff's Department and SID." Investigator Wojtkonski wrote and filed a report regarding that conversation on the same day it occurred, May 23, 2003, which report was included in the investigative file provided to your office.

From the meeting at the US Attorney's Office on June 16, 2003 to the present, my client has been consistent regarding her reasons for barring Sheila Porter. Based upon information provided to me and my client, sometime in the fall of 2004, US Attorney Michael Sullivan acknowledged to a number of his assistants that he did not believe my client's conduct in barring Sheila Porter was criminal. Despite that, your office sought her testimony before the grand jury. (Indeed, it was the initial intention of your office that she be subpoenaed to testify on September 14th, 2004, the day of the primary election in the Sheriff's race.) Sheriff Cabral did voluntarily testify before the grand jury without the necessity of a subpoena. She also declined to assert her Fifth Amendment Rights to avoid being deposed in Sheila Porter's civil lawsuit. The Sheriff's Department provided every document sought by your office, whether informally requested or formally subpoenaed. At no time, did Sheriff Cabral or members of her Department seek to delay their responses or otherwise obstruct the grand jury process. In fact, Sheriff Cabral waived the attorney-client privilege between the Department and her General Counsel, Anne Powers, to facilitate Powers's testimony before the grand jury.

Your attempt to blame my client for the length of this investigation is just plain wrong, and perhaps understandable given your lack of responsibility for the case before being assigned to you. Your letter ignores the eight months between March and November of 2004, during which my client was led to believe that the way we could resolve the investigation and avoid subpoenas and grand jury testimony would be to change

PRINCE . LOBEL . GLOVSKY & TYE

CONFIDENTIAL           001661

J. T. McNeil, Esq.
October 7, 2005
Page 4

Department Policy S220.[1] Through me, Sheriff Cabral promptly responded to your office's repeated requests for changes in the policy language. AUSA Huggard insisted that the policy allow employees to avoid reporting alleged misconduct internally, despite the fact that such a rule would clearly violate the Code of Massachusetts Regulations. When Sheriff Cabral drafted a revision of the policy that essentially mirrored some of the language in 1513(e), Huggard insisted that she delete the word "truthful" as a descriptor for the kind of information an employee could legitimately provide. Huggard also disclosed that US Attorney Sullivan had involved himself personally in drafting of the revisions. In the fall of 2004, with no explanation, your office abandoned all interest in the policy revisions and began to pursue my client's grand jury testimony in earnest.

For the record, the Suffolk County Sheriff's Department employee conduct policy was no different from the policies of other Sheriff's Departments in the Commonwealth or that of the Department of Correction. All were drafted, as required, pursuant to the Code of Massachusetts Regulations. Sheriff Cabral never felt that the policy warranted revision, but AUSA Huggard repeatedly made it clear that if she did not acquiesce to your office's demand, he would seek an indictment against her or members of her staff. My client and certain members of her staff are former prosecutors. They are well aware of the ease with which indictments can be returned, particularly given that the federal rules do not require presentment of exculpatory evidence to the grand jury.

Based upon Huggard's threat to indict (he repeatedly advised me that we were "running out of road" and "running out of real estate" in terms of our ability to make revisions sufficiently satisfactory to the US Attorney that would preclude indictment), I advised my client to make policy changes inconsistent with those found in other sheriff's departments and the Department of Correction. No mention is made in your letter of any concern about the policy, and it is now clear that it played no real role in this matter, and was simply your office's unabashed use of its power to leverage the Sheriff's Department.

Further, had your office not issued target letters to certain personnel in January of 2004, I am certain that they would have appeared voluntarily and testified before the grand jury well before February of 2005. Additionally, at a meeting attended by Gerry Leone, Jim Farmer, Steve Huggard of your office, and Attorney Ralph C. Martin, II in early 2004, your office stated that it regretted the issuance of target letters, but that was the only device they knew of to secure someone's attention to resolve the concerns of the U.S. Attorney's Office. Everyone within the Sheriff's Department accepted this representation in good faith and attempted to meet the concerns of the U.S. Attorney's Office, as outlined above. Your office did not withdraw those target letters and seek their testimony for 13 months.

---

[1] Your office's stated claim that the Sheriff's Department's internal policy needed to be clarified to explicitly protect so-called "whistleblowers" was a pretext. Even assuming that there was a good faith basis to believe that action was taken against Porter in order to retaliate for some lawful action by Porter, Porter was a contract worker, not an employee of the House of Corrections. As I pointed out, the FBI's own internal regulations exempt contract FBI workers from "whistleblower" status. See 28 C.F.R. § 27.2, and "A review of the FBI's Actions in Connection with Allegations Raised by Contract Linguist Sibel Edmonds," Office of the Inspector General, Office of Oversight and Review, January 2005.

PRINCE . LOBEL . GLOVSKY & TYE

CONFIDENTIAL            001662

J. T. McNeil, Esq.
October 7, 2005
Page 5

Given that lengthy delay and the enormous number of conversations and work-related decisions made in that time, it cannot be surprising that detailed recollections of conversations held nearly two years prior during a period of significant transition within the Department would be difficult. Indeed, had their recollections matched exactly, it is likely your office would have viewed that as evidence of collusion and cover-up.

That Mary Ellen Mastrorilli told Sheila Porter she was being barred for speaking to an outside agency seems to be the lynchpin of your conclusions regarding Sheriff Cabral's alleged culpability. Sheriff Cabral articulated her reasons for the barring to Elizabeth Keeley, who then instructed Mastrorilli accordingly. In her letter dated July 22, 2003, Sheriff Cabral informed US Attorney Sullivan that the decision to bar Porter was hers and that she "would readily" take responsibility for it. Thus, only her specific intent was relevant to proof of a violation of 1513(e). Sheriff Cabral never spoke to Ms. Mastrorilli regarding Sheila Porter. Your office has apparently never considered that any disconnect between what Ms. Mastrorilli was told by Elizabeth Keeley and what she subsequently said to Sheila Porter is attributable to Mastrorilli. This is puzzling given that Ms. Mastrorilli remains, to this day, the only person in the Sheriff's Department to express a desire to bar Ms. Porter specifically for speaking with the FBI – a feeling she reduced to writing in a memo that was provided to you pursuant to a grand jury subpoena. Despite that troubling fact, Ms. Mastrorilli has never been viewed as anything other than a cooperating witness by your office.

There was a clear willingness to take Ms. Mastrorilli's version of the facts at face value, right from the outset. As you know, Ms. Mastrorilli testified before the grand jury in September of 2003. After she completed her testimony, Steve Huggard "walked her out of the room" and said, "I knew you would tell the truth." This statement constitutes a remarkable endorsement of a witness whose accuracy of recollection, credibility, and history of properly following instructions was completely untested. Indeed, depositions of my clients, Elizabeth Keeley, Viktor Theiss, and even Sheila Porter, as well as others have subsequently called the reliability of her testimony into question.

It is disingenuous to claim that the onus was on Sheriff Cabral to renounce the reasons provided by Ms. Mastrorilli to Ms. Porter for her barring and that her failure to do so complicated and lengthened the grand jury investigation. My client had no way of knowing that Ms. Mastrorilli had not accurately recounted her reasons for barring Sheila Porter and therefore had no reason to adopt or disavow anything she said. More than once, Department General Counsel Anne Powers asked Steve Huggard to identify the specific issue that was causing the US Attorney's Office to perceive misconduct by my client or members of her staff. Huggard would only repeatedly say that, "something wasn't adding up." Had he been more forthcoming, Sheriff Cabral would have responded and the matter might have been resolved sooner. Once Ms. Mastrorilli had been approached by the FBI for an interview and subpoenaed to the grand jury – and this occurred three months after Porter's barring - it would have been highly inappropriate for Sheriff Cabral to question her and she didn't.

PRINCE . LOBEL . GLOVSKY & TYE 3

CONFIDENTIAL         001663

J. T. McNeil, Esq.
October 7, 2005
Page 6

Among your letter's most astonishing assertions is the claim that Sheriff Cabral failed to reject Ms. Mastrorilli's statements "all the while publicly criticizing Sheila Porter." It is simply false and another example of the less-than-objective approach that has unfortunately characterized the conduct of this case. Any public references to Ms. Porter by my client are within her rights to do as both a public figure, and the subject of a civil claim. The failure of your office to understand these basic tenets, and your inclination to penalize my client for the exercise of her right to defend herself are completely unsound and unprincipled.

As her deposition testimony confirms, Ms. Porter decided to seek positive media coverage for her forthcoming civil lawsuit in August of 2004, less than 3 weeks before the September 14 primary election in the Sheriff's race. More than 13 months had passed since she had been barred and it is difficult to believe the timing was inadvertent. As she testified, she consulted with the FBI before granting interviews with WCVB Channel 5 and the Boston Globe. The Globe article comprised some 17 paragraphs. In it, Ms. Porter criticized Sheriff Cabral, the Sheriff's Department, publicly disclosed her identity as a federal informant, the existence of an open grand jury investigation and the fact that she had testified. The Channel 5 story contained much of the same information.

As expected, my client was contacted for a response. She declined a request for an on-camera interview with Channel 5 or an in-person interview with the Globe. Instead, she issued a four-paragraph press statement. References to Porter were confined to the first two paragraphs - a total of four short sentences – that pointed out that Porter was fired by CMS, not the Sheriff's Department, that she was barred for policy violations and contractual obligations and that she had a motive for seeking media attention at that particular time. The only other time my client has spoken publicly and specifically about Ms. Porter was during a televised debate on WGBH. Her opponent, not she, raised the issue. The debate's host then directly questioned her about it. With typical circumspection, she confined her comments to what was written in the press statement.

Far from continuously criticizing Ms. Porter, or for that matter, criticizing her at all, Sheriff Cabral declined to respond when, in press story after press story, Sheila Porter's allegations were repeated. Even in response to the coverage of press leaks of grand jury information, she declined to do anything other than reference the reasons given in the earlier press statement and her own truthful testimony.

At no time, has my client conducted herself in a manner from which one could reasonably and fairly conclude that she had anything to hide. Despite the aforementioned leaks of grand jury information – made in clear violation of federal law - and the subsequent damage to her reputation, she honored her professional obligation and resisted intense media and other pressures to respond in kind. She held fast to that obligation despite a request made to your office five months ago to investigate the source of those leaks. Though the universe of people to whom the protected information was known should be very small and one would expect that a lengthy investigation would not be necessary, no information regarding the investigation's progress or findings has been forthcoming.

PRINCE.LOBEL.GLOVSKY &TYE

CONFIDENTIAL    001664

J. T. McNeil, Esq.
October 7, 2005
Page 7

It is also important to note that Sheriff Cabral has not allowed her strong feelings about what has occurred in the context of this matter to interfere with her professional obligation to continue to work cooperatively with the US Attorney's Office and the FBI, a duty she takes very seriously. In addition to referring appropriate cases to the FBI for investigation – one as recently as two weeks ago - her Department continues to work cooperatively on joint criminal investigations, the BRI re-entry initiative and the gang intelligence task force.

As I am sure you are aware, we were so troubled by the government's conduct in this case, we reported the matter to the Department of Justice. As I am also sure you are aware, the Public Integrity Section at Main Justice agreed to open an investigation into the handling of this matter by the U.S. Attorney's Office. If the conclusions drawn in your letter were a fair interpretation of the evidence, does it make sense that Sheriff Cabral would invite the scrutiny of a full review by the Department of Justice? Finally, it has not escaped my attention that your letter announcing the end of this investigation comes within one week of Public Integrity's opening of its investigation.

It is most unfortunate, given an objective assessment of the evidence, the attendant circumstances in this case, and the fact that the investigation has been closed that you continue to portray Sheriff Cabral as someone worthy of federal prosecution.

Sincerely,

*Walter B. Prince*

Walter B. Prince, Esq.

WBP/cs

cc – M. J. Sullivan, Esq. (by hand delivery)
    M. K. Loucks, Esq. (by hand delivery)

PRINCE.LOBEL.GLOVSKY & TYE

CONFIDENTIAL

001665

# EXHIBIT B

001319

WALTER B. PRINCE
Partner
wbprince@plgt.com
(617) 456.8003 Tel

Prince Lobel Glovsky & Tye LLP
Attorneys at Law

585 Commercial Street
Boston, MA 02109-1024
(617) 456.8000 Tel
(617) 456.8100 Fax
www.plgt.com

March 31, 2004

**By Hand Delivery**

Stephen Huggard, Esq.
Assistant United States Attorney
Department of Justice
United States Attorney's Office
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210

Re:   Grand Jury Investigation (Sheila Porter)

Dear Steve:

I called earlier hoping to be able to set up a time to personally deliver this material to you today. Unfortunately, you were unavailable, so the material is being hand delivered by messenger.

I have taken our discussion of last week to heart and have crafted a policy that addresses your concerns and also balances the concerns of the Sheriff's Office. Enclosed is a Memorandum of Understanding and a revised S220 for your review and comment. I believe that the combined documents balance the concerns of both parties. A substantial amount of time has been put into carefully addressing the issues and the revised material has major policy implications on the day-to-day running and management of the Sheriff's Department. Therefore, I would like you to give this policy revision substantial consideration; and hopefully, you will agree that its implementation will alleviate future concerns that your office may have in regard to 18 U.S.C. § 1513(e).

Again, please give the material your serious consideration, and if it does address the concerns that you have mentioned; then, hopefully, we will not have to reach the privilege issue.

I look forward to hearing from you at your earliest convenience.

Sincerely,

Walter Prince

WBP/cs
Enclosure

PRINCE ▲ LOBEL ▲ GLOVSKY & TYE LLP

# EXHIBIT C

WALTER B. PRINCE
Partner
wbprince@plgt.com
(617) 456.8003 Tel

Prince Lobel Glovsky & Tye LLP
Attorneys at Law

585 Commercial Street
Boston, MA 02109-1024
(617) 456.8000 Tel
(617) 456.8100 Fax
www.plgt.com

001317

April 6, 2004

**<u>By Hand Delivery</u>**

Stephen Huggard, Esq.
Assistant United States Attorney
Department of Justice
United States Attorney's Office
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210

Re:     <u>Sheila Porter Investigation</u>

Dear Steve:

There has been some additional thought and discussion regarding a revision to S220, and I wanted to send you a copy of the latest change.

At the bottom of Page 2, Paragraph C 2d), you will note that the paragraph has been changed to include the words, "other than reporting truthful information of a crime to a law enforcement agency." This language, as you know, from U.S.C. § 1513(e). We think that it further addresses some of your concerns and brings us into compliance with the federal statute.

I look forward to hearing your comments on this matter at your earliest convenience.

Sincerely,

Walter Prince

WBP/cs
Enclosure

PRINCE.LOBEL.GLOVSKY & TYE LLP

# EXHIBIT D

WALTER B. PRINCE
Partner
wbprince@plgt.com
(617) 456.8003 Tel

001314

Prince Lobel Glovsky & Tye LLP
Attorneys at Law

585 Commercial Street
Boston, MA 02109-1024
(617) 456.8000 Tel
(617) 456.8100 Fax
www.plgt.com

September 2, 2004

**By Facsimile**

Stephen Huggard, Esq.
Assistant United States Attorney
Department of Justice
United States Attorney's Office
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210

Re:   Sheila Porter Investigation

Dear Steve:

As you know, I am leaving for vacation today and I called to alert you to the proposal that I have in mind which I believe resolves your concern.

The proposal is to amend S220 to include the following two paragraphs: 1) "Employees may report any suspected illegal conduct to outside law enforcement agencies without fear of discipline." 2) "Employees must report any suspected illegal conduct to the Sheriff's Investigation Division (SID)."

Conceptually, these two paragraphs satisfy your concern regarding an employee's fear of retaliation for contacting outside agencies, and it satisfies the Sheriff's concern of not being informed of unlawful conduct occurring within the institution.

Some minor refinements may be required, but it appears that a balance is struck on both issues.

Finally, in regard to the witness subpoena that you stated would be served in the very near future, please be advised that service is unnecessary and that the witness will be present on September 14, 2004 at 10:00 a.m.

I will be back in the office on September 8, 2004, and I look forward to your comments.

Sincerely,

Walter B. Prince

WBP/lc

PRINCE.LOBEL.GLOVSKY & TYE LLP

# EXHIBIT E

WALTER B. PRINCE
Partner
wbprince@plgt.com
(617) 456.8003 Tel

Prince Lobel Glovsky & Tye LLP
Attorneys at Law

585 Commercial Street
Boston, MA 02109-1024
(617) 456.8000 Tel
(617) 456.8100 Fax
www.plgt.com

001268

September 28, 2004

**By Hand Delivery**

Stephen Huggard, Esq.
Assistant United States Attorney
Department of Justice
United States Attorney's Office
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210

Re:   Sheila Porter Investigation

Dear Steve:

After our last meeting, I have had an opportunity to review my notes and the file, and there is some doubt in my mind as to whether I conveyed to you our agreement on your changes. I again apologize to you for any lack of communication or any miscommunication on my part. The changes that you suggested to five of the six paragraphs were acceptable in principle, but in our minds, the major issue was focused on the need for the Sheriff to be informed of criminal activity within the institution. The draft language below on this particular point bridges both your and my concerns, and if acceptable, should result in concurrence on the subtle changes I suggest to the five revised paragraphs for consistency.

In the course of our discussions, you have said on several occasions that your office is concerned about protecting the whistle-blower. One of the deficiencies that you have pointed out in our proposed change to S220 is that a whistle-blower could be disciplined or punished for reporting to an outside agency knowledge of a crime without first reporting it to a superior. The example that you have cited on several occasions was that of the first assistant being aware of the sheriff committing a crime. In that instance, the first assistant would be required to report knowledge of the crime to the sheriff, with no protection against retaliation. Also, the first assistant could not report the information solely to an outside agency without suffering discipline.

Taking these points as the key elements of your concern, the following two paragraphs below we believe provide resolution and become the cornerstone for the remaining minor changes to S220.

1)   Employees must report suspected criminal activity to a superintendent, chief of staff or SID (or any other department official authorized or appointed to conduct an investigation), unless the employee has a reasonable belief that such an internal report would result in retaliation to the employee, or the employee has a

PRINCE.LOBEL.GLOVSKY & TYE

S. Huggard, Esq.
September 28, 2004
Page 2

001269

> reasonable belief that such a report would be futile (i.e., the person involved in the suspected criminal activity would be the recipient of the report).

2) In the instances where external reporting is permitted as provided above, the employee must immediately report suspected criminal activity to the Boston Police Department, the Massachusetts State Police, or the Federal Bureau of Investigation, and will not be subject to discipline or retaliation.

We believe that the proposed language addresses your example that you have cited, and provides the employee with the ability to report outside to specific law enforcement agencies without fear of discipline or retaliation if he has a reasonable belief that an internal report would result in retaliation or would be futile. If this language is acceptable, we would propose that it be added to S220 at Paragraph L. This language would now result in minor changes in the five other paragraphs that you suggested revising.

For your convenience, a current copy of S220 is enclosed (revised October 1, 2002) (Tab "A") as well as a revised sheet which contains your proposed revisions (Tab "B"), our proposed revisions based upon the above proposed two paragraphs (Tab "C"), and the combined revisions comprising the new S220 (Tab "D").

In our previous discussions, you have proposed that we change Paragraph C. _Confidential Communications_ by adding the following language to the last sentence of the first paragraph:

> "Communications to law enforcement agencies regarding the commission or possible commission of any criminal offense are not confidential. All employees are authorized to report suspected illegal activity to law enforcement without notifying their supervisors."

We would now suggest that a comma be placed after the word "supervisors" and the following words added:

> "...in accordance with Paragraph L1 below."

This addition will refer the employee to our proposed revised language and will result in consistency within the regulations.

Your revision to Paragraph F _Interaction with Other Employees_ resulted in the deletion of the word, "truthful," from the paragraph. It now reads:

> "Reporting information of the commission or possible commission of a crime to appropriate law enforcement agencies shall not be construed as conducting an investigation."

You have suggested that this language be added to the last sentence of No. 4 and is acceptable to my client.

PRINCE . LOBEL . GLOVSKY & TYE

S. Huggard, Esq.
September 28, 2004
Page 3

001270

You have also struck the word, "truthful," from your proposed Paragraph G <u>On-Duty Interactions with Inmates</u>. Your revised sentence now reads:

> "Reporting information of the commission or possible commission of a crime to law enforcement shall not be construed as interceding or acting on behalf of an inmate's custody status."

You have proposed that this language be added after the last sentence in Paragraph 9. This language is acceptable to my client.

Your revision to Paragraph I <u>Interaction with Inmates, Friends and Families</u> consisted of striking the word, "and," and adding the word, "or," to the last line of the sentence in Paragraph No. 1. Your revision reads as follows:

> "Any contact with an inmate's relatives or friends that results in the reporting of the commission, or possible commission of a crime must be reported to the superintendent within 24 hours <u>or</u> may be reported to the appropriate law enforcement agency."

We now suggest that this sentence have the following additional language, "<u>in accordance with Paragraph 11 below</u>." Once again, my proposed change would add consistency to the regulations.

Finally, your revision to J-5 <u>Conduct Off Duty</u> suggested striking the word, "truthful," from the paragraph and deleting the words, "that does not involve department operations or personnel." Your proposal reads as follows:

> "Employees need not however report contacts with law enforcement officials that consist of reporting information of the commission or possible commission of a crime."

We would now propose to add to this sentence the additional words, "<u>in accordance with Paragraph 11 below</u>."

Finally, we are very close to resolution of our differences, and these changes I submit should satisfy your concerns. I look forward to your comments.

Sincerely,

Walter B. Prince

WBP/cs
Enclosure

PRINCE.LOBEL.GLOVSKY & TYE

# EXHIBIT F

WALTER B. PRINCE
Partner
wbprince@plgt.com
(617) 456.8003 Tel

Prince Lobel Glovsky & Tye LLP
Attorneys at Law

585 Commercial Street
Boston, MA 02109-1024
(617) 456.8000 Tel
(617) 456.8100 Fax
www.plgt.com

001289

September 13, 2004

**By Hand**

Stephen Huggard, Esq.
Assistant United States Attorney
Department of Justice
United States Attorney's Office
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210

Re: Sheila Porter Investigation

Dear Steve:

Pursuant to our conversation on Friday, September 10th, you informed me that the United States Attorney has received our September 2nd proposed revision to S220 and that he has not yet decided whether our proposed revisions to the regulations are acceptable and therefore have resolved this very difficult matter.

As you know, my client is scheduled to appear before the grand jury on Tuesday, September 14th. By this letter, I am requesting, indeed urging, that we postpone for a short period the grand jury appearance so that we can receive the United States Attorney's decision on this critical issue.

Several weeks ago, I asked you for your suggested changes to S220, and you suggested six revisions. We responded by immediately adopting five of your suggested revisions. Our September 2nd revision now incorporates your sixth suggestion.

As you know, on September 10th, I sent to you a copy of the Standards of Employee Conduct of the United States Department of Justice Federal Bureau of Prisons. Our proposed revisions to S220 go beyond even the Bureau of Prison Standards in protecting a whistle-blower employee who goes directly to law enforcement to report suspected criminal activity. Our proposed revisions explicitly state that an employee will not be disciplined for taking such action. We cannot imagine why this policy revision would not satisfy the concerns of the United States Attorney that a whistle-blower not be punished for taking such action.

I respectfully request that this letter be brought to the attention of the United States Attorney before September 14th to avoid the specific need of a grand jury appearance by my client.

I look forward to hearing from you as soon as possible.

Sincerely,

Walter B. Prince

WBP/cs

PRINCE.LOBEL.GLOVSKY & TYE LLP