# EXHIBIT A

```
                                              VOL:  I
 1                                            PAGES: 1-247
                                              EXHIBITS: 1-7
 2

 3

 4              UNITED STATES DISTRICT COURT

 5             FOR THE DISTRICT OF MASSACHUSETTS

 6      * * * * * * * * * * * * * * * *
        SHEILA J. PORTER,              *
 7                    Plaintiff        *
              -vs-                     *   Civil Action
 8      ANDREA CABRAL; SUFFOLK COUNTY  *   No. 04-11935-DPW
        SHERIFF'S DEPARTMENT; SUFFOLK  *
 9      COUNTY and CORRECTIONAL MEDICAL*
        SERVICES, INC.,                *
10                    Defendants       *
        * * * * * * * * * * * * * * * *
11

12        CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

13
           DEPOSITION OF VIKTOR THEISS, ESQUIRE, a witness
14      called on behalf of the Plaintiff, in the
        above-captioned matter, said deposition being
15      taken pursuant to the Federal Rules of
        Civil Procedure, before Patricia M.
16      McLaughlin, a Certified Shorthand Reporter and
        Notary Public in and for the Commonwealth of
17      Massachusetts, at the offices of Goodwin Procter
        LLP, Exchange Place, Boston, Massachusetts, on
18      Tuesday, May 24, 2005, commencing at 10:05 a.m.

19

20

21
               McLAUGHLIN & ASSOCIATES COURT REPORTERS
22                   92 DEVIR STREET, SUITE 304
                  MALDEN, MASSACHUSETTS   02148
23                         781.321.8922
                     WWW.E-STENOGRAPHER.COM
24
```

```
 1              MS. CAULO:  Objection.
 2     A    Yes.
 3     Q    What is that?
 4     A    I found in my dealings with Miss Mastrorilli
 5          that she wasn't always up front.
 6     Q    What do you mean by that?
 7     A    We had interaction to try and select a new
 8          training director.  The old training director
 9          had been removed.  He had not done a good
10          job.  There was a vacant position to be
11          filled.  A committee was formed, including
12          myself, Gene Sumpter from the jail, now the
13          superintendent -- I don't know if he was
14          superintendent then or deputy
15          superintendent -- and Mary Ellen.
16              We all agreed that we would review the
17          candidates that submitted resumes and came to
18          a unanimous consensus on the selection.  We
19          were prepared to make that recommendation to
20          the Sheriff and came to discover that Mary
21          Ellen had subsequently submitted her own
22          recommendation that differed from what she
23          had told all of us and that she was
24          advocating that her second in command at the
```

1          time, ADS Bill Furley, be given the slot of
2          training, despite having no history with
3          training, particularly with corrections
4          officer portions of the training.
5               That was very surprising that we would
6          all be in unanimous agreement expecting to do
7          a joint recommendation and then have someone
8          break ranks from that and do their own
9          independent recommendation.  That really
10         colored my perceptions of what Mary Ellen was
11         capable of doing.
12    Q    When did this happen?
13    A    I don't recall exactly when.  It was sometime
14         in '03.
15    Q    Do you know if it was before or after
16         May 23rd, 2003?
17    A    I can't recall at this point.
18    Q    Was Miss Mastrorilli disciplined in any way
19         for the training selection situation?
20    A    No, her recommendation was just given no
21         weight.
22    Q    Did you have any other interactions with
23         Miss Mastrorilli that caused you to cast
24         doubt on the veracity of her report?

1             MS. CAULO:  Objection.
2   A   You'd have to ask her.
3   Q   You don't have a sense one way or another as
4       to why she would write things down that
5       didn't happen?
6   A   No.
7   Q   How is it that the training episode causes
8       you to cast doubt on what she recorded in
9       this memorandum, Exhibit 4?
10  A   Well, since I didn't see this for many months
11      after, whether that episode occurred right
12      before, shortly thereafter, to me it
13      indicates, combined with the errors
14      self-evident in the memorandum, that
15      Miss Mastrorilli is not always the most
16      accurate.  I won't call her motivations into
17      question; you'll have to ask her.  The
18      inaccuracy is there.
19  Q   Miss Mastrorilli is no longer with the House
20      of Corrections, correct?
21  A   She's left the department.
22  Q   Was she fired?
23  A   No.
24  Q   Was she ever disciplined in any way for her

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

# EXHIBIT B

173

1   issue here, which is about the
2   whistleblower." Then the paragraph goes on
3   to talk about people cooperating with the
4   FBI; another person having prisoner abuse.
5   "You have been accused of firing people for
6   essentially going around you, whistleblowing
7   to the FBI and others. What happened here?"
8       I was not going to get into the
9   substance of that. I was not going to answer
10  that question substantively, anymore than I
11  would answer that question substantively if
12  it didn't involve a whistleblower. If it was
13  someone who was barred or terminated for
14  another reason and any reporter asked me
15  about the substance of the allegations, I
16  wouldn't go into them. I might give a
17  general response but would not go into them.
18      I'm not sure where it is, but at some
19  point in here, Mr. Murphy raises it again and
20  speaks about Miss Porter and some of the
21  specific aspects of the claim. And I didn't
22  go into it then either.
23 Q Sheriff Cabral, do you know a woman named
24  Mary Ellen Mastrorilli?

174

1  A  I do.
2  Q  What were the circumstances under which she
3     ended her employment at the Suffolk County
4     Sheriff's Department?
5  A  I believe she got a job teaching at Boston
6     University and resigned.
7  Q  Had you ever had any occasion to impose any
8     discipline upon Miss Mastrorilli?
9  A  Not discipline. I had had some discussions
10    with her.
11 Q  What were those discussions?
12 A  About her management style, about some
13    decisions and some judgments that she had
14    made.
15 Q  What were the issues of her management style
16    and what were the decisions or judgments that
17    you were discussing?
18 A  There were a few issues. The first that I
19    can recall involved Mary Ellen being part of
20    a committee to look for -- it was not a
21    search committee, but a committee for a
22    training director position, and there were
23    candidates that properly applied for the
24    position and were in the running for the

175

1   position. And she had discussions with the
2   other committee members. They, I guess, all
3   agreed on their recommendations based on
4   their interviews with these people.
5       She subsequently submitted a memo to me
6   recommending two people for the position who
7   were not part of the process, one of whom I
8   believe hadn't even interviewed for the
9   process. I recall having a discussion with
10  her about the appropriateness of doing that
11  since it went beyond who had appropriately
12  applied for the position and given their
13  qualifications for the position and why she,
14  though she had been consulting with her
15  fellow committee members, never raised these
16  other two candidates' names or in the case of
17  one even find out whether or not the person
18  wanted to apply but then put forth a
19  recommendation for that person.
20      There were a couple of other instances.
21  One that I recall where -- I can't recall the
22  person's position. Someone had left a
23  position, and Mary Ellen sent out an E-mail
24  to staff indicating that the position was

176

1   vacant and she was authorized to fill it.
2   She had had no -- first of all, in her
3   capacity, she was not authorized to fill it.
4   She had no conversations with anyone about
5   whether or not that would be an appropriate
6   thing to do. So she was told to retract the
7   E-mail. I didn't speak with her directly, I
8   don't believe, on that, but she was told to
9   retract the E-mail and not take any more
10  solicitations of people who were interested
11  in the position.
12      A third instance that comes to mind is
13  her interaction with the Office of Community
14  Corrections within the Trial Court, and there
15  were some significant problems in the working
16  relationship between Mary Ellen and the folks
17  from the Department of Probation. I had
18  tasked her with creating a better
19  relationship, so that our Community
20  Corrections Department and the personnel at
21  the Trial Court would be working better
22  together and more efficiently.
23      Ultimately, as it turned out, the
24  relationship was not improved, and in fact,

```
                                            VOL:     II
                                            PAGES:   202-397
                                            EXHIBITS: 8-12


                  UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF MASSACHUSETTS



    * * * * * * * * * * * * * * * *
    SHEILA J. PORTER,              *
              Plaintiff            *
         -vs-                      *  Civil Action
    ANDREA CABRAL; SUFFOLK COUNTY  *  No. 04-11935-DPW
    SHERIFF'S DEPARTMENT; SUFFOLK  *
    COUNTY and CORRECTIONAL MEDICAL*
    SERVICES, INC.,                *
              Defendants           *
    * * * * * * * * * * * * * * * *


      CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER


       CONTINUED DEPOSITION OF ANDREA CABRAL, ESQUIRE,
    a witness called on behalf of the Plaintiff, in the
    above-captioned matter, said deposition being
    taken pursuant to the Federal Rules of
    Civil Procedure, before Patricia M.
    McLaughlin, a Certified Shorthand Reporter and
    Notary Public in and for the Commonwealth of
    Massachusetts, at the offices of Goodwin Procter
    LLP, Exchange Place, Boston, Massachusetts, on
    Friday, June 24, 2005, commencing at 10:10 a.m.



              McLAUGHLIN & ASSOCIATES COURT REPORTERS
                   92 DEVIR STREET, SUITE 304
                 MALDEN, MASSACHUSETTS  02148
                        781.321.8922
                    WWW.E-STENOGRAPHER.COM
```

position.  And she had discussions with the other committee members.  They, I guess, all agreed on their recommendations based on their interviews with these people.

She subsequently submitted a memo to me recommending two people for the position who were not part of the process, one of whom I believe hadn't even interviewed for the process.  I recall having a discussion with her about the appropriateness of doing that since it went beyond who had appropriately applied for the position and given their qualifications for the position and why she, though she had been consulting with her fellow committee members, never raised these other two candidates' names or in the case of one even find out whether or not the person wanted to apply but then put forth a recommendation for that person.

There were a couple of other instances.  One that I recall where -- I can't recall the person's position.  Someone had left a position, and Mary Ellen sent out an E-mail to staff indicating that the position was

vacant and she was authorized to fill it. She had had no -- first of all, in her capacity, she was not authorized to fill it. She had no conversations with anyone about whether or not that would be an appropriate thing to do. So she was told to retract the E-mail. I didn't speak with her directly, I don't believe, on that, but she was told to retract the E-mail and not take any more solicitations of people who were interested in the position.

A third instance that comes to mind is her interaction with the Office of Community Corrections within the Trial Court, and there were some significant problems in the working relationship between Mary Ellen and the folks from the Department of Probation. I had tasked her with creating a better relationship, so that our Community Corrections Department and the personnel at the Trial Court would be working better together and more efficiently.

Ultimately, as it turned out, the relationship was not improved, and in fact,

1    it worsened. And Mary Ellen did not wish for
2    the contract with OCC to continue. In my
3    opinion, she let it lapse. She did not
4    inform the Chief of Staff, nor did she inform
5    me, that it was up for renewal. She let it
6    lapse, and they put the contract out to bid.
7    That created a significant problem for us.
8    It was my desire to continue working with OCC
9    even though there were some issues with the
10   contract. It was my desire to continue
11   working with them. I had a conversation with
12   her about that.
13          There were a couple of other things. I
14   don't recall everything right now, but there
15   were some -- Mary Ellen worked in corrections
16   for a number of years. She had worked at
17   front line corrections, and I had a great
18   deal of respect for that. I remember
19   specifically Chief Keeley and I working with
20   her to sort of empower her as a manager, as
21   we had done with other managers, and to sort
22   of bring her along in her supervisory role,
23   but there were these lapses. I had occasion
24   to speak with her more than once about the

1  Q    Is it your belief that she made statements to
2       you that were not accurate?
3  A    It was more that there had been more than one
4       occasion where there had been a conversation
5       with Mary Ellen, and I left the conversation
6       and in some cases others who were present
7       left the conversation believing that everyone
8       was on the same page, that what was said to
9       her was understood by her.  And then
10      something would happen or she would make a
11      decision that would indicate that she didn't
12      understand at all.
13           When I asked her about the
14      recommendation of the two people for the
15      training director job and why she thought it
16      was appropriate to at the eleventh hour, when
17      we were dealing with finalists, make
18      recommendations of people, one of whom hadn't
19      even applied for the job, she didn't really
20      have a good response to this as to why she
21      thought it was appropriate.
22           So there were more conversations with
23      her about her role as a manager and the kind
24      of judgment that one needs to exercise.  I

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

1    believe Elizabeth Keeley had the conversation
2    with her about her sending out the E-mail
3    saying that she was authorized to hire
4    someone for a position, but I know that in my
5    subsequent conversation with Elizabeth about
6    it, there was that same question about it
7    seems as though she understands what you're
8    saying when you say it to her but then
9    there's a decision that's made.
10        I think there was an incident where she
11   wanted to bar someone for something.  I can't
12   remember exactly who, but she had to be
13   stopped from doing that by the Chief of
14   Staff.  So it wasn't an issue where I felt
15   that she was being dishonest with me, but I
16   had cause to question whether or not she
17   fully absorbed what was being said to her and
18   had the ability to sort of act on it.
19  Q   What do you know about the circumstances of
20      where she was attempting to bar someone?
21  A   I have a recollection that there was a
22      circumstance.  I can't remember now who it
23      was or what the specifics of it were.
24  Q   How did it come to your attention?

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922

382

| | | |
|---|---|---|
| 1 | A | Through my Chief of Staff. |
| 2 | Q | What was she reporting to you as to what the |
| 3 | | problem was? |
| 4 | A | What I remember about it was that there was |
| 5 | | some -- I believe it was -- clearly, if it |
| 6 | | was a barring, it would have been a contract |
| 7 | | worker. Mary Ellen wanted to bar this person |
| 8 | | on her own. She wanted to go to them and say |
| 9 | | you're barred. That's what I recall of it. |
| 10 | | I recall that I believe it was the Chief of |
| 11 | | Staff that interceded. |
| 12 | Q | What would be inappropriate of someone at |
| 13 | | Miss Mastrorilli's position barring a |
| 14 | | contract worker? |
| 15 | A | She doesn't have the authority. Unless it's |
| 16 | | something that is a very egregious or exigent |
| 17 | | circumstance that would require immediate |
| 18 | | action, she simply doesn't have the authority |
| 19 | | without speaking with either the Sheriff or |
| 20 | | the Chief of Staff to do that. |
| 21 | Q | Had there been reforms instituted by you that |
| 22 | | moved disciplinary authority down to |
| 23 | | different levels than they had previously |
| 24 | | been in the Sheriff's Office? |

McLAUGHLIN & ASSOCIATES COURT REPORTERS-781.321.8922