UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SHEILA PORTER

       Plaintiff,

v.

ANDREA CABRAL, SUFFOLK COUNTY
SHERIFF'S DEPARTMENT, and SUFFOLK
COUNTY

       Defendants.

Civil Action No.04-11935-DPW

**PLAINTIFF SHEILA PORTER'S OPPOSITION TO DEFENDANTS'
MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF ALLEGED
NEGATIVE CONDUCT OF THE PRIOR ADMINISTRATION**

Plaintiff Sheila Porter ("Mrs. Porter") hereby submits her Opposition to Defendants' Motion *in Limine* to Exclude Evidence of Alleged Negative Conduct of the Prior Administration. Evidence of the widespread and well-known custom of retaliation within the SCSD is central to Mrs. Porter's claims and such evidence is not barred by the hearsay rule.

**I.**    **Evidence of Past Retaliation is Highly Relevant**

Evidence of past retaliation against individuals for exercising their First Amendment rights, even evidence of retaliation from the prior administration, is highly relevant to Mrs. Porter's claims. First, defendants themselves have acknowledged the SCSD's history of retaliation and its relevance to Mrs. Porter. Second, this evidence is relevant to Mrs. Porter's deliberate indifference claim against Sheriff Cabral because it is highly probative of whether Sheriff Cabral should have known of the retaliatory intent of those initiating and recommending the decision to bar. Second, it is relevant to Mrs. Porter's custom and practice claim against the

County because it shows that there was a well-settled and extensive practice of retaliating against individuals for exercising their First Amendment rights.

    A.    **Defendants Have Linked Past Retaliation to Mrs. Porter's Case.**

Defendants claim that evidence of past retaliation is irrelevant to any of Mrs. Porter's claims. Indeed, defendants go so far as to say that there is no evidence that Ms. Cabral was even aware of the Department's history of retaliation. This statement is belied by Ms. Cabral's own testimony. For instance, Ms. Cabral testified at length about her knowledge of the allegations in the *Baron* case, admitting at one point that "there were certainly some things that Mr. Baron was subjected to that were offensive conduct . . ." *See* Cabral Dep., pp. 307-08 (attached hereto as Exhibit ("Ex.") A).

Even more tellingly, Ms. Cabral has repeatedly stated that she adopted the Stern Commission Report as a blueprint for her administration, and she has even linked the Report to the claims in this case. On August 25, 2004, Ms. Cabral authorized the release of press statement "in response to allegations made by" Mrs. Porter appearing in the *Boston Globe*, where Mrs. Porter described the retaliation she had experienced for telling the FBI about an inmate's allegations of abuse. The five-paragraph press statement contains the following statement: "<u>Sheriff Cabral has addressed and remedied the concerns raised in the Stern Commission report</u>" and then describes various actions taken by the sheriff in response to the report. *See* Press Statement, ¶ 5 (Ex. B). Thus, it was the SCSD—not Mrs. Porter—who linked Mrs. Porter's allegations with the Stern Commission Report, which detailed the SCSD's widespread custom of retaliation against individuals who speak out against the Department. Nor was this an isolated incident. In a department-wide newsletter, Ms. Cabral repeatedly cited the Stern Commission Report and the steps she took to implement the recommendations therein. *See Common Ground*

newsletter, p. 1 (Ex. C) ("I have undertaken a review of my administration's efforts to respond to the Stern Commission Report."). Having used the Stern Commission Report as a blueprint for her administration, not only is it evident that Ms. Cabral was aware of the Department's history of retaliation, but the Report is obviously relevant in determining whether her administration has eradicated the custom of retaliation described in the Report.

Consistent with Ms. Cabral's embrace of the Stern Commission report, other SCSD testified that a custom of retaliation existed at the SCSD at least as late as the time when Ms. Cabral took office. For instance, SID Chief Viktor Theiss admitted that the custom existed:

> Q. What do you understand the phrase, code of silence to mean?
>
> A. It means that when people see something or are aware of something, they won't say anything at any cost. When asked, they deny.
>
> Q. Do you understand that the Stern Commission report addressed the code of silence that they believed was present at that time?
>
> A. I do. I wouldn't deny that there was something there . . .

Deposition of Viktor Theiss, pp. 231-32 (Ex. D). The custom of retaliation,[1] as reported on by the Stern Commission, was widespread and well-known. Mrs. Porter is entitled to introduce evidence of this custom in order to show that the Cabral administration adopted the custom of retaliation as its own and barred her in accordance with it.

**B.     The Evidence is Relevant to the Deliberate Indifference Claim Against Sheriff Cabral**

Evidence of the custom of retaliation is also relevant to Mrs. Porter's deliberate indifference claim. Defendants' continue to suggest that Mrs. Porter is not entitled to bring a

---

[1] Mrs. Porter does not objecting to using the phrase "custom of retaliation" instead of "code of silence" if the Court finds the latter to be too inflammatory.

§ 1983 claim against Ms. Cabral on a deliberate indifference theory, arguing that, because Sheriff Cabral had final decision-making authority over whether to bar Mrs. Porter, there cannot be a deliberate indifference claim against her.[2] Courts in this Circuit and elsewhere have rejected such a simplistic view, recognizing the practical reality that in modern bureaucracies, actual decisions to terminate (or in this case bar), or decision that impact the decision to terminate or bar, often are made by subordinates and ratified by the individual with final authority to act. *See Baron v. Suffolk County Sheriff's Department*, 402 F.3d 225, 242 (1st Cir. 2005); *See San Filippo v. Bongiovanni*, 30 F.3d 424, 445-46 (3d Cir. 1994); *see also Ware v. Unified School Dist.*, 902 F.2d 815, 820 (10th Cir. 1990).

First, in *Baron*, the Court held that the jury could conclude from evidence that the Suffolk County Sheriff's subordinate had actual knowledge of retaliation that the Sheriff had constructive knowledge, or should have known about the retaliation. *See* 402 F.3d 225, 242 (1st Cir. 2005). Similarly, in *San Filippo*, the Court recognized that a constitutional deprivation occurs when those who recommend or initiate a plaintiff's termination or barring act with a retaliatory intent, even if the final decision-maker does not share the retaliatory motive.[3] Moreover, while there is no supervisor or municipality liability for mere failure to investigate the motive of subordinates, such liability exists if the final policy-maker acts with deliberate indifference to the retaliatory intent of subordinates. *See San Filippo*, 30 F.3d at 445-46; *see also Ware*, 902 F.2d at 820.

---

[2] Mrs. Porter will introduce ample evidence upon which the jury will be able to conclude that Sheriff Cabral personally had a retaliatory intent. However, as discussed above, she also is entitled to pursue a deliberate indifference claim against Sheriff Cabral.

[3] Indeed, to hold otherwise would permit any subordinate with some influence, or even *de facto* authority, over the termination/barring process to retaliate against someone for exercising their First Amendment rights, so long as the person with actual final authority under state law to make the decision remained ignorant of the retaliation. As discussed below, that ignorance must be deliberate in order to hold the policy-maker liable, but surely a

4

Since mere failure to inquire into the motives of her subordinates is insufficient to establish Sheriff Cabral's liability, Mrs. Porter will have to show deliberate indifference. Two elements of a deliberate indifference claim are that there was a grave risk of harm and actual or constructive knowledge of that risk. *See Camillo-Robles v. Hoyos*, 151 F.3d 1, 7 (1st Cir. 1998). Evidence of a widespread history of retaliating against those who exercise their First Amendment rights, even if this occurred during the prior administration, establishes that there was a grave risk that Mrs. Porter would be retaliated against for exercising her First Amendment rights, and the fact that such retaliation was so extensive demonstrates that Sheriff Cabral knew or should have known about this risk. Indeed, a civil jury was finding that there was widespread retaliation against those who exercised their First Amendment rights in *Baron* at almost the exact same time that Sheriff Cabral was considering barring Mrs. Porter. If the jury credits the evidence that Sheriff Cabral's subordinates initiated the barring process for retaliatory reasons; that Sheriff Cabral knew that there was a long-standing history of retaliating against individuals for exercising their First Amendment rights by communicating to outside law enforcement agencies; that Sheriff Cabral knew that a civil jury was finding as much at virtually the same time that Sheriff Cabral was being presented with Mrs. Porter's purported reporting errors; and that Sheriff Cabral knew that Mrs. Porter had cooperated with the FBI, it will be more than reasonable for the jury to conclude that Sheriff Cabral was deliberately indifferent to the retaliatory motive of those initiating or recommending the barring, and thus is liable.[4]

---

constitutional deprivation occurs if the person who in reality makes, or plays a part in, the decision has a retaliatory motive that causes the deprivation.

[4] Defendant's claim that "there is no evidence that Sheriff Cabral was aware of and acquiesced in this purported practice of retaliation" is highly dubious. Motion in Limine to Exclude Evidence of Alleged Negative Conduct of the Prior Administration p. 8. Sheriff Cabral clearly was aware of the history of retaliation—indeed she made it a campaign issue. Moreover, a reasonable jury could conclude on the above evidence that she acquiesced to this practice by failing to even ask any questions, despite her knowledge that Mrs. Porter cooperated with the FBI.

5

In sum, Mrs. Porter is entitled to present a deliberate indifference claim against Sheriff Cabral to the jury, regardless of if she had final policy-making authority, and evidence of other instances of retaliation are relevant to this deliberate indifference claim.

### C. The Evidence is Relevant to Mrs. Porter's Municipal Liability Claim

It is unclear whether defendants dispute the relevance of prior retaliation to Mrs. Porter's custom and practice claim against the County and SCSD. It is unlikely that defendants are making such a claim in light of the fact that they simultaneously file a motion to bifurcate the trial on the ground that Mrs. Porter's use of evidence of prior retaliation in support of her custom and practice claim against Sheriff Cabral in her individual capacity, the County, and SCSD would prejudice the claim against Sheriff Cabral in her individual capacity. This argument assumes that the evidence will be admissible for this purpose.

In any event, it cannot seriously be disputed that evidence of prior retaliation is relevant to establishing a municipal custom or practice of retaliation.[5] Moreover, the fact that the evidence spans several years and two administrations strengthens rather than weakens the relevance of this evidence. Unlike a municipal policy, which comes into existence because of the top-down affirmative decision of a policymaker, a custom develops from the bottom up. *See Baron*, 402 F.3d at 236. Since policies are adopted by policymakers, they automatically are attributable to the municipality, but customs must be attributed to municipality because they

---

Indeed, Elizabeth Keeley testifies that she told Sheriff Cabral that one reason for the barring was that Mrs. Porter spoke to the FBI.

[5] It would be preposterous for defendants to assert that the evidence of prior retaliation is not relevant to prove a municipal custom because it occurred under a prior administration. This would permit every municipality to wipe the slate clean with each new administration. Such a result would completely ignore the bottom-up nature of municipal customs, which, as described above, are not formally promulgated by a particular administration. *See Baron*, 402 F.3d at 236. It must be remembered that these claims are brought against the County and SCSD, not Sheriff Cabral individually. Of course, the defendants are free to introduce relevant evidence that they believe shows that the custom was eliminated by the Cabral administration, if such evidence exists, but the jury also is

develop from the lower-levels of an organization. *See id.* Therefore, a plaintiff seeking to hold a municipal liability on the basis of a custom must show that the custom "is so <u>well settled</u> and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989) (emphasis added). The evidence of prior retaliation that Mrs. Porter seeks to introduce will establish that there was a well-settled and widespread custom of retaliating against individuals for exercising their First Amendment rights. First, the *Baron* case will show preclusively that this custom existed as early as 1998. Moreover, as described above, the continued existence of this custom is documented by the Stern Commission Report, which was issued on October 15, 2002. In addition, the defendants have repeatedly admitted that a code of silence exists in various arbitration briefs, and numerous present and former SCSD employees—namely Richard Feeney, Deyanira Feliz, and Marie Lockhart—have testified as to the code of silence's continued exists. In addition, Viktor Theiss and Elizabeth Keeley will testify that the safety of informants could not be assured in 2003. Finally, Mrs. Porter and Ms. Jurdak will testify that, contrary to defendants' assertion, the retaliatory custom has continued into the Cabral administration.

Defendants attempt to exclude this extensive evidence of a custom of unconstitutional retaliation proffered by Mrs. Porter on the ground that such evidence deals only with "officer on officer" retaliation, and not "management on independent contractor" retaliation. But nothing in Section 1983 law requires Mrs. Porter show that the precise method of retaliation was employed in the past; and indeed, there almost always will be something different about the way a plaintiff

---

entitled to conclude that there was a widespread and well-settled municipal custom that persisted into the Cabral administration, and that this custom caused Mrs. Porter's barring.

was retaliated against and prior retaliations.[6] Rather Mrs. Porter must establish that there was a widespread and well-established custom of retaliation against individuals for exercising their First Amendment rights. The particulars of how that retaliation was carried our are not significant. At a minimum, the jury should decide what impact, if any, the difference in the manner in which the other instances of retaliation were carried out has on whether a custom exists and if that custom caused the deprivation in the present case.

The unconstitutional custom at issue here is an unconstitutional custom of retaliating against individuals for exercising their First Amendment rights. What makes the retaliatory custom unconstitutional is that an individual suffers an adverse employment action for exercising their rights. There is a whole range of adverse actions that constitute unconstitutional retaliation, including barring and tolerating officer on officer harassment. Indeed, harassment often rises to the level of constructive discharge. *See Baron*, 402 F.3d at 242. Thus, evidence of officer on officer harassment is relevant to show a well-settled and widespread history of unconstitutional retaliation in the department.

## II.   Evidence of Past Retaliation is Not Barred by the Hearsay Rule

### A.   The Stern Commission Report is Admissible

Defendants seek to preclude the Report of the Special Commission on the Suffolk County Sheriff's Department ("Stern Commission Report"). But "admissibility of evidence of this sort is generally favored . . . Reports such as those issued by the Commission [investigating the Suffolk County (NY) District Attorney's Office and police department] are presumed to be admissible in the first instance." *Gentile v. County of Suffolk*, 926 F.2d 142, 148 (2d Cir. 1991).

---

[6] For example, if there is a widespread history of retaliating against corrections officers by making threatening phone-calls, of which the policy-maker has actual or constructive knowledge, and suddenly a cooperator's windshield is smashed, under defendants' theory, the county couldn't be held liable because there is no custom of smashing windshields, only of making threatening phone calls.

8

The Stern Report is clearly admissible to show that the top decisionmakers at the SCSD were aware of its existence, reviewed the Report, and used it as a blueprint for the Cabral administration. Ms. Cabral, Elizabeth Keeley and Viktor Theiss all testified that they reviewed the Report and that they were aware of its focus on the SCSD's history of retaliation; indeed, they claimed that part of their *raison d'etre* was to address the concerns raised in the Report. In addition, as described above, the press release that was drafted by Ms. Keeley and authorized by Ms. Cabral links the Stern Commission Report with Mrs. Porter's claims. Thus, apart from its substantive admissibility, the Report is admissible to show that the SCSD decisionmakers were aware of its existence and attempted to implement its recommendations.

The Report is also admissible on substantive grounds because it is a public record, a recognized exception to the hearsay rule. Fed. R. Evid. 803(8) provides as follows:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to a duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings against the government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate a lack of trustworthiness.

The Stern Commission Report satisfies Rule 803(8)(C) because it is (1) a report of a public office or agency, (2) setting forth factual findings resulting from an investigation made pursuant to authority granted by law, and (3) is trustworthy.

First, the Suffolk Defendants claim, without a shred of authority, that the Stern Commission was not a "public office or agency." On the contrary, reports released by an independent body made within authority granted by law is a public report. *See Cunningham v. Gates*, 229 F.2d 1271, n. 19 (9th Cir. 1993) (affirming admission of Christopher Commission

9

Report, an independent task force which investigated the Los Angeles Police Department); *see Perrin v. Anderson*, 784 F.2d 1040, 1046-47 (10th Cir. 1986) (report of shooting review board, "a properly constituted body of the Department of Public Safety" under state statutory law, was properly admitted); *Jenkins v. Whittaker Corp*, 7895 F.2d 720, 726 n.15 (9th Cir. 1986) (Rule 803(8)(C) requires only that report be authorized, not mandated, by law). Here, the Report states on page 1 as follows: "In the fall of 2001, at the request of Suffolk County Sheriff Richard Rouse, Governor Jane Swift appointed the Special Commission to investigate and report on the operations and management of the Suffolk County Sheriff's Department . . ." The Stern Commission was clearly a public office or agency.

Second, it cannot seriously be argued that the Report does not contain factual findings. The Suffolk Defendants' precise argument that it is inadmissible because it contains opinions was rejected by the Supreme Court in *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988). At issue in *Rainey* was the admissibility of a JAG investigative report of an airplane crash that killed a Navy flight instructor and student. The Supreme Court held that the entire report, including its conclusions and opinions, were admissible. *Id.* at 163. In so doing, the Court stated that district courts should take "a broad approach to admissibility under Rule 803(8)(C)." *Id.* at 170; *see also Lubanksi v. Coleco Industries, Inc.*, 929 F.2d 42, 45 (1st 1991) (endorsing "broad interpretation" approach to determine if a report contains factual findings).

Here, the portions of the Stern Commission Report relied upon by Mrs. Porter—those concluding that a Code of Silence exists at the HOC—are conclusions based on factual investigation. *See* Stern Commission Report, pp. 3-4 (describing the exhaustive methodology of the investigation, which included scores of interviews with SCSD employees, inmates, outside agencies and a review of numerous documents). These conclusions are admissible under *Rainey*;

*see also Gentile v. County of Suffolk*, 129 F.R.D. 435, 449-50 (E.D.N.Y. 1990), *aff'd*, 926 F.2d 142 (2nd 1991) (conclusions contained in report of commission investigating Suffolk County (NY) District Attorney's Office and police department were admissible because they were based on factual findings).

Third, the Report is trustworthy. To determine trustworthiness, most courts look to the four elements included in the Advisory Committee Notes to FRE 803(8)(C): (1) the timeliness of the investigation, (2) the investigator's skill and experience, (3) whether the procedures for hearings were sufficient,[7] and (4) evidence of bias, as when reports are prepared with a view to possible litigation. *See, e.g., Sabel v. Mead Johnson & Co.*, 737 F.Supp. 135, 142 (D. Mass. 1990). As defendants acknowledge, they have the burden of establishing that the report is inadmissible. Motion at 6; *Coleman v. Home Depot*, 306 F.3d 1333, 1341 (3rd Cir. 2002).

The first factor weighs in favor of admissibility. Timeliness focuses on two issues: how recent were the events at the time of the report was drafted, and is the document timely with respect to the allegations of the party seeking its introduction. *Gentile*, 129 F.R.D. 450. The Suffolk Defendants attack the latter notion of timeliness, claiming that the Report is not trustworthy because it was focused on events predating the Cabral administration. Motion, p. 7. But the events underlying Mrs. Porter's barring occurred only seven months after the Report was issued. This is not a situation where the events of the report predated the events underlying the lawsuit by multiple years. *See Carson v. Lewis*, 35 F.Supp. 2d 250, 268 (S.D.N.Y. 1999) (excluding admission of investigative report that predated events of lawsuit by six years). In

---

[7] While the Stern Commission met regularly and conducted numerous interviews, its charge did not include holding public hearings. But this is not fatal to admissibility of a public record where there is other indicia of trustworthiness. *See Baker v. Elcona Homes*, 588 F. 2d 551, 558 (6th Cir. 1978). Moreover, the Report is reliable even without a formal hearing because numerous SCSD witnesses were interviewed and allowed to present their position on the investigation. *See U.S. v. AT&T*, 498 F. Supp. 353, 365 (D.D.C. 1980).

*Gentile*, the court admitted the report, which was similar to the report here, even though the report postdated the events underlying the lawsuit by several years. *See Gentile* at 451.

Moreover, the unconstitutional custom that resulted in Mrs. Porter's barring had been in place at the SCSD for years. Indeed, passage of time is not a factor that helps the Suffolk Defendants when they have offered no evidence that the SCSD did anything to "aggressive[ly] attack [] the code of silence that prevents staff members from reporting the misconduct of fellow staff members." Stern Commission Report, p. 10.[8] The Report is primarily offered to support Mrs. Porter's § 1983 claim against Suffolk County, not Ms. Cabral. There is no evidence that the personnel within the SCSD changed appreciably in the few months after the Report issued.

The Report also easily satisfies the second factor (skill and experience). As the *Sabel* court stated, "it is proper to presume that the official has the skill and expertise to perform the tasks assigned to him by law, and . . . it is the burden of the party opposing admission to establish through specific facts that the official lacks such skill." *Sabel*, 737 F. Supp. at 143 (denying challenge to the qualifications of a high-ranking DEA official). The defendants do not satisfy this burden. The Stern Commission members had impeccable credentials: it was chaired by a former US Attorney and included a former Superior Court Justice, a former chief of the DOJ National Institute of Corrections Jail Center, a former Assistant US Attorney, a local Clerk-Magistrate, a psychiatric social worker, and a lawyer who was a former Boston finance commissioner. This panel is obviously qualified to investigate a law enforcement department. *See Gentile*, 129 F.R.D. at 452 (expertise factor easily satisfied where commission was chaired by former U.S. Attorney and included lawyers and dean of law school).

---

[8] As the Supreme Court has held, "a § 1983 cause of action is as available for the first victim of a policy or custom that would forseeably and avoidably cause an individual to be subjected to deprivation of a constitutional right as it is for the second and subsequent victims." *Oklahoma City v. Tuttle*, 471 U.S. 808, 832 (1985).

12

Finally, there is absolutely no evidence that the Stern Commission members were biased in any way or that the report was prepared with a view to possible litigation. The Suffolk Defendants' conclusory allegations that the Report shows an "obvious bias" against the Sheriff's Department is completely unsupported. Ms. Cabral purported to use this supposedly biased Report and used it as a "blueprint" for her administration. *See* Deposition of Andrea Cabral, p. 309. Moreover, as described above, the methodology used by the Commission demonstrates a meticulous, thorough, utterly unbiased investigation. *See* Stern Commission Report, pp. 3-4.

A weighing of these factors clearly demonstrates the trustworthiness of the Stern Commission Report. Similar independent commissions investigating wrongdoing at law enforcement agencies have routinely been admitted. *See Gentile*, 129 F.R.D. 435 (independent New York Commission investigated district attorney's office and police department); *see also Cunningham v. Gates*, 229 F.2d 1271, n.19 (9th Cir. 1993) (independent task force investigating Los Angeles Police Department). Defendants have not satisfied their burden of demonstrating untrustworthiness; thus, the document is admissible.[9]

As to the "self-critical analysis privilege," it simply has no bearing on the admissibility of the Stern Commission Report. This privilege is only invoked by a party resisting a discovery request. *See Whittingham v. Amherst College*, 164 F.R.D. 124 (D. Mass. 1995). The Suffolk Defendants do not point to a single case that has refused to admit a public report into evidence

---

[9] The cases cited by the Suffolk Defendants in this district have no bearing on the admissibility of the Stern Commission Report. The *Britton* case does not even mention Rule 803(8)(C) and did, in fact, rely on the St. Clair Report in denying the defendants' motion to dismiss. *Britton v. Maloney*, 901 F. Supp. 444, 452 (D. Mass. 1995). Citation to the *Aleves* case is even more misleading, because the court there ruled that it "need not and do not rule at this time on the potential admissibility of any part of the St. Clair Report as evidence at trial" and deferred resolution of its admissibility until a later date. *Alves v. Lemoure*, 794 F.Supp. 34, 35 (D. Mass. 1992). Finally, the *McGrath* court struck the St. Clair Report not because it was hearsay but because it had not been cited in the complaint. *McGrath v. MacDonald*, 853 F. Supp. 1, 2-3 (D. Mass. 1994). In a footnote the court quoted from another case which had ruled that the St. Clair Report was hearsay, but it does not provide sufficient detail on that court's ruling—indeed, it does not even provide the case name or citation—to be applicable here.

13

based on this privilege. Moreover, the SCSD was not "self-evaluating" anything; the Stern Commission was an <u>independent</u> commission that was appointed upon the request of the Suffolk County Sheriff. *See* Stern Commission Report, p. 1.

### B. Testimony of Former Superintendent Richard Feeney and Former Deputy Superintendent Marie Lockhart is Admissible as an Admission of a Party Opponent

Defendants claim that the admissions of former Superintendent Richard Feeney and former Deputy Superintendent Marie Lockhart are not binding on the County because they retired prior to the appointment of Sheriff Cabral. Under FRE 801(d)(2), a "statement that is offered against a party and is . . .(D) a statement by a party's agent or servant concerning a matter within the scope of the agency or employment made during the existence of the relationship" is not hearsay. FRE 801(d)(2); *see also Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1094-95 (1st Cir. 1995). Suffolk County and the SCSD are defendants in this case. Defendants do not dispute that Superintendent Feeney and Deputy Superintendent Lockhart were employees of Suffolk County at the time of their testimony. Nor do they dispute that the testimony concerned a matter within the scope of their employment—namely that a code of silence exists at facilities under their jurisdiction. Therefore, the testimony of Superintendent Feeney and Deputy Superintendent Lockhart is an admission attributable to Suffolk County, and thus is not hearsay.

### C. Briefs Submitted by SCSD Attorneys are Also Party Admissions.

Finally, the SCSD moves to exclude certain briefs submitted by the SCSD in other proceedings. The Suffolk Defendants claim, without citation to authority, that the briefs are inadmissible hearsay because they are "arguments of counsel." These statements are not hearsay

14

because they are admissions by a party-opponent under Fed. R. Evid. 801(d)(2)(A)-(D). *See U.S. v. Kattar*, 840 F.2d 118, 130-31 (1st Cir. 1988) (legal briefs submitted by DOJ were party admissions and thus not hearsay); *Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994) ("Counsel's statement of fact constituted an admission of a party. It was made in a legal brief filed with the court subject to the penalty of sanctions. There can be little dispute, therefore, that defendants' counsel was acting in an authorized capacity when making the assertion.").

### D.    Materials from the *Baron* Case Are Admissible

As described above, defendants curiously state that "there is no evidence in the record that Sheriff Cabral was aware of this purported practice of retaliation," notwithstanding the several pages of deposition testimony where Ms. Cabral described her detailed knowledge of the *Baron* case. *See* Cabral dep., pp. 304-310. The Complaint, docket and verdict form in the *Baron* case are not being offered for their truth, but rather to show that Ms. Cabral was aware of Mr. Baron's allegations and the jury verdict in his favor. This goes directly to Mrs. Porter's deliberate indifference claim against Ms. Cabral and her claim for municipal liability. In addition, the evidence is being introduced to show timing: a jury found the SCSD liable for retaliating against Mr. Baron and violating his civil rights days before Mrs. Porter was barred, and the SCSD moved for a new trial immediately after the barring. Because these materials are not being offered for the truth of the matter asserted, they do not violate the hearsay rule.[10]

### E.    Materials from the *Feliz* Case are Admissible

Finally, the *Feliz* materials are admissible as well. The *Feliz* deposition is admissible as former testimony under Fed. R. Evid. 804(b)(1). This rule states as follows:

> Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with

---

[10] Mrs. Porter has withdrawn the *Boston Globe* article on the *Baron* verdict from the exhibit list.

15

>law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

*See U.S. v. Fraza*, 106 F.3d 1050, 1054 (1st Cir. 1997) (admitting prior deposition testimony). Here, Ms. Feliz gave a deposition in her MCAD proceeding against the SCSD. While Ms. Feliz is not a party to this case, her allegations, like Mrs. Porter's, involved unlawful retaliation against her for reporting the misconduct of corrections officers. Clearly the SCSD had an opportunity to and similar motive to, and indeed did, develop her testimony by cross-examination during this deposition. In addition, Ms. Feliz is unavailable to testify at trial, a requirement under Rule 804, because she is out of the country for the month of January visiting her family. *See* Declaration of David S. Schumacher attached hereto as Exhibit E. Thus, the Feliz deposition is admissible as an exception to the hearsay rule under Rule 804(b)(1).

Even if it was not admissible as an exception to the hearsay rule, the Feliz deposition, as well as her Verified Complaint, are admissible to show that Ms. Cabral's knowledge of her allegations of retaliation, as described above.

## **CONCLUSION**

For the foregoing reasons, Mrs. Porter requests that the Court deny Defendants' Motion *in Limine* to Exclude Evidence of Alleged Negative Conduct of the Prior Administration in its entirety.

                            Respectfully submitted,

                            SHEILA PORTER

                            By her attorneys,

                            */s/ Joseph F. Savage, Jr.*
                            Joseph F. Savage Jr. (BBO # 443030)
                            David S. Schumacher (BBO # 647917)
                            GOODWIN PROCTER LLP
                            Exchange Place
                            Boston, MA  02109
                            (617) 570-1000

Dated: January 3, 2006