# EXHIBIT A

```
                                    1
                    VOL:  I
                    PAGES: 1-118
                    EXHIBITS: 1-4


          UNITED STATES DISTRICT COURT

        FOR THE DISTRICT OF MASSACHUSETTS


* * * * * * * * * * * * * * *
SHEILA J. PORTER,            *
            Plaintiff        *
   -vs-                      *  Civil Action
ANDREA CABRAL; SUFFOLK COUNTY*  No. 04-11935-DPW
SHERIFF'S DEPARTMENT; SUFFOLK*
COUNTY and CORRECTIONAL MEDICAL*
SERVICES, INC.,              *
            Defendants       *
* * * * * * * * * * * * * * *


CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER


    DEPOSITION OF MARY ELLEN MASTRORILLI, a witness
called on behalf of the Plaintiff, in the
above-captioned matter, said deposition being
taken pursuant to the Federal Rules of
Civil Procedure, before Patricia M.
McLaughlin, a Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the offices of Goodwin Procter
LLP, Exchange Place, Boston, Massachusetts, on
Monday, June 27, 2005, commencing at 10:05 a.m.



         McLAUGHLIN & ASSOCIATES COURT REPORTERS
              92 DEVIR STREET, SUITE 304
              MALDEN, MASSACHUSETTS 02148
                    781.321.8922
                WWW.E-STENOGRAPHER.COM
```

```
                                    2
APPEARANCES:

JOSEPH F. SAVAGE, JR., ESQUIRE

     and

DAVID S. SCHUMACHER, ESQUIRE

GOODWIN PROCTER LLP

Exchange Place

Boston, Massachusetts  02109

    On behalf of the Plaintiff

ELLEN CAULO, ESQUIRE

GENERAL COUNSEL

Suffolk County Sheriff's Department

200 Nashua Street

Boston, Massachusetts  02114

    On behalf of the Defendants,

    Andrea Cabral, Suffolk County

    Sheriff's Department and Suffolk

    County

ALEXANDRA B. HARVEY, ESQUIRE

ADLER, COHEN, HARVEY, WAKEMAN & GUEKGUEZIAN

230 Congress Street

Boston, Massachusetts  02110

    On behalf of the Defendant,

    Correctional Medical Services, Inc.
```

```
                                    3
THOMAS R. KILEY, ESQUIRE

COSGROVE, EISENBERG & KILEY, P.C.

One International Place, 18th Floor

Boston, Massachusetts  02110

    On behalf of the Deponent
```

```
                                    4
              I N D E X

WITNESS            DIRECT  CROSS  REDIRECT  RECROSS

MARY ELLEN MASTRORILLI

By Mr. Savage         6

By Ms. Caulo                 46

By Ms. Harvey                         109
```

**Page 37**

Q And the document you have in front of you appears to be a document dated October 1, 2001?
A That's right.
Q Is it your understanding that these have been periodically revised?
A They are normally revised annually.
Q Is it your best memory as you sit here today that C1 and 2A is the same in substance here as to what you conveyed to Miss Porter on June 10th of 2003?
A Yes, it is.
Q And there is nothing in C1 or 2A that specifically refers to medical information, is there?
A No, there is not.
Q So the particular policy infraction that you were flagging was the sharing of confidential information generally?
A Yes.
Q And that was based on your conversation with Miss Keeley?
   MS. CAULO: Objection.
A Yes.

**Page 38**

Q At that point had anyone at the Suffolk County Sheriff's Department told you that Miss Porter had had previous circumstances where she was called upon to share information with the FBI?
A No.
Q And if you had known that, would that have changed your view as to whether she should have been barred?
   MS. CAULO: Objection.
A Yes, it would have.
Q In what way would it have changed your view?
A I believe I would have questioned the barring.
Q To determine whether people at the Suffolk County Sheriff's Office had known about her previous activities?
A That and also the appropriateness of barring someone who is working with law enforcement.
Q Were there any circumstances surrounding either the timing or form of Miss Porter's report to you of the Rene Rosario observations that she made that would have justified in your mind barring her?

**Page 39**

A No.
Q In your experience supervising the medical unit are you aware of whether circumstances surrounding the timing or form of reports would be of sufficient seriousness to warrant barring someone?
A No.
Q What's, in your experience, the typical sanction if there is a problem with either the form of a report or the timeliness of a report?
   MS. CAULO: Objection.
A I supposed taking an employee's entire work history into account it could range from a verbal warning up to and including discipline, termination.
Q Whose decision is that?
A Depending on the severity of the sanction, it could be the immediate supervisor or it could go as high as the Sheriff in the case of termination or barring.
Q After you had your meeting with Miss Porter, did you communicate to anyone that you had had that meeting?

**Page 40**

A I know that I communicated it -- Sheila left at about 5 p.m. that evening, and I communicated it in writing to the lobby officer so that the lobby officer would be aware. I believe I communicated it to the Chief of Staff. That normally would happen in the sense that when an employee or a contract employee is barred, that's a pretty significant event. I probably would have communicated it to my superiors, as well as to the shift commander and the lobby officer.
Q And did you create a written document reflecting the barring?
A Yes, I did.
Q What was that document?
A That was a memo to the lobby officers, the lobby staff, indicating that effective this date Sheila Porter would be barred until further notice, barred from entering the facility.
Q And do you have a memory of communicating with either Mr. Bradley or Miss Keeley after the fact?
A I don't have a specific memory of that,

**Page 81**

realize that one of our contract vendors contacted the FBI on a confidential report about suspicious bruising?" I didn't tell him. I was still waiting for the report to tell him. He was the one that had called me two days after Donna had informed me.

Q I'm asking you: Did you tell Viktor Theiss in this phone conversation that you said you had with him on May 22nd that Donna Jurdak said that Sheila Porter had observed suspicious bruisings on Inmate Rene Rosario after she had conducted a routine medical examination? Did you tell him that? Without looking at the document, did you tell Viktor Theiss that?

A I don't recall. I may have, because I had information, and it was certainly not information I would have kept from him.

Q Why was it information that you would not have kept him from him? Was there some significance to the information that you received from Miss Jurdak?

MR. SAVAGE: Objection.

A Yes.

**Page 82**

Q What was that significance?

A The significance was that suspicious bruising had been reported.

Q Do you have a memory of communicating this significant information to Mr. Theiss?

A I don't recall it specifically, but I may have. I certainly would not have kept it from him. My intention was to get the report from Sheila and give it to him. So I have no reason not to tell him. I was waiting for the report in order to give it to him. So I'm thinking I must have told him, but I don't have an explicit recollection of telling him.

Q Why would you need the report before telling Mr. Theiss in his capacity as Deputy Superintendent of the Sheriff's Investigation Division about the significant information that you had in your possession?

MR. SAVAGE: Objection.
MR. KILEY: Objection. Argumentative. You may answer.

A I wouldn't have kept it from him. I think that he may have indicated to me that he

**Page 83**

already knew, and we have this thing in corrections where, unless it's written down, it didn't happen. So I know I was waiting on that report to formally give to him. I'm thinking that we must have talked about it in this conversation, because I think that's why he called me.

Q It's not reflected in your memorandum of May 23rd, 2003; is that fair?

A Right.

Q There is nothing in there that reflects you're advising Mr. Theiss of the information you received from Miss Jurdak concerning Miss Porter's observations?

MR. KILEY: That's a question.

A Yeah, it looks like the FBI informed him of the suspicious bruising.

Q I'm not asking you what it looks like in terms of the FBI. There is nothing in Paragraph 2 or the first paragraph that would reflect that you had, in fact, provided the information that you received from Donna Jurdak to Viktor Theiss?

MR. SAVAGE: Objection.

**Page 84**

A Right, right. Yes.

Q In your mind, why did you say to Viktor, "I don't know how you feel about it, but I think it is highly inappropriate for a contract employee to contact the FBI about a Suffolk County inmate without our knowledge"?

MR. SAVAGE: Objection.

Q Why did you say that to Viktor?

A Because it's -- my understanding, it was circumventing an already established protocol, where if there is suspicious bruising, suspicious injury, anything of that nature, we have an established protocol inside the correctional institution to deal with those things. So to circumvent the established internal protocol and go to an outside agency is considered in corrections a clear violation.

Q Where is this established protocol?

A It's a correctional convention that you exhaust your internal remedies first before going to an outside agency. I mean, that's always been my understanding, and I believe the 8220 policy speaks a little bit about

**Page 85**

1  divulging information to an outside agency
2  without authorization.
3  Q  Was that of concern to you?
4  A  Yes, it was.
5  Q  Why was that of concern to you?
6  A  I think it's important for any correctional
7     agency to be given an opportunity to
8     investigate its own matters before going to
9     an outside agency.
10 Q  Directing your attention to the third
11    sentence of that second paragraph, "I
12    contacted Viktor and he told me that the FBI
13    told him they received a confidential report
14    from a woman named Sheila Porter."
15    Did I read that correctly?
16 A  Yes?
17 Q  "He said the FBI told him the report
18    contained information describing regarding
19    bruises on Inmate Rosario's body specifically
20    on the arms and in the neck and the chest
21    areas."
22    Did I read that correctly?
23 A  Yes, yes.
24 Q  Did you inform Viktor that the information

**Page 86**

1  that you had was that it was substantial
2  bruising on Mr. Rosario's arms?
3  A  I don't recall specifically whether I told
4     him that. I'm thinking I must have, because
5     my intention was to keep him informed with
6     this information, so I'm thinking I must
7     have. I don't have a specific recollection.
8  Q  Prior to May 22nd, had you had any
9     communication with Mr. Theiss concerning the
10    information that you had received from
11    Miss Jurdak?
12 A  I don't recall, no.
13 Q  The memorandum that is Exhibit No. 2
14    indicates that you said, "I then said I would
15    bar her from entering right now." Is that
16    what you wrote?
17 A  Yes, yes.
18 Q  Did you feel that Miss Porter in your mind
19    should be barred from what you understood had
20    happened?
21 A  From what I understood at that time, yes.
22 Q  You didn't have the authority to bar her?
23 A  That's right.
24 Q  Mr. Theiss didn't recommend to you that she

**Page 87**

1  be barred, correct?
2  A  Right.
3  Q  In fact, he told you not to do anything; is
4     that correct?
5  A  Yes.
6  Q  Did you write this memorandum on a computer
7     at work, Miss Mastrorilli?
8  A  Yes, I did.
9  Q  When I say this, Exhibit No. 2. Which
10    computer was that written on?
11 A  The computer that was in my office that was
12    the area that wasn't far from the visiting
13    room. I forget the exact room number, but
14    there was a computer in my office -- no, no,
15    I wrote it downstairs. I'm getting that job
16    mixed up with my other job. I wrote it
17    downstairs on my computer, where there was a
18    whole collection of offices. There was the
19    classification office, security office, SID
20    office. There were a number of us, records,
21    there were a number of us that were housed in
22    that area. My office was in that area, and I
23    did have a computer in that office, yes.
24 Q  Which floor, which building?

**Page 88**

1  A  I believe it's called Building 1, and it's
2     the first floor. When you enter the
3     facility, it was next to the shift
4     commander's office.
5  Q  And you had your own office in that area?
6  A  Yes, I did.
7  Q  Who had access to your office?
8  A  There were some keys that, I think, were
9     accessible obviously to the key control
10    officer. I can't remember if another Deputy
11    Superintendent had a key to my office. For
12    the most part, those keys were pretty tightly
13    controlled, but I know that the key control
14    officer and possibly the Deputy
15    Superintendent for security and operations
16    may have had a key to the office as well.
17 Q  Did you share that office with anyone?
18 A  No.
19 Q  Who was your secretary at the time in May or
20    June of 2003?
21 A  Well, I didn't have a personal secretary.
22    There was a woman by the name of Karen
23    Campbell who sat outside these offices, and
24    she would kind of work as the administrative

# EXHIBIT B

## PRESS STATEMENT

The Suffolk County Sheriff's Department issues the following statement in response to the allegations made by a former contract worker in a Boston Globe story.

1. The Sheriff's Department did not fire Ms. Porter. She was employed by Correctional Medical Services and was fired by them for reasons that are known to Ms. Porter and CMS.
2. Ms. Porter was asked to leave the House of Correction because she violated Department regulations and contractual obligations. She is clearly biased and has her own agenda for speaking out at this time.
3. Sheriff Cabral's administration has worked cooperatively and effectively with local, state, and federal authorities on a number of investigations and continues to do so. It would be inappropriate for the Department to comment on any pending investigations.
4. Since November 2002, the Sheriff's Department has thoroughly investigated every complaint filed by an inmate, and has proactively investigated wrongdoing by officers that has resulted in 34 officers being terminated and dozens disciplined.
5. Sheriff Cabral has addressed and remedied the concerns raised in the Stern Commission report. She has installed video recording on cameras throughout the HOC, established an off site training academy that to date has trained 70 new correctional officers, expanded the training curriculum and conducted specialized training for over 200 veteran officers. The Department also successfully partnered with Boston Police and the Secret Service during the recent DNC.

Contact Director of Communications
Steve Tompkins
617-828-5134

000991