# EXHIBIT A

PORTER V. CABRAL, ET AL    DEPOSITION OF GERARD HORGAN

---

VOL: I
PAGES: 1-172
EXHIBITS: 1-4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * *
SHEILA J. PORTER,
       Plaintiff
    -vs-                                    Civil Action
ANDREA CABRAL; SUFFOLK COUNTY         No. 04-11935-DPW
SHERIFF'S DEPARTMENT; SUFFOLK
COUNTY and CORRECTIONAL MEDICAL
SERVICES, INC.,
       Defendants
* * * * * * * * * * * * * * * *

DEPOSITION OF GERARD HORGAN, a witness called on behalf of the Plaintiff, in the above-captioned matter, said deposition being taken pursuant to the Federal Rules of Civil Procedure, before Patricia M. McLaughlin, a Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Goodwin Procter LLP, Exchange Place, Boston, Massachusetts, on Friday, May 13, 2005, commencing at 10:05 a.m.

McLAUGHLIN & ASSOCIATES COURT REPORTERS
92 DEVIR STREET, SUITE 304
MALDEN, MASSACHUSETTS 02148
781.321.8922
WWW.E-STENOGRAPHER.COM

---

Page 2

APPEARANCES:

DAVID S. SCHUMACHER, ESQUIRE
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109
   On behalf of the Plaintiff

ELLEN CAULO, ESQUIRE
GENERAL COUNSEL
Suffolk County Sheriff's Department
200 Nashua Street
Boston, Massachusetts 02114
   On behalf of the Defendants,
   Andrea Cabral, Suffolk County
   Sheriff's Department and Suffolk
   County

ALEXANDRA B. HARVEY, ESQUIRE
ADLER, COHEN, HARVEY, WAKEMAN & GUEKGUEZIAN
230 Congress Street
Boston, Massachusetts 02110
   On behalf of the Defendant,
   Correctional Medical Services, Inc.

---

Page 3

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GERARD HORGAN | | | | |
| By Mr. Schumacher | 5 | | | |
| By Ms. Harvey | | 170 | | |

---

Page 4

| No. | Exhibit | Page |
|---|---|---|
| 1 | Amended Notice of Taking Deposition | 7 |
| 2 | Policy S220 | 94 |
| 3 | Memorandum, dated June 4, 2003 | 104 |
| 4 | Revised Policy S220 | 110 |

13

1  spreadsheet?
2  A  Yes.
3  Q  I think you said you spoke to individuals
4     with personal knowledge on the facts
5     underlying Mrs. Porter's claims?
6  A  Yes.
7  Q  Who did you speak to?
8  A  I spoke to former Special Sheriff Patrick
9     Bradley. I spoke Superintendent Viktor
10    Theiss. I spoke to Assistant Deputy
11    Superintendent Neville Arthur. I spoke to
12    Chief of Staff Elizabeth Keeley. I spoke to
13    Department Investigator Stan Wotjonski,
14    Deputy Superintendent Steven Jacobs.
15       And I believe that's it.
16 Q  What did you speak to Mr. Bradley about?
17 A  I asked Pat if he recalled the situation that
18    led to the barring of Sheila Porter and his
19    involvement in that decision.
20 Q  And what did he say about that?
21 A  He remembered the situation. He indicated
22    that Mary Ellen Mastrorilli had approached
23    him and said that there was some concern with
24    the situation -- can I say the inmate's name?

14

1  Q  Yes, there is a protective order in place, so
2     it won't go beyond the attorneys or the
3     parties in this case.
4  A  There was a situation regarding a former
5     inmate, Rene Rosario. There was concern
6     about some medical treatment that had been
7     provided and the lack of documentation.
8     Mary Ellen indicated that she was going to
9     handle the situation.
10       Pat then indicated to me that Elizabeth
11    Keeley and Mary Ellen took it from there and
12    he was pretty much kept out of the loop
13    after.
14 Q  Was it your understanding that Mr. Bradley's
15    only personal knowledge of this case came
16    from his conversation with Miss Mastrorilli?
17 A  Yes.
18 Q  What did you speak to Mr. Theiss about?
19 A  I asked Superintendent Theiss if he was
20    familiar with the Sheila Porter situation,
21    which he was. I asked him if he knew -- I
22    asked him specifically if he knew that she
23    was an informant for the FBI and, if so,
24    what.

15

1  Q  What did he say?
2  A  He said that he understood that Sheila had
3     some involvement with the FBI. He didn't use
4     the word, informant. He said it was after
5     the fact that she was barred.
6  Q  I'm sorry. What was after the fact that she
7     was barred?
8  A  His knowledge came after the fact.
9  Q  So he don't know prior to Miss Porter's
10    barring that Miss Porter had communications
11    with the FBI?
12 A  No.
13 Q  Is it Neville Arthur?
14 A  Yes.
15 Q  What's his position? Is it a he?
16 A  It's a he. Neville is currently the Deputy
17    Superintendent, the No. 2 person in SID. At
18    the time, going back to 2003, he was an
19    investigator. He's been with the department
20    for a good amount of time. He indicated to
21    me -- and I spoke to Neville as well.
22 Q  What did you talk about with Neville?
23 A  I asked Neville if he remembered the
24    Sheila Porter/Rene Rosario situation. He

16

1  indicated that he did. I asked him what was
2  the extent of the knowledge and that if he
3  knew there was FBI involvement with
4  Sheila Porter regarding that situation.
5  Q  How did he respond?
6  A  He indicated to me that he had a conversation
7     with an FBI agent. He estimated it was
8     sometime in the year, 2002, in which -- I
9     believe it was one of two FBI agents. He
10    wasn't sure which one it was. They indicated
11    to him -- one of them indicated to him --
12    that Sheila was someone that they could
13    trust, and they asked him to remain
14    confidential about it.
15 Q  In June, 2003, what was Mr. Arthur's
16    position?
17 A  He was an investigator with SID.
18 Q  Was he involved in the investigation into
19    Inmate Rosario's allegations?
20 A  I'm not sure. Rosario had more than one
21    series of allegations. He was involved in
22    some of them, but I'm not sure if he was
23    involved in this one specifically.
24 Q  Was your purpose in speaking to Mr. Arthur to

Page 21

1  else?
2  A  No. We talked about her meeting with
3     Mary Ellen and that -- we talked about the
4     Porter matter, the Sheila Porter matter.
5     Sorry, Sheila. That she had a meeting with
6     Mary Ellen, where she instructed Mary Ellen
7     Mastrorilli to bar Sheila Porter, gave her
8     the reasons why.
9        Elizabeth said she gave her the laundry
10    list that I just discussed. It was her
11    feeling that Mary Ellen only talked about one
12    of those things and not all of them in the
13    meeting.
14 Q  Did she tell you how she knew that Mary Ellen
15    only talked about one of those reasons in the
16    meeting?
17 A  No.
18 Q  Did she tell you how many meetings or
19    conversations she had with Mary Ellen about
20    the Porter matter?
21 A  I believe it was two, one when Mary Ellen
22    told her about on it -- I'm sorry. It would
23    have been three. The first one would have
24    been when Mary Ellen told her about it. The

Page 22

1     second one would have been after the chief
2     had spoken with the Sheriff and the decision
3     was made to bar Miss Porter and communicated
4     that to Mary Ellen. The third would have
5     been when Mary Ellen called Elizabeth back
6     and indicated that Sheila was asking why and
7     what could she tell her.
8  Q  Did she tell you if she had a subsequent
9     conversation with Miss Mastrorilli that
10    justified her belief that only one of those
11    reasons was communicated to Miss Porter?
12       MS. CAULO: Objection.
13 A  No.
14 Q  So you don't know what she based that belief
15    on?
16 A  No.
17 Q  What did you talk to Mr. Wotjonski about?
18 A  I'll call him Stan. I asked Stan if he was
19    familiar with the Porter matter. He
20    indicated he had some knowledge of it. I
21    asked him if he was familiar with the fact
22    that Sheila had some interactions with the
23    FBI and, if so, when did he know it. He
24    indicated that he did not know that she had

Page 23

1     any interactions with the FBI until after
2     this -- until after the barring had taken
3     place.
4  Q  So Stan told you that he had no idea that
5     Miss Porter had been talking to the FBI until
6     after she was barred?
7  A  Yes.
8  Q  At any time?
9  A  At any time.
10 Q  I believe the last person you mentioned was
11    Mr. Jacobs that you spoke with?
12 A  Yes.
13 Q  What did you speak with him about?
14 A  I asked him if he had any knowledge of the
15    Sheila Porter situation. He indicated that
16    he had a general knowledge about it. I asked
17    him if he knew that she was involved with the
18    FBI and, if so, when. He said that he did
19    not know until after the fact, after the fact
20    that she was barred.
21 Q  Why did you determine to speak with
22    Mr. Jacobs?
23 A  He was the No. 2 person in SID at the time in
24    2003.

Page 24

1  Q  He said he had a general understanding of the
2     Porter matter, if you will?
3  A  Yes.
4  Q  Did he have a direct role in the
5     investigation in any way?
6        MS. CAULO: Objection. Beyond the
7     scope. You may answer.
8  A  I'm not sure if he did or not.
9  Q  Did you speak with Sheriff Cabral?
10 A  No.
11 Q  Why not?
12 A  I thought she was coming in to testify. From
13    my perspective, I think talking to the chief
14    answered the questions that I had.
15 Q  Do you have an understanding about who made
16    the decision to bar Miss Porter?
17       MS. CAULO: Objection. Beyond the
18    scope.
19 A  Yes.
20 Q  Who was that?
21 A  Ultimately, it was Sheriff Cabral.
22 Q  But you thought it was sufficient to talk to
23    the list of people you told me to determine
24    everything you needed to know about this; is

61

1  to provide us with a report on the alleged
2  wrongdoings; and that the fact that
3  Inmate Rosario was telling people that
4  Sheila Porter was an informant, it was
5  concern for her safety as well.
6  Q  Any other reasons why Miss Porter was barred?
7     MS. CAULO: Objection.
8  A  Those are the reasons that I believe are the
9     reasons why.
10 Q  The fact that Miss Porter provided
11    confidential information to individuals
12    outside of the House of Corrections, was that
13    a reason she was barred?
14    MS. CAULO: Objection. Beyond the
15    scope?
16 A  I would say if she provided confidential
17    information to them and to us, we wouldn't be
18    here today.
19 Q  What do you mean by that?
20    MS. CAULO: Objection. Beyond the
21    scope.
22 A  If she had allowed us an opportunity to
23    investigate it, I don't believe she would
24    have been barred.

62

1  Q  Providing confidential information to
2     individuals outside of the department, was
3     that a reason she was barred?
4     MS. CAULO: Objection. Beyond the
5     scope.
6  A  The way you put it, no. If she had provided
7     it along with providing us, then yes. The
8     fact that she did not let us know was the
9     reason why.
10 Q  Is that another reason, because you gave me
11    four reasons, and the fact that she didn't
12    allow the department to investigate, where
13    did that fall in your four reasons?
14 A  The failure to report.
15 Q  This was No. 3, which was refusing an order
16    to provide a report?
17    MS. CAULO: Objection.
18 A  Yes.
19 Q  The fact that she provided confidential
20    information to individuals outside of the
21    House of Corrections, in and of itself, was
22    that a reason for her barring?
23    MS. CAULO: Objection. David, I want to
24    go on the record specifically here.

63

1  Sheriff Cabral was designated as a 30(b)(6)
2  person. She testified. She also testified
3  in her own right as to the reasons that she
4  articulated for the barring of Miss Porter.
5     Superintendent Horgan has indicated that
6  he has no personal knowledge about the
7  barring. He has not been designated to
8  testify about it. He was not involved in
9  that decision.
10    MR. SCHUMACHER: I'll just say, Ellen,
11 we're just getting numerous different stories
12 as to why Sheila Porter was barred, and we
13 have got the Superintendent of the House of
14 Corrections here today. He's allowed to
15 testify as to what he knew in that respect.
16    MS. CAULO: No, David, what he's allowed
17 to testify is he's been designated to
18 represent the department and the county on
19 the topics that you have identified subject
20 of clarification conversation that you and I
21 had. This is not one of those topics.
22    He has indicated that he has no personal
23 knowledge; he was not involved.
24    MR. SCHUMACHER: He's superintendent of

64

1  the House of Corrections.
2     MS. CAULO: He was not at the time.
3     MR. SCHUMACHER: He's the voice of the
4  House of Corrections, and he can certainly
5  provide his understanding as to why an
6  individual who was working in the House of
7  Corrections was barred.
8     MS. CAULO: No, David. He's been
9  designated as a representative pursuant to
10 30(b)(6) to talk about specific topics that
11 you and I have agreed to. This is not one of
12 them. He was not superintendent of the House
13 of Correction at the time, just so the record
14 is clear.
15    I would like this deposition to be
16 designated as confidential.
17    MR. SCHUMACHER: That's your
18 designation, and we are considering whether
19 we are going to challenge it.
20 BY MR. SCHUMACHER:
21 Q  The reason that you just provided to me as to
22    your understanding as to why Mrs. Porter was
23    barred, what's that based on?
24 A  The conversation with Chief Keeley.