**Exhibit A**

00001

1                          VOL: 1
                      PAGES: 1-201
2                     EXHIBITS: 1-7

3

4        UNITED STATES DISTRICT COURT

5        FOR THE DISTRICT OF MASSACHUSETTS

6

7  * * * * * * * * * * * * * * * * *
   SHEILA J. PORTER,            *
8          Plaintiff      *
      -vs-              * Civil Action
9  ANDREA CABRAL; SUFFOLK COUNTY  * No. 04-11935-DPW
   SHERIFF'S DEPARTMENT; SUFFOLK   *
10 COUNTY and CORRECTIONAL MEDICAL *
   SERVICES, INC.,           *
11         Defendants      *
   * * * * * * * * * * * * * * * * *
12

13

14
     DEPOSITION OF ANDREA CABRAL, ESQUIRE, a witness
15 called on behalf of the Plaintiff, in the
   above-captioned matter, said deposition being
16 taken pursuant to the Federal Rules of
   Civil Procedure, before Patricia M.
17 McLaughlin, a Certified Shorthand Reporter and
   Notary Public in and for the Commonwealth of
18 Massachusetts, at the offices of Goodwin Procter
   LLP, Exchange Place, Boston, Massachusetts, on
19 Friday, May 6, 2005, commencing at 9:40 a.m.

20

21
     McLAUGHLIN & ASSOCIATES COURT REPORTERS
22       92 DEVIR STREET, SUITE 304
     MALDEN, MASSACHUSETTS  02148
23         781.321.8922
     WWW.E-STENOGRAPHER.COM
24

**Cabral, Andrea 05/09/05**                    **Page 1**

00002

1  APPEARANCES:

2  JOSEPH F. SAVAGE, JR., ESQUIRE

3      and

4  DAVID S. SCHUMACHER, ESQUIRE

5  GOODWIN PROCTER LLP

6  Exchange Place

7  Boston, Massachusetts  02109

8      On behalf of the Plaintiff

9  ELLEN CAULO, ESQUIRE

10  GENERAL COUNSEL

11  Suffolk County Sheriff's Department

12  200 Nashua Street

13  Boston, Massachusetts  02114

14     On behalf of the Defendants,

15     Andrea Cabral, Suffolk County

16     Sheriff's Department and Suffolk

17     County

18  ALEXANDRA B. HARVEY, ESQUIRE

19  ADLER, COHEN, HARVEY, WAKEMAN & GUEKGUEZIAN

20  230 Congress Street

21  Boston, Massachusetts  02110

22     On behalf of the Defendant,

23     Correctional Medical Services, Inc.

24

**Cabral, Andrea 05/09/05**                    **Page 2**

00033

1       MS. CAULO:  S220 as of yesterday, I

2    believe has just been disseminated.  Off the

3    record.

4       (Discussion held off the record.)

5    BY MR. SAVAGE:

6  Q   In sum and substance, there is a new policy

7    that either has been or is about to be

8    release that addresses the topic we have been

9    discussing, which is cooperation with the

10    FBI?

11  A   What it does is it clarifies, to the extent

12    that anyone felt clarification was needed,

13    that involvement or cooperation with other

14    law enforcement agencies -- it's not

15    particular to the FBI -- that employees can

16    or may cooperate or provide information.

17  Q   Why the policy change?

18  A   That came as a direct result of suggestions

19    made by Assistant U.S. Attorney Steve

20    Huggard.

21  Q   When did you have a conversation or

22    conversations or writings with Mr. Huggard on

23    this topic?

24  A   I have never had conversations or writings

00034

1    with him on this topic.

2  Q   Who has?

3  A   Walter Prince has.

4  Q   Who is Walter Prince?

5  A   He is the attorney who is representing me and

6     the department with regard to the Grand Jury

7     investigation.

8  Q   Your understanding is that Mr. Huggard has

9     communicated to Mr. Prince what the policy of

10    the Sheriff's Department ought to be on the

11    topic of cooperation with law enforcement?

12  A   My understanding is that Mr. Huggard --

13       MS. CAULO:  I object to anything that

14    might require you to discuss matters

15    protected by the attorney-client privilege.

16    You may answer.

17  A   My understanding is that Mr. Huggard over a

18    period of many, many months had conversations

19    with Walter Prince, making suggestions with

20    regard to clarification of the policy.

21  Q   And is it your view that the prior policy was

22    unclear?

23  A   No.

24  Q   What was the prior policy while you were

00046

1   Q   Which would be December?

2   A   That's my best recollection.

3   Q   Of '02?

4   A   Yes.

5   Q   And they were describing to you an incident

6     that had occurred in November, '02?

7   A   I actually don't recall when they said this

8     had happened.

9   Q   As best you can, what did Mr. DeMeo say to

10     you -- is it DeMeo?

11   A   Yes.

12   Q   What did Mr. DeMeo say to you and what did

13     you say to him on this topic of Rene

14     Rosario's cooperation and the role of anyone

15     else at the jail in the cooperation?

16   A   All I remember him telling me was the fact of

17     it, and I can't recall exactly -- I know that

18     there was some overall context about who knew

19     that it had happened versus who didn't.  I

20     sort of came away from the conversation

21     understanding that it had happened; that

22     there was either some miscommunication or

23     there were people who were not in the loop to

24     know that the inmate had been -- was wearing

**Cabral, Andrea 05/09/05**              **Page 46**

00047

1    a monitoring device. That was basically it.

2  Q   Who else was present for this meeting?

3  A   I don't recall exactly who else was in the

4    room. It's possible that Paul DeFazio was

5    there, but I'm not entirely sure.

6  Q   For lack of a better word, were any of your

7    people there, in other words, any of the new

8    staff that you had brought in accompanying

9    you?

10  A   I actually don't recall whether or not this

11    was a meeting that I had or whether or not I

12    had the chief of staff there or -- I know

13    that Victor Theiss wasn't there, because he

14    hadn't started there, but I don't recall

15    whether or not the chief of staff was there.

16  Q   Do you have any notes of that meeting?

17  A   No.

18  Q   Were there any written documents presented at

19    that meeting or referred to at the meeting?

20  A   I'm not positive. I think that he had

21    information from SID files on the cases that

22    he was talking to me about, but I don't think

23    he had a separate document prepared. I could

24    be incorrect about that. I just don't have a

**Cabral, Andrea 05/09/05**          **Page 47**

00068

1    conduct in connection with that.

2        MS. CAULO:  Objection to anything that

3    may be covered by attorney client.

4  Q   Other than writings to lawyers, have you had

5    any writings?

6  A   I don't believe so.

7  Q   This is just a yes or no and not content.

8    Have you had writings to lawyers on this

9    topic?

10 A   I'm sure I have.

11 Q   And other than your lawyer who is sitting

12   here today, have you written to other lawyers

13   on this topic?

14 A   Yes.

15 Q   And who are they?

16 A   Walter Prince.

17 Q   Anyone else?

18 A   No.

19 Q   Have you had any E-mail or other

20   documentary-type communication on this issue,

21   again outside of what you may have had with

22   lawyers?

23 A   No, not to my recollection.

24 Q   So no E-mails to Victor Theiss, to or from

**Cabral, Andrea 05/09/05**                          **Page 68**

00202

```
 1                    VOL:  II
                  PAGES: 202-397
 2                EXHIBITS:  8-12

 3

 4        UNITED STATES DISTRICT COURT

 5     FOR THE DISTRICT OF MASSACHUSETTS

 6

 7 * * * * * * * * * * * * * * * * *
   SHEILA J. PORTER,          *
 8         Plaintiff     *
      -vs-            * Civil Action
 9 ANDREA CABRAL; SUFFOLK COUNTY  * No. 04-11935-DPW
   SHERIFF'S DEPARTMENT; SUFFOLK   *
10 COUNTY and CORRECTIONAL MEDICAL *
   SERVICES, INC.,         *
11         Defendants   *
   * * * * * * * * * * * * * * * * *
12

13 CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

14
       CONTINUED DEPOSITION OF ANDREA CABRAL, ESQUIRE,
15 a witness called on behalf of the Plaintiff, in the
   above-captioned matter, said deposition being
16 taken pursuant to the Federal Rules of
   Civil Procedure, before Patricia M.
17 McLaughlin, a Certified Shorthand Reporter and
   Notary Public in and for the Commonwealth of
18 Massachusetts, at the offices of Goodwin Procter
   LLP, Exchange Place, Boston, Massachusetts, on
19 Friday, June 24, 2005, commencing at 10:10 a.m.

20

21
       McLAUGHLIN & ASSOCIATES COURT REPORTERS
22        92 DEVIR STREET, SUITE 304
          MALDEN, MASSACHUSETTS  02148
23            781.321.8922
          WWW.E-STENOGRAPHER.COM
24
```

**Cabral, Andrea 06/24/05**                    **Page 202**

00203

1  APPEARANCES:

2  JOSEPH F. SAVAGE, JR., ESQUIRE

3      and

4  DAVID S. SCHUMACHER, ESQUIRE

5  GOODWIN PROCTER LLP

6  Exchange Place

7  Boston, Massachusetts  02109

8      On behalf of the Plaintiff

9  ELLEN CAULO, ESQUIRE

10  GENERAL COUNSEL

11  Suffolk County Sheriff's Department

12  200 Nashua Street

13  Boston, Massachusetts  02114

14      On behalf of the Defendants,

15      Andrea Cabral, Suffolk County

16      Sheriff's Department and Suffolk

17      County

18  ALEXANDRA B. HARVEY, ESQUIRE

19  ADLER, COHEN, HARVEY, WAKEMAN & GUEKGUEZIAN

20  230 Congress Street

21  Boston, Massachusetts  02110

22      On behalf of the Defendant,

23      Correctional Medical Services, Inc.

24

00204

1  ALSO PRESENT:

2  SHEILA PORTER

3  JAMES SWEET, GOODWIN PROCTER LLP

4  DENNIS D'ANGELO, GOODWIN PROCTER LLP

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

00253

1     is captured in your memorandum of June 18th,

2     '03?

3  A   Fundamentally they remain the same.

4  Q   When you say fundamentally, are there ways in

5     which they are different today than they were

6     on June 18th of '03?

7  A   The investigation has progressed for two

8     years.  Privileged information indicates to

9     me that there are a number of additional

10    bases for my concern.

11  Q   Let me see if I understand that.  Privileged

12    information indicates to you?

13  A   Conversations that I have had with counsel.

14  Q   When you say counsel in that regard, is that

15    your counsel today or Walter Prince?

16  A   Walter Prince.

17  Q   Who does he represent?

18  A   He represents the Suffolk County Sheriff's

19    Department and the Suffolk County Sheriff.

20  Q   So he represents you personally and the

21    institution of the Suffolk County Sheriff's

22    Department?

23  A   He represents me in my capacity as the

24    Sheriff of Suffolk County.

00254

1  Q   In your capacity as Sheriff of Suffolk

2       County. Does that mean he represents you in

3       the context of a Grand Jury investigation of

4       your conduct?

5  A   To the extent that the Grand Jury

6       investigation involves my acting in my

7       capacity as Sheriff and exercising my

8       authority as Sheriff, making a decision in my

9       role as Sheriff, yes.

10 Q   To be sort of just very narrow about it, to

11      the extent there is a Grand Jury

12      investigation about any of your conduct that

13      may relate to Sheila Porter, Walter Prince

14      represents you in that regard?

15          MS. CAULO: Objection. Asked and

16      answered.

17 A   I'm not sure I understand your question.

18 Q   I'm just trying to figure out the

19      significance of the distinction that you're

20      making that he represents you in your

21      capacity as Sheriff of Suffolk County, given

22      that my understanding of a criminal

23      investigation would be that a human being is

24      either charged or not charged as opposed to

**Cabral, Andrea 06/24/05**                    **Page 254**

00255

1    an office being charged or not charged.

2  A    Right.  I understand the point that you're

3    making.  My position --

4        MS. CAULO:  Is there a question?

5        THE WITNESS:  What is the question?

6  Q    I'm not sure I know.  I'm trying to find out

7    what you're trying to convey to me with the

8    distinction that he is representing you in

9    your capacity as Sheriff of Suffolk County.

10        MS. CAULO:  Objection as to the entire

11    relevance of this line of questioning.

12        MR. SAVAGE:  That's okay.

13  A    Well, I certainly didn't have the authority

14    to bar Sheila Porter from the institution as

15    a private citizen.  I only had that in my

16    capacity as the Sheriff of Suffolk County.

17  Q    Are you aware of Walter Prince making various

18    communications on your behalf and on behalf

19    of the Sheriff's Department to the United

20    States Attorney's Office?

21        MS. CAULO:  Objection.

22  A    I think that's privileged.  What I'm aware of

23    would come from my conversations with him.

24  Q    Have you reviewed any correspondence that

**Cabral, Andrea 06/24/05**                    **Page 255**

00256

1    went from Mr. Prince on your behalf to the

2    United States Attorney's Office?

3       MS. CAULO:  Objection to the extent that

4    it requires the Sheriff to comment on matters

5    that are protected by the attorney-client

6    privilege.

7 Q  I'm being specific in the sense that they are

8    documents that were produced to us, so they

9    are obviously not privileged.  I want to

10    limit my question to those.

11 A  I'm aware that he's communicated with the

12    U.S. Attorney's Office.

13 Q  Have you read those communications?

14 A  I'm sure I have.

15 Q  Did you read them at the time they were made?

16 A  At or near the time that they were made.

17 Q  Those were made by Mr. Prince in his capacity

18    of representing you and the Suffolk County

19    Sheriff's Department?

20 A  They were made by Attorney Prince in the

21    capacity that I previously described.

22 Q  Continuing on in your memorandum, you

23    indicated that, "Sullivan stated that it" --

24    I believe that's referring to the

**Cabral, Andrea 06/24/05**           **Page 256**

00266

1  Q   What was that basis?

2  A   Shortly after I became Sheriff, I became

3      aware of an investigation involving an

4      officer who was suspected of trafficking

5      drugs into the institution. The officer had

6      been under investigation by the FBI for -- I

7      believe it was two years. I know it was

8      clearly over a year, but I believe it was

9      closer to two years. Nothing had come of the

10     investigation, and he had not been arrested.

11     And he had apparently continued to traffic

12     drugs into the institution.

13         The point at which I became Sheriff

14     there had already been a breakdown between

15     the FBI and the Sheriff's Department on the

16     investigation, because my understanding was

17     that the FBI wanted the Sheriff's Department

18     to allow this officer to actually bring drugs

19     into the facility, and Richie DiMeo, who was

20     chief of SID at the time, refused to do that

21     because of the potential danger that was

22     involved.

23         Maureen Robinson, who was the FBI agent

24     on the case, apparently had been very upset

**Cabral, Andrea 06/24/05**                    **Page 266**

00267

1    that the Sheriff's Department wouldn't allow

2    that to happen and had had, I guess, some

3    heated discussions with Richie DiMeo on it.

4        As a result, nothing had been done with the

5    investigation.

6        After I became Sheriff and once I

7    brought Viktor Theiss on board -- so it would

8    have to have been after February of 2003 -- I

9    wanted to get the investigation back on

10   track.  Viktor Theiss reached out to the FBI

11   and the U.S. Attorney's Office.  We resumed a

12   joint investigation.  I don't know how

13   involved SID was in the investigation

14   beforehand, but it began to be a joint

15   investigation at the point when Viktor Theiss

16   became involved.

17       SID, I know put in numerous hours of

18   work on the investigation, and to avoid

19   allowing this officer to bring drugs into the

20   institution, they had worked -- done some

21   good investigative work and had actually

22   discovered a witness in this officer circle

23   who they brought in, and she was going to be

24   willing to testify before the Grand Jury

**Cabral, Andrea 06/24/05**                    **Page 267**

00268

1    against this officer.

2        Without notifying SID or the Sheriff's

3    Department, AUSA Huggard, who was in charge

4    of the investigation, apparently authorized

5    the line AUSA to send this officer a target

6    letter, and we were stunned by the fact that

7    it was a unilateral action on his part,

8    extremely disappointed and angry, because we

9    felt that it not only compromized the

10    investigation, but it was unnecessary.  It

11    also endangered this witness.

12        We asked to have a meeting with the line

13    AUSA, the FBI agent and AUSA Huggard.  We had

14    that meeting, and at that meeting both Viktor

15    Theiss and I made our displeasure with

16    AUSA Huggard's decision very, very clear.  He

17    made it clear to us that he was not happy

18    with what we said.

19 Q   Beyond those circumstances of the

20    disagreement on the case you just described

21    and the conduct of the meeting on June 16th,

22    do you have any other basis to question

23    Mr. Huggard's objectivity?

24 A   Nothing that I can disclose without violating

00269

1    the privilege.

2  Q   What kind of privilege, something you have

3    learned from your lawyer?

4  A   Yes.

5  Q   So I understand which privilege is invoked

6    here at the moment, that's the conversations

7    you may have had with Mr. Prince?

8  A   Yes, and conversations I had with counsel

9    generally.  I wouldn't limit it to just

10    Attorney Prince.

11  Q   Do you have other lawyers beyond counsel who

12    is present here today and Mr. Prince as it

13    relates to the circumstances of Miss Porter

14    being barred?

15  A   No.

16       MR. SAVAGE:  Can we take a five-minute

17    break?

18       (Whereupon, a brief recess was held.)

19    BY MR. SAVAGE:

20  Q   Miss Cabral, Exhibit 8, did you complete

21    typing the document on June 18th, '03?

22  A   I believe so.  I'd have to check, but I

23    believe so.

24  Q   Do you have any memory of doing it on any

**Cabral, Andrea 06/24/05**                    **Page 269**

**Exhibit B**



SEP 2 9 2004

**U.S. Department of Justice**

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

September 28, 2005

Walter Prince, Esq.
Prince Lobel Glovsky & Tye, LLP
585 Commercial Street
Boston, MA 02109-1024

   Re:  Grand Jury Investigation

Dear Mr. Prince:

   I send this letter to inform you of the conclusion of the grand jury investigation regarding Sheriff Andrea Cabral's decision to bar nurse Sheila Porter from the Suffolk County House of Correction in June 2003.  This office has no current intention of seeking an indictment of Sheriff Cabral or the Suffolk County Sheriff's Department in this matter.

   Ordinarily, notification to counsel representing the subject of an investigation of the final decision on whether to present an indictment is made orally or in a brief letter, without substantial elaboration.  However, since it has become clear over the last several months that Sheriff Cabral's view is that this investigation has been motivated by some personal or political hostility toward her, a more detailed explanation of the course of our investigation and our decision is in order.

   There is little question that there was a substantial factual basis to initiate and vigorously pursue this investigation.  Indeed, the sole reason provided by the Suffolk County Sheriff's Department to Ms. Porter for her barring was that she disclosed information to the FBI.  If this matter were indicted, it is clear that the undisputed evidence presented at trial would show that all persons present at the barring, including Former Deputy Superintendent Mastrorilli, Ms. Jurdak and Ms. Porter, would uniformly testify that this was the only reason provided by Ms. Mastrorilli.  Frankly, if the Sheriff's Department was an entity which could be criminally prosecuted under 18 U.S.C. §1513(e), and were this office to make a decision that it was appropriate to pursue a criminal indictment of the institution for the conduct of one of its senior managers, we feel quite confident that a such a prosecution would be successful under the principles articulated in <u>United States v. Bank of New England</u>, 821 F.2d 844 (1st Cir. 1987).

CONFIDENTIAL

001656

This fact alone should dispel any notion that this investigation was improperly motivated.

Because the law does not permit prosecution of the Sheriff's Department, our investigation needed to determine on whose authority Ms. Mastrorilli told Ms. Porter that she was barred for speaking to the FBI. Reaching a conclusion on this issue has not been simple; indeed, statements made by your defense team, Sheriff Cabral, other members of her command staff, as well as actions taken by the Sheriff's Department, were the principal reason that completing this investigation and reaching a charging decision on this issue has taken more than two years.

First, Sheriff Cabral has made repeated claims that Ms. Porter's barring had nothing to do with Ms. Porter's communications with the FBI, notwithstanding the indisputable fact that this was the sole reason provided by the Sheriff's designated representative to Ms. Porter. Indeed, one would have expected the Sheriff's Department either to affirm the statements of its representative, or to acknowledge that those statements were made by the representative, but that they had been made in error and without authority. Your client chose to do neither, all the while publically criticizing Ms. Porter. This conduct by Sheriff Cabral gave rise to the reasonable inference that Ms. Porter had in fact been barred in retaliation for providing information to the FBI, and that the Sheriff's Department was simply circling the wagons in an effort to conceal this fact.

Second, if this matter were indicted and proceed to trial, we expect the evidence would reveal that there were substantial differences between Sheriff Cabral's statements regarding Ms. Porter's barring and those of other senior Sheriff Department employees. Given our concern regarding whether an intentional cover-up was in play, we had to evaluate whether the differences were the product of a criminal effort to obstruct the federal investigation, or were simply the result of differing, but honest, recollections. Those differences, too, necessitated a more in-depth investigation.

Third, the primary reasons offered by the Sheriff's Department for Ms. Porter's barring -- that she failed to properly report the allegations of inmate abuse to the Sheriff's Department in a timely manner and failed in her duties as a nurse to make a proper medical record -- had little basis in fact. Were this case to proceed to trial post-indictment, we believe we could readily establish that Ms. Porter reported the incident to her supervisor and co-workers a short time after the incident; that her supervisor immediately reported that information to her chain of command in the Sheriff's Department; and that this all occurred on the same day as the incident. Moreover, we could establish that the only person at the Suffolk County House of Correction qualified to render an opinion as to what information should be included in the medical file would indicate that Ms. Porter's decision not to document the information received from the inmate in the medical record was appropriate. Accordingly, we were faced with the fact that you and your client had asserted a position from the onset of our investigation which was directly contradicted by credible evidence. There is little question that had your client been more candid from the outset, and the evidence of conduct and intent by employees in the Sheriff's Department not been so confused and contradictory, and had corroborated her statements, our investigation would

have been concluded more rapidly.

In sum, we have concluded that the evidence that we have collected to date regarding whether Sheriff Cabral knowingly and willfully ordered Ms. Mastrorilli to bar Ms. Porter because she disclosed information to the FBI, neither exonerates Sheriff Cabral nor inculpates her with proof beyond a reasonable doubt. Indeed, we believe that your client or others in the top chain of command likely ordered other employees of the Sheriff's Department to bar Ms. Porter because she had disclosed information to the FBI. However, we have determined that it is an appropriate exercise of our discretion, given the burden of proof which we must meet at trial, not to seek an indictment of Ms. Cabral on such charges.

As noted above, the notion that this office acted with any improper motive is unfounded and is belied by the facts in this case. I made it clear to you from our first meeting last December that our aim was to find the truth with respect to this barring, and act in accordance with that evidence. We have acted with due care and caution in completing this investigation and we have reached what we believe is the appropriate decision based upon our review of the evidence collected to date. However, if new evidence comes to light or circumstances otherwise so warrant, this letter shall not preclude this office or a grand jury from reopening this matter.

Very truly yours,

MICHAEL J. SULLIVAN
United States Attorney

By:

JOHN T. MCNEIL
Assistant U.S. Attorney

cc. Michael J. Sullivan, United States Attorney
    Michael K. Loucks, First Assistant U.S. Attorney

CONFIDENTIAL

001658

# Exhibit C

WALTER B. PRINCE
Partner
wbprince@plgt.com
[617] 456.8003 Tel

Prince Lobel Glovsky & Tye LLP
Attorneys at Law

585 Commercial Street
Boston, MA 02109-1024
[617] 456.8000 Tel
[617] 456.8100 Fax
www.plgt.com

October 7, 2005

**By Hand Delivery**

John T. McNeil, Esq.
Assistant United States Attorney
Department of Justice
United States Attorney's Office
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210

Re:    <u>Sheila Porter Investigation</u>

Dear John:

Apart from the long-delayed notice of the appropriate decision by the US Attorney to close the grand jury investigation of my client, both the tone and content of your letter are deeply troubling. The issuance of such a defensive and caustic letter is highly unusual, in my experience as a former Assistant United States Attorney and as private counsel who represents clients before the federal criminal bar.

Far from dispelling the concern that this investigation was motivated by personal animus, political, or other improper impetus, your letter only reinforces my client's beliefs. You draw unwarranted conclusions from the evidence, you improperly vouch for the credibility of witnesses (including a civil litigant who is biased), and you cast unwarranted aspersions on the character and integrity of my client. It appears to be written for consumption and use by parties other than my client. Therefore, I cannot let it go unanswered.

Throughout this investigation, we have been extremely concerned about the connection and communication between your office and Sheila Porter's civil attorney, Joseph Savage. As you know, Sheila Porter testified in her civil deposition that she met with AUSA Huggard and FBI Agents Maureen Robinson and Christa Snyder on June 11, 2003, the day after she was barred. At that meeting, Porter was told that she had been illegally barred; that opinion represented an appalling rush to judgment, especially since there had been no communication with the Sheriff's Department to determine the credibility of Ms. Porter's version of the facts. Additionally, Porter was advised to seek an employment attorney. In addition to the clear impropriety of advising a potential witness to hire a civil attorney, it is clear that Porter would not have independently retained her current attorney, Joe Savage (who does not specialize or routinely practice in employment law), without the guidance of either the U.S. Attorney's office or the FBI. Joe Savage is a former Chief of the US Attorney's Public Corruption Bureau, and a friend of Steve Huggard (who initiated the grand jury investigation) who was Chief of the Public Corruption Bureau at the time. As



PRINCE . LOBEL . GLOVSKY & TYE LLP

CONFIDENTIAL                     001659

J. T. McNeil, Esq.
October 7, 2005
Page 2

your office has been provided my client's memo to file, dated June 18, 2003, and her subsequent letter to US Attorney Sullivan, dated July 22, 2003, you are aware of the meeting that took place at the US Attorney's Office on June 16, 2003. The meeting was represented by then First Assistant U.S. Attorney Gerry Leone to be for the purpose of introducing the new Special Agent in Charge, Kenneth Kaiser, and to discuss ways to improve the historically strained relationship between your office, the FBI, and the Sheriff's Department. No one from the Sheriff's department was told that the meeting would involve a discussion of her decision to bar Sheila Porter. Sheila Porter's barring immediately became the sole topic of conversation, and Sheriff Cabral was asked to justify the exercise of her authority. Despite being taken completely by surprise, she, Elizabeth Keeley, and Viktor Theiss remained at the meeting and explained why Porter had been barred.

During the meeting and *after* Sheriff Cabral and her staff had been questioned about the circumstances of Porter's barring, Chief of Public Corruption Steve Huggard announced that he had *already* targeted the Sheriff's Department for investigation. He apparently made this decision the day after Sheila Porter was barred, based only on her recitation of the facts. The decision to invite my client to a meeting without first informing her that either she or members of her staff were being investigated was clearly improper. This fact, Huggard's behavior, and the tone of the meeting were "shocking" to Sheriff Cabral, and she expressed her significant concerns in the memo, a telephone conversation with and subsequent letter to US Attorney Sullivan. She expressed a specific concern about Huggard's motivation, given a prior and unrelated interaction during which she had upbraided Huggard for his disruption of an investigation. She also reiterated what was explained during the meeting, namely that Porter was not barred in retaliation for speaking to the FBI.

The facts belie any reasonable belief that Sheriff Cabral or members of her staff attempted a cover-up of the true reasons for Porter's barring. My client did not know that Porter's barring would be the topic of discussion in the June 16 meeting. Porter's conduct with regard to the Rene Rosario allegation had been documented before the meeting and her reasons for barring Porter have not changed.

Further, the meeting that occurred between US Attorney Sullivan, Attorney Savage, Sheila Porter, AUSA Steve Huggard, and certain FBI Agents, *while the grand jury investigation was under way and after Attorney Savage had filed a civil lawsuit against Sheriff Cabral seeking money damages,* raises serious questions of impropriety. It is our understanding that Attorney Savage - while in the presence of his client, and acting in his capacity as private counsel to a civil litigant - was permitted in that meeting to vehemently advocate pursuit of my client on federal criminal charges.

We have always questioned why Sheriff Cabral was asked by AUSA Huggard in the grand jury if she felt she had "made any mistakes" in barring Sheila Porter. The issue of mistake has no relevance to 18 USC 1513(e), which is a specific intent crime. It can, however, be quite relevant in a civil lawsuit. Further, as a condition of "resolving the matter," Steve Huggard also informed me that Sheriff Cabral, in a meeting with the US

🖎 PRINCE . LOBEL . GLOVSKY & TYE ⌐

CONFIDENTIAL

001660

J. T. McNeil, Esq.
October 7, 2005
Page 3

Attorney and in the presence of an FBI agent who would be taking notes, would have to "be willing to admit that she made mistakes" in barring Sheila Porter.

Similar concerns were raised by your subpoena of Steve Tompkins, the Sheriff's Department spokesperson. He was not involved in Porter's barring in any way and was never so identified by any party. He was asked certain questions that were relevant only to Porter's civil claim for defamation. He was subsequently subpoenaed for a deposition in Porter's civil case and was asked the very same questions.

Strangely, while Steve Tompkins was subpoenaed to the grand jury, SID Investigator Stan Wojtkonski was not. As you know, Wojtkonski was the investigator to whom FBI Special Agent Christa Snyder first reported what the then unnamed source (Sheila Porter) told her about Rene Rosario's allegations. He immediately wrote a report of that discussion, which was part of the SID investigative file turned over to the US Attorney's Office. What Snyder recounted to Wojtkonski differs substantially from what Sheila Porter ultimately wrote and testified to. Wojtkonski's reports also detailed the Department's concern, from the very beginning, that the "source" identified as a medical staff member by Snyder, had not reported the information to SID. In fact, during a subsequent conversation with Agent Snyder, Investigator Wojtkonski assured her that "no staff member would be hindered from speaking with an outside agency, but that would not absolve the staff member of his or her responsibility to report incidents directly to the Sheriff's Department and SID." Investigator Wojtkonski wrote and filed a report regarding that conversation on the same day it occurred, May 23, 2003, which report was included in the investigative file provided to your office.

From the meeting at the US Attorney's Office on June 16, 2003 to the present, my client has been consistent regarding her reasons for barring Sheila Porter. Based upon information provided to me and my client, sometime in the fall of 2004, US Attorney Michael Sullivan acknowledged to a number of his assistants that he did not believe my client's conduct in barring Sheila Porter was criminal. Despite that, your office sought her testimony before the grand jury. (Indeed, it was the initial intention of your office that she be subpoenaed to testify on September 14th, 2004, the day of the primary election in the Sheriff's race.) Sheriff Cabral did voluntarily testify before the grand jury without the necessity of a subpoena. She also declined to assert her Fifth Amendment Rights to avoid being deposed in Sheila Porter's civil lawsuit. The Sheriff's Department provided every document sought by your office, whether informally requested or formally subpoenaed. At no time, did Sheriff Cabral or members of her Department seek to delay their responses or otherwise obstruct the grand jury process. In fact, Sheriff Cabral waived the attorney-client privilege between the Department and her General Counsel, Anne Powers, to facilitate Powers's testimony before the grand jury.

Your attempt to blame my client for the length of this investigation is just plain wrong, and perhaps understandable given your lack of responsibility for the case before being assigned to you. Your letter ignores the eight months between March and November of 2004, during which my client was led to believe that the way we could resolve the investigation and avoid subpoenas and grand jury testimony would be to change

PRINCE . LOBEL . GLOVSKY & TYE

CONFIDENTIAL

001661

J. T. McNeil, Esq.
October 7, 2005
Page 4

Department Policy S220.[1]  Through me, Sheriff Cabral promptly responded to your office's repeated requests for changes in the policy language.  AUSA Huggard insisted that the policy allow employees to avoid reporting alleged misconduct internally, despite the fact that such a rule would clearly violate the Code of Massachusetts Regulations.  When Sheriff Cabral drafted a revision of the policy that essentially mirrored some of the language in 1513(e), Huggard insisted that she delete the word "truthful" as a descriptor for the kind of information an employee could legitimately provide.  Huggard also disclosed that US Attorney Sullivan had involved himself personally in drafting of the revisions.  In the fall of 2004, with no explanation, your office abandoned all interest in the policy revisions and began to pursue my client's grand jury testimony in earnest.

For the record, the Suffolk County Sheriff's Department employee conduct policy was no different from the policies of other Sheriff's Departments in the Commonwealth or that of the Department of Correction.  All were drafted, as required, pursuant to the Code of Massachusetts Regulations.  Sheriff Cabral never felt that the policy warranted revision, but AUSA Huggard repeatedly made it clear that if she did not acquiesce to your office's demand, he would seek an indictment against her or members of her staff.  My client and certain members of her staff are former prosecutors.  They are well aware of the ease with which indictments can be returned, particularly given that the federal rules do not require presentment of exculpatory evidence to the grand jury.

Based upon Huggard's threat to indict (he repeatedly advised me that we were "running out of road" and "running out of real estate" in terms of our ability to make revisions sufficiently satisfactory to the US Attorney that would preclude indictment), I advised my client to make policy changes inconsistent with those found in other sheriff's departments and the Department of Correction.  No mention is made in your letter of any concern about the policy, and it is now clear that it played no real role in this matter, and was simply your office's unabashed use of its power to leverage the Sheriff's Department.

Further, had your office not issued target letters to certain personnel in January of 2004, I am certain that they would have appeared voluntarily and testified before the grand jury well before February of 2005.  Additionally, at a meeting attended by Gerry Leone, Jim Farmer, Steve Huggard of your office, and Attorney Ralph C. Martin, II in early 2004, your office stated that it regretted the issuance of target letters, but that was the only device they knew of to secure someone's attention to resolve the concerns of the U.S. Attorney's Office.  Everyone within the Sheriff's Department accepted this representation in good faith and attempted to meet the concerns of the U.S. Attorney's Office, as outlined above.  Your office did not withdraw those target letters and seek their testimony for 13 months.

---

[1] Your office's stated claim that the Sheriff's Department's internal policy needed to be clarified to explicitly protect so-called "whistleblowers" was a pretext.  Even assuming that there was a good faith basis to believe that action was taken against Porter in order to retaliate for some lawful action by Porter, Porter was a contract worker, not an employee of the House of Corrections.  As I pointed out, the FBI's own internal regulations exempt contract FBI workers from "whistleblower" status.  See 28 C.F.R. § 27.2, and "A review of the FBI's Actions in Connection with Allegations Raised by Contract Linguist Sibel Edmonds," Office of the Inspector General, Office of Oversight and Review, January 2005.

PRINCE . LOBEL . GLOVSKY & TYE ᴮ

CONFIDENTIAL                    001662

J. T. McNeil, Esq.
October 7, 2005
Page 5

Given that lengthy delay and the enormous number of conversations and work-related decisions made in that time, it cannot be surprising that detailed recollections of conversations held nearly two years prior during a period of significant transition within the Department would be difficult. Indeed, had their recollections matched exactly, it is likely your office would have viewed that as evidence of collusion and cover-up.

That Mary Ellen Mastrorilli told Sheila Porter she was being barred for speaking to an outside agency seems to be the lynchpin of your conclusions regarding Sheriff Cabral's alleged culpability. Sheriff Cabral articulated her reasons for the barring to Elizabeth Keeley, who then instructed Mastrorilli accordingly. In her letter dated July 22, 2003, Sheriff Cabral informed US Attorney Sullivan that the decision to bar Porter was hers and that she "would readily" take responsibility for it. Thus, only her specific intent was relevant to proof of a violation of 1513(e). Sheriff Cabral never spoke to Ms. Mastrorilli regarding Sheila Porter. Your office has apparently never considered that any disconnect between what Ms. Mastrorilli was told by Elizabeth Keeley and what she subsequently said to Sheila Porter is attributable to Mastrorilli. This is puzzling given that Ms. Mastrorilli remains, to this day, the only person in the Sheriff's Department to express a desire to bar Ms. Porter specifically for speaking with the FBI – a feeling she reduced to writing in a memo that was provided to you pursuant to a grand jury subpoena. Despite that troubling fact, Ms. Mastrorilli has never been viewed as anything other than a cooperating witness by your office.

There was a clear willingness to take Ms. Mastrorilli's version of the facts at face value, right from the outset. As you know, Ms. Mastrorilli testified before the grand jury in September of 2003. After she completed her testimony, Steve Huggard "walked her out of the room" and said, "I knew you would tell the truth." This statement constitutes a remarkable endorsement of a witness whose accuracy of recollection, credibility, and history of properly following instructions was completely untested. Indeed, depositions of my clients, Elizabeth Keeley, Viktor Theiss, and even Sheila Porter, as well as others have subsequently called the reliability of her testimony into question.

It is disingenuous to claim that the onus was on Sheriff Cabral to renounce the reasons provided by Ms. Mastrorilli to Ms. Porter for her barring and that her failure to do so complicated and lengthened the grand jury investigation. My client had no way of knowing that Ms. Mastrorilli had not accurately recounted her reasons for barring Sheila Porter and therefore had no reason to adopt or disavow anything she said. More than once, Department General Counsel Anne Powers asked Steve Huggard to identify the specific issue that was causing the US Attorney's Office to perceive misconduct by my client or members of her staff. Huggard would only repeatedly say that, "something wasn't adding up." Had he been more forthcoming, Sheriff Cabral would have responded and the matter might have been resolved sooner. Once Ms. Mastrorilli had been approached by the FBI for an interview and subpoenaed to the grand jury – and this occurred three months after Porter's barring - it would have been highly inappropriate for Sheriff Cabral to question her and she didn't.

PRINCE . LOBEL . GLOVSKY & TYE ᴮ

CONFIDENTIAL

001663

J. T. McNeil, Esq.
October 7, 2005
Page 6

Among your letter's most astonishing assertions is the claim that Sheriff Cabral failed to reject Ms. Mastrorilli's statements "all the while publicly criticizing Sheila Porter." It is simply false and another example of the less-than-objective approach that has unfortunately characterized the conduct of this case. Any public references to Ms. Porter by my client are within her rights to do so as both a public figure, and the subject of a civil claim. The failure of your office to understand these basic tenets, and your inclination to penalize my client for the exercise of her right to defend herself are completely unsound and unprincipled.

As her deposition testimony confirms, Ms. Porter decided to seek positive media coverage for her forthcoming civil lawsuit in August of 2004, less than 3 weeks before the September 14 primary election in the Sheriff's race. More than 13 months had passed since she had been barred and it is difficult to believe the timing was inadvertent. As she testified, she consulted with the FBI before granting interviews with WCVB Channel 5 and the Boston Globe. The Globe article comprised some 17 paragraphs. In it, Ms. Porter criticized Sheriff Cabral, the Sheriff's Department, publicly disclosed her identity as a federal informant, the existence of an open grand jury investigation and the fact that she had testified. The Channel 5 story contained much of the same information.

As expected, my client was contacted for a response. She declined a request for an on-camera interview with Channel 5 or an in-person interview with the Globe. Instead, she issued a four-paragraph press statement. References to Porter were confined to the first two paragraphs - a total of four short sentences -- that pointed out that Porter was fired by CMS, not the Sheriff's Department, that she was barred for policy violations and contractual obligations and that she had a motive for seeking media attention at that particular time. The only other time my client has spoken publicly and specifically about Ms. Porter was during a televised debate on WGBH. Her opponent, not she, raised the issue. The debate's host then directly questioned her about it. With typical circumspection, she confined her comments to what was written in the press statement.

Far from continuously criticizing Ms. Porter, or for that matter, criticizing her at all, Sheriff Cabral declined to respond when, in press story after press story, Sheila Porter's allegations were repeated. Even in response to the coverage of press leaks of grand jury information, she declined to do anything other than reference the reasons given in the earlier press statement and her own truthful testimony.

At no time, has my client conducted herself in a manner from which one could reasonably and fairly conclude that she had anything to hide. Despite the aforementioned leaks of grand jury information - made in clear violation of federal law - and the subsequent damage to her reputation, she honored her professional obligation and resisted intense media and other pressures to respond in kind. She held fast to that obligation despite a request made to your office five months ago to investigate the source of those leaks. Though the universe of people to whom the protected information was known should be very small and one would expect that a lengthy investigation would not be necessary, no information regarding the investigation's progress or findings has been forthcoming.

⊕ PRINCE . LOBEL . GLOVSKY & TYE ⊜

CONFIDENTIAL

001664

J. T. McNeil, Esq.
October 7, 2005
Page 7

It is also important to note that Sheriff Cabral has not allowed her strong feelings about what has occurred in the context of this matter to interfere with her professional obligation to continue to work cooperatively with the US Attorney's Office and the FBI, a duty she takes very seriously. In addition to referring appropriate cases to the FBI for investigation – one as recently as two weeks ago - her Department continues to work cooperatively on joint criminal investigations, the BRI re-entry initiative and the gang intelligence task force.

As I am sure you are aware, we were so troubled by the government's conduct in this case, we reported the matter to the Department of Justice. As I am also sure you are aware, the Public Integrity Section at Main Justice agreed to open an investigation into the handling of this matter by the U.S. Attorney's Office. If the conclusions drawn in your letter were a fair interpretation of the evidence, does it make sense that Sheriff Cabral would invite the scrutiny of a full review by the Department of Justice? Finally, it has not escaped my attention that your letter announcing the end of this investigation comes within one week of Public Integrity's opening of its investigation.

It is most unfortunate, given an objective assessment of the evidence, the attendant circumstances in this case, and the fact that the investigation has been closed that you continue to portray Sheriff Cabral as someone worthy of federal prosecution.

Sincerely,

Walter B. Prince, Esq.

WBP/cs

cc – M. J. Sullivan, Esq. (by hand delivery)
   M. K. Loucks, Esq. (by hand delivery)

PRINCE . LOBEL . GLOVSKY & TYE

CONFIDENTIAL

001665

**Exhibit D**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHEILA PORTER,<br>            Plaintiff<br><br>v.<br><br>ANDREA CABRAL, SUFFOLK COUNTY SHERIFF'S<br>DEPARTMENT, SUFFOLK COUNTY, and<br>CORRECTIONAL MEDICAL SERVICES, INC.,<br><br>            Defendants | )<br>)<br>)<br>)<br>)<br>)       Civil Action No. 04-11935-DPW<br>)<br>)<br>)<br>)<br>) |

## <u>NOTICE OF APPEARANCE</u>

TO THE CLERK OF THE ABOVE-NAMED COURT:

Please enter my appearance on behalf of the defendants, Andrea Cabral, Suffolk County

Sheriff's Department, Elizabeth Keeley, and Viktor Theiss, in the above-identified matter for the

sole purpose of filing and arguing the OPPOSITION OF SUFFOLK COUNTY SHERIFF ANDREA

CABRAL, ELIZABETH KEELEY, VIKTOR THEISS, AND THE SUFFOLK COUNTY SHERIFF'S

DEPARTMENT TO SHEILA PORTER'S PETITION FOR DISCLOSURE OF GRAND JURY

TRANSCRIPTS filed on Tuesday, November 29, 2005.

Respectfully submitted,


 /s/ Walter B. Prince
Walter B. Prince, BBO #406640
Prince, Lobel, Glovsky & Tye LLP
585 Commercial Street
Boston, MA 02109
(617) 456-8000

Date:_____

**Exhibit E**

1 of 45 DOCUMENTS

Copyright 2005 Boston Herald Inc.
The Boston Herald

December 2, 2005 Friday
ALL EDITIONS

**SECTION:** NEWS; Pg. 006

**LENGTH:** 651 words

**HEADLINE:** Plenty behind U.S. attorney's battle vs. sheriff

**BYLINE:** By PETER GELZINIS

**BODY:**

For 28 months, US Attorney Michael J. Sullivan held the threat of indictment over Suffolk County Sheriff Andrea Cabral's head. But when the time came for the feds to put up or shut up, Maximum Mike's office chose to shut up.

However, that didn't stop John T. McNeil, the lead prosecutor for Sullivan, from channeling his frustration into a 2 1/2–page sore loser letter he sent off to Cabral's counsel.

Walter B. Prince is a lawyer, not a prophet. Yet near the beginning of his sprawling seven-page response to McNeil, Andrea Cabral's lawyer made this prophetic observation:

"(Your letter) appears to be written for consumption and use by parties other than my client."

Two months later, the sum and substance of McNeil's letter (which had been under seal) turns up for very public consumption in the Boston Globe. Coincidence? Or was it a consequence of thwarting the feds' criminal indictment, which could blow the legs off a companion $2 million civil suit against Cabral?

It begins with Sheila Porter, a contract nurse at the Suffolk County House of Correction. She claims she lost her job after Cabral learned she was doubling as an FBI informant.

Andrea Cabral insists Porter was not barred from working at the jail because she was passing info to the FBI – but because she did not disclose the same info to the sheriff's own Special Investigation Division.

At the end of a fruitless grand jury excursion spanning 28 months, John McNeil was forced to conclude his 2 1/2–page screed on Andrea Cabral by essentially saying: OK, the government lacked the evidence to bring a case, but don't expect an apology because we still don't like you.

Frankly, it pales next to the 5,000-plus words Walter Prince used in his reply . . . a letter the Globe largely ignored yesterday. Among the detailed rebuttals of every aspect of the case, Prince goes on the offensive: He charges Michael Sullivan and his prosecutorial team with assisting Sheila Porter in laying the groundwork for her civil suit against Cabral, evenas the government was pursuing a criminal indictment against her.

"In addition to the clear impropriety of advising a potential witness to hire a civil attorney," Prince writes, "it is clear that Porter would not have independently retained her current attorney, Joe Savage, without the guidance of either the U.S. Attorney's office or the FBI. Joe Savage is a former Chief of the U.S. Attorney's Public Corruption Bureau."

In other words, Sheila didn't find him in the phone book.

As troubling as it is to think the feds were working both sides of the street, what Walter Prince said yesterday about the essence of this case was more unsettling.

"For two years, I believe (the federal government) tried to leverage (Sheriff Cabral) in a way they never would've dared to do with any other sheriff. And it was done under threat of indictment to suit their own agenda," Prince said.

That "agenda," according to Prince, was to have Cabral step back and allow the FBI to cultivate an informant network

Plenty behind U.S. attorney's battle vs. sheriff The Boston Herald

in her jail.

"There is simply no way on God's green earth that we could surrender control of the jail to the FBI," Prince said. "What they were looking to do, essentially, was run the jail. That's what this case is really all about in my opinion."

Prince suggested the feds may have been emboldened to try and "leverage" Cabral because she was a) a woman and b) new to the job when this erupted. What they forgot is that Cabral was also a prosecutor, and willing to use the government to fight the government.

The "impropriety" Walter Prince detailed formed the basis of a complaint against Michael Sullivan that Cabral took to the Department of Justice in Washington.

"Finally, it has not escaped my attention," Prince concluded, "that your letter announcing the end of this investigation comes within one week of Public Integrity's opening of its investigation."

Coincidence? Or consequence.

**LOAD-DATE:** December 2, 2005