# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____

SHEILA PORTER,                              )
      Plaintiff                              )
                                        )
                  v.                              )
                                          )    Civil Action No. 04-11935-DPW
ANDREA CABRAL, SUFFOLK                       )
COUNTY SHERIFF'S DEPARTMENT,          )
SUFFOLK COUNTY,                             )
      Defendants                             )
_____)

## MEMORANDUM IN SUPPORT OF THE DEFENDANTS ANDREA CABRAL, SUFFOLK COUNTY SHERIFF'S DEPARTMENT AND SUFFOLK COUNTY'S MOTIONS FOR NEW TRIAL AND REMITTITUR

## I.    INTRODUCTION

The Defendants, Andrea Cabral, Suffolk County Sheriff's Department, and Suffolk County hereby move for a new trial pursuant to Fed. R. Civ. P. 59. As grounds for this Motion the Defendants state that the evidence adduced at trial was insufficient to support the jury's verdict, certain pretrial rulings by the Court prevented them from obtaining relevant and discoverable evidence essential to their defense, and in his closing argument, Plaintiff's counsel made repeated and improper appeals to emotion and sympathy and improperly exhorted the jury to send a message by its verdict.

In addition, there was insufficient evidence that Defendant Andrea Cabral engaged in the requisite callous and reckless conduct necessary to support an award of punitive damages. Further, the punitive damage award of $250,000 dollars was excessive as a matter of law.

1

Finally, there was insufficient evidence produced at trial to support an award of $360,000 in compensatory damages.  The evidence presented to the jury on the issue of damages was limited to the testimony of the Plaintiff, her daughter and husband. Statements made by Plaintiff's counsel in closing argument improperly appealed to the jury's sympathy and emotion on the issue of damages.

## II.    FACTS

The following is a summary of the evidence introduced at the trial on this matter. The information contained in the instant memorandum is based on notes taken at trial and memory and not a complete transcript of the proceedings.

The Plaintiff Sheila Porter was a nurse practitioner employed by Correctional Medical Services, Inc. (CMS).  She worked as a nurse practitioner at the Suffolk County House of Correction (HOC) pursuant to a contract between Suffolk County and CMS for the provision of healthcare services at the HOC.[1]  The contract between Suffolk County and CMS provided that the Suffolk County Sheriff's Department (SCSD) retained the right to bar CMS employees from the HOC.  Barring is the standard mechanism for removing contract workers, vendors and volunteers from the HOC.  As a contract nurse practitioner working at the HOC, Mrs. Porter was required to comply with SCSD policies, among them, Policy S220.  Policy S220 requires employees, contract workers and volunteers to submit reports, in writing, of "significant or unusual events" to an immediate supervisor, by the end of their shift.  S220 also requires employees, contract workers and volunteers to submit reports, when requested, to any supervisor or the Sheriff's Investigations Division (SID.)

---

[1] The contract between Suffolk County and CMS terminated in April 2005, when another company, Prison Healthcare Services (PHS) was awarded the contract pursuant to the public bidding process.

Defendant Andrea Cabral was appointed to the position of Suffolk County Sheriff on November 29, 2002. She was later elected to the position in November 2004. Before becoming Sheriff, she was a prosecutor for approximately 16 years, most recently in the Suffolk County District Attorney's Office and the Office of the Attorney General. Specifically, during her tenure in the Attorney General's Office and the Suffolk County District Attorney's Office, she investigated and prosecuted cases of civil rights violations and conducted numerous trainings for police, prosecutors and others on civil rights law, prosecution and related issues. During her tenure in the Suffolk County District Attorney's Office, specifically in the context of domestic violence and sexual assault prosecutions, Sheriff Cabral conducted numerous interoffice, external and statewide trainings on the importance of proper reporting and medical documentation to such prosecutions. Sheriff Cabral also conducted trainings for medical personnel on the importance of accurate and timely documentation of medical records.

Commencing in late 1999 and at the request of the FBI, Mrs. Porter began to provide information to the FBI concerning events at the HOC. On May 19, 2003 Mrs. Porter encountered an inmate, Rene Rosario ("Rosario"), in the infirmary while she was on duty as a nurse practitioner. Mrs. Porter was familiar with inmate Rosario because she had previously assisted the FBI by placing a recording device on him in November 2002 while he was in the infirmary of the HOC. During the May 19, 2003 encounter, inmate Rosario informed Mrs. Porter that an unidentified correction officer had physically assaulted him and he showed her the injuries that he allegedly received because of that assault. Mrs. Porter made specific observations of Rosario's injuries including their

color, size, location and freshness.  Mrs. Porter did not document her observations of inmate Rosario's physical condition in his medical records.

At trial, Mrs. Porter's supervisor, CMS employee and Health Services Administrator Donna Jurdak ("Jurdak") testified that the specific observations made by Mrs. Porter of inmate Rosario's physical condition were significant findings that should be recorded on Interdisciplinary Progress Notes and inserted in his medical records.[2] Ms. Jurdak testified that all medical encounters should be documented, not just those that involve a physical examination, and that such documentation should be done contemporaneously or as soon as possible.  Further, Ms. Jurdak testified that the CMS Policies and Procedures Manual set forth the requirements that all significant findings should be contained in the medical records and that Mrs. Porter was aware of those requirements.  Mrs. Porter testified that she knew that the CMS Policies and Procedures Manual required that significant findings pertaining to an inmate's medical condition be documented in the inmate's medical record.  She also acknowledged that all medical encounters should be documented, not just those that involve a physical examination. Mrs. Porter testified that she did not record her observations in inmate Rosario's medical records because she did not conduct a hands-on physical examination.

Further, SCSD Deputy Superintendent Mary Ellen Mastrorilli ("Mastrorilli") and FBI Agent Christa Snyder both testified that they expected Mrs. Porter's observations to be documented in the medical records.  Ms. Mastrorilli stressed the importance of timely and accurate documentation.  In fact, Agent Snyder testified that she specifically instructed Mrs. Porter that her status as an FBI informant did not relieve her of her obligation to "comply with all of her work-related reporting requirements."

_____

[2] This concession by Ms. Jurdak was elicited on cross-examination.

On May 19, 2003 Mrs. Porter verbally reported some, but not all, of her encounter with inmate Rosario to her supervisor Ms. Jurdak. Ms. Jurdak relayed Mrs. Porter's verbal report to Deputy Superintendent Mary Ellen Mastrorilli.[3] Ms. Mastrorilli instructed Ms. Jurdak to direct Mrs. Porter to submit a written incident report concerning her encounter with inmate Rosario. Ms. Jurdak told Mrs. Porter on May 19, 2003 that she was required to submit a report concerning her encounter with inmate Rosario to Deputy Superintendent Mastrorilli. Mrs. Porter did not report inmate Rosario's allegations to SID as she acknowledged that she was required to do nor did she report it directly to Deputy Superintendent Mastrorilli.

Mrs. Porter testified that she wrote and completed her handwritten report on May 19, 2003, however she did not provide the report to either Ms. Jurdak or Deputy Superintendent Mastrorilli that day. Instead, she took it to her home. Mrs. Porter testified that she submitted a written report, as requested by Deputy Superintendent Mastrorilli, to Ms. Jurdak on May 23, 2003.[4] It was undisputed that Ms. Mastrorilli did not receive the report submitted by Mrs. Porter until May 28, 2003. It was also undisputed that Policy S220 requires a written report to be submitted by the end of the shift. Mrs. Porter acknowledged that her failure to provide a written report as directed

---

[3] The testimony of Ms. Jurdak and Ms. Mastrorilli regarding where this conversation took place and exactly what information was communicated regarding Rosario's injuries and allegations of abuse differed significantly. Ms. Jurdak recalled that she phoned Ms. Mastrorilli while Mrs. Porter was in her office. Ms. Mastrorilli recalled that Ms. Jurdak came to her office alone and provided her information received from Mrs. Porter. Further, Ms. Jurdak was unable to recall exactly what Mrs. Porter told her and what she thereafter communicated to Ms. Mastrorilli. Ms. Jurdak recalled that Mrs. Porter was concerned about Mr. Rosario's presence in the facility. Ms. Mastrorilli could only recall that Ms. Jurdak reported that Mrs. Porter had observed suspicious bruising on Rosario's upper arms.

[4] Mrs. Porter's trial testimony regarding when she was instructed to submit the report and when she submitted the report was inconsistent with her deposition testimony and answers to interrogatories. Further, she testified that it did not occur to her to provide the report directly to Ms. Mastrorilli. She also provided a number of different explanations for why she did not provide the report immediately to Ms. Jurdak, including: Ms. Jurdak had left before it was completed, Ms. Jurdak was in a meeting, and she left the report at home.

until May 23, 2003 was a violation of policy S220. She also testified that she knew failure to comply with Department policies could result in the revocation of her security clearance and barment from the HOC, at any time.

SID commenced an investigation into inmate Rosario's allegations of abuse on May 19, 2003 after a correction officer notified them that Rosario wanted to speak with them. On May 20, 2003 Mrs. Porter contacted FBI Agent Christa Snyder and reported inmate Rosario's allegations of abuse. On May 21, 2003 Agent Snyder spoke with SID investigator Wojtkonski regarding the Rosario allegations and directed him to look in the medical records for more information.[5]

Ms. Mastrorilli testified that she had a telephone conversation with Deputy Superintendent and Chief of SID Viktor Theiss ("Theiss") on May 22, 2003 in which Mr. Theiss told her that Mrs. Porter had reported Rosario's allegations to the FBI. Ms. Mastrorilli testified that she told Mr. Theiss that in her opinion it was highly inappropriate for a contract worker to speak with the FBI about a Suffolk County inmate without the Department knowing. According to Ms. Mastrorilli, Mr. Theiss agreed with her concern. Ms. Mastrorilli then told Mr. Theiss that she would bar Mrs. Porter on that basis immediately. Mr. Theiss did not express his agreement with Ms. Mastrorilli's intention to bar Mrs. Porter.

Ms. Mastrorilli also testified that she did not have the authority to bar contract workers and neither did Mr. Theiss. Ms. Mastrorilli did not inform Mr. Theiss that she was already aware of Rosario's allegations from Ms. Jurdak and that she was waiting for Mrs. Porter to provide her with a report. Ms. Mastrorilli testified that Sheriff Cabral did

---

[5] This exchange took place while Wojtkonski was providing information to another FBI agent as part of an unrelated joint investigation into officer misconduct at the HOC.

not speak with Ms. Mastrorilli regarding Mrs. Porter nor consult with her before making her decision to bar Mrs. Porter.

On May 22, 2003 SID investigators Dacey and Aleman were in the infirmary conducting interviews of the medical staff that had contact with inmate Rosario as reflected in his medical records. Mrs. Porter was not someone whom the investigators had identified to interview because she had not documented inmate Rosario's medical records. Mrs. Porter approached the investigators and told them she had information regarding inmate Rosario and his allegations. When asked if she had written a report of her encounter with inmate Rosario, Mrs. Porter told the investigators that it was "at home on her computer".[6] She did not inform the investigators that Deputy Superintendent Mastrorilli had requested the report from her on May 19, 2003. Further, Mrs. Porter testified that if she had already provided the report to Ms. Jurdak, she would have concealed this information from the investigators.

SID re-interviewed Mrs. Porter on May 28, 2003, the day that they received her report concerning her encounter with inmate Rosario on May 19, 2003. During this interview Mrs. Porter acknowledged that she had contacted the FBI regarding inmate Rosario's allegations but had not notified SID. Mrs. Porter testified that she had a lack of trust with SID as it existed before Sheriff Cabral's administration and that is why she decided not to notify them about the Rosario allegations. Mrs. Porter testified that in May 2003 there were new investigators in SID that she did not know or have a reason to distrust. However, Mrs. Porter acknowledged that SID Investigator Steven Jacobs, someone she trusted and to whom she had reported information in the past, was still in SID.

---

[6] The report Mrs. Porter submitted was handwritten, and not generated by computer.

On or about June 4, 2003 SID closed its investigation into Rosario's allegations, concluding that his allegations that a corrections officer physically assaulted him could not be sustained due to Rosario's conflicting statements as to how the injuries occurred, the lack of corroborating evidence of injuries in the medical records, photographs and other issues related to his credibility. SID kept Agent Snyder apprised of the status of its investigation into inmate Rosario's allegations. Upon the conclusion of the investigation, SID notified Agent Snyder that inmate Rosario's allegations could not be sustained. The FBI did not initiate an independent investigation into Rosario's allegations based upon Mrs. Porter's report to them.

As the Rosario investigation developed, Deputy Superintendent Theiss apprised Chief of Staff Elizabeth Keeley ("Keeley") of the status of the investigation on a number of occasions. In these conversations he advised Ms. Keeley that Mrs. Porter had observed injuries on inmate Rosario but had not documented his medical file. He also informed her that Mrs. Porter had failed to report Rosario's allegations to SID; that a written report had been requested but not provided for more than a week; and that Mrs. Porter had contacted the FBI with information regarding Rosario's allegations. Ms. Keeley testified that she was appalled that Mrs. Porter had not documented Rosario's medical file and filed a written report, yet Porter considered the allegations significant enough to contact the FBI. Ms. Keeley testified that what most concerned her about Mrs. Porter's conduct was that she had not documented the medical file and had failed to file a timely report, not that she had spoken with the FBI.

The Rosario case was the first allegation of inmate abuse made during Sheriff Cabral's tenure. When the investigation was concluded, Mr. Theiss briefed Sheriff

Cabral on the results.  He also informed her about what SID had learned about Mrs.

Porter's conduct as it related to the investigation.  Specifically, Mr. Theiss informed

Sheriff Cabral that Mrs. Porter did not document her observations of Rosario's physical

condition in his medical records and had failed to submit a report of her encounter with

Rosario in a timely fashion after being directed to do so.  Mr. Theiss also informed

Sheriff Cabral that the document that was ultimately received on May 28, 2003 was

written on Interdisciplinary Progress Notes ("Medical Notes") and dated May 19, 2003,

the date of the encounter with Rosario.  Sheriff Cabral did not review any of the

investigative reports contained in the Rosario case file at that time nor before she made

the decision to bar Mrs. Porter.

Mr. Theiss also informed Sheriff Cabral that Mrs. Porter had communicated with

the FBI concerning inmate Rosario's allegations of abuse[7].  During their conversation,

there was no discussion concerning barring Mrs. Porter, nor did Sheriff Cabral consult

with Mr. Theiss regarding her decision, several days later, to bar Mrs. Porter.

On or about June 10, 2003, approximately 5 months and 10 days into her tenure,

Sheriff Cabral made the decision to bar Mrs. Porter from the HOC[8].  She announced her

decision during a conversation with Chief of Staff Keeley.  Sheriff Cabral did not refer,

either by looking up or by verbal mention, to any SCSD policies before making her

decision.  Based upon her experience as a prosecutor, Sheriff Cabral was aware of the

---

[7] Sheriff Cabral was aware that Mrs. Porter had previously assisted the FBI by placing a recording device on inmate Rosario in or about November 2002.  Sheriff Cabral did not know that Mrs. Porter was an informant for the FBI.  That information was provided to her on June 16, 2003 during a meeting at the US Attorney's Office.

[8] Sheriff Cabral testified that in addition to Mrs. Porter, she was involved in the decision to bar two other non-employees from the SCSD.  She barred a physician's assistant who had a direct contract with the Sheriff's Department and who had worked at the Nashua Street Jail for many years for falsifying an employee's medical record.  She also declined to renew the contract of a member of the clergy for his failure to provide a written report when requested.

necessity for Mrs. Porter, a nurse practitioner, to document her encounter with inmate Rosario in his medical record.  She was aware that Mrs. Porter was required to report her encounter, in writing, to the Department and she was aware that a contract employee could be barred at any time.

During this conversation, Ms. Keeley recounted what she knew about Mrs. Porter's conduct in the context of the Rosario investigation and her concerns about that conduct. Specifically, she discussed Mrs. Porter's failure to document the medical records, Mrs. Porter's failure to file a timely report, the differences in Mrs. Porter's observations of Rosario's injuries and what others reported, and Mrs. Porter's reporting outside the Department when she had failed to report internally.  Ms. Keeley recalled that Sheriff Cabral responded to these concerns by emphasizing Mrs. Porter's failure to document the medical records and her failure to file a timely report.  Ms. Keeley also recommended to Sheriff Cabral that Mrs. Porter should be barred.

 In communicating her decision to Ms. Keeley, Sheriff Cabral emphasized Mrs. Porter's failure to document inmate Rosario's medical record, her failure to file a timely report and the fact that the report that was ultimately received was written on Interdisciplinary Progress Notes and dated May 19, 2003, the date of her encounter with inmate Rosario.  Sheriff Cabral did not refer to Policy S220 in her conversation with Ms. Keeley nor did she tell her that Mrs. Porter should be barred because she shared confidential information outside the Department or to the FBI.  Sheriff Cabral testified that although she was aware that Mrs. Porter had provided information to the FBI concerning inmate Rosario, it played no role in her decision to bar her.

Sheriff Cabral asked Ms. Keeley what the process was for barring a contract worker. She did not instruct Ms. Keeley in how to implement the barring or what reasons should be provided to Mrs. Porter for the barring.

Both Ms. Keeley and Sheriff Cabral testified that, at this early stage of the Sheriff's term, they were still familiarizing themselves with the complex operational and personnel needs of the Department and the existing chains of command. Sheriff Cabral testified that, just before her arrival, some 63 members of the Department, many of them senior management staff, had resigned in order to take advantage of an early retirement package offered by the City of Boston. Ms. Keeley testified to a number of exigent financial, staffing and operational matters that required Sheriff Cabral's attention. Both Sheriff Cabral and Ms. Keeley testified to their focus on the need to re-build and re-organize management staff. Sheriff Cabral summarized the challenges she faced at the time as "having to simultaneously operate and reform" the largest Sheriff's Department in the state.

Following her conversation with Sheriff Cabral, Ms. Keeley contacted Ms. Mastrorilli and instructed her to inform Mrs. Porter that she was barred from the HOC. At some point during that process, Ms. Keeley reviewed Policy S220 and recounted for Ms. Mastrorilli the factors that she felt supported the decision to bar Mrs. Porter, including failure to document a medical file, failure to file a timely report, interference with an ongoing investigation, and sharing confidential patient information outside the Department. Sheriff Cabral was not present when Ms. Keeley had this conversation with Ms. Mastrorilli. Ms. Mastrorilli testified that Ms. Keeley only provided one reason for the barring, sharing confidential information outside the Department in violation of

Policy S220.  Providing confidential information to an outside agency was the only

reason that Ms. Mastrorilli gave to Mrs. Porter when she notified her that she was barred

from the HOC on June 10, 2003.

On June 16, 2003 Sheriff Cabral, Ms. Keeley and Mr. Theiss attended a meeting

at the United States Attorney's Office.  In attendance were United States Attorney

Michael Sullivan, First Assistant United States Attorney Gerard Leone, Assistant United

States Attorney Stephen Huggard, FBI Special Agent in Charge (SAC) Ken Kasier and

another representative of the FBI.  The purpose of the meeting, as described by Mr.

Leone during a phone conversation with Ms. Keeley on June 12, 2003, was to introduce

Sheriff Cabral to Ken Kaiser, the new FBI Special Agent in Charge (SAC) and to discuss

ways to improve the historically strained relationship between the SCSD and the FBI.

During this phone conversation, Mr. Leone inquired about the barring of Mrs. Porter and

Ms. Keeley expressed her concerns, **not the Sheriff's**, about Mrs. Porter's conduct in the

context of the Rosario investigation.

At the meeting on June 16, 2003, the barring of Mrs. Porter from the HOC was

raised and became the central focus.  Ms. Keeley testified that she gave an overview of

the Rosario investigation in summary fashion and identified the factors that were

important to her in barring Mrs. Porter.  Ms. Keeley testified that included in those

factors were Mrs. Porter's failure to document inmate Rosario's medical records, her

failure to file a timely report, and her communication of confidential medical information

outside the Department.  Ms. Keeley also testified that during the meeting Sheriff Cabral

emphasized the importance of employees reporting allegations of abuse internally to the

Department. Mr. Theiss testified that he recalled two reasons being provided at the

meeting for barring Mrs. Porter: Mrs. Porter's failure to document inmate Rosario's medical records and her going to the FBI without notifying the Department, although he could not recall who provided them.

Mr. Leone testified that Ms. Keeley provided a list of reasons for the barring of Mrs. Porter but he acknowledged that he could only recall four: providing sensitive medical information to an outside agency; untimely report writing; failure to comply with the policies and procedures of the Department; and concerns for Mrs. Porter's safety. Mr. Leone recalled that after Ms. Keeley recounted her list of reasons, a discussion ensued which focused on report writing, a failure to follow protocol, and documentation of medical records. He testified that the discussion of the documentation of medical records arose in the context of disclosing to an outside agency, but that there was also some conversation regarding the proper protocol for documentation of medical records. He further recalled that Sheriff Cabral participated in this conversation and that she reiterated the reasons for barring Mrs. Porter previously provided by Ms. Keeley. Mr. Leone acknowledged that his notes regarding that meeting, made on June 16, 2003 and on January 5, 2005, reflect that he attributed the comment about providing information to an outside agency to Ms. Keeley only.

Sheriff Cabral testified that she was never asked by anyone at the meeting to state her reasons for barring Mrs. Porter. She recalled participating in the discussion and expressing her concerns about what she thought was significant about Mrs. Porter's conduct in the context of the Rosario investigation. Specifically, Sheriff Cabral testified that she recalled stressing the lack of documentation in the medical records and the failure to file a timely report as reasons for the barring although she could not remember

her specific comments. Sheriff Cabral testified that Ms. Keeley's mention of Mrs.

Porter's communication to an outside agency was relevant to Sheriff Cabral only

inasmuch as it was Mrs. Porter's contact with the FBI that revealed her failure to

document and report her encounter with Rosario internally**.** Sheriff Cabral testified that

she did not correct anything that was stated by Ms. Keeley in the meeting. Sheriff Cabral

also testified that she objected to a request made by United States Attorney Sullivan at

the meeting that she send an office wide e-mail instructing her employees to report

allegations of abuse directly to the FBI. Sheriff Cabral testified that as the Sheriff of

Suffolk County she could not relieve her staff of their responsibility to report allegations

of abuse internally.

Mr. Theiss testified he did not have the authority to bar anyone from the

Department. Mr. Theiss testified that sometime after the June 16, 2003 meeting he had a

conversation with Sheriff Cabral, in which Ms. Keeley was present, where Sheriff Cabral

discussed two main reasons supporting the barring of Mrs. Porter: her failure to document

the medical records and her going to the FBI without notifying the Department. Mr.

Theiss could not recall when that conversation took place. Mr. Theiss acknowledged that

he made a false statement under oath when he testified in an earlier proceeding that he

was not aware of the basis for Mrs. Porter's barring until sometime later.

Sheriff Cabral denied ever telling Viktor Theiss or anyone, that her two main

reasons for barring Mrs. Porter were the lack of documentation in the medical records

and reporting to the FBI without reporting the allegations internally to SID. She testified

that the decision to bar Mrs. Porter from the HOC was appropriate because Mrs. Porter's

failure to document the medical records was a serious dereliction of her fundamental

responsibilities as a nurse practitioner and her failure to file a timely report regarding allegations of inmate abuse was a serious dereliction of department policy. Sheriff Cabral also testified that she believed, given the circumstances, that Mrs. Porter had backdated her report and that she was troubled by the fact that what Mrs. Porter eventually submitted looked like a copy of an original medical record and not an incident report appropriately responsive to the Department's request.

Sheriff Cabral testified that she had also revoked the security clearances of two other contract workers who had direct contracts with the Department. One was a physician's assistant who had, at the request of an officer, added a false entry into a medical record. The other was a clergy person who failed to submit a confidential report in a timely manner and whose conduct evidenced a lack of appreciation for the importance of following Department policies. Upon learning of the latter's conduct, Sheriff Cabral declined to renew his contract with the Department.

The evidence adduced at trial also established that commencing in November 2002 when she was appointed to the position of Suffolk County Sheriff and continuing to date, Sheriff Cabral fostered collaborative relationships and partnerships with numerous local, state and federal law enforcement agencies including the FBI. She instructed her staff to cooperate with the FBI regarding any assistance that they may need with respect to their investigations. Agent Snyder testified that her conversation with SID Investigator Stan Wojtkonski regarding inmate Rene Rosario on May 21, 2003, occurred in the context of the cooperative provision of information to the FBI on an unrelated case. Sheriff Cabral specifically testified to her personal efforts to repair the relationship between the FBI and the Department, a relationship that had broken down before she

became Sheriff. Ms. Keeley, Mr. Theiss and Sheriff Cabral testified regarding joint investigations of criminal conduct by SID and the FBI.[9]

Additionally, Sheriff Cabral and Ms. Keeley testified regarding the implementation of Sheriff Cabral's significant, necessary and comprehensive changes to the Sheriff's Department in the areas of hiring, training, discipline, promotions and investigations. Sheriff Cabral testified that these reforms and changes were intended to enhance the professionalism, accountability and transparency of the Suffolk County Sheriff's Department.

At trial Mrs. Porter's husband and daughter testified regarding their observations of her emotional and physical condition subsequent to being barred from the HOC. Ms. Porter also testified to her emotional, mental and physical condition since she was barred from the HOC. Mrs. Porter testified that she received counseling from approximately July through September 2003 (a total of eight visits) but was prescribed no medication and has received no follow-up treatment. She further acknowledged that she discussed issues in these counseling sessions that were unrelated to her barring from the HOC.

Mrs. Porter testified that she was rehired by CMS in October 2003 to work as a nurse practitioner at the Essex County House of Correction. Although that position provided benefits, she voluntarily left the job in March 2004. She currently works on a per diem basis, by choice, at two correctional facilities.[10] Mrs. Porter testified that her

---

[9] Sheriff Cabral testified that after she was appointed Sheriff in November 2002, she was instrumental in getting a stalled joint FBI/SID drug investigation back on track. She initially contacted Agent Robinson herself and then directed Mr. Theiss to coordinate the investigation with the FBI. Contrary to counsel's closing argument, there was not a "huge fight" or "blow-up" over this joint drug investigation. (Transcript of <u>Porter v. Cabral</u>, Day 7, p.31, attached as Exhibit C). Rather Sheriff Cabral testified that she expressed her displeasure with a decision made by an AUSA that, in her mind, endangered a cooperating witness. Notably, the joint investigation concluded successfully.

[10] The per diem position provided her more flexibility to care for her mother and husband during this time period.

current income is $29,000 dollars less than what she was making while for working for CMS at the HOC in May 2003 and that since June 10, 2003 her lost income totaled $79,000 dollars.  Mrs. Porter testified that she had no written employment contract with CMS in May 2003.  She further testified that she had no guarantee that she would have continued to work for CMS for the rest of her career or that she would have been hired by the next company that had the healthcare services contract at the HOC.

### III.    ARGUMENT

#### A.    Defendants Andrea Cabral, Suffolk County Sheriff's Department Suffolk County Are Entitled To A New Trial Pursuant To Fed.R.Civ.P. 59(a).

The Defendants moved for judgment as a matter of law at the close of the Plaintiff's case and again at the close of all the evidence.  The Court denied the motions without hearing argument.  The case was then submitted to the jury.

Defendants Andrea Cabral, Suffolk County Sheriff's Department and Suffolk County are entitled to a new trial because the jury verdict was not supported by the evidence, the Defendants were unduly prejudiced by the Court's pre-trial rulings and the Plaintiff's improper closing argument improperly influenced and tainted the jury verdict.

##### 1.    The Jury Verdict Was Not Supported By The Evidence

Pursuant to Fed. R. Civ.P.59, a trial judge has ample discretion to set aside the verdict and grant a new trial if he determines that the verdict is contrary to the weight of the evidence such that upholding the verdict will result in a miscarriage of justice. Arrieta-Colon v. Wal-Mart Stores, Inc., 2006 WL 74411 (1st.Cir.PR); citing Johnson v. Spencer Press of Me., Inc., 364 F.3d 368, 375 (1st.Cir.2004)(internal quotations omitted); Shells Title Company, Inc. v. Commonwealth Land Title Insurance Co., 184 F.3d 10, 19

(1st.Cir.1999).   Given the substantial and uncontroverted evidence of Mrs. Porter's policy violations and dereliction of her obligations as a nurse practitioner, in the context of Sheriff Cabral's efforts to enhance the professionalism, accountability and transparency of the Suffolk County Sheriff's Department, it would be a miscarriage of justice to uphold the jury verdict in this case.

During the course of the trial, the Defendants introduced substantial evidence that Mrs. Porter had violated Department policy and had failed to abide by fundamental obligations in her position as a nurse practitioner at the HOC.  Moreover, the Defendants introduced significant evidence of the extensive reforms undertaken by Sheriff Cabral at the Sheriff's Department and her collaboration with other law enforcement agencies at the state, local and federal level.  Further, the jury was informed about Sheriff Cabral's extensive public service in the criminal justice system, particularly as a civil rights prosecutor. This quantum of evidence was more than sufficient to meet the Defendants' burden pursuant to the analysis set forth in Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 97 S. Ct. 568 (1977), that Sheriff Cabral would have barred Mrs. Porter for her conduct regardless of her protected activity.  The jury's verdict is against the weight of this evidence and accordingly this Court should grant the Defendants a new trial.

It is uncontroverted that Mrs. Porter was required to comply with Department policies, including Policy S220.  It is further uncontroverted that S220 required her to submit a written report of her encounter with inmate Rosario to Deputy Superintendent Mary Ellen Mastrorilli, as requested, by the end of her shift on May 19, 2003.  It is also undisputed that Mrs. Porter was obligated to report inmate Rosario's allegations of abuse to SID.  The evidence adduced at trial clearly established that Mrs. Porter did not report

inmate Rosario's allegations of abuse to SID. In fact she made a conscious decision not to report it to them. The evidence also clearly established that she did not submit the report that she was directed to provide on May 19, 2003 until May 23, 2003, and that Deputy Superintendent Mastrorilli did not receive it until May 28, 2003.  Mrs. Porter did not and could not explain how Deputy Superintendent Mastrorilli did not receive it until May 28, 2003.  Mrs. Porter's failure to comply with these fundamental responsibilities and obligations of her employment as a contract nurse practitioner constituted serious violations of Department policy for which her security clearance could be revoked.

It is uncontroverted that Mrs. Porter made significant observations and findings pertaining to inmate Rosario's medical condition while she was on duty in the infirmary on May 19, 2003.  Those significant findings included the size, location, color and freshness of bruises that inmate Rosario said were inflicted by an unidentified correction officer.  CMS Health Services Administrator Jurdak confirmed that Mrs. Porter was required to document those significant findings on Interdisciplinary Progress Notes and insert them into inmate Rosario's medical records.  Indeed, Mrs. Porter herself acknowledged that these were significant findings pertaining to an inmate's medical condition that were required to be documented.  Although, Mrs. Porter testified that she did not document because she did not conduct a physical examination, she acknowledged, as did Ms. Jurdak, that the absence of a physical examination did not obviate the requirement to document her significant findings in inmate Rosario's medical records.

Moreover, Mrs. Porter's failure to document and failure to report occurred in the context of an inmate's allegations of abuse by a correction officer.  This was the first

such allegation of abuse during Sheriff Cabral's brief tenure as Sheriff and it occurred as she was beginning to implement significant and substantial reforms to the Department. These reforms, in the area of hiring, training, discipline, investigations and promotions, were designed to enhance the professionalism and accountability of the Department. It was untenable to Sheriff Cabral, and she so testified, that given her prior experience as a prosecutor, and current responsibilities as Sheriff, a contract nurse practitioner would not document injuries that she observed on an inmate in the inmate's medical records; particularly where a correction officer allegedly inflicted those injuries. Sheriff Cabral believed that this serious lapse in judgment was compounded by Mrs. Porter's failure to report the allegations to SID and to file a written report in a timely manner when directed to do so.

Moreover, every witness who testified and was asked about the importance of timely and contemporaneous documentation responded in the affirmative. Ms. Mastrorilli, Agent Snyder, Ms. Jurdak, Ms. Keeley, and Sheriff Cabral all testified to the importance of such contemporaneous documentation and their expectation that Mrs. Porter would have recorded her observations in the medical records.

There was also substantial evidence that the Sheriff's Department, at the direction of Sheriff Cabral, was actively involved in collaborative partnerships with local, state and federal law enforcement agencies, including the FBI in May 2003 and continuing to date. SID was directed to provide assistance and cooperation to the FBI with respect to any investigation they were conducting at the Department. The Department also worked collaboratively, again at the direction of Sheriff Cabral, with the FBI on joint investigations of criminal misconduct by Department employees. Indeed, when Agent

Snyder had her conversation with investigator Wojtkonski on May 21, 2003 it was occasioned by investigator Wojtkonski's providing the FBI with information on an unrelated joint investigation.

Moreover, Sheriff Cabral personally participated in two other barrings of contract workers involving similar allegations of policy violations and dereliction of duty.  Sheriff Cabral testified that she revoked the security clearances of two other contract workers who had direct contracts with the Department.  One was a physician's assistant who had, at the request of an officer, added a false entry into a medical record.  The other was a clergy person who failed to submit a confidential report in a timely manner and whose conduct evidenced a lack of appreciation for the importance of following Department policies.  Upon learning of the latter's conduct, Sheriff Cabral declined to renew his contract with the Department.

The Plaintiff's contention that Mrs. Porter's policy violations were trifling and not something that a contract worker could be barred for misses the mark.  It is uncontroverted that a contract worker could be barred for violations of Department policy at any time.  Moreover, as discussed above, there was no dispute that Mrs. Porter's conduct was in violation of Department policy and that those policy violations arose in the context of an investigation into serious allegations of inmate abuse.  It is further undisputed that Sheriff Cabral, Chief of Staff Keeley and Chief of SID viewed Mrs. Porter's conduct as a serious dereliction of her responsibilities.

The Plaintiff further contends that the timing of Mrs. Porter's barring is further evidence that it was done because she spoke with the FBI.  In support of this notion the Plaintiff points to a meeting that Sheriff Cabral had with an AUSA, which occurred

approximately three weeks before Mrs. Porter was barred, in which Sheriff expressed her displeasure with some action that the USAO and the FBI had taken on a joint investigation.  Although "close temporal proximity between two events **may** give rise to an inference of causal connection", Nethersole v. Bulger, 287 F.3d 15, 20 (1st. Cir.2002) (emphasis added), that inference is "not necessarily conclusive" where, as in this case, the inference, is considerably weakened by other facts in the case. Lewis v. City of Boston, 321 F.3d 207, 219 (1st.Cir.2003), citing Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 170 (1st.Cir.1998).  Here, Plaintiff's description of this **one** meeting that occurred in the course of a joint investigation that was re-started by the efforts of Sheriff Cabral was grossly exaggerated.  Further, the Department continued to work collaboratively with the FBI on this joint investigation until it was successfully concluded.  Moreover, as with all of the other partnerships with local, state and federal law enforcement agencies, the Department under the direction of Sheriff Cabral continued to work collaboratively with the FBI.

The only direct evidence[11] that Sheriff Cabral considered Mrs. Porter's communication with the FBI in deciding to bar her from the HOC came from Mr. Theiss. In a conversation that he cannot recall when or where it occurred, he testified Sheriff Cabral discussed two main reasons supporting the barring of Mrs. Porter: her failure to

---

[11] There was evidence that other individuals, i.e. Deputy Superintendent Mastrorilli and Chief of Staff Keeley, considered Mrs. Porter's communication with an outside agency to be a factor.  During deliberations, the jury asked a question concerning the first question on the special verdict slip. Specifically the jury wanted to know whether the actions of Sheriff Cabral were sufficient to bind Suffolk County and the Department.  Although the Defendants did not object to the technically correct answer the Court gave in response to the jury's question, Defendants expressed their concern to the Court that, by asking the question, the Jury may impute the actions of Department employees to the Sheriff for purposes of liability.  In light of the jury's unwarranted and excessive award of punitive damages against Sheriff Cabral and the comments by one juror to a Boston Globe reporter, see fn. 20, infra, those concerns appear to have been realized.

document the medical records and her going to the FBI without notifying the Department. Mr. Theiss testified that he was not directly quoting Sheriff Cabral when he recounted this conversation. Notwithstanding the fact that Sheriff Cabral denied saying this to Mr. Theiss, or anyone else, at most it establishes what Sheriff Cabral herself has acknowledged, that: Mrs. Porter's communication to an outside agency was relevant to her only inasmuch as it was Mrs. Porter's contact with the FBI that revealed her failure to document and report her encounter with Rosario internally. It was not the reason for her barring, her conduct was. Moreover, despite what Plaintiff's counsel suggested in his closing, there is absolutely no evidence that Mr. Theiss' false statement at a prior proceeding regarding his knowledge of the reasons for Mrs. Porter's barring was made at the direction of Sheriff Cabral or with her knowledge.

Nor is the testimony of Gerry Leone supportive of the Plaintiff's argument. In his testimony regarding the June 16, 2003 meeting, Mr. Leone acknowledged that his notes regarding that meeting, made after the meeting on June 16, 2003 and on January 5, 2005, reflect that he attributed the comment about providing information to an outside agency to Ms. Keeley only. Indeed, the evidence adduced concerning that meeting indicates all the individuals present who testified had different recollections of what was said and by whom. But where there is consensus, the evidence establishes that Sheriff Cabral was concerned about Mrs. Porter's failure to document and her late reporting. This was the conduct that warranted her barring and in fact was the reason for her barring.

The totality of this evidence established by a preponderance of the evidence that the reasons for barring Mrs. Porter were not pre-textual and that Sheriff Cabral would have revoked her security clearance had she not engaged in protected activity. *See* Mt.

Healthy City School Dis. Bd. of Educ. v. Doyle, 97 S.Ct. 568 (1977).  The jury's verdict was contrary to the weight of the evidence and a new trial should be granted.

        2.        Pre-Trial Rulings Of The Court Warrant A New Trial.

The Court's pre-trial rulings denying the Defendants the opportunity to depose individuals from the FBI and the United States Attorney's Office were unduly prejudicial because they prevented the Defendants from adequately presenting their defense.

Pursuant to Federal Rule of Civil Procedure 26(b) (1), the Defendants were entitled to discovery "regarding any matter, not privileged that is relevant" to their defense. Fed. R. Civ. P. 26(b) (1).  The evidence need not be admissible at trial, so long as "the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Id.  "Relevancy is to be broadly construed at the discovery stage of litigation and a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the subject matter of the action." Church of Scientology of Boston v. I.R.S., 138 F.R.D. 9, 10 (D.Mass.)  In order to establish that a district court abused its discretion in ruling on a discovery matter, there must be a clear showing that the court's order was plainly wrong and resulted in substantial prejudice to the aggrieved party. In Re Public Offering PLE Antititrust Litigation, 427 F.3d 49 (1st. Cir. 2005).

During the course of discovery in this case, Defendants served several written requests and subpoenas on the Federal Bureau of Investigation ("FBI") and the United States Attorney's Office ("USAO") pursuant to regulations promulgated by the Department of Justice, 28 C.F.R. §§ 16.21. et seq.  The United States Attorney, on behalf of both the FBI and the USAO, refused to comply with the aforementioned subpoenas,

contending that to do so would (1) reveal confidential sources; (2) disclose investigative techniques and interfere with enforcement actions; and (3) be unduly burdensome. Thereafter the Defendants moved to compel (Document No. 88).

On September 28, 2005 the Court declined to hear the Defendants' Motions to Compel, indicating that a separate action under the Administrative Procedure Act ("APA") was required.  The Defendants filed a Petition pursuant to the APA on December 9, 2005 seeking review of the decision by the United States Attorney not to comply with the lawfully issued subpoenas. (Civil Action No. 05-CA-12468-DPW). The United States Attorney's Office filed their response to the Defendants' Petition on January 20, 2006 after the trial in the instant matter was concluded.[12] The Court has yet to rule on the Defendants' APA petition.

It is the Defendants' contention that the FBI and the USAO refusal to comply with lawfully issued subpoenas was arbitrary, capricious, and an abuse of discretion, and otherwise not in accordance with the law. *See* 5 U.S.C. § 706(2) (A).  The Court's denial of the Defendants' Motion to Compel or otherwise order compliance with the lawfully issued subpoenas constituted an abuse of discretion and unduly prejudiced the Defendants.

The information and testimony sought by the Defendants was highly relevant to their defense of Mrs. Porter's claims. Specifically, the Defendants sought to discover exactly what information Mrs. Porter communicated to FBI Special Agents Christa

---

[12] In both their Opposition to the Defendants' Motion to Compel and their Opposition to the Petition for Review, the United States Attorney's Office argued that compliance with the Defendants' subpoenas would be unduly burdensome and result in an unacceptable diversion of resources.  It is important to note that while the jury deliberated in this case, Agent Snyder remained at the courthouse and was observed repeatedly throughout the day with the Plaintiff.  (*See* Affidavit of Ellen M. Caulo, attached hereto as Exhibit A).

Snyder and Maureen Robinson ("Agent Snyder" and "Agent Robinson") concerning inmate Rosario's allegations of abuse, her interview by SID investigators Dacey and Aleman on May 28, 2003 and her barring by Sheriff Cabral. The testimony from Agents Snyder and Robinson was relevant, inter alia, to Mrs. Porter's credibility and to rebut her claims in the underlying action.

Agent Snyder was authorized to testify at trial, but only in accordance with an affidavit that she had prepared and the unredacted portions of reports she filed with the FBI regarding her contact with Mrs. Porter and representatives of the SCSD. (See Exhibit B, attached hereto). The credibility of Mrs. Porter and Sheriff Cabral were critical to the jury's resolution of the questions contained in the special verdict form. The Defendants' inability to depose Agent Snyder prior to trial and the restrictions imposed on her testimony at trial prevented the Defendants from discovering admissible evidence relevant to Mrs. Porter's credibility. The purpose of depositions in a civil case is to allow parties to develop evidence, ask specific, detailed questions and, from the answers to those questions, pursue evidence from other sources and make strategic trial decisions based upon the evidence. Here, the Court's rulings denied the Defendants that right, thereby denying them a full and fair opportunity to present their defense.

The Defendants also sought to question the United States Attorney and two former Assistant United States Attorneys concerning the meeting at the United States Attorney's Office on June16, 2003 during which Sheriff Cabral and members of her staff discussed the reasons for Mrs. Porter's barring. The Defendants also sought information and testimony from the United States Attorney and members of his staff concerning their communications with Mrs. Porter regarding the allegations in her amended complaint.

The Court denied the Defendants the opportunity to depose United States Attorney Sullivan and Assistant United States Attorney Huggard. The Court permitted the parties to depose former First Assistant United States Attorney Gerard Leone but restricted the scope of his testimony to the reasons provided by Sheriff Cabral and her staff at the June 16, 2003 meeting for the barring of Mrs. Porter.[13] The effect of the Court's ruling was to highlight one person's recollection of the meeting to the exclusion of others who were present, i.e. Mr. Sullivan and Mr. Huggard, who may have had different recollections that the Defendants were entitled to explore through deposition.[14] In fact, Mr. Leone relied on notes he took after the meeting concluded on June 16, 2003, not contemporaneously, and notes he took eighteen months later to refresh his recollection of what was said at the meeting.

Moreover, the Court's ruling was based in part upon *ex parte* submissions by the United States Attorney's Office that were reviewed *in camera* at a hearing attended only by members of the United States Attorney's Office and the representation by the United States Attorney's Office that Mr. Leone was the person in the best position to testify because he had notes that were prepared after the meeting. The Defendants were not a party to the Court's *in camera* review and were precluded from reviewing the *ex parte* submissions made by the United States Attorney's Office. The Court made significant decisions regarding the extent to which the Defendants could obtain relevant discovery without allowing the Defendants an opportunity to challenge the submissions upon which

---

[13] The parties were notified of the Court's decision on January 5, 2006, three days before trial, following an *ex parte* submission of materials by the United States Attorney's Office and an *in camera* hearing concerning those materials attended only by members of the United States Attorney's Office.

[14] Indeed, the testimony of Sheriff Cabral, Ms. Keeley, Mr. Theiss and Mr. Leone concerning what reasons were provided for the barring of Mrs. Porter at the June 16, 2003 meeting and by who differed in significant respects.

the Court based its decision.  In effect, the Defendants were forced to make strategic decisions without the benefit of knowing all the relevant information.

Further without allowing the Defendants the opportunity to depose Mr. Leone concerning the entirety of the meeting, including questions asked and concerns raised by the representatives of the United States Attorney's Office and the FBI the Defendants were forced to make strategic decisions without the benefit of knowing all the relevant information.  The prejudicial effect of this was compounded at trial when Plaintiff's counsel argued in his closing that five federal officials had accused Sheriff Cabral of improperly barring Mrs. Porter at the meeting on June 16, 2003 (Transcript of <u>Porter v. Cabral</u>, Day 7, p. 32, attached hereto as Exhibit C) and the jury was asked to evaluate the responses provided by the Defendants without the full context in which those responses were provided.

Indeed, during the course of pre-trial discovery in this case, there were a number of *ex parte* submissions and *in camera* hearings that took place without the parties having an opportunity to participate. (9/28/05: Notice by USAO. Filed Under Seal; 11/29/05: Motion to Seal Document by USAO; 11/29/05: Ex Parte Supplemental Response by USAO; 1/04/06: Ex Parte conference held with AUSA; 1/05/06: In Camera Hearing held with AUSA; 1/06/06: Motion to Seal by USAO; 1/06/06: Ex Part Notice by USAO Filed Under Seal).  It is the Defendants' contention that these *ex parte* submissions, in particular the selective provision by the United States Attorney's Office of portions of grand jury materials, and *in camera* hearings directly affected the conduct of the trial in this matter, and the Defendants were unduly prejudiced thereby.

The Court's pre-trial rulings prevented the Defendants from obtaining discoverable and relevant evidence, thereby prejudicing their ability to mount an effective defense to the Plaintiff's allegations.  Accordingly a new trial is warranted.

     3.     <u>Plaintiff's Closing Argument Warrants A New Trial.</u>

During his closing argument, Plaintiff's counsel made repeated and improper appeals to the jury based upon emotion and sympathy.  Plaintiff's counsel asked the jury to lift the plaintiff's pain by returning a verdict in her favor and that by doing so they would be doing something good and right. (Transcript of <u>Porter v. Cabral</u>, Day 7, p. 29, 40-41,attached hereto as Exhibit C).   He repeatedly claimed that Sheriff Cabral had ruined Mrs. Porter's life. (Transcript of <u>Porter v. Cabral</u>, Day 7, p. 30, 37, attached hereto as Exhibit C).  Despite the fact that the evidence established that Mrs. Porter had secured employment within four months of her barring and no evidence had been presented that her emotional condition interfered with her job performance, Plaintiff's counsel improperly displayed to the jury a manufactured "job description" containing an excerpted portion of Mrs. Porter's counseling records from treatment she had received almost two and one-half years previously, listing her "symptoms".[15] (Transcript of <u>Porter v. Cabral</u>, Day 7, p. 40-41, attached hereto as Exhibit C).   Claiming that there was no market place for emotional distress, this improper argument was central to his contention that the jury must award significant compensatory damages because, according to counsel, she was unemployable for any job except one that required the constellation of

---

[15] This improper theme was foreshadowed in Plaintiff's opening when he informed the jury that Mrs. Porter was **diagnosed** with agitated depression.  Mrs. Porter's counseling records contain no such formal diagnosis being made with respect to Mrs. Porter.  Further, the statements made by counsel in his closing were particularly inappropriate given the Court's prior admonishment to counsel that Mrs. Porter was precluded from testifying regarding statements made to her during counseling by the licensed clinical social worker concerning any symptoms she may have had or diagnosis he may have made.

symptoms described by the excerpted portion of her two and one-half year old counseling records.

The "introduction of purely emotional elements into the jury's deliberations is clearly prohibited conduct." Smith v. Kmart Corporation, 177 F.3d 19, 26 (1st. Cir. 1999), citing Doty v. Sewall, 908 F.2d 1053, 1059 (1st. Cir. 1999) (internal citations omitted). These statements had no relevance to the issue of liability and were at best tenuously connected to the issue of damages. The prejudicial effect of these purely emotional and inflammatory statements was realized by the jury's significant award of $360, 000 dollars in compensatory damages given the insufficient evidence to support such an award.

Additionally, Plaintiff's counsel misstated the evidence in his closing argument. In reviewing Ms. Keeley's testimony regarding her conversation with Sheriff Cabral on June 10, 2003, Plaintiff's counsel stated that Ms. Keeley "said, in speaking to an outside agency, that it was integral to the decision.  It was significant. It was important….Elizabeth Keeley said she repeated the Sheriff's reasons again on June 12 to Gerry Leone in the telephone call setting up the June 16th meeting." (Transcript of Porter v. Cabral, Day 7, p. 35, 38 attached hereto as Exhibit C).  Ms. Keeley was clear in her testimony that Mrs. Porter's communication of confidential information to an outside agency was just one of a number of factors that Ms. Keeley, not Sheriff Cabral, felt supported the decision to bar Mrs. Porter.  There was no one significant, critical or integral factor, rather it was the totality of Mrs. Porter's conduct with respect to the Rosario investigation that warranted, in Ms. Keeley's mind, her barring.  Further, Ms. Keeley testified unequivocally that when she spoke with Gerry Leone on June 12, 2003

she communicated what **she, not Sheriff Cabral,** believed were the numerous concerns

regarding Mrs. Porter's conduct and the basis for her reasons for barring.

Moreover, there was no evidence adduced at trial that "five law enforcement

agents were accusing [Sheriff Cabral] of barring Mrs. Porter of being an FBI informant"

at the June 16, 2003 meeting. (Transcript of Porter v. Cabral, Day 7, p. 32, attached

hereto as Exhibit C). This was particularly improper given the Court's pre-trial ruling

that the Plaintiff was precluded from introducing any evidence pertaining to the federal

grand jury investigation into the circumstances surrounding the barring of Mrs. Porter.

Additionally, Plaintiff's counsel repeatedly and improperly exhorted the jury to

deliver a message by their verdict. On at least seven occasions in his closing argument[16]

Plaintiff's counsel admonished the jury to award punitive damages[17] in order to send a

message to Sheriff Cabral[18] and others. He instructed them that their verdict would send a

message to others who deal with whistleblowers.[19] In discussing the awarding of

---

[16] I have got even less guidance for you on the final topic, which is punitive damages. Punitive damages are simply what you say they are. The law permits you – it does not require you, but it permits you – to send a **message** when someone callously disregards the civil rights of another. Now, here it's especially appropriate given that the acts were committed by a civil rights prosecutor who demonstrates no remorse. It is clear Sheriff Cabral will do this next week or next year and as long as she is Sheriff. It's exactly how she plans to run the facility. She needs to be given a **message** to cut it out. But your **message** is also to others dealing with whistleblowers as well. We don't want a world, I submit, where the Sheila Porters hesitate to help those in danger because their bosses haven't gotten the **message** that they can't retaliate. The amount needs to be related to the underlying damage to support her. That's the way society has done the punishment for these things. The ancient text "an eye for an eye" or "ten plates under each of them," the Romans do it even harsher. But it's got to be some number related to the underlying harm. That's fundamentally the way human beings approach punishment and deterrence. And I'm not going to presume to suggest to you a number. But I will say you can't avoid sending a **message**, because if the number is zero, that sends a **message**, too, and I believe it's a long and dangerous **message** based on the evidence in this case. (Transcript Porter v. Cabral, Day 7, pgs. 41-42, attached as Exhibit C).
[17] Conversely, Plaintiff's counsel mentioned the concept of deterrence just twice. (Transcript Porter v. Cabral, Day 7, pgs. 42-43, attached as Exhibit C).
[18] Plaintiff's counsel stated: "It is clear Sheriff Cabral will do this next week or next year and as long as she is Sheriff….She needs to be given a **message** to cut it out….You can't come back the next time that Sheriff Cabral violates someone's rights." (Transcript Porter v. Cabral, Day 7, pgs. 41-43, attached as Exhibit C).
[19] Plaintiff's counsel stated: "But your **message** is also to others dealing with whistleblowers as well. We don't want a world, I submit, where the Sheila Porters hesitate to help those in danger because their bosses

punitive damages, Plaintiff's counsel contended that if the jury determined that the

Plaintiff was not entitled to punitive damages it would send a dangerous message.[20]  This

was clearly improper argument.[21]  The prejudicial effect of this improper argument was

realized by the jury's award of $250,000 dollars in punitive damages against Sheriff

Cabral given the dearth of evidence in the record to justify such an award.

"In assessing the effect of improper conduct by counsel, the Court must examine

the totality of the circumstances, including the nature of the comments, their frequency,

their possible relevance to the real issues before the jury, the manner in which the parties

and the court treated the comments, the strength of the case, and verdict itself." Securities

and Exchange Commission v. Happ, 392 F.3d 12, 26-27 (1st. Cir. 2004), citing P.R.

Aqueduct & Sewer Authority v. Constructora Lluch, Inc., 169 F.3d 68, 82 (1st. Cir.

1999). In this case, where Defendants failed to make a timely objection to Plaintiff's

closing argument, the claim of improper closing is forfeited, not waived, thus and

amenable to review for plain error.  SEC v. Happ, 392 F.3d at 28, fn. 8, citing Smith v.

Kmart Corporation, 177 F.3d at 25.

As discussed above, Plaintiff's counsel's repeated emotional and inflammatory

statements constituted improper argument without any relevance to the issues before the

---

haven't gotten the **message** that they can't retaliate." (Transcript Porter v. Cabral, Day 7, pgs. 41-42, attached as Exhibit C).

[20] Plaintiff's counsel stated: "But I will say you can't avoid sending a **message**, because if the number is zero, that sends a **message** too, and I believe it's a long and dangerous **message** based on the evidence in this case." (Transcript Porter v. Cabral, Day 7, pgs. 42, attached as Exhibit C).

[21] It is important to note that counsel's reference to whistleblowers was also improper in that the Court dismissed the Plaintiff's whistleblower claim at summary judgment because she was not an employee of the Suffolk County Sheriff's Department.  In effect the Court's ruling vindicated Sheriff Cabral who testified that she did not consider Mrs. Porter a whistleblower because she was not an employee of the Department.  The Defendants asked for the jury to be instructed that the Plaintiff's whistleblower claim had been dismissed but the Judge declined to do so.  This testimony concerned statements made by Sheriff Cabral in response to accusations made by her political opponent during a televised debate.  Mrs. Porter contended that Sheriff Cabral's comment during the debate that Mrs. Porter was not a whistleblower caused her pain and suffering, despite the fact that she neither heard nor saw the debate.

jury.  Although the Court issued a curative instruction in his charge to the jury, *see*

Refuse & Envtl. Sys. Inc. v. Indus. Servs. Of Am., Inc., 932 F.2d 37, 40 (1st Cir. 1991)

("A basic premise of our jury system is that the jury follows the court's instructions."),

the Defendants contend that it was not sufficient to cure the significant prejudice caused

by the comments. The Defendants presented substantial evidence that the conduct for

which Sheriff Cabral barred Mrs. Porter was real and not pretextual and that she would

have taken the same action regardless of Mrs. Porter's protected activity. *See* III. A. 1.

*supra*. This is not a case where the Plaintiff's evidence of liability was overwhelming.

Given the disputed evidence of liability, the clear impropriety of counsel's closing

argument, and the jury's award of significant punitive and compensatory damages, the

Court's curative instructions were not sufficient to remove the taint and a new trial is

warranted.

**B.     The Defendants Should Be Granted A New Trial On The Issue Of Damages, Or In The Alternative, Defendants Move For Remittitur Of The Damage Awards.**

1.     The Record Does Not Support The Award Of Punitive Damages.

Punitive damages are "not favored in the law and are allowed only with caution

and within normal limits." Powell v. Alexander, 391 F.3d 1, 15 (1st Cir. 2004), citing

McKinnon v. Kwong Wah Restaurant, 83 F.3d 498, 508 (1st Cir. 1996). The evidence

adduced at trial failed to demonstrate that Sheriff Cabral barred Mrs. Porter in the face of

a perceived risk that such conduct would violate Mrs. Porter's First Amendment rights

under § 1983, Kolstad v. Am. Dental Association, 527 U.S. 526, 536, 119 S.Ct. 2118

(1999), and thus acted with the requisite "evil motive" or "reckless or callous indifference

to the federally protected rights of others," Smith v. Wade, 461 U.S. 30, 56, 103 S.Ct.

1625 (1983) to meet the legal standard for punitive damages under § 1983. Powell v. Alexander, 391 F.3d at 15; Iacobucci v. Boulter, 193 F.3d 14, 26 (1st Cir.1999).[22] Therefore the punitive damage award of $250, 000 against Sheriff Cabral was unwarranted on the basis of the evidence and grossly excessive. *See* Iacobucci, *supra* at 26-27; McMillan v. MSPCA, et al.140 F.3d 288, 306-307 (1st Cir. 1998). Accordingly, the Defendants are entitled to a new trial on the issue of damages, or alternatively, the Court should strike the entire punitive damage award or grant the Defendants' Motion for Remittitur of the punitive damage award.

Punitive damages may be awarded pursuant to 42 U.S.C. § 1983 only where "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Alexander, *supra* at 15, quoting Smith v. Wade, 461 U.S. at 56. The Plaintiff bears a heightened burden in proving punitive damages under §1983: "[she] must demonstrate that [Sheriff Cabral] intentionally, or with conscious indifference, violated [her] federally protected civil rights." Zimmerman v. Direct Federal Credit Union, 262 F.3d 70, 82 (1st Cir. 2001), citing Iacobucci, 193 F.3d at 26. The relevant inquiry is focused on the subjective knowledge or intent of the employer. *See* Romano v. U-Haul Int'l, 233 F.3d 655, 669 (1st Cir.2000). In essence, Mrs. Porter was required to prove that Sheriff Cabral determined to bar her from the HOC knowing that in doing so she was violating her First Amendment right to free speech. Iacobucci, 193 F.3d at 26.

---

[22] Indeed, during the charge conference the Court expressed reservations regarding whether a satisfactory foundation for punitive damages against Sheriff Cabral had been laid during the course of trial. The Court ultimately decided to allow that issue to go to the jury and instructed them accordingly. Post judgment comments by one of the jurors suggest, however, that the jury awarded punitive damages in this case in part to punish the Sheriff's Department, not Sheriff Cabral. (See "Jury tells Cabral to pay damages to ousted nurse; Finds rights violated", Boston Globe, January 20, 2006, Attached as Exhibit B).

There was no evidence produced by Mrs. Porter in this case that Sheriff Cabral's conduct in barring her from the HOC was motivated by an evil intent or motive.[23] Indeed, the evidence adduced at trial, specifically the testimony of Sheriff Cabral, Ms. Keeley and Mr. Theiss, demonstrates that the issue was not Mrs. Porter's affirmative decision to speak to the FBI, but her conscious failure to comply with Department policy and properly report internally what she knew.  Nor does the record establish that the Plaintiff met her burden in proving that Sheriff Cabral intended "to effect a civil rights violation" as a consequence of her barring Mrs. Porter from the HOC.  Id.. The jury's determination that Mrs. Porter's protected speech was a substantial or motivating factor in Sheriff Cabral's decision to bar her from the HOC and that Sheriff Cabral would not have barred her from the HOC, but for that protected speech does not satisfy the legal standard for the imposition of punitive damages under §1983 and did not relieve the Plaintiff of her burden of proof on that issue.[24] See Powell v. Alexander, 391 F.3d at 16 (where liability for deprivation of a federally protected right under §1983 is predicated on intentional conduct, punitive damages will only be available for that subset of cases where evidence is adduced that the defendant was aware of the risk that the intentional conduct would violate federal law); see also Iacobucci, 193 F. 3d at 26 (In upholding district court's remittitur of punitive damage award, Court distinguished between the

---

[23] Plaintiff's suggestion in closing argument that Sheriff Cabral was motivated to retaliate against Mrs. Porter, someone whom she did not know, because of a disagreement with an Assistant United States Attorney over the direction of a joint SCSD/FBI investigation was attenuated at best and not grounded in fact.

[24] During deliberations, the jury asked a question concerning the first question on the special verdict slip. Specifically the jury wanted to know whether the actions of Sheriff Cabral were sufficient to bind Suffolk County and the Department.  Although the Defendants did not object to the technically correct answer the Court gave in response to the jury's question, Defendants expressed their concern to the Court that, by asking the question, the Jury may impute the actions of Department employees to the Sheriff for purposes of liability.  In light of the jury's unwarranted and excessive award of punitive damages against Sheriff Cabral and the comments by one juror to a Boston Globe reporter, see fn. 20, supra, those concerns appear to have been realized.

mens rea required for cognizable claim of §1983 claim grounded in false arrest from that required to justify punitive damages; the former requirement relates only to the conduct not the consequence, i.e. it entails an intent to do the act, not to effect a civil rights violation.).

In Iacobucci v. Boulter, 193 F. 3d 14 (1st Cir. 1999), a plaintiff journalist sued a police officer alleging claims under §1983 predicated on false arrest and excessive force. At the conclusion of the evidence the district court judge allowed the issue of punitive damages to go to the jury although she expressed reservations whether the requisite evidentiary foundation had been laid.[25]  The jury returned a verdict in favor of the Plaintiff on the §1983 false arrest claim and awarded him $135,000 dollars in punitive damages in addition to $75, 000 dollars in compensatory damages.  Concluding that the evidence did not warrant punitive damages, the district court struck that portion of the award.  The First Circuit upheld the district court's remittitur of the punitive damages concluding that it acted appropriately given the dearth of evidence of the defendant police officer's evil motive and/or his subjective awareness that his arrest of the plaintiff lacked probable cause, or his conscious indifference to the possibility that he lacked probable cause.  Iacobucci, supra at 26-27.   In making this determination, the Court recognized that by returning a verdict for the Plaintiff on the §1983 false arrest claim, the jury necessarily found that the Defendant had acted intentionally or recklessly in effectuating the arrest.  However, the Court drew the distinction between a defendant's "intent to do [an] act" and the intent "to effect a civil rights violation" as a consequence of that act. Powell v. Alexander, 391 F.3d at15, citing Iacobucci, 193 F.3d at 26.  It is the latter that is necessary to justify the imposition of punitive damages.

---

[25] The Judge in the instant case expressed similar reservations after the close of all of the evidence.

In <u>Powell v. Alexander</u>, 391 F. 3d 1(1st Cir. 2004), the First Circuit upheld the district court's judgment, that the defendant city solicitor was liable under 42 U.S.C. §1983 for intentionally retaliating against the plaintiff police officer for exercising his First Amendment right to petition the courts to seek redress.  The Court further found that that there was substantial evidence in the record to justify the district court's imposition of punitive damages in the amount of $10,000 dollars against the solicitor for engaging in a "course of behavior that th[e] [district] court deem[ed] outrageous and worthy of condemnation."  <u>Powell</u>, supra at19, citing <u>Powell v.</u> Alexander, 221 F.Supp.2d 119, 152 (D.Mass. 2002).  Specifically, the Court determined that the district court's detailed factual findings that the defendant city solicitor engaged in a particularly egregious course of misconduct, including the deliberate suppression of evidence, were sufficient to support it's implied finding that the defendant acted in the face of a perceived risk that her actions would violate federal law. <u>Powell</u>, supra at 21, citing <u>Kolstad</u>, 527 U.S. at 536.  Thus there was sufficient evidence that the defendant acted with "evil motive" or "reckless or callous indifference to the federally protected rights of others", <i>Id</i>., citing <u>Smith v. Wade</u>, 461 U.S. at 53, to justify the imposition of punitive damages under §1983.

Here, there is simply no competent evidence that Sheriff Cabral subjectively intended to violate Mrs. Porter's First Amendment right to free speech by barring her from the HOC.  Further, there is no evidence that Sheriff Cabral engaged in the kind of prohibited and egregious course of conduct that has been found sufficient to justify the award of punitive damages.  <i>See</i> <u>Powell</u>, <i>supra</i> at 21; <u>Tapalian v. Tusino</u>, 377 F.3d 1, 8 (1st. Cir. 2004)(Punitive damage award of $150,000 dollars issued against defendant town

superintendent was justified where evidence established that defendant had engaged in **prolonged personal vendetta** against plaintiff); Zimmerman v. Federal Direct Credit Union, 262 F.3d 70 (1st. Cir. 2001)(Punitive damage award of $400,000 against employer was not excessive in light of supervisor's **deliberate, systematic campaign** to punish plaintiff employee in retaliation for filing discrimination claim).

Rather, at most, the evidence established that Sheriff Cabral engaged in the solitary act of barring Mrs. Porter from the HOC based upon information provided to her by Mr. Theiss pertaining to Mrs. Porter's conduct in the Rosario investigation. *See* Alicea Rosado v. Garcia Santiago, 562 F.2d 114 (1st.Cir.1977) (Punitive damage award of $10,000 against an individual for single act that constituted violation of plaintiff's First Amendment rights was excessive). This information included the undisputed facts that Mrs. Porter did not document inmate Rosario's medical records with significant findings concerning his medical condition and did not timely file a written report after being directed to do so by a Deputy Superintendent, as well as the fact that Mrs. Porter had communicated with the FBI regarding Rosario's allegations of abuse. It was also undisputed that a failure to file a written report within the time frame contemplated by policy S220 was a violation of S220. This is not the kind of outrageous, reprehensible and egregious conduct repeatedly engaged in by a defendant, while knowing or suspecting that it was unlawful, that warrants the imposition of punitive damages in order to punish and deter such conduct. See BMW of N. America, Inc. v. Gore, 517 U.S. 559, 576-577 (1996); Powell, *Id.*; Tapalian, *Id.*; Zimmerman, *Id.*

Furthermore, the evidence adduced at trial demonstrated that the only course of conduct that Sheriff Cabral repeatedly engaged in from the moment that she took office

in November 2002 was one of professionalizing the Sheriff's Department and fostering

increased collaboration and partnerships with local, state, and federal law enforcement

agencies including the FBI.  Since November 2002, Sheriff Cabral implemented

numerous and unprecedented reforms in the areas of hiring, training, investigations,

discipline and promotions designed to enhance professionalism and accountability in the

Sheriff's Department. The collaborative relationships with outside law enforcement

involved, inter alia, sharing information, joint investigations of criminal activity and

programmatic initiatives.

Moreover, the amount of punitive damages awarded by this jury against Sheriff

Cabral as an individual was excessive as a matter of law.  When punitive damages are

awarded a Court may conduct a de novo review to determine whether the assessment of

such damages was consonant with principles of fundamental fairness.  Zimmerman v.

Federal Direct Credit Union, *supra* at 29.  "Those principles, 'dictate that a person

receive fair notice not only of the conduct that will subject him to punishment, but also of

the severity of the penalty that a State may impose.'" *Id.*, quoting BMW of N. America,

Inc. v. Gore, 517 U.S. 559, 574 (1996).  The United States Supreme Court has identified

three criteria for conducting such a review: (1) the degree of reprehensibility of the

defendant's conduct; (2) the ratio between the compensatory and punitive damages; and

(3) the sanctions imposed in other cases for comparable misconduct.  BMW v. Gore,

*supra* at 575.  Upon de novo review, a punitive damage award will be upheld unless it

"clearly appears that the amount of the award exceeds the outer boundary of the universe

of sums reasonably necessary to punish and deter the defendant's conduct.  Zimmerman,

*supra* at 30, (internal citations omitted).

The First Circuit has interpreted the first criteria set forth in *BMW*-the degree of reprehensibility of the defendant's conduct-as being the most "telling indicium of the reasonableness vel non of a punitive damage award."  Zimmerman, *supra* at 31.  "The simple fact is that some wrongs are more blameworthy than others.  In order to justify a substantial punitive damage award, a plaintiff ordinarily must prove that the defendant's conduct falls at the upper end of the blameworthiness continuum, or put another way, that the conduct reflects a high degree of culpability." *Id.* (internal citations and quotations omitted).  As discussed more thoroughly above, *see* III.A.1., *supra*, Sheriff Cabral's conduct in barring Mrs. Porter does not approach the high level of outrageous and egregious conduct necessary to justify the jury's substantial award of  $250,000 dollars in punitive damages.

Moreover, the award  "exceeds the outer boundary of the universe of sums reasonably necessary to punish and deter [Sheriff Cabral's] conduct".  Zimmerman, *supra* at 30, (internal citations omitted).  *See* Whitfield v. Melendez-Rivera, 431 F.3d 1 (1[st]Cir.2005)(Punitive damages of $15,000 against individual police officers who **shot plaintiff twice as he retreated** not excessive); Fishman v. Clancy, 763 F.2d 485 (1[st]Cir.1985)(Punitive damage awards of $39,000 against superintendent and $26,000 against school principal not excessive where the evidence established that defendants **repeatedly** retaliated against plaintiff for exercising her First Amendment rights); Clifton v. MBTA, 445 Mass. 611 (2005)(Punitive damages of $5 million dollars against employer (public agency) for **outrageous and shocking discrimination in the workplace** remitted to $500,000 dollars; new trial ordered when plaintiff refused to accept remittitur); McMillan v. MSPCA, 140 F.3d 288 (1st Cir.1998)(Punitive damage

award of $135,662.50 against MSPCA and $171,250 against individual defendant based

upon finding of intentional misconduct were **grossly excessive**); Acosta-Sepulveda v.

Hernandez-Purcell, 889 F.2d 9 (1st Cir.1989)(Punitive damages of $10,000 against

individual employer for First Amendment violation not excessive where conduct

constituted **blatant disregard** for free speech); Rowlett v. Anheuser-Busch, Inc., 832

F.2d 194 (1st Cir. 1987)(Punitive damage award of $3 million dollars against defendant

corporation deemed excessive and reduced to $300,000 dollars); Williams v. Brimeyer,

116 F.3d 351 (8th Cir.1997)(Punitive damages of $500 against prison officials for

violating inmate's First Amendment rights not excessive).

     The evidence adduced at trial does not support the jury's award of $250,000

dollars in punitive damages against Sheriff Cabral and it is excessive as a matter of law.

Accordingly the Court should strike the award of punitive damages in its entirety, or

alternatively order remittitur or a new trial.

     2.    The Record Does Not Support The Award Of Compensatory Damages

     The evidence produced at the trial with regard to economic damages was that

Mrs. Porter was currently making $29,000 dollars less than she made when she was

employed by CMS at the HOC and, since June 10, 2003 her lost income has totaled

approximately $79,000 dollars.  However, the evidence also established that Mrs. Porter

voluntarily chose to leave a full time position with benefits to work per diem, fewer hours

for less money.  The evidence also established that Mrs. Porter had no guarantee that she

would have worked for CMS for the next ten years or that she would have been employed

by the next company that held the contract for the provision of healthcare services at the

HOC.  In fact CMS lost the contract at the HOC in April 2005.

The only evidence of emotional distress came from Mrs. Porter and the testimony of her husband and daughter. The only medical evidence consisted of notes from eight visits to a licensed clinical social worker for counseling that terminated in September 2003. There was no expert testimony concerning symptoms, diagnosis or causation. There were no financial records submitted to support a damages award.

Compensatory damages include out- of- pocket losses and other economic harm as well as injury to reputation, personal humiliation and mental anguish and suffering. Memphis Community School District v. Stachura, 477 U.S. 299, 307 (1986).  The economic damages alleged were limited to her reduced income from a per diem job that she took voluntarily and her testimony that she expected to work for the next ten years. Further, any damage to Mrs. Porter's reputation was of her own doing, in granting interviews to the Boston Globe and WCVB Channel 5 fifteen months after she was barred.  Indeed, until Mrs. Porter publicized her barring, the Suffolk County Sheriff's Department had made no public comment concerning her.   Damages for mental distress are only available where there is actual proof of objectively recognizable damages. This standard requires the showing of medically cognizable psychological distress caused by the defendant's conduct.  Perez v. Rodriquez Bou, 575 F.2d 21, 25 (1st Cir. 1978).

An award of damages must be causally related to the defendant's wrongdoing; however the plaintiff should not be made more than whole. Newton v. Rockwook & Co., 261 F. Supp. 485, 488, (D.Mass.1966), aff'd 378 F.2d 315 (1st Cir. 1967). The jury's award of $360,000 in compensatory damages in light of the evidence presented can only be based on speculation or conjecture.  If a damage award "exceeds any rational appraisal or estimate of the damages that could be based on the evidence before it" the court is

obligated to grant a new trial. <u>Bandera v City of Quincy</u>, 220 F.Supp.2d 26, 41 (D. Mass 2002), <i>citing</i> <u>Eastern Mountain Platform Tennis, Inc. v. Sherwin- Williams Co. Inc.</u>, 40 F.3d 492, 502 (1st Cir. 1994).  Given the dearth of evidence at trial on the issue of compensatory damages the award cannot stand.

In the event the jury's award was based on Mrs. Porter's emotional distress, it is grossly disproportionate to the evidence presented and excessive as a matter of law. Mental distress damage awards are not immune from review. See <u>Koster v. Trans World Airlines</u>, 181 F. 3d 24, 34-35 (1st Cir. 1999).   In, <u>Sanchez v. Puerto Rico Oil Company</u>, 37 F.3d 712, (1st Cir. 1994), the jury awarded $150,000 in emotional distress damages that was reduced by the Court to $37,500. In declining to reduce the award further, the Court of Appeals noted that the district court appropriately took into consideration the absence of physiological or psychiatric evidence in remitting the award of the jury. In the present case, there was no medical testimony regarding Mrs. Porter's emotional distress claim.  To the extent that the testimony of her husband and daughter corroborated her claims of emotional distress, both testified that her emotional condition has improved significantly.  Further, the evidence was clear that Mrs. Porter's emotional condition has not prevented her from obtaining gainful employment or interfered with her job performance in her current position.  As stated by the Supreme Court, emotional distress claims are customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff. <u>Carey v. Piphus</u>, 435 U.S. 252, 263-64 (1978).  Genuine injury in this regard **may** be evidenced by one's conduct and observed by others, an award of damages must be supported by competent evidence concerning the injury. <u>Id</u>. n. 20, <i>citing</i> <u>Gertz v. Robert Welch Inc</u>., 418 U.S. 323, (1974). (Emphasis added.)  Other than Mrs.

Porter's own testimony and that of her family, there was a complete absence of any relevant testimony or documentation regarding her emotional distress. The $360,000 award, based in any part on Mrs. Porter's emotional distress claim cannot stand. The Defendants are entitled to a new trial on the issue of damages.

## IV.    CONCLUSION

For the foregoing reasons, Defendants Andrea Cabral, Suffolk County Sheriff's Department and Suffolk County respectfully request that this Court order a new trial on all issues; strike the damages; order a new trial on the issue of damages; or order remittitur consistent with the damages presented at trial.

Respectfully submitted,
For the Defendants
By their Attorney,


/s/ Ellen M. Caulo
Ellen M. Caulo, BBO #545250
Deputy General Counsel
Suffolk County Sheriff's Department
200 Nashua Street
Boston, MA 02114
(617) 961-6681


Date: February 2, 2006

<u>Local Rule Certification</u>

I, Ellen M. Caulo, hereby certify pursuant to Local Rule 7.1 that I have conferred with counsel for the Plaintiff in an effort to resolve the issues raised by this motion.

/s/ Ellen M. Caulo
Ellen M. Caulo