```
                                                                    1

 1                      UNITED STATES DISTRICT COURT

 2                       DISTRICT OF MASSACHUSETTS

 3     * * * * * * * * * * * * * * *

 4     SHEILA J. PORTER
                           Plaintiff
 5
            VERSUS                              CA-04-11935-DPW
 6
       ANDREA CABRAL
 7
                           Defendant
 8
       * * * * * * * * * * * * * * *
 9

10            BEFORE THE HONORABLE DOUGLAS P. WOODLOCK

11                UNITED STATES DISTRICT COURT JUDGE

12                      JURY TRIAL - DAY SEVEN

13                        JANUARY 18, 2006

14

15     APPEARANCES:

16         JOSEPH F. SAVAGE, JR., ESQ, Goodwin, Procter, LLP,

17         53 State Street, Boston, Massachusetts  02109, on

18         behalf of the Plaintiff

19

20         DAVID S. SCHUMACHER, ESQ, Gadsby Hannah, LLP,

21         225 Franklin Street, Boston, Massachusetts  02110,

22         On behalf of the Plaintiff

23

24     (Appearances continued next page)

25
```

```
                                                                    2

 1
 2    APPEARANCES (Continued):
 3
 4         ELLEN CAULO, ESQ. AND JAMES M. DAVIN, ESQ.,
 5         Suffolk County Sheriff's Department, 200 Nashua
 6         Street, Boston, Massachusetts  02114, on behalf
 7         Of the Defendant
 8
 9
10
11
12
13
14
15
16
17
18
19                              Courtroom No. 1 - 3rd Floor
                                1 Courthouse Way
20                              Boston, Massachusetts  02210
                                9:00 A.M. - 11:30 P.M.
21
22
            Pamela R. Owens - Official Court Reporter
23           John Joseph Moakley District Courthouse
                  1 Courthouse Way - Suite 3200
24                Boston, Massachusetts  02210
25
```

28

```
 1              CLOSING ARGUMENT ON BEHALF OF PLAINTIFF
 2         BY MR. SAVAGE:
 3              Good morning.
 4              Ms. Caulo is right about one thing.  This case does
 5    turn on what is credible, what's the credible evidence.  She's
 6    absolutely and fundamentally wrong about something else, which
 7    is what is the question here.  She has beaten the drum on the
 8    issue of were there violations.  But the only question here is
 9    were there violations that would cause somebody to be barred
10    and for what.  And after two witnesses in this case, after
11    Ms. Mary Ellen Mastrorilli and after Donna Jurdak, we all know
12    the answer.  And the answer is no.  We don't have to sort out
13    whether there were or were not violations, because both
14    Ms. Mastrorilli and Ms. Jurdak say whatever happened here is
15    not a basis for barring her for life.
16              Let's just step back a little and think about what
17    we have heard for the last week and a half.  And it really goes
18    back to that old saying, you know, if you're not part of the
19    solution, you're part of the problem.  Sheila Porter refused to
20    be part of the problem whether Sheriff Cabral liked it or not.
21    And, so, even though Sheriff Cabral was angry and in a heated
22    dispute with the FBI over a drug case where she felt left out,
23    Sheila Porter was still going to speak up and meet her duty as
24    a Nurse Practitioner to tell the FBI that a prisoner was in
25    danger whether Andrea Cabral liked it or not.  And she didn't
```

1  like it at all.  You heard from three witnesses, witnesses
2  basically not addressed in the argument you just heard, who
3  directly told you that talking to an outside agency was part of
4  Sheriff Cabral's reason for barring Sheila Porter for life from
5  the Suffolk County House of Corrections.  You heard it directly
6  from colleagues who have been her friends for years:  Viktor
7  Theiss, Elizabeth Keeley, and Gerry Leone.
8         And Mrs. Porter and I want to step back and thank
9  you for the week and a half you've spent here silently judging
10 the facts.  Thank you very much.  It's a sacrifice.  We know
11 it.  But also in this case, it's an opportunity.  I think the
12 greatest experience -- probably the greatest exhilaration and
13 fulfillment a human being could have is to lift the pain and
14 anguish off another human being if it can be lawfully done.  In
15 a few minutes, I'm going to ask you after years to lift the
16 pain and the humiliation and the suffering from Sheila Porter
17 and her family.  If you do, then I submit to you the evidence
18 here demonstrates you must.  You will have done something good
19 and right, something you can carry with you always in this
20 building.  It's been a pleasure for me to try a case for you in
21 this courthouse, not just because the elevators work and the
22 coffee is okay, but because this building itself speaks about
23 this case, about Sheila Porter's situation, her struggle, ours.
24 On the wall downstairs in the jury selection room, there's a
25 quote by Justice Holmes.  It's part of an opinion he wrote that

30

1    spoke to the fact that for those in charge, for those who have
2    no doubt of their ideas on their power, it's natural to sweep
3    away those who speak out. But Justice Holmes said, "The truth
4    comes out better for all of us if all of us can speak freely."
5    He went on to say, "That idea of free speech is at any rate the
6    theory of our constitution. It's an experiment. All of life
7    is an experiment. And at least while that experiment is part
8    of our system," Justice Holmes said, "I think we should be
9    terminably vigilant against attempts to check those who express
10   themselves." So, I ask each of you to be vigilant as we review
11   what happened here. And there are just two questions: Why did
12   Andrea Cabral ruin Sheila Porter's life and what does the law
13   say you can do about it? Andrea Cabral did it because Sheila
14   Porter spoke to the FBI. There's no question that was part of
15   the reason Andrea Cabral fired Sheila Porter for life. It's
16   the only reason that makes sense of all of the facts in the
17   case. It's a reason Viktor Theiss, Elizabeth Keeley and Gerry
18   Leone told you was the Sheriff's reason at the time. And
19   that's really important. What did Andrea Cabral say and
20   believe at the time, not what's the reason that's being given
21   now in litigation? Here she says the FBI had no role, but the
22   evidence is all to the contrary. On that fact, Andrea Cabral
23   is an island. She is alone. And there is nobody, common sense
24   tells us, that she can put her relationship and interaction
25   with the FBI in June of 2003 out of her head.

1   Now, this case isn't about the rules violations or
2   that somebody could or would or should bar Sheila Porter for
3   paperwork reasons.  The case is about did the Sheriff bar
4   Sheila Porter in part for another reason, talking to the FBI?
5   So we don't have to sort out whether Donna Jurdak or Sheila
6   Porter, who wrote the rules that teach medical documentation
7   know more about the right way to document, than the Sheriff
8   does.  But they do.  And we don't need to spend time on whether
9   Mary Ellen Mastrorilli and Donna Jurdak know more than the
10  Sheriff about how the medical unit was run, what reports were
11  handed in and when, what was a real violation, and what was a
12  technical problem.  They clearly know that Andrea Cabral does.
13  All you need to do here is look at what the Sheriff herself
14  said she did.  Look at whether her first explanation in June
15  2003 with the barring had to do with Sheila Porter talking to
16  the FBI makes more sense than the present explanation that it
17  was paperwork.  And why is there a lifetime ban?  Was it really
18  because of a one-time error by a clinician with 34 years
19  experience who was the best nurse practitioner that Donna
20  Jurdak had or was it partially because Sheila Porter spoke to
21  the FBI?
22        Three weeks after, Andrea Cabral had a huge fight
23  over an FBI investigation, the latest blowup in a historically
24  bad relationship between the Suffolk County Sheriff's
25  Department and federal law enforcement.

```
 1              So, let's review some facts.  They all show that
 2   talking to the FBI was part of the reason Mrs. Porter was
 3   fired.  But fact number one:  Why is it the Sheriff now can't
 4   even vaguely recall the meetings where the reasons were
 5   discussed, not the meeting with Elizabeth Keeley, not the
 6   meeting with Viktor Theiss, not clearly the meeting on June
 7   16th?  I mean, why she was able to get on the witness stand was
 8   apparently the FBI was talked about in the June 16th meeting.
 9   That was to her face.  She was talking.  She can't recall
10   hearing it or saying it?  Do you think there is any chance you
11   forget what you say if five federal law enforcement agents were
12   accusing you of barring Mrs. Porter of being an FBI informant?
13   If this is about the filing of papers, why did the Sheriff
14   disrupt medical care of the inmates by forcing Mrs. Porter off
15   the facility with no transitional care?  You remember
16   Mrs. Porter worked for free to help Donna Jurdak keep that unit
17   going.  If it's really about filing the forms, why not say
18   you're gone when we get your replacement?  Because it's not
19   about filing the forms.  It about talking to the FBI.  Why
20   didn't Andrea Cabral consider a lesser sanction if this is
21   really about the paperwork?  Because no lesser sanction would
22   address the real problem -- talking to the FBI.  Why not really
23   be part of law enforcement and encourage Sheila Porter to
24   become an FBI informant, to build on a relationship, whatever
25   it was that Andrea Cabral knew about?  Because she didn't want
```

1  FBI informants in her jail. Why is this the only barring ever
2  for paperwork reasons?
3         You remember Mary Ellen Mastrorilli, Donna Jurdak
4  and even Andrea Cabral said there never had been a firing for
5  paperwork-related reasons. And that's because it's not the
6  only reason. And the two barrings that were just reported that
7  occurred in 2005 after Mrs. Porter are both cases where
8  contract workers filed false reports where the contents of
9  their reports were false about what their interaction with the
10 inmates was. That's not what's being said about Mrs. Porter
11 here. Why is this the only barring that Andrea Cabral can
12 recall even being involved in? Because the FBI is her issue.
13        In June 2003, there was extreme displeasure with
14 federal law enforcement. If these paperwork reasons were real
15 and serious, then why not treat them that way. Why not
16 investigate how the medical unit is run? Why not discipline
17 Mary Ellen Mastrorilli and Donna Jurdak who run the unit? Why
18 not tell Mrs. Porter's employer "what the heck is going on?"
19 Why not let the Board of Nursing know? Why let Mrs. Porter get
20 immediately hired by other Sheriffs? If this is real, then she
21 should have rung the bell. There should have been an alarm
22 that went off. This is real! It's not, ladies and gentlemen.
23 It's not. Why would she bar somebody for a paperwork issue
24 when everybody knew there was no harm to any investigation?
25 Why just Mrs. Porter when other people in this investigation

1  filed reports late or didn't file all the reports they were
2  supposed to file?  Why make a decision based on facts that
3  Sheriff Cabral acknowledged to you turned out to be wrong?  Why
4  not find out the truth?  The answer is always the same.  And
5  it's that Sheila Porter admitted talking to Christa Snyder, the
6  FBI agent.  Just think about what you heard.  Andrea Cabral
7  said she spent hours interviewing new hires.  And this is the
8  first case of inmate abuse and she can't even take the time to
9  read the file.  She didn't need to read the file.  She knew the
10 facts she needed to know.  Mrs. Porter said she spoke to the
11 FBI.  She never looked at the file.  She had a passing
12 conversation with Viktor Theiss who gave her all she needed to
13 know.  And with a flick of the wrist, Sheila Porter is barred.
14 Also remember what I explored on cross-examination, the fact
15 that Andrea Cabral's reasons keep changing.  She can't remember
16 whether it was or wasn't part of the reason that the thing was
17 home on the computer.  In her deposition in May, she said
18 putting it on the wrong form was a reason.  Here she said,
19 "well, I mean that's part of the reason, the other three
20 reasons I've given you."  When she went to the June 16th
21 meeting, she never said backdating was a reason.  Why do these
22 reasons keep moving.  Because I submit to you they are not the
23 whole reason.  The FBI is part of the reason.  It's the only
24 reason that explains all the facts in the case.
25         But now let's go directly to the very heart of it.

35

1  What do Keeley, Theiss and Leone all say that Andrea Cabral
2  said in June of 2003 -- 2003? They were all on the same page.
3  She said the FBI is part of it. It's crystal clear that
4  talking to the FBI is part of the reason.
5       Let's review Ms. Keeley. First, think about her
6  demeanor. How hard was it for me to try and get direct answers
7  from her? Clearly, she did not want to admit to you the truth
8  and hurt her long-time friend and boss. But she had to. And
9  she said on June 10th, she discussed with Andrea Cabral that
10 Sheila Porter went outside of the department with confidential
11 information. She said, in speaking to an outside agency, that
12 it was integral to the decision. It was significant. It was
13 important. She said she relayed the reasons to Mary Ellen
14 Mastrorilli on June 10th, the same day. And you heard what
15 Mary Ellen Mastrorilli said. The reason was Mrs. Porter had
16 spoken to the FBI. Elizabeth Keeley said she repeated the
17 Sheriff's reasons again on June 12th to Gerry Leone in the
18 telephone call setting up the June 16th meeting. And again,
19 the reason is, in part, talking to the FBI. And then at the
20 June 16th meeting, again, Elizabeth Keeley recalls -- because
21 it was repeated -- that "part of the problem was that Porter
22 spoke to an outside agency." Now Andrea Cabral is sitting
23 right there. Andrea Cabral is talking about this topic. And
24 her answer to you was, "Well, apparently it was said." She
25 forgot this? Do you buy that?

1       Viktor Theiss.  He's at the June 16th meeting.
2  There's three people there:  Theiss, Keeley, Cabral and the
3  Suffolk County Sheriff's Department.  He doesn't recall who was
4  speaking, but he recalls clearly, answer, "I recall two reasons
5  being provided, which was failure to document a medical record
6  and going to the FBI without notifying the department."  And
7  then there is Mr. Theiss' testimony of the later week that just
8  had Elizabeth Keeley, himself, and Sheriff Cabral.  And he says
9  that Sheriff Cabral repeated those same two reasons.  Notifying
10  the FBI was part of it.  It was part of that meeting.  It was
11  part of that discussion.  And recall Viktor Theiss' demeanor on
12  the stand.  I submit to you he was a subdued and broken man who
13  was in big trouble.  Andrea Cabral put him in the hot seat by
14  incorrectly answering the interrogatory that Viktor Theiss was
15  the only one consulted on the barring.  So, in May 2005 when he
16  was asked questions in this case under oath about all of the
17  conversations he had with Andrea Cabral, about the reasons for
18  the barring, he did not tell the truth.  He hid the fact that
19  Andrea Cabral, Liz Keeley and himself had that meeting after
20  June 16th.  He hid the fact that one reason for the barring was
21  Mrs. Porter's contact with the FBI.  He hid it for a reason:
22  Because this whole case turns on it.  He had to hide it or the
23  Sheriff and the department are liable.  But he got exposed
24  because there were other statements in January '05 where he
25  hadn't hidden it.  And, so, he had to tell you the truth, that

1  there was a meeting that Andrea Cabral did say one of the
2  reasons was talking to an outside agency. He had to go on and
3  admit that he had testified falsely to us in May. We tried and
4  tried. When we found out about it, he had to tell the truth.
5  He could no longer help Andrea Cabral by testifying falsely.
6  He got caught and he's going to face whatever consequences
7  there are. But nobody would risk those consequences if they
8  weren't caught and forced to tell you the truth.
9           So, what is the truth again? There was a meeting
10 June 16th in this building. And one reason for the Sheriff's
11 decision was talking to the FBI. And there was a second
12 reason. Elizabeth Keeley and Viktor Theiss and Andrea Cabral
13 and again the Sheriff, in her own mind, said that that was one
14 of the reasons. You saw Sheriff Cabral's response to that on
15 the witness stand yesterday. She shrugged and then simply
16 denied that meeting. How ironically that the man Andrea Cabral
17 relied solely upon to ruin Sheila Porter's life provides
18 information that, all alone, is enough for you to give her that
19 life back.
20          Finally, as to the direct words out of Sheriff
21 Cabral's mouth is the testimony you heard of Gerry Leone. He
22 is not in the same boat as Viktor Theiss and Elizabeth Keeley
23 and you could tell from his deameanor on the stand. It didn't
24 have to be dragged out of him. He hasn't hidden anything
25 before. He wasn't trying to weave or duck. He was simply a

1  friend of Andrea Cabral's for years who happens to recall the
2  June 16th meeting clearly and he has notes. He told you how it
3  got set up. June 12th, there's a telephone conversation with
4  Elizabeth Keeley where she gives the reasons that include
5  speaking to an outside agency. Quote, "they have been
6  disclosed" -- "the information had been disclosed
7  inappropriately to an outside agency." They set up the
8  meeting. And as you recall, Mr. Leone said first Elizabeth
9  Keeley gave the reasons three feet away from the Sheriff. They
10 included, among the reasons, that Mrs. Porter had spoken to an
11 outside agency. And then the Sheriff gave the reasons herself
12 and it included the same thing. I don't know if you remember
13 the testimony. But you remember Mr. Leone saying the crux of
14 the focus of the medical information was that medical
15 information had been disclosed outside the agency. So, both
16 Elizabeth Keeley and Andrea Cabral at that meeting said it was
17 one of the reasons. Gerry Leone was absolutely clear. This is
18 the Sheriff speaking as to her reasons.
19         You need no more, I submit to you, ladies and
20 gentlemen. End of story. She says it's absolutely not a
21 reason. It clearly was a reason. The later answers are
22 pretext. The interrogatories, the stories in the press that
23 Mrs. Porter is not a whistleblower for the FBI, they are
24 absolutely of no moment here. They don't make the Sheriff's
25 case.

1              So, let's turn to what the law permits you to do
2    about it.  One of the questions on the verdict form is going to
3    go to damages.  And here, the economic damages are pretty
4    straightforward.  You heard Mrs. Porter testify that she's lost
5    $79,000 since June 3rd -- June 10th, '03 until today.  There's
6    basically no dispute about that.  You also heard her testify
7    that, at present, for the past couple of years, she is making
8    $29,000 a year less than at the House of Correction and that
9    she planned on working for 10 years.  $290,000 plus the
10   79,000 that she's out.  The economic damages are pretty
11   straightforward, $369,000.
12             Now, Ms. Caulo says, "But, wait a minute.  With
13   that number, you're not guaranteed that you would have worked
14   at the House of Correction."  Correct, true.  But it's also not
15   guaranteed that Mrs. Porter will only make $29,000 less
16   forever.  She could have lost her House of Correction job the
17   next day or she could lose the job she has today the next day.
18   She could fall down and get hurt.  So, sure, you can start with
19   the number that she was making $71,000 and she's not going to
20   make it for 10 years, so the damages are $710,000.  But
21   Ms. Cabral and the county got lucky, because Mrs. Porter is a
22   hard worker and she went and got a job and she's able to offset
23   this.  But she can't offset it all and there's only one
24   reasonable number here on the evidence.  And that's the
25   $290,000.

1          The next thing you're going to have to consider is
2   the issue of emotional distress, the emotional suffering to
3   date, and whatever emotional suffering you conclude is likely
4   to continue for the rest of her life.  And nobody can tell you
5   how to value emotional suffering or pain.  There is no
6   marketplace for emotional distress.  There's no way to fully
7   compensate.  You have only got the limited tool the law gives
8   you, which is money damages.
9          So, let me give a couple of thoughts, maybe ways to
10  approach it.  One is you can think about if there was an ad in
11  the newspaper that offered -- Jim, can you put it up?  I offer
12  a job with this description.  You get to be "sleepless,
13  irritable, tearful, (agitated depression)" --
14          THE COURT:  Well, I tell you, I think this is
15  improper argument, Mr. Savage.  And, so, take it off the
16  screen.  The jury will disregard it.  Move on to proper
17  argument.
18          BY MR. SAVAGE:
19          You've got to put a dollar figure on the feelings
20  that Mrs. Porter has.  The flip side or another way to think of
21  it, how much should Mrs. Porter be paid to be relieved of the
22  suffering that she has?  And when you conclude what adequate
23  compensation is, then you need to give that to Mrs. Porter.
24  Now you will recall the evidence.  The anxiety, the agitation,
25  the humiliation, the loss of reputation, the form that she has

41

1   to fill out having lost her security clearance, the loss of her
2   relationship with the FBI. She's an older, long-term
3   employee. That increases the suffering.
4         Maybe another approach is: Is there something
5   greater or less than the economic harm that she's suffered?
6   Well, sure, there are some things that make it greater. The
7   pain is going to go on for more than 10 years. Even the
8   Sheriff recognized that there's special pain for civil rights
9   violations. Could it be less? Sure. Mrs. Porter is extremely
10  lucky to have strong family support that's made the suffering
11  less. And indeed, if you render a verdict in Mrs. Porter's
12  favor, it will lift the pain of some of the future suffering.
13  So, it may be less. I can't tell you a number. I can simply
14  say that the law requires you to compensate her fairly.
15        I have got even less guidance for you on the final
16  topic, which is punitive damages. Punitive damages are simply
17  what you say they are. The law permits you -- it does not
18  require you, but it permits you -- to send a message when
19  someone callously disregards the civil rights of another. Now,
20  here it's especially appropriate given that the acts were
21  committed by a civil rights prosecutor who demonstrates no
22  remorse. It is clear Sheriff Cabral will do this next week or
23  next year and as long as she is Sheriff. It's exactly how she
24  plans to run the facility. She needs to be given a message to
25  cut it out. But your message is also to others dealing with

42

1  whistleblowers as well. We don't want a world, I submit, where
2  the Sheila Porters hesitate to help those in danger because
3  their bosses haven't gotten the message that they can't
4  retaliate. The amount needs to be related to the underlying
5  damage to support her. That's the way society has done the
6  punishment for these things. The ancient text "an eye for an
7  eye" or "ten plates under each of them," the Romans do it even
8  harsher. But it's got to be some number related to the
9  underlying harm. That's fundamentally the way human beings
10 approach punishment and deterrence. And I'm not going to
11 presume to suggest to you a number. But I will say you can't
12 avoid sending a message, because if the number is zero, that
13 sends a message, too, and I believe it's a long and dangerous
14 message based on the evidence in this case.
15          So I need to ask you directly to do a few things.
16 You're going to have a verdict form. And the first question
17 is: Did Sheila Porter establish by a preponderance that her
18 protected speech was a reason for her barring? And I ask you
19 to answer that question "yes."
20          As to the next question, did the Sheriff who stands
21 alone as an island somehow prove by a preponderance that she
22 would have barred Sheila Porter, anyway? And I ask you to
23 answer that "no."
24          And then when it comes to the damages, I ask you to
25 give the compensatory damage figure of $369,000, plus the

1   damage figure that you determine to be right for her pain and
2   suffering and to punish and deter. And this is it. You can't
3   come back two years from now and see how Sheila Porter is
4   coping. You can't come back the next time that Sheriff Cabral
5   violates someone's rights. And so with that, based on this
6   overwhelming evidence, I submit to you, ladies and gentlemen,
7   and I ask you to do what the law and the evidence allows.
8   Thank you each very much.
9           THE COURT: Thank you, Mr. Savage.
10          I think, ladies and gentlemen, before I charge,
11  we'll take a short break of 10 minutes or so. This is an
12  especially important time for you not to discuss this case.
13  And you'll understand that I am going to ask you, before I
14  start my instructions, whether or not you have had any
15  conversations, any communications, anything outside of this
16  court that bears on this case before we get to that final stage
17  of instructions. So, you can commensurate over the Patriots,
18  you can discuss the weather, but don't talk about this case
19  yet. So, we'll take 10 or 15 minutes.
20  (Jury out at 10:10 A.M.)
21          THE COURT: You may be seated. I'm going to ask
22  Ms. Rynne to mark as Jury Exhibit Number 1 the writing that
23  dealt with the economic damages and also to have marked as Jury
24  Exhibit Number 2 -- I'm not quite sure how I would describe it
25  -- whatever it was that was put up in front of the jury that