UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SHEILA PORTER

          Plaintiff,

   v.

ANDREA CABRAL, SUFFOLK COUNTY
SHERIFF'S DEPARTMENT, and SUFFOLK
COUNTY

         Defendants.

Civil Action No.04-11935-DPW

## PLAINTIFF SHEILA PORTER'S OPPOSITION TO
## DEFENDANTS' MOTION FOR A NEW TRIAL AND REMITTITUR

Plaintiff Sheila Porter ("Ms. Porter") hereby submits her Opposition to Defendants'
Motion for a New Trial and Remittitur.

### INTRODUCTION

After 15 months of hard-fought discovery and motion practice, this case was pared down
and presented to the jury to resolve a single issue: why did Sheriff Cabral bar Ms. Porter from
the Suffolk County House of Corrections ("HOC") on June 10, 2003?  Over the course of a
seven-day trial, the jury heard testimony from Ms. Porter, her family, her supervisor, top Suffolk
County Sheriff's Department ("SCSD") decisionmakers, the First Assistant United States
Attorney, an FBI agent, and Sheriff Cabral and concluded that Ms. Porter's communications with
the FBI about allegations of inmate abuse were a substantial or motivating reason why she was
barred and that Sheriff Cabral would not have barred Ms. Porter absent these communications.
The jury awarded Ms. Porter $360,000 in compensatory damages and $250,000 in punitive
damages.

Against this backdrop, Defendants request a new trial, arguing that the jury returned a verdict that was against the weight of the evidence, was unduly influenced by remarks at closing argument, and awarded Ms. Porter an excessive amount of damages. In the alternative, they ask the Court to remit the damage award. None of these arguments have merit, and the verdict should not be disturbed. The jury's verdict was amply supported both by extensive evidence that Sheriff Cabral barred Ms. Porter because she spoke with the FBI—including her own admissions to that effect—and by strong evidence that her proffered contrary reasons are pretextual. Counsel's remarks at closing argument were well within the bounds permitted by law and, in any event, caused no prejudice. Finally, the damage award did not shock the conscience or result in a miscarriage of justice. Therefore, the Motion should be denied in its entirety.

## ANALYSIS

Granting a new trial or remittitur is appropriate only if the verdict constitutes a miscarriage of justice. Defendants' arguments do not even rise to that level. At most, Defendants contend that the evidence could have supported an opposite verdict or that there were errors that they did not object to at the time and that they cannot now show to have affected the outcome in any event. Because the jury's resolution of the disputed evidence and its measured damages award plainly do not reflect a miscarriage of justice, neither a new trial nor remittitur is warranted.

## I.    THE VERDICT WAS OVERWHELMINGLY SUPPORTED BY THE EVIDENCE PRESENTED AT TRIAL.

A new trial is appropriate under Fed. R. Civ. P. 59 only where the verdict is so "seriously mistaken, so clearly against the law or evidence, as to constitute a miscarriage of justice." *Transamerica Premier Ins. Co. v. Ober,* 107 F.3d 925, 929 (1st Cir. 1997); *see also Velazquez v. Figueroa-Gomez*, 996 F.2d 425, 427 (1st Cir. 1993) (holding that a court may only grant a new

trial if it "believes that the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice."). Orders granting a new trial are "sparingly used," *Dall v. Coffin*, 970 F.2d 964, 969 (1st Cir. 1992), and "a jury's verdict on the facts should only be overturned in the most compelling circumstances." *Velazquez*, 996 F.2d at 427. The Court's discretion is limited by the parties' rights to have a jury make the ultimate fact determinations in the case. *See Ahern v. Scholz*, 85 F.3d 774, 780 (1st Cir. 1996). Thus, a judge may not act as a thirteenth juror and overturn a jury verdict on the grounds that she disagrees with it or would have found differently in a bench trial because a "party is not entitled to a new trial merely because the evidence introduced at trial would have supported an opposite verdict." *Chedd-Angier Production Co., Inc. v. Omni Publications Intern., Ltd.*, 756 F.2d 930, 934 (1st Cir. 1985); *see also Ahern*, 85 F.3d at 780; *Real v. Hogan,* 828 F.2d 58, 61 (1st Cir. 1987).

Here, the jury returned a verdict that Ms. Porter established by a preponderance of the evidence that her protected speech in relaying Inmate Rene Rosario's allegations of abuse to the FBI was a substantial or motivating factor in Sheriff Cabral's decision to bar her from the Suffolk County House of Corrections ("HOC"), and that Defendants did not show that Sheriff Cabral would have barred Ms. Porter even if she had not relayed these allegations to the FBI. *See* Verdict, Questions # 1, 2. As we now show, Defendants' motion utterly fails to establish that the verdict is against the "clear weight of the evidence" and reflects a "seriously erroneous result" that, if left to stand, would be a "clear miscarriage of justice." *Chedd-Angier Production Co.,* 756 F.2d at 934.[1]

---

[1] Unfortunately, the transcripts of the trial could not be prepared before this Opposition had to be filed. The ensuing rendition of the evidence presented at trial is taken from counsel's notes.

**A.    The Jury Was Presented With Ample Evidence Affirmatively Showing that Ms. Porter's Communicating With the FBI was a Substantial or Motivating Factor in Sheriff Cabral's Decision to Bar Her.**

The jury heard multiple pieces of evidence affirmatively establishing that Ms. Porter's communications with the FBI about the Rosario allegations were a substantial reason for her barring. Such evidence included the statements and actions of Sheriff Cabral herself, as well as those of her top lieutenants from the SCSD and the First Assistant United States Attorney. The cumulative weight of this evidence clearly supports the jury's verdict.

      1.    <u>Evidence that Sheriff Cabral and Her Staff Admitted in the June 16, 2003 Meeting With the U.S Attorney and the FBI That a Reason for Ms. Porter's Barring Was That She Talked to the FBI.</u>

First, a number of witnesses testified that, at a June 16, 2003 meeting attended by Sheriff Cabral, members of her staff, and representatives from the FBI and U.S. Attorney's Office, Sheriff Cabral stated that one reason she barred Ms. Porter was because she spoke to the FBI. First Assistant U.S. Attorney Gerard Leone testified that the meeting revolved around the circumstances surrounding Ms. Porter's barring, which had occurred six days earlier. Ms. Keeley spoke first. According to Mr. Leone, one of the four reasons Ms. Keeley provided for Ms. Porter's barring was that Ms. Porter released sensitive and confidential medical information outside the facility. A second, related, reason was that, by speaking to an outside agency, Ms. Porter violated SCSD policies and procedures. Thus, two of the four reasons provided by Ms. Keeley for the barring were that Ms. Porter talked to the FBI.

Sheriff Cabral spoke next. Mr. Leone specifically recalled Sheriff Cabral saying that Ms. Porter's communications to the FBI were a reason for her barring.[2] Mr. Leone also testified that Sheriff Cabral "reiterated" the reasons that SCSD Chief-of-Staff Elizabeth Keeley had

---

[2] Mr. Leone testified that, at first, the FBI was not specifically mentioned as the outside agency in question, but the FBI was specifically identified as the recipient of the information later in the meeting.

previously given at the meeting, two of which involved talking to the FBI.[3] On the issue of

medical documentation—the chief reason Sheriff Cabral said she barred Ms. Porter—Mr. Leone

testified that "the crux of the focus of the medical information was that medical information had

been disclosed to an outside agency." Thus, the jury heard an unimpeachably neutral witness (if

anything, a witness more favorably disposed towards Ms. Keeley and the SCSD) testify that

Sheriff Cabral linked her decision to bar with Ms. Porter's communications with the FBI.[4]

  Mr. Leone was not the only witness to testify that Sheriff Cabral stated at this meeting

that Ms. Porter was barred for talking to the FBI. Sheriff Cabral's own hand-picked Chief of the

Sheriff's Investigation Division ("SID"), Viktor Theiss, testified that only two reasons were

given at the June 16th meeting for Ms. Porter's barring, one of which was "going to the FBI

without notifying the Department."

  It was reasonable for the jury to credit this testimony and conclude that one of the reasons

for Ms. Porter's barring that Sheriff Cabral gave at the June 16th meeting was speaking to the

FBI. Indeed, the Defendants presented no contradictory evidence to negate this conclusion—the

most they could muster was that other participants do not recall the reasons Sheriff Cabral gave.

Sheriff Cabral testified that she did not recall what she said at the meeting regarding the reasons

she barred Ms. Porter. As Defendants concede, the jury reasonably could conclude that it was

not credible that Sheriff Cabral could not recall what she said at the meeting. *See* Def. Memo. p.

---

[3]According to Mr. Leone, one of the four reasons Ms. Keeley provided for Ms. Porter's barring was that Ms. Porter released sensitive and confidential medical information outside the facility. A second, related, reason was that, by speaking to an outside agency, Ms. Porter violated SCSD policies and procedures. Thus, two of the four reasons provided by Ms. Keeley for the barring were that Ms. Porter talked to the FBI.

[4] Defendants claim that Mr. Leone testified that his notes regarding the meeting "reflect that he attributed the comment about providing information to an outside agency to Ms. Keeley only." Memo. in Support of Mot. for New Trial and Remittitur ("Def. Memo."), p. 13. Ms. Porter's counsel's notes reflect the opposite—that Mr. Leone had a specific recollection of Sheriff Cabral stating that one reason for the barring was that Ms. Porter spoke to an outside agency about the Rosario allegations—and counsel is confident that when the transcripts become available

26. However, even if the jury believed that Sheriff Cabral does not recall what she said, this testimony does not contradict the affirmative testimony of Mr. Leone and Mr. Theiss.

Similarly, Chief-of-Staff Keeley's testimony that she could not recall the specific statements made by Sheriff Cabral at this meeting do not contradict the testimony of Mr. Leone and Mr. Theiss. Indeed, her admission that the reasons provided by Sheriff Cabral for the barring at the June 16th meeting and previously on June 10, 2003, when the decision to bar was made, were always the same, and that they included speaking to the FBI about the Rosario allegations supports the testimony of these other witnesses that one reason Sheriff Cabral gave for the barring was speaking to the FBI. When asked if Ms. Keeley had told the USAO and FBI that talking to the FBI was a reason for Ms. Porter's barring, Sheriff Cabral responded "apparently she did." Sheriff Cabral also admitted that Ms. Keeley was speaking "for the Department" at the June 16th meeting, and she admitted that she never objected or clarified the reasons provided by Ms. Keeley.

In short, the First Assistant U.S. Attorney and Sheriff Cabral's top two aides—who testified that they were all longtime friends of Sheriff Cabral—each testified that, at the June 16th meeting, Sheriff Cabral indicated that one reason for the barring was Ms. Porter's communications to the FBI. It was more than reasonable for the jury to render a verdict in Ms. Porter's favor based on this testimony.[5]

---

that they will bear this out. The jury could properly conclude that reasons for barring, offered in the Sheriff's presence and not objected to by the Sheriff, were indeed the Sheriff's reasons for the barring.

[5] Defendants claim that the testimony concerning the June 16, 2003 meeting "differed in significant respects." Def. Memo. p. 27 n. 14. On the contrary, Mr. Leone, Mr. Theiss and Ms. Keeley all testified that Sheriff Cabral affirmatively stated or ratified by silence that Ms. Porter was barred for speaking to the FBI during this meeting and the Sheriff said it "apparently" happened. The only witness providing arguably inconsistent testimony on this point—that she could not recall—was Sheriff Cabral herself.

2.    Evidence that Sheriff Cabral Repeated Her Admission That One of the
Two Reasons She Barred Ms. Porter Was Because She Talked to the FBI.

The jury heard evidence that the June 16th meeting was not the only time that Sheriff

Cabral indicated that she barred Ms. Porter because she spoke to the FBI. Mr. Theiss also

testified that he spoke with Sheriff Cabral and Ms. Keeley about the barring subsequent to the

June 16th meeting. Mr. Theiss testified that, during that meeting, Sheriff Cabral said that she

barred Ms. Porter for two reasons: speaking to the FBI without notifying the Department and

failing to document Mr. Rosario's medical file. This testimony is particularly persuasive

because Mr. Theiss admitted that, at his deposition, he provided affirmatively false testimony

under oath when he testified that he did <u>not</u> know the reasons for Ms. Porter's barring, even

though at a prior, secret proceeding he had previously given the testimony described above.

Both the substance of this testimony, and the fact that Mr. Theiss sought to conceal that

substance by providing false contrary testimony, provide strong additional evidence

affirmatively establishing that Ms. Porter was barred because she spoke to the FBI.

3.    Evidence Surrounding the Decision to Bar Ms. Porter Indicates That Ms.
Porter Was Barred Because She Spoke to the FBI.

The evidence presented to the jury regarding the circumstances surrounding Ms. Porter's

barring further supported the verdict. First, former Deputy Superintendent Mary Ellen

Mastrorilli testified that the <u>only</u> reason she was ever given for Ms. Porter's barring was that she

spoke to the FBI. Ms. Mastrorilli testified that, on May 22, 2003, Mr. Theiss telephoned her to

report that he had just learned that Ms. Porter had spoken to the FBI about the Rosario

allegations. *See also* Trial Exhibit 23 (Mastrorilli memorandum to Bradley). Ms. Mastrorilli

testified that she was furious about Ms. Porter's actions and that Mr. Theiss shared this outrage.

She testified that she offered to bar Ms. Porter on the spot, but Mr. Theiss told her to wait until she heard from him again.[6]

Ms. Mastrorilli testified that she next heard from Mr. Theiss on June 10, 2003, when she was told that she could go ahead and bar Ms. Porter. When Ms. Mastrorilli asked him what were the reasons for the barring, she was told to call Ms. Keeley. Ms. Mastrorilli contacted Ms. Keeley, who said that clearly Ms. Porter had divulged confidential patient information to an outside agency, so she had to be barred. Ms. Mastrorilli set up a meeting with Donna Jurdak and Ms. Porter. During this meeting, she told Ms. Porter that she was barred for speaking to an outside agency. She read from the "confidential communications" section of Policy S-220, which prohibits employees from disclosing information about inmates outside the Department. In short, Ms. Mastrorilli testified that she was instructed to bar Ms. Porter solely because she spoke to the FBI, and that was the only reason Ms. Mastrorilli provided for Ms. Porter when she carried out these instructions.

In addition, there is no question that Sheriff Cabral was aware that Ms. Porter had spoken to the FBI about the Rosario allegations and that her top aides believed she should be barred for this reason. Mr. Theiss testified that, in the course of updating Sheriff Cabral about the Rosario investigation, he told her that Ms. Porter had reported the Rosario allegations to the FBI. As mentioned above, Ms. Mastrorilli testified that Mr. Theiss agreed with her that Ms. Porter should be barred for this, but he told her to wait. Ms. Keeley also testified that she believed that talking to the FBI was a barrable offense. On June 10, 2003, Ms. Keeley and Sheriff Cabral discussed Ms. Porter's communications with the FBI. Ms. Keeley testified that she told Sheriff Cabral at

---

[6] Ms. Mastrorilli testified that, if she had known that Ms. Porter was a FBI informant, she would not have believed that barring was appropriate. Indeed, she and Donna Jurdak both testified that, subsequent to the barring, they had a conversation where both expressed their bewilderment about the barring because they believed the SCSD should be working cooperatively with outside law enforcement to root out abuse.

that meeting that she believed that Ms. Porter should be barred, in part, because she disclosed confidential information outside of the Department. Indeed, Ms. Keeley testified that speaking to an outside agency was a "significant" factor in the barring and "integral" to the decision to bar. This evidence concerning the events and discussions at the time of the barring further support the jury verdict.

> 4.    Evidence of SID's Attempts to "Out" Ms. Porter Supports the Jury's Verdict.

The jury also heard evidence that representatives of SID, headed by Mr. Theiss, embarked on a campaign to discover who had contacted the FBI about the Rosario allegations, and when it was discovered that Ms. Porter was the source, SID interrogated her until she admitted that she had spoken to the FBI. SID's preoccupation with this issue is further evidence that Ms. Porter was barred because she spoke to the FBI.

Agent Christa Snyder testified that she had two conversations with SID Agent Stan Wojtkonski where he attempted to determine who had spoken to Agent Snyder about the Rosario allegations. First, during a face-to-face meeting, Agent Snyder said that she was aware of the Rosario allegations, that she was concerned because Rosario had been a witness for the FBI, and that Mr. Wojtkonski should check the medical records for additional information. Mr. Wojtkonski immediately attempted to determine her source, asking "why, did it come from the medical department?" Mr. Theiss testified that, subsequent to this conversation, SID investigators discussed who the source might be, and SID investigator Steve Jacobs suggested that it might be Ms. Porter. Agent Snyder spoke with Mr. Wojtkonski again on May 23rd and Mr. Wojtkonski told her that SID had identified Ms. Porter as the source and that there could be a problem because he was under the mistaken belief that Ms. Porter had not reported the incident internally. Agent Snyder reprimanded Mr. Wojtkonski, telling him that it was inappropriate for

him to try to determine a source and that Agent Snyder told the source that she would pass the information along to SID.

SID then set out to confirm their suspicion that Ms. Porter was Agent Snyder's source. On May 28, 2003, Ms. Porter was summonsed to SID for an interview. She testified that, shortly after it began, the topic and tone of the meeting changed. One of the SID agents leaned forward, lowered his voice and, using a standard misdirection interrogation technique, asked "when did you first talk to Christa?" When Ms. Porter did not immediately respond, the investigator pressed the issue, asking the day and time that she had contacted Agent Snyder and what was the topic of their conversation. Ms. Porter answered truthfully that she had contacted Agent Snyder about the Rosario allegations on May 20th.

In short, the jury heard evidence that representatives of Sheriff Cabral's SID, including Mr. Theiss, engaged in a witch hunt to determine the "leak" to the FBI, and once they surmised that it was Ms. Porter, they used interrogation tactics to elicit an "admission" from her. Importantly, Sheriff Cabral agreed that there was a "concern" among the Department that Ms. Porter informed the FBI about the Rosario allegations before telling SID. Thus, a reasonable jury could infer from this further evidence that Sheriff Cabral barred Ms. Porter for talking to the FBI.[7]

---

[7] The jury also heard Donna Jurdak testify about her unpleasant interactions with Mr. Theiss. In particular, Ms. Jurdak testified that, when she went to report the allegation of inmate abuse to Mr. Theiss, he was sarcastic and uninterested in the allegations, asking her "would the inmate be Rosario?" and "would the nurse be Sheila Porter?" Mr. Theiss also told Ms. Jurdak "I wish your nurses would stop believing inmates." The jury could have concluded from this interaction that Mr. Theiss, the head of SID, was focused on minimizing the reporting of inmate abuse and that the Sheriff's actions were consistent with this position. Reporting to the FBI obviously undermined the desire for silence expressed by the Department's executive staff.

     5.    <u>Evidence Concerning the Dispute Between Sheriff Cabral and the FBI</u>
          <u>Lends Additional Support to the Verdict</u>.

Finally, evidence was presented to the jury that the relationship between the SCSD and the FBI was contentious, providing context for the jury to reasonably conclude that Sheriff Cabral fired Ms. Porter because she communicated with the FBI. Sheriff Cabral and Ms. Theiss each testified that relations between the agencies had been "strained." In addition, both testified about an incident with the FBI where a SCSD correction officer was being used in a joint narcotics investigation. Sheriff Cabral testified that she thought that the FBI had undermined the investigation and endangered the officer when a target letter was issued to that officer by the USAO. According to Sheriff Cabral, there was an "animated discussion" where she expressed her "extreme displeasure" with the USAO and FBI. Importantly, this incident occurred in the spring of 2003—just three weeks before Sheriff Cabral learned that Ms. Porter had communicated with the FBI about the Rosario allegations. With this context, the jury could reasonably have concluded that Ms. Porter became a pawn in a dispute between the SCSD and the FBI, and that Sheriff Cabral retaliated against Ms. Porter and the FBI by barring her once she learned of their confidential relationship.

The cumulative weight of all of this evidence amply—indeed, overwhelmingly—supports the jury's verdict that Ms. Porter's communications with the FBI were a substantial or motivating reason behind Sheriff Cabral's decision to bar her.

**B.    The Jury Was Presented With Strong Evidence that Ms. Porter in Fact Was Not Barred for a Purported Paperwork Violation.**

In addition to the overwhelming affirmative evidence that Ms. Porter was barred because she spoke to the FBI, the jury heard a wealth of evidence that the reasons currently given by

Sheriff Cabral for Ms. Porter's barring are a merely a pretext.[8]  It was undisputed that Ms. Porter

was, as Ms. Jurdak testified, "one of the best nurse practitioners I've ever worked with"; that Ms.

Porter was hard-working, dedicated, and always put in more than 40 hours per week; and that the

inmates were "lucky to have her."  Ms. Jurdak and Ms. Porter testified that Ms. Porter always

received the highest merit raises that CMS allowed.  As we now show, the jury was presented

ample testimony from which to conclude that Ms. Porter, in light of those qualifications, and in

light of her communications with the FBI, in fact was not barred because of a putative one-time

reporting error.

> 1.    The Reasons Provided by the SCSD Kept Changing.

Sheriff Cabral and the SCSD stated under oath in their interrogatories that Ms. Porter was

barred for three reasons: (1) she did not file a timely report concerning her encounter with Mr.

Rosario; (2) she did not document his medical file; and (3) she backdated the report that she did

file.  *See* Trial Ex. 8 (Suffolk Responses to Interrogatories).  But the jury heard testimony that

was inconsistent with this list of reasons for the barring.  Sheriff Cabral admitted that she had

previously provided sworn testimony stating that there were additional reasons for the barring,

including that Ms. Porter had submitted her report of her encounter with Mr. Rosario on the

wrong form.[9]  Moreover, Ms. Keeley testified that she did not recall ever discussing with Sheriff

Cabral that Ms. Porter's allegedly backdated the report, that in her mind it was not a barrable

offense, and that it "played no role in the barring."  Mr. Theiss agreed that he never heard Sheriff

---

[8] As described above, Ms. Porter was required to prove that her communications with the FBI were a substantial or motivating factor in her barring, and that she would not have been barred anyway for other reasons.  The evidence elicited regarding Ms. Porter's alleged paperwork infractions go to both prongs, in that they show that her alleged infractions were not were not, standing alone, sufficient reasons to bar someone, thus exposing them as a pretext for the true reason that Ms. Porter was barred.

[9] Ms. Keeley and Mr. Theiss both testified that they never heard Sheriff Cabral say that this was a reason for the barring, and Ms. Keeley said that, in her mind, the fact that the report was submitted on the wrong form was "not

Cabral say that she barred Ms. Porter for backdating the report, but he also testified that he never heard Sheriff Cabral say that she barred Ms. Porter for submitting a late report; rather, Sheriff Cabral told Mr. Theiss that she barred Ms. Porter because she told the FBI about the Rosario allegations and because she failed to document his medical chart.

Thus, the jury heard inconsistent testimony from Sheriff Cabral and her two top aides regarding the reasons why Ms. Porter was barred, except for the common reason of "talking to the FBI." Under these circumstances, the jury reasonably could have concluded that these reasons were pretextual.

        2.    <u>Even if Ms. Porter Committed Paperwork Violations, the Cumulative Weight of the Evidence Supports the Jury's Verdict That Paperwork Was Not the Reason for Her Barring.</u>

Even if Sheriff Cabral and her top decision-makers had given consistent testimony regarding the reasons for Ms. Porter's barring (which they did not, as we have shown), and even if Ms. Porter had committed paperwork violations in her reporting of the Rosario matter (which she did not, as we show below), there was ample evidence from which the jury properly concluded that Ms. Porter was, in fact, not barred because of those alleged violations.

First, Ms. Jurdak and Ms. Mastrorilli both testified that they have been involved with many barrings and that none have been for the paperwork-type reasons currently advanced for Ms. Porter's barring. Even Sheriff Cabral testified that there had never been a barring purely for paperwork-related reasons.[10] This testimony alone could have convinced the jury that the reasons currently given for the barring are a pretext.

---

significant" and "did not play a role in the barring." Moreover, Ms. Jurdak and Ms. Mastrorilli both testified that incident reports need not be on a particular form.

[10] The two additional barrings described by Sheriff Cabral and Ms. Keeley all involved individuals who <u>falsely</u> reported something; thus, they were barred because they lied, not because of the paperwork itself. Nobody suggested that Ms. Porter's reporting was false in any way.

In addition, Sheriff Cabral and Mr. Theiss admitted that, within the Rosario investigation itself, several SCSD employees filed "late" reports, but none of those individuals were disciplined. Sheriff Cabral also admitted that Nurse Meekins and Physician's Assistant Bringola did not file incident reports at all regarding their encounters with Rosario, but neither were disciplined in any way. That Ms. Porter appears to have been singled out for her paperwork infractions could have led a reasonable jury to conclude that these were not, in fact, the real reason for her barring.

Furthermore, the jury heard testimony that no investigation was conducted into Ms. Porter's alleged reporting errors. Sheriff Cabral admitted that Ms. Porter was not given an opportunity to explain her actions. Sheriff Cabral and Ms. Keeley both testified that nobody contacted Ms. Jurdak, Ms. Mastrorilli or anyone in the medical unit that Ms. Porter interacted with regarding this incident, to test her version of the events. Sheriff Cabral and Ms. Keeley both admitted that there were measures short of barring that they could have taken with Ms. Porter, such as temporary barring or a written warning. The jury reasonably could have determined that the rushed nature of the barring decision is more consistent with barring Ms. Porter for talking to the FBI than for alleged paperwork errors.

Finally, there was absolutely no follow-up regarding Ms. Porter's allegedly "appalling" conduct. For instance, Sheriff Cabral testified that neither Ms. Jurdak nor Ms. Mastrorilli were disciplined for ratifying Ms. Porter's actions. The SCSD never followed up with the medical unit to see if Ms. Porter's reporting and documentation issues were a systemic problem, as one might expect they would have if this was such a serious problem. Sheriff Cabral never reported Ms. Porter's "appalling" conduct to anyone outside the HOC, such as the Board of Nursing. And Sheriff Cabral testified that she never even notified CMS, or instructed anyone to do so, to

14

inform them of the barring, nor did she attempt to notify other Sheriffs in Massachusetts that they should not hire Ms. Porter. The jury could have reasonably concluded that this lack of follow-up indicates that Ms. Porter's alleged paperwork violations were not serious at all, and thus were not the true reason for her barring.

Thus, the jury was presented with voluminous evidence undercutting Sheriff Cabral's testimony that she barred Ms. Porter because of purported paperwork violations. It was not against the clear weight of evidence or a miscarriage of justice for the jury to conclude that alleged paperwork errors could not have been the entire reason why Ms. Porter was barred.

3.   Ms. Porter in Fact Did Not Commit Paperwork Violations.

The jury was also presented with strong evidence that Ms. Porter in fact had not committed any paperwork violations, which supports the jury's decision to reject Defendants' assertion that she was barred for having supposedly committed such offenses.

a.   *Ms. Porter's Report Was Not Untimely.*

First, Sheriff Cabral testified that one reason she barred Ms. Porter was that she filed a late report. But Ms. Mastrorilli and Ms. Jurdak both testified that no time frame (or format) was given for Ms. Porter's report. Ms. Mastrorilli testified that she accepted the report when it was provided for her. Ms. Jurdak testified that Ms. Porter fully complied with all applicable reporting requirements. Moreover, Ms. Jurdak testified that when SID really wanted a report, they came to her and asked for it, and that did not happen in this instance. And Mr. Theiss testified that the timing of Ms. Porter's reporting in no way affected or prejudiced SID's investigation. This is understandable given Ms. Porter's and Mr. Theiss' testimony that Ms. Porter approached SID investigators on the first day of their investigation and provided them with all applicable information concerning her interaction with Mr. Rosario.

The SCSD elicited testimony that Ms. Porter violated a SCSD rule that requires employees to file incident reports by the end of their shift. But Ms. Jurdak testified that this rule was never enforced at the SCSD. Similarly, Ms. Mastrorilli testified that Ms. Porter's actions were only a "technical" violation of the rule, that this rule was never enforced, and there is a big difference between a technical violation of a rule and one that would merit a barring for life. The jury also could have been influenced by the uncontroverted testimony that Ms. Porter immediately orally reported her Rosario encounter to her supervisor, that she provided SID with all information concerning this incident as soon as they began interviews in the medical unit, and that the report that she did file contained no new information. In short, it was more than reasonable for the jury to conclude that the timing of Ms. Porter's reporting was not the reason for Ms. Porter's barring.

> b.    *Ms. Porter Was Not Required to Document Mr. Rosario's Medical Record.*

Second, Sheriff Cabral and others testified that Ms. Porter was barred because she failed to document Mr. Rosario's medical record. But, as Mr. Theiss and other testified, nothing in Policy S-220 or any other written SCSD policy addresses when a medical professional is required to document an inmate's medical file. Thus, the jury reasonably could have concluded that the decision to document is properly left to the CMS professionals.

Both Ms. Porter and her supervisor, Ms. Jurdak, testified that only medical encounters—hands-on physical examinations—need to be documented. The jury may have been particularly persuaded by Ms. Jurdak's testimony because she wrote the CMS policies and procedures handbook. Moreover, Ms. Jurdak testified that there had been a number of instances where she

had made casual observations of an inmate without making an entry in the inmate's chart.[11]  Or

the jury could have credited Ms. Porter's testimony that she did not need to document Mr.

Rosario's medical file because she did not perform a medical exam on him, based on her more

than 35 years of experience as a nurse practitioner and as a nursing instructor (which included

instruction on medical documentation).

*  *  *  *  *

In sum, the jury was presented with overwhelming evidence affirmatively showing that

Ms. Porter was barred because of her speech.  The jury was also presented with strong evidence

that the reasons Sheriff Cabral gave for the barring are pretextual.  Giving due deference to the

jury's verdict, it simply cannot be said that the verdict is contrary to the clear weight of evidence

such that a miscarriage of justice has occurred here.

## II.  THE COURT'S PRETRIAL *TOUHY* RULINGS HAVE NOT YIELDED A MISCARRIAGE OF JUSTICE.

Defendants' second argument—that the Court's pretrial rulings related to the parties'

*Touhy* discovery request were "unduly prejudicial"—merits little response.  The only issue at

trial was the reason or reasons that Sheriff Cabral barred Ms. Porter.  The issues that Defendants

claim they were precluded from exploring based on the Court's pretrial ruling—such as the

"questions asked and concerns raised by the representatives of the United States Attorney's

Office and the FBI" at the June 16th meeting and what Ms. Porter said to Agent Snyder about her

May 28th SID interview—are entirely irrelevant to the jury's determination of liability in this

matter.  *See* Def. Memo. at 26, 28.

---

[11] Defendants incorrectly assert that Ms. Jurdak testified that Ms. Porter's encounter with Mr. Rosario should have been documented in his medical chart.  Def. Memo. pp. 4, 19.  Ms. Porter's counsel's notes reflect precisely the opposite: that Ms. Jurdak clearly testified that Ms. Porter was <u>not</u> required to document her encounter in his chart.

Moreover, Defendants do not even attempt to demonstrate <u>how</u> they were prejudiced by the Court's pretrial rulings, apart from vague assertions that their "strategy" was adversely affected. Defendants concede that a discovery ruling is a basis for overturning a verdict only where there is a <u>clear showing</u> that the court's order was plainly wrong and resulted in substantial prejudice to the aggrieved party. *See* Def. Memo. p. 24 (citing *In re Public Offering PLE Antitrust Litig.*, 427 F.3d 49 (1st Cir. 2005)). Not only have Defendants failed to show error, they have not event attempted to show what testimony they were not permitted to elicit that would have been relevant at trial. Thus Defendants' claim that they were prejudiced by the Court's ruling is completely speculative and certainly does not meet the high standard to grant a new trial.

Finally, Defendants' complaints that they were prejudiced by the Court's pretrial rulings ring hollow given that they prevailed on virtually all of their pretrial motions. The Court granted Defendants' Motion for Summary Judgment on all counts except for the § 1983 and tortious interference counts (and dismissed CMS from the case entirely). The Court granted Defendants' motion to exclude all "code of silence" evidence from the case. Defendants were able to keep out any reference to the changing of Policy S-220, any reference to a grand jury investigation and any evidence of discipline imposed on other employees or barrings of non-employees in Ms. Porter's case-in-chief. Defendants' motion practice was so successful that all that remained was a single issue to be resolved at trial: the reason that Sheriff Cabral barred Ms. Porter. Defendants fall far short of demonstrating that the Court's *Touhy* ruling resulted in a miscarriage of justice. *See Arrieta-Colon v. Wal-Mart Puerto Rico, Inc.*, 2006 WL 74411 (1st Cir. Jan. 13, 2006).

III.    **PLAINTIFF COUNSEL'S CLOSING ARGUMENT DID NOT RESULT IN PLAIN ERROR.**

Defendants' arguments related to alleged improper summation should be rejected because there was no error in Plaintiff Counsel's argument, let alone any plain error.  As Defendants concede in their brief, the standard of review is plain error, since they failed to object during Mr. Savage's closing argument.  *See* Def. Memo. p. 32 (citing *Smith v. Kmart Corp.*, 177 F.3d 19, 26 (1st Cir. 1999)).  In order to establish plain error, Defendants must show that (1) there was an error; (2) the error was plain (*i.e.*, obvious and clear under current law); (3) the error was prejudicial (*i.e.,* it affected substantial rights); and (4) a new trial is needed to prevent a miscarriage of justice.  *See Smith*, 177 F.3d at 26.  A new trial is only appropriate where the error "resulted in a miscarriage of justice or seriously affected the fairness, integrity or public reputation of the judicial proceedings.  Plain error is a rare species in civil litigation, encompassing only those errors that reach the pinnacle of fault envisioned by the standard set forth above." *Id.*  (internal citations omitted).  Defendants have not established that any of the purported shortcomings were in fact errors, let alone that they resulted in a miscarriage of justice.

A.     **Counsel's  Closing Argument On Pain And Suffering Damages Was Legitimate.**

The precise objection that Defendants are raising to counsel's use of Ms. Porter's counseling records during closing argument is unclear.  Defendants appear to suggest that Mr. Savage was arguing that Ms. Porter was only qualified to perform a job that required the constellation of symptoms described in the counseling report.  Def. Memo. pp. 29-30.  This is incorrect.  Counsel discussed at length the nursing jobs Ms. Porter was working and had held and used the counseling records only in connection with argument regarding pain and suffering damages.  *See* Trial transcript p. 40 (Jan. 18, 2006) (Exh. B).

Moreover, while Defendants do not appear to challenge the use of the counseling records to argue pain and suffering damages, any such argument would be futile.  The counseling records were admitted as exhibits during trial, and it is perfectly proper to use admitted exhibits during closing arguments.  *See U.S. v. Young,* 955 F.2d 99, 109 (1st Cir. 1992).  Nor was redacting that exhibit to focus on the symptoms improper.  Plaintiff's counsel conferred with defense counsel before using the exhibit, showed her the redacted version of the exhibit he intended to use, and obtained her consent to use the exhibit.  Finally, use of a hypothetical based upon an admitted trial exhibit is certainly proper.  *See Young*, 955 F.2d at 109 (approving of the use of hypotheticals in closing argument); *see also* Jacob A. Stein, *Closing Arguments: The Art and the Law* § 3:215, p. 3-325 (2d ed.) (proposing and endorsing a hypothetical advertisement as a basis for calculating pain and suffering damages).  Thus, the argument was entirely legitimate.

Defendants also have utterly failed to show prejudice or a miscarriage of justice from these arguments.  Nor could they do so, because the Court stopped counsel's argument before it was even made and gave a curative instruction to the jury.  *See* Trial transcript p. 40 (Jan. 18, 2006) (Exh. B).  For all of these reasons, plain error is absent here.

> **B.  Plaintiff's Counsel Accurately Stated the Evidence.**

It is hard to imagine a situation where an unobjected-to misstatement of the evidence ever could be a basis for overturning a civil verdict where the jury had been properly instructed as to the role of closing argument.  This is precisely what happened here, as the Court stated that "there are some things that aren't evidence:  The arguments of counsel.  What they are permitted to do in argument is to draw your attention to certain pieces of evidence—if, in fact, you find that evidence was there—in attempt to persuade you.  But just because some lawyer says it doesn't

mean that it's a piece of evidence." Trial transcript p. 55:24-56:4 (Jan. 18, 2006) (Exh. B). Thus, the jury knew it was not hearing evidence from counsel.

Defendants cite no authority in support of their argument, and research reveals that no court in the First Circuit has reversed a civil verdict based on a misstatement of the evidence in summation. Indeed, in *Mitchell v. Weaver*, 806 F.2d 300 (1st Cir. 1986), while the Court of Appeals suggests that it might be appropriate in extreme situations to grant a new trial on this basis, the Court affirmed a District Court's denial of a motion for a new trial on the ground that "[t]rials are adversarial proceedings in which things may be said which the other side regards as incorrect and sometimes offensive." *Id.* at 302; *see also Gonzalez-Marin v. Equitable Life Assur.*, 845 F.2d 1140, 1147 (1st Cir. 1998). Similarly, Plaintiff counsel's summary of the evidence in the present case was simply standard fare within the adversarial process.

In any event, plaintiff's counsel did not misstate the evidence, and there was no unfairness or impropriety. First, notwithstanding Defendants' argument to the contrary, Ms. Keeley did testify that speaking to an outside agency was both "significant" and "integral" to the decision to bar Ms. Porter. Moreover, Sheriff Cabral herself testified that in the June 16 meeting, five members of law enforcement informed Sheriff Cabral that Ms. Porter was an FBI informant, repeatedly inquired about the reasons for her barring, and asked her to give Ms. Porter her job back. An "animated" discussion followed. The testimony of Mr. Theiss and AUSA Leone further corroborate that this occurred. Thus, the evidence supported the statement in closing argument that five law enforcement agents were accusing Sheriff Cabral of barring Ms. Porter for being an informant.[12]

---

[12] Plaintiff's counsel's argument that Sheriff Cabral had ruined Ms. Porter's life, and that the jury could lift Ms. Porter's pain and suffering and in so doing do something that is right and good did not improperly introduce purely emotional elements into the jury's deliberation. Plaintiff Counsel's qualification of "if it can lawfully be done" specifically focused in on the jury and their duty to determine the facts and follow the Judge's instructions. *See*

**C.     Plaintiff Counsel's Argument Regarding Sending a Message Was Not Inappropriate.**

Plaintiff's counsel's argument during summation that the jury should use punitive damages to "send a message" to Sheriff Cabral was completely appropriate and in no way prejudiced the jury.  Defendants cite to <u>no</u> cases to the contrary, and for good reason: the law is settled against their position.  For example, in *King v. Macri*, the Court recognized that arguing in summation that an award of punitive damages would "send that same message to others in a position to abuse their authority" was not prejudicial because "[s]imilar remarks are made in summations in most police misconduct trials, and are <u>entirely appropriate</u>."  993 F.2d 294, 298 (2d Cir. 1993) (emphasis added); *see also Smith*, 177 F.3d at 26-27 (holding that a summation in a case were only compensatory damages were available that asked the jury to send a message was improper because it was a request for a punitive form of damages).  Indeed, it would appropriate to charge the jury as follows:

> [U]nder the Federal Civil Rights laws, there are punitive damages because the law has made a determination that an individual citizen bringing an individual civil rights claim has a right to have a jury decide whether or not by the award of some money, a message can be sent.  That message is a specific deterrent to the individuals involved . . .

*Bolton v. Taylor*, 99-CA-12202, 23:6-17 (Aug. 16, 2001) (Exh. A).

Rather than citing cases criticizing "send a message" arguments, the Defendants cite cases holding that "[a] proper punitive damage award in this case would be a sufficient amount to send a clear message to" the Defendants.  *Clifton v. MBTA*, 445 Mass. 611, 624 (2005); *see also McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals*, 140 F.3d 288, 307 (1st

---

Trial transcript p. 29:12-20 (Jan. 18, 2006) (Exh. B).  Asking the jury to follow their instructions which would have the consequence of easing Ms. Porter's pain and suffering was not improper.  Ms. Porter had the right "to implicate the law's moral underpinnings and a juror's obligation to sit in judgment," so long as she does not ask the jury to base their decision on emotion instead of the evidence, which was not done here.  *See Old Chief v. United States*, 519 U.S. 172, 188 (1997).  In fact, Plaintiff Counsel specifically referred to the fact that a verdict in Ms. Porter's favor should <u>reduce</u> her future damages if that was the right thing to do.

Cir. 1998) (affirming case where the Court instructed the jury that punitive damages are "intended to punish the defendants as a warning, both to them and other like-minded individuals . . . ."). In light of all of the above precedent, it is clear that Plaintiff Counsel's "send a message" argument was entirely appropriate.

Even if the argument were improper, the Court instructed the jury that "[y]ou'll recall the call to deliver a message. That's not what we're talking about here. What you're here to do is make a judgment about the appropriate, if any, sanctions to be imposed above compensatory damages." Trial transcript p. 68:11-14 (Jan. 18, 2006) (Exh. B). That instruction precludes any claim of prejudice or miscarriage of justice. As Defendants concede, "[a] basic premise of our jury system is that the jury follows the court's instructions." Def. Memo. p. 33 (quoting *Refuse & Envt'l. Sys. Inc. v. Indus. Servs. of Am., Inc.*, 932 F.2d 37, 40 (1st Cir. 1991)). Finally, any assertion of prejudice or a miscarriage of justice is also meritless because, given the strong evidence supporting the finding of liability and damages, Defendants have failed to show that any error impacted the verdict.[13]

## IV.    THE AWARD OF DAMAGES DOES NOT SHOCK THE CONSCIENCE OR RESULT IN THE DENIAL OF JUSTICE.

Both the compensatory and punitive damages awarded by the jury were supported by the evidence. A court should grant a motion for a new trial on the ground that the jury award is excessive "only when the award exceeds any rational appraisal or estimate of the damages that

---

[13]    Defendants also challenge the use of the term "whistleblower" in conjunction with the request to send a message to Sheriff Cabral. Again, there was no objection raised on this point by Defendants, thus the objection is waived. In any event, there was no error in plaintiff's counsel's statement that "your message is also to others dealing with whistleblowers as well." Def. Memo. pp. 31-32, n. 19, 21. While Defendants seek to engraft a limitation on the meaning of the word "whistleblower" that is found in the Massachusetts Whistleblower Statute, nothing in the common-sense meaning of the word limits it to employees. *See* Webster's Ninth New Collegiate Dictionary, p. 1345 (defining "whistleblower" as "one who reveals something covert or who informs against another."). Moreover, even if Ms. Porter were not a whistleblower (which she was), the argument called on the jurors to consider the need to deter Sheriff Cabral and others from retaliating against other individuals, not Ms.

could be based upon the evidence before it." *Eastern Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., Inc.,* 40 F.3d 492, 502 (1st Cir. 1994). This standard establishes a very high bar, and the jury award will withstand scrutiny unless it is "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." *Bandera v. City of Quincy*, 220 F. Supp. 2d 26, 41 (D. Mass. 2002). The First Circuit elaborated on the high standard for reversing a jury's determination of damages:

> Translating legal damage into money damages-especially in cases which involve few significant items of measurable economic loss-is a matter peculiarly within a jury's ken. For just this reason, [w]e rarely will override the jury's judgment on the appropriate amount of damages to be awarded. The jury, as we see it, is free to run the whole gamut of euphonious notes-to harmonize the verdict at the highest or lowest points for which there is a sound evidentiary predicate, or anywhere in between-so long as the end result does not violate the conscience of the court or strike such a dissonant chord that justice would be denied were the judgment permitted to stand.

*Milone v. Moceri Family, Inc.,* 847 F.2d 35, 37-38 (1st Cir. 1988) (internal citations omitted). Similarly, the standard for granting remittitur is whether the moving party has satisfied the "heavy burden of showing that an award is grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." *Marcano Rivera v. Turabo Medical Center Partnership*, 415 F.3d 162, 173 (1st Cir. 2005). Defendants have failed to show that either the compensatory or punitive damage award in the present case shocked the conscience or resulted in the denial of justice.

### A.     If Anything, the Jury's Compensatory Damages Award Was Less Than What the Evidence Would Have Justified.

#### 1.     The Compensatory Damage Award is Well Within the Evidence.

The jury's verdict awarding Ms. Porter $360,000 in compensatory damages is more than justified by the evidence. The jury did not separate out economic damages and pain and

---

Porter, and it is appropriate to request punitive damages to deter the defendant and others from engaging in *similar*

suffering damages, but an award of $360,000 as to *either* economic damages *or* pain and

suffering damages would not be grossly excessive or shock the conscience in this case, so an

award of $360,000 for both demonstrates balance, restraint, and moderation on the part of the

jury.

Ms. Porter testified that, since her termination, she has lost approximately $79,000 in

income. Similarly, Ms. Porter testified that over the last year, she lost approximately $29,000

and that she expected to work for another 10 years. No evidence to the contrary was presented.

Therefore, the jury was entirely justified in concluding that her damages for lost future earnings

was $290,000. As a result, the evidence supported an economic damages award of up to

$369,000. This is $9,000 above the *entire* compensatory damages actually awarded, without

even reaching the pain and suffering damages.

On the other extreme, even if the jury had awarded $360,000 in pain and suffering

damages and no economic damages, such an award would not shock the conscience in light of

the evidence of serious mental distress. *See Bogle v. McClure*, 332 F.3d 1347, 1362 (11th Cir.

2003) (holding that an award of $500,000 in pain and suffering damages each to several

librarians who were transferred from meaningful supervisory positions to dead-end non-

managerial jobs based on their race and who testified that the transfers caused them to be upset,

embarrassed, humiliated, and ashamed was justified, even though there was no independent

evidence of physical or mental harm).

That the $360,000 award for both economic and pain and suffering damages is lower than

the evidence reasonably would have supported for either type of damage demonstrates that the

jury weighed the evidence carefully, and took a balanced, restrained, and measured approach to

---

wrongdoing. *See EEOC v. Waffle House, Inc.*, 534 U.S. 279, 295 (2002).

damages.  Since the result reached is well below the upper-end of the damages the jury

reasonably could have awarded, the verdict should be permitted to stand.

            2.     <u>Defendants' Arguments on Economic Damages Lack Merit.</u>

       Defendants challenge the damage award on the ground that Ms. Porter voluntarily chose

to leave a full time position in Essex County for a part-time per diem position.  But the evidence

showed that Ms. Porter's daily commute to and from Essex County was sixty-two miles each

way and that this interfered with Ms. Porter's care for her elderly mother and her husband.  It

was thus reasonable for the jury to conclude based on this evidence that Ms. Porter had made a

reasonable effort to mitigated her damages by taking a per diem position.  *See Rasimas v. Mich.*

*Dept. of Mental Health*, 714 F.2d 614, 625 (6th Cir. 1983) ("It is well settled that a claimant has

not failed to make a reasonable effort to mitigate damages where he refused to accept

employment that is an unreasonable distance from his residence."); *NLRB v. The Madison*

*Courier, Inc.*, 472 F.2d 1307, 1314 (D.C. Cir. 1972) (holding that injured plaintiffs "were not

obligated to seek work in Louisville or other areas located over fifty miles from Madison, due to

the excessive commute such jobs would have entailed").

       Similarly, Defendants' challenge to the jury verdict on the ground that there was no

guarantee that Ms. Porter would work for CMS for the next ten years also fails to give due

deference to the jury.  The jury heard testimony from Ms. Porter and Ms. Jurdak that Ms. Porter

was a superior nurse practitioner who always received the highest merit raises at CMS.  Ms.

Porter had reason to believe that her employment at CMS would continue, or that she would be

hired by its successor if CMS was not awarded the next contract, just as Ms. Porter was rehired

by CMS from CHS when it took over at the HOC.  In any event, the evidence that Ms. Porter

expected to work for CMS at the HOC for another ten years was a rational basis upon which the

jury could award future damages because "[m]ere uncertainty in the award of damages is not a

bar to their recovery. . . . Massachusetts law is clear that uncertainty in the award of future

damages does not bar their recovery . . . ." *Larch v. Mansfield Mun. Elec. Dept.*, 272 F.3d 63, 74

(1st Cir. 2001) (citations and quotations omitted) (holding that it was not too speculative to base

a damages award on the assumption that plaintiff would work for defendants until he reached the

age of 65, even though the plaintiff only had a two to three year contract); *see also Kelley v.*

*Airborne Freight Corp.*, 140 F.3d 335, 355 (1st Cir. 1998).

      3.    <u>Defendants' Arguments on Non-Economic Damages Are Similarly</u>
                <u>Meritless</u>.

Defendants also make vague assertions that there was no evidence to support an award of

emotional damages, but this assertion is undercut by Defendants' concession that Ms. Porter and

her family testified as to emotional impact that the unconstitutional barring had on Ms. Porter,

and that this testimony was supported by medical evidence from a mental health professional.

Def. Memo. p. 42.  Moreover, *Sanchez v. Puerto Rico Oil Co.*, 37 F.3d 712 (1st Cir. 1994),

which is cited by Defendants, supports rather than undermines the conclusion that emotional

distress damages were justified in the present case.  First, that case <u>affirmed</u> the granting of

damages for emotional distress.  *See id.* at 723-24.  Moreover, the evidence of emotional distress

is stronger in the present case than in *Sanchez* because, unlike in that case, there is medical

evidence of emotional distress in the present case—namely Ms. Porter's counseling records.

Those counseling records, along with the testimony from the Porter family, reveal that Ms.

Porter could not sleep, compulsively cleaned, gained weight, and uncontrollably cried as a result

of the ordeal.  While Ms. Porter did not introduce live expert testimony regarding her mental

distress, "[t]estimony from a mental health expert is not required to sustain an award for

emotional distress . . . ." *Koster v. Trans World Airlines, Inc.*, 181 F.3d 24, 35 (1st Cir. 1999);

*see also Sanchez*, 37 F.3d at 724. The counseling records were more than adequate to corroborate the testimony of Ms. Porter and her family.[14]

> **B.      Both the Award of Punitive Damages and the Size of the Award Were Warranted.**
>
> > 1.      <u>There Was Sufficient Evidence to Support the Award of Punitive Damages.</u>

Punitive damages are warranted in the present case because Ms. Porter adduced strong evidence that Sheriff Cabral barred her for exercising her First Amendment rights knowing that such a barring violated the Ms. Porter's rights. *See BMW v. Gore*, 517 U.S. 559, 576-77 (1996); *Iacobucci v. Boulter*, 193 F.3d 14, 26 (1st Cir. 1999). Punitive damages may be awarded upon a finding that the defendant intended to violate federal law, or acted with reckless or callous disregard for a plaintiff's rights. *See Smith v. Wade*, 461 U.S. 30, 51 (1983).[15] There is no requirement that there be evidence independent of the violation of the law to justify punitive damages. *Id*. at 51-55. While recklessness is sufficient under *Smith*, the evidence in the present case reveals that Sheriff Cabral acted with the even more culpable mental state of intent. Sheriff Cabral admits that she alone made the decision to bar Ms. Porter.[16]

---

[14] Defendants also suggest that Ms. Porter somehow was asking for the personal attacks unleashed by Sheriff Cabral in the press. Nothing justifies the Sheriff's false statements.

[15] At the charging conference, the Court expressed concern that the punitive damages might not be appropriate because the standard for imposing punitive damages is the same as the standard for imposing liability, so punitive damages might be available in all First Amendment retaliation cases. As discussed in greater detail in Plaintiff's Proposed Jury Instruction Regarding Punitive Damages, the *Smith* Court rejected the argument that punitive damages only can be awarded when there is a finding of a more culpable mental state than the underlying offense. *See Smith*, 461 U.S. at 51-55.

[16] Even if there were no evidence of intentional conduct by Sheriff Cabral (which there is), there is evidence that Sheriff Cabral at a minimum acted with reckless disregard for Ms. Porter's rights, which is a sufficient basis in and of itself for imposing punitive damages. *See Smith*, 461 U.S. at 51. It is undisputed that Mr. Theiss and Ms. Keeley wanted to bar Ms. Porter from the HOC for speaking to the FBI. Moreover, it is undisputed that all Sheriff Cabral's information regarding Ms. Porter came from these two individuals. Finally, Sheriff Cabral testified that she did not have all the information necessary to make the decision whether to bar Ms. Porter. Based on these facts, it was reasonable for the jury to conclude that Sheriff Cabral recklessly disregarded Ms. Porter's rights.

Besides rehashing their arguments as to why there was no evidence of intentional retaliation, which as discussed above lacks merit, Defendants assert that, even if Sheriff Cabral intended to bar Ms. Porter for speaking to the FBI, there was no evidence that she intended to bar her for exercising her First Amendment rights. However, unlike in *Iacobucci*, upon which Defendants rely, it is undisputed that Sheriff Cabral <u>knew</u> that it was unconstitutional to bar someone for speaking to the FBI. *See* 193 F.3d at 26.[17] Therefore, since Sheriff Cabral knew that it violated a person's First Amendment rights to bar them for speaking to the FBI, she <u>knew</u> that she was acting unconstitutionally when she barred Ms. Porter. Thus, her intent to bar Ms. Porter for speaking to the FBI constitutes an intent to violate her First Amendment rights. *See Gore*, 517 U.S. at 576-77 (recognizing that engaging in prohibited conduct while knowing or suspecting that it is unlawful justifies punitive damages).

Defendants also seem to suggest that, based on *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114 (1st Cir. 1977), punitive damages may not be awarded based on a single incident.

---

[17] The issue of Sheriff Cabral's knowledge of the unconstitutionality of barring someone for speaking to the FBI has not been in dispute in this case. Defendants conceded, and the Court ruled, that qualified immunity was not an issue here precisely because the Sheriff was aware that the First Amendment prohibited barring someone for speaking to the FBI. She testified at her deposition that:

    Q    And policy or not policy, I mean you've always understood, I presume, particularly given your background, that there is a First Amendment right to speak, right?
    A    Yes.
    Q    And that the First Amendment right would encompass anyone's right to speak to the FBI or to whomever else they wanted?
    A    I assume so, yes.
    Q    And I'm just saying obvious stuff here. That's a long well-established right that you're personally completely familiar with, right?
    MS. CAULO:    Objection.
    A    I'm familiar with the First Amendment.
    Q    And you're familiar that that's a right that encompasses a right to speak to outside agencies, including the FBI?
    MS. CAULO:    Objection.
    A    Yes, it encompasses the right to speak, and I assume that would include speaking to anyone in outside law enforcement.

Deposition of Andrea Cabral Sworn to on May 6, 2005, pp. 42:6-43:3 (Exh. C). Moreover, even had this issue been in dispute (which it was not), a reasonable jury could conclude that Sheriff Cabral knew that it was unconstitutional to bar someone for speaking to the FBI based on her testimony as to her extensive experience as a civil rights

However, *Alicea Rosado* does not even mention the fact that there was only one unconstitutional act as a basis for its decision to strike the punitive damages award. *See id.* at 121. Rather, the *Alicea* court concluded that the defendant's conduct in that case was not sufficiently reprehensible to warrant punitive damages. Indeed, it would be counter-intuitive to permit punitive damages where a defendant constructively discharges a plaintiff, *see Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 84 (1st Cir. 2001), but not where the defendant engages in the more reprehensible conduct of directly discharging an employee. Thus, many courts have awarded punitive damages based on a single instance of unconstitutional conduct. *See, e.g., Whitfield v. Melendez-Rivera*, 431 F.3d 1, 18-19 (1st Cir. 2005). In any event, Sheriff Cabral's conduct did not consist of a single incident. Not content to merely bar Ms. Porter, Sheriff Cabral proceeded to publicly make repeated false statements about Ms. Porter.

2.     The Size of the Punitive Damages Award Was not Excessive.

The award of $250,000 in punitive damages in the present case was not excessive under *Gore*, 517 U.S. at 575. *Gore* established a three step test for deciding the constitutionality of an award of punitive damages: the court must consider (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Id.*

Under the first step, Sheriff Cabral's unconstitutional conduct was truly reprehensible. First, it not only threatened Ms. Porter's economic interest in her job, it also threatened her emotional well-being. *See State Farm v. Campbell*, 538 U.S. 408, 419 (2003). In this regard, Sheriff Cabral's conduct evidenced an indifference to, and a reckless disregard for, potential

---

prosecutor, and her testimony that she was aware when she became Sheriff that there was a pending criminal trial against other officers and she instructed all her staff to cooperate fully in the FBI's investigation.

emotional damage to Ms. Porter.  *See id.*  In addition, Ms. Porter, a 60 year old nurse who was

caring for a retired husband recovering from two heart attacks and cancer, is financially

vulnerable.  *See id.*  Finally, Sheriff Cabral intentionally violated Ms. Porter's rights.  She

terminated Ms. Porter for communicating to the FBI when Sheriff Cabral knew that it was

unconstitutional to do so.  *See id.*  Indeed, as defense counsel suggested at trial, if anyone knew

about civil rights, it was Sheriff Cabral, the former civil rights prosecutor.  Yet, Sheriff Cabral

and her agents and employees subsequently made false statements about Ms. Porter and

continued to cover-up their unconstitutional conduct.  The jury was entitled to conclude that

Sheriff Cabral and her agents lied about the reasons for the barring while they were incorrectly

accusing Ms. Porter of being a liar in the press.  This sort of conduct is reprehensible in a society

that places such a high value on free speech and that seeks to protect inmates from abuse.[18]

　　　　Under the second step, the Supreme Court has declined to set a fixed ratio between

compensatory damages and punitive damages.  While punitive damages awards exceeding a

single-digit ratio (that is, more than 10 times compensatory damages) may be appropriate where

there is a particularly egregious act,[19] the Court has also made clear that usually the single-digit

ratio range is appropriate.  *See State Farm, 538 U.S. at 425.*  In the present case, the ratio

---

[18] Defendants argue that the Court's failure to instruct the jury that the actions of subordinates could not be imputed to Sheriff Cabral contributed to the "excessive" punitive damages award, as evidenced by a *Boston Globe* article. Def. Memo. p. 22, n. 11, p. 34 n. 22.  The Defendants did no object to the Court's instruction and therefore their argument is now waived.  In any event, the instruction was proper because it properly instructed the jury that, in this case, there was no difference between the Defendants for liability purposes.  Further, this Court should give no consideration to the *Boston Globe* article, and should not inquire into whether the jury understood its instruction because "Rule 606(b) has consistently been used to bar testimony when it is alleged that the jury misunderstood the instructions."  *U.S. v. Sampson*, 332 F. Supp.2d 325, 328 (D. Mass. 2004) (*quoting U.S. v. Jones*, 132 F.3d 232, 245 (5th Cir. 1998)) (refusing to consider statements by a juror to the press in granting a new trial, even in a death penalty case); *see also* Fed. R. Evid. 606(b); Fed. R. Evid. 606(b) 1972 Advisory Committee Note ("testimony or affidavits of jurors have been held incompetent to show . . . misinterpretation of instructions.").

[19] *See Swinton v. Potomac Corp.*, 270 F.3d 794, 818 (9th Cir. 2001) (approving a million dollar punitive damages award where the compensatory damages were only $35,600—a ratio of 28:1—in a hostile work environment case where the compensatory damages were necessarily low due to the low income of the plaintiff and the difficulty of calculating the indignity and distress visited on the plaintiff).

between punitive damages and compensatory damages was only 0.69:1—well below the maximum single digit ratios that would be appropriate under *Gore*. Given that a punitive damages award of up to ten times the compensatory damages—*i.e.*, a punitive damage award of $3,690,000—or greater might be justified under *Gore*, the $250,000 punitive damages actually awarded is extremely reasonable and well within the jury's discretion.

Under the third *Gore* factor, the punitive damages awarded by the jury were below the civil penalties authorized in comparable cases. The Massachusetts Whistleblower Statute authorizes three times lost wages, benefits and other remuneration, and interest thereon to employees who are subject to retaliatory action because they provide information to law enforcement. *See* M.G.L. ch. 149, § 185(d)(4). As discussed above, Ms. Porter introduced evidence that her lost wages were $369,000, not including interest. Therefore, Ms. Porter would be entitled up to $1,107,000 under the Massachusetts Whistleblower Statute—well above the $250,000 in punitive damages actually awarded. Put differently, if the jury concluded that Ms. Porter's lost wages, benefits, and interest was as little as $83,000, treble damages relief of $250,000 would have been justified by comparison to the Whistleblower Statute. The conduct regulated by the Whistleblower Statute is "comparable" to the improper conduct at issue here, so the damages authorized by the Massachusetts Whistleblower Statue are relevant under *Gore*. 517 U.S. at 575.[20]

---

[20] Rather than apply the *BMW* factors to the present case, Defendants present a laundry-list of other cases. But "[t]he First Circuit has eschewed comparisons in other cases in evaluating the validity of a jury's award and has instead relied upon the specific evidence at hand." *Giard v. Darby*, 360 F. Supp. 2d 229, 237 (D. Mass. 2005), citing *Gutierrez-Rodriguez v. Castagena*, 882 F. 2d 553, 579 (1st Cir. 1989). Moreover, most of these cases are not relevant because they deal with substantially different factual situations. *See Whitfield v. Melendez-Rivera*, 431 F.3d 1, 18-19 (1st Cir. 2005); *Fishman v. Clancy*, 763 F.2d 485, 488 (1st Cir. 1985); *Clifton*, 445 Mass. at 624; *McMillan*, 140 F.3d at 307; *Acosta-Sepulveda v. Hernandez-Purcell*, 889 F.2d 9, 13 (1st Cir. 1989); *Williams v. Brimeyer*, 116 F.3d 351 (8th Cir. 1997). To the extent that some of the cited cases are factually similar, they support, rather than undermine, the conclusion that the award of $250,000 in punitive damages in the present case was not excessive. *See Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 84 (1st Cir. 2001) (holding that an award of $400,000 in punitive damages was not excessive); *Rowlett v. Anheuser-Busch, Inc.*, 832 F.2d 194, 207 (1st Cir. 1987) (holding

In short, the punitive damages award was not excessive.

## CONCLUSION

WHEREFORE Defendants Motion for a New Trial and Remittitur should be denied.

Respectfully submitted,

SHEILA PORTER

By her attorneys,

*/s/ Joseph F. Savage, Jr.*
Joseph F. Savage Jr. (BBO # 443030)
David S. Schumacher (BBO # 647917)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA  02109
(617) 570-1000

Dated: February 16, 2006

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served electronically via the electronic filing system on counsel for all parties on this 16th day of February, 2006.

*/s/ James R. Sweet*
James R. Sweet

LIBA/1667573.4

---

that an award of $300,000, which is approximately $500,000 when adjusted for inflation, was not excessive). Indeed, in a recent case where a plaintiff was terminated by a state agency in retaliation for exercising her First Amendment rights, and then the mayor carried out a public smear campaign purportedly in response to a press conference that sought to get the plaintiff her job back, the Court held that an award of $250,000 in punitive damages did not shock the conscience. *See Hardeman v. Albuquerque*, 377 F.3d 1106, 1122-23 (8th Cir. 2004).