# Exhibit A

1               UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3    * * * * * * * * * * * * * * * *
                                   *
4    DAVID BOLTON, JR.             *
                    Plaintiff      *
5                                  *
         VERSUS                    *    CA-99-12202-DPW
6                                  *
     STEPHEN TAYLOR AND            *
7    SCOTT GREANY,                 *
         INDIVIDUALLY AND AS POLICE *
8      OFFICERS OF THE CITY OF     *
     NEW BEDFORD, MASSACHUSETTS    *
9                    Defendants    *
     * * * * * * * * * * * * * * * *

10

            BEFORE THE HONORABLE DOUGLAS P. WOODLOCK

11

            UNITED STATES DISTRICT COURT JUDGE

12

                 JURY TRIAL - DAY FOUR

13

                    AUGUST 16, 2001

14

     APPEARANCES:

15

         KATHLEEN J. WOOD, ESQ., 385 Court Street,
16       P.O. Box 6445, Plymouth, Massachusetts 02362,
         on behalf of the Plaintiff

17

         JOSEPH L. TEHAN, JR., ESQ. AND JONATHAN M.
18       SILVERSTEIN, ESQ., Kopelman & Paige, P.C.,
         31 St. James Avenue, Boston, Massachusetts
19       02116, on behalf of the Defendants

20                        Courtroom No. 1 - 3rd Floor
                          1 Courthouse Way
21                        Boston, Massachusetts 02210
                          9:00 A.M. - 5:00 P.M.

22

            Pamela R. Owens - Official Court Reporter
23          John Joseph Moakley District Courthouse
              1 Courthouse Way - Suite 3200
24              Boston, Massachusetts  02210

25      Method of Reporting:  Computer-Aided Transcription

```
 1                    COURT'S CHARGE TO JURY
 2        BY THE COURT:
 3              Ladies and gentlemen, now that you've heard
 4        all of the evidence in the case and you've heard the
 5        arguments of counsel, it becomes my obligation to
 6        instruct you on the law.  One thing I've noticed -- I
 7        think counsel have noticed as well -- is that you've
 8        been paying very careful attention -- close attention --
 9        to the evidence as it came in.  And I hope that
10        you'll pay the same kind of careful attention to my
11        instructions because this is the point at which our
12        respective responsibilities become clear.
13              The obligation of counsel is to bring to
14        your attention the evidence that they consider to be
15        relevant.  And they have done so and done so, I think,
16        rather effectively.  My obligation is throughout the
17        trial to try to give you the rules under which you're
18        going to operate.  And then you go into the jury room
19        all by yourself.  Nobody is going to second-guess what
20        you do.  We trust you to decide this case on the basis
21        of the evidence itself and the law that I give you.  And
22        this is a case, I suspect, which challenges some of your
23        instincts.  It's brought to your attention aspects of
24        life in New Bedford that perhaps you weren't familiar
25        with and perhaps you find unsettling, language that
```

1    maybe the coarsening of modern life has made us familiar

2    with, but nevertheless is unsettling, activities that

3    one doesn't particularly care for.  But what you have to

4    do is discipline yourself to ask what is truly relevant

5    here.

6              And what is truly relevant here is the

7    question of whether or not the police exceeded their

8    authority.  Police are not vested with the right to

9    punish someone.  They are not vested with the right to

10   pull someone over willy-nilly even if that someone

11   ultimately is convicted of a crime or consorts with a

12   prostitute or uses dirty language.  What this case

13   requires you to do and what we are counting on you to do

14   is exercise a disciplined, fair, nuanced evaluation of

15   the evidence in the case.

16             Was evidence of prostitution relevant?  Of

17   course it was relevant for certain issues and we'll talk

18   about that.  Was dirty language relevant?  Well, that's

19   what people say was said.  So, that's relevant.  Was

20   conviction of a crime relevant?  Yes, it happened.  And

21   you have to accept the judgment of the state court.  But

22   you're going to have to go beyond those facts to address

23   the underlying set of circumstances.

24             Behind me there is a little statue.  You have

25   probably seen statues like that even on the top of

1     courthouses.  It's a statue of a woman.  She's got a

2     sword in one hand; she's got scales in the other; and

3     she's got a blindfold on.  It's pretty easy to see why

4     she's got a sword in one hand.  She's there to enforce

5     the law.  It's pretty easy to see why she's got scales

6     in her hand.  She's there to weigh the evidence.  But

7     why does she have a blindfold on?  She has a blindfold

8     on because she is disciplining herself from being

9     distracted from those things that would unfairly

10    prejudice a nuanced evaluation of the case.

11          Now, you will understand that during the

12    course of a trial, I have to make rulings.  Sometimes

13    when there are good lawyers, as there were here, I

14    can do it in a relatively peremptory way.  You will

15    understand that in a trial, witnesses get emotional.

16    The parties get emotional.  And when that happens and it

17    seems to interfere with the orderly presentation of the

18    evidence, I'll give admonitions.  But you're going to

19    put that all out of your mind.  It's not a suggestion by

20    me that I've ruled against one party or the other on the

21    ultimate issues that you have to decide.  It's simply

22    part of my responsibility to shape the trial in an

23    orderly and fair fashion.

24          During the course of closing argument, from

25    time to time, you heard lawyers say "I believe."

1    Well, in the course of closing argument, people get

2    wound up.  Lawyers get wound up.  They're not supposed

3    to say "I believe.  "  They are here as advocates.  And,

4    so, you'll put that out of your mind as well.  You're

5    focused -- as we all must be focused -- on the evidence

6    itself, not what a lawyer believes or doesn't believe

7    or says they believe or don't believe.  Because you're

8    going to focus on the evidence.

9        Now, what is the evidence?  I told you from

10   the beginning that the evidence was going to be

11   principally the witnesses and that you'd have to size

12   these witnesses up.  And I suspect that it has struck

13   you, as it struck me, that this is a complex set of

14   circumstances, fast moving with lots of apparent

15   contradictions.  I want you to step back from that just

16   a bit and recognize that we're involved in a human

17   enterprise, human beings trying to recall after a very

18   long period of time what precisely happened in a very

19   compressed period of time.  Your responsibility

20   ultimately is to imaginatively re-create what happened

21   so that you can evaluate what it was that occurred that

22   morning in New Bedford.

23        There was a description of the encounter, the

24   tussle -- I'm trying to use a neutral term so that you

25   won't draw some conclusion that I have a view on this

1    which I emphasize I do not.  But I forget which of the

2    officers it was who referred to it as a pig pile.  Well,

3    untangling a pig pile is what you're going to have to

4    do.  And you're going to have to do it by asking

5    yourselves "How much can I believe the witnesses?"  You

6    have the right to believe everything that a witness tells

7    you, nothing a witness tells you, or perhaps something

8    in-between, bits and pieces of what a witness tells you.

9    You'll have in mind the circumstances that might affect

10   recollection.  If you're involved in a pig pile, how

11   clear is your recollection going to be?  You'll

12   understand that from time to time people's recollections

13   are impaired.  Ms. Swain this morning made reference to

14   whether or not she had been high when she had been

15   interviewed by the Internal Affairs Division.  And

16   you'll take that into consideration.  You'll take into

17   consideration that people are pretty excited during

18   these kinds of encounters and you will evaluate that in

19   terms of deciding whether or not the recollections that

20   are presented to you fairly and accurately give you a

21   sense on which you can rely in imaginatively re-creating

22   these circumstances.

23            There have been references to inconsistencies.

24   And I don't think I'm taking a position to say that

25   among various of the witnesses, there have been

 1      inconsistencies, inconsistencies between what they said

 2      on a previous occasion and what they said now.  But it's

 3      not enough simply to establish an inconsistency.  You

 4      have to view it as a tool and how do you use it as a

 5      tool.  Well, you ask yourself, "Does this make a

 6      difference?"  How would an inconsistency make a

 7      difference?  Well, it would make a difference if you

 8      said, "This person said one thing on one occasion, he

 9      said something on another occasion, I can't believe

10      anything that they said."  Or maybe you've had the

11      experience that others have had where you go home to

12      the dinner table and people are having a conversation

13      about seeing the same event and one person says that it

14      happened one way and one person says that it happened

15      another way.  Neither one of them is lying.  And they're

16      just illustrating how fragile recollection is and how

17      difficult ascertaining the truth is.  And, so, you are

18      going to evaluate in a nuanced way the inconsistencies,

19      which you may find, among the witnesses and among the

20      testimony of various witnesses to reach your conclusion

21      about what happened in this case.

22            I am always embarrassed to try to instruct

23      juries on how they evaluate witnesses.  You do it

24      every day.  Every day, somebody is trying to sell you

25      something.  You size them up and you say, "Does this

1   person seem to know what they're talking about?  Does

2   this person have some kind of a bias?  Does this person

3   have an ability to communicate what's going on?  Is this

4   person reliable?"  That's why we have juries.  Because

5   you have a range of life experience that can do in

6   practice what I'm trying to articulate in these

7   instructions.  And you're going to do it here and

8   you're going to do it in connection with some fairly

9   interesting sets of facts.

10          You have other tools quite apart from the

11  testimony of witnesses.  You've got some pictures.  Now,

12  you may also have had the experience that I have of

13  someone like my Aunt Mabel who believed that there was

14  never a camera that could fully capture her appearance.

15  You may have the view that reducing three dimensions

16  into two dimensions is problematic.  You may have the

17  view that Dr. Green expressed, that a chart didn't show

18  the depth and the musculature and so on.  Well, okay.

19  So those are the limitations.  But they're tools.  And,

20  so, you'll look at the photographs to get a sense of

21  what the area was like.  You'll look at the photographs

22  to get a sense of what the injuries were like.  And

23  you'll apply that same kind of common sense, that

24  nuanced evaluation, to those photographs that you apply

25  to the direct testimony of the witnesses.  You've got

1    writings, documents, and the St. Luke's medical

2    records.  And you will walk through how you read medical

3    records or at least how Dr. Green reads medical records.

4    And you'll read those in the same way that you evaluate

5    the testimony of witnesses.  That is, those records

6    reflect somebody saying something.  And you have to ask

7    yourself how reliable was the person who was saying that

8    thing that's reflected in the record.  You'll have the

9    report, the initial report that was made by Mr. Bolton,

10   and you'll look at that.  And you'll ask yourself,

11   as you ask yourself in connection with all of the

12   suggestions of inconsistencies, whether or not when it

13   was made, it was at a time when the events were really

14   fresh, whether or not he was able to express himself

15   well, whether or not he left out things that should have

16   been put in, that you would expect to have been put in

17   that have been testified to here.  You will ask that

18   same question regarding the references to police reports

19   that have been offered.  You'll remember the line of

20   examination of the officers regarding leaving things in

21   police reports, taking things out of police reports, is

22   the police report complete, and you'll consider that as

23   well.

24         There were references to compensation for

25   Dr. Green.  And you'll consider that as well.  You'll

1    recognize that professionals get paid for their time.

2    And the real issue for you is whether or not the

3    payment that they received has somehow influenced their

4    testimony in a fashion that makes it less than fully

5    credible, that makes them a partisan for one side or the

6    other.  The idea of compensation is the same as the idea

7    of bias.  Do cops stick together and testify for each

8    other?  Does a wife support her husband?  Now, there's

9    nothing wrong with any of those.  But they suggest that

10   you're going to be on point in carefully regarding and

11   carefully evaluating what those people have to say.

12   You have these conflicting views.  You have these

13   photographs.  You have statements.  That's the form of

14   the evidence.  But let me ask you to step back a bit.

15           Lawyers and judges frequently speak about

16   evidence as falling into two basic categories:  Direct

17   evidence and circumstantial evidence.

18           Now, direct evidence is pretty easy to

19   understand.  Direct evidence is some witness comes in

20   here and says "I saw him punch him in the nose."

21   That's direct evidence.

22           Circumstantial evidence is a little more

23   difficult to explain, although you understand it

24   implicitly.  It's common sense.  It's what logicians

25   call inferences.  It works something like this.  Let's

1    assume that several months from now, you go to bed at

2    night.  You look out on your front lawn and it's

3    clear.  And you are fortunate enough to go to bed at 10

4    o'clock.  You wake up the next morning.  You look out

5    the window.  It's still clear.  And then you look down

6    and you see there's snow all over the ground.  Now,

7    the way I set this up is you didn't see any snow at

8    10 o'clock last night and you didn't see it snow as you

9    looked out the window, but you see snow on the ground.

10    Well, circumstantial evidence means that you can draw

11    the conclusions from the various observations that you

12    made that it snowed between 10:00 and 8:00.  That's

13    common sense.  And maybe you can go farther.  Maybe

14    you can look at your front lawn and say "There are

15    footprints in the snow.  Somebody must have been

16    wandering around on my front lawn between 10:00 and

17    8:00."  And maybe you can look at the footprints and

18    say, "It must have been a man, look at the size of those

19    footprints."  Well, now we're getting into some judgment

20    areas, I would suggest to you.  You know, in an era in

21    which teenage girls go to their proms in Doc Martins,

22    maybe you can't draw conclusions about the size of

23    footprints and the gender of the person who is in them.

24    But that's for you.  That's for you applying your common

25    sense.  And this case, while it has a series of direct

1    evidence observations, also involves circumstantial

2    evidence, following the footprints to see where they

3    lead.  You look at the injuries.  You say, "what do they

4    consist of, what do they stand for, what conclusions

5    do we draw?"  And you're going to take all of that

6    evidence together, consider all of that evidence, not

7    disregard any of the evidence, follow the instructions

8    that I've given you about certain things not being

9    available for proving the truth of the matter, but just

10   for purposes of establishing whether or not someone

11   has been less than candid.  And you're going to draw

12   your own conclusions.  Draw your own conclusions with

13   respect to what?

14          Well, Ms. Greenberg is going to pass to you

15   the verdict slip that was referenced in the closing

16   arguments so that we can walk through and you can see

17   what it is that we want from you.

18          As frequently happens in cases, it gets

19   sweated down for jury purposes to a series of questions.

20   That way, I don't have to spend a lot of time with you

21   talking about the specific legal references and that

22   sort of thing.

23          But let's start with the basic proposition.

24   The basic proposition is that the burden rests with

25   Mr. Bolton.  Mr. Bolton has to satisfy you by what we

1    call a fair preponderance of the evidence regarding each

2    of the propositions that you'll see here.  Now, some of

3    you may be familiar with the standard in criminal cases.

4    That's proof beyond a reasonable doubt.  It's a very

5    heavy standard.  That's not the standard that's applied

6    here.  The standard that's applied here is is it more

7    likely true than not true?  By a fair preponderance of

8    the evidence, is it more likely true than not true that

9    the propositions for which Mr. Bolton is contending are

10   the case?  And they are crystallized in these questions.

11           On the first page are three questions that

12   deal with the substantive law, what we call liability.

13   And just stepping back a bit without getting into a

14   lengthy discussion of constitutional rights, let me tell

15   you that what we're dealing with here is the question

16   of whether or not there has been a deprivation of

17   Mr. Bolton's constitutional rights to be free from

18   unreasonable seizures.  That's governed generally by

19   the 4th Amendment to the Constitution and the parallel

20   provision of the Massachusetts State Constitution.

21   And the basic proposition -- I'll be more specific as we

22   go along.  But the basic proposition is this:  In this

23   country, we have made a very fundamental choice.  And

24   the very fundamental choice is people are allowed to

25   conduct their business without being bothered by the

14

1    police, intruded upon by the police.  But we recognize

2    that there are competing considerations, considerations

3    that are necessary if we're going to have an orderly

4    society.  And, so, what the Constitution basically says

5    is that reasonable seizures and reasonable arrests are

6    appropriate, and the police may use reasonable force to

7    effect an appropriate arrest.

8           Now, I talked about arrest.  An arrest is a

9    formal undertaking requiring probable cause by the

10   police officers.  And we're not focused on whether or

11   not they have probable cause.  That's been established

12   in connection with the guilty findings of disorderly

13   conduct and the more specific finding with respect to

14   assault and battery on Officer Greany.  We're concerned

15   with a somewhat lesser intrusion that the law permits.

16   This lesser intrusion is what people have been referring

17   to as a traffic stop.  And what the law says is that

18   a police officer who is acting on a reasonable and

19   articulable -- that means you can explain it --

20   suspicion of criminal activity has the right briefly to

21   detain an individual in order to confirm or dispel that

22   suspicion.  You're familiar with it probably yourselves

23   with traffic stops.  That's the traditional one.  A

24   cop pulls you over.  You're not free to go.  You're

25   detained.  But it has to be on the basis of some sort of

1    reasonable suspicion of criminal activity.  And it

2    doesn't have to be serious criminal activity.  It can be

3    a misdemeanor.  It can be a traffic violation.  But they

4    have the right to do that.  That's the balance that we

5    have struck -- the Constitution has struck -- for

6    certain kinds of encounters.  Now, here, the question

7    that you're asking yourself is did Officer Taylor stop

8    Mr. Bolton without reasonable suspicion that Mr. Bolton

9    may have engaged in unlawful activity?  Mr. Bolton has

10    to satisfy it's more likely true than not true that when

11    Officer Taylor stopped him -- that traffic stop -- he

12    didn't have reasonable suspicion that Mr. Bolton had

13    engaged in unlawful activity.

14              Well, what's been suggested to you?  Suggested

15    to you as a traffic violation is squealing tires.  And

16    it is the case that in Massachusetts, as in most states,

17    it is a violation of the Massachusetts motor vehicle law

18    to operate a motor vehicle so as to make a harsh,

19    objectionable or unreasonable noise.  Police have the

20    authority to make a stop for that.  They also have the

21    authority to make a stop for being involved with a

22    person in connection with sex for hire.  Both sides of

23    the transaction are committing a crime.  They have a

24    right to stop in connection with reasonable suspicion

25    of drug activity.  The purpose of this stop as a

1    minimal intrusion is, as I said, to conduct a further

2    investigation.  And it's a price that we've chosen to

3    pay for an orderly society against the backdrop of

4    requiring the police only to do so reasonably.  So, this

5    question asks you "yes" or "no," "Did Officer Taylor

6    stop Mr. Bolton without reasonable suspicion that Mr.

7    Bolton may have engaged in unlawful activity?"

8            Then we move on to the circumstance of what we

9    call excessive force.  This is the point of arrest, a

10   much more serious intrusion.  That is, taking someone

11   before a neutral Magistrate to determine whether or not

12   they have committed a crime or should be held for a

13   crime.  Police officers don't have this empty authority

14   to arrest.  They have the right to use such force as is

15   necessary to effect the arrest.  If somebody is saying,

16   "I don't want to be arrested," they can use whatever

17   force is necessary and appropriate under the

18   circumstances to effect that arrest.  The police

19   officers may have that right, but they don't have the

20   right to punish someone, to take it out on someone.

21   They have the right to enforce the law, but they don't

22   have the right to engage in their own punishment.  And

23   that's what's involved in excessive force.  They have

24   the right to arrest and secure and develop the evidence.

25   But punishment and the evaluation -- ultimate evaluation

1    -- of the evidence is a matter for the courts.  And as

2    a consequence, a person, even if he's been lawfully

3    arrested or detained -- and here you will understand

4    that they were privileged to arrest Mr. Bolton in

5    connection with any disturbance that he was engaged in.

6    And it has been established that he was convicted of

7    disorderly conduct and he was convicted of assault and

8    battery on a police officer.  They are entitled to

9    take such force as a reasonable person would think is

10   required to take one arrested into custody or to

11   effectuate a lawful stop.  And that includes the

12   physical force that's necessary to subdue a person who

13   is struggling with the officer.  But that doesn't mean

14   you get to use any force.  I suppose you could subdue

15   somebody by shooting them in the knee caps.  That would

16   be excessive force under these circumstances.  It has to

17   be measured.

18        Now, I think it was Mr. Tehan in his closing

19   argument who made reference to a long-standing

20   formulation that the Judges have used to describe what

21   goes on and what the law reflects in this area.  That is

22   that when you're evaluating excessive force, not every

23   push or shove that may in the quiet of some judge's

24   chambers or in the hopefully orderly setting of a

25   courtroom is going to be viewed as rising to the level

1    of a constitutional violation.

2         The law recognizes that police officers who

3    are making an arrest, attempting to secure a person for

4    purposes of taking him into custody are often forced to

5    make split-second decisions about the amount of force

6    that's needed to effect an arrest.  And they are

7    operating frequently in circumstances that may be tense,

8    may be potentially dangerous, and are rapidly changing.

9    And, so, you're going to have to evaluate this with a

10   certain degree of practical sense.  We're talking about

11   reasonable.  It's not truly a bright line.  But you're

12   going to ask yourself what were the circumstances that

13   Officer Taylor and Officer Greany were confronting.

14   What was reasonably necessary to effect that arrest to

15   take Mr. Bolton into custody?  While they may not use

16   greater force than is necessary to do that, you will

17   recognize, as the law does, that making an arrest can be

18   a tough operation under less than ideal conditions.  And

19   you'll ask yourself whether or not what they did here

20   has been shown to have been unreasonable.  Because,

21   again, the burden rests with Mr. Bolton to satisfy you

22   that they used unreasonably excessive force in effecting

23   his arrest.  And there's a separate question, obviously,

24   for Officer Taylor and for Officer Greany, because

25   you're going to have to consider the case with respect

1    to them separately and evaluate the case with respect

2    to them separately.  And merely because you may find

3    that one of them engaged in excessive force does not

4    necessarily mean that you've found that the other one

5    has.

6              Now, we turn to the next page and we're

7    turning to the question of damage.  And I want to say

8    that what I've tried to do in this set of questions in

9    consultation with the attorneys is to capture all of the

10    things that may be resolved by you.  But I've also given

11    you instructions when you reach certain questions.  And

12    I'm assuming that you've found, although I'm not

13    instructing you to do it -- but I'm assuming that you've

14    found that there has been an answer of "yes" to question

15    number (1) -- that is, Mr. Bolton has met his burden of

16    showing that he was detained without reasonable

17    suspicion.  And, so, here we're asking you to tell us

18    what are the damages involved?  Now, this is not an

19    exercise in double-entry bookkeeping.  We don't have a

20    scale that we can give you to say this amount of time

21    equals this amount of money.  In fact, we're looking at

22    you as the common conscience of the community to tell us

23    what value, if any, you put on what harm, if any, you

24    find that Mr. Bolton suffered.  And in this first

25    question on the second page -- that is, question number

1    (4) -- which deals with whether or not there was harm as

2    a result of an illegal traffic stop, I'm really focused

3    on that period before what we've called the tussle with

4    the use of force took place.  And you'll ask yourself

5    what's the value of the constitutional right here.  Was

6    Mr. Bolton subjected to a form of dignitary harm because

7    he was pulled over in a public area?  And you heard him

8    talk about how he felt under these circumstances.

9        Now, one of the things the law recognizes is

10   that certain constitutional rights are abstract.  You

11   know, what's the value of the 1st Amendment right?

12   Can you reduce that to a dollar figure?  Well, sometimes

13   it's hard.  And, so, this question is asking you (a) are

14   there compensatory damages -- that is, damages that are

15   necessary to put Mr. Bolton in the position that he

16   would have been in if he hadn't been pulled over.  But

17   even if you don't find compensatory damages, you can

18   still find nominal damages.  And the way ordinarily

19   juries find nominal damages is that they say one dollar.

20   That's not to diminish the importance of the

21   constitutional right.  It's just simply a way of saying

22   it's hard to say how much this is worth, we can't

23   say how much it's worth.  It's a violation of the

24   constitutional right and it has to be vindicated.  And

25   the way we do that is we say one dollar is appropriate.

1          Now, you're asking yourself in these damage

2     areas whether or not there was physical harm, whether

3     or not there was physical pain, but you're also asking

4     yourself whether or not there was harm to a person's

5     sense of dignity.  It's harder to evaluate because you

6     don't have the larger sense of some physical pain that

7     continues.  But it's things like humiliation or mental

8     anguish or matters that interfere with the ordinary

9     conduct of your life, fear of the police thereafter.

10    Those are things that you can consider in making your

11    judgment about what the proper damages -- if you get

12    to this point and you find that there was harm that

13    was visited upon Mr. Bolton as a result of some

14    constitutional violation -- were.

15          The second question on this page, which is

16    question number (5), is again a question that you only

17    get to if you've answered "yes" to either questions (2)

18    or (3).  Questions (2) and (3), you remember, are the

19    specific questions as to excessive force by Officer

20    Greany or Officer Taylor.  And, again, you're asking

21    yourself what kind of damages should be awarded.

22    There's a suggestion that there was an interference with

23    Mr. Bolton's life.  There was pain that Mr. Bolton

24    testified about.  And you'll have to evaluate whether

25    or not you believe it and, if so, whether or not it's

1    compensable and can be reduced to money.  Again, you

2    will consider the question of humiliation, humiliation

3    in the face of his family as a result of this.  Those

4    are the kinds of things that you are entitled to

5    evaluate in making a dollar figure here, or "none" if

6    you choose to do that, or "one dollar" if you say "I

7    can't make a determination, but there was harm, his

8    constitutional rights were violated."

9            Now, that takes us, then, to the third page.

10   And the third page deals with something that we call

11   punitive damages.  You'll notice on the -- one thing I

12   do want to say with respect to question number (5) is

13   while we're talking about whether or not excessive force

14   was used by either Officer Taylor or Officer Greany,

15   question (5) doesn't split up the damages between the

16   two.  And the reason for that is that I've made a legal

17   determination that you can't distinguish the damage

18   here.  They are jointly and severally liable if they're

19   liable at all here.  So it's a single damage figure for

20   the excessive force if you find that.

21           Question (5) is what we call punitive damages.

22   The question really asks you whether or not either or

23   both of these individual defendants acted in a way that

24   was willful or deliberate or malicious or with reckless

25   disregard of Mr. Bolton's constitutional rights.  The

1    issue is:  Is it serious enough to require not just

2    compensation, but punishment?  It's an unusual form of

3    damage in the law.  The Commonwealth of Massachusetts,

4    as a matter of fact, doesn't have punitive damages

5    really for anything other than wrongful death.  But

6    under the Federal Civil Rights laws, there are punitive

7    damages because the law has made a determination that an

8    individual citizen bringing an individual civil rights

9    claim has a right to have a jury decide whether or not

10   by the award of some money, a message can be sent.

11   That message is a specific deterrent to the individuals

12   involved -- Officer Greany, Officer Taylor or, more

13   generally, to police officers -- that if you engage

14   in this kind of thing and you do it willfully or

15   deliberately or maliciously or with reckless disregard

16   of someone's constitutional rights, then you're going to

17   be subject to punitive damages, a fine effectively, a

18   fine that you have to determine in your evaluation of

19   whether or not -- and, if so, to what degree -- the

20   actions of Officer Taylor and Officer Greany were

21   deserving of punitive damages, whether or not and to

22   what degree they were willful or they were deliberate or

23   they were malicious or they were with reckless disregard

24   of his constitutional rights in connection with the

25   excessive force claim.

1          I have given you, as I said, all of the

2     questions that we need answered in order to take this to

3     a final resolution.  The questions are in the order that

4     I expect that you'll walk through.  And I want you to

5     follow those directions very carefully.  If, for

6     example, you answer "no" to questions (1), (2) and (3),

7     you'll see you return the verdict at that point.

8          However, you have got to follow those damage

9     questions if you answered "yes" as to any of (1), (2) or

10    (3).  You have to follow those damage questions through.

11    And I hope the road map tells you how to deal with that.

12          Now, before I go any further, I'll see

13    counsel at the side bar.

14    (Beginning of side bar conference)

15          THE COURT:  Ms. Wood, anything further?

16          MS. WOOD:  No, Your Honor.

17          MR. SILVERSTEIN:  Your Honor, on request

18    number 24, I asked for an instruction that a minor

19    injury is insufficient to support an inference that a

20    police officer used inordinate force to effect an

21    arrest.

22          THE COURT:  No, I didn't give that.

23          MR. TEHAN:  Thank you.  Judge, first, for the

24    record, I confirm that our motion for judgment at the

25    conclusion of the plaintiff's case was indeed filed and

1    denied?

2        THE COURT:  Yes.

3        MR. TEHAN:  Thank you, Judge.  I have just a

4    couple of points to make, Your Honor.  It was something

5    I raised after the plaintiff's counsel closed.  It

6    was the issue of the substantive use of the tape for

7    impeachment purposes.  Forgive me, but I don't recall if

8    I mentioned that or not.

9        The other aspect was I respectfully object to

10   the statement that the plaintiff might be compensated

11   for mental anguish, fear of police, or facing the family.

12   In the absence of any testimony in that regard and

13   indeed no contradiction of that testimony, he was not

14   emotionally distressed.

15       THE COURT:  No.  I decline to say that.

16       I'll give them an instruction on how they

17   conduct their business.

18   (End of side bar conference)

19      BY THE COURT:

20       Let me turn now to the question of how you

21   conduct your business.  And these are suggestions, since

22   I'm not going to be in the jury room.  You're going to

23   have to decide among yourselves how you organize your

24   deliberations.

25       The whole purpose of jury deliberations is to

1    permit a full and civil and careful discussion of all of

2    the evidence.  It's to ensure that everybody gets a

3    chance to participate, that everybody hears what

4    everybody else has to say, and has the opportunity to

5    offer their own views.  My experience is that a way of

6    doing that is simply to sit down at the table and go

7    around and have each person kind of say what evidence

8    was particularly important to them.  Don't take a straw

9    vote at the beginning.  At least that's my suggestion.

10   One of the problems with a straw vote is that people

11   take a position and then they're there to defend the

12   position rather than kind of working it out because what

13   you're involved in is a collective effort at collective

14   recollection.  You want the benefit of what the other 11

15   of you have to say about this.  And, so, a useful way,

16   at least in my experience, is to kind of begin with a

17   discussion of the things that seemed to you to be most

18   pertinent.  And what you'll find is that somebody will

19   mention something and that will prompt further

20   recollection, enrich the recollection.  Now, I warn you

21   the experience that many juries have had, that that

22   person who was sitting next to you and seemed fairly

23   reasonable might start expressing rather unreasonable

24   views.  That's part of the jury process.  You'll be

25   familiar with it from cocktail parties, I suspect.

1    But the idea is together to work this out because your

2    verdict has to be unanimous on any of the questions that

3    you're required to answer.  It requires that everybody

4    listen to what the other fellow has to say and be

5    prepared to reconsider your own views.  That doesn't

6    mean you give up your views, but you're open to fair

7    consideration of what the other person has to say.

8         It is necessary for there to be a foreperson.

9    And Ms. Arrigo, after a nationwide search, in light of

10    the fact that you're sitting in seat number one, you

11    have now become the foreperson of the jury.  And I want

12    you to understand there's no extra money involved in

13    this.  The purpose, however, is simply that somebody has

14    to sit there to make sure the people aren't talking over

15    each other and it moves around in an orderly fashion.

16    It's also the case that it's necessary for someone to

17    comunicate with the Court if you have questions.  My

18    hope is that the instructions have been clear enough,

19    that you won't have any questions.  But if you have any

20    questions about the substance of this case, they should

21    be in writing signed by Ms. Arrigo or, if she declines

22    to sign, signed by one of the jurors.  You give them to

23    the court officer who is going to be outside the jury

24    room or Ms. Greenberg who may be outside the jury room

25    as well.  And I'm going to share them with counsel.

1    We'll talk through how we respond to it.  But anything

2    that's substantive about the case, give it to us in

3    writing.  One thing you shouldn't do, don't tell us

4    where you stand.  At some point, you will take a vote.

5    And maybe at that time, you'll be seven to five on some

6    issue.  Don't tell us.  We're not entitled to know.

7    You're going to have to keep the development of your

8    jury deliberations to yourselves.  But if you have

9    particular questions, as I say, about particular issues

10    -- not that I'm soliciting questions -- the way to do it

11    is to do it in writing.

12          Now, creature comfort things like "when do we

13    eat," that can be addressed to Ms. Greenberg or the

14    court officer outside, although I can answer that

15    question.  It was at 12:30.  We've run a little longer,

16    but they're not taking the food away.  But it was

17    supposed to be at 12:30.  But, presumably, the food

18    will be in there when you go in.  And probably the best

19    thing is to eat lunch and then start your deliberations

20    in the case.

21          When you've reached your final verdict and

22    you're prepared to come back into court and you've

23    answered all the questions that you're required to

24    answer in connection with this, then tell the court

25    officer or Ms. Greenberg and we'll arrange to bring you

1    in.  At some point, if you haven't concluded your

2    deliberations by, say, 4:30 or so today, I'll probably

3    ask Ms. Greenberg just to go in and inquire whether or

4    not you want to stay later because we have to make

5    arrangements if you do.  But don't worry about that as

6    yet.

7            Is there anything else that we need from

8    counsel?

9            MS. WOOD:  No, Your Honor.

10           MR. TEHAN:  No, thank you, Your Honor.

11           THE COURT:  Okay.  So you'll retire to the

12   jury room.  Ms. Greenberg will gather together the bits

13   and pieces of evidence after consultation with the

14   lawyers and you can have lunch and begin your

15   deliberations.  Good luck.

16   (Jury out at 12:50 P.M.)

17           THE COURT:  Five-minute rule.  You've got to

18   be available in five minutes or things will happen in

19   your absence.

20           MR. TEHAN:  Yes, Your Honor.

21           THE COURT:  Okay.  Anything else?

22           MR. TEHAN:  No.

23           MS. WOOD:  Thank you.

24           THE COURT:  You're held harmless, anyway, for

25   30 minutes for lunch yourselves.

1                    RECESSED AT 12:52 P.M.

2     (Reconvened at 2:05 P.M.)

3              THE COURT:  Well, I believe Ms. Greenberg has

4     shared with you what we've marked as Jury Exhibit Number

5     1 which reads, "We, the jury, need to know whether Judge

6     Woodlock has in his instructions declared that it was

7     reasonable suspicion to pull someone over for being

8     seen with a prostitute under the law.  Could we see

9     the transcript of the Judge's instruction regarding

10    that matter?"

11              Well, the full transcript hasn't been

12    prepared.  So, I think what I'll do is bring the jury

13    back in and instruct them about reasonable suspicion

14    again.  Okay?

15              MS. WOOD:  Yes, Your Honor.

16    (Jury in at 2:07 P.M.)

17              THE COURT:  Ladies and gentlemen, I have your

18    inquiry which I'll read back to you and I have marked as

19    Jury Exhibit 1.

20              It reads:  "We, the jury, need to know whether

21    Judge Woodlock in his instructions declared that it was

22    reasonable suspicion to pull someone over for being seen

23    with a prostitute under the law?  Could we see the

24    transcript of the Judge's instructions regarding that

25    matter?"

1          As I think I indicated to you at the outset,

2     the transcript simply isn't going to be available to

3     you.  It's too difficult to get cranked up in the time

4     that we have to do the transcript for you.  There's a

5     second issue that I want to emphasize to you.  You will

6     want to listen to all of the instructions, take into

7     consideration all of the instructions, and don't want to

8     focus on particular instructions to the exclusion or

9     perhaps have you distracted from considering all of the

10    instructions.

11          Nevertheless, let me answer orally this

12    question of reasonable suspicion.  Under the 4th

13    Amendment of the United States Constitution, law

14    enforcement officials are authorized to initiate some

15    sort of investigatory detention (a stop) only if they

16    have reasonable articulable suspicion of criminal

17    activity.  To meet that standard, the Government or

18    the law enforcement officers must point to specific and

19    articulable facts together with rational inferences

20    drawn from those facts that reasonably suggest that

21    criminal activity has occurred or is imminent.  Hunches

22    and generalized suspicions are insufficient.  So, the

23    primary bases are the police officers' observations,

24    the knowledge of police officers with respect to the

25    context, and considerable deferences afforded to such

1    observations and conclusions as the police may make.

2    The assumption is that experienced officers can infer

3    criminal activity from conduct that may seem innocuous

4    to a lay observer.  But, of course, an officer may not

5    base a reasonable suspicion on some isolated instances

6    of innocent activity.

7         Now, your specific question asked whether or

8    not it was a reasonable suspicion to pull someone over

9    for being seen with a prostitute under the law.  You

10   should understand that the crime that is at issue here

11   is sex for hire.  It's not being seen with a prostitute.

12   It's sex for hire.  Nevertheless, being seen with a

13   prostitute may under certain circumstances give rise to

14   a reasonable suspicion that sex for hire has taken

15   place.  To use two extreme examples, merely because

16   someone sits next to a prostitute at a Sunday mass and

17   consequently is seen with her is not enough to give rise

18   to a reasonable suspicion.  By contrast, coming out of a

19   building that's labeled "Bordello" in the company of a

20   known prostitute might give rise to a reasonable

21   suspicion.  The question for you is whether or not

22   there was a reasonable suspicion that criminal activity

23   may have occurred sufficient to justify a brief

24   investigatory detention.

25         I hope that answers the question for you.  And

1    I'll ask you to go back and continue your deliberations.

2    (Jury out at 2:10 P.M.)

3        THE COURT:  Anything else?

4        MR. TEHAN:  No.

5        MS. WOOD:  No.

6        THE COURT:  Okay.

7            RECESSED AT 2:10 P.M.

8        THE COURT:  Well, we're informed we have a

9    verdict.  So, I'll have the jury brought in.

10   (Jury in at 4:50 P.M.)

11       THE COURT:  Madam Foreperson, has the jury

12   reached a unanimous verdict?

13       FOREPERSON:  Yes, we have, Your Honor.

14       THE COURT:  Then Ms. Greenberg will inquire.

15       THE CLERK:  Madam Foreperson, Members of the

16   Jury, harken to your verdict as the Court has recorded

17   it.  Civil Action No. 99-12202-DPW, David Bolton versus

18   Stephen Taylor and Scott Greany.

19       Question (1):  Did Officer Taylor stop Mr.

20   Bolton without reasonable suspicion that Mr. Bolton may

21   have engaged in unlawful activity?  Answer:  Yes.

22       Question (2):  Did Officer Taylor use

23   unreasonably excessive force in effecting Mr. Bolton's

24   arrest?  Answer:  No.

25       Question (3):  Did Officer Greany use

1    unreasonably excessive force in effecting the arrest of

2    Mr. Bolton?  Answer:  No.

3         Question (4):  What amount, if any, do you

4    find would fairly compensate Mr. Bolton for any harm he

5    suffered as a result of the traffic stop by Officer

6    Taylor without regard to any harm suffered as a result

7    of the force used thereafter to effect his arrest?

8    Answer:  $175,000.

9         Signed and dated this August 16th, 2001.

10        So say you, Madam Foreperson, and say you

11   Members of the Jury?

12        REPORTER'S NOTE:  (All jurors responded in

13   the affirmative).

14        THE COURT:  Anything further from counsel?

15        MR. TEHAN:  No, Your Honor.

16        MS. WOOD:  No, Your Honor.

17        THE COURT:  Well, ladies and gentlemen, what

18   that means is that your jury service is concluded.  As I

19   told you throughout, it is your verdict, not mine.  And,

20   so, it would be improper for me to comment on the

21   substance of your verdict.  But I can comment -- as I

22   did in the closing argument and in my instructions --

23   concerning the way in which you went about your

24   business.  It was clear to all of us that you were

25   paying very careful attention to the evidence as it came

1       in, asked a pertinent question during the course of your

2       deliberations, addressed yourself to the issues in the

3       way in which the issues need to be addressed.  That's

4       what we look for from a jury and I believe that that's

5       what we received from you.

6               So, on behalf of the Court and I believe on

7       behalf of the parties, I want to thank you for your jury

8       service here.  I want to offer you some advice, no

9       longer instructions, but just advice.

10              In this judicial circuit, no party or

11      representative of a party may contact a juror after the

12      verdict is returned.  This isn't the kind of case in

13      which that would happen.  And the only way it could

14      happen is with the approval of the Court, and this isn't

15      the kind of case in which I'm going to give approval for

16      that sort of thing.  The reason for that rule is that

17      you've been engaged in a confidential discussion.

18      And the courts see no reason to burden that with the

19      prospect that somebody is going to be asking you what

20      happened during the course of your deliberations.  I

21      no longer can tell you not to talk to anybody.  It's

22      absolutely up to you.  But I make one specific

23      observation in this regard.  You have undoubtedly shared

24      with each other your views about the credibility of

25      various witnesses, what you think about the various

36

```
 1    witnesses, what you think about the evidence in the
 2    case.  And it may occur to you that you wouldn't want to
 3    have somebody else characterize what you said in a
 4    confidential setting.  And if you wouldn't want to have
 5    someone else characterize what you said, then you
 6    probably don't want to characterize what your colleagues
 7    said.  It's up to you, but I encourage you to maintain
 8    the confidentiality of your jury service.  Beyond that,
 9    I can't give you any more instructions except to thank
10    you for your service and you're free to go.  Have a good
11    evening.
12    (Jury out at 4:55 P.M.)
13              THE COURT:  Ms. Greenberg reminds me to be
14    sure that you take back your own exhibits.
15              I anticipate an extensive post trial
16    motion practice with respect to this verdict which has
17    some proportionality problems in terms of the damages
18    that the jury returned.  So, let's set a schedule to
19    deal with that.  Post trial motions, Mr. Tehan, when?
20              MR. TEHAN:  Your Honor, I've only got the 10
21    days, don't I?  Can you extend that?
22              THE COURT:  No.  You can file the motion, the
23    bare bones motion, and brief it after this.
24              MR. TEHAN:  I've done two trials in two weeks,
25    Judge.  I wanted to take the next week off.
```

1           THE COURT:  Just tell me when you want to

2    address this question.

3           MR. TEHAN:  Well, let's push on the envelope.

4    Can I have a month and work back from there if that's a

5    problem?

6           THE COURT:  Yes, you can.  So, I'm talking

7    about September 14.  Is that sufficient?

8           MR. TEHAN:  Can we do that?

9           MR. SILVERSTEIN:  Yes.

10           THE COURT:  Okay.  But you better file a bare

11    bones motion within the 10 days indicating a memorandum

12    to follow.

13           MR. TEHAN:  This is my 59 motion.

14           THE COURT:  Yes.  I mean, the issue, as far as

15    I can see, is going to be one of potential remittitur.

16           MR. TEHAN:  A lot of money.  Thanks, Judge.

17           THE COURT:  Ms. Wood, it's a remarkable amount

18    of money for the claim of a violation of a terry stop.

19           MS. WOOD:  Well, I think what they're having a

20    problem with is that there's a pattern of this.  That's

21    what they're saying the message is.

22           THE COURT:  Well, perhaps, except that no

23    money was awarded for punitive damages.  And punitive

24    damages wasn't submitted to them on this count.

25           But in any event, I just raise it.  I think

38

1     you would both benefit from talking amongst yourselves.

2               MR. TEHAN:  Right, Judge.

3               THE COURT:  And, Ms. Wood, when would you want

4     to respond to that motion.  I've gone to the 14th.

5               MS. WOOD:  How many days do we get -- 30?

6               THE COURT:  No, you don't ordinarily.  But if

7     that's what you think you need --

8               MS. WOOD:  No.

9               THE COURT:  -- then tell me.  Ordinarily, it's

10    a two-week process.

11              MS. WOOD:  Okay, 14.

12              THE COURT:  Okay.  So response by the 28th.

13              MS. WOOD:  Okay.

14              THE COURT:  Okay.

15              MR. TEHAN:  Thank you, Judge.

16              THE COURT:  Thank you very much.  We'll be in

17    recess.

18              MS. WOOD:  Thank you, Your Honor.

19                    RECESSED AT 5:00 P.M.

20

21

22

23

24

25

1                    C E R T I F I C A T E

2            I, PAMELA R. OWENS, Official Court Reporter,

3   U. S. District Court, do hereby certify that the

4   foregoing is a true and correct transcription of the

5   proceedings taken down by me in machine shorthand and

6   transcribed by same.

7                    *Pamela R. Owens* 12/27/05

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25