# Exhibit B

Page 1

1               UNITED STATES DISTRICT COURT

2                 DISTRICT OF MASSACHUSETTS

3    * * * * * * * * * * * * * * * * *

4    SHEILA J. PORTER

                       Plaintiff

5

          VERSUS                         CA-04-11935-DPW

6

     ANDREA CABRAL

7

                       Defendant

8

     * * * * * * * * * * * * * * * * *

9

10         BEFORE THE HONORABLE DOUGLAS P. WOODLOCK

11            UNITED STATES DISTRICT COURT JUDGE

12               JURY TRIAL - DAY SEVEN

13                 JANUARY 18, 2006

14

15   APPEARANCES:

16       JOSEPH F. SAVAGE, JR., ESQ, Goodwin, Procter, LLP,

17       53 State Street, Boston, Massachusetts  02109, on

18       behalf of the Plaintiff

19

20       DAVID S. SCHUMACHER, ESQ, Gadsby Hannah, LLP,

21       225 Franklin Street, Boston, Massachusetts  02110,

22       On behalf of the Plaintiff

23

24   (Appearances continued next page)

25

Page 2
1

2      APPEARANCES (Continued):

3

4          ELLEN CAULO, ESQ. AND JAMES M. DAVIN, ESQ.,

5          Suffolk County Sheriff's Department, 200 Nashua

6          Street, Boston, Massachusetts  02114, on behalf

7          Of the Defendant

8

9

10

11

12

13

14

15

16

17

18

19                                    Courtroom No. 1 - 3rd Floor

                                      1 Courthouse Way

20                                    Boston, Massachusetts  02210

                                      9:00 A.M. - 11:30 P.M.

21

22

                    Pamela R. Owens - Official Court Reporter

23              John Joseph Moakley District Courthouse

                      1 Courthouse Way - Suite 3200

24                    Boston, Massachusetts  02210

25

PORTER V CABRAL - DAY 7>

**Page 3**

1    THE COURT: Well, I have had passed up to me the
2    proposed jury instruction of the plaintiff regarding punitive
3    damages.
4    I will instruct on punitive damages to some degree
5    in the fashion that is outlined in the proposal. The larger
6    question of sustainability of punitive damages, if it comes to
7    that, is something I will take up at a later point. I spent
8    some time, perhaps obsessive, on a minor issue, but it becomes
9    a major issue for purposes of instructions on the question of
10   compensatory damages. And as a consequence, I have three
11   alternative verdict slips that I want to discuss with you to
12   get this straightened away. I also made -- and I don't know if
13   the parties have some proposed changes to the verdict slip or
14   not. I did make one typographical change to question 4a, if
15   you have it, which, as it is written, referred to the unlawful
16   act as "bearing" Sheila Porter from the Suffolk County House of
17   Corrections. That seems to me to implicate a different set of
18   legal principles. So I made it "barring" for that.
19   So let me pass back what are alternatively called
20   Porter one draft, Porter two draft and Porter three draft to
21   tell you what my concerns are. We talked about them a bit
22   yesterday, but I will explain it.
23   My concerns are this: With respect to the question
24   of economic damages and the question of pre-judgment interest,
25   we get ourselves into the problem of present value. If this is

**Page 4**

1    treated as a back pay, front pay, as it effectively is, then
2    we're dealing, I think, with what has been set forth in
3    question 3a in Porter two draft. That is, we have to identify
4    the economic damages up to today separately from the economic
5    damages in the future. Up to today is subject to pre-judgment
6    interest. In the future is subject to discounting for present
7    value and I have to instruct the jury as to discounting for
8    present value. That is to say, an award today is more valuable
9    because you get the money now as opposed to getting it in the
10   future with the discounting that is involved in that. So, when
11   judges are forced to instruct on this kind of issue, it becomes
12   rather complex, including a lengthy discussion of interest
13   rates and the jury's evaluation of interest rates. Now, I'm
14   not sure it is worth the candle. But if I am going to do it, I
15   have to do it, I think, under proposal number two, draft number
16   two. If we go to draft number three, which is the one that we
17   came to rest on yesterday -- I'm sorry, draft number one, which
18   is the one we came to rest on yesterday, I could not, I think,
19   properly impose pre-judgment interest because I don't know how
20   much the economic damages are before the judgment today and how
21   much is after the judgment today. So, I just can't do it.
22   This one doesn't affect it.
23   If, however, we go to proposal number three, just
24   ask damages without breaking them out. Now, that would make it
25   impossible to impose pre-judgment interest on the particulars

**Page 5**

1    of the economic damages up to today. On the other hand, I
2    would call this the Emily LaTella approach, nevermind, it
3    doesn't make a lot of sense in terms of the amount of money
4    involved here. So I raise it simply because I've spent some
5    time thinking about how do I instruct properly on this without
6    surprising the parties at the end by saying with the proposal
7    of yesterday, number one, I'm not in a position to identify
8    what the economic damages subject to pre-judgment interest
9    would be if we ever get to that. So, I raise it. I don't know
10   what your inclinations are with respect to that. But I think I
11   need to know from you what you want. So, Mr. Savage?
12   MR. SAVAGE: Just for entertainment's sake, prior
13   to what I was obsessing on, too, I think it's even more
14   complicated than draft two because I don't think pre-judgment
15   interest could actually run on damages prior to the filing of
16   the suit. So I think there's a separate chunk. I think it is
17   as you've said, more complicated than it's worth with the
18   dollar figures at stake on that piece and we're content with
19   the single draft.
20   THE COURT: The single one which is --
21   MR. SAVAGE: Draft number three.
22   THE COURT: -- draft three. And I simply won't be
23   discussing with the jury present value and that kind of
24   thing.
25   MR. SAVAGE: Right.

**Page 6**

1    THE COURT: Is that agreeable with the defendant?
2    MR. DAVIN: Yes, Your Honor.
3    THE COURT: Okay. So, I will ask my secretary to
4    make up four copies of number three for the jury and so on.
5    But are there any other typos or anything else that the parties
6    have seen? Because what I'm obviously going to do is instruct
7    the jury with them having this in their hands. And the parties
8    are free, of course, to reference it in their closing
9    arguments, although the jury will not have it in their hands at
10   that point. Hearing none -- Michelle?
11   OFF THE RECORD
12   THE COURT: Okay. Anything else that we need to
13   talk about before closing? All right. I think we are one
14   short. Ms. Rynne is going to check again and see.
15   (Jury in at 9:00 A.M.)
16   THE COURT: Good morning. I'm asking Ms. Rynne to
17   move the panel there. When the panels are put there, while I'm
18   talking to you, I feel something like the Wizard of Oz speaking
19   to you from behind a screen. I want to be able to see all of
20   you to start the process of instructing, although I started the
21   process of instructing you on the first day we met. And I'm
22   going to give you instructions, final instructions after you
23   have heard from the lawyers in their closing arguments. And
24   you will keep in mind all of the instructions I have given
25   during the course of the trial.

JANUARY 18, 2006>

Page 7

1       But specifically with respect to closing arguments,
2   you heard me at various times make rulings about various ways
3   that questions were asked and issues were presented to you
4   saying "that's argumentative, this isn't the time to be raising
5   that question in this fashion." And that was true then. It's
6   not true now. Now is the time for argument. And argument is
7   the effort to persuade you, using all of the evidence that has
8   come in to get you to see things the way the various parties
9   see them in any way. I don't mean to depreciate or denigrate argument
10  in any way. It's a very important -- actually fundamentally
11  important to this process because this is the time the lawyers
12  have to focus your attention on what's really in dispute and to
13  marshall all of the evidence that they think supports their
14  proposition. One thing that you have to keep in mind is that
15  just as I used that jigsaw puzzle, for example, at the outset,
16  it's applicable now. During the course of the closing
17  arguments, the lawyers will make reference to what they recall
18  the evidence to be. But if you say "I didn't hear anything
19  like that," of course you're going to disregard that summary of
20  the evidence. The evidence is what you find in this case.
21  Nevertheless, this is the opportunity for the lawyers to be
22  able to present their side and their perspective on the case.
23  And it's very helpful, I think -- it will be very helpful,
24  particularly given the quality of the lawyers here -- to get
25  you right to the things that you need to decide to help us

Page 8

1   resolve this case.
2       Now, under the Massachusetts system, the defendant
3   goes first in closing argument. So we'll hear first from
4   Ms. Caulo and then we'll hear from Mr. Savage. Ms. Caulo?
5       MS. CAULO: Thank you, Your Honor. Your Honor, I
6   may have occasion to use the screens.
7       THE COURT: I'm not the center of attention right
8   now, so you can move it back. I just wanted to be able to see
9   all the jurors.
10      MS. CAULO: I may activate the monitor. I don't
11  plan on using these.
12
13      CLOSING ARGUMENT ON BEHALF OF DEFENDANT
14  BY MS. CAULO:
15      Good morning.
16      Last week, I told you that the evidence produced
17  during the course of this trial would establish that Sheriff
18  Cabral did not revoke Ms. Porter's security clearance and bar
19  her from the House of Correction because she provided
20  information to the FBI.
21      Indeed, I told you that the evidence produced
22  during the course of this trial would establish that Sheriff
23  Cabral revoked Ms. Porter's security clearance and barred her
24  from the House of Correction because she failed to meet some
25  very basic and fundamental obligations as a Nurse Practitioner

Page 9

1   and contract worker working at the House of Correction in
2   caring for the inmates incarcerated there. And I suggest to
3   you that, indeed, the credible evidence in this case proves
4   just that, that Sheriff Cabral barred Ms. Porter because she
5   did not document her significant observations and findings
6   regarding Mr. Rosario's medical condition in his medical record
7   and she did not file a report when she was directed to do so by
8   a Deputy Superintendent of this department and it was not
9   received until nine days later. Sheriff Cabral made this
10  decision. No one else. She has taken full responsibility and
11  and ownership of this decision. And she has taken this witness
12  stand in this courtroom and she has told you what she knew
13  about Ms. Porter's conduct, what she thought about Ms. Porter's
14  conduct, and why, when she was made aware of that conduct, she
15  decided that barring Ms. Porter was the appropriate thing to
16  do. It was the necessary thing to do. You will be asked in
17  this case to decide whether or not Ms. Porter's relaying
18  Mr. Rosario's allegations of abuse to the FBI was a substantial
19  or motivating factor in Sheriff Cabral's decision to bar her
20  from the House of Correction. I suggest to you that the answer
21  to that question, based upon the clear and unwaivering
22  testimony of Sheriff Cabral as well as who she is, her career
23  as a prosecutor, what she was obligated to do as Sheriff and
24  what she wanted to do as Sheriff leads to the unescapable and
25  unequivocal answer of no. This is what Sheriff Cabral did. In

Page 10

1   June of 2004, she knew after being briefed by her Chief of the
2   Investigation Division, Viktor Theiss, that Mrs. Porter had
3   made significant observations of Rene Rosario's medical
4   condition and did not document them in his medical chart. She
5   knew in June 2004 that Mrs. Porter was directed by a Deputy
6   Superintendent to provide a written report of her encounter
7   with Mr. Rosario and she failed to do so until nine days
8   later. Sheriff Cabral knew in June of 2004 that the failure to
9   document and the failure to report occurred in the context of
10  an inmate making allegations of abuse by an officer. And yes,
11  she knew that Mrs. Porter had provided information to the FBI
12  regarding Mr. Rosario's allegations. And this is what she
13  thought about that conduct. Sheriff Cabral was appalled and in
14  disbelief that a medical staff person possessing this specific
15  and fundamental information, direct evidence from an inmate of
16  abuse, would not document the medical records. And Sheriff
17  Cabral did not come to this belief in the importance of
18  documentation overnight. You know that. You know that for 16
19  years, she was a prosecutor prosecuting cases involving civil
20  rights violations, prosecuting cases involving domestic abuse.
21  She knew first hand the importance of timely and
22  contemporaneous documentation. And she's not the only one who
23  thought that. Every single witness who took that stand in this
24  courtroom and was asked a question about whether or not
25  documentation was important responded affirmatively. Christa

PORTER V CABRAL - DAY 7>

Page 11

1  Snyder, the FBI agent with whom Mrs. Porter was working, told
2  you that documentation had evidentiary significance, that one
3  of the first things they do is to subpoena the medical
4  records.
5      Mary Ellen Mastrorilli, the Deputy Superintendent
6  who directed Ms. Porter to provide the report stressed the
7  importance of timely and accurate reporting, particularly in
8  the context of investigations. If it's not written down, it
9  didn't happen.
10     Elizabeth Keeley, the Chief-of-Staff, a veteran
11 prosecutor, spoke to you about her own experience involving
12 cases that were won or lost on the absence of documentation.
13     And yes, even Mrs. Porter told you and acknowledged
14 to you the importance of documentation. She acknowledged that
15 if it's not documented, it didn't happen. If it's not
16 documented, she didn't have the conversation with Mr. Rosario.
17 If it's not documented, she didn't make those fundamental
18 important and critical observations of his medical condition.
19 And Sheriff Cabral also told you what she thought about
20 Mrs. Porter's reporting violations. It was unacceptable to her
21 that a contract worker at the House of Correction would not
22 submit a timely report of inmate abuse when ordered to do so by
23 a Deputy Superintendent. And you know she didn't come to that
24 notion overnight. She told you when she testified -- Sheriff
25 Cabral -- that when she became Sheriff, she began to implement

Page 12

1  significant and substantial reforms in the Sheriff's
2  Department, reforms that went to hiring, training, discipline,
3  promotion, reforms, I suggest to you, ladies and gentlemen,
4  that were necessary and important to enhance the
5  professionalism and accountability of the Suffolk County
6  Sheriff's Department; and reforms, ladies and gentlemen, that
7  are fundamentally necessary to the mission of the department
8  which is the care and custody of the inmates incarcerated
9  there; and reforms, ladies and gentlemen, as Sheriff Cabral
10 testified the other day, that would be rendered meaningless if
11 employees and contract workers were not required to comply with
12 department policy and report allegations of abuse internally.
13 So, what did Sheriff Cabral do? She told you what she did
14 based upon the conduct as she knew it. She barred Mrs. Porter,
15 the only decision that was consonant with her focus of what she
16 wanted to do with the department with respect to reforming and
17 enhancing the professionalism and accountability. Sheriff
18 Cabral did what she thought was right for the department.
19 Mrs. Porter wants you to believe that Sheriff Cabral barred her
20 in retaliation for speaking with the FBI. But you know that
21 upon taking office as Sheriff in November of 2002, she began
22 immediately to partner with and work collaboratively with
23 outside law enforcement agencies, the Boston Police Department,
24 the Suffolk County District Attorney's Office, the Attorney
25 General's Office, the State Police and, yes, the FBI.

Page 13

1      You know from the testimony in this case that on
2  May 21st, when Stan Wojtkonski had his conversation with Agent
3  Snyder outside the Nashua Street Jail, he was there for the
4  purposes of providing documents and evidence requested by the
5  FBI to give it to Agent Kelly. That's why he was there. You
6  know that when Sheriff Cabral came into the department in
7  November of 2002, she was aware of the FBI investigation into
8  allegations of misconduct at the Nashua Street Jail and she
9  directed her staff to cooperate and provide whatever assistance
10 was necessary. And they did. And you know that when she came
11 onboard in November of 2002, she became aware of the joint
12 investigation that had stalled under the prior administration,
13 an investigation into drug dealing at the House of Correction.
14 And Sheriff Cabral restarted that. She made the effort. She
15 contacted the FBI. She was one who directed her Chief of
16 Investigations to get that investigation back on track. And it
17 was and it did. Barring Mrs. Porter because she spoke to the
18 FBI would be completely inconsistent with every single step
19 this Sheriff has taken to enhance professionalism in her office
20 or to work collaboratively with outside agencies, including the
21 FBI.
22     Mrs. Porter wants you to believe that because there
23 was a difference of opinion with respect to one aspect of this
24 joint investigation with the FBI, that somehow Sheriff Cabral
25 decided to retaliate against her. And as evidence of that,

Page 14

1  Mr. Savage, I guess, offers to you an animated conversation
2  that occurred between an Assistant United States Attorney,
3  Sheriff Cabral, and Viktor Theiss approximately three weeks
4  before Sheriff Cabral learns that Mrs. Porter has communicated
5  with the FBI. Ask yourself: Does that make sense that this
6  Sheriff, this reformer, this civil rights prosecutor, this
7  defender of victims' rights would retaliate against
8  Mrs. Porter, someone who she did not know because they provided
9  information to the FBI? I suggest to you it does not make
10 sense. It simply does not make sense.
11     What did Sheriff Cabral say about this conduct of
12 Mrs. Porter and what she decided to do. Sheriff Cabral has
13 articulated her concerns about Mrs. Porter's conduct from the
14 moment she learned of it. She articulated those concerns to
15 Viktor Theiss, to Elizabeth Keeley on June 10th when Sheriff
16 Cabral made the decision to bar Mrs. Porter. Her focus has
17 always been on Mrs. Porter's conduct, what Mrs. Porter did and
18 what she didn't do, not her reporting to the FBI.
19     Mrs. Porter's reporting to the FBI was a footnote.
20 It was not the focus. Its only relevance was that it was the
21 means by which the department came to be aware that Mrs. Porter
22 had not reported internally, had not complied with her
23 obligation to report internally. Sheriff Cabral did not focus
24 on the confidential communication provision of S-220. Indeed,
25 she didn't focus on any particular provision of any department

JANUARY 18, 2006>

Page 15

1  policy when she made the decision to bar Mrs. Porter. She
2  didn't consult with Viktor Theiss regarding that decision. She
3  didn't consult with Mary Ellen Mastrorilli regarding that
4  decision. And indeed, I suggest to you that she really didn't
5  consult with Elizabeth Keeley. Sheriff Cabral spoke her
6  thoughts to Mrs. Keeley and then spoke her decision. She must
7  be barred. She should be barred.
8         Indeed, when there is any consensus regarding what
9  was discussed during the June 16th meeting at the United States
10 Attorney's Office, it is this. It is with reference to the
11 concerns underscored by Sheriff Cabral regarding Mrs. Porter's
12 failure to comply with department policy concerning reporting
13 and documentation.
14        And you have heard some testimony that
15 Mrs. Porter's provision of information to an outside agency was
16 discussed at the June 16th, 2003, meeting. And indeed, at the
17 meeting, it would have been only one person who took notes,
18 albeit after the fact does not have a specific recollection of
19 what exactly was discussed and communicated.
20        You've also heard some testimony that Mary Ellen
21 Mastrorilli wanted to bar Mrs. Porter for communicating with an
22 outside agency or that Viktor Theiss reports to hear from
23 Sheriff Cabral that one of the reasons for her barring was that
24 Mrs. Porter had reported to the FBI and not reported inside.
25        In light of all of the evidence as it's been

Page 16

1  produced during the course of this trial, I suggest to you that
2  that testimony is not sufficient for you to conclude that
3  Mrs. Porter's communications with the FBI was a substantial or
4  a motivating factor in Sheriff Cabral's decision to bar
5  Mrs. Porter.
6         However, should you determine that -- should you
7  determine that Mrs. Porter's communications with the FBI was a
8  substantial or motivating factor in Sheriff Cabral's decision
9  to bar Mrs. Porter from the House of Correction, then I suggest
10 to you that by a preponderance of the evidence, Sheriff Cabral
11 has established that she would have taken the same action
12 regardless of whether or not Mrs. Porter had communicated with
13 the FBI. She would have barred Mrs. Porter even if she hadn't
14 communicated with the FBI. Why? Because her conduct warranted
15 it.
16        Indeed, what we have learned during the course of
17 this trial is that Sheriff Cabral got it right. Mrs. Porter
18 was a Nurse Practitioner employed by Correctional Medical
19 Services to provide health care to inmates incarcerated at the
20 House of Correction. Her primary obligation, indeed her sole
21 obligation was to help her patients, the inmates at the House
22 of Correction. No one is questioning her expertise or her
23 qualifications as a Nurse Practitioner. And, indeed, no one is
24 suggesting that is she not well-intentioned. However, despite
25 the obligations that everyone agrees she was required to comply

Page 17

1  with with respect to her job as a Nurse Practitioner and
2  contract worker at the House of Correction, she made a series
3  of bad judgments and bad decisions, conduct, ladies and
4  gentlemen, that in Sheriff Cabral's estimation warranted her
5  barring even if she didn't talk to the FBI.
6         First, Mrs. Porter decided not to document
7  Mr. Rosario's medical records. They made the decision not to
8  document his charts with a significant finding and observations
9  that she had made regarding his medical condition. You know.
10 You heard the evidence. She spoke with Mr. Rosario long enough
11 and close enough at his cell door to make the significant
12 observations that appeared in a document that's dated May 19th,
13 10 centimeter bruise on the chest. You heard Mrs. Porter. She
14 used her hand to measure it. Ten centimeter bruise on the
15 chest, 10 to 15 centimeter bruise on the bicep. She made
16 specific notations of the color of the injuries, their
17 location, their size, their freshness. Indeed, the plaintiff's
18 own witness, Donna Jurdak, the Health Service Administrator for
19 Correctional Medical Services at the House of Correction, when
20 pressed on cross-examination, acknowledged what we all knew --
21 what we all knew, that these observations by Mrs. Porter were
22 significant findings that she was required to document. The
23 absence of a physical examination did not make these findings
24 any less significant nor did they obviate the need for her to
25 document them. Mrs. Porter was trained on the necessity of

Page 18

1  proper documentation and the fact that all of these significant
2  findings and then the fact that all the significant findings
3  were required to be documented in the chart. She didn't do
4  so. She decided not to do so.
5         Ladies and gentlemen, I invite you to look at the
6  medical records. Look at the medical records, ladies and
7  gentlemen. When you go back to the jury room, look at them.
8  Look at the kinds of information that is contained within those
9  medical records and look at what the information is that's
10 contained in Mrs. Porter's 5-19 Progress Notes. Look at the
11 observations that she made that she reported. Look at the
12 observations that are recorded and made in Mr. Rosario's
13 medical records. Look with particular attention at the
14 notation on May 28th by a nurse who was on the 142 unit, not in
15 the infirmary. She encountered Mr. Rosario. He says to her
16 "I've been beaten, I've been assaulted, I've got an injury."
17 She specifically records that conversation in the medical
18 records and then later she records her observations of the
19 injuries.
20        Ladies and gentlemen, it is undisputed the findings
21 that Mrs. Porter made regarding Mr. Rosario's medical condition
22 that she noted in that document dated May 19 were exactly the
23 kinds of things that she was required to document in
24 Mr. Rosario's medical file and she chose not to do it.
25        Mrs. Porter decided not to do a physical

6 (Pages 15 to 18)

PORTER V CABRAL - DAY 7>

Page 19

1  examination of Mr. Rosario despite the fact that she knew that
2  it was the only way to fully evaluate what his medical
3  condition was, to allow her to more completely evaluate it.
4  She decided not to do an exam. She decided that rather than
5  conduct an exam and report those results, that Mr. Rosario
6  would be better served by contacting the FBI on May 20th. Her
7  obligation was to her papers. Her obligation was to that
8  inmate. Her obligation was to report that inmate's allegations
9  internally and to report what she saw about them. And she did
10  not do so. Instead, she decided to leave the examination for
11  someone else who didn't have a history of Mr. Rosario. That's
12  not sufficient. Mrs. Porter decided not to report
13  Mr. Rosario's allegation to SID, an obligation that everyone
14  acknowledged that she had. Indeed, Agent Snyder's testified
15  here that she always informed Mrs. Porter that she was required
16  to meet the reporting requirements of the department. Agent
17  Snyder further testified that despite the fact that she had
18  passed on some information to SID in this instance on this case
19  did not absolve Mrs. Porter of her obligation to report the
20  allegations of abuse internally to SID.
21       You recall that on cross-examination, Mrs. Porter
22  was reluctant to admit what she had acknowledged in her own
23  deposition testimony, that she had an obligation to report the
24  allegations of abuse internally to SID. You will recall
25  further how she acknowledged that she withheld information from

Page 20

1  the SID investigators, Brian Dacey and Sonya Aleman. In
2  speaking to her on May 22nd, she does not tell them that Mary
3  Ellen Mastrorilli requested a report. She does not tell them.
4  She also stated that if she had already provided the report to
5  Donna Jurdak, she probably would not have shared that
6  information with the investigators. If she had already
7  provided the report to Mrs. Jurdak, she probably would not have
8  shared that piece of information to Brian Dacey and Sonya
9  Aleman, the two investigators charged with the responsibility
10  to investigate Mr. Rosario's allegations of abuse. Instead,
11  Mrs. Porter and Mrs. Jurdak decided that the matter should be
12  reported. Mrs. Porter now designated herself the gatekeeper of
13  what information gets reported to SID and whatever information
14  gets reported. Mrs. Porter further decided when she was going
15  to turn in the report that had been requested by Deputy
16  Superintendent Mastrorilli. It is undisputed that on May 19th,
17  2003, Deputy Superintendent Mastrorilli directed Mrs. Porter to
18  provide a written report of her encounter with Mr. Rosario. It
19  is further undisputed that that report was received by Deputy
20  Superintendent Mastrorilli and SID on May 28th, nine days
21  later.
22       It is equally undisputed, ladies and gentlemen,
23  that policy S-220, I think the provision that hopefully is
24  before you on the screen right now, is a policy that
25  Mrs. Porter acknowledges that she was required to comply with

Page 21

1  and it's a policy that requires that reports be submitted in
2  writing by the end of one's shift or by the end of the day and
3  that the report shall be submitted to one's supervisor unless
4  specifically directed otherwise. Mrs. Porter was directed on
5  May 19th to provide a written report to Deputy Superintendent
6  Mastrorilli and it doesn't get there until May 28th.
7  Mrs. Porter has provided a number of inconsistent explanations
8  for why that is, why the report was not submitted when it was
9  requested. And I suggest to you that none of them are
10  satisfactory. She first says it wasn't finished when Donna
11  Jurdak comes to her office and informed her that a report is
12  being requested. She doesn't tell Donna Jurdak to wait, I'm
13  almost done. You saw the report. It's barely two pages long.
14  Or she tells you that when she finished the report, she went to
15  go give it to Mrs. Jurdak, but Mrs. Jurdak had left for the day
16  or she was in a meeting or she tells you that she didn't bring
17  the report directly to Deputy Superintendent Mastrorilli who
18  had requested it, because it did not occur to her or she didn't
19  bring it to her because she has forgot it at home, a report
20  that she said she had completed or tells you that she puts in
21  her briefcase, brings home, takes it out, even though she is
22  not going to revise it, places it on her computer, and then
23  forgets it for three days. Consider those explanations when
24  you evaluate Mrs. Porter's credibility. Mrs. Porter knew that
25  she was required to comply with department policies. She knew

Page 22

1  that she could be barred from the House of Correction at any
2  time for a violation of department policy. Under cross-
3  examination, Mrs. Porter acknowledged that the late filing of a
4  report was in violation of policy S-220, a policy that she
5  acknowledged that she is required to comply with. And by her
6  own testimony, she acknowledges the report that she was
7  directed to write and provide on May 19th, by her testimony,
8  wasn't provided until May 25th. That's a violation,
9  notwithstanding the fact that the evidence clearly establishes
10  the report doesn't get where it's supposed to go until May
11  28th.
12       It is equally clear that Sheriff Cabral would have
13  barred Mrs. Porter for her conduct regardless of the protected
14  activity that Mrs. Porter engaged in. She viewed Mrs. Porter's
15  failure to document her observations of Mr. Rosario's medical
16  condition in the medical chart after he had reported to her
17  that he had been assaulted by an officer as a serious
18  dereliction of her responsibility as a contract Nurse
19  Practitioner. Sheriff Cabral had every expectation, based upon
20  her own experience as a prosecutor, that Mrs. Porter's
21  observations would be recorded in Mr. Rosario's medical
22  records. Deputy Superintendent Mastrorilli thought that as
23  well. So did the Chief of Staff Elizabeth Keeley. And indeed
24  Donna Jurdak acknowledged that these findings should be in the
25  medical records. Agent Snyder acknowledged it. She testified

JANUARY 18, 2006>

Page 23

1  the first thing she does is go to the medical records. And
2  indeed, Brian Dacey and Sonya Aleman, when they commenced their
3  investigation into Mr. Rosario's allegations, went first to the
4  medical records. Conspicuously absent was anything from
5  Mrs. Porter. This dereliction of her responsibility was
6  compounded by the late reporting, by the failure to provide
7  that written document when it was requested. These aren't
8  pretextual reasons, ladies and gentlemen. Sheriff Cabral, as
9  you know, has taken similar acts with respect to a Physician's
10 Assistant at the Nashua Street Jail and a member of the Clergy
11 at the House of Correction. The message is clear: If you do
12 not recognize the importance of reporting or documentation or
13 choose not to comply with department policies regarding the
14 necessity to report allegations of abuse internally, then you
15 no longer have the privilege of working at the House of
16 Correction.
17      Now, the plaintiff may say "what about Craig
18 Meekins, what about Gayle Bartley, what about Beth Bringola,
19 where are their reports? Look at the medical records. They
20 did their job. Craig Meekins filled out a report, medical
21 observation after use of force form. Beth Bringola did a
22 document that defined it. Gayle Bartley documented her
23 findings. Mrs. Porter's conduct was not mere paperwork. It
24 was a technical violation. To suggest that a failure to comply
25 with department policy regarding the reporting of inmate abuse

Page 24

1  internally or that a failure to document an inmate's medical
2  record is mere paperwork trivializes the essential important
3  obligations that this Sheriff has to the care and custody of
4  the 2300 men and women incarcerated at the Suffolk County
5  Sheriff's Department. Indeed, where there is any consensus
6  regarding what was discussed at that June 16th, 2003, meeting,
7  it was with reference to the concerns underscored by Sheriff
8  Cabral regarding Mrs. Porter's failure to document
9  Mr. Rosario's medical records and her late reporting. And
10 indeed, the necessity of documentation and reporting
11 allegations of abuse internally was stressed by Sheriff Cabral
12 in a response to a suggestion by the United States Attorney
13 that she sent out in an E-mail to her staff telling them that
14 they should report allegations of abuse externally. You heard
15 her response. She would not and could not relieve her staff of
16 their obligation to report allegations of abuse internally.
17 Sheriff Cabral would not abdicate her obligations to protect
18 the inmates entrusted to her care.
19      Mrs. Porter wants you to believe that she has
20 suffered injuries caused by Sheriff Cabral and Suffolk County
21 as a result of her barring. Bear in mind, ladies and
22 gentlemen, that Mrs. Porter did not have a written contract
23 with Correctional Medical Services while she was working at the
24 House of Correction. And, therefore, there was no guarantee
25 that she would continue to work for CMS or whomever the next

Page 25

1  company was that had the contract for health care services at
2  the House of Correction. She knew that she could be barred at
3  any time for violations of department policy. And despite the
4  fact that she obtained full-time employment at CMS within
5  several months of being barred, a job that provided her with
6  benefits, she decided to leave that position. It was her
7  choice to take a job in which she worked fewer hours, was
8  closer to her home, and provided her with more flexibility.
9  Mrs. Porter has not been denied employment and malpractice
10 insurance as a result of her barring. She has not lost her
11 professional license. There have been no complaints filed
12 against her with the Board of Registration and Nursing. Her
13 hourly wages have increased. Certainly, anybody who is
14 terminated from their employment or separated from a job that
15 they care about would be upset even if they do not agree that
16 there was cause for that separation.
17      And while Mrs. Porter saw a therapist, it was for
18 eight visits. There was no medication. There has been no
19 followup treatment. And if you look at the records from those
20 therapy sessions which ended, I believe, in September 2003, you
21 will come to the conclusion that there were a number of issues
22 that were discussed that were separate and apart from the
23 barring from the House of Correction.
24      Finally, it is simply not reasonable for
25 Mrs. Porter to accuse the Sheriff of causing her harm as a

Page 26

1  result of the Sheriff's very measured and restrained response
2  to Mrs. Porter's public allegations of illegal conduct and
3  improper conduct. Fifteen months after she was barred from the
4  House of Correction, Mrs. Porter of her own volition granted
5  interviews with the Boston Globe and Channel 5 in which she
6  accused Sheriff Cabral of illegal conduct. You have seen and
7  you have heard the Sheriff's response to those allegations of
8  illegal conduct made by Mrs. Porter in two very public forums.
9  Mrs. Porter wants you to believe that she was upset over a
10 debate that she neither saw nor heard. She wants you to
11 believe that the press statement issued by Sheriff Cabral in
12 response to the public accusations of illegal conduct caused
13 her harm. These claims, ladies and gentlemen, are simply not
14 reasonable and I urge you to disregard them.
15      Your job in this case is to decide what motivated
16 Sheriff Cabral's decision to bar Mrs. Porter from the House of
17 Correction, not whether the outcome was too severe or too
18 extreme, not whether you would have chosen to do something
19 different. That is not something that is within your purview.
20 I suggest to you, also, ladies and gentlemen, the
21 only witness whose opinion matters concerning the reasons for
22 the barring is Sheriff Cabral and Sheriff Cabral alone. What
23 others may have thought, different things, is not relevant to
24 your consideration. It was her decision and her opinion as
25 articulated by her.

Page 27

1    The evidence in this case establishes by a
2    preponderance of the evidence, ladies and gentlemen, that
3    Sheriff Cabral barred Mrs. Porter solely on the basis of her
4    conduct and barred her because of that conduct regardless of
5    her communications with the FBI. When you are the Sheriff of
6    Suffolk County with 1100 employees and the ultimate
7    responsibility for the care and custody of 2300 mail and female
8    inmates incarcerated there, you are within your rights to
9    expect that a contract worker would document significant
10   findings in an inmate's medical record, and you are within your
11   rights to expect that when a report is requested and directed
12   to be provided, you will get it.
13        Ladies and gentlemen, the evidence in this case
14   supports one verdict and only one verdict, and that is a
15   verdict of favor of Sheriff Cabral and Suffolk County. And I
16   urge you, when you go into that deliberation room, to consider
17   the evidence and return the only verdict that is just, and that
18   is a verdict in favor of my client, Sheriff Cabral and Suffolk
19   County. Thank you.
20        THE COURT: Thank you, Ms. Caulo.
21
22
23
24
25

Page 28

1        CLOSING ARGUMENT ON BEHALF OF PLAINTIFF
2    BY MR. SAVAGE:
3        Good morning.
4        Ms. Caulo is right about one thing. This case does
5    turn on what is credible, what's the credible evidence. She's
6    absolutely and fundamentally wrong about something else, which
7    is what is the question here. She has beaten the drum on the
8    issue of were there violations. But the only question here is
9    were there violations that would cause somebody to be barred
10   and for what. And after two witnesses in this case, after
11   Ms. Mary Ellen Mastrorilli and after Donna Jurdak, we all know
12   the answer. And the answer is no. We don't have to sort out
13   whether there were or were not violations, because both
14   Ms. Mastrorilli and Ms. Jurdak say whatever happened here is
15   not a basis for barring her for life.
16        Let's just step back a little and think about what
17   we have heard for the last week and a half. And it really goes
18   back to that old saying, you know, if you're not part of the
19   solution, you're part of the problem. Sheila Porter refused to
20   be part of the problem whether Sheriff Cabral liked it or not.
21   And, so, even though Sheriff Cabral was angry and in a heated
22   dispute with the FBI over a drug case where she felt left out,
23   Sheila Porter was still going to speak up and meet her duty as
24   a Nurse Practitioner to tell the FBI that a prisoner was in
25   danger whether Andrea Cabral liked it or not. And she didn't

Page 29

1    like it at all. You heard from three witnesses, witnesses
2    basically not addressed in the argument you just heard, who
3    directly told you that talking to an outside agency was part of
4    Sheriff Cabral's reason for barring Sheila Porter for life from
5    the Suffolk County House of Corrections. You heard it directly
6    from colleagues who have been her friends for years: Viktor
7    Theiss, Elizabeth Keeley, and Gerry Leone.
8        And Mrs. Porter and I want to step back and thank
9    you for the week and a half you've spent here silently judging
10   the facts. Thank you very much. It's a sacrifice. We know
11   it. But also in this case, it's an opportunity. I think the
12   greatest experience — probably the greatest exhilaration and
13   fulfillment a human being could have is to lift the pain and
14   anguish off another human being if it can be lawfully done. In
15   a few minutes, I'm going to ask you after years to lift the
16   pain and the humiliation and the suffering from Sheila Porter
17   and her family. If you do, then I submit to you the evidence
18   here demonstrates you must. You will have done something good
19   and right, something you can carry with you always in this
20   building. It's been a pleasure for me to try a case for you in
21   this courthouse, not just because the elevators work and the
22   coffee is okay, but because this building itself speaks about
23   this case, about Sheila Porter's situation, her struggle, ours.
24   On the wall downstairs in the jury selection room, there's a
25   quote by Justice Holmes. It's part of an opinion he wrote that

Page 30

1    spoke to the fact that for those in charge, for those who have
2    no doubt of their ideas on their power, it's natural to sweep
3    away those who speak out. But Justice Holmes said, "The truth
4    comes out better for all of us if all of us can speak freely."
5    He went on to say, "That idea of free speech is at any rate the
6    theory of our constitution. It's an experiment. All of life
7    is an experiment. And at least while that experiment is part
8    of our system," Justice Holmes said, "I think we should be
9    terminably vigilant against attempts to check those who express
10   themselves." So, I ask each of you to be vigilant as we review
11   what happened here. And there are just two questions: Why did
12   Andrea Cabral ruin Sheila Porter's life and what does the law
13   say you can do about it? Andrea Cabral did it because Sheila
14   Porter spoke to the FBI. There's no question that was part of
15   the reason Andrea Cabral fired Sheila Porter for life. It's
16   the only reason that makes sense of all of the facts in the
17   case. It's a reason Viktor Theiss, Elizabeth Keeley and Gerry
18   Leone told you was the Sheriff's reason at the time. And
19   that's really important. What did Andrea Cabral say and
20   believe at the time, not what's the reason that's being given
21   now in litigation? Here she says the FBI had no role, but the
22   evidence is all to the contrary. On that fact, Andrea Cabral
23   is an island. She is alone. And there is nobody, common sense
24   tells us, that she can put her relationship and interaction
25   with the FBI in June of 2003 out of her head.

Page 31

1    Now, this case isn't about the rules violations or
2  that somebody could or would or should bar Sheila Porter for
3  paperwork reasons. The case is about did the Sheriff bar
4  Sheila Porter in part for another reason, talking to the FBI?
5  So we don't have to sort out whether Donna Jurdak or Sheila
6  Porter, who wrote the rules that teach medical documentation
7  know more about the right way to document, than the Sheriff
8  does. But they do. And we don't need to spend time on whether
9  Mary Ellen Mastrorilli and Donna Jurdak know more than the
10  Sheriff about how the medical unit was run, what reports were
11  handed in and when, what was a real violation, and what was a
12  technical problem. They clearly know that Andrea Cabral does.
13  All you need to do here is look at what the Sheriff herself
14  said she did. Look at whether her first explanation in June
15  2003 with the barring had to do with Sheila Porter talking to
16  the FBI makes more sense than the present explanation that it
17  was paperwork. And why is there a lifetime ban? Was it really
18  because of a one-time error by a clinician with 34 years
19  experience who was the best nurse practitioner that Donna
20  Jurdak had or was it partially because Sheila Porter spoke to
21  the FBI?
22    Three weeks after, Andrea Cabral had a huge fight
23  over an FBI investigation, the latest blowup in a historically
24  bad relationship between the Suffolk County Sheriff's
25  Department and federal law enforcement.

Page 32

1    So, let's review some facts. They all show that
2  talking to the FBI was part of the reason Mrs. Porter was
3  fired. But fact number one: Why is it the Sheriff now can't
4  even vaguely recall the meetings where the reasons were
5  discussed, not the meeting with Elizabeth Keeley, not the
6  meeting with Viktor Theiss, not clearly the meeting on June
7  16th? I mean, why she was able to get on the witness stand was
8  apparently the FBI was talked about in the June 16th meeting.
9  That was to her face. She was talking. She can't recall
10  hearing it or saying it? Do you think there is any chance you
11  forget what you say if five federal law enforcement agents were
12  accusing you of barring Mrs. Porter of being an FBI informant?
13  If this is about the filing of papers, why did the Sheriff
14  disrupt medical care of the inmates by forcing Mrs. Porter off
15  the facility with no transitional care? You remember
16  Mrs. Porter worked for free to help Donna Jurdak keep that unit
17  going. If it's really about filing the forms, why not say
18  you're gone when we get your replacement? Because it's not
19  about filing the forms. It about talking to the FBI. Why
20  didn't Andrea Cabral consider a lesser sanction if this is
21  really about the paperwork? Because no lesser sanction would
22  address the real problem -- talking to the FBI. Why not really
23  be part of law enforcement and encourage Sheila Porter to
24  become an FBI informant, to build on a relationship, whatever
25  it was that Andrea Cabral knew about? Because she didn't want

Page 33

1  FBI informants in her jail. Why is this the only barring ever
2  for paperwork reasons?
3    You remember Mary Ellen Mastrorilli, Donna Jurdak
4  and even Andrea Cabral said there never had been a firing for
5  paperwork-related reasons. And that's because it's not the
6  only reason. And the two barrings that were just reported that
7  occurred in 2005 after Mrs. Porter are both cases where
8  contract workers filed false reports where the contents of
9  their reports were false about what their interaction with the
10  inmates was. That's not what's being said about Mrs. Porter
11  here. Why is this the only barring that Andrea Cabral can
12  recall even being involved in? Because the FBI is her issue.
13    In June 2003, there was extreme displeasure with
14  federal law enforcement. If these paperwork reasons were real
15  and serious, then why not treat them that way. Why not
16  investigate how the medical unit is run? Why not discipline
17  Mary Ellen Mastrorilli and Donna Jurdak who run the unit? Why
18  not tell Mrs. Porter's employer "what the heck is going on?"
19  Why not let the Board of Nursing know? Why let Mrs. Porter get
20  immediately hired by other Sheriffs? If this is real, then she
21  should have rung the bell. There should have been an alarm
22  that went off. This is real! It's not, ladies and gentlemen.
23  It's not. Why would she bar somebody for a paperwork issue
24  when everybody knew there was no harm to any investigation?
25  Why just Mrs. Porter when other people in this investigation

Page 34

1  filed reports late or didn't file all the reports they were
2  supposed to file? Why make a decision based on facts that
3  Sheriff Cabral acknowledged to you turned out to be wrong? Why
4  not find out the truth? The answer is always the same. And
5  it's that Sheila Porter admitted talking to Christa Snyder, the
6  FBI agent. Just think about what you heard. Andrea Cabral
7  said she spent hours interviewing new hires. And this is the
8  first case of inmate abuse and she can't even take the time to
9  read the file. She didn't need to read the file. She knew the
10  facts she needed to know. Mrs. Porter said she spoke to the
11  FBI. She never looked at the file. She had a passing
12  conversation with Viktor Theiss who gave her all she needed to
13  know. And with a flick of the wrist, Sheila Porter is barred.
14  Also remember what I explored on cross-examination, the fact
15  that Andrea Cabral's reasons keep changing. She can't remember
16  whether it was or wasn't part of the reason that the thing was
17  home on the computer. In her deposition in May, she said
18  putting it on the wrong form was a reason. Here she said,
19  "well, I mean that's part of the reason, the other three
20  reasons I've given you." When she went to the June 16th
21  meeting, she never said backdating was a reason. Why do these
22  reasons keep moving. Because I submit to you they are not the
23  whole reason. The FBI is part of the reason. It's the only
24  reason that explains all the facts in the case.
25    But now let's go directly to the very heart of it.

## Page 35

1  What do Keeley, Theiss and Leone all say that Andrea Cabral
2  said in June of 2003 -- 2003? They were all on the same page.
3  She said the FBI is part of it. It's crystal clear that
4  talking to the FBI is part of the reason.
5          Let's review Ms. Keeley. First, think about her
6  demeanor. How hard was it for me to try and get direct answers
7  from her? Clearly, she did not want to admit to you the truth
8  and hurt her long-time friend and boss. But she had to. And
9  she said on June 10th, she discussed with Andrea Cabral that
10  Sheila Porter went outside of the department with confidential
11  information. She said, in speaking to an outside agency, that
12  it was integral to the decision. It was significant. It was
13  important. She said she relayed the reasons to Mary Ellen
14  Mastrorilli on June 10th, the same day. And you heard what
15  Mary Ellen Mastrorilli said. The reason was Mrs. Porter had
16  spoken to the FBI. Elizabeth Keeley said she repreated the
17  Sheriff's reasons again on June 12th to Gerry Leone in the
18  telephone call setting up the June 16th meeting. And again,
19  the reason is, in part, talking to the FBI. And then at the
20  June 16th meeting, again, Elizabeth Keeley recalls -- because
21  it was repeated -- that "part of the problem was that Porter
22  spoke to an outside agency." Now Andrea Cabral is sitting
23  right there. Andrea Cabral is talking about this topic. And
24  her answer to you was, "Well, apparently it was said." She
25  forgot this? Do you buy that?

## Page 36

1          Viktor Theiss. He's at the June 16th meeting.
2  There's three people there: Theiss, Keeley, Cabral and the
3  Suffolk County Sheriff's Department. He doesn't recall who was
4  speaking, but he recalls clearly, answer, "I recall two reasons
5  being provided, which was failure to document a medical record
6  and going to the FBI without notifying the department." And
7  then there is Mr. Theiss' testimony of the later week that just
8  had Elizabeth Keeley, himself, and Sheriff Cabral. And he says
9  that Sheriff Cabral repeated those same two reasons. Notifying
10  the FBI was part of it. It was part of that meeting. It was
11  part of that discussion. And recall Viktor Theiss' demeanor on
12  the stand. I submit to you he was a subdued and broken man who
13  was in big trouble. Andrea Cabral put him in the hot seat by
14  incorrectly answering the interrogatory that Viktor Theiss was
15  the only one consulted on the barring. So, in May 2005 when he
16  was asked questions in this case under oath about all of the
17  conversations he had with Andrea Cabral, about the reasons for
18  the barring, he did not tell the truth. He hid the fact that
19  Andrea Cabral, Liz Keeley and himself had that meeting after
20  June 16th. He hid the fact that one reason for the barring was
21  Mrs. Porter's contact with the FBI. He hid it for a reason:
22  Because this whole case turns on it. He had to hide it or the
23  Sheriff and the department are liable. But he got exposed
24  because there were other statements in January '05 where he
25  hadn't hidden it. And, so, he had to tell you the truth, that

## Page 37

1  there was a meeting that Andrea Cabral did say one of the
2  reasons was talking to an outside agency. He had to go on and
3  admit that he had testified falsely to us in May. We tried and
4  tried. When we found out about it, he had to tell the truth.
5  He could no longer help Andrea Cabral by testifying falsely.
6  He got caught and he's going to face whatever consequences
7  there are. But nobody would risk those consequences if they
8  weren't caught and forced to tell you the truth.
9          So, what is the truth again? There was a meeting
10  June 16th in this building. And one reason for the Sheriff's
11  decision was talking to the FBI. And there was a second
12  reason. Elizabeth Keeley and Viktor Theiss and Andrea Cabral
13  and again the Sheriff, in her own mind, said that that was one
14  of the reasons. You saw Sheriff Cabral's response to that on
15  the witness stand yesterday. She shrugged and then simply
16  denied that meeting. How ironically that the man Andrea Cabral
17  relied solely upon to ruin Sheila Porter's life provides
18  information that, all alone, is enough for you to give her that
19  life back.
20          Finally, as to the direct words out of Sheriff
21  Cabral's mouth is the testimony you heard of Gerry Leone. He
22  is not in the same boat as Viktor Theiss and Elizabeth Keeley
23  and you could tell from his deameanor on the stand. It didn't
24  have to be dragged out of him. He hasn't hidden anything
25  before. He wasn't trying to weave or duck. He was simply a

## Page 38

1  friend of Andrea Cabral's for years who happens to recall the
2  June 16th meeting clearly and he has notes. He told you how it
3  got set up. June 12th, there's a telephone conversation with
4  Elizabeth Keeley where she gives the reasons that include
5  speaking to an outside agency. Quote, "they have been
6  disclosed" -- "the information had been disclosed
7  inappropriately to an outside agency." They set up the
8  meeting. And as you recall, Mr. Leone said first Elizabeth
9  Keeley gave the reasons three feet away from the Sheriff. They
10  included, among the reasons, that Mrs. Porter had spoken to an
11  outside agency. And then the Sheriff gave the reasons herself
12  and it included the same thing. I don't know if you remember
13  the testimony. But you remember Mr. Leone saying the crux of
14  the focus of the medical information was that medical
15  information had been disclosed outside the agency. So, both
16  Elizabeth Keeley and Andrea Cabral at that meeting said it was
17  one of the reasons. Gerry Leone was absolutely clear. This is
18  the Sheriff speaking as to her reasons.
19          You need no more, I submit to you, ladies and
20  gentlemen. End of story. She says it's absolutely not a
21  reason. It clearly was a reason. The later answers are
22  pretext. The interrogatories, the stories in the press that
23  Mrs. Porter is not a whistleblower for the FBI, they are
24  absolutely of no moment here. They don't make the Sheriff's
25  case.

## Page 39

1    So, let's turn to what the law permits you to do
2    about it. One of the questions on the verdict form is going to
3    go to damages. And here, the economic damages are pretty
4    straightforward. You heard Mrs. Porter testify that she's lost
5    $79,000 since June 3rd -- June 10th, '03 until today. There's
6    basically no dispute about that. You also heard her testify
7    that, at present, for the past couple of years, she is making
8    $29,000 a year less than at the House of Correction and that
9    she planned on working for 10 years. $290,000 plus the
10    79,000 that she's out. The economic damages are pretty
11    straightforward, $369,000.
12    Now, Ms. Caulo says, "But, wait a minute. With
13    that number, you're not guaranteed that you would have worked
14    at the House of Correction." Correct, true. But it's also not
15    guaranteed that Mrs. Porter will only make $29,000 less
16    forever. She could have lost her House of Correction job the
17    next day or she could lose the job she has today the next day.
18    She could fall down and get hurt. So, sure, you can start with
19    the number that she was making $71,000 and she's not going to
20    make it for 10 years, so the damages are $710,000. But
21    Ms. Cabral and the county got lucky, because Mrs. Porter is a
22    hard worker and she went and got a job and she's able to offset
23    this. But she can't offset it all and there's only one
24    reasonable number here on the evidence. And that's the
25    $290,000.

## Page 40

1    The next thing you're going to have to consider is
2    the issue of emotional distress, the emotional suffering to
3    date, and whatever emotional suffering you conclude is likely
4    to continue for the rest of her life. And nobody can tell you
5    how to value emotional suffering or pain. There is no
6    marketplace for emotional distress. There's no way to fully
7    compensate. You have only got the limited tool the law gives
8    you, which is money damages.
9    So, let me give a couple of thoughts, maybe ways to
10    approach it. One is you can think about if there was an ad in
11    the newspaper that offered -- Jim, can you put it up? I offer
12    a job with this description. You get to be "sleepless,
13    irritable, tearful, (agitated depression)" --
14    THE COURT: Well, I tell you, I think this is
15    improper argument, Mr. Savage. And, so, take it off the
16    screen. The jury will disregard it. Move on to proper
17    argument.
18    BY MR. SAVAGE:
19    You've got to put a dollar figure on the feelings
20    that Mrs. Porter has. The flip side or another way to think of
21    it, how much should Mrs. Porter be paid to be relieved of the
22    suffering that she has? And when you conclude what adequate
23    compensation is, then you need to give that to Mrs. Porter.
24    Now you will recall the evidence. The anxiety, the agitation,
25    the humiliation, the loss of reputation, the form that she has

## Page 41

1    to fill out having lost her security clearance, the loss of her
2    relationship with the FBI. She's an older, long-term
3    employee. That increases the suffering.
4    Maybe another approach is: Is there something
5    greater or less than the economic harm that she's suffered?
6    Well, sure, there are some things that make it greater. The
7    pain is going to go on for more than 10 years. Even the
8    Sheriff recognized that there's special pain for civil rights
9    violations. Could it be less? Sure. Mrs. Porter is extremely
10    lucky to have strong family support that's made the suffering
11    less. And indeed, if you render a verdict in Mrs. Porter's
12    favor, it will lift the pain of some of the future suffering.
13    So, it may be less. I can't tell you a number. I can simply
14    say that the law requires you to compensate her fairly.
15    I have got even less guidance for you on the final
16    topic, which is punitive damages. Punitive damages are simply
17    what you say they are. The law permits you -- it does not
18    require you, but it permits you -- to send a message when
19    someone callously disregards the civil rights of another. Now,
20    here it's especially appropriate given that the acts were
21    committed by a civil rights prosecutor who demonstrates no
22    remorse. It is clear Sheriff Cabral will do this next week or
23    next year and as long as she is Sheriff. It's exactly how she
24    plans to run the facility. She needs to be given a message to
25    cut it out. But your message is also to others dealing with

## Page 42

1    whistleblowers as well. We don't want a world, I submit, where
2    the Sheila Porters hesitate to help those in danger because
3    their bosses haven't gotten the message that they can't
4    retaliate. The amount needs to be related to the underlying
5    damage to support her. That's the way society has done the
6    punishment for these things. The ancient text "an eye for an
7    eye" or "ten plates under each of them," the Romans do it even
8    harsher. But it's got to be some number related to the
9    underlying harm. That's fundamentally the way human beings
10    approach punishment and deterrence. And I'm not going to
11    presume to suggest to you a number. But I will say you can't
12    avoid sending a message, because if the number is zero, that
13    sends a message, too, and I believe it's a long and dangerous
14    message based on the evidence in this case.
15    So I need to ask you directly to do a few things.
16    You're going to have a verdict form. And the first question
17    is: Did Sheila Porter establish by a preponderance that her
18    protected speech was a reason for her barring? And I ask you
19    to answer that question "yes."
20    As to the next question, did the Sheriff who stands
21    alone as an island somehow prove by a preponderance that she
22    would have barred Sheila Porter, anyway? And I ask you to
23    answer that "no."
24    And then when it comes to the damages, I ask you to
25    give the compensatory damage figure of $369,000, plus the

PORTER V CABRAL - DAY 7>

Page 43

1　damage figure that you determine to be right for her pain and
2　suffering and to punish and deter. And this is it. You can't
3　come back two years from now and see how Sheila Porter is
4　coping. You can't come back the next time that Sheriff Cabral
5　violates someone's rights. And so with that, based on this
6　overwhelming evidence, I submit to you, ladies and gentlemen,
7　and I ask you to do what the law and the evidence allows.
8　Thank you each very much.
9　　　　THE COURT: Thank you, Mr. Savage.
10　　　　I think, ladies and gentlemen, before I charge,
11　we'll take a short break of 10 minutes or so. This is an
12　especially important time for you not to discuss this case.
13　And you'll understand that I am going to ask you, before I
14　start my instructions, whether or not you have had any
15　conversations, any communications, anything outside of this
16　court that bears on this case before we get to that final stage
17　of instructions. So, you can commensurate over the Patriots,
18　you can discuss the weather, but don't talk about this case
19　yet. So, we'll take 10 or 15 minutes.
20　　　　(Jury out at 10:10 A.M.)
21　　　　THE COURT: You may be seated. I'm going to ask
22　Ms. Rynne to mark as Jury Exhibit Number 1 the writing that
23　dealt with the economic damages and also to have marked as Jury
24　Exhibit Number 2 -- I'm not quite sure how I would describe it
25　-- whatever it was that was put up in front of the jury that

Page 44

1　was not used during the course of the trial.
2　　　　MR. SAVAGE: No, it was, Your Honor. It is Exhibit
3　3.
4　　　　THE COURT: In what form? You mean, this is the
5　report from the psychiatrist.
6　　　　MR. SAVAGE: Yes, sir.
7　　　　THE COURT: Of what she had?
8　　　　MR. SAVAGE: Yes, sir.
9　　　　THE COURT: All right. So we'll have it marked as
10　Jury Exhibit Number 2.
11　　　　Massachusetts courts are very clear on several
12　things, particularly with respect to pain and suffering, that
13　it is improper argument to say "what's it worth to you to avoid
14　pain and suffering, is it worth a hundred dollars per second,
15　$500 per minute" because it has the effect of generating a
16　judgment that is unrelated to the undertaking that the jury
17　has.
18　　　　Second, delivering a message is not the role of the
19　jury. They decide cases. And an appeal to the jury to deliver
20　a message is simply improper. And, so, I'll be instructing the
21　jury in my own way of what their responsibilities are. People
22　don't deliver messages in criminal verdicts and they don't
23　deliver messages in civil verdicts. They provide damages.
24　That's their responsibility. And, so, the appeal improperly to
25　some larger obligation or some larger writ is something that I

Page 45

1　must bring to the attention of the jury to avoid them being
2　drawn into an undertaking that they are not charged with here.
3　It is one of the problems generally in the area of punitive
4　damages. It's one of the reasons that the Supreme Court has
5　attempted to provide some guidance in this area.
6　　　　So, anything else before we bring the jury in?
7　　　　MR. SAVAGE: Can I be heard on that at a later
8　point, Your Honor?
9　　　　THE COURT: You may.
10　　　　MR. SAVAGE: My understanding of the law is that
11　they have to take it into account the deterrent message.
12　　　　THE COURT: They do. You didn't say deterrence.
13　You said deliver a message. And deliver a message involves
14　something else. Deliver a message says you have the writ to be
15　the punishers of a society. And that is improper argument.
16　　　　MR. SAVAGE: Well, I also repeatedly said
17　deterrence, Your Honor.
18　　　　THE COURT: Not repeatedly. You did say deterrence
19　on occasion. But what you said repeatedly was "deliver a
20　message."
21　　　　MR. SAVAGE: Well, having defined it as a deterrent
22　message, I thought it was proper, Your Honor, and still think
23　it's proper. And I would ask the Court not to give an
24　instruction.
25　　　　THE COURT: You're entitled to -- let me be clear

Page 46

1　ahead of time on what I'm going to do. You're entitled to your
2　objection. And I understand your objection. You can make the
3　objection at the side bar when you come up at the side bar.
4　But overreaching like that is not an effective way to ensure
5　that the jury stays within its responsibilities.
6　　　　So, we'll take a few minutes and then you'll have
7　my instructions.
8　　　　RECESSED AT 10:15 A.M.
9　　　　(Reconvened at 10:30 A.M.)
10　　　　THE COURT: Ready for the jury?
11　　　　Ms. Caulo: Your Honor, one moment before you bring
12　the jury in, if I may. I was wondering if the Court, in light
13　of two references to Mrs. Porter as a whistleblower and sending
14　a message, would the Court be inclined to let the jury know
15　that there have been whistleblower claims that have been filed
16　and dismissed, that under the law --
17　　　　THE COURT: I'm not going to deal with it in that
18　fashion. I will try to help the jury understand what it is
19　that they are supposed to do in some of the language that's
20　been used during the course of the trial. I'll not tell them
21　that one of several claims has been dismissed. that has a way
22　of backfiring and suggesting that other claims survive.
23　　　　Ms. Caulo: Understood.
24　　　　THE COURT: So, are we ready for the jury?
25　　　　Ms. Caulo: Yes. Thank you.

13 (Pages 43 to 46)

Page 47

1  (Jury in at 10:35 A.M.)
2      THE COURT:  Ladies and gentlemen, let me ask you
3  again.  I have asked you repeatedly during the course of the
4  trial.  Have you been exposed to anything about this case
5  outside of the courtroom, either conversations, anything like
6  that?  And I see no response to that and that provides the
7  occasion for me to start my instructions.
8
9          COURT'S CHARGE TO JURY
10  BY THE COURT:
11      We're right at the point at which our various roles
12  become quite clear.  It's the lawyers' responsibility to bring
13  to your attention the evidence that they believe is relevant.
14  It's my responsibility to rule on questions of evidence,
15  including questions of relevance and to instruct you on the
16  law.  And then it's your responsibility to decide the case.
17  You're going to go into that jury room and there's not going to
18  be anybody there but you.  It's the time at which you have to
19  adhere to the rules.  And the rules are the rules that I've
20  tried to emphasize to you throughout the trial, the idea that
21  you decide the case solely on the basis of the evidence that's
22  actually admitted here and my instructions on the law.  And
23  you're going to decide it in light of the questions that were
24  put to you.
25      There was a suggestion in closing argument that

Page 48

1  you're here to deliver a message.  And with all respect, we
2  didn't invite you here to deliver any message.  Your
3  responsibility is to return a verdict, which from the Latin
4  means "say the truth."  And we're going to give you some
5  questions and we want you to give us truthful answers from your
6  perspective to those questions.  It is a matter of profound
7  indifference to us -- and should be -- what the implications
8  are.  You're here to decide whether or not certain factual
9  statements have been proved there that are alleged and, if so,
10  whether damages are appropriate.  You will do that by
11  performing a function that we have for the jury, which is to
12  function as the common conscience of the community, deciding
13  cases as lay people in light of rules and the law.  It is
14  important that you do this in a dispassionate way, in an
15  objective way, and not in this way of passionate argument,
16  however low key it's delivered.
17      When I thought about this case and listened to the
18  arguments some more, I thought about trying to explain what
19  your responsibilities are by reference to an image that we
20  sometimes have of justice.  The lawyers have had all the fun
21  in the case.  They've had the opportunity to show you
22  demonstrative evidence and walk around.  So let me do that.
23  You see this.  It's a statue of justice, Lady Justice.  You
24  sometimes see it at the top of a courthouse.  You don't see it
25  at the top of this courthouse.  But it's a statue in some

Page 49

1  ways helps you to understand what your responsibilities are.
2  You know, you are familiar with it, I'm sure.  It's Lady
3  Justice with a sword in one hand, scales in another, and a
4  blindfold on.  Now it's pretty easy to see why she has scales
5  in her hand.  She's there to weigh the evidence.  It's pretty
6  easy to see why she has a sword in her hand.  She is there to
7  enforce the law.  But why does she have a blindfold on?  She
8  has a blindfold on, I'd suggest to you, ladies and gentlemen,
9  because it is her responsibility to shield herself, to
10  discipline herself, to decide only on the basis of those things
11  that are relevant and material, not passion, not bias, not
12  undue sympathy, not predisposition, but solely on the basis of
13  the evidence as it is relevant here.
14      Now, one of the problems with this case -- not a
15  problem, but a challenge of this case -- is that it starts to
16  seep out into other aspects of controversies in society.  You
17  have been exposed to what appear to be disputes between federal
18  law enforcement and the Sheriff's Department.  You have been
19  exposed to views about what the proper sanctions should be.
20  You have been exposed to the push and tug and robust and wide
21  open quality of debates durings the course of a political
22  campaign.  I exposed you to that because it has a relevance in
23  the way of evaluation.  But one thing you should understand --
24  and actually the lawyers emphasized it in their closing
25  arguments -- is that you're not here to decide whether or

Page 50

1  not the sanction that was imposed on Mrs. Porter was
2  disproportionate.  You're not a personnel board.  You're not
3  here to decide whether or not cheap shots were taken during the
4  course of debates or in the public press.  You're not here to
5  decide who is right and who is wrong, if anybody, in some
6  dispute between the agents of federal law enforcement and the
7  Sheriff's Department.  You're here for purposes of making a
8  judgment about the relevance of the questions that I'm going to
9  be putting to you.  And I'm going to get to that in just a
10  moment.  But I want to emphasize -- let me emphasize that you
11  play by the rules.  And the rules require that you be
12  dispassionate and objective in your evaluation.  That means
13  applying your common sense, your common experience, to the
14  evidence that has been presented in this case.
15      And let me step back a little bit from a definition
16  of what the evidence is to talk about how lawyers and judges
17  sometimes divide evidence in two basic categories.  One is what
18  we call direct evidence.  Somebody observed something and they
19  are here to report on it.  Somebody is standing on the corner.
20  They saw two cars crash into each other and they say "I saw two
21  cars crash into each other."
22      And then there is something we call circumstantial
23  evidence, which is lawyer talk for actually common sense.  But
24  it's the use of logic and inference.  Let me explain it in this
25  way which applies to the weather.  Let's say that tonight or

14 (Pages 47 to 50)

Page 51

1  tomorrow, you go home and because it's been raining, your front
2  lawn is all clear. You go to bed at 10 o'clock and you wake up
3  enough to get here by 9 o'clock. And you look out the window
4  and it looks clear. And then you look down on your front lawn
5  and there is snow on the front lawn. Now the way I just set
6  this up, you'll understand you didn't see it snow. You saw
7  that it was clear the night before, you saw it was clear when
8  you got up, and you also saw snow on the ground. Well, I'd
9  suggest to you that you have circumstantial evidence that it
10 snowed between the hours of 10:00 and whenever it was that you
11 woke up to come to the court. You can draw that conclusion.
12 It's logical, the kind of common inference that people make.
13 And maybe you can go further. Maybe you can look on the front
14 lawn and see foot steps or footprints. And, so, you say,
15 "well, somebody wandered around on my front lawn between the
16 hours of 10:00 and 7:00." And maybe you can even go farther.
17 Maybe you can say "look at the size of those footprints, it
18 must have been a man." Or maybe you can't. Maybe in an age in
19 which teenage girls like to go to the prom in Doc Martins, you
20 want to reserve your judgment or have a more nuanced judgment
21 about that. Now, can you say it must have been a man with
22 glasses on? I'd suggest to you you can't. But what you can do
23 is take bits and pieces of direct evidence and put it together
24 and draw circumstantial conclusions about it because your role
25 as the final finders of fact is to decide how much or how

Page 52

1  little significance you attach to the various pieces of
2  evidence that have come to your attention during the course of
3  trial.
4       This is a case in which you've had people testify
5  about what was said at meetings. And you'll have to decide
6  whether you believe what any one of those people said. This is
7  a case in which you've seen various events take place. And you
8  can say, "well, those are a little bit like the footprints in
9  the snow. They tell me what was going on outside of the
10 presence of other people." What I mean to emphasize by this is
11 that you have very substantial powers to be used the way you
12 use powers generally of perception, observation, and conclusion
13 to draw the best possible judgment you can in this case.
14      Now you should understand that this is a civil
15 case. And in a civil case, we allocate burdens. That is, a
16 party has to prove something to you. They have to prove it to
17 you by what we call a preponderance of the evidence. And what
18 that really means is is the proposition that the party is
19 contending for more likely true than not true? You've probably
20 heard about the standard of beyond a reasonable doubt. That's
21 the standard for a criminal case. That's not the standard
22 here. The standard here is more likely true than not true. It
23 becomes critically important if you say it's 50-50. And if
24 it's 50-50, then the party who bears that burden has not
25 substantially satisfied you. But it's a way of telling you how

Page 53

1  it is that you go about disciplining yourself in the same way
2  that Themis, which is the Greek term for Lady Justice,
3  disciplines herself in evaluation.
4       Now, what is the evidence? Well, the evidence is
5  witnesses, human beings who come in here and testify as to
6  their recollection, as to their perception. I have to tell you
7  that when I charge juries, I'm sometimes embarrassed when I get
8  to this point, because the general guidance for Judges is to
9  explain to the jury how they evaluate witnesses. And, frankly,
10 I don't have to tell you a thing. You do it unconsciously
11 every day in your life. That's why we have you as jurors.
12 Every day in your life somebody is coming to you and they're
13 trying to sell you something, they're trying to persuade you of
14 something, and you size them up. You make a determination. Do
15 they know what they're talking about? Do they remember events
16 in the past? Do they have a bias? Do they have some sort of
17 prejudice? Do they lean toward one side or the other? Are
18 they consistent? All of those things that you do unconsciously
19 are what we're asking you to do consciously here. And, so, let
20 me just for a moment discuss this question of how you go about
21 evaluating witnesses. I talked about bias. That is somebody
22 who is aligned one way or other with one side or the other.
23 There is nothing improper about that. All of us understand in
24 our daily lives that people lean toward one side or the other.
25 But what it means is that you keep on point in evaluating it.

Page 54

1  You ask whether or not they are affiliated with one party or
2  the other. The argument was made by the plaintiff that persons
3  who are employed in the Sheriff's Department might lean toward
4  Sheriff Cabral. You might also say that family members might
5  lean toward the plaintiff. Well, what that means is that you
6  cautiously evaluate their testimony. It doesn't mean you
7  disregard it. It simply means that you're going to be more
8  conscious in dealing with it.
9       There's a question of inconsistencies, what we call
10 inconsistencies. Now, inconsistencies are the things, the
11 stuff of life. None of us can go home after a day with the
12 family and have a discussion about what all of us saw
13 presumably at the same time and not realize that some people
14 see things differently and recall things differently. They
15 have an ability to recall differently and an ability to express
16 themselves differently. So, inconsistencies in some ways are
17 not unusual. But what you're going to be on guard for are
18 inconsistencies that you think are material. Did somebody say
19 something at one point and then say something different at
20 another point? If you're faced with that, you might say "what
21 do I rely on? This person has come down firmly on both sides
22 of the fence." Is the person's testimony consistent with other
23 testimony, other evidence in the case, or is it widely
24 inconsistent or is it mildly inconsistent? You're going to be
25 evaluating those things to make your judgment. You will be

15 (Pages 51 to 54)

## Page 55

1  especially on point when a witness says that they testified
2  falsely on an occasion. That's the kind of testimony that
3  you're going to have to receive with great care and evaluate it
4  with great caution. I'm not suggesting in any way that you
5  disregard any of their testimony. I am suggesting that you be
6  especially disciplined in the way in which you treat it.
7       You have had documents presented to you in the form
8  of exhibits and you have been on the maiden voyage in this
9  courtroom of this kind of equipment owned by the government or
10 owned by the courts. And you'll understand at this time the
11 documents and exhibits are really only as good the people who
12 created them and that you have got to pierce back into your
13 recollection of what were the circumstances in which particular
14 documents were created to decide whether or not the drafter of
15 those documents is reliable, whether or not it's helpful to
16 you. You have seen a series of documents having to do with
17 observations that people have made and you make an evaluation
18 of that as well. I mean only to suggest that just because it's
19 written down doesn't mean it's true. It may and it may not be.
20 And whether a document is is entirely up to you. Because
21 you're going to apply to those documents the same kind of
22 careful evaluation that you apply to evaluation of testimony by
23 witnesses and listening to the arguments of counsel.
24      Now, there are some things that aren't evidence:
25 The arguments of counsel. What they are permitted to do in

## Page 56

1  argument is to draw your attention to certain pieces of
2  evidence -- if, in fact, you find that evidence was there -- in
3  an attempt to persuade you. But just because some lawyer says
4  it doesn't mean that it's a piece of evidence. You have to
5  evaluate that evidence in a larger context.
6       Questions to witnesses in which I sustained
7  objections, you have seen that happen on a number of
8  occasions. I told you at one point in the trial and I'll tell
9  you again. You don't draw any conclusions from the rulings
10 that I make except that you've got to be guided by them.
11 Lawyers have a responsibility to press their case, to look for
12 a resolution from the Court, and I give a resolution. But the
13 questions in which I've sustained an objection, you just put
14 out of your mind. It's not part of the case for you. I have
15 always thought that jurors are a little bit like the folks who
16 have -- I won't call them cheap seats in the theater, but those
17 seats that are over at the corner where you can sometimes see
18 what's going on back stage. Now, if you're a purist, I
19 suppose, and all of you want to sit in the front row center,
20 then you get distracted by that. But if you're not and if
21 you're a person who understands that there is activity that you
22 should focus on and disregard the stuff that occurs back stage,
23 well, you'll understand what your role is in dealing with this
24 question of my rulings on the objections.
25      There are certain issues that were stipulated. The

## Page 57

1  parties agreed, for example, that an FBI agent, if she came in
2  here, would testify in a particular way. And you're entitled
3  to accept that stipulation. The parties don't want to dispute
4  it. And as I'll say at a later point, there are a myriad of a
5  number of issues that could have been disputed in a case like
6  this, but we've tried to sweat the case down to essentials.
7  And, so, the parties don't dispute certain things, don't think
8  that it's worth fighting about, and consequently you're in a
9  position to accept their stipulation, their view about it,
10 their agreement about it.
11      There is another issue. And I'll tell you a little
12 bit about the back stage of this case. An awful lot goes on in
13 a case before it gets to your attention, particularly a case
14 like this in which there are plenty of opportunities for the
15 jury to get distracted over some matters offering red herring
16 hunts. And, so, you can imagine, as I think you've probably
17 inferred by now, that I had long discussions with counsel about
18 various issues that should be brought to your attention, that
19 need to be brought to your attention, and others that don't.
20 And you're, of course, only concerned with what we brought in
21 here. It would be immensely unfair to the parties if you were
22 making your decision on the basis of something that they didn't
23 have an opportunity to confront right here in front of you.
24 But one of the things that happened in trying to talk about how
25 we could make this case come to you as expeditiously as

## Page 58

1  possible is what I'll call order of proof issues. Ordinarily,
2  the plaintiff goes first, the defendant goes second. That's
3  what happened here. And ordinarily what happens in cases is
4  that the plaintiff puts on her witnesses here and I would limit
5  the cross-examination of such witnesses to only what they
6  testified on direct examination. But here, because it would
7  mean having the same witnesses come back again, I said, well,
8  what we'll do is the plaintiff can put on witnesses that she
9  wants to put on and I will permit the defendant to cross-
10 examine them on all of the issues that she thinks are
11 important. And consequently, there is not that limitation
12 which you sometimes see. Now, why do I tell you that. It
13 sounds like inside baseball. It is. I tell you that because I
14 want you to understand that the case doesn't turn on who called
15 the most witnesses. It turns on the nature of what those
16 witnesses said. And, so, you're not going to draw any
17 conclusion from the fact that the plaintiff called most of the
18 witnesses, because that's the way we set it up in the trial.
19 You are focused directly on the principal issues in this case,
20 which are who do you believe and when did the particular events
21 take place and for what reason?
22      Now, let me turn to the questions that we're
23 presenting to you. I'm going to ask Ms. Rynne to pass to you
24 the verdict slip that we've been talking about. We're going to
25 walk through this. And at the risk of keeping you from turning

16 (Pages 55 to 58)

Page 59

1  to see how it turns out at the end, let's start with page one
2  and we'll work our way through. I'm going to instruct you on
3  all of the things that you might possibly confront. But as you
4  can see at each one of the pages, I say if you've answered a
5  particular answer to a question, you either go on or you return
6  your verdict. And, so, what this means is that you may in
7  course of the trial make a deliberation -- excuse me. I
8  apologize for a cold that's getting the better of me. But you
9  may, during the course of deliberations, say you've reached
10  this and you're now going to return the verdict. So I don't
11  mean to suggest that you have to go all the way through on it.
12  I just want to tell you what it is that you're going to be
13  confronting as you go through. What you're not going to be
14  confronting is some legal theories. I'm not going to tell you
15  about the elements of various kinds of causes of action.
16  That's not where we are in this case. Where we are in this
17  case is trying to get answers to two particular questions, fact
18  questions. And then, if it comes to that, you turn to the
19  question of damages.
20        There isn't a dispute between the parties about
21  whether or not there is a 1st Amendment right to communicate
22  with the FBI about matters of interest to the FBI. Neither
23  party disputes that. There is. Now, having recognized that,
24  we come to the question of whether or not there was a form of
25  what we'll call retaliation against Mrs. Porter for her

Page 60

1  exercise of what everybody concedes is a constitutional right.
2  And in making that kind of evaluation, we ask you a particular
3  question that comes out of the case law in this area. What
4  we're asking you is whether or not Mrs. Porter's protected
5  speech -- that is, communications with the FBI -- was a
6  substantial or a motivating factor in the defendant's decision
7  to take action against her. What we're asking you is whether
8  or not it played a substantial part in the actual decision to
9  bar Mrs. Porter. Now, you can understand that things happen in
10  life for a variety of reasons that can be articulated and
11  sometimes can't be articulated. They can happen for one reason
12  or they can happen for a mix of reasons. So you can understand
13  that the defendant here could have taken her action for no
14  reason whatsoever, no articulable reason. She could. She says
15  that she did. She says that she had very particularized
16  reasons having to do with medical records. But if she had no
17  reason and or if she had these other reasons and you find that
18  to be the case, then you can understand by my saying that the
19  plaintiff's speech had played no substantial part and was no
20  motivating factor in the defendant's decision. The defendant
21  could have taken her action as the result of a sole reason or a
22  sole reason broken up into three parts as you saw in the
23  interrogatory. And if that reason or collection of reasons was
24  other than the exercise of a constitutional right, then you
25  can't say that the plaintiff's protected speech was a

Page 61

1  substantial and motivating factor in the defendant's decision.
2  The defendant could take her action for many different reasons,
3  some of which are expressed by her and some that weren't
4  expressed by her, but that you may find during the course of
5  evaluating the evidence. And then you must determine whether
6  or not one of those reasons was that Mrs. Porter exercised her
7  constitutional right to communicate with the FBI. And if that
8  communication with the FBI was one of those reasons, then you
9  must determine whether it played a substantial part in the
10  actual decision to bar her. And if it did play a substantial
11  part, then you must find that plaintiff's protected speech was
12  a substantial or a motivating factor in the defendant's
13  decision.
14        Now, you see that I started this question by saying
15  "Has the plaintiff established by a preponderance of the
16  evidence." This is one in which the plaintiff bears the burden
17  of satisfying you that it's more likely true than not true that
18  her protected speech was a substantial or motivating factor in
19  the decision to bar the plaintiff from the Suffolk County House
20  of Correction.
21        I told you at the outset that you're not here to be
22  a super personnel board, to decide whether or not this was
23  disproportionate sanction, that it was too harsh, that in the
24  exercise of human relations, people shouldn't do that sort of
25  thing. You're not here for that function. But you may

Page 62

1  consider whether or not the sanction was proportionate,
2  consistent in deciding whether or not what have been offered as
3  the reasons for barring are the true reasons and the only
4  reasons or a pretext. So, you're not an H.R. board, but you
5  are going to consider this as part of the circumstantial mix.
6  Similarly, you're not going to get yourself involved in what
7  kind of disputes were going on between law enforcement and the
8  FBI as I told you. But you're going to consider the context in
9  making a judgment about whether or not the exercise of
10  constitutional rights in this fashion was a substantial and
11  motivating factor in the decision to bar by evaluating the
12  context the way you evaluate any context. People are involved
13  in conflicts all the time. And what you've got to do is tease
14  it out a bit to decide whether or not that had an effect in
15  this case in the fashion that I have talked about.
16        You may think that political campaigns lead to
17  rough stuff and people make statements to influence elections
18  on both sides. And I have told you you're not here to evaluate
19  the nature of the election campaign and the attendant publicity
20  related to it. But it may provide you with some insight into
21  the intentions of the defendant here and, to a lesser degree,
22  the evaluation of the credibility of the plaintiff. It's part
23  of the mix, but to be used only for those purposes of deciding
24  how it is you determine whether or not the exercise of those
25  constitutional rights was a substantial and motivating factor.

Page 63

1 If you find that, as I've described this, her exercise of
2 constitutional rights was a substantial or motivating factor,
3 then you answer this question "yes" and you move on to question
4 two. If you find it wasn't, then you answer the question "no"
5 and you return the verdict.
6      So, let's assume that you've answered "yes," not
7 because I'm telling you to answer that question, but because we
8 have got to go through all the potential permutations.
9      Question two asks the question from a somewhat --
10 raises the issue, I should say, from a somewhat different
11 perspective -- that is, from a perspective of the defendant
12 because the defendant here bears the burden on this question.
13 We're assuming that you've gotten to the point of saying, well,
14 Mrs. Porter's exercise of her constitutional rights was a
15 substantial and motivating factor. But you might say there are
16 a lot of factors involved. And what you've got to do here is
17 pull out the question of communication with the FBI and say,
18 "if we didn't have that communication with the FBI, would they
19 still have barred her?" That's the issue. If Mrs. Porter had
20 done what she had done and not communicated to the FBI, that
21 that was not part of the mix, would Ms. Cabral have taken the
22 step that she took? She has the burden of convincing that she
23 would have by a fair preponderance of the evidence.
24      There was a Professor of the Columbia Law School --
25 his name was Thomas Reid Powell -- who once said that "the

Page 64

1 lawyer is someone who can think about several things that are
2 inextricably intertwined and talk about one of them without
3 talking about the other." And that, in some ways, is what
4 we're asking you to do here. At this point you've reached the
5 conclusion that the substantial and motivating factor here was
6 exercise of her constitutional rights. Now you've got to start
7 separating out what you find to be the reasons and evaluate it
8 and weigh whether or not the sanction that was imposed on
9 Mrs. Porter, that of barring, would have been taken. You will
10 consider all of the circumstances, what people said, what they
11 didn't say, what they said they didn't say, all of those
12 things. You'll consider proportionality and conflict to try to
13 tease out the answer to this question if you come to it. If
14 you answer this question "yes," then you'll return a verdict at
15 that point without going any farther. If you answer this
16 question "no," then you move on to the next set of questions.
17      And the next set of questions are the questions of
18 damages. Part of the question of damages that makes it so
19 difficult for Judges to instruct on and for jurors sometimes to
20 come to grips with is that it depends on a variety of
21 contingencies. And judgments like that don't generally -- and
22 in this case entirely -- lend themselves to double-entry
23 bookkeeping, it's not as fixed as that. It does require the
24 exercise of your common sense, your judgment about how things
25 actually work.

Page 65

1      There are two basic elements of damages here. The
2 first is what we call economic damages. And the presentation
3 with respect to economic damages was that after Mrs. Porter was
4 barred and up to today, she has received reduced compensation
5 at her further place of employment and that she may anticipate
6 that for the next 10 years because it's anticipated,
7 Mrs. Porter tells us, that she would have worked for another 10
8 years or so. Now you understand the whole series of
9 contingencies involved with that. Would the contract with the
10 Suffolk County House of Correction by Correctional Medical
11 Services have continued? Would Mrs. Porter have continued to
12 work? Would the demands of family or other demands interfere
13 in some fashion? You will have to ask yourself those questions
14 in making that determination. It is illusory to assume that
15 you see a figure on the board and that's the figure. You have
16 to look more carefully with greater discrimination in
17 evaluating that. What will happen in the future? Will someone
18 decide that, gee, I don't feel like driving that far any longer
19 or there are other things that capture my attention? But those
20 contingencies and your evaluation have to be based on the
21 evidence itself. You're not speculating. You're not just kind
22 of out there free floating. You have heard from Mrs. Porter.
23 You've got some sense of her work ethic. And you'll make an
24 evaluation on the basis of that and other evidence in this case
25 about her ability to get continued employment, at what level

Page 66

1 and for how long that are the economic damages that are at
2 issue here.
3      There is a second element of damages that are
4 referred to as emotional distress or sometimes called pain and
5 suffering. And you saw me restrict the argument with respect
6 to that because of this. This is an area in which the courts
7 have generally been concerned that passion and sympathy can be
8 the source of distraction to the juries in making their
9 evaluation. But let's step back a bit. The law recognizes
10 that if someone has been harmed, they may have pain in the
11 sense of someone has their arm twisted and it causes pain or if
12 they break their leg, but they could also have pain in terms of
13 the interference with how their life would have proceeded
14 absent this wrongful act. I think all of us, to greater or
15 lesser degrees, are tied up in our work, get value from it,
16 satisfaction from it, get a sense of who we are and what we
17 aspire to be. That's real. There's no particular guideline,
18 specific guideline to tell you how you evaluate that, but you
19 may consider it. You may consider whether or not there has
20 been an interference with the enjoyment of life to its full
21 degree as a result of actions. That's what pain and suffering
22 means in this context.
23      Now, I have told you that passion and undue
24 sympathy shouldn't influence you and it shouldn't. And I'll
25 emphasize again this is not about delivering a message. This

18 (Pages 63 to 66)

JANUARY 18, 2006>

## Page 67

1  is about finding just compensation. Because the overarching
2  issue for purposes of damages is to put Mrs. Porter back in the
3  position that she would have been but for -- what you will have
4  found if you get to this point -- the wrongful act of Sheriff
5  Cabral. As hard as it is, this is the guts of what we want
6  from juries, people with diverse backgrounds, diverse
7  experiences coming together and trying to work out a way of
8  expressing in dollars, because that's the only way we have to
9  express it, what damage, if any, was caused.
10  Now, you'll see that I said "Indicate in a dollar
11  figure or 'NONE.'" And you're free to make your calculation
12  based upon your view of what just compensation would be here --
13  that is, what is necessary to put Mrs. Porter back in the
14  position that she would have been but for what, as I've said,
15  you may have found at this point to be the wrongful act. And
16  that could be a dollar amount. One was suggested to you in a
17  writing -- at least part of it in a writing by Mr. Savage --
18  or it could be one dollar: One dollar is what we call nominal
19  damages. That is, in cases, particularly civil rights cases in
20  which someone has been deprived of their civil rights and the
21  jury is satisfied that they are, but nevertheless doesn't
22  believe that there is any real damage as a result, they put
23  down one dollar. So, if you consider that this was a violation
24  of civil rights, but there was no damage, put a dollar down.
25  But you can also put any dollar that is fairly based in the

## Page 68

1  evidence here in your exercise of common sense as well or you
2  can say "none." And if you say that there were no damages,
3  then you're going to return your verdict to us and not move on
4  to the next question. But if you put a dollar figure in there,
5  some actual dollar figure or some nominal dollar figure, then
6  you go on to the next issue. And that's this issue of punitive
7  damages.
8  Punitive damages is a form of damages that is
9  recognized by the law essentially to provide a deterrence, both
10  as to a particular defendant and to others who are similarly
11  situated to the defendant. You'll recall the call to deliver a
12  message. That's not what we're talking about here. What
13  you're here to do is make a judgment about the appropriate, if
14  any, sanction to be imposed above compensatory damages. That
15  is, this is money that would be awarded to Mrs. Porter standing
16  for a punishment, something like a fine. Now, one way to
17  evaluate it is the way that there is evaluation of punishment
18  in the criminal law, which is to say the punishment should be
19  no more than is necessary adequately to deter both the
20  defendant and others similarly situated and to reflect a
21  judgment about the seriousness of the illegal action. This
22  much is clear: That when a party defendant consciously
23  undertakes with a callous or reckless disregard violation of a
24  plaintiff's constitutional rights, you may award punitive
25  damages. We say an award of punitive damages is discretionary

## Page 69

1  in the sense that we're leaving it to your good judgment, but
2  guided by the principle principally, I would suggest to you, of
3  deterrence. Punitive damages are ordinarily awarded simply
4  to -- but specifically to punish a defendant for outrageous
5  conduct, but also to deter her and others like her from
6  performing similar actions in the future. In deciding whether
7  or not to award punitive damages, you should consider whether
8  or not, if you reach this point, Sheriff Cabral may be
9  adequately punished by the award of compensatory damages alone
10  or whether or not her conduct was so extreme or outrageous that
11  actual damages are inadequate to punish the wrongful conduct.
12  You'll consider whether or not the compensatory damages, the
13  actual damages, the page three damages are, standing alone,
14  likely to deter or prevent Sheriff Cabral or others in the same
15  circumstance from committing unlawful acts or wrongful acts.
16  If you decide to award punitive damages, you will be
17  considering those factors in telling us what the proper award
18  would be. You should consider in that connection whether or
19  not and to what degree Sheriff Cabral should be punished based
20  by that award and the degree to which any award will deter and
21  the proportionality of the award of punitive damages to any
22  compensatory damages that are imposed. You may consider
23  whether or not there's a wild departure between what the
24  compensatory damages are and what the punitive damages are in
25  making a judgment about what the proportion is. But this is

## Page 70

1  another matter left to your judgment as the common conscience
2  of the community. You must be disciplined. This is not an
3  opportunity to just go off on your own. You have a limited
4  role. You have to answer the questions here. And the
5  questions here have to be answered in accordance with the rules
6  that I have just given you.
7  Now, before I go on to the final stage of the
8  instructions, I'll see counsel at the side bar.
9  (Beginning of side bar conference)
10  THE COURT: Mr. Savage, anything further?
11  MR. SAVAGE: No. I preserve my earlier objection,
12  Your Honor.
13  THE COURT: The earlier objection to what?
14  MR. SAVAGE: The Court's limiting the discretion on
15  what the jury may consider as a deterrent.
16  THE COURT: If the objection is my treatment of the
17  question of delivering a message, that is preserved.
18  MR. SAVAGE: Thank you.
19  MR. DAVIN: Just a discussion, Your Honor, of
20  proximate cause saying -- there was a suggestion in the
21  testimony of everything else is going to be damages proximately
22  caused by the actions.
23  THE COURT: All right.
24  MR. DAVIN: And I think it was clear in your
25  instruction, but I wanted to make sure they understand that,

## Page 71

1  in absence of protected activity, I think she is within her
2  rights if the misconduct of the plaintiff came to her attention
3  through the protected activity reported to the FBI.
4        THE COURT: I don't think so. It would be
5  confusing for me to argue that particular issue. I'm not going
6  to add that.
7        MR. DAVIN: That's all we have.
8        (End of side bar conference)
9  BY THE COURT:
10       Let me add one further element of the legal instructions
11  to you that I think is implicit, but I do want to emphasize it.
12  When you move from the question of liability, if you do, to
13  damages, you understand that the damages for which a defendant
14  would be responsible are only those that are what we call
15  proximately caused, actually caused. That is to say, to put it
16  in the most extreme form, Mrs. Porter is barred and she walks
17  out of the Suffolk County House of Correction and she is run
18  over by a car. Now, the defendant wouldn't be responsible for
19  the car running over Mrs. Porter. But the defendant is
20  responsible for anything that flows directly as a consequence,
21  as a result of her decision to bar. Interference with job
22  prospects and opportunities, effects on the emotional life of
23  the defendant -- of the plaintiff, excuse me -- on her sense of
24  herself. But there has to be a connection between the act that
25  you find wrongful, if you find it to be wrongful, and the

## Page 72

1  damages that you find are appropriate there. They can't be
2  unrelated or it can't just be everything that happened after
3  the barring.
4        Now, let me turn to the question of how you conduct
5  your deliberations. The whole purpose of jury deliberations, I
6  think, is for a rational discussion of the evidence for
7  purposes of reaching a unanimous verdict. And in the Federal
8  Court, your verdict must be unanimous on all of the questions
9  that you choose to and are required to answer. But that means
10  that -- and should mean that every juror has to decide this
11  case for herself or himself, but you have to give proper
12  consideration to the views of others. And you've got to be
13  prepared to reconsider your own views if you're persuaded by a
14  rational discussion and certainly not solely for the purpose of
15  reaching a unanimous verdict. That is, you're part of a group,
16  but you stand alone. This has to reflect your own judgment in
17  this case. But being part of a group means listening to what
18  the other person has to say. It may happen to you, as
19  frequently happens to jurors, that you get in there and you
20  start discussing and that person who was sitting next to you
21  who seemed so apparently reasonable during the course of the
22  trial before you started discussing the case starts saying
23  things that you find quite striking or surprising or even
24  unreasonable. That's nothing new. That is part of the process
25  to getting to judgment here. And what it requires is civility

## Page 73

1  and a willingness to listen. Now I told you I can't tell you
2  what to do in the jury room. And I can't. But I can make
3  suggestions. And my first suggestion is this: There is always
4  a tendency, I think, to say "let's take a straw vote and see
5  where we are, let's get going." And I'd urge you not to do
6  that. The danger of taking a straw vote early on is people get
7  fixed in positions. And, so, they end up defending their
8  position rather than listening to the conversation. I will
9  make the suggestion. My suggestion is this: That you sit down
10  at the table and you just go around the table and listen to
11  what each individual person says "here is what I thought was
12  significant in the evidence." Part of this is a collective
13  effort at collective recollection for purposes of collective
14  judgment. And people will say things during the course of the
15  process that will cause you to think "oh, yes, now I remember
16  that and that causes me to think about this" and you'll add to
17  the discussion. So I would suggest that at least in the early
18  stages you do that.
19       It is necessary for there to be a foreperson of the
20  jury. And Mrs. Van Hone, you made the mistake of sitting in
21  the first seat here. And, so, after a nationwide search, you
22  have been designated as the foreperson. There is no extra
23  money involved in this. But, what you do have a responsibility
24  to do is just make sure that there is an orderly discussion,
25  that people aren't talking over each other and that sort of

## Page 74

1  thing, so that everybody gets a chance to be heard and that
2  sort of thing. One thing that I'll suggest to you is that if
3  people take a break or they use the facilities, they want to
4  stop for a while, one person wants to leave the room for
5  whatever reason, stop the discussion. The discussion should
6  only take place when everybody is present here. Now, during
7  the course of the deliberations, if you have questions -- my
8  hope is that I have been clear enough about what your
9  responsibilities are and you shouldn't have questions just to
10  avoid your responsibilities. But if you have questions that
11  touch on this case, you'll put them in writing and I will share
12  them with counsel to give you some sort of response. It's
13  generally not an immediate turnaround because we have to
14  discuss the issues here. But if you have something that
15  touches on this case, I want you to put it in writing and
16  deliver it either to Ms. Rynne if she's nearby or to the court
17  officer if he's outside the room. One thing you shouldn't tell
18  us is where you stand. At some point, you will take a vote and
19  you may find yourselves standing eight to four or something
20  like that. Don't tell us. We are not entitled to know. That
21  is part of the ongoing process of reaching a unanimous verdict
22  that we can't even have a peek at. So, don't tell us where you
23  stand at any particular point. But if you have a particular
24  question about the case, put it in writing. Creature comfort
25  kinds of questions like "when do we eat," ordinarily Ms. Rynne

PORTER V CABRAL - DAY 7>

Page 75

1  will be able to tell you that or the court officer. But I have
2  the responsibility today because Ms. Rynne told me. And it's
3  going to be at noon, we'll bring in food for you. I told you
4  yesterday that we'll be ceasing deliberations today at 1:30
5  because one of your number had explained earlier he has a
6  responsibility outside. And that really is meant to emphasize
7  this final point: In criminal cases, one of the unhappiest
8  aspects of my responsibility, among many of the unhappy aspects
9  of criminal cases, is that when we pick the jury, we pick the
10  regular jury and then we have alternates. And when the jury
11  goes out to deliberate, I have to limit it to 12 people and the
12  alternates have to be discharged. I hate to do it. I hate to
13  do it because we have imposed on the time of the alternates to
14  sit on the case and they don't even get the opportunity to
15  resolve it. That doesn't happen in civil cases. I will do
16  everything possible to make sure that everybody gets the
17  opportunity to deliberate. And as I told you, if one of you
18  can't be deliberating, then you should stop it. And, so,
19  that's what we're going to do today. So, if you haven't
20  returned a verdict by 1:30, we'll just bring you in, send you
21  home, and have you come back tomorrow to continue your
22  deliberations. The touchstone is this: That you treat each
23  other with civility, you evaluate only the evidence that's
24  important to you and has been properly presented here in court
25  and that you do it in a dispassionate, unbiased fashion without

Page 76

1  undue sympathy, but with full empathy that human beings should
2  have for all the people who participated in this case in your
3  evaluation of the evidence. If you do that, we'll be
4  satisfied.
5          If there is nothing more from counsel, then I'll
6  let you return to the jury room and now you get a chance to
7  talk about this case. Good luck.
8  (Jury out at 11:30 A.M.)
9          THE COURT: I take it that the parties are in
10  agreement about the evidence that is going into the jury room
11  and what was submitted and so on. The short of it is you're
12  not leaving this room until you are and you give the exhibits
13  to Ms. Rynne so she can take them into the jury room. And I'd
14  like to do that promptly. I think there is agreement on all of
15  the -- what, in fact, was actually admitted in the case. Okay.
16  Five-minute rule. You have got to be some place we can get you
17  in five minutes because things will happen in your absence if
18  you're not. All right. Thank you very much.
19          RECESSED AT 11:30 A.M.
20
21
22
23
24
25

Page 77

1
2
3                    CERTIFICATION
4          I certify that the foregoing is a correct
5  transcript of the record of proceedings in the above-entitled
6  matter to the best of my skill and ability.
7
8
9
10  _____
11  Pamela R. Owens                    Date
12  Official Court Reporter
13
14
15
16
17
18
19
20
21
22
23
24
25

21 (Pages 75 to 77)