# TAB A

# TESTA, HURWITZ & THIBEAULT, LLP

ATTORNEYS AT LAW

125 HIGH STREET
BOSTON, MASSACHUSETTS 02110-2704

OFFICE (617) 248-7000
FAX (617) 248-7100

Direct Dial (617) 248-7507
E-Mail savage@tht.com

July 14, 2003

**VIA FACSIMILE & FIRST CLASS MAIL**

Andrea J. Cabral, Sheriff
Suffolk County Sheriff's Department
20 Bradston Street
Boston, MA  02118

Re:   **Unlawful Treatment of Sheila Porter**

Dear Sheriff Cabral:

This office represents Sheila Porter; please direct all future communications regarding her to my attention.

After nine years working as a Nurse Practitioner at the Suffolk County House of Corrections ("HOC"), Sheila Porter was abruptly terminated on June 10, 2003, in retaliation for cooperating with the FBI concerning illegalities committed by the HOC. The actions of the HOC and its representatives flagrantly violated the Massachusetts Whistleblower Statute, the Massachusetts Civil Rights Act, and 42 U.S.C. § 1983, and constitute a termination in violation of public policy, intentional interference with advantageous relationships, breach of contract and intentional infliction of emotional distress. Mrs. Porter has been significantly damaged by these actions and demands immediate redress of her injuries.

In firing Mrs. Porter without any warning whatsoever, Maryellen Mastrorilli, a Deputy Superintendent of the HOC, summoned Mrs. Porter into a meeting on June 10, 2003 with the Health Services Administrator and cited "Policy S220" issued by the Suffolk County Sheriff's Department, which expressly applies to employees of the Department.[1]  Ms. Mastrorilli accused Mrs. Porter of talking to an "outside agency," in purported violation of the Policy's provision regarding the Department's insistence that all employees keep Department matters -- apparently even criminal activities -- secret. Ms. Mastrorilli then threatened Mrs. Porter that she was forever barred from entering the HOC premises.

---

[1] The Department and the HOC (that is, Suffolk County) are joint employers of Mrs. Porter, along with Correctional Medical Services ("CMS"), the company that placed Mrs. Porter at the HOC. Any references herein to the Department or the HOC are deemed also to refer to Suffolk County.

2649257

TESTA, HURWITZ & THIBEAULT, LLP

Andrea J. Cabral, Sheriff
July 14, 2003
Page 2

While using the Policy against Mrs. Porter as grounds for her unlawful termination, the HOC deprived her of the due process protections to which she was entitled pursuant to that same Policy. Those protections afford Mrs. Porter the right to a hearing regarding the alleged policy offense, and the right to have the HOC prove by a preponderance of evidence that Mrs. Porter engaged in the alleged offense. The HOC's breach of its own Policy by failing to provide these procedural safeguards to Mrs. Porter demonstrates its true retaliatory motives.

Prior to her unlawful discharge, Mrs. Porter had faithfully and successfully served for nine years as Nurse Practitioner at the HOC. Over the course of her tenure, Mrs. Porter learned about numerous questionable and unlawful activities committed by HOC corrections officers and other personnel. Those activities have included, but are not limited to, corrections officers who have impregnated female inmates; the sexual abuse of inmates; the physical abuse of inmates; and other corrupt activities.

Mrs. Porter often became aware of highly relevant and important information regarding suspected abuses by corrections officers, in light of her involvement in the medical care of inmates. Mrs. Porter reported violations of law to the appropriate individuals at the HOC. Moreover, because she witnessed evidence of unlawful activities, Mrs. Porter has been subpoenaed and called to testify in court hearings, trials and depositions. Each and every time, Mrs. Porter testified truthfully and cooperated fully with enforcement officials' requests for information and assistance, including testimony on behalf of corrections officers.

In the course of her involvement in these various proceedings, the FBI requested that Mrs. Porter cooperate with the agency in its investigation into suspected unlawful activities by the HOC. Since the FBI enlisted her assistance five years ago, Mrs. Porter has communicated with the agency on a regular basis and has provided invaluable information, some of which led to criminal indictments of HOC personnel. Well aware of Mrs. Porter's history of law enforcement cooperation, which continued until just prior to her discharge, HOC management has consistently sent a message of indifference or worse in response to Mrs. Porter's good public deeds.

The retaliation suffered by Mrs. Porter and the prevailing attitude of HOC management that abuses should be covered up are consistent with the findings of the Report of the Special Commission on the Suffolk County Sheriff's Department issued in October 2002 (the "Report"). Appointed by the Governor in the fall of 2001 following public allegations of physical and sexual abuse of inmates, the Commission conducted an in-depth investigation into the Sheriff's Department. One of the key problems found by the Commission concerned retaliation. The Commission concluded in its Report that "[s]taff maintain a code of silence due to concern about retaliation," and urged "an aggressive attack on the code of silence that prevents staff members from reporting the misconduct of fellow staff members." The Commission further urged the Sheriff's Department to fully protect those who do come forward with information. In direct contravention of the Commission's urgings, however, the HOC has persisted in its unlawful code of silence and retaliatory pattern and practice.

2649257

TESTA, HURWITZ & THIBEAULT, LLP

Andrea J. Cabral, Sheriff
July 14, 2003
Page 3

Indeed, it was that very code of silence that the HOC relied upon in terminating Mrs. Porter – Policy S220, which attempts to muzzle employees from discussing even criminal activities with anyone outside the Department. By expressly stating that Mrs. Porter had talked to an "outside agency," the HOC could not have been clearer that it discharged Mrs. Porter in retaliation for her refusal to be gagged by the Department's code of silence. This employment action and the Policy are unlawful for many reasons, including that they interfere with Mrs. Porter's First Amendment rights to engage in free speech on matters of public concern, and to report criminal activities to the authorities.

While we would hope that those in law enforcement would meet the highest ethical and legal standards, the HOC has repeatedly failed to do so. To the contrary, the HOC has engaged in egregiously unlawful conduct towards Mrs. Porter. This conduct is all the more disturbing when viewed against the warnings and urgings of the Commission to cease all such activities.

Because the HOC has thrown Mrs. Porter out on the street in retaliation for engaging in good public deeds, she now finds herself with the daunting task of securing a new job. Her prospects of finding other employment at her age and in this economy, however, are slim to none. She is 60 years old and has worked solely in correctional facilities since graduating from nurse practitioner school in 1989. Prior to that time, she was a nurse for more than 20 years. Her strong career record and her reputation have been smeared and sullied by the HOC. Moreover, Mrs. Porter has suffered emotionally in the wake of being unlawfully discharged.

Mrs. Porter is prepared to vindicate her rights in court. In connection with her preparation, please provide me with a copy of Mrs. Porter's personnel file within five days. I have enclosed a signed authorization from Mrs. Porter permitting you to provide such documents to me.

In an effort to avoid litigation, however, Mrs. Porter is willing to resolve her claims on the following terms:

1. Immediate reinstatement to her Nurse Practitioner position at the HOC, along with all fringe benefits, seniority and other rights;
2. Payment of her lost wages and benefits;
3. Payment of the attorneys' fees she has incurred and will incur as a result of the HOC's unlawful conduct;
4. Payment for her emotional distress damages;
5. Payment for the medical bills she has incurred in connection with her emotional distress;
6. Disciplinary action against all those responsible for Mrs. Porter's unlawful termination;

2649257

TESTA, HURWITZ & THIBEAULT, LLP

Andrea J. Cabral, Sheriff
July 14, 2003
Page 4

7. Adequate monitoring of HOC supervisors and other personnel sufficient to eradicate the retaliatory environment;
8. Issuance of a strongly worded policy to all HOC management and employees prohibiting the code of silence and retaliatory acts; and
9. A public apology by the HOC for its wrongdoing.

If I do not receive a response from you within one week, Mrs. Porter will pursue all available remedies through litigation. I look forward to hearing from you.

Very truly yours,

*Joseph Savage (/sws/)*

Joseph F. Savage, Jr.

cc: Sheila Porter
    Jennifer M. Goddard, Esq.

2649257

## AUTHORIZATION TO RELEASE PERSONNEL FILES

I, Sheila Porter, hereby authorize the Suffolk County House of Corrections, the Suffolk County Sheriff's Department and Suffolk County, to release any and all personnel records concerning me, which are maintained by any and all such entities and their employees and representatives, to my attorneys, Jennifer M. Goddard and Joseph Savage, at Testa, Hurwitz & Thibeault, LLP, 125 High Street, Boston, MA 02110. Those records are to include, but not be limited to, any performance appraisals or evaluations, notes, emails concerning me, information concerning my discharge, any warnings, compensation and benefits information, any reports or complaints made by me, and all other information whatsoever concerning me and/or my relationship with the Suffolk County House of Corrections, the Suffolk County Sheriff's Department and Suffolk County.

_____
Sheila Porter

# TAB B

# TESTA, HURWITZ & THIBEAULT, LLP

ATTORNEYS AT LAW

125 HIGH STREET
BOSTON, MASSACHUSETTS 02110-2704

OFFICE (617) 248 7000
FAX (617) 248 7100

Direct Dial (617) 248-7507
E-Mail savage@tht.com

July 14, 2003

**VIA FACSIMILE & FIRST CLASS MAIL**

Sally Powers,
Senior Vice President, Human Resources
Correctional Medical Services, Inc.
12647 Olive Boulevard
St. Louis, MO 63141

    Re:    <u>Unlawful Treatment of Sheila Porter</u>

Dear Ms. Powers:

    This office represents Sheila Porter; please direct all future communications regarding her to my attention.

    After nine years working as a Nurse Practitioner at the Massachusetts Suffolk County House of Corrections ("HOC"), most recently through Correctional Medical Services, Inc. ("CMS"), Sheila Porter was abruptly terminated on June 10, 2003, in retaliation for cooperating with the FBI concerning illegalities committed by the HOC. The actions of CMS and its representatives flagrantly violated the Massachusetts Civil Rights Act and constitute, among other things, a termination in violation of public policy, breach of contract, intentional interference with advantageous relationships, and negligent and intentional infliction of emotional distress. Mrs. Porter has been significantly damaged by these actions and demands immediate redress of her injuries.

    In firing Mrs. Porter without any warning whatsoever, Maryellen Mastrorilli, a Deputy Superintendent of the HOC, summoned Mrs. Porter into a meeting on June 10, 2003 with the CMS Health Services Administrator and cited "Policy S220" issued by the Suffolk County Sheriff's Department, which expressly applies to employees of the Department.[1] Ms. Mastrorilli accused Mrs. Porter of talking to an "outside agency," in purported violation of the Policy's provision regarding the Department's insistence that all employees keep Department matters -- apparently even criminal activities -- secret. Ms. Mastrorilli then threatened Mrs. Porter that she was forever barred from entering the HOC premises.

---

[1] The Department and the HOC (that is, Suffolk County) are joint employers of Mrs Porter, along with CMS

TESTA, HURWITZ & THIBEAULT, LLP

Sally Powers,
Senior Vice President, Human Resources
July 14, 2003
Page 3

Had CMS complied with its contractual obligations to investigate before abruptly discharging Mrs. Porter, it would have learned the following information. Prior to her unlawful termination, Mrs. Porter had faithfully and successfully served for nine years as Nurse Practitioner at the HOC.[1] Over the course of her tenure, Mrs. Porter learned about numerous questionable and unlawful activities committed by HOC corrections officers and other personnel. Those activities have included, but are not limited to, corrections officers who have impregnated female inmates; the sexual abuse of inmates; the physical abuse of inmates; and other corrupt activities.

Mrs. Porter often became aware of highly relevant and important information regarding suspected abuses by corrections officers, in light of her involvement in the medical care of inmates. Mrs. Porter reported violations of law to the appropriate individuals at the HOC. Moreover, because she witnessed evidence of unlawful activities, Mrs. Porter has been subpoenaed and called to testify in court hearings, trials and depositions. Each and every time, Mrs. Porter testified truthfully and cooperated fully with enforcement officials' requests for information and assistance, including testimony on behalf of corrections officers.

In the course of her involvement in these various proceedings, the FBI requested that Mrs. Porter cooperate with the agency in its investigation into suspected unlawful activities by the HOC. Since the FBI enlisted her assistance five years ago, Mrs. Porter has communicated with the agency on a regular basis and has provided invaluable information, some of which led to criminal indictments of HOC personnel. Well aware of Mrs. Porter's history of law enforcement cooperation, which continued until just prior to her discharge, HOC management has consistently sent a message of indifference or worse in response to Mrs. Porter's good public deeds.

The retaliation suffered by Mrs. Porter at the hands of the HOC and CMS, and the prevailing attitude of HOC management that abuses should be covered up, are consistent with the findings of the Report of the Special Commission on the Suffolk County Sheriff's Department issued in October 2002 (the "Report"). Appointed by the Governor in the fall of 2001 following public allegations of physical and sexual abuse of inmates, the Commission conducted an in-depth investigation into the Sheriff's Department. One of the key problems found by the Commission concerned retaliation. The Commission concluded in its Report that "[s]taff maintain a code of silence due to concern about retaliation," and urged "an aggressive attack on the code of silence that prevents staff members from reporting the misconduct of fellow staff members." The Commission further urged the Sheriff's Department to fully protect those who do come forward with information. In direct contravention of the Commission's urgings, however, the HOC has persisted in its unlawful code of silence and retaliatory pattern and practice.

---

[1] Prior to her service with CMS, Mrs. Porter was employed by Correctional Healthcare Solutions, Inc. at the HOC.

2649258

TESTA, HURWITZ & THIBEAULT, LLP

Sally Powers,
Senior Vice President, Human Resources
July 14, 2003
Page 2

CMS took absolutely no action to intervene on Mrs. Porter's behalf or to investigate HOC's allegations. In fact CMS has never even bothered to inform Mrs. Porter that she was terminated, or to provide the reason for her termination. Instead, CMS simply sent Mrs. Porter a final check for final wages through June 10, 2003, and did so more than one week after Mrs. Porter's termination, in violation of M.G.L. ch. 149 § 148, which requires payment of final wages on the date of termination.

By terminating Mrs. Porter's employment without any warning, explanation or discussion with her, CMS breached several of its own policies. For example, CMS's Corrective Action Policy requires that, prior to terminating an employee, CMS must first provide a verbal warning, followed by a written warning, followed by follow-up conversations. In the event a termination is recommended after such steps are followed, two levels of management and the Human Resources Department must review and decide the matter. Moreover, the Area Human Resources Manager is to review a termination recommendation with the employee in order to obtain the employee's version of the relevant facts. Mrs. Porter had the contractual right to receive the procedural protections of the Corrective Action Policy and CMS breached all of those requirements when it discharged Mrs. Porter without any warning or discussions.

Nor can CMS claim that it terminated Mrs. Porter pursuant to the "Immediate Removal or Action" section of its Corrective Action Policy, because Mrs. Porter engaged in absolutely no misconduct, let alone "serious" misconduct. The reasons cited by the HOC were that she talked to an "outside agency." It is true that Mrs. Porter was cooperating with the FBI until just prior to her discharge regarding illegal acts committed by the HOC and its personnel. The information of unlawful activities that Mrs. Porter was providing to the FBI is in no manner confidential to the HOC, and Mrs. Porter has the absolute right, without fear of reprisal, to speak with a law enforcement agency such as the FBI in order to report criminal activities. In fact, Massachusetts has recognized the right to report illegalities to law enforcement agencies as a matter public policy. Mrs. Porter's termination violates that public policy.

Even assuming the "Immediate Removal or Action" Policy provisions applied -- which they do not -- CMS nonetheless failed to abide by all of its obligations under those provisions. Those Policy provisions require CMS to investigate and review any suspected act of serious misconduct, and to have the recommendation regarding the employee's status reviewed by two levels of management, as well as the Human Resources Department. Moreover, in a situation where the correctional institution bars access to an employee, which is exactly what occurred with respect to Mrs. Porter, CMS must "take aggressive action to resolve the situation as soon as practical." Finally, CMS must consider all relevant facts prior to taking any corrective action, including but not limited to prior performance and length of service. CMS afforded Mrs. Porter not one of these protections.

2649258

TESTA, HURWITZ & THIBEAULT, LLP

Sally Powers,
Senior Vice President, Human Resources
July 14, 2003
Page 4

Indeed, it was that very code of silence that the HOC relied upon in terminating Mrs. Porter – Policy S220, which attempts to muzzle employees from discussing information with anyone outside the Department. By expressly stating that Mrs. Porter had talked to an "outside agency," the HOC could not have been clearer that it discharged Mrs. Porter in retaliation for her refusal to be gagged by the Department's code of silence. This employment action and the Policy are unlawful for many reasons, including that they interfere with Mrs. Porter's First Amendment rights to engage in free speech on matters of public concern, and to report criminal activities to the authorities.

By rubber-stamping the HOC's actions towards Mrs. Porter, failing to follow its own Corrective Action policy, and terminating her employment for cooperating with the FBI, CMS demonstrated its own retaliatory motives. Moreover, CMS has exerted economic coercion over Mrs. Porter in interfering with her right to engage in free speech. CMS is equally culpable with the HOC with respect to the shocking treatment of Mrs. Porter.

Because CMS has thrown Mrs. Porter out on the street in retaliation for engaging in good public deeds, she now finds herself with the daunting task of securing a new job. Her prospects of finding other employment at her age and in this economy, however, are slim to none. She is 60 years old and has worked solely in correctional facilities since graduating from nurse practitioner school in 1989. Prior to that time, she was a nurse for more than 20 years. Her strong career record and her reputation have been smeared and sullied by CMS. Moreover, Mrs. Porter has suffered emotionally in the wake of being unlawfully discharged.

Mrs. Porter is prepared to vindicate her rights in court. In connection with her preparation, please provide me with a copy of Mrs. Porter's personnel file within five days. I have enclosed a signed authorization from Mrs. Porter permitting you to provide such documents to me.

In an effort to avoid litigation, however, Mrs. Porter is willing to resolve her claims on the following terms:

1. Immediate reinstatement to employment with CMS and to her Nurse Practitioner position at the HOC, along with all fringe benefits, seniority and other rights;
2. Payment of her lost wages and benefits;
3. Payment of the attorneys' fees she has incurred and will incur as a result of the unlawful conduct of CMS;
4. Payment for her emotional distress damages;
5. Payment for the medical bills she has incurred in connection with her emotional distress;

2649258

TESTA, HURWITZ & THIBEAULT, LLP

Sally Powers,
Senior Vice President, Human Resources
July 14, 2003
Page 5

      6      Disciplinary action against all those responsible for Mrs. Porter's unlawful termination;
      7.     Adequate monitoring of CMS management to ensure all policies are followed;
      8.     Issuance of a strongly worded policy to CMS management prohibiting retaliatory acts; and
      9.     An apology by CMS for its wrongdoing.

If I do not receive a response from you within one week, Mrs. Porter will pursue all available remedies through litigation. I look forward to hearing from you.

Very truly yours,

Joseph F. Savage, Jr.

cc: Sheila Porter
     Jennifer M. Goddard, Esq.

2649258

## AUTHORIZATION TO RELEASE PERSONNEL FILES

I, Sheila Porter, hereby authorize Correctional Medical Services, Inc. ("CMS"), to release any and all personnel records concerning me, which are maintained by CMS and its employees and representatives, to my attorneys, Jennifer M. Goddard and Joseph Savage, at Testa, Hurwitz & Thibeault, LLP, 125 High Street, Boston, MA 02110. Those records are to include, but not be limited to, any performance appraisals or evaluations, notes, emails concerning me, information concerning my discharge, any warnings, compensation and benefits information, any reports or complaints made by me, and all other information whatsoever concerning me and/or my relationship with CMS, the Suffolk County House of Corrections, the Suffolk County Sheriff's Department and/or Suffolk County.

_____
Sheila Porter

# TAB C

JUL. 29. 2003  2:34PM     CMS                                    NO. 8848   P. 2



**Correctional Medical Services**

<u>Via Telecopy 617/248-7100</u>

July 29, 2003

Mr. Joseph F. Savage, Jr.
Testa, Hurwitz & Thibeault, LLP
High Street Tower
125 High Street
Boston, MA 02110

        Re:    <u>Sheila Porter</u>

Dear Mr. Savage:

        This is in response to your letter of July 14, 2003, to Sally Powers. Before responding to the allegations in your letter, it is necessary to state certain background facts.

        Correctional Medical Services ("CMS") contracts with Suffolk County to provide health care services at Suffolk County House of Correction ("Suffolk County"). As a contractor at Suffolk County, CMS employees, and, indeed, CMS itself, are permitted on jail premises only with Suffolk County's permission. Suffolk County reserves the right, by the terms of its Agreement with CMS, to bar any CMS employee from jail premises. Suffolk County's right to bar a CMS employee from the jail's premises is not subject to CMS approval, nor may CMS require any review of that decision. Suffolk County alone controls access to its premises.

        Under the terms of Suffolk County's Agreement with CMS, every CMS employee is required to submit to a security clearance and approval. The security clearance and approval is conducted solely by Suffolk County. The decision to grant the security clearance, or to revoke it, is solely Suffolk County's. No CMS employee may work at the jail without the security clearance.

        CMS maintains written personnel policies, including its Employee Handbook, the *Employee Success Guide*. The *Success Guide* is not a contract of employment. Indeed, the *Success Guide* expressly disclaims being a contract. As relevant here, CMS does not maintain contracts of employment with any of its employees.

        The *Success Guide* is subordinate to CMS' contracts with its clients, such as Suffolk County. CMS cannot publish a policy that takes precedence over its contractual relations with a client.

12647 Olive Boulevard
P.O. Box 419052
Saint Louis, Missouri 63141-9052
314-919-8591 • 800-325-4809

JUL. 29. 2003  2:34PM    CMS                                         NO. 8848   P. 3

Mr. Joseph F. Savage, Jr.                -2-                         July 29, 2003

The *Success Guide* specifically refers to client security policies and states that all CMS employees are subject to those policies. The *Success Guide* also states that the revocation of an employee's security clearance will result in an employee's termination. CMS cannot employ an individual at a site if the client has revoked the employee's security clearance.

Concerning Ms. Porter, she was employed by CMS at Suffolk County as a Nurse Practitioner. CMS was satisfied with Ms. Porter's job performance, work skills, and commitment to her position.

On or around June 10, 2003, CMS was notified that Ms. Porter was "locked out" by Suffolk County. Suffolk County revoked Ms. Porter's security clearance. CMS believes Ms. Porter learned of this action at the same time as CMS; the Company was not consulted prior to this action and had no part in it.

Upon loss of her security clearance, Ms. Porter was no longer able to provide services to CMS at Suffolk County. Since CMS has no other job site in the area at which Ms. Porter could be employed in a comparable position, CMS had no choice but to terminate Ms. Porter's employment.

CMS has attempted to learn from Suffolk County why it made the decision to revoke Ms. Porter's security clearance. CMS has also sought to obtain additional information to determine whether it might be possible to have Ms. Porter's security clearance reinstated so she could be reemployed. These actions by CMS have been unsuccessful.

CMS is sympathetic with Ms. Porter and this regrettable situation. CMS is willing to work with Ms. Porter in attempting to have Suffolk County reinstate her security clearance if that is appropriate. If Ms. Porter's security clearance can be reinstated, CMS would be pleased to rehire Ms. Porter to her prior position. Please advise how we may assist in this process.

As to your letter, there are several inaccurate statements in it. CMS and Suffolk County are not "joint employers" of Ms. Porter. CMS was Ms. Porter's sole employer. CMS is not in a position to investigate the allegations against Ms. Porter, since CMS was never apprised of the details supporting those allegations, nor its opinion solicited.

Your letter suggests that Ms. Porter was employed by CMS pursuant to a contract and has certain contractual rights. This is not correct. Ms. Porter had no contract of employment with CMS and is not entitled to "any procedural protections" described in the *Employee Success Guide*. As noted above, the *Success Guide* is not a contract.

CMS has not "rubberstamped" Suffolk County's decision to revoke Ms. Porter's security clearance. CMS played no role in the process. CMS has not, and will not, make any critical or disparaging remarks concerning Ms. Porter. Ms. Porter's job performance was satisfactory to CMS.

INIMAN2 742170v1

JUL. 29. 2003  2:35PM    Cmo                              NO. 8848   P. 4

Mr. Joseph F. Savage, Jr.             -3-                      July 29, 2003

    At your request, we have copied, and are forwarding to you, the personnel file of Ms. Porter. As noted above, we stand ready to work with your office, and Ms. Porter, to attempt to secure the reinstatement of her security clearance at Suffolk County. Please advise as to how we may accomplish this.

    Please contact me should you have any questions or wish to discuss the matter further.

Very truly yours,

Todd J. Aschbacher
Assistant General Counsel

TJA:kkg

INMAN2 762170v1





**ANDREA J. CABRAL**
SHERIFF

# Suffolk County Sheriff's Department



Jail
200 Nashua Street
Boston, MA 02114
(617) 635-1100

House of Correction
20 Bradston Street
Boston, MA 02118
(617) 635-1000

**BY FACSIMILE AND MAIL**

August 1, 2003

Joseph F. Savage, Jr., Esquire
Testa, Hurwitz & Thibeault
125 High Street
Boston, MA 02110-2704

Re: <u>Sheila Porter</u>

Dear Attorney Savage:

    In response to your letter dated July 30, 2003, in which you allege that you had not received a response to your July 14, 2003 letter, enclosed please find a copy of the letter mailed to you by first class mail on July 22, 2003. As noted in that letter, Ms. Porter is not an employee of the Suffolk County Sheriff's Department ("SCSD") and/or Suffolk County. Even if she were an employee of the SCSD, M.G. L. c. 149, Section 52C does not apply to public employees.

Very truly yours,

Anne P. Powers
General Counsel



ANDREA J. CABRAL
SHERIFF

## Suffolk County Sheriff's Department

Jail
200 Nashua Street
Boston, MA 02114
(617) 635-1100

House of Correction
20 Bradston Street
Boston, MA 02118
(617) 635-1000





**COPY**

July 22, 2003

Joseph F. Savage, Jr., Esquire
Testa, Hurwitz & Thibeault
125 High Street
Boston, MA 02110-2704

Re: <u>Sheila Porter</u>

Dear Attorney Savage:

    Sheriff Andrea J. Cabral has asked me to respond to your July 14, 2003 letter. The allegations contained therein are completely unfounded. With regard to your request for a "copy of Mrs. Porter's personnel file," please be advised that Mrs. Porter is not an employee of the Suffolk County Sheriff's Department and/or Suffolk County rather, she is an employee of Correctional Medical Services, Inc., 12647 Olive Boulevard, St. Louis, MO 63141.

Very truly yours,

Anne P. Powers
General Counsel