# EXHIBIT 4

24830   140

209

Property Address:
Unit No. 2
Carriage Building Condominium
172-178 Green Street
Boston (Jamaica Plain), Massachusetts 02130

## CONDOMINIUM UNIT DEED
## CARRIAGE BUILDING CONDOMINIUM

Robert R. Wilson, Jr., Trustee of Bostek Trust under Declaration of Trust dated December 18, 1986 and recorded with the Suffolk County Registry of Deeds in Book 13253, Page 330, (the "Trust") having a usual place of business in Boston (West Roxbury), Massachusetts, by power conferred by said Declaration of Trust and every other power, for consideration paid of $215,000.00, GRANTS to:

(Name) :      Andrea J. Cabral

(Address) :   172 Green Street, Unit 2
              Jamaica Plain, MA 02130

(hereinafter sometimes referred to as the "Grantee"), with Quitclaim Covenants, Unit 2 (the "Unit"), a unit in the condominium at 172-178 Green Street, Boston (Jamaica Plain District), Suffolk County, Massachusetts, known as the Carriage Building Condominium (the "Condominium"), created pursuant to and subject to the provisions of Massachusetts General Laws, Chapter 183A by Master Deed dated January 13, 2000 and recorded with the Suffolk County Registry of Deeds (the "Registry") on January 26, 2000 in Book 24629 Page 90 (hereinafter called the "Master Deed").

The post office address of the Unit is 172-178 Green Street, Jamaica Plain, Massachusetts 02130

The Unit is conveyed together with:

(a)   An undivided 7.72% percentage interest appertaining to the Unit in the Common Areas and Facilities of the Condominium as described in the Master Deed;

(b)   The exclusive right and easement to use Parking Space 2 and Basement Storage Spaces 2, all as provided in the Master Deed, the location of each of which is shown on the Plans recorded with the Master Deed (hereinafter called the "Plans"); and

24830  141

(c)    The benefit of and subject to all easements, rights, reservations, restrictions, limitations, agreements and provisions contained in said Master Deed, the Declaration of Trust creating Carriage Building Condominium Trust and the Rules and Regulations contained therein, recorded with the Registry in Book 24629, Page 58 (as the same may from time to time be amended by instrument duly filed with said Registry), and said instruments and the provisions thereof are hereby incorporated herein by reference.

Attached hereto is a copy of a portion of the Plans, to which is affixed a verified statement in the form provided for in General Laws Chapter 183A, Section 9, certifying that the plan shows the unit designation of the Unit hereby conveyed and of the immediately adjoining units, and that it fully and accurately depicts the layout of the Unit, its location, dimensions, approximate area, main entrance and immediate common area to which it has access, as built.

The Unit is intended to be used only for "Artists' Mixed Use" purposes as that term is defined in the "Boston Zoning Code & Enabling Act" as Amended through December 13, 1994 (the "Zoning Law") and for any such uses accessory thereto as may be permitted from time to time by the Zoning Law, other applicable laws and as set forth in said Master Deed and is subject to the Restrictions on Use set forth in Section 10 of the Master Deed.

The Unit is hereby conveyed subject to and with the benefit of, as the case may be:

1.    The rights, reservations, restrictions, encumbrances and appurtenances set forth in the Master Deed;

2.    The Carriage Building Condominium Declaration of Trust recorded with the Registry in Book 24629, Page 58;

3.    Any rules and regulations promulgated under said Condominium Declaration of Trust;

4.    The obligation to pay the proportionate share attributable to the Unit of the common expenses;

5.    Such real estate taxes attributable to the Unit for the current year as are not now due and payable; and

6.    Rights of other unit owners to exclusively use certain common areas and facilities, as set forth in the Master Deed.

Grantee, by the acceptance of this Condominium Unit Deed agrees to comply with, perform, assume or pay, as the case may be, all of the foregoing.

24830  142

For Grantor's title, see Deed from Financial Associates, Inc., et als, dated December 19, 1986 and recorded with the Registry in Book 13253, Page 334, and being a portion of the premises conveyed thereby.

The Trustee of the Trust hereby certifies as follows:

1) He is the sole Trustee of the Trust;

2) The Trust has not been modified, amended or rescinded and currently is in full force and effect;

3) All of the Beneficiaries of the Trust are of legal age and under no disability;

4) The Trustee has been duly directed and authorized by all beneficiaries of the Trust to execute, acknowledge, and deliver the within Unit Deed for the aforesaid Unit in the Carriage Building Condominium for the consideration herein stated.

WITNESS my hand and seal this 27th day of March, 2000,

Robert R. Wilson, Jr., Trustee of Bostek Trust, and not individually

CANCELLED

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.                                    March 27, 2000

Then personally appeared the above-named Robert R. Wilson, Jr., Trustee as aforesaid, and acknowledged the foregoing instrument to be his free act and deed before me

Notary Public  Donna D. Braga
My Commission Expires:  2/11/2005

24830    143

210

PREPARED BY AND
AFTER RECORDING MAIL TO:

Return to:

Washington Mutual Bank, FA
C/O DATA PLEX
12691 PALA DRIVE - MS156DPCA
GARDEN GROVE, CA 92841

—— SPACE ABOVE THIS LINE FOR RECORDING DATA ——

**Washington Mutual**

FIRST AMERICAN TITLE INS CO 0000

# MORTGAGE

LOAN NO.: 03-2160-003623620-8

THIS MORTGAGE ("Security Instrument") is given on __April 6, 2000__
The mortgagor is __ANDREA J CABRAL__

("Borrower"). This Security Instrument is given to __Washington Mutual Bank, FA__
_____ which is organized and existing under
the laws of __USA_____, and whose address is __400 East Main Street Stockton,__
__CA 95290_____ ("Lender"). Borrower owes Lender the principal sum of
__Two Hundred Four Thousand Two Hundred Fifty & 00/100__

Dollars (U.S. __204,250.00__). This debt is evidenced by Borrower's note dated the same
date as this Security Instrument ("Note"), which provides for monthly payments, with the full
debt, if not paid earlier, due and payable on __May 1, 2030_____. This Security
Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with
interest, and all renewals, extensions and modifications of the Note; (b) the payment of all
other sums, with interest, advanced under Paragraph 7 to protect the security of this Security
Instrument; and (c) the performance of Borrower's covenants and agreements under this
Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and
convey to Lender, with power of sale, the following described property located in
__Suffolk_____ County, Massachusetts:

LEGAL DESCRIPTION TO BE ATTACHED HERETO AND MADE APART HEREOF

which has the address of __172 GREEN STREET__    _Unit 2_
__JAMAICA PLAIN_____ Massachusetts __02130_____ ("Property Address");

MASSACHUSETTS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3022

73232A (12-97)    Page 1 of 8

35
B

24830  144

LOAN NO.: 03-2380-003623030-9

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.     Payment of Principal and Interest; Prepayment and Late Charges. Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2.     Funds for Taxes and Insurance. Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of Paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. § 2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under Paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

733226 (12-97)                                    Page 2 of 6

24830 145

LOAN NO.: 03-2368-003623030-8

3.    Application of Payments. Unless applicable law provides otherwise, all payments received by Lender under Paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under Paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.

4.    Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in Paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

5.    Hazard or Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with Paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in Paragraphs 1 and 2 or change the amount of the payments. If under Paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

6.    Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any

73202C (12-97)                                      Page 3 of 8

24830   146

LOAN NO.: 03-2380-003627030-8

forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument of Lender's security interest. Borrower may cure such a default and reinstate, as provided in Paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument of Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

7.    Protection of Lender's Rights in the Property. If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this Paragraph 7, Lender does not have to do so. Any amounts disbursed by Lender under this Paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

8.    Mortgage Insurance. If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available    and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

9.    Inspection. Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

10.    Condemnation. The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums

24830  147

LOAN NO.. 03-2380-003621030-8

secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in Paragraphs 1 and 2 or change the amount of such payments.

11.  Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

12.  Successors and Assigns Bound; Joint and Several Liability; Co-signers. The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of Paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

13.  Loan Charges. If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

14.  Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

15.  Governing Law; Severability. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

24830  148

LOAN NO: 03-2380-003623030-8

16. Borrower's Copy. Borrower shall be given one conformed copy of the Note and of this Security Instrument.

17. Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

18. Borrower's Right to Reinstate. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Paragraph 17.

19. Sale of Note; Change of Loan Servicer. The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with Paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

20. Hazardous Substances. Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this Paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this Paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

732317 (12-97)                                    Page 6 of 8

24830  149

LOAN NO.: 03-2350-003623030-5

21.  Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Paragraph 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by applicable law, in the manner provided by applicable law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by applicable law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

22.  Release. Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under applicable law.

23.  Waivers. Borrower waives all rights of curtesy and dower in the Property.

24.  Riders to this Security Instrument. If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable line(s)]

[X] Adjustable Rate Rider        [X] Condominium Rider           [ ] 1-4 Family Rider
[ ] Graduated Payment Rider      [ ] Planned Unit Development Rider [ ] Biweekly Payment Rider
[ ] Balloon Rider                [ ] Rate Improvement Rider       [ ] Second Home Rider
[X] Other(s) [specify]   Exhibit "A"

24830    150

LOAN NO.: 03-2360-003623030-9

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

X _____
ANDREA J CABRAL

-------------[Space Below This Line For Acknowledgment]-------------

COMMONWEALTH OF MASSACHUSETTS, _____ Suffolk _____ County ss:

On this 6th day of April, 2000 , before me personally appeared Andrea J. Cabral

and acknowledged the foregoing to be ___her___ free act and deed.

My commission expires: 11/25/05

_____
Notary Public
Alan H. Shocket

73223H (13-97)                    Page 8 of 8

24830 151

 **Washington Mutual**

ADJUSTABLE RATE RIDER
(12-MTA Index - Payment and Rate Caps)

03-2360-003623030-6

THIS ADJUSTABLE RATE RIDER is made this __6th__ day of __April, 2000_____, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to ____Washington Mutual Bank, FA____ (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

____172 GREEN STREET, JAMAICA PLAIN, MA 02130____
(Property Address)

THIS RIDER CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN __125%__ OF THE ORIGINAL AMOUNT (OR $ __285,312.50____). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THE NOTE AND RIDER. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A.    INTEREST RATE AND MONTHLY PAYMENT CHANGES
    Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of __6.500__ %. The interest rate I will pay will change in accordance with Section 4 of the Note.
    Section 4 of the Note provides for changes in the interest rate and the monthly payments as follows:

32843 (62-99) Page 1 of 6

24830    152

03-2180-003623030-8

"4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES
     (A)   Change Dates
          The interest rate I will pay may further change on the __1st__ day of
__June, 2006__, and on that day every month thereafter. Each
date on which my interest rate could change is called a "Change Date".
     (B)   The Index
          Beginning with the first Change Date, my interest rate will be based on an
Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the
annual yields on actively traded United States Treasury Securities adjusted to a constant
maturity of one year as published by the Federal Reserve Board in the Federal Reserve
Statistical Release entitled "Selected Interest Rates (G.13)" (the "Monthly Yields"). The
Twelve-Month Average is determined by adding together the Monthly Yields for the most
recently available twelve months and dividing by 12.
          The most recent Index figure available as of the date 15 days before each
Change Date is called the "Current Index".
          If the Index is no longer available, the Note Holder will choose a new index
which is based upon comparable information. The Note Holder will give me notice of this
choice.
     (C)   Interest Rate Change
          Before each Change Date, the Note Holder will calculate my new interest rate by
adding __Two & Seventy-Five-Hundredths__ percentage
points __2.750__ % ("Margin") to the Current Index. The Note Holder will then round
the result of this addition to the nearest one thousandth of one percentage point (0.001%).
Subject to the limits stated in Section 4(D) below, this rounded amount will be my new
interest rate until the next Change Date. In the event a new Index is selected, pursuant to
paragraph 4(B), a new Margin will be determined. The new Margin will be the difference
between the average of the old Index for the most recent three year period which ends on
the last date the Index was available plus the Margin on the last date the old Index was
available and the average of the new Index for the most recent three year period which
ends on that date (or if not available for such three year period, for such time as it is
available). The difference will be rounded to the next higher 1/8 of 1%.

33843(07-98)                           Page 2 of 6

24830  153

03-2380-001623030-8

**(D)  Interest Rate Limit**
My interest rate will never be greater than __11.500__ % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

**(E)  Payment Change Date**
Effective every year commencing __June 1, 2005__ , and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the maturity date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of the Note.

**(F)  Monthly Payment Limitations**
Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying.

**(G)  Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**
Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will add the difference to my unpaid principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the  monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

**(H)  Limit on My Unpaid Principal; Increased Monthly Payment**
My unpaid principal can never exceed a maximum amount equal to __125%__ of the principal amount original borrowed.  In the event my unpaid principal would otherwise

33643 (02-99)                          Page 3 of 6

24830  154

03-2380-003623030-8

exceed the __125%__ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

    (I)   Required Full Monthly Payment

       On the __FIFTH__ anniversary of the due date of the first monthly payment, and on that same day every __FIFTH__ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(P).

    (J)   Notice of Changes

       The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

    (K)   Failure to Make Adjustments

       If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid "Principal."

**B.**    **TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

       Covenant 17 of the Security Instrument is amended to read as follows:

       Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not

32843 (02-98)

Page 4 of 6

24830   155

03-2380-903623030-8

exercise this option if: (a) the request to assume is made after one year following recordation of the Deed of Trust, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Agreement or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption, and Lender may increase the maximum interest rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written assumption agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

33643 (03-01)

Page 5 of 6

24830   156

03-3380-003623030-8

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider. Borrower agrees to execute any document necessary to reform this Agreement to accurately reflect the terms of the Agreement between Borrower and Beneficiary or if the original Note, Trust Deed or other document is lost, mutilated or destroyed.

X _____
ANDREA J CABRAL

32843 (07-99)                    Page 6 of 6

24830  157

 **Washington Mutual**

## CONDOMINIUM RIDER

03-2360-003623010-8

THIS CONDOMINIUM RIDER is made this ____6th____ day of ____April, 2000____, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to ____Washington Mutual Bank, FA____ (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

____122 GREEN STREET, JAMAICA PLAIN, MA 02130____
(Property Address)

The Property includes a unit in, together with an undivided interest in the common elements of, a condominium project known as:

____CARRIAGE BUILDING CONDO____ (the "Condominium Project").
(Name of Condominium Project)

If the owners association or other entity which acts for the Condominium Project (the "Owners Association") holds title to property for the benefit or use of its members or shareholders, the Property also includes Borrower's interest in the Owners Association and the uses, proceeds and benefits of Borrower's interest.

CONDOMINIUM COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A.    Condominium Obligations. Borrower shall perform all of Borrower's obligations under the Condominium Project's Constituent Documents. The "Constituent Documents" are the: (i) Declaration or any other document which creates the Condominium Project; (ii) by-laws; (iii) code of regulations; and (iv) other equivalent documents. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

MULTISTATE CONDOMINIUM RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3140 9/90

1637 (12-99)                    Page 1 of 3

24830   158

01-2380-003623030-8

B.   Hazard Insurance. So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy on the Condominium Project which is satisfactory to Lender and which provides insurance coverage in the amounts, for the periods, and against the hazards Lender requires, including fire and hazards included within the term "extended coverage", then:
      (i)   Lender waives the provision in Uniform Covenant 2 for the monthly payment to Lender of one-twelfth of the yearly premium installments for hazard insurance on the Property; and

      (ii)  Borrower's obligation under Uniform Covenant 5 to maintain hazard insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.
      Borrower shall give Lender prompt notice of any lapse in required hazard insurance coverage.
      In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by the Security Instrument, with any excess paid to Borrower.
      C.   Public Liability Insurance. Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.
      D.   Condemnation. The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Uniform Covenant 10.
      E.   Lender's Prior Consent. Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to:
      (i)   the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain;
      (ii)  any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender;

      (iii) termination of professional management and assumption of self-management of the Owners Association; or

MULTISTATE CONDOMINIUM RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3140 9/90

1537 (12-92)                                    Page 2 of 3

24830  159

03-2380-003623030-8

(iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

F.   Remedies. If Borrower does not pay condominium dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Condominium Rider.

X _____
ANDREA J CABRAL

MULTISTATE CONDOMINIUM RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3140 8/90

1537 (12-98)                                    Page 3 of 3

24830    160

## EXHIBIT "A"

Unit 2 (the "Unit"), a unit in the condominium at 172-178 Green Street, Boston (Jamaica Plain District), Suffolk County, Massachusetts, known as the Carriage Building Condominium (the "Condominium"), created pursuant to and subject to the provisions of Massachusetts General Laws, Chapter 183A by Master Deed dated January 13, 2000 and recorded with the Suffolk Registry of Deeds (the "Registry") on January 26, 2000 in Book 24629, page 90 (hereinafter called the "Master Deed").

The post office address of the Unit is: 172-178 Green Street, #2, Jamaica Plain, MA 02130

The Unit is conveyed together with:

a.    An undivided 7.72% percentage interest appertaining to the Unit in the Common Areas and Facilities of the Condominium as described in the Master Deed;

b.    The exclusive right and easement to use Parking Space 2 and Basement Storage Spaces 2, all as provided in the Master Deed, the location of each of which is shown on the Plans recorded with the Master Deed (hereinafter called the "Plans"); and

c.    The benefit of and subject to all easements, rights, reservations, restrictions, limitations, agreements and provisions contain in said Master Deed, the Declaration of Trust creating Carriage Building Condominium Trust and the Rules and Regulations contained therein, recorded with the Registry in Book 24629, Page 58 (as the same may from time to time be amended by instrument duly filed with said Registry), and said instruments and the provisions thereof are hereby incorporated herein by reference.

Attached to Unit Deed is a copy of a portion of the Plans, to which is affixed a verified statement in the form provided for in General Laws Chapter 183A, Section 9, certifying that the plan shows the unit designation of the Unit hereby conveyed and of the immediately adjoining units, and that it fully and accurately depicts the layout of the Unit, its location, dimensions, approximate area, main entrance and immediate common area to which it has access, as built.

The Unit is intended to be used only for "Artists' Mixed Use" purposes as that term is defined in the "Boston Zoning Code & Enabling Act" as Amended through December 13, 1994 (the "Zoning Law") and for any such uses accessory thereto as may be permitted from time to time by the Zoning Law, other applicable laws and as set forth in said Master Deed and is subject to the Restrictions on Use set forth in Section 10 of the Master Deed.

The Unit is hereby conveyed subject to and with the benefit of, as the case may be:

1.    The rights, reservations, restrictions, encumbrances and appurtenances set forth in the Master Deed;

24830  161

2. The Carriage Building Condominium Declaration of Trust recorded with the Registry in Book 24629, Page 58;
3. Any rules and regulations promulgated under said Condominium Declaration of Trust;
4. The obligation to pay the proportionate share attributable to the Unit of the common expenses;
5. Rights of other unit owners to exclusively use certain common areas and facilities, as set forth in the Master Deed.


For Mortgagors title see Deed from Robert R. Wilson, Jr., Trustee of Bostek Trust, recorded herewith.

27544   164

Recording Requested By:
WASHINGTON MUTUAL BANK FA

When Recorded Return To:                                    105

Andrea Cabral
172 Green St, Unit 2
Jamaica Plain, MA 02130-2683

### DISCHARGE OF MORTGAGE

STOCKTON 156- WaMu # 0036Z30349 "Cabral" Lender ID A0U   Suffolk, Massachusetts

KNOW ALL MEN BY THESE PRESENTS that WASHINGTON MUTUAL BANK, FA whose address is
400 E. Main Street STBIRCN,Stockton,CA  95290 3767 holder of a certain Mortgage,
whose parties, dates and recording information are below, does hereby
acknowledge that it has received full payment and satisfaction of the same, and
in consideration thereof, does hereby cancel and discharge said Mortgage.

Original Mortgagor: ANDREA J CABRAL,
Original Mortgagee: WASHINGTON MUTUAL BANK, FA
Date Executed: 04/06/2000
Date Recorded: 04/06/2000
Book/Reel/Liber 24838, Page/Folio 143.
Document /Instrument No. : 210
In the County of SUFFOLK, State of MASSACHUSETTS

Property Address:  172    Green St,Jamaica Plain,MA,02130

IN WITNESS WHEREOF, the said WASHINGTON MUTUAL BANK, FA by its authorized
officer, has hereunto set its corporate hand.

Washington Mutual Bank, FA
On   November 16, 2001

By: _____                                    10.-
    SUE SOUTHWICK, ASST. VICE PRESIDENT

STATE OF California
COUNTY OF San Joaquin

ON November 16, 2001, before me, L. MCCOY, a Notary Public in and for the County
of San Joaquin County, State of California, personally appeared Sue Southwick,
Asst. Vice President, personally known to me (or proved to me on the basis of
satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their authorized capacity, and that by his/her/their signature on the
instrument the person(s), or the entity upon behalf of which the person(s)
acted, executed/the instrument.

_____
L. MCCOY
Notary Expires: 04/02/2005  81299375

                                    L. MCCOY
                                    Commission # 1299375
                                    Notary Public — California
                                    San Joaquin County
                                    My Comm. Expires Apr 2, 2005

                                    (This area for notarial seal)
Washington Mutual, 400 E Main St STB1RCN, Stockton, CA 95290-3947 800-282-4840

27557   254

Return To:
GMAC Mortgage Corporation

200 Century Parkway
Mount Laurel, NJ 08054



323

Prepared By:
Chung Huh

---
[Space Above This Line For Recording Data]
---

## MORTGAGE
MIN 100037506851195553

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated 10/26/2001
together with all Riders to this document.
(B) "Borrower" is Andrea J. Cabral

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee
under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

000685119555

MASSACHUSETTS-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS    Form 3022  1/01

-6A(MA) (0005)

Page 1 of 15

VMP MORTGAGE FORMS - (800)521-7291