UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHEILA PORTER<br><br>    Plaintiff,<br><br>  v.<br><br>ANDREA CABRAL, SUFFOLK COUNTY SHERIFF'S DEPARTMENT, and SUFFOLK COUNTY<br><br>    Defendants. | Civil Action No.04-11935-DPW |

## PLAINTIFF SHEILA PORTER'S SUBSTITUTED OPPOSITION TO DEFENDANTS' MOTION FOR A NEW TRIAL AND REMITTITUR

Plaintiff Sheila Porter ("Ms. Porter") hereby submits her Substituted Opposition to Defendants' Motion for a New Trial and Remittitur.

### INTRODUCTION

After 15 months of hard-fought discovery and motion practice, this case was pared down and presented to the jury to resolve a single issue: why did Sheriff Cabral bar Ms. Porter from the Suffolk County House of Corrections ("HOC") on June 10, 2003?  Over the course of a seven-day trial, the jury heard testimony from Ms. Porter, her family, her supervisor, top Suffolk County Sheriff's Department ("SCSD") decisionmakers, the First Assistant United States Attorney, an FBI agent, and Sheriff Cabral and concluded that Ms. Porter's communications with the FBI about allegations of inmate abuse were a substantial or motivating reason why she was barred and that Sheriff Cabral would not have barred Ms. Porter absent these communications. The jury awarded Ms. Porter $360,000 in compensatory damages and $250,000 in punitive damages.

Against this backdrop, Defendants request a new trial, arguing that the jury returned a verdict that was against the weight of the evidence, was unduly influenced by remarks at closing argument, and awarded Ms. Porter an excessive amount of damages. In the alternative, they ask the Court to remit the damage award. None of these arguments have merit, and the verdict should not be disturbed. The jury's verdict was amply supported both by extensive evidence that Sheriff Cabral barred Ms. Porter because she spoke with the FBI—including her own admissions to that effect—and by strong evidence that her proffered contrary reasons are pretextual. Counsel's remarks at closing argument were well within the bounds permitted by law and, in any event, caused no prejudice. Finally, the damage award does not shock the conscience nor constitute a miscarriage of justice. Therefore, the Motion should be denied in its entirety.

## ARGUMENT

Granting a new trial or remittitur is appropriate only if the verdict constitutes a miscarriage of justice. Defendants' _arguments_—much less the verdict—do not even rise to that level. At most, Defendants contend that the evidence could have supported an opposite verdict or that there were errors that they did not object to at the time and that they cannot now show to have affected the outcome in any event. Because the jury's resolution of the disputed evidence and its measured damages award plainly do not reflect a miscarriage of justice, neither a new trial nor remittitur is warranted.

## I.    THE VERDICT WAS OVERWHELMINGLY SUPPORTED BY THE EVIDENCE PRESENTED AT TRIAL.

A new trial is appropriate under Fed. R. Civ. P. 59 only where the verdict is so "seriously mistaken, so clearly against the law or evidence, as to constitute a miscarriage of justice." _Transamerica Premier Ins. Co. v. Ober,_ 107 F.3d 925, 929 (1st Cir. 1997); _see also Velazquez v. Figueroa-Gomez_, 996 F.2d 425, 427 (1st Cir. 1993) (holding that a court may only grant a new

trial if it "believes that the outcome is against the clear weight of the evidence such that

upholding the verdict will result in a miscarriage of justice.").  Orders granting a new trial are

"sparingly used," *Dall v. Coffin*, 970 F.2d 964, 969 (1st Cir. 1992), and "a jury's verdict on the

facts should only be overturned in the most compelling circumstances." *Velazquez*, 996 F.2d at

427.  The Court's discretion is limited by the parties' rights to have a jury make the ultimate fact

determinations in the case.  *See Ahern v. Scholz*, 85 F.3d 774, 780 (1st Cir. 1996).  Thus, a judge

may not act as a thirteenth juror and overturn a jury verdict on the grounds that she disagrees

with it or would have found differently in a bench trial because a "party is not entitled to a new

trial merely because the evidence introduced at trial would have supported an opposite verdict."

*Chedd-Angier Production Co., Inc. v. Omni Publications Intern., Ltd.*, 756 F.2d 930, 934 (1st

Cir. 1985); *see also Ahern*, 85 F.3d at 780; *Real v. Hogan,* 828 F.2d 58, 61 (1st Cir. 1987).

　　　Here, the jury returned a verdict that Ms. Porter established by a preponderance of the

evidence that her protected speech in relaying Inmate Rene Rosario's allegations of abuse to the

FBI was a substantial or motivating factor in Sheriff Cabral's decision to bar her from the

Suffolk County House of Corrections ("HOC"), and that Defendants did not show that Sheriff

Cabral would have barred Ms. Porter even if she had not relayed these allegations to the FBI.

*See* Verdict, Questions # 1, 2.  Defendants' motion utterly fails to establish that the verdict is

against the "clear weight of the evidence" and reflects a "seriously erroneous result" that, if left

to stand, would be a "clear miscarriage of justice."  *Chedd-Angier Production Co.,* 756 F.2d at

934.

**A.    The Jury Was Presented With Ample Evidence Affirmatively Showing that Ms. Porter's Communicating With the FBI was a Substantial or Motivating Factor in Sheriff Cabral's Decision to Bar Her.**

The jury heard multiple pieces of evidence establishing that Ms. Porter's communications with the FBI about the Rosario allegations were a substantial reason for her barring.  Such evidence included the statements and actions of Sheriff Cabral herself, as well as those of her top lieutenants from the SCSD and the First Assistant United States Attorney.  The cumulative weight of this evidence clearly supports the jury's verdict.

1.    Evidence that Sheriff Cabral and Her Staff Admitted in the June 16, 2003 Meeting With the U.S Attorney and the FBI That a Reason for Ms. Porter's Barring Was That She Talked to the FBI.

A number of witnesses testified that, at a June 16, 2003 meeting attended by Sheriff Cabral, members of her staff, and representatives from the FBI and U.S. Attorney's Office, Sheriff Cabral stated that one reason she barred Ms. Porter was because she spoke to the FBI. This meeting revolved around the circumstances surrounding Ms. Porter's barring, which had occurred six days earlier.  SCSD Chief-of-Staff Elizabeth Keeley spoke first.  According to former First Assistant United States Attorney Gerard Leone, Ms. Keeley provided four reasons for Ms. Porter's barring from the Suffolk County House of Corrections ("HOC"):

> **The first was that sensitive and confidential medical information of an inmate within the facility had been released outside of the facility by Sheila Porter.**  The second related to report writing concerning the incident and that there had been in appropriate and untimely report writing.  **The third, which was somewhat related to the first two, made more pointed reference to policies and procedures within the facility and that those had been violated and reference was made to the S-220, which was an internal document which outlined policies and procedures.**  And then the fourth reason that was given related to the safety of Sheila Porter in that, to their knowledge, it had been disclosed within the facility that Mrs. Porter had acted in an undercover confidential capacity on behalf of the Government, and

that that created a safety situation for not only Sheila Porter, but potentially others.

(Trial Transcript ("Tr.") Day 4, 73:12-74:2, Jan. 12, 2006) (emphasis added).  Thus, two of the four reasons provided by Ms. Keeley for the barring were that Ms. Porter talked to the FBI.

Ms. Keeley confirmed that she told the federal officials at this meeting that one of the reasons Ms. Porter was barred was because she talked to the FBI:

> Q.    The federal officials and the question of what happened with Mrs. Porter, did you give an explanation for the barring?
>
> A.    I spoke -- yes -- about the Rene Rosario investigation and the reasons/factors that involved Sheila Porter's involvement.  Yes.
>
> Q.    Were you yourself saying these things to explain the reasons for Rene -- for Sheila Porter's barring?
>
> A.    Yes.
>
> Q.    And the Sheriff and Viktor [Theiss] were present when you made your explanation?
>
> A.    Yes.
>
> Q.    And was the explanation the same as you have given to us here which included, among other things, talking to an outside agency?
>
> A.    Yes.
>
> Q.    And was it identifying what outside agency it was -- the FBI?
>
> A.    Yes.

(Tr., Day 3, 74:16-75:8, Jan. 11, 2006).

Sheriff Cabral spoke next.  **Mr. Leone specifically recalled Sheriff Cabral saying that Ms. Porter's communications to the FBI were a reason for her barring:**

> The Sheriff basically reiterated all of those reasons.  But the reasons that she didn't -- she wasn't particular about was -- or at least in my memory, the reason she wasn't particular about was the policy and procedures.  She eventually spoke to that issue, but she particularly underscored the reporting issue, **the disclosure of confidential, sensitive medical information issue**, and the safety issue.

(Tr. Day 4, 74:15-21, Jan. 12, 2006) (emphasis added).  Thus, the jury heard an unimpeachably neutral witness testify that Sheriff Cabral linked her decision to bar with Ms. Porter's communications with the FBI.[1]

Mr. Leone was not the only witness to testify that federal officials were told at this meeting that Ms. Porter was barred for talking to the FBI.  Sheriff Cabral's own hand-picked Chief of the Sheriff's Investigation Division ("SID"), Viktor Theiss, testified that only two reasons were given at the June 16th meeting for Ms. Porter's barring, one of which was "going to the FBI without notifying the Department."  (*Id.*, 42:11-12).

This testimony flatly refutes defendants' claim that the evidence at trial established that Sheriff Cabral did not bar Ms. Porter because of her communications with the FBI.  Indeed, defendants' claim that "Mrs. Porter's communication to an outside agency was relevant to [Sheriff Cabral] only inasmuch as it was Mrs. Porter's contact with the FBI that revealed her failure to document and report her encounter with Rosario internally," Def. Memo, p. 23, is directly contradicted by the following excerpts from Mr. Leone's testimony:

> Q.    And was there also a reference regarding the protocol of documenting medical records by Sheriff Cabral and Ms. Keeley?

---

[1] Mr. Leone testified that, at first, the FBI was not specifically mentioned as the outside agency in question, but the FBI was specifically identified as the recipient of the information later in the meeting. *See id.*, 74:6-8 ("[W]hen the reasons were given, it was about an outside agency, but as conversation ensued, [] there was a conversation about that outside agency having been the FBI.")  Mr. Leone testified that it was made clear by SCSD representatives that the recipient of the information was the FBI. *See id.*, 75:2-3 ([D]uring the course of the conversation, particular reference was made to the FBI being the receiving agency.").

> A.    My memory is **when the medical records issue arose, that it arose in the context of medical records information having been disclosed inappropriately outside of the agency**
>
> \* \* \* \*
>
> A.    As far as medical information is concerned, my memory is **the crux and focus of the medical information was that medical information of an inmate had been disclosed outside of the agency inappropriately.**"

Tr., Day 4, 78:6-:79:12, Jan. 12, 2006 (emphasis added).

It was reasonable for the jury to credit this testimony and conclude that a substantial or motivating factor behind Sheriff Cabral's barring of Ms. Porter was her communications with the FBI. Indeed, the Defendants presented no evidence to the contrary—the most they could muster was that other participants do not recall the reasons Sheriff Cabral gave. Sheriff Cabral testified that she did not remember what she said at the meeting regarding the reasons she barred Ms. Porter, *see* Tr. Day 6, 93:1-2, Jan. 17, 2006, and she admitted that she did not object to or correct Ms. Keeley's statement of reasons for the barring, which included Ms. Porter's communications with the FBI. *Id.*, 96:5.[2] The jury reasonably could conclude that it was not credible that Sheriff Cabral could not recall what she said at the meeting. However, even if the jury believed that Sheriff Cabral does not recall what she said, this testimony does not contradict the affirmative testimony of Mr. Leone. Similarly, Chief-of-Staff Keeley's testimony that she could not recall the specific statements made by Sheriff Cabral at this meeting does not contradict the testimony of Mr. Leone and Mr. Theiss. (Tr. Day 3, 75:9-17, Jan. 11, 2006). Indeed, her admission that the reasons provided by Sheriff Cabral for the barring at the June 16th meeting and previously on

---

[2]    When asked if Ms. Keeley testified that speaking to an outside agency was a reason for barring Ms. Porter, Sheriff Cabral testified that "apparently she did." Tr., 1/17/06, p. 96:3.

June 10, 2003, when the decision to bar was made, were always the same, and that they included speaking to the FBI about the Rosario allegations <u>supports</u> the testimony of Mr. Leone that one reason Sheriff Cabral gave for the barring was speaking to the FBI.  (*Id.*, 51:21-52:7).[3]

In short, the First Assistant U.S. Attorney testified that, at the June 16th meeting, Sheriff Cabral indicated that one reason for the barring was Ms. Porter's communications to the FBI.  Chief-of-Staff Keeley and SID Chief Theiss also testified that this reason for the barring was stated in Sheriff Cabral's presence, and Sheriff Cabral did not object.  It was more than reasonable for the jury to render a verdict in Ms. Porter's favor based on this testimony.[4]

2.    <u>Evidence that Sheriff Cabral Repeated Her Admission That One of the<br>Two Reasons She Barred Ms. Porter Was Because She Talked to the FBI</u>.

The jury heard evidence that the June 16th meeting was not the only time that Sheriff Cabral indicated that she barred Ms. Porter because she spoke to the FBI.  Mr. Theiss testified that he spoke with Sheriff Cabral and Ms. Keeley about the barring subsequent to the June 16th meeting.  During this meeting, Sheriff Cabral said that she barred Ms. Porter for two reasons: speaking to the FBI without notifying the Department and failing to document Mr. Rosario's medical file:

---

[3] Defendants claim that Mr. Leone testified that his notes regarding the meeting "reflect that he attributed the comment about providing information to an outside agency to Ms. Keeley only."  Memo. in Support of Mot. for New Trial and Remittitur ("Def. Memo."), p. 13.  In fact, the transcript shows that while Mr. Leone testified that speaking to an outside agency was one of the reasons that Ms. Keeley gave (Tr. Day 4, 81:5-11, Jan. 12, 2006), he did not testify that this reason was attributed to her only, and he had a specific recollection of Sheriff Cabral stating that one reason for the barring was that Ms. Porter spoke to an outside agency about the Rosario allegations.  (*Id.*, 82:2-4).  The jury could properly conclude that reasons for barring, offered in the Sheriff's presence and not objected to by the Sheriff, were indeed the Sheriff's reasons for the barring.

[4] Defendants claim that the testimony concerning the June 16, 2003 meeting "differed in significant respects."  Def. Memo. p. 27 n. 14.  On the contrary, Mr. Leone, Mr. Theiss and Ms. Keeley all testified that Sheriff Cabral affirmatively stated or ratified by silence that Ms. Porter was barred for speaking to the FBI during this meeting and the Sheriff said it "apparently" happened.  (Tr. Day 4, 74:15-21, Jan. 12, 2006; *id.*, 42:7-12).  No witness testified that Sheriff Cabral told the federal officials that she barred Ms. Porter for other reasons; at most, they could not recall what Sheriff Cabral said with respect to the barring.  (*See* Tr. Day 3, 75:18-28, Jan. 11, 2006; Tr. Day 6, 95:8-13, Jan. 17, 2006).

Q.    And do you recall a subsequent meeting with just the three of you -- Ms. Keeley, Ms. Cabral and yourself -- where this same topic of the reasons for Mrs. Porter's barring was discussed?

A.    Yes.

Q.    And do you recall Ms. Cabral speaking in that conversation with the three of you?

A.    Yes.

Q.    And do you recall what, if anything, she said her reasons were for barring Mrs. Porter?

A.    I don't recall exactly what was said, but **I do recall the two reasons I just gave being spoken about.**

Q.    **And they were spoken by Sheriff Cabral?**

A.    **I believe so.**

* * * *

Q.    **You don't disagree with me that the substance of what was said by Ms. Cabral was that one of the two reasons was speaking to the FBI without also speaking to SID?**

A.    **Yes.**

(Tr. Day 4, 42:21-43:17, Jan. 12, 2006) (emphasis added). This testimony is particularly persuasive because Mr. Theiss admitted that, at his deposition, he provided affirmatively false testimony under oath when he testified that he did <u>not</u> know the reasons for Ms. Porter's barring, even though at a prior, secret proceeding he had previously given the testimony described above. (*Id.*, 46:22-47:13). Both the substance of this testimony, and the fact that Mr. Theiss sought to conceal that substance by providing false contrary testimony, provide strong additional evidence affirmatively establishing that Ms. Porter was barred because she spoke to the FBI.

3.    <u>Evidence Surrounding the Decision to Bar Ms. Porter Indicates That Ms. Porter Was Barred Because She Spoke to the FBI.</u>

The evidence presented to the jury regarding the circumstances surrounding Ms. Porter's barring further supported the verdict.  First, former Deputy Superintendent Mary Ellen Mastrorilli testified that the <u>only</u> reason she was ever given for Ms. Porter's barring was that she spoke to the FBI.  (Tr. Day 2, 129:2-130:19, Jan. 10, 2006).  Ms. Mastrorilli testified that, on May 22, 2003, Mr. Theiss telephoned her to report that he had just learned that Ms. Porter had spoken to the FBI about the Rosario allegations.  (*Id.*, 120:5-22).  *See also* Trial Exhibit 23 (Mastrorilli memorandum to Bradley).  Ms. Mastrorilli testified that she was furious about Ms. Porter's actions and that Mr. Theiss shared this outrage.  (Tr. Day 2, 120:16-19, Jan. 10, 2006).  She testified that she offered to bar Ms. Porter on the spot, but Mr. Theiss told her to wait until she heard from him again.  (*Id.*, 120:19-22).[5]

Ms. Mastrorilli testified that she next heard from Mr. Theiss on June 10, 2003, when she was told that she could go ahead and bar Ms. Porter.  (*Id.*, 127:23-128:5).  When Ms. Mastrorilli asked him what were the reasons for the barring, she was told to call Ms. Keeley.  (*Id.*, 128:7-13).  Ms. Mastrorilli contacted Ms. Keeley, who said that clearly Ms. Porter had divulged confidential patient information to an outside agency, so she had to be barred.  (*Id.*, 128:20-129:7).  Ms. Mastrorilli set up a meeting with Donna Jurdak and Ms. Porter.  (*Id.*, 130:24-131:8).  During this meeting, she told Ms. Porter that she was barred for speaking to an outside agency.  (*Id.*, 131:10-17).  She read from the "confidential communications" section of Policy S-220, which prohibits employees from disclosing information about inmates outside the Department.  (*Id.*, 131:17-20; *see* Trial Exhibit 6).  In short, Ms. Mastrorilli testified that she was instructed to

---

[5] Ms. Mastrorilli and Donna Jurdak both testified that, subsequent to the barring, they had a conversation where both expressed their bewilderment about the barring because they believed the SCSD should be working cooperatively with outside law enforcement to root out abuse.  (*Id.*, 135:9-16; *see id.*, 57:5-13).

bar Ms. Porter solely because she spoke to the FBI, and that was the only reason Ms. Mastrorilli

provided for Ms. Porter when she carried out these instructions.

In addition, there is no question that Sheriff Cabral was aware that Ms. Porter had spoken

to the FBI about the Rosario allegations and that her top aides believed she should be barred for

this reason. Mr. Theiss testified that, in the course of updating Sheriff Cabral about the Rosario

investigation, he told her that Ms. Porter had reported the Rosario allegations to the FBI. (Tr.

Day 4, 57:4-21, Jan. 12, 2006). As mentioned above, Ms. Mastrorilli testified that Mr. Theiss

agreed with her that Ms. Porter's conduct was highly inappropriate, but he told her to wait. (Tr.

Day 3, 19:24-20:6, Jan. 11, 2006). Ms. Keeley testified that she believed that talking to the FBI

was a barrable offense. On June 10, 2003, Ms. Keeley and Sheriff Cabral discussed Ms. Porter's

involvement with the Rosario investigation including her communications with the FBI. (*Id.*,

45:5-17). Ms. Keeley testified that she told Sheriff Cabral at that meeting that she believed that

Ms. Porter should be barred, in part, because she disclosed confidential information outside of

the Department (*Id.*, 47:7-8; *id.*, 49:11-13). Indeed, Ms. Keeley testified that speaking to an

outside agency was a "significant" factor in the barring and "integral" to the decision to bar:

> Q:    It was an absolute integral part of the decision that she had
>       spoken to someone outside of the Department?
>
> A:    In the context of the information she had and her failure to
>       document a medical file and a failure to write a report, yes.
>
> * * * *
>
> Q:    Inseparable?
>
> A:    It was significant in the context of her other failures. Yes.

(*Id.*, 53:16-54:2). This evidence concerning the events and discussions at the time of the barring

further support the jury verdict.

11

4.    Evidence of SID's Attempts to "Out" Ms. Porter Supports the Jury's Verdict.

The jury also heard evidence that representatives of SID, headed by Mr. Theiss, embarked on a campaign to discover who had contacted the FBI about the Rosario allegations, and when it was discovered that Ms. Porter was the source, SID interrogated her until she admitted that she had spoken to the FBI.  SID's preoccupation with this issue is further evidence that Ms. Porter was barred because she spoke to the FBI.

Agent Christa Snyder testified that she had two conversations with SID Agent Stan Wojtkonski where he attempted to determine who had spoken to Agent Snyder about the Rosario allegations.  First, during a face-to-face meeting, Agent Snyder said that she was aware of the Rosario allegations, that she was concerned because Rosario had been a witness for the FBI, and that Mr. Wojtkonski should check the medical records for additional information.  (Tr. Day 3, 129:2-131:6, Jan. 11, 2006).  Mr. Wojtkonski immediately attempted to determine her source, asking "[w]hy did this information come from the medical department?"  (*Id.*, 131:7).  Mr. Theiss testified that, subsequent to this conversation, SID investigators discussed who the source might be, and SID investigator Steve Jacobs suggested that it might be Ms. Porter.  (Tr. Day 4, 22:4-23:23, Jan. 12, 2006).  Agent Snyder spoke with Mr. Wojtkonski again on May 23rd and Mr. Wojtkonski told her that SID had identified Ms. Porter as the source and that there could be a problem because he was under the mistaken belief that Ms. Porter had not reported the incident internally.  (Tr. Day 3, 131:23-132:3, Jan. 11, 2006).  Agent Snyder reprimanded Mr. Wojtkonski, telling him that it was inappropriate for him to try to determine a source and that Agent Snyder told the source that she would pass the information along to SID.  (*Id.*, 132:3-6).

SID then set out to confirm their suspicion that Ms. Porter was Agent Snyder's source. On May 28, 2003, Ms. Porter was summonsed to SID for an interview. (Tr. Day 4, 121:8-22,

Jan. 12, 2006). She testified that, shortly after it began, the topic and tone of the meeting changed. (*Id.*, 123:11-15). One of the SID agents leaned forward, lowered his voice and, using a standard misdirection interrogation technique, asked "when did you first talk to Christa?" (Tr. Day 4, 123:19-22, Jan. 12, 2006). When Ms. Porter did not immediately respond, the investigator pressed the issue, asking the day and time that she had contacted Agent Snyder and what was the topic of their conversation. (*Id.*, 124:1-8). Ms. Porter answered truthfully that she had contacted Agent Snyder about the Rosario allegations on May 20th. (*Id.*, 124:11-14).

In short, the jury heard evidence that representatives of Sheriff Cabral's SID, including Mr. Theiss, engaged in a witch hunt to determine the "leak" to the FBI, and once they surmised that it was Ms. Porter, they used interrogation tactics to elicit an "admission" from her. Importantly, Sheriff Cabral agreed that there was a "concern" among the Department that Ms. Porter informed the FBI about the Rosario allegations before telling SID. (Tr. Day 6, 79:14-15, Jan. 17, 2006). Thus, a reasonable jury could infer from this further evidence that Sheriff Cabral barred Ms. Porter for talking to the FBI.[6]

5.    Evidence Concerning the Dispute Between Sheriff Cabral and the FBI Lends Additional Support to the Verdict.

Finally, evidence was presented to the jury that the relationship between the SCSD and the FBI was contentious, providing context for the jury to reasonably conclude that Sheriff Cabral fired Ms. Porter because she communicated with the FBI. Sheriff Cabral and Mr. Theiss each testified that relations between the agencies had been strained. (Tr. Day 6, 19-11:3, 88:3-

---

[6] The jury also heard Donna Jurdak testify about her unpleasant interactions with Mr. Theiss. In particular, Ms. Jurdak testified that, when she went to report the allegation of inmate abuse to Mr. Theiss, he was sarcastic and uninterested in the allegations, asking her "would the inmate be Rosario?" and "would the nurse be Sheila Porter?" (Tr. Day 2, 48:22-24, Jan. 10, 2006). Mr. Theiss also told Ms. Jurdak "I wish your nurses would stop believing inmates." (*Id.*, 48:24-25). The jury could have concluded from this interaction that Mr. Theiss, the head of SID, was focused on minimizing the reporting of inmate abuse and that the Sheriff's actions were consistent with this position. The jury could have reasonable concluded that reporting to the FBI obviously undermined the desire for silence expressed by the Department's executive staff.

10, Jan. 17, 2006; Tr. Day 4, 25:4-18, Jan. 12, 2006). In addition, both testified about an incident

with the FBI where a SCSD correction officer was being investigated in a joint narcotics

investigation. (Tr. Day 4, 24:5-16, Jan. 12, 2006; Tr. Day 6, 89:24-90:7, Jan. 17, 2006). Sheriff

Cabral testified that she thought that the FBI had undermined the investigation and endangered

the officer when a target letter was issued to that officer by the USAO. (Tr. Day 6, 90:16-91:9,

Jan. 17, 2006). According to Sheriff Cabral, there was an "animated discussion" where she

expressed her "extreme displeasure" with the USAO and FBI. (*Id.*, 91:5-92:5). Importantly, this

incident occurred in the spring of 2003—just three weeks before Sheriff Cabral learned that Ms.

Porter had communicated with the FBI about the Rosario allegations. (*Id.*, 92:11-14). With this

context, the jury could reasonably have concluded that Ms. Porter became a pawn in a dispute

between the SCSD and the FBI, and that Sheriff Cabral retaliated against Ms. Porter and the FBI

by barring her once she learned of their confidential relationship.

The cumulative weight of all of this evidence amply—indeed, overwhelmingly—supports

the jury's verdict that Ms. Porter's communications with the FBI were a substantial or

motivating reason behind Sheriff Cabral's decision to bar her.

### B.     The Jury Was Presented With Strong Evidence that Ms. Porter in Fact Was Not Barred for a Purported Paperwork Violation.

In addition to the mountain of affirmative evidence that Ms. Porter was barred because

she spoke to the FBI, the jury heard a wealth of evidence that the reasons currently given by

Sheriff Cabral for Ms. Porter's barring are a merely a pretext.[7] It was undisputed that Ms. Porter

was, as Ms. Jurdak testified, "one of the best [nurse practitioners] I've ever worked with"; that

---

[7] As described above, Ms. Porter was required to prove that her communications with the FBI were a substantial or motivating factor in her barring, and that she would not have been barred anyway for other reasons. The evidence elicited regarding Ms. Porter's alleged paperwork infractions go to both prongs, in that they show that her alleged infractions were not were not, standing alone, sufficient reasons to bar someone, thus exposing them as a pretext for the true reason that Ms. Porter was barred.

Ms. Porter was hard-working, dedicated, and always put in more than 40 hours per week; and that the inmates were "lucky to have her." (Tr. Day 2, 32:18, Jan. 10, 2006). Ms. Jurdak and Ms. Porter testified that Ms. Porter always received the highest merit raises that CMS allowed. (*Id.*, 33:3-4). The jury was presented with ample testimony from which to conclude that Ms. Porter, in light of those qualifications, and in light of her communications with the FBI, in fact was not barred because of a putative one-time reporting error.

1.    The Reasons Provided by the SCSD Kept Changing.

Sheriff Cabral and the SCSD stated under oath in their interrogatories that Ms. Porter was barred for three reasons: (1) she did not file a timely report concerning her encounter with Mr. Rosario; (2) she did not document his medical file; and (3) she backdated the report that she did file. *See* Trial Ex. 8 (Suffolk Responses to Interrogatories). But the jury heard testimony that was inconsistent with this list of reasons for the barring. Sheriff Cabral admitted that she had previously provided sworn testimony stating that there were additional reasons for the barring, including that Ms. Porter had submitted her report of her encounter with Mr. Rosario on the wrong form.[8] (Tr. Day 6, 85:9-87:4, Jan. 17, 2006). Moreover, Ms. Keeley testified that she did not recall ever discussing with Sheriff Cabral that Ms. Porter's allegedly backdated the report and that it played no role in the barring:

> Q:    Backdating was absolutely no part of the reasons that Mrs. Porter was barred in your mind?
>
> A:    Exactly, yes.
>
> Q:    And that's because you have no evidence whatsoever that Mrs. Porter backdated?

---

[8] Ms. Keeley and Mr. Theiss both testified that they never heard Sheriff Cabral say that this was a reason for the barring, and Ms. Keeley said that, in her mind, the fact that the report was submitted on the wrong form was "not significant" and did not play a role in the barring. (Tr. Day 3, 56:11-57:7, Jan. 11, 2006; Tr. Day 4, 45:23-46:3, Jan. 12, 2006). Moreover, Ms. Jurdak and Ms. Mastrorilli both testified that incident reports need not be on a particular form. (Tr. Day 2, 37:9-24, Jan. 10, 2006; *Id.*, 127:10-26).

A:     I don't know whether she did or not. No.

Q:     Well, I didn't ask you whether you knew. I asked you whether you had any evidence she backdated?

A:     No.

Q:     So there is no evidence that she did it, so it's not a part in your mind of the decision to bar?

A:     No.

Q:     And it was never discussed as a factor between you and the Sheriff?

A:     I don't recall on whether the Sheriff—I don't recall that being discussed.

(Tr. Day 3, 54:15-55:5, Jan. 11, 2006).

Mr. Theiss agreed that he never heard Sheriff Cabral say that she barred Ms. Porter for backdating the report. In addition, he testified that he never heard Sheriff Cabral say that she barred Ms. Porter for submitting a late report:

Q:     And the same question: You never discussed with anyone that failing to file or filing late was the reason for barring Mrs. Porter?

\* \* \* \*

A:     I don't remember doing so.

Q:     You don't remember discussing it with her?

A:     Correct.

\* \* \* \*

Q:     And you were never told that backdating was a reason?

A:     Are you talking about backdating in May of 2003?

Q:     Right.

A:    Yes.

(Tr. Day 4, 45:5-46:7, Jan. 12, 2006).  Rather, Sheriff Cabral told Mr. Theiss that she barred Ms.

Porter because she told the FBI about the Rosario allegations and because she failed to document

his medical chart.  (*Id.*, 46:22-47:13).

Thus, whereas Sheriff Cabral and her two top aides provided inconsistent testimony

regarding the reasons why Ms. Porter was barred, the one common reason the jury heard was

"talking to the FBI."  Under these circumstances, the jury reasonably could have concluded that

the "paperwork" reasons were pretextual.

2.    Even if Ms. Porter Committed Paperwork Violations, the Cumulative Weight of the Evidence Supports the Jury's Verdict That Paperwork Was Not the Reason for Her Barring.

Even if Sheriff Cabral and her top decision-makers had given consistent testimony

regarding the reasons for Ms. Porter's barring (which they did not, as we have shown), and even

if Ms. Porter had committed paperwork violations in her reporting of the Rosario matter (which

she did not, as we show below), there was ample evidence from which the jury properly

concluded that Ms. Porter was, in fact, not barred because of those alleged violations.

First, Ms. Jurdak and Ms. Mastrorilli both testified that no one else has ever been barred

for the paperwork-type reasons currently advanced for Ms. Porter's barring.  (Tr. Day 2, 58:8-11,

Jan. 10, 2006; *id.*, 58:19-25).  Even Sheriff Cabral testified that there had never been a barring

purely for paperwork-related reasons.[9]  (Tr. Day 6, 48:9-51:15, Jan. 17, 2006).  This testimony

alone could have convinced the jury that the reasons currently given for the barring are a pretext.

---

[9]  The two additional barrings described by Sheriff Cabral and Ms. Keeley all involved individuals who <u>falsely</u> reported something; thus, they were barred because they lied, not because of the paperwork itself.  Nobody suggested that Ms. Porter's reporting was false in any way.

In addition, Sheriff Cabral and Mr. Theiss admitted that, within the Rosario investigation itself, several SCSD employees filed "late" reports, but none of those individuals were disciplined. (*Id.*, 68:15-69:23; Tr. Day 4, 64:3-10, Jan. 12, 2006). Sheriff Cabral also admitted that Nurse Meekins and Physician's Assistant Bringola did not file incident reports at all regarding their encounters with Rosario, but neither were disciplined in any way. (Tr. Day 6, 74:23-75:5, Jan. 17, 2006). That Ms. Porter appears to have been singled out for her paperwork infractions could have led a reasonable jury to conclude that these were not, in fact, the real reason for her barring.

Furthermore, the jury heard testimony that no investigation was conducted into Ms. Porter's alleged reporting errors. Sheriff Cabral admitted that Ms. Porter was not given an opportunity to explain her actions. (*Id.*, 80:14-16). She testified that nobody contacted Ms. Jurdak, Ms. Mastrorilli or anyone in the medical unit that Ms. Porter interacted with regarding this incident, to test her version of the events. (*Id.*, 80:11-81:11). Sheriff Cabral and Ms. Keeley both admitted that there were measures short of barring that they could have taken with Ms. Porter, such as temporary barring or a written warning. (Tr. Day 3, 80:10-81:5, Jan. 11, 2006; Tr. Day 6, 58:20-59:8, Jan. 17, 2006). The jury reasonably could have determined that the rushed nature of the barring decision is more consistent with barring Ms. Porter for talking to the FBI than for alleged paperwork errors.

Finally, there was absolutely no follow-up regarding Ms. Porter's allegedly "appalling" conduct. For instance, Sheriff Cabral testified that neither Ms. Jurdak nor Ms. Mastrorilli were disciplined for ratifying Ms. Porter's actions. (Tr. Day 6, 62:5-8, Jan. 17, 2006). The SCSD never followed up with the medical unit to see if Ms. Porter's reporting and documentation issues were a systemic problem, as one might expect they would have if this was such a serious

problem. (*Id.*, 61:10-13). Sheriff Cabral never reported Ms. Porter's "appalling" conduct to anyone outside the HOC, such as the Board of Nursing:

> Q. As to the seriousness of the allegations, did you report them to anyone outside of the Suffolk County Sheriff's Department?
>
> A. I don't believe so.
>
> Q. So you did not tell the Board of Nursing or malpractice carriers, any subsequent employers in corrections of this serious violation by Mrs. Porter?
>
> A. No.
>
> Q. Indeed, you didn't even tell CMS what she had done, right?
>
> A. I don't know what was communicated to CMS. I'm not sure.
>
> Q. So far as you know, nothing was communicated?
>
> A. That could very well be. You could be absolutely right about that.

(*Id.*, 63:1-13).

Thus, the jury was presented with voluminous evidence undercutting Sheriff Cabral's testimony that she barred Ms. Porter because of purported paperwork violations. It was not against the clear weight of evidence or a miscarriage of justice for the jury to conclude that alleged paperwork errors could not have been the entire reason why Ms. Porter was barred.

> 3.    Ms. Porter in Fact Did Not Commit Paperwork Violations.

Finally, the jury was also presented with strong evidence that Ms. Porter in fact had not committed any paperwork violations, which supports the jury's decision to reject Defendants' assertion that she was barred for having supposedly committed such offenses.

a.    *Ms. Porter's Report Was Not Untimely.*

First, Sheriff Cabral testified that one reason she barred Ms. Porter was that she filed a late report. (Tr. Day 6, 22:24-23:19, Jan. 17, 2006). But Ms. Mastrorilli and Ms. Jurdak both testified that <u>no</u> time frame (or format) was given for Ms. Porter's report. (Tr. Day 2, 37:9-14, 44:5-7, 127:10-16, Jan. 10, 2006). Ms. Mastrorilli testified that she accepted the report when it was provided for her. (*Id.*, 127:7-9). Ms. Jurdak testified that Ms. Porter fully complied with all applicable reporting requirements. Moreover, Ms. Jurdak testified that when SID really wanted a report, they came to her and asked for it, and that did not happen in this instance. (*Id.*, 45:25-46:2; *id.*, 88:4-14; *id.*, 95:5-8). And Mr. Theiss testified that the timing of Ms. Porter's reporting in no way affected or prejudiced SID's investigation. (Tr. Day 4, 40:2-9, Jan. 12, 2006). This is understandable given Ms. Porter's and Mr. Theiss' testimony that Ms. Porter approached SID investigators on the first day of their investigation and provided them with all applicable information concerning her interaction with Mr. Rosario. (*Id.*, 116:23-118:19; *id.*, 26:11-18).

The SCSD elicited testimony that Ms. Porter violated a SCSD rule that requires employees to file incident reports by the end of their shift. (Tr. Day 2, 67:15-20, Jan. 10, 2006). But Ms. Jurdak testified that she was not even aware of this rule—indicative of how rarely it was enforced. (*Id.*, 39:17-21). Similarly, Ms. Mastrorilli testified that Ms. Porter's actions were only a "technical" violation of the rule, that this rule was never enforced, and there is a big difference between a technical violation of a rule and one that would merit a barring for life. (*Id.*, Day 3, 31:24-32:14). The jury also could have been influenced by the uncontroverted testimony that Ms. Porter immediately orally reported her Rosario encounter to her supervisor, that she provided SID with all information concerning this incident as soon as they began interviews in the medical unit, and that the report that she did file contained no new information. (Tr. Day 5,

58:14-20, Jan. 13, 2006; Tr. Day 4, 94:19-103:2, Jan. 13, 2006). In short, it was more than reasonable for the jury to conclude that the timing of Ms. Porter's reporting was not the reason for Ms. Porter's barring.

>    b.    *Ms. Porter Was Not Required to Document Mr. Rosario's Medical Record.*

Second, Sheriff Cabral and others testified that Ms. Porter was barred because she failed to document Mr. Rosario's medical record. But, as Mr. Theiss and others testified, nothing in Policy S-220 or any other written SCSD policy addresses when a medical professional is required to document an inmate's medical file. (Tr. Day 4, 39:8-22, Jan. 12, 2006; Tr. Day 2, 77:19-78:3, Jan. 10, 2006). Thus, the jury reasonably could have concluded that the decision to document is properly left to the CMS professionals.

Both Ms. Porter and her supervisor, Ms. Jurdak, testified that only medical encounters—hands-on physical examinations—need to be documented:

>    Q.    Ms. Jurdak, moving forward, did you have a practice and custom and experience with documenting encounters with inmates in the medical files?
>
>    A.    Yes.
>
>    Q.    And what sort of medical encounters in your role as supervisor did you require that your employees document in the medical files?
>
>    A.    Well, when they saw somebody for a sick call, there was a form that they used that they filled out. When they did physical exams and they did annual physicals, chronic disease visits, any patient encounter where the practitioner was examining and maybe doing vital signs or involved hands-on examinations.
>
>    Q:    And is that the dividing line in your mind, hands-on?
>
>    MS. CAULO:  Objection

THE COURT:  Overruled

A:  Yes.

(Tr. Day 2, 36:14-37:5, Jan. 10, 2006).  The jury may have been particularly persuaded by Ms.

Jurdak's testimony because she wrote the CMS policies and procedures handbook.  (*Id.*, 84:3-

11).  Moreover, Ms. Jurdak testified that there had been a number of instances where she had

made casual observations of an inmate without making an entry in the inmate's chart:[10]

> Q.    In your view, Ms. Jurdak, if one of your staff people had an
>       encounter through a window and spoke for less than a
>       minute through a door to an inmate, is that something that
>       you would expect them to put into the inmate's medical
>       file?
>
> MS. CAULO:  Objection
>
> THE COURT:  Overruled.  You may answer.  We're
> speaking at or about the time of --
>
> MR. SAVAGE: In June of 2003.
>
> A.    No.  I actually have done that many times myself.
>
> Q.    And have you put it in the file or not put it in the file?
>
> A.    Not put it in the file.

(*Id.* 38:25-39:10).  Or the jury could have credited Ms. Porter's testimony that she did not need

to document Mr. Rosario's medical file because she did not perform a medical exam on him,

based on her more than 35 years of experience as a nurse practitioner and as a nursing instructor

(which included instruction on medical documentation).  (Tr. Day 4, 92:8-17, 96:2-9, Jan. 12,

2006).

* * * * *

---

[10] Defendants incorrectly assert that Ms. Jurdak testified that Ms. Porter's encounter with Mr. Rosario should have been documented in his medical chart.  Def. Memo. pp. 4, 19.  In fact, Ms. Jurdak testified that Ms. Porter was not required to document her encounter in his chart.   (Tr. Day 2, 36:14-37:5, Jan. 10, 2006; *id.*, 38:25-39:10).

In sum, the jury was presented with overwhelming evidence affirmatively showing that Ms. Porter was barred because of her speech. The jury was also presented with strong evidence that the reasons Sheriff Cabral gave for the barring are pretextual. Giving due deference to the jury's verdict, it simply cannot be said that the verdict is contrary to the clear weight of evidence such that a miscarriage of justice has occurred here.

## II.    THE COURT'S PRETRIAL *TOUHY* RULINGS HAVE NOT YIELDED A MISCARRIAGE OF JUSTICE.

Defendants' second argument—that the Court's pretrial rulings related to the parties' *Touhy* discovery request were "unduly prejudicial"—merits little response. The only issue at trial was the reason or reasons that Sheriff Cabral barred Ms. Porter. The issues that Defendants claim they were precluded from exploring based on the Court's pretrial ruling—such as the "questions asked and concerns raised by the representatives of the United States Attorney's Office and the FBI" at the June 16th meeting and what Ms. Porter said to Agent Snyder about her May 28th SID interview—are entirely irrelevant to the jury's determination of liability in this matter. *See* Def. Memo. at 26, 28.

Moreover, Defendants do not even attempt to demonstrate <u>how</u> they were prejudiced by the Court's pretrial rulings, apart from vague assertions that their "strategy" was adversely affected. Defendants concede that a discovery ruling is a basis for overturning a verdict only where there is a <u>clear showing</u> that the court's order was plainly wrong and resulted in substantial prejudice to the aggrieved party. *See* Def. Memo. p. 24 (citing *In re Public Offering PLE Antitrust Litig.*, 427 F.3d 49 (1st Cir. 2005)). Not only have Defendants failed to show error, they have not even attempted to show what testimony they were not permitted to elicit that would have been relevant at trial. Thus Defendants' claim that they were prejudiced by the

Court's ruling is completely speculative and certainly does not meet the high standard to grant a new trial.

Finally, Defendants' complaints that they were prejudiced by the Court's pretrial rulings ring hollow given that they prevailed on virtually all of their pretrial motions. The Court granted Defendants' Motion for Summary Judgment on all counts except for the § 1983 and tortious interference counts (and dismissed CMS from the case entirely). The Court granted Defendants' motion to exclude all "code of silence" evidence from the case. Defendants were able to keep out any reference to the changing of Policy S-220, any reference to a grand jury investigation and any evidence of discipline imposed on other employees or barrings of non-employees in Ms. Porter's case-in-chief. Defendants' motion practice was so successful that all that remained was a single issue to be resolved at trial: the reason that Sheriff Cabral barred Ms. Porter. Defendants fall far short of demonstrating that the Court's *Touhy* ruling resulted in a miscarriage of justice. *See Arrieta-Colon v. Wal-Mart Puerto Rico, Inc.*, 2006 WL 74411 (1st Cir. Jan. 13, 2006).

## III. PLAINTIFF COUNSEL'S CLOSING ARGUMENT DID NOT RESULT IN PLAIN ERROR.

Defendants' arguments related to alleged improper summation should be rejected because there was no error in Plaintiff Counsel's argument, let alone any plain error. As Defendants concede in their brief, the standard of review is plain error, since they failed to object during Mr. Savage's closing argument. *See* Def. Memo. p. 32 (citing *Smith v. Kmart Corp.*, 177 F.3d 19, 26 (1st Cir. 1999)). In order to establish plain error, Defendants must show that (1) there was an error; (2) the error was plain (*i.e.*, obvious and clear under current law); (3) the error was prejudicial (*i.e.,* it affected substantial rights); and (4) a new trial is needed to prevent a miscarriage of justice. *See Smith*, 177 F.3d at 26. A new trial is only appropriate where the error "resulted in a miscarriage of justice or seriously affected the fairness, integrity or public

reputation of the judicial proceedings.  Plain error is a rare species in civil litigation, encompassing only those errors that reach the pinnacle of fault envisioned by the standard set forth above." *Id.* (internal citations omitted).  Defendants have not established that any of the purported shortcomings were in fact errors, let alone that they resulted in a miscarriage of justice.

### A.    Counsel's  Closing Argument On Pain And Suffering Damages Was Legitimate.

The precise objection that Defendants are raising to counsel's use of Ms. Porter's counseling records during closing argument is unclear.  Defendants appear to suggest that Mr. Savage was arguing that Ms. Porter was only qualified to perform a job that required the constellation of symptoms described in the counseling report.  Def. Memo. pp. 29-30.  This is incorrect.  Counsel discussed at length the nursing jobs Ms. Porter was working and had held and used the counseling records only in connection with argument regarding pain and suffering damages.  (Tr. Day 7, 40:1-13, Jan. 18, 2006).

Moreover, while Defendants do not appear to challenge the use of the counseling records to argue pain and suffering damages, any such argument would be futile.  The counseling records were admitted as exhibits during trial, and it is perfectly proper to use admitted exhibits during closing arguments.  *See U.S. v. Young,* 955 F.2d 99, 109 (1st Cir. 1992).  Nor was redacting that exhibit to focus on the symptoms improper.  Plaintiff's counsel conferred with defense counsel before using the exhibit, showed her the redacted version of the exhibit he intended to use, and obtained her consent to use the exhibit.  Finally, use of a hypothetical based upon an admitted trial exhibit is certainly proper.  *See Young*, 955 F.2d at 109 (approving of the use of hypotheticals in closing argument); *see also* Jacob A. Stein, *Closing Arguments: The Art and the Law* § 3:215, p. 3-325 (2d ed.) (proposing and endorsing a hypothetical advertisement as a basis for calculating pain and suffering damages).  Thus, the argument was entirely legitimate.

Defendants also have utterly failed to show prejudice or a miscarriage of justice from these arguments. Nor could they do so, because the Court stopped counsel's argument before it was even made and gave a curative instruction to the jury. (Tr. Day 7, 40:14-17, Jan. 18, 2006). For all of these reasons, plain error is absent here.

### B.    Plaintiff's Counsel Accurately Stated the Evidence.

It is hard to imagine a situation where an unobjected-to misstatement of the evidence ever could be a basis for overturning a civil verdict where the jury had been properly instructed as to the role of closing argument. This is precisely what happened here, as the Court stated that "there are some things that aren't evidence: The arguments of counsel. What they are permitted to do in argument is to draw your attention to certain pieces of evidence—if, in fact, you find that evidence was there—in an attempt to persuade you. But just because some lawyer says it doesn't mean that it's a piece of evidence." (Tr. Day 7, 55:24-56:4, Jan. 18, 2006). Thus, the jury knew it was not hearing evidence from counsel.

Defendants cite no authority in support of their argument, and research reveals that no court in the First Circuit has reversed a civil verdict based on a misstatement of the evidence in summation. Indeed, in *Mitchell v. Weaver*, 806 F.2d 300 (1st Cir. 1986), while the Court of Appeals suggests that it <u>might</u> be appropriate in <u>extreme situations</u> to grant a new trial on this basis, the Court affirmed a District Court's denial of a motion for a new trial on the ground that "[t]rials are adversarial proceedings in which things may be said which the other side regards as incorrect and sometimes offensive." *Id.* at 302; *see also Gonzalez-Marin v. Equitable Life Assur.*, 845 F.2d 1140, 1147 (1st Cir. 1998). Similarly, Plaintiff counsel's summary of the evidence in the present case was simply standard fare within the adversarial process.

In any event, plaintiff's counsel did not misstate the evidence, and there was no unfairness or impropriety. First, notwithstanding Defendants' argument to the contrary, Ms. Keeley <u>did</u> testify that speaking to an outside agency was both "significant" and "integral" to the decision to bar Ms. Porter. (Tr. Day 3, 53:16-54:2, Jan. 11, 2006). Moreover, Sheriff Cabral and Ms. Keeley testified that in the June 16 meeting, five members of law enforcement informed Sheriff Cabral that Ms. Porter was an FBI informant, repeatedly inquired about the reasons for her barring, and asked to give Ms. Porter her job back. (*Id.*, 77:6-11, Jan. 11, 2006; Tr., Day 6, 28:9-34:11, Jan. 17, 2006). An "animated" discussion followed. (Tr. Day 6, 31:10-13, Jan. 17, 2006). The testimony of Mr. Theiss and AUSA Leone further corroborate that this occurred. (Tr. Day 4, 41:12-42:12, Jan. 12, 2006; *id.*, 70:18-72:20). Thus, the evidence supported the statement in closing argument that five law enforcement agents were accusing Sheriff Cabral of barring Ms. Porter for being an informant.[11] (Tr. Day 7, 32:10-12, Jan. 18, 2006).

**C.    Plaintiff Counsel's Argument Regarding Sending a Message Was Not Inappropriate.**

Plaintiff's counsel's argument during summation that the jury should use punitive damages to "send a message" to Sheriff Cabral was completely appropriate and in no way prejudiced the jury. (Tr. Day 7, 41:17-42:14, Jan. 18, 2006). Defendants cite to <u>no</u> cases to the contrary, and for good reason: the law is settled against their position. For example, in *King v. Macri*, the Court recognized that arguing in summation that an award of punitive damages would

---

[11] Plaintiff's counsel's argument that Sheriff Cabral had ruined Ms. Porter's life, and that the jury could lift Ms. Porter's pain and suffering and in so doing do something that is right and good did not improperly introduce purely emotional elements into the jury's deliberation. Plaintiff Counsel's qualification of "if it can be lawfully done" specifically focused in on the jury and their duty to determine the facts and follow the Judge's instructions. (Trial Tr. Day 7, 29:14, Jan. 18, 2006). Asking the jury to follow their instructions which would have the consequence of easing Ms. Porter's pain and suffering was not improper. Ms. Porter had the right "to implicate the law's moral underpinnings and a juror's obligation to sit in judgment," so long as she does not ask the jury to base their decision on emotion instead of the evidence, which was not done here. *See Old Chief v. United States*, 519 U.S. 172, 188 (1997). In fact, Plaintiff Counsel specifically referred to the fact that a verdict in Ms. Porter's favor should <u>reduce</u> her future damages if that was the right thing to do.

"send that same message to others in a position to abuse their authority" was not prejudicial

because "[s]imilar remarks are made in summations in most police misconduct trials, and are

entirely appropriate."  993 F.2d 294, 298 (2d Cir. 1993) (emphasis added); *see also Smith*, 177

F.3d at 26-27 (holding that a summation in a case were only compensatory damages were

available that asked the jury to send a message was improper because it was a request for a

punitive form of damages).  Indeed, it would appropriate to charge the jury as follows:

> [U]nder the Federal Civil Rights laws, there are punitive damages because the law
> has made a determination that an individual citizen bringing an individual civil
> rights claim has a right to have a jury decide whether or not by the award of some
> money, a message can be sent.  That message is a specific deterrent to the
> individuals involved . . .

*Bolton v. Taylor*, 99-CA-12202, 23:6-17 (Aug. 16, 2001) (Exh. A to original Opposition, filed

Feb. 16, 2006 (Docket No. 231).

Rather than citing cases criticizing "send a message" arguments, the Defendants cite

cases holding that "[a] proper punitive damage award in this case would be a sufficient amount

to send a clear message to" the Defendants.  *Clifton v. MBTA*, 445 Mass. 611, 624 (2005); *see*

*also McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals*, 140 F.3d 288, 307 (1st

Cir. 1998) (affirming case where the Court instructed the jury that punitive damages are

"intended to punish the defendants as a warning, both to them and other like-minded individuals

. . . .").  In light of all of the above precedent, it is clear that Plaintiff Counsel's "send a message"

argument was entirely appropriate.

Even if the argument were improper, the Court instructed the jury that "[y]ou'll recall the

call to deliver a message.  That's not what we're talking about here.  What you're here to do is

make a judgment about the appropriate, if any, sanctions to be imposed above compensatory

damages."  (Tr. Day 7, 68:11-14, Jan. 18, 2006).  That instruction precludes any claim of

prejudice or miscarriage of justice.  As Defendants concede, "[a] basic premise of our jury

system is that the jury follows the court's instructions." Def. Memo. p. 33 (quoting *Refuse &amp; Envt'l. Sys. Inc. v. Indus. Servs. of Am., Inc.*, 932 F.2d 37, 40 (1st Cir. 1991)). Finally, any assertion of prejudice or a miscarriage of justice is also meritless because, given the strong evidence supporting the finding of liability and damages, Defendants have failed to show that any error impacted the verdict.[12]

## IV.  THE AWARD OF DAMAGES DOES NOT SHOCK THE CONSCIENCE OR RESULT IN THE DENIAL OF JUSTICE.

Both the compensatory and punitive damages awarded by the jury were supported by the evidence. A court should grant a motion for a new trial on the ground that the jury award is excessive "only when the award exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before it." *Eastern Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., Inc.,* 40 F.3d 492, 502 (1st Cir. 1994). This standard establishes a very high bar, and the jury award will withstand scrutiny unless it is "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." *Bandera v. City of Quincy*, 220 F. Supp. 2d 26, 41 (D. Mass. 2002). The First Circuit elaborated on the high standard for reversing a jury's determination of damages:

> Translating legal damage into money damages-especially in cases which involve few significant items of measurable economic loss-is a matter peculiarly within a jury's ken. For just this reason, [w]e rarely will override the jury's judgment on the appropriate amount of damages to be awarded. The jury, as we see it, is free to run the whole gamut of euphonious notes-to

---

[12]  Defendants also challenge the use of the term "whistleblower" in conjunction with the request to send a message to Sheriff Cabral. (Tr. Day 7, 42:1, Jan. 18, 2006). Again, there was no objection raised on this point by Defendants, thus the objection is waived. In any event, there was no error in plaintiff's counsel's statement that "your message is also to others dealing with whistleblowers as well." Def. Memo. pp. 31-32, n. 19, 21. While Defendants seek to engraft a limitation on the meaning of the word "whistleblower" that is found in the Massachusetts Whistleblower Statute, nothing in the common-sense meaning of the word limits it to employees. *See* Webster's Ninth New Collegiate Dictionary, p. 1345 (defining "whistleblower" as "one who reveals something covert or who informs against another."). Moreover, even if Ms. Porter were not a whistleblower (which she was), the argument called on the jurors to consider the need to deter Sheriff Cabral and others from retaliating against other individuals, not Ms. Porter, and it is appropriate to request punitive damages to deter the defendant and others from engaging in *similar* wrongdoing. *See EEOC v. Waffle House, Inc.*, 534 U.S. 279, 295 (2002).

harmonize the verdict at the highest or lowest points for which there is a
sound evidentiary predicate, or anywhere in between-so long as the end result
does not violate the conscience of the court or strike such a dissonant chord
that justice would be denied were the judgment permitted to stand.

*Milone v. Moceri Family, Inc.,* 847 F.2d 35, 37-38 (1st Cir. 1988) (internal citations omitted).

Similarly, the standard for granting remittitur is whether the moving party has satisfied the

"heavy burden of showing that an award is grossly excessive, inordinate, shocking to the

conscience of the court, or so high that it would be a denial of justice to permit it to stand."

*Marcano Rivera v. Turabo Medical Center Partnership*, 415 F.3d 162, 173 (1st Cir. 2005).

Defendants have failed to show that either the compensatory or punitive damage award in the

present case shocked the conscience or resulted in the denial of justice.

### A.    If Anything, the Jury's Compensatory Damages Award Was Less Than What the Evidence Would Have Justified.

#### 1.    The Compensatory Damage Award is Well Within the Evidence.

The jury's verdict awarding Ms. Porter $360,000 in compensatory damages is more than

justified by the evidence. The jury did not separate out economic damages and pain and

suffering damages, but an award of $360,000 as to *either* economic damages *or* pain and

suffering damages would not be grossly excessive or shock the conscience in this case, so an

award of $360,000 for both demonstrates balance, restraint, and moderation on the part of the

jury.

Ms. Porter testified that, since her termination, she has lost approximately $79,000 in

income. (Tr. Day 4, 137:9, Jan. 12, 2006). Similarly, Ms. Porter testified that over the last year,

she lost between $27,000 and $30,000 and that she expected to work for another 10 years. (*Id.*,

98:23-99:4). No evidence to the contrary was presented. Therefore, the jury was entirely

justified in concluding that her damages for lost future earnings was $290,000. As a result, the

evidence supported an economic damages award of up to $369,000. This is $9,000 above the

*entire* compensatory damages actually awarded, without even reaching the pain and suffering damages.

On the other extreme, even if the jury had awarded $360,000 in pain and suffering damages and no economic damages, such an award would not shock the conscience in light of the evidence of serious mental distress. *See Bogle v. McClure*, 332 F.3d 1347, 1362 (11th Cir. 2003) (holding that an award of $500,000 in pain and suffering damages each to several librarians who were transferred from meaningful supervisory positions to dead-end non-managerial jobs based on their race and who testified that the transfers caused them to be upset, embarrassed, humiliated, and ashamed was justified, even though there was no independent evidence of physical or mental harm).

That the $360,000 award for both economic and pain and suffering damages is lower than the evidence reasonably would have supported for either type of damage demonstrates that the jury weighed the evidence carefully, and took a balanced, restrained, and measured approach to damages. Since the result reached is well below the upper-end of the damages the jury reasonably could have awarded, the verdict should be permitted to stand.

2.    Defendants' Arguments on Economic Damages Lack Merit.

Defendants challenge the damage award on the ground that Ms. Porter voluntarily chose to leave a full time position in Essex County for a part-time per diem position. But the evidence showed that Ms. Porter's daily commute to and from Essex County was sixty-two miles each way and that this interfered with Ms. Porter's care for her elderly mother and her husband. (Tr. Day 4, 134:22-135:4, Jan. 12, 2006). It was thus reasonable for the jury to conclude based on this evidence that Ms. Porter had made a reasonable effort to mitigated her damages by taking a per diem position. *See Rasimas v. Mich. Dept. of Mental Health*, 714 F.2d 614, 625 (6th Cir.

1983) ("It is well settled that a claimant has not failed to make a reasonable effort to mitigate damages where he refused to accept employment that is an unreasonable distance from his residence."); *NLRB v. The Madison Courier, Inc.*, 472 F.2d 1307, 1314 (D.C. Cir. 1972) (holding that injured plaintiffs "were not obligated to seek work in Louisville or other areas located over fifty miles from Madison, due to the excessive commute such jobs would have entailed").

Similarly, Defendants' challenge to the jury verdict on the ground that there was no guarantee that Ms. Porter would work for CMS for the next ten years also fails to give due deference to the jury. The jury heard testimony from Ms. Porter and Ms. Jurdak that Ms. Porter was a superior nurse practitioner who always received the highest merit raises at CMS. (Tr. Day 4, 97:19-20, Jan. 12, 2006; Tr. Day 2, 32:25-33:4, Jan. 10, 2006). Ms. Porter had reason to believe that her employment at CMS would continue, or that she would be hired by its successor if CMS was not awarded the next contract, just as Ms. Porter was rehired by CMS from CHS when it took over at the HOC. In any event, the evidence that Ms. Porter expected to work for CMS at the HOC for another ten years was a rational basis upon which the jury could award future damages because "[m]ere uncertainty in the award of damages is not a bar to their recovery. . . . Massachusetts law is clear that uncertainty in the award of future damages does not bar their recovery . . . ." *Larch v. Mansfield Mun. Elec. Dept.*, 272 F.3d 63, 74 (1st Cir. 2001) (citations and quotations omitted) (holding that it was not too speculative to base a damages award on the assumption that plaintiff would work for defendants until he reached the age of 65, even though the plaintiff only had a two to three year contract); *see also Kelley v. Airborne Freight Corp.*, 140 F.3d 335, 355 (1st Cir. 1998).

3.    Defendants' Arguments on Non-Economic Damages Are Similarly Meritless.

Defendants also make vague assertions that there was no evidence to support an award of emotional damages, but this assertion is undercut by Defendants' concession that Ms. Porter and her family testified as to emotional impact that the unconstitutional barring had on Ms. Porter, and that this testimony was supported by medical evidence from a mental health professional. Def. Memo. p. 42.  Moreover, *Sanchez v. Puerto Rico Oil Co.*, 37 F.3d 712 (1st Cir. 1994), which is cited by Defendants, supports rather than undermines the conclusion that emotional distress damages were justified in the present case.  First, that case <u>affirmed</u> the granting of damages for emotional distress.  *See id.* at 723-24.  Moreover, the evidence of emotional distress is stronger in the present case than in *Sanchez* because, unlike in that case, there is medical evidence of emotional distress in the present case—namely Ms. Porter's counseling records.  (Tr. Day 5, 7:5-25, Jan. 13, 2006).  Those counseling records, along with the testimony from the Porter family, reveal that Ms. Porter could not sleep, compulsively cleaned, gained weight, and uncontrollably cried as a result of the ordeal.  (Tr. Day 4, 7:21-9:9, Jan. 12, 2006; *id.*, 89:7-15; *id.*, 139:11-16).  While Ms. Porter did not introduce live expert testimony regarding her mental distress, "[t]estimony from a mental health expert is not required to sustain an award for emotional distress . . . ."  *Koster v. Trans World Airlines, Inc.*, 181 F.3d 24, 35 (1st Cir. 1999); *see also Sanchez*, 37 F.3d at 724.  The counseling records were more than adequate to corroborate the testimony of Ms. Porter and her family.[13]

---

[13] Defendants also suggest that Ms. Porter somehow was asking for the personal attacks unleashed by Sheriff Cabral in the press.  Nothing justifies the Sheriff's false statements.

**B.      Both the Award of Punitive Damages and the Size of the Award Were Warranted.**

      1.      <u>There Was Sufficient Evidence to Support the Award of Punitive Damages.</u>

Punitive damages are warranted in the present case because Ms. Porter adduced strong evidence that Sheriff Cabral barred her for exercising her First Amendment rights knowing that such a barring violated the Ms. Porter's rights. *See BMW v. Gore*, 517 U.S. 559, 576-77 (1996); *Iacobucci v. Boulter*, 193 F.3d 14, 26 (1st Cir. 1999). Punitive damages may be awarded upon a finding that the defendant intended to violate federal law, or acted with reckless or callous disregard for a plaintiff's rights. *See Smith v. Wade*, 461 U.S. 30, 51 (1983).[14] There is no requirement that there be evidence independent of the violation of the law to justify punitive damages. *Id.* at 51-55. While recklessness is sufficient under *Smith*, the evidence in the present case reveals that Sheriff Cabral acted with the even more culpable mental state of intent. Sheriff Cabral admits that she alone made the decision to bar Ms. Porter.[15] (Tr. Day 6, 55:11-56:3, Jan. 17, 2006).

Besides rehashing their arguments as to why there was no evidence of intentional retaliation, which as discussed above lacks merit, Defendants assert that, even if Sheriff Cabral

---

[14] At the charging conference, the Court expressed concern that the punitive damages might not be appropriate because the standard for imposing punitive damages is the same as the standard for imposing liability, so punitive damages might be available in all First Amendment retaliation cases. As discussed in greater detail in Plaintiff's Proposed Jury Instruction Regarding Punitive Damages (Docket No. 217), the *Smith* Court rejected the argument that punitive damages only can be awarded when there is a finding of a more culpable mental state than the underlying offense. *See Smith*, 461 U.S. at 51-55.

[15] Even if there were no evidence of intentional conduct by Sheriff Cabral (which there is), there is evidence that Sheriff Cabral at a minimum acted with reckless disregard for Ms. Porter's rights, which is a sufficient basis in and of itself for imposing punitive damages. *See Smith*, 461 U.S. at 51. It is undisputed that Mr. Theiss and Ms. Keeley wanted to bar Ms. Porter from the HOC for speaking to the FBI. (Tr. Day 3, 53:16-54:2, Jan. 11, 2006; Tr. Day 2, 127:23-29:7, Jan. 10, 2006). Moreover, it is undisputed that all Sheriff Cabral's information regarding Ms. Porter came from these two individuals. (Tr. Day 6, 55:13-57:8, Jan. 17, 2006). Finally, Sheriff Cabral testified that she did not have all the information necessary to make the decision whether to bar Ms. Porter. (*Id.*, 67:8-14). Based on these facts, it was reasonable for the jury to conclude that Sheriff Cabral recklessly disregarded Ms. Porter's rights.

intended to bar Ms. Porter for speaking to the FBI, there was no evidence that she intended to bar her for exercising her First Amendment rights. However, unlike in *Iacobucci*, upon which Defendants rely, it is undisputed that Sheriff Cabral <u>knew</u> that it was unconstitutional to bar someone for speaking to the FBI. *See* 193 F.3d at 26.[16] Therefore, since Sheriff Cabral knew that it violated a person's First Amendment rights to bar them for speaking to the FBI, she <u>knew</u> that she was acting unconstitutionally when she barred Ms. Porter. Thus, her intent to bar Ms. Porter for speaking to the FBI constitutes an intent to violate her First Amendment rights. *See Gore*, 517 U.S. at 576-77 (recognizing that engaging in prohibited conduct while knowing or suspecting that it is unlawful justifies punitive damages).

Defendants also seem to suggest that, based on *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114 (1st Cir. 1977), punitive damages may not be awarded based on a single incident.

---

[16] The issue of Sheriff Cabral's knowledge of the unconstitutionality of barring someone for speaking to the FBI has not been in dispute in this case. Defendants conceded, and the Court ruled, that qualified immunity was not an issue here precisely because the Sheriff was aware that the First Amendment prohibited barring someone for speaking to the FBI. She testified at her deposition that:

Q        And policy or not policy, I mean you've always understood, I presume, particularly given your background, that there is a First Amendment right to speak, right?
A        Yes.
Q        And that the First Amendment right would encompass anyone's right to speak to the FBI or to whomever else they wanted?
A        I assume so, yes.
Q        And I'm just saying obvious stuff here. That's a long well-established right that you're personally completely familiar with, right?
MS. CAULO:        Objection.
A        I'm familiar with the First Amendment.
Q        And you're familiar that that's a right that encompasses a right to speak to outside agencies, including the FBI?
MS. CAULO:        Objection.
A        Yes, it encompasses the right to speak, and I assume that would include speaking to anyone in outside law enforcement.

Deposition of Andrea Cabral Sworn to on May 6, 2005, pp. 42:6-43:3 (*see* original Opposition, Exh. C (Docket No. 226). Moreover, even had this issue been in dispute (which it was not), a reasonable jury could conclude that Sheriff Cabral knew that it was unconstitutional to bar someone for speaking to the FBI based on her testimony as to her extensive experience as a civil rights prosecutor (Tr. Day 5, 126:18-127:1, Jan. 13, 2006), and her testimony that she was aware when she became Sheriff that there was a pending criminal trial against other officers and she instructed all her staff to cooperate fully in the FBI's investigation (Tr. Day 6, 9:11-10:13, Jan. 17, 2006).

However, *Alicea Rosado* does not even mention the fact that there was only one unconstitutional act as a basis for its decision to strike the punitive damages award. *See id.* at 121. Rather, the *Alicea* court concluded that the defendant's conduct in that case was not sufficiently reprehensible to warrant punitive damages. Indeed, it would be counter-intuitive to permit punitive damages where a defendant constructively discharges a plaintiff, *see Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 84 (1st Cir. 2001), but not where the defendant engages in the more reprehensible conduct of directly discharging an employee. Thus, many courts have awarded punitive damages based on a single instance of unconstitutional conduct. *See, e.g., Whitfield v. Melendez-Rivera*, 431 F.3d 1, 18-19 (1st Cir. 2005). In any event, Sheriff Cabral's conduct did not consist of a single incident. Not content to merely bar Ms. Porter, Sheriff Cabral proceeded to publicly make repeated false statements about Ms. Porter. (Tr. Day 6, 38:18-40:19, 46-48, Jan. 17, 2006).

2.    <u>The Size of the Punitive Damages Award Was not Excessive.</u>

The award of $250,000 in punitive damages in the present case was not excessive under *Gore*, 517 U.S. at 575. *Gore* established a three step test for deciding the constitutionality of an award of punitive damages: the court must consider (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Id.*

Under the first step, Sheriff Cabral's unconstitutional conduct was truly reprehensible. First, it not only threatened Ms. Porter's economic interest in her job, it also threatened her emotional well-being. *See State Farm v. Campbell*, 538 U.S. 408, 419 (2003). In this regard, Sheriff Cabral's conduct evidenced an indifference to, and a reckless disregard for, potential

36

emotional damage to Ms. Porter.  *See id.*  In addition, Ms. Porter, a 60 year old nurse who was caring for a retired husband recovering from two heart attacks and cancer (Tr. Day 4, 12:25-13:12, Jan. 12, 2006), is financially vulnerable.  *See id.*  Finally, Sheriff Cabral intentionally violated Ms. Porter's rights.  She terminated Ms. Porter for communicating to the FBI when Sheriff Cabral knew that it was unconstitutional to do so.  *See id.*  Indeed, as defense counsel suggested at trial, if anyone knew about civil rights, it was Sheriff Cabral, the former civil rights prosecutor.  (Tr. Day 2, 16:18-21, Jan. 10, 2006)  Yet, Sheriff Cabral and her agents and employees subsequently made false statements about Ms. Porter and continued to cover-up their unconstitutional conduct.  The jury was entitled to conclude that Sheriff Cabral and her agents lied about the reasons for the barring while they were incorrectly accusing Ms. Porter of being a liar in the press.  This sort of conduct is reprehensible in a society that places such a high value on free speech and that seeks to protect inmates from abuse.[17]

Under the second step, the Supreme Court has declined to set a fixed ratio between compensatory damages and punitive damages.  While punitive damages awards exceeding a single-digit ratio (that is, more than 10 times compensatory damages) may be appropriate where there is a particularly egregious act,[18] the Court has also made clear that usually the single-digit

---

[17] Defendants argue that the Court's failure to instruct the jury that the actions of subordinates could not be imputed to Sheriff Cabral contributed to the "excessive" punitive damages award, as evidenced by a *Boston Globe* article. Def. Memo. p. 22, n. 11, p. 34 n. 22. The Defendants did not object to the Court's instruction and therefore their argument is now waived.  In any event, the instruction was proper because it properly instructed the jury that, in this case, there was no difference between the Defendants for liability purposes.  Further, this Court should give no consideration to the *Boston Globe* article, and should not inquire into whether the jury understood its instruction because "Rule 606(b) has consistently been used to bar testimony when it is alleged that the jury misunderstood the instructions."  *U.S. v. Sampson*, 332 F. Supp.2d 325, 328 (D. Mass. 2004) (*quoting U.S. v. Jones*, 132 F.3d 232, 245 (5th Cir. 1998)) (refusing to consider statements by a juror to the press in granting a new trial, even in a death penalty case); *see also* Fed. R. Evid. 606(b); Fed. R. Evid. 606(b) 1972 Advisory Committee Note ("testimony or affidavits of jurors have been held incompetent to show . . . misinterpretation of instructions.").

[18] *See Swinton v. Potomac Corp.*, 270 F.3d 794, 818 (9th Cir. 2001) (approving a million dollar punitive damages award where the compensatory damages were only $35,600—a ratio of 28:1—in a hostile work environment case where the compensatory damages were necessarily low due to the low income of the plaintiff and the difficulty of calculating the indignity and distress visited on the plaintiff).

ratio range is appropriate.  *See State Farm, 538 U.S. at 425.*  In the present case, the ratio

between punitive damages and compensatory damages was only 0.69:1—well below the

maximum single digit ratios that would be appropriate under *Gore*.  Given that a punitive

damages award of up to ten times the compensatory damages—*i.e.*, a punitive damage award of

$3,690,000—or greater might be justified under *Gore*, the $250,000 punitive damages actually

awarded is extremely reasonable and well within the jury's discretion.

Under the third *Gore* factor, the punitive damages awarded by the jury were below the

civil penalties authorized in comparable cases.  The Massachusetts Whistleblower Statute

authorizes three times lost wages, benefits and other remuneration, and interest thereon to

employees who are subject to retaliatory action because they provide information to law

enforcement.  *See* M.G.L. ch. 149, § 185(d)(4).  As discussed above, Ms. Porter introduced

evidence that her lost wages were $369,000, not including interest.  Therefore, Ms. Porter would

be entitled up to $1,107,000 under the Massachusetts Whistleblower Statute—well above the

$250,000 in punitive damages actually awarded.  Put differently, if the jury concluded that Ms.

Porter's lost wages, benefits, and interest was as little as $83,000, treble damages relief of

$250,000 would have been justified by comparison to the Whistleblower Statute.  The conduct

regulated by the Whistleblower Statute is "comparable" to the improper conduct at issue here, so

the damages authorized by the Massachusetts Whistleblower Statue are relevant under *Gore*.

517 U.S. at 575.[19]

---

[19] Rather than apply the *BMW* factors to the present case, Defendants present a laundry-list of other cases.  But "[t]he First Circuit has eschewed comparisons in other cases in evaluating the validity of a jury's award and has instead relied upon the specific evidence at hand."  *Giard v. Darby*, 360 F. Supp. 2d 229, 237 (D. Mass. 2005), citing *Gutierrez-Rodriguez v. Castagena*, 882 F. 2d 553, 579 (1st Cir. 1989).  Moreover, most of these cases are not relevant because they deal with substantially different factual situations.  *See Whitfield v. Melendez-Rivera*, 431 F.3d 1, 18-19 (1st Cir. 2005); *Fishman v. Clancy*, 763 F.2d 485, 488 (1st Cir. 1985); *Clifton*, 445 Mass. at 624; *McMillan*, 140 F.3d at 307; *Acosta-Sepulveda v. Hernandez-Purcell*, 889 F.2d 9, 13 (1st Cir. 1989); *Williams v. Brimeyer*, 116 F.3d 351 (8th Cir. 1997).  To the extent that some of the cited cases are factually similar, they support, rather than undermine, the conclusion that the award of $250,000 in punitive damages in the present case was not excessive.

In short, the punitive damages award was not excessive.

## CONCLUSION

WHEREFORE Defendants Motion for a New Trial and Remittitur should be denied.

Respectfully submitted,

SHEILA PORTER

By her attorneys,

*/s/ Joseph F. Savage, Jr.*
Joseph F. Savage Jr. (BBO # 443030)
David S. Schumacher (BBO # 647917)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA  02109
(617) 570-1000

Dated: June 9, 2006

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served electronically via the electronic filing system on counsel for all parties on this 9th day of June, 2006.

*/s/ David S. Schumacher*
David S. Schumacher

LIBA/1667573.5

---

*See Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 84 (1st Cir. 2001) (holding that an award of $400,000 in punitive damages was not excessive); *Rowlett v. Anheuser-Busch, Inc.*, 832 F.2d 194, 207 (1st Cir. 1987) (holding that an award of $300,000, which is approximately $500,000 when adjusted for inflation, was not excessive). Indeed, in a recent case where a plaintiff was terminated by a state agency in retaliation for exercising her First Amendment rights, and then the mayor carried out a public smear campaign purportedly in response to a press conference that sought to get the plaintiff her job back, the Court held that an award of $250,000 in punitive damages did not shock the conscience.  *See Hardeman v. Albuquerque*, 377 F.3d 1106, 1122-23 (8th Cir. 2004).