VOL: I
PAGES: 1-94
EXHIBITS: 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * *
SHEILA J. PORTER, Plaintiff
-vs-
ANDREA CABRAL; SUFFOLK COUNTY SHERIFF'S DEPARTMENT; SUFFOLK COUNTY and CORRECTIONAL MEDICAL SERVICES, INC., Defendants
* * * * * * * * * * * * * * * * *

Civil Action No. 04-11935-DPW

DEPOSITION OF RICHARD DiMEO, a witness called on behalf of the Plaintiff, in the above-captioned matter, said deposition being taken pursuant to the Federal Rules of Civil Procedure, before Patricia M. McLaughlin, a Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Goodwin Procter LLP, Exchange Place, Boston, Massachusetts, on Wednesday, June 22, 2005, commencing at 10:40 a.m.

McLAUGHLIN & ASSOCIATES COURT REPORTERS
92 DEVIR STREET, SUITE 304
MALDEN, MASSACHUSETTS 02148
781.321.8922
WWW.E-STENOGRAPHER.COM

2

APPEARANCES:

ANITA B. BAPOOJI, ESQUIRE
GOODWIN PROCTER LLP
Exchange Place
Boston, Massachusetts 02109
On behalf of the Plaintiff

ELLEN CAULO, ESQUIRE
GENERAL COUNSEL
Suffolk County Sheriff's Department
200 Nashua Street
Boston, Massachusetts 02114
On behalf of the Defendants, Andrea Cabral, Suffolk County Sheriff's Department and Suffolk County

ALEXANDRA B. HARVEY, ESQUIRE
ADLER, COHEN, HARVEY, WAKEMAN & GUEKGUEZIAN
230 Congress Street
Boston, Massachusetts 02110
On behalf of the Defendant, Correctional Medical Services, Inc.

3

JOHN A. KIERNAN, ESQUIRE
BONNER, KIERNAN, TREBACH & CROCIATA
One Liberty Square
Boston, Massachusetts 02109
On behalf of the Deponent

ALSO PRESENT:
Sheila Porter

4

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| RICHARD DiMEO | | | | |
| By Ms. Bapooji | 6 | | | |

| No. | Exhibit | Page |
|---|---|---|
| 1 | The Stern Commission Report | 49 |

STIPULATIONS

At the offices of Goodwin Procter LLP, on Wednesday, June 22, 2005, commencing at 10:40 a.m.

RICHARD DiMEO,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. BAPOOJI:

Q Good morning, Mr. DiMeo. My name is Anita Bapooji, and I'm here on behalf of Sheila Porter. If we could just go around the room and introduce ourselves. To my left is Sheila Porter. If counsel on the other side of the table could introduce themselves.

MS. HARVEY: Alex Harvey for CMS.

MS. CAULO: Ellen Caulo for Andrea Cabral, Suffolk County Sheriff's Department and Suffolk County

MR. KIERNAN: John Kiernan on behalf of Richard DiMeo.

Q Mr. DiMeo, you are here represented by counsel today?

A That's correct.

Q I just want to go through some ground rules for the deposition, and, Counsel, feel free to let me know if you disagree with any of them. This deposition is going to be conducted according to the Federal Rules of Civil Procedure. All objections, except as to form, and any motions to strike are reserved for trial. The witness, John, if this is okay, will read the transcript within 30 days, and we can waive the Notary requirement.

MR. KIERNAN: That's fine.

Q Mr. DiMeo, have you had your deposition taken before?

A I believe I have. Not in regards to this.

Q In what case was that?

A I have no idea.

Q Do you know what it was about? What your testimony was about?

A It was so long ago. Maybe it's senility. It may have been an automobile accident. Honestly, I'm not sure. I'm not sure.

Q Did it have anything to do with your employment at the Suffolk County Sheriff's Department?

A No.

Q Have you ever given a deposition beyond that one that you just mentioned?

A No.

Q Are you on any medication today that would impair your ability to testify?

A No.

Q I just want to go through a couple of ground rules. Let me know if you have any questions or don't understand anything. First, you are under oath just as if you would be testifying in court.

A I understand.

Q The Court Reporter transcribes everything we're saying, so we can't talk at the same time. We just need one of us to talk at once.

If you ever need a break, just let me know, but if I've asked a question, I ask that you answer the question before we take a break. If you don't understand something I say or a question, please say so, and I'll try to rephrase it.

Do all those sound agreeable?
A Yes.
Q Can you tell me, Mr. DiMeo, what you did to prepare for today's deposition?
A Spoke to John, read a little bit of the Complaint.
Q Anything else?
A No.
Q Did you speak to anyone else besides your attorney?
A No.
Q Did you look at any other documents besides the Complaint in this case?
A The subpoena.
Q And you understand you are here testifying today because we served a subpoena on you?
A Yes, but I would have came anyway.
Q Could you tell me, Mr. DiMeo, your work history?
A 1979, I started employment at the Suffolk County District Attorney's Office. I think I spent 22 years there. Then I went to the Suffolk County Sheriff's Department, I believe, in July of 2000. I'd like to check

that. I'm not sure. I really don't know. Maybe personnel at Suffolk County could help me with that.
Q That's fine. Around 2000?
A Yeah, I'm pretty sure it was July. I'm just not sure of what year.
Q What position did you hold when you moved to the Suffolk County Sheriff's Department?
A I was a deputy superintendent in charge of the Investigation Division.
Q And the Investigations Division, is that also referred to as SID?
A Yes.
Q And how long did you stay in that position?
A Two years, a little better than two years. I retired with the incentive. I believe the incentive was the latter part of 2002 or 2003. I think I left in November.
Q Okay.
A I think that was it. At the end of November you had to go.
Q You say you were the deputy superintendent in charge of SID for two years?
A Two years, a little better than two years.

Q And after that you retired?
A Yes.
Q So the only position you held at the Suffolk County Sheriff's Department was deputy superintendent?
A That's correct.
Q Can you tell me a little bit about your educational background?
A High school. Then I went to work.
Q Now, you said you retired with the incentive. What did you mean by that?
A The county offered five years towards your age or five years towards your years of service or any combination thereof, like three towards your age. Well, that put me at 80 percent, and I took advantage of the retirement. It was offered, I'm pretty sure, by the county not by the state, because it had to be approved by the mayor.
Q Who hired you for the position of deputy superintendent at SID?
A Richie Rouse, Brian Burns.
Q You say you retired in November?
A That's my best memory.

Q Do you recall the year?
A I'm not good at this years thing. 2002. Was it 2002? I believe it was.
Q After you retired, what did you do?
A I'd do some private stuff.
Q What private stuff?
A Executive protections, background checks, that kind of stuff.
Q After you retired, did you continue to work in any capacity with the Sheriff's Department?
A Oh, yes, yes, as a consultant, and what I did there was background checks, strictly background checks on new employees coming in, specifically corrections officers. I only did that for a short while. My guess would be six months or so. It was exclusive to that.
Q After you retired, you worked with the Suffolk County Sheriff's Department as a consultant to do background checks?
A That's correct.
Q Did you do anything else during that period helping out the Suffolk County Sheriff's

Department?

A No.

Q Let me ask this question. Was there a new sheriff starting around the same time as when you retired?

A Yes, Andrea Cabral.

Q Did you assist with the transition to the new sheriff?

A A little bit, yeah.

Q What sort of things did you do?

A I welcomed them in. I had known them from the past from the District Attorney's Office, kind of introduced them to a couple of people and spoke with Viktor Theiss about the transition.

Q Who was Viktor Theiss?

A My understanding was he was going to take my position when I left.

Q Do you recall when you spoke to him?

A How do you mean that, specifically?

Q Was it around the time that you retired in November?

A Yeah, shortly.

Q Was it around January, just timing?

A Prior to my leaving.

Q And you left approximately six months after you retired in November of 2002?

A Wait a minute now. That's vague to me. I retired in November. I did not go back to the Sheriff's Department. I worked as a consultant. I wasn't there on a daily basis. I was at home. I did background checks from my home.

The only thing I may have done was go into personnel and pick up folders on people, some future employees they may have wanted me to do background checks on. I want you to understand that I wasn't there every day or a full-time employee. It was on occasion I would go in. Okay?

Q Got it. How long was that period of when you were a consultant?

A Again, six months or about.

Q And approximately how often during a week would you go to the Suffolk County Sheriff's Department?

A It wasn't even weekly. Sometimes it was biweekly, so maybe once every two weeks,

maybe even longer. It would depend upon the hiring process, because they would have classes. There would be so many people that they would want to hire for a class of corrections officers.

So it might take three weeks, and then they say here is a bunch of people we want you to do background checks on; we'd like to get this class in by such and such a date. I would try to do my darndest to try to get background checks done by that date so the class could go on.

Q You may have visited the Sheriff's Department to get personnel records?

A Well, I would go to get the employee packages, personnel folder on the future employee, pick those up, because it would give me an indication of where they worked, and I would check their references, where they lived, if I was going to go to the neighbors to see what type of information I would could gather about the employment of this corrections officer.

Q During the period, that six-month period,

when you were a consultant, who were you reporting to at the Suffolk County Sheriff's Department?

A Susan Grimes.

Q Who is she?

A The head of personnel.

Q What did you understand the mandate of SID to be while you were there?

A To look at any problems, any illegal activities, and to conduct an investigation into any information received either by an inmate, corrections officers, family member, written letter or any type of complaint would be taken seriously.

Q What were your specific duties and responsibilities as the deputy superintendent of SID?

A To oversee any and all investigations and provide training when necessary, review reports, approve reports, develop a tracking system, review the tracking system on a weekly basis with all personnel in regards to complaint that we had received during the day, week, month and year.

Q Anything else?
A No.
Q What is the tracking system that you referred to?
A When I or my department received the complaint, we would put this -- this was a confidential tracking system, held by me and accessible to my personnel, to the sheriff and to the deputy sheriff. Is that what Brian Burns was, the deputy sheriff? Yes, and the deputy sheriff. That would record and document each and every complaint that come in and identify the person that they were complaining about or the charge.
That tracking system was reviewed by me on a weekly basis with my staff. I would get updates. I would review what was going on with each and every complaint. If I thought it needed follow up, they would follow up, my personnel. We would follow that until that case closed. For example, if it was an allegation of abuse by a corrections officer, we would review that until it went to the legal department and was scheduled for a

hearing. They would give me the result of that hearing, and I would document that --
As a matter of fact, if you have a copy of the Stern Report, I believe all of that is in it. Once the legal department was finished with its complaint or the court was finished with its complaint, I would get a disposition and record that.
Q What format was this tracking system in? Was it electronic, paper?
A Both.
Q Did it exist at the time you joined the Suffolk County Sheriff's Department?
A No.
Q So it was something you started?
A Yes.
Q Approximately when did that tracking system begin?
A Immediately.
Q Was it still in place when you retired?
A Yes.
Q Was it still in place both electronically and in paper format?
A Yes.

Q Now, you described the mandate of SID as to looking into any problems or conducting investigations. Did SID also serve as a liaison with outside law enforcement agencies?
A Absolutely.
Q In what way?
A I worked with the State Police, with the FBI, with the Boston Police and the Boston County District Attorney's Office and other correctional facilities.
Q Was being the deputy superintendent an easy job?
A Are you kidding? No.
Q Why was it not?
A It was very difficult.
Q Why was it difficult?
A There were a lot of issues and a lot of problems before I got there. One of the reasons I think they hired me was because I was an outsider, if you will, who I like to think had a good reputation. As a matter of fact, I told the sheriff and Brian Burns when I came there I worked hard to get to where I

am; I don't expect to change it.
Again, if you know the Stern Report, I think it indicates that in the Stern Report. I was proud and proud of what I did, both with the Suffolk County District Attorney's Office and the Sheriff's Department.
Q Why do you think they hired you because you were an outsider?
A Well, I can't be sure. I mean, I can tell you people said to me they needed people who were not from within because of all the issues that were going on at the jail, like some of the things referenced in here with -- I don't want to mention names, but the woman who got pregnant and the Tourette's problem. Those things were appalling. I believe counsel knows what I'm talking about.
Q I don't. When you say as described in here, what were you referring to?
A The pregnant woman, inmate.
Q But you were referring to the Complaint. Were you referring to the Complaint in this case?
A I'm not sure I understand your question.

21

Q Let me actually take a step back. You said there were a lot of issues when you came on board, and you described that there was an issue of an inmate getting pregnant?
A Prior to my getting there, there was an issue. It's referred in here. (Indicating.)
Q When you say in here what do you --
A That's the Complaint, isn't it? Do you want me to get the page or anything?
Q No, I need to put it on the record, because the record can't tell when you're pointing what your pointing to.
A My mistake.
Q What sort of issues did you have to deal with when you came into the Suffolk County Sheriff's Department?
A Where do you begin? From day one, I think I worked an 18-hour day. I was dealing with issues with corrections officers, corrections officers, one corrections officer, a female having an affair with another female inmate, corrections officers abusing inmates, assaulting them, corrections officers bringing in drugs, inmates dealing drugs,

22

inmates with possession of drugs, those kinds of issues.
Q Would you say it was a troubled institution when you joined?
MR. KIERNAN: I only object to the extent that you have to define your terms. What you mean by troubled institution?
A That's exactly where I was going. In comparison to what? I would assume that all institutions are the same; that there is trouble within those institutions, correctional facilities. If you could be more specific, I'd be happy to answer your question.
Q Did you ever work at another correctional institution?
A No.
Q Did you think there were a lot of problems at the institution when you joined?
A Joined?
Q When you started.
A Again, I don't know how to measure that. There were issues there, but I expected issues. I mean it's a correctional

23

institute. I expected problems. I knew it was going to be challenging. I kind of enjoyed the challenge.
Were there problems? Yes. In comparison to other institutions, I don't know. I don't know if it was any better, worse.
Q Now, was there anything else that led you to believe your job was not an easy one?
A Also, let me answer it this way. I worked at the Suffolk County District Attorney's Office for 23 years. I had a ball there. It was fun. It was hard work.
At the jail, it wasn't as much fun. I always felt like no matter what I did people were disliking you. I mean, at the District Attorney's Office you felt like you accomplished something. Not that I didn't accomplish something at the jail, but it was a little more difficult.
I still enjoyed the investigation end of it. That was my expertise. That's what I enjoyed. That's what I had fun with. I'm not saying I had fun at the jail. It was

24

more challenging. I enjoyed the District Attorney's Office better than I did the jail.
Does that help?
Q It does. Thank you. What was your role in the Suffolk County DA's Office?
A I started at police headquarters as an -- can you help me with --
MR. KIERNAN: No.
Q If you recall your last position, that's fine.
A I was chief.
Q Chief of?
A The Investigation Division.
Q And you mentioned, when you just testified, that it was difficult at the jail or at the Suffolk County House of Corrections. How so?
A Did I say it was difficult?
Q I can read it back.
A I think we're clear. Difficult? It troubled me that correction officers had the gaul to beat an inmate or to bring drugs in. It was appalling to me. That part was very difficult for me to take and to understand.
Maybe I can explain it this way also.

My son was an inmate there at one point, not while I was there, although he did come in once when I was there and got transferred out. I can't imagine someone doing that to my son or anybody else's. So that was very difficult for me to put up with that.

Q Was it difficult to do investigations?

A No, I had no problem doing investigations when they did that, none at all.

Q What would you do as part of an investigation?

A Again, will you be more specific? Investigations aren't just --

Q Why don't you walk me through a situation where somebody comes to SID while you were the deputy superintendent and complains about a correction officer.

A I would find out the nature of the complaint, who the corrections officer was. Inmates lie too. So you can't always take what they're saying and just run with it as if it's true. You have to substantiate an awful lot of things. So I would take that complaint, give it a number, tracking, assign someone the

case, and we would look into it.

Q What sorts of things would you do to look into a complaint?

A It depends on what the complaint was.

Q Did you ever feel that some people weren't forthcoming with information as part of an investigation?

A I think that's true in every case. I worked a lot of years in homicide, and they weren't always forthcoming. They always leave a little bit out, both sides. Then you keep pressing, and you try and get as much truth. I guess we're seeking the truth. That's all I can do.

Q Did you ever feel in your role as Deputy Superintendent sometimes you were seeking the truth and people weren't always willing to talk to you?

A I believe they had to talk to me.

Q Why do you believe that?

A Well, if it was -- an inmate probably didn't have to talk to me, but most corrections officers had to talk with me. I think that was something that had to do with their

contract, they had to speak to me or the legal department could compel them to speak to me. If I had to do that, I would.

If your next question is do I recall that? To my memory, I don't remember ever compelling an officer to speak to me. I think I spoke to most. I think we had an understanding, the officers. They knew I was serious about my job, and I took it serious.

Q Did you ever feel there were instances where a guard would not come forward and tell you about a violation committed by another guard?

THE WITNESS: Say that again?

MS. BAPOOJI: Could you read it back?

(Reporter read question as recorded.)

A Did I ever feel that way? I don't know. Did I feel that way? I'm sure there may have been instances. If I think about it, I'm sure that officers probably or inmates or people don't always want to be forthcoming.

Q Why is that?

A I think that's people's nature.

Q Can you explain that? I'm just not sure I understand why that's people's nature?

A Everybody always -- in that facility, I don't know that they're always going to be forthcoming.

Q Why is that the case in that facility?

A Any facility like that.

Q Why is that the case?

A I have no idea.

Q You have no idea why some people don't want to come forward?

A No.

Q Did you ever feel that inmates did not want to come forward and report abuse by guards?

A I would think that that's probably -- yeah, I would think that that happened. Did I ever feel it? You're throwing me with the feeling, do I feel it. Do I think that inmates would be afraid to come forward? Yes, I would think that in fear of retaliation. I would think that's true of any facility.

Q Do you think that's true while you were there?

A Yeah, probably.

Q And the reason that you understand inmates

would not want to come forward is because of a fear of retaliation?

A Fear of retaliation from whom? It could be from other inmates. It could be from corrections officers. It could be people on the street. You're being so broad; it's tough. It's tough for me.

Q You had mentioned the term, retaliation.

A Just now?

Q Do you recall using that word?

A Yes.

Q I just wanted to understand when you used that term who were you thinking they would be retaliated against by.

A People on the street, other inmates, maybe corrections officers. Let me go on further. You're making this so broad. If I thought there was a threat by a corrections officer to an inmate, I would remove the inmate from the facility if that's what you're asking me.

You're being so broad. Let me say this. My first priority is the inmate's safety beyond anything else or a corrections officer or anybody's safety. That was my first

concern then; it is now. If I thought an inmate was in jeopardy, they would be gone. They would go to another institution without a doubt.

Q Did you ever have to transfer an inmate?

A Yes.

Q Under what circumstances?

A Gang members being in the same facility, people that may have given information about other gang members that people knew one another and may not be safe. They would be transferred. If I got a call from the Suffolk County District Attorney's Office that this person is cooperating with so and so, those kinds of things. Now, whether we had --

There was an inmate at the House of Correction who was beaten bad by a corrections officer from South Boston. I can't think of his name. I'm pretty sure we got him quickly out of the facility. We brought criminal charges. I don't think it ever went forward, but I believe he was terminated for that. I would call in the

Boston Police, crime scene, photographs, fingerprints. Whatever needed to be done, we would do. I think they were quite surprised that I would do that.

Q Who would be quite surprised?

A I remember a corrections officer saying that that's the first time he ever saw the Boston Police Identification Unit come in and do a crime scene.

Q At the facility?

A Yes, other than a hanging. I know I went to a couple of hangings at the jail, at least one when I was at the District Attorney's Office.

Q When was that instance when the Boston Police came to the facility?

A During my term.

Q Do you know whether it was at the beginning or the end?

A Somewhere in the middle. That tracking system, I would also talk with the Suffolk County District Attorney on a weekly basis, Bruce Holloway, about that tracking system. If I thought there were any criminal

complaints, he would review; we would discuss. Even if I thought something was close, we would discuss it, and on a weekly basis, I would review that with the Suffolk County DA's Office. I actually wanted them to get copies of the tracking system. I don't think that ever got approved, but I wanted that to happen.

Q Who did you replace as Deputy Superintendent at SID?

A He's still at the jail, I believe. It wasn't Nate Linkoff. It was someone after Nate. I worked with him too. I can't think of his name. It may come to me.

Q Do you believe that staff members were reluctant to report other staff members?

A Do I believe staff members -- I'm sure there may have been a few.

Q Why are you sure?

A Just prior to my coming there, I knew there was some issues. It certainly seemed likely that that was the case. I certainly would be concerned about that in my investigations, having in mind the history there that not

everybody is going to be forthcoming possibly.

Q And you mentioned that before you got there there were some issues with that. What were you referring to?

A Again, back to Red Sting and this report that you sent over to Mr. Kiernan about the complaint, there is some specific indications of problems at the jail within this report that I had heard about prior to my coming there. So I thought there may be some issues that not everybody was going to be forthcoming if they are impregnating female inmates.

Q You knew about some of these instances that you had read about in the Complaint before you started?

A I have heard about them, yes. Yes, I did.

Q I have never heard about this situation involving the Tourette's case that you mentioned. Can you describe that to me, what happened?

A My understanding with the Tourette's case was there was an inmate with Tourette. I never witnessed this. This is only what I heard. I have no specific knowledge of this personally, but what I heard was that there was a kid with Tourette's, who corrections officers made fun of him and eventually beat him. There was a criminal complaint, and I thought they were found guilty. I think Mrs. Porter may know more about that than I do.

Q Did that happen before you were there?

A Before I was there.

Q I believe you testified earlier that you are sure some of the staff wouldn't come forward and tell you about things about other staff.

MS. HARVEY: Objection

MS. CAULO: Objection.

A I'm not sure I said I'm sure. I might have said I'm sure that's possible. Could I be positive? No.

MS. BAPOOJI: I just want to be accurate.

(Witness and counsel conferred.)

BY MS. BAPOOJI:

Q Mr. DiMeo, is there anything you wanted to correct?

A I'd like you to read that back, because I'm not sure you got that terminology right. When I say I'm sure, when you think about it, you've got to think probably that's the case. I don't know how you're interpreting I'm sure. I'm not positive. I didn't see it. I don't know. It may have happened. When you think about it, you say, gee, it's likely that that happened.

Q Do you think it happened?

A No. Tell me what the question is.

Q Let me ask it this way. While you were at the Suffolk County Sheriff's Department, do you think there were instances where staff did not report violations by other staff members?

MS. CAULO: Objection. Clarification as to staff?

MR. KIERNAN: Do you understand the terminology, who staff is?

Q Let me ask it again. When I'm using the term, staff, I'll define that as employees who work at the Suffolk County Sheriff's Department or contract workers who work at the Suffolk County Sheriff's Department.

MS. HARVEY: I object to that definition.

MS. CAULO: I object as well.

MS. BAPOOJI: What is the objection?

MS. HARVEY: Contractors is not a standard definition of the word, staff. You're defining it to me to mean something that the word, staff, does not mean.

Q Do you think there were instances where staff of the Suffolk County Sheriff's Department did not report violations committed by other staff?

MS. HARVEY: I object again.

MS. CAULO: Objection.

MS. HARVEY: I'm only objecting, because you have left your definition of staff on the record. If you're changing it, I'll withdraw my objection.

MS. BAPOOJI: Would you have an objection if I say employees?

MS. HARVEY: No.

BY MS. BAPOOJI:

37

Q Let me ask the question this way. Do you think while you were Deputy Superintendent that employees of the Suffolk County Sheriff's Department did not report violations committed by other employees of the Suffolk County Sheriff's Department?

MR. KIERNAN: Now, I have to object. If you're asking whether he thinks that it happened -- can you parse that question as to whether or not he has direct knowledge that it happened as opposed to whether or not he assumes that it happened? I don't want to him to speculate. Direct knowledge, I have no problem with.

MS. BAPOOJI: But it's kind of hard to ask him of direct knowledge of something that didn't happen. I want to understand if he believes that that occurred.

MR. KIERNAN: He could find out after the fact, so there could be some direct knowledge after the fact. I'm not trying to be an obstructionist. I don't want you to speculate.

BY MS. BAPOOJI:

38

Q Let me take it in steps and pieces then. Hopefully, we can get through this. Are you aware of instances where an employee of the Suffolk County Sheriff's Department did not report a violation committed by another employee?

A No.

Q Do you think that ever occurred?

MS. CAULO: Objection.

Q Let me rephrase the question.

A How do I answer that?

Q I'm asking you if you believe that employees of the Suffolk County Sheriff's Department did not report violations committed by other employees?

MS. CAULO: Objection.

MR. KIERNAN: I just want you to be able to understand the question.

A I'm thinking like do I believe the sky might fall some day. I don't know how to answer a question like that. Do I believe that other employees -- I don't know.

Q Have you ever heard of the term, code of silence?

39

A I read it.

Q Where did you read it?

A In this -- again, I have to refer back to this report that I referred to several other times.

MR. KIERNAN: Just so the record is clear, that's the Complaint. What he is referring to is the Complaint.

Q I want you to forget about that Complaint, Mr. DiMeo.

A I can't forget about that Complaint, and I'll tell you right now I'm not going to forget about that Complaint.

Q I want to know what your testimony is and put that Complaint aside.

A I have been doing that, haven't I?

Q I think so, but you have been referring a number of times to that Complaint.

A Well, only because of the question that you asked me, and in order to be able to answer your question, it would help all of us to refer back to this so everybody understood my answer.

Q I would actually ask that you just base it on

40

your own knowledge and just answer the questions based on what you know and not worry about referring to that Complaint.

A I'm not trying to give you a hard time, but aren't I here because of this?

MS. HARVEY: You asked him if he ever heard of the code of silence, and if he says no, then he's lying because he read it in the Complaint. So if you don't want him to refer to the Complaint, then you have to say other than what you read in the Complaint.

BY MS. BAPOOJI:

Q Fair enough. Let's go back, Mr. DiMeo, and let me ask you this. Other than reading the Complaint in this case, have you ever heard of the term, the code of silence?

A Yes.

Q What was your understanding before you read this Complaint of the term, the code of silence?

A I grew up in East Boston, and there were a lot of rough people and people that may have done illegal things. And they referred to some people, that they had a code of silence.

So do I understand that term? Yes.
Q What do you understand that term to mean?
A That you don't say anything.
Q Do you believe that there was a code of silence at the Suffolk County Sheriff's Department?
MS. CAULO: Objection.
Q You can answer.
A I don't know. I don't know if there was a code of silence. No one ever told me there is a code of silence there. It was never referred to me in any way that there was a code of silence here.
Q So there could have been a code of silence?
MS. HARVEY: Objection.
MS. CAULO: Objection.
MR. KIERNAN: Don't speculate. If you can answer the question, okay. Don't speculate.
A I'm not.
Q So you don't know either way whether there was a code of silence at the Suffolk County Sheriff's Department while you were there?
A No.

Q You do know?
A I don't know that there was a code of silence there.
Q Had anyone ever told you that there was a code of silence at the Suffolk County Sheriff's Department?
MS. CAULO: Objection. Asked and answered.
A If I did, I would have answered yes to the previous question, right?
Q Did you ever think that there may have been a code of silence at the Suffolk County Sheriff's Department?
MS. CAULO: Objection.
A May I ask where you're going? I don't know anything about a code of silence at the jail.
Q Did you ever do anything to investigate whether there was a code of silence at the jail or the House of Correction?
A I'm getting upset now.
Q Why are you getting upset, Mr. DiMeo?
A Because I have answered this question six ways to Sunday so far, and you're persistent with it. I don't know anything about a code

of silence at the jail. Had I known, I would have investigated it. Had someone told me, I would have tried to find out what they were talking about and done something about it. That's why I'm getting upset. I guess I answered.
Q Did you have anything else you wanted to add?
A No.
Q Did you ever think people were --
A I'm not upset at you. I'm upset at the questions, I guess.
Q I just want to understand why you're upset with the questions.
A Because I'm proud of what I do. I answered the question. I told you the truth, and then you pursued it anyway like I didn't answer it.
Q I'm just trying to understand.
A Okay. I'm just explaining. Sorry.
Q That's okay.
A May I ask who this is?
MS. BAPOOJI: The person who has entered the room is an individual by the name of David Schumacher, who is also at Goodwin

Procter. He's another attorney of Sheila Porter's. I should have introduced him.
THE WITNESS: Hi.
Q When you were at the Suffolk County Sheriff's Department, did you think employees would not come forward for fear of retaliation?
A Employees?
Q Correct.
A If they would come forward?
Q Do you understand the question?
A Yeah, I'm trying to process. No. That the employees were afraid to come forward in fear of retaliation? No. Of what?
Q Do you think there was any reason why one correction officer would not report a violation committed by another correction officer?
MS. CAULO: Objection to the premise underlying of that question.
MS. BAPOOJI: Which premise just so I can correct it?
MS. CAULO: There is the premise before Mr. DiMeo that correction officers would not

come forward. So, therefore, you're asking did he think that. I was objecting to that, because I don't think he has testified as such.

Q Let me ask the question another way. Mr. DiMeo, do you think employees of the Suffolk County Sheriff's Department would report all violations committed by other employees?

A I don't know. I would hope so. I would want them to. I would encourage them to. I would talk with them if I felt that they wouldn't come forward. Did that answer your question?

Q Not really.

A That's my best answer, I guess.

Q Did you think that there were times where they did not come forward?

A I don't know. I wouldn't know if they didn't come forward.

Q Do you believe that there were instances where they didn't come forward?

MR. KIERNAN: My objection again. You're asking him to speculate, because he really answered the question. He said he

wouldn't know if they didn't come forward. If you can answer the question, fine, but I ask you not to speculate.

A Yeah, I answered your question.

Q Do you think that some employees would not come forward and report violations because of a fear of retaliation, Mr. DiMeo?

MS. CAULO: Objection. Asked and answered.

MS. HARVEY: Objection. Asked and answered. I have written that exact question, Counsel, right here.

A I have answered it.

Q What was your answer?

A I don't know. I looked over there because I saw the movement.

Q I'm just wondering why you kept looking over to your right shoulder.

A Because I saw the movement and I thought the objection was coming, because I already answered the question.

Q You referred earlier that you had heard the term, code of silence, while you were growing up in East Boston.

A Yes.

Q Have you heard that term in any other context?

A No, I don't think so.

Q Have you ever heard that term used in the context of a corrections facility?

A No, I think I just heard it about the FBI though. Did I read something about a code of silence with the FBI with the guy that just got indicted? Maybe there was a code of silence there. I don't know.

Q Did that have to do with --

A No, I thought that was within the FBI, some code of silence.

Q Now, you testified about a Stern Commission. You mentioned the Stern Commission?

A Yes, I did.

Q What was the Stern Commission?

A It was a body of people who at the request of then Governor Swift were asked to go into the Suffolk County facilities and do a complete record, if you will, of the goings-on with the institution.

Q Did you participate at all?

A Yes.

Q Can you describe what you did?

A I spoke to the individuals who were part of the Stern Commission. We went over -- I guess I answered. We went over my tracking system.

Q Did you go over anything else with the Stern Commission?

A Yes.

Q What else?

A People we had under investigation at the time. The body of the report, I gave them some information as to the contents of my tracking system, and we reviewed some of issues and what I was trying to do and where I was going with that tracking report after and my goals with that report.

Q So you helped them in any way you could to provide information; is that right?

A Yes.

Q You were interviewed by members of the Stern Commission?

A Yes, several.

Q How many times?