PORTER V. CABRAL, ET AL    DEPOSITION OF RICHARD DiMEO

Page 49

1  A   A few.
2  Q   Did the Stern Commission issue a report?
3  A   Yes.
4  Q   Did you ever read that report?
5  A   I believe I did.
6  Q   Do you recall actually receiving a copy of
7      the report?
8  A   The day I received it, no. But I'm pretty
9      sure I read it.
10     MS. BAPOOJI: Can we just mark this as
11     Exhibit 1, please.
12     (Document marked Exhibit No. 1.)
13     BY MS. BAPOOJI:
14 Q   Mr. DiMeo, I'm going to put this in front of
15     you so your attorney has his own copy.
16 A   Thank you.
17 Q   Before you turn to a page, why don't I ask
18     you a question. Do you think the employees
19     at the Suffolk County Sheriff's Department
20     viewed SID with apprehension?
21     MR. KIERNAN: I'm sorry. Could you
22     repeat the question?
23     MS. BAPOOJI: Let me ask it another way.
24     MR. KIERNAN: I don't remember what you

Page 50

1      said. I just didn't hear it.
2      MS. BAPOOJI: I think I want to ask it
3      another way actually.
4  Q   Do you think employees at the Suffolk County
5      Sheriff's Department viewed the activities of
6      SID with skepticism?
7      MS. CAULO: Objection.
8      MR. KIERNAN: Do you understand the
9      question?
10 A   How do you mean, skepticism?
11 Q   Did they fully trust SID?
12 A   I don't know. I don't know. I don't know.
13 Q   Did you ever think that some employees did
14     not trust SID?
15 A   I'm sorry. Say that one more time.
16 Q   Did you ever think some employees of the
17     Suffolk County Sheriff's Department did not
18     trust SID?
19 A   Actually, I think -- I don't know. I think
20     they trusted us. I don't know if some didn't
21     trust us.
22 Q   So it's possible that some didn't trust SID,
23     but you don't know?
24     MS. CAULO: Objection.

Page 51

1      MS. HARVEY: Objection.
2  A   I don't know. I don't know.
3  Q   Now, Mr. DiMeo, I've placed in front of you a
4      document that has been marked as Exhibit 1.
5      Take a moment to look at that and let me know
6      if you recognize it.
7  A   The Stern Report, yes.
8  Q   Is that the document you say you have read
9      before?
10 A   I read the Stern Report before, yeah. I
11     would think this is the document, yeah. I'd
12     have to -- I can't recall all of its
13     contents, but I remember reading some of it,
14     especially that pertained to my department at
15     the time.
16 Q   What do you recall the Stern Report saying
17     about your department?
18 A   I recall that it was complimentary.
19 Q   Did you do anything as a result of reading
20     the Stern Report in your department?
21 A   Not that I recall. How do you mean, did I do
22     anything in result of that?
23 Q   Let me ask it this way. Do you recall
24     whether the Stern Report made any

Page 52

1      recommendations?
2  A   I'm not sure, but I think they would have
3      made recommendations for me to continue with
4      that tracking. I explained to them that I
5      wanted to develop it some more so I could
6      identify problem areas and that kind of stuff
7      by identifying individuals and -- I don't
8      know. I want to say wings, to specific areas
9      of institutions where there were more
10     problems than others and maybe to focus in on
11     those kinds of things and maybe identify
12     problems before they happen. That's my best
13     recollection. I'm not positive.
14 Q   Do you recall any specific recommendations
15     that they had for your department?
16 A   Do I recall -- no. At this point, no.
17 Q   After you read the Stern Report, did you do
18     anything differently at SID?
19 A   I don't think so. Not that I recall.
20 Q   I'd ask you to just turn to Page 9 of
21     Exhibit 1 that's right in front of you,
22     Mr. DiMeo, Page 9 of 62, I just want to
23     direct your attention to the last paragraph.
24     I'm going to read the first line of the last

McLAUGHLIN & ASSOCIATES - 781.321.8922    Pages 49 to 52

PORTER V. CABRAL, ET AL     DEPOSITION OF RICHARD DiMEO

### 53

1. paragraph on Page 9 of Exhibit 1. It says,
2. "The commission urges an aggressive attack on
3. the code of silence that prevents staff
4. members from reporting the misconduct of
5. fellow staff members."
6. A Yes.
7. Q Do you agree with that statement?
8.     MS. CAULO: Objection.
9.     MS. HARVEY: Objection.
10. A What do you mean?
11.     MS. HARVEY: Does he agree the
12. commission should urge an aggressive attack?
13. Sorry.
14. Q Let me ask it this way. Do you recall
15. reading about the code of silence in the
16. Stern Commission Report now that I have put
17. this Exhibit 1 in front of you?
18. A No, no, I don't. Not right now. No, I
19. don't.
20. Q Would you agree that this report, Exhibit 1,
21. finds that there was a code of silence at the
22. Suffolk County Sheriff's Department?
23.     MS. CAULO: Objection. The report
24. speaks for itself.

### 54

1.     MS. HARVEY: Objection.
2.     MR. KIERNAN: I would object. This is a
3. 62-page report. You've pointed to one line,
4. and clearly, my client hasn't had an
5. opportunity to review it in depth. So I'd
6. ask you not to ask your question that goes
7. far beyond the one sentence that you pointed
8. to unless you ask him to read the whole
9. thing.
10.     MS. BAPOOJI: No, I'm not going to ask
11. him to this read the whole thing.
12. Q Mr. DiMeo, do you think there was a code of
13. silence at the Suffolk County Sheriff's
14. Department that prevented staff members from
15. reporting misconduct of fellow staff members?
16.     MS. CAULO: Objection. Asked and
17. answered.
18.     MR. KIERNAN: Objection.
19. A Many times. This is the thing I got upset
20. about. Thank you.
21. Q I'm just trying to see if having you read
22. this document --
23. A No, it doesn't.
24. Q -- changes --

### 55

1. A No, it don't.
2. Q Do you disagree with the recommendation in
3. the Stern Commission and specifically that
4. line that I read regarding the code of
5. silence?
6.     MS. HARVEY: Objection.
7.     MS. CAULO: Objection.
8.     MR. KIERNAN: My objection -- and I
9. think the point has been made before. The
10. sentence simply says that the Commission
11. urges an attack on what they deem to be a
12. code of silence. I'm not sure if you're
13. asking him if he agrees with the
14. recommendation or with the predicate
15. assumption, which he's already told you he
16. doesn't know about.
17.     So could you differentiate between
18. whether or not he agrees with the
19. recommendation or with the predicate
20. assumption?
21. Q Do you agree with the recommendation in the
22. Stern Report regarding the code of silence?
23.     MS. CAULO: Objection.
24.     MS. HARVEY: Objection.

### 56

1.     MR. KIERNAN: That presumes the
2. predicate assumption. That's the issue.
3. He's already taken issue with the predicate
4. assumption.
5. Q Let me ask it this way. Mr. DiMeo, you said
6. you had read the Stern Report, correct?
7. A Yes, I did say that.
8. Q Did you disagree with the Stern Commission
9. Report?
10.     MS. CAULO: Objection. As Mr. Kiernan
11. has indicated, it's a 62-page report that
12. references numerous recommendations from
13. fiscal responsibility to inmate grievances, a
14. whole host of issues.
15. BY MS. BAPOOJI:
16. Q Mr. DiMeo, I believe you said you read the
17. Stern Commission Report, did you not, at one
18. point?
19. A Yes, you're talking over two years.
20. Q When you read it, did you agree or disagree
21. with the report?
22.     MR. KIERNAN: Objection on the same
23. basis. You're asking him questions that
24. could be buried in 62 pages. He could agree

McLAUGHLIN & ASSOCIATES - 781.321.8922    Pages 53 to 56

PORTER V. CABRAL, ET AL    DEPOSITION OF RICHARD DiMEO

**Page 57**

1   with parts of it and disagree with other
2   parts of it. If you can answer the question,
3   go ahead. I just caution you there are 62
4   pages of text before you.
5       MS. CAULO: Objection.
6   A   I understand. Your question is do I agree
7       with this report? Maybe parts. I'm sure
8       there may be parts I disagree with.
9   Q   Do you recall what parts you agreed with the
10      Stern Commission Report on?
11  A   All the nice things they said about me. I'm
12      serious.
13  Q   What nice things were those?
14  A   If my memory recalls -- and I'm not even sure
15      about how many nice things they said, but I
16      thought what they said was refreshing and
17      complimentary to me. And I thought that was
18      nice. I appreciated it.
19  Q   Was there anything you recall that the Stern
20      Commission Report said that you did not agree
21      with?
22  A   At this point, I can't recall whether there
23      were things I didn't agree with or not. I
24      know there was a few things I agreed with.

**Page 58**

1       The things I don't agree with, I'd have to
2       read again, and if I read it all, I could
3       probably tell you what I disagree with.
4   Q   After, Mr. DiMeo, you read the Stern Report,
5       did you take any action in connection with
6       the code of silence?
7       MR. KIERNAN: Objection. I think you're
8       putting a predicate assumption that he has
9       already disclaimed any knowledge of. I don't
10      know how he could possibly answer the
11      question.
12      MS. CAULO: I join in that objection.
13  Q   Do you need the question read back to you,
14      Mr. DiMeo?
15  A   There is a question before me?
16  Q   Yes.
17  A   I guess I do. Yes, I'm sorry.
18      (Reporter read question as recorded.)
19      How do I answer this? I wasn't sure --
20      I think I answered I wasn't aware of the code
21      of silence. So my answer would be no if I
22      didn't know about it.
23  Q   But you don't recall reading about the code
24      of silence in the Stern Report?

**Page 59**

1   A   I really don't. I really don't.
2   Q   Do you recall whether you read the whole
3       Stern Report?
4   A   Knowing me, I doubt that I read this whole
5       report.
6   Q   So it's possible you didn't read the entire
7       report?
8   A   I'm sure I read parts.
9   Q   Do you recall which parts you did not read?
10  A   I want to say the parts that didn't concern
11      me, but they all did. No, I don't recall
12      what I did and didn't.
13  Q   And you just said that they all concerned me?
14  A   Well, anything that would go on at the jail
15      that would be, you know, detrimental to an
16      inmate or a corrections officer would concern
17      me. If this report relates to those kinds of
18      things, something that I was aware of would
19      concern me.
20  Q   Now, Mr. DiMeo, I understand you said you
21      were unaware of any code of silence; am I
22      correct in that?
23  A   I don't, yeah. I said I don't know that
24      there was a code of silence going on.

**Page 60**

1   Q   Do you have any idea why the Stern Commission
2       references a code of silence here on Page 9?
3   A   No.
4   Q   Sorry?
5   A   Nothing.
6   Q   Did the Stern Commission interview other
7       people besides you in connection with issuing
8       its report?
9   A   Yes.
10  Q   Who did they interview?
11  A   My understanding -- again, I wasn't with
12      them. I wasn't present, but I thought they
13      went in every department. I would imagine.
14      It would be kind of foolish if they didn't.
15  Q   Did they speak to correction officers?
16  A   I would hope so.
17  Q   You don't know one way or another whether
18      they did?
19  A   No, I couldn't specifically say they spoke to
20      Corrections Officer Smith. I wouldn't know,
21      but I would guess that they did.
22  Q   How many employees were working under you at
23      SID at the time you were there?
24  A   Approximately nine, give or take.

McLAUGHLIN & ASSOCIATES  -  781.321.8922    Pages 57 to 60

PORTER V. CABRAL, ET AL        DEPOSITION OF RICHARD DiMEO

**61**

1  Q  Did the Stern Commission interview any of
2     those nine people that were working under
3     you?
4  A  I believe they did.
5  Q  Do you know how many?
6  A  I believe all of them. I'm not positive, but
7     that's my belief.
8  Q  If you could just turn to Page 48 of
9     Exhibit 1 that's before you, Mr. DiMeo.
10 A  48?
11 Q  Yes, please. 48 of 62.
12 A  I thought this was going to take a little
13    while.
14 Q  We're already at Page 48. That's not so bad.
15 A  I'm on 48.
16 Q  Great. Now, I'm going to direct your
17    attention to the third paragraph, okay?
18 A  The new SID operation?
19 Q  Yes. Why don't I read that? "The new SID
20    operation has the confidence and trust of the
21    Sheriff's Department administration.
22    Although relations between SID staff and line
23    staff are improving, there continues to be a
24    strong element of distrust of SID by line

**62**

1     staff, who view SID as the enemy."
2        Mr. DiMeo, do you think there was an
3     element of distrust of SID by line staff?
4        MS. CAULO: Objection. Asked and
5     answered.
6  A  I thought I answered that -- and I will
7     answer it again as I thought they trusted us,
8     me.
9  Q  Do you disagree with that statement that I
10    just read in the Stern Commission Report?
11 A  I think, you know, you're pointing out one
12    paragraph and asking -- I mean, I don't know
13    what led up to that part. I would have to
14    read the whole thing and see if I agree with
15    that paragraph.
16 Q  Is there anything in that sentence -- and let
17    me read it again. "Although relations
18    between SID staff and line staff are
19    improving, there continues to be a strong
20    elements of distrust of SID by line staff who
21    view SID as the enemy." Is there anything in
22    that sentence that you agree with?
23 A  Some things, I guess. The SID operation, I
24    think there was confidence and trust with SID

**63**

1     and the administration hopefully was going to
2     get to the inmates that we were serious about
3     what we were doing.
4  Q  Why would that need to get to the inmates?
5  A  That they felt the same; that they could
6     trust us in coming forwards with complaints.
7  Q  And that's because inmates felt that they
8     couldn't trust?
9        MS. CAULO: Objection.
10 A  I don't know. I don't know. I would want --
11    I don't know. I don't know if they felt that
12    way, but I certainly wanted to make sure they
13    were comfortable in coming forward.
14 Q  Did you ever feel that they were not
15    comfortable in coming forward?
16 A  Yes, some inmates probably weren't
17    comfortable.
18 Q  Is that because they feared retaliation?
19 A  Feared retaliation, from whom? I don't know.
20    From other inmates, from corrections
21    officers?
22 Q  From other officers.
23 A  If I thought -- if they said that they were
24    in fear of retaliation, then I would have to

**64**

1     move them to another facility. I'm not sure.
2     See, you're asking questions that take maybe
3     sometimes a broader explanation or you need
4     to be more specific. If you're asking me if
5     an inmate was in fear and they explained that
6     to me, then I would have to move them. A lot
7     of them wouldn't tell you that if they were.
8  Q  Why is that?
9  A  Because they may not want to get transferred;
10    they may be lying; they may not trust an
11    officer.
12 Q  Why wouldn't they trust an officer?
13 A  I don't know. I don't know what they -- why
14    they wouldn't trust them.
15 Q  You have no idea?
16 A  They are in an institution. No, no.
17 Q  But you still think there could be instances
18    where they wouldn't trust an officer, but you
19    don't know why?
20 A  I'm sure that happens, yeah.
21 Q  Why are you sure it happens?
22 A  Well, I would think they would be in fear
23    of -- again, it would depend on the
24    situation. You'd have to be more specific.

McLAUGHLIN & ASSOCIATES  -  781.321.8922    Pages 61 to 64

PORTER V. CABRAL, ET AL     DEPOSITION OF RICHARD DiMEO

Page 65

1 Q What would they be in fear of?
2 A Are they inmates being transferred, losing a
3 visit.
4 Q Would they be in fear of a correction officer
5 taking some adverse action against them?
6 MS. CAULO: Objection.
7 MR. KIERNAN: I'm objecting, because
8 it's a hypothetical, and I'm not sure what
9 you are referring to, that is, what is the
10 underlying premise, that they have done
11 something or they have reported something.
12 I'm confused.
13 MS. BAPOOJI: Thank you. Let me
14 clarify.
15 Q Mr. DiMeo, I believe you said inmates would
16 be fearful -- did I understand that
17 correctly -- in terms of giving reports?
18 A Giving reports?
19 Q Making reports? Did I misunderstand what you
20 were talking about?
21 A If there was an allegation they may be in
22 fear -- if there was an allegation they may
23 be in fear, I think they would be reluctant,
24 yes, but again, I'm not sure they would

Page 66

1 always be forthcoming with that.
2 Q With that, what do you mean by that?
3 A If there was an allegation -- the inmate at
4 the institution, the best memory that I have
5 is the one who got beaten. He was, of
6 course, afraid that if he went back within,
7 that there would be retaliation by that
8 officer if he was still there. We would have
9 to transfer him. In that sense there would
10 be some fear. I would think that that would
11 be normal for him.
12 Q Do you think that fear was reasonable?
13 A In that particular instance, yeah.
14 Q Just getting you back to the line that I read
15 on Page 48 of the document, Exhibit 1, that's
16 in front of you, you said what you agreed
17 with. Is there anything in that sentence --
18 and I'll read it again. "Although relations
19 between SID staff and line staff are
20 improving, there continues to be a strong
21 element of distrust of SID by line staff who
22 view SID as the enemy." Is there anything in
23 that sentence that you disagree with?
24 MS. HARVEY: Objection.

Page 67

1 MS. CAULO: Objection.
2 MS. BAPOOJI: Can I just understand what
3 the objection is?
4 MS. HARVEY: You have already asked him,
5 and he told you that he didn't know about any
6 mistrust. This is their report. So you're
7 asking him whether he agrees with someone
8 else's findings after doing interviews. I
9 don't think he's able to testify to that.
10 MS. CAULO: Further, I think he also
11 previously indicated that he would need to
12 read all of the report leading up to that to
13 have an understanding where that particular
14 sentence came from and what it was based on.
15 BY MS. BAPOOJI:
16 Q Do you understand my question, Mr. DiMeo?
17 A Yes, again, I'd have to read it all to make
18 sure I understood what led up to this.
19 Q I'm focusing on that sentence that I read.
20 I'm happy to reread it if you need me to do
21 that. Was there anything in that sentence
22 that you disagreed with?
23 MS. CAULO: Objection.
24 MS. HARVEY: Same objection.

Page 68

1 MR. KIERNAN: My objection is I think he
2 just said he'd have to read the whole thing
3 to make a judgment.
4 A I thought I answered it the same way also.
5 Q Are you telling me that you can't answer
6 whether you --
7 A No, I'm not saying I can't answer it. What
8 I'm saying is I'd have to read the whole
9 thing to see how it leads up to that
10 paragraph and those sentences that you are
11 referring to before I could answer it.
12 Q Do you think line staff viewed SID as the
13 enemy?
14 A I don't know. I don't know where this came
15 from, so it's hard for me to say.
16 Q I'm not asking you now. I'm asking based --
17 A While I was there did I -- no. With the
18 officers that I -- no, with the officers I
19 spoke to. The dealings I had with officers,
20 no, I think they trusted us.
21 Q So you would disagree with that line in the
22 Stern Report that I read?
23 A Again, I would have to read the whole thing
24 to see what led up to that before I could

McLAUGHLIN & ASSOCIATES - 781.321.8922    Pages 65 to 68

PORTER V. CABRAL, ET AL          DEPOSITION OF RICHARD DiMEO

Page 69

```
 1   answer that question.  It would be difficult.
 2   You're taking a paragraph out of 62 pages and
 3   asking me to comment on one paragraph or
 4   sentence.
 5  Q  And you can't do that?
 6  A  I didn't say I can't do that.  What I said
 7   was, if I read everything that led up to this
 8   and read the whole report, then maybe I could
 9   answer that question.  I'm not trying to give
10   you a hard time honestly.  I mean, you want
11   me to answer these honestly.  I am doing the
12   best I can to answer these.  You're asking me
13   very vague questions and broad questions, and
14   then you get specific on one paragraph when
15   there is 62 pages.
16  Q  Are you able to understand that sentence,
17   Mr. DiMeo?
18      MS. CAULO:  Objection.
19      MS. HARVEY:  Objection.  Anita, he's
20   told you that he does not agree that there
21   was an element of distrust.  When you point
22   to this report and ask him if he agrees, he's
23   telling you he can't tell you whether this
24   report is all right, because he doesn't know
```

Page 70

```
 1   who they are referring to.  It seems clear as
 2   day to me.  I don't understand why you're not
 3   getting that.
 4  A  I don't know who gave them that information,
 5   where it came from.  I have no idea.
 6  Q  You were interviewed by the Stern Commission,
 7   weren't you?
 8  A  Ask me about that and maybe I can help you.
 9  Q  Did the Stern Commission ask you about that?
10  A  About what?
11  Q  About how SID was viewed by other people at
12   the Suffolk County Sheriff's Department?
13  A  Not that I recall.
14  Q  If you could turn to Page 52 of 62 --
15  A  Yes.
16  Q  -- do you see the first asterisk?  And it
17   says, "Staff maintain a code of silence due
18   to concern about retaliation."  I'm going to
19   read further.  "Staff consistently expressed
20   concern that if they reported misconduct by
21   fellow staff they could expect retaliation
22   from their peers in the form of a slower
23   response time by the emergency response team
24   in the event the officer required backup."
```

Page 71

```
 1   Now, Mr. DiMeo, did any staff express a
 2   concern to you that they could expect
 3   retaliation if they reported misconduct by a
 4   fellow staff member?
 5  A  Did any staff report to me -- I'm sorry.
 6   Read that back.
 7      (Reporter read question as recorded.)
 8      No, no, that would upset me.
 9  Q  Why would it upset you?
10  A  If they said that to me, because that would
11   trouble me.  If a staff member said to me --
12   now, I'm assuming that a staff member is a
13   corrections officer in this analogy and they
14   couldn't report abuse by another staff
15   member?  No, that would upset me.  I would
16   want to know why.  Their responsibility is to
17   come forward and to make it a better place.
18   If there is some wrongdoing going on, I would
19   want to know it, and I would insist about
20   them telling me about it.
21  Q  And you would be angry if you found out that
22   was happening?
23  A  Angry, I don't know.  I would want to do
24   something about it.  That's for sure.
```

Page 72

```
 1  Q  But no one ever expressed that to you?
 2  A  Not that I recall.  It's possible they did,
 3   but I don't recall.
 4  Q  So now, the Stern Report, that portion that I
 5   read --
 6  A  The asterisk?
 7  Q  Yes.  You disagree with that asterisk?
 8      MS. CAULO:  Objection.
 9      MS. HARVEY:  Objection.
10  A  You're back to the code of silence.  I think
11   I answered that.
12  Q  Would you disagree with that sentence that
13   staff maintain a code of silence due to
14   concern about retaliation?
15      MS. CAULO:  Objection.
16  A  Asked and answered.
17  Q  Do you disagree with that?
18      MS. HARVEY:  Are you asking him to tell
19   you whether he disagrees that staff told the
20   Stern Commission -- because that's what that
21   sentence says.  Staff expressed concern.
22   That's what they're basing it on.  You're
23   asking him to comment on whether the Stern
24   Commission was told by staff that they had
```

McLAUGHLIN & ASSOCIATES - 781.321.8922    Pages 69 to 72

PORTER V. CABRAL, ET AL    DEPOSITION OF RICHARD DiMEO

Page 73

1  this fear.
2      MS. BAPOOJI: I'm not asking him about
3  that sentence. I'm asking about the
4  sentence, asterisk, "Staff maintain a code of
5  silence due to retaliation."
6      MS. HARVEY: That sentenced is based on
7  the staff consistently expressing concern to
8  the Stern Commission. He's told you what his
9  position is. Now, you're asking him to
10 comment whether he agrees or disagrees that
11 staff expressed concern to the Stern
12 Commission. That's what you're asking.
13 That's why we're objecting.
14 BY MS. BAPOOJI:
15 Q   Let me ask it this way. Can you, Mr. DiMeo,
16     agree or disagree with the statement that
17     staff maintain a code of silence due to
18     concern about retaliation that I read in
19     Exhibit 1?
20      MS. HARVEY: Objection.
21      MR. KIERNAN: Are you asking whether or
22  not he agrees that the report says that, or
23  in his own experience, exclusive of what's in
24  the report? If it's the latter, he's

Page 74

1  answered it repeatedly. Is that what you're
2  asking?
3      MS. HARVEY: Repeatedly.
4      MR. KIERNAN: Is that what you're
5  asking?
6      MS. BAPOOJI: Yes.
7      MR. KIERNAN: Does he have any knowledge
8  of the staff maintaining a code of silence?
9      MS. BAPOOJI: No, I'm asking if he
10 agrees or disagrees with this statement in
11 the Stern Commission Report, that staff
12 maintain a code of silence due to concern
13 about retaliation.
14      MS. CAULO: Objection.
15      MR. KIERNAN: I can only repeat my
16 objection. I think you should differentiate
17 between what the report says and does he have
18 any knowledge of the staff maintaining a code
19 of silence.
20      MS. BAPOOJI: He's answered that.
21      MR. KIERNAN: He sure has.
22      MS. BAPOOJI: So all I'm asking is
23 whether he disagrees or agrees with this
24 statement.

Page 75

1      MS. HARVEY: That goes to my objection.
2  You want him to comment on whether the Stern
3  Commission was told by staff that they have
4  concerns, because that is what that says.
5      MS. CAULO: That is the same objection
6  I'm making.
7  A   I think I answered that too. I don't know
8      where that's coming from. How could I answer
9      it?
10 Q   So you couldn't agree or disagree with that
11     statement? Is that how I understand your
12     testimony?
13 A   I don't know. I don't know where it came
14     from. I answered it.
15 Q   Now, Mr. DiMeo, in terms of ranking at SID,
16     what position were you?
17 A   In terms of ranking at SID what position was
18     I?
19 Q   Yes.
20 A   What do you mean?
21 Q   Were you second in command, third in command?
22 A   First.
23 Q   You were first in command at SID?
24 A   Yes.

Page 76

1      (Whereupon, a brief recess was held.)
2  BY MS. BAPOOJI:
3  Q   Mr. DiMeo, do you know a Sheila Porter?
4  A   This young lady right here?
5  Q   You're indicating the woman sitting beside
6      me?
7  A   Yes, I recognized her when I came in, and I
8      would think that that was Sheila Porter. I
9      think I met her once or twice really at the
10     House of Correction.
11 Q   Do you recall in what context you met her?
12 A   My guess is my physical when I got hired. Do
13     you want to hear about that?
14 Q   That's okay.
15 A   How come? You've gone over everything else.
16 Q   Do you recall meeting her under any
17     circumstances?
18 A   I've one line for this one. They didn't do
19     those kinds of exams.
20 Q   I'm missing something.
21 A   No, I did not.
22 Q   Do you know what Sheila Porter did at the
23     Suffolk County Sheriff's Department?
24 A   A nurse.

McLAUGHLIN & ASSOCIATES  -  781.321.8922    Pages 73 to 76

PORTER V. CABRAL, ET AL     DEPOSITION OF RICHARD DiMEO

Page 77

1  Q  Did you know anything else about
2     Sheila Porter?
3  A  Did I know anything else? I believe at one
4     point the FBI told me that she was
5     cooperating with them.
6  Q  When did the FBI tell you this?
7  A  I think it was near the end of my time there.
8  Q  Do you recall who it was that told you
9     Miss Porter was cooperating with the FBI?
10 A  I believe it was the FBI. My God, two rocket
11    scientists. I'm being sarcastic. I believe
12    they told me, the two female FBI agents.
13 Q  Do you recall their names?
14 A  No. If you told me their names, I would
15    probably know.
16 Q  Can you tell me about the circumstances under
17    which they told you this information?
18 A  Only -- say that again, the circumstances?
19 Q  Yes, how did they come about to tell you this
20    information.
21 A  I think I was at a meeting with them, and we
22    were -- let me see. There were discussions.
23    I don't know if it was -- I think I was told
24    directly. Then I had a liaison who would

Page 78

1     meet with the FBI on occasion, and he would
2     take their phone calls and report --
3     information would go back and forth with the
4     FBI. May I say Sheila, is that okay?
5  Q  That's fine.
6  A  I believe Sheila's name came up as working
7     with the FBI in that context.
8  Q  In what context?
9  A  You know, information going back and forth.
10 Q  Between who and who?
11 A  My liaison with the FBI and the FBI, and I
12    believe they told me once too.
13 Q  Who was your liaison?
14 A  At that time?
15 Q  Yes.
16 A  Neville Arthur.
17 Q  Now, you said there was a meeting that the
18    FBI was present at, where they told you that
19    Sheila Porter was cooperating with them.
20 A  I think when I sat down -- I know I went to
21    their office, and I sat down with them. I
22    think Sheila Porter's name came up then. I
23    can't be positive, but I know at some point
24    that I knew she was cooperating and helping

Page 79

1     out with the FBI.
2  Q  Why did her name come up?
3  A  I think we were watching -- at that point we
4     were watching a corrections officer who was
5     going to be bringing in drugs to an inmate,
6     and I want to say that there was an inmate in
7     there also who was cooperating with us in
8     providing Sheila -- you don't mind my using
9     your first name -- providing Sheila with
10    information, because he would go to her
11    office on a health issue, is my best memory,
12    give her information that would be passed on
13    to us or to the FBI.
14 Q  Who was this inmate?
15 A  I don't know. It would be in my tracking
16    probably. I can't remember his name.
17 Q  Does the name, Rene Rosario, ring any bells?
18 A  I think -- is that the name that's in this
19    Complaint?
20 Q  Beyond the Complaint.
21 A  No, no, it don't.
22 Q  Do you recall that name beyond the Complaint,
23    ever hearing that name, Rosario?
24 A  Not that I'm aware of. I'm not sure. I

Page 80

1     can't say positively I do.
2  Q  When you say that Sheila Porter was
3     cooperating with the FBI, how was she
4     cooperating?
5  A  I think I just explained that. The inmate
6     would -- there was another inmate informant,
7     if you will, who was passing on information
8     via Sheila Porter. That's my memory of it.
9  Q  And did that inmate do anything else to
10    cooperate with the FBI?
11 A  No, I don't think so. Is there more to that
12    question? No, I would have to say, no, not
13    that I know of. I think he was looking for a
14    transfer or a favor if that's what you mean.
15    If there was something in it for him?
16 Q  No. What happened to that inmate?
17 A  I have a memory of an inmate wanting -- he
18    was informing, helping us, because he wanted
19    to be transferred also. That was part of his
20    motivation. I want to say somewhere down the
21    Cape. But I don't know if I'm mixing up
22    investigations or not without all of my stuff
23    in front of me.
24 Q  Do you know whether Sheila Porter ever helped

McLAUGHLIN & ASSOCIATES  - 781.321.8922  Pages 77 to 80

Page 81

1  any other inmates besides that one you just
2  mentioned?
3  A  Helped? Define helped.
4     MS. CAULO: Objection to that question.
5  Q  Do you know of any other instances besides
6     what you just described where Sheila Porter
7     cooperated with the FBI?
8  A  No, again, we got a time frame here. I
9     believe this was towards the end of my stay,
10    so I was kind of on my way out. The new
11    administration was there or almost there, and
12    I was on my way out. So there isn't a hell
13    of a lot of room that we're talking about in
14    that time frame.
15 Q  Who else was with you in that meeting where
16    the FBI told you Sheila Porter was
17    cooperating with them?
18 A  My best memory is the two female FBI agents,
19    possibly Neville, maybe their supervisor and
20    me.
21 Q  The FBI agents' supervisor?
22 A  Yes, their SAC maybe. I don't know. I think
23    that's the person in charge.
24 Q  Did you ever learn anything else about

Page 82

1  Sheila Porter beyond what the FBI told you at
2  that meeting?
3  A  And beyond this report?
4  Q  Not including that. I want you to exclude
5     whatever you've read.
6  A  I can't exclude that report if I have read
7     it. I can't exclude things about it. So I
8     have to refer to it. No.
9     MS. HARVEY: We're talking about the
10    Complaint, not the Stern Commission Report?
11    MS. BAPOOJI: Yes, thank you.
12    THE WITNESS: No. Again, I'm on my way
13    out.
14 Q  And that's when you learned about
15    Sheila Porter cooperating with the FBI, when
16    you were on your way out?
17 A  That one time that I referred to when I had
18    the meeting with the FBI, yeah, near the end
19    of my stay at the jail, that's correct. My
20    stay meaning my employment.
21 Q  Was Miss Porter a whistleblower to the FBI?
22    MS. CAULO: Objection.
23    MR. KIERNAN: Objection. That has a
24    legal connotation. I don't know what you're

Page 83

1  asking. If you could interpret the term,
2  whistleblower, before you answer, I think
3  you'll be well served.
4  A  The question again? Was she a whistleblower
5     for the FBI?
6  Q  Yes.
7  A  I don't know other than what I read in that
8     Complaint. Maybe I read it in the newspaper.
9     Did I read it in a newspaper?
10 Q  I don't know what you read.
11 A  Those are the kinds of questions you're
12    asking me.
13 Q  I don't think that's fair.
14 A  I do. It's a question of interpretation now.
15 Q  Let me get this straight. You learned that
16    Mrs. Porter was cooperating with the FBI as
17    you were on your way out as you were about to
18    retire; is that correct?
19 A  Yes. Now, you know how many times I have
20    answered that, right?
21 Q  And the new sheriff was coming in?
22 A  Yes.
23 Q  And that would be Miss Andrea Cabral?
24 A  Yes.

Page 84

1  Q  Did you help Miss Cabral understand the way
2     the SID department ran?
3  A  Personally?
4  Q  Yes.
5  A  No.
6  Q  Did you do anything to help any of her staff
7     understand the way it was run?
8  A  Yeah, she had a transition team. At that
9     point, Viktor Theiss was part of the
10    transition team with the former State
11    Trooper, and I don't recall his name. Nice
12    man. I can't recall his name. I'm sure that
13    they were part of the transition team that
14    was concerned with SID. I'm pretty sure that
15    I talked at length with them, and I'm pretty
16    sure they interviewed my entire staff.
17 Q  Do you know why they were concerned with the
18    SID?
19 A  Did I use concerned?
20 Q  I believe you did.
21 A  I didn't mean it in that context, sorry.
22    That that was their responsibility would be
23    better put. I'm sorry.
24 Q  That's okay. I didn't try to misinterpret

PORTER V. CABRAL, ET AL          DEPOSITION OF RICHARD DiMEO

Page 85

```
 1    what you said. I just wanted to clarify. In
 2    connection with you working and helping with
 3    that transition process -- am I correct in
 4    that, that you helped with the transition
 5    process?
 6  A By talking to them, yeah.
 7  Q Did Miss Porter's name ever come up?
 8  A I don't think so. No, I don't think so.
 9  Q Did you ever tell Sheriff Cabral anything
10    about Miss Porter?
11  A No, not that I know of, no.
12  Q Did you ever speak to Viktor Theiss about
13    Sheila Porter?
14  A No.
15  Q Have you ever heard the name, Elizabeth
16    Keeley? I apologize, because I'm realizing
17    now as I see your reaction that you --
18  A I want to have fun with that one, but, yes, I
19    know Elizabeth.
20  Q Did you ever have conversations or
21    communications with Miss Keeley about
22    Miss Porter?
23  A No, I don't think so.
24  Q Besides you and Arthur Neville --
```

Page 86

```
 1  A Neville Arthur.
 2  Q Thank you. Was there anyone else to your
 3    knowledge at the Sheriff's Department that
 4    knew that Mrs. Porter was cooperating with
 5    the FBI?
 6  A Yes.
 7  Q Who?
 8  A Superintendent Pat Bradley and maybe Doc
 9    Feeney, Richard Feeney.
10  Q Do you know how they came to know?
11  A Yes.
12  Q How?
13  A I told them.
14  Q Why did you do that?
15  A I believe it was part of my leaving, that I
16    was going over my tracking system and
17    debriefing, if you will, and I believe at
18    that point I explained to the
19    superintendent -- I can't recall what case,
20    but that case I was referring to, and I
21    mentioned that Sheila was part of that in
22    cooperating with the FBI.
23  Q Now, was Mr. Bradley and Mr. Feeney remaining
24    with the Sheriff's Department?
```

Page 87

```
 1  A Were they?
 2  Q Yes, when you told them.
 3  A No, Doc was leaving. I think Doc may have
 4    had an ongoing knowledge of that when I knew
 5    him, because he was the superintendent.
 6    Great guy. I trusted him with everything
 7    also, and I thought that that was a
 8    sensitive -- but anyway, I talked with Doc,
 9    and I talked with the superintendent. He was
10    leaving on the same retirement plan as I.
11    Superintendent Bradley was staying on.
12  Q As part of that transition, did you have any
13    communications with Sheriff Cabral about the
14    SID division?
15  A Did I have? You know, I talked with the
16    sheriff. I welcomed her aboard. If
17    anything, it was small talk about it. So
18    just in passing kind of how are you, how are
19    things going and that kind of stuff. I hope
20    that answered your question.
21  Q As I understand it, in your communications
22    with her, the name, Sheila Porter, did not
23    come up?
24  A With the Sheriff?
```

Page 88

```
 1  Q Yes.
 2  A No, it did not.
 3  Q Do you have any knowledge about an inmate
 4    being placed with a wire by the FBI?
 5  A A wire?
 6  Q Yes.
 7  A No, no.
 8  Q Do you recall an instance where Miss Cabral
 9    asked you to get her personnel file?
10  A Get her personnel file?
11  Q Correct.
12  A Get her personnel file? No. What personnel
13    file? She just came in.
14  Q Her personnel file at the Suffolk County
15    Sheriff's Department.
16  A No, I don't.
17  Q Mr. DiMeo, in May of 2000, were you aware of
18    a complaint made to the SID that one
19    investigator made a sexual remark to a female
20    colleague?
21  A Now, you realize I wasn't there at the time,
22    right?
23       MS. CAULO: May of 2000?
24  Q No, I didn't realize that. When did you
```

McLAUGHLIN & ASSOCIATES  -  781.321.8922   Pages 85 to 88

PORTER V. CABRAL, ET AL     DEPOSITION OF RICHARD DiMEO

**89**

```
 1     start again?  I apologize.  When did you
 2     start at the Sheriff's Department?
 3  A  I thought it was July of 2001.  Again, I said
 4     I might need some help with that.
 5       MS. HARVEY:  I think he testified that
 6     it was July of 2000.
 7       THE WITNESS:  2000 or 2001?
 8       MS. HARVEY:  Your previous testimony was
 9     2000.
10  A  It may have been.
11  Q  Are you aware of a complaint made by somebody
12     at SID regarding a sexual remark made to a
13     female colleague in SID?
14       MS. CAULO:  At what time frame?
15  Q  When you started in 2000.
16  A  That an SID investigator made a sexual remark
17     to another SID person?
18  Q  To a female colleague.
19  A  No.  You know, you might be able to help me
20     with colleague.  What do you mean by
21     colleague?
22  Q  Somebody she worked with or somebody he
23     worked with and if this sounds familiar at
24     all to you --
```

**90**

```
 1  A  It really don't.  That would be something I'd
 2     remember.
 3  Q  Just to close the loop, when I asked you
 4     about Miss Cabral's personnel file, did she
 5     ever ask you to get her personnel file at the
 6     District Attorney's Office?
 7  A  Not that I know of.
 8  Q  Since you retired, Mr. DiMeo, have you been
 9     contacted about Sheila Porter?
10  A  No.  Contacted about Sheila Porter?  No.
11  Q  Has anyone asked you questions about
12     Miss Porter?
13  A  No.
14  Q  Since you retired, has anyone asked you
15     questions about communications you had with
16     Sheriff Cabral?
17  A  No.
18  Q  Have you had communications since you retired
19     with counsel for the Suffolk County Sheriff's
20     Department?
21  A  Ellen?
22  Q  Yes.
23  A  Yes.
24  Q  What were those communications about?
```

**91**

```
 1  A  What was my memory of -- what was my memory
 2     of conversations or information about SID,
 3     and I don't know if it was a wire or if it
 4     was about Sheila, just conversations at the
 5     end and debriefing, because I remember saying
 6     I talked with Superintendent Bradley about
 7     Sheila Porter.  That was about the extent of
 8     it.
 9  Q  Did you tell her anything else?
10  A  No.
11  Q  Did she ask any other further questions?
12  A  I think that was about the extent of it.
13  Q  When was that?
14  A  About a month ago, two months ago.
15  Q  Have you had any other contacts with counsel
16     for the Sheriff's Department?
17  A  No.
18  Q  Have you ever been contacted by the U.S.
19     Attorney's Office since you retired?
20  A  No.
21       MS. BAPOOJI:  If we could just take a
22     brief movement, I think I may be done.  I
23     just want to confer with my client.  Do any
24     of you have any questions that you want to
```

**92**

```
 1     ask?
 2       MS. HARVEY:  No.
 3       (Whereupon, a brief recess was held.)
 4       MS. BAPOOJI:  Those are all the
 5     questions I have.  Thank you so much,
 6     Mr. DiMeo, for coming today.
 7       (Whereupon, the deposition was concluded
 8     at 1:01 p.m.)
```

McLAUGHLIN & ASSOCIATES - 781.321.8922    Pages 89 to 92

PORTER V. CABRAL, ET AL    DEPOSITION OF RICHARD DiMEO

Page 93

```
                    CERTIFICATE

    I, RICHARD DiMEO do hereby certify
that I have read the foregoing transcript of
my testimony, taken on Wednesday, June 22,
2005, and further certify it is a true and
accurate record of my testimony (with the
exception of the corrections listed below):
Page      Line         Correction
_____
_____
_____
_____
_____
_____
_____
_____
    Signed under the pains and penalties of
perjury this _____ day of _____,
2005.
                    _____
                         RICHARD DiMEO
```

Page 94

```
                C E R T I F I C A T E

                COMMONWEALTH OF MASSACHUSETTS

DEPOSITION OF:  RICHARD DiMEO
                WEDNESDAY, JUNE 22, 2005
RE:   PORTER V. CABRAL, ET AL
      CASE NO. 04-11935-DPW

      I, PATRICIA M. McLAUGHLIN, a Certified
Shorthand Reporter and Notary Public in and
for the Commonwealth of Massachusetts, do
hereby certify as follows:
      1.  That RICHARD DiMEO, the witness
whose testimony is hereinbefore set forth,
was duly recorded by me on Wednesday,
June 22, 2005;
      2.  That such testimony was transcribed
by me and is a true and accurate record of
the testimony given by the said witness, to
the best of my knowledge, skill and ability;
      3.  I further certify that I am neither
attorney for, nor related to or employed by
any of the parties, nor financially
interested in this matter; and
      4.  That a dash as used through this
transcript is meant to represent an
interruption in thought or between a question
and answer.
      IN WITNESS THEREOF, I hereunto set my
hand and Notarial seal this 27th day of June,
2005.

              _____
              Patricia M. McLaughlin
              Notary Public
              My Commission Expires:
              May 4, 2012
```

McLAUGHLIN & ASSOCIATES  -  781.321.8922    Pages 93 to 94